**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, <br><br> Defendants. | Civil Action No. 25-cv-240-ACR |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

    A.  Development of the 2016 Carter Policy............................................................... 2
    B.  First Trump Administration Ban.......................................................................... 4
    C.  The 2021 Austin Policy ....................................................................................... 5
    D.  President Trump's Ban ......................................................................................... 7
    E.  Plaintiffs' Military Service ................................................................................... 8

ARGUMENT ...................................................................................................................... 12

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL
    PROTECTION CLAIM............................................................................................... 13

    A.  The Order Discriminates Based on Sex, Warranting Intermediate Scrutiny. .................. 14
    B.  The Order Warrants Intermediate Scrutiny Because It Discriminates Based on
        Transgender Status................................................................................................ 17
    C.  The Order Cannot Survive Any Level of Review. ......................................................... 20

        1.  Deference to Military Judgment Does Not Shield a Facially Discriminatory
            Policy from Heightened Scrutiny........................................................................ 20

        2.  The Order Fails Heightened Scrutiny Because Its Justifications Rest on
            Impermissible Stereotypes................................................................................... 21

        3.  The Ban Also Fails Even Rational Basis Review Because It Undermines
            Rather Than Advances Military Readiness.......................................................... 23

        4.  The Order Bears All the Hallmarks of Unconstitutional Animus............................ 24

II.  PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT AN
     INJUNCTION .............................................................................................................. 26

III. THE BALANCE OF EQUITIES FAVORS AN INJUNCTION .......................................... 27

    A.  Defendants Will Not Suffer Any Harm as a Result of a Preliminary Injunction. ........... 28
    B.  Plaintiffs Will Suffer Significant Harm Absent a Preliminary Injunction...................... 28

IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION .................................................. 29

V.  FACIAL INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE
    HARM TO PLAINTIFFS ............................................................................................. 30

CONCLUSION.................................................................................................................... 34

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ................................................................13, 28

*Able v. United States*,
  968 F. Supp. 850 (E.D.N.Y. 1997) .........................................................27

*Adkins v. City of New York*,
  143 F. Supp. 3d 134 (S.D.N.Y. 2015).........................................18, 19, 20

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
  898 F. Supp. 2d 73 (D.D.C. 2012) ..........................................................29

*Arizona v. United States*,
  567 U.S. 387 (2012).................................................................................32

*Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ....................................................18

*\*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020)..................................................................14, 15, 17

*Brocksmith v. United States*,
  99 A.3d 690 (D.C. 2014) ..........................................................................19

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................................31

*Calixto v. United States Dep't of the Army*,
  No. CV 18-1551 (PLF), 2021 WL 2253351 (D.D.C. June 3, 2021)........20

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
  513 F. Supp. 3d 154 (D.D.C. 2021) .........................................................32

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .................................................................26

*Cisek v. Cisek*,
  No. 80 C.A. 113, 1982 WL 6161 (Ohio Ct. App. July 20, 1982)............19

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020) ...........................................................32, 33

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)................................................................13, 17, 18, 24

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014)................................................................27

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020)......................................................30, 31, 32, 33

*Daly v. Daly*,
  102 Nev. 66 (1986)................................................................19

*Doe 1 v. Trump*,
  275 F. Supp. 3d 167 (D.D.C. 2017)................................................................*passim*

*Doe 2 v. Shanahan*,
  755 F. App'x 19 (D.C. Cir. Jan. 4, 2019) (per curiam)................................................5, 21

*Doe 2 v. Trump*,
  344 F. Supp. 3d at 23................................................................31, 33

*Elzie v. Aspin*,
  841 F. Supp. 439 (D.D.C. 1993)................................................................26

*Emory v. Sec'y of Navy*,
  819 F.2d 291 (D.C. Cir. 1987)................................................................20

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F. Supp. 3d 267 (W.D. Pa. 2017)................................................................18, 20

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018)................................................................18

*Fowler v. Stitt*,
  104 F.4th 770 (10th Cir. 2024)................................................................14

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)................................................................21

*Goldman v. Weinberger*,
  475 U.S. 503 (1986)................................................................21

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir 2013)................................................................29

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)................................................................17, 18, 19, 20

*Hecox v. Little,*
   79 F.4th 1009 (9th Cir. 2023) ...................................................................14, 18

*Hobby Lobby Stores, Inc. v. Sebelius,*
   723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd*, 134 S.Ct. 2751 (2014) ...............29

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n,*
   396 F. Supp. 3d 113 (D.D.C. 2019) .........................................................................28

*Kadel v. Folwell,*
   100 F.4th 122 (4th Cir. 2024) (en banc) ..............................................................14

*Karnoski v. Trump,*
   No. 18-35347, 2018 U.S. App. LEXIS 19912 (9th Cir. July 28, 2018) ...................5

*Karnoski v. Trump,*
   No. 17-cv-1297, 2017 WL 6311305 (W.D. Wash. 2017)...............................4, 5, 33

*\*Lawrence v. Texas,*
   539 U.S. 558 (2003)......................................................................................22

*Log Cabin Republicans v. United States,*
   No. 04-08425, 2012 WL 12952732 (C.D. Cal. Mar. 15, 2012)..........................27

*M.A.B. v. Bd. of Educ. of Talbot Cnty.,*
   286 F. Supp. 3d 704 (D. Md. 2018) .....................................................................18

*McVeigh v. Cohen,*
   983 F. Supp. 215 (D.D.C. 1998) ....................................................................26, 29

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ...................................................................30, 33

*Norsworthy v. Beard,*
   87 F. Supp. 3d 1104 (N.D. Cal. 2015) ..................................................................18

*Owens v. Brown,*
   455 F. Supp. 291 (D.D.C. 1978)............................................................................21

*Risteen v. Youth For Understanding, Inc.,*
   245 F. Supp. 2d 1 (D.D.C. 2002) ..........................................................................26

*Romer v. Evans,*
   517 U.S. 620 (1996)........................................................................22, 25, 27

*\*Rostker v. Goldberg,*
   453 U.S. 57 (1981)......................................................................................20, 21

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ........................................................... 13

*Singh v. Carter*,
  168 F. Supp. 3d 216 (D.D.C. 2016) .............................................. 20, 28

*Stockman v. Trump*,
  No. 17-cv-1799, 2017 WL 9732572 (C.D. Cal. 2017) ................... 4, 5, 33

*Stone v. Trump*,
  280 F. Supp. 3d 747 (D. Md. 2017) ................................................. 4, 33

*Strauder v. West Virginia*,
  100 U.S. 303 (1879) ............................................................................ 27

*Trump v. Karnoski*,
  586 U.S. 1124 (2019) ........................................................................... 5

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ............................................................................ 13

*\*United States v. Virginia (VMI)*,
  518 U.S. 515 (1996) ....................................................................... 14, 21

*\*United States v. Windsor*,
  570 U.S. 744 (2013) ................................................................ 13, 22, 25

*Whitaker v. Kenosha Unified Sch. Dist.*,
  858 F.3d 1034 (7th Cir. 2017) ........................................................... 14

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ................................... 14, 30, 31, 32

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 27

**Other Authorities**

Fifth Amendment ................................................................... 2, 12, 13

Directive-Type Memorandum 16-005 ............................................... 3, 4

DOD Instruction 1300.28: *In-Service Transition for Transgender Service
  Members* ............................................................................................ 6

DOD Instruction 6130.03: *Medical Standards for Appointment, Enlistment, or
  Induction into the Military Services* ................................................. 6

Exec. Order No. 14,004, 86 F.R. 7471 .......................................... 5, 14

Exec. Order No. 14,148, 90 F.R. 8237 ..................................................................................7

Exec. Order No. 14,168, 90 F.R. 8615 ...........................................................................16, 25

Exec. Order No. 14,183, 90 F.R. 8757 ...................................................................... *passim*

Exec. Order No. 14,187, 90 F.R. 8771 ................................................................................16

Exec. Order No. 14,190, 90 F.R. 8853 ................................................................................16

## INTRODUCTION

Thousands of transgender service members currently serve in the United States Armed Forces. These service members have met the military's rigorous standards for service. Nevertheless, pursuant to an executive order issued by President Trump, they have been banned from the Armed Forces based on a characteristic that has no bearing on their fitness for military service.

On January 27, 2025, President Trump issued an executive order, titled "Prioritizing Military Excellence and Readiness," (the "Order") directing the Secretary of Defense to reverse the current accession and retention standards for military service and to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Under the Order, no transgender individuals may enlist or continue their military service.

This is a stark reversal of military policy. Since the United States Department of Defense ("DOD") first announced in June 2016 that it would allow transgender individuals to serve in the military, transgender individuals have served without incident, and, in many cases, with high distinction. The 2016 policy resulted from a lengthy and comprehensive review process by high-ranking military personnel, who concluded that permitting transgender individuals to serve would have no adverse effect on military readiness or effectiveness. President Biden relied on this extensive review and the military's years of experience allowing transgender individuals to serve in rescinding the first Trump Administration's ban in January 2021.

President Trump's Order breaks faith with transgender service members who relied on their government's promise that they could serve their country on equal terms with others. The ban is an irrational and prejudicial attack on service members who have risked their lives to serve their

country. It is manifestly unconstitutional, as it violates Plaintiffs' Fifth Amendment right to equal protection.

Plaintiffs seek a preliminary injunction barring enforcement of the President's Order. The ban will inflict irreparable injuries on Plaintiffs and other prospective and current transgender service members. They will be discharged from service, lose their means of supporting themselves and their families, and stripped of the honor, status, and benefits associated with uniformed service to their country. The Order has denigrated the service of capable, honorable service members based on a characteristic that has nothing to do with fitness to serve. It marks them as unequal and dispensable, demeaning them in the eyes of their fellow service members and the public. Injunctive relief is warranted here. Because the public has no interest in enforcing an unconstitutional policy and has every interest in the service of capable and dedicated individuals in our Armed Forces, both the balance of the equities and the public interest weigh in favor of granting an injunction. The Court should enjoin implementation of the ban.

## STATEMENT OF FACTS

### A.    Development of the 2016 Carter Policy

In July 2015, Secretary of Defense Ashton Carter ordered Brad Carson, Acting Under Secretary of Defense for Personnel and Readiness, to convene a working group (the "Working Group") to identify practical issues related to transgender individuals serving in the Armed Forces and develop an implementation plan addressing those issues with the goal of maximizing military readiness. Declaration of Alex Wagner ("Wagner Decl.") ¶ 9; Declaration of Yvette Bourcicot ("Bourcicot Decl.") ¶ 12. The Working Group included both senior uniformed officers and senior civilian officers from each military department. Bourcicot Decl. ¶ 13. As part of its comprehensive review, the Working Group sought to identify and address all relevant issues relating to service by transgender individuals. Wagner Decl. ¶¶ 9–12; Bourcicot Decl. ¶¶ 13–15.

The Working Group also commissioned the RAND Corporation—an organization which operates as an independent think tank financed by the U.S. government—to study the impact of permitting transgender individuals to serve.  Wagner Decl. ¶¶ 9–12; Bourcicot Decl. ¶¶ 13–15.

The RAND Corporation reviewed all of the relevant scholarly literature and empirical data, including the extensive medical literature, actuarial data, and research and reports from the then-eighteen other countries that permitted service by transgender personnel.  Bourcicot Decl. ¶ 14. This research culminated in the RAND Report, which concluded that allowing transgender individuals to serve would have no adverse impact on unit cohesion, operational effectiveness, or readiness.  Bourcicot Decl. Ex. A at xiii, 39–47.

Following its consultation of the RAND Report and other sources, the Working Group concluded that transgender people should be permitted to serve.  On June 30, 2016, Secretary Carter announced that the country's military would be best served by permitting transgender individuals to serve and declared that transgender individuals "can no longer be discharged or otherwise separated from the military just for being transgender."  Declaration of Joseph Wardenski ("Wardenski Decl.") Ex. A at 4.  In detailing the reasons for the policy, he observed that transgender service members are "talented and trained Americans who are serving their country with honor and distinction.  We invest hundreds of thousands of dollars to train and develop each individual, and we want to take the opportunity to retain people whose talent we've invested in and who have proven themselves."  *Id*. at 1.

Secretary Carter issued Directive-Type Memorandum 16-005 ("DTM 16-005"), which set forth the policy "that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," and that, "[c]onsistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the

military." Wagner Decl. Ex. B. Each of the military departments implemented DTM 16-005 in their respective service branches, and the DOD issued a comprehensive handbook providing guidance on the new policy to both military service members and commanders. Wardenski Decl. Ex. B. The Directive also ordered the Department of Defense to update its accession standards by July 1, 2017, so that no person would be disqualified solely based on transgender status. Wagner Decl. Ex. B. On June 30, 2017, then-Secretary of Defense James Mattis deferred implementing those accession standards by six months. Wardenski Decl. Ex. C.

    **B.    First Trump Administration Ban**

    On July 26, 2017, President Trump announced via Twitter that the government "will not accept or allow transgender individuals to serve in any capacity in the U.S. military." Wardenski Decl. Ex. D. In an open letter, fifty-six retired generals and admirals decried the ban, stating that it would "deprive the military of mission-critical talent . . . [and] would degrade readiness even more than the failed "Don't Ask, Don't Tell" policy. Wardenski Decl. Ex. E. On August 25, 2017, President Trump issued a presidential memorandum directing Secretary Mattis to develop a plan to prevent Secretary Carter's accession policy from going into effect. Wardenski Decl. Ex. F.

    Four separate federal lawsuits challenged President Trump's directive to ban transgender service members, and each court issued a preliminary injunction blocking the ban. *Stone v. Trump*, 280 F. Supp. 3d 747, 767–69 (D. Md. 2017); *Karnoski v. Trump*, No. 17-cv-1297, 2017 WL 6311305, at *1 (W.D. Wash. 2017); *Stockman v. Trump*, No. 17-cv-1799, 2017 WL 9732572, at *1 (C.D. Cal. 2017); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 196–202 (D.D.C. 2017).

    On February 22, 2018, Secretary Mattis presented recommendations to President Trump that would disqualify individuals who "have undergone gender transition" from joining the military. Wardenski Decl. Ex. G. The Mattis Plan included a provision that created a limited exception to that ban for transgender individuals who had already transitioned in reliance on the

prior policy. *Id*. The Department of Justice filed motions to stay the preliminary injunctions on the basis that the Mattis Plan was independent of President Trump's directive.

The Court of Appeals for the Ninth Circuit rejected a motion to stay the preliminary injunction in *Karnoski v. Trump*, No. 18-35347, 2018 U.S. App. LEXIS 19912 (9th Cir. July 28, 2018). In December of 2018, the Department of Justice applied to the Supreme Court for a stay of the preliminary injunctions in *Karnoski v. Trump* and *Stockman v. Trump*. The Supreme Court granted the stays on January 22, 2019. *Trump v. Karnoski*, 586 U.S. 1124 (2019); *Trump v. Stockman*, 586 U.S. 1124 (2019). Meanwhile, the Court of Appeals for the District of Columbia ordered that the district court dissolve its injunction and review the Mattis Plan to determine whether it was distinct from President Trump's directive to ban transgender servicemembers. *Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (per curiam)

After the dissolution of the preliminary injunctions, the ban on transgender military service members as provided in the Mattis Plan went into effect and transgender individuals were unable to enlist in the military. The ban remained in effect until January 25, 2021, when President Biden repealed the ban. Wagner Decl. ¶ 21.

## C.    The 2021 Austin Policy

On January 25, 2021, President Biden issued Executive Order 14004, *Enabling All Qualified Americans to Serve Their Country in Uniform*, which repealed the Trump Administration's ban. Wagner Decl. ¶ 21. President Biden stated that "it shall be the policy of the United States to ensure that all transgender individuals who wish to serve in the United States military and can meet appropriate standards shall be able to do so openly—free from discrimination." Exec. Order No. 14,004, 86 F.R. 7471 at § 1. In his executive order, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces." This included the RAND

Corporation's "meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force . . . that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care.'" *Id*.

Shortly thereafter, the DOD, under the direction of Secretary of Defense Lloyd Austin, revised military policy to once again permit transgender troops to be able to serve on equal terms with others (the "Austin Policy"). Declaration of Gilbert Cisneros ("Cisneros Decl.") ¶¶ 8–11. DOD Instruction 6130.03, entitled *Medical Standards for Appointment, Enlistment, or Induction into the Military Services* ("DoDI 6130.03"), issued in March 2021, authorizes individuals with a history of gender dysphoria to enlist in the military if they have been without symptoms of gender dysphoria for a period of 18 months and have no anticipated surgeries. Wardenski Decl. Ex. H. DOD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"), issued in April 2021, details procedures by which transgender service members may transition while serving. Wagner Decl. Ex. D.

These accession and retention policies for transgender service members subject transgender troops to the same high standards and procedures as other service members regarding medical fitness for duty, physical fitness, uniform and grooming standards, deployability, retention, and military service and readiness. Wagner Decl. Ex. D.

D.      **President Trump's Ban**

On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021 executive order that established the Austin Policy, and directed "the heads of each agency [to] take immediate steps to end Federal implementation of unlawful and radical DEI ideology." Exec. Order No. 14,148, 90 F.R. 8237 at §§ 2, 3.  On January 27, 2025, President Trump issued the Order revoking "all policies, directives, and guidance issued pursuant to" the order that established the non-discriminatory policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.  Exec. Order No. 14,183, 90 F.R. 8757 (the "Order") at § 5.

The Order states that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "use of pronouns that inaccurately reflect an individual's sex" are inconsistent with "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  Order at § 1.

The Order states that having a "'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service."  *Id.*  It further states that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life.  A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id*.

The Order directs the Secretary of Defense to "update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order" within 60 days.  Order at § 4.  The Order also provides

that, effective immediately, "the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* In sum, the Order bans transgender people from the military.

### E.     Plaintiffs' Military Service

Plaintiffs are active-duty transgender service members in the United States military and transgender individuals actively pursuing enlistment.

**Second Lieutenant Nicolas Talbott** has served with distinction in the United States Army Reserves for almost a year. Declaration of Nicolas Talbott ("Talbott Decl.") ¶ 1. Lieutenant Talbott is a thirty-one-year-old transgender man assigned to a Reserve Unit in Pennsylvania. *Id.* Lieutenant Talbott was nominated for and named Honor Graduate at basic combat training by his drill sergeants. *Id.* ¶ 5. As a Lieutenant, he has assumed a role as Platoon Leader in the Military Policing Unit and is scheduled to begin further training for this role in August 2025. *Id.* ¶¶ 2–3. Since transitioning, Lieutenant Talbott has joined the military and served with honor and distinction, including, for example, being named Honor Graduate at basic combat training, completing Officer Candidate School, and assuming the role of Platoon Leader. *Id.* ¶¶ 2, 4–6.

**Major Erica Vandal** has served with distinction in the United States Army for almost fourteen years. Declaration of Erica Vandal ("Vandal Decl.") ¶ 1. Major Vandal is a thirty-six-year-old transgender woman stationed in New York. *Id.* In connection with her promotion to Major, she was selected to attend the resident Command and General Staff Officer Course where she obtained her second of two master's degrees. *Id.* ¶ 3. During her military career, Major Vandal has been awarded a Bronze Star for heroic achievements during her deployment to Afghanistan, a Meritorious Service Medal, one Army Commendation Medal, and two Army Achievement Medals. *Id.* ¶ 9. In her current role as a Brigade Fire Support Officer (FSO), she is responsible

for managing and certifying her brigade's seventy field artillery officers, warrant officers, non-commissioned officers, and soldiers. *Id*. ¶ 2. Since transitioning, Major Vandal has continued to serve with honor and distinction, including being promoted to her current rank of Major, being selected by the Army for schooling related to that promotion, meeting every standard required of her, and deploying to Romania for around five months as part of a mission to deter Russian aggression and assure NATO allies. *Id*. ¶ 15.

**Sergeant First Class Kate Cole** has served with distinction in the United States Army for seventeen years. Declaration of Kate Cole ("Cole Decl.") ¶ 1. Sergeant Cole is a thirty-four-year-old transgender woman stationed in California. *Id*. During her military career, she has been awarded five Army Commendation Medals for exhibiting consistent acts of heroism or meritorious service, seven Army Achievement Medals for outstanding achievement or meritorious service, and recently placed in the top ten percent of all Armor Branch Sergeants First Class in the Army's Order of Merit List. *Id*. ¶¶ 4, 13. In her current role as a Senior Military Science Instructor, she teaches military science to undergraduate students enrolled in the Reserve Officers' Training Corps program at the University of California, Los Angeles. *Id*. ¶ 2. Since transitioning, Sergeant Cole has continued to serve with honor and distinction, including serving as a basic training Drill Sergeant and later as a Platoon Sergeant, deploying to The Republic of Korea for nine months, and assuming her current role as a Senior Military Science Instructor. *Id*. ¶ 2, 10–11. During this time, Sergeant Cole has remained deployable and has never missed any training, events, or schooling. *Id*. ¶ 18.

**Captain Gordon Herrero** has served with distinction in the United States Army for nine years. Declaration of Gordon Herrero ("Herrero Decl.") ¶ 1. Captain Herrero is a thirty-four-year-old transgender man currently stationed in California. *Id*. Captain Herrero was inspired to join

the military by his family's long history of service. *Id.* ¶ 10. During his military career, he has been awarded a Meritorious Service Medal, a Joint Service Commendation Medal, an Army Achievement Medal, and an Army Commendation Medal with two oak leaf clusters. *Id.* ¶ 9. In his current role as an Operations Research Systems Analyst, he is completing his Master of Science degree in preparation to become an instructor at the United States Military Academy at West Point this year. *Id.* ¶¶ 2–3. Since transitioning, Captain Herrero has reported to the United Nations Command Headquarters, remained deployable, passed a record Army Combat fitness test, and successfully executed every mission the Army gave him. *Id.* ¶¶ 14–15.

**Ensign ("ENS") Dany Danridge** has served with distinction in the United States Navy for over twelve years. Declaration of Dany Danridge ("Danridge Decl.") ¶ 1. ENS Danridge is a thirty-year-old transgender man currently enrolled in Flight Training as a Student Naval Flight Officer in Florida. *Id.* From 2012 to 2020, ENS Danridge served on active duty with the United States Navy. *Id.* ¶ 2. In 2020, he was honorably discharged and served in the Navy Reserves while he pursued a bachelor's degree from Liberty University. *Id.* ¶ 14. After completing his degree, he commissioned to active duty in February 2024. *Id.* ¶ 15. During his military career, ENS Danridge has been awarded two Navy and Marine Corps Achievement Medals, including one Sailor of the Year award and one award for his assistance in starting a new command. *Id.* ¶¶ 9, 14. ENS Danridge was also awarded a Global War on Terrorism Service Medal and a Global War on Terrorism Expeditionary Medal for his participation in Operation Inherent Resolve during his deployment in the Middle East. *Id.* ¶ 11. Since transitioning, ENS Danridge has continued to serve with honor and distinction, including, for example, detaching to two carriers, deploying to Italy where he received a Navy and Marine Corps Achievement Medal for his contributions, and being selected for Officer Candidate School. *Id.* ¶¶ 24–25.

**Senior Master Sergeant Jamie Hash** has served with distinction in the active-duty United States Air Force for over thirteen years. Declaration of Jamie Hash ("Hash Decl.") ¶ 1. Senior Master Sergeant Hash is a thirty-seven-year-old transgender woman currently assigned to the Pentagon in Washington, D.C. *Id.* During her military career, Senior Master Sergeant Hash has received four Meritorious Service Medals, one Air Force Commendation Medal, and two Air Force Achievement Medals. She has been awarded numerous awards and honors, including Wing Non-Commissioned Officer ("NCO") of the Year, Field Operating Agency NCO of the Year, Military Volunteer of the Year, the NCO Academy John Levitow Award, AF Operations Directorate Senior Non-Commissioned Officer ("SNCO") of the Year, USAF Operations Directorate Lance P. Sijan SNCO Award, DAF Headquarters ("HQ") Management Engineering Award, DAF HQ Visionary Leadership Award, and SNCO Academy Distinguished Graduate. *Id.* ¶ 11. She was rated first out of forty-five candidates for selection for Senior Master Sergeant, and recently promoted to Senior Master Sergeant (E-8) as of February 1, 2025. *Id.* ¶ 2. Senior Master Sergeant Hash currently serves as a Defense Legislative Fellow for the United States Congress. *Id.* ¶ 3. In this role, she serves on the personal staff of a member of Congress as an advisor on matters related to national security and defense. *Id.* ¶ 4. Since transitioning, Senior Master Sergeant Hash has continued to serve with honor and distinction, including, for example, deploying to HQ Air Forces Africa in Germany, completing a three-year overseas tour in Europe, working at the Pentagon at HQ Air Force, and promoting several times. *Id.* ¶ 19.

**Koda Nature** is a twenty-three-year-old transgender man who resides in Texas. Declaration of Koda Nature ("Nature Decl.") ¶ 1. Mr. Nature comes from a family with a legacy of military service stretching back generations. *Id.* ¶ 2. Mr. Nature has been working with recruiters to enlist and is firmly committed to serving in the military. *Id.* ¶¶ 4, 7.

**Cael Neary** is a transgender man who wants to serve his country and has taken concrete steps to do so. Declaration of Cael Neary ("Neary Decl.") ¶ 1. Mr. Neary is a thirty-year-old Wisconsin resident. *Id.* Mr. Neary has wanted to join the military since he was a teenager. *Id.* He was inspired as a teenager by stories of his family members' military service stretching back to World War II. *Id.* ¶ 2. Mr. Neary delayed enlisting in the military previously due to the ban on military service by transgender individuals during the first Trump Administration. *Id.* ¶¶ 4–5. Mr. Neary began speaking with a military recruiter in June 2024. *Id.* ¶ 8. He attended an appointment with the regional Military Entrance Processing Station in September 2024 and has begun working with his recruiter on completing the paperwork to enlist. *Id.*

Implementation of the Order's ban on military service by transgender individuals would have devastating consequences for Plaintiffs and all other transgender individuals currently serving in the military or seeking to join the military. Current service members would abruptly lose their careers and access to their income and health and other benefits afforded to military members and their families. In addition, long-serving service members would be deprived of the opportunities afforded to service members who retire from the military. Further, transgender individuals seeking to serve their country in the Armed Forces would be unable to enlist or join the military.

## ARGUMENT

This Court should enjoin the Trump Administration's ban on military service by transgender individuals because it violates Plaintiffs' rights to equal protection as guaranteed by the Fifth Amendment, and this violation causes Plaintiffs to suffer serious and irreparable harms that will continue absent this Court's intervention. Plaintiffs have satisfied the standard for obtaining a preliminary injunction here, as they have established: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief,

(3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM**

The President's categorical exclusion of transgender individuals from military service violates equal protection and betrays the commitment Plaintiffs made in volunteering to serve their country, threatening to upend their lives, their careers, and their healthcare.  Thus, Plaintiffs' claims are likely to succeed on the merits.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."  *United States v. Windsor*, 570 U.S. 744, 774 (2013).  By singling out transgender people for differential treatment, the Order creates a sex-based classification that is subject to, and fails, intermediate equal protection scrutiny.  By expressly targeting transgender people, the Order also classifies based on a characteristic that independently meets the traditional criteria for a quasi-suspect classification, warranting heightened review.  In addition, the Supreme Court has long held that government action violates the requirement of equal protection when it is based on "a bare . . . desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or "mere negative attitudes" and "fear," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).  Here, in addition to failing heightened scrutiny, the President's Order fails even this basic test.  And, because the Order's facial discrimination against transgender individuals lacks any rational basis, the ban cannot withstand even the most deferential equal protection review.

A.       **The Order Discriminates Based on Sex, Warranting Intermediate Scrutiny.**

The Order is subject to intermediate scrutiny because it discriminates based on sex.  "[A]ll gender-based classifications . . . warrant heightened scrutiny." *United States v. Virginia (VMI)*, 518 U.S. 515, 555 (1996) (cleaned up).

By expressly classifying—and discriminating against—service members based on transgender status, the ban inherently classifies based on sex.  By targeting transgender people for different treatment, the Order necessarily creates a sex-based classification, because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).  This District previously concluded in enjoining President Trump's first military ban that the transgender classification it created was a sex-based classification, requiring heightened scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause.  *See Doe 1 v. Trump*, 275 F. Supp. 3d at 209, *vacated on other grounds sub nom. Doe 2 v. Trump*, 755 F. App'x 19; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 39–40 (D.D.C. 2020) (holding that "[t]here is no apparent reason why [*Bostock*'s] conclusion—that it is 'impossible' to discriminate based on transgender status without discriminating based on sex—would remain cabined to Title VII" (internal citation omitted)). Multiple circuit courts concur that classifications based on transgender status are inherently sex-based.  *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

The Order creates an explicit sex-based classification by categorically barring transgender individuals from military service.  By its plain terms, the Order establishes a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion,

- 14 -

honesty, humility, uniformity, and integrity" and bars transgender individuals from military service.  Order at § 2.  The Order's statement of purpose establishes as binding government policy that "expressing a false 'gender identity' divergent from an individual's [birth] sex"—that is, being transgender—"cannot satisfy the rigorous standards necessary for military service."  *Id*. § 1.  It further declares that "adoption of a gender identity inconsistent with an individual's sex"—that is, being transgender—"conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."  *Id.*  As if the class-based nature of the exclusion were not already clear enough, the Order reiterates the point a third time, stating that "[a] man's assertion that he is a woman,"—that is, being transgender—"and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id.*  Each of these statements simply declares the transgender status of these service members as itself disqualifying on the facially discriminatory basis that a transgender person cannot be "honorable" or "truthful" or demonstrate "the humility and selflessness required of a service member."

    The Order excludes all transgender persons from military service through the use of various equivalent terms—"expressing a false 'gender identity,'" "adoption of a gender identity inconsistent with an individual's sex," "a man's assertion that he is a woman," and "individuals with gender dysphoria."  Order at §§ 1, 2.  On their face, these are simply different ways to facially describe a transgender person—*i.e.*, a person who identifies and seeks to live in a sex different than their birth sex.  The Order thus exemplifies what the Supreme Court has already made clear: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  *Bostock*, 590 U.S. at 660.

Nor has this Administration made any effort to hide that its singular purpose is to exclude transgender people from American institutions, including the military. In a series of other executive orders and actions, the Administration has: rescinded all existing federal policies recognizing that transgender people are protected under federal laws prohibiting sex and disability discrimination (Exec. Order No. 14,168, 90 F.R. 8615 at § 3); revoked the ability of transgender people to obtain passports or other federal documents that match their sex (*id*.); removed information relating to the safety of transgender Americans traveling to other countries from the State Department website (Wardenski Decl. Ex. I); removed from the CDC website all public health research, data, and guidance that mentions transgender people (*id*.); revoked the ability of transgender federal employees to obtain transition-related medical care, to be classified based on their current sex, or to use pronouns or restrooms and other facilities based on their current sex (Wardenski Decl. Ex. J); announced that it is cutting all federal funding to any federal grant recipients or contractors who recognize the existence of transgender people or provide services to them (Exec. Order No. 14,168, 90 F.R. 8615 at § 3; Exec. Order No. 14,187, 90 F.R. 8771 at § 4); announced its intention to exclude transgender medical care for minors under all federally funded health programs (Exec. Order No. 14,187, 90 F.R. 8771); announced its intention to revoke a current regulation ensuring that transgender people have equal access to homeless shelters (Exec. Order No. 14,168, 90 F.R. 8615 at § 4); directed that all transgender people who are incarcerated in federal prisons be denied any medical treatments for gender dysphoria and be housed based on birth sex regardless of individual safety risks (*id*.); announced its intention to bar transgender students from playing school sports or using restrooms that match their current sex (Exec. Order No. 14,190, 90 F.R. 8853 at § 2); and directed law enforcement officers and state attorneys general

to prosecute school officials who support transgender students (Exec. Order No. 14,190, 90 F.R. 8853 at § 3).

In addition to creating an inherently sex-based classification by excluding transgender individuals, the Order also discriminates based on sex by requiring that service members conform to sex stereotypes associated with their birth sex. It is well established that discrimination based on non-conformity with gender stereotypes constitutes sex-based discrimination. *Doe 1 v. Trump*, 275 F. Supp. 3d at 209; *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (collecting cases). As the Supreme Court has explained, "sex plays an unmistakable and impermissible role" when a person is "intentionally penalize[d] . . . for traits or actions" that would be tolerated in someone of a different sex. *Bostock*, 590 U.S. at 660. As this Court explained in striking down the first ban, "[a] service member who was born a male is punished by the [ban] if he identifies as a woman, whereas that same service member would be free to join and remain in the military if he was born a female, *or if he agreed to act in the way society expects males to act*." *Doe 1 v. Trump*, 275 F. Supp. 3d at 210 (emphasis added). By prohibiting military service by transgender individuals because they do not conform to sex stereotypes, the ban impermissibly discriminates based on sex in a second way.

**B.    The Order Warrants Intermediate Scrutiny Because It Discriminates Based on Transgender Status.**

The Order also independently warrants heightened scrutiny because the class it targets—transgender individuals—satisfies the criteria for at least a quasi-suspect classification. *See Cleburne,* 473 U.S. at 440–41.

This District has already held as much: in a challenge to the Trump Administration's prior ban, this Court recognized that the transgender community satisfies the relevant factors. *See Doe 1 v. Trump*, 275 F. Supp. 3d at 208–09. This Court reasoned, first, that "transgender individuals

- 17 -

have immutable and distinguishing characteristics that make them a discernable class." *Id.* at 208. Second, "[a]s a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination." *Id.* Third, despite this history of discrimination, there is "no argument or evidence suggesting that being transgender in any way limits one's ability to contribute to society." *Id.* And finally, this Court acknowledged that transgender people "represent a very small subset of society" and lack "the sort of political power" that other groups might have "to protect themselves from discrimination." *Id.*

Courts across the country agree that discrimination against transgender individuals warrants heightened scrutiny. *See, e.g.*, *Hecox*, 104 F.4th at 1079; *Grimm*, 972 F.3d at 586; *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

The conclusion of this Court and others that government action singling out transgender people for adverse treatment requires heightened scrutiny is well justified. Policies that expressly target transgender people meet the traditional criteria for a quasi-suspect classification. *See Cleburne*, 473 U.S. at 440–41 (describing criteria).

*First*, numerous courts have recognized that being transgender is an immutable trait. *See, e.g.*, *Grimm*, 972 F.3d at 612–13 (finding that being transgender is not a choice, but is instead "as natural and immutable as being cisgender"); *Evancho*, 237 F. Supp. 3d at 288–90 (concluding that being transgender is "inherent in who they are as people" and "deeply ingrained and inherent in their very beings"); *Bd. of Educ. of Highland Local Sch. Dist.*, 208 F. Supp. 3d at 874 (concluding

- 18 -

that "transgender people have immutable and distinguishing characteristics that define them as a discrete group," because "the characteristic of the class calls down discrimination when it is manifest" (cleaned up)).

*Second*, transgender individuals have been subject to pervasive discrimination both historically and in the present day. Historically, governments have criminalized transgender people for wearing the "wrong" clothing, barred them from being teachers or federal employees or from serving in the military, excluded them from nondiscrimination laws, prevented them from correcting sex markers on government-issued identity documents, excluded coverage of transition-related care in Medicare and Medicaid and for incarcerated transgender people, stripped transgender parents of custody and even parental rights, and barred transgender people from marriage.[1] This discrimination continues in the present day. "The hostility and discrimination that [they] face in our society today is well-documented." *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014). This historical discrimination has escalated dramatically over the past five years, as many states have passed laws denying transgender people basic rights and protections. Wardenski Decl. Ex. N.

*Third*, whether an individual is transgender bears no relation to their ability to perform or contribute to society. *See Grimm*, 972 F.3d at 612 (noting that medical authorities agree that transgender individuals do not have impaired "judgment, stability, reliability, or general social or vocational capabilities" (internal quotations omitted)); *Adkins*, 143 F. Supp. 3d at 139 ("The Court

---

[1] *See, e.g.*, *Cisek v. Cisek*, No. 80 C.A. 113, 1982 WL 6161 at *1–2 (Ohio Ct. App. July 20, 1982) (denying visitation to parent on the basis of parent's transgender status); *Daly v. Daly*, 102 Nev. 66, 70–72 (1986) (terminating parental rights on the basis of parent's transgender status); *M.B. v. D.W.*, 236 S.W.3d 31, 35–38 (Ky. Ct. App. 2007) (same); Wardenski Decl. Ex. K; Wardenski Decl. Ex. L; Wardenski Decl. Ex. M.

is not aware of any data or argument suggesting that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society.").

*Fourth*, transgender individuals "lack the political strength to protect themselves" from discrimination. *Adkins*, 143 F. Supp. 3d at 140.  Transgender individuals make up less than one percent of the country's population.  Out of over 500,000 elected officials nationwide, fewer than two dozen openly transgender people hold elected office at any level of government.  *See, e.g.*, *Evancho*, 237 F. Supp. 3d at 288; *Grimm*, 972 F.3d at 612 (noting that transgender individuals have "not yet been able to meaningfully vindicate their rights through the political process" as they constitute less than one percent of the population).  As a tiny and socially stigmatized group, they have limited recourse through the political process.

In sum, transgender individuals meet every consideration to qualify as members of a suspect class.

### C.    The Order Cannot Survive Any Level of Review.

#### 1.    *Deference to Military Judgment Does Not Shield a Facially Discriminatory Policy from Heightened Scrutiny.*

The government is not "free to disregard the Constitution when it acts in the area of military affairs."  *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981); *see also Singh v. Carter*, 168 F. Supp. 3d 216, 219 (D.D.C. 2016) (enjoining compelling Sikh service member to perform training in violation of his religion); *Calixto v. United States Dep't of the Army*, No. CV 18-1551 (PLF), 2021 WL 2253351, at *4 (D.D.C. June 3, 2021) ("The Army is not 'exempted from constitutional provisions that protect the rights of individuals.'" (quoting *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987))).

The Supreme Court has rejected the argument that facially discriminatory sex classifications should receive a lower level of equal protection scrutiny simply because the

discrimination is based on a military policy.  *See Rostker*, 433 U.S. at 69–71 (rejecting "different equal protection test" for the "military context"); *Frontiero v. Richardson*, 411 U.S. 677, 688–91 (1973) (plurality) (applying heightened scrutiny); *see also Owens v. Brown*, 455 F. Supp. 291, 305–09 (D.D.C. 1978) (invalidating ban on assignment of female service members where overbreadth belied asserted purpose of preserving combat effectiveness and rejecting government's morale and discipline rationales).  Because the Order facially discriminates based on sex, these holdings require the application of heightened scrutiny.

Although courts must be "appropriately deferential" in reviewing "the 'considered professional judgment' of 'appropriate military officials,'" *Doe 2 v. Shanahan*, 755 F. App'x at 25 (quoting *Goldman v. Weinberger,* 475 U.S. 503, 509 (1986)), they do not reflexively defer to government decisions simply because they relate to the military.   Rather, courts have recognized an obligation to credit the military's assessment of the importance of particular asserted interests that might not be considered important in civilian settings.  For example, in *Goldman*, 475 U.S. at 507, the Court credited the importance of the military's asserted interest in the need for uniformity—a consideration with little relevance to civilian workplaces.  But that deference to the importance of the government's asserted interest does not convert heightened scrutiny into mere rational basis review.

        2.    *The Order Fails Heightened Scrutiny Because Its Justifications Rest on Impermissible Stereotypes.*

Under the "heightened review standard" applied to policies that discriminate based on sex or transgender status, the government must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (quotations omitted) (modifications in original).  The justification must be "exceedingly persuasive" and

- 21 -

"genuine," not "hypothesized" or "invented post hoc in response to litigation," and it "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. The "burden of justification is demanding, and it rests entirely on the [government]." *Id*.

The government cannot meet this demanding test because its purported justifications rest on impermissible stereotypes rather than "exceedingly persuasive" evidence. The Order cites "troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" as its justifications. Order at § 2. While these are legitimate military interests in the abstract, the Order's application of them to transgender service members relies exclusively on negative stereotypes and prejudice that cannot constitute important governmental objectives under heightened scrutiny.

Most glaringly, the Order's claims about "honesty" and "humility" rest solely on the invidious stereotype that transgender identity is inherently "false" or "dishonest." The government offers no evidence of actual dishonesty by transgender service members, nor could it; instead, it simply asserts that being transgender is inherently dishonest based on moral or ideological social disapproval. Under well-settled law, such disapproval is not a legitimate, much less an important, state interest. *See Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) ("Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996))); *Windsor*, 570 U.S. at 771 (recognizing that "moral disapproval of homosexuality" is not a legitimate governmental interest). Similarly, the Order's assumption that transgender service members lack "selflessness" is a baseless stereotype refuted by their actual service records.

- 22 -

3.    *The Ban Also Fails Even Rational Basis Review Because It Undermines Rather Than Advances Military Readiness.*

Even under rational basis review, the Order fails because its categorical exclusion of transgender individuals undermines rather than advances military effectiveness in four distinct ways.  First, the ban excludes all transgender people regardless of their demonstrated ability to meet standards.  By departing from the military's merit-based system to exclude service members who meet all objective criteria, the ban damages military effectiveness.  Not only does it directly reduce military capability by removing qualified personnel, but it also undermines recruiting and cohesion by signaling that factors unrelated to merit will override demonstrated ability.  This abandonment of merit-based standards discourages potential recruits and erodes unit cohesion by communicating to all service members that objective standards no longer determine who can serve.

The evidence before this Court supports this.  First, by arbitrarily discharging qualified personnel, the ban directly harms military readiness.  For example, Major Vandal's discharge would deprive her brigade of crucial field artillery expertise that required fourteen years and substantial resources to develop.  The discharge of the other Plaintiffs in active service would result in similar deprivations and harm to military effectiveness.  The military would suffer immediate negative impacts from separating such highly trained individuals at all levels of service.  Wagner Decl. ¶ 40; Cisneros Decl. ¶ 24; Declaration of Shawn Skelly ("Skelly Decl.") ¶ 21.

Second, categorically banning transgender service members—especially after they have been serving successfully for years—undermines rather than promotes unit cohesion.  Similar unfounded concerns about unit cohesion were previously raised regarding racial integration, women in combat, and service by gay, lesbian, or bisexual service members.  Cisneros Decl. ¶ 16; Bourcicot Decl. ¶ 26; Skelly Decl. ¶ 13.  The evidence shows that transgender service members have served for years without any adverse effect on unit cohesion.  Wagner Decl. ¶¶ 27–30, 33;

Cisneros Decl. ¶¶ 16–17, 22; Bourcicot Decl. ¶ 26. Indeed, in many instances this service has strengthened bonds between service members. Herrero Decl. ¶ 13; Hash Decl. ¶ 20; Cole Decl. ¶¶ 17, 19. Removal of valued colleagues despite their demonstrated ability to serve will damage morale and erode service members' trust in command. Wagner Decl. ¶¶ 43–45; Cisneros Decl. ¶ 26.

Third, the ban undermines the government's asserted interest in uniformity by creating a special rule that applies only to transgender people, while continuing to apply otherwise universal and generally applicable accession and retention standards to everyone else. Transgender applicants and service members must meet the same standards as others, including when an individual who is already serving undergoes a gender transition. Wagner Decl. ¶¶ 22, 24; Cisneros Decl. ¶¶ 8–10, 14, 22; Bourcicot Decl. ¶ 33. In such a case, that individual must meet the same standards applied to others of their current sex as reflected on their corrected Defense Enrollment Eligibility Reporting System ("DEERS") marker. Wagner Decl. Ex. D at 6.

Finally, banning all transgender people regardless of their individual merit, qualifications, or character undermines the government's asserted interests in integrity and honesty. As demonstrated by the Plaintiffs in this case, being transgender is no more relevant to these personal characteristics than is a person's race, sex, national origin, or sexual orientation. Bourcicot Decl. ¶ 26; Cisneros Decl. ¶¶ 16, 22. Rather than promoting these interests, the ban erodes honesty and integrity by relying on inaccurate and false stereotypes rather than individual merit.

    4.    *The Order Bears All the Hallmarks of Unconstitutional Animus.*

The timing, context, and sweeping nature of the Order demonstrate that it stems from "negative attitudes," "fear," and "irrational prejudice" rather than legitimate military needs. *Cleburne*, 473 U.S. at 448, 450. Multiple factors establish this impermissible animus.

First, the Order's text openly expresses hostility toward transgender individuals as a class, declaring their identity a "falsehood" incompatible with military values of "honesty" and "integrity." Order at §§ 1, 2. This characterization is directly refuted by the distinguished and decorated service of transgender service members in the record.

Second, the Order's timing and process suggest pretext rather than military necessity. There was no urgency requiring this policy change; the only precipitating event was President Trump's inauguration. The Order disregards the military's prior extensive study supporting inclusion and cites no evidence of problems during four years of open service. Instead, it implements the President's campaign pledge to "end left-wing gender insanity," Wardenski Decl. Ex. O at 15, and follows his December 2024 promise to ban transgender service "with the stroke of my pen on day one." Wardenski Decl. Ex. P.

Third, the Order is part of a broader pattern of targeted discrimination. From its first days, this Administration has moved to strip protections from transgender people across multiple domains—including schools, sports, healthcare, and family life. *See* Exec. Order No. 14,168, 90 F.R. 8615. This context reinforces that the ban reflects "a bare desire to harm a politically unpopular group," which cannot survive any level of scrutiny. *Windsor*, 570 U.S. at 770.

Finally, the Supreme Court has repeatedly struck down laws that impose "a broad and undifferentiated disability on a single named group," particularly where the gap between the stated justifications and actual effects shows the classification was drawn "for the purpose of disadvantaging" the group. *Romer*, 517 U.S. at 632. The transgender military ban is precisely such a measure. Its sweeping exclusion of all transgender individuals regardless of their demonstrated ability to serve, combined with its reliance on stereotypes and its emergence from a

context of broader discrimination, reveal it as unconstitutional animus that "the Equal Protection Clause does not permit." *Id.* at 634–35.

## II.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION

Without a preliminary injunction, Plaintiffs will suffer irreparable harm.  In this Circuit, harm is irreparable where it is "of such imminence that there is a clear and present need for equitable relief," and is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  That standard is amply met here.

Plaintiffs face imminent loss of employment and benefits that courts have consistently recognized as irreparable harm.  Plaintiffs and their families will lose medical and other benefits as a result of separation from the military.  *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (plaintiff would "lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer"); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993).  Loss of medical benefits alone may constitute irreparable harm, particularly when coupled with the financial stresses of unemployment.  *See Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002).

Most urgently, immediate relief is needed because each day transgender service members serve under this discriminatory ban—which officially brands them as unfit—irreparably damages the bonds of trust and unit cohesion essential to military service.  The military depends on strong bonds of mutual trust and respect among unit members to maintain the morale necessary to survive the stresses of military discipline, deployment, and combat.  Wagner Decl. ¶¶ 42, 47; Cisneros Decl. ¶¶ 26, 28; Bourcicot Decl. ¶ 31.  Without an immediate declaration that the ban is likely unconstitutional, transgender service members will continue to serve under a cloud of officially sanctioned opprobrium eroding these essential relationships in ways that cannot be fully repaired

even by ultimately prevailing at trial. A preliminary injunction is therefore urgently needed to preserve their current positions and prevent the irreversible degradation of these critical bonds while this case is litigated. *Cf. Log Cabin Republicans v. United States*, No. 04-08425, 2012 WL 12952732, at *2 (C.D. Cal. Mar. 15, 2012).

In addition, a ban brands Plaintiffs as less capable and worthy of enlisting or serving in the Armed Forces solely because of their transgender status. Such a "status-based enactment divorced from any factual context" violates the equal protection guarantee of the Constitution, which prohibits the government from labelling a group as "unequal to everyone else" based simply upon their status. *Romer*, 517 U.S. at 635. That injury causes real and concrete harms, denying them full citizenship.

Military service has long been one of the hallmarks of equal citizenship and full participation in the civic life of this country. *See Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997). The Order "single[s] out [transgender] service members [and] denies them, without legitimate reason, the right openly to participate as equals in the defense of the nation and imposes 'practically a brand upon them, affixed by law, an assertion of their inferiority.'" *Id.* at 864 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).

For Plaintiffs, service in the military is not merely a job; it is a calling that demands loyalty, honor, and sacrifice in service of their country. They have constructed their entire lives around their military service. The harms they face are serious, immediate, and irreparable.

## III.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

Finally, the balance of equities and the public interest both tip decisively in favor of an injunction. The balance-of-equities factor directs the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014) (quoting *Winter v. Natural Res.*

*Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Singh*, 168 F. Supp. 3d at 234 (in making the "balance of equities" assessment, the Court considers "whether the requested injunctive relief would substantially injure other interested parties" (internal quotation omitted)).  Here, the balance of equities strongly favors granting the preliminary injunction.

### A.    Defendants Will Not Suffer Any Harm as a Result of a Preliminary Injunction.

Defendants will not suffer any harm if this Court issues a preliminary injunction.  In fact, a preliminary injunction would have little impact at all on Defendants, for it would simply maintain the status quo—an accessions policy that has been in place for four years and a retention policy that has been in place, with a relatively brief partial disruption during the last Trump Administration, for nearly ten years.  *See Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 125 (D.D.C. 2019) ("The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." (quoting *Aamer*, 742 F.3d at 1043)).  That is, the military would simply continue to apply the policies that it has already adopted, implemented, and extensively trained service members to follow.

### B.    Plaintiffs Will Suffer Significant Harm Absent a Preliminary Injunction.

By contrast, allowing the ban to take effect would inflict severe harm on Plaintiffs.  As discussed above, the ban will cleave devoted service members from careers built collectively over decades and harm their reputations as soldiers and patriots in ways that cannot be undone, while blocking others from starting careers of service to their country.  It will also force transgender service members to perform their duties in the waning days of their service with the knowledge that they have no viable future in the military as they are demoted in status relative to their peers and commanders and passed over for key assignments, responsibilities, and deployments.  Cole Decl. ¶ 26; Herrero Decl. ¶ 26; Danridge Decl. ¶ 28; Hash Decl. ¶ 24; Nature Decl. ¶¶ 17, 21;

Neary Decl. ¶ 16.  These irreparable harms are only compounded by the multitude of additional practical consequences the ban imposes: loss of steady income, loss of medical care, inability to care for their families, and more.  Talbott Decl. ¶¶ 19–22; Vandal Decl. ¶¶ 19–24; Cole Decl. ¶¶ 22–26; Herrero Decl. ¶¶ 22–26; Danridge Decl. ¶¶ 25–29; Hash Decl. ¶¶ 21–24; *see McVeigh*, 983 F. Supp. at 221 (finding that, while the Senior Chief McVeigh would face a serious injury from discharge from the Marines, "there is no appreciable harm to the Navy if Senior Chief McVeigh is permitted to remain in active service").  The balance of balance of equities thus tips sharply in Plaintiffs' favor, and the ban should be enjoined.

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

Finally, the public interest weighs strongly in favor injunctive relief, foremost because "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."), *aff'd*, 134 S.Ct. 2751 (2014); *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (same).  Because Plaintiffs are likely to succeed on the merits of their equal protection claim, the public interest weighs heavily in their favor.

Further, the public interest weighs in favor of an injunction because allowing the ban to take effect would degrade military readiness and unit cohesion.  Skelly Decl. ¶¶ 20–26; Wagner Decl. ¶¶ 38–46; Cisneros Decl. ¶¶ 23–29; Bourcicot Decl. ¶¶ 29–34.  With respect to readiness, the ban will result in the loss of highly qualified recruits and skilled military personnel, depriving our military and country of their valuable skills, experience, and expertise.  Cisneros Decl. ¶ 24; Wagner Decl. ¶¶ 40–41.  Separation of these individuals will squander the significant resources the military has invested in their education and training.  Cisneros Decl. ¶ 24.  With respect to unit

cohesion, the ban's sudden reversal of established military policy towards a minority group will also erode service members' trust in command. Wagner Decl. ¶¶ 43–45; Cisneros Decl. ¶¶ 26–27. Mutual trust between leaders and followers is essential to unit cohesion and ultimate military effectiveness. Bourcicot Decl. ¶ 31; Wagner Decl. ¶ 45.

Accordingly, all factors weigh distinctly in favor of enjoining the Trump Administration's irrational and arbitrary ban.

## V.    FACIAL INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO PLAINTIFFS

Having established that all factors weigh decisively in favor of issuing a preliminary injunction, this Court should enjoin the implementation of the President's Order nationwide while this case proceeds on the merits. Facial injunctive relief is the only way to maintain the status quo and ensure Plaintiffs do not continue to suffer irreparable harm while Plaintiffs prove, on the merits, that the President's Order is unconstitutional.

This Court has "broad discretion" in tailoring an injunctive remedy to the circumstances and necessities of a given case. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). This broad discretion includes the authority to issue facial injunctions. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 61 (D.D.C. 2020). Both this Circuit and this Court have routinely recognized the necessity and common practice of granting such relief where, as here, a government action is facially unconstitutional. *See, e.g.*, *Nat. Mining Ass'n*, 145 F.3d at 1409 ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 55 (D.D.C. 2020) ("[F]ederal courts have declared unconstitutional and enjoined enforcement of countless state and federal laws in suits brought by individual plaintiffs but benefiting many similarly situated non-parties.").

Plaintiffs are suffering and will continue to suffer irreparable injury due to the President's facially unconstitutional Order, and, as such, facial relief can and should be granted. *See Doe 2 v. Trump*, 344 F. Supp. 3d at 23 ("[I]n circumstances where a plaintiff is injured by a rule of broad applicability, a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." (internal quotation omitted)).

*First*, facial injunctive relief is "the only way" to provide Plaintiffs complete relief during the pendency of this action. *Doe 2 v. Trump*, 344 F. Supp. 3d at 25; *see D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49 (noting that facial relief is necessary to "provide complete relief to the plaintiffs for the 'violation established'" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Indeed, "an injunction that extends only to the named plaintiffs—would not provide Plaintiffs with any meaningful relief" at all. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 62 (cleaned up). As this Court noted in enjoining President Trump's last iteration of an unconstitutional ban on transgender military service nationwide, "if the plan goes into effect with its application enjoined only as to Plaintiffs, Plaintiffs would be ***singled out as an inherently inferior class of service members***, allowed to continue serving only by the Court's limited order and despite the claimed vociferous objections of the military itself." *Doe 2 v. Trump*, 344 F. Supp. 3d at 24 (emphasis added). The only way to avoid compounding "the core class-based injury" that Plaintiffs are already suffering as a result of the President's Order is to ensure that all transgender service members are afforded the dignity of continuing to serve this country as they have, without question or incident, for the past four years. *See id.*

*Second*, a facial injunction is necessary to provide "systemwide relief" for the systemwide injuries inflicted by the ban—both on Plaintiffs and others similarly situated. *See id.* at 26. As this Court has explained, "the 'scope of injunctive relief is dictated by the extent of the violation

established.'"  *Whitman-Walker Clinic*, 485 F. Supp. 3d at 62 (quoting *Califano*, 442 U.S. at 702).

The President's Order not only impacts Plaintiffs, but many other "similarly-situated nonparties"

across the globe who are now in—or are diligently working towards— honorable service to this

country.  *See City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020).  Injunctive relief is

thus "all the more appropriate" because similarly situated current and prospective service members

"experience comparable harms as a result of the [President's Order]," and there is no evidence that

the injuries suffered by Plaintiffs "will be unique to them."  *See Whitman-Walker Clinic*, 485 F.

Supp. 3d at 62–63.  Quite the contrary, the Order is clear that all transgender people will be

immediately deemed unable to "satisfy the rigorous standards necessary for military service" and

swiftly stripped of their right to serve.  Order at § 1

        This widespread impact of the President's Order makes a preliminary facial injunction all

the more necessary to protect the public interest in maintaining uniform and cohesive national

military policy.  Were this ban enjoined as to Plaintiffs—who are geographically spread across the

nation—but otherwise permitted to take effect as to all other transgender service members—who

are serving across all military branches nationwide—the result would be a fractured policy towards

transgender people both within individual units and across units.  *Cf. Cath. Legal Immigr. Network,

Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 178 (D.D.C. 2021) (finding a facial

injunction warranted where it concerned "the nation's immigration policies," noting that the

government had an "interest in establishing a 'uniform Rule of Naturalization.'" (quoting *Arizona

v. United States*, 567 U.S. 387, 394 (2012))).  Moreover, preserving a uniform military policy

towards transgender people "ensures that complete relief remains available to the plaintiffs" at the

conclusion of this litigation.  *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49–50.  Denial of

facial relief would allow the President's Order to be implemented at military stations worldwide—

stations that Plaintiffs could be deployed or reassigned to at a moment's notice. And "[o]nce that egg has been scrambled, restoring the status quo ante will be considerably more disruptive." *Id.* (cleaned up).

*Third*, given this widespread impact of the President's Order, facial relief is necessary "to avoid the chaos and confusion that comes from a patchwork of injunctions." *Barr*, 961 F.3d at 916–17. As we observed in 2017, numerous litigations cropped up nationwide in the wake of the Trump Administration's first ban on transgender military service. *See, e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d 167; *Stone*, 280 F. Supp. 3d 747; *Karnoski*, 2017 WL 6311305; *Stockman*, 2017 WL 9732572. And the quantity of litigations then was likely limited *because* the courts in those cases granted facial preliminary injunctive relief. Now, given that many more transgender individuals are currently serving this country, with many more standing in wait for their opportunity to do so, even more individuals will be affected by and seek to oppose the President's ban this time around. Facial relief would promote national security and the public interest by allowing these individuals to continue focusing their attention on the important work of protecting this nation rather than "filing separate actions for similar relief." *See Doe 2 v. Trump*, 344 F. Supp. 3d at 24. To prevent this "flood of duplicative litigation," facial injunctive relief should be awarded to swiftly restore the status quo. *Id.* (quoting *Nat'l Mining Ass'n*, 145 F.3d at 1409).

In sum, the President's facially unconstitutional Order demands facial relief. Plaintiffs respectfully request that this Court issue an injunction enjoining the President's Order from taking effect so they may continue to diligently serve this nation and regain a modicum of stability in the wake of this ban's upheaval of their plans and lives.

**CONCLUSION**

For the foregoing reasons, this Court should issue an injunction prohibiting the categorical exclusion of transgender people from the military, including ordering that:

1.     Transgender people may not be categorically excluded from military service on the basis of their transgender status;

2.     Plaintiffs Nicolas Talbott, Erica Vandal, Kate Cole, Gordon Herrero, Dany Danridge, and Jamie Hash may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender; and

3.     Plaintiffs Koda Nature and Cael Neary may not be denied the opportunity to accede to military service, or thereafter be denied promotion, reenlistment, or any other equal terms of service on the basis that they are transgender.

February 3, 2025

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter (*pro hac vice* forthcoming)
National Center for Lesbian Rights
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

Respectfully submitted,
*/s/ Joseph J. Wardenski*
Joseph J. Wardenski (D.C. Bar No. 995549)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311
joe@wardenskilaw.com

*Attorneys for Plaintiffs*