# EXHIBIT K

# This Isn't the First Time Conservatives Have Banned Cross-Dressing in America

BY
**CLARE SEARS**

The recent spree of cross-dressing bans has a precedent in the harassment, imprisonment, and deportation of so-called sexual deviants in the US since the 19th century. Civil rights campaigners defeated reactionaries in the '60s. They can do the same today.

Two weeks ago, Tennessee passed a new state law that limits drag shows. Under the law, male and female impersonators who appeal "to a prurient interest" are classified as adult-oriented entertainers and banned from performing on public property or in places where children might be present. Similar bills are pending in at least fourteen states, and more are likely to come.

These bills are the latest in a recent wave of attacks on trans and queer communities, emerging in the wake of multiple state laws that restrict trans people's access to public bathrooms, school sports, and gender-affirming health care, and that ban teachers from discussing sexual or gender identity with elementary school students. Drag bans, however, also have clear connections to earlier laws against public cross-dressing that swept the nation in the nineteenth century and terrorized queer and trans communities in the 1950s and 1960s. The history of anti-cross-dressing laws provides useful context for understanding how gender nonconformity was policed in the past, and how similar laws might be challenged today.

## Nineteenth-Century Cross-Dressing Laws

During the second half of the nineteenth century, multiple cities across the United States passed laws against public cross-dressing. The first appeared in St Louis, Missouri in 1843, followed by Columbus, Ohio in 1848 and Nashville, Tennessee in

1850. Over forty US cities passed similar laws before the end of the nineteenth century, and by the 1920s nineteen additional cities had adopted cross-dressing laws of their own.

Most anti-cross-dressing laws banned public appearance in "a dress not belonging to his or her sex" or "wearing the apparel of the other sex," although some towns and cities passed laws against "indecent dress" or the wearing of "disguises" instead. Anti-cross-dressing laws were typically passed as part of broader anti-vice campaigns that also targeted prostitution, vagrancy, public drunkenness, and disorderly conduct. San Francisco's 1863 law was typical of the time, outlawing cross-dressing as one manifestation of the broader offense of indecency, alongside public nudity, indecent exposure, lewd acts, and immoral performances.

In turn, nineteenth-century anti-vice campaigns gained traction during a period of rapid social and economic change, characterized by urbanization, industrialization, changing patterns of immigration, shifting sexual and gender norms, and the end of slavery. As federal and state governments passed restrictive immigration policies and segregationist Jim Crow laws to protect the economic and political interests of white propertied men, local governments enacted a range of indecency and public nuisance laws — including cross-dressing laws — to impose their vision of social order onto city space.

Anti-cross-dressing laws were the exclusive province of local governments, and no state or federal legislature directly outlawed this type of dress. Several states did, however, pass anti-disguise or masquerade laws that encompassed cross-dressing when enforced. In 1845, for example, New York's state legislature passed an anti-disguise law that made it a crime to appear in public with a painted face or when wearing a disguise designed to prevent identification. Passed in response to rural workers who wore women's dresses and masks while participating in anti-rent protests, the law was later used to criminalize a wide range of cross-dressing practices.

Similarly, in 1874, California's state legislature passed a masquerade law in response to gambling saloon dealers who wore disguises to avoid identification by undercover police. As with New York's anti-disguise statute, local police repurposed California's masquerade law to arrest multiple people for public cross-dressing over the next one hundred years.

During the nineteenth century, anti-cross-dressing laws operated as flexible tools for policing a wide range of gender transgressions. Thousands of people were arrested under these laws, including feminist dress reformers, female impersonators, women who wore men's clothing for travel or work, people who cross-dressed to express same-sex desires, rebellious young women who dressed as men for a night out on the town, and people whose gender identifications did not match the sex they were assigned at birth. Some people were punished with small fines, while others received jail sentences of up to six months. Police harassment and abuse were common, and public exposure in city newspapers could destroy people's lives.

From the late nineteenth century onward, cross-dressing arrests occasionally led to psychiatric institutionalization. In 1895, for example, New York authorities sent a person to Bellevue Hospital's psychiatric wing following their arrest for wearing women's clothing on a body the law deemed male. Similarly, on the other side of the country, Los Angeles police arrested a man named Jack Garland in 1917 and placed him in a state psychiatric institution for refusing to wear women's clothing, after they classified him as female.

For some arrestees, detention in a psychiatric hospital was a traumatic short-term experience; for others it was a life sentence. In 1890, a San Francisco judge sent a person named Dick/Mamie Ruble to the Stockton Insane Asylum for wearing men's clothing in violation of cross-dressing law. In court, Ruble disputed the charge, insisting that "I'm neither a man nor a woman and I've got no sex at all." Judges and doctors viewed this claim as clear evidence of insanity, and Ruble remained in the state asylum for eighteen years, until dying of tuberculosis in 1908.

For people born outside the United States, cross-dressing arrests could also trigger deportation, under an 1891 federal immigration law that facilitated the removal of noncitizens who were convicted of a range of "morals" offenses. In 1917, a San Francisco woman named Geraldine Portica fell afoul of this policy when local police identified her as male and arrested her for wearing women's clothing as prohibited by law. Although Portica had lived as a female in San Francisco since her childhood, she was deported to Mexico after her cross-dressing arrest. Immigration officials also denied some people entry to the United States for wearing clothing that did not match their assigned sex, including Otillie Castnaugle in 1902 and Alejandra Velas in the 1910s.

In the face of arrest, harassment, and punishment, individuals resisted cross-dressing law in multiple ways during the nineteenth century. Some people simply refused to comply with the law, despite being arrested multiple times. In 1870s San Francisco, for example, Jeanne Bonnet faced constant arrest and punishment under the city's cross-dressing law, appearing in court more than twenty times. Despite stiff fines and jail time, however, Bonnet was unrepentant, telling the judge: "You may send me to jail as often as you please but you can never make me wear women's clothing again."

Other people challenged the underlying logic of the law. From the 1860s onward, feminist dress reformers spoke up in court to assert their legal right to wear pants and to dispute the assumption that such clothing belonged exclusively to men. Judges were sometimes sympathetic to these claims, but only dismissed charges against individual offenders, failing to invalidate the law itself.

Another set of people challenged cross-dressing law by asserting their identification with a sex that ostensibly did not "belong" to their body. In 1903, for example, Milton Matson appeared in a San Francisco courtroom following his arrest as a "female in male attire." Addressing the judge, Matson explained that he had lived as a man for over twenty years and demanded legal recognition of his manhood and the accompanying right to wear men's clothes. Matson's challenge was unsuccessful, but it did prompt considerable cultural debate about the legitimacy of cross-dressing law and anticipated one of the legal strategies that lead to the law's demise in the mid-twentieth century.

## Twentieth Century Enforcement and Repeal

Although cross-dressing laws had their legal and social roots in the mid-nineteenth century, they remained in force for more than one hundred years, becoming a central tool for policing queer and trans communities in the 1950s, 1960s, and 1970s. During these decades, antigay and anti-trans policing intensified across the nation, and the visibility of clothing made cross-dressing an easy target.

Police raids on mid-twentieth century queer bars, for example, regularly led to the arrest of butch lesbians, trans women, and gay men in drag for violating cross-dressing law. Firsthand accounts of these raids describe police enforcing a "three items of clothing" rule that required people to wear three articles of gender-appropriate clothing or face arrest.

In most cities, police departments relied upon earlier cross-dressing laws in their assault on queer and trans communities, but some cities adopted new laws that extended the criminalization of cross-dressing even further. In 1944, for example, Detroit extended its cross-dressing ban to private premises that were open or visible to the public. Miami followed suit in 1956 and also passed a law in 1952 that banned female impersonators from performing in the city. During these decades,

hundreds of people were arrested each year for cross-dressing in major cities, and from the 1960s onward, reports of these arrests filled the pages of the burgeoning gay and trans press.

By the 1970s, however, the days of cross-dressing law were numbered. Throughout the mid-twentieth century, queer and trans communities grew in visibility and power, and during the 1960s, activists pursued new militant modes of collective resistance to police harassment. These included spontaneous street protests, such as the 1969 Stonewall riot in New York City and the 1966 Compton's Cafeteria riot in San Francisco, which were triggered in part by police harassment under cross-dressing law. They also included the formation of new transsexual and transvestite organizations that provided resources, support, and advocacy for challenging cross-dressing laws in court. Such activism, of course, did not occur in a vacuum, but emerged in tandem with the era's radical social movements, including the Black Power movement, the Chicano movement, second-wave feminism, gay liberation, and the antiwar movement.

From the late 1960s through the 1980s, people convicted of cross-dressing offenses brought new and successful challenges in court to the legitimacy of cross-dressing law. These challenges built on earlier histories of individual resistance and culminated in a series of state supreme court rulings that found cross-dressing law to be unconstitutional. Supported by activist organizations and sympathetic lawyers, defendants brought cases that successfully challenged two foundational assumptions of cross-dressing law: first, that clothing could be easily identified as belonging to one of two discrete sexes, and second, that people could be similarly neatly classified.

In challenging the first of these assumptions, defendants and their lawyers pointed to the growing popularity of unisex fashions during the 1960s. Promoted by hippy youth subcultures and broader fashion trends, gender ambiguous clothing styles blurred the line between men's and women's dress, rendering bans on clothing that "did not belong to his or her sex" unconstitutionally vague.

In making this argument, lawyers drew from a recent US Supreme Court ruling, *Papachristou v. City of Jacksonville* (1972), which invalidated a local vagrancy law for failing to clearly define illegal conduct. In 1975, the Ohio Supreme Court agreed with this reasoning and ruled that a cross-dressing law in the city of Columbus was unconstitutionally vague, due to shifting definitions of men's and women's clothing. Following this ruling, defendants in other cities issued similar challenges to cross-dressing law, and multiple local ordinances were overturned on these grounds.

In other cases, defendants and their lawyers challenged cross-dressing law as a form of cruel and unusual punishment, in violation of the Eighth Amendment, because it prevented transsexuals from following medically necessarily treatment protocols. Although individuals arrested under cross-dressing law had long argued that gender identity could diverge from the sex assigned at birth, this argument gained new legal credibility in the 1960s due to increasing medical recognition of transsexuality.

In multiple courtrooms, doctors appeared as expert witnesses to testify that cross-dressing law interfered with their treatment of transsexuality, because it criminalized patients' efforts to live as the opposite sex for lengthy periods of time, as established standards of care required. At least some state courts accepted this argument, and cross-dressing laws in Columbus, Chicago, and Houston were invalidated on these grounds.

There are several similarities between earlier anti-cross-dressing laws and the drag bans of today. Both sets of laws are concerned with the public visibility of gender nonconformity, and both conceive of drag as a form of indecency. Anti-cross-dressing laws and drag bans also share a reliance on vague language that makes them flexible tools for policing and vulnerable to constitutional challenge. Importantly, the history of cross-dressing law points to the tenacity of people arrested, as well as the power of collective organizing and struggle. Although current drag bans are in their early stages and have not yet gone

into effect, the history of cross-dressing law provides useful information on how they can be challenged and ultimately overturned.

## CONTRIBUTORS

Clare Sears is an associate professor of sociology and sexuality studies at San Francisco State University, California. They are author of the book *Arresting Dress: Cross-Dressing, Law, and Fascination in Nineteenth-Century San Francisco* (Duke University Press, 2014).

## FILED UNDER

United States

Law / LGBT

Gender / Transphobia / LGBT rights / Transgender Equality