### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,<br><br>               Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>               Defendants. | Civil Action No. 25-cv-240-ACR |

### DECLARATION OF ALEX WAGNER

I, Alex Wagner, declare as follows:

1. From June 10, 2022, through January 20, 2025, I served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness

support for all service members within both the United States Air Force and United States Space Force.

## PROFESSIONAL BACKGROUND

2. I attended Brown University and obtained undergraduate degrees in Political Science and History in 1999. After college, I worked as a research analyst and reporter in Washington, D.C. for three years prior to enrolling at Georgetown University Law Center, graduating with a law degree in 2005.

3. After I graduated law school, I practiced as an attorney at the law firm Preston Gates & Ellis, now K&L Gates. I have since worked in multiple positions within the Department of Defense ("DoD"). From 2009 to 2011, I was the Special Assistant to the Assistant Secretary of Defense (Global Strategic Affairs). I then served as the Senior Advisor to the Deputy Assistant Secretary of Defense (Rule of Law and Detainee Policy) from 2011 to 2014.

4. From 2015 to 2017, I served as Chief of Staff to the Secretary of the Army. In that capacity, I was deeply involved in shaping the development and implementation of policies that, among other things, enabled transgender Americans to serve in the military.

5. On June 7th, 2022, I was confirmed by the U.S. Senate and sworn in as Assistant Secretary of the Air Force for Manpower and Reserve Affairs on June 10, 2022. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve and component affairs, and readiness support for all service members within both the United States Air Force and United States Space Force.

6. For my work in the DoD, I was awarded the Office of the Secretary of Defense Exceptional Public Service Medal in 2015, the Army's Distinguished Public Service Medal in 2017, and the

Department of the Air Force's Decoration for Exceptional Public Service in 2025 (the latter two are the highest awards a civilian can earn).

## THE DEPARTMENT OF THE AIR FORCE

7. The Department of the Air Force ("DAF") is responsible for organizing, training, and equipping two military services: the United States Air Force and the United States Space Force ("USSF"), the forces, respectively, that defend America's air and space domains. It is one of three military departments within the DoD. The DAF, with an annual budget of more than $217.5 billion, employs nearly 700,000 Airmen, Guardians, and civilian employees. The Air Force, including the Air Force Reserve and Air National Guard, operates over 300 flying squadrons, consisting of eight to 24 aircraft each, worldwide. Air and Space Force bases are located across the United States and span the globe.

8. The DAF is one of the world's most technologically sophisticated organizations, in many respects dwarfing the technological capabilities of individual companies in the private sector. Air Force and Space Force personnel train for years to function effectively and develop the leadership skills necessary to advance the critical missions our Nation requires. Recruitment and retention of capable and qualified Airmen and Guardians is of critical importance to the readiness of the DAF.

## PRIOR DEVELOPMENT OF DOD POLICY

9. On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered Brad Carson, in his capacity as Under Secretary of Defense for Personnel and Readiness ("USD P&R"), to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group"). Secretary Carter ordered the Working Group to present its recommendations within 180 days. In the interim, transgender service members were not to be discharged or denied reenlistment or continuation of service for being transgender.

10. The Working Group formulated its recommendations by collecting and considering evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members.

11. The Working Group concluded that banning service by transgender persons would require the discharge of highly trained and experienced service members, leaving unexpected vacancies in operational units and requiring the expensive and time-consuming recruitment and training of replacement personnel.

12. The Working Group also concluded that banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve.

13. In 2016, the RAND Corporation, a federally funded, independent research organization, presented the results of an exhaustive study requested by Mr. Carson. That report was entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"). The RAND Report found no evidence that allowing transgender people to serve would negatively impact unit cohesion, operational effectiveness, or readiness. RAND Report at 69–70.

14. On June 30, 2016, Secretary of Defense Ashton Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), a true and correct copy of which is attached as Exhibit A.

15. The purpose of DTM 16-005 was to "[e]stablish[ ] policy, assign[ ] responsibilities, and prescribe [ ] procedures for the standards for retention, accession, separation, in-service transition,

and medical coverage for transgender personnel serving in the Military Services." Notably, DTM 16-005 set forth the policy that allowed transgender individuals to serve in the military.

16. Through DTM 16-005, the Secretary of Defense ordered the Secretaries of the Military Departments, including the Army, to identify all DoD, Military Department, and Service issuances in need of revision in light of the DoD change in policy, and to submit proposed revisions to USD P&R. USD P&R was tasked with drafting revisions to all necessary issuances consistent with DTM 16-005.

17. To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning in the development and issuance of Army Directive 2016-30, entitled *Army Policy on Military Service of Transgender Soldiers*, a true and correct copy of which is attached as Exhibit B.

18. Army Directive 2016-30 was effective immediately and applied to all personnel in the Active Army, U.S. Army Reserve, and Army National Guard. It stated that "it is Army policy to allow open service by transgender soldiers. The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline. Transgender Soldiers will be subject to the same standards as any other Soldier of the same gender. An otherwise qualified Soldier will not be involuntarily separated, discharged, or denied reenlistment or continuation of service solely on the basis of gender identity." The Directive required the Assistant Secretary of the Army for Manpower and Reserve Affairs (the "ASA (M&RA)") to establish, no later than July 5, 2016, a Transgender Service Implementation Group to develop policies and procedures for transgender service, as well as a Service Central Coordination Cell ("SCCC"), composed of medical, legal, and military personnel experts, to serve as a resource for commanders' inquiries and requests. By October 1,

2016, the ASA (M&RA) was directed to recommend a policy addressing service of transgender soldiers, including "a process by which transgender soldiers may transition gender while serving consistent with mission, training, operational, and readiness needs and a procedure whereby a Soldier's gender marker will be changed in [the Defense Enrollment Eligibility Reporting System ("DEERS")]." In the meantime, the Directive established a process whereby gender marker changes would be handled via Exceptions to Policy ("ETPs") processed by the SCCC and ASA (MR&A), with weekly reports summarizing the ETPs to be provided to the Secretary of the Army, as well as the Chief of Staff of the Army, then General Mark Milley.

19. On October 7, 2016, I also assisted in Secretary Fanning's issuance of a further directive, Army Directive 2016-35, which "establishe[d] policies and procedures for gender transition in the Army." A true and correct copy of Army Directive 2016-35 is attached as Exhibit C.

20. Army Directive 2016-35 provided that "a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition." The Directive provided that gender transition in the Army begins with a diagnosis that gender transition is medically necessary and ends when the Soldier's gender marker in DEERS is changed to show the Soldier's preferred gender. The Directive further stated that for policies and standards that differ according to gender, the Army will recognize a Soldier's gender based on the gender marker that appears in DEERS. It stated that "the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards" according to the gender marker in DEERS.

## THE AUSTIN POLICY

21. On January 25, 2021, President Joseph R. Biden rescinded the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*.  The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."  In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

22. On April 30, 2021, the DoD implemented the EO through the issuance of DoD Instruction ("DoDI") 1300.28, entitled *In-Service Transition for Transgender Service Members* (the "Austin Policy").  The Austin Policy applies to all military departments and sets forth guidance to allow service by qualifying transgender service members, including details regarding medical treatment provisions.  This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and

7

retention is consistent with military service and readiness." A true and correct copy of DoDI 1300.28 is attached as Exhibit D.

23. To implement the Austin Policy, the then-Acting Secretary of the Air Force issued Department of the Air Force Policy Memorandum 2021-36-01 (the "DAF Policy Memorandum"). As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, my responsibilities included overseeing implementation of the DAF's policy permitting service by qualified transgender Airmen and Guardians. A true and correct copy of the DAF Policy Memorandum is attached as Exhibit E.

24. The DAF Policy Memorandum states that "[s]ervice in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness" and that "transgender Service members or applicants for accession must be subject to the same standards as all other persons." For any standard, requirement, or policy that "depends on whether an individual is male or female . . . all persons will be subject to the standard, requirement, or policy associated with their gender marker in [DEERS]."

25. The DAF Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the DAF and the DoD.

26. The DAF Policy Memorandum also confirms that "[n]o person, sole[ly] based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force." Additionally, for service members "whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition," the DAF Policy Memorandum states that they "should be treated, for purposes of separation and

retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition."

27. In overseeing the implementation of the Austin Policy and the DAF Policy Memorandum, I was not aware of any negative impact that service by transgender Airmen or Guardians had on the Air Force, the Space Force, or our overall military readiness.

28. The Austin Policy fosters openness and trust among team members, enabling all members of our total force to bring their full selves to their high stakes mission, and thereby engenders stronger unit cohesion.  This unit cohesion forms the basis of our military's ethos and is vital to successfully advancing America's national security interests around the world.  To ensure America's Air and Space Forces are effective in deterring, denying, and — if necessary—defeating our adversaries, the DAF needs to recruit and retain the best talent the American people have available.  As a result, we must be seen as an employer of choice in a highly competitive talent marketplace.

29. Any organization that is perceived by America's youth as discriminatory will be at a competitive disadvantage in this race for talent.  In 2024, PRRI found that an overwhelming majority of Gen Z adults, ranging in age from 18 to 26, support nondiscrimination protections for LGBT people.  (https://www.prri.org/spotlight/young-americans-views-on-lgbtq-rights/).  In addition, the great majority of young adults know LGBT people as classmates, as teammates, as brothers and sisters, and as cousins.  The Austin Policy not only sends a message to LGBT youth and their families that the military is open to everyone who can meet its high standards; it also sends a message to all other youth that it is not an organization that discriminates.  A true and correct copy of the PRRI analysis is attached as Exhibit F.

30. Further, the Austin Policy enables our military to retain highly trained and specialized service members that the American taxpayers have invested in financially by providing an opportunity to advance professionally and develop their leadership skills to support our readiness.

31. The military also has an obligation to provide health care to all service members. Gender transition-related health care is medically necessary health care. The Austin Policy fulfills the duty owed to service members to provide necessary care in a non-discriminatory manner to promote a ready force. An individual who seeks transgender health care does not abruptly disappear from the ranks, but rather works with a military medical practitioner to ensure readiness, both personal and unit readiness. This is consistent with the military's general medical policies for any other medically necessary treatment. It is also consistent with new parental leave policies enacted in 2022 which enable the military to retain key talent despite brief interruptions in service.

32. What is patently clear to me is that the Austin Policy has not negatively impacted readiness. During my time as Assistant Secretary, I did not attend a single meeting where concerns about the service of transgender Airmen or Guardians were raised.

33. It is also clear to me that allowing transgender service has had little or no effect on unit cohesion. I am not aware of any complaints regarding unit cohesion resulting from the non-discriminatory policy. To the contrary, in my experience, inclusion of transgender service members into units has been a non-issue. In a 2022 visit to Air Force Basic Military Training (BMT) at Lackland Air Force Base, I discussed the inclusion of transgender trainees with the command team of the 37th Training Wing, responsible for, among other things, providing foundational training for those entering the Air Force, Space Force, Air Force Reserve and Air National Guard—generating 93% of the enlisted corps. The command team reported to me that during their time in command, there had been four transgender trainees and there had been no

issues for other trainees or for leadership. To the extent the Austin Policy has had any appreciable impact on unit cohesion, I would assess its impact was either negligible or positive, in that not worrying about hiding one's authentic self improves focus on mission and as a result enables greater trust among team members.

34. Personnel policies that allow transgender service members to be evaluated based on merit rather than transgender status strengthen the military's mission of protecting the United States; they do not jeopardize it. The true power of an All-Volunteer Force that reflects the diversity of the American people is in that it enables those that don't serve to understand it as an extension of their interests. Anyone with a propensity to serve who meets our high entry and retention standards and is courageous enough to pledge that they will support and defend the Constitution, should be able to do so.

## IMPACT OF REVERSING THE AUSTIN POLICY

35. On January 27, 2025, President Trump issued an executive order reversing the Biden Administration's EO and mandating that all transgender people be barred from military service, including those already serving.

36. Such an abrupt reversal of established military personnel policy is both highly unusual and incredibly disruptive.

37. Absent any evidence, the Trump EO claims that the Austin Policy that has been in place since 2021 has had a negative impact on military effectiveness, lethality, and unit cohesion. The Trump EO also claims, without evidence, that transgender people are inherently dishonorable, deceitful, and unfit for military service. These claims are wholly unfounded and refuted by the reality that transgender people are serving honorably, effectively, and often with distinction in our Nation's military while meeting the same performance and medical standards as others. The

11

notion that being transgender reflects negatively on a person's honesty, character, or fitness has no basis in reality, is contradicted every day by the actual contributions of transgender service members, is cruel, and frankly beneath the dignity of the Commander-in-Chief of the United States Armed Forces.

38. Prohibiting transgender individuals from serving in the military is harmful to the military, degrades our recruiting enterprise, undermines unit readiness, and thus is inimical to our national security and the public interest for several reasons.

39. **Loss of Qualified Personnel.** Prohibiting current transgender service members from accessing or serving in the military will result in the loss of opportunity for otherwise qualified Americans to consider military service, not only for transgender Americans, but for the rest of American youth (and their influencers) who would view the military as an institution that discriminates on bases unrelated to those qualifications to serve. Indeed, perhaps the greatest value of the law rescinding "Don't Ask, Don't Tell" in 2010, was in realigning in the eyes of the American people the military's practice with its essential ethos: that ability and merit—rather than unjust discrimination—best enable good order and discipline, unit cohesion, and mission accomplishment.

40. For those currently serving, excising transgender service members from their units would undermine readiness and operational effectiveness. Transgender service members, both officers and enlisted, hold key positions throughout units and well as leadership positions.

41. The loss of qualified personnel as a result of separating transgender service members could be particularly acute at a time of decreased familiarity with military service. Although the DAF has achieved its 2024 enlisted recruiting goals and is well on its way to meet its increased 2025 goals, the DAF like the other services, is currently facing a reduced pool of American who meet

military physical and heath standards. This reality is further compounded by decreased familiarity with military service and especially strong private-sector economic conditions. Unlike many private-sector companies, which can fill vacancies by simply tapping an experienced and flexible labor pool, the DAF builds and grows its own skilled specialists and leaders organically, and this typically requires years or decades.

42. **Worldwide Deployability.** Allowing transgender service members to serve does not create any unique issues relating to deployability. The DAF relies on force management models, reserve component mobilization, and, in some cases, civilian support to meet mission requirements. Civilians are particularly well integrated into USSF operations, as approximately half the manpower of the USSF is civilian. Responding to any deployability issues to the extent that they may arise for some individual transgender service member creates no greater challenges than those recently addressed by, for example, recent expansion of parental leave policies to 12 weeks for both female and male service members, or for the myriad other medical issues that result in short-term periods of non-deployability. There is nothing about the healthcare needs of transgender individuals that in any way presents any unique issues relating to deployment.

43. **Erosion of Trust in Command.** The abrupt reversal of policy is also harmful to military readiness because it erodes service members' trust in their command structure and its professionalism. The military's effectiveness depends on a relationship of mutual trust between leaders and followers. That trust, and the prompt following of commands, is essential to good order and discipline, unit cohesion, and the ensuing rapid response required to address unexpected crises or challenges. Following the adoption of the Austin Policy permitting service by transgender persons in 2021, military leaders instructed service members that they should not discriminate

against their transgender colleagues. For that policy to be abruptly reversed will inevitably erode trust in the reliability and integrity of military decision making.

44. This sudden reversal is harmful both to transgender service members and to other formerly disfavored groups that have been recently integrated into the military and into combat roles. In 2011, the policy prohibiting gay, lesbian, and bisexual people from openly serving in the military was formally repealed. More recently, DoD also removed remaining barriers for women serving in certain combat specialties. The sudden reversal of the DoD's recently adopted policy of inclusion sends a message that politics is driving the changes and other policies promoting readiness and equal opportunity may similarly be arbitrarily reversed.

45. **Readiness and Morale.** The sudden reversal of a policy adopted after substantial deliberation and rigorous data assessment will also have a deleterious effect on morale, as it undermines the confidence of service members that important military policy decisions will be based on rational, deliberate, and merit-based assessments. Airmen, Guardians, and other service members must believe that the orders and policies they are required to follow are based on the best interests of the force and the Nation, not impulse or a partisan political agenda to punish disfavored groups. This trust in the rationality and professionalism of our military leadership is also a key factor in recruiting and retaining talented personnel. The sudden reversal of the Austin Policy is not supported by data nor by lived experience, and as a result, it undermines confidence in the chain of command.

46. The impact to readiness, morale, good order and discipline, unit cohesion, and mission effectiveness engendered by the abrupt reversal of the Austin Policy permitting service by transgender people will have a negative impact not only on transgender service members, but on the joint force as a whole. Any suggestion that those serving to protect and defend our country

will not have the full support of their entire chain of command will also undermine the DAF's ability to attract and retain highly qualified candidates who can perform at the highest levels necessary to complete the incredibly complex and critical national security missions asked of them, particularly in this new era of great power competition.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 3, 2025

Alex Wagner