IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, ERICA VANDAL, KATE )
COLE, GORDON HERRERO, DANY )
DANRIDGE, JAMIE HASH, KODA NATURE, )
and CAEL NEARY, )
)
              Plaintiffs, )
)
v. )
)
DONALD J. TRUMP, in his official capacity as )
President of the United States; the UNITED )
STATES OF AMERICA; PETER B. HEGSETH, )
in his official capacity as Secretary of Defense; )    Civil Action No. 25-cv-240-ACR
MARK AVERILL, in his official capacity as )
Acting Secretary of the Army; the UNITED )
STATES DEPARTMENT OF THE ARMY; )
TERENCE EMMERT, in his official capacity as )
Acting Secretary of the Navy; the UNITED )
STATES DEPARTMENT OF THE NAVY; )
GARY ASHWORTH, in his official capacity as )
Acting Secretary of the Air Force; the UNITED )
STATES DEPARTMENT OF THE AIR FORCE; )
TELITA CROSLAND, in her official capacity as )
Director of the Defense Health Agency; and the )
DEFENSE HEALTH AGENCY, )
)
              Defendants. )

## DECLARATION OF YVETTE BOURCICOT

I, Yvette Bourcicot, declare as follows:

    1. I served as the Acting Assistant Secretary of the Army for Manpower and Reserve Affairs from January 18, 2022, to December 23, 2022, and as Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs from December 23, 2022 to January 20, 2025. In those roles, I managed manpower, personnel, and Reserve Component affairs for the Department of the Army and advised the Secretary of the Army on matters of policy and performance oversight. As

1

a former Department of Defense official, Department of the Army official, and Air Force veteran, I can attest that personnel policies must be based on merit and objective criteria to promote readiness and unit cohesion.

## PROFESSIONAL BACKGROUND

2. I attended Princeton University on an Air Force Reserve Officer Training Corps scholarship and obtained an undergraduate degree in English literature in 2000. I later attended Georgetown University Law Center on an Air Force scholarship, earning a Juris Doctor degree in 2008, having focused on public international law and national security law.

3. From May of 2000 to December of 2010, I served as an officer in the U.S. Air Force in various positions, culminating in my service as a Judge Advocate General (JAG). I later ran my own law practice from March of 2011 to September of 2012, specializing in family law, criminal law, military justice, and administrative law.

4. From September of 2012 to July of 2014, I served as Special Assistant to the General Counsel of the Army, providing legal advice to the General Counsel, the Secretary of the Army, and Army staff on issues including the Army's response to the Washington Navy Yard shooting, accommodating transgender prisoner populations, updating background check procedures for Army Child Development Center workers, compliance with e-discovery requirements, coordinating an enterprise-wide review of Army Medicine, and reforming the Army Behavioral Health system.

5. Following this work, I was asked to join a working group in 2015 studying whether and how transgender individuals could serve in the military (the "Working Group") as a subject matter expert. The Working Group brought together representatives from all branches of the military,

including the Surgeons General from each branch. The Working Group also received extensive input from subject matter experts and members of the transgender community.

6. From July of 2014 to December of 2016, I served as Senior Advisor for International Humanitarian Policy in the Office of the Under Secretary of Defense (Policy) at the Department of Defense. In December of 2016, I became an Associate Deputy General Counsel in the Office of Legal Counsel, Department of Defense, advising on foreign and international litigation, matters pending before the U.S. Supreme Court, and litigation risk associated with personnel policies.

7. From February of 2018 to January of 2022, I worked in the private sector, filling a number of policy and communications roles at technology firms, including Facebook, Airbnb, and Match Group.

8. In January of 2022, I returned to the Department of the Army where I served as Acting Assistant Secretary for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary for Manpower and Reserve Affairs. I advised the Secretary of the Army on matters including human capital, training, readiness, mobilization, military health policies, force structure, manpower management, equal opportunity, recruiting, marketing, and other critical matters.

## THE ARMY

9. The United States Army is the largest of the service branches of the United States Armed Forces and performs land-based military operations. The Department of the Army is one of the three military departments of the DoD. The Army has an annual budget of more than $185.9 billion. For fiscal year 2025, the projected end strength for the Active Army is 442,300 soldiers, with an additional 325,000 soldiers in the Army National Guard, and 175,800 in the United States Army Reserve, for a total of 943,100. The Army's command structure includes four Army

Commands, nine Army Service Component Commands, and thirteen Direct Reporting Units, operating across the United States and around the world.

10. The Army's core mission is to fight and win our Nation's wars by providing prompt, sustained land dominance across the full range of military operations and spectrum of conflict in support of combatant commanders. It does this by executing statutory directives, including organizing, equipping, and training forces for the conduct of prompt and sustained combat operations on land, and by accomplishing missions assigned by the President, Secretary of Defense, and combatant commanders.

11. The Army is the most formidable ground combat force on earth and one of the largest employers in the United States. The Army's continued excellence in executing its many missions is largely due to deliberate investments in soldier training, equipping, and leader development. Soldiers receive training at the highest level, not only in the classroom, but also through rigorous instruction under intense pressure and realistic battlefield conditions. Many Army personnel are employed in highly technical roles that require lengthy and expensive specialized training. Particularly in light of these investments in personnel, recruitment and retention of capable and qualified soldiers is crucial to Army readiness.

**THE WORKING GROUP AND DEVELOPMENT OF DOD EQUAL SERVICE POLICY**

12. On July 28, 2015, after consultations with the secretaries of the military departments, Secretary of Defense Ashton Carter directed Brad Carson, Acting Undersecretary of Defense for Personnel and Readiness, to convene a Working Group to study the policy and readiness implications of allowing transgender persons to serve in the armed forces. Shortly after Brad Carson's directive, I joined the Working Group as a subject matter expert. Initially, the Working Group was asked to begin with the presumption that transgender individuals could serve unless

objective, practical impediments were identified, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness.

13. The Working Group's process was extremely rigorous. We considered information and presentations from a variety of sources, including medical and other experts, drawn from both within and outside of the Department of Defense; senior uniformed officers and senior civilian officers from each military department; senior military personnel who supervised transgender service members; and transgender people on active duty. We also drew specific medical input from Surgeons General from each of the Armed Service branches.

14. One of the many sources that the Working Group relied upon was the RAND Report, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, which the DoD commissioned in 2016. RAND is a non-profit institution, which seeks to make its research freely and readily available to the public. Accordingly, the research provided in RAND's publications is held to high-quality peer-review standards for objective analysis. The RAND Report reviewed all of the relevant scholarly literature and empirical data, including the extensive medical literature, actuarial data, and research and reports from the then- eighteen other countries that permitted service by transgender personnel. The RAND report found that the military's costs, readiness, and unit cohesion would not be impacted by allowing transgender servicemembers to serve equally in the Armed Forces. A true and correct copy of the RAND Report is attached as Exhibit A.

15. In consideration of the RAND Report's empirical findings, along with the multitude of opinions from military and civilian personnel, the Working Group concluded that transgender individuals who meet the standards for military service should be permitted to serve. Accordingly, Secretary of Defense Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"), which required the Secretaries of the

Military Departments, including the Army, to implement the Working Group's equal service policy. The Army implemented two Directives: 2016-30 and 2016-35, which applied to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States. Directive 2016-30 disallowed discrimination based on gender identity and stated, "The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect." Meanwhile, Directive 2016-35 provided policies and standards for transgender soldiers to obtain transition-related medical care.

## THE 2021 AUSTIN POLICY

16. On January 25, 2021, President Joseph R. Biden replaced the first Trump Administration's restrictive ban with Executive Order (EO) 14004, entitled *Enabling All Qualified Americans To Serve Their Country in Uniform*. The EO directed the Secretary of Defense and Secretary of Homeland Security "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." The EO relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender

dysphoria—to exclude them from military service or to limit their access to medically necessary care."

17. On April 30, 2021, the DoD implemented this policy through the issuance of DoD Instruction 1300.28, entitled *In-Service Transition for Transgender Service Members* ("DoDI 1300.28"), which applies to all military departments. This guidance authorizes "service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

18. To implement DoDI 1300.28, the Secretary of the Army issued Army Directive 2021-22 (Army Service by Transgender Persons and Persons With Gender Dysphoria) (the "Policy Memorandum").

19. Under the policy, a transgender service member who wished to transition during service was required to first make a request to their brigade commander. Those requests were routed through several offices within the Army before coming to Manpower and Reserve Affairs for final review. As Acting Assistant Secretary for Manpower and Reserve Affairs, I reviewed each request and made a recommendation on whether to grant the service member's request. Subsequently, as Principal Deputy Assistant Secretary for Manpower and Reserve Affairs, I was notified of each request. Because the transgender population makes up a very small fraction of total Army military personnel, I only reviewed one or two such requests per quarter. To my best recollection, every request I received met the requirements of the policy, and every requesting service member met the necessary standards for serving, so I never had cause to recommend that a request be denied.

20. The Policy Memorandum states that "[t]he Army is open to all who can meet the standards for military service and readiness. It remains committed to treating all Soldiers with dignity and

respect while ensuring good order and discipline, including allowing transgender Soldiers to serve openly . . . ." For any standard, requirement, or policy that "appl[ies] differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS)."

21. The Policy Memorandum specifies that personnel will either be accessed or commissioned in accordance with medical standards issued by the Department of the Army and the DoD.

22. The Policy Memorandum also confirms that "[n]o otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service, or otherwise subjected to adverse action or treatment, solely on the basis of gender identity." Additionally, for any "whose fitness for duty or ability to serve is adversely affected by a medical condition or medical treatment related to gender identity or gender transition," the Policy Memorandum states that they "should be treated, for purposes of separation and retention, just as any other Soldier whose fitness for duty or ability to serve is similarly affected by non-gender identity or gender transition reasons."

23. In implementing the Policy Memorandum, I observed no negative impact from permitting transgender service in the Army or on our military capabilities.

24. The Austin Policy fosters trust among team members and advances unit cohesion. This unit cohesion is vital in protecting America's national security interests around the world. In order to ensure America's Army is effective, we need to be able to be seen as a top-choice employer in a highly competitive market for talent. Any organization that American youth perceive as discriminatory will be at a competitive disadvantage in this contest. The Austin Policy further enables our military to retain highly trained and specialized service members by providing an opportunity to progress and develop leadership and other skills within the military.

25. In my positions as Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs, I would have been aware of any issues arising from the Austin Policy, and responsible for resolving them. However, in all of my time serving in these roles I heard no complaints from the field about how the inclusion of transgender service members caused problems for unit readiness or individual deployability. Although some transgender service members required medical procedures to treat their gender dysphoria that temporarily affected their deployability, this is no different than the myriad medical reasons that any service member might become temporarily non-deployable.

26. I am also unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve. Consistent with the military's experience integrating other previously excluded groups into the ranks, unit cohesion hangs on an individual's ability to do the job in front of them, rather than any concerns regarding identity. Transgender service members have proven themselves able to serve and indeed are serving capably throughout the military. To the extent their service has had any appreciable impact on unit cohesion, it has improved unit cohesion by fostering greater openness and trust among team members.

## RECENT REVERSAL OF POLICY

27. On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021, executive order permitting equal service by transgender individuals. On January 27, 2025, President Trump issued an executive order revoking "all policies, directives, and guidance issued pursuant to" the order establishing that equal service policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.

28. Such an abrupt reversal of established military policy is highly unusual, especially without a significant change in the analysis supporting the policy.  As part of the 2015 Working Group, I can attest to the DOD's lengthy review in deciding whether to adopt an equal service policy.  The Working Group's conclusion that transgender individuals should be allowed to serve on equal terms was the result of a rigorous process involving consultation with experts and military personnel.  President Trump's executive order reverses this carefully considered policy and was ordered without any evidence that allowing transgender individuals to serve over the past four years resulted in any negative impact whatsoever.  The executive order claims that permitting transgender individuals to serve harms military effectiveness and lethality and disrupts unit cohesion; however, as the actual experience of transgender service shows, these claims have no evidentiary basis.

29.  Prohibiting transgender individuals from serving in the military is harmful to the military and to the public interest for several reasons.

30. **Erosion of Merit-Based Accession and Retention.**  The 2021 policy required the Army to make accession and retention decisions based upon merit, not based upon a soldier's transgender status.  This policy upheld an important tenet of military service: that anyone who meets the necessary qualifications and raises their hand to serve should be allowed to serve.  The policy required transgender soldiers to meet the same high standards as all other soldiers.  Under the policy, transgender soldiers served with distinction.  The recission of the policy and implementation of the ban on transgender servicemembers means that an individual's ability to serve is not based on standards and merit but solely based on the outcome of a presidential election.

31. Uniformed service entails dedication and sacrifice—long hours, time away from home, and risk of injury or death are all part of that service.  In return, the Nation promises those service

members that we will honor their service and respect them. Summarily dismissing transgender service members without cause breaks the faith they placed in their leaders and the military as an institution. More broadly, it signals to all service members that their service could also end if they are determined to be members of a politically unpopular group. This sows division and undermines the unit cohesion that is absolutely essential for fighting forces to be effective.

32. **Detriment to Recruitment.** The military is competing for, and successfully attracting talent in today's robust job market. This success is due in large part to policies such as the 2021 Austin Policy. Research shows that the vast majority of young people in our recruit demographic (17-24 years old) do not want to be associated with institutions that are perceived as discriminatory on the basis of race, sex, sexual orientation, religion, or gender identity. This sudden reversal of policy will damage the reputation of the military and diminish its attractiveness as a career path among the young people we most need to persuade to join our ranks.

33. **No Detriment to the Military.** The Austin Policy was implemented following years of thoughtful and careful planning by experts and stakeholders across the military. It takes into account the medical needs of transgender service members and any associated impacts on their ability to serve. Because of this careful planning, I am confident that allowing transgender individuals to serve in the military and accommodating their medical needs is no greater a burden on the military than the accommodation of all other service members' medical needs. The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent. Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability. Those few transgender service members who require more extensive medical

burden on the military than the accommodation of all other service members' medical needs. The transgender population is so small that the impact of their medical needs on unit readiness is virtually nonexistent. Moreover, many transgender individuals do not require extensive medical interventions, particularly those who have accessed after an 18-month medical assessment of stability. Those few transgender service members who require more extensive medical interventions, such as surgeries, are only temporarily unavailable for deployment, similar to any other service member requiring surgery.

## CONCLUSION

34. The Austin Policy was based on years of thoughtful policymaking supported by peer-reviewed scientific research. It has resulted in a stronger, not a weaker military. The sudden reversal of that policy is backed by no research and can be attributable only to animus. It disrespects the transgender service members who have served honorably in the military and threatens to undermine the military's culture, cohesion, and lethality.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3 Feb 25

_____
Yvette Bourcicot