**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY,<br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>　　　　　　　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 25-cv-240-ACR |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs hereby move the Court on an emergency basis to issue a temporary restraining order enjoining the enforcement of President Trump's executive order, titled *Prioritizing Military Excellence and Readiness*, Exec. Order No. 14,183, 90 F.R. 8757 (the "Order") to preserve the status quo pending resolution of Plaintiffs' Application for Preliminary Injunction.  Defendants have already started to discharge transgender service members and turn away transgender applicants, which necessitates this emergency motion.

Pursuant to Local Civil Rule 65.1(a), Plaintiffs' counsel hereby certify that they have notified Defendants' counsel regarding this motion.  Defendants oppose the relief sought herein.

## BACKGROUND

### A.    The Executive Order

On January 20, 2025, President Trump signed the Order revoking President Biden's January 25, 2021 executive order permitting transgender individuals to serve in the military.  On January 27, 2025, President Trump issued the Order revoking "all policies, directives, and guidance issued pursuant to" the Biden Administration's order that established the non-discriminatory policy and directing the Department of Defense ("DOD") "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service. Order § 5.  The Order also directs the Secretary of Defense to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  Order § 1.  Under the Order, no transgender individuals may enlist or continue serving in the military.

### B.    Impact on Plaintiffs

Plaintiffs are six transgender service members and two transgender individuals actively pursuing enlistment.  The ban will inflict irreparable injuries on Plaintiffs and other prospective

and current transgender service members.  They will be discharged or barred from service, lose their means of supporting themselves and their families, and stripped of the honor, status, and benefits associated with uniformed service to their country.  Plaintiffs seek this emergency relief because the DOD is already taking steps to discharge transgender service members and to prevent accession by transgender applicants.

As set forth in the Declaration of Miriam Perelson ("Perelson Decl."), a transgender service member is already being administratively separated based on the Order.  Even after Plaintiffs filed their complaint and after the Court informed counsel for the parties that it expected expedited briefing on a preliminary injunction application, this service member was presented with an ultimatum: that she must be classified and treated as a man—*i.e.*, not be transgender—or be separated pursuant to the Order.  Declaration of Miriam Perelson ("Perelson Decl.") ¶¶ 9–11, Ex. 1.  Being transgender means that she lives in a sex different than her birth sex.  If she is required to serve as a man, including being required to "live in male bays, utilize male latrines, and be partnered with a male battle buddy," *id*., then she cannot serve as a transgender woman.  Requiring Miriam, a transgender woman, to serve as a man is the same as saying she cannot serve at all, since it requires her to stop being transgender, which she cannot do because she is transgender.  When her commanding officer asked her to sign a statement affirming that she would agree not to be transgender, she did not sign because she is transgender.  When she informed her officer that she could not sign the document, she was informed she would be administratively separated.  *Id*. ¶¶ 13–14.

The steps taken against Miriam are consistent with a directive issued on January 31, 2025 by the Secretary of Defense to senior Pentagon leadership, commanders of the Combatant Commands, and field activity directors to take immediate steps to enforce the Order to bar

transgender service members.  Attorney Decl. Ex. A.  Military recruiters have also been directed to cease processing transgender applicants as the branches "await detailed guidance from the DoD." Attorney Decl. Ex. B, C.  Although the Order directs the Secretary of Defense to update guidance in conformity with the Order within 60 days, the effects of the Order are already being felt now. Urgent relief is required to prevent Plaintiffs and other service members from being deprived of their careers and suffering dehumanizing treatment based solely on their transgender status while the Court considers the Application for Preliminary Injunction.

The public has no interest in enforcing an unconstitutional policy, has every interest in the service of capable and dedicated individuals in our Armed Forces, and would be injured if service members were separated and then ordered restored to their posts.  Both the balance of the equities and the public interest weigh in favor of issuing a temporary restraining order.  The Court should temporarily enjoin implementation of the ban pending an order on the Application for Preliminary Injunction.

## ARGUMENT

This Court should pause the Trump Administration's ban on military service by transgender individuals pending resolution of Plaintiffs' Application for Preliminary Injunction because the Order violates Plaintiffs' rights to equal protection as guaranteed by the Fifth Amendment, and this violation causes Plaintiffs to suffer serious and irreparable harms that will continue absent this Court's intervention.  This Court can and should enter such an order "to preserve the status quo for a limited period of time" until this Court renders a decision on the merits of Plaintiffs' Application for Preliminary Injunction.  *Barrow v. Graham*, 124 F. Supp. 2d 714, 715–16 (D.D.C. 2000); *see also M.G.U. v. Nielsen*, 316 F. Supp. 3d 518, 520 (D.D.C. 2018);

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("The status quo is the last *uncontested* status which preceded the pending controversy." (quotation omitted)).

Plaintiffs satisfy the standard for granting a temporary restraining order here, as they have established: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although the tests for a temporary restraining order and preliminary injunction are the same, *see Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022), this Court may grant a temporary restraining order more readily here because, under the applicable standard, the shorter duration of the pause, and fact that it does no more than preserve the status quo, means that the balance of harms and public interest factors tilt even more decisively in Plaintiffs' favor. *See Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011) ("The purpose of a TRO is to maintain the status quo of a case *until the court has an opportunity to hear a request for fuller relief.*" (emphasis added)); *M.G.U. v. Nielsen*, 316 F. Supp. 3d at 520 ("[T]he short duration of [a temporary restraining] order and the imminence of the harm may justify the grant of a temporary restraining order to preserve the status quo.").

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIM.

Plaintiffs raise far more than the "serious legal question on the merits" necessary to establish a likelihood of success on the merits of their equal protection claim. *See Padgett v. Vilsack*, No. 24-2425, 2024 WL 4006050, at *2 (D.D.C. Aug. 30, 2024) (quoting *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)). The President's categorical

exclusion of transgender people lacks any rational basis whatsoever and thus fails even the lowest level of constitutional scrutiny.

By singling out transgender people for differential treatment, the President's Order creates a sex-based classification that is subject to, and fails, intermediate equal protection scrutiny.  *See* ECF 13-1 at 14–16.  By its plain terms, the Order bars transgender individuals from military service on the stated ground that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," Order § 2; in other words, the Order targets transgender status itself on the basis of the facially discriminatory premise that transgender persons lack integrity.  This explicit classification on the basis of transgender status is inherently a sex-based classification because, as the Supreme Court has recognized, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).

Beyond this explicit sex-based classification, the Order also discriminates based on sex by requiring that all service members conform to the sex stereotypes associated with their birth sex. *See* ECF 13-1 at 17.  The Supreme Court has explained that "sex plays an unmistakable and impermissible role" when a person is "intentionally penalize[d] . . . for traits or actions" that would be tolerated in someone assigned the opposite sex at birth.  *Bostock*, 590 U.S. at 660; *see also Doe 1 v. Trump*, 275 F. Supp. 3d 167, 210 (D.D.C. 2017) (explaining, in striking down earlier ban, that "[a] service member who was born a male is punished by the [ban] if he identifies as a woman, whereas that same service member would be free to join and remain in the military if he was born a female, or if he agreed to act in the way society expects males to act."), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).  By prohibiting military service

by transgender individuals because they do not conform to sex stereotypes, the Order impermissibly discriminates based on sex.

The Order also warrants—and fails—intermediate scrutiny for yet a third reason: it discriminates based on transgender status, which is itself a quasi-suspect class. *See* ECF 13-1 at 17–20. As this Court has already recognized in the challenge to the first Trump Administration's similar ban, the transgender community satisfies the relevant factors for identifying a suspect class. *See Doe 1 v. Trump*, 275 F. Supp. 3d at 208–09. This Court found that (1) "transgender individuals have immutable and distinguishing characteristics that make them a discernable class"; (2) "[a]s a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination"; (3) despite this history of discrimination, there is "no argument or evidence suggesting that being transgender in any way limits one's ability to contribute to society"; and (4) transgender people "represent a very small subset of society" and lack "the sort of political power" that other groups might have "to protect themselves from discrimination." *Id.*

There are thus three independent bases supporting the application of intermediate scrutiny to the President's Order—a level of scrutiny the Order cannot withstand. In fact, the Order cannot withstand any level of review. *See* ECF 13-1 at 20–26. The justifications for the President's Order are not rooted in fact or logic, but in impermissible stereotypes and animus towards transgender people. The Order cites promoting "honesty" and "humility" as justifications, but these rest solely on the invidious stereotype that transgender identity is inherently "false" or "dishonest." *See* Order § 2. The Government offers no evidence of actual dishonesty by transgender service members, nor could it; instead, it simply asserts that being transgender is inherently dishonest based on moral or ideological social disapproval. It is well settled that such disapproval is not a legitimate

government interest and thus cannot support government action under even the *lowest* level of scrutiny. *See Lawrence v. Texas*, 539 U.S. 558, 577–78 (2003).

The remaining justifications—"troop readiness, lethality, cohesion, uniformity, and integrity," Order § 2—while legitimate military interests in the abstract, are wholly unrelated to banning transgender service members. As the evidence set forth in the Plaintiffs' Application for Preliminary Injunction makes clear, a categorical ban on transgender people undermines rather than advances military effectiveness. ECF 13-1 at 23–24. It excludes all transgender people regardless of their demonstrated ability to meet standards, departing from the military's merit-based system, and it directly reduces military capabilities by removing qualified personnel. *Id*. Similarly, transgender service members have served for years without any adverse effect on unit cohesion, and in many instances this service has strengthened bonds between service members. *Id*.

The irrationality of the Order is underscored by its context, which reveals that it stems from "negative attitudes," "fear," and "irrational prejudice" rather than legitimate military needs. *City of Cleburne v. Cleburne Living Ctr*. 473 U.S. 432, 448, 450 (1985). The Order's text openly expresses hostility toward transgender individuals as a class, declaring their identity a "falsehood" incompatible with military values of "honesty" and "integrity." Order §§ 1, 2. The Order's timing—immediately following the inauguration of President Trump, who campaigned on a platform of "end[ing] left-wing gender insanity"—and its enactment without any of the usual deliberative processes for such a stark policy change, suggest pretext rather than military necessity. ECF 13-1 at 25. And the Order appears in a broader pattern of targeted discrimination towards transgender people by this Administration. *Id*. at 16. This context reinforces that the ban reflects

"a bare . . . desire to harm a politically unpopular group," which cannot survive any level of scrutiny. *United States v. Windsor*, 570 U.S. 744, 770 (2013).

This policymaking based on stereotypes and animus cannot survive rational basis review even in the realm of military policy: The Government is not "free to disregard the Constitution when it acts in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). Because there is no indication that military officials have exercised any judgment, let alone a studied professional judgment based on evidence, and because the context reveals the true discriminatory motive, the President's Order cannot withstand even the most deferential equal protection review as it lacks any rational basis.

## II.    PLAINTIFFS ARE LIKELY TO FACE IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER.

Without a temporary restraining order, Plaintiffs will suffer irreparable harm that is both "irretrievable" and "serious in terms of its effect on [Plaintiffs]" as this administration proceeds to carry out its discriminatory agenda against transgender people both in the military and in every other sphere of life. *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (quotation omitted).

Plaintiffs face imminent loss of employment and benefits that courts have consistently recognized as irreparable harm. Plaintiffs and their families will lose medical and other benefits because of separation from the military. *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (plaintiff would "lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer"); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993). Loss of medical benefits alone may constitute irreparable harm, particularly when coupled

with the financial stresses of unemployment.  *See Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002).

Implementation of the Order has caused immediate harm to transgender service members who are currently serving.  The Secretary of Defense has issued guidance to senior Pentagon leadership, commanders of the Combatant Commands, and field activity directors to take immediate steps to enforce the Order to bar transgender service members.  Attorney Decl. Ex. A. Already, a service member is being administratively separated because she is transgender. Declaration of Miriam Perelson ("Perelson Decl.") ¶¶ 9–11, 14, Ex. 1.  Military recruiting personnel have also been directed to cease processing transgender applicants as the branches "await detailed guidance from the DoD," irreparably depriving them of the chance to pursue their aspirations and chosen careers.  Attorney Decl. Ex. B, C.

In addition, a ban irreparably brands Plaintiffs as less capable and worthy solely because of their transgender status.  Military service has long been one of the hallmarks of equal citizenship and full participation in the civic life of this country.  *See Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997).  The Order "single[s] out [transgender] service members [and] denies them, without legitimate reason, the right openly to participate as equals in the defense of the nation and imposes 'practically a brand upon them, affixed by law, an assertion of their inferiority.'"  *Id.* (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).

Immediate relief is the only way to stop these irreparable harms.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS.

The balance of the equities and public interest both tip decisively in favor of a temporary restraining order.  "The balance of the equities weighs the harm to Plaintiffs absent a TRO against the harm to the agenc[ies] if the Court grants the motion."  *Chef Time*, 646 F. Supp. 3d at 116; *see Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  The

irreparable harm Plaintiffs face far outweighs the nonexistent harm to Defendants in maintaining

the status quo, and the public interest is best served by allowing Plaintiffs to continue honorably

serving until the motion for preliminary injunction can be adjudicated.

Defendants will not suffer any harm if this Court issues a temporary restraining order.  A

temporary restraining order would simply maintain the status quo that has been in place for years.

By contrast, allowing the ban to take effect cleaves devoted service members from the military,

depriving them of steady income, medical care, and the ability to care for their families, and blocks

others from starting their careers of service to their country.  The balance of equities thus tips

sharply in Plaintiffs' favor.  *See McVeigh*, 983 F. Supp. at 221 (finding that, while the Senior Chief

McVeigh would face a serious injury from discharge from the Marines, "there is no appreciable

harm to the Navy if Senior Chief McVeigh is permitted to remain in active service").

The public interest also weighs strongly in favor of temporary injunctive relief.  Allowing

the ban to take effect would degrade military readiness and unit cohesion and diminish military

capabilities through the loss of highly qualified recruits and skilled military personnel, depriving

our military and country of their valuable skills, experience, and expertise.  *See* ECF 13-1 at 29–

30.  This is especially so for the short duration of any temporary restraining order.  To allow

Defendants to implement the ban only then to have to rewind it would cause harmful disruption to

both Plaintiffs and Defendants.  An orderly consideration by the Court, while the status quo is

maintained is in the interest of all parties, and especially the public.  Accordingly, all factors weigh

distinctly in favor of issuing a temporary restraining order.

## CONCLUSION

For the foregoing reasons, this Court should issue a temporary restraining order preventing

enforcement of the Order.

- 10 -

DATED: February 4, 2025

Respectfully submitted,

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jlevi@glad.org
mbonauto@glad.org

Shannon P. Minter (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257
sminter@nclrights.org

*/s/ Joseph J. Wardenski*
Joseph J. Wardenski (D.C. Bar No. 995549)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311
joe@wardenskilaw.com

*Attorneys for Plaintiffs*