**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; The White House 1600 Pennsylvania Ave. NW, 1st Floor, West Wing Washington, D.C. 20500 | ) ) ) ) ) ) | |
| THE UNITED STATES OF AMERICA; via Department of Justice 950 Pennsylvania Ave. NW Washington, D.C. 20530 | ) ) ) ) ) | Civil Action No. 25-cv-240-ACR |
| PETER B. HEGSETH, in his official capacity as Secretary of Defense; 1000 Defense Pentagon, Room 3E880 Washington, D.C. 20301 | ) ) ) ) ) | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; 101 Army Pentagon Washington, D.C. 20310 | ) ) ) ) ) ) | |
| TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; 1000 Navy Pentagon Washington, D.C. 20350 | ) ) ) ) ) ) | |
| GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; 1670 Air Force Pentagon | ) ) ) ) | |

Washington, D.C. 20330                                    )
TELITA CROSLAND, in her official capacity as              )
Director of the Defense Health Agency; and the            )
DEFENSE HEALTH AGENCY                                     )
7700 Arlington Blvd., Suite 5101                          )
Falls Church, VA 22042                                    )
                                                          )
                        Defendants.                       )

_____

## INTRODUCTION

1.      This is a constitutional challenge to President Donald J. Trump's January 27, 2025 executive order banning transgender people from serving the military, and to provisions of Executive Order 14166 that bar transgender people from serving in the military on equal terms with other service members.  These orders reverse the current policy of the United States Armed Forces permitting transgender people who meet military standards to accede and serve.

2.      Plaintiffs, along with many other transgender service members, have been serving throughout the Armed Forces.  Some Plaintiffs have built their lives around their military service.  Others are just beginning their careers and hope for the opportunity to serve their country in the future.

3.      On January 27, 2025, the President signed an executive order directing the Secretary of Defense to reverse the current accession and retention standards for military service and to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  It confers no authority on the Secretary of Defense to depart from this directive.  As a consequence, no service members who are transgender may enlist or continue their military service.

4.      The January 27 executive order followed Executive Order 14166, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

Government," which President Trump signed on January 20, 2025.  Section 2(a) of Executive Order 14166 provides that all Executive application and interpretation of federal law will apply a definition of "sex" as referring to "an individual's immutable biological classification as either male or female" and providing that sex "does not include the concept of 'gender identity.'"  Section 3 of the January 27, 2025 executive order expressly incorporates the definitions from Executive Order 14166.

5.    Plaintiffs are six transgender service members who collectively have served this nation honorably and with distinction for decades in various branches of the United States military, and two prospective service members wishing to accede to the military.

6.    This ban on transgender people serving in the military violates the Equal Protection component of the Fifth Amendment.

7.    This lawsuit seeks declaratory, preliminary, and permanent injunctive relief against implementation of the President's directive to prohibit transgender individuals from enlisting or serving in the Armed Forces.

## JURISDICTION AND VENUE

8.    This court has jurisdiction over the claims under 28 U.S.C. § 1331, which confers jurisdiction on the district courts over civil actions arising under the Constitution, and 28 U.S.C. §1343, which confers jurisdiction on the district courts over civil actions to redress the deprivation of any right, privilege, or immunity secured by the Constitution.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the acts described in this Complaint occurred in this judicial district.

## PLAINTIFFS

10.     Plaintiffs are active-duty service members in the United States military who are transgender or transgender individuals who are actively pursuing enlistment in the United States military.

11.     Second Lieutenant Nicolas Talbott has served with distinction in the United States Army Reserves for almost a year.

12.     Lieutenant Talbott is a thirty-one-year-old transgender man currently assigned to a Reserve Unit in Pennsylvania.

13.     Lieutenant Talbott was nominated for and named Honor Graduate at basic combat training by his drill sergeants for going above and beyond in training and stepping up to leadership roles.

14.     In his current role as a Lieutenant, he has completed Officer Candidate School, has assumed his role as Platoon Leader in the Military Policing Unit, and is scheduled to begin further training for this role in August 2025.

15.     In or around March 2011, Lieutenant Talbott received a gender dysphoria diagnosis and began receiving transgender healthcare in 2012.

16.     Since beginning to receive transgender healthcare, Lieutenant Talbott has joined the military and completed Officer Candidate School.

17.     Were the prohibition on military service by transgender individuals to be implemented, Lieutenant Talbott would lose the career he has spent years of his life fighting to join, after finally earning his commission, and would be unable to continue to serve the United States people as a member of the military.  Additionally, Lieutenant Talbott would lose his income and access to benefits afforded to military members and their families.

18.     Major Erica Vandal has served with distinction in the United States Army for almost fourteen years.

19.     Major Vandal is a thirty-six-year-old transgender woman currently stationed in New York.

20.     During her military career, Major Vandal has been awarded a Bronze Star for heroic or meritorious achievements or service while engaged against an enemy of the United States, a Meritorious Service Medal, one Army Commendation Medal, and two Army Achievement Medals.

21.     In her current role as a Major, she is responsible for managing her brigade's seventy field artillery officers, warrant officers, non-commissioned officers, and soldiers as well as advising her commander on the employment of everything related to field artillery.

22.     In or around November 2021, Major Vandal received a gender dysphoria diagnosis and began receiving transgender healthcare in or around January 2022.  In or around January 2022, Major Vandal also began transitioning socially within the military and received positive reactions to her transition.

23.     Since beginning to receive transgender healthcare, Major Vandal was promoted to her current rank of major, was selected for prestigious schooling related to that promotion, and deployed to Romania for around five months.

24.     Were the prohibition on military service by transgender individuals to be implemented, Major Vandal would be unable to pursue her career through serving the United States people as a member of the military.  Major Vandal would lose access to benefits afforded to military members and their families for herself, her spouse, and her two children.  Major Vandal's G.I. Bill education benefits would be negatively impacted, as would her ability to transfer

her G.I. Bill education benefits to her children.  Major Vandal's family would lose the only source of income for her household.  Additionally, Major Vandal has served fourteen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

25.    Sergeant First Class Kate Cole has served with distinction in the United States Army for almost seventeen years.

26.    Sergeant Cole is a thirty-four-year-old transgender woman currently stationed in California.

27.    During her military career, she has been awarded five Army Commendation Medals for exhibiting consistent acts of heroism or meritorious service, seven Army Achievement Medals for outstanding achievement or meritorious service, and recently placed in the top ten percent of all Armor Branch Sergeants First Class in the Army's Order of Merit List.

28.    In her current role as a Senior Military Science Instructor, she is responsible for training undergraduate students enrolled in Reserve Officers' Training Corps program at the University of California, Los Angeles.

29.    In or around 2016, Sergeant Cole received a gender dysphoria diagnosis and began receiving transgender healthcare.

30.    Since beginning to receive transgender healthcare, Sergeant Cole has been deployed and promoted, and has received support from fellow service members.

31.    Were the prohibition on military service by transgender individuals to be implemented, Sergeant Cole would be unable to pursue her career and continue to serve the United States people as a member of the military.  Sergeant Cole would lose access to benefits afforded to military members and their families.  Additionally, Sergeant Cole has served for almost

seventeen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

32.    Captain Gordon Herrero has served with distinction in the United States Army for nine years.

33.    Captain Herrero is a thirty-four-year-old transgender man currently stationed in California.

34.    During his military career, he has been awarded a Meritorious Service Medal, a Joint Service Commendation Medal, an Army Achievement Medal, and an Army Commendation Medal with two oak leaf clusters.

35.    In his current role as an Operations Research Systems Analyst, he is completing his master of science degree in preparation to become an instructor at the United States Military Academy at West Point this year.

36.    In April 2021, Captain Herrero received a gender dysphoria diagnosis and began receiving transgender healthcare in October 2021.

37.    Since beginning to receive transgender healthcare, Captain Herrero has served as a detachment commander in The Republic of Korea and as a staff officer in the United Nations Command Headquarters, remained deployable, and received support from his fellow service members.

38.    Were the prohibition on military service by transgender individuals to be implemented, Captain Herrero would be unable to pursue his vocation and lifelong career and continue to serve the United States people as a member of the military.  Captain Herrero would also lose his income and access to benefits afforded to military members and their families. Additionally, Captain Herrero, having already served for nine years, is on a path towards the

military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

39.     Ensign ("ENS") Dany Danridge has served with distinction in the United States Navy for over twelve years.

40.     ENS Danridge is a thirty-year-old transgender man currently enrolled in Flight Training as a Student Naval Flight Officer in Florida.

41.     From 2012 to 2020, ENS Danridge served on active duty with the United States Navy.  In 2020, he was honorably discharged and served in the Navy Reserves while he obtained a bachelor's degree from Liberty University.  After completing his degree, he commissioned to active duty in February 2024.

42.     During his military career, ENS Danridge has been awarded two Navy and Marine Corps Achievement Medals, including one Sailor of the Year award and one award for his assistance in starting a new command; a combat medal for his participation in Operation Inherent Resolve; a Global War on Terrorism Service Medal; and a Global War on Terrorism Expeditionary Medal.

43.     In his current role as a Student Naval Flight Officer, ENS Danridge is enrolled in Flight Training at Training Squadron 10 ("VT-10") to become a Flight Officer.  In addition to performing other officer duties, he attends classes and flight lessons, and is currently ranked in the top ten percent of his training class.

44.     In or around 2017, ENS Danridge received a gender dysphoria diagnosis and began receiving transgender healthcare.

45.     Since beginning to receive transgender healthcare, ENS Danridge has deployed to Italy, where he assisted in starting the Transaction Service Center Naples, for which he was

awarded a Navy and Marine Corps Achievement Medal.  He has also completed multiple detachments, including to two carriers: the USS Theodore Roosevelt and the USS Dwight D. Eisenhower.

46.    While serving in the Navy Reserves, ENS Danridge received overwhelming support from his unit's commanding officer to apply for Officer Candidate School ("OCS").  It was with his commanding officer's support that he was selected for OCS.  He graduated OCS in February 2024.

47.    Were the prohibition on military service by transgender individuals to be implemented, ENS Danridge would be removed from OCS training and would be unable to pursue his vocation and career and continue to serve the United States people as a member of the military. ENS Danridge would also lose access to benefits afforded to military members and their families. Additionally, ENS Danridge has served for twelve years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

48.    Master Sergeant Jamie Hash has served with distinction in the active-duty United States Air Force for over thirteen years.

49.    Master Sergeant Hash is a thirty-seven-year-old transgender woman currently assigned to the Pentagon in Washington, D.C.

50.    During her military career, Master Sergeant Hash has received four Meritorious Service Medals, one Air Force Commendation Medal, and two Air Force Achievement Medals. She has been awarded numerous awards and honors, including Wing Non-Commissioned Officer ("NCO") of the Year, Field Operating Agency NCO of the Year, Military Volunteer of the Year, the NCO Academy John Levitow Award, AF Operations Directorate Senior Non-Commissioned

Officer ("SNCO") of the Year, USAF Operations Directorate Sijan SNCO Award, DAF Headquarters ("HQ") Management Engineering Award, DAF HQ Visionary Leadership Award, and SNCO Academy Distinguished Graduate. She was rated first out of forty-five candidates for selection for Senior Master Sergeant, and her promotion to Senior Master Sergeant (E-8) will be effective February 1, 2025.

51.     In her current role, Master Sergeant Hash is serving as a Defense Legislative Fellow for the United States Congress. This fellowship is highly competitive, and only selects a handful of enlisted Air Force applicants each year. In this role, Master Sergeant Hash serves on the personal staff of a Member of Congress as an advisor on matters related to national security, defense, foreign affairs, and veterans' affairs.

52.     In or around 2016, Master Sergeant Hash received a gender dysphoria diagnosis and began receiving transgender healthcare.

53.     Since beginning to receive transgender healthcare, Master Sergeant Hash has deployed to Germany, served for three years in the United Kingdom, worked in the Pentagon on Global Force Management at Headquarters Air Force, and was selected for the highly competitive Defense Legislative Fellowship.

54.     Were the prohibition on military service by transgender individuals to be implemented, Master Sergeant Hash would be unable to pursue her vocation and career and continue to serve the United States people as a member of the military. Master Sergeant Hash would also lose access to health and other benefits afforded to military members and their families. Additionally, Master Sergeant Hash has served for thirteen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

55.     Trainee Miriam Perelson is twenty-eight-year-old transgender woman who is undergoing U.S. Army basic training in South Carolina.

56.     Trainee Perelson has been preparing for a career in the military since mid-2022. She worked with a military recruiter to complete all necessary steps to enlist in the U.S. Army, completed all required medical and psychological assessments, and was deemed fit to serve.  She disclosed her transgender status to her recruiter.  She met all qualifications for enlistment, and in March 2024, she signed a six-year reserve contract with a two-with a two-year inactive ready reserve obligation.

57.     Trainee Perelson's contract is to serve in the Military Occupational Specialty (MOS) of 35M, Human Intelligence collector, a highly specialized position which requires training to high competency in a foreign language.  Trainee Perelson qualified for this contract due to her high degree of competency in the Russian language.   Trainee Perelson has completed all requirements for a Bachelor of Arts in Russian Language and is scheduled to graduate in May 2025.

58.     Trainee Perelson began basic training on January 13, 2025, with an expected graduation date of March 27, 2025.  She completed reception and began combat training on January 17, 2025.

59.     On the evening of January 31, 2025, a Senior Noncommissioned Officer (NCO) came to Trainee Perelson and told her that she could no longer continue basic training in female living bays or use female latrines.  The following day, February 1, 2025, her supervising officers presented her with a Developmental Counseling Form ("Form").  The Form indicates that its purpose is "to inform [her] of policy changes regarding [her] living accommodations."  Specifically, the Form states that, in order to implement "[t]he President's Executive Order entitled

Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government . . . and subsequent guidance from the Office of Personnel Management," as of 5:00 pm on January 31, 2025, she would be required to "reside in male living bays, utilize male latrines, and be partnered with a male battle buddy . . . ."

60.     The form required Trainee Perelson to initial one of two options: "Yes, I am willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy," or "No, I am not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy." The Form further stated that, if she was not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy, "the Command will initiate administrative separation from the U.S. Army under Chapter 11 of Army Regulation 635-200."

61.     For the evenings of January 31, February 1, and February 2, 2025, Trainee Perelson was required to leave the female bay where she had been housed until that point in basic training and was provided with a cot in an empty classroom to sleep on. Trainee Perelson was forbidden from using female latrines and bathing facilities during that time.

62.     On February 2 and 3, 2025, Trainee Perelson spoke with a Captain in her unit and informed him that she would not select either option or sign the Form. On Monday, February 3, 2025, the Captain told her that Command would immediately begin her separation from the U.S. Army.

63.     If the prohibition on military service by transgender individuals continues to be implemented and Trainee Perelson is separated from the Army, she will be unable to serve the people of the United States as a member of the military. She will be unable to pursue a vocation and career for which she has already completed all necessary requirements and demonstrated her qualifications, and for which she has signed a contract and begun her training.

-12-

64.    Koda Nature is a twenty-three-year-old transgender man who currently resides in Texas.

65.    Mr. Nature comes from a family with a legacy of military service stretching back generations.

66.    Mr. Nature has been working with recruiters from the military to initiate the process of enlistment.

67.    Mr. Nature began transitioning and living his life as a man when he was sixteen years old.

68.    Mr. Nature is committed to serving in the military. Were the prohibition on military service by transgender individuals to be implemented, Mr. Nature would be unable to enlist in the Marines and continue his family's tradition of dedicated military service.

69.    Cael Neary is a transgender man who wants to serve his country through military service and has taken concrete steps to do so.

70.    Mr. Neary is thirty years old and currently resides in Wisconsin.

71.    Mr. Neary has wanted to join the military since he was a teenager. He was inspired as a teenager by stories of family members who served during World War II. In his adulthood, his desire to meaningfully serve his country persists.

72.    Mr. Neary delayed enlisting in the military previously due to the ban on military service by transgender individuals during the first Trump Administration.

73.    Mr. Neary began speaking with a military recruiter in June 2024. He attended an appointment with MEPS in September 2024 and has begun working with his recruiter on completing the paperwork to enlist.

74.    Were the prohibition on military service by transgender individuals to be implemented, Mr. Neary would be unable to enlist in the military, and would be permanently deprived of his opportunity to serve his country, despite his longstanding desire to do so.

## **DEFENDANTS**

75.    Defendant Donald J. Trump is President of the United States and Commander in Chief of the Armed Forces.  On January 27, 2025, President Trump signed an executive order excluding transgender service members from the military.

76.    Defendant United States of America includes all federal government agencies and departments responsible for the implementation of the President's decision.

77.    Defendant Peter B. Hegseth is the United States Secretary of Defense.  He is the leader of the Department of Defense.

78.    Defendant Mark Averill is the Acting United States Secretary of the Army.  He is the leader of the Department of the Army.

79.    Defendant Department of the Army is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Army.

80.    Defendant Terence Emmert is the Acting United States Secretary of the Navy.  He is the leader of the Department of the Navy.

81.    Defendant Department of the Navy is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Navy and the United States Marine Corps.

82.    Defendant Gary Ashworth is the Acting United States Secretary of the Air Force. He is the leader of the Department of the Air Force.

-14-

83.    Defendant Department of the Air Force is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Air Force and the United States Space Force.

84.    Defendant Telita Crosland is a Lieutenant General and serves as Director of the Defense Health Agency.

85.    Defendant Defense Health Agency is a Combat Support Agency that administers health care services for the U.S. Army, U.S. Navy, and U.S. Air Force.  The Defense Health Agency exercises management responsibility for the TRICARE Health Plan, which is the health care program for all uniformed service members of the U.S. Army, U.S. Navy, U.S. Air Force, U.S. Coast Guard, and certain other commissioned corps.

86.    All of the individual Defendants are sued only in their official capacities.

## **TRANSGENDER PEOPLE**

87.    A transgender person is a person who lives, or would live if able, in a sex different from their birth sex.

88.    Gender dysphoria is a treatable medical condition experienced by a transgender person who is unable to live, or prohibited from living, in a sex different than their birth sex.

89.    Being transgender has no relevance to a person's character, integrity, honesty, capabilities, or fitness to serve in the military.

90.    Being transgender is an immutable characteristic; it is not subject to voluntary control and cannot be changed through any medical or mental health intervention.

## STATEMENT OF FACTS

**Background on 2016 Policy Permitting Service by Transgender Service Members**

91.    In May 2014, then-Secretary of Defense Chuck Hagel, a decorated U.S. Army combat veteran, recommended that the military conduct a review of whether transgender people should be permitted to serve in the Armed Forces.

92.    In August 2014, the Department of Defense issued a new regulation that eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess whether maintaining a service-wide ban on service by transgender persons was justified.  *See* Department of Defense Instruction 1332.18.

93.    Secretary Hagel explained that "[e]very qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

94.    Secretary Hagel was succeeded as Secretary of Defense by Ashton B. Carter, who had previously served many years within the Department, including as Deputy Secretary of Defense, Under Secretary of Defense for Acquisition, Technology and Logistics, Assistant Secretary of Defense for International Security Policy, and as a member of the Defense Policy Board and the Defense Science Board.  In July 2015, Secretary Carter announced that the military would begin a comprehensive analysis of whether to maintain the prohibition on military service by transgender people.

95.    In an order establishing a working group to carry out this analysis, made effective as of July 13, 2015, Secretary Carter directed that no servicemember could be involuntarily separated or denied reenlistment or continuation of active or reserve status on the basis of his or her transgender status without the approval of the Under Secretary of Defense for Personnel and Readiness.

-16-

96.    Over the course of a year, Secretary Carter oversaw a comprehensive review of this issue by a working group of the military and civilian leadership of the Armed Services, the Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense.  The working group was chaired by Under Secretary of Defense for Personnel and Readiness Brad Carson.

97.    That year-long process examined copious data on the relevant issues, including but not limited to existing studies and research and input from transgender service members and their commanders, outside expert groups, and medical professionals.

98.    The process also included a careful review of the eighteen other countries that permit military service by transgender people.

99.    The process also included consultation with doctors, employers, and insurance companies regarding the provision of medical care to transgender people.

100.    The Department of Defense also commissioned the RAND Corporation, an organization formed after World War II to connect military planning with research and development decisions, and which now operates as an independent think tank financed by the U.S. government, to analyze relevant data and studies to determine the impact of permitting transgender service members to serve.  Specifically, the RAND Corporation was tasked with (1) identifying the health care needs of the transgender population and the health care costs associated with providing transition-related care; (2) assessing the readiness implications of allowing transgender service members to serve; and (3) reviewing the experiences of foreign militaries that permit transgender individuals to serve.

101.    The study, titled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Study") and issued in May 2016, concluded that allowing transgender people to serve would "cost little and have no significant impact on unit readiness."

102.    The RAND Study noted that the Military Health System already provides the types of health care required by transgender service members to other service members and concluded that health care costs for transgender service members would represent "an exceedingly small proportion of [the Department of Defense's] overall health care expenditures."  The RAND Study also concluded that this minimal incremental cost would likely be offset by savings through diminished rates of other health care costs that would be achieved by providing service members with necessary transition-related medical care.

103.    With respect to the experiences of foreign militaries that permit transgender individuals to serve, the RAND Study noted that the most extensive research on the effects of transgender service have been conducted in Canada, which has permitted transgender individuals to serve since 1998.  Researchers have "found no evidence of any effect on operational effectiveness or readiness.  In fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges . . . . They also found no evidence of any effect on unit or overall cohesion."  This is consistent with research conducted in the United Kingdom, Australia, and Israel, which all permit service by transgender individuals, that found "no significant effect on cohesion, operational effectiveness, or readiness."

104.    Based on the results of this comprehensive, year-long review process and on the RAND Study, the Department of Defense concluded that the needs of the military would be best met by permitting transgender people to serve on equal terms with others.

105.    As laid out by Secretary Carter in remarks delivered on June 30, 2016, that conclusion was based on a number of considerations, including: the need to "recruit[] and retain[] the soldier, sailor, airman, or Marine who can best accomplish the mission" of our nation's Armed Forces; the fact that thousands of "talented and trained" transgender people are already serving and that the military has already invested "hundreds of thousands of dollars to train and develop each" transgender servicemember; the benefits to the military of retaining individuals who are already trained and who have already proven themselves; the need to provide both transgender service members and their commanders with "clear[] and consistent guidance" on questions such as deployment and medical treatment; and the principle that "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so."

106.    On June 30, 2016, Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly.  They can no longer be discharged or otherwise separated from the military just for being transgender."

107.    Also on June 30, 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members."  The memorandum states: "The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness.  Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.  These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity."

-19-

108.    The year-long review process by the Department of Defense also concluded that transgender people should be permitted to accede to the military so long as they had completed all medical treatment associated with their transitions and had been stable in their gender for eighteen months.  The accession policy was scheduled to take effect on July 1, 2017 to allow the branches of the Armed Forces additional time to develop necessary standards and policies.

109.    In September 2016, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military" setting forth guidance and instructions to both military service members and commanders about how to implement and understand the new policies enabling service of transgender service members.

110.    Within 90 days of the lifting of the ban, on October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members."  The instruction set forth further guidance to ensure service by transgender service members, including details regarding revisions to medical treatment provisions.  This instruction was further implemented by a memorandum issued by the Acting Assistant Secretary of Defense for Health Affairs entitled "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members."

111.    Also within 90 days of the lifting of the ban, the Department of Defense issued medical guidance for providing transition-related care to transgender service members.  As a result, transgender service members were able to begin the process of officially changing their gender marker in the military's personnel management system.

112.    Over the next nine months, between October 2016 and June 2017, the services conducted training of the force based on detailed guidance and training materials regarding the policy change.

-20-

113.    On November 29, 2016, the Department of Defense revised "DoD Directive 1020.02E—Diversity Management and Equal Opportunity in the DoD" to prohibit discrimination and harassment on the basis of gender identity.

114.    In 2016, the United States Coast Guard adopted policies and procedures for service by transgender service members that are substantially the same as the Department of Defense policies described above.

115.    On June 30, 2017, the day before the policy permitting transgender people to accede to the military was to take effect, Secretary Mattis extended the period for the development of relevant standards by six months.

**First Trump Administration's Ban on Transgender Service Members**

116.    Early in the morning of July 26, 2017, without any prior indication that he would address military transgender policy, President Trump announced in a series of tweets that the military would no longer permit the service of transgender Americans.

117.    His tweets read: "After consultation with my generals and military experts, please be advised that the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."

118.    Shortly following the announcement, the new policy met with substantial criticism from members of Congress belonging to both political parties.  These critics included Senator John McCain, Chairman of the Senate Armed Services Committee, who said in a statement that "there is no reason to force servicemembers who are able to fight, train, and deploy to leave the military—

regardless of their gender identity." Senator Joni Ernst, another Republican member of the Senate

Armed Services Committee, also publicly expressed opposition to the new policy.

119.    Shortly after the announcement, fifty-six former generals and admirals issued a

public statement denouncing the new policy:

> The Commander in Chief has tweeted a total ban of honorably serving transgender troops. This proposed ban, if implemented, would cause significant disruptions, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades or disobeying policy. As a result, the proposed ban would degrade readiness even more than the failed 'don't ask, don't tell' policy. Patriotic transgender Americans who are serving—and who want to serve—must not be dismissed, deprived of medically necessary health care, or forced to compromise their integrity or hide their identity. President Trump seeks to ban transgender service members because of the financial cost and disruption associated with transgender military service. We respectfully disagree, and consider these claims to be without merit. The RAND Corporation, as well as research in the *New England Journal of Medicine*, found that the financial cost of providing health care to transgender troops would be, at most, $8.4 million per year. This amounts to one one-hundredth of one percent of the military's annual health care budget. As for ostensible disruptions, transgender troops have been serving honorably and openly for the past year, and have been widely praised by commanders. Eighteen foreign nations, including the UK and Israel, allow transgender troops to serve, and none has reported any detriment to readiness.

120.    Admiral Mike Mullen, former Chairman of the Joint Chiefs of Staff, likewise issued

a public statement denouncing the policy: "I led our armed forces under the flawed 'don't ask,

don't tell' policy and saw firsthand the harm to readiness and morale when we fail to treat all

service members according to the same standards. Thousands of transgender Americans are

currently serving in uniform and there is no reason to single out these brave men and women and

deny them the medical care that they require."

121.    Despite the widespread denouncement of the new policy, the President signed a formal directive to the Secretary of Defense and the Secretary of Homeland Security on August 25, 2017.  The directive ordered that the military return to its pre-June 2016 policy forbidding transgender people from joining or serving in the military.

122.    Shortly after the President's formal directive, the Department of Defense announced that transgender service members could continue to serve while the Department of Defense developed an implementation plan.

123.    On March 23, 2018, the White House released a report, endorsed by Secretary of Defense James N. Mattis, purporting to provide support for the President's policy (the "Mattis Report").

124.    The American Psychological Association promptly responded to the Mattis Report, stating that it was "alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."

125.    The American Medical Association also responded, stating that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service" and stating that the Mattis Report "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care."

126.    The Mattis Report was also followed by an extensive report issued by a panel of retired military Surgeons General and scholars from the Palm Center (the "Palm Center Report") refuting the rationale for reinstating the ban on transgender military service.  The expert panel noted that the Mattis Report made "a series of erroneous assertions and mischaracterizations about

the scientific research on the mental health and fitness of individuals with gender dysphoria . . . .

Scholarly research and DoD's own data confirm that transgender personnel . . . are deployable and

medically fit." The panel further explained that "[t]he [Mattis Report] offers no evidence that

inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety . . . .

[T]he military's top Admirals and Generals have explicitly stated that, while the impact on

cohesion is being 'monitored very closely,' they have received 'precisely zero reports of issues of

cohesion, discipline, morale,' and related concerns after two years of inclusive service."

127.    Congressional testimony by the Chiefs of the Army, Navy, and Air Force, as well

as the Commandant of the Marine Corps and the incoming Commandant of the Coast Guard,

further confirmed that a non-discriminatory service policy did not compromise unit cohesion.

Army Chief of Staff General Mark Milley testified, "I have received precisely zero reports of

issues of cohesion, discipline, morale and all those sorts of things." The incoming Coast Guard

Commandant Vice Admiral Karl Schulz similarly testified, "I am not aware of any disciplinary or

unit cohesion issues resulting from the opening of the Coast Guard to transgender individuals."

Navy Chief of Staff Admiral John Richardson testified that he was "not aware of any issues" of

"unit cohesion, disciplinary problems, or issues with morale resulting from open transgender

service." The other service chiefs offered consistent testimony that they were not aware of any

issues resulting from service by transgender individuals.

128.    The Mattis Report outlined a formal policy allowing service members who had

already medically transitioned to continue serving, but barring medical and social transition going

forward and banning accession by transgender individuals. However, the policy did not go into

effect until April 12, 2019, after injunctions blocking the ban were lifted. In the intervening period,

transgender service members continued to serve, in many cases with distinction.

**Background on 2021 Non-Discriminatory Policy**

129.    On January 25, 2021, President Joseph R. Biden issued an executive order overturning the prior ban and directing the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."  The executive order relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

130.    In March 2021, the Office of the Undersecretary of Defense for Personnel and Readiness memorialized guidance regarding accession in "DoD Instruction 6130.03—Medical Standards for Appointment, Enlistment, or Induction into the Military Services."  This instruction sets forth guidance on the circumstances under which transgender individuals may enlist in the military.  In addition to meeting generally applicable accession standards, transgender individuals with a history of gender dysphoria seeking to enlist must have been stable in their gender identity for 18 months prior to enlistment.

131.    On April 30, 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." The instruction set forth guidance to ensure service by transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

132.    The Military Departments and Services promptly issued policies implementing DoD Instruction 1300.28. Each policy subjects transgender service members to the same high standards as their peers.

133.    On October 1, 2021, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military." The 72-page document set forth guidance and instructions to both military service members and commanders about how to implement and understand the policies enabling service by transgender service members.

134.    Under the policy of non-discrimination, transgender service members have served honorably and, in many cases, with distinction, with support from their peers and commanding officers. Permitting transgender service members who are otherwise qualified to serve has not resulted in any detrimental impacts to military readiness.

**The Ban on Transgender Service Members**

135.    President Trump made animosity towards transgender individuals a cornerstone of his campaign for a second term. In February 2023, President Trump released a three-and-a-half minute video in which he promised to "sign a new Executive Order instructing every federal

agency to cease all programs that promote the concept of sex and gender transition at any age."

He followed this pronouncement in April 2023 with a statement that "[upon his] inauguration, [he]

will direct the FDA to convene . . . an independent outside panel to investigate whether transgender

hormone treatments and ideology increase the risk of extreme depression, aggression and even

violence. I think most of us already know the answer . . ."

136.    In August 2023, President Trump indicated at a campaign rally that "I will ban the

Department of Veterans Affairs from wasting a single cent to fund transgender surgeries or sex

change procedures. Those precious taxpayer dollars should be going to care for our veterans in

need, not to refund radical gender experiments for the communist Left." He further elaborated,

"I'll also restore the Trump ban on transgender [sic] in the military."

137.    President Trump's campaign platform further listed "Republicans Will End Left-

wing Gender Insanity" as a pillar and announced plans, among other things, to "ban Taxpayer

funding for sex change surgeries."

138.    In the final weeks before the 2024 presidential election, President Trump's

campaign also released a campaign video juxtaposing clips from "Full Metal Jacket" (captioned

"THEN") with clips of LGBTQ+ service members, drag performers, and Assistant Secretary for

Health Rachel Levine (captioned "NOW" and "THE BIDEN HARRIS MILITARY").

139.    On December 22, 2024, President Trump announced, "[w]ith the stroke of my pen

on day one, we are going to stop the transgender lunacy. And I will sign Executive Orders to . . .

get transgender [sic] out of the military . . . . And that will likewise be done on day one . . . under

the Trump administration it will be the official policy of the United States government that there

are only two genders, male and female . . ."

140.    It is highly unusual for the military to abruptly change its personnel policies to categorically exclude a class of persons from service with no inquiry into their ability to serve under a non-discriminatory policy that has been in effect for years.

141.    On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021 executive order that established the non-discriminatory policy, and directed "the heads of each agency [to] take immediate steps to end Federal implementation of unlawful and radical DEI ideology."

142.    Also on January 20, 2025, President Trump signed Executive Order 14166, which requires all application and interpretation of federal law by the Executive Branch to apply a definition of "sex" as referring to "an individual's immutable biological classification as either male or female" and providing that sex "does not include the concept of 'gender identity.'" Executive Order 14166 defines "gender ideology" as based on a "false claim that males can identify as and thus become women and vice versa." The order further defines "gender identity" as reflecting "a fully internal and subjective sense of self . . . that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

143.    On January 27, 2025, President Trump issued Executive Order 14183 (the "Order") revoking "all policies, directives, and guidance issued pursuant to" the order that established the non-discriminatory policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.

144.    The Order states that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "use of pronouns that inaccurately reflect an individual's sex" are inconsistent with "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

145.    The Order states that having a "'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." It further states that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." The executive order invokes no study of the effectiveness of transgender service members over the past four years, of their ability to serve, or of their integrity and selflessness in volunteering to serve their country, and the directive's stated rationale is refuted by substantial research and testimony, as well as by years of capable and honorable service by transgender service members without issue. Section 3 of the Order expressly incorporates the definitions from Executive Order 14166, including its definitions of "sex," "gender identity," "gender ideology."

146.    The Order directs the Secretary of Defense to "update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order" within 60 days.

147.    The Order has immediate effects, ordering that "the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males."

148.    The Order bans transgender people from military service, stating that transgender status is incompatible with military service and directing the Secretary of Defense to update the standards for retention and accession to reflect this policy.

## COUNT I

### (Fifth Amendment – Equal Protection)

149.    All previous paragraphs are incorporated as though fully set forth herein.

150.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

151.    President Trump's ban on transgender people serving in the military discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

152.    President Trump's ban on transgender people serving in the military was issued without any study of the effectiveness of transgender service members during the past four years or of any problems that may have arisen from their service, without any assessment of whether their service entailed greater costs, or without any assessment of whether any legitimate governmental concerns could be addressed by means other than a categorical ban.

153.    Rather than being based on any legitimate governmental purpose, the ban reflects animosity toward transgender people because of their transgender status.

154.    The categorical exclusion of transgender people from military service lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

155.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

Plaintiffs ask the Court to grant the following relief:

156.    Issue a declaratory judgment that the President's categorical exclusion of transgender people from military service is unconstitutional;

157.    Issue a preliminary and permanent injunction prohibiting the categorical exclusion of transgender people from military service;

158.    Issue a preliminary and permanent injunction prohibiting the categorical exclusion of the named plaintiffs from military service on the basis of their transgender status, including ordering that:

    a.    Plaintiffs Major Erica Vandal, Sergeant Kate Cole, Lieutenant Nicolas Talbott, Captain Gordon Herrero, Sergeant Jamie Hash, Ensign Dan Danridge, and Trainee Miriam Perelson may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender;

    b.    Plaintiffs Cael Neary and Koda Nature may not be denied the opportunity to accede to military service, or be denied promotion, reenlistment, or any other equal terms of service on the basis that they are transgender.

159.    Award Plaintiffs their reasonable costs and attorneys' fees;

160.    Issue any other relief the Court deems appropriate.

DATED: February 4, 2025                    Respectfully submitted,

                                           /s/ Joseph J. Wardenski
Jennifer Levi (*pro hac vice*)             Joseph J. Wardenski (D.C. Bar No. 995549)
Mary L. Bonauto (*pro hac vice*)           WARDENSKI P.C.
GLBTQ LEGAL ADVOCATES & DEFENDERS          134 West 29th Street, Suite 709
18 Tremont Street, Suite 950               New York, NY 10001
Boston, MA 02108                           Telephone: (347) 913-3311
Telephone: (617) 426-1350                  joe@wardenskilaw.com
jlevi@glad.org
mbonauto@glad.org

Shannon P. Minter (*pro hac vice* forthcoming)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257
sminter@nclrights.org

                                           *Attorneys for Plaintiffs*