**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT, *et.al.*

      *Plaintiff*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

      *Defendants*.

No. 1:25-cv-240 (ACR)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    DoD Policy Prior to 2015. ......................................................................... 4

    B.    The 2016 Carter Policy. ............................................................................ 5

    C.    The 2018 Policy. ........................................................................................ 6

    D.    President Biden's Policy. .......................................................................... 7

    E.    President Trump's Executive Orders. ..................................................... 8

    F.    Prior Litigation in the First Trump Administration. ....................... 10

    G.    The Instant Action. ................................................................................ 10

LEGAL STANDARDS............................................................................................11

ARGUMENT ...........................................................................................................11

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS. .........................................11

    A.    Plaintiffs' Claims Are Unlikely to Overcome Threshold Hurdles. .................11

          1.    Plaintiffs' claims are not ripe. ................................................. 11

          2.    Plaintiffs Cannot Satisfy the Administrative Procedure Act's "Final Agency Action" Requirement. ............................. 14

          3.    Plaintiffs have not exhausted their administrative remedies. .................................................................................. 15

    B.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim. ........... 16

          1.    The military's judgment is entitled to significant deference. ................................................................................ 16

          2.    Classification based on transgender status is not sex discrimination.......................................................................... 18

          3.    Transgender individuals do not constitute a quasi-suspect class. ............................................................................ 20

          4.    The *Military* EO withstands constitutional scrutiny. ............... 22

          5.    Alleged animus is not a reason to grant Plaintiff's motion......................................................................................... 26

i

        **6.**    **Other potential line-drawings likely would withstand scrutiny.** ................................................................. 28

    **C.**    **Plaintiffs Are Unlikely to Succeed In Any Challenge to Sex-Based Distinctions in the Military.** ................................................ 31

**II.**    PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUFFER AN IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. ......................................... 33

**III.**    THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION. ................................................................. 35

**IV.**    ANY PRELIMINARY INJUNCTION AGAINST THE MILITARY MUST BE NARROWLY TAILORED. ................................................................. 36

    **A.**    **Any Preliminary Injunction Should Apply to the Named Plaintiffs Only.** ................................................................. 36

    **B.**    **Any Preliminary Injunction Cannot Impede the Military's Discretion To Make Assignment, Deployment, And Operational Decisions.** ................. 39

    **C.**    **Relief Against the President is Improper.** ............................................. 40

**CONCLUSION** ................................................................. 40

## TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner,*
    *387 U.S.* 136, (1967) ............................................................... 12

*Abdullah v. Obama,*
    753 F.3d 193 (D.C. Cir. 2014) ............................................... 11

*Allen v. Wright,*
    468 U.S. 737 (1984) ............................................................... 35

*Am. Petroleum Inst. v. Envt'l Prot. Agency,*
    683 F.3d 382 (D.C. Cir. 2012) ......................................... 12, 14

*Am. Trucking Ass'n, Inc. v. Interstate Comm.,*
    *Comm'n,* 747 F.2d 787 (D.C. Cir. 1984) .............................. 13

*Antonellis v. United States,*
    723 F.3d 1328 (Fed. Cir. 2013) ............................................ 40

*Ass'n of Flight Attendants-CWA v. Chao,*
    493 F.3d 155 (D.C. Cir. 2007) ............................................. 15

*Austin v. U.S. Navy SEALs 1–26,*
    142 S. Ct. 1301 (2022) .......................................................... 40

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................... 15

*Board of Trs. of the Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) ............................................................... 22

*Bois v. Marsh,*
    801 F.2d 462 (D.C. Cir. 1986) ............................................. 16

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ......................................................... 19, 20

*Bowen v. City of New York,*
    476 U.S. 467 (1986) ............................................................... 15

*Bowen v. Gilliard,*
    483 U.S. 587 (1987) ............................................................... 21

*Cargill v. Marsh,*
    902 F.2d 1006 (D.C. Cir. 1990) ................................... 16, 17, 40

*Center for Democracy & Tech. v. Trump,*
  507 F. Supp. 3d 213 (D.D.C. 2020) ...................................................................... 13

*Chamber of Com. v. Reich,*
  57 F.3d 1099 (D.C. Cir. 1995) ............................................................................. 13

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................. 34

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................................ 14, 16, 34

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ......................................................................................... 21, 22

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................. 12

*Cortright v. Resor,*
  447 F.2d 245 (2d Cir. 1971) ................................................................................. 40

*Craig v. Boren,*
  429 U.S. 190 (1976) ......................................................................................... 19, 21

*Dandridge v. Williams,*
  397 U.S. 471 (1970) ............................................................................................. 26

*Dep't of Homeland Sec. v. New York,*
  140 S. Ct. 599 (2020) ................................................................................. 37, 38, 39

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ............................................................................................. 27

*Doe 1 v. Trump,*
  275 F. Supp. 3d 167 (D.D.C. 2017) ...................................................................... 10

*Doe 2 v. Mattis,*
  344 F. Supp. 3d 16 (D.D.C. 2018) ........................................................................ 39

*Doe 2 v. Shanahan,*
  917 F.3d 694 (D.C. Cir. 2019) ..................................................................... *passim*

*Doe 2 v. Shanahan,*
  755 Fed. App'x 19 (D.C. Cir. 2019) ........................................................................ 3

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) ...................................................................... 40

*Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker II*"),
    114 F.4th 1241 (11th Cir. 2024) ........................................................................ 22

*Farris v. Rice*,
    453 F. Supp. 2d 76 (D.D.C. 2006) .................................................................... 34

*FCC v. Beach Communications, Inc.*,
    508 U.S. 307 (1993) .......................................................................................... 23

*Fitzgerald v. Racking Ass'n of Central Iowa*,
    539 U.S. 130 (2003) .......................................................................................... 26

*Florida v. Dep't of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ........................................................................ 37

*Fowler v. Stitt*,
    104 F.4th 770 (10th Cir. 2024) ........................................................................ 21

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................... 15, 40

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .......................................................................................... 20

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) .......................................................................................... 23

*Gill v. Whitford*,
    585 U.S. 48 (2018) ............................................................................................ 37

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) .................................................................................. 15, 17, 36

*Goldman v. Sec'y of Def.*,
    734 F.2d 1531 (D.C. Cir. 1984) ........................................................................ 31

*Goldman v. Weinberger*,
    475 U.S. 503 (1986) ................................................................................ 17, 18, 36

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971) .......................................................................................... 20

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) .......................................................................................... 37

*Harkness v. Sec'y of Navy*,
    858 F.3d 437 (6th Cir. 2017) ............................................................................ 39

*Hayes v. Sec'y of Def.*,
  515 F.2d 668 (D.C. Cir. 1975) ........................................................................ 16

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ...................................................................... 21

*Heidman v. United States*,
  414 F. Supp. 47 (N.D. Ohio 1976) ................................................................. 15

*Heller v. Doe*,
  509 U.S. 312 (1993) ................................................................................ 23, 26

*In re Dep't of Commerce*,
  586 U.S. 956 (2018) ........................................................................................ 27

*Int'l Refugee Assistance Project v. Trump*,
  883 F.3d 233 (4th Cir. 2018) .......................................................................... 28

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) ........................................................................ 21

*Karnoski v. Trump*,
  No. C17-1297 (MJP), 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) .................. 10

*Knehans v. Alexander*,
  566 F.2d 312 (D.C. Cir. 1977) ........................................................................ 35

*Lewis v. Casey*,
  518 U.S. 343 (1996) ........................................................................................ 37

*Lying v. Castillo*,
  477 U.S. 635 (1986) ........................................................................................ 21

*Mass. Bd. of Ret. v. Murgia*,
  427 U.S. 307 (1976) ........................................................................................ 21

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................ 11

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ........................................................................................ 16

*McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*,
  545 U.S. 844 (2005) ........................................................................................ 28

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ........................................................................................ 19

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ........................................................................................ 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... *passim*

*Munaf v. Green,*
    553 U.S. 674 (2008) ..................................................................................... 38

*N.Y. City Transit Auth. v. Beazer,*
    440 U.S. 568 (1979) ..................................................................................... 19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ..................................................................................... 11

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ................................................................... 40

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................ 11, 36

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ..................................................................................... 21

*Orloff v. Willoughby,*
    345 U.S. 83 (1953) .................................................................................. 17, 39

*Parisi v. Davidson,*
    405 U.S. 34 (1972) ......................................................................... 15, 24, 25

*Parker v. Levy,*
    417 U.S. 733 (1974) ..................................................................................... 15

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ....................................................................... 20

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................................................................ 29, 30

*Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.,*
    740 F.2d 21 (1984) .................................................................................. 14, 25

*Randolph-Sheppard Vendors of Am. v. Weinberger,*
    795 F.2d 90 (D.C. Cir. 1986) ....................................................................... 16

*Reinhard v. Johnson,*
    209 F. Supp. 3d 207 (D.D.C. 2016) ............................................................. 35

*Rostker v. Goldberg,
  453 U.S. 57 (1981) ........................................................................ 17, 18, 26, 31

San Antonio Indep. Sch. Dist. v. Rodriguez,
  411 U.S. 1 (1973) .................................................................................. 21, 22

Schlanger v. United States,
  586 F.2d 667 (9th Cir. 1978) ....................................................................... 40

Schlesinger v. Ballard,
  419 U.S. 498 (1975) ............................................................................... 17, 18

Schlesinger v. Councilman,
  420 U.S. 738 (1975) ..................................................................................... 15

Sebra v. Neville,
  801 F.2d 1135 (9th Cir. 1986) ...................................................................... 40

Sessions v. Morales-Santana,
  582 U.S. 47 (2017) ....................................................................................... 19

Shaw v. Austin,
  539 F. Supp. 3d 169 (D.D.C. 2021) ............................................................. 34

Spadone v. McHugh,
  842 F. Supp. 2d 295 (D.D.C. 2012) ............................................................. 35

Steffan v. Perry,
  41 F.3d 677 (D.C. Cir. 1994) .................................................................. 26, 31

Stockman v. Trump,
  No. EDCV 17-1799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ............ 10

Stone v. Trump,
  280 F. Supp. 3d 747 (D. Md. 2017) ............................................................. 10

Stone v. Trump,
  400 F. Supp. 3d 317 (D. Md. 2019) ............................................................. 10

Town of Chester, N.Y. v. Laroe Ests., Inc.,
  581 U.S. 433 (2017) ..................................................................................... 37

Trudeau v. Fed. Trade Comm'n,
  456 F.3d 178 (D.C. Cir. 2006) ..................................................................... 14

*Trump v. Hawaii,
  585 U.S. 667 (2018) ................................................................. 3, 27, 28, 38

*U.S. R.R. Ret. Bd. v. Fritz*,
   449 U.S. 166 (1980) ...................................................................................... 27

*United States v. Navy Seals 1-26 v. Biden*,
   578 F. Supp. 3d 822 (N.D. Tex. 2022) ........................................................ 40

*United States v. Skrmetti*,
   144 S. Ct. 2679 (June 24, 2024) .................................................................. 20

*\*United States v. Virginia*,
   518 U.S. 515 (1996) ............................................................................. *passim*

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
   259 F.2d 921 (D.C. Cir. 1958) .................................................................... 34

*Vacco v. Quill*,
   521 U.S. 793 (1997) .................................................................................... 19

*Vance v. Bradley*,
   440 U.S. 93 (1979) ...................................................................................... 26

*Vance v. Wormuth*,
   No. 3:21-CV-730-CRS, 2022 U.S. LEXIS 67345 (W.D. Ky. Apr. 12, 2022) ......................... 13

*Veitch v. Danzig*,
   135 F.Supp.2d 32 (D.D.C. 2001) ............................................................ 35, 39

*Washington v. Davis*,
   426 U.S. 229 (1976) .................................................................................... 20

*Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*,
   451 U.S. 648 (1981) .................................................................................... 27

*Whitaker v. Kenosha Unified Sch. Dist.*,
   858 F.3d 1034 (7th Cir. 2017) ............................................................... 20, 21

*Williams v. Skrmetti*,
   83 F.4th 460 ..................................................................................... 20, 21, 22

*Wilson v. Walker*,
   777 F.2d 427 (8th Cir. 1985) ...................................................................... 40

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................. 11, 17

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
   93 F.3d 910 (D.C. Cir. 1996) ...................................................................... 29

**STATUTES**

5 U.S.C. § 704 .................................................................................................. 14

5 U.S.C. § 706 .................................................................................................. 14

10 U.S.C. § 1552 .............................................................................................. 16

10 U.S.C. § 7419 .......................................................................................... 5, 33

10 U.S.C. § 7420 ................................................................................................ 5

10 U.S.C. § 8431 ................................................................................................ 5

10 U.S.C. § 8432 ................................................................................................ 5

10 U.S.C. § 9419 ................................................................................................ 5

10 U.S.C. § 9420 ................................................................................................ 5

42 U.S.C. § 2000e-2(a)(1) ............................................................................... 20

**ADMINISTRATIVE MATERIALS**

Executive Order 14004,
    86 Fed. Reg. 7471 (Jan. 28, 2021) .................................................... 7, 8, 28

Executive Order 14168,
    90 Fed. Reg. 8615 (Jan. 20, 2025) .............................................................. 9

Executive Order 14183
    90 Fed. Reg. 8757 (Feb. 3, 2025) ...................................................... 1, 8, 9

**RULES**

Federal Rule of Civil Procedure 23 ................................................................ 38

**OTHER AUTHORITIES**

Elena Kagan, *Presidential Administration*,
    114 Harv. L. Rev. 2245 (2001) ................................................................. 28

Samuel L. Bray, *Multiple Chancellors:  Reforming the National Injunction*,
    131 Harv. L. Rev. 417 (2017) .................................................................... 37

## INTRODUCTION

Shortly after taking office, President Donald Trump, as the new Commander in Chief, issued Executive Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Feb. 3, 2025) ("*Military* EO"). The *Military* EO announces the policy that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are incompatible with the high standards demanded for military service. *Id.* § 2 ("Policy"). It further states a policy against the use of pronouns that inaccurately reflect an individual's sex, consistent with a separate executive order specifying that "sex" refers to an individual's immutable biological classification as either male or female. The *Military* EO itself does not require the discharge of service members but gives the Secretary of Defense 60 days (or until March 28, 2025) to amend the medical standards for accession and retention for the armed forces. In addition, the Secretary has 30 days (or until February 26, 2025) to identify the necessary steps to effectuate the purpose and policy of the Executive Order.

Without waiting for the Secretary's amendment of the medical standards, Plaintiffs bring this Equal Protection challenge to enjoin the implementation of the *Military* EO, which Plaintiffs characterize as imposing "the categorical exclusion of transgender people from military service." Am. Compl. ¶ 154, ECF No. 15. They now seek the extraordinary relief of a preliminary injunction, alleging as irreparable harm consequences flowing from being separated or discharged from the military (or the inability to access into the military). But the Secretary has not yet updated the medical standards or issued final guidance on accession and retention. Until then, and until the Court can determine how any such policy will affect Plaintiffs in a concrete way and whether any certainly impending injury would flow, Plaintiffs' claims are not ripe.

Indeed, there is no clear and present need for emergency relief now because even if the servicemember Plaintiffs are to be discharged, military separation processing takes time. It typically involves several steps based on the servicemember's rank, Service, length of service, recommended characterization of service (*e.g.*, honorable, general, or other than honorable), and other factors, including the basis for the separation, which would need to be supplied by the

Secretary's upcoming policy.

Also fatal to a request for emergency relief is Plaintiffs' failure to show that they are likely to succeed on the merits of this case. Crucially, the Supreme Court has long recognized that judicial deference is at its apogee when a policy concerns the composition of the military. Not only are courts ill-equipped to determine the impact that any intrusion upon military authority might have, but our constitutional scheme charges the Executive and Legislative Branches with carrying out our Nation's military policy. Separation-of-powers concerns thus have constrained the Judiciary's intrusion into military regulations concerning the composition of the military force. Even when a military classification proceeds along a quasi-suspect line (*e.g.* sex), the Supreme Court has applied a deferential standard of review akin to that of rational basis.

Plaintiffs ignore this well-established deference to the military in contending that heightened scrutiny nevertheless applies because the *Military* EO purportedly classifies on the basis of sex and because in their view, transgender individuals constitute a quasi-suspect class. But the *Military* EO does not discriminate on the basis of sex. Its stated policy applies equally to males and females. In either case, gender dysphoria is a presumptive disqualifying condition for military service. Prohibiting pronoun usage that does not correspond to a servicemember's sex also applies equally to servicemember males and females. And if all servicemembers are required to serve in their biological sex, that is not sex discrimination, either.

The Equal Protection guarantee requires only that similarly situated persons be treated alike. A transgender individual identifying as a woman is not similarly situated to a biological female, nor is a transgender individual identifying as a man similarly situated to a biological male. Moreover, the Supreme Court, Congress, and the military have long recognized that military policies can and must account for the distinct immutable biological characteristics of the sexes. Further, the Supreme Court has never recognized transgender individuals to be a quasi-suspect class, nor is it likely to do so. And in any event, the *Military* EO's stated policy focuses on gender dysphoria, which is not a proxy for transgender people because only a subset of transgender individuals suffer from this medical condition.

2

Although a deferential standard of review applies and the *Military* EO easily passes constitutional muster, it would survive heightened scrutiny as well. The Commander in Chief has determined that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere condition and without the benefit of routine medical treatment or special provisions." *Military* EO § 1. These are important government interests, and the *Military* EO's stated policy that gender dysphoria is presumptively disqualifying is substantially related to achieving those interests because the medical condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. Although Plaintiffs contend that the *Military* EO cannot survive even rational basis review because it is allegedly motivated by animus toward transgender people, it cannot be said that the policy "is inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018). Where, as here, a policy "has a legitimate grounding in national security concerns," the Court "must accept that independent justification." *Id.*

Of course, the Secretary's upcoming policy may be broader or narrower—which only shows that judicial review is premature now. But as the Court has recognized, the parties are not starting from a clean slate, given the prior litigation on the Department of Defense's 2018 policy concerning transgender individuals serving in the military. The Supreme Court and the D.C. Circuit allowed that policy to go into effect. The D.C. Circuit, in particular "acknowledge[d] that the military has substantial arguments for why the [2018 policy] complies with the equal protection principles of the Fifth Amendment." *Doe 2 v. Shanahan*, 755 Fed. App'x 19, 25 (D.C. Cir. 2019). The Secretary's upcoming policy could resemble the 2018 policy, which was itself approved by President Trump. Even if not, there is no reason for the Court to speculate on the scope of the forthcoming policy, and no basis to issue emergency relief now, because it necessarily would be predicated on hypothetical facts.

For these reasons, and those stated below, the Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### A.    DoD Policy Prior to 2015.

The D.C. Circuit's decision in *Doe 2* lays out the history of the military's prior policies relevant to transgender people.  *See Doe 2 v. Shanahan*, 917 F.3d 693, 697–700 (Wilkins, J., concurring); *id.* at 709–12 (Williams, J., concurring).  "Prior to 2015, the Department of Defense . . . effectively banned all transgender persons from either joining or remaining in the military."  *Id.* at 696 (Wilkins, J., concurring).  The Department of Defense ("DoD") has long disqualified individuals from entering military service who have "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have."  DoD Report & Recommendations on Military Service by Transgender Persons ("DoD 2018 Report") (Feb. 2018) (Ex. 1) at 9 (citing DoD Instruction 6130.03 ("DoDI 6130.03"), *Medical Standards for Appointment. Enlistment, or Induction in the Military Services* (Apr. 28, 2011), incorporating Change I, (Sept. 13, 2011)).  The military has taken a particularly cautious approach with respect to mental health standards, considering "the unique mental and emotional stresses of military service."  *Id.* at 10; *see also id.* at 20 (noting that "[m]ost mental health conditions . . . are automatically disqualifying" for entry into the military).  As a result, seventy-one percent of Americans between ages 17 to 24 are ineligible to join the military (without a waiver) for mental, medical or behavioral reasons.  *Id.* at 6.

In general, the military has aligned these disqualifying conditions with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), published by the American Psychiatric Association.  *Id.* at 10.  Military standards for decades therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the DSM.  *Id.* at 7, 9–10.  In 2013, the APA at 12, 14–15.  In 2013, the American Psychiatric Association replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria" in the DSM.  *See Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring); *see also* DoD 2018 Report at 10, 12.  It explained that it no longer viewed

identification with a gender different from one's biological sex (*i.e.*, transgender status), on its own, to be a disorder. *See id.* at 12. It stressed, however, that a subset of transgender people suffer from a medical condition called "gender dysphoria," which "manifests as stress and anxiety caused by the incongruence between the sex assigned to the person at birth and the person's preferred gender identity." *Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring). The conditions are "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 708 (Williams, J., concurring); *see also* DoD 2018 Report at 12–13, 21.

Aside from imposing stringent medical standards, the military has also treated servicemembers differently according to their sex as necessary. DoD 2018 Report at 37 (noting that because of the "unique nature of military service," servicemembers "of the same biological sex are often required to live in extremely close proximity to one another"). "Given their biological differences, males and females have long been assigned to separate berthing, bathroom, and shower facilities, and subject to different sets of physical fitness, body fat, uniform, and grooming standards." *Doe 2*, 917 F. 3d at 707 (Williams, J., concurring). Congress too has required the military to separate the two sexes and to ensure their privacy in various contexts. *See* 10 U.S.C. §§ 7419, 7420, 8431, 8432, 9419, 9420.

## B.    The 2016 Carter Policy.

In 2016, Secretary Ashton Carter adopted a policy that allowed transgender servicemembers to transition if they were diagnosed with gender dysphoria by a military medical provider and could adhere to the standards associated with their biological sex until a military medical provider determined that their gender transition was complete. *Doe 2*, 917 F.3d at 710 (Williams, J., concurring). The policy also allowed transgender individuals, including those who had already transitioned, to enter military service if they met certain medical criteria. *See* DoDI 6130.03 Vol I § 6.28(t) (eff. May 6, 2018; Change 5 am. May 28, 2024) ("2024 DoDI 6130.03 Vol I"), ECF No. 13-11 at 5–6. Under that policy, transgender individuals who lacked a history or diagnosis of gender dysphoria, whether they were currently serving or seeking to serve, could serve

if they met the standards associated with their biological sex.  DoD 2018 Report at 4.

C.    **The 2018 Policy.**

Following a change in administration, President Trump issued a memorandum in August 2017 stating that the Carter policy had "failed to identify a sufficient basis to conclude that terminating [DoD's] longstanding policy"—which generally disqualified transgender individuals from service—"would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources[.]"  Presidential Mem. (Aug. 25, 2017) at 2–3, ECF No. 13-9.  The President called for "further study" to ensure that implementation of the Carter policy "would not have those negative effects."  *Id.* at 3.  Secretary James Mattis then convened a panel of experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  DoD 2018 Report at 17.

The panel consisted of "senior uniformed and civilian Defense Department and U.S. Coast Guard leaders[,]" including "combat veterans."  Secretary Mattis' Memorandum for the President concerning Military Service by Transgender Individuals (Feb. 22, 2018) ("2018 Policy") at 1, Ex. 2.  These senior military leaders were selected to be on the panel because of "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces."  DoD 2018 Report at 18.  They were determined to be "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force."  *Id.*  In addition, the panel drew on experts across DoD, including those dedicated to issues involving personnel, medical treatment, and military lethality. *Id.*  The panel also met with commanders of transgender servicemembers and transgender servicemembers themselves.  *Id.*  It further examined information regarding gender dysphoria; its treatment; the impact of this condition on military effectiveness, unit cohesion, and resources; and data regarding servicemembers diagnosed with gender dysphoria.  *Id.* at 18, 31.

Upon the panel's recommendation, and following President Trump's approval (Presidential Memo. March 23, 2028, Ex. 3), Secretary Mattis adopted the 2018 policy, under which transgender

persons with a history or diagnosis of gender dysphoria were disqualified from military service, except: (1) if they had been stable for 36 consecutive months in their biological sex prior to accession; (2) if they were diagnosed with gender dysphoria after entering into service, did not require a change of gender, and remained deployable within applicable retention standards; and (3) currently serving servicemembers who have been diagnosed with gender dysphoria after the Carter policy took effect and prior to the effective date of the 2018 policy could continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.  2018 Policy at 2.  With limited exceptions, transgender persons who required or had undergone gender transition were disqualified.  *Id.*  Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, could serve in their biological sex.  *Id.*

"In the Department's military judgment," this was necessary because service by these individuals is "not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality."  *Id.* at 32, 41.  DoD's judgment was premised on: evidence that those with gender dysphoria continued to have higher rates of psychiatric hospitalization and suicidal behavior even after transition; evidence of higher utilization rates of psychiatric services; the creation of substantial privacy demands that would generate friction in the ranks; the safety risks arising from having training and athletic standards turn on gender identity; evidence that transition could render servicemembers non-deployable for significant periods; and disproportionate transition-related costs.  *Id.* at 19–42.

### D.    President Biden's Policy.

Following another change in administration, President Biden issued Executive Order 14004, largely reverting to the Carter policy.  *See* 86 Fed. Reg. 7471 (Jan. 28, 2021).  A history or diagnosis of gender dysphoria was still a bar to military accession unless the applicant had been asymptomatic for 18 months.   2024 DoDI 6130.03 Vol I § 6.28(t).   An applicant who had undergone "gender affirming surgery" was disqualified unless (1) the surgery was more than 18

7

months prior and (2) no further surgery was required. *Id.* §§ 6.13(g)(1), (4) ("female genital system"); *id.* §§ 6.14(n)(1), (4) ("male genital system"). Prior "gender-affirming hormone therapy" was likewise disqualifying, unless the applicant was "stab[le]" as specified in the medical standards. *See id.* §§ 6.24(t)(1)–(4). All servicemembers were "subject to the standard[s], requirement[s], or polic[ies] associated with their gender marker in the [Defense Enrollment Eligibility Reporting System]." *See* DoDI 1300.28 § 3.1(a) (Change 1, eff. Dec. 20, 2022). That is, a biological male who identified as female, but had not transitioned, was subject to male standards.[1] A servicemember could change his or her gender marker only upon "a diagnosis from a military medical provider" that "gender transition [was] medically necessary," *id.* § 3.4(a), and upon approval of the servicemember's commanding officer, *id.* §§ 3.4(b)–(c), among many other steps and requirements, including the completion of the prescribed medical treatment plan. *Id.* § 3.3(d)(2).

### E.    President Trump's Executive Orders.

On January 27, 2025, President Trump issued the *Military* EO, revoking President Biden's Executive Order 14004. *See* Exec. Order No. 14183 § 5, 90 Fed. Reg. 8757, 8758 (Feb. 3, 2025). The *Military* EO noted that "[l]ongstanding Department of Defense . . . policy (DoD Instruction (DoDI) 6130.03) provides that it is the policy of the DoD to ensure that service members are "[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization." *Id.* § 1. "As a result, many mental and physical health conditions are incompatible with active duty, from conditions that require substantial medication or medical treatment to bipolar and related disorders, eating disorders, suicidality, and prior psychiatric hospitalization." *Id.* The *Military* EO further stated, that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical

---

[1] It is not inevitable that a transgender person will transition, and indeed, evidence suggests that "only 'a subset of transgender may choose to transition.'" *Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring) (citing 2016 RAND Report at x); *see also* 2016 Implementation Handbook at 13 (only "some" transgender individuals feel compelled to transition).

treatment or special provisions." *Id.*

The *Military* EO thus declares that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. And that "this policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.* Section 3 of the *Military* EO incorporates the definitions of Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("*Defending Women* EO"), which provides that "[i]t is the policy of the United States to recognize two sexes, male and female," and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2.

To implement the *Military* EO, DoD is to update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) within 60 days. *Military* EO, § 4(a). The Secretary is also required to promptly end pronoun usage inconsistent with biological sex, *id.* § 4(b), and to identify within 30 days all additional steps and issue guidance necessary to fully implement the order. *Id.* § 4(c). Finally, the *Military EO* provides that "absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* § 4(e).

On February 7, 2025, DoD issued guidance concerning the EO stating that "[i]ndividuals with gender dysphoria have volunteered to serve our country and will be treated with dignity and respect. The Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy guidance and implementation guidance outside of the normal DoD issuance process, including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria, to implement this direction." DoD Memorandum

on Prioritizing Military Excellence and Readiness at 1 (Feb. 7, 2025), ECF No. 33-1. The memorandum also directed a pause on accessions by anyone with a history of gender dysphoria, and on certain medical procedures—including "newly initiated gender-affirming hormone therapy." *See id.* at 1 & n.1.

### F.    Prior Litigation in the First Trump Administration.

As noted, there was extensive litigation in this area.  Following President Trump's August 2017 Memorandum, four federal district courts, including this Court, entered preliminary injunctions prohibiting enforcement of certain directives in the Memorandum.  *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177, 217 (D.D.C. 2017); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017); *Karnoski v. Trump*, No. C17-1297 (MJP), 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, No. EDCV 17-1799, 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017).  Upon the adoption of the 2018 policy, the defendants moved to dissolve those preliminary injunctions.  *See, e.g.*, *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019).  The D.C. Circuit vacated the injunction in *Doe 2* in January 2019.  *See id.*  The Supreme Court likewise stayed the injunctions entered in *Karnoski* and *Stockman*.  *See Trump v. Karnoski*, No. 18A625 (U.S. Jan. 22, 2019) (order staying preliminary injunction); *Trump v. Stockman*, No. 18A627 (U.S. Jan. 22, 2019) (same).  And the *Stone* court dissolved the preliminary injunction it had issued in August 2019.  *See Stone v. Trump*, 400 F. Supp. 3d 317 (D. Md. 2019).  Each case was dismissed following President Biden's revocation of the 2018 policy.

### G.    The Instant Action.

On January 28, 2025, Plaintiffs filed the instant action on behalf of eight Plaintiffs—six of whom are servicemembers, and two others who hope to enlist in the military—alleging a single Equal Protection Count.  *See* Compl. ¶¶ 9–64, ECF No. 1.  On February 4, 2025, Plaintiffs amended the complaint to add a plaintiff who is currently undergoing basic training in the Army.  *See* Am. Compl. ¶¶ 55–63.  Plaintiffs allege that the *Military* EO imposes a categorical ban on transgender individuals serving in the military.  *Id.* ¶¶ 141–48.  Plaintiffs have moved for a preliminary

injunction to prevent the separation, denial of reenlistment, demotion, denial of promotion, and denial of medical treatment for the Plaintiffs currently serving in the military, and to enjoin the alleged ban nationwide.  Mem. of Law in Supp. of Pls.' Appl. for Prelim. Inj. at 41 (Feb. 3, 2025), ECF No. 13-1 ("PI Mot.").

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

This Court should deny Plaintiffs' request for emergency relief because the case is not ripe, Plaintiffs cannot satisfy the Administrative Procedure Act's "final agency action" requirement, and they have not exhausted their administrative remedies.  In any event, Plaintiffs have not shown likely success on their Equal Protection claims.

### A.    Plaintiffs' Claims Are Unlikely to Overcome Threshold Hurdles.

#### 1.    Plaintiffs' claims are not ripe.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Laboratories v.*

*Gardner*, 387 U.S. 136, 148–149, (1967)).  Even assuming certainly impending injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), the Court must still assess whether it "should decide the case," *Am. Petroleum Inst. v. Envt'l Prot. Agency*, 683 F.3d 382, 386 (D.C. Cir. 2012), by evaluating "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration," *Abbott Laboratories*, 387 U.S. at 148–149.

Here, Plaintiffs allege that under the *Military* EO, "no transgender individuals may enlist or continue their military service," PI Mot. at 1, and that the "ban" would "inflict irreparable injuries on Plaintiffs" because "they will be discharged from service, lose their means of supporting themselves and their families, and stripped of the honor, status, and benefits associated with uniformed service to their country," *id*.; *see also* Am. Compl. ¶¶ 149–155 (Equal Protection claim rests on asserted "ban" and "categorial exclusion").  Each of the servicemember Plaintiffs averred in their declarations this single potential irreparable harm.  Decl. of Nicolas Talbott ¶¶ 19–21, ECF No. 13-32 ("Talbott Decl."); Decl. of Erica Vandal ¶¶ 19–23, ECF No. 13-33 ("Vandal Decl."); Decl. of Kate Cole ¶¶ 20–24, ECF No. 13-34 ("Cole Decl."); Decl. of Gordon Herrero ¶¶ 17–21, ECF No. 13-35 ("Herrero Decl."); Decl. of Dany Danridge ¶¶ 26–30, ECF No. 13-36 ("Danridge Decl."); Decl. of Jamie Hash ("Hash Decl.") ¶¶ 21–25, ECF No. 13-37; Decl. of Koda Nature ("Nature Decl.") ¶¶ 12–21, ECF No. 13-38; Decl. of Cael Neary ("Neary Decl.") ¶¶ 13–17, ECF No. 13-39; Decl. of Miriam Perelson ("Perelson Decl.") ¶¶ 16–19, ECF No. 14-5.

But DoD is still determining how to implement the *Military* EO.  While Section 2 of the Executive Order provides that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are incompatible with military service, the "[i]mplementation" provision in Section 4 gives the Secretary until March 28, 2025, to revise the medical standards for retention. It is unknown at this time whether any such new standards will require the servicemember Plaintiffs' separation.  Here, DoD has authorized the Under Secretary of Defense for Personnel and Readiness to "provide additional policy guidance and implementation guidance" "including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria."  Sec'y of Defense, *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025), ECF

No. 33-1.  That additional guidance has not yet been issued.

Here, six of the seven servicemember Plaintiffs allege that they have been diagnosed with gender dysphoria.  Am. Compl. ¶ 15 (Talbott), ¶ 22 (Vandal), ¶ 29 (Cole), ¶ 36 (Herrero), ¶ 44 (Danridge), and ¶ 52 (Hash).  As for Plaintiff Perelson, a trainee, and the two putative enlistees, Plaintiffs Nature and Neary, none of them alleges a diagnosis of gender dysphoria.  *See* Am. Compl. ¶¶ 55–63 (Perelson), ¶¶ 64–68 (Nature), ¶¶ 69–74 (Neary).  But without knowing more, including crucially what DoD's new medical standards will be, the Court would entangle itself in an abstract disagreement if it were to entertain the case now.  While Plaintiffs also seek to "serve in the military on equal terms as other service members," Am. Compl. ¶ 1, an assessment of Plaintiffs' Equal Protection challenge should not be a moving target.

Until DoD has issued guidance, and the full scope of Plaintiffs' alleged injury is known, Plaintiffs' Equal Protection challenge is unfit for judicial determination.  Indeed, "even in cases involving pure legal issues, review is inappropriate when the challenged policy is 'not sufficiently 'fleshed out'" to allow the court to "see the concrete effects and implications" of the policy.  *Chamber of Com. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (quoting *Am. Trucking Ass'n, Inc. v. Interstate Comm. Comm'n,* 747 F.2d 787, 789–90 (D.C. Cir. 1984)); *see, e.g.*, *Center for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213 (D.D.C. 2020) (challenge to executive order unripe where the executive order "only set[] a course of government processes into motion" with concrete regulations to follow); *Vance v. Wormuth*, No. 3:21-CV-730-CRS, 2022 U.S. LEXIS 67345, at *16 (W.D. Ky. Apr. 12, 2022) ("The development of a factual record by [the] Army and its interpretation of the law as applied to these particular facts is crucial. The incomplete record in the case weighs against a finding of ripeness.") (internal citation omitted).

The ripeness doctrine also considers potential hardship to Plaintiffs.  Notably, "hardship that might result from delaying review 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.'"  *Am. Petroleum Inst. v. Env't Prot. Agency*, 683 F.3d 382, 389 (D.C. Cir. 2012) (quoting *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 740 F.2d 21, 31 (1984)).  The *Military* EO does not yet have concrete, irreparable effect

on Plaintiffs, and Plaintiffs suffer no hardship by awaiting the application of concrete policies to them. *Cf. Church*, 573 F. Supp. 3d at 134–35 (finding servicemembers' claims unripe where they could only speculate that their request for religious accommodations from vaccine requirement would be denied, and the record provided no basis to assume that they would be). The agency has not yet promulgated the final standards on retention and accession, and has only begun to issue guidance to ensure that the use of pronouns reflects the individual's biological sex—about which Plaintiffs have alleged no irreparable harm.

### 2. Plaintiffs cannot sidestep the Administrative Procedure Act's "final agency action" requirement.

Instead of preemptively challenging what they speculate the policy will be, the proper way to proceed is for Plaintiffs to wait until DoD has taken "final agency action" and then to challenge that action under the Administrative Procedure Act ("APA"), which "supplies a generic cause of action in favor of persons aggrieved by agency action." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006) (cleaned up); *see also* 5 U.S.C. § 706 (under the APA court may hold unlawful agency action that is "contrary to constitutional right, power, privilege, or immunity"). The APA "limits causes of action under the APA to final *agency* action." *Id.* (emphasis added); 5 U.S.C. § 704. The agency action at issue must be "final," meaning it must (i) "mark the consummation of the agency's decisionmaking process" and (ii) be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78.

Plaintiffs cannot invoke the APA now to challenge the *Military* EO. The President is not an "agency" under the APA, *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992), and a plaintiff cannot challenge the President's action under the APA. Moreover, as discussed, the *Military* EO by itself does not require the servicemember Plaintiffs' separation or prohibit the accession of non-servicemember Plaintiffs. Accordingly, Plaintiffs cannot avoid the APA's requirements by bringing suit before DoD has taken final action. Were it otherwise, a plaintiff challenging federal agency actions could always preemptively bring suit, rendering the APA's "final agency action"

requirement meaningless.  Until DoD takes some final agency action that affects Plaintiffs' legal rights or obligations, Plaintiffs cannot challenge the Executive Orders.

**3.      Plaintiffs have not exhausted their administrative remedies.**

Plaintiffs face another threshold hurdle.  Even if the Executive Order itself could be construed to be provide the basis of discharging the servicemembers without DoD's implementation guidance, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 158 (D.C. Cir. 2007).  "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."  *Parisi v. Davidson*, 405 U.S. 34, 38 (1972); *Bowen v. City of New York*, 476 U.S. 467, 484 (1986).  This is especially true in the military context, "given the judiciary's lack of expertise in areas of military judgment and its long-standing policy of non-intervention in internal military affairs."  *Heidman v. United States*, 414 F. Supp. 47, 48 (N.D. Ohio 1976) (citing *Schlesinger v. Councilman*, 420 U.S. 738 (1975); *Parker v. Levy*, 417 U.S. 733 (1974); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  Even where a controversy survives administrative review, "exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context."  *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Accordingly, this Court and the court of appeals have repeatedly recognized "that a court should not review internal military affairs in the absence of . . . exhaustion of available intraservice corrective measures."  *Church v. Biden*, 573 F. Supp. 3d 118, 137 (D.D.C. 2021) (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986)); *see also Bois*, 801 F.2d at 468 (further cautioning that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their

superior officers"); *Cargill v. Marsh*, 902 F.2d 1006, 1007–08 (D.C. Cir. 1990) (per curiam) (affirming the dismissal of servicemember's claim for failure to exhaust administrative remedies).

The servicemember Plaintiffs do not allege that they have met the "salutary rule that an aggrieved military officer must first exhaust his administrative remedies . . . prior to litigating his claims in a federal court." *Bois*, 801 F.2d at 468; *id.* at 467–68 (affirming dismissal for failure to exhaust where the servicemember had not sought a remedy from the respective Board for Correction of Military Records). Should any Service initiate separation processing against servicemember Plaintiffs, they would have the opportunity to contest separation during those proceedings. *See generally* DoDI 1332.14 (Aug. 1, 2014) (administrative separations of enlisted servicemembers); DoDI 1332.30 (May 11, 2018) (administrative separation of commissioned officers). And even if there is a discharge decision, further procedures before each Service's board for correction of military/naval records would be available to Plaintiffs. *See* 10 U.S.C. § 1552.

Plaintiffs cannot rely on the narrow exception to the exhaustion requirement where pursuing administrative remedies would be "obviously futile." *Hayes v. Sec'y of Def.*, 515 F.2d 668, 674 (D.C. Cir. 1975). That exception applies only when "the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986). At this juncture, it is not "obvious" that the military will lack any discretion to consider servicemember challenges to DoD's application of its future policy to them regarding separation. Indeed, the 2018 Policy contained exceptions that, as noted above, might well apply to Plaintiffs if that policy were reinstated. Accordingly, the exhaustion requirement is an independent bar to Plaintiffs' claims.

## B.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim.

### 1.    The military's judgment is entitled to significant deference.

Courts extend great deference to the political branches when reviewing the "complex, subtle, and professional decisions as to the composition . . . of a military force." *Winter*, 555 U.S.

at 24 (quoting *Gilligan*, 413 U.S. at 10); *see also Orloff v. Willoughby*, 345 U.S. 83 (1953); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990). "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986); *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President."). Because "it is difficult to conceive of an area of governmental activity in which the courts have less competence," *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," *id.*; *see, e.g.*, *Goldman*, 475 U.S. at 507 (explaining that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society").

Thus, even as the Supreme Court refused to label the level of scrutiny applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S at 70, the Court's approach most closely resembles rational-basis review. In *Rostker*, for example, the Supreme Court applied this deferential standard to hold that a facially discriminatory, sex-based draft-registration statute was "not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated." *Id.* at 79 (internal quotation marks omitted). The Court did so even though sex discrimination typically is reviewed under heightened scrutiny. The Court explained that the sex-based classification was within constitutional bounds because Congress determined that the statute minimized "added burdens" and "administrative problems" and promoted "the important goal of military flexibility," and "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.* at 81–82 (internal quotation marks omitted). Instead of conducting its own "evaluation" of the evidence, the Court

17

adopted "an appropriately deferential examination of Congress' evaluation of that evidence." *Id.* at 83. Consistent with rational-basis review, the Court also accepted *post hoc* justifications, even when an analogous policy in the civilian context would call for closer scrutiny. *Id.* at 81; *see id.* at 74–75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *see also Schlesinger*, 419 U.S. at 508 (upholding different mandatory-discharge requirements for male and female naval officers based on what "Congress may . . . quite rationally have believed"). In other words, the Supreme Court has allowed Congress the wide latitude to choose "among alternatives" in furthering military interests. *Rostker*, 453 U.S. at 71–72; *see also Goldman*, 475 U.S. at 510 (political branches had discretion to "draw[] the line" on military standards).

Thus, when vacating the preliminary injunction entered in *Doe 2* concerning DoD's 2018 policy, the D.C. Circuit recognized that "any review must be 'appropriately deferential' in recognition of the fact that the [2018] Plan concerned the composition and internal administration of the military." *Doe 2*, 755 F. App'x at 25 (citing *Rostker*, 453 U.S. at 83).[2] The D.C. Circuit gave that deference and vacated the preliminary injunction issued by the district court. This Court should proceed in a similar fashion in reviewing the Equal Protection challenge here.

## 2. Classification based on transgender status is not sex discrimination.

Plaintiffs contend that the *Military* EO "is subject to intermediate scrutiny" because it "discriminates based on sex." PI Mot. at 14–17. As explained above, however, military regulations concerning the composition of the military force are subject to a deferential standard of review even when the classification is based on sex. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 531–33 (1996). The stated policy of the Executive Order in any event is not sex discrimination because it applies equally to males and females. It provides that gender dysphoria is a disqualifying condition for military service, regardless of sex. And it prohibits pronoun usage

---

[2] This deference owed the military is not diminished by former DoD officials' different opinions. Plaintiffs have attached several such declarations. *See* ECF Nos. 28, 30, 31. As the Supreme Court has noted, such contrary judgment is "quite beside the point" because the desirability of any military regulation "is decided by the appropriate military officials." *Goldman*, 475 U.S. at 509.

that does not correspond to a servicemember's sex, again regardless of whether that servicemember is male or female. Moreover, even if all servicemembers are required to serve in their biological sex, that is not sex discrimination either. Such a policy would not privilege or burden one sex over the other, nor apply one regime to men and another to women. It would be wholly unlike the classifications the Supreme Court has found to be sex-based. *See Craig v. Boren*, 429 U.S. 190 (1976) (prohibition on beer sales to males under 21 while permitting sales to females over 18 was sex classification); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982) (university's policy of admitting women, but not men, was sex classification); *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) ("[p]rescribing one rule for mothers, [and] another for fathers" was sex classification). Thus, the Executive Order "'unquestionably complies' with the Equal Protection Clause" because it treats similarly situated individuals "evenhandedly." *Vacco v. Quill*, 521 U.S. 793, 800 (1997) (quoting *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979)).

Plaintiffs' sex-discrimination argument improperly imports the Supreme Court's Title VII-specific conclusion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), into the distinct Equal Protection context. *See* PI Mot. at 14. In *Bostock*, the Supreme Court reasoned that Title VII's prohibition on sex discrimination incorporated a but-for causation standard and held that when an employer fires an employee because that employee is gay or transgender, sex is necessarily a but-for cause of such discrimination. 590 U.S. at 656, 668-69, 683. The Court's conclusion was derived entirely from Title VII's "plain terms," *id.* at 676, which provide, in relevant part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1). The text of the Equal Protection Clause does not contain any similar language. Moreover, "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Bostock*, 590 U.S. at 681 (rejecting concern that the Court's decision would "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination").

Consistent with this textual distinction, courts have recognized that Title VII and the Equal Protection Clause have different purposes and different functions. *See, e.g.*, *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 484-85 (6th Cir.) (discussing the "[d]ifferences between the language of the statute and the Constitution" along with the distinct principles at play in the Equal Protection Clause and Title VII), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (June 24, 2024).[3]  Thus, for example, disparate impact claims are available under Title VII, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971), but not under the Fourteenth Amendment, *see Washington v. Davis*, 426 U.S. 229, 238–39 (1976).  Rather, a law or policy constitutes sex discrimination for Equal Protection purposes only if it *classifies* individuals based on their sex.[4]  *See Frontiero v. Richardson*, 411 U.S. 677, 682 (1973).  *Bostock*'s Title VII-specific textual analysis is thus inapposite to Equal Protection claims.[5]

### 3.    Transgender individuals do not constitute a quasi-suspect class.

Plaintiffs also contend that the *Military* EO warrants intermediate scrutiny because in their view, transgender individuals constitute a quasi-suspect class.  *See* PI Mot. at 17–20.  But the Supreme Court has not recognized any new suspect class or quasi-suspect class in almost half a century.  *See Boren*, 429 U.S. 190 (sex constitutes quasi-suspect class).  Instead, it has repeatedly declined to do so.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental

---

[3] Although the United States took a different position in *Skrmetti* as to the application of *Bostock* to the Equal Protection context, it has since withdrawn that position.  *See* Letter to the Clerk of Court from Deputy Solicitor General of the U.S. Department of Justice, *United States v. Skrmetti*, No. 23-477 (Feb. 7, 2025).

[4] Plaintiffs cite *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034 (7th Cir. 2017), for the proposition that "classifications based on transgender status are inherently sex-based."  PI Mot. at 14.  The case did not so hold.  Rather, the court concluded that a school district bathroom policy was "based on a sex-classification" and thus subject to heightened scrutiny because "the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate."  *Whitaker*, 858 F.3d at 1051.

[5] For these reasons, out-of-circuit decisions that have applied *Bostock*'s reasoning to Equal Protection claims are unpersuasive.  *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox v. Little*, 104 F.4th 1061, 1079–80 (9th Cir. 2024), *as amended* (June 14, 2024).

disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals qualify as a quasi-suspect class). Given the high bar to establishing a quasi-suspect class and the deference owed in the military context, heightened scrutiny should not apply.

The same conclusion results from an application of the factors the Supreme Court has used to determine whether a quasi-suspect class exists: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment. *See Lying*, 477 U.S. at 638 (citing *Murgia*, 427 U.S. at 313–14). Transgender persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Transgender status is not "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487. Transgender status further is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions." *Id.* at 487; *see also* Br. of American Psychological Association as *Amicus Curiae* at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S.) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Transgender persons are not "political[ly] powerless[]" either. *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. It is therefore untenable to claim that transgender persons "have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at 445. The mere fact that transgender persons may not be able to "themselves mandate the desired legislative responses," and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Id.* Similarly, claims of historical injustice are not sufficient to establish a quasi-suspect class: the Supreme Court in *Cleburne* "rejected the

argument that mental disability is a suspect classification, despite a history of compulsory sterilization, exclusion from public schools, and a system of 'state-mandated segregation and degradation.'" *Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker II*"), 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring) (quoting *Cleburne*, 473 U.S. at 462–63 (Marshall, J., concurring in the judgment and dissenting in part)).

### 4.    The *Military* EO withstands constitutional scrutiny.

Although the precise contours of the Plaintiffs' Equal Protection challenge to their potential separation from, or ineligibility to serve in, the military, are currently unknown, Plaintiffs are unlikely to succeed on the merits because the *Military* EO likely passes constitutional muster.

As noted above, the "policy" provision of the *Military* EO provides that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are inconsistent with military service.  Rational basis review applies to review the classification because a medical condition is not a suspect or quasi-suspect classification.  *See*, *e.g.*, *Board of Trs. of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 365–68 (2001).  Gender dysphoria is a medical condition that involves "clinically significant distress or impairment in social, occupational, or other important areas of functioning."  DoD 2018 Report at 12–13.  It is not a proxy for transgender people because only a subset of transgender individuals suffer from gender dysphoria; *see Doe*, 917 F.3d at 696 (Wilkins, J., concurring); *id.* at 708 (Williams, J., concurring); *cf. Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification.").  Indeed, prior to the Carter policy, an estimated 8,980 servicemembers identified as transgender according to one study, yet at the time of DoD's 2018 review, only 937 of them had obtained a diagnosis for gender dysphoria necessary to qualify for the Carter policy's framework.  DoD 2018 Report at 7 n.10, 32.

Even without according the requisite deference to the military, the *Military* EO's classification based on gender dysphoria withstands scrutiny.  A classification neither involving

fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 318 (1993)). "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 319–20. It is beyond dispute that the Commander in Chief could require that servicemembers be "free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization." *Military* EO, § 1 (quoting DoD Instruction 6130.03). The military has long determined that any mental health condition characterized by clinically significant distress or impairment in functioning raises readiness concerns. *See* DoD 2018 Report at 34. And, the D.C. Circuit previously recognized that the 2018 Policy, which turned on gender dysphoria, was likely constitutional. *Doe 2*, 755 F. App'x at 25 ("We acknowledge that the military has substantial arguments for why the [2018] Plan complies with the equal protection principles of the Fifth Amendment.").

Many of the rationales justifying the 2018 policy—which was approved by President Trump as the Commander in Chief in 2018—would apply here. In brief, the military determined that generally allowing individuals diagnosed with gender dysphoria posed "substantial risks" and would "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." 2018 Policy at 2. In forming this opinion, the DoD panel reviewed evidence that military service can be a contributor to suicidal thoughts. DoD 2018 Report at 21-22. Data pertaining to servicemembers with gender dysphoria reflected similar trends. *See* Data retrieved from Military Health System data repository (Oct. 2017), Ex. 4. The data indicated that servicemembers with gender dysphoria were eight times more likely to express suicidal ideations than servicemembers as a whole (12% versus 1.5%). *Id.* at 9. The data reflected that servicemembers with gender dysphoria were also nine times more likely to have mental health encounters than the servicemember population as a whole (28.l average encounters per servicemember versus 2.7 average encounters per servicemember). *Id.* at

8.  For example, from October 2015 to July 2017, 691 active duty servicemembers diagnosed with gender dysphoria accounted for 19,379 mental health visits.  *Id.*  Upon reviewing this data, which was not available to RAND when it provided its recommendation to Secretary Cater, DoD was concerned about subjecting those with gender dysphoria to the unique stresses of military life. DoD 2018 Report at 21, 42.  Especially given the evidence that military service in itself can be a contributor to suicidal thoughts, DoD had legitimate concerns that allowing those with gender dysphoria to serve would subject them and their comrades to unacceptable risks.  *Id.* at 19, 21.

With respect to unit cohesion specifically, DoD's experts in 2018 heard from a commander who received dueling equal-opportunity complaints over allowing a service member who identified as a female, but had male genitalia, to use the female shower facilities—one from the female members of the unit and one from the individual servicemember.  *Id.*  This episode is consistent with reports from the Canadian military that officers were "called on to balance competing requirements" by meeting a transitioning service member's "expectations . . . while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness" in areas such as "communal showers[] and shipboard bunking."  *Id.* at 40.[6]

DoD further determined that these concerns fully apply to those who have addressed their gender dysphoria by transitioning.  *Id.* at 32.  DoD was concerned about evidence that "rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment," as compared to those without that condition.  *Id.* at 32.  DoD had further, reasonable concerns about the "considerable scientific uncertainty concerning whether these treatments fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria."  *Id.*; *see id.* at 21–27.  DoD further determined that even if the risks associated with gender dysphoria could be fully addressed by gender transition, transition-related medical

---

[6] The military's judgment about unit cohesion and military readiness fairly justify the *Military* EO, and under the deferential standard of review, the Court should not give any weight to the attestation of the former Under Secretary of Defense for Personnel and Readiness, Gilbert Cisneros, who stated that he "would have known of" any "complaints or problems about transgender service members," and yet he "never heard about a single complaint."  Cisneros Decl. ¶ 17, ECF No. 13-30.

treatment could still render transitioning servicemembers "non-deployable for a potentially significant amount of time." *Id.* at 35. Such limits on deployability would have harmful effects on transitioning servicemembers' units because any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which itself "negatively impacts mission readiness." *Id.* Even if the number of such servicemembers is small, the question for DoD was not "whether the military can absorb periods of non-deployability in a small population" because by that metric, "the readiness impact" of many other disqualifying medical conditions would also be "minimal" because they too "exist only in relatively small numbers." *Id.* Rather, the question for DoD was "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* The answers led to the conclusion that general exclusion of those suffering from gender dysphoria was warranted.

Consistent with these determinations supporting the 2018 DoD policy, the *Military* EO explains in Section 1 that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere condition and without the benefit of routine medical treatment or special provisions." The EO then states the policy that gender dysphoria is incompatible with the high standards required for military service. That classification of gender dysphoria thus serves to further a legitimate government interest and clearly survives rational basis review.

In fact, even if the Court were to apply intermediate scrutiny, the *Military* EO survives that standard as well. Under intermediate scrutiny, the policy must "serve[] important governmental objectives" and be "substantially related to the achievements of those objectives." *Virginia*, 518 U.S. at 533 (citations omitted). The military's interests in readiness, lethality, and unit cohesion are undoubtedly "important." *See, e.g.*, *Rostker*, 453 U.S. at 70 ("No one could deny that . . . the Government's interest in raising and supporting armies is an 'important governmental interest.'") (citation omitted). And a policy that turns on gender dysphoria is "substantially related" to those

interests, for the reasons explained above.

Plaintiffs construe the *Military* EO as a "categorical exclusion of transgender people from military services."  Am. Compl. ¶ 154.  But the Executive Order by itself imposes no such exclusion.  Even if there is a categorial ban, under rational-basis review, a classification does not fail simply because it "is not made with mathematical nicety or because in practice it results in some inequality."  *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).  Rather, legislative classifications may be "both underinclusive and overinclusive" and "perfection is by no means required."  *Vance v. Bradley*, 440 U.S. 93, 108 (1979).  Instead, "courts are compelled under rational-basis review to accept a legislature's generalization even when there is an imperfect fit between means and ends."  *Heller*, 509 U.S. at 321; *Steffan v. Perry*, 41 F.3d 677, 687 (D.C. Cir. 1994) (same).  This is so because the task of classifying persons "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line."  *Fitzgerald v. Racking Ass'n of Central Iowa*, 539 U.S. 130, 108 (2003) (quotation marks omitted).  Plaintiffs cannot establish that they will likely succeed on the merits under that deferential standard, especially given the substantial government interests discussed above.

### 5.    Alleged animus is not a reason to grant Plaintiff's motion.

Citing the purportedly "broad and undifferentiated" scope of the *Military* EO, PI Mot. at 25, Plaintiffs contend that the Executive Order cannot survive even rational-basis review because it is allegedly based on animus toward transgender individuals.  *Id.* at 24–25.  However, unlike in the "few occasions" where the Court has struck down a policy on animus grounds, here "[i]t cannot be said that it is impossible to discern a relationship to legitimate [government] interests or that the policy is inexplicable by anything but animus," *Trump v. Hawaii*, 585 U.S. 667, 706 (2018), as demonstrated above.  *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) ("This Court has long disfavored arguments based on alleged legislative motives.").  Where a policy "has a legitimate grounding in national security concerns," for example, the Court "must accept that independent justification."  *Id.*; *see also Doe 2*, 917 F.3d at 731–33 (Williams, J.,

26

concurring).    That is because rational-basis review is objective and does not permit proving government officials' subjective intentions.    *See Doe 2*, 917 F.3d at 732 (Williams, J., concurring) (discussing how *Schlesinger* and *Rostker* involved objective inquiry that did not turn on "motives"); *cf. Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671– 72 (1981) (rational-basis standard asks whether the government rationally "could have" believed that policy will accomplish its objectives); *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (if "there are plausible reasons" for the challenged action, the rational-basis "inquiry is at an end").

Plaintiffs contend that the *Military* EO's timing and process "suggest pretext" because in their view, there was "no urgency requiring this policy change," and "the only precipitating event was President Trump's inauguration."   PI Mot. at 25.   But "'there's nothing unusual about a new' administration 'coming to office inclined to favor a different policy direction[.'"    *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (quoting *In re Dep't of Commerce*, 586 U.S. 956, 957 (2018) (Gorsuch, J., concurring in part, dissenting in part)).   "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations."   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2378 (2001) ("[N]ew administrative interpretations following new presidential elections should provide a reason to think deference appropriate rather than the opposite.").   Indeed, President Biden did just that within days of taking office in issuing Executive Order 14004.

Plaintiffs also assert that animus can be inferred because the President has "moved to strip protections from transgender people across multiple domains" which they say reflects "a bare desire to harm a politically unpopular group."   PI Mot. at 25.   But government justifications that could underlie agency actions to implement those Executive Orders are not before this Court. Moreover, the policy issues implicated by those Executive Orders are complex and there is no basis to paint them with a broad brush.

Nor do campaign statements by the President support Plaintiffs' allegations of animus. *See* PI Mot. at 25. Such statements cannot reveal "the government's ostensible object." *McCreary Cnty., Ky. v. Am. C.L. Union of Ky.*, 545 U.S. 844, 860 (2005). That is why, in *Trump v. Hawaii*, the Supreme Court did not look to the President's campaign statements to determine whether the travel ban at issue in that case was motivated by animus. *See* 585 U.S. at 701–02. Although the *dissenting* justices believed that such statements should be considered, *see, e.g., id.* at 738 n.3 (Breyer, J., dissenting), the majority noted that the question before the Court was "not whether to denounce the [campaign] statements," but rather concerned "the authority of the Presidency itself," *id.* at 702. The majority opinion thus tracked the reasoning of Judge Niemeyer's dissenting opinion in the Fourth Circuit's travel ban case, which had explained that "the Court's reluctance to consider statements made in the course of campaigning derives from good sense and a recognition of the pitfalls that would accompany such an inquiry." *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 374 (4th Cir. 2018) (Niemeyer, J., dissenting); *see also id.* (noting that consideration of campaign statements could "chill political speech," as "[i]t is hard to imagine a greater or more direct burden on campaign speech than the knowledge that any statement made might be used to later support the inference of some nefarious intent when official actions are inevitably subjected to legal challenges").

### 6. Other potential line-drawings likely would withstand scrutiny.

Although the *Military* EO's implementation provision is focused on amending the "medical standards for military service," § 4, DoD possibly could decide, as it did in 2018, to bar from service those transgender individuals who do not have gender dysphoria but are unwilling to serve in their biological sex. DoD 2018 Report at 3. That line-drawing too would be subject to rational-basis review even if military deference did not apply, and it would withstand scrutiny. The Supreme Court has not recognized transgender persons to constitute a quasi-suspect class, and thus no heightened scrutiny would be appropriate for that reason. And while the Equal Protection

28

Case 1:25-cv-00240-ACR    Document 38    Filed 02/12/25    Page 40 of 52

guarantee requires similarly situated persons to be treated alike, it "does not require things which are different in fact or opinion to be treated in law as though they were the same." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). The "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Id.* A transgender individual identifying as a woman is not similarly situated to a biological female. And a transgender individual identifying as a man is not similarly situated to a biological male. DoD can treat each differently from those whose biological sex is the individual's preferred sex.

That line-drawing would survive constitutional scrutiny. Again, DoD's determinations in 2018 would apply fully to justify any such new DoD policy. DoD determined in 2018 that a contrary policy would threaten to "erode reasonable expectations of privacy." DoD 2018 Report at 31, 37. DoD observed that "[g]iven the unique nature of military service," servicemembers must often "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." *Id.* at 37. To protect reasonable expectations of privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women." *Id.* In DoD's judgment, allowing individuals who retain some, if not all, of the anatomy of their biological sex to use the facilities of their preferred gender "would invade the expectations of privacy" of the other servicemembers sharing those facilities. *Id.* Thus, absent the creation of separate facilities for transitioned or transitioning servicemembers, which could be both "logistically impracticable for the Department" as well as unacceptable to those individuals, the military would face irreconcilable privacy demands. *Id.*

Such considerations are far from suspect. Guidance issued under the Carter policy stressed the need to respect the "privacy interests" and "rights of Service members who are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning Service member," and urged commanders to try to accommodate competing interests to the extent they could. 2016 Implementation Handbook at 38, ECF No. 13-5; *see id.* at 22, 29, 33, 60–61, 63–64; *see also* DoD 2018 Report at 38 (discussing some of "[t]he unique leadership challenges arising from gender

29

transition" that "are evident in the Department's handbook").  In addition, the Supreme Court has recognized that the government legitimately could find it "necessary to afford members of each sex privacy from the other sex in living arrangements," *Virginia*, 518 U.S. at 550 n.19, and "[i]n the context of recruit training, this separation is even mandated by Congress," DoD 2018 Report at 37.  With respect to basic training, Congress has required that "the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits," and that "access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy.'"  *Id.* at 29 (citing 10 U.S.C. §§ 4319, 4320, 6931, 6932, 9319, 9320).

Aside from these privacy concerns, DoD was concerned that exempting servicemembers from sex-based standards in training and athletic competitions based on gender identity would generate perceptions of unfairness in the ranks.  *Id.* at 36.  For example, requiring female servicemembers to compete with individuals who identify as female but retain male physiology, DoD reasoned, would likely put the former at a disadvantage.  *Id.* at 31, 36.  And in violent activities, "pitting biological females against" those with male physiology but a female gender identity, and vice versa, could pose "a serious safety risk as well."  *Id.* at 36.  These are legitimate military concerns.  Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for servicemembers to address the biological differences between the sexes.  *Virginia*, 518 U.S. at 550 n.19 (discussing statute requiring standards for women in the service academies to be the same as those for male individuals, except for essential adjustments in such standards "required because of physiological differences between male and female individuals").  In fact, the Supreme Court had deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to . . . physical standards."  *Rostker*, 453 U.S. at 81.

DoD was also concerned that exempting servicemembers from uniform and grooming standards based on gender identity would create friction in the ranks.  For example, allowing someone with male physiology but a female gender identity "to adhere to female uniform and

grooming standards" could frustrate male servicemembers who are not transgender but "would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity."  DoD 2018 Report at 31.  Because "[l]eaders at all levels already face immense challenges in building cohesive military units," DoD decided not to maintain a policy that would "only exacerbate those challenges and divert valuable time and energy from military tasks."  *Id.* at 37–38.  DoD's decision in 2018 to avoid the inescapable "collision of interests" was a legitimate military judgment on unit cohesion and discipline and would similarly support a similar policy today.  *Cf. Goldman v. Sec'y of Def.*, 734 F.2d 1531,1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that it cannot make exceptions . . . for religious reasons without incurring resentment from those who are compelled to adhere to the rules strictly"); *see also Steffan*, 41 F.3d at 686 ("The military is entitled to deference with respect to its estimation" of how particular policies will affect "military discipline.").

### C.    Plaintiffs Are Unlikely to Succeed In Any Challenge to Sex-Based Distinctions in the Military.

Although not specifically identified in the single Equal Protection count of the Amended Complaint, Plaintiffs also seek to "serv[e] in the military on equal terms with other service members," Am. Compl. ¶ 1, requesting that servicemember Plaintiffs not "be . . . denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender[.]"  *Id.* ¶ 158.  Neither the Amended Complaint nor the preliminary injunction motion specifies what unequal treatment is the focus of their Equal Protection challenge.  Indeed, as noted before, Plaintiffs' allegations of irreparable harm in support of the preliminary injunction motion focus only on harm that might flow from the purported categorial ban.[7]  Even the Motion for Temporary Restraining Order was focused on enjoining the

---

[7] That much is confirmed by Plaintiffs' declarations. *See* Talbott Decl. ¶¶ 19–22 ("Impact of Ban") (predicating all future harms on being "prohibited from continuing to serve" and thus "los[ing] a career"); Vandal Decl. ¶¶ 18–23 (predicating harms on being "separated" by "a ban; Cole Decl. ¶¶ 20–24 (assuming "[a] prohibition on military service by transgender individuals like myself"); Herrero Decl. ¶¶ 17–21 (premising all harms—to career, income, and healthcare—on being "prohibited from continuing to serve"); Danridge Decl. ¶¶ 26–30 (premising harms on being

trainee Plaintiff's separation. *See* PI Mot. at 8-9. Accordingly, any vague reference to being treated on equal terms cannot support Plaintiffs' request for the extraordinary relief of a preliminary injunction.

To the extent Plaintiffs are challenging the *Military* EO's stated policy of prohibiting the use of pronouns that inaccurately reflect an individual's sex or the provision in Section 4(d) providing that men and women will have separate sleeping, changing, or bathing facilities, they are unlikely to succeed. Indeed, five of the seven currently-serving Plaintiffs have served for at least nine years.[8] That means they served under the 2018 Policy, under the Carter Policy, and *before* the Carter Policy—when identifying as transgender was generally disqualifying. It also means that they served at times when they surely would have had to use the berthing, changing, and bathing facilities of their biological sexes.

Plaintiffs are unlikely to succeed on this claim. As already discussed above, the requirement to use pronouns consistent with a servicemember's biological sex does not constitute sex discrimination because that requirement applies to both men and women. As for the separate-facilities requirement, that too does not constitute sex discrimination: all servicemembers, male or female, must berth and bathe according to their biological sex. There are no barracks for transgender servicemembers. And, again, the Supreme Court has long endorsed sex-segregated living facilities as "necessary to afford members of each sex privacy from the other sex." *Virginia*, 518 U.S. at 550 n.19. It also "has expressly acknowledged the (rather widely shared) understanding of a key premise of the military['s] judgment: that, in the military setting, physical differences between men and women are enduring: the two sexes are not fungible." *Doe 2*, 917 F.3d at 723 (Williams, J., concurring) (quoting *Virginia*, 518 U.S. at 533 (cleaned up)).

---

"prohibited from continuing to serve"); Hash Decl. ¶¶ 21–25 (premising harms on being "separated from service now"); *see also* Perelson Decl. (in support of TRO motion), ECF No. 14-1, ¶¶ 17–19 (same).

[8] Am. Compl. ¶ 18 (Vandall: 14 years), ¶ 25 (Cole: 17 years), ¶ 32 (Herrero: nine years), ¶ 39 (Danridge: 12 years), ¶ 48 (Hash: 13 years).

Congress, too, has recognized the need for such segregation. *See, e.g.*, 10 U.S.C. § 7419(a)(1) ("The Secretary of the Army shall provide for housing male recruits and female recruits separately and securely for each other during basic training."); *id.* § 8431 (same for Navy); *id.* § 9419 (same for Air Force); *id.* § 7420 (requiring, except in emergencies, that only drill sergeants of the same sex as the housed trainees enter a trainee living area after hours); *id.* § 8432 (same for Navy); *see also* H.R. Conf. Rep. 105-736 at 659–60 (1998) (directing, in the context of a neighboring provision, the Secretary of Defense to report sexual misconduct specifically in recruit training). The privacy, unit cohesion, and discipline concerns DoD examined in 2018 also would apply fully now to support the requirement that sleeping, changing, or bathing facilities be segregated according to servicemembers' biological sex. As DoD found in 2018, "undermining the clear sex-differentiated lines with respect to . . . berthing, bathroom, and shower facilities" would "risk[] unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline." DoD 2018 Report at 40; *id.* 35–40. Accordingly, even assuming Plaintiffs' preliminary injunction is premised on challenging the pronouns and separate facility requirements, they are unlikely to succeed.

## II.    PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE LIKELY TO SUFFER AN IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98. "In the context of military personnel decisions . . . the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs." *Church*, 573 F. Supp. 3d at 145; *see also Shaw v. Austin*, 539 F. Supp. 3d 169, 183 (D.D.C. 2021) (collecting cases).

Plaintiffs' alleged harms do not satisfy the D.C. Circuit's requirement that the harm be both certain and great, as well as beyond remediation. *Chaplaincy*, 454 F.3d at 297. As an initial matter, for the same reasons that Plaintiffs' claims are unripe, Plaintiffs cannot show that they will suffer certain, great, or any actual injuries if the Court does not enter an injunction. Until DoD has revised its medical standards pursuant to the Executive Order, it is not clear that Plaintiffs will be separated or otherwise excluded from military service. And, even if Plaintiffs could establish such an injury, they cannot show that it would be beyond remediation. Plaintiffs allege irreparable harm in the form of "loss of employment and benefits." PI Mot. at 26. But "injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* Accordingly, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006). Plaintiffs' potential employment-related injuries thus could be remedied later and are not irreparable. *See Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016) (concluding that separation from the military did not constitute an irreparable harm); *cf. Knehans v. Alexander*, 566 F.2d 312, 315 (D.C. Cir. 1977) ("This [exhaustion] rule must logically rest on the proposition that such a Correction Board, charged with a responsibility to 'correct an error or remove an injustice,' has by implication sufficient authority to provide the relief appellant now seeks: full reinstatement and backpay." (quoting 10 U.S.C. § 1552) (citation omitted)).

Moreover, "[w]hen plaintiffs have requested an injunction preventing a military discharge, some courts have determined that plaintiffs must make a 'much stronger showing of irreparable harm than [must be made under] the ordinary standard for injunctive relief,' due to the 'magnitude of the interests weighing against judicial interference with the internal affairs of the armed forces.'" *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) (quoting *Veitch v. Danzig,* 135

F.Supp.2d 32, 37 (D.D.C. 2001) and collecting cases).  Here again, the deferential standard of review in military cases tips the scales against granting Plaintiffs' motion.

Plaintiffs also assert irreparable injury in the form of potential harm to "unit cohesion," but that is a potential *governmental* interest, not a private interest on which Plaintiffs may rely.  As explained, DoD determined in the 2018 Report that service by individuals with gender dysphoria would likely undermine "readiness, good order and discipline, sound leadership, and unit cohesion," 2018 Report at 37, 41, 46, and the Executive's judgments in this regard are entitled to deference.  And to the extent Plaintiffs assert irreparable harm on the ground that the "ban brands [them] as less capable and worthy," PI Mot. at 27, such an alleged stigmatizing injury is cognizable "only those persons who are personally denied equal treatment."  *Allen v. Wright*, 468 U.S. 737, 755 (1984).  Because DoD has not yet revised its medical standards, Plaintiffs cannot show that they will personally be denied equal treatment.

Finally, although Plaintiffs seek an injunction ordering that they not "receive adverse treatment or differential terms of service on the basis that they are transgender," ECF No. 13-40 (Proposed Order) at 2, Plaintiffs have not identified any other "adverse treatment" (aside from separations) that would constitute irreparable harm.  Accordingly, any injunction would need to be limited to the issue of separation from military service.

III.    **THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  Plaintiffs have not shown that these factors weigh in their favor.  The Commander in Chief has determined that it is "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," and that this policy is "inconsistent with the medical, surgical and mental health constraints on individuals with gender dysphoria."  *Military* EO § 2. The Constitution charges the President, as Commander in Chief of the Armed Forces, with ultimate

35

responsibility over the Nation's military policy. *See Doe 2*, 917 F.3d at 730 (Williams, J., concurring). "It is this power of oversight and control of military force *by elected representatives and officials* which underlies our entire constitutional system." *Id.* (quoting *Gilligan*, 413 U.S. at 10 (1973)). There is a strong public interest in deferring to the Commander in Chief's judgment on which military policies would best protect the Nation.

Plaintiffs contend that the public interest weighs in favor of an injunction because, according to their declarants, allowing the *Military* EO to be implemented would "degrade military readiness and unit cohesion." PI Mot. at 29. But that is *not* the judgment of the Commander in Chief, who is constitutionally charged with setting military policy, and Plaintiffs' contrary judgment is "quite beside the point." *Goldman*, 475 U.S. at 509. Moreover, the *Military* EO does not itself separate Plaintiffs from the military, and DoD is in the process of revising its medical standards pursuant to the Executive Order. Granting Plaintiffs' their requested relief would directly interfere with DoD's work and the military's ability to address these complex and important issues consistent with the *Military* EO and military priorities.

## IV. ANY PRELIMINARY INJUNCTION AGAINST THE MILITARY MUST BE NARROWLY TAILORED.

### A. Any Preliminary Injunction Should Apply to the Named Plaintiffs Only.

For the reasons explained above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a preliminary injunction is appropriate, the injunction should be limited to the Plaintiffs before this Court. *See Doe 2*, 917 F.3d at 740 (Williams, J., concurring) ("[E]ven if a remedy were appropriate in this case—and it's not—it should in no event extend beyond the actual plaintiffs."). A broader nationwide injunction would transgress both Article III and longstanding equitable principles by affording relief that is not necessary to redress any cognizable, irreparable injury to Plaintiffs. And it would frustrate the development of the law, while obviating the requirements for and protections of class-action litigation.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation

omitted).  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Doe 2*, 917 F.3d at 739–40 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.'  Nothing more." (quoting *Gill*, 585 U.S. at 72)).  Thus, "a plaintiff's judicial 'remedy must be tailored to redress *the plaintiff's* particular injury.'"  *Doe 2*, 917 F.3d at 740 (quoting *Gill*, 585 U.S. at 73).

Principles of equity reinforce those limitations.  A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789.  *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999).  And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare"); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 425 (2017) ("There is an easy, uncomplicated answer to the question whether the national injunction is traceable to traditional equity:  *no*.")

Nationwide injunctions also "take a toll on the federal court system." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring).  "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . . encourages multiple judges and multiple circuits to weigh in" on a given legal question.  *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring).  In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring).  Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring).  "A single loss and the policy goes on ice—possibly for good, or just as possibly for

some indeterminate period of time until another court jumps in to grant a stay." *Id.* Judicial restraint "is especially appropriate where, as here, the case concerns the internal operations of the military." *Doe 2*, 917 F.3d at 740. "Our constitutional framework 'requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.'" *Id.* (quoting *Munaf v. Green*, 553 U.S. 674, 700 (2008)). Accordingly, any remedy must not "extend beyond the actual plaintiffs." *Id.*

Permitting nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief: class actions. It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while failing to afford the Government the corresponding benefit of a definitive resolution of the underlying legal issues to all potential claimants if it prevails instead.

Plaintiffs nonetheless contend that a nationwide injunction is necessary because it is "the only way" to prevent irreparable harm to Plaintiffs during the pendency of this action. PI Mot. at 31 (quoting *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 25 (D.D.C. 2018)). That is incorrect; an injunction prohibiting Defendants from excluding Plaintiffs from military service would prevent the primary irreparable harm alleged, which is the "imminent loss of employment and benefits" that would result from separations. *Id.* at 26. Nor is nationwide relief appropriate to remedy harms to "similarly situated" nonparties, *id.* at 32; as noted, Article III limits the judicial power to redressing injuries to Plaintiffs in this suit. And the potential "quantity of litigations" over this issue, *see id.* at 33, is a reason *not* to issue a nationwide injunction. Tailored relief would ensure that "multiple judges and multiple circuits" may continue to weigh in on this issue, rather than restricting debate to this Court. *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring); *see, e.g.*, *Shilling v. Trump*, No. 2:25-cv-00241 (W.D. Wash. Feb. 6, 2025) (similar challenge to *Military* EO). For all these reasons, any injunction should be limited to the named Plaintiffs only.

**B.      Any Preliminary Injunction Cannot Impede the Military's Discretion To Make Assignment, Deployment, And Operational Decisions.**

Even if the Court were inclined to grant Plaintiffs some preliminary relief, any such injunction should not interfere with military assignment, deployment, and operational decisions. *See* Am. Compl. ¶ 158 (seeking an order requiring that Plaintiffs may not "be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, or otherwise receive adverse treatment or differential terms of service on the basis that they are transgender"). Decisions about how to assign and deploy servicemembers are for the military to make, under the supervision of the President as Commander in Chief, not civilian courts. For that reason, challenges to such assignment decisions are non-justiciable even when they involve a constitutional challenge.[9]

The Supreme Court recently has recognized that a district court may not interfere with the military's assignment decisions. In *United States Navy Seals 1-26 v. Biden*, the district court enjoined the Navy "from taking any adverse action against Plaintiffs on the basis of Plaintiffs' requests for religious accommodation" as to DoD's COVID-19 vaccination policy, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022). The Supreme Court stayed the injunction to the extent it barred the Navy from considering Navy Seals' vaccination statuses when making deployment, assignment, and other operational decisions. *See Austin v. U.S. Navy SEALs 1–26*, 142 S. Ct. 1301 (2022) (Mem.); *see also Navy SEAL v. Sec'y of the U.S. Dep't of Def.*, No. 22-10645, slip op. at 3 (11th Cir. Mar. 30, 2022) (court of appeals "follow[ed] the Supreme Court's lead" and stayed the district

---

[9] *See, e.g., Orloff*, 345 U.S. 83 (declining to review servicemember challenge to a military assignment decision that was allegedly discriminatory punishment for his invocation of the constitutional right against self-incrimination); *Harkness v. Sec'y of Navy*, 858 F.3d 437, 443 (6th Cir. 2017) (noting in a case involving a First Amendment challenge to military assignment decisions that "courts are generally reluctant to review claims involving military duty assignments"); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) (holding mandamus claim for reassignment is nonjusticiable); *Schlanger v. United States*, 586 F.2d 667, 671 (9th Cir. 1978) ("[C]ourts should not review internal military decisions such as duty order or duty assignments."); *Sebra v. Neville*, 801 F.2d 1135, 1141 (9th Cir. 1986) (same); *Wilson v. Walker*, 777 F.2d 427, 429 (8th Cir. 1985) (same); *Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971) (same); *Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013) ("Courts are in no position to determine the 'best qualified Officer' or the 'best match' for a particular billet.").

court's injunction pending appeal "insofar as it precludes the Navy from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions"). Likewise here, any injunction should be appropriately limited to avoid intrusion into military assignment, deployment, and operational decisions.

### C.    Relief Against the President is Improper.

Although Plaintiffs have named the President as a Defendant, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief."). Accordingly, in *Doe 2 v. Trump*, the district court dismissed "the President as a party to this case." 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive] relief against the President directly."). The Court therefore lacks jurisdiction to enter Plaintiffs' requested relief against the President and, as in *Doe 2*, should dismiss him as a defendant.

### CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction. If the Court is inclined to issue any injunctive relief, Defendants respectfully request a stay for five (5) days to allow the Solicitor General time to decide whether to seek appellate relief, and if such relief is sought, a stay pending disposition of the appeal.

Dated: February 12, 2025                     Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Acting Assistant Attorney General

                                             ALEXANDER K. HAAS
                                             Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/ *Jason C. Lynch*
JASON C. LYNCH
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1359
Jason.Lynch@usdoj.gov

*Counsel for Defendants*

41