# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, and CAEL NEARY<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>*Defendants*. | Civil Action No. 1:25-cv-240-ACR |

## BRIEF *AMICUS CURIAE* OF CONSTITUTIONAL ACCOUNTABILITY CENTER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
David H. Gans (DC Bar No. 461002)
Praveen Fernandes (DC Bar No. 472773)
Ana M. Builes (DC Bar No. 1659789)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF *AMICUS CURIAE* ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

ARGUMENT ...................................................................................................... 4

    I.    THE CONSTITUTION GUARANTEES EQUAL PROTECTION FOR ALL AND FORBIDS THE FEDERAL GOVERNMENT FROM ENACTING POLICIES SINGLING OUT A CLASS OF INDIVIDUALS FOR DISFAVORED LEGAL STATUS ................................................................ 4

    II.   THE ORDER'S JUSTIFICATIONS FOR THE BAN ON SERVICE BY TRANSGENDER SERVICE MEMBERS ARE SIMILAR TO THOSE THAT WERE OFFERED TO JUSTIFY PAST DISCRIMINATION ON THE BASIS OF RACE, SEXUAL ORIENTATION, AND GENDER ................................... 7

    III.  LIKE PRIOR DISCRIMINATION BY THE MILITARY, A BAN ON SERVICE BY TRANSGENDER SERVICE MEMBERS CANNOT SURVIVE JUDICIAL SCRUTINY ........................................................... 16

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ................................................................................... 4, 5

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ................................................................................... 7

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................................... 4, 6

*The Civil Rights Cases*,
    109 U.S. 3 (1883) ....................................................................................... 5

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................................... 6

*Doe 1 v. Trump*,
    275 F. Supp. 3d 167 (D.D.C. 2017) .......................................................... 2, 3, 18

*Doe 2 v. Shanahan*,
    755 F. App'x 19 (D.C. Cir. 2019) ............................................................. 2

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ................................................................................... 10

*Hampton v. Mow Sun Wong*,
    426 U.S. 88 (1976) ..................................................................................... 4

*Heller v. Doe*,
    509 U.S. 312 (1993) ................................................................................... 2, 5, 16

*J.E.B. v. Alabama ex rel. T.B.*,
    511 U.S. 127 (1994) ................................................................................... 2, 6

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ................................................................... 2

*Lyng v. Castillo*,
    477 U.S. 635 (1986) ................................................................................... 4

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Matthews v. Lucas*,
    427 U.S. 495 (1976) ................................................................. 6

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................. 2, 5

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ................................................................. 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................. 6

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ................................................................. 4

*Orr v. Orr*,
    440 U.S. 268 (1979) ................................................................. 7

*Personnel Administrator of Mass. v. Feeney*,
    442 U.S. 256 (1979) ................................................................. 6

*Philips v. Perry*,
    106 F.3d 1420 (9th Cir. 1997) .................................................. 8

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................. 5, 6, 19

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ................................................................... 7

*Students for Fair Admissions v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023) ................................................................. 2, 5

*Sweatt v. Painter*,
    339 U.S. 629 (1950) ................................................................. 5

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................. 2, 7, 16

*United States v. Windsor*,
    570 U.S. 744 (2013) ................................................................. 1, 5, 6, 19

### TABLE OF AUTHORITIES – cont'd

**Page(s)**

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1978) .................................................................. 6

*Watkins v. U.S. Army*,
    875 F.2d 699 (9th Cir. 1989) ................................................... 9

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975) .................................................................. 4

*Zobel v. Williams*,
    457 U.S. 55 (1982) .................................................................... 5

CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

*Authorization for Appropriations for Fiscal Year 2011: Hearing on S. 3454 Before the
    S. Comm. on Armed Servs.*, 111th Cong. (2010) ..................... 12

156 Cong. Rec. S7244 (daily ed. Sept. 21, 2010) ......................... 12

Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515
    (2010) ........................................................................................ 12

S. Rep. No. 103-112 (1993) ........................................................... 10, 11

10 U.S.C. § 654(a)(15) .................................................................... 11

U.S. Const. amend. V ...................................................................... 1, 4

OTHER AUTHORITIES

Lizette Alvarez, *G.I. Jane Breaks the Combat Barrier*, N.Y. Times, Aug. 16, 2009 .... 15

Aaron Belkin et al., Palm Ctr., *One Year Out: An Assessment of DADT Repeal's Impact
    on Military Readiness* (2012) ................................................... 13

Br. for Julius W. Becton, Jr., et al. as *Amici Curiae* in Support of Respondents, *Grutter v.
    Bollinger*, 539 U.S. 306 (2003) .............................................. 10

Elisabeth Bumiller, *Top Defense Officials Seek to End 'Don't Ask, Don't Tell'*,
    N.Y. Times, Feb. 3, 2010 ......................................................... 11

Karen DeYoung, *Colin Powell Now Says Gays Should Be Able to Serve Openly in Mili-
    tary*, Wash. Post, Feb. 4, 2010 ................................................ 11

iv

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Maj. Jeffrey S. Dietz, *Military's Direct Ground Combat Exclusion of Women*,
207 Mil. L. Rev. 86 (2011) ..................................................................... 15

DoD Instruction 6130.03: Medical Standards for Military Service: Appointment, Enlistment, or Induction (Mar. 28, 2024) ............................................... 18

Joycelyn Elders, MD, et al., Palm Ctr., *Report of the Transgender Military Service Commission* (2014) ........................................................................ 17, 18

Exec. Order No. 9981, 13 Fed. Reg. 4313 ...................................... 9

Exec. Order No. 14,004, 86 Fed. Reg. 7471 ................................... 18

Exec. Order No. 14,183, 90 Fed. Reg. 8757 ............................... 1, 2, 7, 19

Jody Feder, Cong. Rsch. Serv., *"Don't Ask, Don't Tell": A Legal Analysis* (2013) ..... 13

Richard Halloran, *Fighting Women*, N.Y. Times, Sept. 3, 1989 ................... 14

Margaret C. Harrell & Laura L. Miller, RAND Nat'l Def. Rsch. Inst., *New Opportunities for Military Women: Effects Upon Readiness, Cohesion, and Morale* (1997) ......... 14

Robert T. Herres et al., Presidential Comm'n on the Assignment of Women in the Armed Forces, *Report to the President* (1992) ...................................... 14

Lawrence Kapp, Cong. Rsch. Serv., *Recruiting and Retention: An Overview of FY2011 and FY2012 Results for Active and Reserve Component Enlisted Personnel* (2013) ................................................................................. 13

Memorandum from Henry Arnold, Commander of the Army Air Corp, *Employment of Negro Personnel in Air Corps Units* (May 31, 1940) ............................. 8

Brian Mitchell, *Women in the Military: Flirting with Disaster* (1997) .............. 14

J. Todd Moye, *Freedom Flyers: The Tuskegee Airmen of World War II* (2010) ......... 9

Matthew Rosenberg & Dave Phillips, *Pentagon Opens All Combat Roles to Women: 'No Exceptions'*, N.Y. Times, Dec. 4, 2015 ......................................... 15

Bernard Rostker et al., RAND Nat'l Def. Rsch. Inst., *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment* (1993) .......................... 8, 9, 10

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Agnes Gereben Schaefer et al., RAND Nat'l Def. Rsch. Inst., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (2016)................................... 16, 17

U.S. Dep't of Def., *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell"* (Nov. 30, 2010) ................................................. 9, 11

Tom Vanden Brook, *Hagel Hails Gay Pride at Transformed Pentagon*, USA Today, June 25, 2013.......................................................................................................... 13

*War and the Second Sex*, Newsweek (Aug. 4, 1991)...................................................... 14

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus* Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC has a strong interest in the scope of the Fifth Amendment's protections for liberty and equality and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

The Constitution's guarantee of equal protection implicit in the Fifth Amendment requires that the federal government respect fundamental rights central to individual dignity and autonomy for all persons, including transgender persons. Yet on January 27, 2025, President Donald Trump once again issued an Executive Order categorically barring transgender persons from serving in the U.S. military. Exec. Order No. 14,183, 90 Fed. Reg. 8757 (the "Order"). This Order violates the Constitution's guarantee of equal protection.

The Due Process Clause of the Fifth Amendment provides that no "person" shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. By broadly protecting all "person[s]," the Amendment guarantees to all, regardless of race, sex, sexual orientation, or gender identity, dignity and equality under the law, "withdraw[ing] from Government the power to degrade or demean," *United States v. Windsor*, 570 U.S. 744, 774 (2013). "[A]t the heart of the Constitution's guarantee of equal protection lies the simple

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* made a monetary contribution to the brief's preparation or submission. All parties have consented to the filing of this brief.

command that the Government must treat citizens as individuals, not as simply components of a racial [or] sexual . . . class." *Students for Fair Admissions v. President & Fellows of Harvard College*, 600 U.S. 181, 223 (2023) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). To effectuate that guarantee, the Constitution requires policies that single out a class of people for disparate treatment to have—at the very least—"a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). And classifications that discriminate based on sex require heightened judicial scrutiny. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994); *United States v. Virginia*, 518 U.S. 515, 531-33 (1996); *see also Karnoski v. Trump*, 926 F.3d 1180, 1200-02 (9th Cir. 2019) (holding that intermediate scrutiny applied to President Trump's 2017 military ban on service by transgender members); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 209 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (same).

The government's ban on military service by transgender persons cannot withstand judicial scrutiny. The Order states that service by transgender individuals is incomptabile with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Order § 2. But these purported concerns are the very same concerns that have been cited, time and again, by opponents of greater integration of our military—and they are the same concerns that, time and again, have proven to be rooted in unsupported stereotypes and misplaced fears.

When the military was racially segregated, proponents of that policy claimed it was necessary for unit cohesion and military effectiveness; when gay and lesbian individuals were prohibited from serving openly, proponents of that policy claimed it was necessary for unit cohesion and military effectiveness; and when women were forbidden from serving in combat

roles, proponents of that policy claimed it was necessary for unit cohesion and military effectiveness. Yet the military is now racially integrated, gay men and lesbians serve openly, and women routinely see open combat—and there have been no negative effects on unit cohesion or military effectiveness. To the contrary, military experts agree that ending those discriminatory policies and ensuring diversity in the military's ranks actually strengthened the military. Concerns about unit cohesion and military effectiveness did not justify treating some classes of military service members in a discriminatory manner then, and they do not do so now.

Transgender individuals have been serving openly without negative consequences since 2016. This should come as no surprise: a military-commissioned study concluded that open service by transgender individuals would not negatively affect military effectiveness or unit cohesion in the Armed Forces. That yearslong study culminated in then-Secretary of Defense Ash Carter's announcement, on June 30, 2016, that transgender Americans could serve openly. Dkt. No. 15, at ¶ 106. A year later, during his first administration, President Trump announced that the military would no longer permit service by transgender Americans. *Id*. at ¶ 116. Courts in this district, and elsewhere, concluded that the 2017 ban was likely unconstitutional, in part, because President Trump had abruptly revoked the right of transgender individuals to serve "for reasons contrary to the only then-available studies." *See, e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d at 215.

The evidence that allowing transgender individuals to serve openly has no impact on troop readiness and cohesion is now, if anything, even stronger. Shortly after taking office, President Biden overturned the prior ban and once again allowed transgender Americans who could "meet the appropriate standards" to serve. Dkt. No. 15, at ¶ 129. For the past four years, transgender individuals like Plaintiffs have served openly and with distinction at the highest

levels of the military, and they have done so with overwhelming support from their units. *See id.*
at ¶ 134. The Order simply assumes, contrary to this evidence, that a transgender service
member "cannot satisfy the rigorous standards necessary for military service." Order § 1.

In sum, the government's singling out of transgender people for exclusion from military
service cannot survive judicial scrutiny. It impermissibly rests purely on "negative attitudes,"
"fear," and "irrational prejudice[s]" about transgender people, *City of Cleburne v. Cleburne
Living Ctr.*, 473 U.S. 432, 448, 450 (1985), and serves no purpose other than to "disrespect and
subordinate" transgender service members by "lock[ing] them out of a central institution of the
Nation's society," *Obergefell v. Hodges*, 576 U.S. 644, 670, 675 (2015)—military service. This
ban cannot be squared with the Fifth Amendment's guarantee of equal protection for all people.

## ARGUMENT

I. **THE CONSTITUTION GUARANTEES EQUAL PROTECTION FOR ALL AND
FORBIDS THE FEDERAL GOVERNMENT FROM ENACTING POLICIES SIN-
GLING OUT A CLASS OF INDIVIDUALS FOR DISFAVORED LEGAL STA-
TUS.**

The Due Process Clause of the Fifth Amendment, which provides that no "person" shall
"be deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V,
guarantees all persons dignity and equality under the law. While the text of the Fifth
Amendment "is not as explicit a guarantee of equal treatment as the Fourteenth Amendment,"
the Supreme Court has consistently held that "the Constitution imposes upon federal, state, and
local government actors the same obligation to respect the personal right to equal protection of
the laws." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231-32 (1995); *see Lyng v.
Castillo*, 477 U.S. 635, 636 n.2 (1986) ("The concept of equal justice under law is served by the
Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the
Fourteenth Amendment." (quoting *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976)));

*Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."); *Windsor*, 570 U.S. at 774 ("the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment [due process] right all the more specific and all the better understood and preserved").  These repeated holdings reflect that at both the federal and state levels, "equality of citizenship is of the essence in our Republic." *Zobel v. Williams*, 457 U.S. 55, 70 (1982) (Brennan, J., concurring).

The Constitution's profound commitment to equal protection is reflected in the Fifth Amendment's broad language, protecting "any person."  *See Adarand*, 515 U.S. at 227 ("[t]he Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*").  As a personal right that belongs to all individuals, the right of equal protection secures equality to all persons, regardless of race, sex, sexual orientation, or gender identity.  "[A]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial [or] sexual . . . class." *Students for Fair Admissions*, 600 U.S. at 223 (quoting *Miller*, 515 U.S. at 911); *see The Civil Rights Cases*, 109 U.S. 3, 24 (1883) (Constitution prohibits any policy "which has the effect of denying to any race or class, *or to any individual*, the equal protection of the laws" (emphasis added)).  Thus, the Constitution prohibits "'indiscriminate imposition of inequalities'" "born of animosity toward the class of persons affected."  *Romer v. Evans*, 517 U.S. 620, 633, 634 (1996) (quoting *Sweatt v. Painter*, 339 U.S. 629, 635 (1950)).

In giving effect to the constitutional requirement of equal protection, the Supreme Court has insisted that when policies single out a particular class of people for disparate treatment, there must, at the very least, be "a rational relationship between the disparity of treatment and

5

some legitimate government purpose." *Heller*, 509 U.S. at 320. And even under rational basis review, the Supreme Court has long recognized that courts have a constitutional obligation to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (explaining that "deference in matters of policy cannot . . . become abdication in matters of law"); *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring) ("[a]bdication of responsibility is not part of the constitutional design").

This is why rational basis scrutiny, while deferential, does not require a reviewing court to abdicate its constitutional responsibility to enforce the guarantee of equal protection for all persons. To the contrary, the government may not subject any group of persons to adverse treatment "born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634; *Windsor*, 570 U.S. at 770 ("The Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group." (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534-35 (1978))). For that reason, the Supreme Court has been "especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a 'tradition of disfavor'" in order to prevent the use of a "stereotyped reaction [that] may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." *Cleburne*, 473 U.S. at 453 n.6 (Stevens, J., concurring) (quoting *Matthews v. Lucas*, 427 U.S. 495, 520-21 (1976) (Stevens, J., dissenting)).

When laws classify based on sex, courts must subject them to even more rigorous scrutiny. As the Supreme Court has long recognized, "all gender-based classifications . . . require 'an exceedingly persuasive justification' in order to survive constitutional scrutiny."

*J.E.B.*, 511 U.S. at 136 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 273 (1979)); *Sessions v. Morales-Santana*, 582 U.S. 47, 57-58 (2017); *Virginia*, 518 U.S. at 531-33. The Court's insistence on "skeptical scrutiny of official action denying rights or opportunities based on sex responds to volumes of history," *id.* at 531, and reflects the fact that sex-based laws "carry the inherent risk of reinforcing . . . stereotypes," *Orr v. Orr*, 440 U.S. 268, 283 (1979), and "generalizations about the way men and women are," *Morales-Santana*, 582 U.S. at 57; *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 660-61 (2020) (because "transgender status" is "inextricably bound up with sex," to "discriminate on [this] ground[]" is to "intentionally treat individual[s] . . . differently because of their sex").

The "heightened standard" demanded by longstanding precedents "does not make sex a proscribed classification," *Virginia*, 518 U.S. at 533, but it does require judges to hold the government to its "demanding" burden of justifying sex-based discrimination and to ensure it does not indulge in "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* "Overbroad generalizations . . . , the Court has come to comprehend, have a constraining impact, descriptive though they may be of the way many people still order their lives." *Morales-Santana*, 582 U.S. at 63.

The transgender military ban at issue here cannot survive judicial scrutiny, no matter the standard of review, as the remainder of this brief explains.

## II. THE ORDER'S JUSTIFICATIONS FOR THE BAN ON SERVICE BY TRANSGENDER SERVICE MEMBERS ARE SIMILAR TO THOSE THAT WERE OFFERED TO JUSTIFY PAST DISCRIMINATION ON THE BASIS OF RACE, SEXUAL ORIENTATION, AND GENDER.

According to the government, transgender individuals are categorically unfit for service because they lack "a soldier's commitment to an honorable, truthful, and disciplined lifestyle,"

Order § 1, and allowing service by transgender individuals would undermine "readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," *id.* § 2. These supposed justifications are strikingly similar to justifications offered in the past to support racial segregation in the military, the military's "Don't Ask, Don't Tell" policy preventing gay men and lesbians from serving openly, and the military's prohibition on women serving in combat roles. Yet the military has since abandoned all of those policies, recognizing that military effectiveness is furthered by allowing all who are able to serve to do so. These historical analogues suggest that the government's proffered justifications should be treated with great skepticism as legitimate reasons for discriminating against transgender service members.

*First*, those opposed to racial integration in the military in the first half of the twentieth century justified their position with misguided fears about unit cohesion and military effectiveness. Bernard Rostker et al., RAND Nat'l Def. Rsch. Inst., *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment* 171-72 (1993) ("1993 RAND Study"), https://www.rand.org/pubs/monograph_reports/MR323.html (opponents of integration argued that "[r]acial mixing . . . would undermine unit cohesion among the troops and thereby impair their morale, readiness, and ability to perform as a unified combat force"); *see Philips v. Perry*, 106 F.3d 1420, 1439 (9th Cir. 1997) (Fletcher, J., dissenting) ("[T]he 'unit cohesion' rationale . . . is disturbingly similar to the arguments used by the military to justify the exclusion from and segregation of African Americans in military service.").

For instance, in 1935, Rear Admiral Adolphus Andrews, Chief of the Navy Bureau of Navigation, argued that if Black service members were enlisted as seamen, "team work, harmony, and ship efficiency [would be] seriously handicapped." 1993 RAND Study 172. Likewise, General Henry Arnold, commander of the Army Air Corp, wrote in 1940 that "Negro pilots

cannot be used in our present Air Force since this would result in having Negro officers serving over white enlisted men. This would create an impossible social problem." Memorandum from Henry Arnold, Commander of the Army Air Corp, *Employment of Negro Personnel in Air Corps Units* (May 31, 1940), *quoted in* J. Todd Moye, *Freedom Flyers: The Tuskegee Airmen of World War II* 14 (2010). And during "World War II both the Army chief of staff and the Secretary of the Navy justified racial segregation in the ranks as necessary to maintain efficiency, discipline, and morale." *Watkins v. U.S. Army*, 875 F.2d 699, 729 (9th Cir. 1989) (Norris, J., concurring in the judgment).

Though the reluctance to integrate was presented as being based upon concerns about unit cohesion and military effectiveness, the trepidation was in truth based upon racism and stereotypes about Black Americans. For instance, in 1946, Major General Idwal Edwards, the Army's Assistant Chief of Staff for Organization and Training, acknowledged that his preference for racial segregation was related to his views about the "ineptitude and limited capacity of the Negro soldier." U.S. Dep't of Def., *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell"* 82 (Nov. 30, 2010), http://www.washingtonpost.com/wp-srv/special/politics/dont-ask-dont-tell/DADTReport_FINAL.pdf. Similarly, "[m]any white Americans (especially Southerners) responded with visceral revulsion to the idea of close physical contact with blacks." 1993 RAND Study 160.

Despite these attitudes, on July 26, 1948, President Harry Truman issued an Executive Order requiring "equality of treatment and opportunity for all persons in the armed services without regard to race, color, religion or national origin." Exec. Order No. 9981, §1, 13 Fed. Reg. 4313 (July 26, 1948). And "[b]y the late 1950s, the Army, like the Navy and the Air Force be-

fore it, had come to accept . . . the view that racial integration actually benefited the military" be-cause "[o]nce blacks and whites began to share the risks, rewards, and responsibilities of military life more equitably, morale problems diminished."  1993 RAND Study 178, 180.  In short, the warnings that racial integration would harm military readiness and unit cohesion proved to be unfounded.  Indeed, integration of the armed forces has actually strengthened the military's ef-fectiveness.  *See Grutter v. Bollinger*, 539 U.S. 306, 331 (2003) ("[A] 'highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to pro-vide national security.'" (quoting Br. for Julius W. Becton, Jr., et al. as *Amici Curiae* in Support of Respondents 5, *Grutter*, 539 U.S 306 (No. 02-214))).

*Second*, essentially the same debates that played out over racial integration in the first half of the twentieth century played out over the open service of gay men and lesbians in the sec-ond half.  Just like the opponents of racial integration before them, those who supported the mili-tary's "Don't Ask, Don't Tell" policy argued that allowing gay men and lesbians to serve openly in the military would negatively affect military effectiveness and unit cohesion.  For instance, General Colin Powell testified before Congress that "[t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies. . . .  [T]he presence of open homosexuality would have an unacceptable det-rimental and disruptive impact on the cohesion, morale, and esprit of the armed forces."  S. Rep. No. 103-112, at 275, 278 (1993).  Likewise, General H. Norman Schwarzkopf testified that "the introduction of an open homosexual into a small unit immediately polarizes that unit and de-stroys the very bonding that is so important for the unit's survival in time of war."  *Id.* at 280.

And Lieutenant General Calvin Waller testified that allowing gay men and lesbians "total open-ness in our Armed forces would cause less ready units or units that would not nearly be as effec-tive as the units we currently have."  *Id.*

For that reason, Congress itself concluded in 1993 that "[i]n view of the unique condi-tions that characterize military life, there is broad agreement that lifting the restrictions on the service of gay men and lesbians would be detrimental to the best interests of the armed forces." *Id.* at 278.  Indeed, in the statutory provision that codified the "Don't Ask, Don't Tell" policy, Congress specifically stated that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability."  10 U.S.C. § 654(a)(15).

Again, however, experience ultimately showed that such fears were unfounded, and that there was no reason to conclude that open service in the military by gay men and lesbians would harm military effectiveness and unit cohesion.  As the Department of Defense explained when Congress was considering repealing "Don't Ask, Don't Tell" in 2010, "aside from the moral and religious objections to homosexuality, much of the concern about 'open' service [was] driven by misperceptions and stereotypes about what it would mean if gay Service members were allowed to be 'open' about their sexual orientation."  U.S. Dep't of Def., *supra,* at 5.  The conclusions of this study mirrored the views of then-Chairman of the Joint Chiefs of Staff Admiral Mike Mul-len, who testified to the Senate Armed Services Committee that the policy should be repealed, and noted that he had "served with homosexuals since 1968" without issue and that "[e]verybody in the military ha[d]."  Elisabeth Bumiller, *Top Defense Officials Seek to End 'Don't Ask, Don't Tell'*, N.Y. Times, Feb. 3, 2010, at A1.  Even General Powell, whose opposition to open service

by gay service members contributed to the adoption of the "Don't Ask, Don't Tell" policy, ulti-mately changed his view and supported an end to that policy. *See* Karen DeYoung, *Colin Powell Now Says Gays Should Be Able to Serve Openly in Military*, Wash. Post, Feb. 4, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/02/03/AR2010020302292.html.

Members of Congress from across the political spectrum also realized that the important interests of unit cohesion and military effectiveness could not justify the "Don't Ask, Don't Tell" policy. For example, Senator Susan Collins noted in debate that "[a]t least 28 countries, includ-ing Great Britain, Australia, Canada, the Netherlands, and Israel allow open service by lesbian and gay troops," and "[n]one of these countries—not one—report[ed] morale or recruitment problems." 156 Cong. Rec. S7234 (daily ed. Sept. 21, 2010) (statement of Sen. Collins). Fur-thermore, she argued that the "Don't Ask, Don't Tell" policy actually reduced military effective-ness, noting that "8 percent of the servicemembers let go under [the policy] held critical occupa-tions . . . such as interpreters." *Id.* Similarly, Senator Joseph Lieberman noted that "[m]ore than 14,000 members of the military ha[d] been put out of the services since 1993 . . . , not because they weren't good soldiers, sailors, marines or airmen, not because they violated any military code of conduct but only because of their private sexual orientation." 156 Cong. Rec. S7244 (daily ed. Sept. 21, 2010). This, he noted, cost taxpayers more than $600 million. *Id.* Likewise, Senator Carl Levin rejected the argument that "allowing gays and lesbians to serve openly would damage unit cohesion and morale," arguing instead that "there is no evidence that the presence of gay and lesbian colleagues would damage our military's ability to fight." *Authorization for Ap-propriations for Fiscal Year 2011: Hearing on S. 3454 Before the S. Comm. on Armed Servs.*, 111th Cong. (2010). Following careful deliberation, Congress in December 2010 repealed the

"Don't Ask, Don't Tell" policy and formally permitted gay men and lesbians to serve openly. *See* Don't Ask, Don't Tell Repeal Act of 2010, Pub. L. No. 111-321, 124 Stat. 3515 (2010).

Since that time, study after study has shown that repeal of the "Don't Ask, Don't Tell" policy had no negative impact on unit cohesion or military effectiveness. One prominent report released a year after the policy's repeal found "no overall negative impact on military readiness or its component dimensions, including cohesion, recruitment, retention, assaults, harassment or morale." Aaron Belkin et al., Palm Ctr., *One Year Out: An Assessment of DADT Repeal's Impact on Military Readiness* 4 (2012), https://www.palmcenter.org/wp-content/uploads/2017/12/One-Year-Out_0.pdf. By 2013, the Congressional Research Service had noted that the "repeal [of "Don't Ask, Don't Tell"] appears to have proceeded smoothly." Jody Feder, Cong. Rsch. Serv., *"Don't Ask, Don't Tell": A Legal Analysis* 3 (2013); *see* Lawrence Kapp, Cong. Rsch. Serv., *Recruiting and Retention: An Overview of FY2011 and FY2012 Results for Active and Reserve Component Enlisted Personnel* (2013) (noting that recruitment and retention remained strong in fiscal years 2011 and 2012). In fact, Defense Secretary Chuck Hagel remarked in 2013 that allowing gay men and lesbians to serve openly has made "our nation and our military stronger, much stronger." Tom Vanden Brook, *Hagel Hails Gay Pride at Transformed Pentagon*, USA Today, June 25, 2013, https://www.usatoday.com/story/nation/2013/06/25/gays-in-military/2455547/ (quoting Chuck Hagel, Sec'y of Def.). In short, as with opposition to racial integration of the military, the justifications offered by the opponents of open service by gay men and lesbians turned out to have no basis in fact: gay and lesbian service members have been serving openly for nearly a decade and a half with no reported decline in military effectiveness or unit cohesion.

*Third*, opponents of women's equal participation in combat also claimed that treating women equally would harm military effectiveness and unit cohesion.  For instance, a 1992 report by the Presidential Commission on the Assignment of Women in the Armed Forces—which recommended that women be excluded from combat roles—opined that "unit cohesion can be negatively affected by the introduction of any element that detracts from the need for such key ingredients as mutual confidence, commonality of experience, and equitable treatment."  Robert T. Herres et al., Presidential Comm'n on the Assignment of Women in the Armed Forces, *Report to the President* 25 (1992), https://babel.hathitrust.org/cgi/pt?id=umn.31951d00277676f.  The Commission believed that women would undermine these values because of, among other things, the "lack of privacy on the battlefield," "traditional Western values where men feel a responsibility to protect women," "sexual misconduct," and the possibility of "pregnancy."  *Id.*  Similarly, General Robert Barrow of the Marine Corps stated in congressional testimony that the decision not to allow women to serve in combat roles is about "combat effectiveness, combat readiness," and "national security."  *War and the Second Sex*, Newsweek (Aug. 4, 1991), http://www.newsweek.com/war-and-second-sex-202970.  Another commentator suggested that "[t]he presence of women inhibits male bonding, corrupts allegiance to the hierarchy, and diminishes the desire of men to compete for anything but the attentions of women."  Brian Mitchell, *Women in the Military: Flirting with Disaster* 175 (1997); *see* Richard Halloran, *Fighting Women*, N.Y. Times, Sept. 3, 1989, http://www.nytimes.com/1989/09/03/books/fighting-women.html (same).

Again, however, subsequent experience has shown that these fears were unfounded. Even before women were allowed to serve in combat roles, a 1997 RAND National Defense Research Institute study concluded that "gender integration is perceived to have a relatively small

effect on readiness, cohesion, and morale in the units . . . studied," and that "gender integration . . . [had] a positive effect, raising the level of professional standards."  Margaret C. Harrell & Laura L. Miller, RAND Nat'l Def. Rsch. Inst., *New Opportunities for Military Women: Effects Upon Readiness, Cohesion, and Morale*, at xvii, xviii (1997), https://www.rand.org/pubs/mono-graph_reports/MR896.html.  Indeed, during the wars in Afghanistan and Iraq, Army command-ers skirted the official prohibition on women in combat roles when they needed more soldiers for crucial jobs, and women serving in these positions "repeatedly proved their mettle in combat." Lizette Alvarez, *G.I. Jane Breaks the Combat Barrier*, N.Y. Times, Aug. 16, 2009, at A1.

Moreover, as more and more members of the military concluded that "[a]ssertions that women do not possess the leadership capability or that they will destroy unit cohesion are overbroad generalizations, and are disproved by the actual successful combat performance of mixed-gender combat support units," Maj. Jeffrey S. Dietz, *Breaking the Ground Barrier: Equal Protection Analysis of the U.S. Military's Direct Ground Combat Exclusion of Women*, 207 Mil. L. Rev. 86, 113 (2011), the military ultimately changed its position, first rescinding the rule that restricted women from serving in combat units in 2013, and then officially opening all combat roles to women by late 2015, *see* Matthew Rosenberg & Dave Phillips, *Pentagon Opens All Combat Roles to Women: 'No Exceptions'*, N.Y. Times, Dec. 4, 2015, at A1.  In the nearly a dec-ade since that policy change took effect, there has been no negative impact on the military's ef-fectiveness or unit cohesion.

In sum, the government's claim that allowing transgender people to serve will cause dis-ruption to unit cohesion and military effectiveness is nothing new.  Time and again, these argu-ments have been trotted out to justify treating other groups of service members unequally, whether racial minorities, gay men and lesbians, or women, and each time the purported fears

15

have proven to be unfounded, based on some combination of misunderstanding, prejudice, and stereotypes. As the next Section shows, there is no more basis for these claims now than there was in the past.

III. **LIKE PRIOR DISCRIMINATION BY THE MILITARY, A BAN ON SERVICE BY TRANSGENDER SERVICE MEMBERS CANNOT SURVIVE JUDICIAL SCRUTINY.**

To survive rational basis review, there must be "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*, 509 U.S. at 320. To survive heightened review, the government must establish an "exceedingly persuasive justification" for "official action denying rights or opportunities based on sex." *Virginia*, 518 U.S. at 531. The government's ban on transgender service members cannot satisfy either test.

To start, the reasons the government has offered for excluding transgender individuals from the military are contradicted by the judgment of the military itself. Indeed, the results of the military-commissioned RAND study released in 2016 demonstrated that allowing open service by transgender people would not materially affect unit cohesion or military effectiveness. *See* Agnes Gereben Schaefer et al., RAND Nat'l Def. Rsch. Inst., *Assessing the Implications of Allowing Transgender Personnel To Serve Openly* (2016), https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/RR1530/RAND_RR1530.pdf. With regard to unit cohesion, the study considered the experiences of foreign militaries that allowed transgender people to serve openly, and concluded that in those countries, "there [was] no significant effect of openly serving transgender service members on cohesion, operational effectiveness, or readiness." *Id.* at 44. For instance, in the United Kingdom, commanders "found no effect on cohesion." *Id.* at 45. Likewise, in Canada, an extensive review "found no evidence of any effect on

16

operational effectiveness or readiness" and "no evidence of any effect on unit or overall cohesion." *Id.* Though these foreign militaries noted that some service members harbored prejudices and hostility toward transgender people, "this resistance was apparently short-lived." *Id.*

With regard to readiness and ability to deploy, the RAND study analyzed relevant data and predicted that the treatment and recovery time for service members seeking gender transition-related treatment each year would "represent[] 0.0015 percent of available deployable labor-years across the [active component] and [selected reserve]." *Id.* at 42. Thus, the study concluded that "a service member's care would have a substantial overall impact on readiness *only* if that service member worked in an especially unique military occupation, if that occupation was in demand at the time of transition, and if the service member needed to be available for frequent, unpredicted mobilizations." *Id.* at 43 (emphasis added). The experience of foreign militaries confirmed these findings. For instance, Israeli military commanders "reported that transgender personnel perform their military duties and contribute effectively to their units." *Id.* at 45. Commanders in the United Kingdom "reported that increases in diversity had led to *increases* in readiness and performance." *Id.* at 60 (emphasis added). Moreover, the study noted that continuing to prohibit transgender people from serving openly had its own deleterious effects: "worsening mental health status, declining productivity, and other negative outcomes due to lack of treatment for gender identity-related issues." *Id.* at 46.

These results echoed a 2014 Report of the Transgender Military Service Commission at the Palm Center. *See* Joycelyn Elders, MD, et al., Palm Ctr., *Report of the Transgender Military Service Commission* (2014), https://palmcenterlegacy.org/wp-content/uploads/2014/03/Transgender-Military-Service-Report_1.pdf. That study concluded that "[w]ith few exceptions, transgender service members are deployable and medically ready. . . . [C]ross-

sex hormone treatment and mental health considerations do not, in general, impede the deploya-

bility of transgender service members, and the public record includes instances in which

transgender individuals deployed [as civilians] after having undergone transition." *Id.* at 16.  In

short, even before the U.S. military allowed transgender persons to serve openly in 2016, there

was a wealth of uncontroverted evidence that allowing transgender people to serve openly in the

military would have no negative impact on unit cohesion or military effectiveness.  Indeed, this

Court concluded that the 2017 military ban was likely unconstitutional in part because it stood

"contrary to the only then-available studies."  *Doe 1 v. Trump*, 275 F. Supp. 3d at 215.

    In addition, transgender Americans like Plaintiffs have been serving openly for the last

four years since President Biden repealed the 2017 ban, relying on "substantial evidence that al-

lowing transgender individuals to serve in the military does not have any meaningful negative

impact on the Armed Forces."  Exec. Order No. 14,004, 86 Fed. Reg. 7471, § 1.  The experi-

ences of service members like Plaintiffs for the past four years have, if anything, more concretely

confirmed the military's prior conclusions: transgender people can serve openly in the military

without negatively affecting the military's performance, readiness, or cohesion.

    Notably, the government does not assert that there have been any problems with

transgender individuals serving in the military during the period the policy has been in effect in

the United States.  Instead, the Order justifies its categorical ban in part by suggesting that

transgender service members cannot "adhere to [the] high mental and physical health standards"

imposed by the Armed Services.  But all military service members must meet strict physical and

mental health requirements for accession, retention, or deployment, *see, e.g.*, DoD Instruction

6130.03: Medical Standards for Military Service: Appointment, Enlistment, or Induction (Mar.

28, 2024), and the government has not demonstrated that all, or even many, transgender individuals who have transitioned or are transitioning would fail to meet these requirements. The government's categorical exclusion from military service of all transgender people thus sweeps far more broadly than any legitimate policy aimed at improving military effectiveness. *See Romer*, 517 U.S. at 633 ("By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."). Also troubling is the Order's insidious suggestion that a categorical ban is necessary to "[d]efend[] [w]omen." Order § 3. When a "statutory objective is to exclude or 'protect' members of one gender" based on "archaic and stereotypic notions," the "objective itself is illegitimate." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).

In sum, President Trump's ban "impos[es] a broad and undifferentiated disability on a single named group," *Romer,* 517 U.S. at 632—transgender service members—and "degrade[s]" and "demean[s]" them by denying them the opportunity to serve our nation, *Windsor*, 570 U.S. at 774. As explained above, no legitimate government interests support that policy decision, so it cannot withstand judicial scrutiny, heightened or otherwise. The Due Process Clause of the Fifth Amendment does not permit this sort of unsupported discrimination.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
David H. Gans (DC Bar No. 461002)
Praveen Fernandes (DC Bar No. 472773)
Ana M. Builes (DC Bar No. 1659789)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

Counsel for *Amicus Curiae*

Dated: February 14, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages. I further certify that this brief complies with the Court's general typeface and type style requirements for motions because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016, a 12-point Times New Roman font, and two spaces between sentences.

Executed this 14th day of February, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod
*Counsel for Amicus Curiae*