## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICHOLAS TALBOTT, et al.,

*Plaintiffs,*

v.

DONALD J. TRUMP, et al.,

*Defendants.*

Civil Action No. 25-cv-240-ACR

## BRIEF OF FORMER MILITARY DEPARTMENT HEADS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Harold Hongju Koh
Peter Gruber Rule of Law Clinic
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
203-432-4932
harold.koh@ylsclinics.org

Andrew T. Tutt (D.C. Bar 1026916)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5242
Andrew.tutt@arnoldporter.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

**INTEREST OF *AMICI CURIAE***     **1**

**INTRODUCTION**     **2**

**ARGUMENT**     **4**

    I.     Historically, the courts have awarded broad deference only to military policy decisions arising from painstaking policy processes and careful sifting of evidence, neither of which has occurred here.     4

    II.    The President's actions departed sharply from decades of practice involving similar military policy changes.     13

    III.    Secretary Hegseth's memorandum does not cure the blatant procedural deficiencies in President Trump's Executive Order.     21

    **CONCLUSION**     **25**

# TABLE OF AUTHORITIES

## Cases

*Austin v. U.S. Navy Seals 1-26*,
  142 S. Ct. 1301 (2022) ........................................................................................ 21

*Doe 1 v. Trump*,
  275 F. Supp. 3d 167 (D.D.C. 2017) ................................................................ 15, 16

*Doe 2 v. Shanahan*,
  755 F. App'x 19 (D.C. Cir. 2019) .......................................................... *passim*

*Goldman v. Weinberger*,
  475 U.S. 503 (1986) ................................................................................... 3, 16, 20

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 554 (4th Cir. 2017) ........................................................................ 20, 21

*Karnoski v. Trump*,
  No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ................... 15

*Koraematsu v. United States*,
  323 U.S. 214 (1944) ...................................................................................... 25

*Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*,
  72 F. Supp. 2d 560 (D. Md. 1999) ...................................................................... 20

*Nuclear Regulatory Comm'n v. Fed. Labor Relations Auth.*,
  859 F.2d 302 (4th Cir. 1988) ............................................................................ 20

*Owens v. Brown*,
  455 F. Supp. 291 (D.D.C. 1978) .................................................................... 19, 21

*Rostker v. Goldberg*,
  453 U.S. 57 (1981) .................................................................................. 15, 18, 21

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ............................................................................ 18

*Stockman v. Trump*,
  No. EDCV171799JGBKKX, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ........... 15

*Stone v. Trump*,
  280 F. Supp. 3d 747 (D. Md. 2017) .................................................................... 15

*Thomasson v. Perry*,
  80 F.3d 915 (4th Cir. 1996) ............................................................ 19, 20

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) ............................................................................ 20

*United States v. Fordice*,
  505 U.S. 717 (1992) ............................................................................ 25

*United States v. Kanasco, Ltd.*,
  123 F.3d 209 (4th Cir. 1997) .............................................................. 20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................ 24

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................................ 3, 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .............................................................................. 8

**Administrative Materials**

Executive Order No. 9,981, 13 Fed. Reg. 4,313 (July 28, 1948) .................................................... 6

Executive Order No. 14,004, 86 Fed. Reg. 7,471 (Jan. 25, 2021) .......................................... 12, 16

Executive Order No. 14,183, 90 Fed. Reg. 8,757 (Jan. 27, 2025) .................................... 2, 14, 17

Presidential Memorandum from the President of the United States to Secretaries of
  Defense and Homeland Security, 82 Fed. Reg. 41,319 (Aug. 25, 2017) .................................. 14

**Other Authorities**

Barbara Starr et al., *US Joint Chiefs Blindsided by Trump's Transgender Ban*, CNN (July 27,
  2017, 5:40 PM EDT) .......................................................................................... 14

*Christopher C. Miller: Biography*, U.S. Department of Defense ........................................... 17, 18

Declaration of Brad R. Carson in Support of Plaintiffs' Motion for Preliminary Injunction,
  *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 14 Sept. 2017) ...................................... 10

Declaration of Raymond Edwin Mabus, Jr. In Support of Plaintiffs' Motion for Preliminary
  Injunction, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 28 Aug. 2017) ..................... 10

Defendants Opposition To Plaintiff, Feb. 12, 2024 ECF No. 38 ........................................... 22, 23

*Department of Defense Instruction 1300.28: In-Service Transition for Transgender Service Members*, U.S. Department of Defense (Oct. 1, 2016) ............................................................. 11

*Department of Defense Report and Recommendations on Military Service by Transgender Persons*, U.S. Department of Defense (Feb. 2018) ................................................... 23

James N. Mattis, Secretary of Defense, *Memorandum: Military Service by Transgender Individuals*, U.S. Department of Defense (Feb. 22, 2018) ...................................... 22

Jody Feder, *"Don't Ask, Don't Tell": A Legal Analysis,* CRS Rep. R40795, Aug. 6, 2013 .......... 8

Julie Hirschfeld Davis & Helene Cooper, *Trump Says Transgender People Will Not Be Allowed in the Military*, N.Y. Times (July 26, 2017) ........................................ 14

Kristy N. Kamarck, *Women in Combat: Issues for Congress*, Cong. Res. Serv. R42075, Dec. 13, 2016 ................................................................... 9

*Mandate for Leadership—The Conservative Project, Project 2025*, Heritage Found. 104 (2023) ....................................................................................... 17

Martin Binkin & Mark J. Eitelberg, *Blacks and the Military* (1982) ............................................. 5

Martin E. Dempsey & Leon E. Panetta, *Memorandum: Elimination of the 1994 Direct Ground Combat Definition and Assignment Rule* (Jan. 24, 2013) .......................................... 9

Memorandum in Support of Defendants Motion to Dismiss, *Stone v. Trump*, 17-cv-02459 (Oct. 12, 2017) ....................................................... 3, 15

Memorandum in Support of Preliminary Injunction, *Talbott v. Trump*, 25-cv-240, Feb. 3, 2025 .............................................................. 13

Memorandum, Assistant Secretary of Defense for Health Affairs, to Assistant Secretary of the Army et al., *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members* (July 29, 2016) ................................................................ 11

Michael Lee Lanning, *African Americans in the Revolutionary War* (2005) ................................ 5

Pete Hegseth, Secretary of Defense, *Memorandum: Prioritizing Military Excellence and Readiness*, U.S. Department of Defense (Feb. 7, 2025) ........................................ 21, 22, 23

President's Committee on Civil Rights, *To Secure These Rights: The Report of the President's Committee on Civil Rights* XI (1947), Harry S. Truman Library and Museum .. 5, 6

RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ix (2016) ............................................................................................... 11

*Records of the President's Committee on Civil Rights* (2000), Harry S. Truman Library and Museum ...................................................................................................... 5

*Records of the President's Committee on Equality of Treatment and Opportunity in the Armed Services*, Harry S. Truman Library and Museum ..................................................................... 6

*Report to Congress on the Review of Laws, Policies, and Regulations Restricting the Service of Female Members in the U.S. Armed Forces*, U.S. Department of Defense (Feb. 2012).... 8, 9

Shannon L. Dunlap et al., *Support for Transgender Military Service from Active Duty United States Military Personnel*, 18 Sexuality Rsch. & Social Pol. 137 (2021) ............................... 23

*Statement by Secretary of Defense Ash Carter on DOD Transgender Policy*, U.S. Department of Defense (July 13, 2015)............................................................ 10

*Statement by Secretary of Defense Jim Mattis on Military Service by Transgender Individuals*, U.S. Department of Defense (Aug. 29, 2017)............................................................ 15

*Statement from Pentagon Press Secretary Peter Cook on Secretary Carter's Approval of Women in Service Review Implementation Plans*, U.S. Department of Defense (Mar. 10, 2016) .......... 9

*Transgender Service in the U.S. Military: An Implementation Handbook*, U.S. Department of Defense (2016)....................................................................................................................... 1

U.S. Department of Defense, *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell,"* Nov. 30, 2010 .................................................... 7, 8

U.S. Secretary of Defense, *Remarks on the Women-in-Service Review* (Dec. 3, 2015)................. 9

Vice Admiral Donald C. Arthur et al., *DoD's Transgender Ban Has Harmed Military Readiness*, Palm Ctr. (Nov. 2020) .............................................................................. 23

**Miscellaneous**

@realDonaldTrump, Twitter (July 26, 2017, 8:55 AM), https://x.com/realDonaldTrump/status/890193981585444864 ................................ 14

@realDonaldTrump, Twitter (July 26, 2017, 9:04 AM), https://x.com/realDonaldTrump/status/890196164313833472 ................................ 14

@realDonaldTrump, Twitter (July 26, 2017, 9:08 AM), https://x.com/realDonaldTrump/status/890197095151546369 .................... 14

## INTEREST OF *AMICI CURIAE*

Amici are Frank Kendall and Christine Wormuth, former Secretaries of the Air Force and Army, respectively. They have been responsible for the readiness of the service members under their command in times of hostilities and peace. They have supervised and participated in policy processes involving military readiness and personnel at the senior-most levels of the U.S. government, across the last administration. They greatly appreciate and value military expertise and the need for the judiciary to defer to it when the circumstances demand. They file this submission to offer their perspective that this is not such a case. Judicial deference to military judgment is not warranted, where, as here, there is an absence of any considered military policymaking process or changed factual circumstances. That is particularly true where, as here, there is a sharp departure from decades of precedent on the approach of the U.S. military to a major personnel policy change that leads to a policy based on naked discrimination.

## INTRODUCTION

On January 27, 2025, President Trump issued an Executive Order, entitled *Prioritizing Military Excellence and Readiness* ("Executive Order" or "Order"), that would bar transgender individuals from enlisting or continuing their military service, no matter how capably they might be executing their duties.[1] This Order came as a complete departure from the previous policy; was issued without even a pretense of changed factual circumstances; and is entirely devoid of the extensive review that this type of action demands and typically receives. This harmful measure would impact thousands of transgender service members who currently serve in the United States Armed Forces, despite their exemplary performance and unquestioned loyalty to their country. Under these extreme circumstances—where the military abandons its established rigorous decision-making process for an opaque, hasty, and discriminatory process that produces a significant policy departure—this Court is not obliged to grant deference.

President Trump's Executive Order did not identify any policymaking process or consultations with senior military officials leading to the decision. The Executive Order failed to supply any evidence demonstrating that the ban was necessary for reasons of military necessity, national security, national emergency, or any other legitimate national interest.[2] Instead, the Order is littered with vague generalizations and unsupported statements that express discriminatory hostility to a group of service members who have been serving ably and loyally. The few factual assertions contained in the Order directly contradict every evidence-based analysis supporting the prior policy that allowed transgender service members to serve.

Previously, President Trump sought to shield his punitive and conclusory acts from judicial

---

[1] Exec. Order No. 14,183, 90 Fed. Reg. 8,757 (Jan. 27, 2025).

[2] *Id.*

review. He claimed that he was owed "the utmost deference" in cases "involving the judgment of military authorities," whether or not new facts demand military policies, and whether or not the policy directive constitutes naked official discrimination.[3] His latest assertions, much like his prior 2017 efforts to enact this ban through tweets and a memorandum, again ignore a crucial fact: the President's logic *did not involve the judgment of any military authorities*.  In fact, the President's actions at issue here are about as far removed as one could imagine from those cases where courts have deferred to the genuine "considered" or "professional judgment" of the executive branch on military matters.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (quotations and citations omitted); *Goldman v. Weinberger*, 475 U.S. 503, 508-09 (1986).

The defendants can point to no case where a court afforded deference to a President's military judgment when that President undertook no considered review, consulted no military officials, and cited no evidence, new emergency, or change in factual circumstance to support a dramatic policy reversal.  History shows that the President's actions here represent a remarkable departure from decades of practice across multiple administrations regarding the proper approach to making major policy changes concerning military personnel issues.  It should be no surprise that a policy reached without evidence and through such an arbitrary process will be counterproductive. It would critically impair our military's readiness, harm unit cohesion, and deplete urgently needed military resources, while stigmatizing able and loyal service members who have daily demonstrated their capability to succeed in their military roles.

The courts should defer to considered military judgment when it is warranted, but judicial deference to presidential military policy has limits. It does not extend to allowing the President to

---

[3] Mem. in Supp. of Def. Mot. to Dismiss, *Stone v. Trump*, 17-cv-02459, Oct. 12, 2017, at 3, 22 [hereinafter "Def. Mem."]; *see also id.* at 23-25.

order a capricious and discriminatory act that involved no considered consultation, professional

military decision-makers, or evidentiary basis for review. The Order serves no salutary military

purpose. It will only inflict grievous harm on the blameless service members adversely affected

and therefore should be enjoined pending discovery and trial.

## ARGUMENT

President Trump's Executive Order does not rest on facts reflecting the longstanding history

of judicial deference to the military involving major personnel changes. Many courts granted

preliminary injunctions to block a similar Trump Administration policy, issued with minimal

administrative process in 2017, emphasizing that such significant changes require thorough analysis

grounded in the expertise of experienced military officials. President Trump's attempt to bypass

established protocol to enact this sweeping change is not only inappropriate but also reveals an effort

to evade the rigorous scrutiny that reasoned decision-making requires. This Court should not give

such an unreasoned order the judicial deference normally given to considered and thoughtful policy

decisions that have been properly vetted by military policy experts.

**I.    Historically, the courts have awarded broad deference only to military policy decisions arising from painstaking policy processes and careful sifting of evidence, neither of which has occurred here.**

Throughout its history, the U.S. military has exercised great care in the selection, training,

and retention of qualified personnel as an integral aspect of military readiness. Significant changes

to military personnel policies—particularly those involving the categorical exclusion of entire

groups from military service—have been subjected time and again to a painstaking process that

includes three conjoined elements: (1) a searching policy review, (2) involving senior military

officials, (3) that thoroughly examines the best available evidence on the impact and consequences

of the change. This practice reflects both the gravity of these decisions and their impact on the

country and its service members, and the recognition that even small changes in military policy can dramatically affect our Armed Forces' readiness to defend the nation.

The paradigmatic case of a major personnel change in the U.S. military was President Truman's decision seven decades ago to integrate African Americans into the Armed Forces. Although African Americans had served in the United States military since the Revolutionary War,[4] many had served in segregated units due to perceived concerns about unit cohesion and morale.[5] Prompted by growing concern about racial inequality and unrest in the United States, on December 5, 1946, President Truman issued Executive Order No. 9808 appointing the President's Committee on Civil Rights, a presidential commission comprised of senior defense officials, religious leaders, and civil rights activists to study, *inter alia*, the desegregation of the military.[6] Over nearly a year, the Committee deliberated across ten meetings, undertook multiple studies, heard from numerous witnesses in public and private hearings, received hundreds of communications from private organizations and individuals, and was assisted in its work by twenty-five agencies across the federal government.[7]

In December 1947, the Committee issued its final report. The report found that the practices of the military services in excluding African Americans was "indefensible." The report further concluded that that practice had "cost[] lives and money in the inefficient use of human resources," "weaken[ed] our defense" by "preventing entire groups from making their maximum

---

[4] Michael Lee Lanning, *African Americans in the Revolutionary War* 73 (2005).
[5] Martin Binkin & Mark J. Eitelberg, *Blacks and the Military* 25-26 (1982).
[6] *Records of the President's Committee on Civil Rights* (2000), HARRY S. TRUMAN LIBRARY AND MUSEUM, https://www.trumanlibrary.gov/library/federal-record/records-presidents-committee-civil-rights-record-group-220.
[7] President's Committee on Civil Rights, *To Secure These Rights: The Report of the President's Committee on Civil Rights* XI (1947), HARRY S. TRUMAN LIBRARY AND MUSEUM, https://www.trumanlibrary.gov/library/to-secure-these-rights; *Records of the President's Committee on Civil Rights*, *supra* note 6.

contribution to the national defense," and "impose[d] heavier burdens on the remainder of the population."[8] As a result, the Committee called for an immediate end to discrimination and segregation based on "race, color, creed, or national origin, in the organization and activities of all branches of the Armed Services."[9] Only after a comprehensive review and thorough evaluation of the evidence did President Truman move to implement these recommendations through Executive Order No. 9981; he declared that it would henceforth be the policy of the United States to require equality of treatment and opportunity for all persons in the U.S. Armed Services without regard to race. He also convened a Committee on Equality of Treatment and Opportunity in the Armed Services to "recommend revisions in military regulations in order to implement the government's policy of desegregation of the armed services."[10] The message of the Truman Executive Orders was clear: U.S. military personnel policies should not serve discriminatory aims or pander to particular segments of the electorate. Executive orders should follow, not precede, thoughtful administrative policy deliberations. Such deliberations are necessary to ensure that every American service member is to be judged solely on their ability to serve and the content of their character. The President's Executive Order desegregating the U.S. military was only issued after (1) a comprehensive year-long policy review (2) conducted by a committee which included senior defense officials (3) that gathered evidence from twenty-five agencies, held public and private hearings, and ultimately recommended ending racial segregation in the Armed Services.

---

[8] *To Secure These Rights: The Report of the President's Committee on Civil Rights* XI, *supra* note 6, at 46-47, 162-63.
[9] *Id.* at 163.
[10] *Records of the President's Committee on Equality of Treatment and Opportunity in the Armed Services*, HARRY S. TRUMAN LIBRARY AND MUSEUM, https://www.trumanlibrary.gov/library/federal-record/records-presidents-committee-equality-treatment-and-opportunity-armed; Exec. Order No. 9,981, 13 Fed. Reg. 4,313 (July 28, 1948).

The Obama Administration followed a similarly searching three-part process in ordering the repeal of the Don't Ask, Don't Tell directive, which had prohibited gay, lesbian or bisexual people from serving openly in the military.  The repeal of Don't Ask, Don't Tell followed (1) a comprehensive review by a working group, (2) co-chaired by a senior defense official and including other senior members of the Armed Services, (3) based on evidence and supplemented by RAND Corporation research and legal analysis. As with President Truman's racial desegregation order, the repeal of Don't Ask, Don't Tell came on the heels of a comprehensive Pentagon review. In March 2010, Secretary of Defense Gates convened a working group co-chaired by the General Counsel of the Department of Defense and the U.S. Army Commander in Europe and comprised of senior civilian and military leaders from across the Armed Services to undertake a comprehensive review of the impacts of a repeal of the law.[11] The working group organized 95 "information exchange forums" at 51 bases and installations around the world, conducted 140 focus groups, solicited input from nearly 400,000 service members, engaged the RAND Corporation to update its earlier 1993 study, studied foreign militaries' integration of gays and lesbians, and conducted a thorough legal review.[12]

On November 30, 2010, the working group issued a 256-page report rejecting any conclusory contention that allowing gays to serve openly in the military would result in long-lasting and detrimental effects on unit cohesion or the ability of units to conduct military missions.[13]  It also offered a series of recommendations for implementing a repeal of the law in the areas of leadership, training, education and the management of moral and religious objections.[14]

---

[11] *Report of the Comprehensive Review of the Issues Associated with a Repeal of "Don't Ask, Don't Tell,"* U.S. DEP'T OF DEF. (Nov. 30, 2010), https://apps.dtic.mil/sti/pdfs/ADA533004.pdf.
[12] *Id.* at 33-39.
[13] *Id.* at 119.
[14] *Id.* at 3.

Shortly thereafter, Secretary Gates and Chairman of the Joint Chiefs Admiral Mullen called on Congress to immediately repeal the Don't Ask, Don't Tell directive. The end result was not an executive order, but a detailed bill passed by both houses of Congress, which President Obama then signed into law. Seven months later, President Obama, newly confirmed Secretary of Defense Panetta, and Admiral Mullen formally certified under the new statute, with Congressional approval, that the American military was ready to repeal the old policy.[15]

The historic decision to open combat roles to women likewise emerged from a careful evidence-based process—this time, a congressionally mandated policy and legal review undertaken by the Secretary of Defense, in consultation with the Military Department Secretaries, of the policies and regulations that had officially barred women from serving in combat positions. Once again, the policy change opening combat roles to women was based on a three-stage process: (1) an "extensive review"[16] (2) conducted by the Secretary of Defense in conjunction with the Military Department Secretaries and (3) informed by thirty studies carried out under the direction of the Secretaries. After an "extensive review" of the policies and laws governing the assignment of women in the Armed Forces and the feasibility of opening military occupational specialties to women that had previously been closed to them, the Department of Defense concluded that, given the "dynamics of the modern-day battlefield . . . there is no compelling reason for continuing the portion of the policy that precludes female [s]ervice members from being assigned to . . . direct

---

[15] Jody Feder, *"Don't Ask, Don't Tell": A Legal Analysis,* CRS Rep. R40795, Aug. 6, 2013; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum.").

[16] *Report to Congress on the Review of Laws, Policies, and Regulations Restricting the Service of Female Members in the U.S. Armed Forces*, U.S. DEP'T OF DEFENSE 3 (Feb. 2012), https://www.esd.whs.mil/Portals/54/Documents/FOID/Reading%20Room/Other/17-F-0263_Report_to_Congress_restricting_the_Service_of_Female_member_US_Armed_Forces_FEB-2012.pdf.

ground combat units."[17] The Department of Defense declared its intent to rescind the "co-location restriction" that prevented female Service members from being assigned to units that were required to physically co-locate with direct ground combat units.[18]

At the time, Secretary Panetta also directed an in-depth review of barriers to women's service. After several months of study, he announced the recission of the Direct Combat Exclusion Rule, allowing women to serve in previously restricted occupations.[19] He also called on each of the services to undertake their own separate "women in the service" reviews of how to move forward with the integration of women into previously closed positions and identify any recommended exemptions for particular positions.[20] This process led to more than thirty additional studies over the next three years to inform the contours of the policy change.[21] Only after the Secretaries of each of the services had completed their careful reviews and submitted their final recommendations did Secretary of Defense Ashton Carter order the military to open all combat jobs to women who met the validated occupational standards.[22] As in the prior two cases, executive action followed evidence-based inquiry by expert military officials fully assessing the policy decision's implications for military readiness and unit cohesion.

---

[17] *Id.*

[18] *Id.* at 4.

[19] Martin E. Dempsey & Leon E. Panetta, *Memorandum: Elimination of the 1994 Direct Ground Combat Definition and Assignment Rule* (Jan. 24, 2013), https://dod.defense.gov/Portals/1/Documents/wisrjointmemo.pdf.; Kristy N. Kamarck, *Women in Combat: Issues for Congress*, Cong. Res. Serv. R42075, Dec. 13, 2016.

[20] *Statement from Pentagon Press Secretary Peter Cook on Secretary Carter's Approval of Women in Service Review Implementation Plans*, U.S. DEP'T OF DEF. (Mar. 10, 2016), https://www.defense.gov/News/Releases/Release/Article/690086/statement-from-pentagon-press-secretary-peter-cook-on-secretary-carters-approval.

[21] *Supra* note 16.

[22] U.S. SEC'Y OF DEF., *Remarks on the Women-in-Service Review* (Dec. 3, 2015), https://www.defense.gov/News/Speeches/Speech-View/Article/632495/remarks-on-the-women-in-service-review; Kamarck, *supra* note 19.

Finally, the opening of military service to transgender personnel, which the Executive Order under challenge here attempts to undo, similarly emerged from a rigorous evidence-based policymaking process. The decision to open military service to transgender personnel was based on (1) an extensive policy review (2) by a working group consisting of senior defense officers from each military service (3) informed by consultations with relevant experts, healthcare insurance companies, and commanders of transgender personnel and an independent study. In July 2015, Secretary Carter issued a directive creating a formal working group to study the "policy and readiness implications of welcoming transgender persons to serve openly" in the military.[23] Over the course of the following year, the working group engaged in what one senior member described as a "detailed, deliberative, [and] carefully run process."[24] Each military service branch was represented in the working group by a senior uniformed officer, a senior civilian official, and various staff members.[25] The working group created sub-groups to investigate specific issues, consulted with medical, personnel, and readiness experts, and spoke with health insurance companies and commanders of transgender service members.[26] At the end of this comprehensive process, the working group unanimously concluded that transgender individuals should be permitted to serve openly in the Armed Forces.[27]

At the same time, the Department of Defense additionally commissioned a separate, independent study from the RAND Corporation. The study focused on seven broad research

---

[23] *Statement by Secretary of Defense Ash Carter on DOD Transgender Policy*, U.S. DEP'T OF DEF. (July 13, 2015), https://www.defense.gov/News/Releases/Release/Article/612778/statement-by-secretary-of-defense-ash-carter-on-dod-transgender-policy/.

[24] Decl. of Raymond Edwin Mabus, Jr. In Support of Plaintiffs' Motion for Preliminary Injunction at 3, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 28 Aug. 2017).

[25] Decl. of Brad R. Carson in Support of Plaintiffs' Motion for Preliminary Injunction at 3, *Karnoski v. Trump*, No. 2:17-cv-1297 (W.D. Wash. 14 Sept. 2017).

[26] *Id*. at 3.

[27] *Id*. at 7.

questions, among them the cost of providing medical coverage to transgender individuals, assessment of the potential readiness implications of the proposed policy, and any applicable lessons from the eighteen foreign militaries that already allowed open transgender service.[28] RAND laid out its findings in a 71-page report, concluding that allowing transgender people to serve openly would place an "exceedingly small" burden on health care expenditures and have a "minimal impact" on readiness.[29]  Only after the thorough review carried out by these two groups did Secretary Carter announce the policy change in June 2016.  For more than a year after that change, transgender individuals currently in the military were able to serve openly alongside their fellow service members.  The Department released a 71-page handbook specifying implementation strategies,[30] and issued guidelines for both in-service medical transition procedures and treatment of gender dysphoria.[31]  This studied, measured, and incremental process would have concluded on January 1, 2018, with the accession of openly transgender individuals into the U.S. military.

A similar cursory ban implemented by President Trump in 2017 prevented that accession from taking effect until January 25, 2021.[32] On that day, President Biden repealed the ban and issued Executive Order 14004, *Enabling All Qualified Americans to Service Their Country in Uniform*. As

[28] RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ix (2016).
[29] *Id*. at xi & 47.
[30] *Transgender Service in the U.S. Military: An Implementation Handbook*, U.S. DEP'T OF DEF. (2016), https://dod.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf.
[31] *Department of Defense Instruction 1300.28: In-Service Transition for Transgender Service Members*, U.S. DEP'T OF DEF. (Oct. 1, 2016), https://dod.defense.gov/Portals/1/features/2016/0616_policy/DoD-Instruction-1300.28.pdf; Memorandum, Assistant Secretary of Defense for Health Affairs, to Assistant Secretary of the Army et al., *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members* (July 29, 2016), https://dod.defense.gov/Portals/1/features/2016/0616_policy/Guidance_for_Treatment_of_Gender_Dysphoria_Memo_FINAL_SIGNED.pdf.
[32] *See infra* Part II.

11

in the prior three historical episodes, the issuance of Executive Order 14004 did not precede, but followed and was based upon: (1) a policy review conducted prior to the admission of openly transgender personnel that (2) incorporated additional opinions from senior defense officials (3) in a full evidentiary administrative record. In line with the history of deference traditionally afforded to careful and considered military processes, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful impact on the Armed Forces."[33] This evidence included not only the aforementioned RAND study, but also the 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force . . . that they were not aware of any issues of unit cohesion, disciplinary problems, or issues or morale resulting from open transgender service."[34] President Biden's Executive Order was further supported by a statement from a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care.'"[35]

In contrast to the executive decision under review here, each of the above personnel decisions was the product of a rigorous policy review involving senior military officials and an evidence-based examination of the likely impact of the proposed change. But in 2017 this established practice was broken for the first time when President Trump sharply deviated from two longstanding norms: the procedural norm of searching evidence-based review and the substantive norm of reducing discrimination in the armed forces except where directly related to an

---

[33] Exec. Order No. 14,004, 86 Fed. Reg. 7,471 at § 1.
[34] *Id.*
[35] *Id.*

individual's capacity to serve. Now, the same President once again seeks to reinstate this policy change through an Executive Order that sidesteps the comprehensive three-part review process that has become standard for military policy changes of this magnitude. The conclusory Executive Order merely asserts, without supporting evidence, that "[c]onsistent with the military mission and longstanding DoD policy, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service."[36] This assertion flatly contradicts current military practice, where transgender service members must meet—and do meet—the same high standards as all other service members, including medical and physical fitness requirements, uniform and grooming protocols, deployability, retention, and overall military service and readiness requirements.[37]

## II.    The President's actions departed sharply from decades of practice involving similar military policy changes.

Departing from the long-standing Presidential practice described above, President Trump has now attempted for the second time to circumvent and reverse the careful evidence-based process undertaken by past administrations, while at the same time demanding the judicial deference afforded to the military when it effectuates policy change in a non-arbitrary and capricious manner. In July 2017, President Trump suddenly announced a ban on transgender persons serving in the military through a series of tweets.[38] Now, he once again seeks to enact the

---

[36] *Supra* note 1.

[37] Mem. in Supp. of Prelim. Inj., *Talbott v. Trump*, 25-cv-240, Feb. 3, 2025 at 6.

[38] "The United States Government will not accept or allow . . . [t]ransgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and implications of the overwhelming . . . victory and cannot be burdened with the tremendous medical costs and disruption that transgender [sic] in the military would entail. Thank you[.]" @realDonaldTrump, TWITTER (July 26, 2017, 8:55 AM), https://x.com/realDonaldTrump/status/890193981585444864; @realDonaldTrump, TWITTER (July 26, 2017, 9:04 AM), https://x.com/realDonaldTrump/status/890196164313833472;

same ban—this time through executive order—but without providing any substantive evidence,

demonstrating any changed circumstance or national emergency, or showing that a careful

investigation supported such an abrupt and discriminatory policy change.

In both President Trump's previous and current attempts to implement this change, no

effort was made—nor any evidence presented—to show that the order resulted from any analysis

of the cost or disruption allegedly caused by allowing transgender individuals to serve openly in

the military. Before President Trump's 2017 ban, Joint Chiefs of Staff were not consulted prior to

President Trump's tweets enacting the ban, and Secretary of Defense Mattis was given only a day's

notice prior to their publication.[39] President Trump acted on his own volition with no consultation

of senior military officials. Four weeks after his initial tweets, President Trump issued a

Memorandum to the Secretary of Defense and the Secretary of Homeland Security entitled

"Military Service by Transgender Individuals."[40] This Memorandum instructed the Department

of Defense to reinstate its pre-June 2016 policy, which broadly banned transgender individuals

from joining the military and authorized the discharge of those serving openly.[41] Again, the

---

@realDonaldTrump, TWITTER (July 26, 2017, 9:08 AM), https://x.com/realDonaldTrump/status/890197095151546369.

[39] Barbara Starr et al., *US Joint Chiefs Blindsided by Trump's Transgender Ban*, CNN (July 27, 2017, 5:40 PM EDT), http://www.cnn.com/2017/07/27/politics/trump-military-transgender-ban-joint-chiefs/index.html; Julie Hirschfeld Davis & Helene Cooper, *Trump Says Transgender People Will Not Be Allowed in the Military*, N.Y. TIMES (July 26, 2017), https://www.nytimes.com/2017/07/26/us/politics/trump-transgender-military.html.

[40] Presidential Memorandum from the President of the United States to Secretaries of Defense and Homeland Security, 82 Fed. Reg. 41,319 (Aug. 25, 2017) [hereinafter "Presidential Memorandum"].

[41] The Proclamation states that the new policies will go into effect by March 23, 2018, and the Department of Defense has already started to develop plans to carry out the directive. Presidential Memorandum, *supra* note 1; *Statement by Secretary of Defense Jim Mattis on Military Service by Transgender Individuals*, U.S. DEP'T OF DEF. (Aug. 29, 2017), https://www.defense.gov/News/Releases/Release/Article/1294351/statement-by-secretary-of-defense-jim-mattis-on-military-service-by-transgender.

Memorandum failed to identify any policy process that led to the President's decision or any evidence to support it.

When President Trump tried enacting this ban in 2017, he sought to shield his decision from judicial scrutiny by invoking "the highly deferential review" that courts have historically afforded military judgments.[42]  When suit was brought to challenge the order, the courts articulated the common-sense proposition that no deference was owed to "military judgment" when no military judgment was ever actually exercised. In the words of Judge Kollar-Kotelly of this Court:

> The study and evaluation of evidence that the *Rostker* Court found warranted judicial deference is completely absent from the current record. . . . [T]he record at this stage of the case shows that the reasons offered for categorically excluding transgender individuals were not supported and *were in fact contradicted* by the only military judgment available at the time.

*Doe 1 v. Trump*, 275 F. Supp. 3d 167, 214 (D.D.C. 2017) (emphasis added) (citing *Rostker v. Goldberg*, 453 U.S. 57 (1981)), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (vacated on narrow grounds discussed in Part III below).[43] Indeed, where the President's directive contradicts an established, evidence-based military understanding, judicial deference to military judgment cuts *against* the President's action:

> As far as the Court is aware at this preliminary stage, all of the reasons proffered by the President for excluding transgender individuals from the military in this case were not merely unsupported, but were actually contradicted by the studies, conclusions and judgment of the military itself. . . . In short, the military concerns purportedly underlying the President's decision had been studied and rejected by the military itself.

---

[42] Def. Mem. at 3.

[43] *Accord Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017) ("President Trump's tweets did not emerge from a policy review, nor did the Presidential Memorandum identify any policymaking process or evidence demonstrating that the revocation of transgender rights was necessary for any legitimate national interest."); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305, at *8 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, No. EDCV171799JGBKKX, 2017 WL 9732572, at *14 (C.D. Cal. Dec. 22, 2017).

*Id.* at 212-13. The D.C. Circuit granted the motion to vacate the preliminary injunction on the narrow grounds that the government had satisfied its burden of demonstrating that the Department of Defense policy (the "Mattis Plan") differed sufficiently from the ban enjoined in *Doe 1*. *Doe 2 v. Shanahan*, 755 F. App'x 19, 22-25 (D.C. Cir. 2019). The Biden Executive Order quickly rescinded this plan, which is discussed further in Part III below.[44]

The President's 2025 Executive Order exhibits the same flaws as the 2017 ban—it was issued without any supporting evidence, coordination, or policy transparency. The President's actions show no respect whatsoever for military decision-making or professional military judgment; indeed, the President's action does not evidence *any* involvement of military officials in the decision-making process that led to the Executive Order. Rather, the President is once again seeking to displace the considered judgment of military officials regarding the treatment of transgender individuals in the military.

To be sure, the Supreme Court has given "great deference to the *professional judgment of military authorities* concerning the relative importance of a particular military interest," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (emphasis added) (quotations and citations omitted), and the "*considered professional judgment*" of "appropriate military officials," *Goldman v. Weinberger*, 475 U.S. 503, 508-09 (1986) (emphasis added). But the record in this case hints at nothing remotely resembling a considered professional judgment of this sort.

Instead of grounding the Executive Order in formal military review, President Trump appears to have drawn directly from "Project 2025"—a political document developed by the

---

[44] *See* Exec. Order No. 14,004, 86 Fed. Reg. 7,471 (Jan. 25, 2021) (providing that "The Secretary of Defense shall . . . immediately prohibit involuntary separations, discharges, and denials of reenlistment or continuation of service on the basis of gender identity or under circumstances relating to their gender identity").

Heritage Foundation. The parallels are striking. Project 2025's Chapter 4 demands that the military "[r]everse policies that allow transgender individuals to serve in the military."[45] It asserts that "[g]ender dysphoria is incompatible with the demands of military service,"[46] and that in order to "[r]estore standards of lethality and excellence[,]" servicemembers "with gender dysphoria should be expelled from military service."[47] The Executive Order echoes this language almost verbatim, declaring that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" is inconsistent with the military's "high standards for troop readiness, [and] lethality,"[48] although the Biden review expressly found to the contrary.[49] Neither the Executive Order, nor Project 2025, supply any evidence to support these sweeping claims, which directly contradict the conclusions of the military's previous formal policy reviews.

The author of Project 2025's Chapter 4, Christopher Miller,[50] served briefly as acting Secretary of Defense from November 2020 to January 2021.[51] Miller retired from the Army as a Colonel in 2014—well before the military's policy change permitting transgender service members to serve openly.[52] During his abbreviated tenure as acting Secretary, the record reflects no formal effort to review or assess the impact of the U.S. military's policy on transgender service members. Now, eleven years removed from military service and lacking any relevant experience with the military's transgender service policy that has been in place with respect to thousands of

---

[45] *Mandate for Leadership—The Conservative Project, Project 2025*, HERITAGE FOUND. 104 (2023), https://static.project2025.org/2025_MandateForLeadership_FULL.pdf.
[46] *Id.* at 104.
[47] *Id.* at 103.
[48] *Supra* note 1.
[49] *See infra* Part I.
[50] *Supra* note 45 at 91.
[51]    *Christopher    C.    Miller:    Biography*,    U.S.    DEP'T    OF    DEF., https://www.defense.gov/About/Biographies/Biography/Article/2111192/christopher-c-miller.
[52] *Id.*; *see also supra* note 23.

service members over the previous four years, Miller's Project 2025 paper offered only unsupported assertions about transgender service members' alleged inability to serve effectively. The Executive Order's wholesale adoption of Project 2025's language, coupled with this conspicuous absence of any proper military assessment to refute prior detailed findings, reveals that the abrupt policy change following the 2025 inauguration was driven by discriminatory animus—not military necessity, changed circumstances, or any genuine national emergency.

This Circuit has established that courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" when evaluating an injunction that affects military affairs. *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (internal quotations omitted). Here, as in 2017, the record is wholly devoid of any such professional military judgment. As in *Singh*, the record establishes no connection between the military interests in lethality and readiness and the government's policy determination. *Id*. at 103. Instead, the determination rests on naked prejudice against a group, not based on any individualized assessment of performance or ability.

Courts have historically required evidence of considered judgment before extending constitutional deference to the coordinate branches' military personnel policies. In *Rostker v. Goldberg*, 453 U.S. 57 (1981), the Supreme Court upheld the constitutionality of provisions that authorized the President to require men, but not women, to register for the draft. The Court deferred to "Congress' evaluation of th[e] evidence," because Congress, unlike in other gender-based discrimination cases, had acted with "deliberate consideration" rather than "unthinkingly" or "reflexively." *Id.* at 72, 83 (quoting Br. for Appellees) (citations omitted). The Court emphasized that Congress had thoroughly examined the issue through "hearings, floor debate, and in committee." *Id.* at 72; *see also id.* at 63, 79.

In contrast, in *Owens v. Brown*, 455 F. Supp. 291 (D.D.C. 1978), the U.S. District Court for the District of Columbia struck down a statutory provision prohibiting women from serving on most Navy vessels. While acknowledging that "oversight of military operations typically involves complex, subtle, and professional judgments that are best left to those steeped in the pertinent learning" and thus "a high degree of deference is owed to the political branches of government in the area of military affairs," the court nonetheless found this particular restriction unconstitutional. *Id.* at 299 (quotations and citations omitted). The court emphasized two key factors that militated against granting unwarranted deference: the provision had been "added casually, over the military's objections and without significant deliberation," and Navy evidence from experiments on the USS Sanctuary had demonstrated that in fact, women could effectively serve in non-combat naval roles. *Id.* at 305, 309.

The Fourth Circuit also has afforded deference to the national security prerogatives of the executive based on whether the decision reflected a considered policymaking process. In *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996), the court premised its decision upholding the constitutionality of the Don't Ask, Don't Tell policy on a lengthy discussion of the policy deliberations that took place before the enactment of the directive. *Id.* at 922-24. This "exhaustive review" included a military working group with senior members of each service; a study undertaken by the RAND Corporation; regular consultation with the Joint Chiefs of Staff and leaders of each service; discussions with legal experts; analysis by the House and Senate Armed Services Committees; and lengthy Congressional debate. *Id.* at 922. It was only after this "considered judgment" from the coordinate branches of government that the court recognized the "need for deference [to the] . . . military's experience." *Id.* at 923, 926.

Conversely, the Fourth Circuit has chosen not to defer to the President when the record

shows no evidence of such considered judgment or process.  In *Int'l Refugee Assistance Project ("IRAP") v. Trump*, the Fourth Circuit ruled that the plaintiffs would likely succeed in their Establishment Clause challenge to an Executive Order restricting entry from several Muslim-majority countries, despite the President's invocation of national security grounds. 857 F.3d 554 (4th Cir. 2017), *vacated as moot sub nom.*, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017).[53] In reaching that conclusion, the Court gave significant weight to "the exclusion of national security agencies from the decision-making process," and the fact that "President Trump issued the First Executive Order without consulting the relevant national security agencies," exactly what has happened here. *Id.* at 592, 596. The court then determined the Order's "stated national security interest was provided in bad faith, as a pretext for its religious purpose." *Id.* at 592.

The circumstances of this case reveal none of the hallmarks of military policy judgment that traditionally warrant judicial deference.  This is not a case involving the "professional judgment" of "appropriate military officials." *Goldman*, 475 U.S. at 508-09.  No military officials were involved in the President's decision-making.[54]  Nor is this a case where the decision resulted from an "exhaustive review" of relevant evidence, because there was no administrative review to speak of.  *Thomasson*, 80 F.3d at 927.  The President's Executive Order thus mirrors his 2017 tweets and Memorandum, where the decision was made "casually," *Owens,* 455 F. Supp. at 305,

---

[53] Although the decision was vacated as moot, such decisions are relied on by courts for their persuasive value, including those in the Fourth Circuit. *See, e.g.*, *United States v. Kanasco, Ltd.*, 123 F.3d 209, 211 (4th Cir. 1997); *Nuclear Regulatory Comm'n v. Fed. Labor Relations Auth.*, 859 F.2d 302, 309 (4th Cir. 1988); *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 567 (D. Md. 1999) (same).

[54] Input from only Pete Hegseth, newly appointed as Secretary of Defense, and Christopher Miller is a cursory consultation that stands in stark contrast to the comprehensive military leadership input detailed in Part I, which reflected the considered judgement of career senior military officials with extensive command experience and strategic expertise.

"reflexively and not for any considered reason," *Rostker*, 453 U.S. at 72, "without consulting the relevant national security agencies" in the process, *IRAP*, 857 F.3d at 596. Concurring in *Austin v. U.S. Navy Seals 1-26*, Justice Kavanaugh reaffirmed that "the Court has long emphasized ... the complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." 142 S. Ct. 1301, 1302 (2022) (citations omitted). But his deference is not automatically granted simply because military officials are the defendants; it must be earned through evidence that professional military judgment has actually been thoughtfully and reasonably exercised.

### III.    Secretary Hegseth's memorandum does not cure the blatant procedural deficiencies in President Trump's Executive Order.

On February 7, 2025, Secretary of Defense Pete Hegseth circulated a memorandum that parroted President Trump's Executive Order ("the Hegseth Memo" or "the Memo").[55] The conclusory Hegseth Memo demonstrates no attempt to engage with existing research or to seek the professional judgment of military officials. Instead, the Memo simply repeats the President's predetermined, discriminatory conclusion, without any effort to assess individual service records or fitness for duty.[56] Like the Executive Order it cites, Hegseth's memorandum provides no substantive or procedural basis for abruptly implementing this policy change.

The government draws a false parallel between Secretary Hegseth's forthcoming policy and the 2018 Mattis policy challenged in *Doe 2 v. Shanahan*.[57] But the government has failed to

---

[55] Pete Hegseth, Secretary of Defense, *Memorandum: Prioritizing Military Excellence and Readiness*, U.S. DEP'T OF DEF. (Feb. 7, 2025), https://storage.courtlistener.com/recap/gov.uscourts.dcd.276845/gov.uscourts.dcd.276845.33.1.pdf.

[56] *Id.* ("Effective immediately, all new accessions for individuals with a history of gender dysphoria are paused, and all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused.").

[57] Def.'s Opp. to Pl. at 3, Feb. 12, 2024 ECF No. 38.

show that the Hegseth Memo, or any other "upcoming policy," is anything more than a rubberstamp of President Trump's Executive Order. In 2018, six months after President Trump's initial tweets, Secretary of Defense James Mattis issued a revised plan on transgender individuals.[58] The Mattis Plan created exemptions from the general ban on transgender persons serving in the military, thereby allowing some transgender individuals to serve. The D.C. Circuit vacated the preliminary injunction that the district court had placed on Trump's initial ban, determining that the Mattis Plan was not "foreordained" by President Trump's 2017 tweets and memorandum. *Doe 2*, 755 F. App'x at 23. Critical to this decision was Secretary Mattis's independent review: he convened "a panel of military and medical experts" and "consider[ed] . . . new evidence gleaned from" the Obama Administration's policy of open transgender military service. *Id.* Through this process, Secretary Mattis took pains to demonstrate that he had not simply rubber-stamped President Trump's earlier directive.

The same cannot be said of the Hegseth Memo. The Memo shows no indication that the Department of Defense engaged with any existing research; collected any data; deliberated with any military officials; assessed any past practice; or conducted any independent evaluation of the prior policy's merits.[59] Nor does the Memo detail any substantive or procedural defect in the personnel policy permitting transgender service approved by the Biden Executive Order sufficient

---

[58] James N. Mattis, Sec'y of Def., *Memorandum: Military Service by Transgender Individuals*, U.S. DEP'T OF DEF. (Feb. 22, 2018), https://media.defense.gov/2018/mar/23/2001894037/-1/-1/0/military-service-by-transgender-individuals.pdf.

[59] Two recent independent studies—neither of which are referenced in the Hegseth Memo—concluded that barring transgender persons from military service *harms* military readiness. *See* Vice Admiral Donald C. Arthur et al., *DoD's Transgender Ban Has Harmed Military Readiness*, PALM CTR. (Nov. 2020), https://www.palmcenter.org/wp-content/uploads/DoDs-Transgender-Ban-Has-Harmed-Military-Readiness-copy-3.pdf; Shannon L. Dunlap et al., *Support for Transgender Military Service from Active Duty United States Military Personnel*, 18 Sexuality Rsch. & Social Pol. 137 (2021).

to warrant summary termination of that Order. Instead, the one-page Memo simply repeats without analysis President Trump's summary Executive Order.[60] Given that the Hegseth Memo was wholly "foreordained" by President Trump's Executive Order, it does not meet the standard applied by the D.C. Circuit in *Doe 2*, and does not even begin to cure the glaring procedural deficiencies in the President's transgender ban.

The government's further attempt to invoke the 2018 Mattis Plan as precedent for the present ban is entirely misplaced.[61] Over the past seven years, the factual premises underlying the Mattis Plan have been decisively refuted.[62] As the D.C. Circuit emphasized in *Doe 2*, any re-evaluation of policy must "consider . . . new evidence gleaned from" the experience of past administrations. *Doe 2*, 755 F. App'x at 23. The Department of Defense under Mattis acknowledged that understanding the risks—or absence thereof—of allowing transgender persons to openly serve in the armed forces was "continuing to be better understood as new data become available[.]"[63] The Biden Administration's four years of experience with open transgender service, and subsequent assessment and findings by expert officials, conclusively demonstrated that allowing transgender individuals to join and remain in the military in no way compromises the military's effectiveness and lethality. Thus, whatever the merits of the Mattis Plan may have been in 2018, that Plan could no longer pass muster today.

---

[60] Hegseth, *supra* note 54 ("As the President clearly stated in Executive Order 14183 . . . ."). The Hegseth Memo was published a mere eleven days after President Trump's Executive Order 14183.
[61] Def.'s Opp. to Pl. at 3, Feb. 12, 2024 ECF No. 38. It is also worth noting all supporting documents in their opposition are over seven years old.
[62] *See, e.g.*, *supra* note 59.
[63] *Department of Defense Report and Recommendations on Military Service by Transgender Persons*, U.S. DEP'T OF DEF. 44 (Feb. 2018), https://media.defense.gov/2018/mar/23/2001894037/-1/-1/0/military-service-by-transgender-individuals.pdf.

As Part I above demonstrates, the process behind President Trump's decision marked a flagrant deviation from the historical approach traditionally followed with respect to military personnel changes. The Supreme Court has emphasized that "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). Given that executive action implementing significant military personnel positions have traditionally followed the thorough three-part process described above, and then been bolstered by the subsequent able performance of the excluded persons now admitted to equal service, one could hardly imagine a starker departure from "normal procedural sequence" than the conclusory Executive Order at issue here. Both President Trump and Secretary Hegseth failed to consult any military experts; failed to ground their decision in any evidence; ignored extensive experience acquired through lived experience with actual transgendered service; and made no attempt to conduct any meaningful discourse or review process with military officials.

This flagrant departure from past precedent and process raises serious questions about whether the discriminatory animus that drove President Trump's 2017 policy changes motivated this Executive Order and the Hegseth Plan as well. Extending judicial deference to such discriminatory action would create dangerous precedent, enabling future discriminatory executive orders to overturn carefully considered policies, without any individual assessment of the fitness and performance of the service members being discharged. As Justice Thomas observed in *United States v. Fordice,* "[I]f a policy remains in force, without adequate justification and despite tainted roots . . . it appears clear—clear enough to presume conclusively—that the [Government] has failed to disprove discriminatory intent." 505 U.S. 717, 747 (1992) (Thomas, J., concurring). As

Justice Robert Jackson memorably warned in his *Korematsu* dissent, courts must decline to give blind deference to discriminatory executive intent:

> [O]nce a judicial opinion rationalizes such an order to show that it conforms to the Constitution, or rather rationalizes the Constitution to show that the Constitution sanctions such an order, the Court for all time has validated the principle of . . . discrimination . . . The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forth a plausible claim of urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes.

*Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting).

## CONCLUSION

For all of the foregoing reasons, amici submit that the plaintiffs' requests for relief should be granted.

February 14, 2024

Respectfully submitted,

Harold Hongju Koh*                          _____
Peter Gruber Rule of Law Clinic[64]         Andrew T. Tutt (D.C. Bar 1026916)
Yale Law School[65]                         Arnold & Porter Kaye Scholer LLP
127 Wall Street                             601 Massachusetts Avenue, NW
P.O. Box 208215                             Washington, DC 20001
New Haven, CT 06520-8215                    (202) 942-5242
203-432-4932                                Andrew.tutt@arnoldporter.com
harold.koh@ylsclinics.org

*application for *pro hac vice*
forthcoming

*Counsel for Amici Curiae*

---

[64] Law student interns Mia Alvarez, Jack Baisley, Emily Elledge, Fred Halbhuber, Caroline Kapp, Inbar Pe'er, and Brady Worthington contributed to this brief's drafting under counsel for the amici's supervision.

[65] This brief sets forth the views of the signatories, counsel, and law student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of either Yale Law School or Yale University.

**CERTIFICATE OF SERVICE**

I, Andrew T. Tutt, hereby certify that on February 14, 2025, the foregoing document was filed and served through the CM/ECF system.

Respectfully submitted,

_____
Andrew T. Tutt (D.C. Bar 1026916)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5242
Andrew.tutt@arnoldporter.com

26