# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:25-cv-00240 |
| Defendants. | ) ) | |

_____

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................- 1 -

    A.  Accession And Retention Standards for Transgender Service Members ..........- 1 -

    B.  Differences Between the 2025 Order and the 2018 Mattis Plan.......................- 3 -

    C.  *Doe 2 v. Shanahan*'s Relevance to This Case.....................................................- 4 -

ARGUMENT .......................................................................................................- 6 -

    A.  Plaintiffs' Claims Are Ripe..........................................................................- 6 -

    B.  Neither the Administrative Procedures Act nor Exhaustion Apply to this Case - 10 -

    C.  The Order Requires, and Fails, Heightened Scrutiny .......................................- 11 -

        1.  The Order requires heightened scrutiny because it classifies based on sex- 11 -

        2.  The Order requires heightened scrutiny because transgender status is a quasi-suspect classification....................................................................................- 13 -

        3.  The Order cannot withstand rational basis review, much less the heightened scrutiny it requires....................................................................................- 15 -

        4.  The Order cannot withstand any level of scrutiny because it reflects unconstitutional animus. ...............................................................................- 17 -

    D.  Deference to Military Judgment Does Not Obviate the Need for Heightened Scrutiny ..................................................................................................- 18 -

    E.  Plaintiffs Are Suffering Irreparable Harms.....................................................- 20 -

    F.  The Equities and Public Interest Weigh in Favor of a Preliminary Injunction.- 21 -

    G.  Facial Relief Is Appropriate..........................................................................- 22 -

CONCLUSION...................................................................................................- 24 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) .................................................................................................7, 8, 9

*Allen v. Wright*,
  468 U.S. 737 (1984) ...........................................................................................................23

*Antonellis v. United States*,
  723 F.3d 1328 (Fed. Cir. 2013) .......................................................................................27

*Ass'n of Flight Attendants-CWA v. Chao*,
  493 F.3d 155 (D.C. Cir. 2007) .........................................................................................13

*Austin v. U.S. Navy SEALs 1–26*,
  142 S. Ct. 1301 (2022) ...............................................................................................26, 27

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ...........................................................................................5, 14, 16

*Bowen v. City of New York*,
  476 U.S. 467 (1986) ...........................................................................................................13

*Brandt v. Rutledge*,
  677 F. Supp. 3d 877 (E.D. Ark. 2023) ............................................................................17

*Califano v. Wescott*,
  443 U.S. 76 (1979) .............................................................................................................15

*Cargill v. Marsh*,
  902 F.2d 1006 (D.C. Cir. 1990) .......................................................................................26

*Casa, Inc. v. Trump*,
  No. DLB-25-201, 2025 U.S. Dist. LEXIS 20921 (D. Md. Feb. 5, 2025) .............................24

*Center for Democracy & Tech. v. Trump*,
  507 F. Supp. 3d 213 (D.D.C. 2020) .................................................................................11

*Chamber of Com. v. Reich*,
  57 F.3d 1099 (D.C. Cir. 1995) .........................................................................................10

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .........................................................................................23

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010) ..................................................................................................6

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 ..........................................................................................................20

*Comm. for GI Rts. v. Callaway,*
  518 F.2d 466 (D.C. Cir. 1975) ..............................................................................12

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,*
  473 U.S. 788 (1985) ..............................................................................................12

*Cortright v. Resor,*
  447 F.2d 245 (2d Cir. 1971) ..................................................................................27

*Cty. of Santa Clara v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ..............................................................................12

*Doe 1 v. Trump,*
  275 F. Supp. 3d 167 (D.D.C. 2017), <u>vacated sub nom. *Doe 2 v. Shanahan*</u>, 755
  F. App'x 19 (D.C. Cir. 2019) ........................................................................ *passim*

*Doe 1 v. Trump,*
  No. 17-1597 (CKK), 2017 U.S. Dist. LEXIS 211561 (D.D.C. Dec. 11, 2017) ......25

*Doe 1 v. Trump,*
  No. 17-5267, 2017 U.S. App. LEXIS 26477 (D.C. Cir. Dec. 22, 2017) ...................19, 24, 25

*Doe 2 v. Shanahan,*
  755 Fed. Appx. 19 (D.C. Cir. 2019) ................................................................ *passim*

*Evancho v. Pine-Richland Sch. Dist.,*
  237 F. Supp. 3d 267 (W.D. Pa. 2017) ...................................................................17

*Fowler v. Stitt,*
  104 F.4th 770 (10th Cir. 2024) .......................................................................14, 15

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  972 F.3d 586 (4th Cir. 2020) ................................................................................16

*Harkness v. Sec'y of the Navy,*
  858 F.3d 437 (6th Cir. 2017) ................................................................................26

*Hayes v. Sec'y of Def.,*
  515 F.2d 668 (D.C. Cir. 1975) ..............................................................................13

*Hecox v. Little,*
  79 F.4th 1009 (9th Cir. 2023) ...............................................................................15

*Hernandez–Montiel v. I.N.S.*,
   225 F.3d 1084 (9th Cir. 2000), *overruled on other grounds by Thomas v.
   Gonzales*, 409 F.3d 1177 (9th Cir. 2005), *vacated*, 547 U.S. 183 ..........................................17

*Int'l Refugee Assistance Proj. v. Trump*,
   857 F.3d 554 (4th Cir. 2017) (en banc), *vacated on mootness grounds*, 583
   U.S. 912, 2017 U.S. LEXIS 6265 (Oct. 10, 2017) ..................................................24

*Kadel v. Folwell*,
   100 F.4th 122 (4th Cir. 2024) (en banc) ...........................................................4, 15

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ..........................................................................24

*Karnoski v. Trump*,
   No. C17-1297-MJP, 2018 WL 1784464 (W.D. Wash. Apr. 13, 2018), *vacated
   on other grounds*, 926 F.3d 1180 (9th Cir. 2019).........................................17, 26

*Lawrence v. Texas*,
   539 U.S. 558 (2003) (O'Connor, J., concurring) ...................................................6

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982)...........................................................................................15

*Obergefell v. Hodges*,
   576 U.S. 644 (2015)...........................................................................................20

*Orloff v. Willoughby*,
   345 U.S. 83 (1953)............................................................................................26

*Orr v. Orr*,
   440 U.S. 268 (1979)...........................................................................................15

*Parisi v. Davidson*,
   405 U.S. 34 (1972)............................................................................................13

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
   795 F.2d 90 (D.C. Cir. 1986).............................................................................13

*Roe v. United States DOD*,
   947 F.3d 207 (4th Cir. 2020) .............................................................................25

*Romer v. Evans*,
   517 U.S. 620 (1996)........................................................................................7, 20

*Rostker v. Goldberg*,
   453 U.S. 57 (1981)....................................................................................21, 22, 24

*Schlanger v. United States*,
  586 F.2d 667 (9th Cir. 1978) ........................................................................27

*Sebra v. Neville*,
  801 F.2d 1135 (9th Cir. 1986) ......................................................................27

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017).........................................................................................15

*Toilet Goods Assn., Inc. v. Gardner*,
  387 U.S. 158 (1967).........................................................................................7

*Trudeau v. Fed. Trade Comm'n*,
  456 F.3d 178 (D.C. Cir. 2006) ......................................................................12

*Trump v. Hawaii*,
  585 U.S. 667 (2018)..................................................................................12, 20

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017).......................................................................................25

*U.S. Navy SEALs 1-26 v. Biden*,
  578 F. Supp. 3d 822 (N.D. Tex. 2022) ..........................................................26

*United States v. Hatter*,
  532 U.S. 557 (2001).......................................................................................25

*United States v. Windsor*,
  570 U.S. 744 (2013).......................................................................................20

*Vance v. Wormuth*,
  No. 3:21-CV-730-CRS, 2022 U.S. LEXIS 67345 (W.D. Ky. Apr. 12, 2022) ......................11

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)...........................................20

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017), *cert. dismissed*, 583 U.S. 1165 (2018)................................14

*Wilson v. Walker*,
  777 F.2d 427 (8th Cir. 1985) ........................................................................27

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952).......................................................................................12

**Statutes**

Administrative Procedure Act.................................................................11, 12

v

Civil Rights Act of 1964 Section 703(a) .......................................................................5

**Other Authorities**

First Amendment .........................................................................................12, 27

Fifth Amendment ........................................................................................11, 20

Fourteenth Amendment ....................................................................................14

Department of Navy, Decision Guidance Memorandum #N00-30, January 28,
    2025.................................................................................................................9, 10

DOD Instruction 6130.03, *Medical Standards for Military Service: Appointment,
    Enlistment, or Induction* (May 28, 2024)................................................................1

DOD Instruction 6130.03, *Medical Standards for Military Service: Retention*
    (Jun. 6, 2022) ..........................................................................................................1

Exec. Order No. 14183, 90 F.R. 8757 ................................................3, 4, 13

Exec. Order No. 14168, 90 F.R. 8615 ...............................................................9

## INTRODUCTION

Plaintiffs—seven transgender service members and two transgender accession candidates—seek to preliminarily enjoin two executive orders that declare transgender individuals unfit for military service, require them to serve in their birth sex, and mandate their discharge.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Accession And Retention Standards for Transgender Service Members

The Department of Defense ("DoD") maintains distinct sets of medical standards for entering service (accession) and for continuing service (retention). *See* Volume 1 of DOD Instruction 6130.03, *Medical Standards for Military Service: Appointment, Enlistment, or Induction* (May 28, 2024) ("DoDI 6130.03 Vol. 1") (accession standards) and Volume 2 of DOD Instruction 6130.03, *Medical Standards for Military Service: Retention* (Jun. 6, 2022) ("DoDI 6130.03 Vol. 2") (retention standards). These standards reflect different military interests and considerations. Supp. Wagner Decl. ¶ 4.

Accession standards are stringent due to the military's long-term investment in each recruit, including lifetime medical care and extensive training. These standards aim to ensure recruits can complete their initial term and serve additional years. Supp. Wagner Decl. ¶¶ 2-3.

The Austin Policy requires transgender service members to meet the same standards as others for medical fitness, physical fitness, uniform and grooming, deployability, and retention. DoDI 1300.28, Ex. D to Wagner Decl., ECF No. 13-25 at 1.2.a. For accession, transgender individuals must demonstrate 18 months of stability post-transition. *See* DTM-16-005, Ex. A to Wagner Decl., ECF No. 13-22 at 5, § 2; DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1). This requirement is based on the same considerations applied to other treatable medical conditions at accession, reflecting standard military medical policy rather than any unique restriction on transgender service. Supp. Wagner Decl. ¶ 4.

Retention standards, by contrast, focus on service members' current ability to perform duties and deploy, recognizing both the military's investment in personnel and diverse military roles.  Supp. Wagner Decl. ¶ 5.  Under DoDI 6130.03 Vol. 2, Ex. A to Suppl. Wagner Decl., medical conditions require individualized evaluation for retention.  *See* DoDI 6130.03 Vol. 2 at 1.2.b(1), 3.2, 3.3.a(1).  No condition automatically disqualifies a person from service; instead, each member is evaluated on their ability to perform specific duties and serve in deployed or garrison conditions.  Supp. Wagner Decl. ¶¶ 6-7.

For transgender service members receiving gender transition-related medical care, the Austin policy uses the same individualized assessment process used for all service members.  Supp. Wagner Decl. ¶ 13.  DoDI 1300.28 does not specify a fixed period during which transgender service members must be classified as nondeployable after gender transition.  Supp. Wagner Decl. ¶ 14.  While new recruits must demonstrate 18-month post-transition stability, Supp. Wagner Decl. ¶ 4, current service members face no fixed waiting period, Supp. Wagner Decl. ¶ 6.  Instead, their deployment status is evaluated using the same standards that each Military Department and Service branch applies to all other service members.  DoDI 1300.28 at 3.1.

Experience has shown that most transgender service members experience few or no deployment limitations related to their gender transition.  Supp. Wagner Decl. ¶ 14; Vandal Decl., ECF No. 13-33 at ¶ 17; Cole Decl., ECF No. 13-13 at ¶ 17; Herrero Decl. ECF No. 13-35 at ¶¶ 14–15; Dandridge Decl., ECF No. 13-36 at ¶ 22; Hash Decl., ECF No. 13-37 at ¶ 18.

**B. Differences Between the 2025 Order and the 2018 Mattis Plan**

The President's Order[1] differs significantly from the earlier Mattis Plan in its treatment of transgender service members. While the Mattis Plan included protections for currently serving transgender service members, the Order provides none. The differences are particularly stark in two areas.

First, under the Mattis Plan, transgender service members could use pronouns and facilities matching their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS). Department of Defense Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) ("Mattis Plan"), ECF No. 38-1 at 7–8. In contrast, the Order requires all service members to use facilities and pronouns based on their birth sex, regardless of their DEERS marker. Exec. Order No. 14183, 90 Fed. Reg. 8757, § 4 (b) & (d); ECF No. 14-3 at 3.

Second, the Mattis Plan primarily focused on medical standards. However, the new restrictions on pronouns and facilities in the Order do not even purport to be based on medical considerations. These new policies prevent transgender individuals from serving, as they must be treated according to their birth sex. 90 Fed. Reg. 8757, § 4 (d); ECF No. 14-3 at 3; ECF No. 23-1 at 2. Such restrictions would have been impossible under the Mattis Plan because they conflict with its grandfather clause that protected transgender service members' right to continue serving. Mattis Plan at 7–8.

To be clear, Plaintiffs do not agree that the Mattis Plan could have survived constitutional review--a question *Doe v. Shanahan* never reached. As the D.C. Circuit acknowledged, "the

---

[1] This brief uses the phrases "the Order" or "the Executive Order" to refer to both Executive Orders challenged here: "Prioritizing Military Excellence and Readiness," Exec. Order No. 14183 and "Defending Women from Gender Ideology." Exec. Order No. 14168. Exec. Order No. 14183 incorporates Exec. Order No. 14168 by reference, and both stand together to direct the exclusion of transgender people from military service because they are transgender.

Mattis Plan continues to bar many transgender persons from joining or serving in the military." 917 F.3d 694, 701-02 (D.C. Cir. 2019)..  As the Court itself said, the opinion was not "dispositive of whether the Mattis Plan targets only transgender persons or is instead facially neutral" *Id.*

As the Fourth Circuit held in *Kadel v. Folwell*, "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it."  100 F.4th 122, 146 (4th Cir. 2024).  Unlike pregnancy in *Geduldig*, which can be discussed independently of sex, "gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status."  Predicating military service on the absence of gender dysphoria strikes at "the very heart of transgender status" and functions as an impermissible proxy for transgender discrimination.

Finally, the Mattis Plan restricted service based on the medical diagnosis of gender dysphoria and its treatment.  Mattis Plan at 34–45.  While it banned most transgender people from serving, it did not expressly state, as this Order does, that being transgender made someone inherently unfit for military service.

### C.  *Doe 2 v. Shanahan*'s Relevance to This Case

As set forth above, *Doe 2 v. Shanahan*, 755 Fed. Appx. 19 (D.C. Cir. 2019) is not dispositive of the issue before this Court.  To the extent that the question of what it means to be transgender is central to this Court's analysis, *Bostock v. Clayton Cnty*.  is instructive.  590 U.S. 644 (2020).  In *Bostock*, the Court held that discrimination against transgender individuals is necessarily discrimination based on sex.  *Id*. at 660.  Ms. Stephens was fired after informing her employer that she planned to "live and work full-time as a woman."  *Id.* at 654.  If, as the government suggests, living as one's birth sex were compatible with being transgender, then Ms. Stephens's employer could have simply required her to present as male while maintaining employment.  The Court's rejection of this possibility demonstrates that living as a sex different

- 4 -

from one's birth sex is not severable from transgender status for purposes of discrimination analysis.

Well-established anti-discrimination principles confirm that policies affecting only a subset of a protected class still constitute classifications based on that protected status. As the Supreme Court explained, simply because a class defined by a protected characteristic "does not include all members," does not make the class neutral. *Rice v. Cayetano*, 528 U.S. 495, 516-517; *see also Phillips v. Martin Marietta Corp*., 400 U.S. 542, 543 (1971) (hiring policy targeting women classifies based on sex even though not all women are mothers). Or, as the Supreme Court recognized in *Goldman v. Weinberger*, a ban on yarmulkes constitutes a religious classification even though not all Jewish people wear yarmulkes. 475 U.S. 503, 513 (1986). That some transgender individuals might theoretically serve in their birth sex does not change the fact that the Order classifies based on transgender status.

This principle is particularly salient given that Plaintiffs have lived as a sex different than their birth sex for years or decades. Many have undergone medical transition including hormone therapy and irreversible surgeries, making it physically and socially impossible to live or work in their birth sex. *See Christian Legal Soc'y v. Martinez,* 561 U.S. 661, 689 (2010) (rejecting argument that discrimination based on conduct rather than status is permissible where the conduct is so closely correlated with the status that they are effectively indistinguishable).

The analysis remains the same even though "transgender" may sometimes serve as an umbrella term encompassing various forms of gender nonconformity. This principle is well-established in the context of sexual orientation: while terms like "gay" or "queer" may broadly describe individuals who depart from gender norms, a policy targeting the narrower and more specific class of those who engage in same-sex relationships constitutes a classification based on

sexual orientation. *See Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring). Similarly, a policy targeting those who live as a sex different than their birth sex creates a classification based on transgender status, regardless of whether some individuals who might identify as transgender in other contexts fall outside its scope.

## ARGUMENT

### A. Plaintiffs' Claims Are Ripe

This case easily meets the two-part test for ripeness under *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149 (1967) ("requiring [a court] to evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration"). The core legal question—whether the Order's treatment of transgender service members violates equal protection—is fit for immediate review. Plaintiffs and other transgender service members face immediate violation of their constitutional rights and loss of their military careers—"irremediable adverse consequences [that will] flow from requiring a later challenge." *Toilet Goods Assn., Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

Defendants' argument ignores that the President of the United States, in his capacity as Commander in Chief, has issued an order directing the Secretary of Defense to exclude transgender people from military service. As this Court previously held in a challenge to President Trump's prior ban, the President's directives "are the operative policy toward military service by transgender service members. The Court must and shall assume that the directives . . . will be faithfully executed. *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 194 (D.D.C. 2017), vacated sub nom. *Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019). In the two weeks since the parties first appeared before this Court, the government has issued a barrage of directives to implement the Order by blocking accession for transgender applicants, cancelling scheduled medical care for transgender service members, blocking assignments, and ordering transgender service members to

revert to serving in their birth sex—*i.e.*, to stop being transgender.  A challenge to government action is ripe when the program "is quite clearly set forth" and the court is "asked to decide whether its adoption was constitutional."  *Abbott Labs v. Gardner*, 387 U.S. at 149.  Here, the Order and its implementing directives clearly set forth policies that immediately impact Plaintiffs' rights. The constitutional questions are therefore ripe for review.

On its face, the Order establishes a policy that being transgender is incompatible with military service.  As the Order forthrightly states, "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." Exec. Order No. 14183, 90 C.F.R. 8757 (2025).  The Order also makes clear that this alleged incompatibility is independent of medical treatments: "*Beyond the hormonal and surgical medical interventions involved*, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."  *Id.*  (emphasis added).  The Order goes further, stating that even telling others that one is transgender is incompatible with service: "A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id.*  In sum, the Order states that transgender people are not permitted to serve because they are inherently dishonorable, dishonest, undisciplined, and do not have the humility or selflessness required of service members.

The Order also directs the Secretary of Defense to take actions to "reflect the purpose and policy of the order," including, among others:

- within 60 days, update the current medical standards relating to accession and retention that permit transgender people to join and serve in the military;
- "promptly issue directives to end invented and identification-based pronoun usage;"
- within thirty days, "identify all additional steps and issue guidance necessary to fully implement this order" and "submit to the President through the Assistant to

the President for National Security Affairs a report that summarizes these steps;"

- and "ensure that all military departments and services fully comply with the provisions of this order." *Id.*

The Order also provides that: "Absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* The Order incorporates definitions from Executive Order 14168 that define "sex" as "an individual's immutable biological classification as either male or female" at birth; accordingly, this directive deprives transgender service members of any ability to be recognized as or to serve in a sex different than their sex at birth. The President's directives put Plaintiffs in an impossible situation, requiring them to stop being transgender, which they cannot do. Vandal Supp. Decl. ¶ 8; Hash Supp. Decl. ¶ 5; Herrero Supp. Decl. ¶ 5; Perelson Supp. Decl. 15.

Defendants claim there is no basis for this Court's legal review because the Order merely directs future changes to military service requirements, without specifying exact details. However, he government's own documents unequivocally show that the policies mandated by the Order facially target service members based on their transgender status/gender identity:

- "As the President clearly stated in Executive Order 14183, 'Prioritizing Military Excellence and Readiness,' January 27, 2025: '**Expressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service**.'" (Secretary of Defense, MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP, February 7, 2025)
- "This memorandum provides guidance on the processing of **applicants who identify as transgender**, in light of the Executive Order titled 'Prioritizing Military Excellence and Readiness,' signed by the President on January 27, 2025." (Department of Navy, DECISION GUIDANCE MEMORANDUM #N00-30, January 28, 2025)
- "The recent Executive Order mandates a revision of Department of Defense (DoD) policies concerning the enlistment and service of **transgender individuals**." (*Id.*)
- "Effective immediately, **any Future Sailors currently in the DEP who are identified as transgender** will have their ship dates postponed pending further DoD guidance." (*Id.*)

- "**Applicants who self-identify as transgender** are not eligible to process for enlistment at this time." (*Id*.)
- "Ensure that intimate spaces for women, girls, or females (or for men, boys, or males) are designated by biological sex and **not gender identity**." (Secretary of Defense, MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP, January 31, 2025)
- "Review all forms that require entry of an individual's sex and ensure that all list male or female only, and **not gender identity**." (Department of the Army, MEMORANDUM FOR SEE DISTRIBUTION, Implementing Guidance for Executive Order Defending Women, filed February 6, 2025).
- "Ensure that intimate spaces, including but not limited to bathrooms, changing facilities, and sleeping quarters, designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and **not gender identity**." (*Id*.)
- "Review all forms that require entry of an individual's sex and ensure that all list male or female only and **not gender identity**." (Department of the Air Force, MEMORANDUM FOR ALL MAJCOM-FOA-DRU-FLDCOM-COCOM/CC, February 4, 2025).
- "Ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and **not gender identity**." (*Id*.)

Ripeness doctrine does not require waiting for every implementation detail before reviewing clearly established government policies that impose concrete injuries. In contrast to the cases cited to by Defendants, the Order's "concrete effects and implications" are already clear. *Chamber of Com. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995). The Order's declaration that transgender identity is incompatible with military service immediately demeans transgender service members and impacts their standing in the military community. *See* Hash Supp. Decl. ¶ 6–9; Herrero Supp. Decl. ¶ 10. Transgender service members must immediately revert to pronouns and use facilities that conflict with their current DEERS markers. Transgender service members are already being held back from assignments and denied medically needed care. *See* Vandal Supp. Decl. ¶ 2–5; Sale Decl. ¶ 10–12; Shishkina Decl. ¶ 12–15; McCallister Decl. ¶ 11–14; Tyson Decl. ¶ 7–12; Bettis Decl. ¶ 10–14; Pickett Decl. ¶ 6–24. And absent this Court's intervention, the plain terms of the Order unequivocally require that Plaintiffs be discharged and lose their military

careers.

**B. Neither the Administrative Procedures Act nor Exhaustion Apply to this Case**

Plaintiffs assert Fifth Amendment equal protection claims, not administrative claims under the Administrative Procedure Act ("APA"). Plaintiffs directly challenge the constitutionality of the Executive Order itself, because it is the Order that establishes the rule that transgender persons may not serve in the military. This is consistent with many other constitutional challenges brought directly to Presidential executive orders. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985); *Cty. of Santa Clara v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *Trump v. Hawaii*, 585 U.S. 667 (2018).

None of the cases Defendants cite support the proposition that Plaintiffs must forgo challenging a facially discriminatory executive order until an agency adopts further steps implementing the order that can be challenged under the APA. *See Franklin*, 505 U.S. at 801 (unavailability of APA challenge "does not dispose of appellees' constitutional claims"); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (involving no executive order, but recognizing an independent cause of action under the First Amendment even where APA "final agency action" is absent). No need exists to "wait and see" if the DoD will adopt a policy that violates Plaintiffs' constitutional rights where the Order provides unambiguous, inflexible direction regarding the key terms of the policy. Plaintiffs are entitled directly to challenge the constitutionality of the Order itself.

Similarly, constitutional challenges bypass administrative exhaustion requirements since they must be decided by courts, not administrative boards. As held in *Adair v. England*, constitutional claims are "singularly suited to a judicial forum and clearly inappropriate to an administrative board." 183 F. Supp. 2d 31, 55 (D.D.C. 2002)., *aff'd sub nom. In re Navy*

*Chaplaincy*, No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020) (citation omitted); *see also Comm. for GI Rts. v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975) (same).  Here, Plaintiffs challenge the facial constitutionality of a policy, not individual administrative actions, making judicial review appropriate without exhaustion.  *See Comm. For GI Rts.*, 518 F.2d at 474 ("The issues involved [in this case] are purely legal, requiring no exercise of military discretion or expertise.  The federal courts are in a better position to consider the constitutional issues presented than are the various military bodies referred to by the appellants.").[2]

Administrative exhaustion is also not required here because it would be futile.  The Order definitively establishes that being transgender is incompatible with military service and mandates DoD implementation without discretion.  Courts have held that exhaustion is unnecessary when "the agency will almost certainly deny any relief . . . because it has a preconceived position." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986).

## C. The Order Requires, and Fails, Heightened Scrutiny

### 1. The Order requires heightened scrutiny because it classifies based on sex.

As Plaintiffs have shown, the Order classifies based on sex in the most literal sense.  On its face, it creates a sex-based classification by excluding from military service those who "adopt[] . . . a gender identity inconsistent with an individual's sex."  90 Fed. R. 8758 § 1.

Defendants contend that the Order does not discriminate based on sex because it "applies

---

[2] None of the cases cited by Defendants in support of their contention that Plaintiffs must exhaust their administrative remedies before pursuing their claims before this Court apply that principle to a facial challenge on which the agency could not give relief.  *See, e.g., Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 158 (D.C. Cir. 2007) (plaintiffs failed to submit a petition for FAA rulemaking); *Parisi v. Davidson*, 405 U.S. 34, 38 (1972) (challenging denial of individual discharge application); *Bowen v. City of New York*, 476 U.S. 467, 484–85 (1986) (waiving the exhaustion requirement where plaintiffs contended that "a systemwide, unrevealed policy was inconsistent in critically important ways with established regulations.").

equally to males and females."  Defs.' Opp. to Pls.' Mot. for Preliminary Injunction ("Opp."), ECF

No. 38 at 18.  The Supreme Court expressly rejected that argument in *Bostock,* holding that the

discrimination inquiry focuses on "individuals rather than groups."  *Bostock*, 590 U.S. at 659.  For

this reason, it is no defense "for an employer to say it discriminates against both men and women

because of sex."  *Id.*

Defendants argue it is inappropriate to apply *Bostock*'s discrimination analysis in the equal

protection context.  But just as with Title VII, "the Supreme Court has consistently held that the

Fourteenth Amendment 'protect[s] *persons*, not *groups*.'"  *Fowler v. Stitt*, 104 F.4th 770, 791 (10th

Cir. 2024) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995); *Parents Involved*

*in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007)).  In the same way that Title

VII protects each "individual" from discrimination, the Fifth Amendment's equal protection

component guarantees each "person" the equal protection of the laws.  *See id.*  Defendants argue

that "a law or policy constitutes sex discrimination for Equal Protection purposes only if it

*classifies* individuals based on their sex."  Opp. at 20.  But when a policy that facially subjects

individuals to disparate treatment, there simply is no logical or practical difference between saying

that the policy treats an individual less favorably "because of" sex and saying that the policy treats

an individual less favorably by establishing a sex-based "classification."  Numerous courts have

held that *Bostock*'s discrimination analysis applies in the equal protection context.  *See, e.g.*,

*Fowler*, 104 F.4th at 793; *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox*

*v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023).

Defendants argue that the Order's exclusion of transgender service members is "wholly

unlike the classifications the Supreme Court has found to be sex-based," Opp. at 19, but in every

post-1970s equal protection case addressing a law that treats individuals differently based on their

sex, the Supreme Court has consistently applied the same analysis of what constitutes a facial classification based on sex as in statutory discrimination cases. *See, e.g., Orr v. Orr*, 440 U.S. 268, 278 (1979) ("In authorizing the imposition of alimony obligations on husbands, but not on wives, the Alabama statutory scheme 'provides that different treatment be accorded on the basis of sex; it thus establishes a classification subject to scrutiny under the Equal Protection Clause.") (ellipses and internal quotation marks omitted); *Califano v. Wescott*, 443 U.S. 76, 84 (1979) ("[T]his Court has not hesitated to strike down gender classifications that result in benefits being granted or denied to family units on the basis of the sex of the qualifying parent."); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) ("Our decisions . . . establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification.") (internal quotation marks omitted); *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017) ("Laws granting or denying benefits on the basis of the sex of the qualifying parent, our post-1970 decisions affirm, differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee.") (internal quotation marks omitted).  There is no reasoned basis for a different understanding of what constitutes facial sex discrimination for equal protection purposes than the straightforward analysis the Supreme Court applied in *Bostock*.

### 2. The Order requires heightened scrutiny because transgender status is a quasi-suspect classification.

Defendants offer no persuasive response to Plaintiffs' argument that transgender people bear all the hallmarks of a quasi-suspect class. *See Doe 1*, 275 F. Supp. 3d at 208–09.  They present no argument or evidence to rebut Plaintiffs' showing that transgender individuals have long been the targets of pervasive *de jure* and private discrimination, both historically and today.  Nor do they argue that "being transgender in any way limits one's ability to contribute to society." *Id.*

- 13 -

Defendants weakly assert that transgender persons somehow are not politically powerless because they have tried for many years to pass federal legislation protecting them from discrimination— an effort that has not been successful.  In short, Defendants offer no substantial argument or evidence to counter what the historical record makes plain: "Transgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 613 (4th Cir. 2020), as amended (Aug. 28, 2020).

Defendants instead focus their argument mainly on one of the four factors, arguing that transgender individuals do not have "immutable and distinguishing characteristics that make them a discernable class." *Doe 1,* 275 F. Supp. 3d at 208.  For this, Defendants point to the existence of individuals who at some point in their lives decide to stop receiving medical treatment for gender dysphoria.  The fact that some individuals "detransition" does not undermine the immutable nature of transgender identity.  The legal concept of immutability does not require absolute biological determinism or complete impossibility of change.  Courts have long recognized that characteristics can be legally immutable even when they are capable of being suppressed in response to government oppression.  The Ninth Circuit specifically addressed this issue in the asylum context, holding that "[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them." *Hernandez–Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005), *vacated,* 547 U.S. 183.  Multiple courts have since applied similar reasoning to conclude that being transgender is "immutable" for purposes of equal protection analysis. *See, e.g., Karnoski v. Trump,* No. C17-1297-MJP, 2018 WL 1784464, at *10 (W.D. Wash. Apr. 13, 2018), *vacated on other grounds*, 926 F.3d 1180 (9th Cir. 2019) (citing *Hernandez-*

*Montiel*, 225 F.3d at 1093); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (transgender status is "deeply ingrained and inherent"); *Brandt v. Rutledge,* 677 F. Supp. 3d 877, 905–06, 918 (E.D. Ark. 2023) (concluding being transgender is immutable notwithstanding trial evidence concerning detransition).  The existence of a small number of individuals who detransition does not negate the immutable character of transgender identity.

### 3.  The Order cannot withstand rational basis review, much less the heightened scrutiny it requires.

The Order banning transgender military service fails both heightened scrutiny and rational basis review because it excludes qualified individuals based solely on their transgender status, without relation to their fitness to serve.

The government relies on outdated 2018 data about gender dysphoria and mental health outcomes that is irrelevant to the Order's scope.  The Austin Policy, which the Order directs changed, requires transgender service members to meet the same standards as others.  At accessions, this happens by subjecting transgender individuals to the same considerations that apply to other enlistees with treatable conditions.  For retention, transgender individuals with medical needs receive the same individualized assessments as to their status and deployability as others.  The Order abandons this proven approach in favor of a class-based ban—a standard applied to no other group.

The Order forces the separation of proven service members, resulting in the loss of trained personnel.  If the government's concern were truly medical readiness, it would follow standard military practice of evaluating individual fitness to serve along with deployability limits rather than imposing blanket separation.

Unlike the 2018 Mattis Plan which at least ostensibly focused on medical standards, the current Order's restrictions on pronouns and facilities usage have no connection to medical fitness.

These requirements forcing transgender individuals to serve in their birth sex, regardless of their official DEERS sex marker, reveal that the policy targets transgender status itself.

The government cannot evade heightened scrutiny by arguing this is not a class-based ban because some transgender individuals might serve by suppressing their identity. The Supreme Court has rejected similar arguments in other discrimination cases, rejecting the claim that a facially discriminatory classification must disadvantage all members of a group. A ban on marriage for same-sex couples is a class-based ban, even if not all gay and lesbian people will ever marry. A restriction on mothers is sex discrimination, even though not all women are mothers. This principle is especially relevant here, where Plaintiffs have transitioned and lived in a different sex for years, making service in their birth sex impossible.

While military judgment deserves deference, such deference requires actual military expertise. In contrast, this Order: contradicts established military practices regarding individualized assessment for retention and deployments; was imposed without contemporary military input or fact-finding; fails to demonstrate how excluding transgender individuals relates to military interests; contains internal contradictions regarding medical care and readiness; focuses on non-medical requirements unrelated to service capability.

Defendants must demonstrate how the ban substantially relates to military interests beyond merely citing concerns about lethality, readiness, and unit cohesion. The policy's departure from standard military practices and its focus on non-medical requirements reveal it does not genuinely serve these interests. In addition, where some of the asserted interests challenge the morality and even the humanity of Plaintiffs, even under rational basis review, the government must advance some rational relationship between these allegations of lack of discipline, selfishness, and dishonesty and the targeted group, which the government has not and cannot do here.

- 16 -

**4.  The Order cannot withstand any level of scrutiny because it reflects unconstitutional animus.**

Defendants argue that "animus is not a reason to grant Plaintiffs' motion."  Def. Br. at 26.

Of course, this Court found otherwise in enjoining the President's first attempt at banning

transgender individuals from the military.  *See Doe 1*, 275 F. Supp. at 212-13 & n.10 (considering

the plain text of the President's exclusion of transgender people from the military as well as "the

circumstances surrounding [its] announcement" and concluding that the plaintiffs were likely to

succeed in proving that the policy was motivated by animus or a discriminatory purpose and not

"genuine concerns regarding military efficacy").  The D.C. Circuit declined to stay that injunction.

*Doe 1 v. Trump*, No. 17-5267, 2017 U.S. App. LEXIS 26477, at *4 (D.C. Cir. Dec. 22, 2017).

Judge Wilkins later explained that decision:

> Given that intemperate contemporaneous statements by policymakers, departures
> from normal procedures, and adoption of policies unsupported or contrary to data
> can be considered evidence that invidious discrimination was "a motivating factor"
> in the decision, *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.
> 252, 266-68, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977), the course of events leading
> up to the 2017 Presidential Memorandum had more than a whiff of the stench of
> arbitrariness and of a "bare . . . desire to harm a politically unpopular group."  *U.S.
> Dept. of Agric. v. Moreno*, 413 U.S. 528, 534, 93 S. Ct. 2821, 37 L. Ed. 2d 782
> (1973).

*Doe 2*, 917 F.3d at 699 (Wilkins, J., concurring).

The presence of animus is even more apparent in the current Order, which declares that

being transgender "conflicts with a soldier's commitment to an honorable, truthful, and disciplined

lifestyle, even in one's personal life," and "is not consistent with the humility and selflessness

required of a service member."  There is no factual basis for these assertions, which raises the

"inevitable inference" that the Order is "born of animosity" toward transgender people.  *Romer*,

517 U.S. at 634 (striking down "a status-based enactment divorced from any factual context" that

would support the classification).

Moreover, the Order's "avowed purpose and practical effect" is "to impose a disadvantage, a separate status, and so a stigma" on transgender people. *United States v. Windsor*, 570 U.S. 744, 770 (2013). "[N]o legitimate purpose overcomes the purpose and effect to disparage and to injure." *Id.* at 775; *see also id.* at 774 (explaining that "the Fifth Amendment itself withdraws from Government the power to degrade or demean"); *Obergefell v. Hodges*, 576 U.S. 644, 662 (2015) (explaining that the Court struck down the law challenged in *Windsor* because it "impermissibly disparaged" same-sex couples).[3]

Finally, the issuance of multiple other executive orders and federal agency actions targeting transgender people contemporaneously with the Order is also evidence of discriminatory intent or animus. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534–35 (considering contemporaneous resolution adopted at same time as challenged ordinances as evidence of discriminatory intent).

### D. Deference to Military Judgment Does Not Obviate the Need for Heightened Scrutiny

Defendants are wrong to argue that rational basis applied in *Rostker v. Goldberg*, 453 U.S. 57, 69–70 (1981). As Judge Wilkins's concurring opinion in *Doe 2* noted, "[i]n *Rostker*, the Court declined the Government's invitation to declare that rational basis scrutiny, rather than heightened scrutiny, necessarily applies to all military policies, even when the policy includes a facially discriminatory classification." 917 F.3d at 704. Applying heightened scrutiny, the Court in *Rostker* upheld the sex-based selective service registration based on the then-existing exclusion of

---

[3] In contrast, *Trump v. Hawaii* involved a facially neutral proclamation with legitimate stated purposes backed by agency findings and evidence.

women from combat, which put men and women into dissimilar positions with respect to a potential draft.  453 U.S. at 77-79.  Nothing in *Rostker* or any subsequent case law supports Defendant's contention that *Rostker* applied rational basis review.

Most recently, in *Singh v. Berger*, the D.C. Circuit strongly affirmed that "the cost of military service has never entailed the complete surrender of all basic rights." 56 F.4th 88, 92 (D.C. Cir. 2022) (internal quotations committed).  "When it acts in the area of military affairs, Congress remains subject to the limitations of the Due Process Clause." *Id*. (quoting *Rostker*, 453 U.S. at 67).  As the court explained, when an injunction "addresses military affairs, courts give great deference to the professional judgment of military authorities concerning the importance of a particular military interest.  *Id.* at 95 (internal quotations omitted).  However, that deference does not preclude requiring the military to show a sufficiently close connection between its asserted interest and the challenged policy.  *Id*. at 99.

In *Singh*, the Court held that "even giving the widest berth" to the military's asserted in uniform grooming standards, its claimed compelling need for grooming uniformity did not stand up to the exception to boot camp grooming rules that the Corps has already created and that seriously undermine the Corps' contention that it can brook no departures for Plaintiffs.  *Id.*; *see also Doe 2*, 917 F.3d at 703 (Wilkins, J., concurring) (suggesting the result in *Goldman* would have been different if the policy "permit[ted] the wearing of any religious headgear except yarmulkes").[4]

Similarly, Plaintiffs do not question the importance of the asserted interests of the military in readiness, lethality, and unit cohesion.  Rather, they contend there is no rational much less

---

[4] None of the military cases cited by Defendants involve facially discriminatory policies requiring heightened scrutiny.

substantial relationship between furthering those interests and excluding transgender people from military service. Like the disparate treatment of the Plaintiffs in *Singh*, the military's claim that it has a compelling need to exclude Plaintiffs and other transgender service members because they have gender dysphoria does not stand up to its individualized treatment of all other medical conditions.

In all other cases, the military evaluates service members with medical conditions based on their actual ability to perform duties. No other medical condition triggers automatic discharge. In addition, transgender service members face unique restrictions that are untethered from the military's medication regulations, such as limitations on which facilities they can use, where they can be housed, and what pronouns they can use. Thus, as in *Singh*, the proper application of deference to military judgment does not obviate the need for heightened scrutiny with respect to the required fit between the government's asserted interests and its policy.

### E. Plaintiffs Are Suffering Irreparable Harms.

Defendants fundamentally misapprehend the nature and magnitude of the irreparable harms Plaintiffs face. To establish irreparable harm, Plaintiffs must demonstrate injury that is "both certain and great" and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The harms here are both.

First, Defendants incorrectly reduce Plaintiffs' injuries to mere loss of employment and benefits. But military service is not just a job for these Plaintiffs. It is a calling and way of life to which they have dedicated themselves in service of their country. The deprivation of their ability to serve works an immediate and profound injury that cannot be remedied by monetary compensation.

Second, unlike the families in *Allen v. Wright*, 468 U.S. 737, 755 (1984), who challenged racism in private schools their children did not seek to attend, these servicemembers are the direct

targets of an Order that brands them as undermining "troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Their Commander in Chief's declaration that they are unfit to serve solely for being transgender undermines their leadership, advancement opportunities, and peer relationships.

Third, Defendants incorrectly suggest Plaintiffs have not identified current adverse treatment short of separation. To the contrary, the record is replete with concrete harms caused by the Order that are mounting seemingly every day: Senior Master Sergeant Hash has already lost opportunities in her current role. *See* Supp. Hash Decl. at ¶ 6. Staff Sergeant Herrero had to forego educational opportunities that would have bolstered his career. *See* Supp. Herrero Decl. at ¶ 7–9. After dedicating years preparing for a capstone leadership role at West Point, Staff Sergeant Herrero now faces the certain loss of this opportunity absent an injunction here. *See id.* Major Vandal has been denied medically needed care. *See* Supp. Vandal Decl. at ¶ 2–4. Private Perelson was placed in isolation during basic training, *see* Supp. Perelson Decl. at ¶ 2–3, and the Order's marking of transgender service members as unfit has altered how others view her in ways that cannot be undone without an injunction, *see* Supp. Perelson Decl. at ¶ 4–14. Monetary relief after the fact could never remedy the damage being inflicted by these immediate harms.

**F. The Equities and Public Interest Weigh in Favor of a Preliminary Injunction**

Defendants argue that "there is a strong public interest in deferring to the Commander in Chief's judgment on which military policies would best protect the Nation." Defs.' Br. at 36. But "deference does not mean abdication," and the government is not "free to disregard the Constitution when it acts in the area of military affairs." *Rostker*, 453 U.S. at 67, 70. Because the Executive Orders at issue are likely unconstitutional as set forth above, the public interest is served, not harmed, by enjoining their enforcement. *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir.

2020).  "If anything," our system of government "is improved by such an injunction."  *Casa, Inc. v. Trump*, No. DLB-25-201, 2025 U.S. Dist. LEXIS 20921, at *47 (D. Md. Feb. 5, 2025).  Allowing a likely unconstitutional executive order to take effect would "inflict the greater institutional injury."  *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017) (en banc), *vacated on mootness grounds*, 583 U.S. 912, 2017 U.S. LEXIS 6265 (Oct. 10, 2017).

The fact that this case concerns the military does not change the public-interest analysis.  "Military interests do not always trump other considerations."  *Doe 2*, 755 F. App'x at 24 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008)) (cleaned up).  A "bare invocation of 'national defense' simply cannot defeat every motion for preliminary injunction that touches on the military."  *Doe 1*, 275 F. Supp. 3d at 217.

### G.  Facial Relief Is Appropriate

The equities and precedent support facial relief in this case.  While Defendants contend this Court cannot issue a facial injunction, the Fourth Circuit has rejected this argument as contrary to binding precedent.  *Roe v. United States DOD*, 947 F.3d 207, 232 (4th Cir. 2020).  Moreover, the Supreme Court recently upheld a nationwide injunction protecting parties "similarly situated to" the plaintiffs.  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 582 (2017).

This Court has confirmed there is "nothing improper" about preliminarily enjoining facially unconstitutional presidential directives.  *Doe 1 v. Trump*, No. 17-1597 (CKK), 2017 U.S. Dist. LEXIS 211561, at *13 (D.D.C. Dec. 11, 2017) (citing *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307, 195 L. Ed. 2d 665 (2016), and *Harmon v. Thornburgh*, 878 F.2d 484, 495 (D.C. Cir. 1989)).  Such relief is particularly appropriate when the directives will inevitably cause irreparable harm to all similarly situated individuals.  *See IRAP*, 582 U.S. at 582.  Every federal court that reviewed the President's first transgender military ban granted this relief, and the D.C. Circuit upheld this Court's injunction as to non-plaintiffs.  *Doe 1*, 2017 U.S. App. LEXIS 26477,

at *12.  Plaintiffs now seek the same relief: an injunction preventing Defendants "from taking any action relative to transgender individuals that is inconsistent with the status quo that existed" before January 20, 2025, regarding accessions, retentions, medical care, and other affected circumstances.  *Karnoski*, 2017 U.S. Dist. LEXIS 203481, at *33; *see also Doe 1*, 275 F. Supp. 3d at 217 (same).[5]

Defendants argue that preliminary injunctive relief would improperly "impede the military's discretion to make assignment, deployment, and operational decisions."   Defs. Br. at 39.  They primarily cite *Austin v. U.S. Navy SEALs 1–26*, 142 S. Ct. 1301 (2022) (Mem.), but that case supports Plaintiffs' request.

In *Navy SEALs*, the district court enjoined the Navy from enforcing a policy that disqualified service members refusing vaccines for religious reasons, but not those unvaccinated for other reasons.  *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 827, 840 (N.D. Tex. 2022).  The Supreme Court left this portion intact, confirming courts' authority to enjoin facially discriminatory military rules.

The Supreme Court only stayed a different part of the injunction that broadly prohibited "adverse action" against plaintiffs based on religious accommodation requests.  *Id.* at 840.  The Court specified that this vague language could not "preclude[] the Navy from considering [plaintiffs'] vaccination status in making deployment, assignment, and other operational decisions."  142 S. Ct. 1301.  This aligned with precedent against judicial review of individual military personnel decisions.

---

[5] Plaintiffs do not seek a "mandatory injunction" that would require Defendants to take any particular action with respect to Plaintiffs or anyone else.  *See Stockman*, 2017 U.S. Dist. LEXIS 221323, at *44 (discussing the difference between prohibitory and mandatory injunctions). Plaintiffs simply seek to restore the status quo prior to January 20, 2025.

This ruling does not bar preliminary injunctive relief here. Unlike in *Navy SEALs*, Plaintiffs are not asking the Court to review individual duty assignments. Instead, they challenge facially discriminatory executive orders that themselves restrict military discretion.

## CONCLUSION

For the foregoing reasons, this Court should issue an injunction prohibiting the categorical exclusion of transgender people from the military.

DATED: February 14, 2025

Respectfully submitted,

/s/ Joseph J. Wardenski
Joseph J. Wardenski (D.C. Bar No. 995549)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311
joe@wardenskilaw.com

Jennifer Levi (*pro hac vice*)
Mary L. Bonauto (*pro hac vice*)
Sarah Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jlevi@glad.org
mbonauto@glad.org
saustin@glad.org
mhaley@glad.org

Shannon P. Minter (*pro hac vice*)
Christopher F. Stoll (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257
sminter@nclrights.org

Sara E. Kropf (*pro hac vice*)
Kropf Moesley PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
Telephone: 202-627-6900
sara@kmlawfirm.com

Inga S. Bernstein (*pro hac vice* forthcoming)
Zalkind Duncan and Bernstein LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: 617-742-6020
ibernstein@zalkindlaw.com

*Attorneys for Plaintiffs*