## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, KODA NATURE, and CAEL NEARY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; the UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>Defendants. | Civil Action No. 1:25-cv-00240 |

## DECLARATION OF ROAN PICKETT

I, Roan Pickett, declare as follows:

1. I am an active duty Staff Sergeant in the US Army stationed in Fort Johnson, Louisiana. I enlisted in the Army on or about October 2012 and currently serve in the Army Criminal Investigations Division. I am a transgender man.

### History of Care

2. In or about November 2016, I received a diagnosis of gender dysphoria and began the process of transitioning in or about February 2017. Part of my treatment plan involved a surgery, which occurred on May 9, 2024.

3. Following that surgery, however, I unfortunately experienced a postoperative complication requiring repair. The repair was scheduled for January 30, 2025, at Cedars Sinai Medical Center in Los Angeles, California.

4. In preparation for this surgery, I received a Defense Travel System (DTS) voucher to cover my travel from Louisiana to Los Angeles. I also received orders for Medical Temporary Duty (Medical TDY) to remain in Los Angeles for a short time following my surgery to recover. Because this was a repair to correct a postoperative complication and not a new treatment, both the DTS and the Medical TDY should have been considered approved in connection with the original surgery.

5. On January 27, 2025, I left Fort Johnson in my personal car to begin the long drive to Los Angeles. I stopped at a friend's house in El Paso, Texas, for the night.

## Impact of the Ban

6. On January 28, I woke up to a missed call and a text from Mr. Kyle Heinz, the Assistant Special Agent (ASAC) in charge at Fort Johnson, LA, asking me to call him as soon as I could. I returned his call, and he notified me that my DTS voucher was revoked but told me they were still working on getting it approved again. He notified me that I should know that I may or may not get reimbursed for my travel and lodging to California, but I could still go and have my surgery.

7. I did not quite understand but I acknowledged. Due to the current and rapidly changing climate with recent executive orders regarding transgender service members, I did not want to fight about the funding. I just wanted to get this repair done and return to duty. I feared for my career with the potential for a ban on transgender service members, and believed that this could be my only chance in the foreseeable future to get this repair. So, I told him I would continue to drive on to California, even if it was out of my own pocket.

8. That afternoon, around 1:18 pm, I spoke with Department of the Army Criminal Investigative Department (DACID) Behavioral Health Officer, Major Hannah Thomas, LCSW from the Fort Cavazos office, who had been assisting me in coordinating my Medical TDY. I told her what Mr. Heinz had said, and she told me she was working on it. Her tone sounded optimistic. She told me that other Special Agents had been on medical TDY that had been funded by DACID. In the past, she would have to provide the appropriate policies and documentation regarding Medical TDY, and ultimately DACID would fund the Medical TDY IAW existing policy.

9. Later that evening, around 8:00 pm, I was around the middle of Arizona still headed to California when I got another call from Major Hannah Thomas. She told me I would be receiving a call from the Special Agent in Charge (SAC) at the Fort Cavazos office to have a conversation with me that she did not want to have.

10. About 5–10 minutes later, I received a call from SAC Thomas at Fort Cavazos. She stated she was sorry we had to meet this way for the first time as this is not how she would want to meet. She asked me to pull over to talk. So, I pulled into a gas station parking lot. We spoke on the phone for around 35–40 minutes.

11. SAC Thomas stated she had been ordered to give me an order to stop, turn around, and report back to Fort Johnson. She stated that it had came to their attention that my Defense Health Agency (DHA) wavier was expired because I had changed duty stations. She said it had been determined that I needed a new one with my new unit. She did not clarify who had made that determination.

12. I told her I knew that was not accurate information as I had confirmed with DHA several months ago that DHA wavier was still valid for this surgical repair. DHA had notified me that my wavier was valid for 12 months after a procedure for postoperative complications, and I reiterated that the surgery was less than one year ago. I also told her that DHA had notified me that my wavier followed me and that I would not have to redo one when I moved to a new unit. I explained to her that this had nothing to do with gender reassignment surgery, but that this was a repair, and that a new waiver was not required for a repair.

13. She restated that it had come to their attention that I would need a new DHA waiver due to it being expired and because I was at a new unit. She stated that whatever I chose to do, I should know certain actions could have effects.

14. I offered to take personal leave, rather than Medical TDY, but was told that I still needed to return to Fort Johnson without undergoing my surgery.

15. My surgery had been scheduled for 6–7 months, and my chain of command was aware of it. Until I received this series of calls on January 28, at no point had anyone told me that I would need to reschedule my surgery for any duty obligation or other reason.

16. I understood this to mean that I had a choice to obey an order and return to Fort Johnson without the repair or to go on and have my repair but be considered AWOL for having disobeyed a direct order.

17. At that time, TRICARE was still willing to cover my surgery, and my surgeon was still willing to perform it. I was willing to proceed without travel reimbursement, even though I knew that the DHA waiver should still have been valid. But I was being ordered to turn around, return to Fort Johnson, and forgo my surgical repair.

18. This felt like an impossible choice. I had to choose between receiving medically necessary surgery that I knew had been approved or upholding my oath and obeying a direct order.

19. SAC Thomas asked me where I was and how far away I was from Fort Johnson. I told her I was in the middle of Arizona about 1,371 miles away from Fort Johnson. She said, "since you have been driving all night, I suggest you find a hotel and get some sleep and start driving back tomorrow." She asked if it was reasonable for me to report to Fort Johnson on January 31, which was one day after the scheduled surgery.

20. I said, yes it was. I told her that during my almost 12 years of Army service, I have never been in trouble or refused to follow an order. She asked if I was safe, and I said, "yes." She asked if I understood the order, and I said, "yes." She said that I would need to check in with her via text message around 8:00 am the following morning and every four hours to let her know I was continuing back to Fort Johnson.

21. While in Arizona, SAC Thomas received an email from Chief Counsel of DACID, LTC Dan Soeffing, which I was able to obtain, clarifying the order as follows: "The Soldier must return to the place of duty. No surgery." A true and accurate copy of that email is attached to this declaration as **EXHIBIT A**.

22. I understood what my two choices were, although they did not feel like real choices. It felt like whichever I would choose, I would suffer.

23. I leaned into my support network that night. I made a pro and con list, I spoke with my surgeon, and ultimately, I decided I would obey the order and return to Fort Johnson without the medically necessary care. Despite an 8-month waiting list for care, I would work with and hope that Cedars Sinai could reschedule my surgery before my insurance approval expired and hopefully before policy changed.

24. Major Thomas and I spoke again the morning, and I told her I made a choice to obey the direct order and return, hoping for a new surgery date.

25. I have always served honorably and want nothing more than to be treated with the same respect and dignity as any other service member. Being ordered to turn around and not receive this medically necessary care means that I must continue to live with a postoperative surgical complication with no end in sight.

26. I was ordered to turn around not because my care was unnecessary but because it was related to my health care as a transgender person. I want to be recognized for my history of service and achievements as a service member and not treated differently because I am transgender.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 14, 2025

Roan Pickett