# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) No. 1:25-cv-00240 (ACR) |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' SUPPLEMENTAL BRIEFING ON IMMUTABILITY**

Transgender people have "immutable and distinguishing characteristics that make them a discernable class." *Doe 1 v. Trump,* 275 F. Supp. 3d 167, 208 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019). Substantial evidence shows that being transgender has a biological basis. Conversely, conversion therapy, which aims to change gender identity or force a transgender person to live in their birth sex, has no basis in medical science, is ineffective, and causes severe physical and psychological harms.

## I.  Being Transgender Is Highly Resistant to Change, and Efforts to Change a Person's Gender Identity Cause Serious Harm

Medical science recognizes that being transgender is "not a mental disorder," Brown Decl., ECF No. 32 at ¶ 16, and that gender identity is deep-seated, established early in life, and impervious to change through external influences. *See Doe v. Austin*, 2024 WL 4653290, at *2 (D. Me. Nov. 1, 2024) ("Gender identity is 'innate, impervious to external influences, and cannot be changed by medical or psychological intervention.'") (quoting Department of Justice stipulation).

That transgender individuals—like everyone—initially live in their birth sex does not undermine the immutability of transgender status. *All* individuals initially live in their birth sex. That is why the process of changing that so a person can live in a different sex is called "transition." For this reason, the government's claim that the Carter and Austin policies "require transgender people to live in their birth sex" before they undergo gender transition misses the mark. By its nature, transition is a process that is preceded by living in one's birth sex. That is simply what it means to be transgender (a person is identified as one sex at birth and then lives as another). The Carter and Austin policies enable transgender people to transition and to serve in their current sex. In contrast, the Mattis policy required transgender service members (other than those grandfathered in) to serve in their birth sex with no option to transition and no medical care for gender dysphoria—*i.e.*, the Mattis policy required transgender people to suppress their transgender

1

identity, just as discredited and harmful conversion therapies seek to do.

The existence of a pre-transition period (which of necessity is present for every transgender person) does not suggest that being transgender is mutable or that transition is optional for transgender persons who require it. Rather, it reflects the reality that a person's transgender identity becomes clear over time (just as sexual orientation does), and that differing circumstances cause individual transgender people to become aware of their transgender status at different times. Many transgender people (like many gay people) report feeling a profound sense of difference from their peers from an early age; however, due to lack of information and support, they may not learn of what it means to be transgender until they are older. Even as adults, people may delay or avoid transitioning due to "fear of being abandoned by family or friends, fearing economic loss . . . , and being discriminated against and stigmatized." Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health, Issue Supp. 1, at S40 (2022) (citations omitted) ("WPATH Standards"). Attempts to prevent transition through conversion efforts are harmful precisely because they seek to suppress or deny an immutable aspect of identity, not because they maintain a *status quo* of a person's birth sex, that everyone initially lives with but that is a source of intense distress only for transgender people.

In 2023, the Department of Health and Human Services ("HHS") concluded that "no available research indicates that change efforts are effective in altering gender identity." Ex. A, Dep't of Health and Human Servs., Substance Abuse and Mental Health Servs. Admin., *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* 9 (2023) ("2023 SAMHSA Report"). The panel found that research shows "change efforts can cause significant harm." *Id.* This review followed an earlier 2015 HHS report, which also concluded "none of the existing research supports the premise that mental or behavioral health interventions

can alter gender identity" and that such interventions "are coercive, can be harmful, and should not be part of behavioral health treatment." *See* Ex. B, Dep't of Health and Human Servs., Substance Abuse and Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 1 (2015) ("2015 SAMHSA Report").[1]

Similarly, the American Psychological Association has found that "individuals who have experienced pressure or coercion to conform to their sex assigned at birth or therapy that was biased toward conformity to one's assigned sex at birth have reported harm resulting from these experience[s] such as emotional distress, loss of relationships, and low self-worth." Ex. C, American Psychological Association, *APA Resolution on Gender Identity Change Efforts* 2 (Feb. 2021) ("APA GICE Resolution"), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf (citing studies). Gender identity change efforts ("GICE") "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse." *Id.* at 4. The APA has affirmed "that scientific evidence and clinical experience indicate that GICE put individuals at significant risk of harm [and]. . . opposes GICE because such efforts put individuals at significant risk of harm." *Id.* at 3. Leading medical and mental health professional associations agree. *See, e.g.,* Ex. D, Jessica N. Fish & Stephen T. Russel, *Sexual Orientation and Gender Identity Change Efforts Are Unethical and Harmful*, 110 Am. J. Public Health 1113-14 (2020).

These reviews recognize a growing body of research that demonstrates the serious harm associated with efforts to change gender identity including by requiring transgender people to live

---

[1] These reports formerly were available on SAMHSA's website. They appear to have been removed recently. For the Court's convenience, copies are attached as Exhibits A and B.

in their birth sex. To cite one example, a 2019 study documented a dramatically increased risk of suicidality among transgender youth exposed to conversion therapy. *See, e.g.*, Ex. E, Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA Psychiatry 68-76 (2019)*; see also* Ex. C, APA GICE Resolution at 1 (citing studies).

## II.    Scientific Research Provides Strong Evidence that Gender Identity Has a Biological Basis

Strong research supports the conclusion that gender identity has a biological basis. *See Doe v. Austin*, 2024 WL 4652999, at *4 ("'There is a scientific consensus that gender identity is biologically based and a significant body of medical research that gender dysphoria has a physical and biological etiology.'") (quoting stipulation by the Department of Justice). For example, research shows that transgender women and non-transgender women have similar brain structures, specifically in the volume of the bed nucleus of the stria terminalis.[2]

Similarly, twin studies have shown that if one identical twin is transgender, the other is much more likely to be transgender compared to fraternal twins.[3] Twin studies provide strong genetic evidence, since identical twins (sharing DNA) show higher transgender concordance than fraternal twins (sharing only environment).

Other research has investigated differences in specific genes associated with being

---

[2] Ex. F, J.N. Zhou et al., *A Sex Difference in the Human Brain and its Relation to Transsexuality*, 378 Nature 68-70 (1995); *see also* Ex. G, Eileen Luders et al., *Regional Gray Matter Variation in Male-to-Female Transsexualism*, 46 Neuroimage 904–07 (2009); Ex. H, Giuseppina Rametti et al., *White Matter Microstructure in Female to Male Transsexuals Before Cross-Sex Hormonal Treatment. A Diffusion Tensor Imaging Study*, 45 J. Psychiatr. Res. 199–204 (2011); Ex. I, H. Berglund et al., *Male-to-Female Transsexuals Show Sex-Atypical Hypothalamus Activation When Smelling Odorous Steroids*, 18 Cereb. Cortex 1900–08 (2007); Ex. J, Ivanka Savic & Stefan Arver, *Sex Dimorphism of the Brain in Male-to-Female Transsexuals*, 21 Cereb. Cortex 2525–33 (2011).

[3] Ex. K, Gunter Heylens et al., *Gender Identity Disorder in Twins: A Review of the Case Report Literature*, 9 J. Sex. Med. 751–57 (2012).

transgender. For example, one study found differences in the estrogen receptor gene in transgender women when compared to the same gene in non-transgender men.[4] Yet another area of investigation has examined the influence of fetal exposure to hormones on gender identity. Study of an intersex condition called congenital adrenal hyperplasia, which results in female fetuses being exposed to much higher levels of testosterone compared to other female fetuses, has shown that the percentage of those with this condition who experience gender dysphoria during their lives is higher than that of the general population.[5] This research indicates that fetal hormone exposure plays a role in the development of gender identity.[6]

### III. Many Courts Have Recognized that Transgender Status Is "Immutable" for Purposes of Equal Protection Analysis

Recognizing that being transgender is not subject to voluntary change and is also a deeply personal characteristic that a person should not have to change to avoid governmental discrimination, numerous courts have concluded that classifications based on transgender status are "immutable" in the constitutional sense. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 612–13 (4th Cir. 2020), as amended (Aug. 28, 2020) ("[G]ender identity is formulated

---

[4] Ex. L, Susanne Henningsson et al., *Sex Steroid-Related Genes and Male-to-Female Transsexualism*, 30 Psychoneuroendocrinology 657–664 (2005); *see also* Ex. M, Stephen M. Rosenthal, *Approach to the Patient: Transgender Youth: Endocrine Considerations*, 99 J. Clin. Endocrinol. Metab. 4379-89 (2014).

[5] Ex. N, Arianne B. Dessens et al., *Gender Dysphoria and Gender Change in Chromosomal Females with Congenital Adrenal Hyperplasia*, 34 Arch. Sex. Behav. 389–97 (2005).

[6] The district court correctly recognized that the executive order's definitions of male and female in Exec. Order No. 14168, 90 Fed. Reg. 8615 exclude intersex individuals. While being intersex and being transgender are distinct characteristics, this adoption of purposefully discriminatory definitions for male and female that are sweeping, unprecedented in the breadth of reach across federal law, and scientifically ungrounded, is further evidence of animus. *See United States v. Windsor*, 570 U.S. 744, 771 (2013) (finding animus where federal statute "writes inequality into the entire United States Code" via "a system-wide enactment with no identified connection to any particular area of federal law"); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (finding animus where law imposed "a broad and undifferentiated disability on a single named group").

5

for most people at a very early age, and . . . being transgender is not a choice. Rather, it is as natural and immutable as being cisgender. . . . "); *Kadel v. Folwell*, 100 F.4th 122, 143 (4th Cir. 2024) (same); *Brandt v. Rutledge,* 677 F. Supp. 3d 877, 905–06, 918 (E.D. Ark. 2023) (same); *Karnoski v. Trump,* No. C17-1297-MJP, 2018 WL 1784464, at *10 (W.D. Wash. Apr. 13, 2018), *vacated on other grounds*, 926 F.3d 1180 (9th Cir. 2019) (same); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (transgender status is "deeply ingrained and inherent"); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016) (same) (quoting *Windsor,* 699 F.3d at 183); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015) (same).

DATED: February 21, 2025                                     Respectfully submitted,

                                                             */s/ Joseph J. Wardenski*

Jennifer Levi (*pro hac vice*)                               Joseph J. Wardenski (D.C. Bar No. 995549)
Mary L. Bonauto (*pro hac vice*)                             WARDENSKI P.C.
Sarah Austin (*pro hac vice*)                                134 West 29th Street, Suite 709
GLBTQ LEGAL ADVOCATES & DEFENDERS                            New York, NY 10001
18 Tremont Street, Suite 950                                 Telephone: (347) 913-3311
Boston, MA 02108                                             joe@wardenskilaw.com
Telephone: (617) 426-1350
jlevi@glad.org
mbonauto@glad.org
saustin@glad.org
mhaley@glad.org

Shannon P. Minter (*pro hac vice*)
Christopher F. Stoll (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257
sminter@nclrights.org

Sara E. Kropf (DC Bar No. 481501)
KROPF MOESLEY PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
Telephone: 202-627-6900
sara@kmlawfirm.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN AND BERNSTEIN LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: 617-742-6020
ibernstein@zalkindlaw.com

                                                             *Attorneys for Plaintiffs*

7