**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, MINERVA BETTIS, AUDRIE GRAHAM, ROAN PICKETT, AMIAH SALE, QUINN TYSON, CLAYTON McCALLISTER, GREYSON SHISHKINA, KODA NATURE, CAEL NEARY, MICHELLE BLOOMROSE, SAMUEL AHEARN, VERA WOLF, and REGAN MORGAN, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA; via Department of Justice 950 Pennsylvania Ave. NW Washington, D.C. 20530 | ) ) ) ) ) ) |
| PETER B. HEGSETH, in his official capacity as Secretary of Defense; 1000 Defense Pentagon, Room 3E880 Washington, D.C. 20301 | ) ) ) ) ) |
| MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; 101 Army Pentagon Washington, D.C. 20310 | ) ) ) ) ) ) |
| TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; 1000 Navy Pentagon Washington, D.C. 20350 | ) ) ) ) ) ) |
| GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; 1670 Air Force Pentagon Washington, D.C. 20330 | ) ) ) ) ) ) ) ) |

Civil Action No. 25-cv-240-ACR

**THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

-1-

TELITA CROSLAND, in her official capacity as     )
Director of the Defense Health Agency; and the     )
DEFENSE HEALTH AGENCY     )
7700 Arlington Blvd., Suite 5101     )
Falls Church, VA 22042     )
     )
                    Defendants.     )
_____     )
     )

## **INTRODUCTION**

1.     This is a constitutional challenge to President Donald J. Trump's January 27, 2025, executive order (Executive Order 14183) (the "Executive Order"), related provisions of a second executive order, Executive Order 14168 (the "Gender Ideology Order"), and to memoranda of the Department of Defense implementing those orders that together exclude transgender people from military service and subject transgender service members to unequal, harmful, and demeaning treatment.   These harms include falsely describing transgender service members as inherently immoral (lacking honesty, humility, and integrity), singling them out for denial of medically appropriate care, and forcing them to cease being transgender (which they cannot do)—by requiring them to live and serve in their birth sex, including with respect to pronouns, housing, facilities, and how they describe themselves to others.   These changes reverse the current policy of the United States Armed Forces that permits transgender people who meet military standards to accede and serve on equal terms with other service members.   In addition, they establish an official policy requiring transgender people to be treated as an inferior, disfavored, and despised class, including in ways that diminish their service and make it impossible for them to serve.   They compel military officials either to exclude transgender individuals from service or to subject them to conversion-therapy like conditions that require them to suppress being transgender.

2.      Plaintiffs, along with many other transgender service members, have been serving throughout the Armed Forces.  Some Plaintiffs have built their lives around their military service.  Others are just beginning their careers and hope for the opportunity to serve their country in the future.

3.      On January 20, 2025, President Trump issued the Gender Ideology Order, Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  Section 2(a) of the Gender Ideology Order provides that all Executive application and interpretation of federal law will apply a definition of "sex" and related terms (male, female, man, boy, woman, girl) that is designed to prevent any recognition of transgender people by defining sex as fixed at birth.

4.      On January 27, 2025, the President signed the Executive Order, which directed the Secretary of Defense to reverse the current accession and retention standards for military service and to adopt instead a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  It confers no authority on the Secretary of Defense to depart from this directive.

5.      The Executive Order states: "Consistent with the military mission and longstanding DoD policy, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.  Beyond the hormonal and surgical medical interventions involved, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life.  A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."

6.      Section 3 of the January 27, 2025, Executive Order expressly incorporates the definitions of "sex" and related terms from the Gender Ideology Order.

7.      The Executive Order further states that its policy of "establish[ing] high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity . . . . is also inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex."  It directs the Secretary of Defense to "promptly issue directive for DoD to end invented and identification-based pronoun usage."

8.      The Executive Order provides that: "Absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males."

9.      The Executive Order provides that "all policies, directives, and guidance issued pursuant to Executive Order 14004 [which permitted military service by transgender individuals] shall be rescinded to the extent inconsistent with the provisions of this order."

10.      The Executive Order directs the Secretary of Defense to within 30 days of the issuance of the order: "(i) identify all additional steps and issue guidance necessary to fully implement this order; and (ii) submit to the President through the Assistant to the President for National Security Affairs a report that summarizes these steps."

11.      The Executive Order provides: "(a) Within 60 days of the date of this order, the Secretary of Defense (Secretary) shall update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention

(September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order."

12.    On February 7, 2025, Defendant Secretary of Defense Hegseth issued a memorandum "Prioritizing Military Excellence and Readiness" that paused "all new accessions for individuals with a history of gender dysphoria" and "all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members . . . ."

13.    On February 26, 2025, Darin Selnick, acting as Under Secretary of Defense for Personnel and Readiness, issued a further memorandum entitled "Additional Guidance on Prioritizing Military Excellence and Readiness" (the "Implementing Policy") along with an accompanying Attachment articulating a policy "effective immediately" to implement policy changes "pursuant to Executive Order 14183" (the "Implementing Guidance").  The Implementing Policy reiterated the premise of the Executive Order that service by transgender persons is inconsistent the "honesty, humility, uniformity, and integrity" demanded of service members.  The Implementing Guidance states that transgender status is "incompatible with military service," that transgender persons "are no longer eligible for military service," and that they "will be processed for separation from military service."  The Implementing Guidance purports to carve out an "exception," which applies only to persons who are not transgender.

14.    The Implementing Guidance also implements the Gender Ideology Order's directive to mis-categorize transgender persons.  While transgender service members are being processed for separation, the Implementing Guidance states that they will be categorized by their birth sex for purposes of sleeping, changing, and bathing facilities as well as pronoun usage and that they will be denied medical care related to their transgender status.

15.     Defendants have issued other documents implementing the Executive Order, including a February 28, 2025 Department of Defense memorandum, entitled "Clarifying Guidance on Prioritizing Military Excellence and Readiness," and a Department of the Air Force memorandum, dated March 1, 2025, entitled "Additional Guidance for Executive Order 14183, 'Prioritizing Military Excellence and Readiness.'"

16.     Plaintiffs are transgender service members who collectively have served this nation honorably and with distinction for decades in various branches of the United States military, and prospective service members wishing to accede to the military.

17.     This singling out of transgender people in order to brand them as inherently immoral and unfit and to restrict their ability to serve in the military, including by requiring them to serve, if at all, in their birth sex violates the Equal Protection component of the Fifth Amendment.

18.     This lawsuit seeks declaratory, preliminary, and permanent injunctive relief against implementation of the President's directive to prohibit transgender individuals from enlisting or serving in the Armed Forces, to require transgender service members to live and serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others), and to deny them medical treatment for gender dysphoria.

## JURISDICTION AND VENUE

19.     This court has jurisdiction over the claims under 28 U.S.C. § 1331, which confers jurisdiction on the district courts over civil actions arising under the Constitution, and 28 U.S.C. § 1343, which confers jurisdiction on the district courts over civil actions to redress the deprivation of any right, privilege, or immunity secured by the Constitution.

20.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the acts described in this Complaint occurred in this judicial district.

**PLAINTIFFS**

21.    Plaintiffs are active-duty service members in the United States military who are transgender or transgender individuals who are actively pursuing enlistment in the United States military.

22.    Second Lieutenant Nicolas Talbott has served with distinction in the United States Army Reserves for almost a year.

23.    Lieutenant Talbott is a thirty-one-year-old transgender man currently assigned to a Reserve Unit in Pennsylvania.

24.    This is a recent photo of Lieutenant Talbott:



25.    Lieutenant Talbott was nominated for and named Honor Graduate at basic combat training by his drill sergeants for going above and beyond in training and stepping up to leadership roles.

26.     In his current role as a Lieutenant, he has completed Officer Candidate School, has assumed his role as Platoon Leader in the Military Policing Unit, and is scheduled to begin further training for this role in August 2025.

27.     In or around March 2011, Lieutenant Talbott received a gender dysphoria diagnosis and began receiving hormone therapy in 2012.

28.     Lieutenant Talbott completed transition many years before joining the military.

29.     Since joining the military, he has completed Officer Candidate School.

30.     Were the prohibition on military service by transgender individuals to be implemented, Lieutenant Talbott would lose the career he has spent years of his life fighting to join, after finally earning his commission, and would be unable to continue to serve the United States people as a member of the military.  Additionally, Lieutenant Talbott would lose his income and access to benefits afforded to military members and their families.

31.     Lieutenant Talbott serves in the U.S. Army as a man, including adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir" when appropriate.  Lieutenant Talbott's commander has supported his service and assured him that, from his perspective, his being a transgender man will have no impact on his ability to continue serving.

32.      It is not possible for Lieutenant Talbott to serve in the military as a woman, which he is not.  He is a man, looks like a man and has used men's facilities since his transition without incident.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion

and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot serve as a man in the military, he cannot serve at all.

33.    Major Erica Vandal has served with distinction in the United States Army for almost fourteen years.

34.    Major Vandal is a thirty-six-year-old transgender woman currently stationed in New York.

35.    This is a recent photo of Major Vandal:



36.    During her military career, Major Vandal has been awarded a Bronze Star for heroic or meritorious achievements or service while engaged against an enemy of the United States, a Meritorious Service Medal, one Army Commendation Medal, and two Army Achievement Medals.

37.    In her current role as a Major, she is responsible for managing her brigade's seventy field artillery officers, warrant officers, non-commissioned officers, and soldiers as well as advising her commander on the employment of everything related to field artillery.

38.    In or around November 2021, Major Vandal received a gender dysphoria diagnosis and began receiving hormone therapy in or around January 2022.  In or around January 2022, Major Vandal also began transitioning socially within the military and received positive reactions to her transition.

39.    Since beginning to receive transgender healthcare, Major Vandal was promoted to her current rank of major, was selected for prestigious schooling related to that promotion, and deployed to Romania for around five months.

40.    Were the prohibition on military service by transgender individuals to be implemented, Major Vandal would be unable to pursue her career through serving the United States people as a member of the military.  Major Vandal would lose access to benefits afforded to military members and their families for herself, her spouse, and her two children.  Major Vandal's G.I. Bill education benefits would be negatively impacted, as would her ability to transfer her G.I. Bill education benefits to her children.  Major Vandal's family would lose the only source of income for her household.  Additionally, Major Vandal has served fourteen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

41.    Major Vandal has already felt the effects of the ban.  On December 18, 2024, Major Vandal, in collaboration with her nurse care manager, submitted a revision to her Military Treatment Plan to include surgical interventions that were not authorized on her original plan.  On February 13, 2025, a human resources technician for her brigade received an email response from the Service Central Coordination Cell ("SCCC") informing her that "… review of transgender actions is suspended pending implementation guidance … any actions submitted on/after 3 January 2025 are being held at the SCCC in the interim."  The email further stated that the reason for halting all

transgender healthcare treatments was a February 7, 2025, guidance from defendant Secretary of Defense Hegseth.  In short, the Order has prevented Major Vandal from obtaining any further evaluations for medically necessary care as part of her transition plan.

42.    Major Vandal's gender marker in DEERS is female.  Major Vandal serves in the U.S. Army as a woman and meets all standards applicable to service members identified with a female DEERS gender marker.  Serving as a transgender woman in the armed forces includes adhering to female grooming standards, living in women's berthing units, using women's changing and bathing facilities, and being referred to as a woman, including use of honorifics such as "Ma'am." Her command has supported her service and assured her that, from their perspective, her being a transgender woman will have no negative impact on her ability to continue serving.

43.    It is not possible for Major Vandal to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

44.    Sergeant First Class Kate Cole has served with distinction in the United States Army for almost seventeen years.  Sergeant Cole is a thirty-four-year-old transgender woman currently stationed in California.

45.     This is a recent photo of Sergeant Cole:



46.     During her military career, she has been awarded five Army Commendation Medals for exhibiting consistent acts of heroism or meritorious service, seven Army Achievement Medals for outstanding achievement or meritorious service and recently placed in the top ten percent of all Armor Branch Sergeants First Class in the Army's Order of Merit List.

47.     In her current role as a Senior Military Science Instructor, she is responsible for training undergraduate students enrolled in Reserve Officers' Training Corps ("ROTC") program at the University of California, Los Angeles.

48.     In or around 2016, Sergeant Cole received a gender dysphoria diagnosis and began receiving hormone therapy.

49.     Since beginning to receive transgender healthcare, Sergeant Cole has been deployed and promoted and has received support from fellow service members.

50.     Were the prohibition on military service by transgender individuals to be implemented, Sergeant Cole would be unable to pursue her career and continue to serve the United States people as a member of the military.  Sergeant Cole would lose access to benefits afforded to military members and their families.  Additionally, Sergeant Cole has served for almost seventeen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

51.     Sergeant Cole's DEERS marker is female.  Sergeant Cole serves in the U.S. Army as a woman and meets all standards applicable to service members with a female DEERS gender marker.  Serving as a transgender woman in the armed forces includes adhering to female grooming standards, living in women's berthing units, using women's changing and bathing facilities, and being referred to as a woman, including use of honorifics such as "Ma'am."  Her command supports her service and has assured her that, from their perspective, her being a transgender woman has not had and will not have any negative impact on her ability to continue serving.

52.     It is not possible for Sergeant Cole to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

53.     Captain Gordon Herrero has served with distinction in the United States Army for nine years.

54.    Captain Herrero is a thirty-four-year-old transgender man currently stationed in California.

55.    This is a recent photo of Captain Herrero:



56.    During his military career, he has been awarded a Meritorious Service Medal, a Joint Service Commendation Medal, an Army Achievement Medal, and an Army Commendation Medal with two oak leaf clusters.

57.    In his current role as an Operations Research Systems Analyst, he is completing his Master of Science degree in preparation to become an instructor at the United States Military Academy at West Point this year.

58.    In April 2021, Captain Herrero received a gender dysphoria diagnosis and began receiving hormone therapy in October 2021.

59.    Since beginning to receive transgender healthcare, Captain Herrero has served as a detachment commander in The Republic of Korea and as a staff officer in the United Nations

Command Headquarters, remained deployable, and received support from his fellow service members.

60.     Were the prohibition on military service by transgender individuals to be implemented, Captain Herrero would be unable to pursue his vocation and lifelong career and continue to serve the United States people as a member of the military.  Captain Herrero would also lose his income and access to benefits afforded to military members and their families.  Additionally, Captain Herrero, having already served for nine years, is on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

61.     Captain Herrero has already been impacted by the ban.  As part of his service, Captain Herrero is currently pursuing a Master of Science degree in Applied Mathematics at the Naval Postgraduate School.  His motivation for earning this degree is so that he can serve as an Instructor in the Department of Mathematical Sciences at the United States Military Academy ("USMA") at West Point in New York.  However, the EO has made that future uncertain.  It is no longer clear that the time and effort he is currently putting into his studies will enable him to assume that role.  At this point, he does not even know if he will be able to remain in the Army long enough to graduate.

62.     This concern has already led him, at the advice of his academic advisor, to seek an early graduation and early report date to USMA.  As a result of this accelerated timeline, he is now ineligible for an Academic Certificate in Network Science that he would have otherwise earned from his studies.  If he is flagged for separation because he is transgender, he will lose the career-making opportunity to teach at USMA.

63.    Captain Herrero's DEERS marker is male.  Captain Herrero serves in the U.S. Army as a man and meets all standards applicable to service members identified with a male DEERS gender marker.  Serving as a transgender man in the armed forces includes adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir."  His command has supported his service and assured him that, from their perspective, his being a transgender man will have no negative impact on his ability to continue serving.

64.    It is not possible for Captain Herrero to serve in the military as a woman, which he is not.  He is a man, looks like a man and has used men's facilities since his transition without incident.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot serve as a man in the military, he cannot serve at all.

65.    Ensign ("ENS") Dany Danridge has served with distinction in the United States Navy for over twelve years.

66.    ENS Danridge is a thirty-year-old transgender man currently enrolled in Flight Training as a Student Naval Flight Officer in Florida.

67.    This is a recent photo of ENS Dandridge:



68.    From 2012 to 2020, ENS Danridge served on active duty with the United States Navy.  In 2020, he was honorably discharged and served in the Navy Reserves while he obtained a bachelor's degree from Liberty University.  After completing his degree, he commissioned to active duty in February 2024.

69.    During his military career, ENS Danridge has been awarded two Navy and Marine Corps Achievement Medals, including one Sailor of the Year award and one award for his assistance in starting a new command; a combat medal for his participation in Operation Inherent Resolve; a Global War on Terrorism Service Medal; and a Global War on Terrorism Expeditionary Medal.

70.    In his current role as a Student Naval Flight Officer, ENS Danridge is enrolled in Flight Training at Training Squadron 10 ("VT-10") to become a Flight Officer.  In addition to performing other officer duties, he attends classes and flight lessons and is currently ranked in the top ten percent of his training class.

71.     In or around 2017, ENS Danridge received a gender dysphoria diagnosis, started hormone therapy, and transitioned to live as a man.

72.     ENS Danridge has deployed to Italy, where he assisted in starting the Transaction Service Center Naples, for which he was awarded a Navy and Marine Corps Achievement Medal. He has also completed multiple detachments, including to two carriers: the USS Theodore Roosevelt and the USS Dwight D. Eisenhower.

73.     While serving in the Navy Reserves, ENS Danridge received overwhelming support from his unit's commanding officer to apply for Officer Candidate School ("OCS").  It was with his commanding officer's support that he was selected for OCS. He graduated OCS in February 2024.

74.     Were the prohibition on military service by transgender individuals to be implemented, ENS Danridge would be removed from OCS training and would be unable to pursue his vocation and career and continue to serve the United States people as a member of the military. ENS Danridge would also lose access to benefits afforded to military members and their families. Additionally, ENS Danridge has served for twelve years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

75.     ENS Dandridge's DEERS marker is male.  ENS Dandridge serves in the U.S. Navy as a man and meets all standards applicable to service members identified with a male DEERS gender marker.  Serving as a man in the armed forces includes adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir."  His command has supported his service and assured him that, from their perspective, being a transgender man will have no negative impact on his ability to continue serving.

76.     It is not possible for ENS Dandridge to serve in the military as a woman, which he is not.  He is a man, looks like a man and has used men's facilities since his transition without incident.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot serve as a man in the military, he cannot serve at all.

77.     Master Sergeant Jamie Hash has served with distinction in the active-duty United States Air Force for over thirteen years.

78.     Master Sergeant Hash is a thirty-seven-year-old transgender woman currently assigned to the Pentagon in Washington, D.C.

79.     This is a recent photo of Master Sergeant Hash:



-19-

80.     During her military career, Master Sergeant Hash has received four Meritorious Service Medals, one Air Force Commendation Medal, and two Air Force Achievement Medals.  She has been awarded numerous awards and honors, including Wing Non-Commissioned Officer ("NCO") of the Year, Field Operating Agency NCO of the Year, Military Volunteer of the Year, the NCO Academy John Levitow Award, AF Operations Directorate Senior Non-Commissioned Officer ("SNCO") of the Year, USAF Operations Directorate Sijan SNCO Award, DAF Headquarters ("HQ") Management Engineering Award, DAF HQ Visionary Leadership Award, and SNCO Academy Distinguished Graduate.  She was rated first out of forty-five candidates for selection for Senior Master Sergeant, and her promotion to Senior Master Sergeant (E-8) will be effective February 1, 2025.

81.     In her current role, Master Sergeant Hash is serving as a Defense Legislative Fellow for the United States Congress.  This fellowship is highly competitive and only selects a handful of enlisted Air Force applicants each year.  In this role, Master Sergeant Hash serves on the personal staff of a Member of Congress as an advisor on matters related to national security, defense, foreign affairs, and veterans' affairs.

82.     In or around 2016, Master Sergeant Hash received a gender dysphoria diagnosis, initiated hormone therapy, and transitioned to female.

83.     Since that time, Master Sergeant Hash has deployed to Germany, served for three years in the United Kingdom, worked in the Pentagon on Global Force Management at Headquarters Air Force, and was selected for the highly competitive Defense Legislative Fellowship.

84.     Were the prohibition on military service by transgender individuals to be implemented, Master Sergeant Hash would be unable to pursue her vocation and career and continue to serve the United States people as a member of the military.  Master Sergeant Hash would also lose

access to health and other benefits afforded to military members and their families. Additionally, Master Sergeant Hash has served for thirteen years on a path towards the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

85.    Master Sergeant Hash's DEERS marker is female. She serves in the U.S. Air Force as a woman and meets all standards applicable to service members identified with a female DEERS gender marker. Serving as a transgender woman in the armed forces includes adhering to female grooming standards, living in women's berthing units, using women's changing and bathing facilities, and being referred to as a woman, including use of honorifics such as "Ma'am.".

86.    It is not possible for Master Sergeant Hash to serve in the military as a man, which she is not. She is a woman, looks like a woman and has used women's facilities since her transition without incident. It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men. If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job. In short, if she cannot serve as a woman in the military, she cannot serve at all.

87.    Private First Class Miriam Perelson is a twenty-eight-year-old transgender woman taking part in U.S. Army basic training in South Carolina.

88.    Private Perelson has been preparing for a career in the military since mid-2022. She worked with a military recruiter to complete all necessary steps to enlist in the U.S. Army, completed all required medical and psychological assessments, and was deemed fit to serve. During that process, she disclosed to her recruiter that she is a transgender woman. She met all qualifications for enlistment, including being stable for 18 months following her gender transition from male to female,

and in March 2024, she signed a six-year reserve contract with a two-year inactive ready reserve obligation. Private Perelson received a gender dysphoria diagnosis in October 2015 and initiated transition-related health care around that time. Private Perelson enlisted as a woman.

89.     Private Perelson's contract is to serve in the Military Occupational Specialty ("MOS") of 35M, Human Intelligence collector, a highly specialized position which requires training to high competency in a foreign language. Private Perelson qualified for this contract due to her high degree of competency in the Russian language. Private Perelson has completed all requirements for a Bachelor of Arts in Russian Language and is scheduled to graduate in May 2025.

90.     Private Perelson began basic training on January 13, 2025, with an expected graduation date of March 27, 2025. She completed reception and began combat training on January 17, 2025.

91.     On the evening of January 31, 2025, a NCO came to Private Perelson and told her that she could no longer continue basic training in female living bays or use female latrines. The following day, February 1, 2025, her supervising officers presented her with a Developmental Counseling Form ("Form"). The Form indicates that its purpose is "to inform [her] of policy changes regarding [her] living accommodations." Specifically, the Form states that, in order to implement "[t]he President's Executive Order entitled Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government . . . and subsequent guidance from the Office of Personnel Management," as of 5:00 pm on January 31, 2025, she would be required to "reside in male living bays, utilize male latrines, and be partnered with a male battle buddy . . . . "

92.     The form required Private Perelson to initial one of two options: "Yes, I am willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy," or "No, I am not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy."

The Form further stated that, if she was not willing to live in male bays, utilize male latrines, and be partnered with a male battle buddy, "the Command will initiate administrative separation from the U.S. Army under Chapter 11 of Army Regulation 635-200."

93. For the evenings of January 31, February 1, and February 2, 2025, Private Perelson was required to leave the female bay where she had been housed until that point in basic training and was provided with a cot in an empty classroom to sleep on. Private Perelson was forbidden from using female latrines and bathing facilities during that time.

94. On February 2 and 3, 2025, Private Perelson spoke with a Captain in her unit and informed him that she would not select either option or sign the Form. On Monday, February 3, 2025, the Captain told her that Command would immediately begin her separation from the U.S. Army.

95. In spite of assurances in a declaration filed by Lieutenant Colonel Jonathan Baker that "no separation or adverse actions [were] pending against PFC Perelson," ECF No. 19-1, Private Perelson's commander continued to house her separately from her female unit until February 8, 2025.

96. On February 8, 2025, Private Perelson was returned to the female barracks in Delta Company where she had originally been housed. She stayed that night in those barracks.

97. On February 10, 2025, Private Perelson was informed she was being transferred to a different female company, Bravo Company, and would be staying in a different female barracks. She was not told why she was being transferred.

98. On February 11, 2025, Private Perelson was told that the reason command changed her company assignment from Delta Company to Bravo Company was because of complaints made against her by service members in her original company, Delta Company. All of those complaints

were made after her return to her original barracks from which she had been removed.  That is, upon information and belief, all the complaints were filed sometime between February 8 and February 10.

99.    On February 20, Private Perelson was moved from Bravo Company to Alpha Company.  She was told the reason related to further complaints made against her by service members in Bravo Company.

100.    She is currently housed in a separate facility in Alpha Company away from other members of her company.  That facility is single-occupancy.

101.    This pattern of singling out Private Perelson for unique assignments and transfers stems from the issuance of the challenged Orders and has subjected Private Perelson to disparate and hostile terms of service because she is transgender.

102.    If the prohibition on military service by transgender individuals continues to be implemented and Private Perelson is separated from the Army, she will be unable to serve the people of the United States as a member of the military.  She will be unable to pursue a vocation and career for which she has already completed all necessary requirements and demonstrated her qualifications, and for which she has signed a contract and begun her training.

103.    Private Perelson's DEERS marker is female.  She is serving in the U.S. Army as a woman and meets all standards applicable to service members identified with a female DEERS marker.  Prior to the issuance of the challenged orders, Private Perelson was treated as other women in the military including, adhering to female grooming standards, living in women's berthing units, using women's changing and bathing facilities, and being referred to as a woman, including use of honorifics such as "Ma'am."

104.    It is not possible for Private Perelson to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without

incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "Sir" it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

105.    Major Minerva Bettis is a transgender woman who serves as an intelligence analyst and weapons officer in the U.S. Air Force, stationed at Nellis Air Force Base in Nevada.

106.    Major Bettis graduated from the U.S. Air Force Academy in 2014 and the U.S. Air Force Weapons School in 2018.

107.    Since arriving at Nellis Air Force Base two and a half years ago, Major Bettis has been instructing at the Weapons School, training others how to be weapons officers and NCOs so that they can become instructors in the field.

108.    Major Bettis has received an Air and Space Achievement Medal, two Air and Space Commendation medals, and a Meritorious Service Medal.  On two occasions, Major Bettis was ranked first in Company Grade officer stratifications on her performance reports.  Throughout her career, Major Bettis was typically ranked in the top third of performers.  Her command has supported her service as a transgender service member and encouraged her to accept new assignments because she is the right person for the job.

109.    Major Bettis received a gender dysphoria diagnosis in August of 2022 and began transition through the use of hormone therapy beginning in January of 2023.

110.    As part of her medical care plan, Major Bettis was scheduled for gender transition surgery on February 11, 2025.

111.    On February 5, Major Bettis received a phone call informing her that the Naval Medical Center was stopping all transition-related surgeries pending further guidance. Major Bettis has been unable to obtain her medically necessary surgery.

112.    It is not possible for Major Bettis to serve in the military as a man, which she is not. She is a woman, looks like a woman and has used women's facilities since her transition without incident. It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men. If others were required to refer to her by male pronouns or address her as "Sir" it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job. In short, if she cannot serve as a woman in the military, she cannot serve at all.

113.    Officer Audrie Graham is a twenty-seven-year-old transgender man serving as a Petty Officer Third Class, Rank E-4, in the U.S. Navy on active duty at Naval Air Station Oceana. in Virginia Beach, Virginia.

114.    After serving as a firefighter for approximately five years, Officer Graham enlisted in the Navy in 2020. In the Navy, Officer Graham was awarded Sailor of the Quarter once and Sailor of the Week twice.

115.    Officer Graham was diagnosed with gender dysphoria on or about March 24, 2021, and began hormone treatments in or around August 2023 as part of his approved medical care plan.

116.    As part of his medical care plan, Officer Graham's treating physicians determined that he needs gender transition surgery. Officer Graham's medically necessary and prescribed surgery was set for February 5, 2025, at the Naval Medical Center in Portsmouth, Virginia.

117.    On February 5, 2025, Officer Graham and his wife arrived for his 9:30 am appointment. Officer Graham changed into a surgical gown, had an IV inserted, and was

administered nerve blockers to his chest and shoulders along with a sedative to help with the pain. Soon after, the surgeon came in and began to mark Officer Graham's chest for the surgery and was told that the team was preparing the operating room.

118.    After an hour or two, the surgeon returned and informed Officer Graham that the surgery would be unable to proceed due to the Executive Order.

119.    Officer Graham had to then change back into his regular clothes and leave the hospital without having received the medically necessary and prescribed surgery.

120.    Officer Graham wants to be able to serve his country on the same terms as any other service member.  Instead, Officer Graham is currently being denied medically necessary care solely because he is transgender.  Upon information and belief, no other active military service members are denied medically necessary and prescribed care because of who they are.

121.    It is not possible for Officer Graham to serve in the military as a woman, which he is not.  He is a man, looks like a man and has used men's facilities since his transition without incident.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot serve as a man in the military, he cannot serve at all.

122.    Staff Sergeant Roan Pickett is a transgender man currently serving in the Army Criminal Investigations Division at Fort Johnson, Louisiana.  Sergeant Pickett enlisted in the Army in or about October 2012.

123.    This is a recent photo of Sergeant Pickett:



124.    Sergeant Pickett received a diagnosis of gender dysphoria in or about November of 2016.  He began taking medically prescribed hormones as part of treatment for gender dysphoria in or about February of 2017 to enable him to live as a man.

125.    As part of his medical treatment plan, Sergeant Pickett underwent surgery on May 9, 2024.  Sergeant Pickett has since experienced a post-operative complication requiring repair.

126.    The repair was scheduled for January 30, 2025, at Cedars Sinai Medical Center in Los Angeles, California.   On January 27, 2025, based on a plan carefully worked out with his command, Sergeant Pickett left Fort Johnson to begin the drive to Los Angeles.

127.    On the morning of January 28, Sergeant Pickett woke up to a missed call and text from the Assistant Special Agent ("ASAC") in charge at Fort Johnson, asking Sergeant Pickett to call him as soon as possible.  Upon returning the call, Sergeant Pickett was notified that his Defense

Travel System voucher covering his travel had been revoked. He was informed that he would no longer be reimbursed for his travel to California and lodging necessary to accommodate him before and after his surgery.

128. Later that evening, Sergeant Pickett received another call from the SAC at Fort Cavazos informing him that his Defense Health Agency ("DHA") waiver that authorized the procedure was expired. Sergeant Pickett was ordered to immediately return to Fort Johnson without undergoing the planned surgery.

129. Sergeant Pickett was denied healthcare, not because it was unnecessary, but because he is a transgender person. Sergeant Pickett has served honorably and wants to be treated with the same respect and dignity as any other service member. He wants to be provided medical care on the same terms as it is provided to non-transgender service members, including being able to receive care for a post-surgical complication. Because of the challenged Orders, he is being denied equal treatment in the military because he is transgender including by being denied essential medical care on equal terms with others.

130. Sergeant Pickett's DEERS marker is male. He has served in the U.S. Army as a man and met all standards applicable to service members identified with a male DEERS gender marker. Serving as a transgender man in the armed forces includes adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir." His command has supported his service and assured him that, from their perspective, his transition has no negative impact on his ability to continue serving.

131. It is not possible for him to serve in the military as a woman, which he is not. He is a man, looks like a man and has used men's facilities since his transition without incident. It would

be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot serve as a man in the military, he cannot serve at all.

132.    Master Sergeant Amiah Sale is a thirty-eight-year-old transgender woman serving on active duty in the U.S. Army at Fort Riley, Kansas.  Sergeant Sale is scheduled for a one-year Permanent Change of Station (PCS) to South Korea on March 10, 2025.

133.    This is a recent photo of Master Sergeant Sale:



134.    Sergeant Sale enlisted in the U.S. Army at the age of twenty and has continued to serve for the past eighteen-years in a variety of positions including as a radio operator and recruiter.

135.     Sergeant Sale has been awarded two Meritorious Service Medals, seven Army Commendation Medals, and six Army Achievement Medals.  Sergeant Sale is also a member of the Sergeant Audie Murphy Club, a nonprofit organization that recognizes top noncommissioned officers in the U.S. Army.

136.     Sergeant Sale was diagnosed with gender dysphoria in or about June of 2023 by an Army physician and began hormone replacement therapy in or around December of 2023.  In August of 2024, Sergeant Sale completed her transition and changed her DEERS marker to "F".

137.     In the fall of 2024, Sergeant Sale began the process of scheduling a surgery that her military medical team deemed to be medically necessary.

138.     That surgery was scheduled for February 21, 2025, to take place at Madigan Army Medical Center in Tacoma, Washington.  Because of the short recovery time for this treatment, and because it would result in no duty-limiting profile, Sergeant Sale was able to schedule the surgery so that it had no impact on her service schedule.

139.     On February 10, 2025, less than two weeks before her surgery date, Sergeant Sale was told that her surgery was cancelled due to the February 7, 2025, Memorandum from Secretary of Defense Hegseth, which ordered that "[e]ffective immediately, . . . all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused."

140.     Because of the cancellation of her surgery, Sergeant Sale may not be able to deploy to South Korea for a year, due to no fault of her own.  And if she does deploy, she will have to delay this surgery for at least a year because of serving on deployment.

141.      Sergeant Sale wants to be treated the same as other service members.  Sergeant Sale does not want to be denied medically necessary medical treatment solely because she is transgender.

142.    Sergeant Sale's DEERS marker is female.  She has served in the U.S. Army as a woman and met all standards applicable to service members identified with a female DEERS gender marker.  Serving as a transgender woman in the armed forces includes adhering to female grooming standards, living in women's berthing units, using women's changing and bathing facilities, and being referred to as a woman, including use of honorifics such as "Ma'am."  Her command has supported her service and assured her that, from their perspective, her being a transgender woman will have no negative impact on her ability to continue serving.  Among the accomplishments listed for her recommendation to receive a Meritorious Service Medal was her work acting as a subject matter expert for soldiers seeking transgender medical care, which enabled them to return more rapidly to deployable status and enhanced readiness in her unit.

143.    It is not possible for Sergeant Sale to serve in the military as a man, which she is not. She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

144.    Master Sergeant Quinn Tyson is a transgender woman serving in the U.S. Space Force, stationed at Shriever Air Force Base in Colorado.

145.    This is a recent photo of Sergeant Tyson:



146.    Sergeant Tyson first enlisted in the U.S. Army in 2014 after having graduated with a bachelor's degree in mechanical engineering.  For eight years, Sergeant Tyson worked as a satellite controller before her unit was transferred into the U.S. Space Force on July 28, 2022.

147.    Sergeant Tyson has been awarded five Army Achievement Medals, three Army Commendation Medals, and one Air and Space Force Commendation Medal.  Her command has supported her service and assured her that, from their perspective, her being a transgender woman will have no negative impact on her ability to continue serving.

148.    Sergeant Tyson received a gender dysphoria diagnosis in or about December 2022 and began hormone therapy as part of her medical treatment plan in February of 2023.  As part of her treatment plan, Sergeant Tyson's physician determined that surgery was medically necessary. Sergeant Tyson was able to schedule her surgery for April 24, 2025.

149.    After the Secretary of Defense issued his February 7, 2025, Guidance, Sergeant Tyson's scheduled surgery was removed from the hospital calendar.

150.    On February 10, Sergeant Tyson received an email stating that surgeries for transgender care "have been paused."  Sergeant Tyson tried to search for alternative military providers to perform her medically necessary surgery.  However, on February 13, Sergeant Tyson received another email making clear that she would not be able to access medically necessary transition-related care.

151.    By being denied access to medically necessary surgery solely because she is transgender, Sergeant Tyson has been singled out and treated adversely with no legitimate or important justification.  Sergeant Tyson seeks to receive the same medical benefits that are available to non-transgender service members and to be able to serve on the same terms as others.

152.    It is not possible for Sergeant Tyson to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

153.    Commander Michelle Bloomrose is a forty-five-year-old transgender woman currently serving as the Director of Judge Advocate General's ("JAG") Corps Training in the Office of the Judge Advocate General.  She has served honorably and meritoriously in the U.S. Navy for over nineteen years.

154.    Commander Bloomrose joined the Navy in 2004.  In 2005, she was admitted to the Virginia State Bar and completed Navy Officer Indoctrination School and the Basic Lawyer Course at Naval Justice School in 2005.  Commander Bloomrose is also a member of the Navy-Marine Corps Court of Criminal Appeals, the U.S. Court of Appeals for the Armed Forces, and the U.S Supreme Court bars.

155.    Commander Bloomrose has deployed to provide legal counsel for combat operations three times.  Due to her significant quantitative and qualitative operational law experience and her demonstrated proficiency at its practice, the Navy authorized her a subspecialty "S" code in National Security Law.  Additionally, in 2017, the Navy selected and funded Commander Bloomrose to enroll in the Environmental Law post-graduate program at The George Washington University School of Law.  Based on her Master of Laws degree and following five years of Environmental Law practice, the Navy authorized her a subspecialty "Q" code in Environmental Law, which qualifies her as one of less than a dozen (out of about 1000) Navy judge advocates who is authorized to provide unsupervised legal counsel to the Navy's senior-most uniformed leaders on national and international environmental regulatory compliance for all Navy operations and activities.  During her naval service, Commander Bloomrose has been awarded five Meritorious Service Medals, one Joint Service Commendation Medal, two Navy and Marine Corps Commendation Medals, and one Navy and Marine Corps Achievement Medal.

156.    In June 2024, the Senate confirmed Commander Bloomrose's appointment to the grade of Captain, and the tender of her appointment is projected to be on September 1, 2025. Pursuant to Navy policy, a Navy officer must decline an appointment to Captain if she will retire before she can complete three years time-in-grade.

157.    Commander Bloomrose received a gender dysphoria diagnosis in July of 2024.  She began socially transitioning while off-duty in August 2024 and then began both medical treatment and socially transitioning on duty in November of 2024.

158.    Since the Executive Order was signed, a February 20, 2025, military dermatology appointment that was part of her medical treatment plan was cancelled.  Additionally, because her September 1, 2025, acceptance of her Senate-confirmed appointment to the grade of Captain in the Navy is contingent upon her ability to serve until September 1, 2028, the Executive Order not only prevents Commander Bloomrose from continuing her current service, but it also denies her a career-making promotion to Captain, the capstone grade in the JAG Corps, toward which she has been striving for nearly twenty-five years.  And, because she will only become eligible for full retirement benefits in the grade of Captain once she completes twenty-three years of active-duty service (to include three years of active-duty service in the grade of Captain), if Captain Bloomrose is forced to retire or is involuntarily separated because of the Executive Order before September 1, 2028, she will be denied retirement benefits in the grade of Captain for the rest of her life.

159.    It is not possible for Commander Bloomrose to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job.  In short, if she cannot serve as a woman in the military, she cannot serve at all.

160.    Staff Sergeant Vera Wolf is a thirty-two-year-old transgender woman currently serving as a weapons specialist in the Air Force.  She has served honorably for nearly eight years.

161.    Staff Sergeant Wolf enlisted in the Air Force in April 2017.  She served in explosive ordinance disposal before transitioning to her current role as a weapons specialist.  In her current role, she loads ammunition on AC-130 gunships, among other duties.

162.    Staff Sergeant Wolf has been deployed overseas twice.  She once deployed to Afghanistan between 2018 and 2019.  Later, she redeployed to Afghanistan and was part of the final group of service members leaving the country as the U.S. drew down its presence there.  She finished that tour in the Middle East in the United Arab Emirates, Kuwait, and Qatar.  She has received an Air and Space Commendation Medal, an Air and Space Achievement Medal, two Meritorious Service Medals, two Air Force Good Conduct Medals, a Global War on Terrorism Medal.

163.    Staff Sergeant Wolf received a gender dysphoria diagnosis in November 2019 and worked with medical providers to develop a treatment plan.  As part of her treatment plan, her physician determined that two surgeries were medically necessary.  She was scheduled to undergo one of those surgeries in late March.  This surgery was cancelled shortly after the issuance of the January 28, 2025 memorandum halting medical care for transgender service members.

164.    By being denied access to medically necessary surgery solely because she is transgender, Staff Sergeant Wolf has been singled out and treated adversely with no legitimate or important justification.  Staff Sergeant Wolf seeks to receive the same medical benefits that are available to non-transgender service members and to be able to serve on the same terms as others.

165.    It is not possible for Staff Sergeant Wolf to serve in the military as a man, which she is not.  She is a woman, looks like a woman and has used women's facilities since her transition without incident.  It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men.  If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and

disruption, negatively impacting her ability to effectively perform the duties of her job. In short, if she cannot serve as a woman in the military, she cannot serve at all.

166.    Staff Sergeant Regan Morgan is a thirty-one-year-old transgender woman currently serving as a Special Forces Medical Sergeant with the military occupational specialty (MOS) 18D. She has served honorably for more than five years.

167.    Staff Sergeant Morgan began the process of transitioning, which invited threats to Staff Sergeant Morgan and his career. She received a gender dysphoria diagnosis in November 2019 and began receiving transgender healthcare, including hormone therapy, shortly thereafter.

168.    It is not possible for Staff Sergeant Morgan to serve in the military as a man, which she is not. She is a woman, looks like a woman and has used women's facilities since her transition without incident. It would be extraordinarily disruptive for her to use men's restrooms and showers, sleep in men's berthing units, or otherwise access sex-segregated facilities for men. If others were required to refer to her by male pronouns or address her as "sir," it would cause confusion and disruption, negatively impacting her ability to effectively perform the duties of her job. In short, if she cannot serve as a woman in the military, she cannot serve at all.

169.    Mr. Samuel Ahearn is a twenty-four-year-old transgender man who is a candidate at the Officer Candidate School for the U.S. Navy in Newport, Rhode Island.

170.    Mr. Ahearn received a gender dysphoria diagnosis in July of 2019. He began transitioning to live as a man that same year and has undergone hormone therapy.

171.    Following his college graduation in 2023, he began the process of acceding to the U.S. Navy.

172.    Mr. Ahearn was medically cleared by MEPS in August 2024 and began Officer Candidate School in November 2024. He completed his training and met all the required standards.

His recruiter knew that Mr. Ahearn is transgender throughout this process and supported his accession.

173.    Mr. Ahearn was scheduled to graduate from his program on February 14, 2025, but Navy command has not allowed him to graduate due to the Executive Order.  His Executive Officer and Commanding Officer both supported his graduation and sought a waiver to allow Mr. Ahearn to graduate, but the waiver request was denied.

174.    Because he has been denied his graduation, he is currently being held in the Talent Management Group.  This group is usually reserved for trainees who do not successfully complete their academic work, or who are unable to meet standards due to medical issues.  However, neither applies to Mr. Ahearn.

175.    Mr. Ahearn has passed all of his coursework and has met all standards, and he is being retained in the Talent Management Group and denied his graduation solely because he is transgender.

176.    Mr. Ahearn is a transgender man, and it would not be possible for him to serve in the Navy as a woman.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing unites, or otherwise access sex-segregated facilities for women. If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if Mr. Ahearn cannot serve as a man, he cannot serve at all.

177.    Mr. Clayton McCallister is a twenty-four-year-old transgender man who, on January 22, 2025, signed his contract to enlist to serve in the Pararescue mission of Special Warfare Operator Enlistment ("SWOE").

178.    This is a recent photo of Mr. McCallister:



179.    Because of the extremely demanding physical fitness standards for his position as a Pararescuer, he spent over a year training with a special warfare contractor who specializes in personnel development.  Mr. McCallister attended weekly training and development sessions, in addition to working out two hours per day, between five and seven days per week.

180.    Mr. McCallister was cleared by MEPS on July 25, 2024, and met the demanding physical fitness standards to serve as a Pararescuer.

181.    Mr. McCallister signed his contract on January 22, 2025, and was given a ship-out date of March 4, 2025.  On February 5, 2025, Mr. McCallister quit the job he had been working in for the past one and a half years in preparation for his ship-out date.  He took these actions in reliance on assurances from his recruiters that he would be shipping out on the date provided.

182.    Two days later, on February 7, 2025, Mr. McCallister received a call from a Lieutenant Colonel at Air Force Headquarters informing him that, due to the Executive Order, his ship-out date was being placed on an indefinite hold.  Mr. McCallister is no longer scheduled to ship out on March 4, 2025, as planned.

183.    Mr. McCallister and his wife recently adopted a daughter in October of 2024.  He was planning to support his family on his military salary.  Now, because he quit his job to prepare to ship out, he has no income to support his family.

184.    Mr. McCallister wants to proudly serve the United States in uniform and to be judged based on merit, not the fact that he is transgender.

185.    Mr. McCallister is a transgender man who met the standards for enlistment in the military as a man, including that he transitioned and is stable in his sex as male for more than 18 months.  Mr. McCallister received a gender dysphoria diagnosis in October of 2021 and began transition-related health care around that time.  It would not be possible for Mr. McCallister to join the military as a woman, which he is not.  He is a man, looks like a man and will be perceived to be a man when he uses sex-segregated facilities.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot join the military as a man, he cannot serve at all.

186.    Greyson Shishkina is a 19-year-old Navy recruit.  He enlisted in the U.S. Navy on November 22, 2024.  He is transgender.  He received a gender dysphoria diagnosis in 2021 and began receiving hormone therapy around that time.

187.    This is a recent photo of Mr. Shishkina:



188.    He signed a contract with the Navy to become a Hospital Corpsman and was given a ship-out date of February 24, 2025.  In preparation for this ship-out date, he ended his apartment lease, quit his job, and withdrew from his college studies.  He took these actions in reliance on assurances from his recruiters that he would be shipping out on the date provided.

189.    In late January or early February 2025, the recruiting chief at his Navy recruitment center called to say that, because President Trump had signed the Executive Order, his ship-out date had been postponed to September 23, 2025.  His recruiting chief informed him that the delay was to determine the implementation of the Executive Order, including whether he would be able to serve in the Navy at all.

190.    This postponement—and probable cancellation—has upended his life. He is unable to plan for his future because he cannot be confident that he will be able to ship out on his postponed

September 23 date. He stands not only to lose out on a military career but also on the many months of work and study that he has foregone in preparation for his now postponed military service.

191.    Mr. Shishkina enlisted in the Navy as a man and met all of the accessions standards to do so. It would not be possible for him to join the military as a woman, which he is not. He is a man, looks like a man and will be perceived to be a man when he uses sex-segregated facilities. It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women. If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job. In short, if he cannot join the military as a man, he cannot serve at all.

192.    Koda Nature is a twenty-three-year-old transgender man who currently resides in Texas.

193.    This is a recent photo of Mr. Nature:



194.     Mr. Nature comes from a family with a legacy of military service stretching back generations.

195.     Mr. Nature has been working with recruiters from the military to initiate the process of enlistment.

196.     Mr. Nature has lived as a man since he was sixteen years old.

197.     Mr. Nature is committed to serving in the military.  Were the prohibition on military service by transgender individuals to be implemented, Mr. Nature would be unable to enlist in the Marines and continue his family's tradition of dedicated military service.

198.     Mr. Nature has been on hormone therapy to be and live as a man for 4+ years and received a formal gender dysphoria diagnosis, which is a requirement to receive transgender health care in the military, in November 2024.  It would not be possible for him to join the military as a woman, which he is not.  He is a man, looks like a man and will be perceived to be a man when he uses sex-segregated facilities.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot join the military as a man, he cannot serve at all.

199.     Cael Neary is a transgender man who wants to serve his country through military service and has taken concrete steps to do so.

200.     Mr. Neary is thirty years old and currently resides in Wisconsin.

-44-

201.    This is a recent photo of Mr. Neary:



202.    Mr. Neary has wanted to join the military since he was a teenager.  He was inspired as a teenager by stories of family members who served during World War II.  In his adulthood, his desire to meaningfully serve his country persists.

203.    Mr. Neary delayed enlisting in the military previously due to the ban on military service by transgender individuals during the first Trump Administration.

204.     Mr. Neary began speaking with a military recruiter in June 2024.  He attended an appointment with MEPS in September 2024 and has begun working with his recruiter on completing the paperwork to enlist.

205.    Were the prohibition on military service by transgender individuals to be implemented, Mr. Neary would be unable to enlist in the military and would be permanently deprived of his opportunity to serve his country, despite his longstanding desire to do so.

206.    Mr. Neary is a man; he transitioned years ago to be and live as a man.  He received a gender dysphoria diagnosis in 2014 and is on hormone therapy to enable him to live as a man.  It would not be possible for him to join the military as a woman, which he is not.  He is a man, looks like a man and will be perceived to be a man when he uses sex-segregated facilities.  It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex- segregated facilities for women.  If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job.  In short, if he cannot join the military as a man, he cannot serve at all.

## **DEFENDANTS**

207.    Defendant United States of America includes all federal government agencies and departments responsible for the implementation of the President's decision.

208.    Defendant Peter B. Hegseth is the United States Secretary of Defense.  He is the leader of the Department of Defense.

209.    Defendant Mark Averill is the Acting United States Secretary of the Army.  He is the leader of the Department of the Army.

210.    Defendant Department of the Army is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Army.

211.    Defendant Terence Emmert is the Acting United States Secretary of the Navy.  He is the leader of the Department of the Navy.

212.    Defendant Department of the Navy is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Navy and the United States Marine Corps.

213.    Defendant Gary Ashworth is the Acting United States Secretary of the Air Force. He is the leader of the Department of the Air Force.

214.    Defendant Department of the Air Force is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Air Force and the United States Space Force.

215.    Defendant Telita Crosland is a Lieutenant General and serves as Director of the Defense Health Agency.

216.    Defendant Defense Health Agency is a Combat Support Agency that administers health care services for the U.S. Army, U.S. Navy, and U.S. Air Force.  The Defense Health Agency exercises management responsibility for the TRICARE Health Plan, which is the health care program for all uniformed service members of the U.S. Army, U.S. Navy, U.S. Air Force, U.S. Coast Guard, and certain other commissioned corps.

217.    All of the individual Defendants are sued only in their official capacities.

## **TRANSGENDER PEOPLE**

218.    A transgender person is a person who lives, or would live if able, in a sex different from their birth sex.

219.    Gender dysphoria is a treatable medical condition experienced by a transgender person who is unable to live, or prohibited from living, in a sex different than their birth sex.

220.    Being transgender has no relevance to a person's character, integrity, honesty, capabilities, or fitness to serve in the military.

221.    Being transgender is an immutable characteristic; it has a biological foundation and is not subject to voluntary control and cannot be changed through any medical or mental health intervention.

222.    Requiring a transgender person to live in their birth sex is harmful and efforts to make someone do so is akin to conversion therapy, just as requiring a gay person to be in a different-sex relationship would be. International human rights organizations and medical experts have recognized that such practices are harmful, abusive, and can rise to the level of torture.

223.    As U.S. courts have recognized, no person should be required to suppress the immutable characteristic of being transgender to avoid governmental discrimination or persecution.

## STATEMENT OF FACTS

**Background on 2016 Policy Permitting Service by Transgender Service Members**

224.    In May 2014, then-Secretary of Defense Chuck Hagel, a decorated U.S. Army combat veteran, recommended that the military conduct a review of whether transgender people should be permitted to serve in the Armed Forces.

225.    In August 2014, the Department of Defense issued a new regulation that eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess whether maintaining a service-wide ban on service by transgender persons was justified. *See* Department of Defense Instruction 1332.18.

226.    Secretary Hagel explained that "[e]very qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

227.    Secretary Hagel was succeeded as Secretary of Defense by Ashton B. Carter, who had previously served many years within the Department, including as Deputy Secretary of Defense, Under Secretary of Defense for Acquisition, Technology and Logistics, Assistant Secretary of

Defense for International Security Policy, and as a member of the Defense Policy Board and the Defense Science Board.  In July 2015, Secretary Carter announced that the military would begin a comprehensive analysis of whether to maintain the prohibition on military service by transgender people.

228.    In an order establishing a working group to carry out this analysis, made effective as of July 13, 2015, Secretary Carter directed that no servicemember could be involuntarily separated or denied reenlistment or continuation of active or reserve status on the basis of his or her transgender status without the approval of the Under Secretary of Defense for Personnel and Readiness.

229.    Over the course of a year, Secretary Carter oversaw a comprehensive review of this issue by a working group of the military and civilian leadership of the Armed Services, the Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense.  The working group was chaired by Under Secretary of Defense for Personnel and Readiness Brad Carson.

230.    That year-long process examined copious data on the relevant issues, including but not limited to existing studies and research and input from transgender service members and their commanders, outside expert groups, and medical professionals.

231.    The process also included a careful review of the eighteen other countries that permit military service by transgender people.

232.    The process also included consultation with doctors, employers, and insurance companies regarding the provision of medical care to transgender people.

233.    The Department of Defense also commissioned the RAND Corporation, an organization formed after World War II to connect military planning with research and development decisions, and which now operates as an independent think tank financed by the U.S. government,

to analyze relevant data and studies to determine the impact of permitting transgender service members to serve.  Specifically, the RAND Corporation was tasked with (1) identifying the health care needs of the transgender population and the health care costs associated with providing transition-related care; (2) assessing the readiness implications of allowing transgender service members to serve; and (3) reviewing the experiences of foreign militaries that permit transgender individuals to serve.

234.    The study, titled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Study") and issued in May 2016, concluded that allowing transgender people to serve would "cost little and have no significant impact on unit readiness."

235.    The RAND Study noted that the Military Health System already provides the types of health care required by transgender service members to other service members and concluded that health care costs for transgender service members would represent "an exceedingly small proportion of [the Department of Defense's] overall health care expenditures."  The RAND Study also concluded that this minimal incremental cost would likely be offset by savings through diminished rates of other health care costs that would be achieved by providing service members with necessary transition-related medical care.

236.    With respect to the experiences of foreign militaries that permit transgender individuals to serve, the RAND Study noted that the most extensive research on the effects of transgender service have been conducted in Canada, which has permitted transgender individuals to serve since 1998.  Researchers have "found no evidence of any effect on operational effectiveness or readiness. In fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges . . . . They also found no evidence of any effect on unit or overall cohesion."  This is consistent with research

conducted in the United Kingdom, Australia, and Israel, which all permit service by transgender individuals, that found "no significant effect on cohesion, operational effectiveness, or readiness."

237.    Based on the results of this comprehensive, year-long review process and on the RAND Study, the Department of Defense concluded that the needs of the military would be best met by permitting transgender people to serve on equal terms with others.

238.    As laid out by Secretary Carter in remarks delivered on June 30, 2016, that conclusion was based on a number of considerations, including: the need to "recruit[] and retain[] the soldier, sailor, airman, or Marine who can best accomplish the mission" of our nation's Armed Forces; the fact that thousands of "talented and trained" transgender people are already serving and that the military has already invested "hundreds of thousands of dollars to train and develop each" transgender servicemember; the benefits to the military of retaining individuals who are already trained and who have already proven themselves; the need to provide both transgender service members and their commanders with "clear[] and consistent guidance" on questions such as deployment and medical treatment; and the principle that "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so."

239.    On June 30, 2016, Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly. They can no longer be discharged or otherwise separated from the military just for being transgender."

240.    Also on June 30, 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members."  The memorandum states: "The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to

serve in the military. These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity."

241.    The year-long review process by the Department of Defense also concluded that transgender people should be permitted to accede to the military so long as they had completed all medical treatment associated with their transitions and had been stable in their gender for eighteen months.  The accession policy was scheduled to take effect on July 1, 2017, to allow the branches of the Armed Forces additional time to develop necessary standards and policies.

242.    In September 2016, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military" setting forth guidance and instructions to both military service members and commanders about how to implement and understand the new policies enabling service of transgender service members.

243.    Within 90 days of the lifting of the ban, on October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members."  The instruction set forth further guidance to ensure service by transgender service members, including details regarding revisions to medical treatment provisions.  This instruction was further implemented by a memorandum issued by the Acting Assistant Secretary of Defense for Health Affairs entitled "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members."

244.    Also within 90 days of the lifting of the ban, the Department of Defense issued medical guidance for providing transition-related care to transgender service members.  As a result,

transgender service members were able to begin the process of officially changing their gender marker in the military's personnel management system.

245.    Over the next nine months, between October 2016 and June 2017, the services conducted training of the force based on detailed guidance and training materials regarding the policy change.

246.    On November 29, 2016, the Department of Defense revised "DoD Directive 1020.02E—Diversity Management and Equal Opportunity in the DoD" to prohibit discrimination and harassment on the basis of gender identity.

247.    In 2016, the United States Coast Guard adopted policies and procedures for service by transgender service members that are substantially the same as the Department of Defense policies described above.

248.    On June 30, 2017, the day before the policy permitting transgender people to accede to the military was to take effect, Secretary Mattis extended the period for the development of relevant standards by six months.

**First Trump Administration's Ban on Transgender Service Members**

249.    Early in the morning of July 26, 2017, without any prior indication that he would address military transgender policy, President Trump announced in a series of tweets that the military would no longer permit the service of transgender Americans.

250.    His tweets read: "After consultation with my generals and military experts, please be advised that the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military. Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."

251.    Shortly following the announcement, the new policy met with substantial criticism from members of Congress belonging to both political parties. These critics included Senator John McCain, Chairman of the Senate Armed Services Committee, who said in a statement that "there is no reason to force servicemembers who are able to fight, train, and deploy to leave the military—regardless of their gender identity." Senator Joni Ernst, another Republican member of the Senate Armed Services Committee, also publicly expressed opposition to the new policy.

252.    Shortly after the announcement, fifty-six former generals and admirals issued a public statement denouncing the new policy:

> The Commander in Chief has tweeted a total ban of honorably serving transgender troops. This proposed ban, if implemented, would cause significant disruptions, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades or disobeying policy. As a result, the proposed ban would degrade readiness even more than the failed 'don't ask, don't tell' policy. Patriotic transgender Americans who are serving—and who want to serve—must not be dismissed, deprived of medically necessary health care, or forced to compromise their integrity or hide their identity. President Trump seeks to ban transgender service members because of the financial cost and disruption associated with transgender military service. We respectfully disagree, and consider these claims to be without merit. The RAND Corporation, as well as research in the *New England Journal of Medicine*, found that the financial cost of providing health care to transgender troops would be, at most, $8.4 million per year. This amounts to one one-hundredth of one percent of the military's annual health care budget. As for ostensible disruptions, transgender troops have been serving honorably and openly for the past year, and have been widely praised by commanders. Eighteen foreign nations, including the UK and Israel, allow transgender troops to serve, and none has reported any detriment to readiness.

253.    Admiral Mike Mullen, former Chairman of the Joint Chiefs of Staff, likewise issued a public statement denouncing the policy: "I led our armed forces under the flawed 'don't ask, don't

tell' policy and saw firsthand the harm to readiness and morale when we fail to treat all service members according to the same standards. Thousands of transgender Americans are currently serving in uniform and there is no reason to single out these brave men and women and deny them the medical care that they require."

254.    Despite the widespread denouncement of the new policy, the President signed a formal directive to the Secretary of Defense and the Secretary of Homeland Security on August 25, 2017.  The directive ordered that the military return to its pre-June 2016 policy forbidding transgender people from joining or serving in the military.

255.    Shortly after the President's formal directive, the Department of Defense announced that transgender service members could continue to serve while the Department of Defense developed an implementation plan.

256.    On March 23, 2018, the White House released a report, endorsed by Secretary of Defense James N. Mattis, purporting to provide support for the President's policy (the "Mattis Report").

257.    The American Psychological Association promptly responded to the Mattis Report, stating that it was "alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."

258.    The American Medical Association also responded, stating that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service" and stating that the Mattis Report "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care."

259.     The Mattis Report was also followed by an extensive report issued by a panel of retired military Surgeons General and scholars from the Palm Center (the "Palm Center Report") refuting the rationale for reinstating the ban on transgender military service.  The expert panel noted that the Mattis Report made "a series of erroneous assertions and mischaracterizations about the scientific research on the mental health and fitness of individuals with gender dysphoria . . . . Scholarly research and DoD's own data confirm that transgender personnel . . . are deployable and medically fit."  The panel further explained that "[t]he [Mattis Report] offers no evidence that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety . . . . [T]he military's top Admirals and Generals have explicitly stated that, while the impact on cohesion is being 'monitored very closely,' they have received 'precisely zero reports of issues of cohesion, discipline, morale,' and related concerns after two years of inclusive service."

260.     Congressional testimony by the Chiefs of the Army, Navy, and Air Force, as well as the Commandant of the Marine Corps and the incoming Commandant of the Coast Guard, further confirmed that a non-discriminatory service policy did not compromise unit cohesion.  Army Chief of Staff General Mark Milley testified, "I have received precisely zero reports of issues of cohesion, discipline, morale and all those sorts of things."  The incoming Coast Guard Commandant Vice Admiral Karl Schulz similarly testified, "I am not aware of any disciplinary or unit cohesion issues resulting from the opening of the Coast Guard to transgender individuals."  Navy Chief of Staff Admiral John Richardson testified that he was "not aware of any issues" of "unit cohesion, disciplinary problems, or issues with morale resulting from open transgender service."  The other service chiefs offered consistent testimony that they were not aware of any issues resulting from service by transgender individuals.

261.    The Mattis Report outlined a formal policy allowing service members who had already medically transitioned to continue serving but barring medical and social transition going forward and banning accession by transgender individuals.  However, the policy did not go into effect until April 12, 2019, after injunctions blocking the ban were lifted.   In the intervening period, transgender service members continued to serve, in many cases with distinction.

**Background on 2021 Austin Policy**

262.    On January 25, 2021, President Joseph R. Biden issued an executive order overturning the prior ban and directing the Secretary of Defense and Secretary of Homeland Security Lloyd Austin to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."   The executive order relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

263.    In March 2021, the Office of the Undersecretary of Defense for Personnel and Readiness memorialized guidance regarding accession in "DoD Instruction 6130.03—Medical

Standards for Appointment, Enlistment, or Induction into the Military Services." This instruction sets forth guidance on the circumstances under which transgender individuals may enlist in the military. In addition to meeting generally applicable accession standards, transgender individuals with a history of gender dysphoria seeking to enlist must have been stable in their gender identity for 18 months prior to enlistment.

264.    On April 30, 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." The instruction set forth guidance to ensure service by transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

265.    The Military Departments and Services promptly issued policies implementing DoD Instruction 1300.28. Each policy subjects transgender service members to the same high standards as their peers.

266.    On October 1, 2021, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military." The 72-page document set forth guidance and instructions to both military service members and commanders about how to implement and understand the policies enabling service by transgender service members.

267.    Under the Austin Policy, transgender service members have served honorably and, in many cases, with distinction, with support from their peers and commanding officers. Permitting transgender service members who are otherwise qualified to serve has not resulted in any detrimental impacts to military readiness.

**The Ban on Transgender Service Members**

268.    President Trump made animosity towards transgender individuals a cornerstone of his campaign for a second term.  In February 2023, President Trump released a three-and-a-half minute video in which he promised to "sign a new Executive Order instructing every federal agency to cease all programs that promote the concept of sex and gender transition at any age."  He followed this pronouncement in April 2023 with a statement that "[upon his] inauguration, [he] will direct the FDA to convene . . . an independent outside panel to investigate whether transgender hormone treatments and ideology increase the risk of extreme depression, aggression and even violence. I think most of us already know the answer . . ."

269.    In August 2023, President Trump indicated at a campaign rally that "I will ban the Department of Veterans Affairs from wasting a single cent to fund transgender surgeries or sex change procedures.  Those precious taxpayer dollars should be going to care for our veterans in need, not to refund radical gender experiments for the communist Left."  He further elaborated, "I'll also restore the Trump ban on transgender [sic] in the military."

270.    President Trump's campaign platform further listed "Republicans Will End Left-wing Gender Insanity" as a pillar and announced plans, among other things, to "ban Taxpayer funding for sex change surgeries."

271.    In the final weeks before the 2024 presidential election, President Trump's campaign also released a campaign video juxtaposing clips from "Full Metal Jacket" (captioned "THEN") with clips of LGBTQ+ service members, drag performers, and Assistant Secretary for Health Rachel Levine (captioned "NOW" and "THE BIDEN HARRIS MILITARY").

272.    On December 22, 2024, President Trump announced, "[w]ith the stroke of my pen on day one, we are going to stop the transgender lunacy.  And I will sign Executive Orders to . . . get

transgender [sic] out of the military . . . . And that will likewise be done on day one . . . under the Trump administration it will be the official policy of the United States government that there are only two genders, male and female . . ."

273.    It is highly unusual for the military to abruptly change its personnel policies to exclude a class of persons from service with no inquiry into their ability to serve under a policy that has been in effect for years.

274.    On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021 executive order that established the Austin policy."

275.    Also on January 20, 2025, President Trump signed the Gender Ideology Order, which requires all application and interpretation of federal law by the Executive Branch to apply a definition of "sex" as referring to "an individual's immutable biological classification as either male or female" at birth and providing that sex "does not include the concept of 'gender identity.'"  The Gender Ideology Order defines "gender ideology" as based on a "false claim that males can identify as and thus become women and vice versa."  The order further defines "gender identity" as reflecting "a fully internal and subjective sense of self . . . that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

276.    The Gender Ideology Order provides that "the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy: (a) 'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.' (b) 'Women' or 'woman' and 'girls' or 'girl' shall mean adult and juvenile human females, respectively. (c) 'Men' or 'man' and 'boys' or 'boy' shall mean adult and juvenile human males, respectively. (d) 'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell. (e) 'Male' means a

person belonging, at conception, to the sex that produces the small reproductive cell."

277.    The definitions of sex, male, female, women, girls, men, and boys, were adopted to expressly ensure that no federal laws or policies recognize transgender people.

278.    Prior to the adoption of the Gender Ideology Order, there was no federal, comprehensive definition of the terms, sex, male, female, women, girls, men, or man.

279.    On January 27, 2025, President Trump issued Executive Order 14183 (the "Executive Order") revoking "all policies, directives, and guidance issued pursuant to" the order that established the Austin policy and directing the Department of Defense "to take all necessary steps to implement the revocations" in order to exclude transgender people from military service.

280.    The Executive Order states that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "use of pronouns that inaccurately reflect an individual's sex" are inconsistent with "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

281.    The Executive Order states: "Consistent with the military mission and longstanding DoD policy, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service. Beyond the hormonal and surgical medical interventions involved, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."

282.    Section 3 of the January 27, 2025, Executive Order expressly incorporates the definitions of "sex" and related terms from the Gender Ideology Order.

283.    The Executive Order further states that its policy of "establish[ing] high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity . . . .is also inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex."  It directs the Secretary of Defense to "promptly issue directive for DoD to end invented and identification-based pronoun usage."

284.    The Executive Order provides that: "Absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males."

285.    The Executive Order provides that "all policies, directives, and guidance issued pursuant to Executive Order 14004 [which permitted military service by transgender individuals] shall be rescinded to the extent inconsistent with the provisions of this order."

286.    The Executive Order directs the Secretary of Defense to within 30 days of the issuance of the order: "(i) identify all additional steps and issue guidance necessary to fully implement this order; and (ii) submit to the President through the Assistant to the President for National Security Affairs a report that summarizes these steps."

287.    The Executive Order provides: "(a) Within 60 days of the date of this order, the Secretary of Defense (Secretary) shall update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order."

288.    The Executive Order invokes no study of the effectiveness of transgender service members over the past four years of their ability to serve, or of their integrity and selflessness in volunteering to serve their country, and the directive's stated rationale is refuted by substantial research and testimony, as well as by years of capable and honorable service by transgender servicemembers without issue.   Section 3 of the Executive Order expressly incorporates the definitions from the Gender Ideology Order, including its definitions of "sex," "gender identity," and "gender ideology."

289.    On January 28, 2025, James Preston Waters III of the Navy Recruiting Command issued Decision Guidance Memorandum #N00-30 implementing the Executive Order. Pursuant to this Memorandum, "[a]pplicants who self-identify as transgender are not eligible to process for enlistment at this time."

290.    On January 31, 2025, Defendant Secretary of Defense Hegseth issued a Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands Defense Agency, and DOD Field Activity Directors ("First Hegseth Memo") implementing Executive Order 14168.  Pursuant to the First Hegseth Memo, the Department of Defense must "[e]nsure that intimate spaces for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity."

291.    On February 4, 2025, Mark Lewis, Acting Assistant Secretary of the Army for Manpower and Reserve Affairs, issued a Memorandum implementing the Gender Ideology Order. The Memorandum requires the Army to "[e]nsure that intimate spaces, including but not limited to bathrooms, changing facilities, and sleeping quarters, designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity."

292.    On February 4, 2025, Gwendolyn R. DeFilippi, Acting Assistant Secretary of the Air Force for Manpower and Reserve Affairs, issued a Memorandum implementing the Gender Ideology Order requiring the Air force to "[c]ease the use of 'preferred pronouns' (he/him, she/her, or they/them) to identify one's gender identity in professional communications" and "[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity.

293.    On February 7, 2025, Defendant Secretary of Defense Hegseth issued a Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands Defense Agency, and DOD Field Activity Directors ("Second Hegseth Memo") implementing the Executive Order. The memo states that "[e]ffective immediately, all new accessions for individuals with a history of gender dysphoria are paused, and all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused."

294.    The Hegseth Memo further clarifies that "[f]or the purposes of this guidance, these procedures include unscheduled, scheduled, or planned genital reconstruction surgery associated with gender transition, gender affirming surgery, sex reassignment surgery, or newly initiated gender-affirming hormone therapy."

295.    The Second Hegseth Memo further directs that "The Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy and implementation guidance outside of the normal DoD issuance process, including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria, to implement this direction." Deviating from the normal DoD policy issuance processes, especially in a situation where it involves a reversal of existing policy, is highly unusual and unprecedented. Ordinarily,

changes to existing policy would only be undertaken after careful study and review and only in response to significant, documented problems with existing policy. Similarly, ordinarily the implementation of new policy by the DoD is rolled out in a careful, orderly fashion that provides clear and timely guidance and with due regard for the interests and stability of affected individuals, their commanding officers and units and the stability of the military as a whole. All such considered policy review and guidance is absent here.

296.    On February 14, the U.S. Army X (formerly Twitter) account tweeted that the Army "will no longer allow transgender individuals to join the military and will stop performing or facilitating procedures associated with gender transition for service members."



297.    On February 26, 2025, Darin S. Selnick, who is Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, issued a Memorandum with the subject "Additional Guidance on Prioritizing Military Excellence and Readiness" (the "Implementing Policy"). The attachment to the Memorandum outlines policy guidance governing implementation of the Executive Order (the "Implementing Guidance"), which the Memorandum declares "is effective immediately." It further provides that "effective immediately," guidance related to In-service transition for Transgender Service Members, for Gender-Affirming Health Care, for

-65-

Treatment of Gender Dysphoria and other specific guidance for medical care in military treatment facilities are "cancelled."

298.    The Implementing Guidance declares that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" are incompatible with the "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Accordingly, the Implementing Guidance declares that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service" and "will be processed for separation from military service."

299.    Although the Implementing Guidance purports to include a waiver to the retention portion of the ban, see Section 4.3(c), the waiver set forth in the does not apply to transgender persons, as it only applies to service members who (a) demonstrate 36 months of stability in their birth sex, (b) demonstrate that they have never attempted to transition, and (c) agree to serve in their birth sex. None of the Plaintiffs in active military service can demonstrate that they have not attempted to transition as they have all completed transition or have initiated transition and are soon to have completed it. For the same reason, none can demonstrate 36 months of stability in their birth sex because they are all currently living in a sex different than their birth sex and have been for months and, for many, years.

300.    Any waiver included in the accessions portion of the policy, *see* Section 4.1, also will not authorize enlistment or commissioning of transgender accession candidates because it requires the person to serve in their birth sex, something that is incompatible with being transgender.

301.    None of the Plaintiffs, including those currently serving and those who are accessions candidates, can serve in their birth sex.

302.    The Implementing Guidance also incorporates the definition of sex from the Gender Ideology Order, which denies the existence of transgender persons, and provides that "[a]ll Service members will only serve in accordance with their sex, defined in Executive Order 14168." Accordingly, "[w]here a standard, requirement, or policy depends on whether the individual is a male or female . . . all persons will be subject to the standard, requirement, or policy associated with their sex" and "[p]ronoun usage when referring to Service members must reflect a Service member's sex." The Implementing Guidance further requires service members "to use . . . sleeping, changing, or bathing facilities designated for" their birth sex.

303.    The Implementing Guidance also declares that "[n]o funds from the Department of Defense will be used to pay for Service members' unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy."

304.    The Implementing Guidance directs that the Secretaries of the Military Departments within 30 days, by March 30, to "establish procedures and implement steps to identify Service members" subject to administrative separation procedures based on the terms of the guidance. Section 3.4(e).

305.    The Implementing Guidance further directs the Secretaries within 30 days of "identification pursuant to 3.4(e)," to "begin separation actions." Section 3.4(f).

306.    The Implementing Guidance also directs the Secretaries to ensure all Service members identified by the Department who "are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and all other Joint assignments" are "reassigned to their respective Military Services for the purpose of initiating administrative separation processes." Section 3.4(g).

307.    On February 28, 2025, Tim Dill, who is Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs, issued a Memorandum with the subject "Clarifying Guidance on Prioritizing Military Excellence and Readiness" (the "Clarifying Guidance"). This Clarifying Guidance states that "DoD personnel shall take no action to identify Service members pursuant to the [Implementing Guidance] until March 26, 2025. It points out, however, that "this clarifying guidance does not apply to medical qualification determinations for applicants for military service, including determinations for individuals preparing to ship to initial entry training." As such, there is an immediate ban on the accession of all transgender persons into the military.

308.    On March 1, 2025, the Department of the Air Force issued a memorandum entitled "Additional Guidance for Executive Order 14183, 'Prioritizing Military Excellence and Readiness.'" This memorandum immediately rescinded all Exceptions to Policy ("ETPs") authorizing transgender Air Force members to adhere to sex-specific facilities, dress and appearance, and fitness standards for a sex different from their birth sex, requiring all transgender service members to immediately adhere to the standards associated with their birth sex or face separation or other consequences.

## COUNT I

### (Fifth Amendment – Equal Protection – Exclusion from Service)

309.    All previous paragraphs are incorporated as though fully set forth herein.

310.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

311.    A policy preventing or restricting transgender people from serving in the military discriminates against Plaintiffs based on their sex and based on their transgender status, without

lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

312.    Subjecting transgender service members to differential terms for discharge, administrative separation, or any other departures from the terms of service or severance from service, because they are transgender violates the Equal Protection component of the Due Process Clause of the Fifth Amendment.

313.    President Trump's Order preventing transgender people from serving in the military was based on unsupported generalizations and a political goal to eradicate transgender people rather than on evidence about the effectiveness of transgender service members during the past four years or of any problems that may have arisen from their service.  The Implementing Guidance issued by the Department of Defense, and policies designed to effectuate the directives in the Order, merely effectuate this unsupported Order.

314.    Rather than being based on any legitimate governmental purpose, the ban reflects animosity toward transgender people because of their transgender status.

315.    The group-based exclusion of transgender people from military service lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

316.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT II

### (Fifth Amendment – Equal Protection – Requirement to Serve in Birth Sex)

317.    All previous paragraphs are incorporated as though fully set forth herein.

318.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

319.    A policy requiring transgender people to serve in in the military only in their birth sex (with respect to, *inter alia*, pronouns, housing, facilities, restrictions on the medical care one can receive, and how they describe themselves to others), discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

320.    President Trump's executive orders requiring individuals to serve only in their birth sex were based on unsupported generalizations and a political goal to eradicate transgender people rather than on evidence about issued without any study of the effectiveness of transgender service members during the past four years or of any problems that may have arisen from their service.  The Implementing Guidance issued by the Department of Defense merely effectuates these unsupported orders.

321.    Rather than being based on any legitimate governmental purpose, the restrictions reflect animosity toward transgender people because of their transgender status.

322.    The group-based policy requiring transgender people to suppress their transgender identity and serve in their birth sex lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

323.    Plaintiffs challenge each and every provision of the Order, the Implementing Guidance, and any other policies designed to carry out the directives in these directives, that subject them to differential terms of service because they are transgender.

324.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT III

### (Fifth Amendment – Equal Protection – Discriminatory Definition of Sex)

325.    All previous paragraphs are incorporated as though fully set forth herein.

326.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

327.    A policy that defines "sex" based only on an "immutable biological classification" at "conception" or otherwise requires transgender people to serve in in the military only in their birth sex (with respect to, *inter alia*, pronouns, housing, facilities, restrictions on medical care, and how they describe themselves to others), discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

328.    President Trump's executive orders defining "sex" in a manner that requires individuals to serve only in their birth sex were based on unsupported generalizations and a policy predicated on the goal of attempting to eradicate transgender people and exclude them from any legal recognition or protection in any arena including military service.  The policy is not based on evidence and was issued without regard to transgender people's ability to serve as demonstrated through the years of service by these Plaintiffs and the thousands of other transgender service members who have courageously served and continue to do so.  The Implementing Guidance issued by the Department of Defense, and any other policies designed to carry out the directives in the executive orders and Implementing Guidance, merely effectuate these unsupported orders.

329.    Rather than being based on any legitimate governmental purpose, the definition reflects animosity toward transgender people because of their transgender status.

330.    Applying a definition of "sex" that creates a group-based policy requiring transgender people to suppress their transgender identity and serve in their birth sex lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.  It is also unprecedented in federal law to have a sweeping definition of sex that applies throughout federal law and policy.  And doing so for the purpose of denying transgender people the law's protection violates Equal Protection guarantees in the most fundamental way by making a group of people stranger to the law.

331.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT IV

### (Procedural Due Process)

332.    All previous paragraphs are incorporated as though fully set forth herein.

333.    Plaintiffs Major Erica Vandal, Sergeant Kate Cole, Lieutenant Nicolas Talbott, Captain Gordon Herrero, Sergeant Jamie Hash, Ensign Dan Danridge, Private Miriam Perelson, Major Minerva Bettis, Petty Officer Audrie Graham, Sergeant Roan Pickett, Sergeant Amiah Sale, and Sergeant Quinn Tyson state this claim against Defendants.

334.    Defendants have deprived the currently serving Plaintiffs of procedural due process in violation of the Fifth Amendment. Plaintiffs reasonably relied on the military's previous policy allowing service by transgender people in a sex different than their birth sex, including the Austin Policy under which they were serving at the time the President issued the Order preventing transgender people from serving in the military.

335.    The currently serving Plaintiffs reasonably relied on the Austin Policy by completing the process for gender transition provided under that policy, by receiving transition- related medical care, by satisfying all fitness standards and other requirements needed to serve in their sex following

transition, and by actually serving in their sex after transition (including complying with grooming standards, living in berthing units, and using changing and bathing facilities based on their post-transition gender marker in DEERS). Plaintiffs also reasonably relied on representations from their chain of command as alleged herein.

336.    The currently serving Plaintiffs have a protectible liberty interest in their continued military service in their sex following transition and in continued transition-related medical care.

337.    The currently serving Plaintiffs have a protectible property interest in their continued military service in their sex following transition and in continued transition-related medical care. The Order and effectuating Implementing Guidance deprive them of their careers and the related current and future benefits that they have earned as a result of their military service.

338.    Defendants have provided no adequate procedural protections for Plaintiffs. The Order, effectuating Implementing Guidance, and any other policies designed to carry out the directives in the Order and Implementing Guidance, declare the class of transgender people unfit for service and require their exclusion, rendering futile any procedures that otherwise might apply to protect service members from separation.

339.    Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

## COUNT V

### (Estoppel)

340.    All previous paragraphs are incorporated as though fully set forth herein.

341.    Plaintiffs had settled expectations based on the military's policy permitting service by transgender service members in a sex different than their birth sex and reasonably relied on that

policy by completing transition and serving in compliance with the Austin Policy, or by taking substantial and detrimental action to enter military service in reliance on that policy.

342.    The currently serving Plaintiffs reasonably relied on the Austin Policy by completing the process for gender transition provided under that policy, by receiving transition-related medical care, by satisfying all fitness standards and other requirements needed to serve in their sex following transition, and by actually serving in their sex after transition (including complying with grooming standards, living in berthing units, and using changing and bathing facilities based on their post-transition gender marker in DEERS).  Plaintiffs also reasonably relied on representations from their chain of command and/or military recruiters as alleged herein.

343.    Plaintiffs were induced to inform their commanding officers or recruiters that they are transgender and otherwise to complete all requirements to serve in their sex following transition. The Order deprives them of property and liberty interests by eliminating the stability and certainty they previously had in their future careers and benefits, including post-military and retirement benefits that depend on the length of their service.

344.    The Order, effectuating Implementing Guidance, and any other policies designed to carry out these directives, work a serious injustice on Plaintiffs by punishing them for doing what Defendants explicitly induced them to do by complying with the requirements of the Austin Policy and related assurances from their commanders or recruiters to serve openly as transgender service members.  Enforcing the Order, effectuating Implementing Guidance, and other policies designed to carry out the directives in these directives to deprive Plaintiffs of their careers and benefits would lead to an egregiously unfair result that a court of equity should not permit.

345.    Defendants therefore should be equitably estopped from implementing the Order, Implementing Guidance, and any other policies designed to carry out these directives, as applied to Plaintiffs.

## **PRAYER FOR RELIEF**

Plaintiffs ask the Court to grant the following relief:

346.    Issue a declaratory judgment that the Executive Order's group-based exclusion of transgender people from military service and group-based policy that transgender people be denied medical care for the treatment of gender dysphoria and required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others) is unconstitutional;

347.    Issue a preliminary and permanent injunction prohibiting enforcement of the group-based exclusion of transgender people from military service or the group-based policy that transgender people be denied medical care for the treatment of gender dysphoria and required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others);

348.    Issue a preliminary and permanent injunction prohibiting enforcement of the class-based exclusion of the named plaintiffs from military service on the basis of their transgender status and the group-based policy that transgender people be denied medical care for the treatment of gender dysphoria and required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others), including ordering that:

    a. Plaintiffs Major Erica Vandal, Sergeant Kate Cole, Lieutenant Nicolas Talbott, Captain Gordon Herrero, Sergeant Jamie Hash, Ensign Dany Danridge, Private Miriam Perelson, Major Minerva Bettis, Petty Officer Audrie Graham, Sergeant Roan

Pickett, Sergeant Amiah Sale, and Sergeant Quinn Tyson may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, required to serve in their birth sex (including with respect to pronouns, housing, facilities, or how they describe themselves to others) or otherwise receive adverse treatment or differential terms of service on the basis of Executive Orders 14183 or 14168, the Implementing Guidance, or the fact that they are transgender;

b. Plaintiffs Cael Neary, Koda Nature, Clayton McCallister, and Greyson Shishkina may not be denied the opportunity to accede to military service, or be required to serve in their birth sex (including with respect to pronouns, housing, facilities, or how they describe themselves to others), or be denied promotion, reenlistment, or any other equal terms of service on the basis of Executive Orders 14183 or 14168, the Implementing Guidance, any other policies designed to carry out the directives in the executive orders or Implementing Guidance, or the fact that they are transgender.

349.    Issue a preliminary injunction requiring Defendants to hold open the voluntary separation offer outlined in Section 4.4(a)(4) of the Implementing Guidance as applied to Plaintiffs Major Erica Vandal, Sergeant Kate Cole, Lieutenant Nicolas Talbott, Captain Gordon Herrero, Sergeant Jamie Hash, Ensign Dany Danridge, Private Miriam Perelson, Major Minerva Bettis, Petty Officer Audrie Graham, Sergeant Roan Pickett, Sergeant Amiah Sale, and Sergeant Quinn Tyson pending resolution of this action;

350.    Award Plaintiffs their reasonable costs and attorneys' fees;

351.    Issue any other relief the Court deems appropriate.

DATED: March 4, 2025                              Respectfully submitted,

                                                 /s/ Joseph J. Wardenski
Jennifer Levi (*pro hac vice*)                   Joseph J. Wardenski (D.C. Bar No. 995549)
Mary L. Bonauto (*pro hac vice*)                 WARDENSKI P.C.
Sarah Austin (*pro hac vice*)                    134 West 29th Street, Suite 709
Michael Haley (*pro hac vice*)                   New York, NY 10001
GLBTQ LEGAL ADVOCATES & DEFENDERS                Telephone: (347) 913-3311
18 Tremont Street, Suite 950                     joe@wardenskilaw.com
Boston, MA 02108
Telephone: (617) 426-1350                        Sara E. Kropf (DC Bar No. 481501)
jlevi@glad.org                                   KROPF MOESLEY PLLC
mbonauto@glad.org                                1100 H Street NW
saustin@glad.org                                 Suite 1220
mhaley@glad.org                                  Washington, DC 20005
                                                 Telephone: 202-627-6900
                                                 sara@kmlawfirm.com
Shannon P. Minter (*pro hac vice*)
Christopher F. Stoll (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370 San Francisco, CA
94102 Telephone: (415) 392-6257
sminter@nclrights.org

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: 617-742-6020
ibernstein@zalkindlaw.com

                                                 *Attorneys for Plaintiffs*