**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, MIRIAM PERELSON, MINERVA BETTIS, AUDRIE GRAHAM, ROAN PICKETT, AMIAH SALE, QUINN TYSON, CLAYTON McCALLISTER, GREYSON SHISHKINA, KODA NATURE, and CAEL NEARY,<br><br>    Plaintiffs,<br><br>v.<br><br>The UNITED STATES OF AMERICA; PETER B. HEGSETH, in his official capacity as Secretary of Defense; MARK AVERILL, in his official capacity as Acting Secretary of the Army; the UNITED STATES DEPARTMENT OF THE ARMY; TERENCE EMMERT, in his official capacity as Acting Secretary of the Navy; the UNITED STATES DEPARTMENT OF THE NAVY; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; the UNITED STATES DEPARTMENT OF THE AIR FORCE; TELITA CROSLAND, in her official capacity as Director of the Defense Health Agency; and the DEFENSE HEALTH AGENCY,<br><br>    Defendants. | Civil Action No. 25-cv-240-ACR |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' RENEWED APPLICATION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

    A.     The 2016 Carter Policy ................................................................... 2
    B.     First Trump Administration Ban ....................................................... 4
    C.     The 2021 Austin Policy .................................................................. 4
    D.     President Trump's Second Ban........................................................ 6
    E.     DOD Implementation of the Second Ban ......................................... 8
    F.     Plaintiffs' Military Service ............................................................ 11

ARGUMENT ........................................................................................................................16

I.      PLAINTIFFS' CLAIMS ARE RIPE ................................................................ 17

II.     ADMINISTRATIVE EXHAUSTION DOES NOT APPLY TO THIS CASE............... 19

III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
       EQUAL PROTECTION CLAIMS AS ALLEGED IN COUNTS I-III OF THE
       THIRD AMENDED COMPLAINT ................................................................. 20

    A.     The Order and Implementing Guidance Are Motivated by Unconstitutional
           Animus and, But for Animus, Would Not Have Been Enacted................................. 21
    B.     The Order and Implementing Guidance Warrant Heightened Scrutiny Because
           They Facially Classify Based on Sex and Transgender Status and Mandate
           Disparate Treatment of Transgender Service Members. ............................................ 28
    C.     The Order and Guidance Also Violate Equal Protection Because They Were
           Adopted at Least in Part for a Discriminatory Purpose. ............................................ 42
    D.     The Order and Guidance Cannot Survive Any Level of Review. .............................. 46

IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ESTOPPEL CLAIM............. 57

V.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT
       AN INJUNCTION ....................................................................................... 61

VI.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION .................................... 66

VII.   FACIAL INJUNCTIVE RELIEF IS NECESSARY TO PREVENT
       IRREPARABLE HARM TO PLAINTIFFS....................................................... 67

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023), *cert. denied* 144 S. Ct. 683 (2024)............................................55

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................................18

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967).................................................................................................................18, 19

*Able v. United States*,
   968 F. Supp. 850 (E.D.N.Y. 1997) ...............................................................................................66

*Adair v. England*,
   183 F. Supp. 2d 31 (D.D.C. 2002)......................................................................................21, 49, 50

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) .........................................................................................42

*Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
   429 U.S. 252 (1977).........................................................................................................23, 26, 44, 45

*ATC Petroleum, Inc. v. Sanders*,
   860 F.2d 1104 (D.C. Cir. 1988).....................................................................................................58

*Austin v. U.S. Navy SEALs 1–26*,
   142 S. Ct. 1301 (2022)....................................................................................................................69

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
   598 U.S. 175 (2023)........................................................................................................................20

*B.P.J. v. W. Va. State Bd. of Educ.*,
   98 F.4th 542 (4th Cir. 2024) ..........................................................................................................41

*Bartko v. SEC*,
   845 F.3d 1217 (D.C. Cir. 2017).....................................................................................................59

*Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) .........................................................................................42

*Bd. of Trs. of Univ. of Alabama v. Garrett*,
   531 U.S. 356 (2001) (Kennedy, J., concurring)......................................................................44, 52

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) ........................................................................53

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ..........................................................................35, 42, 55

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023) ..........................................................35

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) .......................................................................................44

*Brocksmith v. United States*,
    99 A.3d 690 (D.C. 2014) ...............................................................................43

*Calixto v. United States Dep't of the Army*,
    No. CV 18-1551 (PLF), 2021 WL 2253351 (D.D.C. June 3, 2021).....................48

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
    513 F. Supp. 3d 154 (D.D.C. 2021) ..............................................................70

*Chamber of Com. of U.S. v. Reich*,
    57 F.3d 1099 (D.C. Cir. 1995) ......................................................................21

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ......................................................................63

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .......................................................................................46

*Cisek v. Cisek*,
    No. 80 C.A. 113, 1982 WL 6161 (Ohio Ct. App. July 20, 1982)...........................43

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ........................................................................70

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................................25, 51

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) .......................................................................................35

*Comm. for GI Rts. v. Callaway*,
    518 F.2d 466 (D.C. Cir. 1975) ......................................................................21

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) ..................................................................67

*Corniel-Rodriguez v. INS,*
    532 F.2d 301 (2d Cir. 1976)...............................................................................62

*Crawford v. Cushman,*
    531 F.2d 1114 (2d Cir. 1976)..............................................................................54

*D.C. v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................68, 69

*D.C. v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d at 49–50 ....................................................................................70

*Daly v. Daly,*
    102 Nev. 66 (1986) ............................................................................................43

*Davis v. D.C.,*
    158 F.3d 1342 (D.C. Cir. 1998) ..........................................................................63

*Department of Homeland Security v. Regents of the University of California,*
    591 U.S. 1 (2020)...............................................................................................22

*Diaz v. Brewer,*
    656 F.3d 1008 (9th Cir. 2011) ............................................................................58

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022)...........................................................................................38

*Doe 1 v. Trump,*
    275 F. Supp. 3d 167 (D.D.C. 2017) .......................................................... *passim*

*Doe 1 v. Trump,*
    Civil Action No. 17-1597 (CKK), 2017 U.S. Dist. LEXIS 211561 (D.D.C.
    Dec. 11, 2017).....................................................................................................69

*Doe 1 v. Trump,*
    No. 17-5267, 2017 U.S. App. LEXIS 26477 (D.C. Cir. Dec. 22, 2017) ................69

*Doe 2 v. Shanahan,*
    755 F. App'x 19 (D.C. Cir. 2019) .............................................................. *passim*

*Doe 2 v. Trump,*
    344 F. Supp. 3d 16 (D.D.C. 2018) ...............................................................69, 70, 71

*Doe v. Austin,*
    No. 2:22-CV-00368-NT, 2024 WL 4653290 (D. Me. Nov. 1, 2024)................35, 37

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.,*
    897 F.3d 518 (3d Cir. 2018), *cert denied*, 139 S. Ct. 2636 (2019).........................55

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024) ................................................................41

*Doe v. Ladapo*,
    737 F.Supp.3d 1240 (N.D. Fla. 2024) .......................................44, 45, 46

*Doe v. Rumsfeld*,
    341 F. Supp. 2d 1 (D.D.C. 2004) ..............................................................69

*Eknes-Tucker v. Governor of Alabama*,
    80 F.4th 1205 (11th Cir. 2023) ..................................................................44

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ........................................................42

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ......................................................43

*Flack v. Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ......................................................35

*Fowler v. Stitt,,*
    104 F.4th 770 (10th Cir. 2024) ..................................................42, 44, 46

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ...................................................................................48

*Geduldig v. Aiello*,
    417 U.S. 484 (1974) ...................................................................................38

*Genesis Health Ventures, Inc. v. Sebelius*,
    798 F. Supp. 2d 170 (D.D.C. 2011) ...........................................................59

*Goldman v. Weinberger*,
    475 U.S. 503 (1986) ............................................................................49, 50

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ..................................................................63

*Graham v. Richardson*,
    403 U.S. 365 (1971) ...................................................................................57

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ....................................................35, 42, 55

*Grumman Ohio Corp. v. Dole*,
    776 F.2d 338 (D.C. Cir. 1985) ..................................................................62

*Heckler v. Community Health Servs. of Crawford Cty., Inc.*,
    467 U.S. 51 (1984) ........................................................................................................61

*Hecox v. Little*,
    104 F 4th 1061 (9th Cir. 2024) ...............................................................................41, 42

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) .............................................................................46

*J.E.B. v. Alabama ex rel. T.B.*,
    511 U.S. 127 (1994) ...............................................................................................35, 36

*Johnson v. Williford*,
    682 F.2d 868 (9th Cir. 1982) .........................................................................................62

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*,
    396 F. Supp. 3d 113 (D.D.C. 2019) ...............................................................................67

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ................................................................................. *passim*

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) .......................................................................................67

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) .................................................................................37, 71

*Karnoski v. Trump*,
    No. C17-1297-MJP, 2017 U.S. Dist. LEXIS 203481 (W.D. Wash. Dec. 11,
    2017) ...............................................................................................................................69

*Keating v. FERC*,
    569 F.3d 427 (D.C. Cir. 2009) .......................................................................................59

*L.E. by Esquivel v. Lee*,
    728 F. Supp. 3d 806 (M.D. Tenn. 2024) ........................................................................41

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) .........................................................................................53

*Log Cabin Republicans v. United States*,
    No. 04-08425, 2012 WL 12952732 (C.D. Cal. Mar. 15, 2012) .....................................67

*Loving v. Virginia*,
    388 U.S. 1 (1967) ...........................................................................................................35

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
    286 F. Supp. 3d 704 (D. Md. 2018) ...............................................................................43

*M.B. v. D.W.*,
  236 S.W.3d 31 (Ky. Ct. App. 2007) ..................................................................43

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
  861 F.3d 206 (D.C. Cir. 2017)..........................................................................59

*Mem'l Hosp. v. Maricopa Cty.*,
  415 U.S. 250 (1974).........................................................................................57

*Mills v. D.C.*,
  571 F.3d 1304 (D.C. Cir. 2009)........................................................................63

*Moser v. United States*,
  341 U.S. 41 (1951)...........................................................................................62

*Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*,
  859 F.2d 156 (D.C. Cir. 1988)..........................................................................21

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)........................................................................68

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir. 2013)..........................................................................44

*In re Navy Chaplaincy*,
  No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020)..............................21

*Navy Seal 1 v. Austin*,
  586 F. Supp. 3d 1180 (M.D. Fla. 2022)............................................................65

*Nken v. Holder*,
  556 U.S. 418 (2009).........................................................................................68

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) .............................................................43

*Owens v. Brown*,
  455 F. Supp. 291 (D.D.C. 1978) . Because the Order ..............................48, 56, 57

*Parents for Privacy v. Barr*,
  949 F.3d 1210 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020)................55, 71

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979).........................................................................................45

*Plyler v. Doe*,
  457 U.S. 202 (1982).................................................................................29, 57, 58

*Powell v. Marsh*,
    560 F. Supp. 636 (D.D.C. 1983) ................................................................61

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................63

*Risteen v. Youth for Understanding, Inc.*,
    245 F. Supp. 2d 1 (D.D.C. 2002) ............................................................66

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................ *passim*

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ................................................................48

*Schelske v. Austin*,
    649 F. Supp. 3d 254 (N.D. Texas 2022) ................................................65

*Singh v. Carter*,
    168 F. Supp. 3d 216 (D.D.C. 2016) ................................................48, 50

*Stockman v. Trump*,
    No. EDCV 17-1799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ................................69, 71

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ................................................69, 71

*Tirrell v. Edelblut*,
    No. 24-CV-251-LM-TSM, 2024 WL 4132435 (D.N.H. Sept. 10, 2024) ................................41

*Toilet Goods Assn., Inc. v. Gardner*,
    387 U.S. 158 (1967) ................................................................19, 21

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ................................................................23

*United States v. Virginia (VMI)*,
    518 U.S. 515 (1996) ................................................30, 50, 51, 56

*United States v. Windsor*,
    570 U.S. 744 (2013) ................................................22, 26, 39, 40

*Von Hoffburg v. Alexander*,
    615 F.2d 633 (5th Cir. 1980) ................................................................65

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................45

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ................................................................35, 42, 55

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ...........................................................42, 68, 70

**Statutes**

Defense of Marriage Act, Pub. L. No. 104-199 (1996) ..........................................39, 40

**Other Authorities**

U.S. Const. amend. V .............................................................................................18

Exec. Order No. 14,004, 86 F.R. 7471 .................................................... *passim*

Exec. Order No. 14,168, 90 F.R. 8615 .................................................... *passim*

Exec. Order No. 14,183, 90 F.R. 8757 .................................................... *passim*

## INTRODUCTION

This case is a test of the core democratic principle that makes our country worth defending—that every person is of equal dignity and worth and is entitled to equal protection of the laws.  The administration's policy targeting transgender service members violates this principle and disrespects those who serve our nation.

The Plaintiffs in this case include an Army Major who received a Bronze Star for meritorious achievements while serving as a Battery Commander in Afghanistan.  A Sergeant First Class who has received five Army Commendation Medals and seven Army Achievement Medals. An Ensign who was named Sailor of the Year and is now a Student Naval Flight Officer.  They have decades of experience, training, and education, including a West Point education and several master's degrees.  They are leaders, responsible for the training, performance, and wellbeing of troops they oversee, and they are preparing the next generation of military leaders for success in ROTC and West Point.

These individuals have dedicated their lives to serving their country, meeting and exceeding the rigorous standards for military service, with significant military investment in their training.  They serve honorably, have followed official policies permitting their service, and have engaged in no wrongdoing.  They seek nothing more than the opportunity to continue dedicating their lives to defending the Nation.  Yet these accomplished servicemembers are now subject to an order that says they must be separated from the military based on a characteristic that has no bearing on their proven ability to do the job.  This is a stark and reckless reversal of policy that denigrates honorable transgender servicemembers, disrupts unit cohesion, and weakens our military.

The unprecedented nature of this policy is instructive.  As noted in *Romer v. Evans*, "discriminations of an unusual character especially suggest careful consideration to determine

whether they are obnoxious to the constitutional provision."  517 U.S. 620, 633 (1996).  Like the provision invalidated in *Romer*, this order "identifies persons by a single trait and then denies them protection across the board," disregarding individual qualifications and applying standards inconsistent with those used for other service members.  "It is not within our constitutional tradition to enact [policies] of this sort."  *Id.*

## STATEMENT OF FACTS

### A.    The 2016 Carter Policy

In 2016, following a comprehensive study and thorough review by senior military leadership, Secretary of Defense Ashton Carter announced a policy permitting transgender individuals to serve openly in the military.  Decl. of Alex Wagner ("Wagner Decl."), ECF No. 13-20 ¶ 14; Decl. of Yvette Bourcicot ("Bourcicot Decl."), ECF No. 13-28 ¶¶ 12–15.  This decision was based on rigorous research, including a RAND Corporation study commissioned by the Department of Defense, which concluded that allowing transgender individuals to serve openly would have no adverse impact on unit cohesion, operational effectiveness, or readiness.  Bourcicot Decl. Ex A, ECF No. 13-29 at 14; 60–68.

The Carter Policy, implemented through Directive-Type Memorandum 16-005, established that "service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," and that transgender individuals meeting those standards would be allowed to serve.  Wagner Decl. Ex. A, ECF No. 13-22 at 2–7.  The Carter Policy authorized gender transition during military service and the enlistment of transgender individuals who had already transitioned.  *See* Decl. of Joseph Wardenski ("Wardenski Decl.") Ex. H, ECF No. 13-11.

According to the Department of Defense's Implementation Handbook (Sept. 30, 2016), a transgender service member is one who "intends to begin transition, is undergoing transition, or has completed transition."  Wardenski Decl. Ex. B, ECF No. 13-5 at 12.  The handbook provided

protocols for changing gender markers in records, applying sex-based standards of the transitioned gender, and accessing medical care. *Id.* at 18–21. It also included scenarios covering various stages of transition. *Id.* at 49–58. In sum, the "open service" policy recognized that transgender service required not just allowing different identity from birth sex but enabling transgender individuals to serve in that identity throughout their military careers.

As Dr. Brown explains, the very purpose of the open service policy is to allow transgender individuals to live in accordance with their gender identity. Dr. Brown clarifies that "the definition of transgender has always presumed that transgender individuals live—or would live if permitted—in accordance with their gender identity." Supp. Decl. of George Richard Brown ("Brown Supp. Decl."), ECF No. 32 ¶ 5. He emphasizes that any interpretation suggesting otherwise fundamentally misunderstands what it means to be transgender: "The opinion in *Doe 2 v. Shanahan* creates a false distinction between transgender individuals who 'identify' differently from their birth sex and those who 'live in accordance' with their gender identity. Such a distinction fundamentally misunderstands the nature of being transgender." *Id.* ¶ 7. While Dr. Brown acknowledges and Plaintiffs do not dispute that "some transgender individuals may [live in their birth sex] due to external constraints like prejudice or discrimination," he clarifies that "this does not represent a sustainable situation for most transgender people." *Id.* ¶ 14. To the contrary, "forcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." *Id.* ¶ 10. The Austin policy recognizes that meaningful transgender service requires allowing a transgender service member not simply to "identify" as another sex, but to live consistently with their gender identity, just as non-transgender service members do.

**B.      First Trump Administration Ban**

On July 26, 2017, President Trump announced via Twitter that the government "will not accept or allow Transgender individuals to serve in any capacity in the U.S. military." Wardenski Decl. Ex. D, ECF No. 13-7 at 2. This was formalized in a presidential memorandum on August 25, 2017 ("White House Directive" or "Directive"). Wardenski Decl. Ex. F, ECF No. 13-9. That White House Directive ordered the Secretary of Defense to return to the policy in place "prior to June 2016" that prohibited transgender people from serving in a sex different than their birth sex, halted all use of DoD resources for "sex reassignment surgical procedures for military personnel," and directed Secretary Mattis to develop an implementation plan. *Id.* at 3.

Secretary Mattis released the "Mattis Plan" on February 22, 2018 (ECF No. 13-10), which reversed the Carter Policy by barring transgender individuals who had transitioned, needed to transition, or would transition from military service. Wardenski Decl. Ex. G. Only those who had already transitioned under the Carter Policy could remain in service. All others with gender dysphoria could serve only in "their biological sex" and only if they did not "require a change of gender." *Id.* at 2–3, 10–11.

This approach reversed the Carter Policy by requiring transgender service members to forego medically necessary care and suppress their transgender identity as a condition of service. *Id.* As Dr. Brown explained, this requirement causes serious harm and is not sustainable, just as requiring a non-transgender person to live in a sex different than their gender identity would not be sustainable.

**C.      The 2021 Austin Policy**

On January 25, 2021, President Biden issued Executive Order 14004, "Enabling All Qualified Americans to Serve Their Country in Uniform," which repealed the Trump Administration's transgender military ban. Exec. Order No. 14,004, 86 F.R. 7471 (Jan. 25, 2021).

- 4 -

The Executive Order stated that "it shall be the policy of the United States to ensure that all transgender individuals who wish to serve in the United States military and can meet appropriate standards shall be able to do so openly—free from discrimination." *Id.* § 1.

Secretary of Defense Lloyd Austin implemented this directive by revising military policy to again permit transgender troops to serve openly and on equal terms with other service members. Declaration of Gil Cisneros ("Cisneros Decl."), ECF No. 13-30 ¶¶ 8–11.  The framework was established through two key instructions:

1. DoD Instruction 6130.03, Volume 1 (Accessions), which authorizes transgender individuals to enlist in a sex different than their birth sex if they have been stable for 18 months following gender transition- —i.e., living in a different sex than their birth sex and have no anticipated need of additional medical care for treatment of gender dysphoria other than continued hormone use.  Wardenski Decl. Ex. H, ECF No. 13-11 §§ 6.13.g; 6.14.n; 6.28.t;

2. DoD Instruction 1300.28, which details procedures for in-service gender transition. The instruction requires transgender service members to receive a gender dysphoria diagnosis and a medical treatment plan for gender transition, follow that treatment plan, and change their sex marker in DEERS.  Upon changing their sex marker in DEERS, the service member would then be subject to all military standards for others service members of the same sex as determined by a person's DEERs marker.  Wagner Decl. Ex. D, ECF No. 13-25 at 8-11.

This policy has been successfully implemented for over four years.  *See, e.g.*, Decl. of Erica Vandal ("Vandal Decl."), ECF No. 13-33 ¶¶ 9, 15; Decl. of Kate Cole ("Cole Decl."), ECF No. 13-34 ¶¶ 4, 13; Decl. of Gordon Herrero ("Herrero Decl."), ECF No. 13-35 ¶¶ 9, 14–15; Decl. of Jamie Hash ("Hash Decl."), ECF No. 13-37 ¶ 11.  Plaintiffs' military witnesses know of no studies or other information available through military sources that demonstrates transgender people as a group have been serving other than honorably and meeting military standards.  Wagner Decl., ECF No. 13-20 ¶¶ 27–46; Bourcicot Decl., ECF No. 13-28 ¶ 23–33; Decl. of Carlos Del Toro ("Del Toro Decl."), ECF No. 48-2 ¶¶ 15–20; Cisneros Decl., ECF No. 13-30 ¶¶ 20–28.

### D.    President Trump's Second Ban

On January 27, 2025, President Trump issued Executive Order 14183, titled "Prioritizing Military Excellence and Readiness."  Exec. Order No. 14,183, 90 F.R. 8757 (Jan. 27, 2025) (the "Order").  The Order directs the Secretary of Defense to reverse the current transgender military policy and adopt, instead, a policy predicated on the President's Order stating that being transgender is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  *Id.* § 2.

The Order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service."  *Id.* § 1.  It further declares that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."  *Id.* It also states that, a "man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id.*

The Order deprives transgender service members of any ability to be recognized as or to serve in a sex different than their sex at birth.  *Id.* § 3.  It does so by incorporating definitions from Executive Order 14168 that defines "sex" as "an individual's immutable biological classification as either male or female" at birth,  and then providing that, effective immediately, "the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males."  Exec. Order No. 14,168, 90 F.R. 8615 (Jan. 20, 2025) at § 2 (a)–(e*); id.* § 4(d).  The Order also directs that transgender service members may not use "identification-based" pronouns, the Order § 4(b), meaning that they must use pronouns based on their birth sex.

The Order's incorporation of the definition of sex from Executive Order 14168 reflects purposeful discrimination.  Decl. of Dr. Carrie Baker ("Baker Decl.") ¶¶ 13–15.  The adoption of

this definition represents a deliberate intent to exclude transgender people from legal recognition and protection. *Id.*  As legal historian Dr. Carrie Baker explains, "By defining sex exclusively by reference to a person's reproductive capacity at birth, it creates a classification that entirely excludes transgender people." *Id.* ¶ 15.  Just as states and the federal government began defining marriage explicitly to exclude same-sex couples while claiming to merely codify longstanding definitions, the Order's definition of sex as fixed at birth represents not a continuation of historical practice but "a novel reaction to increasing social recognition of transgender individuals." *Id.* ¶ 21.  This approach follows "a recognizable pattern of using selective definitions to restrict rights when marginalized groups gain social visibility and recognition." *Id.* ¶ 24.  The definition incorporated into the military ban "ties a person's sex to their birth sex in a way that, like the marriage definitions referred to earlier, on its face and by design denies transgender people the law's protections." *Id.* ¶ 25.

The Order directs the Secretary of Defense to update military medical standards to reflect the "purpose and policy of this Order" within 60 days.  The Order § 4(a).  In the meantime, the government has issued a barrage of directives to carry out the Order's purposes by "pausing" accession for transgender applicants, cancelling scheduled medical care for transgender service members, blocking "ship off" assignments, and ordering transgender service members to revert to serving in their birth sex—something Plaintiffs in this case cannot do.  For example, the Department of Navy's Decision Guidance Memorandum #N00-30, issued January 28, 2025, states that "[a]pplicants who self-identify as transgender are not eligible to process for enlistment at this time" and that "any Future Sailors currently in the DEP who are identified as transgender will have their ship dates postponed pending further DoD guidance."  Wardenski Decl. Ex Q, ECF No. 14-2 at 1.

The Order is extreme.  Unlike the Mattis Plan, which included a limited exception for transgender individuals who had already transitioned in reliance on the prior policy, the current Order provides no such protection for currently serving transgender service members who relied on the Carter and Austin policies to transition in service.  The current Order's restrictions on pronouns, berthing, and facilities have no connection to medical considerations.  And the Order openly disparages transgender people, falsely labeling them as inherently dishonest, untrustworthy, undisciplined, and selfish.

### E.    DOD Implementation of the Second Ban

On February 26, 2025, the Department of Defense issued a memorandum titled, "Additional Guidance on Prioritizing Military Excellence and Readiness," which ends transgender people's ability to serve in the military.  Office of the Secretary of Defense, *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb.  26, 2025), ECF No. 63-1 (the "Implementing Guidance").  The Implementing Guidance carries out the direction of the President to the Department of Defense in the challenged Executive Orders.  *Id.* at 1.  It sets a 30-day period for the military to identify transgender people in service and then sets a 30-day period for the initiation of administrative separation proceedings.  *Id.* at 5.

The Implementing Guidance declares that "the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service," directly reversing previous policies that allowed transgender service members to transition and serve in a different sex than their birth sex.  *Id.* at 1.  Specifically, it reverses: (1) "DoDI 1300.28, 'In-Service Transition for Transgender Service Members,' April 30, 2021," (2) "Defense Health Agency Procedural Instruction 6025.21, 'Guidance for Gender-Affirming Health Care of Transgender and Gender-Diverse Active and Reserve Component

Service Members,' May 12, 2023," (3) "Acting Assistant Secretary of Defense for Health Affairs Memorandum, 'Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Member,' July 29, 2016," and (4) "Principal Deputy Assistant Secretary of Defense for Health Affairs Memorandum, 'Guidance for Medical Care in Military Treatment Facilities for Service Members Diagnosed with Gender Dysphoria,' March 18, 2019." *Id.* at 2.

Section 1.f. states that the Department is adopting the same definitions of sex set forth in Executive Order 14,168, which define sex as fixed at birth for the express purpose of excluding transgender people from military service. *Id.* at 3. Section 1.g. reinforces the exclusion of transgender service members by requiring that all military standards related to "medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards" will be based on birth sex. *Id.*

The operative provisions for establishing that a transgender person will be subject to administrative separation are set forth in Sections 4.1 and 4.3. Section 4.1 sets forth the terms of excluding transgender people from service by revising the standards for enlistment to exclude them. *Id.* at 6. Section 4.3 sets forth the terms of excluding transgender people from service by revising retention standards to exclude them. *Id.* at 8.

The accessions provisions, Section 4.1, purports to create a potential "waiver," but no transgender person would be able to use it because it is unavailable to anyone who has transitioned or ever seeks to transition. Decl. of Martha Soper ¶ 15. A "waiver" that requires a transgender person to serve in their birth sex is a waiver only for people who can prove they are not actually transgender. 2d Supp. Decl. of Alex Wagner ("2d Supp. Wagner Decl."); Supp. Decl. of Yvette Bourcicot ("Supp. Bourcicot Decl.") ¶¶ 3-5.

Similarly, the retention "waiver" in Section 4.3c is unavailable to any transgender person. It excludes anyone with "a current diagnosis or history of . . . gender dysphoria," anyone showing "symptoms consistent with gender dysphoria" (§ 4.3(a)), anyone with "a history of cross-sex hormone therapy or sex reassignment surgery" (§ 4.3(b)), and anyone who has "attempted to transition" (§ 4.3(c)(2))—disqualifying all Plaintiffs. It further requires "36 consecutive months of stability in the Service member's" birth sex without clinically significant distress (§ 4.3(c)(1)), which Dr. Brown explains is medically impossible for people with gender dysphoria. Secretary of Defense Memo at 8. The waiver thus only benefits people mistakenly identified as transgender. Supp. Brown Decl. ¶¶ 24–25.

Section 4.4 states that any troops identified by the procedures set forth in the February 26 memo who "are not granted a waiver pursuant to Section 4.3 . . . will be processed for administrative separation." Secretary of Defense Memo at 8. Under Section 4.4(a)(1), no such troops are eligible for review by the common process for medical evaluation, the Disability Evaluation System (DES), which would provide service members with more protection. *Id.*; *see* 2d Supp. Wagner Decl. ¶¶ 5-7.

The rest of the memorandum principally establishes a financial incentive for transgender service members to voluntarily separate. Transgender service members must select voluntary separation within a very short period, 30 days from the issuance of the guidance, in order to obtain the financial incentives. Secretary of Defense Memo at 9.

This represents an unprecedented approach to removing a specific group of service members from the military.

The memorandum also terminates all medical care related to gender transition. Section 1.j. states that "No funds from the Department of Defense will be used to pay for Service members'

unscheduled, scheduled, or planned medical procedures associated with facilitating sex reassignment surgery, genital reconstruction surgery as treatment for gender dysphoria, or newly initiated cross-sex hormone therapy." *Id.* at 4. Section 4.2.b. further specifies that "All unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria are cancelled." *Id.* at 7. No other medical condition exists for which service members are prohibited from receiving the only known and established means of treatment. *See* Supp. Decl. of Shawn Skelly ("Supp. Skelly Decl.") ¶ 12.

### F.    Plaintiffs' Military Service

The sixteen plaintiffs in this action embody the highest ideals of military service—dedication to country, selfless commitment to duty, and excellence in their respective roles. For these service members and prospective recruits, military service represents not merely a career, but a calling and a profound expression of their desire to protect and defend the United States. These plaintiffs have built lives dedicated to military service. Master Sergeant Jamie Hash of the Air Force serves at the Pentagon as a highly competitive Defense Legislative Fellow for Congress, a prestigious position that selects only a handful of enlisted Air Force applicants each year. Hash Decl., ECF No. 13-37 ¶¶ 1, 3. Major Erica Vandal has devoted fourteen years to Army service, earning a Bronze Star for heroism. Vandal Decl., ECF No. 13-33 ¶¶ 1, 9. Sergeant First Class Kate Cole has dedicated nearly seventeen years to the Army, now training the next generation of officers through ROTC at UCLA. Cole Decl., ECF No. 13-34 ¶¶ 1–2. These plaintiffs have structured their entire adult lives around their commitment to military service.

For others, military service represents a family tradition and deeply personal calling. Prospective enlistee Koda Nature comes from a family with a legacy of military service stretching back generations and seeks to continue this tradition of service. Decl. of Koda Nature ("Nature

Decl."), ECF No. 13-38 ¶ 2. Cael Neary has wanted to join the military since he was a teenager, inspired by his grandfather's service during World War II. Decl. of Cael Neary ("Neary Decl."), ECF No. 13-39 ¶ 2. His desire to meaningfully serve his country has persisted into adulthood, leading him to actively pursue enlistment despite previous barriers. *Id.* ¶¶ 3–9.

Each plaintiff has demonstrated exceptional commitment to meeting and exceeding military standards. Second Lieutenant Nicolas Talbott was named Honor Graduate during basic training for going "above and beyond" and "stepping up to leadership roles." Decl. of Nicholas Talbott ("Talbott Decl."), ECF No. 13-32 ¶ 5. Clayton McCallister spent over a year in specialized training to meet the extraordinarily demanding standards for Pararescue, one of the military's most physically challenging roles. Decl. of Clayton McCallister ("McCallister Decl."), ECF No. 51 ¶ 5. Ensign Dany Danridge ranks in the top ten percent of his Naval Flight Officer training class. Decl. of Dany Danridge ("Danridge Decl."), ECF No. 13-36 ¶ 5. Master Sergeant Amiah Sale's command recommended her for a Meritorious Service Medal, specifically noting her work as a subject matter expert helping other transgender service members return more rapidly to deployable status, directly enhancing unit readiness. Supp. Decl. of Amiah Sale ("Supp. Sale Decl.") ¶ 6.

The Armed Forces have invested heavily in developing these service members' specialized skills and leadership abilities. Major Minerva Bettis, a graduate of both the Air Force Academy and Air Force Weapons School, instructs at the Weapons School, training others to become weapons officers. Decl. of Minerva Bettis ("Bettis Decl."), ECF No. 48-1 ¶ 3. Captain Gordon Herrero is completing a master's degree specifically to serve as an instructor at West Point. Herrero Decl. ¶ 2–3; Supp. Decl. of Gordon Herrero ("Supp. Herrero Decl."), ECF No. 48-23 ¶ 7. Staff Sergeant Roan Pickett serves in the Army's Criminal Investigations Division. Decl. of Roan Pickett ("Picket Decl."), ECF No. 48-16 ¶ 1. These plaintiffs represent not just dedicated service

members, but repositories of specialized knowledge and training that the military has spent years cultivating.

The opportunity to serve in the armed forces represents a unique form of national service that has no civilian equivalent. Plaintiff Clayton McCallister has spent over a year preparing for the extraordinarily demanding role of Pararescue, only to have his ship-out date placed on indefinite hold just days after signing his contract. McCallister Decl., ECF. No. 51 ¶¶ 5, 8, 11. Plaintiff Greyson Shishkina, who enlisted to become a Hospital Corpsman, faces similar uncertainty after his ship-out date was postponed with his recruiting chief informing him that the delay was to determine whether he would be allowed to serve at all. Decl. of Greyson Shishkina ("Shishkina Decl."), ECF No. 50 ¶¶ 7, 12. These plaintiffs face the imminent loss of the opportunity to serve their country in roles for which they have demonstrated qualification and dedicated significant preparation.

For plaintiffs already serving, the Executive Orders threaten to abruptly end careers to which they have dedicated their lives. Captain Gordon Herrero faces the loss of a career-making opportunity to teach at West Point, despite his exceptional qualifications and the Army's investment in his specialized graduate education. Herrero Decl., ECF No. 13-35 ¶¶ 2–3; Supp. Herrero Decl., ECF No. 13-35 ¶¶ 7–9. Lieutenant Talbott stands to lose the career he fought for years to join, just after finally earning his commission. Talbott Decl., ECF No. 13-32 ¶¶ 4–6.

The Order and Implementing Guidance also subject transgender service members to disparate and demeaning terms of service imposed on no other group or individual service members. The requirements to serve in their birth sex, to use pronouns that do not match who they are, for transgender men to be made to bunk with women and transgender women to be made to bunk with men, and for all to be denied essential medical care routinely provided to others in

- 13 -

service, disrupts and interferes with their ability to serve.  *See, e.g.*, Supp. Decl. of Jamie Hash ("Supp. Hash Decl."), ECF No. 48-22 ¶¶ 3–4; Supp. Herrero Decl. ¶¶ 3–4; Supp. Decl. of Miriam Perelson ("Supp. Perelson Decl."), ECF No. 48-24 at ¶ 15; Supp. Decl. of Erica Vandal ("Supp. Vandal Decl."), ECF No. 48-25 at ¶¶ 6–7.

Private First Class Miriam Perelson's experience vividly illustrates this disparity.  On January 31, 2025, an NCO informed Private Perelson she could no longer continue basic training in female living bays or use female latrines.  Decl. of Miriam Perelson ("Perelson Decl."), ECF No. 14-5 ¶ 7.  The following day, she was presented with a Developmental Counseling Form requiring her to either agree to "live in male bays, utilize male latrines, and be partnered with a male battle buddy" or face administrative separation.  *Id.* ¶¶ 8–11.  When she refused to select either option, she was told Command would immediately begin her separation from the Army.  *Id.* ¶ 14.

Despite assurances that "no separation or adverse actions [were] pending," Decl. of Lieutenant Colonel Jonathan S. Baker, ECF No. 19-1 ¶ 5, Private Perelson was housed separately from her female unit until February 8, then subjected to transfers between three different companies within just ten days, purportedly due to "complaints" that only emerged after the Executive Orders. Supp. Perelson Decl., ECF No. 48-24 ¶¶ 5–14.  This pattern of singling out Private Perelson for unique assignments and transfers stems directly from the challenged Orders and has subjected her to disparate and hostile terms of service because she is transgender.

The requirement to serve in their birth sex subjects all transgender service members to similarly impossible conditions.  Lieutenant Talbott, Captain Herrero, Ensign Danridge, and Staff Sergeant Pickett are men who have lived and served as men for years.  Talbott Decl., ECF No. 13-32 ¶¶ 9–17; Herrero Decl., ECF No. 13-35 ¶¶ 10–16; Danridge Decl., ECF No. 13-36 ¶¶ 17–25;

- 14 -

Pickett Decl., ECF No. 48-16 at ¶¶ 1–2.  They adhere to male grooming standards, use men's facilities, and are recognized as men by their colleagues and commanders.  *See, e.g.*, Supp. Herrero Decl., ECF. NO. 48-23 ¶¶ 3–4.  Being forced to serve as women would create extraordinary disruption, confusion, and humiliation.  *See id.*  Similarly, Major Vandal, Sergeant Cole, Master Sergeant Hash, and Sergeant Sale are women who have served with distinction in that capacity. Vandal Decl., ECF No. 13-33 ¶¶ 12–17; Cole Decl., ECF No. 13-34 ¶¶ 14–19; Hash Decl., ECF No. 13-37 ¶¶ 12–20; Sale Decl., ECF No. 48-18 ¶¶ 5–6.  Their commanders have supported their service and confirmed that their transgender status has had no negative impact on their ability to serve effectively.  *See, e.g.*, Vandal Decl., ECF No. 13-33 ¶ 17; Herrero Decl., ECF No. 13-35 ¶ 16; Sale Supp. Decl. ¶¶ 4-6.  To require transgender women to serve as men and transgender men to serve as women is to deny them the ability to serve at all.  *See, e.g.*, Supp. Hash Decl., ECF No. 48-2 ¶¶ 3–4; Supp. Herrero Decl., ECF No. 48-23 ¶¶ 3–4; Supp. Perelson Decl., ECF No. 48-24 ¶ 15; Supp. Vandal Decl., ECF No. 48-25 ¶¶ 6–7.  It undermines their ability to do their job and subjects them to treatment to which no other service members are subjected.

For the plaintiffs, the impact of being made to serve in their birth sex is profound and irreparable.  Each plaintiff has stated a variation of the same truth: "It is not possible for [them] to serve in the military as [their birth sex], which [they] are not."  Plfs' 3d Am. Compl., ECF No. 69 ¶ 32.  As Lieutenant Talbott's statement makes clear: "It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women.  Supp. Decl. of Nicolas Talbott ("Supp. Talbott Decl.") ¶ 6. If others were required to refer to him by female pronouns or address him as 'Ma'am,' it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties

of his job. *Id.* ¶ 7.  In short, if he cannot serve as a man in the military, he cannot serve at all." *Id.* at 9.  The same is true for all of the 16 Plaintiffs before this Court.

The Executive Orders and the Department of Defense Guidances issued thereunder also deny transgender service members medically necessary care because they are transgender. Secretary of Defense, *Mem. for Senior Pentagon Leadership* (Feb. 7, 2025), ECF No. 33-1.  No other group of service members is denied treatment deemed medically necessary by military healthcare providers.

The human impact of this disparate treatment, including the denial of medical care, is stark. On February 5, 2025, Petty Officer Audrie Graham arrived for scheduled surgery that his military medical team had deemed necessary.  Decl. of Audrie Graham ("Graham Decl."), ECF No. 48-3 ¶¶ 7–8.  After changing into a surgical gown, having an IV inserted, and being administered nerve blockers and sedatives, he was informed that the surgery could not proceed due to the Executive Order. *Id.* ¶¶ 9–10.  Staff Sergeant Roan Pickett, who developed a post-operative complication resulting from a military approved and provided surgery, had his January 30 surgery canceled while en route to the military medical facility.  Pickett Decl., ECF No. 48-16 ¶¶ 6–26.  Major Minerva Bettis's February 11 military-approved surgery was canceled on February 5. Bettis Decl., ECF No. 48-1 ¶¶ 7–10.  Master Sergeant Amiah Sale's February 21 surgery was canceled on February 10.  Sale Decl., ECF No. 48-18 ¶ 10.

## ARGUMENT

This Court should enjoin the Order and Implementing Guidance barring transgender military service because they violate Plaintiffs' Fifth Amendment equal protection rights, causing serious, irreparable harm that will continue without Court intervention.  This Court should also enjoin the Order and Implementing Guidance because the military should be estopped from separating transgender service members who transitioned under military policies that explicitly

authorized their steps to transition, making it fundamentally unjust to now cite their compliance with authorized medical protocols and standards as grounds for administrative separation. Plaintiffs have satisfied the standard for obtaining a preliminary injunction here, as they have established: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).

## I.    PLAINTIFFS' CLAIMS ARE RIPE

At this late juncture, where, as Defendants admit, the policies authorizing transgender members to serve have been rescinded and Defendants are actively taking steps to enforce the directives in the Implementation Guidance, there can be no real question that this case is ripe for review. These circumstances easily meet the two-part test for ripeness under *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967) ("requiring [a court] to evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration"). Plaintiffs and other transgender service members face immediate violation of their constitutional rights and loss of their military careers—"irremediable adverse consequences [that will] flow from requiring a later challenge." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

The Implementation Guidance explicitly states that its policy guidance "is effective immediately." ECF 63-1 at 1. The policy guidance then declares, echoing the Order's policy directive, that "[i]t is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," and that "individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," cannot serve under this policy. *Id.* at 3. The

Implementation Guidance requires separation of "Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," *id.*, and, even before their separation, precludes their service as transgender persons: requiring, for example, that transgender service members use the facilities and pronouns applicable to their birth sex, and depriving them of medically necessary care, *id.* at 1–2. A challenge to government action is ripe when the program "is quite clearly set forth" and the court is "asked to decide whether its adoption was constitutional." *Abbott Labs*, 387 U.S. at 149. Although the DoD issued a memorandum entitled "Clarifying Guidance on Prioritizing Military Excellence and Readiness" on February 28, 2025 advising DoD personnel to "take no action to identify Service members pursuant to the attachment" while the Secretaries of the Military Departments work to establish procedures for identifying transgender service members for separation, *see* ECF 65-1 at 3, this clarifying guidance does not pause the implementation of policies that require transgender people to serve in their birth sex and mandate their separation.

The Implementation Guidance's suggestion that the ban can be "waive[d]" for certain service members does not defeat ripeness. The purported "waiver," which Defendants disingenuously cite as a reason they "do not know whether the DoD policy . . . would require Plaintiffs be separated," *see* ECF 66 at 3, is unavailable to transgender persons such as Plaintiffs. As described in their declarations, each of the Plaintiffs currently serving has "attempted to transition" and is living according to their gender identity, rather than "their birth sex." *See*, *e.g.*, Supp. Talbott Decl. ¶ 8; Wolf Decl. ¶ 21; 2d Supp. Herrero Decl. ¶ 8; Supp. Tyson Decl. ¶ 6. Likewise, the accession Plaintiffs are "disqualified for military service" because they, at the very least, "exhibit symptoms consistent with[] gender dysphoria," and are ineligible for a waiver

because, as transgender persons, they do not live according to "the applicant's sex."  *See* ECF 63-1 at 4–5.

The Implementation Guidance is clear that every transgender service member will be put into administrative separation, which makes this claim.  *See, e.g., Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191 (2023) (finding that being subjected to an illegitimate proceeding constitutes a "here-and-now injury" that is "impossible to remedy once the proceeding is over" sufficient to render challenge reviewable).  Although Defendants claim they "cannot prejudge" the outcome of these proceedings and concede only that "retention is unlikely," *see* ECF 66 at 5, the Implementation Guidance provides no path beyond speculation about purely discretionary relief that Plaintiffs could continue to serve.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*, 859 F.2d 156, 168 (D.C. Cir. 1988) (finding claims ripe despite agency's qualification that it may not exercise its authority to impose conditions outlined in regulations); *Chamber of Com. of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (finding facial challenge to executive order ripe even where the order gave the agency discretion to exempt certain individuals from the general rule).  Plaintiffs do not need to await the even greater injury of ultimate separation to vindicate their constitutional rights.  *See Toilet Goods Ass'n*, 387 U.S. at 164**.**

## II.    ADMINISTRATIVE EXHAUSTION DOES NOT APPLY TO THIS CASE

Plaintiffs need not undergo administrative separation proceedings or exhaust administrative remedies before challenging the facially unconstitutional Order and Implementation Guidance.  Administrative exhaustion does not apply where "the gravamen of the plaintiffs' claims revolves around constitutional challenges" because "[r]esolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board."  *Adair v. England*, 183 F. Supp. 2d 31, 55 (D.D.C. 2002), *aff'd sub*

*nom. In re Navy Chaplaincy*, No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020); *Comm.*

*for GI Rts. v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975).

Plaintiffs likewise are not required to exhaust administrative remedies because doing so

would be futile.  Although Defendants claim they "cannot prejudge" administrative outcomes (*see*

ECF 66 at 5), this position contradicts the policy's plain terms.

## III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL PROTECTION CLAIMS AS ALLEGED IN COUNTS I-III OF THE THIRD AMENDED COMPLAINT

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it

the prohibition against denying to any person the equal protection of the laws."  *United States v.*

*Windsor*, 570 U.S. 744, 774 (2013).  Under settled law, even where a policy does not otherwise

warrant heightened scrutiny, a policy based on animus violates equal protection because it lacks a

legitimate governmental purpose.  *See Dep't of Homeland Security v. Regents of the University of*

*California*, 591 U.S. 1, 34 (2020) (citing *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429

U.S. 252, 266 (1977)).  In addition, a plaintiff may show an equal protection violation where "the

government has expressly classified individuals" based on race, sex, or other suspect factors.

*Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 63 (D.C. Cir. 2016) (citing *Parents*

*Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 712-720 (2007)).  Even in the

absence of showing a law classifies on its face, a plaintiff may demonstrate a violation of equal

protection where a government policy has a "disproportionate impact and [Defendants] are

motivated by a . . . discriminatory purpose." *Id.* (quoting *Adarand Constructors, Inc. v. Peña*, 515

U.S. 200, 213 (1995)).

The Order and Implementing Guidance fail constitutional scrutiny for all these reasons.

First, their plain language and the circumstances of their issuance clearly show they were adopted

to effectuate "a bare . . . desire to harm a politically unpopular group," which is never a legitimate

governmental objective. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Second, they facially classify service members based on sex and transgender status—classifications requiring heightened scrutiny which the policy cannot withstand. Third, even if viewed as merely having disparate effects on transgender personnel, the record amply demonstrates they were adopted for a discriminatory purpose and therefore fail equal protection review.

### A.    The Order and Implementing Guidance Are Motivated by Unconstitutional Animus and, But for Animus, Would Not Have Been Enacted

Under any level of scrutiny, government action violates equal protection when its "discontinu[ity] with the reasons offered for it" renders it "inexplicable by anything but animus toward the class it affects." *See*, *e.g.*, *Romer*, 517 U.S. at 632; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). Under this longstanding doctrine, Plaintiffs need only show that animus was "a motivating factor," not the sole or even primary factor. *See Arlington Heights*, 429 U.S. at 265–66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."). Once that threshold showing has been made, the burden shifts to the government to show that it would have enacted the challenged policy even if animus were not a factor, which it cannot do here. *Id.*; *see also Doe v. Ladapo,* 737 F. Supp. 3d 1240, 1273 (N.D. Fla. 2024) ("a showing of impermissible motive undermines the presumption of good faith ordinarily afforded legislation").

The Order and Implementing Guidance clearly demonstrate unconstitutional animus. Issued abruptly amid several orders targeting transgender people, the ban reverses a carefully developed policy that was based on extensive study, including the comprehensive Rand Institute report. The Order provides no evidence of problems with transgender service, ignores the

successful service of thousands of transgender personnel since 2015, and contains openly derogatory language—characterizing transgender identity as "false" and incompatible with an "honorable, truthful, and disciplined lifestyle" and with "humility and selflessness."  It falsely conflates transgender identity with unrelated conditions like bipolar and eating disorders, implies without evidence that transgender healthcare causes "excessive time lost from duty," and contradicts the military's own prior findings that transgender service does not harm readiness.

The Implementing Guidance intensifies the targeting of transgender people.  It portrays transgender identity as delusional, defining gender identity as "a fully internal and subjective sense of self, disconnected from biological reality and sex" that "does not provide a meaningful basis for identification" (Glossary G2).  Without evidence, it declares transgender service "incompatible with military service" and "not in the best interests of the Military Services" (§ 1.c).  The policy falsely claims transgender individuals cannot meet military standards of "readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" (§ 1.b) and makes unsubstantiated claims about "medical, surgical, and mental health constraints" that contradict both medical evidence and transgender service members' actual service records.  It abruptly cancels existing inclusive policies, terminates all transition-related healthcare, and requires identification and separation of transgender service members within just 30 days.  The policy reverses previous military leadership determinations while citing no new evidence and completely disregards years of successful service by transgender personnel, including those with exemplary records.

The Implementing Guidance treats gender dysphoria unlike any other medical condition: while others receive individual fitness evaluations, those with gender dysphoria face automatic separation.  Unprecedentedly, the policy uniquely uses "voluntary separation" to eliminate an entire service member group and applies administrative separation (typically for misconduct) to

individuals who are meeting standards and serving honorably. *See* 2d Supp. Wagner Decl. ¶¶ 4–7; Supp. Skelly Decl. ¶ 13; 2d Supp. Cisneros Decl. ¶¶ 4, 5; Soper Decl. ¶ 12. In another highly unusual procedure, it separates members based on a medical condition that would normally undergo individualized assessment through the Disability Evaluation System. *See* 2d Supp. Wagner Decl. ¶¶ 6–7; 2d Supp. Cisneros Decl. ¶¶ 6, 7; Soper Decl. ¶ 11. Defendants' avoidance of this system suggests the policy stems from anti-transgender animus rather than genuine medical fitness concerns.

The timing, context, and sweeping nature of the Order and Implementing Guidance demonstrate that they reflect "negative attitudes," "fear," and "irrational prejudice" rather than legitimate military needs. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Multiple factors establish this impermissible animus.

First, the Order's text openly expresses hostility toward transgender individuals as a class, declaring their identity a "falsehood" incompatible with military values of "honesty" and "integrity." Order at §§ 1, 2. The Implementing Guidance repeats and amplifies these group-based negative characterizations, which are directly refuted by the distinguished and decorated service of transgender service members in the record. Such overt expressions of animosity toward a disfavored group—especially when proffered as an official explanation of government action—are rare and warrant careful consideration by this Court. *Cf. Romer*, 517 U.S. at 633 (holding that "laws singling out a certain class of citizens for disfavored legal status or general hardships are rare" and warrant careful consideration for that reason). In this critical respect, the Order and Implementing Guidance are nothing like the facially neutral policy challenged in *Hawaii v. Trump*. Here, the government's facial targeting of, and animosity toward, transgender people are apparent on the face of the policy and expressly stated.

- 23 -

Second, the timing of the Order and Implementing Guidance suggest pretext rather than military necessity, as does the highly unusual process by which they were developed and promulgated.  There was no urgency requiring this policy change; the only precipitating event was the presidential election.  The Order and Implementing Guidance disregard the military's prior extensive study supporting inclusion and cite no evidence of problems arising from four years (and more, for some service members) of open service by thousands of transgender troops.  *See* Bourcicot Decl. ¶ 28; Skelly Decl. ¶¶ 16–17.

The rollout of the new policies has been unusual as well.  Rather than the careful and orderly process by which most military policies are implemented, the implementation of this policy has been chaotic, subjecting Plaintiffs and others to a constantly shifting landscape of conflicting directives and actions.  "It has been rolled out on an extremely expedited timeline that puts the affected service members under enormous pressure to make life-altering decisions without adequate time to seek counsel or reflect.  It comes with no guidance on how units should adapt, reconfigure, or adjust to the loss of a teammate performing an important role."  2d Supp. Wagner Decl. ¶ 12.

Third, the Order is part of a broader pattern of targeted discrimination.  From its first days, this administration has moved to strip protections from transgender people across multiple domains—including housing, social services, schools, sports, healthcare, employment, international travel, and family life.  *See* Exec. Order No. 14,168, 90 F.R. 8615.  This context reinforces that the ban reflects "a bare desire to harm a politically unpopular group," which cannot survive any level of scrutiny.  *Windsor*, 570 U.S. at 770; *see also Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.").

- 24 -

Finally, the Supreme Court has repeatedly struck down laws that impose "a broad and undifferentiated disability on a single named group," particularly where the gap between the stated justifications and actual effects shows the classification was drawn "for the purpose of disadvantaging" the group. *Romer*, 517 U.S. at 632. The transgender military ban is precisely such a measure. Its sweeping exclusion of all transgender individuals regardless of their demonstrated ability to serve, combined with its reliance on stereotypes and its emergence from a context of broader discrimination, reveal it as unconstitutional animus that "the Equal Protection Clause does not permit." *Id.* at 634–35.

In the face of this overwhelming evidence of animus, Defendants have made no serious attempt, nor could they, to show that the government would have enacted this sweeping exclusion if animus were not a factor. In lieu of such a showing, Defendants have done little more than grasp at straws. In total, their "evidence" consists of an outdated report by former Secretary Mattis, two more recent reports that expressly reach *positive* conclusions about continued service by transgender people, and a belated and unsupported attempt to raise the issue of costs associated with providing healthcare to transgender people. Wardenski Decl. Ex. V. None of these provide even a shred of legitimate support for purging all transgender people from military service, much less overcome the presumption of illegitimacy created by the obvious role of animus as a motivating factor in the adoption of this policy.

Transgender service members have been serving openly for the past four years and yet Defendants can point to no contemporary evidence of any problems with their service, relying instead on extremely limited and outdated data from a 2018 report by former Secretary Mattis that was itself hastily compiled to supply an ex post facto justification for the transgender ban precipitously imposed in 2017. As detailed in the supplemental declaration of Dr. George Brown,

the 2018 Secretary of Defense Memorandum "is based largely on misconceptions about transgender healthcare, the application of double standards to transgender service members, and speculative concerns about potential problems with deployability."  Supp. Brown Decl. ¶ 29.  "To the extent it relied on any data about actual transgender service members, the data showed no basis for concern."  *Id.*; *see also id.* ¶¶ 30–37 (explaining why data relied on by the Mattis Report does not support any negative inferences about transgender service members); Wardenski Decl. Ex. S.

Defendants also cite a 2021 analysis of data on transgender service members that expressly concludes that transgender applicants who seek to join the military are "similar to the full military applicant pool" and that "rates of adverse attrition and existing service prior to service (EPTS) discharge among TG members were similar to the total force."  Wardenski Decl. Ex. W.  While finding that rates of disability evaluation were estimated to be higher among transgender service members, the review offers no adverse explanation of that finding, and the most likely explanation, as explained by Dr. Brown, is that prior research has shown that "transgender service members are likely to volunteer for and participate in high-risk combat activities and are therefore more likely to suffer combat-related injuries such as PTSD and traumatic brain injury than a matched cohort of cisgender Veterans."  Supp. Brown Decl. ¶ 41.  The 2021 analysis also found that transgender service members were more deployable than a matched cohort of service members with a diagnosis of depression, and confirmed that hormone therapy had no impact in their deployability.  Wardenski Decl. Ex. W.  Nothing in this analysis supports excluding all transgender people from service, especially as transgender applicants and troops must meet the same accession and retention standards, including those relating to deployability, as others.  Supp. Brown Decl. ¶¶ 51–63.

Defendants cite a 2025 medical literature review that similarly found no evidence to support barring transgender people from military service and reached no negative conclusions about their service.  The review confirmed that "[r]esearch findings consistently show . . . the benefits of gender-affirming care."  Wardenski Decl. Ex. X.  It found that while transgender people as a group have higher rates of suicidality, that is due not to any inherent pathology but rather to "discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization."  Wardenski Decl. Ex. X.  The review found that "[r]esearch demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination."  Wardenski Decl. Ex. X.  These findings support the military's existing policy of treating transgender people equally and permitting them to serve so long as they meet the same standards as others.  Supp. Brown Decl. ¶¶ 51–63.

Finally, Defendants note, without more, that DoD spent slightly more than 52 million dollars providing medical care to treat gender dysphoria over a period of nearly ten years, from 2015 to 2024.  Wardenski Decl. Ex. V.  As military declarants have explained that figure is miniscule compared both to the overall health budget and to the much higher costs of many other types of commonly provided care.  *See, e.g.*, Supp. Brown Decl. ¶ 64; 2d Supp. Cisneros Decl. ¶¶ 11–14.  Moreover, Defendants already provide the same medical services to non-transgender troops.  Supp. Brown Decl. ¶ 65.  As such, Defendants' attempted reliance on this factor serves rather to reinforce than to mitigate the inescapable inference that but for animus, this policy would never have been enacted.  *See Plyler v. Doe*, 457 U.S. 202, 227 (1982).

- 27 -

**B.**    **The Order and Implementing Guidance Warrant Heightened Scrutiny Because They Facially Classify Based on Sex and Transgender Status and Mandate Disparate Treatment of Transgender Service Members.**

By singling out transgender people for differential treatment, the Order and Implementing Guidance facially classify based on sex and transgender status in multiple ways:

- First, they facially bar transgender people from military service by declaring that "adoption of a gender identity inconsistent with an individual's [birth] sex" renders a person unfit to serve. Order § 1. The Order and Implementing Guidance are replete with statements rejecting transgender people in the military, including that, "An individual's sex is immutable, unchanging during a person's life," Guidance § 1.(f), and that "a man's assertion that he is a woman," Order § 1, is not consistent with military values. *See also* Gender Ideology Order § 1.

- Second, they impose conditions on military service that facially discriminate against transgender individuals by excluding anyone who has gone through gender transition or even "attempted to transition," Guidance § 4.3(c)(2), and by requiring them to serve, if at all, only by suppressing their transgender identity and serving in their birth sex. These include provisions concerning the use of pronouns, housing, and facilities and the denial of transition-related medical care.

- Third, they expressly classify based on sex and transgender status by incorporating a sweeping federal definition of "sex" as based on an "immutable biological classification" at "conception"—a definition adopted for the first time across all federal law and with the avowed purpose and intended effect of eradicating all federal legal recognition of transgender people. By incorporating this definition, Defendants' policies seek to eradicate even the possibility of recognizing that transgender people exist and to purge them from military service. *See* Baker Decl. ¶ 24.

By expressly targeting transgender people for disparate treatment in each of these ways, the Order and Implementing Guidance create explicit sex-based classifications that require application of heightened scrutiny. *See United States v. Virginia (VMI)*, 518 U.S. 515, 555 (1996). They also independently warrant heightened scrutiny because they classify based on transgender status, a characteristic that meets the traditional criteria for a quasi-suspect classification. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017). Because Defendants can offer no "exceedingly persuasive" justification for the accession and retention

policies' facial targeting of transgender people, those policies fail the exacting demands of heightened scrutiny. *VMI*, 518 U.S. at 533.

              *1.*      *The Order and Guidance Facially Exclude Transgender People from Military Service.*

The plain terms of the Order repeatedly state that being transgender is incompatible with military service. The Order establishes a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" and bars transgender individuals from military service. 90 Fed. R. 8757 § 2. It declares as binding government policy that "expressing a false 'gender identity' divergent from an individual's [birth] sex cannot satisfy the rigorous standards necessary for military service" and that "adoption of a gender identity inconsistent with an individual's [birth] sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." *Id*. § 1. The Order then restates this group-based exclusion a third time, providing that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.* The Order declares the transgender status of these service members as itself disqualifying on the facially discriminatory basis that a transgender person cannot be "honorable" or "truthful" or demonstrate "the humility and selflessness required of a service member."

The Implementing Guidance repeats and amplifies the Order's denigration and exclusion of transgender service members. Like the Order, the Guidance provides that military service by transgender individuals is inconsistent with standards of "readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Guidance § 1(b). It directs that transgender individuals will no longer be eligible for accession to military service, and that current transgender service

members will be identified and then processed for administrative separation and dismissed from service.  *Id.* §§ 1(d), (e); 3.4(e), (f); 4.1(a), (b); 4.3(a), (b); 4.4(a).

The Order and Implementing Guidance exclude transgender people from military service through the use of various substantively equivalent terms:  "expressing a false 'gender identity,'" "adoption of a gender identity inconsistent with an individual's sex," "a man's assertion that he is a woman," "individuals with gender dysphoria," "exhibit[ing] symptoms consistent with, gender dysphoria," "history of sex reassignment," "pursuit of a sex transition," and "attempt" at transition. 90 Fed. R. 8757 §§ 1, 2; Guidance §§ 1(b)–(e); 4.1(b); 4.3(b), (c)(2).

The Order and Implementing Guidance have none of the features of the Mattis Plan that led the D.C. Circuit, based on its limited review of that policy, to conclude that it differed from the original 2017 ban.  *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019).  Unlike the Mattis Plan, the Order and Implementing Guidance contain no reliance exception allowing transgender service members who began serving openly in reliance on earlier policies to continue serving and receiving transition-related medical care.  *See id.*  at 24.  Instead of permitting continued service by Plaintiffs and other transgender service members who have served honorably under the previous policy, the Implementing Guidance directs that they all be processed for immediate separation.  An Air Force memorandum issued following the Implementing Guidance announced that no exceptions to birth sex requirements are permitted, effective upon issuance of the Implementing Guidance.  *See* ECF No. 65.

In addition, while the Mattis Plan purported to be based exclusively on medical considerations, the Order and Implementing Guidance expressly state that transgender people are inherently morally unfit and lack the character to serve, and they expressly bar transgender

- 30 -

service as such by rejecting anyone who has gone through transition (living in a different sex) and requiring all service members to live and serve in their birth sex.

> 2.  *The Order and Guidance Facially Discriminate Against Transgender Service Members and Recruits by Imposing Conditions of Service that Reject Anyone Who Has Transitioned and Requiring Them to Suppress Their Transgender Identity and Serve in Their Birth Sex.*

The Order and Implementing Guidance facially discriminate against transgender service members by subjecting them to discriminatory terms of service that require them to suppress or deny their transgender identity, as well as by excluding anyone who has or would go through gender transition and by denying transition-related medical care.  The Order expressly commands the military to require all transgender service members, including those who have completed their transition, to use housing, bathing, and other facilities based on their birth sex rather than their current sex as reflected in DEERS.  *See* 90 Fed. R. § 4(d).  Because of the Hobson's Choice this presents transgender service members, more recent guidance explains that the only way these provisions can be reconciled is to put transgender service members on administrative leave pending their separation following administrative separation proceedings.  The Order also requires that transgender service members be referred to (and refer to themselves) using pronouns based on their birth sex rather than their current sex.  *See id.* § 4(b).

The Implementing Guidance parallels the Order by providing that "all Service members will only serve in accordance with their [birth] sex and by requiring that standards related to "medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards," as well as pronoun usage, will be based on birth sex.  Implementing Guidance § 1(f), (g), (h).  The Order and Implementing Guidance further provide that no transition-related medical care, including previously "scheduled, or planned" care, will be provided to transgender service members, with a limited exception for hormone

therapy for certain service members already receiving it until they are separated. Implementing Guidance §§ 1(j), 4.2; *see also* Wardenski Decl. Ex. Y ("FAQ"). Numerous service members had medical procedures cancelled, halting their ability to complete transition plans and subjecting them to rescission of authorizations allowing them to serve other than in their birth sex. Bettis Decl. ¶¶ 10–12; Graham Decl. ¶¶ 7–10; Pickett Decl. ¶¶ 6–24; Sale Decl. ¶ 10; Tyson Decl. ¶¶ 7–12; Supp. Bettis Decl. ¶ 4; Supp. Tyson Decl. ¶ 4; Wolf Decl. ¶ 17.

On their face, these provisions subject transgender service members to starkly disparate treatment based on their sex and transgender status. Taken together, they compel transgender service members to stop being transgender (an impossibility) for the brief time they may be able to remain in military service before facing separation. Because transgender service members clearly cannot do this, Defendants authorize command to place transgender service members on administrative leave pending administrative separation proceedings. *See, e.g.*, Supp. Danridge Decl. ¶¶ 6–7; 2d Supp. Vandal Decl. ¶¶ 6–7; 2d Supp. Cole Decl. ¶¶ 6–7; 2d Supp. Hash Decl. ¶¶ 6–7. These provisions also ensure that, going forward, no transgender individuals will be permitted to join the military, and service members who recognize they are transgender after joining the service will either be discharged or forced to suppress and deny their transgender identity for as long as they can. And for those who may try to do that, they will be separable once they exhibit symptoms of gender dysphoria. Implementing Guidance §§ 4.3(a); 4.3(c)(1).

In sum, by requiring all service members to identify and serve in their birth sex, the Order and Implementing Guidance facially discriminate against transgender people and ensure they cannot serve. As Plaintiffs' expert witness Dr. George Brown explains, "a transgender person is someone who lives in a different sex than their birth sex or would if able to." Supp. Brown Decl. ¶ 4. He continues: "The very core of being transgender necessarily involves a drive to

- 32 -

alignment between one's internal gender identity and one's lived experience . . . It would be no easier for a transgender man to live as a woman than for a non-transgender man to live as a woman." *Id.* at ¶ 5. As Dr. Brown explains, "the concept of gender identity inherently encompasses how a person experiences and expresses that identity, including how they are seen by others as someone who is a man or a woman." *Id.* at ¶ 6. "Forcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." *Id.* ¶ 10. "While some transgender individuals may [suppress their gender identity] due to external constraints like prejudice or discrimination . . . this does not represent a sustainable situation." *Id.* ¶ 14.

Recognizing this reality, many courts have held that laws and policies that single out transgender individuals for disparate treatment like that required under the Order and Implementing Guidance discriminate based on sex and transgender status. Courts have repeatedly held, for example, that requiring transgender people to access shared facilities based only on their birth sex rather than their current, post-transition sex impermissibly classifies based on sex and transgender status. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608–13 (4th Cir. 2020); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050–54 (7th Cir. 2017). In *Bostock v. Clayton County*, the Supreme Court held that an employer's termination of a transgender woman because she could not comply with the employer's requirement that she present at work as male constituted discrimination based on sex. 590 U.S. 644, 654 (2020). Similarly, the denial of medical care for gender transition facially discriminates because "[t]he excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status." *Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024);

- 33 -

*see also Doe v. Austin*, No. 2:22-CV-00368-NT, 2024 WL 4653290, at *13 (D. Me. Nov. 1, 2024);

*Brandt v. Rutledge*, 677 F. Supp. 3d 877, 917–22 (E.D. Ark. 2023); *Flack v. Wis. Dep't of Health*

*Servs.*, 328 F. Supp. 3d 931, 951–53 (W.D. Wis. 2018).

It is no answer to say that these provisions do not discriminate because they impose the

same requirement on all service members to serve only in their birth sex. As the Fourth Circuit

recognized in *Kadel*, "[t]his argument elides common sense and is inconsistent with Supreme

Court precedent about how to approach equal-protection analyses." 100 F.4th 122, 147 (4th Cir.

2024). This is because "[t]he proper focus of constitutional inquiry is the group for whom the law

is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles v. Patel*, 576

U.S. 409, 418 (2015) (quotations omitted). The Supreme Court long ago rejected the argument

that a law or policy that classifies on a suspect basis such as race does not discriminate as long as

it applies equally to people of all races. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 10 (1967).

Similarly, a policy that applies explicitly sex-based criteria is subject to intermediate scrutiny even

if it applies to equally to men and women. *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 146

(1994). Just as sex-based peremptory challenges were not saved from heightened scrutiny by the

fact that such challenges could be asserted against men as well as women, the fact that all service

members must serve in their birth sex does not insulate that facially sex-based restriction from

intermediate scrutiny under the equal protection component of the Due Process Clause of the Fifth

Amendment. The equal protection component is a guarantee that each individual is free of

disparate treatment based on a core, protected aspect of identity, regardless of how others are

treated. *Id*.

Defendants also cannot avoid the facially discriminatory nature of these provisions by

arguing that transgender service members are not similarly situated to other service members.

When government action facially discriminates, the Supreme Court has never required a showing that the disadvantaged group is "similarly situated" to others "as a threshold hurdle." *Kadel*, 100 F.4th at 155. The Court "has instead used the similarly situated inquiry to decide whether the governmental interest for discrimination is justified." *Id.* (citing *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 62–68 (2001)). The "similarly situated" inquiry therefore is relevant only to determining whether the discrimination can withstand constitutional scrutiny, not whether discrimination has occurred in the first place. *See id.* In any event, transgender applicants and service members are similarly situated to others in their ability to meet the same medical, readiness, and standards as others, including the few areas in which sex-based standards apply. Transgender men meet the same standards as other men, and transgender women meet the same standards as other women. *See, e.g.*, 2d Supp. Hash Decl. ¶ 4; Supp. Sale Decl. ¶4; 2d Supp. Herrero Decl. ¶ 4; Supp. Danridge Decl. ¶ 4.

Nor is it an answer to say that these provisions classify based on a medical condition—gender dysphoria—rather than based on sex or transgender status. As an initial matter, the restrictions that require transgender service members to serve only in their birth sex are not tethered to a medical diagnosis at all. These include the requirements that access to housing and other facilities, compliance with uniform and grooming standards, and pronoun usage be based on a service member's birth sex rather than their post-transition sex as reflected in DEERS. Those requirements say nothing of a medical diagnosis. These also include changing every transgender person's DEERS marker to their birth sex, regardless of medical condition, history, or circumstance. *See* FAQ at 4. These discriminatory terms are applied to all transgender service members regardless of any current or past gender dysphoria diagnosis, and they do not claim to be based on any medical justification. The Implementing Guidance simply requires Defendants to

take steps to identify current transgender service members, change their military records to reflect their birth sex, and ensure that they may serve only in their birth sex until such time as they are processed for separation.  *See* Guidance § 3.4.

In addition, as many courts have held, the provisions of the Order and the Implementing Guidance that draw lines based on a diagnosis, history, or symptoms of gender dysphoria also facially classify and single out transgender servicemembers for disparate treatment.  This is because "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Kadel*, 100 F.4th at 146; *Doe v. Austin*, 2024 WL 4653290, at *11–12 (concluding insurance coverage exclusion for "sex gender changes" facially discriminates based on sex and transgender status and is subject to heightened scrutiny).  It is also obvious from the definition of the group to be identified for separation, which is not even limited to those with a "current diagnosis or history of . . . gender dysphoria," but includes anyone identified even who "exhibit[s] symptoms consistent with" gender dysphoria.  Guidance § 3.4(e).  The Implementing Guidance thus itself makes clear the goal—identify and separate everyone who is transgender by identifying the broadest pool of anyone who might possibly be transgender.  Then make anyone identified prove they are not transgender.  Guidance §§ 4.3(c)(1)–(3); *see* Supp. Bourcicot Decl. ¶¶ 3–8; Supp. Skelly Decl. ¶¶ 2–8; 2d Supp. Wagner Decl. ¶¶ 2–5.

As Dr. Brown states, a transgender person is one who lives or seeks to live in a sex other than their birth sex.  *See* Supp. Brown Decl. ¶ 4.  Defendants' prohibition on medical care for gender dysphoria targets transgender service members as a group because it bans medical care for that very purpose: care that enables a transgender person to live in a sex other than their birth sex.  Moreover, the discrimination inherent in such a prohibition remains facially based on sex and transgender status even though some transgender individuals may not receive a gender dysphoria

diagnosis or obtain medical treatment for it.  These provisions facially target service members based on their transgender status because "gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status." *Kadel*, 100 F.4th at 146.[1]

> 3.    *The Order and Guidance Facially Discriminate Against Transgender Service Members and Recruits by Incorporating a Definition of "Sex" that Denies Legal Recognition to Transgender People and Requires Them to Serve in their Birth Sex.*

For similar reasons, the Order and Implementing Guidance facially classify based on sex and transgender status by incorporating definitions from the Gender Ideology Order that define "sex" as "an individual's immutable biological classification as either male or female" at birth, 90 Fed. Reg. 8615 § 2(a), and by applying those definitions to require transgender service members to serve in their birth sex.

The fact that these provisions purport to establish universal definitions of "male" and "female" that apply across all departments and programs of the federal government serves only to underscore that they facially target transgender people for differential treatment, consistent with the administration's stated goal of eliminating any legal recognition or protection of transgender people in employment, healthcare, education, housing, sports, social services, military service, and other arenas.  The breadth of their application and the timing and context of their issuance shows—as the administration has openly asserted—that they were adopted for the express purpose of eliminating all legal recognition of transgender people across the entire

---

[1] For this reason, cases such as *Geduldig v. Aiello*, 417 U.S. 484 (1974) and *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), do not apply here.  Unlike the laws at issue in *Geduldig* or *Dobbs*—which did not name women as targeted by the challenged laws—the disparate treatment of transgender service members is expressly mandated on the face of the policies at issue.  *See Kadel*, 100 F.4th at 147 (exclusion of coverage for gender dysphoria care facially discriminates based on sex because application of the exclusion "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity").

- 37 -

federal government and federal law.  Baker Decl. ¶¶ 13–15, 23–25.  In this respect, the Gender Ideology Order bears a striking resemblance to an earlier federal enactment—the Defense of Marriage Act (DOMA)—which employed a similar approach of purporting to establish a uniform federal definition of "marriage," but the true purpose and effect of which was to deny federal recognition to the marriages of same-sex couples.  *See id.* ¶¶ 4–7.

In *Windsor*, the Supreme Court recognized that the sweeping breadth and unusual character of such an enactment belied any suggestion that it simply established a benign and uniform definition, and the enactment was instead a class-based enactment designed to "impose inequality" on legally married same-sex couples.  570 U.S. at 772.  The Court noted that Congress had not previously found it necessary to establish a federal definition of marriage but elected to do so only in response to efforts by same-sex couples to seek the freedom to marry under state law.  *See id.* at 767–69.  The same is true here where neither Congress nor the Executive has ever before found it necessary to define sex for federal law purposes.  The Executive has done so here, for the first time in our Nation's history, as part of a comprehensive effort to deny equal protections of law for transgender people.  *See* Baker Decl. ¶¶ 14–16, 23–25.

The *Windsor* Court found that DOMA's "unusual deviation" from past practice demonstrated that its true purpose was "to impose a disadvantage, a separate status, and so a stigma" on legally married same-sex couples.  570 U.S. at 770.  Crucial to the Court's holding that DOMA violated equal protection was that the statute "[wrote] inequality into the entire United States Code" through a "system-wide enactment with no identified connection to any particular area of federal law."  *Id.* at 771; *see also Romer*, 517 U.S. at 632 (invalidating state constitutional amendment that imposed "a broad and undifferentiated disability on a single named group").

- 38 -

In the same way as DOMA, the Gender Ideology Order breaks from tradition by purporting to establish for the first time a federal definition of "sex."  *See* 90 Fed. Reg. 8615 § 2(a).  Both the text of the Gender Ideology Order and the context in which it was issued demonstrate that it was adopted not to respond to any legitimate policy need, but "to identify a subset of [persons]—transgender people—"and make them unequal."  *Windsor*, 570 U.S. at 772.  The Gender Ideology Order itself makes its purpose plain, stating that it was issued in order to reverse legal protections that "permit men to self-identify as women" or reflect a "self-assessed gender identity," which it asserts is based on a "false claim that males can identify as and thus become women and vice versa."  90 Fed. Reg. 8615, §§ 1, 2(f).  The Gender Ideology Order thus labels transgender identity as a falsehood and sets forth a policy to eradicate legal recognition of transgender people in "all Executive interpretation of and application of Federal law and administration policy."  *Id.* § 2.

As Dr. Baker explains, the context in which these definitions were adopted demonstrate that they represent a "reaction to increasing social recognition of transgender individuals" rather than an effort to enact a definition for legitimate policy reasons.  Baker Decl. ¶ 21.  This approach is a "sharp break from . . . historical precedent and practice" and follows "a recognizable pattern of using selective definitions to restrict rights when marginalized groups gain social visibility and recognition."  *Id.* ¶ 24.

In other cases, courts have readily found that similar definitions of sex facially discriminate based on transgender status.  *See, e.g.*, *Hecox v. Little*, 104 F.4th 1061, 1078 (9th Cir. 2024) ("The definition of 'biological sex' in the Act is written with seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." (quotation

omitted)); *Doe v. Horne*, 115 F.4th 1083, 1105 (9th Cir. 2024) (similar); *L.E. by Esquivel v. Lee*, 728 F. Supp. 3d 806, 831 (M.D. Tenn. 2024); *Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 4132435, at *7 (D.N.H. Sept. 10, 2024) (similar). As the Fourth Circuit has explained, "[t]he undisputed purpose—and the only effect—of [such] definition[s] is to exclude transgender [individuals] from the definition of ['male' or] 'female' and thus to exclude them . . . . That is a facial classification based on gender identity." *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 556 (4th Cir. 2024).

In sum, the Order and Implementing Guidance facially classify service members and recruits based on their sex and transgender status, singling them out for immediate separation and exclusion and requiring those in service to serve under discriminatory conditions until their separation is completed.

> 4. *Because the Order and Guidance Facially Classify Based on Sex and Transgender Status, They Are Subject to Heightened Scrutiny.*

By expressly classifying—and discriminating against—service members based on transgender status, the Order and Implementing Guidance inherently classify based on sex because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). This District previously concluded in enjoining President Trump's first military ban that the transgender classification it created was a sex-based classification, requiring heightened scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause. *See Doe 1*, 275 F. Supp. 3d at 209; *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 39–40 (D.D.C. 2020). Multiple circuit courts concur that classifications based on transgender status are inherently sex-based. *See Fowler v.*

*Stitt*, 104 F.4th 770,  793 (10th Cir. 2024); *Kadel*, 100 F.4th at 153; *Hecox*, 104 F. 4th at 1074; *Whitaker*, 858 F.3d at 1051.

The Order also independently warrants heightened scrutiny because the class it targets— transgender individuals—satisfies the criteria for at least a quasi-suspect classification.  *See Doe 1*, 275 F. Supp. 3d at 208–09.  First, "transgender individuals have immutable and distinguishing characteristics that make them a discernable class." *Id.* at 208.  *See also* Plaintiffs' Supp. Briefing on Immutability, ECF No. 57; Supp. Brown Decl. ¶¶ 8–9.  Second, "[a]s a class, transgender individuals have suffered, and continue to suffer, severe persecution and discrimination." *Doe 1*, 275 F. Supp. 3d at 208–09. Third, despite this history of discrimination, there is "no argument or evidence suggesting that being transgender in any way limits one's ability to contribute to society." *Id.*  And finally, transgender people "represent a very small subset of society" and lack "the sort of political power" that other groups might have "to protect themselves from discrimination." *Id.* Courts across the country agree that discrimination against transgender individuals warrants heightened scrutiny.  *See, e.g.*, *Hecox*, 104 F.4th at 1079; *Grimm*, 972 F.3d at 586; *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Bd. of Educ. of Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

The record before the Court amply supports that transgender status satisfies each of the factors that define a quasi-suspect classification.  In particular, transgender individuals have been subject to pervasive discrimination both historically and in the present day.  Historically, governments have criminally punished transgender people for wearing the "wrong" clothing,

barred them from being teachers or federal employees or from serving in the military, excluded them from nondiscrimination laws, prevented them from correcting sex markers on government-issued identity documents, excluded coverage of transition-related care under Medicare and Medicaid and for incarcerated transgender people, stripped transgender parents of custody and even parental rights, and barred transgender people from marriage.[2]  This discrimination continues in the present day.  "The hostility and discrimination that [they] face in our society today is well-documented."  *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014).  This historical discrimination has escalated dramatically over the past five years, as many states have passed laws denying transgender people basic rights and protections.  *See* Wardenski Decl. Ex. N.

### C.    The Order and Guidance Also Violate Equal Protection Because They Were Adopted at Least in Part for a Discriminatory Purpose.

Furthermore, even if the provisions of the Order and Guidance that impose differential treatment based on a history of gender dysphoria did not facially discriminate based on sex and transgender status, those provisions still would be subject to heightened scrutiny for a different reason.  A facially neutral policy is nevertheless subject to heightened scrutiny under equal protection principles if it was "adopted with discriminatory intent."  *See In re Navy Chaplaincy*, 323 F. Supp. 3d 25, 41 (D.D.C. 2018), *aff'd*, No. 19-5204, 2020 WL 11568892 (D.C. Cir. Nov. 6, 2020*)* (citing *Arlington Heights*, 429 U.S. at 266); *see also Fowler*, 104 F.4th at 784–85 (even assuming facial neutrality, state policy of denying transgender applicants amendment of birth certificates was subject to heightened scrutiny where plaintiffs "alleged facts from which we may reasonably infer purposeful discrimination on the basis of transgender status"); *Eknes-Tucker v.*

---

[2] *See, e.g.*, *Cisek v. Cisek*, No. 80 C.A. 113, 1982 WL 6161 at *1–2 (Ohio Ct. App. July 20, 1982) (denying visitation to parent on the basis of parent's transgender status); *Daly v. Daly*, 102 Nev. 66, 70–72 (1986) (terminating parental rights on the basis of parent's transgender status); *M.B. v. D.W.*, 236 S.W.3d 31, 35–38 (Ky. Ct. App. 2007) (same); Wardenski Decl. Ex. K; Wardenski Decl. Ex. L; Wardenski Decl. Ex. M.

*Governor of Ala.*, 80 F.4th 1205, 1230 (11th Cir. 2023) (facially neutral statute is subject to heightened scrutiny if it is "a pretext for invidious discrimination against [transgender] individuals"); *Doe v. Ladapo*, 737 F. Supp. 3d at 1282 (subjecting state statute banning medical care for transgender minors to intermediate scrutiny under *Arlington Heights*).

A discriminatory purpose need not be the sole or even primary motivation to warrant heightened scrutiny. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern . . . ." *Arlington Heights*, 429 U.S. at 265. But "[w]hen there is a proof that a discriminatory purpose has been *a motivating factor* in the decision, . . . judicial deference is no longer justified." *Id.* at 265–66 (emphasis added). Nor does proving a discriminatory purpose require a showing of subjective hatred, malice, or a self-conscious desire to harm. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70 (1993). "Prejudice . . . may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. A court may infer purposeful discrimination based on the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Where a "clear" and "stark" pattern of disparate impact "emerges from the effect" of the challenged policy, "[t]he evidentiary inquiry is . . . relatively easy," and "impact alone" may be "determinative." *Arlington Heights*, 429 U.S. at 266. Other relevant facts include the "historical background" of the

- 43 -

challenged policy, the "sequence of events leading up to the challenged" policy, and "[d]epartures from the normal procedural sequence" in the adoption of the policy. *Id.* at 267.

Applying the *Arlington Heights* factors, the record overwhelmingly demonstrates that purposeful discrimination was a motivating factor underlying the Order—in other words, that the Order was issued "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

First, the stark disparate impact of the Order and Guidance is clear:  only transgender service members are affected by the exclusion from military service and denial of medical care to those with a history or symptoms of gender dysphoria. *See, e.g.*, *Fowler*, 104 F.4th at 786 (finding discriminatory purpose where challenged "[p]olicy affects transgender people but not cisgender people"); *Doe v. Ladapo*, 737 F. Supp. 3d at 1269 (same).

Second, the historical background demonstrates that the Order is only the latest chapter in President Trump's yearslong effort to exclude transgender people from the military, an effort that dates back to the announcement of the first ban in 2017.  At every turn, those efforts have been accompanied by actions and efforts reflecting unvarnished hostility toward transgender people as a group.  This Court may take into account other actions taken contemporaneously and tied to the same poisonous tree, including the Gender Ideology Order, which is expressly incorporated by reference into the Order banning transgender military service, as well as throughout the other Executive Orders targeting transgender people in schools and for denials of federal funding. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) ("Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of

- 44 -

the decision making body."); *Hecox v. Little*, 479 F. Supp. 3d 930, 984 (D. Idaho 2020) ("That the Idaho government stayed in session amidst an unprecedented national shut down to pass two laws which dramatically limit the rights of transgender individuals suggests the Act was motivated by a desire for transgender exclusion, rather than equality for women athletes, particularly when the national shutdown preempted school athletic events, making the rush to the pass the law unnecessary."); *Doe v. Ladapo*, 737 F. Supp. 3d at 1274 ("Perhaps the best evidence of [animus] is another statute passed on the very same day as the statute at issue here.").

Third, the specific events leading up to the issuance of the Order and Implementing Guidance include repeated displays of overt animosity toward transgender service members. The Order itself accuses transgender people of lacking the "honesty," "humility," "integrity," "honor[]," "truthful[ness]," and "discipline[]" needed for military service, and the Implementing Guidance repeats those accusations. 90 Fed. Rep. 8757 §§ 1–2. The Order expressly incorporates the definitions from the Gender Ideology Order, which purports to entirely eradicate the legal recognition of transgender people from every aspect of federal law and policy. *See id.* § 3.

Fourth, the Order and Implementing Guidance were issued in a rushed and highly unusual manner that reflects multiple departures from the normal procedural sequence for adoption of military policies. *See* Supp. Skelly Decl. ¶¶ 16–18; 2d Supp. Wagner Decl. ¶¶ 10–12. The Order was issued a week after President Trump took office and was preceded by no apparent study. The implementing Guidance was issued 30 days later in a similarly rushed manner that involved no evident effort to study in any meaningful way the record of open service by transgender service members during the years the Austin Policy was in effect. Even the rollout of this Implementing Guidance had to be almost immediately "clarify[ied]." *See* ECF No. 65. And, rather stunningly, a core direction of the Implementing Guidance, identifying the group subject to separation, remains

subject to forthcoming instruction. *See* FAQ at 2 ("The Department will provide supplemental guidance which will address the identification of Service members diagnosed with gender dysphoria."). In these respects, the Order and Implementing Guidance stand in stark contrast from the Carter and Austin policies, which were preceded by extensive factfinding, study by military professionals, and orderly implementation. *See* Wagner Decl. ¶¶ 9–27; Bourcicot Decl. ¶¶ 12–23.

In short, the record demonstrates that the Order and Implementing Guidance were motivated at least in part by purposeful discrimination against transgender individuals. That discriminatory purpose is woven throughout the record before the Court and appears at every stage of the process that led to the adoption of the challenged policy. Indeed, the purpose to discriminate is stated on the face of the Order and Implementing Guidance, which declare that transgender people cannot be sufficiently honest, humble, disciplined, or honorable to be worthy of military service. For this additional reason, the Order and Implementing Guidance subject to intermediate scrutiny under the equal protection component of the Fifth Amendment.

### D.    The Order and Guidance Cannot Survive Any Level of Review.

#### 1.    *Deference to Military Judgment Does Not Shield a Facially Discriminatory Policy from Heightened Scrutiny.*

The government is not "free to disregard the Constitution when it acts in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981); *see also Singh v. Carter*, 168 F. Supp. 3d 216, 219 (D.D.C. 2016) (enjoining compelling Sikh service member to perform training in violation of his religion); *Calixto v. U.S. Dep't of the Army*, No. CV 18-1551 (PLF), 2021 WL 2253351, at *4 (D.D.C. June 3, 2021) ("The Army is not 'exempted from constitutional provisions that protect the rights of individuals.'" (quoting *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987))).

As Judge Wilkins's concurring opinion in *Doe 2* noted, "[i]n *Rostker*, the Court declined the Government's invitation to declare that rational basis scrutiny, rather than heightened scrutiny, necessarily applies to all military policies, even when the policy includes a facially discriminatory classification."  917 F.3d at 704.  Rather, the Court in *Rostker* held that the military's sex-based selective service registration could survive equal protection review even under intermediate scrutiny based on the then-existing exclusion of women from combat, which put men and women into dissimilar positions with respect to a potential draft.  453 U.S. at 77–79; *see also Frontiero v. Richardson*, 411 U.S. 677, 688–91 (1973) (plurality) (applying heightened scrutiny in equal protection sex-discrimination challenge to military benefits rules); *Owens v. Brown*, 455 F. Supp. 291, 305–09 (D.D.C. 1978) (invalidating ban on assignment of female service members and rejecting government's morale and discipline rationales where the ban's overbreadth belied asserted purpose of preserving combat effectiveness).  Because the Order facially discriminates based on sex, these holdings require the application of heightened scrutiny.

Although courts must be "appropriately deferential" in reviewing "the 'considered professional judgment' of 'appropriate military officials,'" *Doe 2 v. Shanahan*, 755 F. App'x at 25 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986)), they do not reflexively defer to government decisions simply because they relate to the military.   Rather, courts have recognized an obligation to credit the military's assessment of the importance of particular asserted interests that might not be considered important in civilian settings.  For example, in *Goldman*, the Court credited the importance of the military's asserted interest in the need for uniformity—a consideration with little relevance to civilian workplaces.  *See* 475 U.S. at 507.  But that deference to the importance of the government's asserted interest does not convert heightened scrutiny into mere rational basis review.  This District has explicitly rejected extending *Goldman* beyond the

context of Free Exercise challenges regarding military conduct regulations, explaining that "[a]lthough this Court is mindful of the Supreme Court's admonishment that the judiciary should give substantial deference to matters related to management of the military, such protection does not extend to practices that may subvert one's inalienable constitutional rights." *Adair*, 183 F. Supp. 2d at 52 (rejecting the "slippery slope" of extending *Goldman* to Equal Protection and Establishment Clause claims).

Most recently, in *Singh v. Berger*, the D.C. Circuit strongly affirmed that "the cost of military service has never entailed the complete surrender of all basic rights." 56 F.4th 88, 92 (D.C. Cir. 2022) (internal quotations committed). "When it acts in the area of military affairs, Congress remains subject to the limitations of the Due Process Clause." *Id*. (cleaned up) (quoting *Rostker*, 453 U.S. at 67). As the court explained, when an injunction "addresses military affairs, courts give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest. *Id*. at 95 (internal quotations omitted). However, that deference does not preclude requiring the military to show a sufficiently close connection between its asserted interest and the challenged policy. *Id*. at 99.

In *Singh*, the Court held that "even giving the widest berth" to the military's asserted in uniform grooming standards, its claimed compelling need for grooming uniformity did not stand up to the exception to boot camp grooming rules that the Corps has already created, which that seriously undermined the Corps' contention that it could brook no departures for Plaintiffs. *Id*.; *see also Doe 2*, 917 F.3d at 703 (Wilkins, J., concurring) (suggesting the result in *Goldman* would have been different if the policy "permit[ted] the wearing of any religious headgear except yarmulkes").

Plaintiffs do not question the military's interests in readiness, lethality, and unit cohesion.

- 48 -

Rather, they argue that there is no rational—much less substantial—relationship between advancing these interests and excluding transgender people from service. Like in *Singh*, the claim that transgender service members with gender dysphoria must be excluded to advance these interests conflicts with the military's individualized approach to all other medical conditions.

For all other conditions, the military evaluates service members based on actual performance ability, with no other condition triggering automatic discharge. *See* 2d Supp. Wagner Decl. ¶¶ 5–7. Additionally, transgender service members face unique restrictions unrelated to medication regulations, including limitations on facilities, housing, and pronoun use. Therefore, as in *Singh*, proper deference to military judgment does not eliminate the need for heightened scrutiny regarding the fit between the government's interests and its policy.

> 2.  *Defendants cannot meet their burden under heightened scrutiny and the challenged policy fails even rational basis review*

Under heightened review, the government must prove the Order and Implementation Guidance are substantially related to an exceedingly persuasive justification. *VMI*, 518 U.S. at 533. "The justification must be genuine, not hypothesized or invented post hoc in response to litigation," and cannot rely on "overbroad generalizations" about transgender people. *Id*. Even without heightened scrutiny, the Order and Implementation Guidance fail basic equal protection requirements—there must be a rational relationship between the classification and objective. *Cleburne v*, 473 U.S. at 442. The asserted justifications are so disconnected from the ban's broad sweep that they fail even this basic test.

Defendants claim barring military service by transgender people advances the same governmental interests that were asserted in support of the 2018 Mattis Plan: (1) promoting military readiness, based on purported concerns about the deployability of transgender troops; (2) promoting unit cohesion, based on concerns about maintaining sex-based standards; and

(3) lowering costs. *See* ECF No. 38 at 23–26, 28–31. None of these asserted justifications justifies singling out and disqualifying transgender people from service as Defendants have done.

### (a) The Ban does not promote military readiness.

Banning individuals from military service because they are transgender undermines military readiness. The military already has universal policies for enlistment, deployment, and retention. *See* DODi 6130.03, Vol. 1, at 2; Soper Decl. ¶ 22. Apart from transgender people, the military relies on these universal standards to determine fitness to serve; no other class of people is excluded from individualized evaluation under those standards or presumed to be unfit simply by virtue of their membership in a particular class. Because transgender service members must already comply with military-wide policies, having a separate policy that excludes them from service simply for being transgender serves only to bar transgender individuals who are fit to serve and to deploy.

First, all prospective service members undergo rigorous examination for preexisting physical or mental health conditions that might preclude enlistment. *See* DoD Instruction 6130.03 at 1.2(d); Supp. Brown Decl. ¶¶ 62–63. Ignoring this existing screening process, the Order and Implementing Guidance justify banning transgender people by claiming higher rates of suicidality and psychiatric diagnoses. Defendants' own review acknowledges that discrimination drives elevated suicidality in transgender people. Regardless, Defendants cannot justify singling out transgender people when the military already directly screens for these conditions. Anyone with suicidal behavior history—transgender or not—is barred from enlisting. *See* DODi 6130.03, Vol. 1, at 6.28(m). Anyone with anxiety or depression history—transgender or not—faces the same enlistment criteria. *See id.* at 5.29(f), (q); *see also* Supp. Wagner Decl. ¶¶ 2–7; 2d Supp. Wagner Decl. ¶¶ 4–7; Soper Decl. ¶ 20; Supp. Brown Decl. ¶ 63. Under these universal standards, all

enlistees are screened to ensure medical and mental health history meets service requirements. Defendants don't claim all transgender people share characteristics raising fitness concerns. Therefore, the ban only excludes qualified transgender applicants, impeding rather than advancing military readiness.

The irrationality of excluding fit applicants explains why the military does not categorically exclude other demographic groups with disproportionate rates of mental health conditions. Soper Decl. ¶¶ 19, 21. For example, children of service members have significantly elevated suicide attempt rates, Supp. Brown Decl. ¶¶ 60–61, yet aren't barred from service. Defendants' anomalous approach to transgender people strongly suggests animus rather than legitimate concerns. *Cf. Garrett*, 531 U.S. at 366 n.4 (noting that a policy should be struck down where its "justifications . . . made no sense in light of how the [government] treated other groups similarly situated in relevant respects").

The Order and Implementing Guidance irrationally cite deployability concerns to exclude even transgender individuals who have completed transition and require only the same routine hormone therapy many other service members receive. *See* Guidance §§ 4.3(c)(2), 4.4(a) (requiring separation based on "history" of gender dysphoria and denying waivers for anyone who has "attempted to transition"). This policy excludes medically stable and fit individuals who could meet the same accession criteria as other applicants. Highlighting this irrationality, the Implementing Guidance "designates" fully deployable transgender service members as nondeployable once "processed for separation." § 4.4(a)(3).

Second, the policy also irrationally creates a special rule requiring discharge of any service member with a "history" or "symptoms" of gender dysphoria rather than relying on medical retention standards that already apply to all service members. Under those existing standards, any

service member who develops a health condition that could result in unfitness must undergo a medical evaluation process, including review by a medical evaluation board. *See* DOD Instruction 1332.18 at § 3.2.a (purpose of medical evaluation board); § 3.3.a (purpose of physical evaluation board); § 5.2 (criteria for referral); *see also* Soper Decl. ¶ 13. That review determines whether there are restrictions on the person's ability to serve and may, where appropriate, result in discharge. *See id.* The Order and Implementing Guidance divert transgender service members from individualized review and subject them to automatic discharge. Nothing about gender dysphoria or its treatment justifies bypassing the ordinary medical evaluation process. Defendants don't claim that all transgender people requiring gender transition would fail individualized review. The policy's only effect is to discharge otherwise fit individuals—undermining, rather than advancing, military readiness.

In sum, singling out transgender people based on speculation that some may fail military standards is both dramatically overinclusive (excluding many fit to serve) and underinclusive (ignoring non-transgender people with medical needs causing nondeployment or increased health risks). Laws that are "grossly over- and under-inclusive" are "so poorly tailored" to legitimate interests that they "cannot survive heightened scrutiny." *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *see also Bostic v. Schaefer*, 760 F.3d 352, 382 (4th Cir. 2014) (rejecting justifications "so underinclusive" that they "must have rested on irrational prejudice" (cleaned up)). As the Second Circuit held in *Crawford v. Cushman*, military policies targeting conditions associated with specific groups—there, pregnant women—in such anomalous fashion fail even rational basis review: "Why the Marine Corps should choose, by means of the mandatory discharge of pregnant Marines, to insure its goals of mobility and readiness, but not to do so regarding other disabilities

- 52 -

equally destructive of its goals, is subject to no rational explanation." 531 F.2d 1114, 1123 (2d Cir. 1976).

### (b) Defendants' arguments about unit cohesion are circular and rest on impermissible gender stereotypes.

Defendants' claim that transgender service members are "[i]ncompatible with [s]ex-[b]ased [s]tandards" is meritless. 2018 Panel Report 35; *see* ECF No. 38 at 30. Plaintiffs do not challenge differing standards for men and women, and claiming transgender servicemembers are incompatible with "biologically-based" standards merely restates the discriminatory policy as justification. Plaintiffs simply seek equal treatment. Allowing transgender men to serve as men and transgender women as women does not disrupt sex-based standards where they exist. Under the Austin Policy, a service member's sex is determined by the DEERS marker. Changing this marker requires completed gender transition and commander approval based on "expected impacts on mission and readiness." This process ensures the military maintains appropriate sex-based standards for all service members, including transgender personnel.

Defendants' claim that transgender service members violate others' privacy rights, *see* ECF No. 38 at 29, has no merit, as demonstrated by experience under the Austin Policy. Arguing that transgender service members' mere presence violates privacy rights relies on the same impermissible gender stereotypes that make discrimination against transgender people "a form of discrimination on the basis of gender." *Doe 1*, 275 F. Supp. 3d at 209. Defendants' reliance on these stereotypes demonstrates why the Order and Implementing Guidance fail heightened scrutiny. Their argument essentially claims transgender people inherently undermine sex-based standards. If accepted, this reasoning would justify excluding transgender people from all

institutions with sex-based facility criteria—schools, workplaces, public accommodations—effectively banishing them from civic life entirely.

Courts have rejected the use of Defendants' privacy rationale to justify discrimination against transgender individuals in other settings. *See A.C. v. Metro.  Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Grimm*, 972 F.3d at 614; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018) ("[W]e decline to recognize . . . a right that would be violated by the presence of students [in restrooms or locker rooms] who do not share the same birth sex."); *Whitaker*, 858 F.3d at 1052 ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of . . . any other student who used the bathroom at the same time."), *cert. dismissed*, 138 S. Ct. 1260 (2018).[3]

As these courts have recognized, permitting transgender individuals to live in accord with their gender identity does not undermine the existence of sex-based activities or facilities, nor does it threaten the privacy or safety interests of others.  The same analysis applies here.  To the extent Defendants claim there is anything unique about the military justifying a departure from this established precedent, that argument is belied by the military's successful implementation of extensive guidance and training since the adoption of the Austin Policy.  With nearly 8 years of experience integrating transgender people into the service, it is notable that Defendants present no

---

[3] Such claimed privacy concerns are no more adequate to justify requiring transgender service members to serve in their birth sex than they would be to justify the exclusion of gay male service members from men's facilities or lesbian service members from women's facilities.  In either case, such a policy would violate equal protection by relying on a sex-based characteristic—sexual orientation or gender identity—to exclude individuals from the same facilities used by others. *See Bostock,* 590 U.S. at 660.  Rather than justifying the discrimination, the claimed privacy interest relies on irrational fears and stigmatizing stereotypes, falsely implying that gay or transgender individuals pose a threat to the safety or privacy of others.

evidence in support of their claims and rely instead on hypothetical rather than actual concerns. 2018 Panel Report 36-37.14; ECF No. 38 at 30.  Under the heightened scrutiny that applies to this case, such hypothetical justifications are insufficient to justify Defendants' policy.  *See VMI*, 518 U.S. at 533.  And "[t]o the extent this is a thinly-veiled reference to an assumption that other service members are biased against transgender people, this would not be a legitimate rationale for the challenged policy."  *Doe 1,* 275 F. Supp. 3d at 212 n.10 (citing *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")).

Defendants' arguments are similar to those rejected by the court in *Owens*.  In that case, the government sought to justify a law that barred Navy commanders from assigning female personnel to ships.  *Owens v. Brown*, 455 F. Supp. 291, 294–95 (D.D.C. 1978).  The government argued that permitting such assignments would undermine morale and discipline, citing "the unknown effects that full sexual integration might have on group dynamics."  *Id*. at 306.  The court rejected that justification as legally insufficient and granted summary judgment to the Plaintiffs: "Commanding Officers have sufficient authority to deal with persons having difficulty adjusting to mixed crews. . . .  Adjustments and thawing of previously held barriers to the presence of women and acceptance by the male ship's company are social facts of life which must be recognized and dealt with."  *Id*. at 309 (internal citation and marks omitted).  The court therefore concluded that "none of the practical concerns regarding the integration of male and female personnel afford a warrant for upholding the total exclusion reflected in [the challenged law]. Whatever problems might arise from integrating shipboard crews are matters that can be dealt with through appropriate training and planning."  *Id*.  The same analysis applies here.  Commanding officers have ample authority to deal with any persons having difficulty adjusting to transgender

service members, just as they have dealt with any such issues relating to the military's inclusion

of women, racial and religious groups, and gay people, and as they have already been doing with

respect to transgender service members under the Austin Policy.  In light of those realities,

Defendants' hypothetical concerns that transgender people undermine cohesion, order, or

discipline have no bases in fact; like those rejected in *Owens*, they are legally insufficient to justify

a policy that facially discriminates based on sex.

> **(c) Banning transgender people from military service cannot be justified based on cost.**

Since President Trump issued the Order on January 27, Defendants have not cited medical

costs as justification; however, in the February 26, 2025 Action Memo, they newly claim that "the

costs associated with their health care . . . make continued service by such individuals

incompatible with the Department's rigorous standards and national security imperative to deliver

a ready, deployable force."  Wardenski Decl. Ex. V.  Under heightened review, Defendants "must

do more than show that denying . . . medical care . . . saves money."  *Mem'l Hosp. v. Maricopa

Cnty.*, 415 U.S. 250, 263 (1974).  "The conservation of the taxpayers' purse is simply not a

sufficient state interest" to justify an equal protection violation under heightened scrutiny.  *Id.*; *see

also Graham v. Richardson*, 403 U.S. 365, 375 (1971).  Even under rational basis review, "a

concern for the preservation of resources standing alone can hardly justify the classification used

in allocating those resources."  *Plyler*, 457 U.S. at 227.  The government must justify why it chose

a particular group to bear the cost-saving burden.  *Id.* at 229; *see also Diaz v. Brewer*, 656 F.3d

1008, 1013 (9th Cir. 2011).

Defendants have not explained why the cost savings they seek should be borne by

transgender service members.  They have stipulated that the total cost of treating service members

for gender dysphoria represents "a small fraction of DoD's total medical budget."  ECF No. 66 at

2.  Former Deputy Undersecretary Skelly confirms that under the Austin Policy, no concerns were raised by the Assistant Secretary for Health Affairs or Defense Health Agency staff concerning the cost of treating transgender service members.  *See* Supp. Skelly Decl. ¶ 14; *see also* 2d Supp. Wagner Decl. ¶¶ 8–9.[4]  In short, Defendants have no sufficient cost-related justification for a policy banning transgender persons from military service or requiring the denial of medical care while current service members are processed for separation.  Their cost-savings argument does nothing more than attempt to "justify [their] classification with a concise expression of an intention to discriminate."  *Plyler*, 457 U.S. at 227.

## IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ESTOPPEL CLAIM

Estoppel bars Defendants from reversing course and discharging or denying accession to Plaintiffs based on their transgender status.  The D.C. Circuit has established that the "fundamental principle of equitable estoppel applies to government agencies, as well as private parties."  *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (quoting *Invs. Rsch. Corp. v. SEC*, 628 F.2d 168, 174 n.34 (D.C. Cir. 1980)).  For claims against the government, Plaintiffs must prove—beyond the traditional elements of equitable estoppel—that the government "behave[d] in ways that . . . will cause an egregiously unfair result."  *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017); *see also Keating v. FERC*, 569 F.3d 427, 434 (D.C. Cir. 2009); *see also Keating v. FERC*, 569 F.3d 427, 434 (D.C. Cir. 2009).  Here, where the government has failed to

---

[4] By way of comparison, for the 2025 Defense Health Program budget, DoD requested approximately $2.6 million for veterinary services alone.  Def. Health Program, U.S. Dep't of Def., *Fiscal Year (FY) 2025 President's Budget Operation and Maintenance Def. Health Program Justification Estimates* 53 (2024).  Since 2015, the Department has requested over $200 million for veterinary services as part yearly budgets. *See* Def. Health Program, U.S. Dep't of Def., *Fiscal Year (FY) 2015-2024 President's Budget Operation and Maintenance Def. Health Program Estimates* (2015-2025), available at https://comptroller.defense.gov/Budget-Materials/FY2025BudgetJustification/.  This is nearly four times the amount Defendants state was spent on providing medical care to transgender service members in that same time period. *See* ECF No. 66 at 2.

treat Plaintiffs with even the "minimum standard of decency, honor, and reliability," *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017), the case for estoppel is clear.

First, numerous DoD statements and policies since July 2015 assured Plaintiffs that they would be able to serve in the military as transgender, specifically, that they could serve in a sex different than their birth sex. *See, e.g., Genesis Health Ventures, Inc. v. Sebelius*, 798 F. Supp. 2d 170, 185 (D.D.C. 2011) (Medicare intermediary's verbal agreement, and its subsequent actions honoring that agreement, gave rise to detrimental reliance). These assurances began in 2015 when Secretary Carter elevated decision making for discharges of transgender troops to the level of Undersecretary Brad Carson and initiated a Working Group to evaluate the readiness implications of "welcoming transgender persons to serve." Wardenski Decl., ECF No. 13-10, Ex. G at 18. On June 30, 2016, Secretary Carter announced that the country's military would be best served by permitting transgender individuals to serve and declared that transgender individuals "can no longer be discharged or otherwise separated from the military just for being transgender." Wardenski Decl., ECF No. 13, Ex. A at 4. That initial announcement was followed by DTM 16-005, which set forth the policy "that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," and that, "[c]onsistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military," Wagner Decl., ECF No. 13, at Ex. B, and specifically set forth terms of how people could transition in service. Each of the military departments implemented DTM 16-005 in their respective service branches, and the DOD issued a comprehensive handbook providing guidance on the new policy to both military service members and commanders, reiterating the specific means by which a person could transition in service. Wardenski Decl., ECF No. 13, at Ex. B.

The Directive also ordered the Department of Defense to update its accession standards by July 1, 2017, so that no person would be disqualified solely based on transgender status, and setting forth that a person who transitioned and was stable in a different sex for 18 months who could meet service standards could enlist.  Wagner Decl., ECF No. 13, at Ex. B.  While Secretary Mattis, during the first Trump Administration, implemented a change in policy that disqualified individuals who "have undergone gender transition" from joining the military, even the Mattis Plan included a provision that created an exception to that ban for transgender individuals who had already transitioned in reliance on the prior policy.  Wardenski Decl., ECF No. 13, at Ex. G.

On January 25, 2021, President Biden issued Executive Order 14004, Enabling All Qualified Americans to Serve Their Country in Uniform, which repealed the prior Trump Administration's ban and set the status quo.  Wagner Decl., ECF No. 13, at ¶ 21.  President Biden stated that "it shall be the policy of the United States to ensure that all transgender individuals who wish to serve in the United States military and can meet appropriate standards shall be able to do so openly—free from discrimination."  Exec. Order No. 14,004, 86 F.R. 7471 at § 1.  Shortly thereafter, the DOD, under the direction of Secretary Austin, revised military policy to once again permit transgender troops to be able to serve on equal terms with others, including to be able to serve after going through gender transition.  Cisneros Decl. ¶¶ 8–11.  DoDI 6130.03, issued in March 2021, reflects that change.  Wardenski Decl., ECF No.13, at Ex. H.  DoDI 1300.28, issued in April 2021, details procedures by which transgender service members may transition while serving.  Wagner Decl., ECF No. 13, at Ex. D.

Second, Plaintiffs relied on these official policies to their detriment.  In accordance with DoDI 1300.28, which details procedures for service members to transition, change their DEERS markers, and continue in service in a different sex, Plaintiffs informed their commanding officers

of their transgender status and underwent transition. *See* Wagner Decl., ECF No. 13, at Ex. D at 9; *see also, e.g.*, Herrero Decl. ¶ 13 ("[M]y brigade commander approved my transition timeline, and I was cleared to begin hormone replacement therapy."); Cole Decl. ¶ 15 ("I notified my command that I was transgender, officially changed my name, and began the process of changing my gender marker in the Defense Enrollment Eligibility System (DEERS)."); Vandal Decl. ¶ 14 ("I informed my immediate chain of command and received nothing but support and acceptance from my command and others who learned I was transgender."); Supp. Danridge Decl. ¶ 5 ("My command supports my service and has assured me that, from their perspective, my being a transgender man will have no negative impact on my ability to continue serving.") Supp. Bettis Decl. ¶ 6 (same). Plaintiffs acted on the military's unequivocal assurance that they could transition and continue serving or enlist in service.

They now face administrative separation precisely because of the transitions they underwent with express military authorization. This constitutes a clear "adverse change in status," the definition of detrimental reliance. *Heckler v. Community Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 62 (1984). Not only did Plaintiffs rely on the military's representations that they could remain in service as transgender persons, but they are also now exposed under the challenged policy to grave harm, including the end of military careers, the loss of healthcare, and the harms associated with being subjected to administrative separation proceedings, where they relied on military assurances. *See, e.g., Powell v. Marsh*, 560 F. Supp. 636, 640 (D.D.C. 1983).

Third, such reliance was entirely reasonable. What the military promised transgender individuals like Plaintiffs was not a gratuitous favor casually bestowed, but an official commitment of equal treatment after a lengthy, highly deliberative, and public review process. *Cf. Moser v.*

*United States*, 341 U.S. 41, 46 (1951) (finding "justifiable reliance" where Plaintiff sought "guidance from the highest authority to which he could turn" and acted on reasonable belief).

Finally, the circumstances here amply demonstrate affirmative governmental misconduct that "will cause an egregiously unfair result." *Grumman Ohio Corp. v. Dole*, 776 F.2d 338, 347 (D.C. Cir. 1985) (quoting *Gen. Accounting Off. v. Gen. Accounting Off. Personnel Appeals Bd.*, 698 F.2d 516, 526 & n.57 (D.C. Cir. 1983)).  It is difficult to imagine anything more unfair than subjecting service members to administrative separation after assuring them they could take steps to transition that are now the basis for their dismissal.  As the Ninth Circuit held in *Watkins v. U.S. Army*, estoppel is appropriate where "the Army did not stand aside" while Plaintiff continued to serve in reliance of military policy, but "plainly acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting [Plaintiff]."  875 F.2d 699, 708 (9th Cir. 1989).  Similarly, courts have applied estoppel where the government provided "active misadvice," *Johnson v. Williford*, 682 F.2d 868, 872-73 (9th Cir. 1982), or where the affirmative misconduct of government officials precluded adverse action, *Corniel-Rodriguez v. INS*, 532 F.2d 301, 302 (2d Cir. 1976).  This Court should enjoin the ban because the military should be estopped from separating transgender service members who transitioned under military policies that explicitly authorized such medical care, making it fundamentally unjust to now cite their authorized medical treatment as grounds for administrative separation.  To withhold judicial relief in these exceptional circumstances would repudiate "elementary fairness" in favor of governmental "entrap[ment]." *Moser*, 341 U.S. at 47.

## V.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION

For the purposes of a preliminary injunction, harm is irreparable where it is "of such imminence that there is a clear and present need for equitable relief," and is "beyond remediation."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The Order and Implementing Guidance are already inflicting multiple harms on Plaintiffs, any one of which easily satisfies this standard.

The denial of Plaintiffs' constitutional equal protection rights is, itself, irreparable injury warranting preliminary relief.  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998); see also *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303.  The Order and Guidance impose an immediate and irreparable constitutional harm by branding Plaintiffs as less capable and worthy of enlisting or serving in the Armed Forces solely because of their transgender status. Such a "status-based enactment divorced from any factual context" violates the equal protection guarantee of the Constitution, which prohibits the government from labelling a group as "unequal to everyone else" based simply upon their status.  *Romer*, 517 U.S. at 635.

All currently serving Plaintiffs have been marked for administrative separation under the February 26, 2025 memorandum.  The Implementing Guidance precludes their referral to the Disability Evaluation System (DES), the evaluation system typically used to review how a medical condition impacts a service member's deployability and role.  Section 4.4(a)(1); 2d Supp. Cisneros Decl. at 5; Soper Decl. ¶ 13.  This designation itself constitutes irreparable harm as administrative separation is a process typically reserved for service members engaged in misconduct or failure to meet standards—not for treatable medical conditions that do not interfere with service.  Soper Decl. ¶ 16; 2d Supp. Cisneros Decl. at 5.  Unlike the Disability Evaluation System, administrative separation proceedings provide no opportunity to rebut allegations about how a medical condition would restrict deployability—which transgender status does not, and which Defendants are not

even claiming it does.  2d Supp. Cisneros Decl. ¶ 7.  Every Plaintiff faces this threat because they all have a current diagnosis or history of gender dysphoria and have either transitioned or are close to completing transition.  *See* ECF No. 63-1 at 3 ¶¶ 1.f–1.g.  None meets the requirements of the waiver provisions because they cannot serve in their birth sexes, nor can they demonstrate that they have never attempted to transition.  *See id.* at 6–7 ¶ 4.1.c; 8 ¶ 4.3.c; *see also, e.g.*, 2d Supp. Vandal Decl. ¶ 8; 2d Supp. Perelson Decl. ¶ 16; Supp. Cole Decl. ¶ 8; Supp. Graham Decl. ¶ 5.

Moreover, service members subjected to separation proceedings are deemed nondeployable while those proceedings are pending.  Section 4.4(a)(3).  The military has now stated that Plaintiffs will be placed on administrative leave during separation proceedings, FAQ at 1-2, preventing them from performing their duties and making it impossible to meet goals required for advancement and promotion.  One Plaintiff will be denied a Senate-confirmed position, Declaration of Michelle Bloomrose ¶ 8.  Another faces loss of a competitive post in Hill staff leadership Supp. Hash Decl. ¶¶ 6–8.  Being marked as "unfit" and "undisciplined" is directly interfering already with her opportunities in that position.  One Plaintiff has been denied graduation, Declaration of Samuel Ahearn Decl. ¶ 9, while another risks denial of an elite leadership position at a military academy.  Supp. Herrero Decl. ¶¶ 7–9.  Some Plaintiffs have had ship-off dates canceled or postponed indefinitely, Shishkina Decl. ¶ 12; McCallister Decl. ¶¶ 11–12, while others have been recalled from remote deployments in combat zones—putting them at physical risk, including because their colleagues have been told they are unfit to serve, Morgan Decl. ¶¶ 17–22.

Multiple courts have recognized that the mere initiation of separation proceedings in violation of constitutional rights constitutes irreparable injury warranting preliminary relief, even before those proceedings conclude.  *See, e.g.*, *Navy Seal 1 v. Austin*, 586 F. Supp. 3d 1180, 1203

(M.D. Fla. 2022) (plaintiff Marine who refused Covid-19 vaccine on religious grounds "face[d] immediate processing for separation or other punishment," and thus "irreparable harm will result absent injunctive relief"); *Schelske v. Austin*, 649 F. Supp. 3d 254, 275 (N.D. Texas 2022) (holding that existence of administrative military separation process and opportunity to seek waiver did not negate irreparability of threatened separation proceedings where outcome of proceedings is effectively predetermined); *see also Von Hoffburg v. Alexander*, 615 F.2d 633, 638 (5th Cir. 1980) (holding that military plaintiff need not exhaust administrative remedies to challenge discharge due to homosexual conduct where such remedies do not "provide a genuine opportunity for adequate relief").

The identification mechanism itself is causing immediate harm. The Implementation Guidance directs the Service Secretaries to "establish procedures and implement steps to identify Service members." Section 3.4(e). This identification began immediately upon issuance of the Implementation Guidance, causing such immediate havoc that the military had to issue a "clarification" prohibiting medical record reviews that violate service members' privacy. A later FAQ states that formal identification procedures are forthcoming. FAQ at 2. Yet simultaneously, service members on deployment have been recalled stateside Morgan Decl. ¶¶ 17–22, and others have had authorizations to serve consistent with their gender identity rescinded, Wolf Decl. ¶ 17; Supp. Bettis Decl. ¶ 4; Supp. Tyson Decl. ¶ 4, placing them in violation of standards which the Implementing Guidance directs they cannot violate. Section 4.2(a) (service members have a "responsibility" to meet standards). This mandatory yet vague identification process has already caused serious and extensive harms to Plaintiffs.

Plaintiffs face an impossible "Hobson's choice": voluntarily leave the career to which they have committed their lives or face certain administrative separation. This coerced choice itself

constitutes irreparable injury. For Plaintiffs, military service is far more than a job—it is a career and a calling to which they have, in many cases, devoted years of their lives. *See, e.g.*, Talbott Decl. ¶ 4; Vandal Decl. ¶ 1; Cole Decl. ¶ 1; Herrero Decl. ¶ 1; Danridge Decl. ¶ 1; Hash Decl. ¶ 1. Military service has long been one of the hallmarks of equal citizenship and full participation in the civic life of this country. *See, e.g.*, *Able v. United States*, 968 F. Supp. 850, 864 (E.D.N.Y. 1997) (listing military service as one of the "primary acts of public citizenship"). It is harmful and untenable to force them to either voluntarily leave or risk separation through inappropriate proceedings designed to address circumstances not presented by service members who are meeting their performance standards.

The military has already halted medical care for all transgender service members, cancelled all pending surgeries with none further to be authorized, and will not provide hormone therapy to anyone not already prescribed such treatment. This abrupt termination of medically necessary care exposes Plaintiffs to immediate health risks that cannot be remedied absent preliminary relief. *See, e.g.*, Bettis Decl. ¶¶ 10–12; Graham Decl. ¶¶ 7–10; Pickett Decl. ¶¶ 6–24; Sale Decl. ¶ 10; Tyson Decl. ¶¶ 7–12. Additionally, Plaintiffs and their families will lose medical and other benefits upon separation from the military. Loss of medical benefits alone may constitute irreparable harm, particularly when coupled with the financial stresses of seeking a new livelihood. *See Risteen v. Youth for Understanding, Inc.*, 245 F. Supp. 2d 1, 16 (D.D.C. 2002).

Finally, each day under this discriminatory ban irreparably damages the bonds of trust and unit cohesion essential to military service. Wagner Decl. ¶¶ 42, 47; Cisneros Decl. ¶¶ 26, 28; Bourcicot Decl. ¶ 31. The Order brands transgender service members as undermining "troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," eroding essential professional relationships that cannot be repaired even by prevailing at trial. A preliminary

injunction is urgently needed to prevent this irreversible harm.  *Cf. Log Cabin Republicans v. United States*, No. 04-08425, 2012 WL 12952732, at *2 (C.D. Cal. Mar. 15, 2012).

## VI.     THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

The balance of equities and public interest both favor an injunction.  The Court must "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief."  *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014). These factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Defendants will not suffer harm from a preliminary injunction.  It would merely preserve accessions and retention policies that have been in place for 4 years, with transgender people serving for nearly 10 years.  *See Jubilant DraxImage Inc. v. U.S. Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 125 (D.D.C. 2019) ("The primary purpose of a preliminary injunction is to preserve the status quo.").

The public interest also favors an injunction.   Despite military deference, "Military interests do not always trump other considerations."  *Doe 2*, 755 F. App'x at 24.  A "bare invocation of 'national defense' simply cannot defeat every motion for preliminary injunction that touches on the military."  *Doe 1*, 275 F. Supp. 3d at 217.  Since the Executive Orders are likely unconstitutional, enjoining them serves the public interest.  *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).

Conversely, as explained more fully in Section V above, the ban would severely harm Plaintiffs by ending careers built over years, damaging reputations, preventing necessary medical care, and interfering with hard-earned leadership posts and career advancement.

The ban would also degrade military readiness and unit cohesion by causing the loss of qualified personnel and their valuable skills.  Skelly Decl. ¶¶ 20–26; Wagner Decl. ¶¶ 38–46; Cisneros Decl. ¶¶ 23–29; Bourcicot Decl. ¶¶ 29–34.  It would waste resources invested in training. Cisneros Decl. ¶ 24.  Moreover, suddenly reversing established policy toward a minority group would erode service members' trust in command.  Wagner Decl. ¶¶ 43–45; Cisneros Decl. ¶¶ 26– 27.  This trust is essential to unit cohesion and military effectiveness.  Bourcicot Decl. ¶ 31; Wagner Decl. ¶ 45.

## VII.    FACIAL INJUNCTIVE RELIEF IS NECESSARY TO PREVENT IRREPARABLE HARM TO PLAINTIFFS

Facial injunctive relief is the only way to ensure Plaintiffs do not continue to suffer irreparable harm.

This Court has "broad discretion" in tailoring injunctive remedies.  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998).  This includes authority to issue facial injunctions.  *Whitman-Walker Clinic*, 485 F. Supp. 3d at 61.  Both this Circuit and Court routinely recognize the necessity of such relief when government action is facially unconstitutional.  *See, e.g.*, *Nat. Mining Ass'n*, 145 F.3d at 1409.

That this case involves a military policy heightens the need for facial relief.  Every federal court to consider the President's first attempt to ban military service by transgender people enjoined that policy in all its applications,[5] and the D.C. Circuit declined to stay this Court's injunction as to non-plaintiffs.  *Doe 1 v. Trump*, No. 17-5267, 2017 U.S. App. LEXIS 26477, at

---

[5] *Doe 1 v. Trump*, No. 17-1597 (CKK), 2017 U.S. Dist. LEXIS 211561, at *13 (D.D.C. Dec. 11, 2017); *Stone v. Trump*, 280 F. Supp. 3d 747, 757, 772 (D. Md. 2017); *Stockman v. Trump*, No. EDCV 17-1799 JGB (KKx), 2017 U.S. Dist. LEXIS 221323, at *51 (C.D. Cal. Dec. 22, 2017); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 U.S. Dist. LEXIS 203481, at *32–33 (W.D. Wash. Dec. 11, 2017).

*12 (D.C. Cir. Dec. 22, 2017); *see also Austin v. U.S. Navy SEALs 1–26*, 142 S. Ct. 1301 (2022) (Mem.) (confirming courts' authority to enjoin facially discriminatory military rules); *Roe v. U.S. Dep't of Defense*, the Fourth Circuit.  947 F.3d 207, 232 (4th Cir. 2020) (affirming a preliminary injunction prohibiting the Air Force from "an unexplained categorical policy, which effectively operated as a ban" on service by people with HIV); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 16 (D.D.C. 2004) (entering permanent injunction prohibiting the military from requiring anthrax vaccines).

Plaintiffs will continue to suffer irreparable injury unless this Court grants facial relief.  *See Doe 2 v. Trump*, 344 F. Supp. 3d 16, 23 (D.D.C. 2018) ("[I]n circumstances where a plaintiff is injured by a rule of broad applicability, a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." (internal quotation omitted)).

First, facial relief is "the only way" to protect Plaintiffs.  *Id.* at 25; *see U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49.  An injunction limited to named plaintiffs "would not provide Plaintiffs with any meaningful relief."  *Whitman-Walker Clinic*, 485 F. Supp. 3d at 62 (cleaned up).  When enjoining the previous transgender military ban, this Court noted that relief applied only to Plaintiffs would single them out "as an inherently inferior class of service members, allowed to continue serving only by the Court's limited order."  *Doe 2 v. Trump*, 344 F. Supp. 3d at 24.  Only enjoining the entire policy will prevent "the core class-based injury."  *See* ECF 63-1 at 5.

Second, a facial injunction is necessary to provide "systemwide relief" for the systemwide injuries caused by the ban.  *See id*. at 26.  "[T]he 'scope of injunctive relief is dictated by the extent of the violation established.'"  *Whitman-Walker Clinic*, 485 F. Supp. 3d at 62 (quoting *Califano*, 442 U.S. at 702); *cf. Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 178 (D.D.C. 2021) (finding facial injunction warranted for "nation's immigration policies"

to maintain a "uniform Rule").  Without facial relief, the President's Order would take effect at military stations worldwide—where Plaintiffs could be deployed anytime.  Enjoined the ban only for Plaintiffs, would subject them to a high risk of serving in a unit or under the command of leaders unprepared to serve alongside transgender troops.  That Defendants have already placed transgender troops on administrative leave rather than allowing them to continue serving in their current sex demonstrates why a partial remedy would be ineffective.  Protecting only the Plaintiffs while all other transgender troops face separation would inevitably mark Plaintiffs as exceptions who cannot meet standards—not as qualified service members protected from discriminatory standards.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a preliminary injunction preventing enforcement of the Order and Implementing Guidance in their entireties.

## REQUEST FOR RELIEF

For the foregoing reasons, this Court should issue an injunction prohibiting the exclusion of transgender people, including Plaintiffs, from military accessions and retention, or subjecting them to disparate terms of accessions or retention including ordering that:

(a) Defendants may not enforce or implement the challenged Executive Orders or Implementing Guidance or any other policies designed to carry out the directives in those orders to exclude or subject transgender service members, enlistees, and prospective enlistees to disparate terms, including without limitation incorporating the definitions of sex in Executive Order 14168, Order § 2, in military policy;

(b) Defendants may not take any other action to (i) initiate or continue separation proceedings against current transgender service members for being transgender;

(ii) require transgender service members to adhere to facilities, grooming, housing, or other sex-specific standards associated with their birth sex; (iii) require transgender service members to use pronouns or honorifics associated with their birth sex; (iii) deny medical care to transgender service members for being transgender; (iv) delay or deny the enlistment or commissioning of prospective service members because they are transgender; or (v) place transgender service members on administrative leave for being transgender or for not conforming to standards associated with their birth sex;

(c) Any other relief as is just and proper to ensure that Plaintiffs and other transgender service members and enlistees are not subject to disparate terms of enlistment, commissioning, retention, service, promotion, or any other terms of military service.

DATED: March 4, 2025

Respectfully submitted,

*/s/ Joseph J. Wardenski*
Joseph J. Wardenski (D.C. Bar No. 995549)
joe@wardenskilaw.com
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Sara E. Kropf (D.C. Bar No. 48501)
sara@kmlawfirm.com
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

Inga S. Bernstein (*pro hac vice*)
ibernstein@zalkindlaw.com
ZALKIND DUNCAN AND BERNSTEIN LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: (617) 742-6020

Jennifer Levi (*pro hac vice*)
jlevi@glad.org
Mary L. Bonauto (*pro hac vice*)
mbonauto@glad.org
Michael Haley (*pro hac vice*)
mhaley@glad.org
Sarah Austin (*pro hac vice*)
saustin@glad.org
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Shannon P. Minter (*pro hac vice*)
sminter@nclrights.org
Amy Whelan (*pro hac vice*)
awhelan@nclrights.org
Christopher F. Stoll (*pro hac vice*)
cstoll@nclrights.org
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257