IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-00240 |
| ) | |
| UNITED STATES OF AMERICA *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**SUPPLEMENTAL DECLARATION OF YVETTE BOURCICOT**

I, Yvette Bourcicot, declare as follows:

1.  I have reviewed the February 26 memorandum implementing the executive order banning transgender people from serving in the military. It is apparent from my review that this memo is designed to make accession of transgender people virtually impossible and to entirely purge currently serving transgender personnel from the armed forces. It is also clear that the interest that the policy serves is entrenching invidious discrimination against a minority group, and not military readiness.

2.  I have reviewed the waiver provisions in sections 4.1. (accessions) and 4.3. (retention) in the February 26 memorandum.

3.  The accessions waiver provision in 4.1. is designed to exclude anyone who is transgender from being able to obtain a waiver. The vast majority of accessions candidates are entry-level and presenting themselves to be trained as warfighters. Therefore, they would be unable to support the claim required by section 4.1.c. that "there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities."

4.  Moreover, the policy is designed to exacerbate a candidate's gender dysphoria. Per

1

section 4.1.c., the waiver requires a transgender person to serve in their birth sex. To the extent any transgender person could obtain a waiver for accessions under 4.1.c, they would be required to suppresses who they are as a transgender person. In my experience, such a person will experience distress directly stemming from their attempt to serve in their birth sex despite having a gender identity different than their birth sex. This would make them susceptible to administrative separation as set forth in section 4.3.

5. Lastly, given the defendants' well-publicized animus towards transgender service members, it is extraordinarily unlikely that even if an accessions candidate were able to meet the onerous burdens imposed by the policy, that an approval authority would risk the personal and professional consequences of signing such a waiver. As a result, section 4.1 is effectively a ban on accessions for transgender people.

6. Similarly, section 4.3 is an effective ban on retention of transgender service members, no matter how honorable their service or essential their duties. The waiver provisions are a barrier for anyone with a gender dysphoria diagnosis who is receiving supportive treatment.

7. A transgender service member is only eligible to be considered for a waiver if they meet all of the following conditions: 1) they have been stable for 36 consecutive months in their birth sex without distress, 2) they have never attempted to transition their sex to align with their gender identity, and 3) they are willing to serve in their birth sex going forward. Given the previous policy which encouraged service members to work with their commands and medical providers to resolve their dysphoria with supportive treatment, no one can meet that standard. People who meet the first waiver condition are definitionally not transgender. Anyone stable in their birth sex for 36 consecutive months does not have gender dysphoria and is not covered by this policy. The second condition is equally problematic -- it is unlikely that anyone who received a gender dysphoria

diagnosis under the previous policy "never attempted" to experience inhabiting their gender identity. And the third requirement that a transgender service member must serve in their birth sex as a condition of a waiver is indeed no waiver – a waiver indicates the service will accept the service member's condition, rather than willfully ignoring and exacerbating it.

8. To the final point, the discussion above regarding accessions recruits' requirement to serve in their birth sex applies to retention cases as well. If a person has an accurate gender dysphoria diagnosis, they cannot live in their birth sex without experiencing the distressing symptoms of gender dysphoria. Treatment for gender dysphoria includes providing a transgender person the opportunity to express themselves consistent with their gender identity and not in their birth sex. Accordingly, there is no retention waiver that requires a transgender person to live in their birth sex that would not specifically contradict their treatment plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2025

_____
Yvette Bourcicot