**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-00240 |
| ) | |
| UNITED STATES OF AMERICA *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**SUPPLEMENTAL DECLARATION OF GEORGE BROWN, M.D.**

I, George R. Brown, M.D., declare as follows:

1. I understand that Plaintiffs submit me as an expert in two primary areas based on my clinical experience with transgender civilian and military members, work with the Department of Veterans Affairs, and knowledge of the scientific and other research about transgender persons: (1) the diagnosis and treatment of gender dysphoria; and (2) the application of military medical standards to transgender persons. My background, education, clinical experience, and research efforts are set forth in my previous declaration (ECF No. 32) and my *curriculum vitae* (ECF No. 32-1).

2. I submit this declaration to clarify statements attributed to me in the *Doe 2 v. Shanahan* opinion regarding the definition of transgender identity and to address the government's guidance about how to discharge transgender service members and the government's asserted justifications for doing so.

3. In my previous declarations, based on my extensive clinical experience and training in treating transgender patients, I defined transgender individuals as "people who have a gender identity that is different from the sex they were assigned at birth." This definition was quoted in the *Doe 2 v. Shanahan* opinion.

4. In the present case, again based on my extensive clinical experience and training in treating transgender patients, I offered a definition that a transgender person is someone who lives in a different sex than their birth sex or would if able to. These definitions are not different in substance as I explain below.

5. I wish to clarify that in my decades of extensive experience and training in treating transgender patients and engaging in medical research about transgender people, the

1

definition of transgender has always presumed that transgender individuals live—or would live if permitted—in accordance with their gender identity. The very core of being transgender necessarily involves a drive to align one's internal gender identity and one's lived experience. Just as a non-transgender person is naturally driven to live and interact with others consistently with their gender identity, so is a transgender person. It would be no easier for a transgender man to live as a woman than for a non-transgender man to live as a woman. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (noting that all "people strive for consistency between how they view themselves and how others react and respond to them" and describing the serious harms caused when transgender people are unable to live and be treated by others consistently with the sex with which they identify).

6. While I defined transgender individuals in terms of how one "identifies," rather than explicitly stating how one "lives," the concept of gender identity inherently encompasses behavioral and social aspects, including how a person experiences and expresses that identity and how they are seen by others as someone who is a man or a woman. The term "identify" was never meant to suggest that transgender status is merely an internal recognition that can be readily suppressed. This is no different than for the majority of people who "identify" as cisgender.

7. The opinion in *Doe 2 v. Shanahan* creates a false distinction between transgender individuals who "identify" differently from their birth sex and those who "live in accordance" with their gender identity. Such a distinction fundamentally misunderstands the nature of being transgender. *Id*.

8. Significant and growing research shows that gender identity has a biological foundation and that being transgender is an immutable characteristic. *See*, for example, C.E. Roselli, *Neurobiology of gender identity and sexual orientation*, J Neuroendocrinology 2018 July; 30(7); Fisher, A. D., Ristori, J., Morelli, G., & Maggi, M. (2018*). The molecular mechanisms of sexual orientation and gender identity*. Mol Cell Endocrinol, 467, 3–13; Fisher, A. D., & Cocchetti, C. (2020). *Biological basis of gender identity*. In *The Plasticity of Sex* (pp. 89–107); Saraswat, A., Weinand, J. D., & Safer, J. D. (2015). *Evidence supporting the biologic nature of gender identity*. Endocr Pract, 21(2), 199–204; Roselli, C. E. (2018). *Neurobiology of gender identity and sexual orientation*. J Neuroendocrinol, 30(7), e12562; Steensma, T. D., Kreukels, B. P., de Vries, A. L., & Cohen-Kettenis, P. T. (2013). *Gender identity development in adolescence*. Horm Behav, 64(2), 288–297; Savic, I., Garcia-Falgueras, A., & Swaab, D. F. (2010). *Sexual differentiation of the human brain in relation to gender identity and sexual orientation*. Prog Brain Res, 186, 41–62; Foreman, M., Hare, L., York, K., et al. (2019). *Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*. J Clin Endocrinol Metab, 104(2), 390–396; Polderman, T. J. C., Kreukels, B. P. C., Irwig, M. S., et al. (2018). *The Biological Contributions to Gender Identity and Gender Diversity: Bringing Data to the*

2

*Table*. Behav Genet, 48(2), 95–108; Kruijver, F. P., Zhou, J.-N., Pool, C. W., Hofman, M. A., Gooren, L., & Swaab, D. F. (2000). *Male-to-female transsexuals have neuron numbers in a limbic nucleus*. J Clin Endocrinol Metab, 85(5), 2034–2041; Garcia-Falgueras, A., & Swaab, D. F. (2008). *A sex difference in the hypothalamic uncinate nucleus: relationship to gender identity*. Brain, 131(Pt 12), 3132–3146; Zhou, J.-N., Hofman, M. A., Gooren, L. J. G., & Swaab, D. F. (1995). *A sex difference in the human brain and its relation to transsexuality*. Nature, 378, 68–70.

9. This is consistent with decades of clinical experience confirming that being transgender is deeply rooted and not susceptible to voluntary or coercive efforts to change. In the past, therapists and state officials used a variety of methods to try to change transgender identity, including involuntary confinement, aversion therapies, electroshock therapy, and medications. These methods caused severe harm to transgender individuals but did not change their gender identities. Based on contemporary medical science and practice, attempts to change a person's gender identity are unethical and harmful. For example, *see* Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). *Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults*. JAMA Psychiatry, 77(1); Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). *Stigma, mental health, and resilience in an online sample of the US transgender population*. American Journal of Public Health, 103(5), 943-951; D'Augelli, A. R., Grossman, A. H., & Starks, M. T. (2006). *Childhood gender atypicality, victimization, and PTSD among lesbian, gay, and bisexual youth*. Journal of Interpersonal Violence, 21(11), 1462-1482; Green, A. E., Price-Feeney, M., Dorison, S. H., & Pick, C. J. (2020). *Self-reported conversion efforts and suicidality among US LGBTQ youths and young adults*, 2018. American Journal of Public Health, 110(8), 1221- 1227.

10. Forcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions. *See* American Psychological Association, Resolution on Gender Identity Change Efforts (2021). Within the medical and psychological community, that discomfort when it rises to the level of clinically significant distress is called gender dysphoria. Gender dysphoria is a serious but treatable condition. The treatment includes enabling someone to go through gender transition, a process by which a transgender person goes from living in their birth sex to living in a different sex. *See* Boedecker A: *Adjunctive interventions: Supportive services for gender role transition*. In *Adult Transgender Care*, edited by Michael Kauth and Jillian Shipherd; Chapter 10, pp 161-174; Taylor and Francis, NY, 2018.

11. Of course, everyone initially lives in their birth sex. That is true by definition of it being a person's birth sex. But the fact that a transgender person initially lives in their birth sex does not make living in one's birth sex a characteristic associated with being transgender, nor does it mean that any significant number of transgender people could or would do so

3

if they had an option that did not jeopardize their employment, cause family rejection, or stigmatize them in ways that keep them from being able to support themselves or their family. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (describing how social and family rejection, economic pressures, and the threat of violence affects when and how transgender people transition and the harmful impact of these barriers to transition on their mental and physical wellbeing).

12. In addition, it is well-established throughout the medical community that practices that aim to suppress or change a person's gender identity are harmful and traumatizing. Such practices are referred to as "conversion therapy," "reparative therapy," or "gender identity change efforts" and are rejected by the medical and mental health community because of the harms they cause. *See*, *e.g.*, American Psychological Association, Resolution on Gender Identity Change Efforts (2021). Just as conversion or reparative therapy that strives to make gay people suppress their sexual orientation is harmful and traumatizing, so are efforts to make a transgender person live in their birth sex harmful and traumatizing and rejected by the medical and the mental health community. Many national and international professional healthcare organizations have publicly warned against the harmful effects of these practices, including the American Psychological Association, American Academy of Family Physicians, American Academy of Nursing, American Counseling Association, American Medical Association, and many others.

13. Therefore, when I stated that transgender individuals are those who "have a gender identity that is different from the sex they were assigned at birth," I was describing individuals who live—or would live if permitted—in accordance with that gender identity. I did not mean to suggest that there are transgender people who have a gender identity different than their birth sex who do not wish to be able to live consistent with their gender identity.

14. It is simply not accurate to suggest, as the *Doe 2* opinion does, that many transgender individuals comfortably live or serve in their birth sex. While some transgender individuals may do so due to external constraints like prejudice or discrimination, or because they are in a developmental process to understand and accept their gender identity, or because they do not have access to medical support for transition, or because they will lose jobs or families if they transition, this does not represent a sustainable situation. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146 (describing external restraints that prevent or delay transition for some transgender people and the harms caused by those external restraints).

15. To be clear, it can be difficult for a transgender person to understand and accept that they have a gender identity different than their birth sex. Some live in denial of their true identity, especially in late adolescence and early adulthood. Others do not embrace their

transgender identity for a variety of reasons. They may have family that might reject them or they may lose their job if others know that the person is transgender. But for transgender people, living in one's birth sex causes serious distress and being made to do so exacerbates that distress and can be disabling and traumatizing.

16. Based on my clinical experience with hundreds of transgender people who have served on active duty and on my extensive research and training in this specialized area of medicine, the medical and psychological understanding of what it means to be transgender has always encompassed both internal identity and its external manifestations. This is true in the same way that the medical and psychological understanding of sexual orientation includes aspects both of a person's identity – that internalized sense of how someone feels being a gay person – as well as the external manifestation of that identity which includes being romantically or sexually intimate with someone of the same sex.

17. The *Doe 2* opinion's implication that many transgender individuals neither transition nor wish to transition also fails to recognize that people transition in different ways – whether through social transition, medications, surgeries, or combinations of those interventions. The determination of which modalities to use depends on an individualized medical assessment. Not all transgender individuals transition in the same way. That said, gender transition, steps a person takes to live in a different sex, is a crucial component of ameliorating gender dysphoria for transgender people. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146.

18. To clarify the discussion of statistics cited in the opinion: while some studies show varying percentages of transgender individuals who have undergone specific medical interventions, these statistics should not be misinterpreted to suggest that many transgender individuals have no desire to live in accordance with their gender identity. Social transition—changing one's name, pronouns, dress, documents, and other aspects associated with being able to live in a different sex—is often the most critical aspect of transition for many transgender individuals, whether or not a person pursues using medications or undergoing surgery as part of a prescribed transition plan. *See*, *e.g.*, David Mathew Doyle, *Transgender identity: Development, management and affirmation*, Current Opinion in Psychology 2022, 48:10146.

19. In addition, data about transgender individuals' desire to transition taken in the context of a person facing hostility, social opprobrium, or negative consequences if they transition, which would be the case for people serving in the military prior to 2016, should not be interpreted to mean that there are transgender people who do not wish to live consistent with their gender identity.

20. The suggestion that "transgender individuals can serve and are serving with distinction under the standards for their biological sex" means that there are transgender people who do not wish to live consistent with their gender identity misrepresents my testimony and the extensive clinical evidence regarding the psychological harm caused by forcing transgender individuals to deny who they are. What it means is that there are many transgender individuals who have the incredible fortitude and resilience to serve their country despite the unbearable societal pressures under which they live. I have observed that this resilience can last from weeks, to months, and occasionally to years, but rarely for the lifetime of an individual who identifies as transgender. It would be a distortion to use that fact to justify continued and further oppression of this group.

21. In conclusion, my definition of transgender has always encompassed individuals who live or would live in accordance with their gender identity if permitted to do so. To interpret my statements otherwise is to fundamentally misunderstand both my testimony and the medical consensus on what it means to be transgender.

22. I have read the document dated February 26, 2025, titled "Additional Guidance on Prioritizing Military Excellence and Readiness," including the attachment labeled "Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria."

23. This attachment sets forth a general policy requiring the separation of transgender service members and barring accession by transgender individuals.

24. With respect to the retention of current transgender service members, the attachment offers an apparent waiver in Section 4.3(c); however, its conditions prevent any transgender person from qualifying for exemption from administrative separation for the following reasons:

    - **No transgender person who has transitioned or taken any steps to transition is eligible.** Anyone disqualified under Section 4.3(b) for receiving gender transition treatment cannot qualify for a waiver because Section 4.3(c)(2) requires proof they "have never attempted to transition." This includes anyone who transitioned or took any steps to transition during service.

    - **No person accurately diagnosed with gender dysphoria is eligible.** Service members disqualified under Section 4.3(a) for having a gender dysphoria diagnosis cannot qualify because Section 4.3(c)(1) requires "36 consecutive months of stability in the service member's sex without clinically significant distress"—a medical impossibility since those diagnosed with gender dysphoria, by definition, have clinically significant distress. Therefore, no transgender person with an accurate gender dysphoria diagnosis could ever meet this requirement.

6

- **No transgender person forced to serve in their birth sex is eligible**. Similarly, Section 4.3(c)(3) requires service members to be "willing and able" to serve in their birth sex as a condition for waiver—which would cause gender dysphoria and clinical distress in a transgender person and subject them to discharge.

25. The only practical impact of the waiver would be to permit a person who was *inaccurately* diagnosed with gender dysphoria, or who transiently "displays symptoms consistent with gender dysphoria" but does not actually have gender dysphoria, to demonstrate that they are not in fact transgender or gender dysphoric.

26. I have read the document dated 2/26/2025 entitled: Action Memo from Tim Dill, which states that the policy requiring discharge of transgender service member was based on the following:

    (1) **SecDef Memorandum, "Military Service by Transgender Individuals," February 22, 2018**, which "conclude[d] that there are substantial risks associated with allowing accession and retention of individuals with a history or diagnosis of gender dysphoria… ."

    (2) **A 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity** which found that "rates of disability evaluation were estimated to be higher among [transgender] service members… . Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period."

    (3) **A 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs** that included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime,…[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts," "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of evidence on transgender mental health and gender-affirming care is low to moderate.

27. These three sources do not provide any legitimate medical basis for banning transgender people from military service.

28. The misconceptions and faulty analysis employed by the 2018 SecDef Memorandum are thoroughly explained in a 2018 report authored by former surgeons general of several branches, titled: "DoD's Rationale for Reinstating the Transgender Ban Is Contradicted by Evidence."

29. I have read that report and agree with its analysis and conclusions, including that the 2018 SecDef Memorandum is based largely on misconceptions about transgender healthcare, the application of double standards to transgender service members, and speculative concerns about potential problems with deployability. To the extent it relied on any data about actual transgender service members, the data showed no basis for concern.

30. I was an expert in the 2017 case challenging the Mattis Policy and, in that capacity, reviewed the underlying data regarding transgender service members discussed in the 2018 DecDef Memorandum, which was produced during that litigation and provided to me by the plaintiffs in that case. My career as an academic research psychiatrist, including conducting extensive research within the Department of Defense and the Department of Veterans Affairs for many years, enables me to critically assess research design, methodology, and outcomes.

31. As an initial matter, none of the data relates to service members who have completed transition and are enlisting for the first time—the group of people who meet the Open Service standards and began the process of enlisting on or after January 1, 2018. The data are exclusively from service members who were diagnosed with gender dysphoria while already serving, in some cases well before any guidance was provided by DOD for treatment. Again, this means that the data reflects a group of people who were serving in the shadows for months to years before they were allowed to serve openly.

32. Even with respect to these service members, the data is fundamentally flawed and presented in a grossly misleading manner. The study period for the data was for the 22-month period from October 1, 2015 to July 26, 2017. But Secretary Carter's Open Service Directive was not issued until June 30, 2016, and the military did not issue force-wide treatment protocols for gender dysphoria until October 1, 2016. As a result, for 12 out of the 22 months in the study, the service members were, with few exceptions, not serving openly and not receiving DOD-sanctioned treatments for gender dysphoria.

33. If the purpose of the study is to draw conclusions about the health of transgender service members under the Carter policy, it is fundamentally illegitimate to include data from before that policy went into effect and before those service members were allowed to receive health care under DOD guidelines to treat their gender dysphoria.

34. For example, the 2018 SecDef Memorandum cited data from the study for the proposition that transgender service members had an average of 28.1 mental health encounters over a 22-month period. *See id*. at 24. But it is impossible to determine whether these mental health encounters occurred before or after the Carter policy went into effect. If the utilization rate dropped once service members started receiving care for gender dysphoria, then the data would actually support the efficacy of the Carter policy.

8

35. The 2018 SecDef Memorandum also ignored the critical fact that service members were required to meet with mental health providers numerous times to document their gender dysphoria as a precondition for receiving health care for gender dysphoria, and for continued access to cross-sex hormones.  It is unknown how many of these "mental health" visits were mandated/required, as opposed to visits voluntarily requested by service members for mental health care.  As a result, without more specific data, there is no reason to conclude that mental health visits by transgender service members who are initiating transition-related care are a sign of co-morbid mental health conditions.  The report is quite misleading is this regard, as it implied that all mental health visits by transgender service members were initiated for the treatment of mental illnesses, when an unknown, but likely significant, percentage were actually administrative visits rather than mental health treatment visits.

36. Similarly, the 2018 SecDef Memorandum cited data from the study for the proposition that service members with gender dysphoria are "eight times more likely to attempt suicide than Service members as a whole." *Id*. at 12.  In fact, the underlying data refer to "suicidal ideation," not actual suicide attempts.  Moreover, with respect to suicidal ideation, the data does not reveal whether the suicidal ideation was reported before or after the service member was allowed to serve openly and receive treatment.  Given the fundamental flaws with the study methodology and the low number of observed events, the data presented on this, and other, mental health questions are not interpretable in any meaningful way.

37. The 2018 SecDef Memorandum distorts my own work by citing a study in which I documented that some transgender veterans who have received treatment after years of living in the shadows continue to have health disparities even after their gender dysphoria is resolved through treatment.  *See id*. at 21 n.60.  The veterans in my study were untreated veterans for a long period of time and survived—but did not thrive—while living an inauthentic life in the shadows on active duty.  Many of the transgender veterans included in this large study had never received treatment for gender dysphoria.  Clearly, the population group of transgender individuals in that study is not comparable to the population group of people who have already received medical care, resolved their gender dysphoria, and are coming to the military openly stating they are transgender.

38. In short, transgender individuals should be screened and evaluated for mental health conditions the same way every other person is screened and evaluated.  There is no medical basis for using a transgender individual's history of gender dysphoria as a proxy for other mental health conditions that they do not have.

39. The Action Memo's description of the 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity is highly selective and misleading.

40. The Action Memo omits the main findings of the 2021 review, which were: (1) "Transgender service members appear similar to the full military applicant pool in terms of the proportion with history of any pre-accession medical disqualification status as well as the distribution of specific medical disqualifications." (2) "Rates of adverse attrition and existing prior to service (EPTS) discharge among transgender service members were similar to the total force."

41. While it is true that "the rates of disability evaluation were estimated to be higher among TG service members," no negative conclusions can be drawn from that statistic for at least two reasons. First, research has found that transgender service members are likely to volunteer for and participate in high-risk combat activities and are therefore more likely to suffer combat-related injuries such as PTSD and traumatic brain injury than a matched cohort of cisgender Veterans (George R. Brown & Kenneth T. Jones, *Mental Health and Medical Health Disparities* in 5135 *Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study*, 3 LGBT Health 128 (2016)). The data in the 2021 review specifically show that transgender service members have the same distribution of psychiatric diagnoses as non-transgender service members. Accordingly, the top three diagnoses in the AMSARA report associated with medical separation were those associated with combat and other stressful military service: psychiatric conditions like PTSD and depression, musculoskeletal issues, and neuropsychiatric conditions such as traumatic brain injuries.

42. In addition, the review includes a period of time in which a transgender service member who was diagnosed with gender dysphoria could not receive medical care because they had not transitioned before the reliance exception in the Mattis Plan went into effect. It is not surprising that a disproportionate number of such individuals would have been recommended for discharge by the Disability Evaluation System.

43. In addition, the Action Memo misleadingly states that the "review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period." In fact, the relevant sentence from the review is focused on conveying the absence of significant concerns regarding deployability and states: "We estimate that fewer than 40% of the transgender service members identified as part of this study would have been deemed non-deployable due to mental health reasons at some time during the 24 months following initial diagnosis." That is, fewer than 40% were estimated to have been non-deployable *at any time* during that 24-month period. By taking that statement out of context and paraphrasing it in a misleading way, the Action Memo falsely suggests that 40% of transgender service members were non-deployable for 24 months.

44. In addition, the review is clear that this data figure cannot be used to compare the deployability of transgender and non-transgender service members, stating: **"Importantly, data were not available from non-transgender service members that**

10

**could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-depolyability rate."** *Id*. Therefore, it is not reported whether or not the transgender service members with a gender dysphoria-related diagnosis were more likely or less likely to have any period of nondeployability compared to matched cisgender service members.

45. Notably, the review *was* able to meaningfully compare retention and deployability data from the cohort of transgender service members with data from a cohort of presumably cisgender service members diagnosed with depression. The review found that transgender service members **"stayed in service longer, on average, than did the depression cohort"** and **"also had a greater proportion of members available for deployment than the depression cohort."**

46. Short periods of non-deployability are common for virtually all service members. There is nothing about the medical treatments received by transgender service members for gender dysphoria that would have any significant impact on their deployability. For example, the review noted that **transgender service members "with hormone therapy did not appear to differ meaningfully in their deployability from those without hormone therapy,"** underscoring that hormone therapy is not a significant impediment to deployability. *Id*.

47. In sum, nothing in the review supports banning accession or retention of transgender people. To the extent the data examined in the review permits meaningful comparisons between transgender and non-transgender service members, transgender service members stay in service longer and are more deployable than those with another much more common diagnosis (depression) which is not a *de facto* basis for discharge. In addition, the data show that the use of hormone therapy by transgender service members does not have any discernable impact on deployability. *Id*.

48. The military allows people with a history of other medical conditions to enlist and serve even when the condition is currently being managed by medication. Individuals with abnormal menstruation, dysmenorrhea, and endometriosis may enlist if their conditions are adequately managed through hormone medication. See DODI 6130.03, Enclosure 4 §§ 14(a), (d), (e). Individuals with Gastro-Esophageal Reflux Disease or high cholesterol may enlist if they are taking medication with no relevant side effects. *Id.* §§ 13(a), 25(i).

49. Military policy also allows service members to take a range of medications, including hormones, while deployed in combat settings. Access to medication is predictable, as "[t]he Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide." *See* M. Joycelyn Elders et al., *Medical Aspects of Transgender Military Service*, 41 Armed Forces & Soc'y 199, 207 (Aug. 2014) (the "Elders Commission Report").

50. Hormone therapy is neither too risky nor too complicated for military medical personnel to administer and monitor. The risks associated with use of cross-sex hormone therapy to treat gender dysphoria are low and not any higher than for the hormones that many non-transgender active-duty military personnel currently take. The medications do not have to be refrigerated, and alternatives to injectables are readily available, further simplifying treatment plans. Clinical monitoring for risks and effects is not complicated and, with training and/or access to consultations, can be, and is, performed by a variety of medical personnel in the DOD. This is the military services' current practice in support of the limited medical needs of their transgender troops in CONUS (Continental United States) and in deployment stations worldwide. Stable, transitioned troops require only yearly laboratory monitoring for cross-sex hormone treatment (which is consistent with the yearly, routine laboratory health screenings that all active-duty troops receive).

51. The 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs likewise provides no support for banning transgender people from military service.

52. The review found that '[r]esearch findings consistently show..........the benefits of gender-affirming care." *Id*. at 1.

53. That conclusion is consistent with an extremely broad consensus within the medical community that the treatments for gender dysphoria are well-established, safe, and effective. Seventy years of clinical experience and data have demonstrated the efficacy of treatment for the distress resulting from gender dysphoria. *See*, for example, the multi-country, long-term follow up study: Tim C. van de Grift et al., *Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study*, 79 Psychosomatic Med. 815 (Sept. 2017).

54. It is true that the strength of the evidence on the efficacy of that care is "low to moderate" on one type of scale used in evidence-based medical studies that grade studies in a hierarchy, if such studies are possible to conduct on a given condition. However, it is also true that many other types of standard healthcare is delivered daily in a routine fashion in spite of the inherent limitations of the research currently available. Based on this GRADE scale (the authors do not cite what type of grading system they are using in the AMSARA report and attached Tabs) only randomized, double-blind placebo controlled studies are considered "high" quality evidence. *See* Linan Zeng, Romina Brignardello-Petersen, Monica Hultcrantz, Reed A.C. Siemieniuk, Nancy Santesso, Gregory Traversy, Ariel Izcovich, Behnam Sadeghirad, Paul E. Alexander, Tahira Devji, Bram Rochwerg, Mohammad H. Murad, Rebecca Morgan, Robin Christensen, Holger J. Schünemann, Gordon H. Guyatt, GRADE guidelines 32: *GRADE offers guidance on choosing targets of GRADE certainty of evidence ratings*, Journal of Clinical Epidemiology, Volume 137, 2021, Pages 163-175. However, performing such studies is difficult or impossible for many types of healthcare. For example, one of the most

common surgical procedures performed in the United States is a tonsillectomy on minors, with over 530,000 cases completed a year, using multiple, competing surgical techniques. However, a review of the evidence base for this very common procedure, including when to apply it and the best surgical techniques to utilize, is not supported by "double blind" controlled studies in spite of the common use of this treatment over centuries. *See* Reginald F. Baugh et al., *Clinical Practice Guideline: Tonsillectomy in Children*, 144 Otolaryngology–Head and Neck Surgery S1 (2011)). Baugh and coauthors noted: "While there is a body of literature from which the guidelines were drawn, significant gaps remain in knowledge about preoperative, intraoperative, and postoperative care in children who undergo tonsillectomy." *Id.* at S22.

55. Similarly, acute appendicitis is one of the most common causes of acute abdominal pain in the United States. However, it remains unclear whether the common approach of appendectomy is superior to nonsurgical treatment with antibiotics in many patients. A Cochrane review of the evidence for this common procedure performed in DoD medical treatment facililties was inconclusive: "We could not conclude whether antibiotic treatment is or is not inferior to appendectomy. Because of the low to moderate quality of the trials, appendectomy remains the standard treatment for acute appendicitis." See Ingrid M. H.A. Wilms et al., *Appendectomy Versus Antibiotic Treatment for Acute Appendicitis,* Cochrane Database of Systematic Rev. (2011). In other words, the prevailing standard of care, in spite of the "low quality" of evidence in support of surgery over a nonsurgical alternative, remains the accepted standard. *See also* Brett Doleman et al, *Appendectomy versus antibiotic treatment for acute appendicitis*, Cochrane Database of Systematic Rev. (2024) (noting continued absence of high-quality evidence).

56. There is no valid basis for insisting that treatment for gender dysphoria—unlike treatment for virtually every other medical condition—be supported by "high" quality evidence, a standard that few if any medical conditions are required to (or could) meet.

57. The review found that while transgender individuals experience higher rates of suicidality than non-transgender people, that disparity is "driven by discrimination and minority stress," not any inherent pathology. As the review repeatedly states, the increased risk of suicidality is due to "discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization." *Id*. at 2.

58. The review also found: "Research demonstrates that suicide risk among transgender and gender-diverse (TGD) individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination." *Id*.

59. In addition, what is important from a military perspective is not whether a person has suicidal ideation but whether they can competently serve and be deployable. The

13

military's own research showed that transgender service members are more deployable than service members with depression, another condition associated with high rates of suicidality. *See* Analysis of Psychological Stability as a Factor in Determining Medical Accession Standards for Transgender Individuals (2021).

60. There is no medical basis for using a transgender person's history of gender dysphoria as a proxy for other medical conditions that the person does not actually have. This approach is akin to assuming non-transgender female applicants are, or should be considered, clinically depressed, as it is well known that depressive disorders are about twice as common in non-transgender females than in non-transgender males. *See* Paul R. Albert, *Why Is Depression More Prevalent in Women?* 40 J. of Psychiatry & Neuroscience 219-21 (2015). Women are twice as likely as men to have anxiety disorders, but the military does not bar women from military service. Research indicates that Black and Latino people are more likely to experience chronic, prolonged, and severely debilitating depression than white people (Rahn Kennedy Bailey et al, *Racial and ethnic differences in depression: current perspectives.* Neuropsychiatric Disease and Treatment, 019:15 603–609). One study of California school children shows that children of service members are more than 50 percent more likely to have attempted suicide than the general population. *See* Exhibit B, Vice Admiral Donald C. Arthur, USN (Ret.), Former Surgeon General of the U.S. Navy, et al., DoD's Rationale for Reinstating the Transgender Ban is Contradicted by Evidence, Palm Center (April 2018).

61. Despite these elevated risk factors, the military does not disqualify these groups from service because these statistical differences reflect population-level patterns influenced by social determinants of health, systemic factors, and access to care. They do not predict individual outcomes, as many people within these groups never develop mental health conditions, while others outside these groups do. If a transgender individual who seeks to enlist in the military has already transitioned, no longer experiences gender dysphoria, and has been screened for other mental health conditions (including depression, anxiety, and suicidal ideation) there is no valid reason to conclude that individual is at elevated risk of developing one of these comorbidities in the future.

62. For all non-transgender people, the military uses an individualized assessment of fitness. There is no reason to apply a different standard to transgender people than to all other groups.

63. There is no reason to use a person's transgender status as a proxy for depression, anxiety, or suicidal ideation because the military directly screens for those conditions. Anyone with a history of suicidal behavior—whether transgender or not—is categorically barred from enlisting. See DODI 6130.03, Enclosure 4 § 29(n). Anyone with a history of anxiety or depression—whether transgender or not—is barred from enlisting unless, inter alia, they have been stable and without medical treatment for 24 consecutive months or 36 consecutive months respectively. *See id.* §§ 29(f), (p). As a result, any transgender

14

      individual who actually has one of those conditions is already screened out without a need for a categorical ban.

64. Any argument that the costs of providing medical care to transgender service members justifies a ban is specious. The costs of the treatments used to treat gender dysphoria are far lower than for many other routinely provided mental health, medical and surgical treatments. For example a hospital workup of a person presenting to an emergency room with chest pain averaged over $32,000 in 2010 dollars (over $46,000 in 2025 dollars). Priest, V, Scuffham, P, Hachamovitch, R. et al. *Cost-Effectiveness of Coronary Computed Tomography and Cardiac Stress Imaging in the Emergency Department: A Decision Analytic Model Comparing Diagnostic Strategies for Chest Pain in Patients at Low Risk of Acute Coronary Syndromes*. J Am Coll Cardiol Img. 2011 May, 4 (5) 549–556. https://doi.org/10.1016/j.jcmg.2011.03.008. The health care dollars expended by DoD on transgender troops with gender dysphoria on an annual basis, considered as a fraction of the military's overall health care expenses, are de minimis.

65. In addition, the same medications (hormone therapies) and surgeries (mastectomies, hysterectomies, genital reconstruction) are provided to non-transgender service members, so any reliance on this factor would be based on bias toward transgender people, not on costs.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I declare under penalty of perjury that the foregoing is true and correct.

- Dated: March 3, 2025

_____
George R. Brown, MD, DFAPA

16