IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:25-cv-00240 (ACR) |
| ) | |
| DONALD J. TRUMP, in his official capacity as ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DECLARATION OF CARRIE N. BAKER, J.D., PH.D., IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**

I, Carrie N. Baker, J.D.. Ph.D., declare as follows:

1. I make this declaration based on my own personal knowledge.

**HISTORICAL PARALLELS BETWEEN MARRIAGE DEFINITION AND SEX DEFINITION LAWS**

2. As a scholar of legal history specializing in gender and sexuality, I observe a striking parallel between past efforts to legally define marriage to exclude same-sex couples and current attempts to legally define sex to exclude transgender people. A true and correct copy of my Curriculum Vitae is attached hereto as **Exhibit A.**

3. In response to legal cases and a political movement seeking the freedom to marry on behalf of same-sex couples, many states adopted definitions of marriage that purported to codify preexisting understandings but were expressly designed to exclude same-sex couples from legal recognition.

4. Between 1996 and 2012, Congress enacted the Defense of Marriage Act and 37 states enacted laws or constitutional amendments defining marriage, for all legal purposes, exclusively as the union of one man and one woman.

5. These legislative actions were often presented as merely codifying or preserving common-sense and historical understandings of marriage, not for a discriminatory purpose. But as many courts including ultimately the United States Supreme Court recognized, they were enacted to address a contemporary development—the emergence of a movement for marriage equality for same-sex couples—and for the purpose of excluding such couples from marriage.

6. As history readily shows, there is no single, unchanging legal definition of marriage. Rather, legal definitions of marriage have continuously evolved throughout American history. The Supreme Court invalidated prohibitions on interracial marriage in 1967 in *Loving v. Virginia*. Coverture doctrines that denied married women legal personhood gradually disappeared from American law through the late 19th and early 20th centuries. Divorce laws transformed from fault-based to no-fault systems beginning in the 1970s, fundamentally altering the legal meaning of marriage.

7. What proponents called "traditional" marriage when codified in contemporary laws was in fact a selective interpretation and definition designed specifically to exclude same-sex couples. Many states did not even formally define marriage until motivated to do so in order to exclude same-sex couples from marrying.

## MASSACHUSETTS AS AN ILLUSTRATIVE EXAMPLE

8. Massachusetts is typical of how many states historically regulated marriage. Prior to the debate about marriage equality for same-sex couples, Massachusetts did not affirmatively define

marriage in its statutes. Instead, its marriage laws simply established negative restraints on marriage based on age or consanguinity.

9. The same was true in many states that enacted definitions of marriage for the first time in response to the growing visibility of same-sex couples seeking the freedom to marry, which made it even more apparent that the purpose of adding a seemingly benign and neutral definition was in fact to exclude those couples.

10. Although presented as "neutral" definitions that simply described what marriage is as a matter of history and fact, these statutory definitions legally established facial classifications based on sexual orientation by limiting marriage only to different-sex couples.

11. Some people may not see the obvious facial classification created by laws limiting marriage to different-sex couples because of the ubiquitousness of that definition and because it is one that has been assumed throughout much of history. But, by definition, such a law facially distinguishes between different-sex and same-sex couples—i.e., facially draws a line based on sexual orientation. And as a matter of history, it is plain that such laws were enacted specifically to draw such a line in order to reserve marriage for heterosexual couples.

12. In some cases, states defending such laws argued to courts that these marriage laws did not discriminate based on sexual orientation because a gay man was free to marry a woman, and a lesbian woman was free to marry a man. As most courts recognized, however, that argument ignored the both the meaning of sexual orientation and the obvious real-world impact of restricting marriage to different-sex couples. *See, e.g., Latta v. Otter*, 771 F.3d 456, 467 (9th Cir. 2014) (rejecting argument that marriage ban discriminated based on "procreative capacity" rather than sexual orientation); *Baskin v. Bogan,* 12 F. Supp. 3d 1144, 1160 (S.D. Ind.), aff'd, 766 F.3d 648 (7th Cir. 2014) (rejecting argument that marriage ban did not discriminate against same-sex

couples "because they may marry just like opposite-sex couples may marry; the law merely impacts them differently"); *Rolando v. Fox*, 23 F. Supp. 3d 1227, 1232 (D. Mont. 2014) (rejecting argument that marriage ban was "facially neutral" law that had only "a disparate impact as applied to gays and lesbians"); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 962 (E.D. Mich. 2013) (rejecting argument that marriage ban did not discriminate because same-sex couples were not similarly situated to married couples).

### CURRENT PARALLELS IN SEX DEFINITION LAWS

13. Today, we are witnessing a similar "definitional backlash" as several states and now federal agencies are adopting legal definitions of sex that purport to simply reflect "common sense" definitions of sex but in fact are expressly adopted to exclude transgender people from recognition and protection. These definitions selectively emphasize certain biological characteristics while ignoring others and are implemented precisely to zero in on the key distinction between transgender and non-transgender people—which is that, unlike non-transgender people, transgender people live in a sex different than their birth sex.

14. Just as states and the federal government generally did not define marriage before doing so in order to exclude same-sex couples (while claiming to merely be codifying longstanding definitions), so neither states nor the federal government adopted statutory definitions of sex before doing so recently in order to exclude transgender people from legal protection or recognition.

15. The definition of sex in the Gender Ideology Executive Order is a clear example. By defining sex exclusively by reference to a person's reproductive capacity at birth, it creates a classification that entirely excludes transgender people.

- 5 -

16. Some people may not see the obvious facial classification created by a law that defines sex as determined at birth because of the ubiquitousness of that understanding and because it is one that has been assumed throughout much of history.

17. But, by definition, if a law defines a person's sex as fixed at birth, it excludes recognition of transgender people who live in a sex different than their birth sex.  Such a law facially classifies based on transgender status, just as a law that defines marriage as the union of a man and a woman classifies based on sexual orientation.

### HISTORICAL ABSENCE OF UNIVERSAL SEX DEFINITIONS

18. Historically, the general trajectory of our law has been to diminish the importance of sex as a legal category.  Today, whether an individual is male or female is no longer legally relevant to marriage, child custody, employment, education, professional licensure, elected office, voting or most other legal domains.

19. In the areas where sex continues to have legal relevance, such as sports and housing for incarcerated people, states and other relevant bodies such as sporting associations and state and federal prison bureaus have developed a variety of ways to accommodate transgender people. Similarly, many states allow transgender individuals to change their sex designation on birth certificates and other identification documents, recognizing that some people live in a sex different from their birth sex.

20. In the area of non-discrimination, courts have construed laws and policies that prohibit discrimination based on sex broadly to include discrimination based on societal expectations and norms associated with sex, not merely on a person's physical anatomy or biological characteristics. In this way, legal understandings of sex have shifted over time, particularly regarding women's legal status and rights.

21. Recent attempts to enact statutory definitions of sex represent a sharp break from this historical precedent and practice. In particular, the federal government's definition of sex in the Gender Ideology Executive Order in extremely narrow biological terms represents not a continuation of historical practice but rather a novel reaction to increasing social recognition of transgender individuals—just as marriage definition laws were reactions to increasing recognition of same-sex relationships.

22. Even where biology would be significant, as in medicine, its determination depends on context. A surgeon's understanding of sex could turn on a different set of factors than an endocrinologist's understanding or even a reproductive medicine doctor's understanding. There is no universally valid "scientific" definition of sex that would make sense or be useful in every medical or scientific context, much less in every legal context.

## CONCLUSION

23. In the case of the new federal definition of sex in the Gender Ideology Executive Order, the definition purports to preserve a traditional understanding while actually creating a new, restrictive definition. The definition selectively invokes certain biological concepts while ignoring others and is explicitly motivated by the desire to exclude transgender people from legal recognition.

24. Based on historical evidence and contemporary developments, I affirm that legally defining sex in narrow biological terms linking a person's sex to their birth sex follows a recognizable pattern of using selective definitions to restrict rights when marginalized groups gain social visibility and recognition.

25. Like the adoption of marriage definitions for the purpose of excluding same-sex couples, the definition of sex in the Gender Ideology Executive Order, on its face, excludes transgender

people from federal laws.  The definition ties a person's sex to their birth sex in a way that, like the marriage definitions referred to earlier, on its face and by design denies transgender people the law's protections.

- 8 -

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 26, 2025

_____
Carrie N. Baker