# EXHIBIT G



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

FEB 2 2 2018

MEMORANDUM FOR THE PRESIDENT

SUBJECT: Military Service by Transgender Individuals

"Transgender" is a term describing those persons whose gender identity differs from their biological sex. A subset of transgender persons diagnosed with gender dysphoria experience discomfort with their biological sex, resulting in significant distress or difficulty functioning. Persons diagnosed with gender dysphoria often seek to transition their gender through prescribed medical treatments intended to relieve the distress and impaired functioning associated with their diagnosis.

Prior to your election, the previous administration adopted a policy that allowed for the accession and retention in the Armed Forces of transgender persons who had a history or diagnosis of gender dysphoria. The policy also created a procedure by which such Service members could change their gender. This policy was a departure from decades-long military personnel policy. On June 30, 2017, before the new accession standards were set to take effect, I approved the recommendation of the Services to delay for an additional six months the implementation of these standards to evaluate more carefully their impact on readiness and lethality. To that end, I established a study group that included the representatives of the Service Secretaries and senior military officers, many with combat experience, to conduct the review.

While this review was ongoing, on August 25, 2017, you sent me and the Secretary of Homeland Security a memorandum expressing your concern that the previous administration's new policy "failed to identify a sufficient basis" for changing longstanding policy and that "further study is needed to ensure that continued implementation of last year's policy change would not have ... negative effects." You then directed the Department of Defense and the Department of Homeland Security to reinstate the preexisting policy concerning accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." You made clear that we could advise you "at any time, in writing, that a change to this policy is warranted."

I created a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders and directed them to consider this issue and develop policy proposals based on data, as well as their professional military judgment, that would enhance the readiness, lethality, and effectiveness of our military. This Panel included combat veterans to ensure that our military purpose remained the foremost consideration. I charged the Panel to provide its best military advice, based on increasing the lethality and readiness of America's armed forces, without regard to any external factors.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical

professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed available information on gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike previous reviews on military service by transgender individuals, the Panel's analysis was informed by the Department's own data obtained since the new policy began to take effect last year.

Based on the work of the Panel and the Department's best military judgment, the Department of Defense concludes that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender. Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all Service members, including transgender Service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.

The prior administration largely based its policy on a study prepared by the RAND National Defense Research Institute; however, that study contained significant shortcomings. It referred to limited and heavily caveated data to support its conclusions, glossed over the impacts of healthcare costs, readiness, and unit cohesion, and erroneously relied on the selective experiences of foreign militaries with different operational requirements than our own. In short, this policy issue has proven more complex than the prior administration or RAND assumed.

I firmly believe that compelling behavioral health reasons require the Department to proceed with caution before compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations. Preservation of unit cohesion, absolutely essential to military effectiveness and lethality, also reaffirms this conclusion.

Therefore, in light of the Panel's professional military judgment and my own professional judgment, the Department should adopt the following policies:

- Transgender persons with a history or diagnosis of gender dysphoria are disqualified from military service, except under the following limited circumstances: (1) if they have been stable for 36 consecutive months in their biological sex prior to accession; (2) Service members diagnosed with gender dysphoria after entering into service may be retained if they do not require a change of gender and remain deployable within applicable retention standards; and (3) currently serving Service members who have been diagnosed with gender dysphoria since the previous administration's policy took effect and prior to the effective date of this new policy, may continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria.

- Transgender persons who require or have undergone gender transition are disqualified from military service.

2

- Transgender persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, may serve, like all other Service members, in their biological sex.

I have consulted with the Secretary of Homeland Security, and she agrees with these proposed policies.

By its very nature, military service requires sacrifice. The men and women who serve voluntarily accept limitations on their personal liberties – freedom of speech, political activity, freedom of movement - in order to provide the military lethality and readiness necessary to ensure American citizens enjoy their personal freedoms to the fullest extent. Further, personal characteristics, including age, mental acuity, and physical fitness – among others – matter to field a lethal and ready force.

In my professional judgment, these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the survival and success of our Service members around the world. The attached report provided by the Under Secretary of Defense for Personnel and Readiness includes a detailed analysis of the factors and considerations forming the basis of the Department's policy proposals.

I therefore respectfully recommend you revoke your memorandum of August 25, 2017, regarding Military Service by Transgender Individuals, thus allowing me and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to implement appropriate policies concerning military service by transgender persons.

Attachment:
As stated

cc:
Secretary of Homeland Security

# DEPARTMENT OF DEFENSE REPORT AND RECOMMENDATIONS
## ON
## MILITARY SERVICE BY TRANSGENDER PERSONS



**FEBRUARY 2018**

## Table of Contents

**Executive Summary** ................................................................................................ 2

**History of Policies Concerning Transgender Persons** ......................................... 7

  Transgender Policy Prior to the Carter Policy .......................................................... 8

    A. Accession Medical Standards ................................................................................ 8

    B. Retention Standards ............................................................................................. 11

  The Carter Policy ...................................................................................................... 12

    A. Changes to the DSM ........................................................................................... 12

    B. The Department Begins Review of Transgender Policy ..................................... 13

    C. New Standards for Transgender Persons ............................................................ 14

      1. Retention Standards ......................................................................................... 14

      2. Accession Standards ........................................................................................ 15

**Panel of Experts Recommendation** .................................................................... 17

**Recommended Policy** ........................................................................................... 19

  Discussion of Standards ........................................................................................... 19

    A. Mental Health Standards ..................................................................................... 19

    B. Physical Health Standards ................................................................................... 27

    C. Sex-Based Standards ........................................................................................... 28

  New Transgender Policy ........................................................................................... 32

    A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex ........................................................................................................... 32

    B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified ............................................................................................................... 32

      1. Undermines Readiness .................................................................................... 32

      2. Incompatible with Sex-Based Standards ........................................................ 35

      3. Imposes Disproportionate Costs ..................................................................... 41

    C. Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances ........................................................... 41

      1. Accession of Individuals Diagnosed with Gender Dysphoria ........................ 42

      2. Retention of Service Members Diagnosed with Gender Dysphoria ............... 42

      3. Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria. ...................................................................................................... 42

**Conclusion** ........................................................................................................... 44

## Executive Summary

It is a bedrock principle of the Department of Defense that any eligible individual[1] who can meet the high standards for military service without special accommodations should be permitted to serve. This is no less true for transgender persons than for any other eligible individual. This report, and the recommendations contained herein, proceed from this fundamental premise.

The starting point for determining a person's qualifications for military duty is whether the person can meet the standards that govern the Armed Forces. Federal law requires that anyone entering into military service be "qualified, effective, and able-bodied."[2] Military standards are designed not only to ensure that this statutory requirement is satisfied but to ensure the overall military effectiveness and lethality of the Armed Forces.

The purpose of the Armed Forces is to fight and win the Nation's wars. No human endeavor is more physically, mentally, and emotionally demanding than the life and death struggle of battle. Because the stakes in war can be so high—both for the success and survival of individual units in the field and for the success and survival of the Nation—it is imperative that all Service members are physically and mentally able to execute their duties and responsibilities without fail, even while exposed to extreme danger, emotional stress, and harsh environments.

Although not all Service members will experience direct combat, standards that are applied universally across the Armed Forces must nevertheless account for the possibility that any Service member could be thrust into the crucible of battle at any time. As the Department has made clear to Congress, "[c]ore to maintaining a ready and capable military force is the understanding that each Service member is required to be available and qualified to perform assigned missions, including roles and functions outside of their occupation, in any setting."[3] Indeed, there are no occupations in the military that are exempt from deployment.[4] Moreover, while non-combat positions are vital to success in war, the physical and mental requirements for those positions should not be the barometer by which the physical and mental requirements for all positions, especially combat positions, are defined. Fitness for combat must be the metric against which all standards and requirements are judged. To give all Service members the best chance of success and survival in war, the Department must maintain the highest possible standards of physical and mental health and readiness across the force.

While individual health and readiness are critical to success in war, they are not the only measures of military effectiveness and lethality. A fighting unit is not a mere collection of individuals; it is a unique social organism that, when forged properly, can be far more powerful than the sum of its parts. Human experience over millennia—from the Spartans at Thermopylae to the band of brothers of the 101st Airborne Division in World War II, to Marine squads fighting building-to-building in Fallujah—teaches us this. Military effectiveness requires

---

[1] 10 U.S.C. §§ 504, 505(a), 12102(b).
[2] 10 U.S.C. § 505(a).
[3] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," pp. 8-9 (Apr. 2016).
[4] Id.

transforming a collection of individuals into a single fighting organism—merging multiple individual identities into one. This transformation requires many ingredients, including strong leadership, training, good order and discipline, and that most intangible, but vital, of ingredients—unit cohesion or, put another way, human bonding.

Because unit cohesion cannot be easily quantified, it is too often dismissed, especially by those who do not know what Justice Oliver Wendell Holmes called the "incommunicable experience of war."[5] But the experience of those who, as Holmes described, have been "touched with fire" in battle and the experience of those who have spent their lives studying it attest to the enduring, if indescribable, importance of this intangible ingredient. As Dr. Jonathan Shay articulated it in his study of combat trauma in Vietnam, "[s]urvival and success in combat often require soldiers to virtually read one another's minds, reflexively covering each other with as much care as they cover themselves, and going to one another's aid with little thought for safety."[6] Not only is unit cohesion essential to the health of the unit, Dr. Shay found that it was essential to the health of the individual soldier as well. "Destruction of unit cohesion," Dr. Shay concluded, "cannot be overemphasized as a reason why so many psychological injuries that might have healed spontaneously instead became chronic."[7]

Properly understood, therefore, military effectiveness and lethality are achieved through a combination of inputs that include individual health and readiness, strong leadership, effective training, good order and discipline, and unit cohesion. To achieve military effectiveness and lethality, properly designed military standards must foster these inputs. And, for the sake of efficiency, they should do so at the least possible cost to the taxpayer.

To the greatest extent possible, military standards—especially those relating to mental and physical health—should be based on scientifically valid and reliable evidence. Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members.

Not all standards, however, are capable of scientific validation or quantification. Instead, they are the product of professional military judgment acquired from hard-earned experience leading Service members in peace and war or otherwise arising from expertise in military affairs. Although necessarily subjective, this judgment is the best, if not only, way to assess the impact of any given military standard on the intangible ingredients of military effectiveness mentioned above—leadership, training, good order and discipline, and unit cohesion.

For decades, military standards relating to mental health, physical health, and the physiological differences between men and women operated to preclude from military service transgender persons who desired to live and work as the opposite gender.

---

[5] *The Essential Holmes: Selections from the Letters, Speeches, Judicial Opinions, and Other Writings of Oliver Wendell Holmes, Jr.*, p. 93 (Richard Posner, ed., University of Chicago Press 1992).
[6] Jonathan Shay, *Achilles in Vietnam*, p. 61 (Atheneum 1994).
[7] Id. at 198.

Relying on a report by an outside consultant, the RAND National Defense Research Institute, the Department, at the direction of Secretary Ashton Carter, reversed that longstanding policy in 2016. Although the new policy—the "Carter policy"—did not permit all transgender Service members to change their gender to align with their preferred gender identity, it did establish a process to do so for transgender Service members who were diagnosed with gender dysphoria—that is, the distress or impairment of functioning that is associated with incongruity between one's biological sex and gender identity. It also set in motion a new accession policy that would allow applicants who had a history of gender dysphoria, including those who had already transitioned genders, to enter into military service, provided that certain conditions were met. Once a change of gender is authorized, the person must be treated in all respects in accordance with the person's preferred gender, whether or not the person undergoes any hormone therapy or surgery, so long as a treatment plan has been approved by a military physician.

The new accession policy had not taken effect when the current administration came into office. Secretary James Mattis exercised his discretion and approved the recommendation of the Services to delay the Carter accession policy for an additional six months so that the Department could assess its impact on military effectiveness and lethality. While that review was ongoing, President Trump issued a memorandum to the Secretary of Defense and the Secretary of Homeland Security with respect to the U.S. Coast Guard expressing that further study was needed to examine the effects of the prior administration's policy change. The memorandum directed the Secretaries to reinstate the longstanding preexisting accession policy until such time that enough evidence existed to conclude that the Carter policy would not have negative effects on military effectiveness, lethality, unit cohesion, and military resources. The President also authorized the Secretary of Defense, in consultation with the Secretary of Homeland Security, to address the disposition of transgender individuals who were already serving in the military.

Secretary Mattis established a Panel of Experts that included senior uniformed and civilian leaders of the Department and U.S. Coast Guard, many with experience leading Service members in peace and war. The Panel made recommendations based on each Panel member's independent military judgment. Consistent with those recommendations, the Department, in consultation with the Department of Homeland Security, recommends the following policy to the President:

A.    <u>Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex.</u>  Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are qualified for service, provided that they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which transgender persons without a history or diagnosis of gender dysphoria must serve, like everyone else, in their biological sex.

B.    Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified. Except for those who are exempt under this policy, as described below, and except where waivers or exceptions to policy are otherwise authorized, transgender persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be ineligible for service. For reasons discussed at length in this report, the Department concludes that accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs. Underlying these conclusions is the considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery—interventions which are unique in psychiatry and medicine—remedy the multifaceted mental health problems associated with gender dysphoria.

C.    Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances. Transgender persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver or exception to policy as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1.    *Accession of Individuals Diagnosed with Gender Dysphoria.* Persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability (i.e., absence of gender dysphoria) immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex.

2.    *Retention of Service Members Diagnosed with Gender Dysphoria.* Consistent with the Department's general approach of applying less stringent standards to retention than to accession in order to preserve the Department's substantial investment in trained personnel, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[8]

3.    *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.* Transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary care,

---

[8] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences. This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order. The Service member must, however, adhere to the Carter policy procedures and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months). While the Department believes that its solemn promise to these Service members, and the investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy.

Although the precise number is unknown, the Department recognizes that many transgender persons who desire to serve in the military experience gender dysphoria and, as a result, could be disqualified under the recommended policy set forth in this report. Many transgender persons may also be unwilling to adhere to the standards associated with their biological sex as required by longstanding military policy. But others have served, and are serving, with distinction under the standards for their biological sex, like all other Service members. Nothing in this policy precludes service by transgender persons who do not have a history or diagnosis of gender dysphoria and are willing and able to meet all standards that apply to their biological sex.

Moreover, nothing in this policy should be viewed as reflecting poorly on transgender persons who suffer from gender dysphoria, or have had a history of gender dysphoria, and are accordingly disqualified from service. The vast majority of Americans from ages 17 to 24—that is, 71%—are ineligible to join the military without a waiver for mental, medical, or behavioral reasons.[9] Transgender persons with gender dysphoria are no less valued members of our Nation than all other categories of persons who are disqualified from military service. The Department honors all citizens who wish to dedicate, and perhaps even lay down, their lives in defense of the Nation, even when the Department, in the best interests of the military, must decline to grant their wish.

Military standards are high for a reason—the trauma of war, which all Service members must be prepared to face, demands physical, mental, and moral standards that will give all Service members the greatest chance to survive the ordeal with their bodies, minds, and moral character intact. The Department would be negligent to sacrifice those standards for any cause. There are serious differences of opinion on this issue, even among military professionals, but in the final analysis, given the uncertainty associated with the study and treatment of gender dysphoria, the competing interests involved, and the vital interests at stake—our Nation's defense and the success and survival of our Service members in war—the Department must proceed with caution.

---

[9] The Lewin Group, Inc., "Qualified Military Available (QMA) and Interested Youth: Final Technical Report," p. 26 (Sept. 2016).

## History of Policies Concerning Transgender Persons

For decades, military standards have precluded the accession and retention of certain transgender persons.[10] Accession standards—i.e., standards that govern induction into the Armed Forces—have historically disqualified persons with a history of "transsexualism." Also disqualified were persons who had undergone genital surgery or who had a history of major abnormalities or defects of the genitalia. These standards prevented transgender persons, especially those who had undergone a medical or surgical gender transition, from accessing into the military, unless a waiver was granted.

Although retention standards—i.e., standards that govern the retention and separation of persons already serving in the Armed Forces—did not require the mandatory processing for separation of transgender persons, it was a permissible basis for separation processing as a physical or mental condition not amounting to a disability. More typically, however, such Service members were processed for separation because they suffered from other associated medical conditions or comorbidities, such as depression, which were also a basis for separation processing.

At the direction of Secretary Carter, the Department made significant changes to these standards. These changes—i.e., the "Carter policy"—prohibit the separation of Service members on the basis of their gender identity and allow Service members who are diagnosed with gender dysphoria to transition to their preferred gender.

Transition-related treatment is highly individualized and could involve what is known as a "medical transition," which includes cross-sex hormone therapy, or a "surgical transition,"

---

[10] For purposes of this report, the Department uses the broad definition of "transgender" adopted by the RAND National Defense Institute in its study of transgender service: "an umbrella term used for individuals who have sexual identity or gender expression that differs from their assigned sex at birth." RAND National Defense Research Institute, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, p.75 (RAND Corporation 2016), available at https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/ RR1530/RAND_RR1530.pdf ("RAND Study"). According to the Human Rights Campaign, "[t]he transgender community is incredibly diverse. Some transgender people identify as male or female, and some identify as genderqueer, nonbinary, agender, or somewhere else on or outside of the spectrum of what we understand gender to be." Human Rights Campaign, "Understanding the Transgender Community," https://www.hrc.org/resources/ understanding-the-transgender-community (last visited Feb. 14, 2018). A subset of transgender persons are those who have been diagnosed with gender dysphoria. According to the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, "gender dysphoria" is a "marked incongruence between one's experienced/expressed gender and assigned gender" that "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 452-53 (5th ed. 2013). Based on these definitions, a person can be transgender without necessarily having gender dysphoria (i.e., the transgender person does not suffer "clinically significant distress or impairment" on account of gender incongruity). A 2016 survey of active duty Service members estimated that approximately 1% of the force—8,980 Service members— identify as transgender. Office of People Analytics, Department of Defense, "2016 Workplace and Gender Relations Survey of Active Duty Members, Transgender Service Members," pp. 1-2. Currently, there are 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016. In addition, when using the term "biological sex" or "sex," this report is referring to the definition of "sex" in the RAND study: "a person's biological status as male or female based on chromosomes, gonads, hormones, and genitals (intersex is a rare exception)." RAND Study at 75.

7

which includes sex reassignment surgery. Service members could also forego medical transition treatment altogether, retain all of their biological anatomy, and live as the opposite gender—this is called a "social transition."

Once the Service member's transition is complete, as determined by the member's military physician and commander in accordance with his or her individualized treatment plan, and the Service member provides legal documentation of gender change, the Carter policy allows for the Service member's gender marker to be changed in the DEERS. Thereafter, the Service member must be treated in every respect—including with respect to physical fitness standards; berthing, bathroom, and shower facilities; and uniform and grooming standards—in accordance with the Service member's preferred gender. The Carter policy, however, still requires transgender Service members who have not changed their gender marker in DEERS, including persons who identify as other than male or female, to meet the standards associated with their biological sex.

The Carter policy also allows accession of persons with gender dysphoria who can demonstrate stability in their preferred gender for at least 18 months. The accession policy did not take effect until required by court order, effective January 1, 2018.

The following discussion describes in greater detail the evolution of accession and retention standards pertaining to transgender persons.

Transgender Policy Prior to the Carter Policy

A.    Accession Medical Standards

DoD Instruction (DoDI) 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services*, establishes baseline accession medical standards used to determine an applicant's medical qualifications to enter military service. This instruction is reviewed every three to four years by the Accession Medical Standards Working Group (AMSWG), which includes medical and personnel subject matter experts from across the Department, its Military Services, and the U.S. Coast Guard. The AMSWG thoroughly reviews over 30 bodily systems and medical focus areas while carefully considering evidence-based clinical information, peer-reviewed scientific studies, scientific expert consensus, and the performance of existing standards in light of empirical data on attrition, deployment readiness, waivers, and disability rates. The AMSWG also considers inputs from non-government sources and evaluates the applicability of those inputs against the military's mission and operational environment, so that the Department and the Military Services can formally coordinate updates to these standards.

Accession medical standards are based on the operational needs of the Department and are designed to ensure that individuals are physically and psychologically "qualified, effective, and able-bodied persons"[11] capable of performing military duties. Military effectiveness requires that the Armed Forces manage an integrated set of unique medical standards and qualifications because all military personnel must be available for worldwide duty 24 hours a day without

---

[11] 10 U.S.C. § 505(a).

restriction or delay. Such duty may involve a wide range of demands, including exposure to danger or harsh environments, emotional stress, and the operation of dangerous, sensitive, or classified equipment. These duties are often in remote areas lacking immediate and comprehensive medical support. Such demands are not normally found in civilian occupations, and the military would be negligent in its responsibility if its military standards permitted admission of applicants with physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have.

In sum, these standards exist to ensure that persons who are under consideration for induction into military service are:

- free of contagious diseases that probably will endanger the health of other personnel;
- free of medical conditions or physical defects that may require excessive time lost from duty for necessary treatment or hospitalization, or probably will result in separation from service for medical unfitness;
- medically capable of satisfactorily completing required training;
- medically adaptable to the military environment without the necessity of geographical area limitations; and
- medically capable of performing duties without aggravation of existing physical defects or medical conditions.[12]

Establishing or modifying an accession standard is a risk management process by which a health condition is evaluated in terms of the probability and effect on the five listed outcomes above. These standards protect the applicant from harm that could result from the rigors of military duty and help ensure unit readiness by minimizing the risk that an applicant, once inducted into military service, will be unavailable for duty because of illness, injury, disease, or bad health.

Unless otherwise expressly provided, a current diagnosis or verified past medical history of a condition listed in DoDI 6130.03 is presumptively disqualifying.[13] Accession standards reflect the considered opinion of the Department's medical and personnel experts that an applicant with an identified condition should only be able to serve if they can qualify for a waiver. Waivers are generally only granted when the condition will not impact the individual's assigned specialty or when the skills of the individual are unique enough to warrant the additional risk. Waivers are not generally granted when the conditions of military service may aggravate the existing condition. For some conditions, applicants with a past medical history may nevertheless be eligible for accession if they meet the requirements for a certain period of "stability"—that is, they can demonstrate that the condition has been absent for a defined period

---

[12] Department of Defense Instruction 6130.03, *Medical Standards for Appointment, Enlistment, or Induction in the Military Services* (Apr. 28, 2010), incorporating Change 1, p. 2 (Sept. 13, 2011) ("DoDI 6130.03").
[13] Id. at 10.

of time prior to accession.[14]  With one exception,[15] each accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions.

Historically, mental health conditions have been a great concern because of the unique mental and emotional stresses of military service.  Mental health conditions frequently result in attrition during initial entry training and the first term of service and are routinely considered by in-service medical boards as a basis for separation.  Department mental health accession standards have typically aligned with the conditions identified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), which is published by the American Psychiatric Association (APA).  The DSM sets forth the descriptions, symptoms, and other criteria for diagnosing mental disorders.  Health care professionals in the United States and much of the world use the DSM as the authoritative guide to the diagnosis of mental disorders.

Prior to implementation of the Carter policy, the Department's accession standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[16]  These standards were consistent with DSM-III, which in 1980, introduced the diagnosis of transsexualism.[17]  In 1987, DSM-III-R added gender identity disorder, non-transsexual type.[18]  DSM-IV, which was published in 1994, combined these two diagnoses and called the resulting condition "gender identity disorder."[19]  Due to challenges associated with updating and publishing a new iteration of DoDI 6130.03, the DoDI's terminology has not changed to reflect the changes in the DSM, including further changes that will be discussed later.

DoDI 6130.03 also contains other disqualifying conditions that are associated with, but not unique to, transgender persons, especially those who have undertaken a medical or surgical transition to the opposite gender.  These include:

- a history of chest surgery, including but not limited to the surgical removal of the breasts,[20] and genital surgery, including but not limited to the surgical removal of the testicles;[21]

---

[14] See, e.g., id. at 47.

[15] The accession standards for applicants with HIV are not waivable absent a waiver from both the accessing Service and the Under Secretary of Defense for Personnel and Readiness.  See Department of Defense Instruction 6485.01, *Human Immunodeficiency Virus (HIV) in Military Service Members* (Jun. 7, 2013).

[16] DoDI 6130.03 at 48.

[17] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III)*, pp. 261-264 (3rd ed. 1980).

[18] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R)*, pp. 76-77 (3rd ed. revised 1987).

[19] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, pp. 532-538 (4th ed. 1994).

[20] DoDI 6130.03 at 18.

[21] Id. at 25-27.

- a history of major abnormalities or defects of the genitalia, including but not limited to change of sex, hermaphroditism, penis amputation, and pseudohermaphroditism;[22]
- mental health conditions such as suicidal ideation, depression, and anxiety disorder;[23] and
- the use of certain medications, or conditions requiring the use of medications, such as hormone therapies and anti-depressants.[24]

Together with a diagnosis of transsexualism, these conditions, which were repeatedly validated by the AMSWG, provided multiple grounds for the disqualification of transgender persons.

    B.    <u>Retention Standards</u>

The standards that govern the retention of Service members who are already serving in the military are generally less restrictive than the corresponding accession standards due to the investment the Department has made in the individual and their increased capability to contribute to mission accomplishment.

Also unlike the Department's accession standards, each Service develops and applies its own retention standards. With respect to the retention of transgender Service members, these Service-specific standards may have led to inconsistent outcomes across the Services, but as a practical matter, before the Carter policy, the Services generally separated Service members who desired to transition to another gender. During that time, there were no express policies allowing individuals to serve in their preferred gender rather than their biological sex.

Previous Department policy concerning the retention (administrative separation) of transgender persons was not clear or rigidly enforced. DoDI 1332.38, *Physical Disability Evaluation*, now cancelled, characterized "sexual gender and identity disorders" as a basis for allowing administrative separation for a condition not constituting a disability; it did not require mandatory processing for separation. A newer issuance, DoDI 1332.18, *Disability Evaluation System (DES)*, August 5, 2014, does not reference these disorders but instead reflects changes in how such medical conditions are characterized in contemporary medical practice.

Earlier versions of DoDI 1332.14, *Enlisted Administrative Separations*, contained a cross reference to the list of conditions not constituting a disability in former DoDI 1332.38. This was how "transsexualism," the older terminology, was used as a basis for administrative separation. Separation on this basis required formal counseling and an opportunity to address the issue, as well as a finding that the condition was interfering with the performance of duty. In practice, transgender persons were not usually processed for administrative separation on account of gender dysphoria or gender identity itself, but rather on account of medical comorbidities (e.g., depression or suicidal ideation) or misconduct due to cross dressing and related behavior.

---

[22] Id.
[23] Id. at 47–48.
[24] Id. at 48.

The Carter Policy

At the direction of Secretary Carter, the Department began formally reconsidering its accession and retention standards as they applied to transgender persons with gender dysphoria in 2015. This reevaluation, which culminated with the release of the Carter policy in 2016, was prompted in part by amendments to the DSM that appeared to change the diagnosis for gender identity disorder from a disorder to a treatable condition called gender dysphoria. Starting from the assumption that transgender persons are qualified for military service, the Department sought to identify and remove the obstacles to such service. This effort resulted in substantial changes to the Department's accession and retention standards to accommodate transgender persons with gender dysphoria who require treatment for transitioning to their preferred gender.

A.    Changes to the DSM

When the APA published the fifth edition of the DSM in May 2013, it changed "gender identity disorder" to "gender dysphoria" and designated it as a "condition"—a new diagnostic class applicable only to gender dysphoria—rather than a "disorder."[25] This change was intended to reflect the APA's conclusion that gender nonconformity alone—without accompanying distress or impairment of functioning—was not a mental disorder.[26] DSM-5 also decoupled the diagnosis for gender dysphoria from diagnoses for "sexual dysfunction and parphilic disorders, recognizing fundamental differences between these diagnoses."[27]

According to DSM-5, gender dysphoria in adolescents and adults is "[a] marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following":

- A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
- A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

---

[25] See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, pp. 451-459 (5th ed. 2013) ("DSM-5").

[26] RAND Study at 77; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (May 15, 2014), p. 1 ("This change was intended to reflect a consensus that gender nonconformity is not a psychiatric disorder, as it was previously categorized. However, since the condition may cause clinically significant distress and since a diagnosis is necessary for access to medical treatment, the new term was proposed."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, pp. 1182-83 (2016) ("In the DSM-5, [gender dysphoria] has replaced the diagnosis of 'gender identity disorder' in order to place the focus on the dysphoria and to diminish the pathology associated with identity incongruence.").

[27] Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (2016).

12

- A strong desire for the primary and/or secondary sex characteristics of the other gender.
- A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
- A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
- A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Importantly, DSM-5 observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[28]

B.    The Department Begins Review of Transgender Policy

On July 28, 2015, then Secretary Carter issued a memorandum announcing that no Service members would be involuntarily separated or denied reenlistment or continuation of service based on gender identity or a diagnosis of gender dysphoria without the personal approval of the Under Secretary of Defense for Personnel and Readiness.[29]  The memorandum also created the Transgender Service Review Working Group (TSRWG) "to study the policy and readiness implications of welcoming transgender persons to serve openly."[30]  The memorandum specifically directed the working group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[31]

As part of this review, the Department commissioned the RAND National Defense Research Institute to conduct a study to "(1) identify the health care needs of the transgender population, transgender Service members' potential health care utilization rates, and the costs associated with extending health care coverage for transition-related treatments; (2) assess the potential readiness impacts of allowing transgender Service members to serve openly; and (3) review the experiences of foreign militaries that permit transgender Service members to serve openly."[32]  The resulting report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, reached several conclusions.  First, the report estimated that there are between 1,320 and 6,630 transgender Service members already serving in the active component of the Armed Forces and 830 to 4,160 in the Selected Reserve.[33]  Second, the report predicted "annual gender transition-related health care to be an extremely small part of the overall health care provided to the [active component] population."[34]  Third, the report estimated that active component "health care costs will increase by between $2.4 million and $8.4 million annually— an amount that will have little impact on and represents an exceedingly small proportion of

---

[28] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, p. 453 (5th ed. 2013).
[29] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).
[30] Id.
[31] Id.
[32] RAND Study at 1.
[33] Id. at x-xi.
[34] Id. at xi.

[active component] health care expenditures (approximately $6 billion in FY 2014)."[35]  Fourth, the report "found that less than 0.0015 percent of the total available labor-years would be affected, based on estimated gender transition-related health care utilization rates."[36]  Finally, the report concluded that "[e]xisting data suggest a minimal impact on unit cohesion as a result of allowing transgender personnel to serve openly."[37]  "Overall," according to RAND, "our study found that the number of U.S. transgender Service members who are likely to seek transition-related care is so small that a change in policy will likely have a marginal impact on health care costs and the readiness of the force."[38]

The RAND report thus acknowledged that there will be an adverse impact on health care utilization and costs, readiness, and unit cohesion, but concluded nonetheless that the impact will be "negligible" and "marginal" because of the small estimated number of transgender Service members relative to the size of the active component of the Armed Forces.  Because of the RAND report's macro focus, however, it failed to analyze the impact at the micro level of allowing gender transition by individuals with gender dysphoria.  For example, as discussed in more detail later, the report did not examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy at the unit and sub-unit levels, all of which are critical to unit cohesion.  Nor did the report meaningfully address the significant mental health problems that accompany gender dysphoria—from high rates of comorbidities and psychiatric hospitalizations to high rates of suicide ideation and suicidality—and the scope of the scientific uncertainty regarding whether gender transition treatment fully remedies those problems.

C.      New Standards for Transgender Persons

Based on the RAND report, the work of the TSRWG, and the advice of the Service Secretaries, Secretary Carter approved the publication of DoDI 1300.28, *In-service Transition for Service Members Identifying as Transgender*, and Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," on June 30, 2016.  Although the new retention standards were effective immediately upon publication of the above memoranda, the accession standards were delayed until July 1, 2017, to allow time for training all Service members across the Armed Forces, including recruiters, Military Entrance Processing Station (MEPS) personnel, and basic training cadre, and to allow time for modifying facilities as necessary.

1.      *Retention Standards*.  DoDI 1300.28 establishes the procedures by which Service members who are diagnosed with gender dysphoria may administratively change their gender.  Once a Service member receives a gender dysphoria diagnosis from a military physician, the physician, in consultation with the Service member, must establish a treatment plan.  The treatment plan is highly individualized and may include cross-sex hormone therapy (i.e., medical transition), sex reassignment surgery (i.e., surgical transition), or simply living as the opposite gender but without any cross-sex hormone or surgical treatment (i.e., social

---

[35] Id. at xi-xii.
[36] Id. at xii.
[37] Id.
[38] Id. at 69.

transition). The nature of the treatment is left to the professional medical judgment of the treating physician and the individual situation of the transgender Service member. The Department does not require a Service member with gender dysphoria to undergo cross-sex hormone therapy, sex reassignment surgery, or any other physical changes to effectuate an administrative change of gender. During the course of treatment, commanders are authorized to grant exceptions from physical fitness, uniform and grooming, and other standards, as necessary and appropriate, to transitioning Service members. Once the treating physician determines that the treatment plan is complete, the Service member's commander approves, and the Service member produces legal documentation indicating change of gender (e.g., certified birth certificate, court order, or U.S. passport), the Service member may request a change of gender marker in DEERS. Once the DEERS gender marker is changed, the Service member is held to all standards associated with the member's transitioned gender, including uniform and grooming standards, body composition assessment, physical readiness testing, Military Personnel Drug Abuse Testing Program participation, and other military standards congruent to the member's gender. Indeed, the Service member must be treated in all respects in accordance with the member's transitioned gender, including with respect to berthing, bathroom, and shower facilities. Transgender Service members who do not meet the clinical criteria for gender dysphoria, by contrast, remain subject to the standards and requirements applicable to their biological sex.

2. *Accession Standards.* DTM 16-005 directed that the following medical standards for accession into the Military Services take effect on July 1, 2017:

(1)    A history of gender dysphoria is disqualifying, unless, as certified by a licensed medical provider, the applicant has been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

(2)    A history of medical treatment associated with gender transition is disqualifying, unless, as certified by a licensed medical provider:

    (a)    the applicant has completed all medical treatment associated with the applicant's gender transition; and

    (b)    the applicant has been stable in the preferred gender for 18 months; and

    (c)    if the applicant is presently receiving cross-sex hormone therapy post-gender transition, the individual has been stable on such hormones for 18 months.

(3)    A history of sex reassignment or genital reconstruction surgery is disqualifying, unless, as certified by a licensed medical provider:

    (a)    a period of 18 months has elapsed since the date of the most recent of any such surgery; and

(b)    no functional limitations or complications persist, nor is any additional surgery required.[39]

---

[39] Memorandum from Ashton Carter, Secretary of Defense, "Directive-type Memorandum (DTM) 16-005, 'Military Service of Transgender Service Members,'" Attachment, pp. 1-2 (June 30, 2016).

## Panel of Experts Recommendation

The Carter policy's accession standards for persons with a history of gender dysphoria were set to take effect on July 1, 2017, but on June 30, after consultation with the Secretaries and Chiefs of Staff of each Service, Secretary Mattis postponed the new standards for an additional six months "to evaluate more carefully the impact of such accessions on readiness and lethality."[40]  Secretary Mattis specifically directed that the review would "include all relevant considerations" and would last for five months, with a due date of December 1, 2017.[41]  The Secretary also expressed his desire to have "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department."[42]

While Secretary Mattis's review was ongoing, President Trump issued a memorandum, on August 25, 2017, directing the Secretary of Defense, and the Secretary of Homeland Security with respect to the U.S. Coast Guard, to reinstate longstanding policy generally barring the accession of transgender individuals "until such time as a sufficient basis exists upon which to conclude that terminating that policy and practice" would not "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."[43]  The President found that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."[44]  Accordingly, the President directed both Secretaries to maintain the prohibition on accession of transgender individuals "until such time as the Secretary of Defense, after consulting with the Secretary of Homeland Security, provides a recommendation to the contrary" that is convincing.[45]  The President made clear that the Secretaries may advise him "at any time, in writing, that a change to this policy is warranted."[46]  In addition, the President gave both Secretaries discretion to "determine how to address transgender individuals currently serving" in the military and made clear that no action be taken against them until a determination was made.[47]

On September 14, 2017, Secretary Mattis established a Panel of Experts to study, in a "comprehensive, holistic, and objective" manner, "military service by transgender individuals, focusing on military readiness, lethality, and unit cohesion, with due regard for budgetary constraints and consistent with applicable law."[48]  He directed the Panel to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."[49]

---

[40] Memorandum from James N. Mattis, Secretary of Defense, "Accession of Transgender Individuals into the Military Services" (June 30, 2017).
[41] Id.
[42] Id.
[43] Memorandum from Donald J. Trump, President of the United States, "Military Service by Transgender Individuals" (Aug. 25, 2017).
[44] Id. at 1.
[45] Id. at 2.
[46] Id.
[47] Id.
[48] Memorandum from James N. Mattis, Secretary of Defense, "Terms of Reference—Implementation of Presidential Memorandum on Military Service by Transgender Individuals," pp. 1-2 (Sept. 14, 2017).
[49] Id. at 2.

The Panel consisted of the Under Secretaries of the Military Departments (or officials performing their duties), the Armed Services' Vice Chiefs (including the Vice Commandant of the U.S. Coast Guard), and the Senior Enlisted Advisors, and was chaired by the Under Secretary of Defense for Personnel and Readiness or an official performing those duties. The Secretary of Defense selected these senior leaders because of their experience leading warfighters in war and peace or their expertise in military operational effectiveness. These senior leaders also have the statutory responsibility to organize, train, and equip military forces and are uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force. The Panel met 13 times over a span of 90 days.

The Panel received support from medical and personnel experts from across the Departments of Defense and Homeland Security. The Transgender Service Policy Working Group, comprised of medical and personnel experts from across the Department, developed policy recommendations and a proposed implementation plan for the Panel's consideration. The Medical and Personnel Executive Steering Committee, a standing group of the Surgeons General and Service Personnel Chiefs, led by Personnel and Readiness, provided the Panel with an analysis of accession standards, a multi-disciplinary review of relevant data, and information about medical treatment for gender dysphoria and gender transition-related medical care. These groups reported regularly to the Panel and responded to numerous queries for additional information and analysis to support the Panel's review and deliberations. A separate working group tasked with enhancing the lethality of our Armed Forces also provided a briefing to the Panel on their work relating to retention standards.

The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of individuals with gender dysphoria. The Panel also reviewed information and analyses about gender dysphoria, the treatment of gender dysphoria, and the effects of currently serving individuals with gender dysphoria on military effectiveness, unit cohesion, and resources. Unlike past reviews, the Panel's analysis was informed by the Department's own data and experience obtained since the Carter policy took effect.

To fulfill its mandate, the Panel addressed three questions:

- Should the Department of Defense access transgender individuals?
- Should the Department allow transgender individuals to transition gender while serving, and if so, what treatment should be authorized?
- How should the Department address transgender individuals who are currently serving?

After extensive review and deliberation, which included evidence in support of and against the Panel's recommendations, the Panel exercised its professional military judgment and made recommendations. The Department considered those recommendations and the information underlying them, as well as additional information within the Department, and now proposes the following policy consistent with those recommendations.

## Recommended Policy

To maximize military effectiveness and lethality, the Department, after consultation with and the concurrence of the Department of Homeland Security, recommends cancelling the Carter policy and, as explained below, adopting a new policy with respect to the accession and retention of transgender persons.

The Carter policy assumed that transgender persons were generally qualified for service and that their accession and retention would not negatively impact military effectiveness. As noted earlier, Secretary Carter directed the TSRWG, the group charged with evaluating, and making recommendations on, transgender service, to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective practical impediments are identified."[50] Where necessary, standards were adjusted or relaxed to accommodate service by transgender persons. The following analysis makes no assumptions but instead applies the relevant standards applicable to everyone to determine the extent to which transgender persons are qualified for military duty.

For the following reasons, the Department concludes that transgender persons should not be disqualified from service solely on account of their transgender status, provided that they, like all other Service members, are willing and able to adhere to all standards, including the standards associated with their biological sex. With respect to the subset of transgender persons who have been diagnosed with gender dysphoria, however, those persons are generally disqualified unless, depending on whether they are accessing or seeking retention, they can demonstrate stability for the prescribed period of time; they do not require, and have not undergone, a change of gender; and they are otherwise willing and able to meet all military standards, including those associated with their biological sex. In order to honor its commitment to current Service members diagnosed with gender dysphoria, those Service members who were diagnosed after the effective date of the Carter policy and before any new policy takes effect will not be subject to the policy recommended here.

Discussion of Standards

The standards most relevant to the issue of service by transgender persons fall into three categories: mental health standards, physical health standards, and sex-based standards. Based on these standards, the Department can assess the extent to which transgender persons are qualified for military service and, in light of that assessment, recommend appropriate policies.

A.    Mental Health Standards

Given the extreme rigors of military service and combat, maintaining high standards of mental health is essential to military effectiveness and lethality. The immense toll that the burden and experience of combat can have on the human psyche cannot be overstated. Therefore, putting individuals into battle, who might be at increased risk of psychological injury, would be reckless, not only for those individuals, but for the Service members who serve beside them as well.

---

[50] Memorandum from Ashton Carter, Secretary of Defense, "Transgender Service Members" (July 28, 2015).

The Department's experience with the mental health issues arising from our wars in Afghanistan and Iraq, including post-traumatic stress disorder (PTSD), only underscores the importance of maintaining high levels of mental health across the force. PTSD has reached as high as 2.8% of all active duty Service members, and in 2016, the number of active duty Service members with PTSD stood at 1.5%.[51] Of all Service members in the active component, 7.5% have been diagnosed with a mental health condition of some type.[52] The Department is mindful of these existing challenges and must exercise caution when considering changes to its mental health standards.

Most mental health conditions and disorders are automatically disqualifying for accession absent a waiver. For example, persons with a history of bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder (to name a few) are barred from entering into military service, unless a waiver is granted.[53] For a few conditions, however, persons may enter into service without a waiver if they can demonstrate stability for 24 to 36 continuous months preceding accession. Historically, a person is deemed stable if they are without treatment, symptoms, or behavior of a repeated nature that impaired social, school, or work efficiency for an extended period of several months. Such conditions include depressive disorder (stable for 36 continuous months) and anxiety disorder (stable for 24 continuous months).[54] Requiring a period of stability reduces, but does not eliminate, the likelihood that the individual's depression or anxiety will return.

Historically, conditions associated with transgender individuals have been automatically disqualifying absent a waiver. Before the changes directed by Secretary Carter, military mental health standards barred persons with a "[h]istory of psychosexual conditions, including but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias."[55] These standards, however, did not evolve with changing understanding of transgender mental health. Today, transsexualism is no longer considered by most mental health practitioners as a mental health condition. According to the APA, it is not a medical condition for persons to identify with a gender that is different from their biological sex.[56] Put simply, transgender status alone is not a condition.

Gender dysphoria, by contrast, is a mental health condition that can require substantial medical treatment. Many individuals who identify as transgender are diagnosed with gender dysphoria, but "[n]ot all transgender people suffer from gender dysphoria and that distinction," according to the APA, "is important to keep in mind."[57] The DSM-5 defines gender dysphoria as

---

[51] Deployment Health Clinical Center, "Mental Health Disorder Prevalence among Active Duty Service Members in the Military Health System, Fiscal Years 2005-2016" (Jan. 2017).
[52] Id.
[53] DoDI 6130.03 at 47-48.
[54] Id.
[55] Id. at 48.
[56] DSM-5 at 452-53.
[57] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018). Conversely, not all persons with gender dysphoria are transgender. "For example, some men who are disabled in combat, especially if their injury includes genital wounds, may feel that they are no longer men because their bodies do not conform to their concept of manliness. Similarly, a woman who opposes plastic surgery, but who must undergo mastectomy because of breast

a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration," that is manifested in various specified ways.[58]  According to the APA, the "condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."[59]

Transgender persons with gender dysphoria suffer from high rates of mental health conditions such as anxiety, depression, and substance use disorders.[60]  High rates of suicide ideation, attempts, and completion among people who are transgender are also well documented in the medical literature, with lifetime rates of suicide attempts reported to be as high as 41% (compared to 4.6% for the general population).[61]  According to a 2015 survey, the rate skyrockets to 57% for transgender individuals without a supportive family.[62]  The Department is concerned that the stresses of military life, including basic training, frequent moves, deployment to war zones and austere environments, and the relentless physical demands, will be additional contributors to suicide behavior in people with gender dysphoria.  In fact, there is recent evidence that military service can be a contributor to suicidal thoughts.[63]

Preliminary data of Service members with gender dysphoria reflect similar trends.  A review of the administrative data indicates that Service members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%).[64]

---

cancer, may find that she requires reconstructive breast surgery in order to resolve gender dysphoria arising from the incongruence between her body without breasts and her sense of herself as a woman."  M. Jocelyn Elders, George R. Brown, Eli Coleman, Thomas Kolditz & Alan Steinman, "Medical Aspects of Transgender Military Service," *Armed Forces & Society*, p. 5 n.22 (Mar. 2014).

[58] DSM-5 at 452.

[59] DSM-5 at 453.

[60] Cecilia Dhejne, Roy Van Vlerken, Gunter Heylens & Jon Arcelus, "Mental health and gender dysphoria:  A review of the literature," *International Review of Psychiatry*, Vol. 28, pp. 44-57 (2016); George R. Brown & Kenneth T. Jones, "Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration:  A Case-Control Study," *LGBT Health*, Vol. 3, p. 128 (Apr. 2016).

[61] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults:  Findings of the National Transgender Discrimination Survey*, p. 2 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf; H.G. Virupaksha, Daliboyina Muralidhar & Jayashree Ramakrishna, "Suicide and Suicide Behavior among Transgender Persons," *Indian Journal of Psychological Medicine*, Vol.38, pp. 505-09 (2016); Claire M. Peterson, Abigail Matthews, Emily Copps-Smith & Lee Ann Conard, "Suicidality, Self-Harm, and Body Dissatisfaction in Transgender Adolescents and Emerging Adults with Gender Dysphoria," *Suicide and Life Threatening Behavior*, Vol. 47, pp. 475-482 (Aug. 2017).

[62] Ann P. Haas, Philip L. Rodgers & Jody L. Herman, *Suicide Attempts among Transgender and Gender Non-Conforming Adults:  Findings of the National Transgender Discrimination Survey*, pp. 2, 12 (American Foundation for Suicide Prevention and The Williams Institute, University of California, Los Angeles, School of Law 2014), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf.

[63] Raymond P. Tucker, Rylan J. Testa, Mark A.Reger, Tracy L. Simpson, Jillian C. Shipherd, & Keren Lehavot, "Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans," *Suicide and Life Threatening Behavior* DOI: 10.1111/sltb.12432 (epub ahead of print), pp. 1-10 (2018); Craig J. Bryan, AnnaBelle O. Bryan, Bobbie N. Ray-Sannerud, Neysa Etienne & Chad E. Morrow, "Suicide attempts before joining the military increase risk for suicide attempts and severity of suicidal ideation among military personnel and veterans," *Comprehensive Psychiatry*, Vol. 55, pp. 534-541 (2014).

[64] Data retrieved from Military Health System data repository (Oct. 2017).

Service members with gender dysphoria are also nine times more likely to have mental health encounters than the Service member population as a whole (28.1 average encounters per Service member versus 2.7 average encounters per Service member).[65]  From October 1, 2015 to October 3, 2017, the 994 active duty Service members diagnosed with gender dysphoria accounted for 30,000 mental health visits.[66]

It is widely believed by mental health practitioners that gender dysphoria can be treated. Under commonly accepted standards of care, treatment for gender dysphoria can include: psychotherapy; social transition—also known as "real life experience"—to allow patients to live and work in their preferred gender without any hormone treatment or surgery; medical transition to align secondary sex characteristics with patients' preferred gender using cross-sex hormone therapy and hair removal; and surgical transition—also known as sex reassignment surgery—to make the physical body—both primary and secondary sex characteristics—resemble as closely as possible patients' preferred gender.[67]  The purpose of these treatment options is to alleviate the distress and impairment of gender dysphoria by seeking to bring patients' physical characteristics into alignment with their gender identity—that is, one's inner sense of one's own gender.[68]

Cross-sex hormone therapy is a common medical treatment associated with gender transition that may be commenced following a diagnosis of gender dysphoria.[69]  Treatment for women transitioning to men involves the administration of testosterone, whereas treatment for men transitioning to women requires the blocking of testosterone and the administration of estrogens.[70]  The Endocrine Society's clinical guidelines recommend laboratory bloodwork every 90 days for the first year of treatment to monitor hormone levels.[71]

As a treatment for gender dysphoria, sex reassignment surgery is "a unique intervention not only in psychiatry but in all of medicine."[72]  Under existing Department guidelines

---

[65] Data retrieved from Military Health System data repository (Oct. 2017).  Study period was Oct. 1, 2015 to July 26, 2017.

[66] Data retrieved from Military Health System data repository (Oct. 2017).

[67] RAND Study at 5-7, Appendices A & C; see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 1 (May 15, 2014) ("The full therapeutic approach to [gender dysphoria] consists of 3 elements or phases, typically in the following order:  (1) hormones of the desired gender; (2) real-life experience for 12 months in the desired role; and (3) surgery to change the genitalia and other sex characteristics (e.g., breast reconstruction or mastectomy).  However, not everyone with [gender dysphoria] needs or wants all elements of this triadic approach."); Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1183 (Oct. 2016) ("The Endocrine Society proposes a sequential approach in transsexual care to optimize mental health and physical outcomes.  Generally, they recommend initiation of psychotherapy, followed by cross-sex hormone treatments, then [sex reassignment surgery].").

[68] RAND Study at 73.

[69] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons:  An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[70] Id. at 3885-3888.

[71] Id.

[72] Ceclilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011); see also Hayes Directory, "Sex Reassignment Surgery for the Treatment of

implementing the Carter policy, men transitioning to women may obtain an orchiectomy (surgical removal of the testicles), a penectomy (surgical removal of the penis), a vaginoplasty (surgical creation of a vagina), a clitoroplasty (surgical creation of a clitoris), and a labiaplasty (surgical creation of the labia). Women transitioning to men may obtain a hysterectomy (surgical removal of the uterus), a mastectomy (surgical removal of the breasts), a metoidioplasty (surgical enlargement of the clitoris), a phalloplasty (surgical creation of a penis), a scrotoplasty (surgical creation of a scrotum) and placement of testicular prostheses, a urethroplasty (surgical enlargement of the urethra), and a vaginectomy (surgical removal of the vagina). In addition, the following cosmetic procedures may be provided at military treatment facilities as well: abdominoplasty, breast augmentation, blepharoplasty (eyelid lift), hair removal, face lift, facial bone reduction, hair transplantation, liposuction, reduction thyroid chondroplasty, rhinoplasty, and voice modification surgery.[73]

The estimated recovery time for each of the surgical procedures, even assuming no complications, can be substantial. For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to eight weeks; an orchiectomy is up to six weeks; and a vaginoplasty is up to three months.[74] When combined with 12 continuous months of hormone therapy, which is required prior to genital surgery,[75] the total time necessary for surgical transition can exceed a year.

Although relatively few people who are transgender undergo genital reassignment surgeries (2% of transgender men and 10% of transgender women), we have to consider that the rate of complications for these surgeries is significant, which could increase a transitioning Service member's unavailability.[76] Even according to the RAND study, 6% to 20% of those receiving vaginoplasty surgery experience complications, meaning that "between three and 11 Service members per year would experience a long-term disability from gender reassignment

---

Gender Dysphoria," p. 2 (May 15, 2014) (noting that gender dysphoria "does not readily fit traditional concepts of medical necessity since research to date has not established anatomical or physiological anomalies associated with [gender dysphoria]"); Hayes Annual Review, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria" (Apr. 18, 2017).

[73] Memorandum from Defense Health Agency, "Information Memorandum: Interim Defense Health Agency Procedures for Reviewing Requests for Waivers to Allow Supplemental Health Care Program Coverage of Sex Reassignment Surgical Procedures" (Nov. 13, 2017); see also RAND Study at Appendix C.

[74] University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[75] RAND Study at 80; see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

[76] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

surgery."[77]  The RAND study further notes that of those receiving phalloplasty surgery, as many as 25%—one in four—will have complications.[78]

The prevailing judgment of mental health practitioners is that gender dysphoria can be treated with the transition-related care described above.  While there are numerous studies of varying quality showing that this treatment can improve health outcomes for individuals with gender dysphoria, the available scientific evidence on the extent to which such treatments fully remedy all of the issues associated with gender dysphoria is unclear.  Nor do any of these studies account for the added stress of military life, deployments, and combat.

As recently as August 2016, the Centers for Medicare and Medicaid Services (CMS) conducted a comprehensive review of the relevant literature, over 500 articles, studies, and reports, to determine if there was "sufficient evidence to conclude that gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria."[79]  After reviewing the universe of literature regarding sex reassignment surgery, CMS identified 33 studies sufficiently rigorous to merit further review, and of those, "some were positive; others were negative."[80]  "Overall," according to CMS, "the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding . . . , small sample sizes, lack of validated assessment tools, and considerable [number of study subjects] lost to follow-up."[81]  With respect to whether sex reassignment surgery was "reasonable and necessary" for the treatment of gender dysphoria, CMS concluded that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."[82]

Importantly, CMS identified only six studies as potentially providing "useful information" on the effectiveness of sex reassignment surgery.  According to CRS, "the four best designed and conducted studies that assessed the quality of life before and after surgery using validated (albeit, non-specific) psychometric studies did not demonstrate clinically significant changes or differences in psychometric test results after [sex reassignment surgery]."[83]

---

[77] RAND Study at 40-41.

[78] Id. at 41.

[79] Tamara Jensen, Joseph Chin, James Rollins, Elizabeth Koller, Linda Gousis & Katherine Szarama, "Final Decision Memorandum on Gender Reassignment Surgery for Medicare Beneficiaries with Gender Dysphoria," Centers for Medicare & Medicaid Services, p. 9 (Aug. 30, 2016) ("CMS Report").

[80] Id. at 62.

[81] Id.

[82] Id. at 65.  CMS did not conclude that gender reassignment surgery can never be necessary and reasonable to treat gender dysphoria.  To the contrary, it made clear that Medicare insurers could make their own "determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances."  Id. at 66. Nevertheless, CMS did decline to require all Medicare insurers to cover sex reassignment surgeries because it found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria.

[83] Id. at 62.

24

Additional studies found that the "cumulative rates of requests for surgical reassignment reversal or change in legal status" were between 2.2% and 3.3%.[84]

A sixth study, which came out of Sweden, is one of the most robust because it is a "nationwide population-based, long-term follow-up of sex-reassigned transsexual persons."[85] The study found increased mortality and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group.[86] As described by CMS: "The mortality was primarily due to completed suicides (19.1-fold greater than in [the control group]), but death due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well. We note, mortality from this patient population did not become apparent until after 10 years. The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease (18%). The risk for attempted suicide was greater in male-to-female patients regardless of the gender of the control."[87]

According to the Hayes Directory, which conducted a review of 19 peer-reviewed studies on sex reassignment surgery, the "evidence suggests positive benefits," including "decreased [gender dysphoria], depression and anxiety, and increased [quality of life]," but "because of serious limitations," these findings "permit only weak conclusions."[88] It rated the quality of evidence as "very low" due to the numerous limitations in the studies and concluded that there is

---

[84] Id.

[85] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 6 (Feb. 2011); see also id. ("Strengths of this study include nationwide representativity over more than 30 years, extensive follow-up time, and minimal loss to follow-up. . . . Finally, whereas previous studies either lack a control group or use standardised mortality rates or standarised incidence rates as comparisons, we selected random population controls matched by birth year, and either birth or final sex.").

[86] Id. at 7; see also at 6 ("Mortality from suicide was strikingly high among sex-reassigned persons, also after adjustment for prior psychiatric morbidity. In line with this, sex-reassigned persons were at increased risk for suicide attempts. Previous reports suggest that transsexualism is a strong risk factor for suicide, also after sex reassignment, and our long-term findings support the need for continued psychiatric follow-up for persons at risk to prevent this. Inpatient care for psychiatric disorders was significantly more common among sex-reassigned persons than among matched controls, both before and after sex reassignment. It is generally accepted that transsexuals have more psychiatric ill-health than the general population prior to the sex reassignment. It should therefore come as no surprise that studies have found high rates of depression, and low quality of life, also after sex reassignment. Notably, however, in this study the increased risk for psychiatric hospitalization persisted even after adjusting for psychiatric hospitalization prior to sex reassignment. This suggests that even though sex reassignment alleviates gender dysphoria, there is a need to identify and treat co-occurring psychiatric morbidity in transsexual persons not only before but also after sex reassignment.").

[87] CMS Report at 62. It bears noting that the outcomes for mortality and suicide attempts differed "depending on when sex reassignment was performed: during the period 1973-1988 or 1989-2003." Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," *PLoS One*, Vol. 6, p. 5 (Feb. 2011). Even though both mortality and suicide attempts were greater for transsexual persons than the healthy control group across both time periods, this did not reach statistical significance during the 1989-2003 period. One possible explanation is that mortality rates for transsexual persons did not begin to diverge from the healthy control group until after 10 years of follow-up, in which case the expected increase in mortality would not have been observed for most of the persons receiving sex reassignment surgeries from 1989-2003. Another possible explanation is that treatment was of a higher quality from 1989-2003 than from 1973-1988.

[88] Hayes Directory, "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," p. 4 (May 15, 2014).

not sufficient "evidence to establish patient selection criteria for [sex reassignment surgery] to treat [gender dysphoria]."[89]

With respect to hormone therapy, the Hayes Directory examined 10 peer-reviewed studies and concluded that a "substantial number of studies of cross-sex hormone therapy each show some positive findings suggesting improvement in well-being after cross-sex hormone therapy."[90]  Yet again, it rated the quality of evidence as "very low" and found that the "evidence is insufficient to support patient selection criteria for hormone therapy to treat [gender dysphoria]."[91]  Importantly, the Hayes Directory also found: "Hormone therapy and subsequent [sex reassignment surgery] failed to bring overall mortality, suicide rates, or death from illicit drug use in [male-to-female] patients close to rates observed in the general male population.  It is possible that mortality is nevertheless reduced by these treatments, but that cannot be determined from the available evidence."[92]

In 2010, Mayo Clinic researchers conducted a comprehensive review of 28 studies on the use of cross-sex hormone therapy in sex reassignment and concluded that there was "very low quality evidence" showing that such therapy "likely improves gender dysphoria, psychological functioning and comorbidities, sexual function and overall quality of life."[93]  Not all of the studies showed positive results, but overall, after pooling the data from all of the studies, the researchers showed that 80% of patients reported improvement in gender dysphoria, 78% reported improvement in psychological symptoms, and 80% reported improvement in quality of life, after receiving hormone therapy.[94]  Importantly, however, "[s]uicide attempt rates decreased after sex reassignment but stayed higher than the normal population rate."[95]

The authors of the Swedish study discussed above reached similar conclusions: "This study found substantially higher rates of overall mortality, death from cardiovascular disease and suicide, suicide attempts, and psychiatric hospitali[z]ations in sex-reassigned transsexual individuals compared to a healthy control population.  This highlights that post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up.  Even though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons."[96]

Even the RAND study, which the Carter policy is based upon, confirmed that "[t]here have been no randomized controlled trials of the effectiveness of various forms of treatment, and

[89] Id. at 3.
[90] Hayes Directory, "Hormone Therapy for the Treatment of Gender Dysphoria," pp. 2, 4 (May 19, 2014).
[91] Id. at 4.
[92] Id. at 3.
[93] Mohammad Hassan Murad, Mohamed B. Elamin, Magaly Zumaeta Garcia, Rebecca J. Mullan, Ayman Murad, Patricia J. Erwin & Victor M. Montori, "Hormonal therapy and sex reassignment:  a systematic review and meta-analysis of qualify of life and psychosocial outcomes," *Clinical Endocrinology*, Vol. 72, p. 214 (2010).
[94] Id. at 216.
[95] Id.
[96] Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. Johansson, Niklas Långström & Mikael Landén, "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery:  Cohort Study in Sweden," *PLoS One*, Vol. 6, pp. 1-8 (Feb. 2011).

most evidence comes from retrospective studies."[97]  Although noting that "[m]ultiple observational studies have suggested significant and sometimes dramatic reductions in suicidality, suicide attempts, and suicides among transgender patients after receiving transition-related treatment," RAND made clear that "none of these studies were randomized controlled trials (the gold standard for determining treatment efficacy)."[98]  "In the absence of quality randomized trial evidence," RAND concluded, "it is difficult to fully assess the outcomes of treatment for [gender dysphoria]."[99]

Given the scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria, it is imperative that the Department proceed cautiously in setting accession and retention standards for persons with a diagnosis or history of gender dysphoria.

B.    Physical Health Standards

Not only is maintaining high standards of mental health critical to military effectiveness and lethality, maintaining high standards of physical health is as well.  Although technology has done much to ease the physical demands of combat in some military specialties, war very much remains a physically demanding endeavor.  Service members must therefore be physically prepared to endure the rigors and hardships of military service, including potentially combat.  They must be able to carry heavy equipment sometimes over long distances; they must be able to handle heavy machinery; they must be able to traverse harsh terrain or survive in ocean waters; they must be able to withstand oppressive heat, bitter cold, rain, sleet, and snow; they must be able to endure in unsanitary conditions, coupled with lack of privacy for basic bodily functions, sometimes with little sleep and sustenance; they must be able to carry their wounded comrades to safety; and they must be able to defend themselves against those who wish to kill them.

Above all, whether they serve on the frontlines or in relative safety in non-combat positions, every Service member is important to mission accomplishment and must be available to perform their duties globally whenever called upon.  The loss of personnel due to illness, disease, injury, or bad health diminishes military effectiveness and lethality.  The Department's physical health standards are therefore designed to minimize the odds that any given Service member will be unable to perform his or her duties in the future because of illness, disease, or injury.  As noted earlier, those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[100]  To access recruits with higher rates of anticipated unavailability for deployment thrusts a heavier burden on those who would deploy more often.

---

[97] RAND Study at 7.
[98] Id. at 10 (citing only to a California Department of Insurance report).
[99] Id.
[100] DoDI 6130.03 at 2.

Historically, absent a waiver, the Department has barred from accessing into the military anyone who had undergone chest or genital surgery (e.g., removal of the testicles or uterus) and anyone with a history of major abnormalities or defects of the chest or genitalia, including hermaphroditism and pseudohermaphroditism.[101] Persons with conditions requiring medications, such as anti-depressants and hormone treatment, were also disqualified from service, unless a waiver was granted.[102]

These standards have long applied uniformly to all persons, regardless of transgender status. The Carter policy, however, deviates from these uniform standards by exempting, under certain conditions, treatments associated with gender transition, such as sex reassignment surgery and cross-sex hormone therapy. For example, under the Carter policy, an applicant who has received genital reconstruction surgery may access without a waiver if a period of 18 months has elapsed since the date of the most recent surgery, no functional limitations or complications persist, and no additional surgery is required. In contrast, an applicant who received similar surgery following a traumatic injury is disqualified from military service without a waiver.[103] Similarly, under the Carter policy, an applicant who is presently receiving cross-sex hormone therapy post-gender transition may access without a waiver if the applicant has been stable on such hormones for 18 months. In contrast, an applicant taking synthetic hormones for the treatment of hypothyroidism is disqualified from military service without a waiver.[104]

## C.   Sex-Based Standards

Women have made invaluable contributions to the defense of the Nation throughout our history. These contributions have only grown more significant as the number of women in the Armed Forces has increased and as their roles have expanded. Today, women account for 17.6% of the force,[105] and now every position, including combat arms positions, is open to them.

The vast majority of military standards make no distinctions between men and women. Where biological differences between males and females are relevant, however, military standards do differentiate between them. The Supreme Court has acknowledged the lawfulness of sex-based standards that flow from legitimate biological differences between the sexes.[106] These sex-based standards ensure fairness, equity, and safety; satisfy reasonable expectations of privacy; reflect common practice in society; and promote core military values of dignity and respect between men and women—all of which promote good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality.

---

[101] Id. at 25-27.
[102] Id. at 46-48.
[103] Id. at 26-27.
[104] Id. at 41.
[105] Defense Manpower Data Center, Active and Reserve Master Files (Dec. 2017).
[106] For example, in *United States v. Virginia*, the Court noted approvingly that "[a]dmitting women to [the Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs." 518 U.S. 515, 550-51 n.19 (1996) (citing the statute that requires the same standards for women admitted to the service academies as for the men, "except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals").

28

For example, anatomical differences between males and females, and the reasonable expectations of privacy that flow from those differences, at least partly account for the laws and regulations that require separate berthing, bathroom, and shower facilities and different drug testing procedures for males and females.[107]  To maintain good order and discipline, Congress has even required by statute that the sleeping and latrine areas provided for "male" recruits be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training and that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits" to ensure "after-hours privacy for recruits during basic training."[108]

In addition, physiological differences between males and females account for the different physical fitness and body fat standards that apply to men and women.[109]  This ensures equity and fairness.  Likewise, those same physiological differences also account for the policies that regulate competition between men and women in military training and sports, such as boxing and combatives.[110]  This ensures protection from injury.

---

[107] See, e.g., Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017); Department of the Air Force, Air Force Instruction 32-6005, "Unaccompanied Housing Management," p. 35 (Jan 29., 2016); Department of the Army, Human Resources Command, AR 600-85, "Substance Abuse Program" (Dec. 28, 2012) ("Observers must . . . [b]e the same gender as the Soldier being observed.").

[108] See 10 U.S.C. § 4319 (Army), 10 U.S.C. § 6931 (Navy), and 10 U.S.C. § 9319 (Air Force) (requiring the sleeping and latrine areas provided for "male" recruits to be physically separated from the sleeping and latrine areas provided for "female" recruits during basic training); 10 U.S.C. § 4320 (Army), 10 U.S.C. § 6932 (Navy), and 10 U.S.C. § 9320 (Air Force) (requiring that access by drill sergeants and training personnel "after the end of the training day" be limited to persons of the "same sex as the recruits").

[109] See, e.g., Department of the Army, Army Regulation 600-9, "The Army Body Composition Program," pp. 21-31 (June 28, 2013); Department of the Navy, Office of the Chief of Naval Operations Instruction 6110.1J, "Physical Readiness Program," p. 7 (July 11, 2011); Department of the Air Force, Air Force Instruction 36-2905, "Fitness Program," pp. 86-95, 106-146 (Aug. 27, 2015); Department of the Navy, Marine Corps Order 6100.13, "Marine Corps Physical Fitness Program," (Aug. 1, 2008); Department of the Navy, Marine Corps Order 6110.3A, "Marine Corps Body Composition and Military Appearance Program," (Dec. 15, 2016); see also United States Military Academy, Office of the Commandant of Cadets, "Physical Program Whitebook AY 16-17," p. 13 (specifying that, to graduate, cadets must meet the minimum performance standard of 3:30 for men and 5:29 for women on the Indoor Obstacle Course Test); Department of the Army, Training and Doctrine Command, TRADOC Regulation 350-6, "Enlisted Initial Entry Training Policies and Administration," p. 56 (Mar. 20, 2017) ("Performance requirement differences, such as [Army Physical Fitness Test] scoring are based on physiological differences, and apply to the entire Army.").

[110] See, e.g., Headquarters, Department of the Army, TC 3-25.150, "Combatives," p. A-15 (Feb. 2017) ("Due to the physiological difference between the sexes and in order to treat all Soldiers fairly and conduct gender-neutral competitions, female competitors will be given a 15 percent overage at weigh-in."); id. ("In championships at battalion-level and above, competitors are divided into eight weight class brackets. . . . These classes take into account weight and gender."); Major Alex Bedard, Major Robert Peterson & Ray Barone, "Punching Through Barriers:  Female Cadets Integrated into Mandatory Boxing at West Point," *Association of the United States Army* (Nov. 16, 2017), https://www.ausa.org/articles/punching-through-barriers-female-cadets-boxing-west-point (noting that "[m]atching men and women according to weight may not adequately account for gender differences regarding striking force" and that "[w]hile conducting free sparring, cadets must box someone of the same gender"); RAND Study at 57 (noting that, under British military policy, transgender persons "can be excluded from sports that organize around gender to ensure the safety of the individual or other participants"); see also International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_

Uniform and grooming standards, to a certain extent, are also based on anatomical differences between males and females. Even those uniform and grooming standards that are not, strictly speaking, based on physical biology nevertheless flow from longstanding societal expectations regarding differences in attire and grooming for men and women.[111]

Because these sex-based standards are based on legitimate biological differences between males and females, it follows that a person's physical biology should dictate which standards apply. Standards designed for biological males logically apply to biological males, not biological females, and vice versa. When relevant, military practice has long adhered to this straightforward and logical demarcation.

By contrast, the Carter policy deviates from this longstanding practice by making military sex-based standards contingent, not necessarily on the person's biological sex, but on the person's gender marker in DEERS, which can be changed to reflect the person's gender identity.[112] Thus, under the Carter policy, a biological male who identifies as a female (and changes his gender marker to reflect that gender) must be held to the standards and regulations for females, even though those standards and regulations are based on female physical biology, not female gender identity. The same goes for females who identify as males. Gender identity alone, however, is irrelevant to standards that are designed on the basis of biological differences.

Rather than apply only to those transgender individuals who have altered their external biological characteristics to fully match that of their preferred gender, under the Carter policy, persons need not undergo sex reassignment surgery, or even cross-sex hormone therapy, in order to be recognized as, and thus subject to the standards associated with, their preferred gender. A male who identifies as female could remain a biological male in every respect and still must be treated in all respects as a female, including with respect to physical fitness, facilities, and uniform and grooming. This scenario is not farfetched. According to the APA, not "all individuals with gender dysphoria desire a complete gender reassignment. . . . Some are satisfied with no medical or surgical treatment but prefer to dress as the felt gender in public."[113] Currently, of the 424 approved Service member treatment plans, at least 36 do not include cross-

---

consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion; NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

[111] "The difference between men's and women's grooming policies recognizes the difference between the sexes; sideburns for men, different hairstyles and cosmetics for women. Establishing identical grooming and personal appearance standards for men and women would not be in the Navy's best interest and is not a factor in the assurance of equal opportunity." Department of the Navy, Navy Personnel Command, Navy Personnel Instruction 156651, "Uniform Regulations," Art. 2101.1 (July 7, 2017); see also Department of the Army, Army Regulation 670-1, "Wear and Appearance of Army Uniforms and Insignia," pp. 4-16 (Mar. 31, 2014); Department of the Air Force, Air Force Instruction 26-2903, "Dress and Personal Appearance of Air Force Personnel," pp. 17-27 (Feb. 9, 2017); Department of the Navy, Marine Corps Order P1020.34G, "Marine Corps Uniform Regulations," pp. 1-9 (Mar. 31, 2003).

[112] Department of Defense Instruction 1300.28, *In-service Transition for Service Members Identifying as Transgender*, pp. 3-4 (June 30, 2016).

[113] American Psychiatric Association, "Expert Q & A: Gender Dysphoria," available at https://www.psychiatry.org/patients-families/gender-dysphoria/expert-qa (last visited Feb. 14, 2018).

sex hormone therapy or sex reassignment surgery.[114]  And it is questionable how many Service members will obtain any type of sex reassignment surgery.  According to a survey of transgender persons, only 25% reported having had some form of transition-related surgery.[115]

The variability and fluidity of gender transition undermine the legitimate purposes that justify different biologically-based, male-female standards.  For example, by allowing a biological male who retains male anatomy to use female berthing, bathroom, and shower facilities, it undermines the reasonable expectations of privacy and dignity of female Service members.  By allowing a biological male to meet the female physical fitness and body fat standards and to compete against females in gender-specific physical training and athletic competition, it undermines fairness (or perceptions of fairness) because males competing as females will likely score higher on the female test than on the male test and possibly compromise safety.  By allowing a biological male to adhere to female uniform and grooming standards, it creates unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity.

These problems could perhaps be alleviated if a person's preferred gender were recognized only after the person underwent a biological transition.  The concept of gender transition is so nebulous, however, that drawing any line—except perhaps at a full sex reassignment surgery—would be arbitrary, not to mention at odds with current medical practice, which allows for a wide range of individualized treatment.  In any event, rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women.[116]  Only up to 25% of surveyed transgender persons report having had some form of transition-related surgery.[117]  The RAND study estimated that such rates "are typically only around 20 percent, with the exception of chest surgery among female-to-male transgender individuals."[118]  Moreover, of the 424 approved Service member treatment plans available for study, 388 included cross-sex hormone treatment, but only 34 non-genital sex reassignment surgeries and one genital surgery have been completed thus far.  Only 22 Service members have requested a waiver for a genital sex reassignment surgery.[119]

Low rates of full sex reassignment surgery and the otherwise wide variation of transition-related treatment, with all the challenges that entails for privacy, fairness, and safety, weigh in favor of maintaining a bright line based on biological sex—not gender identity or some variation thereof—in determining which sex-based standards apply to a given Service member.  After all, a person's biological sex is generally ascertainable through objective means.  Moreover, this approach will ensure that biologically-based standards will be applied uniformly to all Service members of the same biological sex.  Standards that are clear, coherent, objective, consistent, predictable, and uniformly applied enhance good order, discipline, steady leadership, and unit cohesion, which in turn, ensure military effectiveness and lethality.

---

[114] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).
[115] Id.
[116] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, *The Report of the 2015 U.S. Transgender Survey*, pp. 100-103 (National Center for Transgender Equality 2016) available at https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.
[117] Id. at 100.
[118] RAND Study at 21.
[119] Defense Health Agency, Supplemental Health Care Program Data (Feb. 2018).

New Transgender Policy

In light of the forgoing standards, all of which are necessary for military effectiveness and lethality, as well as the recommendations of the Panel of Experts, the Department, in consultation with the Department of Homeland Security, recommends the following policy:

A. Transgender Persons Without a History or Diagnosis of Gender Dysphoria, Who Are Otherwise Qualified for Service, May Serve, Like All Other Service Members, in Their Biological Sex.                ,

Transgender persons who have not transitioned to another gender and do not have a history or current diagnosis of gender dysphoria—i.e., they identify as a gender other than their biological sex but do not currently experience distress or impairment of functioning in meeting the standards associated with their biological sex—are eligible for service, provided that they, like all other persons, satisfy all mental and physical health standards and are capable of adhering to the standards associated with their biological sex. This is consistent with the Carter policy, under which a transgender person's gender identity is recognized only if the person has a diagnosis or history of gender dysphoria.

Although the precise number is unknown, the Department recognizes that many transgender persons could be disqualified under this policy. And many transgender persons who would not be disqualified may nevertheless be unwilling to adhere to the standards associated with their biological sex. But many have served, and are serving, with great dedication under the standards for their biological sex. As noted earlier, 8,980 Service members reportedly identify as transgender, and yet there are currently only 937 active duty Service members who have been diagnosed with gender dysphoria since June 30, 2016.

B. Transgender Persons Who Require or Have Undergone Gender Transition Are Disqualified.

Except for those who are exempt under this policy, as described below in C.3, and except where waivers or exceptions to policy are otherwise authorized, persons who are diagnosed with gender dysphoria, either before or after entry into service, and require transition-related treatment, or have already transitioned to their preferred gender, should be disqualified from service. In the Department's military judgment, this is a necessary departure from the Carter policy for the following reasons:

1. *Undermines Readiness.* While transition-related treatments, including real life experience, cross-sex hormone therapy, and sex reassignment surgery, are widely accepted forms of treatment, there is considerable scientific uncertainty concerning whether these treatments fully remedy, even if they may reduce, the mental health problems associated with gender dysphoria. Despite whatever improvements in condition may result from these treatments, there is evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment, as compared to persons without gender dysphoria.[120] The persistence of these problems is a risk for readiness.

---

[120] See *supra* at pp. 24-26.

Another readiness risk is the time required for transition-related treatment and the impact on deployability. Although limited and incomplete because many transitioning Service members either began treatment before the Carter policy took effect or did not require sex reassignment surgery, currently available in-service data already show that, cumulatively, transitioning Service members in the Army and Air Force have averaged 167 and 159 days of limited duty, respectively, over a one-year period.[121]

Transition-related treatment that involves cross-sex hormone therapy or sex reassignment surgery could render Service members with gender dysphoria non-deployable for a significant period of time—perhaps even a year—if the theater of operations cannot support the treatment. For example, Endocrine Society guidelines for cross-sex hormone therapy recommend quarterly bloodwork and laboratory monitoring of hormone levels during the first year of treatment.[122] Of the 424 approved Service member treatment plans available for study, almost all of them—91.5%—include the prescription of cross-sex hormones.[123] The period of potential non-deployability increases for those who undergo sex reassignment surgery. As described earlier, the recovery time for the various sex reassignment procedures is substantial. For non-genital surgeries (assuming no complications), the range of recovery is between two and eight weeks depending on the type of surgery, and for genital surgeries (again assuming no complications), the range is between three and six months before the individual is able to return to full duty.[124] When combined with 12 continuous months of hormone therapy, which is recommended prior to genital surgery,[125] the total time necessary for sex reassignment surgery could exceed a year. If the operational environment does not permit access to a lab for monitoring hormones (and there is certainly debate over how common this would be), then the Service member must be prepared to forego treatment, monitoring, or the deployment. Either outcome carries risks for readiness.

Given the limited data, however, it is difficult to predict with any precision the impact on readiness of allowing gender transition. Moreover, the input received by the Panel of Experts varied considerably. On one hand, some commanders with transgender Service members

---

[121] Data reported by the Departments of the Army and Air Force (Oct. 2017).

[122] Wylie C. Hembree, Peggy Cohen-Kettenis, Lous Gooren, Sabine Hannema, Walter Meyer, M. Hassan Murad, Stephen Rosenthal, Joshua Safer, Vin Tangpricha, & Guy T'Sjoen, "Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Vol. 102, pp. 3869-3903 (Nov. 2017).

[123] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017). Although the RAND study observed that British troops who are undergoing hormone therapy are generally able to deploy if the "hormone dose is steady and there are no major side effects," it nevertheless acknowledged that "deployment to all areas may not be possible, depending on the needs associated with any medication (e.g., refrigeration)." RAND Study at 59.

[124] For example, assuming no complications, the recovery time for a hysterectomy is up to eight weeks; a mastectomy is up to six weeks; a phalloplasty is up to three months; a metoidioplasty is up to 8 weeks; an orchiectomy is up to 6 weeks; and a vaginoplasty is up to three months. See University of California, San Francisco, Center of Excellence for Transgender Health, "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People," available at http://transhealth.ucsf.edu/trans?page=guidelines-home (last visited Feb. 16, 2018); see also Discussion with Dr. Loren Schechter, Visiting Clinical Professor of Surgery, University of Illinois at Chicago (Nov. 9, 2017).

[125] RAND Study at 80; see also id. at 7; Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1184 (Oct. 2016) (noting that Endocrine Society criteria "require that the patient has been on continuous cross-sex hormones and has had continuous [real life experience] or psychotherapy for the past 12 months").

reported that, from the time of diagnosis to the completion of a transition plan, the transitioning Service members would be non-deployable for two to two-and-a-half years.[126]  On the other hand, some commanders, as well as transgender Service members themselves, reported that transition-related treatment is not a burden on unit readiness and could be managed to avoid interfering with deployments, with one commander even reporting that a transgender Service member with gender dysphoria under his command elected to postpone surgery in order to deploy.[127]  This conclusion was echoed by some experts in endocrinology who found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use.[128]  Of course, postponing treatment, especially during a combat deployment, has risks of its own insofar as the treatment is necessary to mitigate the clinically significant distress and impairment of functioning caused by gender dysphoria.  After all, "when Service members deploy and then do not meet medical deployment fitness standards, there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower."[129]  In short, the periods of transition-related non-availability and the risks of deploying untreated Service members with gender dysphoria are uncertain, and that alone merits caution.

Moreover, most mental health conditions, as well as the medication used to treat them, limit Service members' ability to deploy.  Any DSM-5 psychiatric disorder with residual symptoms, or medication side effects, which impair social or occupational performance, require a waiver for the Service member to deploy.[130]  The same is true for mental health conditions that pose a substantial risk for deterioration or recurrence in the deployed environment.[131]  In managing mental health conditions while deployed, providers must consider the risk of exacerbation if the individual were exposed to trauma or severe operational stress.  These determinations are difficult to make in the absence of evidence on the impact of deployment on individuals with gender dysphoria.[132]

The RAND study acknowledges that the inclusion of individuals with gender dysphoria in the force will have a negative impact on readiness.  According to RAND, foreign militaries that allow service by personnel with gender dysphoria have found that it is sometimes necessary to restrict the deployment of transitioning individuals, including those receiving hormone therapy and surgery, to austere environments where their healthcare needs cannot be met.[133]  Nevertheless, RAND concluded that the impact on readiness would be minimal—e.g., 0.0015% of available deployable labor-years across the active and reserve components—because of the

---

[126] Minutes, Transgender Review Panel (Oct. 13, 2017).
[127] Id.
[128] Minutes, Transgender Review Panel (Nov. 9, 2017).
[129] Institute for Defense Analyses, "Force Impact of Expanding the Recruitment of Individuals with Auditory Impairment," pp. 60-61 (Apr. 2016).
[130] Modification Thirteen to U.S. Central Command Individual Protection and Individual, Unit Deployment Policy, Tab A, p. 8 (Mar. 2017).
[131] Id.
[132] See generally Memorandum from the Assistant Secretary of Defense for Health Affairs, "Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications," pp. 2-4 (Oct. 7, 2013).
[133] RAND Study at 40.

exceedingly small number of transgender Service members who would seek transition-related treatment.[134] Even then, RAND admitted that the information it cited "must be interpreted with caution" because "much of the current research on transgender prevalence and medical treatment rates relies on self-reported, nonrepresentative samples."[135] Nevertheless, by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers.[136] And yet that is no reason to allow persons with those conditions to serve.

The issue is not whether the military can absorb periods of non-deployability in a small population; rather, it is whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible. As the Department has noted before: "[W]here the operational requirements are growing faster than available resources," it is imperative that the force "be manned with Service members capable of meeting all mission demands. The Services require that every Service member contribute to full mission readiness, regardless of occupation. In other words, the Services require all Service members to be able to engage in core military tasks, including the ability to deploy rapidly, without impediment or encumbrance."[137] Moreover, the Department must be mindful that "an increase in the number of non-deployable military personnel places undue risk and personal burden on Service members qualified and eligible to deploy, and negatively impacts mission readiness."[138] Further, the Department must be attuned to the impact that high numbers of non-deployable military personnel places on families whose Service members deploy more often to backfill or compensate for non-deployable persons.

In sum, the available information indicates that there is inconclusive scientific evidence that the serious problems associated with gender dysphoria can be fully remedied through transition-related treatment and that, even if it could, most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time. By this metric, Service members with gender dysphoria who need transition-related care present a significant challenge for unit readiness.

        2.    *Incompatible with Sex-Based Standards.* As discussed in detail earlier, military personnel policy and practice has long maintained a clear line between men and women where their biological differences are relevant with respect to physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards. This line promotes good order and discipline, steady leadership, unit cohesion, and ultimately military

---

[134] Id. at 42.

[135] Id. at 39.

[136] According to the National Institute of Mental Health, 2.8% of U.S. adults experienced bipolar disorder in the past year, and 4.4% have experienced the condition at some time in their lives. National Institute of Mental Health, "Bipolar Disorder" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/bipolar-disorder.shtml. The prevalence of schizophrenia is less than 1%. National Institute of Mental Health, "Schizophrenia" (Nov. 2017) https://www.nimh.nih.gov/health/statistics/schizophrenia.shtml.

[137] Under Secretary of Defense for Personnel and Readiness, "Fiscal Year 2016 Report to Congress on the Review of Enlistment of Individuals with Disabilities in the Armed Forces," p. 9 (Apr. 2016).

[138] Id. at 10.

effectiveness and lethality because it ensures fairness, equity, and safety; satisfies reasonable expectations of privacy; reflects common practice in the society from which we recruit; and promotes core military values of dignity and respect between men and women. To exempt Service members from the uniform, biologically-based standards applicable to their biological sex on account of their gender identity would be incompatible with this line and undermine the objectives such standards are designed to serve.

First, a policy that permits a change of gender without requiring any biological changes risks creating unfairness, or perceptions thereof, that could adversely affect unit cohesion and good order and discipline. It could be perceived as discriminatory to apply different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology. For example, it unfairly discriminates against biological males who identify as male and are held to male standards to allow biological males who identify as female to be held to female standards, especially where the transgender female retains many of the biological characteristics and capabilities of a male. It is important to note here that the Carter policy does not require a transgender person to undergo any biological transition in order to be treated in all respects in accordance with the person's preferred gender. Therefore, a biological male who identifies as female could remain a biological male in every respect and still be governed by female standards. Not only would this result in perceived unfairness by biological males who identify as male, it would also result in perceived unfairness by biological females who identify as female. Biological females who may be required to compete against such transgender females in training and athletic competition would potentially be disadvantaged.[139] Even more importantly, in physically violent training and competition, such as boxing and combatives, pitting biological females against biological males who identify as female, and vice versa, could present a serious safety risk as well.[140]

This concern may seem trivial to those unfamiliar with military culture. But vigorous competition, especially physical competition, is central to the military life and is indispensable to the training and preparation of warriors. Nothing encapsulates this more poignantly than the words of General Douglas MacArthur when he was superintendent of the U.S. Military Academy and which are now engraved above the gymnasium at West Point: "Upon the fields of friendly

---

[139] See *supra* note 109. Both the International Olympic Committee (IOC) and the National Collegiate Athletic Association (NCAA) have attempted to mitigate this problem in their policies regarding transgender athletes. For example, the IOC requires athletes who transition from male to female to demonstrate certain suppressed levels of testosterone to minimize any advantage in women's competition. Similarly, the NCAA prohibits an athlete who has transitioned from male to female from competing on a women's team without changing the team status to a mixed gender team. While similar policies could be employed by the Department, it is unrealistic to expect the Department to subject transgender Service members to routine hormone testing prior to biannual fitness testing, athletic competition, or training simply to mitigate real and perceived unfairness or potential safety concerns. See, e.g., International Olympic Committee Consensus Meeting on Sex Reassignment and Hyperandrogensim (Nov. 2015), https://stillmed.olympic.org/Documents/Commissions_PDFfiles/Medical_commission/2015-11_ioc_consensus_meeting_on_sex_reassignment_and_hyperandrogenism-en.pdf; NCAA Office of Inclusion, NCAA Inclusion of Transgender Student-Athletes (Aug. 2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

[140] See *supra* note 109.

strife are sown the seeds that, upon other fields, on other days will bear the fruits of victory."[141] Especially in combat units and in training, including the Service academies, ROTC, and other commissioning sources, Service members are graded and judged in significant measure based upon their physical aptitude, which is only fitting given that combat remains a physical endeavor.

Second, a policy that accommodates gender transition without requiring full sex reassignment surgery could also erode reasonable expectations of privacy that are important in maintaining unit cohesion, as well as good order and discipline. Given the unique nature of military service, Service members of the same biological sex are often required to live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom. Because of reasonable expectations of privacy, the military has long maintained separate berthing, bathroom, and shower facilities for men and women while in garrison. In the context of recruit training, this separation is even mandated by Congress.[142]

Allowing transgender persons who have not undergone a full sex reassignment, and thus retain at least some of the anatomy of their biological sex, to use the facilities of their identified gender would invade the expectations of privacy that the strict male-female demarcation in berthing, bathroom, and shower facilities is meant to serve. At the same time, requiring transgender persons who have developed, even if only partially, the anatomy of their identified gender to use the facilities of their biological sex could invade the privacy of the transgender person. Without separate facilities for transgender persons or other mitigating accommodations, which may be unpalatable to transgender individuals and logistically impracticable for the Department, the privacy interests of biological males and females and transgender persons could be anticipated to result in irreconcilable situations. Lieutenants, Sergeants, and Petty Officers charged with carrying out their units' assigned combat missions should not be burdened by a change in eligibility requirements disconnected from military life under austere conditions.

The best illustration of this irreconcilability is the report of one commander who was confronted with dueling equal opportunity complaints—one from a transgender female (i.e., a biological male with male genitalia who identified as female) and the other from biological females. The transgender female Service member was granted an exception to policy that allowed the Service member to live as a female, which included giving the Service member access to female shower facilities. This led to an equal opportunity complaint from biological females in the unit who believed that granting a biological male, even one who identified as a female, access to their showers violated their privacy. The transgender Service member responded with an equal opportunity complaint claiming that the command was not sufficiently supportive of the rights of transgender persons.[143]

The collision of interests discussed above are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions. Leaders at all levels

---

[141] Douglas MacArthur, *Respectfully Quoted: A Dictionary of Quotations* (1989), available at http://www.bartleby.com/73/1874.html.
[142] See *supra* note 108.
[143] Minutes, Transgender Review Panel (Oct. 13, 2017). Limited data exists regarding the performance of transgender Service members due to policy restrictions in Department of Defense 1300.28, *In-Service Transition for Transgender Service Members* (Oct. 1, 2016), that prevent the Department from tracking individuals who may identify as transgender as a potentially unwarranted invasion of personal privacy.

already face immense challenges in building cohesive military units. Blurring the line that differentiates the standards and policies applicable to men and women will only exacerbate those challenges and divert valuable time and energy from military tasks.

The unique leadership challenges arising from gender transition are evident in the Department's handbook implementing the Carter policy. The handbook provides guidance on various scenarios that commanders may face. One such scenario concerns the use of shower facilities: "A transgender Service member has expressed privacy concerns regarding the open bay shower configuration. Similarly, several other non-transgender Service members have expressed discomfort when showering in these facilities with individuals who have different genitalia." As possible solutions, the handbook offers that the commander could modify the shower facility to provide privacy or, if that is not feasible, adjust the timing of showers. Another scenario involves proper attire during a swim test: "It is the semi-annual swim test and a female to male transgender Service member who has fully transitioned, but did not undergo surgical change, would like to wear a male swimsuit for the test with no shirt or other top coverage." The extent of the handbook's guidance is to advise commanders that "[i]t is within [their] discretion to take measures ensuring good order and discipline," that they should "counsel the individual and address the unit, if additional options (e.g., requiring all personnel to wear shirts) are being considered," and that they should consult the Service Central Coordination Cell, a help line for commanders in need of advice.

These vignettes illustrate the significant effort required of commanders to solve challenging problems posed by the implementation of the current transgender service policies. The potential for discord in the unit during the routine execution of daily activities is substantial and highlights the fundamental incompatibility of the Department's legitimate military interest in uniformity, the privacy interests of all Service members, and the interest of transgender individuals in an appropriate accommodation. Faced with these conflicting interests, commanders are often forced to devote time and resources to resolve issues not present outside of military service. A failure to act quickly can degrade an otherwise highly functioning team, as will failing to seek appropriate counsel and implementing a faulty solution. The appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline.

The RAND study does not meaningfully address how accommodations for gender transition would impact perceptions of fairness and equity, expectations of privacy, and safety during training and athletic competition and how these factors in turn affect unit cohesion. Instead, the RAND study largely dismisses concerns about the impact on unit cohesion by pointing to the experience of four countries that allow transgender service—Australia, Canada, Israel, and the United Kingdom.[144] Although the vast majority of armed forces around the world do not permit or have policies on transgender service, RAND noted that 18 militaries do, but only four have well-developed and publicly available policies.[145] RAND concluded that "the available research revealed no significant effect on cohesion, operational effectiveness, or

---

[144] RAND Study at 45.
[145] Id. at 50.

readiness."[146]  It reached this conclusion, however, despite noting reports of resistance in the ranks, which is a strong indication of an adverse effect on unit cohesion.[147]  Nevertheless, RAND acknowledged that the available data was "limited" and that the small number of transgender personnel may account for "the limited effect on operational readiness and cohesion."[148]

Perhaps more importantly, however, the RAND study mischaracterizes or overstates the reports upon which it rests its conclusions. For example, the RAND study cites *Gays in Foreign Militaries 2010: A Global Primer* by Nathaniel Frank as support for the conclusions that there is no evidence that transgender service has had an adverse effect on cohesion, operational effectiveness, or readiness in the militaries of Australia and the United Kingdom and that diversity has actually led to increases in readiness and performance.[149]  But that particular study has nothing to do with examining the service of transgender persons; rather, it is about the integration of homosexual persons into the military.[150]

With respect to transgender service in the Israeli military, the RAND study points to an unpublished paper by Anne Speckhard and Reuven Paz entitled *Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service*. The RAND study cites this paper for the proposition that "there has been no reported effect on cohesion or readiness" in the Israeli military and "there is no evidence of any impact on operational effectiveness."[151]  These sweeping and categorical claims, however, are based only on "six in-depth interviews of experts on the subject both inside and outside the [Israeli Defense Forces (IDF)]: two in the IDF leadership—including the spokesman's office; two transgender individuals who served in the IDF, and two professionals who serve transgender clientele—before, during and after their IDF service."[152]  As the RAND report observed, however: "There do appear to be some limitations on the assignment of transgender personnel, particularly in combat units. Because of the austere living conditions in these types of units, necessary accommodations may not be available for Service members in the midst of a gender transition. As a result, transitioning individuals are typically not assigned to combat units."[153]  In addition, as the RAND study notes, under the Israeli policy at the time, "assignment of housing, restrooms, and showers is typically linked to the birth gender, which does not change in the military system until after gender reassignment surgery."[154]  Therefore, insofar as a Service member's change of gender is not recognized until after sex reassignment

---

[146] Id. at 45.

[147] Id.

[148] Id.

[149] Id.

[150] Nathaniel Frank, "Gays in Foreign Militaries 2010: A Global Primer," p. 6 *The Palm Center* (Feb. 2010), https://www.palmcenter.org/wpcontent/uploads/2017/12/FOREIGNMILITARIESPRIMER2010FINAL.pdf ("This study seeks to answer some of the questions that have been, and will continue to be, raised surrounding the instructive lessons from other nations that have lifted their bans on openly gay service.").

[151] Rand Study at 45.

[152] Anne Speckhard & Reuven Paz, "Transgender Service in the Israeli Defense Forces: A Polar Opposite Stance to the U.S. Military Policy of Barring Transgender Soldiers from Service," p. 3 (2014), http://www.researchgate.net/publication/280093066.

[153] RAND Study at 56.

[154] Id. at 55.

surgery, the Israeli policy—and whatever claims about its impact on cohesion, readiness, and operational effectiveness—are distinguishable from the Carter policy.

Finally, the RAND study cites to a journal article on the Canadian military experience entitled *Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness* by Alan Okros and Denise Scott. According to RAND, the authors of this article "found no evidence of any effect on unit or overall cohesion."[155] But the article not only fails to support the RAND study's conclusions (not to mention the article's own conclusions), but it confirms the concerns that animate the Department's recommendations. The article acknowledges, for example, the difficulty commanders face in managing the competing interests at play:

> Commanders told us that the new policy fails to provide sufficient guidance as to how to weigh priorities among competing objectives during their subordinates' transition processes. Although they endorsed the need to consult transitioning Service members, they recognized that as commanding officers, they would be called on to balance competing requirements. They saw the primary challenge to involve meeting trans individual's expectations for reasonable accommodation and individual privacy while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness. To do so, they said that they require additional guidance on a range of issues including clothing, communal showers, and shipboard bunking and messing arrangements.[156]

Notwithstanding its optimistic conclusions, the article also documents serious problems with unit cohesion. The authors observe, for instance, that the chain of command "has not fully earned the trust of the transgender personnel," and that even though some transgender Service members do trust the chain of command, others "expressed little confidence in the system," including one who said, "I just don't think it works that well."[157]

In sum, although the foregoing considerations are not susceptible to quantification, undermining the clear sex-differentiated lines with respect to physical fitness; berthing, bathroom, and shower facilities; and uniform and grooming standards, which have served all branches of Service well to date, risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline. The Department acknowledges that there are serious differences of opinion on this subject, even among military professionals, including among some who provided input to the Panel of Experts,[158] but given the vital interests at stake—the survivability of Service members, including

---

[155] Id. at 45.

[156] Alan Okros & Denise Scott, "Gender Identity in the Canadian Forces," *Armed Forces and Society* Vol. 41, p. 8 (2014).

[157] Id. at 9.

[158] While differences of opinion do exist, it bears noting that, according to a Military Times/Syracuse University's Institute for Veterans and Military Families poll, 41% of active duty Service members polled thought that allowing gender transition would hurt their unit's readiness, and only 12% thought it would be beneficial. Overall, 57% had a negative opinion of the Carter policy. Leo Shane III, "Poll: Active-duty troops worry about military's transgender

transgender persons, in combat and the military effectiveness and lethality of our forces—it is prudent to proceed with caution, especially in light of the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health.

          3.    *Imposes Disproportionate Costs.*  Transition-related treatment is also proving to be disproportionately costly on a per capita basis, especially in light of the absence of solid scientific support for the efficacy of such treatment.  Since implementation of the Carter policy, the medical costs for Service members with gender dysphoria have increased nearly three times—or 300%—compared to Service members without gender dysphoria.[159]  And this increase is despite the low number of costly sex reassignment surgeries that have been performed so far.[160]  As noted earlier, only 34 non-genital sex reassignment surgeries and one genital surgery have been completed,[161] with an additional 22 Service members requesting a waiver for genital surgery.[162]  We can expect the cost disparity to grow as more Service members diagnosed with gender dysphoria avail themselves of surgical treatment.  As many as 77% of the 424 Service member treatment plans available for review include requests for transition-related surgery, although it remains to be seen how many will ultimately obtain surgeries.[163]  In addition, several commanders reported to the Panel of Experts that transition-related treatment for Service members with gender dysphoria in their units had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care.[164]

          Taken together, the foregoing concerns demonstrate why recognizing and making accommodations for gender transition are not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality.  Therefore, it is the Department's professional military judgment that persons who have been diagnosed with, or have a history of, gender dysphoria and require, or have already undergone, a gender transition generally should not be eligible for accession or retention in the Armed Forces absent a waiver.

      C.  <u>Transgender Persons With a History or Diagnosis of Gender Dysphoria Are Disqualified, Except Under Certain Limited Circumstances.</u>

---

policies," *Military Times* (July 27, 2017) available at https://www.militarytimes.com/news/pentagon-congress/2017/07/27/poll-active-duty-troops-worry-about-militarys-transgender-policies/.

[159] Minutes, Transgender Review Panel (Nov. 2, 2017).

[160] Minutes, Transgender Review Panel (Nov. 2, 2017).

[161] Data retrieved from Military Health System Data Repository (Nov. 2017).

[162] Defense Health Agency Data (as of Feb. 2018).

[163] Data reported by the Departments of the Army, Navy, and Air Force (Oct. 2017).

[164] Minutes, Transgender Review Panel (Oct. 13, 2017); see also Irene Folaron & Monica Lovasz, "Military Considerations in Transsexual Care of the Active Duty Member," *Military Medicine*, Vol. 181, p. 1185 (Oct. 2016) ("As previously discussed, a new diagnosis of gender dysphoria and the decision to proceed with gender transition requires frequent evaluations by the [mental health professional] and endocrinologist.  However, most [military treatment facilities] lack one or both of these specialty services.  Members who are not in proximity to [military treatment facilities] may have significant commutes to reach their required specialty care.  Members stationed in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations.").

As explained earlier in greater detail, persons with gender dysphoria experience significant distress and impairment in social, occupational, or other important areas of functioning. Gender dysphoria is also accompanied by extremely high rates of suicidal ideation and other comorbidities. Therefore, to ensure unit safety and mission readiness, which is essential to military effectiveness and lethality, persons who are diagnosed with, or have a history of, gender dysphoria are generally disqualified from accession or retention in the Armed Forces. The standards recommended here are subject to the same procedures for waiver as any other standards. This is consistent with the Department's handling of other mental conditions that require treatment. As a general matter, only in the limited circumstances described below should persons with a history or diagnosis of gender dysphoria be accessed or retained.

1.    *Accession of Individuals Diagnosed with Gender Dysphoria.* Given the documented fluctuations in gender identity among children, a history of gender dysphoria should not alone disqualify an applicant seeking to access into the Armed Forces. According to the DSM-5, the persistence of gender dysphoria in biological male children "has ranged from 2.2% to 30%," and the persistence of gender dysphoria in biological female children "has ranged from 12% to 50%."[165] Accordingly, persons with a history of gender dysphoria may access into the Armed Forces, provided that they can demonstrate 36 consecutive months of stability—i.e., absence of gender dysphoria—immediately preceding their application; they have not transitioned to the opposite gender; and they are willing and able to adhere to all standards associated with their biological sex. The 36-month stability period is the same standard the Department currently applies to persons with a history of depressive disorder. The Carter policy's 18-month stability period for gender dysphoria, by contrast, has no analog with respect to any other mental condition listed in DoDI 6130.03.

2.    *Retention of Service Members Diagnosed with Gender Dysphoria.* Retention standards are typically less stringent than accession standards due to training provided and on-the-job performance data. While accession standards endeavor to predict whether a given applicant will require treatment, hospitalization, or eventual separation from service for medical unfitness, and thus tend to be more cautious, retention standards focus squarely on whether the Service member, despite his or her condition, can continue to do the job. This reflects the Department's desire to retain, as far as possible, the Service members in which it has made substantial investments and to avoid the cost of finding and training a replacement. To use an example outside of the mental health context, high blood pressure does not meet accession standards, even if it can be managed with medication, but it can meet retention standards so long as it can be managed with medication. Regardless, however, once they have completed treatment, Service members must continue to meet the standards that apply to them in order to be retained. Therefore, Service members who are diagnosed with gender dysphoria after entering military service may be retained without waiver, provided that they are willing and able to adhere to all standards associated with their biological sex, the Service member does not require gender transition, and the Service member is not otherwise non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).[166]

---

[165] DSM-5 at 455.
[166] Under Secretary of Defense for Personnel and Readiness, "DoD Retention Policy for Non-Deployable Service Members" (Feb. 14, 2018).

3.      *Exempting Current Service Members Who Have Already Received a Diagnosis of Gender Dysphoria.*  The Department is mindful of the transgender Service members who were diagnosed with gender dysphoria and either entered or remained in service following the announcement of the Carter policy and the court orders requiring transgender accession and retention.  The reasonable expectation of these Service members that the Department would honor their service on the terms that then existed cannot be dismissed.  Therefore, transgender Service members who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy, may continue to receive all medically necessary treatment, to change their gender marker in DEERS, and to serve in their preferred gender, even after the new policy commences.  This includes transgender Service members who entered into military service after January 1, 2018, when the Carter accession policy took effect by court order.  The Service member must, however, adhere to the procedures set forth in DoDI 1300.28, and may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months).  While the Department believes that its commitment to these Service members, including the substantial investment it has made in them, outweigh the risks identified in this report, should its decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption instead is and should be deemed severable from the rest of the policy.

## Conclusion

In making these recommendations, the Department is well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues. But as the forgoing analysis demonstrates, the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed. In fact, the RAND study itself repeatedly emphasized the lack of quality data on these issues and qualified its conclusions accordingly. In addition, that study concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs. In its view, however, such harms were negligible in light of the small size of the transgender population. But especially in light of the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect, the Department is not convinced that these risks could be responsibly dismissed or that even negligible harms should be incurred given the Department's grave responsibility to fight and win the Nation's wars in a manner that maximizes the effectiveness, lethality, and survivability of our most precious assets—our Soldiers, Sailors, Airmen, Marines, and Coast Guardsmen.

Accordingly, the Department weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring in developing these recommendations. It is the Department's view that the various balances struck by the recommendations above provide the best solution currently available, especially in light of the significant uncertainty in this area. Although military leadership from the prior administration reached a different conclusion, the Department's professional military judgment is that the risks associated with maintaining the Carter policy—risks that are continuing to be better understood as new data become available—counsel in favor of the recommended approach.