# EXHIBIT L

**The New York Review of Books**

# What Sex Does

**Paisley Currah**
May 27, 2022

For transgender people in the United States, the sheer number of institutions with discrete authority to define sex ensnares us in Kafkaesque contradictions.



John Prieto/The Denver Post via Getty Images

A woman at the division of motor vehicles in Denver, Colorado, 1988

In the mid-1960s, a woman asked New York City's Bureau of Records and Statistics to change the M on her birth certificate to an F. "Anonymous" had done everything she could to function socially as a woman: she had had her gender identity affirmed by a medical professional; she had "assumed the name and role of a female" and undergone gender-affirming medical care.[1] But as long as the M remained on her birth certificate, her ability to move through the world as a woman would be compromised.

This was not the first time the city had been asked to change an M to an F on a birth certificate. The director of the Bureau of Records and Statistics had responded positively to three earlier requests, basing his decision in two cases on lab tests (which the city's health commissioner described as "very tenuous") indicating hormone levels in what was thought to be the appropriate range for women.[2] After a handful of requests, however, the official balked. What had been a few odd cases now seemed to augur a larger trend. The director asked for policy guidance from the Board of Health, which has jurisdiction over the New York City Health Code, including rules for birth certificates. (New York City sets its policies on birth certificates separate from the rest of New York State. For other jurisdictions, birth certificate policy is set at the state or territory level.) The commissioner of the Board of Health, George James, requested "an exhaustive inquiry into the subject" and asked the New York Academy of Medicine to convene an ad hoc committee of medical experts for the purpose.

The committee was composed almost entirely of medical doctors. Strikingly, however, it spent a good part of its time considering "the legal aspects of a change of sex." The legal implications, the committee found, would include allowing marriage between a transsexual woman and a nontranssexual man, changing draft status, denying or providing access to benefits, and enabling individuals to obtain passports with the new sex classification. In its report, widely cited in court decisions over the following decades, the committee concluded that "the desire of concealment of a change of sex by the transsexual is outweighed by the public interest for protection against fraud." The Board of Health followed the committee's recommendations: as a matter of policy, transsexual people would not be able to have their sex changed on birth certificates issued by the city. Anonymous's request was denied and she subsequently lost a legal challenge.

Over the next five decades, the city's policy would be amended four more times. In 1971, the Board ruled that the city could issue new birth certificates with no sex designation to applicants who submitted a psychiatric evaluation, a "detailed operative record," a "post-operative examination signed by a physician," and a court order granting a name change. (At the time, the policy was among the most liberal in the United States.) In 2006, the city agreed to issue new birth certificates listing the reclassified sex, but still required applicants to submit evidence of "sex change surgery," despite the recommendation of a new committee—on which I served, along with transgender health care experts and transgender rights advocates—that the requirement for genital surgery or indeed for any bodily modification be dropped. We argued that transition was an individualized process and that gender identity, not genitals, should determine sex classification. Initially, the Board of Health appeared willing to adopt the recommendation and went so far as to promulgate it for public comment. But after a public outcry at the idea that one might transition without medical intervention, and after other city agencies weighed in against the proposal, it was withdrawn.

It was not until 2014 that the City Council passed legislation that made it possible for people born in the city to change the sex marker on their birth certificate to have it correspond to their gender identity. Individuals requesting these changes would not be required to have undergone any medical treatment, though they would have to provide an affidavit from a medical professional or social service provider attesting to the change. Four years later, the city added a non-binary gender category and removed the requirement for a medical affidavit. Today, those born in New York City need only submit their own affidavit to change the sex marker on their birth certificate to F, M, or X.

*

How should we tell the story of this long struggle over sex reclassification, and to what should we attribute its eventual success? From the above account, one might think that trans advocates and the city spent five decades arguing over the most accurate definition of sex. During my time on the advisory committee in 2005, that's what I thought was going on. For advocates, it seemed that policies adopted at various points by the government—not allowing individuals to change their sex designation at all, requiring proof from medical professionals and insisting on surgery, leaving sex designation off identity documents, limiting the categories to M or F—were rooted in outdated ideas about sex, even as trans people's demands changed over the decades. The city's recalcitrance was understood as at best ill-informed or, at worst and more likely, transphobic.

And yet, as the 1965 committee's emphasis on "the legal aspects" of sex reclassification suggests, considerations about what sex does for different governing apparatuses have often had a far bigger part in determining the rules than ideas about what sex "really is." The debate over sex was in fact taking place in two different registers. Trans advocates made their claims in the register of expertise and truth, working from the assumption that sex reclassification policies should be based on the correct definition of sex (whether that definition indexes common sense or contemporary medical knowledge). Representatives of the state, meanwhile, responded to those claims in the register of governing and politics. Their main concern was with the practical consequences of changing the rules. Studying the history of the process, and reviewing a lawsuit later brought against New York City by a trans rights organization, led me to the revelation that the city bureaucrats were the real Foucauldians: they understood that sex was not a thing in itself but something instrumentalized differently by different agencies.

Throughout this essay, I use the old-fashioned and awkward word "sex" to talk about government decisions to classify individuals as male or female. Why use "sex" and not "gender"? Among feminist theorists, since the 1980s "gender" has won almost universal acceptance as the most suitable term to describe the norms that govern relations between men and women. When one sees "sex" and "gender" used together, often the former signifies bodily difference and the latter refers to the social norms that make those differences matter.[3] Using "sex," especially when it's not accompanied by "gender," can be a way of signaling that one understands sex as a naturally occurring attribute of the body which accounts for differences in the identities, roles, and expressions of boys and girls, men and women, masculinity and femininity.

But that's not my intention here. I use "sex," rather, precisely because its meaning is so contested. Gender, for its part, does mean something: decades of scholarship and activism have created a shared body of historical knowledge about the ways norms, narratives, practices, conventions, and laws have arranged bodies, identities, roles, and expressions in hierarchies of difference. It is those ideologies of gender that undergird the state determinations of "male" and "female" I have been describing. The only thing we can say for sure about what sex means, on the other hand, is what a particular state actor says it means. For my purposes here, sex is not a thing, a property, or a trait, but the outcome of decisions backed by legal authority. And its meaning changes.



CBS via Getty Images

People stand in line at the department of motor vehicles in Los Angeles, 1965

This is not to say that the body does not come into it. In state rules on sex classification, evidence of material characteristics—penises or vaginas, XX or XY chromosomes, breasts or beards—can still determine whether one is male or female for state purposes. But which material is material is not consistent. Nor is this to say that sex does not matter. Unlike the definitions put forth by individuals or circulated by activists and researchers, state declarations of sex are backed by the force of law. When you're arrested for "false personation," when your parental relationship with your children is permanently severed, when your marriage is declared void, when you arrive at your polling place only to be denied the right to vote, when you lose your benefits as a surviving spouse—all because of what a judge or a policy or an identity document says your sex is—then the definition matters a great deal.

*

During the 1965 policy deliberations in New York, the director of the city's Bureau of Records and Statistics wrote to the National Center for Health Statistics asking for guidance on the question of sex reclassification. In researching a response, the letter's recipient, the chief of the Registration Methods Branch, "consulted a number of security and nonsecurity agencies in the Federal Government for their viewpoints." This official found that the issue "has been a long-time and difficult problem for them as well." The federal government could not give the city any guidance, he concluded, "since various agencies carry out differing responsibilities" and "the problems which confront them vary." In fact, he wrote, "the more we delved into the problem, the more the ramifications that cropped up." Officials at some agencies were concerned with identity management and ensuring a perfect correspondence between an individual and their records over their life span, while officials at agencies that distributed benefits based on gender were worried about how individuals who changed their sex would unsettle their work.

For transgender people in the United States, the sheer number of state institutions with discrete authority to define sex ensnares us in Kafkaesque contradictions. In 1998, for example, an Idaho resident named "Jane Jones"

was arrested and briefly imprisoned for the crime of "marriage under false personation." The police had come to her home with a search warrant in the course of investigating her husband for writing bad checks. When the officer looked over her papers during the search, he discovered a discrepancy between the identity information on her driver's license ("John," male) and her marriage certificate ("Jane," female). According to what were then Idaho's state policies, Jane could have changed the sex classification on her driver's license if she had wanted to negotiate the bureaucracy and give officials at the Department of Motor Vehicles a letter from a physician documenting the history of her body and her gender identity. But until 2018, the Idaho Office of Vital Statistics would not change the sex classification on the birth certificates they issue.

This inconsistency makes more sense if we understand that these dissimilar constructions of sex furthered different government projects. Various state agencies do different things: regulate marriage and families; make decisions about property; track births and deaths; provide residents with identity documents; house the homeless; attend to public health; regulate the professions; ensure the security of air travel; incarcerate populations. Each agency's policy on sex reclassification therefore varies too. Some state agencies will recognize the new sex of anyone requesting a change, some will not, and some require genital surgery and other medical treatments. One's classification has often depended on how a particular agency sees individuals: as workers, as incarcerated people, as parents, as spouses, as students, as voters, or as social service clients.

In response to claims made in a 2011 lawsuit that the surgery requirement for sex reclassification on birth certificates was irrational, lawyers for New York City admitted that other documents, such as driver's licenses issued by the state of New York, United States passports, and even birth certificates issued in other jurisdictions, may use different criteria to classify people as F or M. But "the existence of different approaches to similar problems," they argued, "does not render an agency's rule irrational." In other words, the rationality of each agency's approach to sex classification depended on its remit, not on what sex is in itself. From the city's perspective, sex was a mobile property.

The purpose of an identity document is to establish a relationship between it and the person who carries it. Sex markers on the document that do not reflect the gender presentation of its holder weaken that connection. It is hardly surprising, then, that state divisions of motor vehicles were among the first government agencies to let people change the sex on their driver's licenses and, later, to drop reclassification requirements like surgery. Their function is to watch over individuals and track their movements across the state's territory. An F on the driver's license of a balding, bearded man like myself hinders the public and private protectors of the security state.

Marriage is different. Decisions about marriage concern the state's interest not in identification (fixing who one is) but of distribution (deciding what one gets). As scholars such as Nancy F. Cott and Peggy Pascoe have shown, marriage is and has long been an instrument of governing that turns some individuals into families and families into nations by regulating social reproduction, inheritance, and property ownership.

The meeting minutes of the New York Academy of Medicine's ad hoc committee in 1965 suggest that the possibility that a transsexual person might use a new birth certificate to marry—and hence "fraudulently" enter into an opposite-sex marriage—was a constant worry. A member of the 2005 New York City Advisory Committee on Amending Birth Certificates for Transgender Persons told me that once the requirement of body modification—which had almost universally been considered a guarantee of a transition and its permanence—was dropped in 2006, policymakers were once again concerned that one member of a cisgender gay or lesbian couple would simply change the F or M on their birth certificate and present that when applying for a marriage license.



Los Angeles Examiner/USC Libraries/Corbis vis Getty Images

The Marriage License Bureau of the Los Angeles County Court House, under construction, 1958

By the first years of this century, same-sex marriage had become the newest front in the culture wars. Between 1998 and 2008, thirty states passed constitutional amendments limiting marriages and in some cases even civil unions to one man and one woman. The authors of these amendments, however, hadn't thought to define what they meant by "man" and "woman." While many marriages involving a trans spouse went uncontested and unnoticed—although the Social Security Administration advised its field agents to "treat as questionable" any marriage where one party had changed their gender before getting married—a few unlucky people had their marriages challenged by ex-spouses or others with an interest in the estate, and found themselves proving ground for a new, more conservative approach to sex classification.

During this period, a series of appellate courts in states that were otherwise slowly coming to accommodate the needs of transgender people in their identity document policies—including Texas (1999), Kansas (2002), Florida (2004), and Illinois (2005)—issued decisions that invalidated marriages involving a transgender person on the grounds that sex was set for life at birth. For the transgender person in these marriages, the union was an opposite-sex union. For the courts, the sex assigned at birth remained one's sex for the purposes of marriage, even after a person had changed the sex on their birth certificate: these were then same-sex marriages, invalid under state law. In each of these cases, someone wanted to possess things generally conveyed by marriage: a husband's estate, a spouse's wrongful death claim, custody of children.

Certainly these decisions harmed trans people. But transphobia alone can't explain why state DMVs were making sex reclassification less onerous even as appellate judges were finding that sex was fixed at birth. Since these decisions occurred just as the panic about same-sex marriage was escalating, it seems likelier to conclude that state officials were discomfited by the exceptional marriages of transgender people less because they feared that a handful of people would enjoy certain rights than because they saw that such marriages

challenged the entire rationale for who could get married to whom. Sex classification turned out to be a critical part of the institutions that used the distinction between men and women to regulate families—from patriarchal family law to the biological fictions central to the family itself, like the common law construction that husbands are by default the fathers of their wives' children.

*

In New York State, the question of ersatz heterosexual marriages became moot when the ban on same-sex marriage was ended in 2011. Along with the election of a progressive mayor in 2013 and the growing visibility of the transgender rights movement, that decision made it possible for advocates to override some of the governing rationales of the city's agencies and, in 2014, effectively remove body modifications as requirements for sex reclassifications on birth certificates in both the city and the state.

The victory that made gender identity the only basis for birth certificate reclassification in New York City was, in other words, not the result of an agreement between advocates and the city about the ontological foundation of sex. It was possible because, over the course of the twentieth century, the ability of courts and agencies to treat people differently because of their sex classification had diminished.

This was in significant part a result of the legal victories of the women's rights movement—its success at removing traditional gender arrangements from the law. The misclassification of trans people was historically a consequence not simply of transphobia, but of the denial to women of the rights and resources available to men. (Just as transgender marriages invoked same-sex marriages, so marriage equality was as much about gender equality as it was about gay rights.) Sex classifications were necessary for enforcing policies that enshrined those inequalities. When people with a gender identity not traditionally associated with the sex assigned to them at birth—members of a category that hadn't been anticipated when the system was put in place—attempted to change their sex classification, they were unintentionally challenging the entire apparatus governing sex-based legal subordination.

In 2015, *Obergefell* v. *Hodges* felled one of the last relics of this state-sponsored discrimination nationwide. The consequences of sex classification came to matter less once an F designation could no longer be used to curtail civil and property rights or to deny equal access to education and the professions—and still less once an M or an F designation could no longer be used to enforce heteronormativity through bans on same-sex marriage. It is precisely because there is so much *less* at stake in sex classification than there used to be that contemporary policymakers and judges have less reason than their predecessors to deny reclassification requests and reforms, or to erect obstacles like genital surgery requirements.

And yet while the formal allotment of rights and resources based on gender has ended, its precondition—the ability of governments to distinguish between men and women, and to use their police powers to decide who is a man and who is a woman—remains part of the architecture of governments. The New York City reforms addressed the pressing needs of both binary and non-binary trans people whose inability to negotiate identity bureaucracies— unnoticeable and quotidian to cisgender people—creates barriers to their

participation in social, economic, and civic life. But they did not reimagine what M, X, or F are meant to signify. If they had, no newborn would have sex markers on their birth certificates; those would be added later, when children were old enough to have and to know their gender identity.[4] Or there would be no sex designation for anyone.

Instead, sex reclassification policy, in having its exceptions tailored to accommodate a particular minority group, has evolved into a vehicle of contemporary identity politics. In blue states, it serves as a political tool to recognize the needs of the part of the constituency that identifies as transgender; the mayor of New York City at the time, Bill de Blasio, announced his support of the reforms by affirming that "transgender and gender non-conforming New Yorkers deserve the right to choose how they identify and to live with respect and dignity." In other parts of the United States, transgender identity politics has been exploited by the right wing to incite an ugly culture war. Transgender people have been targeted as frauds, potential sex offenders, and dupes of "transgender ideology." Progressive policies are increasingly mirrored in red states by legislation meant to harm trans people, especially trans and non-binary youth and trans girls. From a spate of bathroom bills in state legislatures that began in 2015 to a new round of anti-trans bills in the past two years, aimed at preventing medical professionals from providing gender-affirming care to transgender teens and trans girls from participating in girls' sports, transgender people have become a focus of ire from the conservative movement.

This backlash has come in response to remarkable gains in the visibility and acceptance of the transgender movement over the last decades. From policy reforms to opinion trends, campaigns for transgender equality appear to have advanced with astonishing speed, while other issues of concern to women have largely stalled, either making little progress or suffering real setbacks. Compare the very positive transgender employment rights decision in 2020, *Bostock* v. *Clayton County*, authored by a justice appointed by President Trump, to the reversal of the constitutional right to abortion that is expected in the coming weeks.

After *Roe* is overturned, will *Obergefell* be left intact? Justice Alito's attack on substantive due process in *Roe* would easily apply to the Court's 2015 same-sex marriage decision. Collegial deference to a fellow Republican-appointed justice may make the Court less inclined to revisit Justice Gorsuch's opinion in *Bostock* in the near future, but it's entirely possible that the Court will prevent Democratic administrations at the federal and state levels from extending *Bostock*'s logic—that laws banning discrimination on the basis of sex apply to LGBT people—to other areas, like education and health care.

The apotheosis of the apparent divergence between transgender and women's issues appears almost uncannily in the leaked *Dobbs* draft, in Alito's burnishing of a much-reviled 1974 decision, *Geduldig* v. *Aiello*. In that case, the Court found that discrimination against pregnant women is not gender-based and does not violate the Equal Protection Clause. The crucial distinction, Justice Stewart wrote, was not between women and men but between "pregnant women and nonpregnant persons."

It might be tempting to take *Bostock* and *Geduldig*'s countervailing logics—the former holds that changing one's sex is protected by a sex discrimination statute, even as the latter finds that pregnancy discrimination has nothing to

do with one's status as M or F—as an invitation to tinker with the rules of inclusion and exclusion until non-discrimination laws cover exactly who we want them to cover (women and transgender and non-binary people, in many cases). But on those terms, *Geduldig* is right: not only are not all women pregnant, but not all "pregnant women" are women. These realities don't alter the economic and physical hardships of carrying an unwanted pregnancy to term. Now that gender can no longer be a legal mechanism used to enforce inequality—it can only be invoked to *demand* equality—one's status as F or M or X carries few state-administered distributive consequences. But governments still distribute burdens unequally, from lower capital gains taxes to incarceration rates to, very soon it seems, forced pregnancies.

Sex classification systems were not initially put in place with trans people in mind. Over time, we've managed to find recognition within most of these systems, as in New York City. Recently, the right has reciprocated: directly targeting trans people by insisting on particular constructions of sex. But using the law to ensure that people won't be treated differently because of their gender at their workplace, at the DMV, or at school can only do so much. For trans people, for women, for anyone, non-discrimination laws are a necessary but insufficient condition for real equality. Truly transformative change lies outside the category-driven arithmetic of identity politics in its liberal form: a large-scale assault on income inequality; prison abolition; the adoption of universal public-payer health care; and the creation of policies that enshrine all aspects of reproductive justice, from abortion to parenting to education. We need a transgender feminist approach that refuses to engage on the terms the right and the center have set out for us—what sex really means, what category this or that person falls under—and focuses on the material consequences of policies themselves.

**Adapted from Paisley Currah's** *Sex Is as Sex Does: Governing Transgender Identity***, to be published by** NYU Press **May 31.**

## Paisley Currah

Paisley Currah is a Professor of Political Science and Women's and Gender Studies at Brooklyn College and the CUNY Graduate Center. He is the author of *Sex Is as Sex Does: Governing Transgender Identity*. (May 2022)

- Joanne Meyerowitz, *How Sex Changed* (Harvard, 2002).

- This number does not include cases involving intersexed people. For the birth certificates of "pseudo hermaphrodites," officials would declare that an error had been made in the original birth certificate and make the requested change. The Board of Health had maintained a distinction between intersexed individuals and individuals whose gender identity later turned out not to match the sex assigned at birth. The policy for change of sex classification for intersexed individuals was not under debate.

- For a different but fascinating and generative account of the legal distinction between sex and gender, see Sonia K. Katyal, "The Numerus Clausus of Sex," *Chicago Law Review*, Vol. 84, No. 1 (2017).

- The New York City Department of Health and Mental Hygiene's description of the changes to the health code makes it clear that X is not an option among the categories assigned at birth. Parents can elect

to change the sex designation to X after the original birth certificate has been issued. Interestingly, the department names the designation options at birth as "'sex' categories" and the categories that can be opted into later as "gender categories."

© 1963-2025 NYREV, Inc. All rights reserved.