**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| NICOLAS TALBOTT, *et.al.* |
| *Plaintiff*, |
| v. |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, |
| *Defendants*. |

No. 1:25-cv-240-ACR

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RENEWED MOTION**
**<u>FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

    **A.**    DoD Policy Prior to 2015 .....................................................................................4

    **B.**    The 2016 Carter Policy ........................................................................................6

    **C.**    The 2018 Policy....................................................................................................7

    **D.**    President Biden's Policy ......................................................................................9

    **E.**    President Trump's Executive Orders....................................................................9

    **F.**    DoD's 2025 Policy .............................................................................................11

    **G.**    Prior Litigation in the First Trump Administration ..........................................14

    **H.**    The Instant Action and Motion .........................................................................15

LEGAL STANDARDS ........................................................................................................15

ARGUMENT .......................................................................................................................15

I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIM..........................................................................................................................15

    **A.**    The Servicemember Plaintiffs Have Failed to Exhaust Their Administrative
Remedies. ...........................................................................................................15

    **B.**    The DoD Policy Should Be Evaluated Under Rational-Basis Review. ..........................18

    1.    The accession and retention standards are based on a medical condition and
medical history, not "transgender status."........................................................18

    2.    The Policy's other standards are likewise subject to rational-basis review...................20

    3.    Even if the Policy classifies based on "transgender status" rather than gender
dysphoria, intermediate scrutiny would not apply. ..........................................22

    **C.**    The DoD Policy Survives Constitutional Scrutiny. .........................................26

    1.    The military's judgment is entitled to significant deference. ...........................26

    2.    The Policy passes any level of review................................................................28

3.      Alleged animus is not a reason to grant Plaintiffs' motion............................................39

**D.**     Plaintiffs Are Unlikely to Succeed in Their Challenge to the 2025 Policy's
Other Standards ..........................................................................................................43

**E.**     Plaintiffs Are Unlikely to Succeed on Their Estoppel Claim........................................45

II.     PLAINTIFFS HAVE NOT DEMONSTRATED CERTAINLY IMPENDING
IRREPARABLE INJURY. ...................................................................................................47

III.    THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A
PRELIMINARY INJUNCTION. ........................................................................................49

IV.      ANY PRELIMINARY INJUNCTION SHOULD APPLY TO THE NAMED
PLAINTIFFS ONLY............................................................................................................50

V.      ANY PRELIMINARY INJUNCTION CANNOT IMPEDE THE MILITARY'S
DISCRETION TO MAKE ASSIGNMENT, DEPLOYMENT, AND
OPERATIONAL DECISIONS.............................................................................................52

CONCLUSION....................................................................................................................................54

## CASES

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) ........................................................... 15

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................ 45

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024) ...................................................... 48

*Antonellis v. United States*,
  723 F.3d 1328 (Fed. Cir. 2013) ........................................................ 54

*Ass'n of Flight Attendants-CWA v. Chao*,
  493 F.3d 155 (D.C. Cir. 2007) ......................................................... 15

*ATC Petroleum, Inc. v. Sanders*,
  860 F.2d 1104 (D.C. Cir. 1988) ....................................................... 46

*Austin v. U.S. Navy Seals 1-26*,
  142 S. Ct. 1301 (2022) ............................................................... 1, 54

*Bois v. Marsh*,
  801 F.2d 462 (D.C. Cir. 1986) ......................................................... 16

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) .......................................................... 22, 23, 24

*Bowen v. City of New York*,
  476 U.S. 467 (1986) ........................................................................ 16

*Bowen v. Gilliard*,
  483 U.S. 587 (1987) ........................................................................ 25

*Cargill v. Marsh*,
  902 F.2d 1006 (D.C. Cir. 1990) .............................................. 16, 26, 54

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ..................................................... 47, 48

*Chappell v. Wallace*,
  462 U.S. 296 (1983) ........................................................................ 55

*Church v. Biden*,
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................... 16, 48

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ................................................................... 25, 26

*City of Dallas v. Stanglin,*
490 U.S. 19 (1989) ..................................................................28

*Cortright v. Resor,*
447 F.2d 245 (2d Cir. 1971) .....................................................54

*Craig v. Boren,*
429 U.S. 190 (1976) ................................................................25

*Dandridge v. Williams,*
397 U.S. 471 (1970) ................................................................29

*Dep't of Homeland Sec. v. New York,*
140 S. Ct. 599 (2020) ....................................................51, 52, 53

*Doe 1 v. Trump,*
275 F. Supp. 3d 167 (D.D.C. 2017)...........................14, 45, 47

*Doe 2 v. Mattis,*
344 F. Supp. 3d 16 (D.D.C. 2018) ..........................................53

*Doe 2 v. Shanahan,*
755 F. App'x 19 (D.C. Cir. 2019)....................................*passim*

*Doe 2 v. Shanahan,*
917 F.3d 694 (D.C. Cir. 2019) .......................................*passim*

*Eknes-Tucker v. Governor of Alabama ("Eknes-Tucker I"),*
80 F.4th 1205 (11th Cir. 2023)................................................23

*Eknes-Tucker v. Governor of Alabama ("Eknes-Tucker II"),*
114 F.4th 1241 (11th Cir. 2024) ........................................23, 26

*Emery Min. Corp. v. Sec'y of Labor,*
744 F.2d 1411 (10th Cir. 1984) ..............................................46

*Farris v. Rice,*
453 F. Supp. 2d 76 (D.D.C. 2006) ..........................................48

*FCC v. Beach Commc'ns, Inc.,*
508 U.S. 307 (1993) ..........................................................28, 29

*Florida v. Dep't of Health & Human Servs.,*
19 F.4th 1271 (11th Cir. 2021)................................................51

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................42

*GAO v. Gen. Accounting Office Pers. Appeals Bd.*,
    698 F.2d 516 (D.C. Cir. 1983) ...................................................................47

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019)....................................................................45

*Gill v. Whitford*,
    585 U.S. 48 (2018) ....................................................................................51

*Gilligan v. Morgan*,
    413 U.S. 1 (1973)................................................................................*passim*

*Goldman v. Secretary of Def.*,
    734 F.2d 1531 (D.C. Cir. 1984),
    *aff'd*, 475 U.S. 503 (1986) .......................................................................37

*Goldman v. Weinberger*,
    475 U.S. 503 (1986) ..........................................................................*passim*

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) ..................................................................................51

*Hanson v. Dist. of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ................................................................48

*Harkness v. Sec'y of Navy*,
    858 F.3d 437 (6th Cir. 2017)....................................................................54

*Hayes v. Sec'y of Def.*,
    515 F.2d 668 (D.C. Cir. 1975) .................................................................17

*Heidman v. United States*,
    414 F. Supp. 47 (N.D. Ohio 1976) ..........................................................16

*Heller v. Doe*,
    509 U.S. 312 (1993) ..................................................................................29

*In re al-Nashiri*,
    791 F.3d 71 (D.C. Cir. 2015) ...................................................................48

*In re Dep't of Commerce*,
    586 U.S. 956 (2018) ...........................................................................32, 41

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017)...............................................................48

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024)......................................................24, 40, 45

*Karnoski v. Trump*,
   No. C17-1297 (MJP), 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ...................................14

*Knehans v. Alexander*,
   566 F.2d 312 (D.C. Cir. 1977) ...........................................................................................49

*Kreis v. Sec'y of Air Force*,
   866 F.2d 1508 (1989) .........................................................................................................54

*L.W. by & through Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023)................................................................... 1, 22, 23, 25

*Lehnhausen v. Lake Shore Auto Parts Co.*,
   410 U.S. 356 (1973)...........................................................................................................29

*Lewis v. Casey*,
   518 U.S. 343 (1996) ..........................................................................................................51

*Lyng v. Castillo*,
   477 U.S. 635 (1986)...........................................................................................................25

*Mass. Bd. of Ret. v. Murgia*,
   427 U.S. 307 (1976) ..........................................................................................................25

*Masters Pharm. Inv. v. DEA*,
   861 F.3d 206 (D.C. Cir. 2017) ..........................................................................................47

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ..........................................................................................................15

*McCarthy v. Madigan*,
   503 U.S. 140 (1992) ..........................................................................................................16

*Miss. Univ. for Women v. Hogan*,
   458 U.S. 718 (1982) ..........................................................................................................24

*Morris Comm's, Inc. v. FCC*,
   566 F.3d 184 (D.C. Cir. 2009) ..........................................................................................46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).............................................................................................................41

*Munaf v. Green*,
   553 U.S. 674 (2008) ..........................................................................................................52

*Myers v. Bethlehem Shipbuilding Corp.*,
   303 U.S. 41 (1938).............................................................................................................15

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ................................................................................................46

*Nken v. Holder*,
556 U.S. 418 (2009) ..........................................................................................15, 49

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ................................................................................................25

*OPM v. Richmond*,
496 U.S. 414 (1990) ................................................................................................45

*Orloff v. Willoughby*,
345 U.S. 83 (1953) .................................................................................. 1, 26, 53, 54

*Parisi v. Davidson*,
405 U.S. 34 (1972) ..................................................................................................16

*Parker v. Levy*,
417 U.S. 733 (1974) ................................................................................................16

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 (6th Cir. 2021)...................................................................................23

*Randolph-Sheppard Vendors of Am. v. Weinberger*,
795 F.2d 90 (D.C. Cir. 1986) ..................................................................................17

*Reaves v. Ainsworth*,
219 U.S. 296 (1911) ................................................................................................53

*Reinhard v. Johnson*,
209 F. Supp. 3d 207 (D.D.C. 2016)..........................................................................49

*Rostker v. Goldberg*,
453 U.S. 57 (1981) ...........................................................................................*passim*

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973) ..............................................................................................25, 26

*Schlanger v. United States*,
586 F.2d 667 (9th Cir. 1978)...................................................................................54

*Schlesinger v. Ballard*,
419 U.S. 498 (1975) ..........................................................................................26, 28

*Schlesinger v. Councilman*,
420 U.S. 738 (1975) ................................................................................................16

*Sebra v. Neville*,
    801 F.2d 1135 (9th Cir. 1986) ............................................................... 54

*Shaw v. Austin*,
    539 F. Supp. 3d 169 (D.D.C. 2021) ........................................................ 48

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) .................................................................. 27

*Spadone v. McHugh*,
    842 F. Supp. 2d 295 (D.D.C. 2012) ........................................................ 48

*Steffan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ................................................................. 38

*Stockman v. Trump*,
    No. EDCV 17-1799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) ...................... 14

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ........................................................ 14

*Stone v. Trump*,
    400 F. Supp. 3d 317 (D. Md. 2019) ........................................................ 14

*Tennessee v. Cardona*,
    No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ............................. 23

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) .............................................................................. 51

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ....................................................................... *passim*

*United States v. Browning*,
    630 F.2d 694 (10th Cir. 1980) ............................................................... 46

*United States v. Owens*,
    54 F.3d 271 (6th Cir. 1995) ................................................................... 46

*United States v. Skremetti*,
    144 S. Ct. 2679 (2024) ........................................................................... 1

*United States v. Virginia*,
    518 U.S. 515 (1996) ....................................................................... 29, 36

*United States Navy Seals 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) .................................................... 54

*Vance v. Bradley*,
  440 U.S. 93 (1979) ...................................................................................29

*Vance v. Wormuth*,
  No. 3:21-CV-730-CRS, 2022 U.S. LEXIS 67345 (W.D. Ky. Apr. 12, 2022).........................17

*Veitch v. Danzig*,
  35 F.Supp.2d 32 (D.D.C. 2001) ...............................................................48

*Wilson v. Walker*,
  777 F.2d 427 (8th Cir. 1985).................................................................54

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................15, 26, 29

## STATUTES

10 U.S.C. § 1182 ............................................................................12, 17

10 U.S.C. § 1552 ...............................................................................49

10 U.S.C. § 4319 ...............................................................................36

10 U.S.C. § 7419 ..............................................................................5, 36

28 U.S.C. § 1491 ...............................................................................48

42 U.S.C. § 2000e-2 ............................................................................23

## RULES

Fed. R. Civ. P. 8(c) ..........................................................................45

## REGULATIONS

86 Fed. Reg. 7471 (Jan. 25, 2021) .............................................................9

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the
  Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)
  ("*Defending Women* EO") ..................................................................10, 42

*Prioritizing Military Excellence and Readiness*,
  Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("*Military* EO")...................*passim*

## OTHER AUTHORITIES

Elena Kagan, *Presidential Administration*,
  114 Harv. L. Rev. 2245 (2001)...............................................................41

*Independent Review of Gender Identity Services for Children and Young People:  Final Report*
   ("Cass Report") (April 2024) *available at,*
   https://cass.independentreview.uk/home/publications/final-report/ ......................................45

Samuel L. Bray, *Multiple Chancellors:  Reforming the National Injunction*,
   131 Harv. L. Rev. 417 (2017) .............................................................................................51

The Federalist No. 70...............................................................................................................42

## INTRODUCTION

"Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). "[J]udges are not given the task of running the [military]," and indeed, "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953).

The Judiciary must be especially careful to adhere to the usual—and highly deferential—rules governing judicial review of military decisionmaking when it involves "a vexing and novel topic of medical debate" about which the people, the States, and the federal government are engaged in policy debates. *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 471–72 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (June 24, 2024). "Constitutionalizing new areas of American life is not something federal courts should" ever "do lightly." *Id.* Courts should be especially cautious about doing so in the military context when the Supreme Court repeatedly has upheld military policies that, according to some, "would unquestionably have fallen had any government attempted to apply them in the civilian world." *Doe 2 v. Shanahan*, 917 F.3d 694, 732 (D.C. Cir. 2019) (Williams, J., concurring).

In an exercise of "professional military judgment[]" about the composition of our Nation's armed forces, *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), the Department of Defense ("DoD") has long disqualified individuals from entering military service who have physical or emotional impairments. DoD has been particularly cautious about service by individuals with mental health conditions, given the unique mental and emotional stresses of military service. For that reason, the vast majority of Americans between ages 17 and 24 are ineligible to join the military for mental, medical, or behavioral reasons. In any context other than the one at issue in this case, DoD's professional military judgment about the risks of allowing individuals with physical or emotional impairments to serve in the military would be virtually unquestionable. Indeed, "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the

Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process." *Id.*

Even in this context, multiple Administrations have acknowledged the risks stemming from service by individuals with gender dysphoria, a mental health condition associated with clinically significant distress or impairment in social, occupational, or other important areas of human functioning. That the policies have differed reflects only that military leaders have had varying degrees of willingness to tolerate such risks and have drawn lines based on different cost-benefit calculations at different times. But all such decisions are committed to the military's discretion because the composition of the military is an area where the Supreme Court has long recognized that judicial deference is at its highest point. Not only are courts ill-equipped to determine the impact that any intrusion upon military authority might have, but, as noted above, our constitutional scheme charges the Executive and Legislative Branches with carrying out the Nation's military policy. Separation-of-powers concerns thus significantly constrain the Judiciary's intrusion into military regulations in this area.

Against this backdrop, Plaintiffs who are servicemembers or who wish to enlist in the military sued to challenge new DoD policy that presumptively disqualifies individuals with gender dysphoria from military service. DoD issued the new policy to implement the new Commander in Chief's Executive Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("*Military* EO"), which stated that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are incompatible with the high standards demanded for military service. The *Military* EO also prohibits the use of sleeping, changing, or bathing facilities by servicemembers who do not belong to the sex designated for such facilities.

Plaintiffs now seek the extraordinary relief of a preliminary injunction alleging Equal Protection violations and equitable estoppel. But there is no clear and present need for emergency relief now because the servicemembers have yet to exhaust the administrative processes available under the new DoD policy, and their potential loss of employment or inability to join the military does not constitute irreparable harm because it is subject to remediation.

More importantly, Plaintiffs are unlikely to succeed on the merits of their claims. Plaintiffs argue that heightened scrutiny applies because the DoD policy purportedly classifies on the basis of sex and targets trans-identifying individuals who, in Plaintiffs' view, constitute a quasi-suspect class. But the DoD policy does neither. Rather than discriminating on the basis of sex, it classifies on the basis of a medical condition—gender dysphoria—and applies equally to male and female servicemembers. To the extent the policy requires separate facilities for the two sexes, that is consistent with the Supreme Court, Congress, and the military's longstanding recognition that military policies can and must account for the distinct immutable biological characteristics of the sexes. Further, gender dysphoria is not a proxy for trans-identifying individuals because only a subset of such individuals suffers from this medical condition. And even if it were a proxy, the Supreme Court has never recognized trans-identifying individuals to be a quasi-suspect class; indeed, it has not recognized a constitutionally protected class for nearly half a century.

Accordingly, the DoD policy is subject to the highly deferential rational-basis review and easily passes constitutional muster, but it would survive heightened scrutiny as well. The Commander in Chief has determined that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere condition and without the benefit of routine medical treatment or special provisions." *Military* EO § 1. DoD has likewise announced its policy that service in the Military Services is open to all persons who can meet the high standards for military service and readiness without special accommodations. DoD's policy of presumptively disqualifying individuals with gender dysphoria is substantially related to the important government interests in military readiness and lethality because the medical condition is associated with clinically significant distress or impairment of important areas of functioning. Although Plaintiffs contend that the DoD policy cannot survive even rational-basis review because it is allegedly motivated by animus toward trans-identifying people, that argument is foreclosed by Supreme Court precedent. It cannot be said that the policy "is inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018) (citation omitted). Where, as here, a policy "has a legitimate grounding in national security concerns," the

Court "must accept that independent justification." *Id.* As the Court has recognized, the parties are not starting from a clean slate, given the prior litigation on DoD's 2018 policy that closely resembles the current policy. The Supreme Court and the D.C. Circuit allowed that policy to go into effect. The D.C. Circuit, in particular "acknowledge[d] that the military has substantial arguments for why the [2018 policy] complies with the equal protection principles of the Fifth Amendment." *Doe 2 v. Shanahan*, 755 Fed. App'x 19, 25 (D.C. Cir. 2019). The Court should find the same.

As for Plaintiffs' estoppel claim, the Court should reject it out of hand, just as the Court did in *Doe 1* concerning the 2018 policy. Not only have Plaintiffs failed to identify a cause of action, but the remedy is unavailable to estop the Federal Government from making generally applicable policy changes. Even beyond those threshold problems, Plaintiffs are unlikely to make the requisite showings that the government promised them never to change the prior policy and that the government engaged in affirmative misconduct.

For these reasons, and those stated below, the Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### A. DoD Policy Prior to 2015

The separate opinions in the D.C. Circuit *Doe 2* decision lay out the history of the military's prior policies relevant to trans-identifying individuals and individuals diagnosed with gender dysphoria. *See Doe 2*, 917 F.3d at 697–700 (Wilkins, J., concurring); *id.* at 709–12 (Williams, J., concurring). "Prior to 2015, the Department of Defense . . . effectively banned all transgender persons from either joining or remaining in the military." *Id.* at 696 (Wilkins, J., concurring). DoD has long disqualified individuals from entering military service who have "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have." DoD Report & Recommendations on Military Service by Transgender Persons ("DoD 2018 Report") (Feb. 2018) (ECF No. 73-8) at 9 (citing DoD Instruction 6130.03 ("DoDI 6130.03"), *Medical*

*Standards for Appointment. Enlistment, or Induction in the Military Services* (Apr. 28, 2011), incorporating Change I, (Sept. 13, 2011)).  The military has sensibly taken a particularly cautious approach with respect to mental health standards, considering "the unique mental and emotional stresses of military service."  *Id.* at 10; *see also id.* at 20 (noting that "[m]ost mental health conditions . . . are automatically disqualifying" for entry into the military).  As a result, seventy-one percent of Americans between ages 17 to 24 are ineligible to join the military (without a waiver) for mental, medical or behavioral reasons.  *Id.* at 6.

In general, the military has aligned these disqualifying conditions with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), published by the American Psychiatric Association.  *Id.* at 10.  Military standards for decades therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the DSM.  *Id.* at 7, 9–10.  In 2013, the American Psychiatric Association replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria" in the DSM.  *See Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring); *see also* DoD 2018 Report at 10, 12.  It explained that it no longer viewed identification with a gender different from one's sex (*i.e.*, trans-identifying status), on its own, to be a disorder.  *See id.* at 12.  It stressed, however, that a subset of trans-identifying people suffers from a medical condition called "gender dysphoria," which "manifests as stress and anxiety caused by the incongruence between the sex assigned to the person at birth and the person's preferred gender identity."  *Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring).  The condition is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."  *Id.* at 708 (Williams, J., concurring); *see also* DoD 2018 Report at 12–13, 21.

Aside from imposing stringent medical standards, the military has also long treated servicemembers differently according to their sex as necessary.  "Given their biological differences, males and females have long been assigned to separate berthing, bathroom, and shower facilities, and subject to different sets of physical fitness, body fat, uniform, and grooming standards."  *Doe 2*, 917 F. 3d at 707 (Williams, J., concurring).  Congress too has required the

military to separate the two sexes and to ensure their privacy in various contexts. *See* 10 U.S.C. §§ 7419, 7420, 8431, 8432, 9419, 9420.

### B. The 2016 Carter Policy

In July 2015, then-Secretary of Defense Ashton Carter ordered the creation of a working group to study the policy and readiness implications of open service by trans-identifying persons, but instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Memorandum from Secretary Carter (July 28, 2015), Ex. 1. As part of this review, DoD commissioned the RAND National Defense Research Institute ("RAND") to conduct a study. DoD 2018 Report at 13. The resulting RAND Report concluded that the proposed policy change would have "an adverse impact on health care utilization and costs, readiness, and unit cohesion," but that these harms would be "'negligible' and 'marginal' because of the small, estimated number" of trans-identifying servicemembers relative to the size of the armed forces as a whole. *Id.* at 14; *see* RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* at xi–xii, 39–44, 46–47, 69–70 (2016), ECF No. 72-70 ("RAND Report"). Secretary Carter did not seek out or receive input from the military Service Chiefs as part of this review. *See* May 26, 2018, Testimony of Secretary James Mattis Before the Senate Armed Services Committee at 62 ("Mattis Testimony"), Ex. 2.

In 2016, Secretary Carter adopted a policy that allowed trans-identifying servicemembers to transition if they were diagnosed with gender dysphoria by a military medical provider and could adhere to the standards associated with their biological sex until a military medical provider determined that their gender transition was complete. *Doe 2*, 917 F.3d at 710 (Williams, J., concurring). The policy also allowed trans-identifying individuals, including those who had already transitioned, to enter military service if they met certain medical criteria. *See* DoDI 6130.03 Vol I § 6.28(t) (eff. May 6, 2018; Change 5 am. May 28, 2024) ("2024 DoDI 6130.03 Vol I"), ECF No. 13-11 at 5–6. Under that policy, trans-identifying individuals who lacked a history or diagnosis of gender dysphoria, whether they were currently serving or seeking to serve, could

serve if they met the standards associated with their biological sex.  DoD 2018 Report at 4.

The Carter Policy was not immediately implemented, however, because of concerns raised by multiple military branches and requests for up-to-three-year delays in implementing the policy. *See* Mattis Testimony, Ex. 2 at 62.  The Army, for example, requested "a delay in implementing the draft accessions policy until July 1, 2019, to allow for a meaningful analysis and determination regarding the impact of transgender accessions on the Army's readiness," noting that "some transgender Soldiers experience extensive medical non-deployability both before and after transition[.]"  Service Responses to Deputy Secretary Work Mem. (May 8, 2017), Ex. 3.  The Marine Corps requested a 24-month delay, and the Air Force recommended a 12- to 36-month delay, noting that "information received from Combatant Commands (CCMDs) raises significant concerns about the potential availability, readiness, and deployability of potential transgender accessions that warrants more study."  *Id.*  In June 2017, Secretary Mattis approved the Services' recommendation to delay the implementation of the accession standards and established a group of senior officials to evaluate more carefully the impact on military readiness and lethality.  Sec'y of Defense, *Accession of Transgender Individuals Into the Military Service* (June 30, 2017), Ex. 4.

### C.  The 2018 Policy

In August 2017, President Trump issued a memorandum stating that the Carter policy had "failed to identify a sufficient basis to conclude that terminating [DoD's] longstanding policy"— which generally disqualified transgender individuals from service—"would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources[.]"  Presidential Mem. (Aug. 25, 2017) at 2–3, ECF No. 13-9.  The President called for "further study" to ensure that implementation of the Carter policy "would not have those negative effects."  *Id.* at 3.  Secretary Mattis then convened a panel of experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  DoD 2018 Report at 17.

The panel consisted of "senior uniformed and civilian Defense Department and U.S. Coast

Guard leaders[,]" including "combat veterans." Secretary Mattis' Memorandum for the President concerning Military Service by Transgender Individuals (Feb. 22, 2018) ("2018 Policy") at 1, ECF No. 38-2. These senior military leaders were selected to be on the panel because of "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces." DoD 2018 Report at 18. They were determined to be "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." *Id.* In addition, the panel drew on experts across DoD, including those dedicated to issues involving personnel, medical treatment, and military lethality. *Id.* The panel also met with commanders of trans-identifying servicemembers and those servicemembers themselves. *Id.* It further examined information regarding gender dysphoria; its treatment; the impact of this condition on military effectiveness, unit cohesion, and resources; and data regarding servicemembers diagnosed with gender dysphoria. *Id.* at 18, 31.

Upon the panel's recommendation, and following President Trump's approval (Presidential Memo. March 23, 2018, ECF No. 38-3), Secretary Mattis adopted the 2018 policy, under which trans-identifying persons with a history or diagnosis of gender dysphoria were disqualified from military service, except: (1) if they had been stable for 36 consecutive months in their biological sex prior to accession; (2) if they were diagnosed with gender dysphoria after entering into service, did not require a change of gender, and remained deployable within applicable retention standards; and (3) currently serving servicemembers who had been diagnosed with gender dysphoria after the Carter policy took effect and prior to the effective date of the 2018 policy could continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria. 2018 Policy at 2. With limited exceptions, trans-identifying persons who required or had undergone gender transition were disqualified. *Id.* Trans-identifying persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, could serve in their biological sex. *Id.*

"In the Department's military judgment," this was necessary because service by these individuals is "not conducive to, and would likely undermine, the inputs—readiness, good order

and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality." *Id.* at 32, 41. DoD's judgment was premised on: evidence that those with gender dysphoria continued to have higher rates of psychiatric hospitalization and suicidal behavior even after transition; evidence of higher utilization rates of psychiatric services; the creation of substantial privacy demands that would generate friction in the ranks; the safety risks arising from having training and athletic standards turn on gender identity; evidence that transition could render servicemembers non-deployable for significant periods; and disproportionate transition-related costs. *Id.* at 19–42.

### D. President Biden's Policy

Immediately after taking office, President Biden issued Executive Order 14004, largely reverting to the Carter policy based on his judgment that "the Secretary of Defense's 2016 conclusions remain valid[.]" *See* 86 Fed. Reg. 7471 (Jan. 25, 2021). A history or diagnosis of gender dysphoria was still a bar to military accession unless the applicant had been asymptomatic for 18 months. 2024 DoDI 6130.03 Vol I § 6.28(t). An applicant who had undergone sex reassignment surgery was disqualified unless (1) the surgery was more than 18 months prior and (2) no further surgery was required. *Id.* §§ 6.13(g)(1), (4); *id.* §§ 6.14(n)(1), (4). Prior cross-sex hormonal interventions were likewise disqualifying, unless the applicant was "stab[le]" as specified in the medical standards. *See id.* §§ 6.24(t)(1)–(4). All servicemembers were "subject to the standard[s], requirement[s], or polic[ies] associated with their gender marker in the [Defense Enrollment Eligibility Reporting System ("DEERS")]." *See* DoDI 1300.28 § 3.1(a) (Change 1, eff. Dec. 20, 2022). That is, a biological male who identified as female, but had not transitioned, was subject to male standards. A servicemember could change his or her gender marker only upon "a diagnosis from a military medical provider" that "gender transition [was] medically necessary," *id.* § 3.4(a), and upon approval of the commanding officer, *id.* §§ 3.4(b)–(c), among other steps and requirements, including the completion of the prescribed medical treatment plan, *id.* § 3.3(d)(2).

### E. President Trump's Executive Orders

On January 27, 2025, President Trump issued the *Military* EO, revoking President Biden's Executive Order 14004. *See* Exec. Order No. 14183, § 5, 90 Fed. Reg. 8757, 8758 (Jan 27, 2025). The *Military* EO noted that "[l]ongstanding Department of Defense . . . policy (DoD Instruction (DoDI) 6130.03) provides that it is the policy of the DoD to ensure that service members are '[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization.'" *Id.* § 1. "As a result, many mental and physical health conditions are incompatible with active duty, from conditions that require substantial medication or medical treatment to bipolar and related disorders, eating disorders, suicidality, and prior psychiatric hospitalization." *Id.* The *Military* EO further stated that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical treatment or special provisions." *Id.*

The *Military* EO thus declared that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. And that "this policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.* Section 3 of the *Military* EO incorporated the definitions of Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("*Defending Women* EO"), which provided that "[i]t is the policy of the United States to recognize two sexes, male and female," and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2.

The *Military* EO required DoD to update the medical standards for accession and retention within 60 days, *id.*, § 4(a), to promptly end pronoun usage inconsistent with biological sex, *id.* § 4(b), and to identify within 30 days all additional steps and issue guidance necessary to fully implement the order, *id.* § 4(c). It further provided that "[a]bsent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing

facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* § 4(e).

On February 7, 2025, Secretary of Defense Pete Hegseth authorized and delegated authority to the Under Secretary of Defense for Personnel and Readiness "to provide additional policy guidance and implementation guidance outside of the normal DoD issuance process." DoD Memorandum on Prioritizing Military Excellence and Readiness at 1 (Feb. 7, 2025), ECF No. 33-1. The memorandum also directed a pause on accession by anyone with a history of gender dysphoria, and on certain medical procedures—including "newly initiated gender-affirming hormone therapy." *See id.* at 1 & n.1.

**F. DoD's 2025 Policy**

On February 26, 2025, DoD issued "Additional Guidance on Prioritizing Military Excellence and Readiness." *See* Notice Ex. 1 (Feb. 26, 2025), ECF No. 63-1 (the "2025 Policy" or "Policy"). The Policy proceeds in six pertinent parts, as supplemented by additional guidance.

First, the Policy affirms that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," are inconsistent with the standards of military service. 2025 Policy § 1.b.[1]  Accordingly, persons meeting the criteria are generally disqualified from serving. *Id.* § 1.d.

Second, the Policy sets accessions and retention standards to further the stated policy. For accession, the policy disqualifies anyone with gender dysphoria or a history of hormonal/surgical transitioning from joining the military, unless given "a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities." *Id.* §§ 4.1.a–c. To be eligible for such a waiver, the applicant must be willing to serve in his or her biological sex. *Id.* § 4.1.c. Per subsequent clarifying guidance, "a compelling Government interest" can include "special experience, special training, and advanced

---

[1] For brevity, Defendants will refer to "a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," as having gender dysphoria.

education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department."   Office of the Undersecretary of Defense, *Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention & Accession Waivers* (Mar. 4, 2025), ECF No. 70-1 ("Mar. 4, 2025 Clarifying Guidance").   The clarifying guidance further provides that, to be eligible for such a waiver, an individual must meet the following criteria:

> 1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and

> 2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and

> 3. The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

*Id.* at 1–2.

With respect to current servicemembers, gender dysphoria or hormonal/surgical transition is likewise disqualifying unless there is a compelling government interest in retention and the member meets the same three criteria above.   *See* 2025 Policy §§ 4.3.a–c.

Third, the Policy establishes that disqualified servicemembers will be processed for administrative separation.   Enlisted members will be processed under DoDI 1332.14 ("Enlisted Administrative Separations), and commissioned officers will be processed under DoDI 1332.30 ("Commissioned Officer Administrative Separations").   All enlisted servicemembers who are separated involuntarily will, if desired by the member, be afforded an administrative separation board.   2025 Policy § 4.4.a.6.[2]   All commissioned officers who are involuntarily separated will, if desired by the officer, be afforded a board of inquiry.   *Id.* § 4.4.a.7 (citing 10 U.S.C. § 1182).

---

[2] In this way, the 2025 Policy expands the right to such boards.   For example, a servicemember with fewer than six years of total active and reserve military service typically would not be entitled to an administrative separation board, but would be separated under the Notification procedures. *See* DoDI 1332.14, § 5.2.

Fourth, the Policy sequences the separation process.  Before any separation proceedings take place, the Military Departments must "[e]stablish procedures and implement steps to identify servicemembers who have [gender dysphoria]."  *See id.* §§ 3.3.e, 4.4.b ("Separation proceedings for individuals identified pursuant to section 3.4.e. of this attachment will be initiated after the Secretaries of Military Departments complete the requirements in section 3.4.e. of this attachment.").  In supplemental guidance issued on February 28, 2025, DoD reiterated that "[w]hile the Secretaries of the Military Departments establish procedures and implement steps to identify servicemembers as required in the [2025 Policy], DoD personnel shall take no action to identify Service members pursuant to the [2025 Policy] until March 26, 2025."  *See* Office of the Undersecretary of Defense, *Clarifying Guidance on Prioritizing Military Excellence & Readiness* (Feb. 28, 2025), ECF No. 65-1 ("Feb. 8 2025 Clarifying Guidance").

Fifth, the Policy reiterates the Secretary's February 7, 2025, instruction that all surgical procedures associated with facilitating sex reassignment are cancelled but that existing cross-sex hormonal interventions may continue until separation is complete.  *Id.* § 4.2.b, c.  Servicemembers, however, may consult with a DoD healthcare provider concerning a diagnosis of gender dysphoria and receive mental health counseling for such a diagnosis.  *Id.* § 4.2.d.

Sixth, the Policy affirms adherence to the definitions in the *Defending Women* EO, and provides that in keeping with good order and discipline, "[p]ronoun usage when referring to Service members must reflect a Service member's [biological] sex."  *See* 2025 Policy § 1.f, 1.h.  And "[w]here a standard, requirement, or policy depends on whether the individual is a male or female . . . all persons will be subject to the standard, requirement or policy associated with their sex."  *Id.* § 1.g.

The Policy was informed "through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria," including "a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria.  *See* Feb. 26, 2025 Action Memo (ECF No. 73-23) at 3.  Specifically, DoD considered, among other things, the 2018

DoD Report, a 2021 review conducted by DoD concerning rates of disability and non-deployability of servicemembers with gender dysphoria, a 2025 medical literature review concerning rates of suicidal ideation and psychiatric diagnoses for trans-identifying individuals, and a review of cost data related to treatment for gender dysphoria. *Id.* at 3–4.

Since DoD issued the Policy, the Military Departments have been issuing their own implementing guidance. The Air Force, for example, has issued guidance providing, among other things, that "access to intimate spaces, such as showers, bathroom, and lodging facilities, and applicable dress and appearance and physical fitness standards, will be determined by a member's biological sex." Department of the Air Force, *Additional Guidance for Executive Order 14183 "Prioritizing Military Excellence and Readiness"* (Mar. 1, 2025) at 2, ECF No. 67-1. It further gives commanders "the latitude to place members on administrative absence to promote good order and discipline while they are being processed for separation," and for those members on administrative absence, the requirement to adhere to the standards associated with their biological sex is temporarily waived. *Id.*

### G. Prior Litigation in the First Trump Administration

There was extensive litigation concerning DoD's policy regarding trans-identifying people following President Trump's August 2017 Memorandum, and four federal district courts, including this Court, entered preliminary injunctions prohibiting enforcement of certain directives in the Memorandum. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177, 217 (D.D.C. 2017); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017); *Karnoski v. Trump*, No. C17-1297 (MJP), 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, No. EDCV 17-1799, 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017). Upon the adoption of the 2018 policy, the defendants moved to dissolve those preliminary injunctions. *See, e.g.*, *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019). The D.C. Circuit vacated the injunction in *Doe 2* in January 2019. *See id.* The Supreme Court likewise stayed the injunctions entered in *Karnoski* and *Stockman*. *See Trump v. Karnoski*, No. 18A625 (U.S. Jan. 22, 2019) (order staying preliminary injunction); *Trump v. Stockman*, No. 18A627 (U.S. Jan. 22, 2019) (same). And the *Stone* court dissolved the

preliminary injunction it had issued in August 2019.  *See Stone v. Trump*, 400 F. Supp. 3d 317 (D. Md. 2019).  Each case was dismissed following President Biden's revocation of the 2018 policy.

### H.  The Instant Action and Motion

On January 28, 2025, Plaintiffs filed the instant action on behalf of eight Plaintiffs—six of whom are servicemembers, and two others who hope to enlist in the military—alleging a single Equal Protection Count.  *See* Compl. ¶¶ 9–64, ECF No. 1.  Since then, Plaintiffs have moved for a preliminary injunction and amended their complaint three more times adding new claims and plaintiffs.  Third. Am. Compl., ECF No. 69 ("3d Am. Compl.").  Their instant renewed motion for preliminary injunction is based on Equal Protection and estoppel claims.  Pls.' Renewed Appl. For Prelim. Inj., ECF No. 72.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014).  Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

### A.  The Servicemember Plaintiffs Have Failed to Exhaust Their Administrative Remedies.

Judicial review is premature at this stage because the servicemember Plaintiffs have not yet exhausted the administrative remedies prescribed by the Policy.  *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 158 (D.C. Cir. 2007) ("[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

(quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938))). "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 38 (1972); *Bowen v. City of New York*, 476 U.S. 467, 484 (1986). This is especially true in the military context, "given the judiciary's lack of expertise in areas of military judgment and its long-standing policy of non-intervention in internal military affairs." *Heidman v. United States*, 414 F. Supp. 47, 48 (N.D. Ohio 1976) (citing *Schlesinger v. Councilman*, 420 U.S. 738 (1975); *Parker v. Levy*, 417 U.S. 733 (1974); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). Even where a controversy survives administrative review, "exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Accordingly, this Court and the D.C. Circuit have repeatedly recognized "that a court should not review internal military affairs in the absence of . . . exhaustion of available intraservice corrective measures." *Church v. Biden*, 573 F. Supp. 3d 118, 137 (D.D.C. 2021) (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986)); *see also Bois*, 801 F.2d at 467–68 (affirming dismissal for failure to exhaust where the servicemember had not sought a remedy from the relevant Board for Correction of Military Records and cautioning that "[c]ivilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers" (citation omitted)); *Cargill v. Marsh*, 902 F.2d 1006, 1007–08 (D.C. Cir. 1990) (per curiam) (affirming the dismissal of servicemember's claim for failure to exhaust administrative remedies).

The servicemember Plaintiffs have not satisfied the "salutary rule that an aggrieved military officer must first exhaust his administrative remedies . . . prior to litigating his claims in a federal court." *Bois*, 801 F.2d at 468. The Policy provides that all enlisted servicemembers and officers identified for involuntary separation processing pursuant to the Policy will, if desired by the enlisted servicemember or officer, be afforded an administrative separation review board (enlisted

servicemembers) or a Board of Inquiry (officers), *see* Policy § 4.4.a. & a.(6), (7), and "be afforded all applicable administrative processing protections," *see* DoDI 1332.14 (Aug. 1, 2024) § 5.3 (administrative separation board procedures); DoDI 1332.30 (May 11, 2018) § 5 (Board of Inquiry procedures). Enlisted servicemembers may be administratively separated "following a determination that doing so is in the best interest of the relevant Military Service," and officers may be separated when their "retention is not clearly consistent with the interests of national security." Policy § 4.4.a.

Plaintiffs cannot rely on the narrow exception to the exhaustion requirement where pursuing administrative remedies would be "obviously futile." *Hayes v. Sec'y of Def.*, 515 F.2d 668, 674 (D.C. Cir. 1975). That exception applies only when "the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986). As explained above, Plaintiffs can contest their separation before an administrative separation board or board of inquiry. Administrative separation boards may recommend that servicemembers subject to this policy be retained, and that recommendation may be approved by the separation authority or Secretary of the relevant service. *See* DoDI 1332.14 at 5.3.e(7), f(4)(b). Similarly, when a Board of Inquiry determines that an officer should be retained, the "case is closed," subject to narrow exceptions. *See* 10 U.S.C. § 1182(d)(1)(A); DoDI 1332.30 § 5.6(d). Neither the Court nor Defendants can prejudge what those boards may ultimately decide with respect to the servicemember Plaintiffs. At a minimum the "development of a factual record" by the Military Services will be of assistance to the Court in its judicial review of the involuntary separation. *Vance v. Wormuth*, No. 3:21-CV-730-CRS, 2022 U.S. LEXIS 67345, at *16 (W.D. Ky. Apr. 12, 2022) (internal citation omitted).

### B. The DoD Policy Should Be Evaluated Under Rational-Basis Review.

### 1. The accession and retention standards are based on a medical condition and medical history, not "transgender status."[3]

Plaintiffs' fear of a "categorical exclusion of transgender people from military service," Compl. ¶ 140, has not come to pass. Simply put, DoD's new accessions and retention standards do not exclude all trans-identifying individuals. Instead, they turn on gender dysphoria and a history of hormonal or surgical transition. Mem. of Law in Supp. of Pls.' Renewed Appl. for Prelim. Inj. at 28–30, ECF No. 72-1 ("Pls.' Br.").[4]  Plaintiffs' argument repeats the error that the D.C. Circuit noted in *Doe 2*. *See* 755 Fed. App'x at 24 ("Plaintiffs contended that the Mattis Plan's exclusion of transgender persons who have gender dysphoria or who are unwilling to serve in their biological sex constitutes a blanket ban, arguing this case as if all transgender individuals either (1) have gender dysphoria or (2) transition to their preferred gender."). As the D.C. Circuit observed, even though the *Doe* plaintiffs "characterized these as 'essential' and 'defining' aspects of being transgender," "all the reports supporting both the Carter Policy and the Mattis Plan defined transgender persons as 'identifying' with a gender other than their biological sex." *Id.* (citing May 11, 2018 Decl. of Dr. George Brown)).[5]  Importantly, as the D.C. Circuit noted, those reports

---

[3] To the extent Plaintiffs continue to challenge the *Miliary EO*, *see, e.g.*, Pls.' Br. at 28, they lack standing to do so. No Plaintiff can be separated or prevented from joining the military based on the Executive Order alone—as Defendants have long maintained. *See* Defs.' Opp'n at 11–14 (Feb. 12, 2025), ECF No. 38. In other words, those harms are not traceable to the Executive Order. Nor would enjoining the Executive Order necessarily remedy Plaintiffs' harms, as the DoD policy may remain. And of course, the President who issued the Executive Orders has been dismissed from the case. *See* Minute Order (Feb. 13, 2025). The focus of the Court's equal-protection analysis should be the 2025 Policy and its supplemental clarifying guidance.

[4] Plaintiffs persist in mischaracterizing the relevant policy. For example, Plaintiff suggest that the 2025 Policy "provides that military service by *transgender individuals* is inconsistent with standards of 'readiness, lethality, cohesion, honesty, humility, uniformity, and integrity.'" (quoting 2025 Policy § 1(b) (emphasis added)). But the 2025 Policy says that cited military standards are "inconsistent with the medical, surgical, and mental health constraints on *individuals with gender dysphoria*." 2025 Policy § 1.b. (emphasis added).

[5] This declaration can be found at *Doe 2 v. Trump*, No. 18-5257 (D.C. Cir. Sep. 21, 2018), Document #1752080 ("*Doe 2 J.A.*") at 839. Defendants will refer to the J.A. page numbers when citing this joint appendix.

"repeatedly state that not all transgender persons seek to transition to their preferred gender or have gender dysphoria," and some were willing and able to serve in their biological sex. *Id.* (citing 2016 Implementation Handbook at 13; 2016 RAND Report at x, 6–7, 20; 2014 Palm Center Report at 5). Indeed, the 2018 DoD Report found that there were "many" such servicemembers, who "have served, and [we]re serving, with great dedication under the standards of their biological sex." DoD 2018 Report at 32 (noting that of the 8,980 trans-identifying servicemembers at that time, only 937 had been diagnosed with gender dysphoria). Thus, it is not surprising that both *Doe 2* concurrences rejected the notion that gender dysphoria is something with which all trans-identifying people have been diagnosed. *See Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring); *id.* at 707 (Williams, J., concurring).

Plaintiffs submit a supplemental declaration from their expert Dr. George Brown, offering the new definition "that a transgender person is someone who lives in a different sex than their birth sex or would if able to," *see* Mar. 3, 2025 Decl. of Dr. Brown, ECF No. 72-78—a definition that was conspicuously absent in Dr. Brown's initial declaration in this case, *see* Feb. 2, 2025 Decl. of Dr. Brown, ECF No. 32, and is irreconcilable with his prior testimony in *Doe 2*, *see* Aug. 30, 2017 Decl. of Dr. Brown ¶ 13 (*Doe 2* J.A. 1056) ("The term 'transgender' is a term used to describe someone who experiences any significant degree of misalignment between their gender identity and their assigned sex at birth."). Notably, Dr. Brown previously indicated that not all trans-identifying persons would develop gender dysphoria or undergo medical transition. *See id.* ¶ 19 ("Only the subset of transgender people who have clinically significant distress or impairment qualify for a diagnosis of Gender Dysphoria."); May 11, 2018 Brown Decl. ¶ 9 (*Doe 2* J.A. 839) (same); *id.* ("If a transgender person develops gender dysphoria, they *can* receive appropriate transition-related care that resolves the clinically significant distress." (emphasis added)).[6]

---

[6] Dr. Brown's testimony now that the concept of identification "inherently encompasses" some outward expression, Mar. 3, 2025 Brown Decl. ¶ 6, is likewise contrary to his prior testimony, *see* Aug. 30, 2017 Brown Decl. ¶ 14 (*Doe 2* J.A. 1056) ("Gender identity describes a *person's internalized, felt sense* of who they are as male or female.") (emphasis added); *see also Karnoski v. Trump*, June 23, 2020 Brown Dep. Tr. 72:3–10 (distinguishing between gender identity and gender expression: "So gender identity is a core responsibility of every person. It's a subjective

That is consistent with Plaintiffs' own experiences. Plaintiffs Vandal, Cole, Danridge, Hash, Bettis, Pickett, Sale, and Bloomrose, for example, have all served for at least 12 years. *See* 3d Am. Compl. ¶ 33 (Vandal), ¶ 44 (Cole), ¶ 65 (Danridge), ¶ 77 (Hash), ¶ 106 (Bettis), ¶ 122 (Pickett), ¶ 134 (Sale), ¶ 153 (Bloomrose). That means that they served for years before the Carter Policy was announced, in a time when service by trans-identifying individuals was generally prohibited, and only transitioned pursuant to gender-dysphoria diagnoses that post-date the Carter Policy. Many of the Plaintiffs were only diagnosed in the past several years and thus had served according to the standards of their biological sex for much of their military careers. *See, e.g.*, 3d Am. Compl. ¶¶ 153–59 (Commander Bloomrose has been in the Navy for more than 19 years, and was only diagnosed with gender dysphoria last July and only began transitioning last August); ¶¶ 44, 48 (Cole served for approximately eight years before being diagnosed); ¶¶ 106, 109 (Bettis for 12 years); ¶¶ 134, 136 (Sale for 16 years). To the extent that trans-identifying persons would prefer to serve in the sex with which they identify even if they do not have gender dysphoria, that does not suggest that there is a categorical ban. In fact, such servicemembers *can* continue serving under the standards of their biological sex.

### 2. The Policy's other standards are likewise subject to rational-basis review.

The 2025 Policy provides that access to intimate spaces, and other military standards—such as uniforms, grooming, and physical fitness—shall be determined according to a servicemember's biological sex. 2025 Policy § 5. Plaintiffs argue that these provisions present a "Hobson's Choice" for trans-identifying servicemembers, "including those who have completed their transition," by "requir[ing] them to suppress or deny their transgender identity." Pls.' Br. at 31. But that is a red herring, because anyone with a history of gender dysphoria, or who has transitioned medically, will be processed for separation (absent a waiver) under the new retention

---

sense of one's self as male, female or something other than male or female. And it's related to gender expression, in that the gender expression is what is objective and is seen on the outside, *versus the subjective experience of gender identity, which is an internal sense.*" (emphasis added)), Ex. 5. Yet that is the very "false distinction" that he now accuses the *Doe 2* court of making. Mar. 3, 2025 Brown Decl. ¶ 7.

standards. *See* 2025 Policy §§ 4.3.a–b.[7]

The relevant question, therefore, is whether DoD can constitutionally require trans-identifying persons *without* gender dysphoria, and who have *not* transitioned medically, to abide by the standards of their biological sex, as has always been DoD's policy (absent a waiver)—including under the prior Administration and under the 2016 Carter Policy. *See* DoDI 1300.28 § 3.1.a. (Apr. 30, 2021, ch. 1 eff. Dec. 20, 2022) ("When a standard, requirement, or policy depends on whether the individual is male or female (e.g., medical fitness for duty; physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all Service members will be subject to the standard, requirement, or policy associated with their gender marker in DEERS."); DoDI 1300.28 § 1.2.b (June 30, 2016) ("Coincident with that gender marker, the Services apply, and the member is responsible to meet, all standards for uniforms and grooming; body composition assessment (BCA); physical readiness testing (PRT); Military Personnel Drug Abuse Testing Program (MPDATP) participation; and other military standards applied with consideration of the member's gender."); *id.* ("As to facilities subject to regulation by the military, the Service member will use those berthing, bathroom, and shower facilities associated with the member's gender marker in DEERS.").

Indeed, under the Austin policy—the *status quo* that Plaintiffs' motion would preserve—a servicemember could only change his or her gender marker in DEERS upon "a diagnosis from a military medical provider" that "gender transition [was] medically necessary," DoDI 1300.28 § 3.4.a. (2022); upon approval of the servicemember's commanding officer, *id.* §§ 3.4.b–c.; and after many other steps and requirements, including the completion of the prescribed medical treatment plan, *id.* § 3.3.d.2. Absent a change of the gender marker in DEERS, trans-identifying servicemembers had to abide by their biological sex. If that is unconstitutional, then no

---

[7] Plaintiffs offer other red herrings, such as suggesting that the sex-based standards "are not tethered to a medical diagnosis." Pls.' Br. at 36. But there is no reason why grooming standards, and intimate facilities would be based on any medical diagnosis. Instead, it makes eminent sense to set accession and retention standards based on medical conditions or medical history, and then to require all remaining servicemembers to abide by the standards of their biological sexes.

Administration in the history of this Nation has ever administered a constitutional policy regarding trans-identifying people.  At bottom, section 5 of the DoD Policy merely confirms the military's longstanding requirement in this regard, and it does so without distinguishing between the two sexes or classifying on a servicemember's trans-identifying status.  Because the policy does not burden a fundamental right or classify based on a constitutionally protected class, rational-basis review applies.

3.    **Even if the Policy classifies based on "transgender status" rather than gender dysphoria, intermediate scrutiny would not apply.**

a)    **Distinguishing based on "transgender status" is not the same as distinguishing based on sex.**

The 2025 Policy does not distinguish on the basis of sex in the way that sex-based classifications typically distinguish on the basis of sex.  It regulates all servicemembers, "regardless of sex."  *Skrmetti*, 83 F.4th at 480.  It is an "across-the-board regulation [that] lacks any of the hallmarks of sex discrimination."  *Id.*  "It does not prefer one sex over the other."  *Id.* "It does not include one sex and exclude the other."  *Id.*  "It does not bestow benefits or burdens based on sex."  *Id.*  "And it does not apply one rule for males and another for females."  *Id.*

Plaintiffs cite the Supreme Court's Title VII-specific conclusion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in arguing that the 2025 Policy constitutes sex discrimination.  *See* Pls.' Br. at 34–35.  In *Bostock*, the Supreme Court reasoned that Title VII's prohibition on sex discrimination incorporated a but-for causation standard and held that when an employer fires an employee because that employee is gay or transgender, sex is necessarily a but-for cause of such discrimination if, among other things, the individuals are "similarly situated."  590 U.S. at 656, 668–69, 683.

*Bostock* is inapposite.  The Supreme Court's conclusion in *Bostock* was derived entirely from Title VII's "plain terms," *id.* at 676, which provide, in relevant part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1). The text of the Equal Protection Clause does not contain any similar language, and for that reason, Title VII's "text-driven reasoning applies only to Title VII," not to constitutional equal protection claims. *Skrmetti*, 83 F.4th at 484–85; *see also, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024) ("As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination. Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX."); *id.* (collecting cases); *Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker I*"), 80 F.4th 1205, 1229 (11th Cir. 2023); *Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker II*"), 114 F.4th 1241, 1263 (11th Cir. 2024) (Lagoa, J., concurring) (collecting analysis of the issue).

Tellingly, the Supreme Court in *Bostock* rejected the employer's argument that to isolate sex, the Court had to keep all other variables constant. 590 U.S. at 671. The Court reasoned that "[t]he employers might be onto something if Title VII only ensured equal treatment between groups of men and women[.]" *Id.* Equal treatment, of course, is the Equal Protection analysis here. Lest there be any doubt, "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Bostock*, 590 U.S. at 681 (rejecting concern that the Court's decision would "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination"). *Bostock*'s Title VII-specific analysis is thus inapplicable here.

Moreover, *Bostock* proceeds from the premise that an employer discriminates against a person because of sex where the employer "treat[s] that individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. While in the Title VII context individuals are generally "similarly situated" because "[a]n individual's homosexuality or transgender status is not relevant to employment decisions," *id.* at 660, men and women are not similarly situated when

it comes to certain military standards.  In addition, DoD's retention and accessions standards treat everyone equally regardless of sex.

Plaintiffs rely heavily on decisions concerning medical transition, such as *Kadel v. Folwell*, 100 F.4th 122, 146 (4th Cir. 2024) (8-6 en banc decision).  *See* Pls.' Br. at 34–37.  *Kadel* held that certain funding restrictions on the provision of certain kinds of treatments implicated suspect classifications because the questions were framed in a way that turned on sex—*e.g.*, allowing mastectomies to treat cancer, but not to treat gender dysphoria, 100 F.4th at 134, or allowing females to receive vaginoplasty and breast reconstruction but not males, *id.* at 153.

The Government believes that *Kadel* is wrongly decided, but the case is in any event unhelpful to Plaintiffs because the "two reasons" *Kadel* found the state laws in that case to be "textbook sex discrimination," *id.* at 153–54, would not apply to a purported ban on trans-identifying persons.  First, the ban could be applied "without referencing sex." *Id.* at 153.  Unlike in *Kadel*, DoD would *not* need to know "what sex [the applicant] was assigned at birth." *Id.*  Male or female, the applicant or servicemember would be banned for *identifying as* the opposite sex. That is not a sex-based distinction.  Second, the purported ban on trans-identifying persons would not be "based on gender stereotypes." *Id.* at 154.  Such a ban would equally bar men who identify as women and women who identify as men, and thus, it would be "free of fixed notions concerning the roles and abilities of males and females." *Id.* (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724–25 (1982)).  Accordingly, *Kadel* and other similar cases in the context of medical treatment for gender dysphoria are inapposite.

### b)  Trans-identifying persons do not constitute a quasi-suspect class.

Plaintiffs also contend that the *Military* EO warrants intermediate scrutiny because, in their view, trans-identifying individuals constitute a quasi-suspect class.  *See* Pls.' Br. at 41–43.  But the Supreme Court has not recognized any new suspect class or quasi-suspect class in almost half a century.  *See Craig v. Boren*, 429 U.S. 190 (1976) (sex constitutes quasi-suspect class).  Instead, it has repeatedly declined to do so.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

442 (1985) (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals qualify as a quasi-suspect class). Given the high bar to establishing a quasi-suspect class and the deference owed in the military context (as will be discussed below), heightened scrutiny should not apply.

The same conclusion results from an application of the factors the Supreme Court has used to determine whether a quasi-suspect class exists: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment. *See Lying v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Murgia*, 427 U.S. at 313–14). Trans-identifying persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). "Transgender status" is not "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487. It further is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions." *Id.*; *see also* Br. of American Psychological Association at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S. 2024) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Trans-identifying persons moreover are not "political[ly] powerless[]" either. *San Antonio Indep. Sch. Dist.*, 411 U.S. at 28. "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting[,]" and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. Indeed, the trans-identifying people have attracted the support of twenty States, former high-ranking military officials, and the large law firm that has entered an appearance in this case, among others. *Cf. id.* at 487. And trans-identifying persons achieved at least some version of their desired military policy from the last two Democratic Administrations and can reasonably be expected to do so again from the next Democratic Administration. It is therefore untenable to claim that trans-identifying persons "have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at

445.  The mere fact that trans-identifying persons may not be able to "mandate the desired . . . responses" from every Administration, and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient.  *Id.*  Similarly, claims of historical injustice towards trans-identifying individuals are not sufficient to establish a quasi-suspect class.  The Supreme Court in *Cleburne* "rejected the argument that mental disability is a suspect classification, despite a history of compulsory sterilization, exclusion from public schools, and a system of 'state-mandated segregation and degradation.'"  *Eknes-Tucker II*, 114 F.4th at 1266 (Lagoa, J., concurring) (quoting *Cleburne*, 473 U.S. at 462–63 (Marshall, J., concurring in the judgment and dissenting in part)).  If that combination of historical injustices was not enough to establish a quasi-suspect class, neither are Plaintiffs' claims of historical injustice.

### C. The DoD Policy Survives Constitutional Scrutiny.

#### 1. The military's judgment is entitled to significant deference.

Courts extend great deference to the political branches when reviewing the "complex, subtle, and professional decisions as to the composition . . . of a military force."  *Winter*, 555 U.S. at 24 (quoting *Gilligan*, 413 U.S. at 10); *see also Orloff*, 345 U.S. at 93–94; *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990).  "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy."  *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (citation omitted); *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President." (internal citations omitted)).  Because "it is difficult to conceive of an area of governmental activity in which the courts have less competence," *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," *id.* at 67; *see, e.g.*, *Goldman*, 475 U.S. at 507 (explaining that judicial "review of military regulations

challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society").[8]

Thus, even as the Supreme Court refused to label the level of scrutiny applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S at 70, the Court's approach most closely resembles rational-basis review. In *Rostker*, for example, the Supreme Court applied this deferential standard to hold that a facially discriminatory, sex-based draft-registration statute was "not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated." *Id.* at 79 (citation omitted). The Supreme Court did so even though sex discrimination typically is reviewed under heightened scrutiny. The Court explained that the sex-based classification was within constitutional bounds because Congress determined that the statute minimized "added burdens" and "administrative problems" and promoted "the important goal of military flexibility," and "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.* at 81–82 (citation omitted). Instead of conducting its own "evaluation" of the evidence, the Court adopted "an appropriately deferential examination of Congress' evaluation of that evidence." *Id.* at 83. Consistent with rational-basis review, the Court also accepted *post hoc* justifications, even when an analogous policy in the civilian context would call for closer scrutiny. *Id.* at 81; *see id.* at 74–75 (relying on 1980 legislative record to sustain 1948 statute exempting women from draft-registration requirement); *see also Schlesinger*, 419 U.S. at 508 (upholding different mandatory-discharge requirements for male and female naval officers based on what "Congress may . . . quite rationally have believed"). In other words, the Supreme Court has allowed Congress and the Executive wide latitude to choose "among alternatives" in furthering military interests. *Rostker*,

---

[8] Plaintiffs cite *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022), for the proposition that military deference "does not preclude requiring the military to show a sufficiently close connection between its asserted interest and the challenged policy." Pls.' Mot. at 49. But *Singh* involved a challenge under the Religious Freedom Restoration Act ("RFRA"), where Congress specifically required the "demanding compelling-interest and least-restrictive-means test," 56 F.4th at 92, which is strict scrutiny. There is no such statutory requirement here. And as importantly, *Singh* illustrates judicial deference to Congress's politically accountable judgment expressed in RFRA, which is consistent with the military-deference caselaw discussed above.

453 U.S. at 71–72; *see also Goldman*, 475 U.S. at 510 (political branches had discretion to "draw[]
the line" on military standards).

In *Trump v. Hawaii*, the Supreme Court offered two justifications for this highly deferential
standard of review in an analogous context. First, the Court noted that "[j]udicial inquiry into the
national-security realm raises concerns for the separation of powers by intruding on the President's
constitutional responsibilities in the area of foreign affairs," 585 U.S. at 704, or in this case, the
President's role as the Commander in Chief. Second, the Court found that "when it comes to
collecting evidence and drawing inferences on questions of national security, the lack of
competence on the part of the courts is marked." *Id.* Thus, when vacating the preliminary
injunction entered in *Doe 2* concerning DoD's 2018 policy, the D.C. Circuit recognized that "any
review must be 'appropriately deferential' in recognition of the fact that the [2018] Plan concerned
the composition and internal administration of the military." 755 F. App'x at 25 (citing *Rostker*,
453 U.S. at 83). This Court should proceed in a similar fashion in reviewing the Equal Protection
challenge here.

### 2. The Policy passes any level of review

As explained above, because the Policy does not discriminate on the basis of sex or against
any suspect class, rational-basis review applies. Rational-basis review "is a paradigm of judicial
restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). It is "the most relaxed
and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v.
Stanglin*, 490 U.S. 19, 26 (1989). Under this standard, the challenged policy enjoys "a strong
presumption of validity," and the challenger bears "the burden 'to negative every conceivable basis
which might support it'" without regard to "whether the conceived reason for the challenged
distinction actually motivated the [decision]." *Beach*, 508 U.S. at 314–15 (quoting *Lehnhausen v.
Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Courts are further "compelled under
rational-basis review to accept . . . generalizations even when there is an imperfect fit between
means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). That is, a classification does not fail
simply because it "is not made with mathematical nicety or because in practice it results in some

inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Rather, classifications may be "both underinclusive and overinclusive" and "perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979).

Plaintiffs contend that intermediate scrutiny applies. Under that standard, the policy must "serve[] important governmental objectives" and be "substantially related to the achievements of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citations omitted). Under either standard, however, the presumptive disqualification of individuals with gender dysphoria or history of medical transitioning satisfies constitutional scrutiny.

As DoD explained with respect to the 2018 policy, generally allowing such individuals to serve poses "substantial risks" and would "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." DoD 2018 Report at 2. DoD reached the same conclusion in the 2025 Policy, finding that "continued service by such individuals [is] incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force." Action Memo at 4; *see also* 2025 Policy, § 1.c ("Service by [ ] individuals [with gender dysphoria] is not in the best interest of the Military Services and is not clearly consistent with the interests of national security.").

Because courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter*, 555 U.S. at 24, the Court must give due deference to DoD's military judgment that the presumptive disqualifying of individuals with gender dysphoria serves to minimize the identified risks and deliver a ready, deployable force. As explained below, ample evidence supports the military's judgment on this issue.

### a)    Military Readiness

As DoD explained in 2018 and reiterated as to its current policy (which expressly relies on the 2018 report, *see* Action Memo at 3), service by individuals with gender dysphoria poses at least two significant risks to military readiness.

*First*, DoD is concerned about subjecting those with a history of gender dysphoria to the unique stresses of military life. *See* DoD 2018 Report at 21, 42. At the outset, any mental-health condition characterized by clinically significant distress or impairment in functioning raises readiness concerns. That is why servicemembers suffering from "[a]ny DSM-5 psychiatric disorder with residual symptoms" that "impair social or occupational performance[]" need "a waiver . . . to deploy," as the military must consider the "risk of exacerbation if the individual were exposed to trauma or severe operational stress." *Id.* at 34. Particularly given "the absence of evidence on the impact of deployment on individuals with gender dysphoria," DoD concluded that this condition posed readiness risks. *Id.*; *see also id.* at 42. That judgment has also been reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had been stable without clinically significant distress for 18 months.

In forming this conclusion, DoD's panel of experts reviewed evidence that military service can be a contributor to suicidal thoughts. *Id.* at 21–22. Data pertaining to servicemembers with gender dysphoria reflected similar trends. *See id.* The 2018 Report noted that "[s]ervice members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%)." *Id.* The data reflected that servicemembers with gender dysphoria were also nine times more likely to have mental health encounters than the servicemember population as a whole (28.l average encounters per servicemember versus 2.7 average encounters per servicemember). *Id.* For example, from October 2015 to October 3, 2017, the 994 active-duty servicemembers diagnosed with gender dysphoria accounted for 30,000 mental health visits. *Id.*[9] Especially given the evidence that military service in itself can be a contributor to suicidal thoughts, DoD had legitimate concerns that allowing individuals with gender dysphoria to serve would subject them and their comrades to unacceptable risks. *Id.* at 19, 21.

As noted, the current policy expressly relied on these findings from the 2018 Report. *See* Action Memo at 3. DoD also relied on a 2021 review conducted by its Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity, which

---

[9] This data was not available to RAND when it provided its recommendation to Secretary Carter.

found that "rates of disability evaluation were estimated to be higher among [transgender] service members." Action Memo at 3 (alterations in original). This review further found that "nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period." *Id.* DoD determined that "[t]his level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements." *Id.*

The current policy further relied on a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, which found that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime[.]" *Id.* The review further found that "the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their [non-trans-identifying] counterpart," that "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to [non-trans-identifying] individuals," and "the strength of evidence on transgender mental health and [sex-reassignment] care is low to moderate." *Id.* at 3–4.

These concerns are not new. The 2016 RAND Report relied on by both Secretary Carter and President Biden cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria as a general matter, given "the absence of quality randomized trial evidence"— "the gold standard for determining treatment efficacy"—and that, in any event, "it is not known how well these findings generalize to military personnel." RAND Report at 10. Although Secretary Carter and President Biden were more willing to tolerate these suicide-related risks, the current Commander in Chief and Secretary of Defense are not constitutionally compelled to hew to the risk tolerance of their predecessors. "'[T]here's nothing unusual about a new' administration 'coming to office inclined to favor a different policy direction[.]'" *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (quoting *In re Dep't of Commerce*, 586 U.S. 956, 958 (2018) (Gorsuch, J., concurring in part and dissenting in part)).

*Second*, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by sex-reassignment interventions, it remains the case that transition-related

medical treatment—namely, cross-sex hormonal intervention and sex-reassignment surgery—could render transitioning servicemembers "non-deployable for a potentially significant amount of time." DoD 2018 Report at 35. Even the Endocrine Society recommends "quarterly bloodwork and laboratory monitoring of hormone levels during the first year" of transition intervention, meaning that if "the operational environment does not permit access to a lab for monitoring hormones," then the transitioning servicemember must forgo "treatment, monitoring, or the deployment," each of which "carries risks for readiness." *Id.* at 33. That period of potential non-deployability only increases for those who obtain sex-reassignment surgery, which in addition to a recommended "12 continuous months" of cross-sex hormonal intervention "prior to genital surgery," comes with "substantial" recovery time, even without complications. *Id.*

In addition to being inherently problematic in the military setting, these limits on deployability could have harmful effects on transitioning servicemembers' units as a whole. As DoD explained, any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which itself "negatively impacts mission readiness." *Id.* at 35. On top of these personal costs, servicemembers who deploy more frequently to "compensate for" their unavailable comrades face risks to family resiliency. *Id.* And when servicemembers with medical conditions do deploy but then fail to meet fitness standards in the field, "there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower." *Id.* at 34. All of this, DoD has concluded, poses a "significant challenge for unit readiness." *Id.* at 35.

Again, these are not new concerns. Secretary Carter likewise acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs," DTM 16-005 Att. at 2, ECF No. 72-60, a conclusion reflected in his policy's requirement that applicants with a history of transition-related treatment demonstrate that they had finished treatment and had been stable and free of complications for an 18-month period in order to serve,

*id.* at 1–2.  Likewise, RAND acknowledged that gender transition by servicemembers "will have a negative impact on readiness."  DoD 2018 Report at 34.  Although RAND dismissed this harm as "minimal" because it estimated that an "exceedingly small number of transgender Service members . . . would seek transition-related treatment" as compared to the servicemember population as a whole, *id.* at 34–35, DoD is not constitutionally obliged to follow suit.  The question for DoD is not "whether the military can absorb periods of non-deployability in a small population"; by that metric, "the readiness impact" of many other disqualifying medical conditions, "from bipolar disorder to schizophrenia," would also be "minimal" because they too "exist only in relatively small numbers."  *Id.* at 35.  Rather, the question for DoD is "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible."  *Id.*  In answering that question, DoD has concluded that the limitations on deployability posed by gender transition are unacceptably high.

In other words, the differences between the Carter and Austin policies and the DoD's current policy reflect different judgments by military leadership over what limits on deployability and other readiness considerations they are willing to tolerate.  DoD's present judgment on that issue merits significant deference.  *See Rostker*, 453 U.S. at 81–82 (deferring to Congress's judgment on matters of deployability with respect to exempting women from draft registration).  That is particularly true given that the current policy simply ended the Carter and Austin approach of giving gender transition special treatment when it comes to readiness concerns.  Under the Carter and Austin policies, for example, an applicant who received genital surgery following an injury could not serve absent a waiver, yet an applicant who received genital surgery as part of a gender transition was provided a free pathway to military service.  *See* DoDI 6130.03 (eff. May 6, 2018) at 25; DoD 2018 Report at 10–11, 28.  In short, DoD reasonably has concluded that the risks stemming from the uncertain efficacy of, and constraints imposed by, treatment for gender dysphoria favors presumptively disqualifying individuals with that condition.  That sort of analysis

is common when amending medical accession or retention standards, and DoD's current more cautious approach is hardly out of the norm.  *See* DoD 2018 Report at 3, 8–10.

Plaintiffs argue that DoD's 2018 review is outdated, but they also admit that individuals with gender dysphoria suffer from higher rates of suicidality.  Pls.' Br. at 27.  Plaintiffs speculate that this increased rate of suicidality is due to "discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence or victimization."  *Id.*  But even if that were correct, it does not change the fact that military service by such individuals still creates an unavoidable risk, particularly considering the unique stress of military life and the lack of evidence about the efficacy of treatment to offset such risk in the military context.

Plaintiffs further contend that military standards that screen for anxiety, depression, and suicidality can address the military's concerns about admitting applicants with gender dysphoria. *Id.* at 51–52.  But the military has long disqualified applicants with a history of disorders that are associated with mental-health concerns, such as post-traumatic stress disorder or body dysmorphic disorder.  *See* DoDI 6130.03 at 44-45.  Moreover, in addition to anxiety, depression, and suicidality, gender dysphoria involves "clinically significant distress" and "impairment in social, occupational, or other important areas of functioning," which itself raises readiness concerns.  DoD 2018 Report at 13; *see also* 2025 Policy at 10 (defining gender dysphoria).

### b)      Unit cohesion, good order, and discipline

Apart from these readiness concerns, DoD reasonably determined that exempting individuals with gender dysphoria who have undergone gender transition or seek to do so from the military's sex-based standards would undermine "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality."  DoD 2018 Report at 28.

As DoD has explained, a contrary approach would risk, among other things, "erod[ing] reasonable expectations of privacy" by other servicemembers.  *Id.* at 31, 37.  Indeed, "[g]iven the unique nature of military service," servicemembers must often "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom."  *Id.* at 37.  To

protect reasonable expectations of privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women." *Id.* In DoD's judgment, allowing trans-identifying individuals—some of whom retain the anatomy of their biological sex—to use the facilities of their preferred gender "would invade the expectations of privacy" of the other servicemembers sharing those facilities. *Id.* Thus, absent the creation of separate facilities for transitioned or transitioning servicemembers, which could be both "logistically impracticable for the Department," as well as unacceptable to those servicemembers, the military would face irreconcilable privacy demands. *Id.*

Such considerations are not animated by animus toward trans-identifying individuals. The implementation handbook for the Carter policy, for example, repeatedly stressed the need to respect the "privacy interests" and "rights of Service members who are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning Service member[,]" and urged commanders to try to accommodate competing interests to the extent that they could. *See, e.g.*, 2016 Implementation Handbook at 38; *see id.* at 22, 29, 33, 60–61, 63–64; *see also* DoD 2018 Report at 38 (discussing some of "[t]he unique leadership challenges arising from gender transition" that "are evident in the Department's handbook"). In addition, the Supreme Court has recognized that it is "necessary to afford members of each sex privacy from the other sex in living arrangements," *Virginia*, 518 U.S. at 550 n.19, and "[i]n the context of recruit training, this separation is even mandated by Congress," DoD 2018 Report at 37.

With respect to basic training, for example, Congress has required that "the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits," and that "access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits,' to ensure 'after-hours privacy.'" *Id.* at 29 (citing 10 U.S.C. §§ 4319, 4320, 6931, 6932, 9319, 9320). While Plaintiffs may prefer a policy that disregards the interests of servicemembers who feel uncomfortable sharing close living spaces with those of the opposite biological sex, *see* Pls.' Br. at 55–56, DoD's current policy is consistent with statutory privacy protections.

35

Aside from these privacy-related considerations, DoD has expressed concerns that exempting servicemembers from sex-based standards in training and athletic competitions on the basis of gender identity would generate perceptions of unfairness in the ranks. DoD 2018 Report at 36. For example, requiring female servicemembers to compete with biological males who identify as female but retain male physiology, DoD reasoned, would likely put the former at a disadvantage. *Id.* at 31, 36. And in violent activities, "pitting biological females against" those with male physiology but a female gender identity, and vice versa, could pose "a serious safety risk as well." *Id.* at 36.

Again, these are legitimate military concerns. Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for servicemembers to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19 (discussing statute requiring standards for women in the service academies to "be the same as those . . . for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals"). Indeed, the Supreme Court has deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to . . . physical standards." *Rostker*, 453 U.S. at 81. Especially given DoD's view that "physical competition[] is central to the military life and is indispensable to the training and preparation of warriors," DoD 2018 Report at 36, DoD's judgments in this respect are entitled to deference.

DoD is also concerned that exempting servicemembers from uniform and grooming standards based on gender identity would create friction in the ranks. For example, allowing someone with male physiology but a female gender identity "to adhere to female uniform and grooming standards" could frustrate male servicemembers who do not identify with the opposite sex but "would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity." DoD 2018 Report at 31; *cf. Goldman v. Sec'y of Def.*, 734 F.2d 1531, 1540 (D.C. Cir. 1984) (deferring to Air Force's judgment "that it cannot make exceptions . . . for religious reasons without incurring resentment from those who are compelled

to adhere to the rules strictly"), *aff'd*, 475 U.S. 503 (1986).  Again, such concerns were reflected in the Carter policy's implementation handbook, which advised commanders that in considering exceptions to "uniform and grooming standards," commanders should account for their "impact on unit cohesion and good order and discipline."  2016 Implementation Handbook at 28.

The point is not that DoD deems the needs or views of certain servicemembers to take priority over those of others.  Rather, it is that the inescapable "collision of interests" injected by the Carter and Austin policies' departure from military uniformity poses "a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions," DoD 2018 Report at 37, a problem compounded by the risks to unit cohesion stemming from the significant limits on deployability discussed above.  Under the Carter policy, the "routine execution of daily activities" could become a recurring source of uncertainty, if not "discord in the unit," requiring commanders "to devote time and resources to resolve issues not present outside of military service."  *Id.* at 38.  And any flawed or delayed solution could "degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline."  *Id.*  Given that "[l]eaders at all levels already face immense challenges in building cohesive military units," DoD concluded that it would be unwise to maintain a policy that "will only exacerbate those challenges and divert valuable time and energy from military tasks." *Id.* at 37–38.  This Court should defer to that military judgment regarding how best to handle this collision of interests.  *See Steffan v. Perry*, 41 F.3d 677, 686 (D.C. Cir. 1994) (en banc) ("[t]he military is entitled to deference with respect to its estimation" of how particular policies will affect "military discipline").

Plaintiffs have little to say about the "substantial risks" to an effective national defense that DoD has concluded would flow from a contrary policy.  DoD 2018 Report at 2.  While they contend that trans-identifying servicemembers have been serving under the Austin Policy for years without disruption to unit cohesion, Pls.' Br. at 22–24, they rely only on declarations and testimony of former military officials who claim that they were unaware of problems regarding unit cohesion,

*see*, *e.g.*, Pls.' Br. at 57–58, 67.  This includes a declaration from the former Under Secretary of Defense for Personnel and Readiness.  But as the declaration of the current official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs explains, "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary."  Dill Decl. ¶ 6, ECF No. 52-1; *see also* Mattis Testimony at 63 (explaining that such complaints would not necessarily be shared with senior DoD officials), Ex. 2; *see also id.* at 58 (testimony of former Chairman of the Joint Chiefs Dunford stating "I would not typically hear of individual cases of cohesion or discipline issues.").  More importantly, it would be "'quite wrong'" for this Court to "'undertake an independent evaluation of evidence, rather than adopting an appropriately deferential examination' of the" (current) "*political branches'* 'evaluation of that evidence.'"  *Doe 2*, 917 F.3d at 720 (Williams, J., concurring) (quoting *Rostker*, 453 U.S. at 83) (cleaned up).

### c)    Disproportionate costs

Finally, DoD noted that a review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapies; $3,135,593 for cross-sex hormonal intervention, and $14,324,739 for surgical care.  Action Memo at 4.  This is consistent with DoD's finding in 2018 that transition-related interventions under the Carter policy was "proving to be disproportionately costly on a per capita basis[.]"  DoD 2018 Report at 41.  Specifically, DoD noted that the medical costs for servicemembers with gender dysphoria was "nearly three times" compared to servicemembers without this condition.  *Id.*  And that was "despite the low number of costly sex reassignment surgeries that have been performed so far"—34 non-genital procedures and one genital surgery— which likely increased as more servicemembers avail themselves of these measures in the last few years.  *Id.*

Several commanders had also reported that providing servicemembers in their units with transition-related interventions "had a negative budgetary impact" because of the use of

"operations and maintenance funds to pay for . . . extensive travel throughout the United States to obtain specialized medical care." *Id.* This is not surprising, given that transition-related interventions "require[] frequent evaluations" by both a mental-health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." *Id.* at 41 n.164. Transitioning servicemembers consequently "may have significant commutes to reach their required specialty care," with those "stationed in more remote locations fac[ing] even greater challenges." *Id.*; *see, e.g.*, 3d Am. Compl. ¶¶ 122–26 (discussing a plaintiff's need to travel from his duty station in Louisiana to California to repair complications from sex-reassignment surgery). To be sure, the healthcare cost for treating servicemembers' gender dysphoria is small relative to DoD's total healthcare expenditure, but such cost and benefit analysis is decidedly for DoD, not this Court, to make. Given the military's general interest in maximizing efficiency through minimizing costs, DoD 2018 Report at 3, DoD reasonably concluded that its disproportionate expenditures on facilitating gender transition should be better devoted elsewhere, *see id.* at 41. That considered judgment is entitled to significant deference.

### 3.    Alleged animus is not a reason to grant Plaintiffs' motion.

Plaintiffs contend that even if the Policy would otherwise survive constitutional scrutiny, it must be struck down because the *Military* and *Defending Women* EOs, as well as the resulting Policy, were allegedly "motivated by unconstitutional animus." Pls.' Br. at 21. In Plaintiffs' view, this is so even if animus is "not the sole or even primary factor," but just one "motivating factor" for the Policy. *Id.* at 22. Binding Supreme Court precedent forecloses this argument.

In *Hawaii*, as in this case, the plaintiffs challenged a policy that they alleged "was motivated not by concerns pertaining to national security but by animus toward Islam." 585 U.S. at 681. The plaintiffs—and the dissent—thus contended that "a more stringent standard of review" applied. *Id.* at 741 (Sotomayor, J., dissenting). But the *Hawaii* majority rejected that argument, holding that, in the national security context, the Court must "uphold the policy so long as it can be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705; *see also Kadel*, 100 F.4th at 176 (Richardson, J., dissenting) ("plaintiffs must show that the choice

to exclude gender dysphoria . . . is so irrational that nothing could explain it other than an intent to discriminate against transgender persons").

"The *Hawaii* Court offered two justifications for this standard of review—both of which readily apply here." *Doe 2*, 917 F.3d at 732 (Williams, J., concurring). "For one, judicial inquiry into the national-security realm raises concerns for the separation of powers by intruding on the President's constitutional responsibilities." *Id.* (cleaned up). "For another, when it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the parts of the courts is marked." *Id.* "For both of these reasons, [a court's] review into matters of national security is highly constrained." *Id.* As Judge Williams explained in his concurrence in *Doe 2*, this "highly deferential approach is evident in the [Supreme] Court's review—and affirmance—of two facially discriminatory, gender-based classifications that would unquestionably have failed had any government attempted to apply them in the civilian world." *Id.* (discussing *Schlesinger* and *Rostker*).

Here, as in *Hawaii*, "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" 585 U.S. at 706. "[B]ecause there is persuasive evidence that [the Policy] has a legitimate grounding in national security concerns, quite apart from any [animus], [the Court] must accept that independent justification." *Id.* The Policy "is expressly premised on legitimate purposes[,]" *id.*,: to ensure "the high mental and physical standards necessary for military service." 2025 Policy at 1. The text of the Policy does not exhibit animosity toward trans-identifying servicemembers and, like the proclamation at issue in *Hawaii*, the Policy "reflects the results of a . . . review process" undertaken by a panel of military experts. 585 U.S. at 707. Plaintiffs may challenge the Policy "based on their perception of its effectiveness and wisdom," but courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.* at 707–08 (citation omitted).

As for Plaintiffs' contention that a law subject to rational-basis review is unconstitutional if animus was a motivating factor, Pls.' Br. at 24, it is incorrect as a matter of law. Under *Hawaii*,

the question is whether the Policy "can reasonably be understood to result from a justification independent of unconstitutional grounds," not whether animus is one motivating factor. 585 U.S. at 705. In any event, Plaintiffs' allegations of animus are unfounded.

*First*, Plaintiffs inferred animus from their view that there was "no urgency requiring this policy change[,]" and "the only precipitating event was the presidential election." Pls.' Br. at 24. But as noted above, "'there's nothing unusual about a new' administration 'coming to office inclined to favor a different policy direction[.]'" *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (quoting *In re Dep't of Commerce*, 586 U.S. at 957 (Gorsuch, J., concurring in part, dissenting in part)). "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part); *see also* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2378 (2001) ("[N]ew administrative interpretations following new presidential elections should provide a reason to think deference appropriate rather than the opposite."). Indeed, President Biden did just that within days of taking office in issuing Executive Order 14004. An "energetic Executive" action does not equate to an Executive acting with animus. *Cf.* The Federalist No. 70.

*Second*, Plaintiffs contend that animus can be inferred because the *Military* EO "provides no evidence of problems with" service by individuals with gender dysphoria. Pls.' Br. at 21. But Executive Orders are not agency actions, *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992), and they would not typically provide the sort of supporting rationale that would be required for an agency action. By contrast, the 2018 Policy was based on an analysis of problems with service by individuals with gender dysphoria. And the President was of course aware of the evidence supporting the 2018 Policy when he issued the Executive Order, as he himself approved that policy. The 2025 Policy in turn provided additional support for the decision to presumptively disqualify those with gender dysphoria. *See* Action Memo and its attachments.

*Third*, Plaintiffs contend that the Policy was motivated by animus because of alleged

41

"derogatory language" in the *Military* EO, which they contend is "part of a broader pattern of targeted discrimination." Pls.' Br. at 22, 24. But, as an initial matter, now that DoD has issued an actual Policy that directly affects Plaintiffs, the focus of the Court's inquiry is *that* Policy—not the *Military* EO, and certainly not Executive Orders arising in different contexts. *See Hawaii*, 585 U.S. at 704–05. In any event, the *Military* EO's "incorporation of the definition of sex from Executive Order 14168" does not "reflect[] purposeful discrimination," as Plaintiffs contend. Pls.' Br. at 7. That definition provides simply that "sex" shall "refer to an individual's immutable biological classification as either male or female," *i.e.*, belonging to the sex that produces either sperm or egg cells. *Defending Women* EO § 2(a). Even if reasonable people might disagree about whether that is the best possible definition of "sex," such a definition hardly reflects "purposeful discrimination" or animus on its face.

*Fourth*, Plaintiffs contend that there is no evidence that the government "would have enacted [the Policy] if animus were not a factor." Pls.' Br. at 25. But that argument is refuted by the historical record. Under President Trump, DoD *did* enact a substantially similar policy in 2018 after conducting an extensive study of the issue, and the Supreme Court and D.C. Circuit allowed that policy to go into effect. And these policies were less restrictive than the policies of every presidential Administration of any party prior to 2015. Thus, contrary to Plaintiffs' contention, there is substantial evidence that the government would have issued the same policy regardless of any alleged animus.

*Finally*, Plaintiffs argue that it is "highly unusual" to "separate[] members based on a medical condition that would normally undergo individualized assessment through the Disability Evaluation System." Pls.' Br. at 23. But DoD treats at least 11 other conditions as presumptively disqualifying and does not afford an individualized determination. If the Service member has "any [heart] valve replacement," for example, that is "not compatible with retention" and "Paragraph 5.11.a does not apply." *See* DoDI 6130.03-V2 § 5.11(b)(1) (ch. 1, eff. June 6, 2022). "Paragraph 5.11.a" refers to the otherwise-applicable requirement that a condition "must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military

duties of the Service members office, grade, rank, or rating." *Id.* ¶ 5.11.a.  That individualized determination is not made with respect to heart-valve replacements, nor with cardiomyopathy or heart failure (*id.* § 5.11.c.2.); a pacemaker (*id.* § 5.11.d.); or Catecholiminergic Polymorphic Ventricular Tachycardia (*id.* § 5.11.f.3.).  There are other conditions that are likewise not subject to an individualized determination: kidney transplants (*id.* § 5.15.h.); chronic kidney disease (*id.* § 5.15.l.); hereditary angioedema (*id.* § 5.23.g.); recurrent rhabdomyolysis (*id.* § 5.23.h.); permanent or progressive cognitive impairment due to Alzheimer's disease or other dementias (*id.* § 5.26.d.); and epilepsy (*id.* § 5.26.k.).  With respect to behavioral health, specifically, the DoD Policy provides that disqualifying conditions "should either be referred to the DES or processed for administrative separation, based on whichever is appropriate for that condition."  *Id.* § 5.28.e.

> **D.    Plaintiffs Are Unlikely to Succeed in Their Challenge to the 2025 Policy's Other Standards**

In addition to seeking a preliminary injunction prohibiting the military from excluding them from service, Plaintiffs also seek a preliminary injunction prohibiting the military from (i) "requir[ing] transgender service members to adhere to facilities, grooming, housing, or other sex-specific standards associated with their birth sex," (ii) "requir[ing] transgender service members to use pronouns or honorifics associated with their birth sex," and (iii) deny[ing] medical care to transgender service members for being transgender[.]"  Pls.' Br. at 71; *see also* 3d Am. Compl. ¶¶ 317–24.  Plaintiffs have not established that they are entitled to such an injunction.

First, with respect to facilities, grooming, and housing, as noted above, anyone with a history of gender dysphoria will be processed for separation (absent a waiver) under the new retention standards, so the only question is whether DoD can constitutionally require trans-identifying individuals *without* gender dysphoria to abide by the standards of their biological sex. *See supra* Section I.B.2.  But, as noted, that has always been DoD's policy, and the 2018 report (on which the current Policy relies) lays out in detail why such a policy is important for unit cohesion, good order, and discipline.  *See supra* Section I.C.2.b.

Second, the requirement to use pronouns consistent with a servicemember's biological sex

does not constitute sex discrimination because that requirement applies to both men and women. The military, moreover, has an interest in "uniformity," *Goldman*, 475 U.S. at 510, and a policy that provides for a uniform way for servicemembers to address senior officers and others reasonably furthers that interest.  A contrary policy allowing servicemembers to choose for themselves which pronouns to use when addressing others would risk leading to confusion and disuniformity.  *See id.* at 507–08; *see also* World Professional Association for Transgender Health, Standard of Care 8 at S80 (trans-identifying individuals "may use the pronouns they/them/theirs, or neopronouns which include e/em/eir, ze/zir/hir, er/ers/erself among others").  This is particularly the case when those servicemembers who have a gender marker different from their biological sex in DEERS or are planning to transition will already be processed for separation.

Third, with respect to medical care, again, individuals with gender dysphoria will be processed for separation, absent a waiver.  Until such individuals are separated, DoD will of course continue to provide the same medical care that it provides to non-trans-identifying individuals. DoD will also continue to provide cross-sex hormonal interventions to servicemembers who have been receiving it, if recommended by a health-care provider, until they are separated.  *See* 2025 Policy § 4.2(c).  The only change in policy is that DoD will no longer provide sex reassignment surgery for servicemembers who are diagnosed with gender dysphoria between now and their separation.  *See id.* § 4.2(b).  But that decision is not irrational, considering that "emerging gender dysphoria treatments"—such as "cross-sex hormones, and gender reassignment surgery—are matters of significant scientific debate and uncertainty."  *Kadel*, 100 F.4th at 193 (Wilkinson, J., dissenting); *see also Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019) ("sex reassignment surgery remains one of the most hotly debated topics within the medical community today"); *Independent Review of Gender Identity Services for Children and Young People:  Final Report* ("Cass Report") at 195 (April 2024), *available at* https://cass.independentreview.uk/home/publications/final-report/ (finding that, while deaths by suicide in trans-identifying individuals are tragically above the national average in the United Kingdoms, there is "no evidence that gender-affirmative treatments reduce this").

Accordingly, Plaintiffs have not established that they are likely to succeed on their Equal Protection Claim as it relates to any of these other alleged forms of unequal treatment.

### E.    Plaintiffs Are Unlikely to Succeed on Their Estoppel Claim

Plaintiffs are also unlikely to succeed on their estoppel claim.  *See generally Doe 1 v. Trump*, 275 F. Supp. 3d 167, 205–07 (D.D.C. 2017) (dismissing estoppel claim).  As a threshold matter, Plaintiffs' estoppel claim fails because there is no recognized federal cause of action for estoppel.  "[P]rivate rights of action to enforce federal law must be created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and Congress has created no cause of action for estoppel.  To the contrary, the Federal Rules of Civil Procedure recognize estoppel as an affirmative defense, not a cause of action.  Fed. R. Civ. P. 8(c).

Even assuming *arguendo* that the remedy of estoppel could be applied to the federal government, it certainly is not available here—to compel the military to access and retain individuals with a medical condition that it believes is incompatible with the high mental and physical standards necessary for military service.  *See OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990) (noting that "equitable estoppel will not lie against the Government as it lies against private litigants," and leaving open the possibility that "no estoppel will lie against the Government in any case").

At a minimum, estoppel does not apply to policy changes by the Federal Government.  *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation." (citation omitted)).  Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with the applicable procedures.  It is therefore unsurprising that Plaintiffs do not cite any case holding that a federal agency is estopped from changing its generally applicable policies.  All their cases involve isolated

instances of promises made by the Government to particular individuals, which relate only to those individuals' personal circumstances.  *See* Pls.' Br. at 59, 62.

In any event, Plaintiffs cannot satisfy the elements of an estoppel claim.  Even in situations where a court has concluded that an estoppel claim against the government might be available— such as individualized challenges to non-policy actions—courts "invoke the doctrine of estoppel against the government with great reluctance."  *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (application of estoppel to government must be "rigid and sparing").  In the rare circumstances in which equitable estoppel may apply against the government, a party must show that: "(1) there was a 'definite' representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable and (4) the government engaged in affirmative misconduct."  *Morris Comm's, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009) (internal quotation marks omitted).  At least three of those factors are missing here.

First, none of the statements or policies cited by Plaintiffs "definitely" represented to them that the Carter or Austin policies were permanent and not subject to change.  As the court recognized in *Doe 1*, none of the statements or policies was a "definite representation to any of the individual Plaintiffs," but rather "constituted a broad policy decision by the government that affected scores of individuals."  275 F. Supp. 3d at 206.  The government "did not specifically represent to any particular individual that he or she would be permitted to serve." *Id.*  Accordingly, "[t]he cases that Plaintiffs cite are distinguishable." *Id.*

Second, any reliance on statements or policies would not have been reasonable because it is well known that government policies may be changed for any number of reasons.  The likelihood of such a shift was especially foreseeable here given that the government has changed its policies on this issue *each time* the Administration changed in 2017, 2021, and 2025.

Third, there is no evidence suggesting that Defendants engaged in the "affirmative misconduct" necessary to sustain a claim of estoppel against the government.  *See Masters Pharm.*

46

*Inv. v. DEA*, 861 F.3d 206, 225 (D.C. Cir. 2017).  The bar for establishing "affirmative misconduct" is high, requiring a showing of "misrepresentation or concealment, or, at least, behav[ior] . . . that . . . will cause an egregiously unfair result."  *GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 526 (D.C. Cir. 1983).  Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct.  Simply changing government policy is not misconduct.  *See Doe 1*, 275 F. Supp. 3d at 207 (government had not engaged in "misconduct" as the court understood that term in this context).

Accordingly, Plaintiffs' estoppel claim is unlikely to succeed.

## II.  PLAINTIFFS HAVE NOT DEMONSTRATED CERTAINLY IMPENDING IRREPARABLE INJURY.

The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The moving party must demonstrate an injury "both certain and great[]" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id.* (citation omitted).  The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98.  "In the context of military personnel decisions . . . the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs."  *Church*, 573 F. Supp. 3d at 145 (quotation omitted); *see also Shaw v. Austin*, 539 F. Supp. 3d 169, 183 (D.D.C. 2021) (collecting cases).  Moreover, "[w]hen plaintiffs have requested an injunction preventing a military discharge, some courts have determined that plaintiffs must make a 'much stronger showing of irreparable harm than [must be made under] the ordinary standard for injunctive relief,' due to the 'magnitude of the interests weighing against judicial interference with the internal affairs of the armed forces.'"  *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) (quoting *Veitch v. Danzig*, 35 F.Supp.2d 32, 37 (D.D.C. 2001)).  Here again, the deferential standard of review in military cases strongly weighs against granting Plaintiffs' motion.

As an initial matter, alleged constitutional violations alone do not necessarily constitute irreparable harm.  *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1334 (D.C.

Cir. 2024); *Hanson v. D.C.*, 120 F.4th 223, 244 (D.C. Cir. 2024).   Rather, Plaintiffs must demonstrate an "immediate or ongoing harm stemming from" the alleged constitutional violation, *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) (citing *In re al-Nashiri*, 791 F.3d 71, 79–80 (D.C. Cir. 2015)), including that the harm is "beyond remediation," *Chaplaincy*, 454 F.3d at 297.

As explained above, any Plaintiff processed for separation will have the opportunity to contest their separation before an administrative separation board or a Board of Inquiry, and seek review before the relevant record correction board.   Further, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006); *see also* 28 U.S.C. § 1491(a)(1) (authorizing courts "to issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records").   "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Farris*, 453 F. Supp. 2d at 79–80.   Plaintiffs' alleged injuries related to separation thus could be remedied later and are not irreparable.   *See Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016) (concluding that separation from the military did not constitute an irreparable harm); *cf. Knehans v. Alexander*, 566 F.2d 312, 315 (D.C. Cir. 1977) ("This [exhaustion] rule must logically rest on the proposition that such a Correction Board, charged with a responsibility to 'correct an error or remove an injustice,' has by implication sufficient authority to provide the relief appellant now seeks: full reinstatement and backpay." (quoting 10 U.S.C. § 1552) (citation omitted)).

To the extent Plaintiffs assert irreparable harm on the ground that the Policy "brand[s] [them] as less capable and worthy," Pls.' Br. at 63, their claim of reputational injury is speculative and not sufficient to constitute irreparable harm.   *Reinhard*, 209 F. Supp. 3d at 220 ("Although reputational injury can be used to establish irreparable harm in certain circumstances . . . as with all other forms of irreparable harm, the showing of reputational harm must be concrete and

corroborated, not merely speculative."); *id.* (servicemember's involuntary separation for misconduct did not constitute irreparable harm despite claim that the discharge will create a "stigma," or otherwise "unfairly paint" plaintiff).

Plaintiffs further argue that the requirement to be identified by their biological sex is an irreparable harm. Plaintiffs Tyson, Bettis, and Wolf, for example, allege that they suffer irreparable harm because they are placed in violation of military standards which the Service directs that they cannot violate. *See* Pls.' Br. at 64. But these plaintiffs have been placed on administrative absence, and in this interim period, the relevant Service has waived the requirement that they serve in their biological sex. Plaintiffs suffer no concrete harm while taking administrative absence in advance of any potential separation proceedings. And as discussed, separation is not an irreparable harm.

### III. THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Plaintiffs have not shown that these factors weigh in their favor. The Commander in Chief has determined that it is "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," and that this policy is "inconsistent with the medical, surgical and mental health constraints on individuals with gender dysphoria." *Military* EO § 2. The Constitution charges the President, as Commander in Chief of the Armed Forces, with ultimate responsibility over the Nation's military policy. *See Doe 2*, 917 F.3d at 730 (Williams, J., concurring). "It is this power of oversight and control of military force *by elected representatives and officials* which underlies our entire constitutional system." *Id.* (quoting *Gilligan*, 413 U.S. at 10). There is a strong public interest in deferring to the Commander in Chief's judgment on which military policies would best protect the Nation. This is especially true where, as here, the judgment is based on the recommendation of a panel of senior military leaders and experts who conducted

"extensive review and deliberation" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." DoD 2018 Report at 18.

Plaintiffs contend that the public interest favors an injunction because, according to their declarants, allowing the *Military* EO to be implemented would "degrade military readiness and unit cohesion." PIs.' Br. at 68. But that is *not* the judgment of the Commander in Chief, who is constitutionally charged with setting military policy, and Plaintiffs' contrary judgment is immaterial. *Goldman*, 475 U.S. at 509. Moreover, the fact that former military officials responsible for prior DoD policy regarding military service by trans-identifying individuals reached a different conclusion is "beside the point." *Id.* (dismissing "expert testimony" from former military official that "religious exceptions" to uniform standards "will increase morale"). The Supreme Court has repeatedly remained unmoved, including as recently as in *Hawaii*, by the fact that a particular national-security policy is not supported by the views of certain "former national-security officials," 585 U.S. at 748 (Sotomayor, J., dissenting), cautioning that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters" and that "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security,'" *id.* at 708 (majority op.). There is no reason why the views of former military officials in this case should be given greater weight than that of the Commander in Chief.

## IV. ANY PRELIMINARY INJUNCTION SHOULD APPLY TO THE NAMED PLAINTIFFS ONLY.

For the reasons explained above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a preliminary injunction is appropriate, the injunction should be limited to the Plaintiffs before this Court. *See Doe 2*, 917 F.3d at 740 (Williams, J., concurring) ("[E]ven if a remedy were appropriate in this case—and it's not—it should in no event extend beyond the actual plaintiffs."). A broader nationwide injunction would transgress both Article III and longstanding equitable principles by affording relief that is not necessary to redress any cognizable, irreparable injury to Plaintiffs. And it would frustrate the development of the law, while obviating the requirements for and protections of class-action litigation.

"Article III of the Constitution limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Doe 2*, 917 F.3d at 739–40 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.' Nothing more." (quoting *Gill*, 585 U.S. at 72)). Thus, "a plaintiff's judicial 'remedy must be tailored to redress *the plaintiff's* particular injury.'" *Doe* 2, 917 F.3d at 740 (quoting *Gill*, 585 U.S. at 73).

Principles of equity reinforce those limitations. A court's equitable authority to award relief is generally confined to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 319 (1999). And "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare"); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 425 (2017) ("There is an easy, uncomplicated answer to the question whether the national injunction is traceable to traditional equity: *no*.").

Nationwide injunctions also "take a toll on the federal court system[.]" *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). "The traditional system of lower courts issuing interlocutory relief limited to the parties at hand . . . encourages multiple judges and multiple circuits to weigh in" on a given legal question. *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring). In contrast, nationwide injunctions "prevent[] legal questions from percolating through the federal courts[.]" *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). Moreover, "[i]f a single successful challenge is enough to stay the challenged rule across the country, the government's hope of implementing any new policy could face the long odds of a straight sweep, parlaying a 94-to-0 win in the district

courts into a 12-to-0 victory in the courts of appeal." *New York*, 140 S. Ct. at 601 (Gorsuch, J., concurring). "A single loss and the policy goes on ice—possibly for good, or just as possibly for some indeterminate period of time until another court jumps in to grant a stay." *Id.* Judicial restraint "is especially appropriate where, as here, the case concerns the internal operations of the military." *Doe 2*, 917 F.3d at 740. "Our constitutional framework 'requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.'" *Id.* (quoting *Munaf v. Green*, 553 U.S. 674, 700 (2008)). Accordingly, any remedy must not "extend beyond the actual plaintiffs." *Id.*

Permitting nationwide injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief:  class actions.  It enables all potential claimants to benefit from nationwide injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of Civil Procedure 23, while failing to afford the Government the corresponding benefit of a definitive resolution of the underlying legal issues to all potential claimants if it prevails instead.

Plaintiffs nonetheless contend that a nationwide injunction is necessary because it is "the only way" to prevent irreparable harm to Plaintiffs during the pendency of this action.  Pls.' Br. at 68 (quoting *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 25 (D.D.C. 2018)).  That is incorrect; an injunction prohibiting Defendants from excluding Plaintiffs from military service would prevent the primary irreparable harm alleged, which is the imminent loss of employment and benefits that would result from separation.  Tailored relief would ensure that "multiple judges and multiple circuits" may continue to weigh in on this issue, rather than restricting debate to this Court.  *New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring); *see, e.g.*, *Shilling v. Trump*, No. 2:25-cv-00241 (W.D. Wash. Feb. 6, 2025) (similar challenge to *Military* EO).  For all these reasons, any injunction should be limited to the named Plaintiffs only.

## V.  ANY PRELIMINARY INJUNCTION CANNOT IMPEDE THE MILITARY'S DISCRETION TO MAKE ASSIGNMENT, DEPLOYMENT, AND OPERATIONAL DECISIONS.

Even if the Court were inclined to grant Plaintiffs' some preliminary relief, any such

injunction should not interfere with military assignment, deployment, and operational decisions. Here, Plaintiffs seek a broad injunction that would essentially require the Court to insert itself into the military chain of command as the commanding officer of any trans-identifying servicemember in any Military Service. *See* 3d Am. Compl. ¶ 348 (seeking an order requiring that Plaintiffs and other trans-identifying servicemember may not be "separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, required to serve in their birth sex (including with respect to pronouns, housing, facilities, or how they describe themselves to others) or otherwise receive adverse treatment or differential terms of service on the basis . . . that they are transgender"). Decisions about how to assign and deploy servicemembers are for the military to make, under the supervision of the President as Commander in Chief, not civilian courts. For that reason, challenges to such assignment decisions are non-justiciable even when they involve a constitutional challenge.

In *Reaves v. Ainsworth*, 219 U.S. 296 (1911), for example, the Court refused to second-guess the military's determination of a servicemember's "fitness for promotion[.]" *Id.* at 298. In *Orloff*, the Court emphasized that it had "found no case where th[e] Court ha[d] assumed to revise duty orders as to one lawfully in the service." 345 U.S. at 94. Circuit courts likewise have uniformly declined to second-guess military judgments regarding fitness for duty and assignments. *See, e.g.*, *Harkness v. Sec'y of Navy*, 858 F.3d 437, 443 (6th Cir. 2017) (noting in a case involving a First Amendment challenge to military assignment decisions that "courts are generally reluctant to review claims involving military duty assignments[]"); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) (holding mandamus claim for reassignment is nonjusticiable); *Antonellis v. United States*, 723 F.3d 1328, 1336 (Fed. Cir. 2013) ("Courts are in no position to determine the 'best qualified Officer' or the 'best match' for a particular billet."); *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (1989) ("Appellant's request for retroactive promotion falls squarely within the realm of nonjusticiable military personnel decisions. To grant such relief would require us to second-guess the Secretary's decision about how best to allocate military personnel in order to serve the security needs of the Nation."); *Schlanger v. United States*, 586 F.2d 667, 671 (9th Cir. 1978)

("[C]ourts should not review internal military decisions such as duty order or duty assignments."); *Sebra v. Neville*, 801 F.2d 1135, 1141-1142 (9th Cir. 1986)(same); *Wilson v. Walker*, 777 F.2d 427, 429 (8th Cir. 1985) (same); *Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971) (same). And that hesitance has extended even to constitutional challenges. *See*, *e.g., Orloff*, 345 U.S. at 93-94 (Fifth Amendment); *Harkness*, 858 F.3d at 443-445 (First Amendment).

And when district courts have disregarded this uniform caselaw, the Supreme Court has intervened. In *United States Navy Seals 1-26 v. Biden*, the district court enjoined the Navy "from taking any adverse action against Plaintiffs on the basis of Plaintiffs' requests for religious accommodation" as to DoD's COVID-19 vaccination policy, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022). The Supreme Court stayed the injunction to the extent it barred the Navy from considering Navy Seals' vaccination status when making deployment, assignment, and other operational decisions. *See Austin*, 142 S. Ct. at 1301; *see also Navy SEAL v. Sec'y of the U.S. Dep't of Def.*, No. 22-10645, slip op. at 3 (11th Cir. Mar. 30, 2022) (court of appeals "follow[ed] the Supreme Court's lead" and stayed the district court's injunction pending appeal "insofar as it precludes the Navy from considering the plaintiffs' vaccination status in making deployment, assignment, and other operational decisions"). The preliminary injunction sought here flouts the above principles, seeking to override "professional military judgments" about military needs and requirements. *Gilligan*, 413 U.S. at 10; *see also Chappell v. Wallace*, 462 U.S. 296, 300 (1983) (warning against suits that "tamper with the established relationship between enlisted military personnel and their superior officers"). Accordingly, any injunction must be appropriately limited to avoid intrusion into military assignment, deployment, and operational decisions.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction. If the Court is inclined to issue any injunctive relief, Defendants respectfully request a stay for two (2) days to allow the Solicitor General time to decide whether to seek appellate relief, and if such relief is sought, a stay pending disposition of the appeal.

Dated: March 11, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEX HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/ *Jason C. Lynch*
JASON C. LYNCH
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1359
Jason.Lynch@usdoj.gov

*Counsel for Defendants*