```
1                    IN THE UNITED STATES DISTRICT COURT
                            DISTRICT OF COLUMBIA
2

3    NICOLAS TALBOTT, et al.      ) CIVIL NO.:
                                  ) 25-0240-ACR
4              Plaintiff,         )
          vs.                     )
5                                 )
     DONALD J. TRUMP, et al.,     )
6                                 ) March 12, 2025
               Defendant.         ) Washington, D.C.
7    _____) 10:30 a.m.

8
                        Transcript of Motions Hearing
9                    Before the Honorable Ana C. Reyes
                         United States District Judge
10

11   APPEARANCES:

12   For the Plaintiffs:

13         Jennifer Levi, Esquire
           Michael R. Haley, Esquire
14         GLBTQ Legal Advocates & Defenders
           18 Tremont Street
15         Suite 950
           Boston, MA 02108
16
           Shannon P. Minter, Esquire
17         National Center for Lesbian Rights
           1401 21st St.
18         Suite #11548
           Sacramento, CA 95811
19
           Sara E. Kropf, Esquire
20         Kropf Moseley PLLC
           1100 H Street, NW
21         Suite 1220
           Washington, DC 20003
22
           Inga S. Bernstein, Esquire
23         Zalkind Duncan & Bernstein LLP
           65a Atlantic Avenue
24         Boston, MA 02110

25
```

1    APPEARANCES: (Cont'd)

2

3    For the Defendants:

4         Jason Manion, Esquire
          U.S. Department of Justice
5         950 Pennsylvania Avenue, NW
          Washington, DC 20530-0001
6
          Jason C. Lynch, Esquire
7         Jean Lin, Esquire
          Elizabeth Brooke Layendecker, Esquire
8         U.S. Department of Justice
          1100 L Street NW
9         Washington, DC 20005

10

11

12

13

14

15

16

17

18

19

20

21    Reported by:    Christine T. Asif, RPR, FCRR
                      Federal Official Court Reporter
22                    333 Constitution Avenue, NW
                      Washington, D.C. 20001
23                    (202) 354-3247

24

25    Proceedings recorded by machine shorthand; transcript produced
      by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  Your Honor, this is civil action 25-240,
 3    Nicolas Talbott, et al., versus Donald J. Trump, et al.
 4              Will parties please come forward to the lectern,
 5    identify yourselves for the record.  We'll start with the
 6    plaintiff's counsel first this morning.
 7              MS. LEVI:  Good morning, Your Honor.
 8              THE COURT:  Good morning, Ms. Lynch.
 9              MS. LEVI:  Jennifer Levi for the plaintiffs.
10              THE COURT:  Every time.  Every time.  It's just I
11    can't get Mr. Lynch out of my head.
12              MS. LEVI:  Understood.  Understood.
13              With me at counsel table is --
14              MR. MINTER:  Shannon Minter for the plaintiffs.
15              MR. HALEY:  Michael Haley for the plaintiffs, Your
16    Honor.
17              MS. KROPF:  Sara Kropf for the plaintiffs.
18              MS. BERNSTEIN:  Inga Bernstein for the plaintiffs.
19              THE COURT:  All right.  Thank you for your brief.  I
20    thought it was very well done.
21              MS. LEVI:  Thank you.
22              THE COURT:  Mr. Manion?
23              MR. MANION:  Jason Manion, Your Honor --
24              THE COURT:  Manion?
25              MR. MANION:  -- for the United States.  I'm joined
```

1    at counsel table by Jason Lynch, Jean Lin, and Elizabeth
2    Layendecker.
3              THE COURT:  All right.  You are a late-morning
4    addition to the crew?
5              MR. MANION:  I am.
6              THE COURT:  How did you get involved?
7              MR. MANION:  I work in the associate's office.
8              THE COURT:  All right.  I understand that you worked
9    for Senator Ted Cruz on the Justice Barrett confirmation
10   process?
11             MR. MANION:  I did, Your Honor.
12             THE COURT:  What was that like?
13             MR. MANION:  It was a very quick process.
14             THE COURT:  It was very quick?  Did you get any
15   sleep?
16             MR. MANION:  Not a lot.
17             THE COURT:  So I did an event with Justice Barrett
18   last year, and she was getting introduced to everyone and she
19   got introduced to me.  And I, you know, introduced myself,
20   assuming she had no idea who I was.  But she politely
21   introduced herself and then said, "I love that picture of you
22   and your dog."  And so I was like, yeah, you are brilliant.
23             MR. MANION:  It's a great picture, Your Honor.
24             THE COURT:  Yeah.  All right.  Thank you.
25   Welcome.

1          All right.  Who's going to speak for the government

2    today?

3          MR. MANION:  I am, Your Honor.

4          THE COURT:  All right.  Come on up.

5          All right.  So I assume you've been caught up on the

6    transcripts from what happened the last couple of days or last

7    two hearings?

8          MR. MANION:  Yes, Your Honor.

9          THE COURT:  Okay.  And you're obviously caught up on

10   the record?

11         All right.  So I want to go back over the 2017 memo

12   and then the 2018 Mattis policy for a bit, because I'm trying

13   to understand the scope of the current policy, okay?  And you

14   can get whatever you need.

15         MR. MANION:  Thank you.

16         All right.  I believe I have everything, Your

17   Honor.

18         THE COURT:  All right.  This is my understanding of

19   what happened, but correct me if I'm wrong.  So as I

20   understand it, in 2017, President Trump sent out a tweet in

21   which he announced that there was going to be a transgender

22   ban.  And then a 2017 memo came out in which he essentially

23   said, I'm putting -- I'm keeping all current policies in place

24   until I get a memo from the Secretary of Defense and from the

25   Secretary of the Department of Homeland Security; is that

1    correct?

2            MR. MANION:  Well, I -- my understanding is that the

3    tweet did not start the process, that the secretary was

4    already -- had begun this process before the tweet.

5            THE COURT:  Okay.

6            MR. MANION:  But I don't -- I don't dispute that

7    there was a tweet before the memo.

8            THE COURT:  All right.  Great.

9            All right.  And then a judge of this court sort of

10   enjoined that memo, as I understand it.  The memo wanted

11   another memo from the Secretary of Defense and the Secretary

12   of Homeland Security.  And that process kept going, but this

13   Court, not me, another judge in this court, enjoined that 2017

14   memo; right?

15           MR. MANION:  Yes, I believe so.

16           THE COURT:  Okay.  And that memo used the word

17   "transgender."  Trust me, it did.

18           MR. MANION:  All right.

19           THE COURT:  Okay.  And then the D.C. Circuit, in *Doe*

20   *1*, said, We're not going to touch the preliminary injunction.

21   We're not going to stay it.  It's going to stay in place;

22   right?

23           MR. MANION:  That may be true.  I'll take your word

24   for that.  I'm not -- I was not involved, and I have not

25   studied that part of the litigation closely.

1          THE COURT:  Okay.  You don't know what *Doe 1* did in
2     the D.C. Circuit?
3          MR. MANION:  I know what *Doe 2* did.
4          THE COURT:  Okay.  Would you agree with me that *Doe
5     1*, also kind of important?
6          MR. MANION:  Sure, Your Honor.
7          THE COURT:  Okay.  All right.
8          Take it from me, in *Doe 1*, the D.C. Circuit decided
9     not to stay the injunction.  All right?  So the injunction is
10    in place while the memo is happening.  And then the memo comes
11    out, and the defendants ask the Court to dissolve the
12    injunction and the Court refuses.  At that point it goes to
13    *Doe 2*, right, in the D.C. Circuit twice?
14         MR. MANION:  Yes.
15         THE COURT:  What happens then?
16         MR. MANION:  So I think in *Doe 2*, the D.C. Circuit
17    initially, in a nonpublished opinion, dissolves the injunction
18    and then followed it up with two published concurrences.
19         THE COURT:  Right.  And the basis to dissolve the
20    injunction was that things had changed between the 2017 memo
21    and 2018 memo; right?
22         MR. MANION:  Yes, Your Honor.
23         THE COURT:  Okay.  And the D.C. Circuit thought that
24    was important?
25         MR. MANION:  Yes.

1          THE COURT:  All right.  And one of the things that

2     changed was that there had been extensive analysis, a working

3     group, a lot of effort done to figure out sort of what the

4     best policy would be, and that resulted in the Mattis policy

5     report; right?

6          MR. MANION:  Yeah, I certainly agree that there was

7     that level -- there was extensive analysis.  I think the

8     change that mattered was there was a new policy.

9          THE COURT:  Okay.

10          MR. MANION:  There was a policy from DOD that was

11     the operative document rather than the executive order at that

12     point.

13          THE COURT:  Okay.  Not sure there was.  Okay.  All

14     right.  I'll take your word for it.  I don't think it really

15     matters.

16          And one of the things that was at issue in *Doe 2* was

17     that the Court didn't find any -- well, one of the things the

18     Court said was that it's not clear to us that this policy

19     excludes all transgender people; right?

20          MR. MANION:  Yes.

21          THE COURT:  And that's because from the 2017 memo,

22     which used the word "transgender," to the 2018 memo, which did

23     not use the word "transgender," that was the change; right?

24     Among other changes, but in terms of the scope that was one of

25     the changes.

1          MR. MANION:  Sure.

2          THE COURT:  Okay.  And if someone were to say to you

3     or me, the main difference between *Doe 1* and *Doe 2* is that in

4     the 2017 memo, the word "transgender" was used and the 2018

5     memo the word "transgender" was not used, would you agree that

6     that was the main difference, or was that not the main

7     difference?

8          MR. MANION:  I don't believe that was the main

9     difference.  I think the primary difference is there was an

10    executive order in the first instance, which directed the

11    development of a policy.  Later on, there was a policy.  And

12    much had changed between those two documents.

13         THE COURT:  Just things change with time.

14         MR. MANION:  Sure.

15         THE COURT:  You get more experience, there's more

16    research done; right?

17         MR. MANION:  Sure.

18         THE COURT:  And you have to take those things into

19    account.

20         MR. MANION:  Well --

21         THE COURT:  I mean, that's why we do the additional

22    research, is to take the additional information we have into

23    account.

24         MR. MANION:  It's often true that military

25    decision-makers try to have the best research.

1          THE COURT:  Because that makes sense; right?  I

2  mean, you don't want outdated research before you make new

3  policy, or do you?  Do you want outdated research when you

4  make new policy?

5          MR. MANION:  I -- I mean, ultimately, it's up to the

6  decision-makers what --

7          THE COURT:  Oh, can you -- are there decision-makers

8  in our military right now who rely on outdated policies and

9  are not up to speed on current events, current medicine,

10  current weapons technology?

11          MR. MANION:  I don't know that there are.

12          THE COURT:  Okay.  Can you and I agree that there

13  probably aren't?

14          MR. MANION:  I hope there are not.

15          THE COURT:  Okay.  Good.

16          All right.  And, in fact, one of the things that the

17  Mattis policy said expressly was that the difference between

18  the policy in 2018 and the policy that had been done earlier

19  was that the policy that had been done earlier didn't have

20  up-to-date information.  It didn't have up-to-date information

21  of what occurred at the department, and it did not have

22  up-to-date information as to the experience -- as to the

23  experience that people had had; right?  And if you want a cite

24  for that, if you want to go to it, it is -- my clerk here is

25  going to tell me in a moment.  Hold on.

1          Where's the quote from yesterday?  Sorry.  I'm just

2    trying to get quote so we're all on the same page.

3          Here it is.  All right.  The exact quote is on the

4    docket in the Mattis policy at 13-10, so it's docket 13,

5    Exhibit 10.  And at the very front, I think, the Mattis policy

6    says, quote, "Unlike past reviews, the panel's analysis was

7    informed by the department's own data and experience obtained

8    since the Carter policy took effect."

9          Do you see where I am?

10         MR. MANION:  I don't see where you are.  I'll take

11   your word for it that they said that.

12         THE COURT:  Okay.  All right.  So understandably,

13   because the Carter policy -- the Carter policy, according to

14   Mattis, according to the Mattis report, was not up-to-date.

15   It didn't have information that would have permitted it,

16   according to Mattis, to have an up-to-date understanding as to

17   the service of transgender people and the service of people

18   with gender dysphoria.

19         And so therefore, unlike the previous Carter policy,

20   this policy was informed by the department's own data and

21   experience obtained since the Carter policy took effect, which

22   had been two years earlier; right?

23         MR. MANION:  Yes, Your Honor.

24         THE COURT:  Okay.  And that was important to General

25   Mattis, when he signed off on this policy, that it was

1    up-to-date; right?  I mean, he told us that; right?

2         MR. MANION:  Sure, Your Honor.

3         THE COURT:  And it was important to the D.C. Circuit

4    that the policy was up-to-date, because that's one of the

5    things that the D.C. Circuit said at length in *Doe 2*, which

6    was that all of this work had been done, and we now know the

7    current set of events; right?

8         MR. MANION:  I'm not sure if the D.C. Circuit had a

9    majority opinion -- or I'm sorry, do you mean in the first

10   one?

11        THE COURT:  Well, in the unpublish- -- I mean in the

12   unpublished one.

13        MR. MANION:  Yeah.  Yes, Your Honor, that's right.

14        THE COURT:  I'm just -- yes, agreed, it's not

15   precedential, it didn't make a final decision, but in terms of

16   lifting the stay -- or I'm sorry, in terms of remanding and

17   requiring the judge to dissolve the injunction, the thing that

18   was important to the unpublished group was that the Mattis

19   policy, there had been a working group, they had had a lot of

20   information that went into it, months of work, and it was

21   up-to-date; right?

22        MR. MANION:  So certainly that played into the

23   changed circumstances analysis.  I think to the extent you're

24   suggesting that there's some requirement for the President to

25   do APA-style work on an executive order, I --

1          THE COURT:  I'm not -- did I say the word "APA"?

2     Did I say the word "President"?

3          MR. MANION:  No, I don't -- you didn't say --

4          THE COURT:  I'm just asking questions, and I'd

5     appreciate it if you answer them, okay?

6          MR. MANION:  Sure.

7          THE COURT:  All right.  That was important to the

8     D.C. Circuit and it was important to General Mattis, right,

9     that these things be thoroughly researched and up-to-date;

10    right?

11         MR. MANION:  Sure, Your Honor.

12         THE COURT:  Okay.  All right.  Now, you all -- I'm a

13    little bit confused as to the scope of this injunction -- this

14    Hegseth policy, because you all sent me a -- how many pages

15    was your opposition?  It was very well done, by the way.  I

16    meant to say that.  It was a very well-done opposition.

17         MR. MANION:  50-something, I think.

18         THE COURT:  Okay.  All right.  So both briefs, I

19    meant to say, were quite well done.

20         But never once -- well, in the opposition,

21    throughout the opposition, you all say that, "The relevant

22    question is whether the Department of Defense can

23    constitutionally require trans-identifying persons, without

24    gender dysphoria and who have not transitioned medically, to

25    abide by the standards of their biological sex, as has always

1    been DOD policy absent a waiver."  And that's at page 21.

2    Right?

3                 MR. MANION:  Do you mind if I grab --

4                 THE COURT:  Sure.  Go ahead.

5                 MR. MANION:  Yes, Your Honor.

6                 THE COURT:  But that's not the full policy; right?

7    You left an important part out; right?  The policy doesn't

8    just cover people with a history or diagnosis of gender

9    dysphoria or who have transitioned medically; right?  There's

10   kind of an important part you left out.  What's the important

11   part you left out?

12                MR. MANION:  Well, we certainly didn't intentionally

13   leave anything out, but I think what you're going for is

14   probably the "symptoms consistent with that diagnosis".

15                THE COURT:  Yeah, it's in the same sentence.  And my

16   question is:  What does "exhibit symptoms of gender dysphoria"

17   mean?  Because I honestly thought that I was going to see in

18   your opposition, here's what this means, because symptoms of

19   gender dysphoria could mean anything.  I mean, depression

20   could be a symptom of gender dysphoria.  And if everyone who's

21   depressed is out of the military, we've got -- you know, we're

22   going to have problems.  So what does "exhibits symptoms of

23   gender dysphoria" mean?

24                MR. MANION:  I don't think there's been any policy

25   guidance interpreting that term.

1          THE COURT:  Okay.  Well --

2          MR. MANION:  I can tell you how I understand it.

3          THE COURT:  Well, you're the government's lawyer so,

4     please, go ahead.

5          MR. MANION:  We understand this to correspond with

6     the definition in the *DSM-5* for gender dysphoria.  We

7     intend -- we understand it to be intended to sweep in people

8     who would qualify for that diagnosis, but who haven't formally

9     received that diagnosis.

10         THE COURT:  Okay.  But that's not how -- that's not

11    the limitation of the policy, is it?  I mean, the policy is

12    "exhibits symptoms with."  That could mean anything.

13         MR. MANION:  And it hasn't -- it hasn't been defined

14    as far as --

15         THE COURT:  Was that a problem with the policy that,

16    presumably, it could be so expansive as to basically touch

17    upon every single transgender person?  Because cross-dressing

18    could be a symptom of gender dysphoria.  In fact, it is under

19    the *DSM-5*, one of the issues associated with gender dysphoria.

20    It could be wanting to be with other people of a sex that you

21    identify with, which, by the way, could also be, I don't know,

22    being gay, separately.  But that's in the *DSM-5* as well.  Is

23    that what we're covering?

24         MR. MANION:  So I think I have two points.  First,

25    there hasn't yet been a policy -- a policy documentation that

1    defines that term for the military branches.  That's not a

2    problem at this point, because --

3                THE COURT:  It is a problem at this point, because

4    this is going into effect on March 26th.

5                MR. MANION:  And there's still time.  I mean, as

6    Your Honor has seen, there are -- there have been, every few

7    days, additional documents that are --

8                THE COURT:  Well, did you ask your clients, hey, I'm

9    going to go to court and Judge Reyes, you know, we might not

10   like her so much, or we might love her, I don't know, but I

11   think we can all agree that she's usually prepared; fair?

12               MR. MANION:  Sure, Your Honor.

13               THE COURT:  Okay.  And that you had to know I was

14   going to ask you what that meant, so did you go to your

15   clients and say what does this mean, because the judge now has

16   to sign off on a policy, and our entire opposition is based on

17   this policy having a limited scope, and this seems like it

18   opens up the entire scope to basically anything.

19               MR. MANION:  So we are not asking this Court to sign

20   off on any policy.  We're asking this Court not to enjoin

21   other --

22               THE COURT:  Well, you're asking me not to enjoin the

23   policy.

24               MR. MANION:  Sure.

25               THE COURT:  And in order to do that, I have to make

1    sure that the policy passes constitutional -- or at least

2    plaintiffs are unlikely to show that it's going to pass

3    constitutional muster; right?

4              MR. MANION:  Sure.

5              THE COURT:  And one of the issues I have to look at

6    is, as you said in your opposition, the limit -- your

7    opposition, so far as I can tell, the sole -- it has two

8    bases.  One, it's a very limited policy.  It does not cover

9    all transgender people.  It just covers people with a history

10   and diagnosis of gender dysphoria and those who have attempted

11   to or have transitioned.  That's your opposition.  And it

12   leaves out the most critical clause of the policy, which is,

13   it's not limited that way.  It says, also, "exhibits symptoms

14   consistent with."  And, two, your reliance on the Mattis

15   policy, which we're going to get to at length later.  But how

16   can I say that a policy is limited when, on its own terms, it

17   could include essentially every transgender person?

18             MR. MANION:  So it's our top-line view that the

19   policy is not that broad.  Even if the policy is that broad,

20   it is still a constitutional policy.

21             THE COURT:  All right.  So even if the policy covers

22   all transgender people, in your view, it's constitutional.

23             MR. MANION:  Yes.

24             THE COURT:  Okay.  And the policy does cover all

25   transgender people; right?

1           MR. MANION:  No.

2           THE COURT:  Okay.  Well, you're aware, right,

3    because I put it on the public docket, that the Secretary of

4    Defense posted or reposted a tweet from the Department of

5    Defense Rapid Response -- the Department of Defense Rapid

6    Response Team is a team within the Department of Defense that

7    was put in place by the Secretary; correct?

8           MR. MANION:  I don't know who makes up that team.

9           THE COURT:  Okay.  You know, it's an official

10   Department of Defense --

11          MR. MANION:  Sure, I don't dispute that.

12          THE COURT:  Okay.  And on the day after the policy

13   issued, you're aware of the rapid response tweet; right?

14          MR. MANION:  Yes.

15          THE COURT:  Okay.  And what had happened was

16   that CBS News had an article that was titled "'The U.S. will

17   begin removing transgender troops from the military within

18   30 days unless they obtain a waiver on a case-by-case basis,'

19   the Pentagon said in a Wednesday memo"; right?

20          MR. MANION:  I -- I would not be surprised to learn

21   that there was coverage about that.

22          THE COURT:  Okay.  Fair.  There was coverage.

23          And in response, the Department of Defense rapid

24   response team sort of tweeted out that article and said,

25   quote, "Transgender troops are disqualified from service

1    without an exemption"; right?

2            MR. MANION:  They did.

3            THE COURT:  Okay.  And the Secretary of Defense, the

4    same Secretary of Defense who issued the policy, retweeted

5    that quote, that tweet.  And so the Secretary of Defense, who

6    issued this policy, wrote, quote, "Transgender troops are

7    disqualified from service without an exemption."  So can you

8    and I agree that this policy covers all transgender people

9    unless they obtain an exemption which is outlined in the

10   policy and that we will get to.

11           MR. MANION:  We can't, Your Honor.  That's not what

12   the policy says.

13           THE COURT:  I'm sorry, but that's what the Secretary

14   of Defense said, and he's the guy who wrote the policy and

15   he's the guy who's enforcing the policy and he's the guy who's

16   going to issue the implemented policies.

17           MR. MANION:  So I don't dispute that people often

18   use "transgender" as a shorthand.

19           THE COURT:  No, no, no.  No.  Hold on.  Hold on.

20   This isn't people.  This isn't my friend, Jane, on the street

21   who I pass by.  This is the Secretary of Defense.  This is the

22   guy who issued the policy.

23           Now, if we want to know what the policy covers or is

24   intended to cover, who would be the best person to ask?  Would

25   it be the person who wrote the policy?

1    MR. MANION:  To know what the policy is, you should

2    look at the policy, you should not look at the tweet.

3    THE COURT:  No.  Why?  Why shouldn't I look at the

4    words of the guy who used the policy?  Because here's what

5    happens, here's what happens, someone goes out to the public

6    and says this is what we're doing.  We're getting rid of all

7    transgender people, because they lack integrity, because

8    they're undisciplined, because they're liars, because they

9    have a false gender ideology, for all these reasons we're

10   getting rid of all transgender people; right?

11   And then lawyers write a policy, and they very

12   scrupulously don't use the word "transgender," and then you

13   stand up in court and say, no, Your Honor, you've got it all

14   wrong, the policy has nothing to do with transgender people.

15   It's not about people with gender dysphoria.  We -- God bless,

16   we want as many transgender people serving as humanly

17   possible, just as long as they never had gender dysphoria or

18   exhibit any symptoms of it.

19   Is that really how you think that this all works?

20   That you can say one thing in public, the person who writes

21   the policy, and then say something else in court?  Because

22   this wasn't an internal email meant for a couple of people's

23   eyes.  This wasn't some off-the-cuff remark at a cocktail

24   party.  This was a post to his millions of followers on a

25   public website that has funded -- his Twitter account, by the

1    way, is funded by the American taxpayer.  So explain to me why

2    I should ignore that in my assessment of this policy.

3              MR. MANION:  Well, I have a practical reason and

4    then a legal reason.  Practically, I mean, this policy would

5    not have fit in a tweet.  It's not unusual for people to use

6    shorthand on Twitter.

7              THE COURT:  We're not talk- -- stop talking about

8    people.  We're not talking about people.  We're talking about

9    the Secretary of Defense.  So if you want to say to me on the

10    public record, the Secretary of Defense often used shorthand

11    in a loose, non-thought-out way, then make that argument, but

12    don't talk to me about people, because we're talking about one

13    specific person.

14              MR. MANION:  So maybe turning to the legal argument,

15    if I may.

16              THE COURT:  So the practical one, you would agree,

17    doesn't -- doesn't get you there.

18              MR. MANION:  No, I think it does.  But I take it you

19    disagree, and so I'd like to --

20              THE COURT:  No, I actually want an answer to the

21    question.  Do you believe that the Secretary of Defense, Pete

22    Hegseth, when he -- who is your client, when he retweeted

23    this, was using loose language that he didn't fully comprehend

24    or fully think out?

25              MR. MANION:  I've never said that.  I'm not saying

1    that.

2                THE COURT:  Okay.  Because you agree with me that

3    that's not what happened; right?

4                MR. MANION:  I think he used shorthand for a policy

5    that was far too long to fit into a tweet.

6                THE COURT:  Okay.  In one shorthand that we could

7    use is it bans all transgender people, because you would agree

8    that that is the shorthand of what this policy does.

9                MR. MANION:  I don't agree that's the shorthand of

10   what the policy does.  I do agree that's the shorthand that

11   the Secretary used or the Secretary retweeted.

12               THE COURT:  Okay.  So if I asked you to get me a

13   declaration from the Secretary of Defense that said, "I

14   retweeted this, but I didn't mean to use the

15   word 'transgender,' this policy does not ban all transgender

16   people," you would be able to do that, then.  It wouldn't be a

17   problem?

18               MR. MANION:  Well, I am not going to agree to

19   getting a declaration from the Secretary unless Your Honor

20   orders it.

21               THE COURT:  I'm not going to order it, but I'm

22   telling you right now, the record is, is that his words are

23   that this covers all transgender people.  And I'm not going to

24   speculate that he was just being sloppy when he did that.  I'm

25   going to take him at his word, because that's what I do, I

1    take people at their word.  And if you want to rebut that with

2    other evidence, because this is evidence in the record, then

3    you've got until Monday, if you want, to get me a declaration

4    in which he says that's not what I meant.  And if I don't get

5    that declaration, I'll take that into account.

6           But I'm not going to take -- I'm not going to

7    assume, for purposes of my analysis, that when the Secretary

8    of Defense said the policy that I wrote bans all transgender

9    people, that what he really meant to say was -- that what he

10   really meant to say was the policy that I wrote bans everyone

11   with gender dysphoria and those who have a history and

12   diagnosis of gender dysphoria and those who exhibit symptoms

13   of gender dysphoria and those who have ever attempted to

14   transition, because you're right, the shorthand for that is

15   all transgender people, because that is what that is.  And if

16   you want to have the Secretary of Defense, or any of his

17   associates or whomever, send me a signed declaration, I'll

18   take that into account that that's not what he meant.

19          MR. MANION:  Thank you, Your Honor.

20          THE COURT:  All right.  What was the legal reason?

21          MR. MANION:  *Trump v. Hawaii*.  So, I mean, all these

22   same things could have been said about the President's

23   tweets.

24          THE COURT:  No, they couldn't, because you know why?

25   Because by the time the Court got -- the Supreme Court got

1    *Trump v. Hawaii*, it very expressly said that the tweets that

2    started this whole thing off, and the Muslim ban, the tweets

3    of the President were for the first proclamation.  And by the

4    time we had gotten to *Trump v. Hawaii*, in the Supreme Court,

5    numerous other things had happened, and the Supreme Court

6    expressly said, expressly said that the original tweets were

7    no longer connected to the policy that had been conducted by

8    the time it got to the Supreme Court.

9           There had been new proclamations and instead of the

10   original tweet which banned Muslim people in the original

11   proclamation, by the time you got to the second -- the

12   proclamation in front of the Supreme Court, they did not

13   reference gender -- they did not reference religion at all,

14   they did not reference Muslim people at all.  The countries

15   that they covered were not all Muslim majority countries.  And

16   so you couldn't even see that there was a tie between religion

17   and proclamations as they came out.  They were national

18   security.

19          And Chief Justice Roberts was quite clear, quite

20   clear in saying that all of the work that had been done, all

21   of the analysis that had been done between the original

22   tweet and the time -- and the new proclamations, there were

23   separate proclamations -- made the original tweets not

24   relevant to the analysis.

25          But that is not what we have here.  We have here a

1   tweet that occurred literally the day after the policy was

2   issued by the guy who issued the policy, and we are here less

3   than three weeks later.  So explain to me how *Trump v. Hawaii*

4   impacts my analysis of this tweet.

5           MR. MANION:  I'm not saying every detail here aligns

6   with every detail of *Trump v. Hawaii*.

7           THE COURT:  Okay.  What details here align?  Let me

8   know.

9           MR. MANION:  You have statements that were made,

10  public-facing.  Some were campaign statements.  Some were

11  tweets.  The ultimate policy did not reflect the language in

12  those tweets.

13          THE COURT:  Well, the original policy that was

14  enjoined did, and that's why it was enjoined; right?

15          MR. MANION:  The policy that was under review in the

16  Supreme Court --

17          THE COURT:  No, no.  Let's be clear here.  Let's be

18  very clear here, because what we're not going to do is confuse

19  this record.  All right?  You're not going to get up here and

20  say this is *Trump v. Hawaii* and let's just all -- it's just

21  all one big mix, because it's not how litigation works.

22          The original tweet that led to the original ban,

23  that original ban was enjoined by the Court; right?

24          MR. MANION:  Yes.

25          THE COURT:  It was enjoined by the Courts.  And

1    there is no court that looked at the original tweet and the

2    original ban, as far as I can recall, that said that was

3    a-okay.  It was enjoined.

4         By the time it got to the Supreme Court, the tweets

5    are literally like, what, a year or two later?  Much later,

6    months, if not a year or two later.  Things have completely

7    changed.

8         So we don't have the same situation here that we did

9    in *Trump v. Hawaii*.  Next.

10        MR. MANION:  Well, it's our view that we do.  We --

11        THE COURT:  Well, I'm sorry, I don't -- look, it

12   can --

13        MR. MANION:  We will argue that here, we'll argue

14   that to the D.C. Circuit, we'll argue that to the Supreme

15   Court.

16        THE COURT:  Sir, it can be your view that I'm

17   10 foot tall, but I think everyone here is going to agree that

18   I'm not 10 feet tall.  So explain to me how what I just said

19   was wrong and, therefore, you might convince me that you are

20   right and I am wrong.  Did I get the record wrong?

21        MR. MANION:  I'm not sure -- I'm not sure you got it

22   wrong, Your Honor.  So but it's often the case that Supreme

23   Court holdings that rest on facts that are not precisely the

24   same to the facts in a particular case does not --

25        THE COURT:  It's not just that the facts are

1    changed.  It's that in the opinion itself, Chief Justice

2    Roberts said these original facts that led to the original

3    injunctions are no longer relevant.  We can't say that here;

4    right?  Can you tell me that this tweet that happened the day

5    after the same person who tweeted issued the policy is the

6    same situation as we had in the entire litigation of *Trump v.*

7    *Hawaii*, and by the time it got to Supreme Court?  Because if

8    that's your view, fine, I'll move on.

9         MR. MANION:  Sure.  I don't think it's factually

10   identical, but I think the point remains that the policy is

11   the thing that has operative effect.  The policy is the thing

12   we should be analyzing, not tweets or campaign statements or

13   things along those lines.

14        THE COURT:  But that's not what the Supreme Court

15   said.  You keep saying that.  The Supreme Court didn't say

16   that the tweets are irrelevant.  The Supreme Court never -- if

17   the same proclamation had been at the Supreme Court, and there

18   had been a current tweet by the President that this was a

19   Muslim ban and he was only going to apply it to Muslim, I

20   don't care what the policy says, you really that think the

21   Court would have been like, "eh"?  Because that's not what

22   Chief Justice Roberts said.

23        MR. MANION:  So I mean, I think -- yes, I do think

24   the Supreme Court would have looked at the scope of the policy

25   and treated that as dispositive rather than tweets about it.

1    I also think that the Supreme Court would have come out the

2    same way, because what it said was even if these things show

3    animus, you can't explain this policy.  It's not only

4    explainable by animus.  There are legitimate reasons that were

5    in that proclamation, as there are in this policy, that touch

6    on an area, in a core constitutional area of power for the

7    President, where judicial deference must be at its highest.

8    So I -- no, I do think it comes out the same way.

9            THE COURT:  All right.  And the Supreme Court,

10    though, didn't just take those rationalizations at face value;

11    right?  Chief Justice Roberts didn't say you've got these

12    rationalizations, and they're your rationalizations and I'm

13    just not going to look at them; right?  He actually analyzed

14    the rationalizations that the government gave; right?

15            MR. MANION:  Well, he did, but in a much more

16    deferential way than --

17            THE COURT:  But he analyzed them.

18            MR. MANION:  Sure.

19            THE COURT:  He didn't just say you guys said this,

20    you're the President, you're the military, you said "X,"

21    therefore, X.  He analyzed it.  The Court analyzed what they

22    were doing; right?

23            MR. MANION:  The Court did.

24            THE COURT:  Okay.  All right.  What's the other

25    difference?

1          MR. MANION:  I think that's what I have to say about

2    that, Your Honor.

3          THE COURT:  Okay.  All right.  So basically,

4    your arg- -- okay.  All right.

5          Okay.  I have another question about the scope of

6    the policy.  The policy excludes anyone who has ever had

7    gender dysphoria, any history of gender dysphoria?

8          MR. MANION:  Yes.

9          THE COURT:  Okay.  And you understand, because it

10   seems like you're familiar with the DSM-5, that many people

11   have gender dysphoria in early childhood that can get resolved

12   and then they go on to lead lives of one, two decades without

13   gender dysphoria; right?

14         MR. MANION:  I don't have any reason to dispute

15   that.

16         THE COURT:  Okay.  This policy would cover them too.

17   If I had gender dysphoria when I was 10 years old, and I got

18   treatment for it, and I was 10, 20 years stable with my

19   diagnosis, this policy would cover me; right?

20         MR. MANION:  Yes.  Absent a waiver, yes.

21         THE COURT:  Yes.  Okay.

22         And you understand, because the Hegseth policy cited

23   a 2025 literature review.  You're familiar with that

24   literature review?

25         MR. MANION:  I understand that one was done, yes.

 1                    THE COURT:  Okay.  But have you read the literature

 2     review?

 3                    MR. MANION:  I have not.

 4                    THE COURT:  You haven't?

 5                    MR. MANION:  I have not.

 6                    THE COURT:  You're in for quite a long afternoon

 7     then, because I have.  And it also reviewed an AMSARA report;

 8     right?  And it quoted from an AMSARA report?

 9                    MR. MANION:  I believe so.

10                    THE COURT:  Okay.  Have you not read that report?

11                    MR. MANION:  I have not, Your Honor.

12                    THE COURT:  So my clerk, Guillermo, and I had a

13     conversation on Monday, because I had said, you know what, we

14     should send out a minute order saying that I want counsel to

15     be prepared to discuss the Mattis policy, the AMSARA report,

16     and the 2025 Literature review.  And there were a couple other

17     things that we wanted you to be able to answer.  And we looked

18     at each other on Monday and was like we don't have to do that.

19     Of course they're going to be prepared.  The Hegseth policy

20     cites three reports, I mean, of course, they're going to know

21     what those reports are.  But you don't -- you didn't read the

22     reports.

23                    MR. MANION:  I have not, Your Honor.

24                    THE COURT:  Okay.  Do you think it's important, when

25     the Court is reviewing the only three reports that the Hegseth

1  policy cites, to understand whether those reports actually say

2  what the Hegseth policy quoted?

3              MR. MANION:  I don't think it's the Court's proper

4  role to reassess the evidence, but if the question is

5  whether --

6              THE COURT:  No, I'm not reassessing the evidence.

7  I'm not going to do that.  I'm going to look at what the

8  Hegseth policy quoted from those two reports, putting the

9  Mattis policy away, and I'm going to analyze whether it

10 grossly mischaracterized those reports and whether, in fact,

11 if you read the two reports, they actually support keeping

12 transgender people in the armed forces.

13             And you can't be surprised by this because the

14 plaintiffs had a declaration from their Dr. Brown who, at

15 length, discussed how egregiously misquoted these two studies

16 were.  And I'm not going to sort of reweigh that evidence, but

17 I am going to ask you, after I go through both of those

18 reports with you, or someone else on your team if they want to

19 take up those reports, whether I should not take into account

20 that they're pretext.  Because those two reports, if you read

21 them, and you and I are going to go through them, or someone

22 on the government and I are going to go through them together,

23 support keeping transgender people in the military.  And the

24 two things that were quoted in the Hegseth policy were taken

25 way out of context and mischaracterized even in the quotations

1    that they had.

2         Now, if I'm able to show that through the discussion

3    that we're going to have on those two reports, would you agree

4    that would be relevant to my analysis with respect animus and

5    pretext, at a minimum, and certainly with respect to what

6    deference this policy is owed?  Because -- and you might want

7    to ask Mr. Lynch.  Because when we left here on February 19th,

8    Mr. Lynch and I had a conversation on the record in which I

9    expressly said, I have no idea what studies the Hegseth policy

10   is going to rely on, I have no clue, but I'm going to tell you

11   this, I'm going to review them carefully, and I'm going to

12   expect you all to review them carefully.  And Mr. Lynch agreed

13   with me that whether that data actually supported the policy

14   would be an important consideration.  And you think it just

15   doesn't matter; whatever the data says, it's irrelevant to my

16   analysis?

17        MR. MANION:  Well, I think if you look at Supreme

18   Court cases like *Goldman*, for example, there, there's expert

19   testimony on the other side.  There is disagreement with the

20   view of the military on the facts.  And what the Supreme Court

21   says is you don't second-guess the military's professional

22   medical -- or professional military judgments.

23        THE COURT:  Okay.  So your view is, is that even if

24   the military is totally wrong, actually takes two studies

25   which say transgender people -- which supports keeping

1    transgender people in the military and so grossly misquotes

2    them and misuses them, I'm just supposed to be like, I mean,

3    fine, I guess if -- if in the constitutional analysis, yeah,

4    you might be doing this in order to pretend that you have

5    studies that will allow you to discriminate against a group of

6    people, and I just have to defer to that, your view is that

7    that's just what I have to do.

8              MR. MANION:  Well, I mean, I don't agree with every

9    way that you've characterized that.

10             THE COURT:  Okay.  Well, why don't we do this, why

11   don't we go to the studies.  All right?  I suggest that you

12   get out the Hegseth policy.

13             And does someone else on your team want to address

14   these studies, Mr. Lynch?  Mr. Lynch --

15             MR. LYNCH:  Sorry.

16             THE COURT:  -- is there someone else on your team

17   who's better able to address these studies?  Has someone on

18   your team looked at these studies?  Mr. Lynch, I'm asking you

19   a question.  Has someone on your team looked and understand

20   these studies who would be better able to prepare -- to

21   discuss them with me than someone who's standing up here

22   defending a policy that cites on three studies and hasn't read

23   at least two of them?

24             MR. LYNCH:  No, I don't believe we have anybody

25   who's more prepared to discuss the studies, Your Honor.

1           THE COURT:  All right.  I am -- all right.  Well,

2     get out the studies.  You and I are going to go through them

3     together.  And you're going to tell me whether or not I should

4     defer to them in the way that the military characterized them.

5     And when I take you through the policies, if you need time to

6     review where we are, just let me know.

7           So -- by the way, do you study political theory at

8     all?  Have you?

9           MR. MANION:  Not particularly, Your Honor.

10          THE COURT:  Know anything about John Rawls and the

11    "Veil of Ignorance"?

12          MR. MANION:  I've heard of it.  I'm -- I'm not

13    familiar.

14          THE COURT:  Okay.  It's actually quite cool.  So the

15    "Veil of Ignorance" theory from John Rawls is as follows:

16    Assume that you are creating a society.  You are in charge of

17    creating a society.  But here's the thing, after you create

18    it, you have no idea where you're going to fall in that

19    society; right?  So you can create a society, and you're going

20    to basically be reborn into that society, and you're going to

21    have no -- you're going to have no ability to say where in the

22    society you will fall; right?

23          And the point being that if you are creating

24    society, and there is a -- you know that there is a risk that

25    you will fall in any part of the society, you will, most of

1   the time, have a more democratic, egalitarian society, just --

2   you know, right, because you wouldn't want to be stuck in the

3   bad part of society, so you don't create a bad part of

4   society.  Very roughly stated.  I'm sure there are political

5   theorists who are groaning right now.  But that's basically

6   it.

7            The reason I mention this is because when I spoke to

8   Mr. Lynch on February 19th and said these studies are going to

9   be important to me, and we're going to go through them, I had

10  the "Veil of Ignorance."  I had no idea what the policies were

11  going to say; right?  Because the Hegseth policy, there's no

12  way I could have known what the policies were going to say;

13  right?

14           MR. MANION:  Sure.

15           THE COURT:  On February 19th, before I had any idea

16  what the policy was going to say or what the studies were

17  going to say that supported it, I said these studies are going

18  to be really important to me; fair?

19           MR. MANION:  Sure, Your Honor.

20           THE COURT:  Okay.  All right.

21           All right.  Let's get out the AMSARA report, which

22  is at docket 24.  First, let's start there with the Hegseth

23  policy.

24           Actually, you know what?  Even though -- I'm going

25  to do you a favor.  I'm going to take a half-hour break.  And

1    during that break, you and your colleagues -- or you, someone,

2    whoever wants to talk with them, is going to review what the

3    Hegseth policy said about the AMSARA report.  And then you're

4    going to review the AMSARA report.  And I think it's not on

5    the public docket because you all sent it to me.

6          The AMSARA report had -- is that -- is this the one

7    with the three phases?  Okay.  There was a four-phase report,

8    and the Hegseth policy cited the third phase, but only

9    actually attached the fourth phase.  So I had to ask you all

10   for the third phase.  And you sent me the first, second, and

11   third and fourth phases.

12         Mr. Lynch, do you have the third and fourth phase

13   here that you all can review?  Because it's important.

14         MR. LYNCH:  We have the fourth phase, Your Honor,

15   because the plaintiffs attached.  The third phase I can pull

16   up electronically to reference.

17         THE COURT:  We'll get you a printout.  Can we --

18   we'll get you a printout of that.  We'll get you a couple

19   printouts.  And then I also want you all to look at the

20   literature review.

21         So here's exactly what I want, is I want a -- you to

22   look at what the Hegseth policy says about each report,

23   probably take them each in turn, and then I want you to look

24   at the reports.  And then when we come back, I'm going to take

25   you through them.  At the end of that, you're going to tell me

 1    whether you think I should defer to those reports.  Okay?

 2                    MR. MANION:  Yes, Your Honor.

 3                    THE COURT:  All right.  We'll be back at 11:40.

 4                    (A recess was taken from 11:10 a.m. to 11:42 a.m.)

 5                    THE COURT:  I want to start with the AMSARA report.

 6    Who wants to talk for the government?

 7                    MR. MANION:  I will, Your Honor.

 8                    THE COURT:  Okay.  So I want to start with the

 9    Hegseth policy and what it says about the report.  So if you

10    could please turn to -- it's actually -- I should say the

11    Hegseth policy includes an action memo; right?

12                    MR. MANION:  Yes.

13                    THE COURT:  And it's the action memo that discusses

14    the three studies, the Mattis policy and the two studies?

15                    MR. MANION:  Yes, Your Honor.

16                    THE COURT:  Okay.  And it also discusses cost data?

17                    MR. MANION:  Yes, Your Honor.

18                    THE COURT:  Okay.  And -- one second.  All right.

19    So if we -- unfortunately, my pages aren't numbered.  If we go

20    to the action memo, and we turn to the third page of the

21    action memo?

22                    MR. MANION:  I'm there, Your Honor.

23                    THE COURT:  Okay.  So if we go to the first sort of

24    dash, it says, "This policy was informed through consideration

25    of, among other things, the President and the Secretary's

written direction."

And that would be the executive order by the President and the pause order by the Defense Secretary and the Hegseth policy?

MR. MANION:  I believe so, Your Honor.

THE COURT:  Okay.

"And existing and prior DOD policy," that would be the then-in-place Austin policy, and the prior DOD policy would be the Mattis policy and the Carter policy?

MR. MANION:  I don't know if it was amended to those, but I would assume those were included.

THE COURT:  Okay.

"And prior DOD studies and review of service by individuals with gender dysphoria, including a review of medical literature regarding the risk associated with presence and treatment of gender dysphoria," and the prior DOD studies would be the Mattis policy and the 221 review conducted by the Psychological Health Center of Excellence.  And then the literature would be -- review would be the third bullet point, which would be the 2025 medical review, literature review. And then there was cost data.

MR. MANION:  So, certainly, it doesn't say it was limited to those, but I would, I think -- it does say that these three bullet points were included.

THE COURT:  Okay.  But we don't -- by the way, this

```
1    is -- I always tell my clerks, and they get sick of hearing
2    this, that I don't ever want anything written in the passive
3    tense, because then you don't know who is doing what.  And
4    this is written in the passive tense; right?  "The policy was
5    informed through consideration of."  We don't know who
6    considered these issues; right?  It's not active tense.  If
7    this was active tense, they would say so-and-so considered
8    blah, blah, blah; right?  But we don't know who so-and-so was?
9              MR. MANION:  It's not listed here, Your Honor.
10             THE COURT:  Okay.  We don't know if it was the
11   person who wrote the action memo who was Mr. Dill, who I think
12   is a declarant in this case?
13             MR. MANION:  It is a Dill memo, Your Honor, yes.
14             THE COURT:  Okay.  But we don't know if he
15   considered it.  We don't know if Secretary of Defense Hegseth
16   considered it.  We don't know if, you know, the intern
17   considered these.  We just don't know who considered these.
18             MR. MANION:  This doesn't say, Your Honor.
19             THE COURT:  Okay.  And to the extent that we know
20   anything about what was considered, it was just these three
21   studies and the cost data; right?
22             MR. MANION:  Yes.  It says that was included in the
23   study.
24             THE COURT:  Okay.  All right.  So when it discusses
25   the -- so I call it the AMSARA report.  Is that okay with you?
```

1          MR. MANION:  Sure.

2          THE COURT:  It's just acronym.  All right.

3          It says, quote, A 2021 review conducted by DOD's

4   Psychological Health Center of Excellence and the Accession

5   Medical Standards Analysis and Research Activity which found

6   that, quote, rates of disability evaluation were estimated to

7   be higher among transgender service members, end quote.  And

8   then it has at tab 12.  And then that included phase IV of the

9   study in tab 12 to the action memo.

10         And then it says -- goes on, "Additionally, this

11  review found that nearly 40 percent of service members with

12  gender dysphoria and an observed cohort were nondeployable

13  over a 24-month period.  This level of nondeployability

14  creates significant readiness risk and placed additional

15  burdens on service members without gender dysphoria to meet

16  requirements."

17         Do you see that?

18         MR. MANION:  Yes, Your Honor.

19         THE COURT:  Did I read that correctly?

20         MR. MANION:  I believe so.

21         THE COURT:  Does the action memo say anything else

22  about this report?

23         MR. MANION:  No, Your Honor.

24         THE COURT:  Okay.  All right.  I want to start with

25  the second part of the -- we're going to get to both parts,

1    but I want to start with the part that starts, "Additionally,

2    this review found that nearly percent [sic] of service members

3    with gender dysphoria in an observed cohort were nondeployable

4    over a 24-month period.  This level of nondeployability

5    creates significant readiness risk and places additional

6    burdens on service members without gender dysphoria to meet

7    requirements."

8            Now, without ever looking at the report, what's the

9    first question that we will have about that conclusion?  Like

10   if all I did was read the report -- read the action memo and

11   nothing else, what would leap out to me as the main question

12   with that conclusion?

13           MR. MANION:  I'm not sure, Your Honor.

14           THE COURT:  Okay.  We would want to know, right,

15   what -- if the question is the level of nondeployability of

16   transgender people is too high, if that's the conclusion, we

17   need to know in comparison to what; right?

18           MR. MANION:  That would be helpful data, yes.

19           THE COURT:  It would be necessary data; right?

20   Because if the level of deployability of transgender people

21   over 24 months was 40 percent, and it's not actually that and

22   we'll get to that in a moment, and the level of nondeployment

23   over 24 months for nontransgender people was 80 percent, then,

24   in fact, we would have an issue; right?  Not with the

25   transgender folks, but with the nontransgender folks?

1          MR. MANION:  That would be good to know, yes, Your

2    Honor.

3          THE COURT:  Right.  Okay.

4          We can't say anything about whether or not this

5    deployability data is meaningful unless we know in comparison

6    to what; right?  Not just helpful, necessary?

7          MR. MANION:  I think if there was data available for

8    the other class of people, you would want to know that.

9          THE COURT:  And if there wasn't data available, you

10   couldn't draw any conclusion about this, could you?

11         MR. MANION:  I think, yes, you can.  The military

12   can conclude that 40 percent or nearly 40 percent

13   nondeployability is an unacceptably high number.

14         THE COURT:  How can it do that if the nondeployable

15   rate for other people is 80 percent?  If the nontransgender

16   cohort has a 50 percent nondeploy- -- let's say if the average

17   nondeployability rate for the military is 50 percent, and the

18   transgender military rate is 40 percent, then that would not

19   be an unacceptable number; right?  That would be an

20   above-average number.

21         MR. MANION:  Yeah.  If you knew that data, that

22   would certainly be a reason to question how the military

23   reached that conclusion.

24         THE COURT:  Okay.  Can the military reach that

25   conclusion without that data?

1          MR. MANION:  If the -- if that is the only available

2     data for the military, I think, yes, they can reach the

3     conclusion that that's an unacceptably high rate.

4          THE COURT:  Okay.  What if the military only looked

5     at that transgender group to obtain the data?  Would that tell

6     us anything?  What if for other people they just didn't bother

7     looking and they only looked at this one group?  Would that

8     tell us anything?

9          MR. MANION:  I think it would tell you what -- what

10    it was that they were trying to study.

11         THE COURT:  Or who they were trying to study; right?

12    It wouldn't tell you what they were trying to study, it would

13    tell you who they were trying to study.  Because if the

14    military wanted to know if it had problems with deployability

15    rates, it wouldn't just focus on one cohort of people, it

16    would focus across the board; right?

17         MR. MANION:  Yeah --

18         THE COURT:  There's two things that you could study.

19    You could study how transgender people function in the

20    service, or you could study what are the causes of high

21    nondeployability in the military.  And if you want to just

22    study nondeployability, you would study the latter; right?

23         MR. MANION:  Sure.

24         THE COURT:  Okay.  All right.

25         Now, let's go to the actual memo, and this is the

1    phase III part of the memo -- or the report, sorry.

2            So unfortunately, the phase -- do you have -- did my

3    clerk get you Phase III?

4            MR. MANION:  Yes.

5            THE COURT:  Okay.  All right.  And unfortunately,

6    these are not numbered, but if you could go to Phase III, and

7    I think it's -- if you go to page 1?

8            MR. MANION:  Yes, Your Honor.

9            THE COURT:  Okay.  If you go to the background

10   section.

11           Now, one of the things, whenever you're considering

12   a study that you want to know, is what its limitations are;

13   right?

14           MR. MANION:  Sure.

15           THE COURT:  Because some studies are well-connected

16   studies with a lot of data, and some studies don't have a lot

17   of date and so they're not as meaningful; right?

18           MR. MANION:  Sure.

19           THE COURT:  Okay.  All right.

20           By the way, what was your undergraduate degree in?

21           MR. MANION:  Business management.

22           THE COURT:  Okay.  We -- did you go to business

23   school?

24           MR. MANION:  I did not go to a particular business

25   school, no.

1                THE COURT:  We -- I was in the law library --

2                MR. MANION:  And certainly not graduate, if that's

3    what you mean.

4                THE COURT:  Yeah.  No, I was in the law library

5    studying for finals with friends once -- I just told my clerks

6    this the other day -- and it was quiet, because we're all

7    nerds and we're all studying, and we're trying to deal with

8    some economic issue because I was taking a law and econ course

9    and I don't understand economics or business.  And this guy

10   across the table, you know, we -- my friend and I clearly had

11   no idea what we were talking about, and he was like, I don't

12   mean to eavesdrop, but I think I can help you.  And I was

13   like, yeah, sure, that would be great.  So then he proceeded

14   to help us and we got squared away.

15                And we said are you at the law school?  And he said

16   no, I'm actually at the business school.  And the business

17   school was across the river.  I said, well, what are you doing

18   in the law school library, you're across the river.  And he's

19   like, well, I'm studying for finals too and if I go to the

20   business -- if I go to the business school library, everyone's

21   having a good time and talking and nothing ever gets done.  If

22   I go to the law library, everyone's just quiet, no one talks

23   to anyone, and I -- you know, this is the first time anyone's

24   talked to me while I've been here.  So, there's that.  All

25   right.

1          I had no idea what grade I got, by the way.  I don't

2     remember.

3          All right.  So if you go to sort of the paragraph

4     that starts, "A number of factors limit our ability to apply

5     medical administrative data meaningfully to address the

6     important questions posed around a session waiting period for

7     transgender recruits."

8          Do you see that?

9          MR. MANION:  Yes, Your Honor.

10         THE COURT:  Okay.  And if you go down further,

11    there's a half of a sentence that starts, "Transgender status

12    was only evident following entering into military service."

13         Do you see that?  And I want to start at the next

14    sentence.

15         MR. MANION:  I'm sorry, can you say that again, Your

16    Honor.

17         THE COURT:  Sure.  So there's -- there's a line.

18    It's the one, two, three, four, five, six, seventh line down

19    that begins "Transgender status."

20         MR. MANION:  Yes, Your Honor.

21         THE COURT:  Okay.  If you go to the end of that

22    line, there's a sentence that begins "Analysis."

23         MR. MANION:  Yes.

24         THE COURT:  Okay.  "Analysis and interpretation are

25    further limited by the lack of availability of accurate

1    readiness, deployability, and duty limitation data."

2                Do you see that?

3                MR. MANION:  Yes, Your Honor.

4                THE COURT:  Okay.  So off the bat, we know that this

5    deployability data is somewhat limited, right, because we

6    don't have a lot of it?

7                MR. MANION:  Sure.

8                THE COURT:  Okay.  "And it is important to note that

9    members of the transgender community are encouraged, and in

10   many cases required, to maintain contact with mental health

11   services."

12               Do you see that?

13               MR. MANION:  Yes, Your Honor.

14               THE COURT:  Okay.  Put a pin on that, because the

15   other conclusion of -- that the Hegseth policy cites is that

16   transgender people are evaluated 10 percent more often than

17   nontransgender people; right?  That's the first part of the

18   quote.  They don't give the percentages, but they say they're

19   evaluated more often?

20               MR. MANION:  Rates of disability evaluation, yes.

21               THE COURT:  Right.  So that's evaluation, not actual

22   currents; right?

23               MR. MANION:  Yes.

24               THE COURT:  They're two different things.  One is if

25   you get evaluated, and two is you actually have an issue?

1          MR. MANION:  Sure.

2          THE COURT:  And this is telling us that, "Members of

3     the transgender community are encouraged, and in many cases

4     required, to maintain contact with mental health services";

5     right?

6          MR. MANION:  Yes.

7          THE COURT:  To be evaluated.  This might explain to

8     us, might explain to us one reason why transgender people have

9     a higher rate of evaluation; right?

10         MR. MANION:  Sure.

11         THE COURT:  Okay.  All right.  And that wouldn't be

12    because -- okay.  Anyway.

13         All right.  "As such, using administrative data

14    alone to distinguish contacts with mental health service

15    providers that might be duly limiting from those mental health

16    contacts that are functionally equivalent to wellness visits,

17    poses a substantial threat to the validity and

18    interpretation" --

19         Sorry, sorry, I know, go slow.  Sorry.

20         I'm getting yelled at, politely, but yelled at by my

21    court reporter.  All right.  Let me start -- let me switch.

22    Let me restart again.

23         "Using administrative data alone to distinguish

24    context with mental health service providers that might be

25    duly limiting from those mental health contacts that are

1    functionally equivalent to wellness visits, poses a

2    substantial threat to the validity and interpretability of

3    potential findings."

4              Do you see that?

5              MR. MANION:  Yes.

6              THE COURT:  Okay.  And what that's saying is we have

7    to be careful with how we use this data of transgender people

8    having visits, wellness visits or psychotherapy visits,

9    because they might be having them for reasons unrelated to

10   them being transgender or that aren't because any issue

11   inherent with being transgender; right?

12             MR. MANION:  I think that's a fair interpretation,

13   yes.

14             THE COURT:  Okay.  All right.

15             And then do you see that, then, the next paragraph,

16   third line, it says, "PHCOE undertook analysis to identify a

17   cohort of transgender service members and describe patterns of

18   health care utilization that might indicate nondeployability

19   or other duty limitations"; right?

20             MR. MANION:  Yes, Your Honor.

21             THE COURT:  And might is italicized?

22             MR. MANION:  It is.

23             THE COURT:  Okay.  And what the authors are telling

24   you is, is that this is -- this is a maybe.

25             MR. MANION:  Sure.

1          THE COURT:  All right.  Okay.  And by the way, I

2   didn't come up with all this on my own.  You understand that

3   plaintiffs' expert, Dr. Brown, did the entire analysis that

4   I'm about to do with you; right?  Or I guess you don't.  You

5   didn't read that?  Did you read Dr. Brown's reports?

6          MR. MANION:  Not in their entirety, no.

7          THE COURT:  Okay.  All right.

8          But the point being, Ms. Levi, could you please

9   confirm that everything I'm about to go through was in

10  Dr. Brown's report?

11         MS. LEVI:  Dr. Brown extensively addressed the

12  findings in here.  I imagine everything you're about to go

13  through is in Dr. Brown's report.

14         THE COURT:  Okay.  All right.

15         Now, I could take you all through this, and it will

16  take me a long time, but will you take my word for it that

17  with respect to deployability data, the report had data for

18  transgender people but not for a cohort of other service

19  members?

20         MR. MANION:  I'm aware of that, Your Honor.  Yes.

21         THE COURT:  Okay.  All right.  So it's data with

22  respect to nondeployability that was quoted in the Hegseth

23  policy.  The 40 percent number was not compared against

24  anything.  There was nothing to compare it to; right?

25         MR. MANION:  That's right, Your Honor.

1          THE COURT:  Okay.  But they were able to make a

2     different comparison; right?  Because they were able to take

3     the cohort of people who were transgender and compare that to

4     a cohort of nontransgender, depressed people.  Do you

5     understand that?  And that's at page 2.

6          MR. MANION:  I'm sorry, which page, Your Honor?

7          THE COURT:  Well, let me just take you to page 3.

8     If you go to page 3, there's a graph.

9          MR. MANION:  Yes.

10          THE COURT:  And it says, right above that, "How this

11     compares to retention amongst nontransgender service members,

12     however, is not known."  So the retention numbers we only know

13     for transgender people.

14          MR. MANION:  Yes.

15          THE COURT:  Okay.  And if we go for -- if we go

16     for -- you will see that -- on page 4, that they did do a

17     analysis between the transgender cohort that they've been

18     studying and a cohort of other service members with

19     depression.

20          Do you see that there was that analysis?

21          MR. MANION:  Yes, Your Honor.

22          THE COURT:  Okay.  And the conclusion, when they

23     compared the transgender cohort with another cohort of

24     depressed people, was that transgender people served less, the

25     same as, or more than the people who were depressed?

1          MR. MANION:  I'm sorry, you said they served?  Are

2    you asking how they served in comparison?

3          THE COURT:  Yeah, did the -- did the transgender

4    people serve overall a less amount of time, a similar amount

5    of time, or a longer amount of time than the depressed people

6    after both cohorts' diagnoses?

7          MR. MANION:  It appears longer, Your Honor.

8          THE COURT:  Right.  So the transgender people

9    actually were deployed longer than the nontransgender,

10   depressed people; right?

11         MR. MANION:  That's what this says, yes.

12         THE COURT:  Okay.  Would that support excluding

13   transgender people?  Yes or no?

14         MR. MANION:  I mean, standing alone --

15         THE COURT:  Well, don't worry, we're not going to --

16   we're not going to stand it alone.  We're going to get through

17   the rest of the study.  But just let's get the pillars down.

18   Because that's one pillar, right, how long people were

19   deployed.

20         So the fact that transgender people deploy longer

21   than a cohort of nontransgender people who are depressed,

22   after a gender diagnosis and after depression diagnosis, would

23   tell us that they are actually better suited to stay in

24   service than a cohort of people with depression, because they

25   can stay longer.  At least for this like one little thing that

1    we're looking at; right?

2            MR. MANION:  That's an argument someone can make,

3    yes.

4            THE COURT:  Could someone make a reasonable judgment

5    that no, the fact that transgender people can stay in service

6    longer than nontransgender people is a reason to kick

7    transgender people out?  Would that be a rational conclusion

8    that one would draw?

9            MR. MANION:  Well --

10           THE COURT:  Just on this one issue.  Don't -- I

11   understand we have a whole study.

12           MR. MANION:  Yeah.

13           THE COURT:  Because unlike, you know, some

14   quotations that are taken out of context, I actually read the

15   whole thing.  So but let's just stick with me on this one

16   thing.  That supports keeping people, transgender people in

17   service over keeping people with a diagnosis of depression in

18   service, if that's all we were looking at; right?

19           MR. MANION:  Sure, Your Honor.

20           THE COURT:  Okay.  All right.

21           And if we continue, "As presented in Figure 2 below,

22   50 percent of the transgender cohort had left service in the

23   first 23 months following gaining cohort eligibility.  Amongst

24   the depressed cohort, however, 50 percent have left service

25   within the first 14 months."

1          Right.  So considerably faster than those who left

2     from the transgender group; right?

3          MR. MANION:  Sure, Your Honor.

4          THE COURT:  All right.  And when people are in

5     service, they get trained to be in service, and that costs

6     money, right, it costs money to train them, it costs money to

7     house them, it costs money to employ them; right?

8          MR. MANION:  Sure.

9          THE COURT:  And that -- those are sunk investment

10    costs, that when the person leaves, that sunk cost leaves with

11    them; right?

12         MR. MANION:  Yes, Your Honor.

13         THE COURT:  All right.  Now, if we keep going down

14    to below the graph, and we go down to one, two, three, four,

15    five -- fifth line, the first part of that paragraph uses --

16    is -- discusses how the report is defining certain issues.

17    And then it says "using this definition."

18         Do you see that?

19         MR. MANION:  Yes, Your Honor.

20         THE COURT:  "Using this definition,

21    around 60 percent or more of the transgender service member

22    cohort remained deployable throughout the 24 months following

23    cohort eligibility."

24         That means 60 percent of the people in the cohort

25    were deployable for the entire 24 months; right?

```
 1              MR. MANION:  I believe so, Your Honor.

 2              THE COURT:  Okay.  Now, it continues, "In general,

 3    10 percent or fewer of the cohort were nondeployable for

 4    reasons related to inpatient mental health stays in the two

 5    years following initial diagnoses"; right?

 6              MR. MANION:  Yes, Your Honor.

 7              THE COURT:  And then, "About 30 percent of the

 8    cohort would have been nondeployable as a result of outpatient

 9    mental health contacts unrelated to gender dysphoria in the

10    24 months following identification."

11              Do you see that?

12              MR. MANION:  Yes, Your Honor.

13              THE COURT:  And that's -- we're going to get to in a

14    moment, but that's part of where the 40 percent number comes

15    from, from in the Hegseth policy, okay?  But we're going to

16    get to it.

17              It says, "Finally, important data were not available

18    from nontransgender service that could serve as a basis for

19    comparison to indicate if supposed nondeployability rates

20    amongst the nontransgender cohort deferred from the overall

21    nondeployability rate."

22              Do you see that?

23              MR. MANION:  Yes, Your Honor.

24              THE COURT:  And that's what we were discussing

25    earlier; right?
```

1              MR. MANION:  Yes.

2              THE COURT:  So when the Hegseth policy says

3    40 percent nondeployable over 24 months, what this study is

4    telling you is, standing alone, that's meaningless, because we

5    don't know what the comparison is to other service members;

6    right?

7              MR. MANION:  Well, I don't know if I would say it's

8    meaningless.  It's at least a number.

9              THE COURT:  It's a number.

10             MR. MANION:  It's some data.  There's not data for

11   the rest of it in this report.

12             THE COURT:  All right.  Do you -- by any chance, do

13   you know what the ether is or was in physics before Einstein's

14   Theory of Special Relativity came out?

15             MR. MANION:  No, Your Honor.

16             THE COURT:  Okay.  It's actually quite interesting.

17   So under Newtonian physics, we have space and time are set

18   things; right.  There's space, there's time, they don't

19   change.  And when physicists would assess how fast things were

20   moving, they would assess it in comparison to this ether that

21   was out there, including light.  Light, for example, would

22   move faster around the earth if it was traveling with the

23   earth's rotation and slower around the earth if it was

24   traveling against the rotation, because there was this like

25   ether in the air.  That's why -- that's where the phrase "It's

1    in the ether" comes from.  It's from this belief that

2    scientists had before Einstein came around.

3            But there were a -- famous experiments that were

4    done which show that light, in fact, did not travel

5    differently through space depending on the earth's rotation,

6    which sort of called into question whether there was like this

7    ether.  And the reason ether was important was because when

8    you're saying something is moving at "X" miles an hour, you

9    need to know in relation to what; right?  And what people

10   thought about was that it would be in relation to the ether.

11           And Einstein came around and said actually, no,

12   everything revolves around the speed of light, because the

13   speed of light is constant.  The speed of light never changes,

14   at all, ever.  It's why we will never be able to go probably

15   10,000 light years away, because the speed of light never

16   changes, and you can't actually travel faster than the speed

17   of light, unless, in Star Trek, they have a whole thing where

18   the space -- anyway.  In Star Trek, they do it, and it turns

19   out it's consistent with the Theory of Relatively.  But that's

20   for another day.

21           Anyway, the point being is that what Einstein came

22   up with, what he understood, is that everything has to be

23   relative to each other.  Space and time change and move.

24   Everything's relative to each other.  You can't just take

25   something in space and know anything about it unless you're

1    relating it to something else; right?  Like if Bob was in

2    space, and we don't know anything about what Bob is acting in

3    relative to, and without taking into account gravity -- Bob

4    being in space is meaningless, is the point.

5           And the overall point being that if we just have a

6    number in space of nondeployability, that is meaningless

7    unless we have something to compare it to.  Which was a long

8    way of saying that we kind of need to know what the overall

9    service rate in nondeployability is in order to fully

10   understand the 40 percent number.  But -- all right.

11          It's really fascinating, by the way, if you want to

12   learn about it.  There are a lot of physics for dumb people

13   books out there which are really quite good.

14          Okay.  So -- and if we go down on page 5, it

15   continues further.  If you start at the line like "As noted

16   above."

17          Do you see that?  We're on page 5.

18          MR. MANION:  Yes, Your Honor.

19          THE COURT:  Okay.

20          "The transgender cohort stayed in service longer" --

21          We've already discussed that; right?

22          MR. MANION:  Oh, yes.  Yes.

23          THE COURT:  Okay.

24          -- "on average than did the depression cohort.

25          "Interestingly, the transgender cohort also had a

1    greater proportion of members available for deployment than

2    the depression cohort."

3              Do you see that?

4              MR. MANION:  I do, Your Honor.

5              THE COURT:  All right.  So not only -- we're going

6    to keep a list here.  So, one, we have TJ cohort, one longer

7    time in service for the transgender people, right, on average.

8    Two, we have greater proportion of TJ members for deployment.

9              Do you see that?

10              MR. MANION:  As compared to the other cohort being

11    discussed, yes.

12              THE COURT:  Yes, as compared to the depression

13    cohort.  Yup, important.  You've caught on, no ether.

14              All right.  And then it finishes, "Collectively,

15    this analysis suggests that within the first 24 months

16    following receipt of a cohort-qualifying diagnosis, members of

17    the transgender cohort are more deployable than members of the

18    matched cohort of service members with depressive orders";

19    right?

20              MR. MANION:  Yes, Your Honor.

21              THE COURT:  Okay.

22              Now, it also discussed -- it also analyzed those

23    transgender people who were given hormone as medication and

24    not as medication.  And that's on page 7.  Did you -- were you

25    able to look at that?

1          MR. MANION:  Not during the break, Your Honor.

2          THE COURT:  Okay.  Well, let me make a long story

3    for you short.  If you go to the top of page 7, this says,

4    "There was no meaningful difference in readiness outcomes

5    between those members of the transgender cohort who received

6    hormone therapy and those who did not."

7          Do you see that?

8          MR. MANION:  Yes, Your Honor.

9          THE COURT:  Okay.  So one of the issues that has

10   been discussed, and I think was discussed maybe in your

11   opposition, is that people with gender dysphoria need hormone

12   and so they're nondeployable, right, for periods of time

13   because it's hard to get the hormone things out and about to

14   jungles or whatnot; right?

15         MR. MANION:  Yes, Your Honor.

16         THE COURT:  Okay.  By the way, footnote.  What about

17   diabetics?  Are all diabetics excluded from service?

18         MR. MANION:  I'm not aware, Your Honor.

19         THE COURT:  Okay.  They're not.

20         And you're aware that diabetics need insulin; right?

21         MR. MANION:  Yes, Your Honor.

22         THE COURT:  Someone could have hormone needs,

23   someone could have insulin needs, but we don't automatically

24   say if you're diabetic, you can't come into the military just

25   because you need insulin; right?  We do a case-by-case

1    analysis?

2              MR. MANION:  I'm not aware, Your Honor.

3              THE COURT:  All right.

4              Mr. Lynch, are you aware?

5              MR. LYNCH:  I don't have specific --

6              THE COURT:  Okay.  Well, there's a woman behind you

7    in a military uniform who I think is in-house counsel, yes?

8              MR. LYNCH:  Yes.

9              THE COURT:  Why don't we ask her.

10             I want to know if everyone -- if every diabetic is

11   excluded from military service.

12             MS. WILES:  I'm not aware of that --

13             THE COURT REPORTER:  I can't hear her.

14             THE COURT:  It's okay.

15             All right.  I've looked.  It's not a disqualifying

16   condition.  And in any event, even if it were, we'd do a

17   case-by-case analysis, right, with respect to people who are

18   in service?

19             MS. WILES:  I would say that, Your Honor.

20             THE COURT:  All right.  Thank you.

21             Would you agree with me that at least based on this

22   study, which I did not bring into this case, the Hegseth

23   policy cited, the deployability is not impacted by those who

24   need hormones, because it's the same for those who need

25   hormones and those who don't; right?

1          MR. MANION:  Within the cohort, yes, Your Honor.

2          THE COURT:  Within the cohort.

3          MR. MANION:  Yes.

4          THE COURT:  Yes.  Okay.

5          All right.  Now, let's go to what we've been talking

6     about, which is, the Hegseth policy says -- if I'm back to the

7     Hegseth policy -- and this is not a quotation; right?  This is

8     just the Hegseth policy's analysis of this report?  I'm on

9     page, I think 3, of the action memo.

10         MR. MANION:  Oh, sorry.  Yeah.

11         THE COURT:  All right.

12         It says, "Additionally, this review found," and what

13    comes next is not a quotation; right?

14         MR. MANION:  That's right, Your Honor.

15         THE COURT:  Okay.  Whoever wrote this, wrote this

16    action policy, made this summary.

17         "Additionally, this review found that nearly

18    40 percent of service members with gender dysphoria, in an

19    observed cohort, were nondeployable over a 24-month period."

20         How would you read that?  The way that I read that

21    is that 40 percent of transgender people could not deploy for

22    within -- for 24 months after diagnosis.  How would you read

23    that?

24         MR. MANION:  I can see how you would read it that

25    way.  I'm not sure that's the only reading available.

63

1              THE COURT:  Okay.  How would you read it?

2              MR. MANION:  An alternate reading is that they were

3      nondeployable during a 24-month period.

4              THE COURT:  For some point during the 24-month

5      period.

6              MR. MANION:  That's right.

7              THE COURT:  Right.  And in fact, that's what the

8      study concludes, that they were nondeployable for some period

9      of time within the 24-month period; right?

10             MR. MANION:  Sure.

11             THE COURT:  And in fact, if we go to the conclusion,

12     the conclusion is that, "Fewer than 40 percent of the

13     transgender service members identified as a part of this study

14     would have been deemed nondeployable due to mental health

15     reasons at some time during the 24 months following initial

16     diagnosis."

17             Now, do you know why it says "would have been deemed

18     nondeployable"?

19             MR. MANION:  I do not, Your Honor.

20             THE COURT:  It's because they didn't actually do the

21     analysis.  They didn't have the records to do the analysis.

22     So they just made best guesses based on what little data they

23     had, which was why the limitations that I began with, or that

24     the study began with, were quite important.  So it's not that

25     they weren't.  They didn't do a retrospective study.  They

1    just assumed, based on what the little data they had, that the

2    people would be nondeployable for some time period over 24

3    months.  But what do we not know from that speculation?

4                MR. MANION:  I assume whether they indeed were.

5                THE COURT:  Or how long they were.

6                MR. MANION:  Sure.

7                THE COURT:  Because it could be that 39 percent of

8    the transgender service people were nondeployable for five

9    days, 1 percent was nondeployable for a month.  But it just

10   happened some point within two years.  It doesn't even really

11   tell us how long anyone was nondeployable; right?  It's kind

12   of a meaningless number.  Not only do we not have anything to

13   compare it to with respect to nontransgender people, we don't

14   even know the number of days that the people were actually

15   nondeployable; right?

16               MR. MANION:  I mean, again, I would not adopt the

17   meaningless characterization, but I agree that it does not

18   have those comparators that you're discussing.

19               THE COURT:  Okay.  So 40 percent could have been

20   nondeployable for two days.  40 percent could have been

21   nondeployable for two weeks.  We just have no idea of knowing;

22   right?

23               MR. MANION:  Well, I can't tell from the face of

24   this document.

25               THE COURT:  Okay.  Well, this document is the one

1    that you guys cited.  I didn't cite this document.  I didn't

2    come up with it.  This is your main support.  This is, in

3    fact, the main piece of study that you all have to say that

4    you're concerned about nondeployability rates for transgender

5    folks.  And so would you agree with me -- well, scratch that.

6    Let's continue to see where it goes.

7            "Members of the transgender cohort were likely" --

8    this is the conclusions.  "Members of the transgender cohort

9    were likely to remain in military service longer than were

10   members of a matched depression cohort and were less likely to

11   be nondeployable due to their mental health utilization."

12           Right?

13           MR. MANION:  Yes, Your Honor.

14           THE COURT:  Okay.  Why wasn't that in the policy?

15   Why wasn't -- I mean, it's the very next sentence.  Would you

16   agree with me that if the policy was accurately fronting this

17   study, along with all the other things that we have mentioned,

18   that it would have noted that the study concluded that

19   transgender people were more deployable, were longer

20   deployable, and were longer in service than a trans- -- a

21   cohort of depressed service members?  Wouldn't that have been

22   a more fair representation of this study?

23           Let me ask you this:  You agree that you can't just

24   pick and choose, like, sentences from a study; right?

25           MR. MANION:  Sure.

```
1              THE COURT:  Okay.  Because that wouldn't be
2     accurately reflecting a -- that wouldn't -- scratch that.
3              MR. MANION:  Right.  And if I may just add to my
4     answer.
5              THE COURT:  Sure.
6              MR. MANION:  Maybe I should't say one can't do that.
7     One can rely on parts of a study for what -- for the
8     relevant -- or what they view as relevant from a study.
9              THE COURT:  Yeah, but you wouldn't look at a study
10    and say I like this part of the study, the other parts of the
11    study that go against the conclusion I've been told to draw I
12    don't want to rely on, so I can just ignore those.  Like
13    that's not right; right?  You can't do that.
14             MR. MANION:  Yeah, and I wouldn't accept that
15    there's any evidence that that's what happened here either.
16             THE COURT:  Stay tuned.  Because we're about to get
17    to Phase IV.
18             All right.  Let's get back to the action memo.
19    Let's look at the first line of what this says about the
20    study.
21             Do you see that?
22             It found -- the study found that, quote, rates of
23    disability evaluation were estimated to be higher among
24    transgender service members, dot, dot, dot, quote; right?
25             MR. MANION:  Yes.
```

 1              THE COURT:  That's all that this says about the

 2     Phase IV study; right?

 3              MR. MANION:  I believe so, Your Honor.

 4              THE COURT:  There's nothing else in the action memo.

 5     There's nothing else in the Hegseth policy.  There's no tweet

 6     from the Secretary of Defense talking about the rest of the

 7     Phase IV study; right?

 8              MR. MANION:  Not that I know of, Your Honor.

 9              THE COURT:  Okay.  Let's go to the Phase IV study.

10              Now, to be sure, the Phase IV study did find that

11     there was a higher evaluation rate for transgender people of

12     about 11 to 12 percent, all right.  What else -- what other

13     comparisons did the study make?

14              MR. MANION:  I'm not aware, Your Honor.

15              THE COURT:  Well, it made four or five other

16     comparisons.  And the comparisons are important, because one

17     thing is how often someone is evaluated and something else

18     entirely is how many occurrences actually come out of those

19     evaluations.  You would agree with that; right?

20              MR. MANION:  Can you repeat that, please.

21              THE COURT:  Yeah, sure.  Someone could be evaluated

22     15 times -- actually, let me -- because I'm going to use this

23     later.  Someone could be evaluated -- someone could be

24     evaluated 15 times and someone -- and a different person could

25     be evaluated 10 times, and all that tells us is how often

1    they're evaluated.  It doesn't tell us what their actual

2    occurrence rates are; right?

3            MR. MANION:  I agree.

4            THE COURT:  Okay.  What you want to know is not how

5    often they're evaluated, just, you want to know what the

6    actual occurrence rates are; right?  That's the key factor;

7    right?

8            MR. MANION:  I'm not sure.  A key to what?

9            THE COURT:  Well, we're trying to figure out whether

10   to keep people with gender dysphoria out of the military, and

11   what the Hegseth policy is, is that we have to keep them out

12   of the military because a study found that they were evaluated

13   at a rate of 11, 12 percent higher, which, by the way, the

14   Hegseth policy doesn't say.  I just know that because I read

15   the study.

16           So -- but if we're trying to think of why people are

17   being kept out of the military, we're not just looking at how

18   often they're evaluated, we're actually looking at the

19   occurrence rates, how often things happen to them; right?

20           MR. MANION:  That would be one way of looking at it,

21   Your Honor, yes.

22           THE COURT:  Okay.  Would it surprise you to learn

23   that in every single category, and there are four or five of

24   them, where the report studied the rates of occurrence between

25   transgender people and nontransgender people, every single

1    rate was similar between the two?

2            MR. MANION:  I'm happy to talk through these with

3    you if you want.

4            THE COURT:  Okay.  All right.  Let's go through

5    them.

6            Sorry, I just have to get to the right place in my

7    notes so I can give you page numbers.

8            All right.  So if you go to docket 73-23 at page 4,

9    so page 4 of this study, of the Phase IV part of the study.

10           MR. MANION:  I have that, Your Honor.

11           THE COURT:  Okay.  Sorry.  I'm looking for a

12   specific quote, I apologize.

13           Okay.  Can you go to -- start with page 2, says "key

14   findings"?

15           MR. MANION:  Yes, Your Honor.

16           THE COURT:  "Transgender service members appear

17   similar to the full military applicant pool in terms of

18   proportion with history of any preaccession, medical

19   qualifications, as well as the distribution of specific

20   medical disqualifications."

21           Did I read that correctly?

22           MR. MANION:  I believe so, Your Honor.

23           THE COURT:  What that is saying is, is that

24   transgender persons have similar occurrence rates than

25   nontransgender people; right?

1          MR. MANION:  I believe preaccession, but yes.

2          THE COURT:  Well, as well as the distribution of

3    specific medical disqualifications.

4          MR. MANION:  Yeah, I see that language as well.

5          THE COURT:  Okay.

6          "Rates of adverse attrition and existing prior to

7    service discharge among transgender service members were

8    similar to the total force"; right?

9          MR. MANION:  Yes, Your Honor.

10          THE COURT:  Meaning that the level of attrition of

11    people, once they're in service, is similar between

12    transgender people and nontransgender people; right?

13          MR. MANION:  Yes, Your Honor.

14          THE COURT:  "However, the rates of disability

15    evaluation were estimated to be higher among transgender

16    service members"; right?

17          MR. MANION:  Yes, Your Honor.

18          THE COURT:  Okay.  So we have a number of issues in

19    which the key findings are that with respect to occurrence

20    rates, rates are similar between transgender people and

21    nontransgender people, and we have one finding that

22    transgender people are evaluated at a 11 to 12 percent higher

23    rate than nontransgender people.

24          Now, would it be a fair characterization of this

25    report to only cite the part about the higher level of

1    evaluation of people and ignore the similar rates and not

2    mention those at all?  Would that be a fair characterization

3    of the findings of this study?

4            MR. MANION:  I think it's a fair characterization of

5    what was characterized, Your Honor.

6            THE COURT:  That might be the most legal thing I

7    have ever heard anyone say in my 25 years of doing this.  Well

8    done.

9            But why don't we answer my question.  Would it be a

10   fair characterization of this report to say only that the

11   report found that the disability evaluation was higher among

12   transgender people and leave out what the actual occurrence

13   rates were?  Would that be a fair or unfair characterization,

14   or you can't say?

15           MR. MANION:  I can't say, Your Honor.

16           THE COURT:  All right.

17           Now, I'm not a math whiz, I know, because I never

18   did well in math.  But why don't you and I work through

19   something together.  If one group of people have a higher

20   evaluation rate than another group of people, but the same

21   occurrence rate, what does that tell us about the group that

22   is evaluated more in comparison to the group that is evaluated

23   less when you keep constant the occurrence rates?  It tells us

24   that the people who are evaluated higher have a lower

25   occurrence rate than the people who are evaluated less.

1    Because if you're evaluated more times, but you have the same

2    occurrence rates as someone who's evaluated less,

3    mathematically, the person who's evaluated more has -- that

4    group has a less occurrence rate, the actual rate of

5    occurrences than the group who's evaluated less.

6            So what all these four things tell us, if we're

7    looking at them together, is that transgender people have a

8    lower overall rate of occurrences, because you have to factor

9    in how often they're evaluated, than nontransgender people.

10   Do you understand that?  It's just math.

11           MR. MANION:  I do, Your Honor.  Sure.

12           THE COURT:  I didn't do the math wrong.

13           MR. MANION:  Not that I know of, Your Honor.  No.

14           THE COURT:  Okay.  All right.

15           MR. MANION:  I don't think that -- I mean, I think

16   that the fact of evaluation is also relevant to the

17   considerations about how service members are spending their

18   time.

19           THE COURT:  Well, not if they're required to be

20   evaluated for no particular reason, because as we've seen, the

21   occurrence rates are smaller.

22           Now, maybe that's an argument.  I don't know of

23   anyone who would make it.  But -- by the way, we're not

24   talking like it's 50, 60, 70 percent higher; right?  It's 11

25   to 12 percent higher; right?  Which means that for every

1    person who's evaluated 11 -- every transgender person who's

2    evaluated 11 times, a nontransgender person is evaluated 9 or

3    10 times; right?  That's the math.

4             MR. MANION:  Sure, Your Honor.

5             THE COURT:  That's not -- that's not meaningful, is

6    it?  I mean, is it -- if you say -- if you want to say you

7    can't answer, you can say you can't answer.

8             MR. MANION:  I will not characterize it as

9    meaningless.

10            THE COURT:  All right.  Would you characterize it as

11    meaningful?

12            MR. MANION:  I'm not a military expert.  I don't

13    know if it is meaningful or not.

14            THE COURT:  Okay.

15            Sorry.  There's one more quote I'm -- if you go to

16    the last page, right before the conclusion, the study actually

17    broke down different types of occurrences and whether or not

18    they were similar amongst transgender people and

19    nontransgender people.

20            And we're going to go to Exhibit 8, table 8.  But do

21    you see on the paragraph above conclusion -- we're at one,

22    two, three, four, five, six, seven, eight -- it says -- seven,

23    I'm sorry -- "The most commonly evaluated conditions among

24    cohort members."

25            Do you see that?

1          MR. MANION:  Yes, Your Honor.

2          THE COURT:  Okay.  "Psychiatric, 54 percent;

3     musculoskeletal, 28 percent; neurological, 18 percent, were

4     comparable to those of all service members evaluated for

5     disability."

6          Do you see that?

7          MR. MANION:  I do, Your Honor.

8          THE COURT:  So not only did the study just say

9     occurrences rates -- occurrences are similar, they actually

10    broke it down by occurrence type; right?

11         MR. MANION:  Yes, Your Honor.

12         THE COURT:  And for psychiatric, it was the same;

13    right?

14         MR. MANION:  They were comparable, Your Honor.

15         THE COURT:  Comparable.

16         For musculoskeletal -- I can't say this word.

17    Musculoskeletal.  Who came up with this word?

18    Muscle-skeletal-something.  That's -- I assume that's muscle,

19    skeleton, bones and stuff; right?

20         MR. MANION:  I assume, Your Honor.

21         THE COURT:  Okay.  And those are the same too;

22    right?

23         MR. MANION:  Comparable, yes.

24         THE COURT:  Yup.

25         And neurological; right?

1            MR. MANION:  Comparable, yes.

2            THE COURT:  Okay.

3            MR. MANION:  To other service members evaluated for

4   disability.

5            THE COURT:  Yeah.  But we're talking about

6   disabilities, right, and whether or not we need to get rid of

7   one, whether or not we need to exclude one; right?

8            MR. MANION:  Sure, Your Honor.

9            THE COURT:  Okay.  All right.  So do you see that at

10  the end of the Phase IV, there's like a PowerPoint it looks

11  like someone put together?  It says "Analysis of medical

12  administrative data on transgender service members"?

13           MR. MANION:  Yes, Your Honor.

14           THE COURT:  All right.  And if you go to one, two,

15  three, four, five, it says "Findings outcome"?

16           MR. MANION:  Yes, Your Honor.

17           THE COURT:  So it has some of the findings we've

18  been discussing.  The first is "Transgender versus all service

19  members:  Similar adverse attrition and EPTS discharge";

20  right?

21           MR. MANION:  Yes, Your Honor.

22           THE COURT:  "Higher disability evaluation"?

23           MR. MANION:  Yes, Your Honor.

24           THE COURT:  "Similar percent of retired"; right?

25           MR. MANION:  Yes, Your Honor.

```
1              THE COURT:  So let's add similar percent of retired
2      on here, on our list, of retired people with disabilities.
3      And that's important, because Tricare is the military
4      insurance arm and it insures veterans; right?
5              MR. MANION:  Yes, Your Honor.
6              THE COURT:  Okay.
7              "Similar" -- "Rate:  Similar with the most common
8      evaluated condition, psychiatric, MSK, neurological"; right?
9              MR. MANION:  Yes, Your Honor.
10             THE COURT:  "Transgender versus service members
11     diagnosed with psychiatric disorder:  Transgender stay in
12     service longer"; right?
13             MR. MANION:  Yes, Your Honor.
14             THE COURT:  And, B, "Longer in service time does not
15     equate to deployability."
16             And I won't take you through it, but the reason they
17     say that is because they don't have any confidence in their
18     deployability analysis; right?
19             MR. MANION:  Yes, Your Honor.
20             THE COURT:  All right.
21             MR. MANION:  Or that at least may be a reason why
22     they said that.
23             THE COURT:  Okay.
24             And then if we go -- there's more comparisons;
25     right?
```

1              MR. MANION:  I'm sorry, the next slide?

2              THE COURT:  The next findings, yeah.  The next --

3              MR. MANION:  Yes.

4              THE COURT:  -- key findings.

5              "Comparison of transgender persons versus all SMS

6      service members:  Similar proportion with history of any

7      preaccession, medical disqualification status"; right?  So

8      let's add that to our list.

9              "Distribution of specific medical

10     disqualifications"; right?  That's the psychiatric, et cetera,

11     that we just talked about.  Right, similar?

12             MR. MANION:  Yes, Your Honor.

13             THE COURT:  Okay.

14             "Rates of adverse attrition."  Those are similar.

15             "EPTS discharge summary"; right?

16             MR. MANION:  Yes, Your Honor.

17             THE COURT:  And there's a higher evaluation rate for

18     transgender people, which means that there's a lower

19     occurrence rate for transgender people.

20             Okay.  So let's go through my list, all right?  The

21     Hegseth policy, the only thing it notes is that there are

22     higher evaluation rates for transgender people.  And it

23     doesn't note that there are similar occurrences.  So what we

24     don't know from the face of the Hegseth policy is that there

25     is a lower occurrence rate; right?  So we have the Hegseth

1       policy says one thing; right?

2             Here's what else the study found:  Transgender

3       persons have longer time in service.  After -- with respect to

4       disability cohort, greater proportion of transgender members

5       are available for deployment after a diagnosis.  Hormone and

6       nonhormone rates of deployment are similar, psychiatric rates

7       are similar, MSK rates are similar, neurological rates are

8       similar.  Similar percentage of retired people with a

9       disability, similar preaccession medical disqualification,

10      similar rates of adverse attrition, and similar rates of EPTS

11      discharge.

12            And I've just listed off ten things; right?

13            MR. MANION:  Yeah, I think what they're similar to

14      might vary between someone else, but I agree.

15            THE COURT:  Right.

16            Okay.  Is it a fair characterization of a study to

17      quote, out of 11 things that compared, pick out the one thing

18      where the transgender people were higher, which isn't that

19      much higher, 10 or 11 percent, and not even put that into

20      context that what that higher evaluation means, because

21      there's similar occurrence numbers, is that it's a lower

22      occurrence rate.  Is that a fair characterization of this

23      study?  And if you want to say I can't say, you can say I

24      can't say.

25            MR. MANION:  Yeah, I can't say that, Your Honor.

1          THE COURT:  All right.  Does this study, if we read

2     the whole thing, support keeping transgender people in service

3     or making them leave service?  Well, I'll tell you the answer.

4     You know how we know the answer?  Other than the obvious, is

5     that this study was done in 2021.  Why is that important?  Why

6     is it important that this study was conducted in 2021?

7          MR. MANION:  I'm not sure what you're getting at,

8     Your Honor.

9          THE COURT:  Sure.  The Austin policy, the current

10    policy that the Hegseth policy seeks to replace, was put into

11    place in 2021 under the Biden administration.  And this study

12    that we have just gone through was supportive, was used by the

13    working group who put the Austin policy into place.

14          Now, before the Austin policy was in place, the

15    Mattis policy allowed people to stay in if they had 36 months'

16    of diagnose -- of stability after gender dysphoria diagnosis.

17    And the specific thing that this study was commissioned to do

18    was to see if that 36-month period of stability was the right

19    amount, too high, or too low.  And having reviewed this study,

20    the military -- the military, the President of the United

21    States and the military, decided that the diagnosis rate

22    should only be 18 months.  It halved the rate of the stability

23    issue for gender dysphoria based on this study.

24          Now, if we want to use this study to address whether

25    or not people with gender dysphoria or transgender people

should be kicked out of the military, who do I defer to?  Do I

defer to the group of military experts who used this study to

put in place the Austin policy, which the Hegseth policy seeks

to replace, and which accurately analyzed the entire policy,

or should I defer to the military experts who cherry-picked

one part of this study, misrepresented even that, and ignored

the rest of it, and ignored the obvious import of it?

You keep telling me I have to defer to the military

experts who studied this.  This is the same study.  Both

experts reviewed it.  So do I defer to the military experts

who reviewed the whole thing, and understood the whole thing,

and took it for what it was worth, which was there's no reason

to exclude people with gender dysphoria or transgender, based

at least with respect to deployability and occurrence rates,

or do I take the people who threw this study into a list of

three other studies within a period of 7 days to 30 months

and, totally grossly, misleadingly, either intentionally or

unintentionally, mischaracterized it?  I have to defer to one

or the other.  Who do I defer to?

MR. MANION:  You defer to the current military.

That's clear under the Supreme Court's case law.  That's

clear under the Constitution.

THE COURT:  Okay.  You tell me what Supreme Court

case says that I'm supposed to ignore military policy,

military experts, who reviewed a study, ignore the content of

1    the studies, ignore everything about what the study says,

2    ignore why someone would so misleadingly mischaracterize a

3    study other than to come to a preordained conclusion, and

4    defer to those military people.  You give me the Supreme Court

5    cite, and I and my clerk and I will review it carefully at the

6    lunch break.  You let me know.

7            MR. MANION:  Great.  I think the best cite that I

8    have for you right now is *Goldman v. Weinberger*.

9            THE COURT:  Okay.  We'll look at that --

10           MR. MANION:  Let me just, if I may --

11           THE COURT:  Yeah, sure.  Go ahead.

12           MR. MANION:  -- I could tell you a couple reasons

13   why.

14           There, the petitioner's claimed that the military's

15   assertion, quoting from the Supreme Court's decision, was

16   "mere ipse dixit, with no support from actual experience or a

17   scientific study in the record, and it's contradicted by

18   expert testimony."

19           What the Supreme Court said is whether or not expert

20   witnesses may disagree with the military on that point is

21   quite beside the point, because Courts are required to defer

22   to the military's judgment on this.

23           And there's no reason that one military secretary --

24   no reason under the Constitution that one military secretary

25   can lock into place one particular version of a policy that

1    every future president must abide by.

2            THE COURT:  Well, of course not.  That would be

3    ridiculous.

4            MR. MANION:  I agree.

5            THE COURT:  Yeah.  But that's not what we're doing

6    here.  What we're doing here is deciding with respect to two

7    different military people.  One who, as of 2021, had recent

8    data; and, two, who, as of 2025, had only the 2021 data.

9    Because we're going to get to this at length after the break.

10    You all didn't look at any other data.

11            Of those two competing military persons, not for all

12    time that, you know, former Secretary Austin gets to decide

13    military policy, but just for right now, just really for the

14    status quo for the pendency of this litigation.  It's not even

15    going to be for the whole litigation or for all time.  It's

16    just during the pendency of the litigation.  Who should I

17    defer to?

18            MR. MANION:  To the current Commander in Chief of

19    the United States, to his Secretary of Defense.

20            THE COURT:  Okay.  Because -- because with a new --

21    because with a new administration, the new President can do

22    what he wants; right?

23            MR. MANION:  Within the Constitution, yes.

24            THE COURT:  Yeah, within the Constitution.

25            MR. MANION:  Yes.

1          THE COURT:  Okay.  And in your opposition, you

2    quoted a bunch of people saying that, but I couldn't help but

3    notice that they were all concurrences or dissents.  There's

4    actually no Supreme Court case or any case that you cited me

5    to that says that a new administration can put in new

6    policies.  And then you also cited to 130-page *Journal* article

7    by Justice Elena Kagan.  Did you read that whole article?

8          MR. MANION:  I have in the past but not --

9          THE COURT:  You have in the past?

10          MR. MANION:  Yes.

11          THE COURT:  Did you recently?

12          MR. MANION:  Not recently, no.

13          THE COURT:  Okay.  We're going to go through it.

14    We're going to go through it now and then I'll probably take a

15    short lunch break.

16          All right.  Why don't you get out Justice Kagan's,

17    then-Professor Kagan's study.

18          MR. MANION:  Your Honor, I don't have that

19    printed.

20          THE COURT:  All right.  I'm just going to take you

21    through it then.  If you want to get it on your computer and

22    have your laptop up, that's fine too.

23          I mean, just as a practice tip, if you're in court

24    and you cite things, you maybe should have them available.

25    And while we're at it, maybe you should read all of the cases

in a case, like *Doe 1*, and maybe you should read the studies.

But that's just a PSA for lawyers out there.

All right.  So you quote Justice Kagan, then-Professor Kagan's *Law Review* article entitled "New Administrative Interpretations Following New Presidential Elections," to provide a reason to think deference appropriate rather than the opposite; right?  That's the article?

MR. MANION:  One second, Your Honor.

THE COURT:  Sure.  Oh, I think it's on page -- I don't remember what page of your brief it's on.  I'm sorry.

MR. MANION:  All right.  I found the quote, Your Honor.

THE COURT:  All right.  I just want to give the quote you all gave for this article, this 130-page article. You all quoted it.  And by the way, you're on page 41, and just to back up what I said earlier, your first point is, "There's nothing unusual about a new administration coming to office inclined to favor a different policy direction," and you cite the concurrence in *Doe 2*, which is quoting Gorsuch concurring in part and dissenting in part in a Supreme Court case.  Then you also quote Justice Rehnquist concurring in part, dissenting in part, and then you quote this *Law Review* article by Justice Kagan; right?

MR. MANION:  Yes, Your Honor.

THE COURT:  So for those -- for that point, that the

1   new president can issue a new policy, those -- that's what we

2   have and I'll also look at *Goldman*.  Right?

3           MR. MANION:  I don't think that that's a very

4   disputable point, but yes, that's what we cited.

5           THE COURT:  Okay.  And this is what you quote, it's

6   from the Harvard *Law Review*, "New administrative

7   interpretations following new presidential elections should

8   provide a reason to think deference appropriate rather than

9   the opposite."

10          Do you see that?

11          MR. MANION:  Yes, Your Honor.

12          THE COURT:  All right.  What context was she writing

13  in?

14          MR. MANION:  From this paragraph, it appears it's

15  about the *Chevron* deference.

16          THE COURT:  *Chevron* deference.  In fact, her whole

17  article was about deference and *Chevron* deference; right?  I

18  mean, that was the vast majority of the article?

19          MR. MANION:  I couldn't tell you that, Your Honor.

20          THE COURT:  And what she was getting at in this

21  particular paragraph is that if -- because there have -- we

22  have a vast administrative state, when you have a new

23  president come into power, we shouldn't just necessarily give

24  the new president deference to his agencies -- or the agencies

25  deference, because we don't know if the agencies have had any

1    interaction with the president, if this reflects the

2    president's actual views or anything about it; right?

3                Let me just get to the punch line.  The punch line

4    is, is that her point is that we should give agencies

5    deference, the same *Chevron* deference.  She was -- she was

6    contemplating a different *Chevron* standard.  And under her

7    *Chevron* standard, unlike what was in law at the time, the same

8    *Chevron* deference should be given to a new administration if

9    the president was personally involved.  Not more deference

10    just because there's a new president involved, but the same

11    amount of deference that there's a new president involved, if

12    he was involved in the administrative agency action.

13                Do you want to read that and see if I've said that

14    correctly?

15                MR. MANION:  I read this as being a prodeference to

16    the new president point.

17                THE COURT:  Okay.  Well, then clearly you haven't

18    read it, the whole thing, or recently or in context, because

19    it's giving deference, the same deference a new president

20    should get -- a new agency should get as the past agency, if

21    the president was involved in the decision-making power.  It

22    certainly does not stand.  And I am confident, because I took

23    her for administrative law class, that Justice Kagan has said

24    that a new president coming into power we should just blindly

25    defer to because it's a new president; fair?  In fact, no

1    Court says that; right?

2        MR. MANION:  So first off, I did not say that

3    Justice Kagan had -- had written about that point that I made

4    about deferring to this president.  But --

5        THE COURT:  Well, you quoted her.  I didn't quote

6    her.  It was in your opposition.  You quoted her for the point

7    that there's nothing unusual about a new administration coming

8    into office inclined to favor a different policy direction and

9    then noting that we have to defer to the new president.

10   That's what you quoted her for; right?

11       MR. MANION:  So we quoted her specifically for the

12   proposition that changes in administration frequently bring

13   changes in policy.  That's absolutely true.

14       THE COURT:  Sure.  Duh.

15       MR. MANION:  Yes.

16       THE COURT:  Doesn't mean I have to defer to them

17   blindly, though; right?  She's not saying that a new president

18   coming in can put out whatever policy they want and I have to

19   defer to it even if it's based on misleading studies or no

20   data or whatnot.  She's not saying that.  In fact, no Supreme

21   Court case says that; right?

22       MR. MANION:  In the context we're talking about for

23   this case, it's the military deference standard, not the

24   *Chevron* deference standard.  And for the military deference

25   standard, you, I think, defer to the current military.

1          THE COURT:  Okay.  So I have to defer to the current

2    military, that's been -- that issued this policy within

3    30 days of the new president coming into power, based on --

4    God, we haven't even gotten to Mattis and the other policy

5    yet, but at least based on one policy that grossly

6    mischaracterizes the record and, in fact, supports keeping

7    transgender people in office.  And your view is I just have to

8    ignore all that.  I have no role in that.  Not only because

9    I'm not qualified to read studies as a Court, although --

10   well, we're going to get to that in a moment.  And even though

11   the fact of the way that they're mischaracterizing these

12   studies might show animus, that just -- I should not take that

13   into consideration.

14          MR. MANION:  So I'm happy to talk through the case

15   law on that.  I think --

16          THE COURT:  Well, let's talk -- go ahead.

17          MR. MANION:  I think the *Goldman* case that I cited,

18   and read you some quotes from here not that long ago, says

19   whether or not expert witnesses believe that --

20          THE COURT:  Were they comparing -- this wasn't just

21   expert witnesses.  This was a military policy put in place by

22   the President of the United States with help from military

23   generals.  And now I'm being asked to defer instead blindly to

24   a new president with a new military staff, and you're saying

25   that -- I just want to make sure I understand the law, and I

will read *Goldman* at the break, believe me.  That these are

consistent and that I just have to defer to the new policy and

the new military people blindly without looking at all into

whether or not anything they're doing is actually supported by

what they're saying, or what they're citing, or their

conduct.

              MR. MANION:  So under the case law, yes, you defer

to the military.  You do not reassess the evidence that they

were doing, in part because this is -- this is not just a

let's look at studies and see what studies tell us we must do.

There's a predictive judgment that layers on top of that.  So

with the data that's available, the military is predicting and

determining its judgment about whether the data -- whether it

is wise given the data to have someone with one disability in

the military or not.  The military makes those judgments all

the time, and that's something that --

              THE COURT:  Oh, yeah, you say that in your brief.

Identify for me a single other time in recent history where

the military has excluded a group of people for having a

disqualifying issue.  Because I can't think of one.  Bipolar

people, I could be bipolar, my clerks could be bipolar, for

all I know, Ms. Levi or you could be bipolar.  But we're all

different kinds of people; right?  It's not targeting a

specific group of people.  So you give me a exclusionary

criteria currently in the military that is aimed or that only

1    impacts one group of people.

2              MR. MANION:  Well, when you say "one group," I'm not

3    sure that this is going to be responsive exactly.  But I think

4    the most recent example of the military making a judgment in a

5    politically sensitive area that resulted in large amounts of

6    service members leaving would have been the COVID vaccine.

7    According to publicly available data --

8              THE COURT:  But the COVID 19 -- hold on.  Hold on.

9    Hold on.  COVID hit everyone.  I know, because I got it.  And

10   I'm confident --

11             Raise your hand if you got COVID, if you don't mind

12   raising your hand.

13             Look around.

14             UNIDENTIFIED SPEAKER:  I didn't get vaccinated

15   (indiscernible).

16             THE COURT:  Okay.  Thank you.

17             All right.  Lots of people raised their hands;

18   right?

19             MR. MANION:  Yes, Your Honor.

20             THE COURT:  All different kinds of people; right?

21             MR. MANION:  Sure.

22             THE COURT:  Men, women, different, so far as I can

23   tell, races different, I assume, sexualities.  Obviously, we

24   have some transgender people.  So it wasn't just aimed at

25   getting rid of one group of people when you hit the COVID-19;

1    right?

2              MR. MANION:  I mean, it was aimed at people meeting

3    a medical criteria.  They excluded people on that basis.

4              THE COURT:  No, no, I know.  I know.  I don't

5    disagree with you that the military can decide medical

6    criteria for service members.

7              MR. MANION:  Great.

8              THE COURT:  The question in this case is far

9    different than that.  The question in this case is whether the

10   military, under the equal protection rights afforded to every

11   American under the Due Process Clause of the 5th Amendment, if

12   the military can, within likely constitutional -- because I

13   don't even have to find they did -- it's a

14   constitutional violation, just a likely violation.  The

15   question is whether they can do that in targeting a specific

16   issue, medical issue that impacts a specific group that the

17   administration disfavors.  That's the question; right?  So

18   COVID-19 or bipolar disease or any of the other things you

19   cite tell us nothing about that; right?

20             MR. MANION:  I mean, it's our position that this is

21   a disqualification based on a medical condition.  And so --

22             THE COURT:  No, I understand.  But --

23             MR. MANION:  But it is our position that if you view

24   it otherwise, and if you view it as a total ban on transgender

25   people serving in the military --

1           THE COURT:  Or if, you know, the Secretary of

2  Defense views it that way, since he's tweeted exactly that,

3  but go ahead.

4           MR. MANION:  But even if that's the case, we think

5  it's constitutional.

6           THE COURT:  Okay.  All right.  We're going to take a

7  lunch break and then we're going to get into why you think

8  it's constitutional at the break.  I suggest that you -- I'm

9  not going to spend as much time on the literature review, but

10  I suggest you at least look at the military review.

11          By the way, just before we break, what else is wrong

12  with quoting -- what else is ironic about quoting Justice

13  Kagan's *Journal* in this case -- *Journal* article in this case?

14          MR. MANION:  I'm not sure what you're referring to,

15  Your Honor.

16          THE COURT:  Well, *Chevron* has been overruled; right?

17          MR. MANION:  Yes.

18          THE COURT:  Because things happen; right?  Between

19  2000 -- if I -- if I had been on the bench in 2018, I would

20  have applied *Chevron* and now I can't; right?  It's

21  important -- in other words, it's important to keep up-to-date

22  on things.

23          MR. MANION:  I don't think you would have applied

24  *Chevron* in this case, but --

25          THE COURT:  No, not in this case, in general.

```
 1              MR. MANION:  Sure.  Sure, Your Honor.

 2              THE COURT:  Yeah.  Because we need to keep updated

 3     on current events, right, when we are doing things?

 4              MR. MANION:  Yeah, I think it's very relevant what

 5     the appropriate standard of law that you're applying to a case

 6     is.

 7              THE COURT:  Because in all areas of life we have to

 8     be updated; right?

 9              MR. MANION:  Sure, Your Honor.

10              THE COURT:  Okay.  Let's be back here at 1:45.

11              (A recess was taken from 12:57 p.m. to 1:46 p.m.)

12              THE COURT:  All right.  Mr. -- how do I pronounce

13     your name?  I apologize.

14              MR. MANION:  Manion.

15              THE COURT:  Manion?

16              MR. MANION:  Yes.

17              THE COURT:  Okay.  So I -- I don't think -- you

18     haven't appeared before me before, have you, before today?

19              MR. MANION:  Not here, Your Honor.

20              THE COURT:  Okay.  So I didn't explain, and I should

21     have earlier.  So how I usually run my hearings is I have a

22     lot of questions and I ask them and then I let the attorneys

23     talk as long as they want to put anything they want on the

24     record and convince me of anything they want.  And I still

25     have a lot of questions, but I want to give you the
```

1    opportunity to do that now and then I'll let Ms. Levi, you

2    know, do that with respect to any of the things that we have

3    discussed this morning.

4            And I just want to say that I realize I'm asking a

5    lot of questions here.  And the reason I'm asking the

6    questions is because they are asking me to do something that

7    no one should take lightly.  I mean, they're asking me to

8    enjoin the President of the United States and the Secretary of

9    Defense, and I wouldn't feel comfortable doing that unless I

10   was assured that that was the right approach.  And I

11   personally can't be assured of that unless I'm asking all

12   these questions.  And you're the one who's in front of me.  So

13   I'm not asking all these questions, you know, because I like

14   asking questions.  I really do need to know, if I enjoin this

15   thing, that that's what I should be doing.

16           MR. MANION:  Absolutely, Your Honor.

17           THE COURT:  Not to say that reasonable minds

18   couldn't differ on that and, you know, maybe reasonable minds

19   might, but so I just wanted to sort of lay those things out

20   for you.

21           MR. MANION:  I do have two quick housekeeping things

22   that I would like to flag.

23           THE COURT:  Sure.

24           MR. MANION:  So my military colleagues looked into

25   your question about diabetes in particular and informed me

1     that there is a mandatory disqualifier for diabetes on the

2     accession front and then a mandatory referral to DES on

3     retention.  So I'm not sure if that came through in our

4     earlier exchange, but I just wanted to put that on the record.

5          THE COURT:  All right.  But I understand -- I'm

6     sorry.  I understand that's for diabetes 1, and that with

7     respect to retention, there is a referral, but there's a

8     case-by-case analysis.  And one of the things that can happen

9     is that people taking insulin can be put in parts of the

10    military where they don't have to deploy to places where there

11    isn't insulin.  But I might be wrong about that.  I'm not

12    going to base my decision on that, but thank you for the

13    clarification.

14         MR. MANION:  Great.

15         The second thing, Your Honor, is just I believe

16    that -- or my colleagues told me at least some of the AMSARA

17    that we've been discussing was not on the record.  So if it's

18    all right with you, we would like to file that on the docket

19    after the hearing today.

20         THE COURT:  For the what?  I'm sorry?

21         MR. MANION:  Some of the AMSARA, a report that we've

22    been discussing.

23         THE COURT:  Oh, yeah, yeah, yeah.  That would be

24    great.  Thank you.  I appreciate that.  Thank you.

25         MR. MANION:  Yes.  Thanks.

1          THE COURT:  Yeah.  Okay.  With respect to anything

2     that we discussed this morning, is there anything you want to

3     sort of add or go through?  And then I have had a chance to

4     review *Goldman*, so we can talk about that.  And then I'll let

5     Ms. Levi, if she wants to say anything, get up.  And then I'm

6     only going to quickly go through the second study, because

7     this is taking too much time.  But go ahead.

8          MR. MANION:  Just so I'm clear, will I have another

9     opportunity to sort of sum up or give our bottom line on this,

10    or is this my chance here?

11         THE COURT:  Oh, yeah.  No, no, no, you're -- I am

12    not leaving here -- well, other than the court reporters, I'm

13    not leaving here --

14         MR. MANION:  Great.

15         THE COURT:  -- until you say -- until you've had

16    your say.

17         MR. MANION:  Yeah.  Well, then --

18         THE COURT:  I think it's very important for all the

19    lawyers to have their say.

20          I will say this again.  I said this on the morning

21    of the 19th.  It is important that both sides be well

22    represented here.  And I am thankful that both sides' briefs

23    were excellent.  That's why I said that at the get-go.  And

24    I'm thankful for you taking up here all these questions,

25    because this whole thing doesn't work unless both sides are

1    well represented.

2          So go ahead.  But you -- I'm not leaving,

3    assuming -- you know, and if we have to come back, we have to

4    come back -- until you feel like you've had your say.

5          MR. MANION:  Yeah, so I'm happy to go fairly quickly

6    into any remaining questions you have.  I think at some point

7    I would like to discuss in a little more detail some of the

8    doctrinal themes we think will help situate the discussions

9    we've been having.

10         THE COURT:  Okay.  You can do that now if you

11   want.

12         MR. MANION:  So as a top line, and we can discuss

13   this more if appropriate, but I think there's several themes

14   here that play into this that are extremely important for Your

15   Honor to keep in mind.  Obviously, as you've already

16   suggested, they're asking for an extraordinary remedy.

17   There's no presumption of an injunction.  There's no

18   presumption of some kind of injunctive relief.  And so the

19   burden should be on the plaintiffs to have established that.

20         And then as -- as you're analyzing the issues here

21   in this case, military deference, we've talked about that some

22   already.  Certainly, also the fact that constitutional rights

23   don't apply to the same -- with the same level of force in the

24   military context.  And so even if you thought that the policy

25   here is something that would run into problems in the civilian

1    world, still, I can -- we can talk through some of these

2    cases, but *Rostker*, *Goldman*, *Weiss*, cases involving things

3    like sex-based classifications, First Amendment issues, things

4    that the Supreme Court already has said are subject to

5    heightened scrutiny.  Then when those are reviewed in the

6    military context, the Supreme Court has used less than what

7    would have applied in the civilian context.

8            I assume we will talk more about animus as well.

9            THE COURT:  We're going to get to animus, don't

10   worry.

11           MR. MANION:  Yes.  And so there, the -- I think the

12   clear lesson of *Trump v. Hawaii* -- and we can talk about

13   *Trump v. Hawaii*, but I think the clear lesson from there is

14   that even if you think or even -- yeah, even if a Court looks

15   at this and says that there's reason to think that the

16   President or that people in the President's government have

17   some kind of animus against a person, that's still not enough

18   to enjoin a policy.  And so you have to look and see whether

19   it can be explained by anything else besides animus.

20           And here, there's -- I'll use a quote from

21   Judge Williams in *Doe 2*, in his concurrence.  I fully

22   understand that's not binding, but because I agree with it, I

23   will.  He said that, "There's an abundance, and some might say

24   a superabundance, of legitimate military justifications that

25   were proffered in support of this policy."  All of those came

1    from the 2018 --

2         THE COURT:  Hold on.  Hold on.  In support of the

3    2018 policy.

4         MR. MANION:  Sure.

5         THE COURT:  Okay.

6         MR. MANION:  Sure.  But those same justifications

7    have carried through to this policy as well.

8         THE COURT:  Well, if the policies are the same but

9    they're not.

10        MR. MANION:  I didn't say the policies were the

11   same.

12        THE COURT:  I'm just saying -- I'm sorry.  I was

13   going to let you talk.  I'm sorry.  I can't help myself

14   sometimes.

15        MR. MANION:  And so when you're doing an animus

16   analysis, I just don't see how you can exclude every

17   legitimate basis and come to a conclusion that animus is the

18   only guiding factor.

19        Now, the way that I understand this to work out is

20   that animus is sort of a short-cut around sort of normal

21   scrutiny.  So I'm not saying that you wouldn't still do a

22   scrutiny analysis even if you agree with me on this point, but

23   that scrutiny is quite relaxed in the military context

24   compared to the civilian context.

25        And so, you know, I think the one other thing I do

want to flag is I think when you are assessing the likelihood

of success on the merits, when you are deciding whether to

enjoin a presidential policy based on a prediction that the

plaintiffs will ultimately succeed here, I think it's helpful

to consider, too, the -- I mean, it's not exactly imminent but

very likely in the next three months we will have guidance

from the Supreme Court on some of the issues that are present

here in the *Skrmetti* decision.  And so --

THE COURT:  So I'm aware of the youth transgender

case.  Which ones are you thinking of right now?

MR. MANION:  I'm talking about the same case at the

Supreme Court, but part of those questions in the civilian

context is whether transgender status is a suspect class,

whether a rational basis review would apply to a law involving

that or not.  And so --

THE COURT:  Well, hold on, that case is -- you agree

with me that that case is about the state interest in

navigating or regulating care for underage people; right?

MR. MANION:  Sure.

THE COURT:  And you, I think, would agree that the

Supreme Court could reach the issue without even touching

whether or not transgender people are suspect class.

MR. MANION:  Yeah, I agree that they could.

THE COURT:  Okay.

MR. MANION:  But that is one of the questions, as

1    the case was argued and briefed, that the Court has been asked

2    to decide.  And so we may well see a decision soon.  And so I

3    think that's -- the uncertainty of the law in this space

4    should play into your assessment of the likelihood on the

5    merits.

6              THE COURT:  Okay.  With respect to whether or not

7    transgender people are suspect class, irrespect- -- but a

8    separate question, of course, about whether this is sex-based

9    classification.  Those are two different things; right?

10             MR. MANION:  No, I agree, but both of those.

11             THE COURT:  Okay.

12             MR. MANION:  I think both the sex-based

13   classification question and the suspect class question are

14   embedded in the *Skrmetti* -- the *Skrmetti* briefing and

15   argument.

16             THE COURT:  Okay.  Well, we're -- okay.  All right.

17   Okay.  Anything else that you want to go over?

18             MR. MANION:  No, I think that's it for now.  But

19   happy to continue answering questions.

20             THE COURT:  Okay.  You will.

21             Ms. Levi, do you want to come up and address

22   anything we've discussed this morning or anything that was

23   just said.

24             MS. LEVI:  I'm going to ask my co-counsel,

25   Mr. Minter.

1          THE COURT:  Oh, Mr. Minter.

2          MS. LEVI:  Supplement regarding the Dr. Brown

3  letter.

4          MR. MINTER:  Thank you, so much, Your Honor.  I hope

5  this is the right time and just tell me if it's not, but the

6  defendants introduced this entire deposition from Dr. Brown

7  and then made some representations about it.  And I just

8  want -- we wanted to call your attention to just three places

9  in that deposition that are so clear and make it so clear that

10  the testimony that he presented in his new declaration is

11  completely consistent with his deposition testimony.

12          THE COURT:  I don't really care about all that.

13  That's not going to factor into my decision-making.  If you

14  want to take me through it, you're free to, but I'm not going

15  to base this on a battle of the experts.  I think he's right.

16  I can't just defer to the plaintiff's expert.  Now, whether I

17  can defer to other military people I think is right.  And he

18  and I will talk about *Goldman* in a second.  But I'm not going

19  to get into comparing what he said in a declaration versus

20  what he said in deposition.

21          MR. MINTER:  I hear Your Honor.  Take three minutes?

22          THE COURT:  You can take as long as you want.  I'm

23  just telling you it's not going to be important to me.

24          MR. MINTER:  I understand, thank you.

25          Well, I just want -- so this is 81-5, page 134,

1    where Dr. Brown says, "I would reiterate that all transgender

2    individuals seek to live their life in their gender identity,"

3    consistent with his testimony in the new declaration.

4            Then on page 153, "Do you understand the Mattis

5    policy to ban the accession and retention of transgender

6    service members"?

7            He answer's, "Yes, it functionally does."

8            The attorney questioning him, "What is your basis

9    for that belief?

10            "Because the policy seems to suggest that there is

11    some population of transgender people who are perfectly

12    comfortable living and serving in their sex assignment at

13    birth, their birth sex, and effectively, that is a null set."

14            And then last, on page 83.

15            QUESTION:  "Do all transgender people experience

16    symptoms of gender dysphoria?"

17            And then Dr. Brown answers, "At some point in their

18    life, I would say yes to that."

19            Thank you, Your Honor.  I appreciate your indulgence

20    of that.

21            THE COURT:  Okay.  Anything else that you want to

22    say?

23            You can sit down for a moment.

24            Anything else?

25            MS. LEVI:  No, Your Honor.

1              THE COURT:  All right.  Service Member Wiles?

2              MS. WILES:  Yes, Your Honor.

3              THE COURT:  Can you come to the podium, please.

4              MS. WILES:  Your Honor, I'm not --

5              THE COURT:  I promise you, you're going to be fine.

6     Come on up.

7              MS. LIN:  Your Honor, can we raise an objection?

8     This is not a witness that the government's presenting --

9              THE COURT:  I'm going to literally talk to her about

10    nothing related to this case.  Just everyone calm down.  You

11    guys, stop having heart attacks.

12             Come on up.

13             MS. WILES:  Yes, Your Honor.

14             THE COURT:  Do you recognize those two people?

15    Those are my law clerks.

16             MS. WILES:  Yeah, I was in --

17             THE COURT:  You went to law school with them.

18             MS. WILES:  Yeah.

19             THE COURT:  Yeah.  Were they any good?  He tells me

20    that he was in administrative law and fed courts with you, and

21    she says you were -- she was in fed courts with you, I

22    think.

23             MS. WILES:  Correct.

24             THE COURT:  Were they gunners, Jon and Sam?

25             MS. WILES:  Um, I would say she spoke more than he

```
1    did.
2                 THE COURT:  Oh, yeah?
3                 MS. WILES:  Yeah.
4                 THE COURT:  Okay.  Did they actually -- like were
5    they prepared for class or were they like hung over?
6                 MS. WILES:  Well, again, I don't think --
7                 Did you even speak?
8                 She was definitely prepared in class.  I'm not sure
9    about -- I'm sure he was.
10                THE COURT:  Okay.  And all of you went to UVA?
11                MS. WILES:  That's correct, Your Honor.
12                THE COURT:  Which we all agree is an excellent law
13   school.
14                MS. WILES:  Yes, Your Honor.
15                THE COURT:  All right.  You can be seated.
16                All right.  So I told you that I would review
17   Goldman, and I have.  And so Goldman was a case about an
18   individual wearing a yarmulke --
19                MR. MANION:  Yes, Your Honor.
20                THE COURT:  -- in the military.  And the decision
21   was based on questions of military and uniform uniformity?  It
22   was about military uniformity versus religion, First
23   Amendment?
24                MR. MANION:  Yes, Your Honor.
25                THE COURT:  Okay.  And part of the opinion was
```

1    when -- it says that, "Judicial deference is apogee when

2    legislative action under the congressional authority to raise

3    and support armies and make rules and regulations for their

4    governments is challenged."

5                Do you see that or recall that?

6                MR. MANION:  Yes, Your Honor.

7                THE COURT:  That's a quote from *Rostker*?

8                MR. MANION:  Yes, I believe so.

9                THE COURT:  Okay.  We don't have a congressional

10   issue here; right?

11               MR. MANION:  Sure.

12               THE COURT:  Okay.  And the reason they mention that

13   is because the policy that -- the uniform policy that was in

14   place was in part based on congressional direction?

15               MR. MANION:  Yes, Your Honor.

16               THE COURT:  Okay.  All right.  Congress hasn't said

17   anything about transgender service in the military, right, in

18   terms of the law that's being followed?

19               MR. MANION:  I think that's mostly right.  Congress

20   has directed separate sex-segregated housing --

21               THE COURT:  Sure.

22               MR. MANION:  -- in at least the training context.

23   So there is some overlap, maybe not a lot, but there's some

24   overlap between express congressional decision-making on this

25   and the policy here.

1          THE COURT:  All right.  And then the standard that

2     the Supreme Court rejected by petition -- by the petitioner

3     was:  Exception to its uniform dress requirements for

4     religious apparel unless the accoutrements create a,

5     quote/unquote, clear danger of undermining discipline in

6     esprit de corps.

7          Right?

8          MR. MANION:  Yes, Your Honor.

9          THE COURT:  And the Supreme Court rejected that

10    quote/unquote clear danger analysis; right?

11         MR. MANION:  I think it did more than that, but yes,

12    it certainly did.

13         THE COURT:  Okay.  All right.  And this is the

14    part -- you say, "He contends that the Air Force's assertion

15    to the country is mere ipse dixit, with no support from actual

16    experience or scientific study in the record and is

17    contradicted by expert testimony."

18         And that's what you've been focused on?

19         MR. MANION:  Yes.

20         THE COURT:  Okay.  But they weren't comparing two

21    different policies put in place by one president and one

22    military group of experts and a second president and a

23    military group of experts; right?

24         MR. MANION:  Not here, Your Honor, no.

25         THE COURT:  No, okay.  Do you have a case that you

```
 1    can point me to where -- and I'll ask both parties, because

 2    I -- this is not -- this is going to sound like a rhetorical

 3    question.  It really isn't a rhetorical question.  Do you have

 4    a case where I have basically competing policies in this kind

 5    of like back-to-back manner from one president and the

 6    military to another president and the military?

 7              MR. MANION:  Not -- I mean, certainly not in the

 8    same sort of circumstances we're talking about here.  I do

 9    think every change in military policy in some sense is a

10    change from -- it's a reassessment of the military's

11    professional judgment about an issue.

12              THE COURT:  Okay.

13              MR. MANION:  But I'm not aware of one that has the

14    level of study and reports and different conclusions as this

15    one.

16              THE COURT:  Okay.  All right.

17              MR. MANION:  I don't -- I don't view the Supreme

18    Court's overall doctrine of judicial deference as -- or -- of

19    military deference as being limited to circumstances where you

20    don't have those competing --

21              THE COURT:  No, I understand, but I mean -- okay.

22    All right.  I understand.  I understand your point.

23              So let's talk a little bit about the Mattis policy.

24    Well, hold on.  Before we do that, I want to -- I want to

25    actually discuss the Hegseth policy for a little bit and the
```

1    deference issue again, because I'm trying to understand this.

2    And I brought this up a little bit at our last hearing.

3            MR. MANION:  And, Your Honor, is this the action

4    memo or the actual policy?

5            THE COURT:  I'm actually just going to ask a general

6    question, but yeah.

7            MR. MANION:  Okay.

8            THE COURT:  So I don't -- I assume you've read the

9    transcript from the last two hearings.

10           MR. MANION:  I did, Your Honor.

11           THE COURT:  But at one point I said that I couldn't

12   remember how to say Ms. Levi's name and that the way I could

13   remember it was that I remember the Beyonce *Levi's Jeans* song.

14           MR. MANION:  Yes.

15           THE COURT:  You remember that?  Because *Levi's Jeans*

16   is a great song.  All right.  Let's say the Hegseth policy

17   came out and it had no analysis whatsoever, and it's cited as

18   support the Beyonce album and it cited as support an Indigo

19   Girls album.  And they said those two albums support keeping

20   transgender people out of the military.  Would I defer to

21   that?

22           And I'm not trying -- this isn't a trick question.

23   What I'm trying to find out is there must be a -- there must

24   be a point where I can't just say, blindly, they said that

25   this says "X," and then I just ignore what it is, or that I do

1    a full analysis of the studies and, you know, basically do my

2    own de novo review, although given where the Supreme Court is

3    on *Chevron* these days and what power Courts have, who knows,

4    but let's just assume that's right.

5            So I think what we're dealing with is somewhere in

6    the middle or towards one end or the other, and I just want to

7    know from you where deference gives way to some support is

8    needed for the policy, if at all.

9            MR. MANION:  So I think that depends quite a lot on

10   what the standard of review is here.  In normal, rational

11   basis review, which the Supreme Court, I think, has

12   approximated the military deference to that even in

13   circumstances where it would ordinarily be a higher -- higher

14   standard of review.  But --

15           THE COURT:  What's the standard -- what's a quote --

16   what's a decision for that?

17           MR. MANION:  If you give me just one second.  I

18   think -- so the one that I have in mind, I think is *Rostker*.

19           THE COURT:  Okay.

20           MR. MANION:  And in particular -- it doesn't -- I

21   don't think *Rostker* says this is -- in fact, I think *Rostker*

22   declines to adopt a formal title for the deference that it's

23   applying.  But it uses words like "rationally."  It uses what

24   Congress -- or what -- maybe in that case it was Congress,

25   but --

1          THE COURT:  It was Congress.

2          MR. MANION:  -- the relevant decision-maker

3    rationally might have thought, which is the kind of thing that

4    you do usually in a rational basis review.

5          THE COURT:  Right, but it didn't -- but *Rostker*

6    wasn't like writ large if Congress -- I mean, what had

7    happened in *Rostker* was Congress had done detailed study of

8    the issue and then issued legislation; right?  And that's, in

9    part, why the Court was granting rational deference.

10         MR. MANION:  But I think that in rational basis

11   review, in normal cases of rational basis review, the

12   legislature or the decision-maker doesn't have to provide the

13   reasoning at the time.  And you can look at what they

14   rationally might have thought.

15              And so if it's rational basis review, even if they

16   say here's one of the things we had in mind, that's not the

17   end of the story.  And you don't say just because I find this

18   to be -- one of the justifications to be wholly unrelated or

19   wholly unsupported, that's not the end of the analysis,

20   because the question is, was there, could there have been a

21   rational basis for this.  And there's -- Courts, all the time,

22   do take post hoc justifications when looking at something

23   under rational basis.

24              And so this is not a -- this is not a -- an APA

25   claim.  This is not something where there's some kind of State

1    Farm requirement to show your work.  This is not something

2    along those lines.  I think *Chevron* -- I understand that you

3    set that aside, but I think whether an agency interpretation

4    of a actual statute is just wholly apart from this case, and

5    move away from deference to agencies interpreting statutes

6    says nothing about other deference doctrines.

7          THE COURT:  Okay.  So your answer to my question, I

8    just want to make sure I understand, is, if the Hegseth policy

9    had come out and cited as support the Beyonce album and an

10   Indigo Girls album in the early years -- because the later

11   years, eh -- then I would just have to say, okay, you know, I

12   just have to defer.  If there's -- if they say the Beyonce

13   album is proof to us that transgender people or people with

14   gender dysphoria upset unit cohesion, I just have to say okay.

15         MR. MANION:  Well, I -- I'm not sure how to answer

16   that, Your Honor.

17         THE COURT:  Okay.

18         MR. MANION:  That's, I think, so far afield from

19   this.

20         THE COURT:  It's not actually that far afield

21   because we -- well, go ahead.

22         MR. MANION:  Well, I mean, usually, what you would

23   say is here's a policy that Congress or the decision-maker has

24   made.  If you're trying to figure out if there's a rational

25   basis for that, you don't say I find one of your legislative

findings or maybe your only legislative finding to be -- to, itself, not support the policy and, therefore, I am going to enjoin the statute or its policy.  You would ask whether the policy, there's some rational relation to a legitimate like government objective.

THE COURT:  Right.  But in order to do that, I need to understand if the policy -- I can't just -- that involves some data analysis; right?  So if I had a policy that says I'm going to exclude all Yankees from the military because they upset unit cohesion, there has to be some correlation between Yankees fans and unit cohesion, and the only way a Court can assess that is understanding whether there's any data that supports that; right?

MR. MANION:  So you would -- yeah, I think you would see whether it was -- whether there was --

THE COURT:  A correlation, something.

MR. MANION:  Yeah, a quite -- correlation in the rational basis context.

THE COURT:  Right.  Something has to say to me that what the military is saying upsets unit cohesion, actually, in some way, shape or form upsets unit cohesion.

Now, maybe I have a -- maybe I have vast deference as to what they tell me supports that, but at some point there has to be some analysis by the Court, right, some analysis of what they're saying.  Because it just can't be that the

1    military says we are getting rid of Yankees fans because they

2    impact unit cohesion, and our data for that is found in the

3    most recent Beyonce album and it won album of the year, and

4    some people are upset because she won for the country music

5    album of the year even though they were upset she hadn't won

6    earlier -- like whatevs.  Like I can't get into all that;

7    right?  I just have to say Yankee people plus Beyonce album

8    equals effect on unit cohesion; the people who said Beyonce

9    album are the military and, therefore, that's where my

10   analysis ends.

11              MR. MANION:  So I don't think that I'm going to be

12   able to satisfactorily tell you what the outer bounds of

13   deference would be, because I think so many of the cases that

14   we have that discuss this are dealing with things where there

15   are legitimate government reasons that are proffered in

16   support of the policy.  And the way that the Supreme Court

17   analyzes those is it says we give deference to the

18   professional military judgments, we don't reweigh the facts,

19   and we look to see, if there's a rational basis review,

20   whether there's a rational connection.  And in --

21              THE COURT:  Okay.  I think -- okay.  Go ahead.

22   Sorry.

23              MR. MANION:  Well, we think that's clearly met here.

24   We can talk about that.  But I -- I don't think you need to

25   know the answer to your harder questions about Beyonce and

1    Yankees fans, because I think this is well within the types of

2    decisions that the Supreme Court has afforded its traditional

3    highly deferential review.

4              THE COURT:  Okay.  And what are those decisions

5    again?  *Rostker*.

6              MR. MANION:  *Rostker* is one.  *Goldman* is another.

7              THE COURT:  *Goldman*.  And which one else?

8              MR. MANION:  *Weiss*.

9              THE COURT:  *Weiss*.  What else?

10             MR. MANION:  *Schlesinger*.  Those are a few that I

11   have sort of marked down.  I don't think those cover the whole

12   ground of military deference case law, but those are -- those

13   are a few of those.

14             THE COURT:  Okay.  All right.  So I don't want to go

15   through this ad nauseam like we did with the earlier report,

16   because, frankly, I want to get -- there's a lot more that I

17   want to get through.  But the other thing the Hegseth policy

18   relied on was the 2025 medical literature review; right?

19             MR. MANION:  Yes, Your Honor.

20             THE COURT:  And this -- you claim that this, quote,

21   55 percent of transgender individuals experience suicidal

22   ideation, and 29 percent attempted suicide in their lifetime.

23   And the suicide attempt rate is estimated to be 13 times

24   higher among transgender individuals compared to their

25   cisgender counterparts.  And then also, Transgender

1    individuals are approximately twice as likely to receive a

2    psychiatric diagnosis compared to cisgender individuals,

3    quote.  And then that, "The strength of the evidence on

4    transgender mental health and gender affirming care is low to

5    moderate"; right?  That's in the action policy.  I just read

6    from the action policy.

7                   MR. MANION:  Yes, Your Honor.

8                   THE COURT:  That's how it characterizes that study?

9                   MR. MANION:  Yeah, as including those findings,

10   yes.

11                  THE COURT:  Okay.  What's the first thing that's

12   wrong when we see that analysis that we might want to ask

13   about?

14                  MR. MANION:  I assume you're going to ask what else

15   is in the report.

16                  THE COURT:  Well, obviously, yes.  That's what --

17   yes.  But just assuming we knew nothing else other than that,

18   what would we want to know?

19                  MR. MANION:  I assume you're getting at what the

20   rates are for people outside of that category.

21                  THE COURT:  Well, yeah.  Okay.  Two things we'd want

22   to know.  The other thing we would want to know is these

23   studies that they're reviewing, are they studying people in

24   the military; right?  Because the question is what people --

25   how people are behaving in the military.

1          Now, you can have ascension rates -- ascension

2     policies already take into account suicidal ideation and

3     depression and attempted suicide; right?  I mean, there are

4     already policies that deal with suicide before you get into

5     the Army; right?

6          MR. MANION:  Yes, I believe so.

7          THE COURT:  Okay.  So if we're talking about suicide

8     rates, we would want to know about how -- what the rates are

9     for suicidal ideation in the military; right?  That's what

10    would be the informative part of it.

11         MR. MANION:  Well, I don't think that would be the

12    only thing that would be informative.  Because one of the

13    justifications here is a concern about the increased stresses

14    of military life on people with -- who already have high

15    likelihoods of suicide or suicidal tendencies.

16         THE COURT:  Okay.  Go -- please walk through the

17    2025 literature review, which literally reviewed dozens of

18    studies on transgender persons, and telling me how -- where

19    any study shows that any of them are more susceptible to the

20    stresses of military life than, say, someone with depression,

21    or anyone.

22         MR. MANION:  I don't know if any of these studies

23    address that exact --

24         THE COURT:  No study has ever addressed that; right?

25    I mean, the fact that military life might be more stressful

1   for transgender people than nontransgender people, you would

2   want to look at people in the military; right?  And do we have

3   a report that looked at this?  We do.  It's the AMSARA report

4   that we went over ad nauseam this morning.  When you actually

5   compare people in the military, who have mental and physical

6   fitness requirements that they have to meet to get into the

7   military and to stay into the military, that are already

8   policy, the rates of psychotherapy issues between the two

9   cohorts are what?

10              MR. MANION:  Similar.

11              THE COURT:  Similar.

12              Do you know what else this 2025 literature review

13   finds?  It finds that people who go through gender transition,

14   either through hormone care or surgical care, that there is

15   literally no regrets, and that people who go through

16   gender-affirming care are -- have very high levels of mental,

17   physical, and psychiatric satisfaction, and the conclusion is,

18   is that going through gender-affirming care and process

19   dramatically helps people with gender dysphoria.

20              So can you explain to me how it is that the

21   conclusion we should draw from that is don't let people who

22   are transgender get hormone treatment, don't let them get

23   gender-affirming care, make them live in their biological sex.

24   Because if you look at this whole study, it will

25   overwhelmingly tell you that that is going to make things

1    worse for the person, not better.

2         MR. MANION:  Respectfully, this policy doesn't say

3    everything you said it does.  In particular --

4         THE COURT:  I'm not talking about the policy.  I'm

5    talking about the study.

6         MR. MANION:  I understand.  But then you asked about

7    a policy that you -- or you asked about a policy that would

8    prohibit cross-sex hormone therapy.  This policy doesn't do

9    that.

10        THE COURT:  Oh, no, no, only for -- no.  Great

11   point.  Apparently, hormone is a deployability -- hormone

12   therapy, according to this policy, is a deployability issue

13   only for people with gender dysphoria.  Because lots of people

14   get hormone therapy, for reasons totally unrelated to gender

15   dysphoria, and this policy doesn't cover that; right?  It

16   targets, as an issue for deployability, only one subset of

17   people who get hormone therapy; right?

18        MR. MANION:  Yes, Your Honor.

19        THE COURT:  What does that tell us about whether or

20   not the medical concern with deployability and hormone

21   reflected in the policy is genuine?  When it cites a study

22   that says hormone therapy will make gender dysphoria better,

23   when it cites studies that say that people who are recovering

24   or who are post gender diagnosis are more likely to stay in

25   the military than those with depression, and that the

1  deployability average between those receiving hormone therapy

2  and not hormone therapy are the same.  What would it tell you

3  about a policy that says we are going to ban hormone therapy

4  just for people with gender dysphoria or we're going to ban

5  people with gender dysphoria or who are transgender because

6  they require hormone therapy?  If you can't answer it, you can

7  say I can't answer.

8       MR. MANION:  It's not unusual for policymakers to

9  target one particular perceived issue at a time.  And so just

10  the fact that --

11       THE COURT:  Yeah, you could --

12       MR. MANION:  Just the fact that there is -- that

13  they have made a determination about hormone usage as related

14  to one medical condition, tells you that was the issue they

15  were focused on.

16       THE COURT:  Okay.  Well, what about the fact that

17  they also say you can't get mastectomies?  They only reference

18  that with people with gender dysphoria.  They didn't allow --

19  they didn't ban all mastectomies even though mastectomies,

20  whether you're male, transgender or not, would have the same

21  deployability issues.  So now we've targeted hormones for just

22  one group of people, we've targeted mastectomies for just

23  group of people, even though all service members can have

24  these issues.  What does that tell you about what we're doing?

25  Are we just looking at these individual issues and thinking

1    critically about how they impact deployability in the

2    military, or are we coming up with pretext to keep out a group

3    of people from the military?  And I can go -- there's more.

4    There's more examples.  I mean, we can go through it.  And if

5    you can't answer, you can't answer.  It's fine.

6                MR. MANION:  I mean, I don't mean to run away from

7    the fact that the -- the government-wide position -- that

8    there are -- there are broader things going on here than just

9    this one policy.  And it is a priority issue that --

10               THE COURT:  What's the issue?  Use words.  I'm sorry

11   "it"?  What was "it"?

12               MR. MANION:  So as applied to this context it's

13   people with gender dysphoria in the military.  On a more broad

14   level --

15               THE COURT:  Yeah, but that's not -- so but that's

16   not because there's medical concerns.  That's because we don't

17   like people with gender dysphoria.  Because if it was we're

18   targeting medical issues, you wouldn't just be targeting

19   subsets of medical issues and only analyzing them with respect

20   to transgender people or people with gender dysphoria.  You

21   would be analyzing them writ large; right?

22               MR. MANION:  So I -- I'm not saying that this was

23   a -- that this was some review or a comprehensive review of

24   medical reasons why --

25               THE COURT:  It wasn't any review.  I mean, it wasn't

1   any updated review.  The two updated reviews -- the one

2   updated review we have is this 2025 military review of the

3   literature.  And it will tell you that -- by the way, and I

4   was right about this last time we met.  I hadn't read the

5   studies, but I assumed, and it turns out I was right.  Do you

6   know why people with trans- -- with gender dysphoria have

7   higher rates of suicidal ideation?  It's in the literature

8   review.  It will tell you.  Do you want me just to tell you?

9           MR. MANION:  Please, Your Honor.

10          THE COURT:  Okay.  It's because they face such

11  stigma and discrimination in society.  All of the studies show

12  that transgender people and people with gender dysphoria are

13  not more inherently subjected to suicide or likely to have

14  suicide ideation, that's not it.  It's not biological.  It's

15  not inherent.  It's because they face discrimination and

16  abuses and all kinds of slurs and all these things that are

17  heaped up onto transgender people.

18          Which is why you see similar rates of people who are

19  in the military with respect to psychotherapy.  Because the

20  people in the military, we've already assessed that either

21  that hasn't impacted them, or it hasn't impacted them

22  sufficiently, that they have different psychotherapy rates

23  than people without gender dysphoria.

24          Does that tell us anything?  What does that tell us?

25  Let me ask you this:  I assume you would agree with me with

the following:  The answer to suicide ideation caused by

discrimination is not further discrimination; right?  If you

can't answer, just say you can't answer.

MR. MANION:  Here's what I can say.  I think the

question of how to respond to risks that every administration

for all of American history has thought that -- initially, all

transgender people, eventually only those with gender

dysphoria, there's always been concern in the military about

service by that -- by those categories of people.  And the

question of how to respond to that is something that different

military leadership has had different responses to.  And that

is a policy choice that is for the military to make.  And it's

something to which this Court should defer.

THE COURT:  Okay.  Fair enough.

Let me ask you this question:  You cite, in your

opposition, some congressional testimony that was given by

General Dunford in 2018.  This was testimony that came out

right after the Mattis policy came out.  It was literally a

month or two, like maybe after -- maybe a few days after it

was published.  There was a congressional hearing in which

Senator Gillibrand asked General Dunford -- who was, by the

way, the chair of the Joint Chiefs of Staff at the time --

some questions.  And you cited it for the proposition that

high-ranking military officials can't be expected to know of

every complaint that there is, right, to try to call into

1  question the declaration for the foundation for Mr. Cisneros.

2  Do you recall that?

3         MR. MANION:  I didn't write the brief, Your Honor.

4  Could you tell me which page you're talking about?

5         THE COURT:  Oh, yeah.  Sure.  Okay.

6         MR. MANION:  It does sound familiar.  I just don't

7  know where in the brief.

8         THE COURT:  Yeah.  Sorry, it's in the portion --

9  okay.  If you go to 38?

10         MR. MANION:  I'm there, Your Honor.

11         THE COURT:  All right.  Do you see where you have a

12  quotation -- I'll just read the whole paragraph:  The

13  declaration of the current official performing the duties of

14  the Assistant Secretary of Defense for Manpower and Reserve

15  Affairs explains, quote, It would be highly unusual for an

16  individualized service member's complaints regarding unit

17  cohesion, military readiness, medical readiness,

18  deployability, and legally, to reach the level of the

19  Undersecretary, end quote.

20         And that's a declaration by Mr. Dill that's at 52-1;

21  right?

22         MR. MANION:  Yes, Your Honor.

23         THE COURT:  And then you cite some testimony from

24  General Mattis; right?

25         MR. MANION:  Yes, Your Honor.

1          THE COURT:  And then you cite some testimony of the

2    former Chairman of the Chiefs Joint -- of the Joint Chiefs,

3    Dunford, stating, "I would not typically hear of individual

4    cases of cohesion or discipline issues"; right?

5          MR. MANION:  Yes, Your Honor.

6          THE COURT:  And that's the point you all are

7    making.

8          MR. MANION:  Yes, I believe so.

9          THE COURT:  Okay.  And the Chairman of the Joint

10   Chiefs, I'm no military expert, but the most high-level

11   person -- uniformed officer, the most highly -- well, person

12   in the military is the Joint -- is the Chair of the Joint

13   Chiefs?

14         MR. MANION:  I'm not familiar enough with the

15   hierarchy to say on that.

16         THE COURT:  Okay.  All right.  Well, I've watched a

17   lot of TV, and it's the Joint -- it's the Chair of the Joint

18   Chiefs of Staff, is the highest-ranking uniformed officer.

19   And if you want to check with the people behind you, I'm happy

20   for you to do that.

21         But either way, right, there's a reason that you

22   quoted him, because you have some level of faith in what he

23   has to say; right?

24         MR. MANION:  Probably at least that point.

25         THE COURT:  Probably at least for that point.  Okay.

```
1              Did you, or whoever wrote that paragraph, actually

2    read the next line?

3              MR. MANION:  I've not read it, Your Honor.

4              THE COURT:  Huh?

5              MR. MANION:  I've not read it, Your Honor.

6              THE COURT:  Okay.  We're going to read it.

7              MR. MANION:  All right.

8              THE COURT:  Because it's kind of important.  I have

9    it in my notes.

10             Can you email it to me?  Because I brought the wrong

11   thing.

12             It is, just so you know --

13             Actually, Jon, can you just go back and grab it for

14   me, too, while -- oh, you're -- it's okay, Jon.

15             One second, it's coming up.  I'm sorry.  I thought I

16   had it in my notes and I don't.

17             Okay.  So this is document 81-2, and this is what

18   the -- document that supports the citation you all made;

19   right?  If you just want to take a look.

20             MR. MANION:  Give me a moment, Your Honor.

21             THE COURT:  Sure.  Take your time.

22             MR. MANION:  I believe I have it now, Your Honor.

23             THE COURT:  All right.  And we're on page 58?

24             MR. MANION:  Yes, Your Honor.

25             THE COURT:  Line 12?
```

1          MR. MANION:  Yes, Your Honor.

2          THE COURT:  Okay.  And this is testimony that you've

3   put into the record because you think I should pay attention

4   to it; right?

5          MR. MANION:  Yes, Your Honor.

6          THE COURT:  Okay.

7          MR. MANION:  I don't know if we put it in the record

8   or not, but we --

9          THE COURT:  You did put it -- I'm -- this is --

10         MR. MANION:  Okay.  All right.

11         THE COURT:  -- basically an exhibit to your

12   opposition.

13         Mr. Lynch, could you please confirm that for the

14   record.

15         MR. LYNCH:  That's correct.

16         THE COURT:  All right.  And Senator Gillibrand --

17   and by the way, this is dated April 2018.  It was days after

18   the Mattis policy came out, all right, but obviously had been

19   in works for the months.

20         "SENATOR GILLIBRAND:  Thank you, Mr. Chairman.

21         "General Dunford, your fellow chiefs have told me

22   that they are not aware of any instances of issues with unit

23   cohesion, morale, and discipline as a result of open

24   transgender service.  Have you heard of any incidents?

25         "GENERAL DUNFORD:  Senator, thanks.  I would not

1    typically hear of individual cases of cohesion or discipline

2    issues."

3              Right?  And that's what you guys want me to pay

4    attention to; right?

5              MR. MANION:  Yes, Your Honor.

6              THE COURT:  Okay.  Let's keep reading.

7              So very next line:

8              "And maybe just a comment on transgender.  For me"

9    -- the Chairman of the Joint Chiefs of Staff, under

10   President Trump, first administration -- "For me the issue

11   with transgender has never been about cohesion or discipline

12   anyway.  It was just about any individual, regardless of

13   circumstances, being able to meet the physical and mental

14   qualifications for being worldwide deployable.  So if an

15   individual is serving without accommodation, then I do not

16   think I would expect to see discipline or cohesion issues in

17   that unit."

18             Did I read that correctly?

19             MR. MANION:  I believe you did, Your Honor.

20             THE COURT:  Okay.  Chairman of the Joint Chiefs of

21   Staff is saying, just because people are transgender or have

22   gender dysphoria doesn't do anything to the unit cohesion or

23   discipline.  It's whether or not those people can meet the

24   physical and mental qualifications of service.

25             Now, we've had some more plaintiffs file, but you

1    would agree with me, as Mr. Lynch did, always -- let me read

2    back.  I've offered the government the opportunity to

3    cross-examine any declarant; right?

4                MR. MANION:  You have, Your Honor.

5                THE COURT:  Okay.  Multiple times; right?

6                MR. MANION:  I believe so, Your Honor.

7                THE COURT:  Including up until the new declarants

8    and the new plaintiffs, and I gave you all time and said if

9    you guys want to cross-examine them, I'll call them to the

10   bench; right?

11               MR. MANION:  Yes, Your Honor.

12               THE COURT:  All right.  And on Saturday, you all

13   sent me an email and said you didn't want to cross-examine

14   anyone; right?

15               MR. MANION:  That's my understanding, Your Honor.

16               THE COURT:  Not my choice.  They would be available

17   if you wanted them; right?

18               MR. MANION:  Yes, Your Honor.

19               THE COURT:  Okay.  And I also told Mr. Lynch at our

20   last hearing that if you didn't cross-examine any of them, I

21   would have no basis to call their declarations into question,

22   and I would have to accept them as true for purposes of my

23   factual findings, which I'm sure you read when you read the

24   declaration.  And I asked Mr. Lynch if he had any question as

25   to whether or not any of the active duty plaintiffs -- well,

1    let me rephrase because there are just too many nots.  Let me

2    start over.

3              With respect to all of the active duty plaintiffs,

4    you agree with me, as Mr. Lynch did, that they have met all

5    current physical and mental fitness qualifications.

6              MR. MANION:  I don't have any reason to dispute

7    that.

8              THE COURT:  Okay.  And they have been deployed

9    across the world.  They've been deployed to Qatar, they've

10   been deployed to Iraq, they've been deployed to U.S.S.

11   carriers, Air Force carriers, they've been deployed to Poland,

12   they've been deployed to South Korea.  I could go on.  They've

13   been deployed worldwide.  Yeah?

14             MR. MANION:  Yes, Your Honor.

15             THE COURT:  All right.  And each of them currently

16   is serving without any accommodation, right, other than

17   general, you know, whatever any other regular person gets.

18   There's not a special accommodation for any of them separate

19   from what any other service member would get; right?

20             MR. MANION:  I assume you're not talking about the

21   Carter policy.

22             THE COURT:  No, I'm just asking about the current

23   plaintiffs.

24             MR. MANION:  No, I understand.  Other than the

25   Carter policy, I'm not aware of any other -- anything that is

1    allowing them to serve, any special --

2         THE COURT:  Yeah, they have no special

3    accommodations.  Major Talbott, like every other service

4    member, has been deemed physically and mentally fit for duty,

5    has no accommodations, has had no issues with deployability

6    and has more service awards than you and I have books in our

7    library; fair?  Other than the books in our library because I

8    imagine you're well read.

9         MR. MANION:  I -- I have no reason to dispute that,

10   Your Honor.

11        THE COURT:  Okay.  So Major Talbott will be

12   discharged from the military because Major Talbott's service,

13   my military people are telling me, is going to present a

14   problem for unit cohesion or discipline, notwithstanding that

15   the Chairman of the Joint Chiefs of Staff has determined that

16   transgender people do not present those issues, so long as,

17   like Major Talbott, they have all the other qualifications

18   we've talked about.

19        And let me ask you this question:  Should I defer to

20   the Chairman of the Joint Chiefs of Staff, who has had -- who

21   had a stellar military career and was the Joint Chief of Staff

22   chair during President Trump's first administration, or should

23   I defer to defendant Pete Hegseth, who, at the time he issued

24   this policy, had been the Secretary of Defense for

25   about 30 days, and had no prior military history other than I

1  think he had an early deployment before his television career.

2  So who do I defer to?

3          MR. MANION:  You defer -- I mean -- yeah, you defer

4  to Secretary Hegseth and to the decision that was made.  There

5  is obviously the case that there has been disagreement from

6  administration to administration, from different military

7  leadership to other military leadership, about these issues.

8  It's obviously true.

9          THE COURT:  I just want to make sure --

10          MR. MANION:  But just the fact that there was, under

11  the last administration -- or just the fact that there has

12  been disagreement on that doesn't mean we pick out one or two

13  of these past military leaders and say somehow their view is

14  definitive.  I think the military judgment doctrine -- or

15  deference doctrine requires you to defer to the military, the

16  current military.

17          THE COURT:  Okay.  Well, you point to me any case in

18  American history that says to a Court you should defer on a

19  military policy that is undoing another military policy that

20  was put in place after review by the President of the United

21  States and careful review by military leaders, you should

22  ignore that and defer instead to a policy put in place by an

23  individual who has been the Secretary of Defense for about

24  30 days and who cited in his reasoning, two studies that

25  undercut what he is doing.

1          MR. MANION:  I hope I can cite to your decision

2    soon.

3          THE COURT:  What's that?

4          MR. MANION:  I said I hope I can cite to your

5    decision soon.  I mean, I agree that I don't -- I've told you

6    this already.  I don't have a case that has every specific

7    fact that's at issue here.

8          THE COURT:  Anything remotely -- we haven't even

9    gotten to the animus.  I mean, anything remotely close to

10   this?

11         MR. MANION:  I mean, I think every single of the

12   Supreme Court's and Courts of Appeals military deference

13   doctrines are deference to the current military, I think by

14   definition.  And so --

15         THE COURT:  You don't think that if I -- okay.  All

16   right.  Go ahead.  I'm sorry.  I don't mean to cut you off.

17         MR. MANION:  Well, I think by definition, these are

18   Courts that are deferring to current military judgments about

19   an issue.  And so I think that if the view that you

20   articulated from the Chairman of the Joint Chief of Staff --

21         THE COURT:  Hold on, I didn't -- hold on.  Let's be

22   clear here.  I didn't put words in his mouth.  Plaintiffs

23   didn't even put this into the record.  This is your exhibit

24   that you quoted to me.

25         And here's the thing, because I was at Williams &

1    Connolly for 22 years, and the one thing that I was taught

2    from the day I got there and that I taught since the day I

3    left is you never, ever, ever put in a document before the

4    Court until you've read the whole thing.  Because like the

5    studies we went through, and like this testimony shows, when

6    you do that, inevitably, there will be things in the document

7    that you're going to have to grapple with.

8            And now you guys put this at issue.  You guys put in

9    his testimony.  And you're saying I should accept it for the

10   proposition that he might know about all complaints, but for

11   the purposes of being transgender has never been about

12   cohesion discipline anyway.  I didn't summarize what he said.

13   I quoted it directly; right?

14           MR. MANION:  I didn't mean anything by the word

15   "articulate" other than --

16           THE COURT:  Okay.

17           MR. MANION:  Other than you had read me that

18   review.

19           THE COURT:  Okay.  All right.

20           MR. MANION:  So -- but I don't think that -- I don't

21   think that we need that quote.  I don't think we're asking you

22   to pay special deference to that quote.  What we are asking

23   you to do is defer to the military judgment of the current

24   military.

25           THE COURT:  Okay.  Now, with respect to the military

1    judgment that I'm supposed to be deferring to, throughout your

2    opposition you cite almost exclusively the Mattis policy.  I

3    mean, you guys don't really touch on the other two studies at

4    all.  But probably if I took a drink every time I saw "see

5    cite to the Mattis policy for the military deference point,"

6    you know, I'd probably be in a coma somewhere.  You guys,

7    that's your main point of analysis; right?

8              MR. MANION:  Well, I think it's the most

9    comprehensive thing that we are citing, yes.

10             THE COURT:  Okay.

11             MR. MANION:  And it's something that represents the

12   views of the current military, at least in large part.

13             THE COURT:  Okay.  What's wrong with the Mattis

14   policy and deferring to it right now and relying on it?

15             MR. MANION:  We're asking you to defer to this

16   military's judgment, which is based, in part, on the Mattis

17   policy.  We're not asking for special deference to the Mattis

18   policy standing alone but to --

19             THE COURT:  Okay.  But why would it be reasonable,

20   what would be the issue with someone, anyone, any military

21   person, today, relying on the Mattis policy that was written

22   in 2018?  It's out-of-date.  It's seven years out-of-date.

23   When the Mattis policy was conducted, when the studies were

24   conducted, they didn't have any experience with transgender

25   people serving in the military, openly.  It hadn't happened.

So all of their report, a lot of their report was based on, as you said, military assessments of what we can predict into the future.  I'm using your words from earlier; right?

But now we've been through that future.  Since 2021, transgender persons have served openly in the military.  When the Hegseth policy was put in place, did anyone look at that history to determine what actually is the case?

Did anyone look in General Mattis's own words, the department's own data?

MR. MANION:  I don't know any more about the deliberative process than what is in our brief, what is described in his action memo.

THE COURT:  Okay.  Can you and I both agree that the answer to that is no, that no one has looked at the service records for people with gender dysphoria and transgenderism?

MR. MANION:  I can't agree, just because I don't know the answer.

THE COURT:  Okay.  Well, you do know the answer, actually, because in -- I asked the government a number of questions for purposes of this hearing, and it's docket 66, I can like recite it to you verbatim.  But the most stunning part of that response is I asked how many individuals are currently serving with gender -- are currently serving in the military and how many with gender dysphoria, and do you know what the -- have you read docket 66?

1          MR. MANION:  I have, Your Honor.

2          THE COURT:  Okay.  Do you know what the response to

3    that was?

4          MR. MANION:  I believe that it was that the military

5    does not have that data.

6          THE COURT:  Yeah.  Not only do you not have the data

7    of how many transgender people, you have no access to get the

8    data, because the military does not track people by gender

9    identity.  So explain to me how anyone could come to the

10   conclusion that gender identity, which this executive order

11   calls a false ideology, has presented a problem to the

12   military when the military can't even tell me how many people

13   with gender identity there are in the military, what their

14   service records are, and you have no way of finding out

15   either.  We are literally in the land of Beyonce now.  Because

16   there is nothing.

17         And I'm not saying this -- there's nothing like, you

18   know, I'm exaggerating.  I'm saying you literally don't track

19   the information.  You can't get me that information.  How can

20   someone decide that a group of people are hurting unit

21   cohesion and discipline if we have no records of them doing so

22   and we don't even know who they are?

23         MR. MANION:  The person and the people who are

24   entrusted to decide that question are the military and the

25   President.  And if there's not actual data to back something

1    up, the question, then, is a professional military judgment.

2    Again, as I said, a prediction.

3            THE COURT:  Even if it's based on discrimination.

4    Okay.  Let me ask you this question:  I issue -- well, I'm not

5    the President.  I'll never be the president, because I wasn't

6    born in the United States and because I'm an introvert and

7    probably couldn't get elected to be dogcatcher.  But let me

8    ask you this question:  President Jones -- oh, we'll do

9    President Janeway, because I'm a huge *Star Trek* fan, and

10   Kathryn Janeway is like my favorite *Star Trek* character;

11   right.

12           So President Janeway issues an executive order that

13   says all white males are undisciplined, lack humility, have no

14   integrity, do not have a warrior ethos, are liars -- I think

15   there's some other stuff.  But she issues an executive order

16   that says that, and says, to the Secretary of Defense, I want

17   you to issue a policy implementing getting rid of all white

18   men because of all these issues.  And then the policy that is

19   implemented has this same language, also says that all white

20   men lack integrity and are undisciplined and are liars,

21   et cetera, because that language is also in the Hegseth

22   policy, and we think that they are a problem for unit cohesion

23   because of that, and the three studies I give you say the

24   opposite, but so be it.

25           Am I deferring to the military there?  And is it

okay for them to exclude a group of people based on negative

aspersions that are unsupported by any fact and, as a group,

there is no study supporting that they actually present unit

cohesion problems?  Is that -- is that what I'm supposed to

defer to?

          MR. MANION:  I think the clear -- so we've talked

about this already, that there is a -- even if you don't find

there to be animus, there is still some -- there is still some

watered-down version of whatever the appropriate standard of

review would be for a constitutional question.  I think in

your hypothetical, we would be starting from a starting point

of strict scrutiny because, as you described it, it was a

race-based classification.  And so I think we would take --

          THE COURT:  Okay.  Sorry.  Let's just say men.  I

was just -- men who wear Red Sox hats.  I mean, I was just

trying to -- I don't want to bring strict scrutiny into

this.

          MR. MANION:  Okay.  So then I think the question is

there's still a sex-based classification; you take the

watered-down version of intermediate scrutiny and apply it.

          THE COURT:  Okay.  What is the language of the

watered-down level of -- and this is not a rhetorical

question.  I actually want to know.  Like I know what the

level of intermediate scrutiny is in the Supreme Court cases,

but you're talking about a watered-down version.  So just what

1   is the language that I should be looking at, or what is your

2   view of what the test is?

3           MR. MANION:  So when I say "watered down," it's

4   because -- because the -- every single one of these cases on

5   constitutional challenges to military procedures, the

6   sex-based classification in *Rostker*, the First Amendment

7   challenge in *Goldman*, they don't apply the standard strict

8   scrutiny, intermediate scrutiny when reviewing those.

9           THE COURT:  Okay.  *Rostker* was before the *VMI*

10  decision; right?

11          MR. MANION:  Yes, I believe so.

12          THE COURT:  Okay.  So *Rostker* actually -- the

13  intermediate scrutiny that applies today to sex-based

14  classifications was not in existence when *Rostker* was decided.

15  It came in existence with Justice Ginsberg.  So of course I'm

16  not going to find it in *Rostker*.  I'm also not going to find

17  it in *Goldman*, for the same reason.  So how is *Rostker* telling

18  me anything about the intermediate scrutiny based on sex-based

19  classifications that didn't exist when *Rostker* was decided?

20          MR. MANION:  So maybe *Goldman* is a safer case for me

21  to cite.  I mean, it's a --

22          THE COURT:  It's also before *VMI*.

23          MR. MANION:  Sure, but it's not a -- that's not a

24  race --

25          THE COURT:  Okay.  Go ahead.

1          MR. MANION:  It's not a sex-based case.

2          THE COURT:  Okay.  Go ahead.

3          MR. MANION:  It's a First Amendment case.  It's

4     something where you would have strict scrutiny.  And there,

5     the -- we've talked about some of the language already, but

6     there, the Court still defers to the professional military

7     judgment.  And you can -- you can look at that and say I

8     really don't believe that having a yarmulke on your head is

9     likely to pose the problems that the military said at the

10    time, and yet it's still a very deferential review.

11         THE COURT:  Would you agree with me that deciding a

12    Supreme Court case based on whether or not someone can wear a

13    yarmulke is somewhat of a different situation that is

14    presented to me right now and whether or not the President of

15    the United States, based on outdated data and data that

16    contradicts the position and the Secretary of Defense can keep

17    out an entire category of people for no other reason, so far

18    as I can tell, that they think that that category of people

19    are dishonest, selfish, unhumble, liars?  Do you really think

20    that *Goldman* gets me there, that that tells me like, yeah,

21    Judge, just whatevs, that's what the Secretary of Defense

22    said.  Putting aside his tweet.

23         MR. MANION:  I mean, every one of these cases I

24    think tells you that there are sometimes military regulations

25    that fall on different classes of people different ways.  And

1    even when the Court is faced with that, even when there are

2    good reasons to dispute the military judgment on that, even if

3    there's expert witnesses, even if it's not even obvious why

4    the military reached that conclusion, that's the through line

5    of I think the Supreme Court's military deference case law.

6            THE COURT:  And if I think that it's animated by

7    discrimination, and that all of the reasoning is pretext for

8    discrimination, I ignore that?  Like that's not my role to try

9    to figure that out?  This is not a rhetorical.  This is a

10   question.

11           MR. MANION:  I think the only way you get to -- the

12   only way that -- I view animus as basically a short-cut around

13   this kind of constitutional analysis.  And the only way you

14   can get there, I think, under *Trump v. Hawaii*, is if the

15   policy can be explained by nothing else other than animus.

16   And here, there are the facially legitimate reasons --

17           THE COURT:  But they're not supported by anything.

18   I can say that -- I mean, it can't be that I can say a group

19   of people are dishonest, selfish, liars, with no integrity and

20   no warrior ethos, all evidence to the contrary, because we

21   have the plaintiffs in front of us whose service records are

22   each remarkable -- I encourage you, if you haven't already, to

23   go through them.  You're going to get rid of all these very

24   qualified people, who the military has sunk millions of

25   dollars into training, who have specialized jobs, for no other

1   reason than they have had gender dysphoria or they've

2   transitioned, and I'm just supposed to say, you know what,

3   okay?

4           Well, let me ask you this:  Cost, cost was a fourth

5   issue; right?

6           MR. MANION:  Yes, Your Honor.

7           THE COURT:  And, Mr. Lynch, when we were here last,

8   I said if you all were going to rely on cost, I was going to

9   have some questions; right?

10          MR. LYNCH:  Yes, Your Honor.

11          THE COURT:  So nothing about what's coming is going

12  to be a surprise; right?

13          All right.  The Mattis policy -- the Hegseth policy

14  says, "A review of cost data by the Office of the Assistant

15  Secretary of Defense for Health Affairs indicated that between

16  2015 and 2024, the Department of Defense spent $52,084,407

17  providing care to active duty service members to treat gender

18  dysphoria, including" -- I'll round -- 15,000 for

19  psychotherapy -- "15 million for psychotherapy, 3 million for

20  hormone therapy, and 14 million for surgical care."

21          See that?

22          MR. MANION:  Yes, Your Honor.

23          THE COURT:  And then it continues, "While service

24  members with gender dysphoria volunteered to serve their

25  country, the cost associated with their health care, coupled

1    with the medical and readiness risk associated with their

2    diagnosis and associated treatment that can limit their

3    deployability, make continued service by such individuals

4    incompatible with the Department's rigorous standards."

5           All right.  We've already gone through the

6    limitation on deployability, which is nowhere on the record

7    and, if anything, shows that transgender people are more

8    deployable than depressed persons.

9           So let's refer to cost.  So the Hegseth policy

10   estimated 52 million spent on gender dysphoria over a course

11   of 10 years; right?

12          MR. MANION:  Yes, Your Honor.

13          THE COURT:  And in -- I asked some questions about

14   these numbers, and I asked for more information, because why?

15          MR. MANION:  Because you were wondering what the

16   percentage that was of the military budget --

17          THE COURT:  Well, I was wondering that, but I also

18   wanted to draw comparisons; right?  I wanted to draw

19   comparisons as to -- because I also asked you to break out the

20   numbers for psychotherapy for nonservice members and hormone

21   therapy or other therapies for nontransgender people and the

22   surgical care; right?  Because I wanted to see if it was

23   actually more expensive to treat people with gender dysphoria

24   than not.  Which you would agree would be the relevant

25   analysis; right?  We can't just go -- we can't just say these

1    people cost too much money without knowing how much money any

2    average person costs; right?

3              MR. MANION:  Sure, Your Honor.

4              THE COURT:  Okay.  And you all can't do that,

5    because you don't keep track of how many you have.  But let's

6    put that aside for a moment.  You couldn't get me any of the

7    numbers that I asked for, for the comparison, why?  It's in

8    the docket.

9              MR. MANION:  It is.  Yeah, I'm just trying to pull

10   that back up, Your Honor.  I wasn't involved in --

11             THE COURT:  Sure.  It's questions 1, 2, and 3.

12             MR. MANION:  Yes, Your Honor.  One second.

13             THE COURT:  And 4, I guess.

14             Okay.  Are you there?

15             MR. MANION:  I do have the questions, yes.

16             THE COURT:  Okay.  So question was the total amount

17   of Department of Defense spending from 2015 to 2024, which was

18   is the years that were reviewed for gender dysphoria, so I can

19   do a comparison which we will get to.

20             "The total amount of DOD spending per year from 2015

21   to 2024 on psychotherapy for all service members and the total

22   overall for that time period."

23             Do you see that?

24             MR. MANION:  Yes, Your Honor.

25             THE COURT:  So what I wanted to do, obviously, was,

1    you're telling me it cost $15 million to treat people with

2    gender dysphoria, and what I was looking for was what we can

3    compare that with respect to whether or not these people cost

4    more or less; right?

5              MR. MANION:  Yes, Your Honor.

6              THE COURT:  Okay.  And your response was that you

7    obtained the recent psychotherapy cost data for service

8    members diagnosed with gender dysphoria by extracting cost

9    data by the International Classification of Disease code for

10   gender dysphoria.  While the same process could presumably be

11   completed in the aggregate for the nine-year period, this is a

12   time-consuming process that could take three to four weeks

13   longer, especially given -- quote, especially given the

14   relevant staff's primary responsibility to perform mission

15   critical functions; right?

16             MR. MANION:  Yes, Your Honor.

17             THE COURT:  So what you're saying is if you wanted

18   to get that comparison data, we would have to have somebody

19   work on it, and that person would be taken away from

20   performing mission critical functions; right?

21             MR. MANION:  Yes, Your Honor.

22             THE COURT:  Okay.  Why was it okay to take people

23   away from performing mission critical functions to study how

24   expensive gender dysphoria is, but it doesn't matter -- but we

25   can't possibly take them away when we're trying to actually

try to contextualize those numbers?

MR. MANION:  I don't know the answer to that, Your Honor.

THE COURT:  All right.  While we're at it, the military had 918 billion appropriated to it in 2024?

MR. MANION:  Yes, Your Honor.

THE COURT:  All right.  And the estimated cost of 52 billion over ten years is what the Hegseth policy looked at.

MR. MANION:  Yes, Your Honor.

THE COURT:  Okay.  So if you want to do the math along with me get out a calculator.  So the estimated cost of 52 million over 10 years is about 57 ten thousandths of a percent, .005 percent of the military's appropriation for 2024 alone.  Would you agree that that is somewhat more than just a small fraction, or less than just a small fraction?  I mean, it's not like not even a rounding error; right?

MR. MANION:  Sure, Your Honor.

THE COURT:  And then assuming 5.2 million per year the estimated transgender cost was 57 hundred thousandths of a percent, .0057 percent of total military spending for 2024; right?

MR. MANION:  I'm sorry, can you ask me that again?

THE COURT:  Oh, I was just giving you the numbers. I don't expect you to do this in your head.  But you would also agree that this is minuscule, 57 hundred thousandths of a

1    percent of total military budget; right?

2              MR. MANION:  I think we've stipulated already that

3    it's a small fraction.

4              THE COURT:  And I'm saying that small fraction

5    overstates it by an order over 10,000 magnitudes, but okay.

6              Now, remember the conversation we had about ether a

7    while back?

8              MR. MANION:  Yes, Your Honor.

9              THE COURT:  And we were talking about special

10   relativity, and how you have to have things in reference to

11   each other, you can't just take one thing out of context;

12   right?

13             MR. MANION:  Yes, Your Honor.

14             THE COURT:  Okay.  If we're going to try to figure

15   out if gender -- if people with gender dysphoria are more

16   expensive or somehow prohibitively expensive, wouldn't we want

17   to know, one, some comparison to some other surgical issues,

18   or at least what the percentage of overall surgical or

19   psychotherapy care there is, which I asked for and you can't

20   get me.  We might also want to know whether there are other

21   less important things that we provide for -- or equally

22   important things that we provide for in the military where we

23   can cut costs without impacting a specific group of people;

24   right?  These are two things that we might want to look at?

25             MR. MANION:  Sure, Your Honor.

1          THE COURT:  Okay.  None of that happened here,

2    though, right?

3          MR. MANION:  I think you -- well, if we're close to

4    a break I do want to confer with my colleagues maybe on the

5    break about this, because I believe there is some comparator

6    data that we have.

7          THE COURT:  It is, it's from 2018.  And it's a graph

8    in the Mattis policy.  And it says that transgender people are

9    more expensive by 1 or 2 or 3 times than nontransgender

10   people.  But if you look at the graph, you understand

11   immediately why that is, because the graph has the care for

12   transgender people and the care for nontransgender people up

13   over time.  But it also has the dates when the Carter policy

14   went into effect and when the Mattis policy went into effect.

15   And I think it was before the Austin policy.

16          And what you see is that there is a spike in the

17   care for transgender people after the Carter policy goes into

18   effect.  It comes down and there's another spike after the

19   Mattis policy comes into effect.  And then it comes way back

20   down and starts to, if you full out the numbers, I am

21   confident would even out.  And the reason for that is, the

22   only possible explanation is, that you would see that graph is

23   because they're going to pent up demand, because transgender

24   people couldn't get care for being transgender or gender

25   dysphoria before the ban.

1          So of course when you're allowing care for the first

2     time in 2016 and in 2018 you're going the see spikes, but

3     those spikes are going to come back down.  Which is why I keep

4     insisting that the 2018 data is outdated.  Because I would bet

5     a lot that if we actually did the analysis as to the cost per

6     service member, medical costs, and the costs per transgender

7     persons with the same sort of medical histories, are if not

8     the same, similar.  And why do I think that?  Because all

9     other rates are similar which we found from again the AMSARA

10    study and report.

11          So yes, confer with your colleague at a break.  But

12    I'm confident that he's going to tell you that that's what he

13    was referring to because it's in your brief and I actually

14    looked it all up.

15          All right.  You would agree with me that you would

16    want to know the comparison of transgender people's cost to

17    other people's cost if you're going to say that transgender

18    people are disproportionately expensive; right?

19          MR. MANION:  Sure, Your Honor.

20          THE COURT:  And you can't do that because you don't

21    have any idea how many people in the military are transgender;

22    right?  Or you don't even have any idea how many have a

23    history of gender dysphoria or a current diagnosis of gender

24    dysphoria; right?

25          MR. MANION:  I don't know that we do, Your Honor.

1          THE COURT:  Okay.  These would be important things

2     to know; right?

3          MR. MANION:  So can I just say one quick.

4          THE COURT:  You can say as much as you want.

5          MR. MANION:  Yeah, I mean, I think when I've been

6     answering that yes these are things you might want to know,

7     I've been answering that --

8          THE COURT:  It's not just like I'm -- look, I am

9     curious, because, you know, the -- who here thinks that the

10    best like two minutes in all of Ted Lasso is when he did his

11    be curious thing with darts, anyone know what I'm talking

12    about?  Raise your hand if you thought that was the best part

13    of the show?  Okay.  Plaintiff's counsel, but they have to

14    agree with me.  All right.  It was.

15          But his thing is basically like be curious.  So I

16    looked at all this stuff.  If we just say transgender people

17    cost $52 million and therefore they're too expensive to have

18    in the military, that's meaningless.  That's meaningless.

19    Unless we can say that we can't cut these costs anywhere else,

20    or -- and/or that transgender people cost more than

21    nontransgender people or people with gender dysphoria.

22    Because otherwise it's just a number.  I could say they cost

23    $10 and it's too much.  I could say they cost $10 million and

24    they cost too much.  I'm just saying here's how much they

25    cost, and because they cost this much they are too expensive.

1    I mean, that's what the Hegseth policy is doing; right?

2         MR. MANION:  So I think my one global response to

3    this is that, you know, it's great to sit here and say these

4    are things you would want to know if you're making a decision,

5    but deference has to do some work in this context.

6         THE COURT:  Well, what am I deferring to, though?

7    I'm just deferring to a number picked out of the air, that's

8    all I'm deferring to.  And there's Supreme Court cases that we

9    don't just -- we don't just accept someone saying cost is an

10   issue.  I mean, how can I defer to someone putting out a

11   number out there, which has no context whatsoever, no matter

12   what the number was.  If this was all animus, if this was all

13   pretext.  I would just throw it out there and I would do no

14   comparison.  That's what I would do.  Because we can't compare

15   things -- I know you didn't read, maybe it wasn't Dr. Brown it

16   was the other expert.  One of the experts actually did a

17   number comparison.  Want to guess what she compared it to?

18        MR. MANION:  No.

19        THE COURT:  She compared it to how much the military

20   pays per year for Viagra.  Do you want to take a guess as to

21   how much the military pays per year for Viagra?  And by the

22   way I'm not -- this is not to cast aspersions on Viagra, it is

23   used for many things including to treat depression, but do you

24   know how much?

25        MR. MANION:  I do not, Your Honor.

1            THE COURT:  42 million per year in 2024, 42 million.

2    Now, that's compared to 5.2 million for people who had gender

3    dysphoria.

4            MR. MANION:  I think 52 million.

5            THE COURT:  No, it's 52 million over ten years.

6            MR. MANION:  Oh, I apologize.

7            THE COURT:  I'm just averaging, 5.2 for one year;

8    right?  If I take an average of 52 over 10.

9            MR. MANION:  Sure, Your Honor.  Sure.

10            THE COURT:  Okay.  So if we're going to cut costs

11    because the military in its 9 -- well, let me ask you this,

12    who's more expensive per year for the military, people with

13    gender dysphoria or people with -- who need Viagra?

14            MR. MANION:  I think as you've been pointing out all

15    along, we need to know how many people are taking that

16    Viagra.

17            THE COURT:  Well no, we just need to know who's more

18    expensive, it doesn't matter how many people.

19            MR. MANION:  If it's a cost per service member, it

20    does matter.  I guess you're saying that maybe one class of

21    medical care is more expensive than another class.

22            THE COURT:  Yeah, okay.  Fair enough.  What's more

23    expensive medical care for gender dysphoria at $5.2 million a

24    year or medical care that requires use of Viagra which is $42

25    million a year.

1          MR. MANION:  I don't independently know the number,

2     but accepting that number it's the Viagra treatment.

3          THE COURT:  By an order of almost 8 or 9; right?

4          MR. MANION:  Yes, Your Honor.

5          THE COURT:  In fact, we could cut that treatment, I

6     don't know, by -- I don't know, we could cut that treatment by

7     I think one percent or two percent and get to the 5.2 million

8     dollar number.

9          Now, am I supposed to defer to that, or am I

10    supposed to think to myself, huh, maybe something other than

11    medical costs is playing a role here?

12         MR. MANION:  We can talk about animus, I'm sure we

13    will.  But I really -- I mean, the -- you won't see in any of

14    the Supreme Court cases or Court of Appeals cases this level

15    of second guessing --

16         THE COURT:  Have you ever seen a Supreme Court level

17    this level of derogatory language towards a group of people in

18    an executive order and a policy, because I went through and

19    checked.  And I looked at the language of *Windsor*, I looked at

20    the language of *Romer*, I looked at the language of *City of*

21    *Cleburne* which dealt with hippies, there was nothing in DOMA

22    that was criticizing homosexuals.  They didn't mention the

23    word homosexual.  There was nothing in *Romer* that mentioned --

24    had any characterization about how that law was -- those laws

25    were in place.  *City of Cleburne*, there was no discussion of

1    hippies, they just said you can't get food stamps if unrelated

2    family members are in the same household.

3          Now, I realize those aren't military contexts.  But

4    the Supreme Court's never been faced with anything like this.

5    I've looked.  I've looked.  This is -- I mean if you can point

6    to me where any court has deferred to the military judgment

7    based on an assertion that an entire group of people are

8    dishonest, liars, who lack integrity, all evidence to the

9    contrary currently in the record, then I'll take a look.  But

10   I can't imagine that I'm just supposed to defer to that.

11         And look, I have no doubt that I'm not the last step

12   on this train journey, right.  Whatever happens is going to go

13   up and people are either going to confirm me or overrule me or

14   whatever.  I just have to do the best I can with the evidence

15   in front of me.  Is there a case like that?

16         MR. MANION:  I think the closest case is *Trump v.*

17   *Hawaii.*  And happy to save that for after the break or talk

18   about it now, whichever --

19         THE COURT:  I want to take a break.  But I will let

20   you talk about it when we get back.  Okay.

21         MR. MANION:  Thank you.

22         THE COURT:  It is 3:06, I actually didn't get lunch,

23   so why don't we come back at 3:20 on the dot.

24         (A recess was taken from 3:06 p.m. to 3:22 p.m.)

25         THE COURT:  The good news -- by the way, I take it

1    you all know that there's another case involving this

2    executive order and policy in Seattle; right?  I saw a minute

3    order I guess from a day or two ago that they're going to have

4    a hearing on March 25th, and the judge has given each side 30

5    minutes.  And on a scale of 1 to 10 how much would you rather

6    be in front of that judge right now?

7          MR. MANION:  I'm not going to answer that

8    question.

9          THE COURT:  Come on up.  I would rather be that

10   judge right now.

11         All right.  I just have a few questions for you on

12   animus, and then I will let you go -- not let you go, you can

13   talk about whatever you want on animus or anything that we've

14   discussed.  I just want to make sure we have the record clear

15   on a few things.

16         And the good thing for you is that I have to be out

17   of here by 5:00.  I don't think we're going to need to come

18   back here Monday, but if we do, if either of you feel like you

19   haven't been heard and need more time I'll come back Monday.

20         MR. MANION:  Thank you, Your Honor.

21         COURT:  Okay.  So I just want to make sure that I

22   ask you these questions.

23         All right.  So you'll recall that the executive

24   order says that -- well, it says a number of things, but one

25   of the things is that having to care for people with gender

1    dysphoria or who have medically transitioned is inconsistent

2    with high standards for troop readiness, lethality, cohesion,

3    honesty, humility, uniformity, integrity; right?

4                MR. MANION:  One second, Your Honor.

5                THE COURT:  Sure.

6                MR. MANION:  I have the policy in front of me, I

7    have the EO somewhere.

8                THE COURT:  Okay.  You just want to take my word for

9    that one?

10               MR. MANION:  Well --

11               THE COURT:  Go to the --

12               MR. MANION:  Can you ask the question again about

13   the EO.

14               THE COURT:  Yeah, sure, let me just myself get to

15   what I'm trying to get to.

16               All right.  So the executive order says that "The

17   military mission requires a singular focus on developing the

18   requisite warrior ethos and the pursuit of military excellence

19   that cannot be diluted to accommodate political agendas or

20   other ideologies harmful to unit cohesion"; right?  That's in

21   the first paragraph.

22               MR. MANION:  Yes, Your Honor.

23               THE COURT:  Okay.  And I think plaintiffs agree I

24   think we all agree that, obviously, the military's mission

25   requires a focus on developing the things that he mentions;

1    right?

2              MR. MANION:  I hope so, Your Honor.

3              THE COURT:  Okay.  Can you point me to the evidence

4    in the record before me that the military's singular focus has

5    been taken away by people with certain political agendas or

6    other ideologies harmful to unit cohesion.

7              MR. MANION:  Off the top of my head I don't have

8    specific evidence to point you to.

9              THE COURT:  Okay.  "Recently however, the armed

10   forces have been afflicted with radical and gender ideology to

11   appease activists unconcerned with the requirements of

12   military service, like physical and mental health,

13   selflessness and unit cohesion."  Can you please point me to

14   the evidence in the record that the armed forces have been

15   afflicted with radical gender ideology, for any reason?

16             MR. MANION:  Off the top of my head I don't have

17   evidence that I can point you to about that, Your Honor.

18             THE COURT:  Okay.  "Consistent with the military

19   mission and long-standing DOD policy expressing a false gender

20   identity divergent from an individual's sex cannot satisfy the

21   rigorous standards necessary for military service."  And the

22   last time I was here with Mr. Lynch he agreed, and assume you

23   too, that what they mean by that is transgender people.

24             MR. MANION:  I'm sorry, can you repeat the question?

25             THE COURT:  Sure.  "Expressing a false gender

identity divergent from an individual's sex," that's referring

to transgender people; right?

            MR. MANION:  Well, I don't think that that's a -- it

depends on the definition of transgender, which I realize has

been a question in this case.  But I think this refers at

least to transgender people who are expressing actively that

identity.

            THE COURT:  You mean by living?

            MR. MANION:  Who are not living as their biological

sex.

            THE COURT:  Yeah, they're living.  Because no

transgender person can wholly live in their biological sex,

because part of their internal mental identity tells them that

living in their biological sex is mentally harmful to them.

And all of the studies that have been done on this confirm

that.  So, let me maybe have the exemption, if you're a

transgender person who has in no way exhibited any thoughts

orally about their gender status, and who lives fully in the

sex of their biological sex, then this doesn't refer to that

transgender person; right?

            MR. MANION:  As far as I know, no.  And also the

policy doesn't capture a person who fits that description

either.

            THE COURT:  Right.  So basically in order -- the

policy and the -- that does not cover basically only those

1    transgender people who have never said out loud, I'm

2    questioning my gender, because is any other group of people in

3    the transgender community not covered by the policy,

4    especially given the clause "exhibits symptoms of gender

5    dysphoria"?

6              MR. MANION:  I mean, I think every recent policy has

7    recognized there's a difference between someone who may

8    identify as transgender and remains living consistent with

9    their biological sex, and someone who has gender dysphoria,

10    and I think you can add in exhibits signs thereof.  What I

11    understand of the plaintiff's definition in this case is

12    somewhere in between.

13              THE COURT:  I don't care about definitions.  I'm

14    just trying to understand what this policy covers.

15              MR. MANION:  And --

16              THE COURT:  Other than an individual who internally,

17    in their head, thinks that they are a different gender than

18    their biological sex, and has never said that in hearing

19    distance, spitting distance of anyone, has never exhibited

20    symptoms of gender dysphoria, has never been diagnosed with

21    it, or has never transitioned, and is willing to live in their

22    biological sex, which as we saw from this study that you all

23    cited, that the Hegseth policy cited, makes their depression

24    worse.  Other than that small category of people and I don't

25    even know -- to me that's probably a null set, everybody else

1    who's transgender is covered; right?

2         MR. MANION:  I would just point you back to the

3    definition in the policy, so it's individuals who have a

4    current diagnosis or history of or exhibit symptoms consistent

5    with gender dysphoria, that's who's covered by the policy.

6         THE COURT:  You agree that that applies to every

7    single plaintiff in this case; right?

8         MR. MANION:  I think that's right, yes.

9         THE COURT:  Okay.  So all the plaintiffs in this

10   case are going to be discharged, the active duty ones; right?

11        MR. MANION:  Absent a waiver, yes.

12        THE COURT:  And the waiver -- let's get to the

13   waiver.  Because you actually -- I asked about this in Exhibit

14   66 as well.  Do you recall that?

15        MR. MANION:  I don't recall that, Your Honor.

16        THE COURT:  Okay.  Well let's go to Exhibit 66.

17        MR. MANION:  Which document is that, Your Honor?

18        THE COURT:  I'm sorry, the document -- docket 66,

19   which was the answers to the questions I asked you all.

20        MR. MANION:  Yes, Your Honor.

21        THE COURT:  And I said, the question was for each

22   plaintiff, answer whether implementation of the action memo

23   would require him or her to be separated from the armed

24   forces.  And then you say defendants do not know whether the

25   policy which sets forth the conditions and processes for

separation would require plaintiffs to be separated from the

armed forces for the following reasons:

With respect to currently serving plaintiffs, their

potential separation depends on whether they have a current

diagnosis or history of, exhibits symptoms consistent with

gender dysphoria, or history of cross sex hormone therapy or

history of sex reassignment, et cetera.  While many, though

not all, plaintiffs allege a prior diagnosis of gender

dysphoria, and many allege to have received transgender health

care, the specifics of that health care are not provided.

Without knowing more it is difficult for defendants to begin

to assess whether any of the plaintiffs would fall within

Section 43A, 43B of the policy, did you write that?

THE COURT:  Okay.  Do you stand by that or do you

want to amend that?

Your life is going to go a lot easier in terms of

just time, if you agree that based on the declarations, which

are the only evidence in the record before me, and we all

assume that none of the plaintiffs are lying, they would all

fit in this definition.  Not a single one of them hasn't done

one of these things and if not multiple of them.  And if you

want to -- Mr. Lynch, maybe you and Ms. Lin know the

plaintiffs better.

MR. MANION:  Could I take one second?

 1              THE COURT:  Sure, you can take as much as you want.

 2              MR. MANION:  Your Honor, so I'm aware that this was

 3      filed before the most recent complaint.  I don't know the

 4      details of the declarations well enough, and I don't think

 5      anyone on my team knows them well enough to know if they have

 6      changed on that point.  So we would be happy to file a

 7      supplement on that.

 8              THE COURT:  Okay.  Ms. Levi can you just -- I will

 9      let you if you want to contest it.  But Ms. Levi, do all of

10      the new plaintiffs fit those definitions?

11              MS. LEVI:  Yes, Your Honor.

12              THE COURT:  All right.  If you want to look into it,

13      totally fine.  By Monday if you disagree just let me know.

14              MR. MANION:  Thank you, Your Honor.

15              THE COURT:  So based on everything we know, at least

16      with respect to the original plaintiffs, and presumably and

17      you'll tell me otherwise by Monday if not, all the plaintiffs

18      are subject to discharge.

19              MR. MANION:  I think absent a waiver.

20              THE COURT:  Absent a waiver.  We're going to get to

21      the waiver next.  I want to take this step-by-step.  Absent a

22      waiver, they are all discharged; right?

23              MR. MANION:  Yes.  So it's -- I think -- I don't

24      have any reason to dispute the language of the policy.  And so

25      if each of the plaintiffs meet the -- fail to meet retention

1    criteria then I think with, you know, coming back to the

2    waiver when we do, then yes, I would think that that would

3    start the separation process.

4            THE COURT:  It would start and end the separation

5    process absent the waiver; right?

6            MR. MANION:  Well, my understanding is that the next

7    steps at this point would be sending them to an

8    administrative -- well, going to a board for separation.

9            THE COURT:  Right.  And if the board was actually

10   following the policy it would discharge them; right?  That's

11   my question, if I -- if the policy goes into effect, are they

12   going to be discharged, putting aside the waiver?  Are they

13   subject to discharge, putting aside the waiver?

14           MR. MANION:  So I don't know for sure that they will

15   be separated --

16           THE COURT:  I'm not asking if you know that they

17   will be separated.

18           MR. MANION:  Yes.  But I do think that assuming they

19   meet these requirements, we can assume that they will be --

20   that the separation process will begin.

21           THE COURT:  Okay.  Ms. Levi, do each of the current

22   plaintiffs meet this definition?

23           MS. LEVI:  Yes, they do, Your Honor.

24           THE COURT:  Okay.  All right.  Again, if you look at

25   the declarations over, you know, the next couple days and you

1    disagree, by all means submit something to me by Monday at

2    5:00, okay?

3              MR. MANION:  Thank you.

4              THE COURT:  All right.  Even assuming that one or

5    more currently serving plaintiffs fall within section of the

6    policy, that does not compel their administrative separation,

7    rather such service members may elect to separate voluntarily

8    and receive twice as much in separation pay as they would if

9    separated involuntarily.  And service members with more than

10   18 but less than 20 years of service will be eligible for

11   early retirement.  I mean that sounds grand, I mean, two times

12   something or other.

13             So either they are going to be separated or they

14   should separate themselves -- or they can separate themselves,

15   those are basically the two choices.

16             MR. MANION:  Absent a waiver, I believe so.  Yes.

17             THE COURT:  Okay.  Would you agree with me that if

18   you don't want to leave the military, if you enjoy your career

19   that you spent years if not decades building, someone

20   saying -- oh, by the way, if they go through the separation

21   policy, they do not receive twice the separation pay, to the

22   contrary, they're penalized; right?  Do you know how they're

23   penalized if they go through the separation policy?  They're

24   force to pay back their bonuses from however many years

25   they've gotten them.  And some of them may also be required to

1    pay back tuition. Now, doesn't really seem like much of a

2    choice to me.

3            All right. So let's get to the waiver point. Even

4    for those plaintiffs who do not elect voluntary separation or

5    are ineligible for early retirement, the policy provides --

6    this is you quoting the policy -- for a waiver on a

7    case-by-case basis provided there is a compelling government

8    interest in retaining the service member that directly

9    supports war fighting capabilities and the service member

10   concerned meets certain criteria; right?

11           MR. MANION:  Yes, Your Honor.

12           THE COURT:  And but even if you are told that your

13   work directly supports war fighting capabilities -- by the way

14   who grants the waiver?  Like how do we know someone's going to

15   get the waiver?

16           MR. MANION:  I don't -- I don't know the answer to

17   that, Your Honor.

18           THE COURT:  Okay.  This is again the problem with

19   using the passive tense.  So even if they get picked for the

20   waiver, which is not automatic and some unknown person decides

21   that based on some nebulous criteria, they still don't get the

22   exemption unless they, one, demonstrate 36 consecutive months

23   of stability in the member sex without clinically significant

24   distress or impairment in social, occupational, or other

25   important areas of function, and the service member

1    demonstrates that he or she has never attempted to transition

2    to any sex other than their sex.  I'm not sure how you prove a

3    negative, but so be it.  And the service member is willing and

4    able to adhere to all applicable standards, including the

5    standards associated with the service member's sex.  Those are

6    the three criteria; right?

7              MR. MANION:  Yes, Your Honor.

8              THE COURT:  Tell me which plaintiffs meet those

9    criteria?

10             MR. MANION:  I'm not aware that any of them do.

11             THE COURT:  They don't; right?  None of the

12   plaintiffs meet that criteria, right?

13             In fact, the only people who would meet that

14   criteria, even assuming they get picked for a waiver, are

15   people essentially who have never had any therapy for gender

16   dysphoria, who have never taken any step whatsoever to

17   transition, and is willing and able to adhere to being of

18   their biological sex, which as we saw will make their

19   depression worse not better, but putting that aside.

20             Can you and I agree that this is essentially null

21   set, that this was designed to exclude all transgender people,

22   but be able to say you can get a waiver?

23             MR. MANION:  I mean, no, I don't agree with that,

24   Your Honor.

25             THE COURT:  Okay.  Well you tell me -- this

1    certainly is not an exemption that would allow anyone to serve

2    openly as a transgender person; right?

3                MR. MANION:  I think that's right, Your Honor.

4                THE COURT:  Okay.  Basically we're having just don't

5    tell for purposes of trans -- it's not even don't ask, people

6    can ask, but just don't tell for purposes of transgender

7    people.  They have to essentially be in hiding while they're

8    in service.

9                MR. MANION:  I'm not sure that's right, but they

10   have to be willing to live in their biological sex under that

11   criteria.

12               THE COURT:  Which if you look at any of the

13   literature which you all cited would tell you for them that

14   causes more depression not less, so that undermines the

15   suicide whatever point you all were making.  But let me just

16   stick with this.  This basically bans all transgender people,

17   except those who are willing to live in a sex that they do not

18   mentally associate with and that the gender that the *DSM-5*

19   would say to them, this is untreat -- this is potentially

20   untreated issue, or not everyone wants to live in their

21   biological sex or does not not want to live in their

22   biological sex.

23               But even if there are some random -- not random, I

24   don't mean to say random.  If there are some small number of

25   people who would fit this definition, can you and I agree that

1    it would be a minuscule amount of people.  First of all,

2    someone somewhere has to give them a waiver.  So they have to

3    directly support war fighting capabilities.  And I don't know

4    what that means, I assume you do.  And they have to have never

5    made any attempt to live in the gender that they identify

6    with.  And they have to live as a gender they don't identify

7    with.  And my understanding is 24/7.

8            Can you and I agree that that -- if it's not a null

9    set, it's pretty close.

10           MR. MANION:  Well, I'm not sure all the ways that

11   you characterized that are the way that this would be

12   interpreted.  For example, I think you cited never -- never

13   attempted or had lived in or lived as the gender other than --

14   or the sex other than their birth sex.  But the policy talks

15   about transitioning here.

16           THE COURT:  Attempted transition.

17           MR. MANION:  That's right.

18           THE COURT:  Okay.  What's an attempted transition?

19   What characterizes an attempted to transition?  I am a female,

20   my gender identity is male, and I start wearing pants and

21   slacks, have I attempted to transition?  With a tie.  Because

22   I want to go through the process, or at least I want to try

23   out the process, is that an attempt at transition?

24           MR. MANION:  I don't know how this language will be

25   implemented.

```
 1              THE COURT:  Who will implement it?  Is there going

 2    to be a policy issued by the secretary of defense.

 3              MR. MANION:  I don't know who is the granting --

 4              THE COURT:  Okay.

 5              MR. MANION:  -- the granting official or will be.

 6              THE COURT:  But we know that the person who's in

 7    charge of the policy thinks that this will refer, or at least

 8    the policy refers to all transgender people.

 9              MR. MANION:  I -- I don't know that.  I --

10              THE COURT:  So I just want to make sure I

11    understand.  Standing here today, you do not understand the

12    scope of the ban, because you think I shouldn't take Secretary

13    Hegseth at his word.  You don't understand the scope of

14    "exhibits symptoms of gender dysphoria," which you could drive

15    a truck through in terms of tagging anyone of exhibiting

16    symptoms.  By the way, who determines if you are exhibiting

17    symptoms of gender dysphoria.

18              MR. MANION:  I don't know the answer to that, Your

19    Honor.

20              THE COURT:  Could be anybody, right?  I mean, what

21    happens if some service member gets -- well, I'm not going to

22    go into it, but you don't know the answer; right?

23              MR. MANION:  I don't know the answer.

24              THE COURT:  You don't know the answer of what

25    "attempted to transition means"; right?
```

1          MR. MANION:  Can I have a moment?

2          THE COURT:  Sure.

3          MR. MANION:  Thank you.

4          So, Your Honor, my understanding is that DOD has

5    confirmed that this language about transition or attempt to

6    transition refers to medical transition.

7          THE COURT:  Okay.  Where is that?  If you guys want

8    to put it in the record.  I haven't seen it, but I could have

9    missed something.

10          Ms. Levi, have you seen that?

11          MS. LEVI:  No, Your Honor.

12          MR. MANION:  Your Honor, that is our understanding

13    of the DOD's position.

14          THE COURT:  All right.  If that's the position you

15    all are going to take in this litigation, can I please get

16    that on the docket by Monday by 5:00?

17          MR. MANION:  Yes.  We will -- if that is something

18    we can represent, we will.

19          THE COURT:  All right.  And if you can't represent

20    that, can you let me know that as well?

21          MR. MANION:  Yes, Your Honor.

22          THE COURT:  All right.  Now, even if you somehow get

23    the waiver, even if you somehow have 36 months of stability in

24    your sex, even if you're able to demonstrate that you've never

25    attempted to transition.  How you do that, again, I don't

1    know.  You have to be willing and able to adhere to all

2    applicable standards, including the standards associated with

3    the service member's sex.

4         Now for anyone who has transitioned that's

5    impossible; right?  You can't untransition medically.

6         MR. MANION:  Not that I'm aware of, Your Honor,

7    although --

8         THE COURT:  Okay.  So certainly -- sorry.

9         MR. MANION:  My understanding is that there is a

10   class of people who at least attempt to detransition.

11        THE COURT:  Ah, yes.  Yes.

12        MR. MANION:  But I'm not an expert in that.

13        THE COURT:  That is the *L.W.* court in the 6th

14   Circuit discussed detransitioning as a basis that we can think

15   that being transgender is not biologically driven and,

16   therefore, not immutable for the quasi-suspect classification.

17   But I asked both sides to brief the biology of it.  And the

18   plaintiffs have a tremendous amount of studies, including an

19   expert in this area, who says that most people who voluntarily

20   detransitioned against their will and that there are bad

21   mental outcomes for those who transition -- detransition.

22   And, of course, for a lot of people it's not medically

23   appropriate.  But, anyway.

24        Assuming I'm right, that people who have been

25   through gender affirming care can't detransition, or can't go

1    back.  They can't live in standards associated with their sex;

2    right?  With their biological sex.

3           MR. MANION:  I don't have any reason standing here

4    right now to dispute that.

5           THE COURT:  Okay.  And do you have any idea of what

6    percentage of transgender people in the military today could,

7    even assuming they get a waiver, meet those three criteria.

8           MR. MANION:  Well, I don't.  I do want to clarify

9    something from the last section.  So when we were talking

10   about what the military is and is able to track.  We -- the

11   military is able to track gender dysphoria and gender

12   dysphoria related treatment.  What the military does not track

13   as I understand it, is people who don't have gender dysphoria

14   who might identify as transgender.

15          THE COURT:  Okay.

16          MR. MANION:  And so --

17          THE COURT:  Totally fair.

18          MR. MANION:  No, I don't have the answer to what

19   percentage might fall within or outside of these criteria.

20          THE COURT:  Okay.  Totally fair, by the way, based

21   on the estimates that you gave me for the Tricare, the

22   insurance, because you did tell me that you could only look at

23   gender dysphoria.  What percentage of people in the military

24   were treated -- or what number were treated for gender

25   dysphoria in between January 2016 and May 2021?  So for a

1    five-year period how many people received care for gender

2    dysphoria in the military.

3              MR. MANION:  Is this question 8 in this --

4              THE COURT:  Yeah, but you put an attachment of a

5    Congressional Research Service that looked at Tricare coverage

6    of gender affirming care.  It was updated January 10, 2025,

7    you all attached that to the docket 66.

8              MR. MANION:  I see it.  If the numbers are there,

9    that's all I know.

10             THE COURT:  Okay.  So if you look at the second

11   page.

12             MR. MANION:  Yes, Your Honor.

13             THE COURT:  It says between January 1, 2016 and May

14   14th, 2021, DOD reportedly spent approximately $15 million to

15   provide gender affirming care, surgical and nonsurgical, to

16   1,892 active duty service members.  Do you see that?

17             MR. MANION:  I do Your Honor.

18             THE COURT:  What immediately jumps out at you about

19   that number, compared to other numbers we discussed?  It tells

20   you that the $52 million number is too high or this is too low

21   or there was a shift between 2022 and 2024.  Because if you

22   average this out, this would average out to about 3 million

23   per year spent on gender affirming care, whereas the 52 number

24   if you average it out is 5.2 million.  But it's neither here

25   nor there.

1          So that is -- so let's take 1,892 active service

2     members.  Which as I understand it is the number that I have

3     other than in 2016 the Rand Corporation estimated that between

4     1,320 and 6,630 of the 1.3 million active duty service members

5     identified as the opposite biological sex.

6          So let's just stick with gender dysphoria, right,

7     because that's apparently all that what we're addressing.

8     What percentage of the 1.3 million people who are currently

9     serving in the armed forces, assuming that -- let's just

10    assume all of them are currently still receiving care, let's

11    just assume 2,000 members, so the most we could say about this

12    number.  So 2,000 people are being treated for gender

13    dysphoria in the active military of 1.3 million people.

14         Do you know what percentage that is?

15         MR. MANION:  I don't, Your Honor.

16         THE COURT:  Do you want to guess with me that's

17    exceedingly small.

18         MR. MANION:  Yes, Your Honor.

19         THE COURT:  Nonexistent, practically.

20         MR. MANION:  Small percentage, Your Honor.

21         THE COURT:  All right.  So if you assume 189 --

22    1,892 duty service members receive treatment every year, which

23    is a high estimate based on this analysis, but let's just go

24    with it, with a current military active duty roster of about

25    1.3 million people, that means 0.14 percent of the military is

1    currently receiving treatment for gender dysphoria.  That

2    means that for every 1,000 people we can expect that less than

3    two will require care for gender dysphoria.  Can you explain

4    to me, please, how two out of 1,000 people impact negatively

5    unit cohesion?

6              MR. MANION:  I don't have an answer for that beyond

7    what's in the record.

8              THE COURT:  Well, there's no answer in the record.

9    If there's an answer in the record, tell me what the answer in

10   the record is.  If there is no answer, you can't answer.

11   That's fine.

12             MR. MANION:  This is a -- these are judgments that

13   the military is making.

14             THE COURT:  Okay.  So the current military is making

15   the judgment that a diagnosis of gender dysphoria of which .14

16   percent of the military is composed, which costs eight times

17   less per year to treat than Viagra, which the joint chiefs of

18   staff has said do not cause unit cohesion, who we have Bronze

19   medal awards winner plaintiffs, all kinds of awards, who have

20   the same rates of psychotherapy as other service members.

21   That those people, just need to get rid of all of them.  We

22   get rid of these 1,892 people and then we will have a fighting

23   force.  I mean, by God then we will have a fighting force,

24   right now we don't.  Because of this false gender ideology

25   that you can't tell me how many people espouse.  Am I supposed

1    to defer to that?

2              MR. MANION:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MR. MANION:  I mean, again, I don't agree with every

5    characterization within the question, but yes the judgement of

6    the military --

7              THE COURT:  Let me re-ask the question then.  Am I

8    supposed to defer to the judgment of a secretary of defense

9    who has been -- I'm going to talk and the second I say

10   something you disagree with let me know and I'm going to stop.

11   I'm going to defer to a population of concern, mental concern,

12   that effects 0.14 percent of the military currently; that

13   costs the same to treat as that for nongender -- people with

14   not gender dysphoria, who have similar rates -- I'm sorry,

15   better rates of length of deployability than a depression

16   cohort; and who the immediate previous president and military

17   decided after months of judgment and study should be permitted

18   to serve, and I'm just -- do you disagree with anything I've

19   just said?

20             MR. MANION:  I think two points, Your Honor.

21             THE COURT:  Just answer the question, have I

22   mischaracterized anything in my question?

23             MR. MANION:  I disagree with two points, Your Honor.

24   The first one is on the cost.  There is evidence in this

25   record to show a 3X --

1          THE COURT:  Yeah, that's the Mattis policy graph.

2     Can you cite that for me, the docket, so that when I write my

3     opinion I know exactly what I'm looking at.

4          MR. MANION:  I can in a second, Your Honor.

5          THE COURT:  Okay.  By the way, that was from before

6     2018; right?  We don't have any idea what the number is today?

7          MR. MANION:  I understand that.

8          THE COURT:  I'm not asking if you understand it, I'm

9     asking if I'm right.  Is that right?

10         MR. MANION:  You asked if the report is from 2018,

11    yes, I believe it is.

12         THE COURT:  Okay.  And so the numbers that you're

13    looking at for the three times higher is seven years outdated?

14         MR. MANION:  That may be the case, but those are

15    numbers from seven years ago.  And -- but there is evidence

16    about a disproportionate cost.

17         THE COURT:  Okay.  But just give me the docket

18    number and the page number so I know precisely what I'm

19    supposed to be looking at.

20         MR. MANION:  It is 73-7 is the docket number, page

21    41 of the report.  I don't have a file stamped version.

22         THE COURT:  All right.  Thank you.  Is that the page

23    with the graph on it?  No.

24         MR. MANION:  It is not, Your Honor.

25         THE COURT:  Okay.  Well, there's another page with

1    the graph on it that we will pull out.  Thank you.

2          MR. MANION:  I think the second piece, I mean, I

3    don't fully disagree with what you said, but that the last

4    president decided after months of study.  The initial

5    executive order from President Biden was on a very similar

6    time line to the initial executive order here.

7          THE COURT:  Okay.  Go ahead.

8          MR. MANION:  Those were my --

9          THE COURT:  Yeah, but I'm talking about the policy

10   that was actually implemented.  And that was implemented nine

11   months after the executive order.  And that policy

12   implementation had a considerable working group behind it.

13         Now, what do we have today that we didn't even have

14   in 2021?  Or 2018?  We have data about transgender people

15   serving openly, at least we should.  Because we have four

16   years of experience with this.  If there was an issue with

17   unit cohesion, I assume somebody along the way would have

18   said, you know, you have these people serving openly who are

19   transgender and it's just making it impossible for us to do

20   our jobs.  If this was a problem you would have so many of

21   these complaints that somebody might start collecting them;

22   right?  Is there a database somewhere in the military of

23   complaints about transgender people at all?

24         MR. MANION:  I don't know if there is or not, Your

25   Honor.

1          THE COURT:  Okay.  Certainly, no one looked at one

2     before we had the Hegseth policy issued, because it's not in

3     the policy; right?

4          MR. MANION:  The policy certainly doesn't mention

5     any such database.

6          THE COURT:  Okay.  As between an outdated by seven

7     years report and a current analysis that had no analysis of

8     actual transgender people serving openly.  And an analysis

9     based on data from, you know, this year or last year, the

10     analysis with the data would be more informative; right?

11          MR. MANION:  I mean, I think at the end of the day

12     we're asking you to defer to the military's judgment.  That

13     includes predictions.  That includes things that may not be

14     quantifiable.  That's the point of the military deference

15     doctrine.

16          THE COURT:  Okay.  You keep assuming that there's

17     judgment embedded in this.  What judgment is embedded in this.

18     The judgment that's embedded in this so far as I can tell is

19     that some people believe that -- well, let's just use

20     Secretary of Defense Hegseth's own words, transgender people

21     are -- lack warrior ethos, are liars, lack integrity, are not

22     humble, are selfish, and can't meet physical and mental health

23     requirements.  So far as I can tell, that's the only judgment

24     I've seen.  What other judgment is there?

25          MR. MANION:  I mean, I would point you back to the

1    Mattis report.  I would point you to the other data that the

2    Hegseth policy says --

3         THE COURT:  So the two studies that support keeping

4    transgender people in the military, if we read them in full

5    and actually looked at them and didn't cherry pick them, and

6    the 2018 Mattis policy.  And I know that you're going to

7    disagree with my characterization of the studies, but let's

8    just even give you that.  What we have in the record is a 2018

9    study, a 2021 study, because that was the AMSARA report, and

10   the medical literature review from 2025, right, those are the

11   things that I'm looking at; right?

12        MR. MANION:  Those are the things that the action

13   memo said were among the things that were considered here.

14        THE COURT:  Okay.  Well, let me ask you about that

15   then.  Where -- when I say the three studies, I'm going to be

16   referring to those three studies, okay, so I don't have to say

17   it every time.

18        MR. MANION:  Yes, Your Honor.

19        THE COURT:  Where in those three studies can I find

20   discussion of whether people with gender dysphoria or

21   transgender people lack a warrior ethos?

22        MR. MANION:  I don't know that those studies refer

23   to that, Your Honor.

24        THE COURT:  Okay.  Where in there -- where anywhere

25   can I find a study that shows that transgender people lack

1    warrior ethos.

2              MR. MANION:  Respectfully, Your Honor, you don't

3    need to find a study like that in order to defer to the

4    military judgement.

5              THE COURT:  Okay.  Why don't you and I agree that

6    I'm going to ask the questions and what I'm going to look at.

7    And then I'll let you tell me what I shouldn't look at.  First

8    I want to get the questions out, okay?

9              MR. MANION:  Okay.

10             THE COURT:  Where in the three studies am I going to

11   find that being transgender or being -- or having gender

12   dysphoria or history of it are inconsistent with humility and

13   selflessness?

14             MR. MANION:  I don't know that any of those address

15   that.

16             THE COURT:  Okay.  When you say I don't know, what

17   you mean is none of them do; right?  Because Mr. Lynch's -- I

18   mean, I'm happy to let you all have until Monday to get me

19   briefing on what they did, but where in those studies am I

20   going to find that transgender people or people with gender

21   dysphoria are unconcerned with the requirements of military

22   service, like physical and mental health?

23             MR. MANION:  I can't point you to a place in those

24   studies, Your Honor.

25             THE COURT:  Okay.  Or selflessness or unit cohesion;

right?

MR. MANION:  Same, Your Honor.

THE COURT:  Okay.  Where am I going to find in any study, and in particular those three studies, that expressing a false gender identity divergent from an individual's sex is -- cannot satisfy, if you do that you cannot satisfy the rigorous standards necessary for military service?

MR. MANION:  Same answer, Your Honor.

THE COURT:  Which is none; right?

MR. MANION:  I don't have a place in those studies to point you to.

THE COURT:  Because there is no place in those studies to point me to.  Point me to any place in any study. You guys have been -- you've had this litigation for over a month now; right?

MR. MANION:  I'm not sure when the original complaint was filed, Your Honor.

THE COURT:  All right.  And while we're doing this I want to get this on the record.  Mr. Lynch, can you just come up for a moment.  The plaintiffs have asked me to issue a TRO in this case two or three times; right.

MR. LYNCH:  They have.

THE COURT:  And every time I've denied that request; right?

MR. LYNCH:  I think they were withdrawn once or

```
 1    twice, but you have not entered a TRO.

 2              THE COURT:  And the reason -- actually I meant to

 3    put this on the record earlier.  Some point last week we all

 4    got on the phone at 9:00 p.m. because the plaintiffs wanted to

 5    file a TRO.  And I said, and correct me if I'm wrong either of

 6    you, because Ms. Levi, Mr. Lynch, and Ms. Lin, you were all on

 7    the phone.  And I just want to put on the record what we

 8    discussed.  And I should have done that earlier.  I apologize.

 9              Plaintiffs wanted me to issue a TRO because one of

10    the plaintiffs was being -- was going to be forced to appear

11    dressed in their biological sex; right?

12              MR. LYNCH:  Yes.

13              THE COURT:  And Ms. Levi was pretty adamant that I

14    issue a TRO.  And you all said to me we don't know what the

15    situation is.  The commander could, you know, put the person

16    on administrative leave.  And Ms. Levi said, that's still not

17    a -- that still deserves a TRO because the person will suffer,

18    you know, the indignities and the constitutional violations;

19    right?

20              MR. LYNCH:  That's accurate to my recollection,

21    yes.

22              THE COURT:  Ms. Levi?

23              MS. LEVI:  Yes, Your Honor.

24              THE COURT:  And I said, no, not going to accept --

25    or if you want to file it I'm not going to enter a TRO.  And
```

1    we spent some time on the phone and we came up with a

2    compromise by you two; right?

3                THE COURT:  MR. LYNCH:  Yes.

4                THE COURT:  Which was a person -- any plaintiffs

5    would be put on administrative leave pending the litigation,

6    which is not what Ms. Levi wanted; right?

7                MR. LYNCH:  The Court said it would not enter a TRO

8    so long as plaintiffs were placed on administrative absence.

9    And while in that status would not have to conform with the

10   standards of their biological sex.

11               THE COURT:  And you all agreed to that.  Your

12   commanders agreed to that.

13               MR. LYNCH:  We've confirmed as to every plaintiff

14   who has come to us that that has been the case.

15               THE COURT:  Okay.  Ms. Levi, that wasn't what you

16   wanted, though, right?  That was a compromise?

17               MS. LEVI:  No, plaintiffs did not want that, Your

18   Honor.

19               THE COURT:  Okay.  And I said, I think a few times

20   on that phone call, that I was not going to enter a TRO

21   because this was too important for us to do this quickly.  And

22   I wanted to give both the parties, and especially the

23   government, every chance to put evidence and briefing before

24   me, right, before I entered a TRO.  And I was pretty adamant

25   about that point.

1          MR. LYNCH:  I recall you saying something to that

2    effect, Your Honor, yes.

3          THE COURT:  And, in fact -- oh, Ms. Levi.

4          MS. LEVI:  I thought you were going to address me.

5    I'll sit back down.

6          THE COURT:  No.  No.  Is that basic -- and then the

7    first TRO, Ms. Levi said we're going to file the TRO.  And I

8    brought everyone in and I brought Ms. Lin in and we came up

9    with a different compromise because I didn't want to do this

10   on a TRO; right?

11         MR. LYNCH:  Yes.

12         THE COURT:  So right now I've had at least two

13   opportunities to enter a TRO in this matter and I haven't,

14   because I wanted to go through the preliminary injunction

15   process, so that we all thought carefully about what was going

16   to happen; right?

17         MR. LYNCH:  I think that's fair to say, yes.

18         THE COURT:  Okay.  Thank you.

19         All right.  So you all have had some time on this.

20         Ms. Levi, when did you file your complaint?

21         MS. LEVI:  I believe it was January 28th, Your

22   Honor.

23         THE COURT:  Okay.  So I guess maybe not -- oh,

24   January?

25         MS. LEVI:  Yes, I believe it was a the day after the

```
 1    executive --

 2              THE COURT:  Oh, so you've had a month and a half.

 3    So you've had about a month and a half.

 4              Okay.  So if we keep going down in the policy it

 5    says adoption of a gender identity, inconsistent with a

 6    individual sex conflicts with the soldier's commitment to a

 7    honorable, truthful, and disciplined lifestyle.

 8              Do you see that?

 9              MR. MANION:  Yes, Your Honor.

10              THE COURT:  Can you point to me any study anywhere

11    that supports that proposition?

12              MR. MANION:  No, Your Honor.

13              THE COURT:  Can you and I agree that the plaintiffs

14    who you agree are going to be put through separation

15    proceedings, and are not eligible I think you agree to the

16    exemptions, contradict that assertion?  Their service records

17    alone contradict that assertion?  They are literally living

18    proof that persons with gender dysphoria or who are

19    transgender can be honorable, truthful, and disciplined in

20    their lifestyle in the military?

21              MR. MANION:  I can't answer that, Your Honor.

22              THE COURT:  You can't?

23              MR. MANION:  No.

24              THE COURT:  Because you haven't reviewed their

25    declarations?
```

```
 1                    MR. MANION:  This is the military judgment that --
 2                    THE COURT:  Yeah, I know.  I know.
 3                    MR. MANION:  I'm not prepared to contradict it
 4       today.
 5                    THE COURT:  I'm not asking you to contradict
 6       military judgment.  I'm just asking you whether certain
 7       evidence contradicts it or not?
 8                    MR. MANION:  I don't have an answer for that, Your
 9       Honor.
10                    THE COURT:  Okay.  If I went through, you would
11       agree with me that calling people liars and lacking integrity
12       and not able to meet rigorous standards for discipline is
13       insulting.  Yes or no, or you can't say?
14                    MR. MANION:  It may be.  None of these documents use
15       those words.
16                    THE COURT:  Yeah, no.  It says it's inconsistent
17       with -- being transgender or having gender dysphoria is
18       inconsistent with living a honorable, truthful, and
19       disciplined lifestyle, which means it is consistent with
20       living a dishonorable, lying, undisciplined lifestyle; right?
21                    MR. MANION:  I don't have anything to add to these
22       words, Your Honor.
23                    THE COURT:  All right.  Is saying that transgender
24       people or people with gender dysphoria, if their inherent
25       identity is inconsistent with a commitment to an honorable,
```

1    truthful, and disciplined lifestyle, is that demeaning to

2    them?

3              MR. MANION:  I don't have a characterization for

4    that, Your Honor.

5              THE COURT:  Is it insulting to them?

6              MR. MANION:  Same answer, Your Honor.

7              THE COURT:  Okay.  And if I asked you about all the

8    other words in here, with respect to the characterization of

9    transgender people or people with gender dysphoria, you would

10   have the same answer?

11             MR. MANION:  Yes, Your Honor.

12             THE COURT:  There's nothing in the studies; right?

13             MR. MANION:  That says those same things, no, Your

14   Honor, not that I know of.

15             THE COURT:  That says anything close to those

16   things; right?

17             MR. MANION:  Not that I know of your, Your Honor.

18             THE COURT:  Okay.  And certainly not in the record

19   before me; right?

20             MR. MANION:  No, Your Honor.

21             THE COURT:  And if I asked whether those character

22   aspersions were demeaning or insulting, your answer so far as

23   I understand it is I can't answer that; is that fair?

24             MR. MANION:  Yes, Your Honor.

25             THE COURT:  Okay.  And if we go to the Hegseth

1    policy, because I understand, I think, that you think for some

2    reason I shouldn't look at the executive order.  We're just

3    going to have to agree to disagree on that.  Actually, I was

4    wrong about something last time, Mr. Lynch.  I said -- you

5    said we can't look at the language of the executive order,

6    we're going to say we have to look at the language of the

7    policy.

8            And I said I'm going to tell you what the policy's

9    going to say.  It's not going to have any of these words,

10   right, because they all show animus.  And whoever writes this

11   policy is going to say we respect the service of people with

12   gender dysphoria, but for blah, blah, blah reasons, hormone

13   treatment costs, we can't fund them or something or other;

14   right?  My prediction at the time was that the policy would

15   exclude all the language from the executive order that was

16   problematic; right?

17           MR. LYNCH:  As I recall.

18           THE COURT:  And I was totally wrong about that;

19   right?  Because the policy says that it is DOD policy -- it's

20   the policy of the United States Government to establish high

21   standards for service, member readiness, lethality, cohesion,

22   honesty, humility, uniformity, and integrity.  This policy is

23   inconsistent with the medical, surgical, and mental health

24   constraints on an individuals with gender dysphoria, or who

25   have a current diagnosis or history of, or exhibit symptoms

1    consistent with gender dysphoria.  And I'll just stop there, I

2    won't even go to all transgender people even though the

3    Secretary of Defense -- but just so that I wrap this up,

4    you -- there's no evidence before me in the record today that

5    people with gender dysphoria, et cetera, cannot establish high

6    standards for these various things, right, that's nowhere in

7    evidence?

8         MR. MANION:  But I think for some of these there is,

9    the Mattis report.

10        THE COURT:  All right.  Well that's fine.  I don't

11    want to fight --

12        MR. MANION:  Not for all of them.

13        THE COURT:  All right.  For lethality, like two

14    people who have English as a second language, we're not going

15    to get this right.  Okay.  Lethality.  I'll skip over

16    cohesion, even though the chair said not a problem.  Honesty,

17    humility, and integrity.  Anything in any study for either of

18    those?

19        MR. MANION:  I'm sorry to ask you to repeat, but

20    which of those?

21        THE COURT:  Sure.  Lethality, honesty, humility, and

22    integrity, any support for those, anywhere in the record?

23        MR. MANION:  So at least as to three of those I'm

24    not going to be able to point you to anything.  I can't tell

25    you for sure at the moment whether lethality is covered in the

1    Mattis report our not.

2              THE COURT:  Okay.  Would you agree with me that

3    saying that someone's being is inconsistent with honesty,

4    humility, and integrity is demeaning?  That inherently, as a

5    matter of biology, they cannot have honesty, humility or

6    integrity.

7              MR. MANION:  If I can say two things, Your Honor.

8              THE COURT:  Say as many things as you want.

9              MR. MANION:  First, I don't think paragraph says

10   anything about anyone's being.  It talks about a condition.

11   So that's my first response to that.

12             THE COURT:  The condition being gender dysphoria --

13             MR. MANION:  Yes.

14             THE COURT:  -- or exhibiting symptoms of it?

15             MR. MANION:  Yes, Your Honor.

16             THE COURT:  Okay.  So people with gender dysphoria

17   can't be honest, humble, or have integrity.  Do you think

18   that's demeaning to people with gender dysphoria?

19             MR. MANION:  I can't answer that question, Your

20   Honor.

21             THE COURT:  Okay.  All right.  One of the things the

22   Supreme Court looks at when it's looking at animus is whether

23   particular issue has been singled out; right?  If you were

24   basically just looking at one thing in order to basically say,

25   hey, we're just doing an analysis, but it's never been done

```
 1    before.  Supreme Court case law is that that's problematic,

 2    yeah?

 3              I'll move on.  All right.  If we can go back to

 4    docket 66.

 5              MR. MANION:  Yes, Your Honor.

 6              THE COURT:  I said please give me data

 7    identification of any, quote, mental health constraint, which

 8    is the language of the policy, right, other than gender

 9    dysphoria that DOD has previously found to be inconsistent

10    with, quote, honesty, humility, and integrity.  And the answer

11    was 613003 and 628 lists many learning, psychiatric, and

12    behavioral disorders that are generally incompatible with

13    military service.  The Department does not typically list the

14    specific basis supporting disqualification for such

15    conditions.

16              Do you see that?

17              MR. MANION:  Yes, Your Honor.

18              THE COURT:  So the answer is there are none, this is

19    the only time, with respect to gender dysphoria, that the

20    Department of Defense has found a condition to be inconsistent

21    with honesty, humility, and integrity; right?  You can name no

22    other situation.

23              MR. MANION:  I cannot, Your Honor.

24              THE COURT:  Okay.  I don't want to run out of time

25    before you want to put anything on the record.  Is there
```

1    anything more that you want to say about what we've been

2    discussing?  And I'm not trying to be like, I don't mean that

3    rhetorically, I mean actually.

4         MR. MANION:  Yeah, I mean, briefly, yes.  I think

5    that when it comes to this animus question *Trump v. Hawaii*, I

6    think is extremely relevant here, and the bottom line rule

7    from *Trump v. Hawaii* is that the policy must be explainable by

8    nothing other than animus.  And I think that the arguments

9    that the plaintiffs in *Trump v. Hawaii* made are very similar

10   to the arguments in this case, which is this is something that

11   it appears the president is singling out one group of people

12   for disfavorable treatment.  That he's made statements that

13   they argued were animus.  And on that basis the whole policy

14   should go.

15        And the Supreme Court even -- I mean, I think

16   it's -- it doesn't really take a position on whether the

17   statements actually constituted animus or not.  Although, I

18   think it suggested some displeasure with the statements

19   themselves, and still said that the -- that a policy cannot be

20   vacated unless it can be explained by nothing other than

21   animus.  And here, even in the paragraph that we were just

22   talking about, there are multiple facially legitimate reasons

23   for the conclusion about gender dysphoria as a condition.  And

24   even if you think -- even if you think that these -- the three

25   that we keep coming back to are evidence of animus that

1    doesn't get over the hump to then vacating or enjoining the

2    policy.

3              THE COURT:  Okay.

4              MR. MANION:  And so I mean that's -- so, and I think

5    if you look at the proclamation in *Trump v. Hawaii* and if you

6    see --

7              THE COURT:  The one -- the original one that was

8    enjoined or the one that went to the Supreme Court?

9              MR. MANION:  Even the one that went to the Supreme

10    Court.  The reasons given for barring groups of people from

11    coming into the country had to do with terrorism.

12              THE COURT:  Yeah.

13              MR. MANION:  I assume no one wants to be called a

14    terrorist either, but --

15              THE COURT:  Well, but we're making -- that's not an

16    adjective, that's a noun.

17              MR. MANION:  And --

18              THE COURT:  Being a terrorist is not an adjective.

19    It's a noun.  You are someone who terrorizes.

20              MR. MANION:  Fine, which is a pretty negative thing

21    to say about someone is my point.  And --

22              THE COURT:  But you contest that; right?  I mean,

23    they had a way to test whether or not someone was a terrorist

24    by data -- I mean, how are you going to test whether a whole

25    group of people as a group of people lack -- I mean, how can

1    you even say that, that a whole group of people lack humility?

2    I mean, it's just nonsensical on its face; right?

3              MR. MANION:  So even if you treat those as markers

4    of animus, as I said before, that's still not enough to enjoin

5    the policy.

6              THE COURT:  Okay.  What would be enough?

7              MR. MANION:  If the only possible justification for

8    it was animus.

9              THE COURT:  Okay.  The only possible justification I

10   can say out loud, or the only possible justification that had

11   something other than pretext behind it?

12             MR. MANION:  I mean, I think the entire argument in

13   *Trump v. Hawaii* was that the ultimate justification was

14   pretextual and that this was really --

15             THE COURT:  No.  No.  No.  That was not the argument

16   in *Trump v. Hawaii*.  That was the argument at the beginning of

17   *Trump v. Hawaii*.  By the time the proclamation got to the

18   Supreme Court, the Supreme Court said it was totally

19   disembodied from the pretext of the earlier proclamation,

20   because there had been what?  Months and months of study with

21   various departments of the government, which no one questioned

22   in terms of their bias, and was not facially derogatory on its

23   face.  Because by the time the proclamation got to the Supreme

24   Court, it did not talk about religion, it did not mention

25   Muslims, it was not limited to countries that were majority

1    Muslim.  And some of the countries barely had any Muslim

2    people at all. All of these led the Supreme Court to say, all

3    of that space in between, all those things that happened we

4    have a new proclamation.

5           So it's not similar.  And I understand your argument

6    that it is.  We're just going to have to, you know, someone

7    smarter than both you and I me is going to figure that, or at

8    least smarter than me.

9           MR. MANION:  Fair enough, Your Honor.  I think,

10   unless you have more to talk about, I'm happy to rest on the

11   briefs, but also happy to stay up as much longer as you

12   like.

13          THE COURT:  Let me just check my notes, do you just

14   mind waiting a second.

15          Oh, yeah, I want to talk about pronounces for a

16   moment.  Can you tell me what -- by the way, because I was

17   curious, so I'm a total nerd and I'm an introvert and so I

18   spend a lot of time reading.  And last week I'm reading this

19   book which is phenomenal, by Josephine Quinn, *How the World

20   Made the West*.  And I was like trying to, you know, not think

21   about this case, to be quite honest.  And so I was trying to

22   focus.  And then it has a footnote -- or it's not a footnote.

23   It has a note on page 20, Sumerian, the word's first written

24   tongue has no surviving relatives.  Like many later languages

25   it operated on the basis of grammatical genders.  Quote,

1    unquote genders, but these were not male, female, and neuter.

2    Instead Sumerian speakers organized their world into people

3    including gods, and nonpeople including animals.  It's pretty

4    interesting; right?

5                    MR. MANION:  Sure.

6                    THE COURT:  Okay.  You would agree with me that

7    pronoun use does not effect military readiness in any material

8    way?

9                    MR. MANION:  I can't agree with you on that, Your

10   Honor.

11                   THE COURT:  Okay.  You recall that I offered

12   Mr. Lynch that if he could bring anyone to testify I would be

13   happy to have them testify?

14                   MR. MANION:  Yes, Your Honor.

15                   THE COURT:  And you brought no one; right?

16                   MR. MANION:  Yes, Your Honor.

17                   THE COURT:  And let me ask you a bit about barracks

18   issues.  My understanding on the barracks issue is that

19   there's a privacy concern?

20                   MR. MANION:  Yes, Your Honor.

21                   THE COURT:  Okay.  And the way that the EO addresses

22   whether someone goes into female or male is based on their

23   reproductive systems; right?  Whether their reproductive

24   system has -- generates sperm or eggs; right?

25                   MR. MANION:  I believe that's right, Your Honor.

```
1              THE COURT:  Okay.  That's not the only way that we
2      look at people's sexes; right?  I mean, scientists at least
3      don't just look at reproductive sex, they also look at
4      anatomical sex and they look at chromosonal sex; right?  I
5      understand that's not what this policy does, but do you know
6      that?
7              MR. MANION:  I don't know either way, Your Honor.
8              THE COURT:  Okay.  Do you know that there are
9      intersex persons who have both male and female reproductive
10     tissue in the same person?
11             MR. MANION:  I don't know the science on that, Your
12     Honor.
13             THE COURT:  Okay.  Just take my word for it.
14             MR. MANION:  Okay.
15             THE COURT:  They exist.  Where would we put them?
16     Would we put them in the male barracks or the female barracks?
17             MR. MANION:  I don't know, Your Honor.
18             THE COURT:  Okay.  Presumably we would put them in
19     the sex that they look most like maybe; right?  Your person
20     wants to talk to you.  Someone wants to talk to you.
21             MR. MANION:  May I have a moment, Your Honor?
22             THE COURT:  Yeah.
23             MR. MANION:  Your Honor, we may have a answer to
24     this at the Monday stage in a declaration.
25             THE COURT:  Okay.  I mean, it doesn't need to be in
```

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    a declaration, but okay.

2            MR. MANION:  We have an understanding, but I'm not

3    firm enough in it to make a representation.

4            THE COURT:  Okay.  You understand that there are

5    some individuals who have one reproductive sex, and a separate

6    opposite anatomical sex?  So there's someone who can -- who

7    can create -- their reproductive system would, if working

8    properly create sperm.  And I don't know enough to know if

9    they do or don't, would have an anatomical female structure in

10   the reverse, that someone can have a female reproductive

11   structure, but look anatomically male, or close to male?

12           MR. MANION:  I don't know the answer to that, Your

13   Honor.

14           THE COURT:  Okay.  Assume with me that I'm right

15   about this.  That person would presumably be put in the male

16   barracks; right?  I mean, we wouldn't put that person in the

17   female barracks based on their reproductive system, that

18   wouldn't make any sense.  We would put them in the male

19   barracks; right?

20           MR. MANION:  I don't know the answer to that, Your

21   Honor.  If there is one we will attempt to provide that.

22           THE COURT:  Okay.  But if the concern is privacy,

23   where would we put that person?  What's the privacy concern?

24   It's not reproductive system someone has, it's what anatomical

25   sex someone has; right?

1              MR. MANION:  Again, Your Honor, I don't know the

2       answer to where someone you're describing --

3              THE COURT:  I'm asking as a matter of logic.

4              MR. MANION:  I don't have an answer, Your Honor.

5              THE COURT:  Okay.  I had a clerk last year different

6       from Sam, he was called Sam.  Ironically, a Jon replaced a Jon

7       and a Sam replaced a Sam.  If I wanted you to tell me what sex

8       Sam is, or if you wanted to know, and I didn't understand the

9       words male and female, what would you ask me?

10             MR. MANION:  I don't know, Your Honor.

11             THE COURT:  Would you ask me, well, do their

12      reproductive systems create eggs or sperm?  Or would you ask

13      me what does the person look like?

14             MR. MANION:  I don't know, Your Honor.

15             THE COURT:  Okay.  Ms. Levi?

16             MS. LEVI:  Yes, Your Honor.

17             THE COURT:  How would you find out if Sam who worked

18      for me last year is a male or female.

19             MS. LEVI:  I imagine someone would ask about their

20      physiology.

21             THE COURT:  Okay.  Thank you.  If we have people who

22      are post transition, and their anatomical being is similar, a

23      trans man, what's the problem with putting that person in male

24      barracks?  And what's the problem with putting a woman who

25      has -- a man who has transitioned, a trans woman into female

1    barracks in terms of privacy concerns?  Their anatomical sex

2    is now consistent with the sex that they've been put into the

3    barracks.  What's the privacy concern?

4              MR. MANION:  I don't have an answer to that.

5              THE COURT:  Is there an answer to that, other than

6    none?

7              MR. MANION:  Can I have a moment?

8              THE COURT:  Yeah.  Sure.

9              MR. MANION:  Thank you.

10             MR. MANION:  I don't have an answer to that, Your

11   Honor.

12             THE COURT:  Okay.

13             All right.  I think maybe Ms. Levi can address this.

14   Ms. Levi, I do want to talk to you about a few things.

15             I know it's not easy to be up here for hours getting

16   questions from a judge, but thank you for doing it.  And thank

17   you for preparing.  And welcome to your team.

18             MR. MANION:  Thank you, Your Honor.

19             THE COURT:  All right.  Ms. Levi I'm still not quite

20   sure what was allowed under the Austin policy in terms of

21   service.  Am I right that with respect to people in the

22   military that people who had been diagnosed with gender

23   dysphoria, who were in treatment for gender dysphoria, and who

24   had a medical plan to transition, were treated as their, for

25   lack of a better word, biological sex until their transition,

1    at which time they could change their marker in DEERS?

2         MS. LEVI:  Under the retention policy, a transgender

3    person who gets a diagnosis for gender dysphoria gets a

4    medical treatment plan, and they would get an exception to

5    policy to allow them to live consistent with the target sex.

6    And then when they completed that transition plan, they change

7    their DEERS marker.  My understanding is during the period,

8    during transition, that there were accommodations made to

9    allow people to live consistent with the target sex.  And then

10   after the DEERS marker change, people lived consistent with

11   the DEERS marker.

12        THE COURT:  Okay.  And with respect to privacy

13   concerns, like bunking or showers or whatever, who takes

14   care -- like if I have a concern, I don't want to shower next

15   to a trans woman, who would I -- like, how would that get

16   resolved, do you know?

17        MS. LEVI:  Yeah, I mean, there's a transgender

18   handbook which is in the record which explains that command

19   can take into account the daily experiences that people need

20   to be addressed to ensure people's privacy.

21        THE COURT:  So if the issue is I don't want to

22   shower with a trans woman, the commander could just have the

23   trans woman shower at different time or shower in different

24   barracks or whatever; right?

25        MS. LEVI:  There could be accommodations made, yes,

Your Honor.

THE COURT:  I mean, this isn't an insolvable problem?

MS. LEVI:  My understanding it's been a very solvable problem and there haven't been issues raised, concerns raised.

THE COURT:  Okay.  Let's talk scope of the injunction for a moment.  My understanding is that you -- what exactly do the plaintiffs want?

MS. LEVI:  We're asking this court to enjoin the executive order, the implementation of it pursuant to the February 26th guidance, and all of the documents and policies that have issued to carry out the directives under the executive order.

THE COURT:  Okay.  But I thought -- the defendants said in their opposition that you want me to deal with deployability issues.  Or what was it that you guys think I shouldn't deal with?  Because I tend to agree with them, I can't tell the Army how to deploy people.  It was in your opposition I saw.

MR. MANION:  Yeah, I would just point you to the -- I would just point you the *Navy Seal v. Austin* Supreme Court decision where the solicitor general asked the Supreme Court to vacate an injunction.  And there's very specific language in there, we would ask for that, Your Honor.

1          THE COURT:  All right.  Do you know what I'm talking

2     about?  Do you know what he's talking about?

3          MS. LEVI:  Yes, I do, Your Honor.  We're asking the

4     Court to enjoin the executive order and the implementation

5     guidance and all of the policies that have been developed

6     pursuant to it.  We're not asking this Court to interfere with

7     the day-to-day operations of the military beyond enjoining all

8     of the directives that carry out the order that precludes

9     transgender people from serving, and that also subjects them

10    to serving under a policy that deems them unfit for serving

11    because of who they are.  And that would include issuing an

12    injunction that prohibits the -- all of the directives that

13    have been issued by the military to carry out the executive

14    order.

15         THE COURT:  Pending the -- pending the permanent

16    injunction or someone above me saying I was wrong.

17         MS. LEVI:  Yes, Your Honor.

18         THE COURT:  All right.  If I do that.  And why

19    should I enjoin the -- if you want to be heard on this I'm

20    happy to have you talk on this.  If I enjoin, why shouldn't I

21    just enjoin as to the plaintiffs, why should I enjoin the

22    whole thing?

23         MS. LEVI:  Well, the problem is that the executive

24    order and all the directives subject individuals to terms of

25    service that demeans them, that calls into question their

1    integrity, and that there's no way to issue an order that

2    singularly applies to them, which doesn't defeat their -- both

3    their safety and their ability to carry out their jobs.  And I

4    think that some of the examples that we've seen already

5    transpire, where people have been pulled from combat, have

6    been pulled from their positions, has seriously eroded their

7    ability -- their integrity.  I mean, what service members rest

8    upon is other people's faith and confidence and belief in

9    them.  And that to continue to serve under an order that deems

10   them unfit for service because of who they are irreparably

11   harms them in multiple ways.  And we ask the Court to enjoin

12   the order and all of these policies, because it's the only way

13   to provide relief to the individuals in the case.

14            THE COURT:  All right.  What about the -- I'm -- the

15   defendant's argument which is not -- I'm not quite sure that

16   it matters at the end of the day, but they say that I can

17   enjoin the policy, but not the executive order.  On what basis

18   can I understand -- that's my understanding is that your

19   argument?  Okay.  I got a thumb's up from counsel.  All right.

20   So what about that.

21            MS. LEVI:  All right.  The February 26th memorandum,

22   which is issued subject to the February 7th directive to carry

23   out the executive order incorporates the terms of the

24   executive order, as do all of the policies that the defendants

25   have continued to file with this Court.  And I'm happy to

1    go and read them --

2            THE COURT:  No, I don't want you to do that.

3    Please, God, don't.

4            MS. LEVI:  In any case, the plaintiff's position is

5    they are completely integrated.  And all of the directives

6    that have been issued incorporate and reference the executive

7    order, including of course the definition of sex, that has

8    been incorporated into the February 26th memorandum as well.

9            THE COURT:  I take it if I don't enjoin the

10   executive order, if I enjoin anything, if I don't enjoin the

11   executive order, then the secretary of defense could just do

12   again what he did here or something close to it; right?  He

13   would still be under orders to do that?

14           MS. LEVI:  Yes.  Definitely that is still the case.

15   And also transgender service members will continue to be

16   serving under an order that deems them unfit for service for

17   all of the reasons that you've already read.  And that does

18   interfere with their ability to be able to serve.  And I also

19   want to say that it is a constitutional injury to them, which

20   is not just abstract.  It is actually the harm that erodes

21   their ability to serve.

22           THE COURT:  All right.  Do you want to be heard on

23   the scope issue?

24           MR. MANION:  No.

25           THE COURT:  Okay.  All right.  Thank you, everyone.

1      Especially thank you to the government, I know that is --

2              MS. LEVI:  I'm sorry, Your Honor, can I -- I just

3      wanted one thing for the record, because this came up and it

4      may be briefed on Monday, but I want to be clear that there is

5      a definition of transition that is in the record, which is in

6      ECF 13-25.  And it's very clear that it includes the period of

7      time when individuals change from the gender role associated

8      to their sex assigned at birth to a different gender role.

9      And that involves social transition as well as medical

10     transition.  And I just want to point the Court to page 22 of

11     23 of document 13- --

12             THE COURT:  What document was that?

13             MS. LEVI:  It's document 13- --

14             THE COURT:  No, what is the document?

15             MS. LEVI:  I'm sorry, that's the Department of

16     Defense instruction 1300.28, which is the policy by which

17     transgender people have been authorized to transition in

18     service.

19             THE COURT:  The Austin policy?

20             MS. LEVI:  Correct.

21             THE COURT:  Okay  And if I enjoin -- if I enjoin

22     I'm just going to -- my understanding is that I enter a status

23     quo as of January 19th injunction, because that was the last

24     time the parties didn't dispute this issue; right?

25             MS. LEVI:  Yes.  That would be plaintiff's

1    position.

2           THE COURT:  Is that correct for the Government?

3    Thumb's up.  Okay.  All right.

4           MS. LEVI:  Thank you, Your Honor.

5           THE COURT:  No one hold me to what I'm about to say,

6    I will repeat, underline, italicize, and bold that.  My strong

7    hope is to get an opinion out in this case on either March

8    18th or March 19th.  If that is going to get pushed back for

9    any reason, I will let the parties know by email.  If I enter

10   an injunction, I will give the -- I will stay on my own motion

11   the injunction for a period of about 48 hours.

12          If -- could you please talk to my former partner and

13   good friend, the Interim Solicitor General, Sara Harris, or

14   whoever's going to be handling the appeal if I enter an

15   injunction, to sort of think about that in terms of their

16   workload for next week.  And if whenever I issue the decision

17   you all find, if I grant the injunction, that you need more

18   than 48 hours to file an emergency stay, just reach out to

19   chambers.  I'm willing to go longer if I think it's actually

20   needed.  But I'm certainly not going to go past the 25th,

21   okay?  If I enter an injunction.  All right?

22          MS. LEVI:  May I ask a question.  Plaintiffs would

23   just like to know if the minute order that the Court entered,

24   and I don't remember now if it's February 5th or February 7th,

25   but to alert the plaintiffs and the Court to significant -- or

1    to changes in the --

2              THE COURT:  That still applies.

3          MS. LEVI:  Okay.

4              THE COURT:  Oh, they filed something, apparently one

5    of the plaintiffs got a notice of something that wasn't put on

6    the docket.  Can you all just talk to them.  I'll put that on

7    the docket, just to make sure you guys are keeping each other

8    updated on things.

9          MS. LEVI:  Yes, definitely we will -- we will notify

10   defendants if we know of any changes that the plaintiffs

11   experience.  But I'm asking because we haven't always been

12   notified in advance and people are under pressing

13   circumstances at the moment, people have been withdraw from

14   deployments.

15             THE COURT:  I understand.  I mean, look, I think the

16   lawyers in front of me are acting in good faith.  I think that

17   their clients, so far as I can tell, are acting in good faith

18   with respect to notifying you all of updates.  You know, life

19   comes at you fast and things happen very quickly.  I'm sure

20   there are times they just don't have the time to give you

21   notice before things happen.  You guys just do your best.

22   Okay?

23             All right.  Same thing happens, if anything happens

24   and you need my attention just reach out by email or phone and

25   I'll get -- as you know, I'll get on it right away.  Okay.

1            All right.  Thank you, everyone.

2            (The proceedings were concluded at 4:41 p.m.)

3

4            I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
record of proceedings in the above-entitled matter.

5

6            _____/s/_____
                     Christine T. Asif
                     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
April 2018.
  127:17.
February 19th
  35:8.
February 19th,
  32:7,
  35:15.
February 26th
  204:12,
  206:21,
  207:8.
February 5th
  209:24.
February 7th
  206:22.
February 7th,
  209:24.
January 1, 2016
  174:13.
January 10,
  2025,
  174:6.
January 19th
  208:23.
January 2016
  173:25.
January 28th,
  186:21.
March  209:8.
March 18th
  209:7.
March 25th,
  156:4.
March 26th
  16:4.
May  199:21,
  209:22.
May 14th, 2021,
  174:13.
May 2021
  173:25.
#11548 1:35.
$10 151:23.
$15 146:1,
  174:14.
$42 153:24.
$5.2 153:23.
$52 143:16,
  151:17,

  174:20.
.
.
.
< 0 >.
0.14 175:25,
  177:12.
00 156:17,
  165:2,
  184:4.
000 57:15,
  143:18,
  148:5,
  175:11,
  175:12,
  176:2,
  176:4.
005 147:13.
0057 147:20.
02108 1:30.
02110 1:47.
06 155:22,
  155:24.
084 143:16.
.
.
< 1 >.
1 6:20, 7:1,
  7:5, 7:8,
  9:3, 44:7,
  64:9, 84:1,
  93:10, 93:11,
  95:6, 145:11,
  149:9, 156:5,
  174:16,
  175:1, 175:4,
  175:22,
  176:2, 176:4,
  176:22.
1.3 175:4,
  175:8,
  175:13,
  175:25.
10 11:5, 26:17,
  26:18, 29:17,
  29:18, 37:4,
  47:16, 55:3,
  57:15, 67:25,
  73:3, 78:19,
  144:11,
  147:12,

  148:5, 153:8,
  156:5.
10:30 a.m.
  1:13.
11 37:3, 37:4,
  67:12, 68:13,
  70:22, 72:24,
  73:1, 73:2,
  78:17,
  78:19.
1100 1:40,
  2:16.
12 40:8, 40:9,
  67:12, 68:13,
  70:22, 72:25,
  93:11,
  126:25.
1220 1:41.
13 11:4,
  115:23.
13- 208:11,
  208:13.
13-10 11:4.
13-25 208:6.
130-page 83:6,
  84:14.
1300.28
  208:16.
134 102:25.
14 53:25,
  143:20,
  176:15.
1401 1:34.
15 67:22,
  67:24,
  143:18,
  143:19.
153 103:4.
18 1:28, 74:3,
  79:22,
  165:10.
189 175:21.
19 90:8.
19th 96:21,
  209:8.
.
.
< 2 >.
2 7:3, 7:13,
  7:16, 8:16,

  9:3, 12:5,
  51:5, 53:21,
  69:13, 84:19,
  98:21,
  145:11,
  149:9,
  175:11,
  175:12.
20 29:18,
  155:23,
  165:10,
  197:23.
2000 92:19.
20001 2:44.
20003 1:42.
20005 2:17.
2015 143:16,
  145:17,
  145:20.
2016 150:2,
  175:3.
2017 5:11,
  5:20, 5:22,
  6:13, 7:20,
  8:21, 9:4.
2018 5:12,
  7:21, 8:22,
  9:4, 10:18,
  92:19, 99:1,
  99:3, 123:17,
  135:22,
  149:7, 150:2,
  150:4, 178:6,
  178:10,
  179:14,
  181:6,
  181:8.
202 2:45.
2021 40:3,
  79:5, 79:6,
  79:11, 82:7,
  82:8, 136:4,
  179:14,
  181:9.
2022 174:21.
2024 143:16,
  145:17,
  145:21,
  147:5,
  147:13,

147:20,
153:1,
174:21.
2025 1:11,
29:23, 30:16,
38:20, 82:8,
115:18,
117:17,
118:12,
122:2,
181:10.
20530-0001
2:10.
21 14:1.
21st 1:34.
22 134:1,
155:24,
208:10.
221 38:17.
23 53:23,
208:11.
24 35:22,
41:21, 41:23,
54:22, 54:25,
55:10, 56:3,
59:15, 62:22,
63:15,
64:2.
24-month 40:13,
41:4, 62:19,
63:3, 63:4,
63:9.
24/7 169:7.
25 71:7.
25-0240-ACR
1:6.
25-240 3:2.
25th 209:20.
28 74:3.
29 115:22.
.
.
< 3 >.
3 51:7, 51:8,
62:9, 143:19,
145:11,
149:9,
155:22,
155:23,
155:24,

174:22.
30 18:18, 55:7,
80:16, 88:3,
131:25,
132:24,
156:4.
320 175:4.
333 2:43.
354-3247
2:45.
36 79:15,
166:22,
171:23.
36-month
79:18.
38 124:9.
39 64:7.
3X 177:25.
.
.
< 4 >.
4 51:16, 69:8,
69:9, 145:13,
211:2.
40 37:3, 40:11,
41:21, 42:12,
42:18, 50:23,
55:14, 56:3,
58:10, 62:18,
62:21, 63:12,
64:19,
64:20.
407 143:16.
41 84:15,
178:21,
211:2.
42 37:4,
153:1.
43A 162:13.
43B 162:13.
45 93:10.
46 93:11.
48 209:11,
209:18.
.
.
< 5 >.
5 58:14, 58:17,
156:17,
165:2.

5.2 147:18,
153:2, 153:7,
154:7,
174:24.
50 42:16,
42:17, 53:22,
53:24,
72:24.
50-something
13:17.
52 144:10,
147:7,
147:12,
153:4, 153:5,
153:8,
174:23.
52-1 124:20.
54 74:2.
55 115:21.
57 93:11,
147:12,
147:19,
147:25.
58 126:23.
5:00 171:16.
5th 91:11.
.
.
< 6 >.
6 175:4.
60 54:21,
54:24,
72:24.
613003
193:11.
628 193:11.
630 175:4.
65a 1:46.
66 136:20,
136:25,
161:14,
161:16,
161:18,
174:7,
193:4.
6th 172:13.
.
.
< 7 >.
7 59:24, 60:3,

80:16.
70 72:24.
73-23 69:8.
73-7 178:20.
.
.
< 8 >.
8 73:20, 154:3,
174:3.
80 41:23,
42:15.
81-2 126:17.
81-5 102:25.
83 103:14.
892 174:16,
175:1,
175:22,
176:22.
.
.
< 9 >.
9 73:2, 153:11,
154:3,
184:4.
918 147:5.
950 1:29,
2:9.
95811 1:36.
[sic] 41:2.
_____/s/___
_____
211:8.
.
.
< A >.
a-okay 26:3.
a.m. 37:4.
abide 13:25,
82:1.
ability 34:21,
46:4, 206:3,
206:7,
207:18,
207:21.
able 22:16,
30:17, 32:2,
33:17, 33:20,
51:1, 51:2,
57:14, 59:25,
114:12,

128:13,
167:4,
167:17,
167:22,
171:24,
172:1,
173:10,
173:11,
188:12,
191:24,
207:18.
above 51:10,
73:21,
205:16.
above-average
42:20.
above-entitled
211:6.
above. 58:16.
absence
185:8.
Absent 14:1,
29:20,
161:11,
163:19,
163:20,
163:21,
164:5,
165:16.
Absolutely
87:13,
94:16.
abstract
207:20.
abundance
98:23.
abuses
122:16.
accept 66:14,
129:22,
134:9, 152:9,
184:24.
accepting
154:2.
access 137:7.
Accession 40:4,
95:2,
103:5.
accommodate
157:19.

accommodation
128:15,
130:16,
130:18.
accommodations
131:3, 131:5,
203:8,
203:25.
According
11:13, 11:14,
11:16, 90:7,
119:12.
account 9:19,
9:23, 20:25,
23:5, 23:18,
31:19, 58:3,
117:2,
203:19.
accoutrements
107:4.
accurate 46:25,
184:20.
accurately
65:16, 66:2,
80:4.
acronym 40:2.
across 43:16,
45:10, 45:17,
45:18,
130:9.
acting 58:2,
210:16,
210:17.
action 3:2,
37:11, 37:13,
37:20, 37:21,
39:11, 40:9,
40:21, 41:10,
62:9, 62:16,
66:18, 67:4,
86:12, 106:2,
109:3, 116:5,
116:6,
136:12,
161:22,
181:12.
active 39:6,
39:7, 129:25,
130:3,
143:17,

161:10,
174:16,
175:1, 175:4,
175:13,
175:24.
actively
159:6.
activists
158:11.
Activity
40:5.
actual 43:25,
47:21, 68:1,
68:6, 71:12,
72:4, 81:16,
86:2, 107:15,
109:4, 112:4,
137:25,
180:8.
ad 115:15,
118:4.
adamant 184:13,
185:24.
add 66:3, 76:1,
77:8, 96:3,
160:10,
188:21.
addition 4:4.
additional
9:21, 9:22,
16:7, 40:14,
41:5.
Additionally
40:10, 41:1,
62:12,
62:17.
address 33:13,
33:17, 46:5,
79:24,
101:21,
117:23,
182:14,
186:4,
202:13.
addressed
50:11,
117:24,
203:20.
addresses
198:21.

addressing
175:7.
adhere 167:4,
167:17,
172:1.
adjective
195:16,
195:18.
administration
79:11, 82:21,
83:5, 84:17,
86:8, 87:7,
87:12, 91:17,
123:5,
128:10,
131:22,
132:6,
132:11.
Administrative
46:5, 48:13,
48:23, 75:12,
84:5, 85:6,
85:22, 86:12,
86:23,
104:20,
164:8, 165:6,
184:16,
185:5,
185:8.
adopt 64:16,
110:22.
adoption
187:5.
advance
210:12.
adverse 70:6,
75:19, 77:14,
78:10.
Advocates
1:27.
Affairs 124:15,
143:15.
affirming
116:4,
172:25,
174:6,
174:15,
174:23.
afflicted
158:10,

158:15.
afforded 91:10,
  115:2.
afield 112:18,
  112:20.
afternoon
  30:6.
agencies 85:24,
  85:25, 86:4,
  112:5.
agency 86:12,
  86:20,
  112:3.
agendas 157:19,
  158:5.
aggregate
  146:11.
ago 88:18,
  156:3,
  178:15.
agreed 12:14,
  32:12,
  158:22,
  185:11,
  185:12.
Ah 172:11.
ahead 14:4,
  15:4, 81:11,
  88:16, 92:3,
  96:7, 97:2,
  112:21,
  114:21,
  133:16,
  140:25,
  141:2,
  179:7.
aimed 89:25,
  90:24,
  91:2.
Air 56:25,
  107:14,
  130:11,
  152:7.
al 3:3.
album 109:18,
  109:19,
  112:9,
  112:10,
  112:13,
  114:3, 114:5,

114:7,
  114:9.
albums
  109:19.
alert 209:25.
align 25:7.
aligns 25:5.
allege 162:8,
  162:9.
allow 33:5,
  120:18,
  168:1, 203:5,
  203:9.
allowed 79:15,
  202:20.
allowing 131:1,
  150:1.
almost 135:2,
  154:3.
alone 48:14,
  48:23, 52:14,
  52:16, 56:4,
  135:18,
  147:14,
  187:17.
already 6:4,
  58:21, 97:15,
  97:22, 98:4,
  117:2, 117:4,
  117:14,
  118:7,
  122:20,
  133:6, 139:7,
  141:5,
  142:22,
  144:5, 148:2,
  206:4,
  207:17.
alternate
  63:2.
Although 88:9,
  110:2, 172:7,
  194:17.
amend 162:16.
amended
  38:10.
Amendment
  91:11, 98:3,
  105:23,
  140:6,

141:3.
American 21:1,
  91:11, 123:6,
  132:18.
Among 8:24,
  37:25, 40:7,
  66:23, 70:7,
  70:15, 71:11,
  73:23,
  115:24,
  181:13.
Amongst 51:11,
  53:23, 55:20,
  73:18.
amount 52:4,
  52:5, 79:19,
  86:11,
  145:16,
  145:20,
  169:1,
  172:18.
amounts 90:5.
AMSARA 30:7,
  30:8, 30:15,
  35:21, 36:3,
  36:4, 36:6,
  37:5, 39:25,
  95:16, 95:21,
  118:3, 150:9,
  181:9.
Ana C. Reyes
  1:17.
Analysis.
  46:22.
analyze 31:9.
analyzed 28:13,
  28:17, 28:21,
  59:22,
  80:4.
analyzes
  114:17.
analyzing
  27:12, 97:20,
  121:19,
  121:21.
anatomical
  199:4, 200:6,
  200:9,
  200:24,
  201:22,

202:1.
anatomically
  200:11.
and/or
  151:20.
animals
  198:3.
animated
  142:6.
animus 28:3,
  28:4, 32:4,
  88:12, 98:8,
  98:9, 98:17,
  98:19, 99:15,
  99:17, 99:20,
  133:9, 139:8,
  142:12,
  142:15,
  152:12,
  154:12,
  156:12,
  156:13,
  190:10,
  192:22,
  194:5, 194:8,
  194:13,
  194:17,
  194:21,
  194:25,
  196:4,
  196:8.
announced
  5:21.
answering
  101:19,
  151:6,
  151:7.
answers 103:17,
  161:19.
anybody 33:24,
  170:20.
Anyway 48:12,
  57:18, 57:21,
  128:12,
  134:12,
  172:23.
APA 13:1,
  111:24.
Apa-style
  12:25.

apart 112:4.
apogee 106:1.
apologize
   69:12, 93:13,
   153:6,
   184:8.
apparel
   107:4.
Apparently
   119:11,
   175:7,
   210:4.
appeal
   209:14.
Appeals 133:12,
   154:14.
appear 69:16,
   184:10.
APPEARANCES
   1:21, 2:1.
appeared
   93:18.
appears 52:7,
   85:14,
   194:11.
appease
   158:11.
applicable
   167:4,
   172:2.
applicant
   69:17.
applied 92:20,
   92:23, 98:7,
   121:12.
applies 140:13,
   161:6, 206:2,
   210:2.
apply 27:19,
   46:4, 97:23,
   100:14,
   139:20,
   140:7.
applying 93:5,
   110:23.
appreciate
   13:5, 95:24,
   103:19.
approach
   94:10.

appropriate
   84:6, 85:8,
   93:5, 97:13,
   139:9,
   172:23.
appropriated
   147:5.
appropriation
   147:13.
approximated
   110:12.
approximately
   116:1,
   174:14.
area 28:6,
   90:5,
   172:19.
areas 93:7,
   166:25.
arg- 29:4.
argue 26:13,
   26:14.
argued 101:1,
   194:13.
argument 21:11,
   21:14, 53:2,
   72:22,
   101:15,
   196:12,
   196:15,
   196:16,
   197:5,
   206:15,
   206:19.
arguments
   194:8,
   194:10.
arm 76:4.
armed 31:12,
   158:9,
   158:14,
   161:23,
   162:2,
   175:9.
armies 106:3.
Army 117:5,
   204:19.
around 46:6,
   54:21, 56:22,
   56:23, 57:2,

57:11, 57:12,
   90:13, 99:20,
   142:12.
article 18:16,
   18:24, 83:6,
   83:7, 84:4,
   84:7, 84:14,
   84:23, 85:17,
   85:18,
   92:13.
articulate
   134:15.
articulated
   133:20.
ascension
   117:1.
aside 112:3,
   141:22,
   145:6,
   164:12,
   164:13,
   167:19.
Asif 2:41,
   211:4,
   211:9.
aspersions
   139:2,
   152:22,
   189:22.
assertion
   81:15,
   107:14,
   155:7,
   187:16,
   187:17.
assess 56:19,
   56:20,
   113:12,
   162:12.
assessed
   122:20.
assessing
   100:1.
assessment
   21:2,
   101:4.
assessments
   136:2.
assigned
   208:8.

assignment
   103:12.
Assistant
   124:14,
   143:14.
associate 4:7,
   168:18.
associated
   15:19, 38:15,
   143:25,
   144:1, 144:2,
   167:5, 172:2,
   173:1,
   208:7.
associates
   23:17.
Assume 5:5,
   23:7, 34:16,
   38:11, 64:4,
   74:18, 74:20,
   90:23, 98:8,
   109:8, 110:4,
   116:14,
   116:19,
   122:25,
   130:20,
   158:22,
   162:20,
   164:19,
   169:4,
   175:10,
   175:11,
   175:21,
   179:17,
   195:13,
   200:14.
assumed 64:1,
   122:5.
Assuming 4:20,
   97:3, 116:17,
   147:18,
   164:18,
   165:4,
   167:14,
   172:24,
   173:7, 175:9,
   180:16.
assured 94:10,
   94:11.
Atlantic

1:46.
attached 36:9,
  36:15,
  174:7.
attachment
  174:4.
attacks
  104:11.
attempt 115:23,
  169:5,
  169:23,
  171:5,
  172:10,
  200:21.
Attempted
  17:10, 23:13,
  115:22,
  117:3, 167:1,
  169:13,
  169:16,
  169:18,
  169:19,
  169:21,
  170:25,
  171:25.
attention
  102:8, 127:3,
  128:4,
  210:24.
attorney
  103:8.
attorneys
  93:22.
attrition 70:6,
  70:10, 75:19,
  78:10.
attrition.
  77:14.
Austin 38:8,
  79:9, 79:13,
  79:14, 80:3,
  82:12,
  149:15,
  202:20,
  204:22,
  208:19.
authority
  106:2.
authorized
  208:17.

authors
  49:23.
automatic
  166:20.
automatically
  60:23.
availability
  46:25.
available 42:7,
  42:9, 43:1,
  55:17, 59:1,
  62:25, 78:5,
  83:24, 89:12,
  90:7,
  129:16.
Avenue 1:46,
  2:9, 2:43.
average 42:16,
  58:24, 59:7,
  120:1, 145:2,
  153:8,
  174:22,
  174:24.
averaging
  153:7.
awards 131:6,
  176:19.
aware 18:2,
  18:13, 50:20,
  60:18, 60:20,
  61:2, 61:4,
  61:12, 67:14,
  100:9,
  108:13,
  127:22,
  130:25,
  163:2,
  167:10,
  172:6.
away 31:9,
  45:14, 57:15,
  112:5, 121:6,
  146:19,
  146:23,
  146:25,
  158:5,
  210:25.
.
.
< B >.

back 5:11,
  36:24, 37:3,
  62:6, 66:18,
  84:16, 93:10,
  97:3, 97:4,
  126:13,
  129:2,
  137:25,
  145:10,
  148:7,
  149:19,
  150:3,
  155:20,
  155:23,
  156:18,
  156:19,
  161:2, 164:1,
  165:24,
  166:1, 173:1,
  180:25,
  186:5, 193:3,
  194:25,
  209:8.
back-to-back
  108:5.
background
  44:9.
bad 35:3,
  172:20.
ban 5:22,
  22:15, 24:2,
  25:22, 25:23,
  26:2, 27:19,
  91:24, 103:5,
  120:3, 120:4,
  120:19,
  149:25,
  170:12.
banned 24:10.
bans 22:7,
  23:8, 23:10,
  168:16.
barely 197:1.
barracks
  198:17,
  198:18,
  199:16,
  200:16,
  200:17,
  200:19,

201:24,
  202:1, 202:3,
  203:24.
Barrett 4:9,
  4:17.
barring
  195:10.
base 95:12,
  102:15.
based 16:16,
  61:21, 63:22,
  64:1, 79:23,
  80:13, 87:19,
  88:3, 88:5,
  91:21, 100:3,
  105:21,
  106:14,
  135:16,
  136:1, 138:3,
  139:1,
  140:18,
  141:12,
  141:15,
  155:7,
  162:18,
  163:15,
  166:21,
  173:20,
  175:23,
  180:9,
  198:22,
  200:17.
bases 17:8.
basic 186:6.
Basically
  15:16, 16:18,
  29:3, 34:20,
  35:5, 108:4,
  110:1,
  127:11,
  142:12,
  151:15,
  159:24,
  159:25,
  165:15,
  168:4,
  168:16,
  192:24.
basis 7:19,
  18:18, 55:18,

91:3, 99:17,
100:14,
103:8,
110:11,
111:4,
111:10,
111:11,
111:15,
111:21,
111:23,
112:25,
113:18,
114:19,
129:21,
166:7,
172:14,
193:14,
194:13,
197:25,
206:17.
bat 47:4.
battle
102:15.
began 63:23,
63:24.
begin 18:17,
162:11,
164:20.
beginning
196:16.
begins 46:19,
46:22.
begun 6:4.
behaving
116:25.
behavioral
193:12.
behind 61:6,
125:19,
179:12,
196:11.
belief 57:1,
103:9,
206:8.
below 53:21,
54:14.
bench 92:19,
129:10.
Bernstein 1:44,
1:45, 3:18.

beside 81:21.
besides
98:19.
best 8:4, 9:25,
19:24, 63:22,
81:7, 151:10,
151:12,
155:14,
210:21.
bet 150:4.
better 33:17,
33:20, 52:23,
119:1,
119:22,
162:24,
167:19,
177:15,
202:25.
Beyonce 109:13,
109:18,
112:9,
112:12,
114:3, 114:7,
114:8,
114:25,
137:15.
beyond 176:6,
205:7.
bias 196:22.
Biden 79:11,
179:5.
big 25:21.
billion 147:5,
147:8.
binding
98:22.
biological
13:25,
118:23,
122:14,
159:9,
159:12,
159:14,
159:19,
160:9,
160:18,
160:22,
167:18,
168:10,
168:21,

168:22,
173:2, 175:5,
184:11,
185:10,
202:25.
biologically
172:15.
biology 172:17,
192:5.
Bipolar 89:20,
89:21, 89:22,
91:18.
birth 103:13,
169:14,
208:8.
bit 5:12,
13:13,
108:23,
108:25,
109:2,
198:17.
blah 39:8,
190:12.
bless 20:15.
blindly 86:24,
87:17, 88:23,
89:3,
109:24.
board 43:16,
164:8,
164:9.
Bob 58:1, 58:2,
58:3.
bold 209:6.
bones 74:19.
bonuses
165:24.
book 197:19.
books 58:13,
131:6,
131:7.
born 138:6.
Boston 1:30,
1:47.
bother 43:6.
bottom 96:9,
194:6.
bounds
114:12.
branches

16:1.
break 35:25,
36:1, 60:1,
81:6, 82:9,
83:15, 89:1,
92:7, 92:8,
92:11,
144:19,
149:4, 149:5,
150:11,
155:17,
155:19.
brief 3:19,
84:10, 89:17,
124:3, 124:7,
136:11,
150:13,
172:17.
briefed 101:1,
208:4.
briefing
101:14,
182:19,
185:23.
briefly
194:4.
briefs 13:18,
96:22,
197:11.
brilliant
4:22.
bring 61:22,
87:12,
139:16,
198:12.
broad 17:19,
121:13.
broader
121:8.
broke 73:17,
74:10.
Bronze
176:18.
Brooke 2:14.
brought 109:2,
126:10,
186:8,
198:15.
Brown 31:14,
50:3, 50:5,

50:10, 50:11,
50:13, 102:2,
102:6, 103:1,
103:17,
152:15.
budget 144:16,
148:1.
building
165:19.
bullet 38:19,
38:24.
bunch 83:2.
bunking
203:13.
burden 97:19.
burdens 40:15,
41:6.
Business 44:21,
44:22, 44:24,
45:9, 45:16,
45:20.
.
.
< C >.
C. 1:12, 2:12,
2:44, 6:19,
7:2, 7:8,
7:13, 7:16,
7:23, 12:3,
12:5, 12:8,
13:8,
26:14.
CA 1:36.
calculator
147:11.
call 39:25,
102:8,
123:25,
129:9,
129:21,
185:20.
called 57:6,
195:13,
201:6.
calling
188:11.
calls 137:11,
205:25.
calm 104:10.
campaign 25:10,

27:12.
capabilities
166:9,
166:13,
169:3.
capture
159:22.
care. 143:20.
career 131:21,
132:1,
165:18.
careful 49:7,
132:21.
carefully
32:11, 32:12,
81:5,
186:15.
carried 99:7.
carriers
130:11.
carry 204:13,
205:8,
205:13,
206:3,
206:22.
Carter 11:8,
11:13, 11:19,
11:21, 38:9,
130:21,
130:25,
149:13,
149:17.
case-by-case
18:18, 60:25,
61:17, 95:8,
166:7.
cases 32:18,
47:10, 48:3,
83:25, 98:2,
111:11,
114:13,
125:4, 128:1,
139:24,
140:4,
141:23,
152:8,
154:14.
cast 152:22.
categories
123:9.

category 68:23,
116:20,
141:17,
141:18,
160:24.
caught 5:5,
5:9, 59:13.
cause 176:18.
caused 123:1.
causes 43:20,
168:14.
CBS 18:16.
Center 1:33,
38:18,
40:4.
certain 54:16,
158:5,
166:10,
188:6.
Certainly 8:6,
12:22, 14:12,
32:5, 38:22,
42:22, 45:2,
86:22, 97:22,
107:12,
108:7, 168:1,
172:8, 180:1,
180:4,
189:18,
209:20.
certify
211:4.
cetera 77:10,
138:21,
162:7,
191:5.
Chair 123:22,
125:12,
125:17,
131:22,
191:16.
Chairman 125:2,
125:9,
127:20,
128:9,
128:20,
131:15,
131:20,
133:20.
challenge

140:7.
challenged.
106:4.
challenges
140:5.
chambers
209:19.
chance 56:12,
96:3, 96:10,
185:23.
change 8:8,
8:23, 9:13,
56:19, 57:23,
108:9,
108:10,
203:1, 203:6,
203:10,
208:7.
changed 7:20,
8:2, 9:12,
12:23, 26:7,
27:1,
163:6.
changes 8:24,
8:25, 57:13,
57:16, 87:12,
87:13, 210:1,
210:10.
character
138:10,
189:21.
characterizatio
n 64:17,
70:24, 71:2,
71:4, 71:10,
71:13, 78:16,
78:22,
154:24,
177:5, 181:7,
189:3,
189:8.
characterize
73:8,
73:10.
characterized
33:9, 34:4,
71:5,
169:11.
characterizes
116:8,

169:19.
charge 34:16,
 170:7.
check 125:19,
 197:13.
checked
 154:19.
cherry 181:5.
cherry-picked
 80:5.
Chevron 85:15,
 85:16, 85:17,
 86:5, 86:6,
 86:7, 86:8,
 87:24, 92:16,
 92:20, 92:24,
 110:3,
 112:2.
Chief 24:19,
 27:1, 27:22,
 28:11, 82:18,
 131:21,
 133:20.
Chiefs 123:22,
 125:2,
 125:10,
 125:13,
 125:18,
 127:21,
 128:9,
 128:20,
 131:15,
 131:20,
 176:17.
childhood
 29:11.
choice 123:12,
 129:16,
 166:2.
choices
 165:15.
choose 65:24.
Christine 2:41,
 211:4,
 211:9.
chromosonal
 199:4.
Circuit 6:19,
 7:2, 7:8,
 7:13, 7:16,

7:23, 12:3,
 12:5, 12:8,
 13:8, 26:14,
 172:14.
circumstances
 12:23, 108:8,
 108:19,
 110:13,
 128:13,
 210:13.
cisgender
 115:25,
 116:2.
Cisneros
 124:1.
citation
 126:18.
cite 10:23,
 65:1, 70:25,
 81:5, 81:7,
 83:24, 84:19,
 91:19,
 123:15,
 124:23,
 125:1, 133:1,
 133:4, 135:2,
 135:5,
 140:21,
 178:2.
cited 29:22,
 36:8, 61:23,
 65:1, 83:4,
 83:6, 85:4,
 88:17,
 109:17,
 109:18,
 112:9,
 123:23,
 132:24,
 160:23,
 168:13,
 169:12.
cites 30:20,
 31:1, 33:22,
 47:15,
 119:21,
 119:23.
citing 89:5,
 135:9.
City 154:20,

154:25.
CIVIL 1:5,
 3:2.
civilian 97:25,
 98:7, 99:24,
 100:12.
claim 111:25,
 115:20.
claimed
 81:14.
clarification
 95:13.
clarify
 173:8.
class 42:8,
 86:23,
 100:13,
 100:22,
 101:7,
 101:13,
 105:5, 105:8,
 153:20,
 153:21,
 172:10.
classes
 141:25.
Classification
 101:9,
 101:13,
 139:13,
 139:19,
 140:6, 146:9,
 172:16.
classifications
 98:3, 140:14,
 140:19.
Clause 17:12,
 91:11,
 160:4.
clear 8:18,
 24:19, 24:20,
 25:17, 25:18,
 80:21, 80:22,
 96:8, 98:12,
 98:13, 102:9,
 107:5,
 107:10,
 133:22,
 139:6,
 156:14,

208:4,
 208:6.
clearly 45:10,
 86:17,
 114:23.
Cleburne
 154:21,
 154:25.
CLERK 3:2,
 10:24, 30:12,
 44:3, 81:5,
 201:5.
clerks 39:1,
 45:5, 89:21,
 104:15.
client 21:22.
clients 16:8,
 16:15,
 210:17.
clinically
 166:23.
close 133:9,
 149:3, 169:9,
 189:15,
 200:11,
 207:12.
closely 6:25.
closest
 155:16.
clue 32:10.
co-counsel
 101:24.
cocktail
 20:23.
code 146:9.
cohesion
 112:14,
 113:10,
 113:11,
 113:20,
 113:21,
 114:2, 114:8,
 124:17,
 125:4,
 127:23,
 128:1,
 128:11,
 128:16,
 128:22,
 131:14,

134:12,
137:21,
138:22,
139:4, 157:2,
157:20,
158:6, 176:5,
176:18,
179:17,
182:25,
190:21,
191:16.
cohesion.
158:13.
cohort-qualifyi
ng 59:16.
cohort. 59:2.
cohorts 52:6,
118:9.
colleague
150:11.
colleagues
36:1, 94:24,
95:16,
149:4.
collecting
179:21.
Collectively
59:14.
COLUMBIA 1:2.
coma 135:6.
combat 206:5.
comes 7:10,
28:8, 55:14,
57:1, 62:13,
149:18,
149:19,
194:5,
210:19.
comfortable
94:9,
103:12.
coming 84:17,
86:24, 87:7,
87:18, 88:3,
121:2,
126:15,
143:11,
164:1,
194:25,
195:11.

command
203:18.
Commander
82:18,
184:15,
203:22.
commanders
185:12.
comment
128:8.
commissioned
79:17.
commitment
187:6,
188:25.
common 76:7.
commonly
73:23.
community 47:9,
48:3,
160:3.
Comparable
74:4, 74:14,
74:15, 74:23,
75:1.
comparator
149:5.
comparators
64:18.
compare 50:24,
51:3, 58:7,
64:13, 118:5,
146:3,
152:14.
compared 50:23,
51:23, 59:10,
59:12, 78:17,
99:24,
115:24,
116:2,
152:17,
152:19,
153:2,
174:19.
compares
51:11.
comparing
88:20,
102:19,
107:20.

Comparison
41:17, 42:5,
51:2, 52:2,
55:19, 56:5,
56:20, 71:22,
77:5, 145:7,
145:19,
146:18,
148:17,
150:16,
152:14,
152:17.
comparisons
67:13, 67:16,
76:24,
144:18,
144:19.
compel 165:6.
compelling
166:7.
competing
82:11, 108:4,
108:20.
complaint
123:25,
163:3,
183:17,
186:20.
complaints
124:16,
134:10,
179:21,
179:23.
completed
146:11,
203:6.
completely
26:6, 102:11,
207:5.
composed
176:16.
comprehend
21:23.
comprehensive
121:23,
135:9.
compromise
185:2,
185:16,
186:9.

computer
83:21.
computer-aided
2:49.
concern 117:13,
119:20,
123:8,
177:11,
198:19,
200:22,
200:23,
202:3,
203:14.
concerned 65:4,
166:10.
concerns
121:16,
202:1,
203:13,
204:6.
conclude
42:12.
concluded
65:18,
211:2.
concludes
63:8.
conclusion
41:9, 41:12,
41:16, 42:10,
42:23, 42:25,
43:3, 47:15,
51:22, 53:7,
63:11, 63:12,
66:11, 73:16,
73:21, 81:3,
99:17,
118:17,
118:21,
137:10,
142:4,
194:23.
conclusions
65:8,
108:14.
concurrence
84:19,
98:21.
concurrences
7:18, 83:3.

concurring
  84:20,
  84:21.
condition
  61:16, 76:8,
  91:21,
  120:14,
  192:10,
  192:12,
  193:20,
  194:23.
conditions
  73:23,
  161:25,
  193:15.
conduct 89:6.
conducted 24:7,
  38:17, 40:3,
  79:6, 135:23,
  135:24.
confer 149:4,
  150:11.
confidence
  76:17,
  206:8.
confident
  86:22, 90:10,
  149:21,
  150:12.
confirm 50:9,
  127:13,
  155:13,
  159:15.
confirmation
  4:9.
confirmed
  171:5,
  185:13.
conflicts
  187:6.
conform
  185:9.
confuse
  25:18.
confused
  13:13.
Congress
  106:16,
  106:19,
  110:24,

111:1, 111:6,
  111:7,
  112:23.
Congressional
  106:2, 106:9,
  106:14,
  106:24,
  123:16,
  123:20,
  174:5.
connected
  24:7.
connection
  114:20.
Connolly
  134:1.
consecutive
  166:22.
consider
  100:5.
considerable
  179:12.
considerably
  54:1.
consideration
  32:14, 37:24,
  39:5,
  88:13.
considerations
  72:17.
considered
  39:6, 39:7,
  39:15, 39:16,
  39:17, 39:20,
  181:13.
considering
  44:11.
Consistent
  14:14, 17:14,
  57:19, 89:2,
  102:11,
  103:3,
  158:18,
  160:8, 161:4,
  162:5,
  188:19,
  191:1, 202:2,
  203:5, 203:9,
  203:10.
constant 57:13,

71:23.
constituted
  194:17.
Constitution
  2:43, 80:22,
  81:24, 82:23,
  82:24.
constitutional
  17:1, 17:3,
  17:20, 17:22,
  28:6, 33:3,
  91:12, 91:14,
  92:5, 92:8,
  97:22,
  139:10,
  140:5,
  142:13,
  184:18,
  207:19.
constitutionall
  y 13:23.
constraint
  193:7.
constraints
  190:24.
Cont'd 2:1.
contact 47:10,
  48:4.
contacts 48:14,
  48:16, 48:25,
  55:9.
contemplating
  86:6.
contends
  107:14.
content
  80:25.
contest 163:9,
  195:22.
context 31:25,
  48:24, 53:14,
  78:20, 85:12,
  86:18, 87:22,
  97:24, 98:6,
  98:7, 99:23,
  99:24,
  100:13,
  106:22,
  113:18,
  121:12,

148:11,
  152:5,
  152:11.
contexts
  155:3.
contextualize
  147:1.
continue 53:21,
  65:6, 101:19,
  206:9,
  207:15.
continued
  144:3,
  206:25.
continues 55:2,
  58:15,
  143:23.
contradict
  187:16,
  187:17,
  188:3,
  188:5.
contradicted
  81:17,
  107:17.
contradicts
  141:16,
  188:7.
contrary
  142:20,
  155:9,
  165:22.
conversation
  30:13, 32:8,
  148:6.
convince 26:19,
  93:24.
cool 34:14.
core 28:6.
Corporation
  175:3.
corps 107:6.
Correct 5:19,
  6:1, 18:7,
  104:23,
  105:11,
  127:15,
  184:5,
  208:20,
  209:2,

211:5.
correctly
  40:19, 69:21,
  86:14,
  128:18.
correlation
  113:10,
  113:16,
  113:17.
correspond
  15:5.
Cost 37:16,
  38:21, 39:21,
  54:10, 143:4,
  143:8,
  143:14,
  143:25,
  144:9, 145:1,
  146:1, 146:3,
  146:7, 146:8,
  147:7,
  147:11,
  147:19,
  150:5,
  150:16,
  150:17,
  151:17,
  151:20,
  151:22,
  151:23,
  151:24,
  151:25,
  152:9,
  153:19,
  177:24,
  178:16.
costs 54:5,
  54:6, 54:7,
  54:10, 145:2,
  148:23,
  150:6,
  151:19,
  153:10,
  154:11,
  176:16,
  177:13,
  190:13.
counsel 3:6,
  3:13, 4:1,
  30:14, 61:7,

151:13,
  206:19.
counterparts
  115:25.
countries
  24:14, 24:15,
  196:25,
  197:1.
country 107:15,
  114:4,
  143:25,
  195:11.
couple 5:6,
  20:22, 30:16,
  36:18, 81:12,
  164:25.
coupled
  143:25.
course 30:19,
  30:20, 45:8,
  82:2, 101:8,
  140:15,
  144:10,
  150:1,
  172:22,
  207:7.
Courts 25:25,
  81:21,
  104:20,
  104:21,
  110:3,
  111:21,
  133:12,
  133:18.
cover 14:8,
  17:8, 17:24,
  19:24, 29:16,
  29:19,
  115:11,
  119:15,
  159:25.
coverage 18:21,
  18:22,
  174:5.
covered 24:15,
  160:3, 161:1,
  161:5,
  191:25.
covering
  15:23.

covers 17:9,
  17:21, 19:8,
  19:23, 22:23,
  160:14.
COVID 90:6,
  90:8, 90:9,
  90:11.
COVID-19 90:25,
  91:18.
create 34:17,
  34:19, 35:3,
  107:4, 200:7,
  200:8,
  201:12.
creates 40:14,
  41:5.
creating 34:16,
  34:17,
  34:23.
crew 4:4.
criteria 89:25,
  91:3, 91:6,
  164:1,
  166:10,
  166:21,
  167:6, 167:9,
  167:12,
  167:14,
  168:11,
  173:7,
  173:19.
critical 17:12,
  146:15,
  146:20,
  146:23.
critically
  121:1.
criticizing
  154:22.
cross 162:6.
cross-dressing
  15:17.
cross-examine
  129:3, 129:9,
  129:13,
  129:20.
cross-sex
  119:8.
Cruz 4:9.
curious 151:9,

151:11,
  151:15,
  197:17.
current 5:13,
  5:23, 10:9,
  10:10, 12:7,
  27:18, 79:9,
  80:20, 82:18,
  87:25, 88:1,
  93:3, 124:13,
  130:5,
  130:22,
  132:16,
  133:13,
  133:18,
  134:23,
  135:12,
  150:23,
  161:4, 162:4,
  164:21,
  175:24,
  176:14,
  180:7,
  190:25.
currently
  89:25,
  130:15,
  136:23,
  155:9, 162:3,
  165:5, 175:8,
  175:10,
  176:1,
  177:12.
currents
  47:22.
cut 133:16,
  148:23,
  151:19,
  153:10,
  154:5,
  154:6.
.
.
< D >.
daily 203:19.
danger 107:5,
  107:10.
darts 151:11.
dash 37:24.
data. 47:1.

database
179:22,
180:5.
date 44:17.
dated 127:17.
dates 149:13.
day 18:12,
25:1, 27:4,
45:6, 57:20,
134:2, 156:3,
180:11,
186:25,
206:16.
day-to-day
205:7.
days 5:6, 16:7,
18:18, 64:9,
64:14, 64:20,
80:16, 88:3,
110:3,
123:19,
127:17,
131:25,
132:24,
164:25.
DC 1:42, 2:10,
2:17.
de 107:6,
110:2.
deal 45:7,
117:4,
204:16,
204:18.
dealing 110:5,
114:14.
dealt 154:21.
decades 29:12,
165:19.
decide 82:12,
91:5, 101:2,
137:20,
137:24.
decided 7:8,
79:21,
140:14,
140:19,
177:17,
179:4.
decides
166:20.

deciding 82:6,
100:2,
141:11.
decision 12:15,
81:15, 95:12,
100:8, 101:2,
105:20,
110:16,
132:4, 133:1,
133:5,
140:10,
152:4,
204:23,
209:16.
decision-maker
111:2,
111:12,
112:23.
decision-makers
9:25, 10:6,
10:7.
decision-making
86:21,
102:13,
106:24.
decisions
115:2,
115:4.
declarant
39:12,
129:3.
declarants
129:7.
declaration
22:13, 22:19,
23:3, 23:5,
23:17, 31:14,
102:10,
102:19,
103:3, 124:1,
124:13,
124:20,
129:24,
199:24,
200:1.
declarations
129:21,
162:18,
163:4,
164:25,

187:25.
declines
110:22.
deemed 63:14,
63:17,
131:4.
deems 205:10,
206:9,
207:16.
DEERS 203:1,
203:7,
203:10,
203:11.
defeat 206:2.
Defendant 1:12,
131:23,
206:15.
Defendants 2:5,
7:11, 102:6,
161:24,
162:11,
204:15,
206:24,
210:10.
Defenders
1:27.
defending
33:22.
deferential
28:16, 115:3,
141:10.
deferred 55:20,
155:6.
deferring 87:4,
133:18,
135:1,
135:14,
138:25,
152:6, 152:7,
152:8.
defers 141:6.
defined
15:13.
defines 16:1.
defining
54:16.
Definitely
105:8,
207:14,
210:9.

definition
15:6, 54:20,
133:14,
133:17,
159:4,
160:11,
161:3,
162:21,
164:22,
168:25,
207:7,
208:5.
definition.
54:17.
definitions
160:13,
163:10.
definitive
132:14.
degree 44:20.
deliberative
136:11.
demand
149:23.
demeaning
189:1,
189:22,
192:4,
192:18.
demeans
205:25.
democratic
35:1.
demonstrate
166:22,
171:24.
demonstrates
167:1.
denied
183:23.
Department 2:8,
2:15, 5:25,
10:21, 11:7,
11:20, 13:22,
18:4, 18:5,
18:6, 18:10,
18:23, 136:9,
143:16,
144:4,
145:17,

193:13,
193:20,
208:15.
departments
196:21.
depending
57:5.
depends 110:9,
159:4,
162:4.
deploy 52:20,
62:21, 95:10,
204:19.
deployability
41:20, 42:5,
43:14, 47:1,
47:5, 50:17,
61:23, 76:18,
80:14,
119:11,
119:12,
119:16,
119:20,
120:1,
120:21,
121:1,
124:18,
131:5, 144:3,
144:6,
177:15,
204:17.
deployability.
76:15.
deployable
54:22, 54:25,
59:17, 65:19,
65:20,
128:14,
144:8.
deployed 52:9,
52:19, 130:8,
130:9,
130:10,
130:11,
130:12,
130:13.
deployment
59:1, 59:8,
78:5, 78:6,
132:1.

deployments
210:14.
deposition
102:6, 102:9,
102:11,
102:20.
depressed
14:21, 51:4,
51:24, 51:25,
52:5, 52:10,
52:21, 53:24,
65:21,
144:8.
depression
14:19, 51:19,
52:22, 52:24,
53:17, 58:24,
59:2, 59:12,
65:10, 117:3,
117:20,
119:25,
152:23,
160:23,
167:19,
168:14,
177:15.
depressive
59:18.
derogatory
154:17,
196:22.
DES 95:2.
describe
49:17.
described
136:12,
139:12.
describing
201:2.
description
159:22.
deserves
184:17.
designed
167:21.
detail 25:5,
25:6, 97:7.
detailed
111:7.
details 25:7,

163:4.
determination
120:13.
determine
136:7.
determined
131:15.
determines
170:16.
determining
89:13.
detransition
172:10,
172:21,
172:25.
detransitioned
172:20.
detransitioning
172:14.
developed
205:5.
developing
157:17,
157:25.
development
9:11.
diabetes 94:25,
95:1, 95:6.
diabetic 60:24,
61:10.
diabetics
60:17,
60:20.
diagnose
79:16.
diagnosed
76:11, 146:8,
160:20,
202:22.
diagnoses 52:6,
55:5.
diagnosis 14:8,
14:14, 15:8,
15:9, 17:10,
23:12, 29:19,
52:22, 53:17,
59:16, 62:22,
78:5, 79:16,
79:21, 116:2,
119:24,

144:2,
150:23,
161:4, 162:5,
162:8,
176:15,
190:25,
203:3.
diagnosis.
63:16.
differ 94:18.
difference 9:3,
9:6, 9:7,
9:9, 10:17,
28:25, 60:4,
160:7.
different
47:24, 51:2,
67:24, 73:17,
82:7, 84:18,
86:6, 87:8,
89:23, 90:20,
90:22, 90:23,
91:9, 101:9,
107:21,
108:14,
122:22,
123:10,
123:11,
132:6,
141:13,
141:25,
160:17,
186:14, 201:5,
203:23,
208:8.
differently
57:5.
difficult
162:11.
Dill 39:11,
39:13,
124:20.
diluted
157:19.
directed 9:10,
106:20.
direction
84:18, 87:8,
106:14.
direction.

38:1.
directive
  206:22.
directives
  204:13,
  205:8,
  205:12,
  205:24,
  207:5.
directly
  134:13,
  166:8,
  166:13,
  169:3.
disabilities
  75:6, 76:2.
disability
  40:6, 47:20,
  66:23, 70:14,
  71:11, 75:4,
  75:22, 78:4,
  78:9,
  89:14.
disability.
  74:5.
disagree 21:19,
  81:20, 91:5,
  163:13,
  165:1,
  177:10,
  177:18,
  177:23,
  179:3, 181:7,
  190:3.
disagreement
  32:19, 132:5,
  132:12.
discharge 70:7,
  75:19, 77:15,
  78:11,
  163:18,
  164:10,
  164:13.
discharged
  131:12,
  161:10,
  163:22,
  164:12.
discipline
  107:5, 125:4,

127:23,
  128:1,
  128:11,
  128:16,
  128:23,
  131:14,
  134:12,
  137:21,
  188:12.
disciplined
  187:7,
  187:19,
  188:19,
  189:1.
discriminate
  33:5.
discrimination
  122:11,
  122:15,
  123:2, 138:3,
  142:7,
  142:8.
discuss 30:15,
  33:21, 33:25,
  97:7, 97:12,
  108:25,
  114:14.
discussed
  31:15, 58:21,
  59:11, 59:22,
  60:10, 94:3,
  96:2, 101:22,
  156:14,
  172:14,
  174:19,
  184:8.
discusses
  37:13, 37:16,
  39:24,
  54:16.
discussing
  55:24, 64:18,
  75:18, 95:17,
  95:22,
  194:2.
discussion
  32:2, 154:25,
  181:20.
discussions
  97:8.

Disease 91:18,
  146:9.
disembodied
  196:19.
disfavorable
  194:12.
disfavors
  91:17.
dishonest
  141:19,
  142:19,
  155:8.
dishonorable
  188:20.
disorder
  76:11.
disorders
  193:12.
displeasure
  194:18.
dispositive
  27:25.
disproportionat
  e 178:16.
disproportionat
  ely 150:18.
disputable
  85:4.
dispute 6:6,
  18:11, 19:17,
  29:14, 130:6,
  131:9, 142:2,
  163:24,
  173:4,
  208:24.
disqualificatio
  n 77:7, 78:9,
  91:21,
  193:14.
disqualificatio
  ns 70:3,
  77:10.
disqualificatio
  ns. 69:20.
disqualified
  18:25,
  19:7.
disqualifier
  95:1.
disqualifying

61:15,
  89:20.
dissenting
  84:20,
  84:22.
dissents
  83:3.
dissolve 7:11,
  7:19,
  12:17.
dissolves
  7:17.
distance
  160:19.
distinguish
  48:14,
  48:23.
distress
  166:24.
Distribution
  69:19, 70:2,
  77:9.
District 1:1,
  1:2, 1:18.
divergent
  158:20,
  159:1,
  183:5.
dixit 81:16,
  107:15.
docket 11:4,
  18:3, 35:22,
  36:5, 69:8,
  95:18,
  136:20,
  136:25,
  145:8,
  161:18,
  171:16,
  174:7, 178:2,
  178:17,
  178:20,
  193:4, 210:6,
  210:7.
doctrinal
  97:8.
doctrine
  108:18,
  132:14,
  132:15,

180:15.
doctrines
    112:6,
    133:13.
document 8:11,
    64:24, 64:25,
    65:1, 126:17,
    126:18,
    134:3, 134:6,
    161:17,
    161:18,
    208:11,
    208:12,
    208:13,
    208:14.
documentation
    15:25.
documents 9:12,
    16:7, 188:14,
    204:12.
DOD 8:10, 14:1,
    38:7, 38:8,
    38:13, 38:16,
    40:3, 145:20,
    158:19,
    171:4,
    171:13,
    174:14,
    190:19,
    193:9.
Doe 6:19, 7:1,
    7:3, 7:4,
    7:8, 7:13,
    7:16, 8:16,
    9:3, 12:5,
    84:1, 84:19,
    98:21.
does. 103:7.
dog. 4:22.
dogcatcher
    138:7.
doing 20:6,
    28:22, 33:4,
    39:3, 45:17,
    71:7, 82:5,
    82:6, 89:4,
    89:9, 93:3,
    94:9, 94:15,
    99:15,
    120:24,

132:25,
137:21,
152:1,
183:18,
192:25,
202:16.
dollar 154:8.
dollars
    142:25.
DOMA 154:21.
Donald 3:3.
DONALD J.
    TRUMP, et al.
    1:10.
done 3:20, 8:3,
    9:16, 10:18,
    10:19, 12:6,
    13:15, 13:19,
    24:20, 24:21,
    29:25, 45:21,
    57:4, 71:8,
    79:5, 111:7,
    159:15,
    162:21,
    184:8,
    192:25.
dot 66:24,
    155:23.
doubt 155:11.
down 46:10,
    46:18, 52:17,
    54:13, 54:14,
    58:14, 73:17,
    74:10,
    103:23,
    104:10,
    115:11,
    140:3,
    149:18,
    149:20,
    150:3, 186:5,
    187:4.
dozens
    117:17.
dramatically
    118:19.
draw 42:10,
    53:8, 66:11,
    118:21,
    144:18.

dress 107:3.
dressed
    184:11.
drink 135:4.
drive 170:14.
driven
    172:15.
DSM-5 15:6,
    15:19, 15:22,
    29:10,
    168:18.
Due 63:14,
    65:11,
    91:11.
Duh 87:14.
duly 48:15,
    48:25.
dumb 58:12.
Duncan 1:45.
DUNFORD 123:17,
    123:21,
    125:3,
    127:21,
    127:25.
during 36:1,
    60:1, 63:3,
    63:4, 63:15,
    82:16,
    131:22,
    203:7,
    203:8.
duties
    124:13.
duty 47:1,
    49:19,
    129:25,
    130:3, 131:4,
    143:17,
    161:10,
    174:16,
    175:4,
    175:22,
    175:24.
.
.
< E >.
E. 1:38.
earlier 10:18,
    10:19, 11:22,
    55:25, 84:16,

93:21, 95:4,
    114:6,
    115:15,
    136:3, 184:3,
    184:8,
    196:19.
early 29:11,
    112:10,
    132:1,
    165:11,
    166:5.
earth 56:22,
    56:23,
    57:5.
easier
    162:17.
easy 202:15.
eavesdrop
    45:12.
ECF 208:6.
econ 45:8.
economic
    45:8.
economics
    45:9.
effect 11:21,
    16:4, 27:11,
    114:8,
    149:14,
    149:18,
    149:19,
    164:11,
    186:2,
    198:7.
effect. 11:8.
effectively
    103:13.
effects
    177:12.
effort 8:3.
egalitarian
    35:1.
eggs 198:24,
    201:12.
egregiously
    31:15.
eh 27:21,
    112:11.
eight 73:22,
    176:16.

Einstein 56:13,
  57:2, 57:11,
  57:21.
either 66:15,
  80:17,
  118:14,
  122:20,
  125:21,
  137:15,
  155:13,
  156:18,
  159:23,
  165:13,
  184:5,
  191:17,
  195:14,
  199:7,
  209:7.
elect 165:7,
  166:4.
elected
  138:7.
Elections 84:6,
  85:7.
electronically
  36:16.
Elena 83:7.
eligibility
  53:23.
eligibility.
  54:23.
eligible
  165:10,
  187:15.
Elizabeth 2:14,
  4:1.
email 20:22,
  126:10,
  129:13,
  209:9,
  210:24.
embedded
  101:14,
  180:17,
  180:18.
emergency
  209:18.
employ 54:7.
encourage
  142:22.

encouraged
  47:9, 48:3.
end 36:25,
  40:7, 46:21,
  75:10, 110:6,
  111:17,
  111:19,
  124:19,
  164:4,
  180:11,
  206:16.
ends 114:10.
enforcing
  19:15.
English
  191:14.
enjoin 16:20,
  16:22, 94:8,
  94:14, 98:18,
  100:3, 113:3,
  196:4,
  204:10,
  205:4,
  205:19,
  205:20,
  205:21,
  206:11,
  206:17,
  207:9,
  207:10,
  208:21.
enjoined 6:10,
  6:13, 25:14,
  25:23, 25:25,
  26:3,
  195:8.
enjoining
  195:1,
  205:7.
enjoy 165:18.
enough 98:17,
  123:14,
  125:14,
  153:22,
  163:4, 163:5,
  196:4, 196:6,
  197:9, 200:3,
  200:8.
ensure
  203:20.

enter 184:25,
  185:7,
  185:20,
  186:13,
  208:22,
  209:9,
  209:14,
  209:21.
entered 184:1,
  185:24,
  209:23.
entering
  46:12.
entire 16:16,
  16:18, 27:6,
  50:3, 54:25,
  80:4, 102:6,
  141:17,
  155:7,
  196:12.
entirely
  67:18.
entirety
  50:6.
entitled
  84:4.
entrusted
  137:24.
EO 157:7,
  157:13,
  198:21.
EPTS 75:19,
  77:15,
  78:10.
equal 91:10.
equally
  148:21.
equals 114:8.
equate 76:15.
equivalent
  48:16,
  49:1.
eroded 206:6.
erodes
  207:20.
error 147:16.
Especially
  146:13,
  160:4,
  185:22,

208:1.
espouse
  176:25.
esprit 107:6.
Esquire 1:25,
  1:26, 1:32,
  1:38, 1:44,
  2:7, 2:12,
  2:13, 2:14.
essentially
  5:22, 17:17,
  167:15,
  167:20,
  168:7.
establish
  190:20,
  191:5.
established
  97:19.
estimate
  175:23.
estimated 40:6,
  66:23, 70:15,
  115:23,
  144:10,
  147:7,
  147:11,
  147:19,
  175:3.
estimates
  173:21.
et 3:3, 77:10,
  138:21,
  162:7,
  191:5.
ether 56:13,
  56:20, 56:25,
  57:1, 57:7,
  57:10, 59:13,
  148:6.
ethos 138:14,
  142:20,
  157:18,
  180:21,
  181:21,
  182:1.
evaluated
  47:16, 47:19,
  47:25, 48:7,
  67:17, 67:21,

67:23, 67:24,
67:25, 68:1,
68:5, 68:12,
68:18, 70:22,
71:22, 71:24,
71:25, 72:1,
72:2, 72:3,
72:5, 72:9,
72:20, 73:1,
73:2, 73:23,
74:4, 75:3,
76:8.
evaluation
40:6, 47:20,
47:21, 48:9,
66:23, 67:11,
70:15, 71:1,
71:11, 71:20,
72:16, 75:22,
77:17, 77:22,
78:20.
evaluations
67:19.
event 4:17,
61:16.
events 10:9,
12:7, 93:3.
eventually
123:7.
everybody
160:25.
everyone 4:18,
14:20, 23:10,
26:17, 45:20,
45:22, 61:10,
90:9, 104:10,
168:20,
186:8,
207:25,
211:1.
Everything
5:16, 50:9,
50:12, 57:12,
57:22, 57:24,
81:1, 119:3,
163:15.
evidence 23:2,
31:4, 31:6,
31:16, 66:15,
89:8, 116:3,

142:20,
155:8,
155:14,
158:3, 158:8,
158:14,
158:17,
162:19,
177:24,
178:15,
185:23,
188:7, 191:4,
191:7,
194:25.
evident
46:12.
exact 11:3,
117:23.
exactly 36:21,
90:3, 92:2,
100:5, 178:3,
204:9.
exaggerating
137:18.
example 32:18,
56:21, 90:4,
169:12.
examples 121:4,
206:4.
exceedingly
175:17.
Excellence
38:18, 40:4,
157:18.
excellent
96:23,
105:12.
except
168:17.
Exception
107:3,
203:4.
exchange
95:4.
exclude 75:7,
80:13, 99:16,
113:9, 139:1,
167:21,
190:15.
excluded 60:17,
61:11, 89:19,

91:3.
excludes 8:19,
29:6.
excluding
52:12.
exclusionary
89:24.
exclusively
135:2.
executive 8:11,
9:10, 12:25,
38:2, 137:10,
138:12,
138:15,
154:18,
156:2,
156:23,
157:16,
179:5, 179:6,
179:11,
187:1, 190:2,
190:5,
190:15,
204:11,
204:14,
205:4,
205:13,
205:23,
206:17,
206:23,
206:24,
207:6,
207:10,
207:11.
exemption 19:1,
19:9, 159:16,
166:22,
168:1.
exemption.
19:7.
exemptions
187:16.
Exhibit 11:5,
14:16, 20:18,
23:12, 73:20,
127:11,
133:23,
161:4,
161:13,
161:16,

190:25.
exhibited
159:17,
160:19.
exhibiting
170:15,
170:16,
192:14.
exhibits 14:22,
15:12, 17:13,
160:4,
160:10,
162:5,
170:14.
exist 140:19,
199:15.
existence
140:14,
140:15.
existing 38:7,
70:6.
expansive
15:16.
expect 32:12,
128:16,
147:24,
176:2.
expected
123:24.
expensive
144:23,
146:24,
148:16,
149:9,
150:18,
151:17,
151:25,
153:12,
153:18,
153:21,
153:23.
experience
9:15, 10:22,
10:23, 11:7,
11:21, 81:16,
103:15,
107:16,
115:21,
135:24,
179:16,

210:11.
experiences
    203:19.
experiments
    57:3.
expert 32:18,
    50:3, 73:12,
    81:18, 81:19,
    88:19, 88:21,
    102:16,
    107:17,
    125:10,
    142:3,
    152:16,
    172:12,
    172:19.
experts 80:2,
    80:5, 80:9,
    80:10, 80:25,
    102:15,
    107:22,
    107:23,
    152:16.
explain 21:1,
    25:3, 26:18,
    28:3, 48:7,
    48:8, 93:20,
    118:20,
    137:9,
    176:3.
explainable
    28:4,
    194:7.
explained
    98:19,
    142:15,
    194:20.
explains
    124:15,
    203:18.
explanation
    149:22.
express
    106:24.
Expressing
    158:19,
    158:25,
    159:6,
    183:4.
expressly

10:17, 24:1,
    24:6, 32:9.
extensive 8:2,
    8:7.
extensively
    50:11.
extent 12:23,
    39:19.
extracting
    146:8.
extraordinary
    97:16.
extremely
    97:14,
    194:6.
eyes 20:23.
.
.
< F >.
face 28:10,
    64:23, 77:24,
    122:10,
    122:15,
    196:2,
    196:23.
faced 142:1,
    155:4.
facially
    142:16,
    194:22,
    196:22.
fact 10:16,
    15:18, 31:10,
    41:24, 52:20,
    53:5, 57:4,
    63:7, 63:11,
    65:3, 72:16,
    85:16, 86:25,
    87:20, 88:6,
    88:11, 97:22,
    110:21,
    117:25,
    120:10,
    120:12,
    120:16,
    121:7,
    132:10,
    132:11,
    133:7, 139:2,
    154:5,

167:13,
    186:3.
factor 68:6,
    72:8, 99:18,
    102:13.
factors 46:4.
facts 26:23,
    26:24, 26:25,
    27:2, 32:20,
    114:18.
factual
    129:23.
factually
    27:9.
fail 163:25.
Fair 16:11,
    18:22, 35:18,
    49:12, 65:22,
    70:24, 71:2,
    71:4, 71:10,
    71:13, 78:16,
    78:22, 86:25,
    123:14,
    131:7,
    153:22,
    173:17,
    173:20,
    186:17,
    189:23,
    197:9.
fairly 97:5.
faith 125:22,
    206:8,
    210:16,
    210:17.
fall 34:18,
    34:22, 34:25,
    141:25,
    162:12,
    165:5,
    173:19.
false 20:9,
    137:11,
    158:19,
    158:25,
    176:24,
    183:5.
familiar 29:10,
    29:23, 34:13,
    124:6,

125:14.
family 155:2.
famous 57:3.
fan 138:9.
fans 113:11,
    114:1,
    115:1.
far 15:14,
    17:7, 22:5,
    26:2, 90:22,
    91:8, 112:18,
    112:20,
    141:17,
    159:21,
    180:18,
    180:23,
    189:22,
    210:17.
Farm 112:1.
fascinating
    58:11.
fast 56:19,
    210:19.
faster 54:1,
    56:22,
    57:16.
favor 35:25,
    84:18,
    87:8.
favorite
    138:10.
FCRR 2:41,
    211:4.
fed 104:20,
    104:21.
Federal 2:42.
feel 94:9,
    97:4,
    156:18.
feet 26:18.
fellow
    127:21.
female 169:19,
    198:1,
    198:22,
    199:9,
    199:16,
    200:9,
    200:10,
    200:17,

201:9,
201:18,
201:25.
few 16:6,
115:10,
115:13,
123:19,
156:11,
156:15,
185:19,
202:14.
Fewer 55:3,
63:12.
fifth 54:15.
fight 191:11.
fighting 166:9,
166:13,
169:3,
176:22,
176:23.
Figure 8:3,
53:21, 68:9,
112:24,
142:9,
148:14,
197:7.
file 95:18,
128:25,
163:6,
178:21,
184:5,
184:25,
186:7,
186:20,
206:25,
209:18.
filed 163:3,
183:17,
210:4.
final 12:15.
Finally
55:17.
finals 45:5,
45:19.
find 8:17,
67:10, 91:13,
109:23,
111:17,
112:25,
139:7,

140:16,
181:19,
181:25,
182:3,
182:11,
182:20,
183:3,
201:17,
209:17.
finding 70:21,
113:1,
137:14.
Findings 50:12,
69:14, 70:19,
71:3, 75:15,
75:17, 77:2,
77:4, 113:1,
116:9,
129:23.
findings.
49:3.
finds 118:13.
Fine 27:8,
33:3, 83:22,
104:5, 121:5,
163:13,
176:11,
191:10,
195:20.
finishes
59:14.
firm 200:3.
fit 21:5, 22:5,
131:4,
162:21,
163:10,
168:25.
fitness 118:6,
130:5.
fits 159:22.
five 46:18,
54:15, 64:8,
67:15, 68:23,
73:22,
75:15.
five-year
174:1.
flag 94:22,
100:1.
focus 43:15,

43:16,
157:17,
157:25,
158:4,
197:22.
focused 107:18,
120:15.
folks 41:25,
65:5.
followed 7:18,
106:18.
followers
20:24.
Following
46:12, 53:23,
54:22, 55:5,
55:10, 59:16,
63:15, 84:5,
85:7, 123:1,
162:2,
164:10.
follows
34:15.
food 155:1.
foot 26:17.
footnote 60:16,
197:22.
Force 70:8,
97:23,
107:14,
130:11,
165:24,
176:23.
forced
184:10.
forces 31:12,
158:10,
158:14,
161:24,
162:2,
175:9.
foregoing
211:5.
form 113:21.
formal
110:22.
formally
15:8.
former 82:12,
125:2,

209:12.
forth 161:25.
forward 3:4.
found 40:5,
40:11, 41:2,
62:12, 62:17,
66:22, 68:12,
71:11, 78:2,
84:11, 114:2,
150:9, 193:9,
193:20.
foundation
124:1.
four 46:18,
54:14, 67:15,
68:23, 72:6,
73:22, 75:15,
146:12,
179:15.
four-phase
36:7.
fourth 36:9,
36:11, 36:12,
36:14,
143:4.
fraction
147:15,
148:3,
148:4.
frankly
115:16.
free 102:14.
frequently
87:12.
friend 19:20,
45:10,
209:13.
friends 45:5.
front 11:5,
24:12, 94:12,
95:2, 142:21,
155:15,
156:6, 157:6,
210:16.
fronting
65:16.
full 14:6,
69:17, 110:1,
149:20,
181:4.

fully 21:23,
  21:24, 58:9,
  98:21,
  159:18,
  179:3.
function 43:19,
  166:25.
functionally
  48:16, 49:1,
  103:7.
functions
  146:15,
  146:20,
  146:23.
fund 190:13.
funded 20:25,
  21:1.
future 82:1,
  136:3,
  136:4.
.
< G >.
gaining
  53:23.
gave 28:14,
  84:14, 129:8,
  173:21.
gay 15:22.
gender-affirmin
  g 118:16,
  118:18,
  118:23.
genders 197:25,
  198:1.
General 11:24,
  13:8, 55:2,
  92:25, 109:5,
  123:17,
  123:21,
  124:24,
  127:21,
  127:25,
  130:17,
  136:8,
  204:23,
  209:13.
generally
  193:12.
generals

88:23.
generates
  198:24.
genuine
  119:21.
get-go 96:23.
gets 45:21,
  82:12,
  130:17,
  141:20,
  170:21,
  203:3.
getting 4:18,
  20:6, 20:10,
  22:19, 48:20,
  79:7, 85:20,
  90:25, 114:1,
  116:19,
  138:17,
  202:15.
GILLIBRAND
  123:21,
  127:16,
  127:20.
Ginsberg
  140:15.
Girls 109:19,
  112:10.
Give 47:18,
  69:7, 81:4,
  84:13, 85:23,
  86:4, 89:24,
  93:25, 96:9,
  110:17,
  114:17,
  126:20,
  138:23,
  169:2,
  178:17,
  181:8,
  185:22,
  193:6,
  209:10,
  210:20.
given 59:23,
  86:8, 89:14,
  110:2,
  123:16,
  146:13,
  156:4, 160:4,

195:10.
gives 110:7.
giving 86:19,
  147:23.
GLBTQ 1:27.
global 152:2.
God 20:15,
  88:4, 176:23,
  207:3.
gods 198:3.
Goldman 32:18,
  81:8, 85:2,
  88:17, 89:1,
  96:4, 98:2,
  102:18,
  105:17,
  115:6, 115:7,
  140:7,
  140:17,
  140:20,
  141:20.
Gorsuch
  84:19.
gotten 24:4,
  88:4, 133:9,
  165:25.
Government 5:1,
  15:3, 28:14,
  31:22, 37:6,
  98:16, 104:8,
  113:5,
  114:15,
  129:2,
  136:19,
  166:7,
  185:23,
  190:20,
  196:21,
  208:1,
  209:2.
government-wide
  121:7.
governments
  106:4.
grab 14:3,
  126:13.
grade 46:1.
graduate
  45:2.
grammatical

197:25.
grand 165:11.
grant 209:17.
granting 111:9,
  170:3,
  170:5.
grants
  166:14.
graph 51:8,
  54:14, 149:7,
  149:10,
  149:11,
  149:22,
  178:1,
  178:23,
  179:1.
grapple
  134:7.
gravity 58:3.
Great 4:23,
  6:8, 45:13,
  81:7, 91:7,
  95:14, 95:24,
  96:14,
  109:16,
  119:10,
  152:3.
greater 59:1,
  59:8, 78:4.
groaning
  35:5.
grossly 31:10,
  33:1, 80:17,
  88:5.
ground
  115:12.
groups
  195:10.
guess 33:3,
  50:4, 145:13,
  152:17,
  152:20,
  153:20,
  156:3,
  175:16,
  186:23.
guesses
  63:22.
guessing
  154:15.

guidance 14:25,
    100:6,
    204:12,
    205:5.
guiding
    99:18.
Guillermo
    30:12.
gunners
    104:24.
guy 19:14,
    19:15, 19:22,
    20:4, 25:2,
    45:9.
guys 28:19,
    65:1, 104:11,
    128:3, 129:9,
    134:8, 135:3,
    135:6, 171:7,
    183:14,
    204:17,
    210:7,
    210:21.
.
.
< H >.
Haley 1:26,
    3:15.
half 46:11,
    187:2,
    187:3.
half-hour
    35:25.
halved 79:22.
hand 90:11,
    90:12,
    151:12.
handbook
    203:18.
handling
    209:14.
hands 90:17.
happen 68:19,
    92:18, 95:8,
    186:16,
    210:19,
    210:21.
happened 5:6,
    5:19, 18:15,
    22:3, 24:5,

27:4, 64:10,
    66:15, 111:7,
    135:25,
    149:1,
    197:3.
happening
    7:10.
happens 7:15,
    20:5, 155:12,
    170:21,
    210:23.
happy 69:2,
    88:14, 97:5,
    101:19,
    125:19,
    155:17,
    163:6,
    182:18,
    197:10,
    197:11,
    198:13,
    205:20,
    206:25.
hard 60:13.
harder
    114:25.
harm 207:20.
harmful 157:20,
    158:6,
    159:14.
harms 206:11.
Harris
    209:13.
Harvard 85:6.
hats 139:15.
Hawaii 23:21,
    24:1, 24:4,
    25:3, 25:6,
    25:20, 26:9,
    27:7, 98:12,
    98:13,
    142:14,
    155:17,
    194:5, 194:7,
    194:9, 195:5,
    196:13,
    196:16,
    196:17.
head 3:11,
    141:8,

147:24,
    158:7,
    158:16,
    160:17.
Health 38:18,
    40:4, 47:10,
    48:4, 48:14,
    48:15, 48:24,
    48:25, 49:18,
    55:4, 55:9,
    63:14, 65:11,
    116:4,
    143:15,
    143:25,
    158:12,
    162:9,
    162:10,
    180:22,
    182:22,
    190:23,
    193:7.
heaped
    122:17.
hear 61:13,
    102:21,
    125:3,
    128:1.
heard 34:12,
    71:7, 127:24,
    156:19,
    205:19,
    207:22.
hearing 39:1,
    95:19, 109:2,
    123:20,
    129:20,
    136:20,
    156:4,
    160:18.
hearings 5:7,
    93:21,
    109:9.
heart 104:11.
heightened
    98:5.
help 45:12,
    45:14, 83:2,
    88:22, 97:8,
    99:13.
helpful 41:18,

42:6,
    100:4.
helps 118:19.
hereby 211:4.
herself 4:21.
hiding 168:7.
hierarchy
    125:15.
high 41:16,
    42:13, 43:3,
    43:20, 79:19,
    117:14,
    118:16,
    157:2,
    174:20,
    175:23,
    190:20,
    191:5.
high-level
    125:10.
high-ranking
    123:24.
Higher 40:7,
    48:9, 66:23,
    67:11, 68:13,
    70:15, 70:22,
    70:25, 71:11,
    71:19, 71:24,
    72:24, 72:25,
    75:22, 77:17,
    77:22, 78:18,
    78:19, 78:20,
    110:13,
    115:24,
    122:7,
    178:13.
highest 28:7.
highest-ranking
    125:18.
highly 115:3,
    124:15,
    125:11.
hippies 154:21,
    155:1.
histories
    150:7.
history 14:8,
    17:9, 23:11,
    29:7, 69:18,
    77:6, 89:18,

123:6,
131:25,
132:18,
136:7,
150:23,
161:4, 162:5,
162:6, 162:7,
182:12,
190:25.
hit 90:9,
90:25.
hoc 111:22.
Hold 10:25,
19:19, 90:8,
90:9, 99:2,
100:16,
108:24,
133:21,
209:5.
holdings
26:23.
Homeland 5:25,
6:12.
homosexual
154:23.
homosexuals
154:22.
honest 192:17,
197:21.
honestly
14:17.
Honesty 157:3,
190:22,
191:16,
191:21,
192:3, 192:5,
193:10,
193:21.
Honorable 1:17,
187:7,
187:19,
188:18,
188:25.
hope 10:14,
102:4, 133:1,
133:4, 158:2,
209:7.
Hormone 59:23,
60:6, 60:11,
60:13, 60:22,

78:5, 118:14,
118:22,
119:8,
119:11,
119:14,
119:17,
119:20,
119:22,
120:1, 120:2,
120:3, 120:6,
120:13,
143:20,
144:20,
162:6,
190:12.
hormones 61:24,
61:25,
120:21.
hour 57:8.
hours 202:15,
209:11,
209:18.
house 54:7.
household
155:2.
housekeeping
94:21.
housing
106:20.
huge 138:9.
humanly
20:16.
humble 180:22,
192:17.
humility
138:13,
157:3,
182:12,
190:22,
191:17,
191:21,
192:4, 192:5,
193:10,
193:21,
196:1.
hump 195:1.
hundred 147:19,
147:25.
hung 105:5.
hurting

137:20.
hypothetical
139:11.
.
.
< I >.
idea 4:20,
32:9, 34:18,
35:10, 35:15,
45:11, 46:1,
64:21,
150:21,
150:22,
173:5,
178:6.
ideation
115:22,
117:2, 117:9,
122:7,
122:14,
123:1.
identical
27:10.
identification
193:7.
identification.
55:10.
identified
63:13,
175:5.
Identify 3:5,
15:21, 49:16,
89:18, 160:8,
169:5, 169:6,
173:14.
identity 103:2,
137:9,
137:10,
137:13,
158:20,
159:1, 159:7,
159:13,
169:20,
183:5, 187:5,
188:25.
ideologies
157:20,
158:6.
ideology 20:9,
137:11,

158:10,
158:15,
176:24.
Ignorance
34:11,
34:15.
Ignorance.
35:10.
ignore 21:2,
66:12, 71:1,
80:24, 80:25,
81:1, 81:2,
88:8, 109:25,
132:22,
142:8.
ignored 80:6,
80:7.
III 44:1, 44:3,
44:6.
imagine 50:12,
131:8,
155:10,
201:19.
immediate
177:16.
immediately
149:11,
174:18.
imminent
100:5.
immutable
172:16.
impact 114:2,
121:1,
176:4.
impacted 61:23,
122:21.
impacting
148:23.
impacts 25:4,
90:1,
91:16.
impairment
166:24.
implement
170:1.
implementation
161:22,
179:12,
204:11,

205:4.
implemented
  19:16,
  138:19,
  169:25,
  179:10.
implementing
  138:17.
import 80:7.
impossible
  172:5,
  179:19.
in-house
  61:7.
incidents
  127:24.
inclined 84:18,
  87:8.
include 17:17,
  205:11.
included 38:11,
  38:24, 39:22,
  40:8.
includes 37:11,
  180:13,
  208:6.
Including
  38:14, 56:21,
  116:9, 129:7,
  143:18,
  152:23,
  167:4, 172:2,
  172:18,
  198:3,
  207:7.
incompatible
  144:4,
  193:12.
inconsistent
  157:1,
  182:12,
  187:5,
  188:16,
  188:18,
  188:25,
  190:23,
  192:3, 193:9,
  193:20.
incorporate
  207:6.

incorporated
  207:8.
incorporates
  206:23.
increased
  117:13.
independently
  154:1.
indicate 49:18,
  55:19.
indicated
  143:15.
indignities
  184:18.
Indigo 109:18,
  112:10.
indiscernible
  90:15.
individual
  105:18,
  120:25,
  125:3, 128:1,
  128:12,
  128:15,
  132:23,
  158:20,
  159:1,
  160:16,
  183:5,
  187:6.
individualized
  124:16.
individuals
  38:14, 103:2,
  115:21,
  115:24,
  116:1, 116:2,
  136:22,
  144:3, 161:3,
  190:24,
  200:5,
  205:24,
  206:13,
  208:7.
indulgence
  103:19.
ineligible
  166:5.
inevitably
  134:6.

information
  9:22, 10:20,
  10:22, 11:15,
  12:20,
  137:19,
  144:14.
informative
  117:10,
  117:12,
  180:10.
informed 11:7,
  11:20, 37:24,
  39:5,
  94:25.
Inga 1:44,
  3:18.
inherent 49:11,
  122:15,
  188:24.
inherently
  122:13,
  192:4.
initial 55:5,
  63:15, 179:4,
  179:6.
initially 7:17,
  123:6.
injunction
  6:20, 7:9,
  7:12, 7:17,
  7:20, 12:17,
  13:13, 97:17,
  186:14,
  204:8,
  204:24,
  205:12,
  205:16,
  208:23,
  209:10,
  209:11,
  209:15,
  209:17,
  209:21.
injunctions
  27:3.
injunctive
  97:18.
injury
  207:19.
inpatient

55:4.
insisting
  150:4.
insolvable
  204:2.
instance
  9:10.
instances
  127:22.
Instead 24:9,
  88:23,
  132:22,
  198:2.
instruction
  208:16.
insulin 60:20,
  60:23, 60:25,
  95:9,
  95:11.
insulting
  188:13,
  189:5,
  189:22.
insurance 76:4,
  173:22.
insures 76:4.
integrated
  207:5.
integrity 20:7,
  138:14,
  138:20,
  142:19,
  155:8, 157:3,
  180:21,
  188:11,
  190:22,
  191:17,
  191:22,
  192:4, 192:6,
  192:17,
  193:10,
  193:21,
  206:1,
  206:7.
intend 15:7.
intended 15:7,
  19:24.
intentionally
  14:12,
  80:17.

interaction 86:1.
interest 100:17, 166:8.
interesting 56:16, 198:4.
Interestingly 58:25.
interfere 205:6, 207:18.
Interim 209:13.
intermediate 139:20, 139:24, 140:8, 140:13, 140:18.
intern 39:16.
internal 20:22, 159:13.
internally 160:16.
International 146:9.
interpretabilit y 49:2.
interpretation 46:24, 48:18, 49:12, 112:3.
Interpretations 84:5, 85:7.
interpreted 169:12.
interpreting 14:25, 112:5.
intersex 199:9.
introduced 4:18, 4:19, 4:21, 102:6.
introvert 138:6, 197:17.

investment 54:9.
involuntarily 165:9.
involved 4:6, 6:24, 86:9, 86:10, 86:11, 86:12, 86:21, 145:10.
involves 113:7, 208:9.
involving 98:2, 100:14, 156:1.
ipse 81:16, 107:15.
Iraq 130:10.
ironic 92:12.
Ironically 201:6.
irrelevant 27:16, 32:15.
irreparably 206:10.
irrespect- 101:7.
issued 18:13, 19:4, 19:6, 19:22, 25:2, 27:5, 88:2, 111:8, 131:23, 170:2, 180:2, 204:13, 205:13, 206:22, 207:6.
issues 15:19, 17:5, 39:6, 54:16, 60:9, 70:18, 97:20, 98:3, 100:7, 118:8, 120:21, 120:24, 120:25, 121:18, 121:19, 125:4,

127:22, 128:16, 131:5, 131:16, 132:7, 138:12, 138:15, 138:18, 148:17, 198:18, 204:5, 204:17.
issues. 128:2.
issuing 205:11.
italicize 209:6.
italicized 49:21.
itself 27:1, 113:2.
IV 40:8, 66:17, 67:2, 67:7, 67:9, 67:10, 69:9, 75:10.
.
.
< J >.
J. 3:3.
Jane 19:20.
Janeway 138:9, 138:10, 138:12.
January 186:24.
Jason 2:7, 2:12, 3:23, 4:1.
Jean 2:13, 4:1.
Jeans 109:13, 109:15.
Jennifer 1:25, 3:9.
jobs 142:25, 179:20, 206:3.
John 34:10,

34:15.
joined 3:25.
Joint 123:22, 125:2, 125:9, 125:12, 125:17, 128:9, 128:20, 131:15, 131:20, 131:21, 133:20, 176:17.
Jon 104:24, 126:13, 126:14, 201:6.
Jones 138:8.
Josephine 197:19.
Journal 83:6, 92:13.
journey 155:12.
Judge 1:18, 6:9, 6:13, 12:17, 16:9, 16:15, 98:21, 141:21, 156:4, 156:6, 156:10, 202:16.
judgement 177:5, 182:4.
judgment 53:4, 81:22, 89:11, 89:13, 90:4, 108:11, 132:14, 134:23, 135:1, 135:16, 138:1, 141:7, 142:2, 155:6, 176:15, 177:8, 177:17, 180:12, 180:17,

180:18,
180:23,
180:24,
188:1,
188:6.
judgments
32:22, 89:15,
114:18,
133:18,
176:12.
Judicial 28:7,
106:1,
108:18.
jumps 174:18.
jungles
60:14.
Justice 2:8,
2:15, 4:9,
4:17, 24:19,
27:1, 27:22,
28:11, 83:7,
83:16, 84:3,
84:21, 84:23,
86:23, 87:3,
92:12,
140:15.
justification
196:7, 196:9,
196:10,
196:13.
justifications
98:24, 99:6,
111:18,
111:22,
117:13.
.
.
< K >.
Kagan 83:7,
83:16, 83:17,
84:3, 84:4,
84:23, 86:23,
87:3,
92:13.
Kathryn
138:10.
keep 27:15,
54:13, 59:6,
68:10, 68:11,
71:23, 80:8,

92:21, 93:2,
97:15, 121:2,
128:6,
141:16,
145:5, 150:3,
180:16,
187:4,
194:25.
keeping 5:23,
31:11, 31:23,
32:25, 53:16,
53:17, 79:2,
88:6, 109:19,
181:3,
210:7.
kept 6:12,
68:17.
key 68:6, 68:8,
69:13, 70:19,
77:4.
kick 53:6.
kicked 80:1.
kind 7:5,
14:10, 58:8,
64:11, 97:18,
98:17, 108:4,
111:3,
111:25,
126:8,
142:13.
kinds 89:23,
90:20,
122:16,
176:19.
knowing 64:21,
145:1,
162:11.
known 35:12.
known. 51:12.
knows 110:3,
163:5.
Korea 130:12.
Kropf 1:38,
1:39, 3:17.
.
.
< L >.
lack 20:7,
46:25,
138:13,

138:20,
155:8,
180:21,
181:21,
181:25,
195:25,
196:1,
202:25.
lacking
188:11.
land 137:15.
language 21:23,
25:11, 70:4,
138:19,
138:21,
139:21,
140:1, 141:5,
154:17,
154:19,
154:20,
163:24,
169:24,
171:5, 190:5,
190:6,
190:15,
191:14,
193:8,
204:24.
languages
197:24.
laptop 83:22.
large 90:5,
111:6,
121:21,
135:12.
Lasso 151:10.
last 4:18, 5:6,
73:16,
103:14,
109:2, 109:9,
122:4,
129:20,
132:11,
143:7,
155:11,
158:22,
173:9, 179:3,
180:9, 184:3,
190:4,
197:18,

201:5,
201:18,
208:23.
late-morning
4:3.
Later 9:11,
17:15, 25:3,
26:5, 26:6,
67:23,
112:10,
197:24.
latter 43:22.
Law 45:1, 45:4,
45:8, 45:15,
45:18, 45:22,
80:21, 84:4,
84:22, 85:6,
86:7, 86:23,
88:15, 88:25,
89:7, 93:5,
100:14,
101:3,
104:15,
104:17,
104:20,
105:12,
106:18,
115:12,
142:5,
154:24,
193:1.
laws 154:24.
lawyer 15:3.
lawyers 20:11,
84:2, 96:19,
210:16.
lay 94:19.
Layendecker
2:14, 4:2.
layers 89:11.
lead 29:12.
leaders 132:13,
132:21.
leadership
123:11,
132:7.
leap 41:11.
learn 18:20,
58:12,
68:22.

learning
  193:11.
least 17:1,
  33:23, 52:25,
  56:8, 61:21,
  76:21, 80:14,
  88:5, 92:10,
  95:16,
  106:22,
  125:24,
  125:25,
  135:12,
  148:18,
  159:6,
  163:15,
  169:22,
  170:7,
  172:10,
  179:15,
  186:12,
  191:23,
  197:8,
  199:2.
leave 14:13,
  71:12, 79:3,
  165:18,
  184:16,
  185:5.
leaves 17:12,
  54:10.
leaving 90:6,
  96:12, 96:13,
  97:2.
lectern 3:4.
led 25:22,
  27:2,
  197:2.
left 14:7,
  14:10, 14:11,
  32:7, 53:22,
  53:24, 54:1,
  134:3.
Legal 1:27,
  21:4, 21:14,
  23:20,
  71:6.
legally
  124:18.
legislation
  111:8.

legislative
  106:2,
  112:25,
  113:1.
legislature
  111:12.
legitimate
  28:4, 98:24,
  99:17, 113:4,
  114:15,
  142:16,
  194:22.
length 12:5,
  17:15, 31:15,
  82:9,
  177:15.
Lesbian 1:33.
less 25:2,
  51:24, 52:4,
  65:10, 71:23,
  71:25, 72:2,
  72:4, 72:5,
  98:6, 146:4,
  147:15,
  148:21,
  165:10,
  168:14,
  176:2,
  176:17.
lesson 98:12,
  98:13.
Lethality
  157:2,
  190:21,
  191:13,
  191:15,
  191:21,
  191:25.
letter 102:3.
level 8:7,
  40:13, 41:4,
  41:15, 41:20,
  41:22, 70:10,
  70:25, 97:23,
  108:14,
  121:14,
  124:18,
  125:22,
  139:22,
  139:24,

154:14,
  154:16,
  154:17.
levels
  118:16.
LEVI 1:25, 3:9,
  3:21, 50:8,
  89:22, 94:1,
  96:5, 101:21,
  109:12,
  109:13,
  109:15,
  163:8, 163:9,
  164:21,
  171:10,
  184:6,
  184:13,
  184:16,
  184:22,
  185:6,
  185:15,
  186:3, 186:7,
  186:20,
  201:15,
  202:13,
  202:14,
  202:19,
  203:2.
liars 20:8,
  138:14,
  138:20,
  141:19,
  142:19,
  155:8,
  180:21,
  188:11.
library 45:1,
  45:4, 45:18,
  45:20, 45:22,
  131:7.
life 93:7,
  103:2,
  103:18,
  117:14,
  117:20,
  117:25,
  162:17,
  210:18.
lifestyle
  187:7,

187:20,
  188:19,
  188:20,
  189:1.
lifetime
  115:22.
lifting
  12:16.
Light 56:21,
  57:4, 57:12,
  57:13, 57:15,
  57:17.
lightly 94:7.
likelihood
  100:1,
  101:4.
likelihoods
  117:15.
likely 65:7,
  65:9, 65:10,
  91:12, 91:14,
  100:6, 116:1,
  119:24,
  122:13,
  141:9.
limit 17:6,
  46:4,
  144:2.
limitation
  15:11, 47:1,
  144:6.
limitations
  44:12, 49:19,
  63:23.
limited 16:17,
  17:8, 17:13,
  17:16, 38:23,
  46:25, 47:5,
  108:19,
  196:25.
limiting 48:15,
  48:25.
Lin 2:13, 4:1,
  162:23,
  184:6,
  186:8.
Line 46:17,
  46:18, 46:22,
  49:16, 54:15,
  58:15, 66:19,

86:3, 96:9,
97:12, 126:2,
126:25,
128:7, 142:4,
179:6,
194:6.
lines 27:13,
112:2.
list 59:6,
76:2, 77:8,
77:20, 80:15,
193:13.
listed 39:9,
78:12.
lists 193:11.
literally 25:1,
26:5, 104:9,
117:17,
118:15,
123:18,
137:15,
137:18,
187:17.
Literature
29:23, 29:24,
30:1, 30:16,
36:20, 38:15,
38:19, 38:20,
92:9, 115:18,
117:17,
118:12,
122:3, 122:7,
168:13,
181:10.
litigation
6:25, 25:21,
27:6, 82:14,
82:15, 82:16,
171:15,
183:14,
185:5.
little 13:13,
52:25, 63:22,
64:1, 97:7,
108:23,
108:25,
109:2.
live 103:2,
118:23,
159:12,

160:21,
168:10,
168:17,
168:20,
168:21,
169:5, 169:6,
173:1, 203:5,
203:9.
lived 169:13,
203:10.
lives 29:12,
159:18.
living 103:12,
159:8, 159:9,
159:11,
159:14,
160:8,
187:17,
188:18,
188:20.
LLP 1:45.
lock 81:25.
logic 201:3.
long 20:17,
22:5, 30:6,
50:16, 52:18,
58:7, 60:2,
64:5, 64:11,
88:18, 93:23,
102:22,
131:16,
185:8.
long-standing
158:19.
Longer 24:7,
27:3, 52:5,
52:7, 52:9,
52:20, 52:25,
53:6, 58:20,
59:6, 65:9,
65:19, 65:20,
76:12, 76:14,
78:3, 146:13,
197:11,
209:19.
looked 26:1,
27:24, 30:17,
33:18, 33:19,
43:4, 43:7,
61:15, 94:24,

118:3,
136:14,
147:8,
150:14,
151:16,
154:19,
154:20,
155:5, 174:5,
180:1,
181:5.
looking 41:8,
43:7, 53:1,
53:18, 68:17,
68:18, 68:20,
69:11, 72:7,
89:3, 111:22,
120:25,
140:1, 146:2,
178:3,
178:13,
178:19,
181:11,
192:22,
192:24.
looks 75:10,
98:14,
192:22.
loose 21:11,
21:23.
lot 4:16, 8:3,
12:19, 44:16,
47:6, 58:12,
93:22, 93:25,
94:5, 106:23,
110:9,
115:16,
125:17,
136:1, 150:5,
162:17,
172:22,
197:18.
Lots 90:17,
119:13.
loud 160:1,
196:10.
love 4:21,
16:10.
low 79:19,
116:4,
174:20.

lower 71:24,
72:8, 77:18,
77:25,
78:21.
lunch 81:6,
83:15, 92:7,
155:22.
lying 162:20,
188:20.
.
.
< M >.
MA 1:30,
1:47.
machine 2:48.
magnitudes
148:5.
main 9:3, 9:6,
9:8, 41:11,
65:2, 65:3,
135:7.
maintain 47:10,
48:4.
Major 131:3,
131:11,
131:12,
131:17.
majority 12:9,
24:15, 85:18,
196:25.
male 120:20,
169:20,
198:1,
198:22,
199:9,
199:16,
200:11,
200:15,
200:18,
201:9,
201:18,
201:23.
males 138:13.
man 201:23,
201:25.
management
44:21.
mandatory 95:1,
95:2.
manner 108:5.

Manpower
  124:14.
March 12
  1:11.
marked
  115:11.
marker 203:1,
  203:7,
  203:10,
  203:11.
markers
  196:3.
mastectomies
  120:17,
  120:19,
  120:22.
matched 59:18,
  65:10.
material
  198:7.
math 71:17,
  71:18, 72:10,
  72:12, 73:3,
  147:10.
mathematically
  72:3.
matter 32:15,
  146:24,
  152:11,
  153:18,
  153:20,
  186:13,
  192:5, 201:3,
  211:6.
mattered 8:8.
matters 8:15,
  206:16.
Meaning
  70:10.
meaningful
  42:5, 44:17,
  60:4, 73:5,
  73:11,
  73:13.
meaningfully
  46:5.
meaningless
  56:4, 56:8,
  58:4, 58:6,
  64:12, 64:17,

73:9,
  151:18.
means 14:18,
  54:24, 72:25,
  77:18, 78:20,
  165:1, 169:4,
  170:25,
  175:25,
  176:2,
  188:19.
meant 13:16,
  13:19, 16:14,
  20:22, 23:4,
  23:9, 23:10,
  23:18,
  184:2.
medal 176:19.
medically
  13:24, 14:9,
  157:1, 172:5,
  172:22.
medication
  59:23,
  59:24.
medicine
  10:9.
meet 40:15,
  41:6, 118:6,
  128:13,
  128:23,
  163:25,
  164:19,
  164:22,
  167:8,
  167:12,
  167:13,
  173:7,
  180:22,
  188:12.
meeting 91:2.
meets 166:10.
Member 54:21,
  104:1,
  124:16,
  130:19,
  131:4, 150:6,
  153:19,
  166:8, 166:9,
  166:23,
  166:25,

167:3, 167:5,
  170:21,
  172:3,
  190:21.
members.
  73:24.
memorandum
  206:21,
  207:8.
Men 90:22,
  138:18,
  138:20,
  139:14,
  139:15.
mental 47:10,
  48:4, 48:14,
  48:15, 48:24,
  48:25, 55:4,
  55:9, 63:14,
  65:11, 116:4,
  118:5,
  118:16,
  128:13,
  128:24,
  130:5,
  158:12,
  159:13,
  172:21,
  177:11,
  180:22,
  182:22,
  190:23,
  193:7.
mentally 131:4,
  159:14,
  168:18.
mention 35:7,
  71:2, 106:12,
  154:22,
  180:4,
  196:24.
mentioned
  65:17,
  154:23.
mentions
  157:25.
mere 81:16,
  107:15.
merits 100:2,
  101:5.

met 114:23,
  122:4,
  130:4.
Michael 1:26,
  3:15.
middle 110:6.
miles 57:8.
million 143:19,
  143:20,
  144:10,
  146:1,
  147:12,
  147:18,
  151:17,
  151:23,
  153:1, 153:2,
  153:4, 153:5,
  153:23,
  153:25,
  154:7,
  174:14,
  174:20,
  174:22,
  174:24,
  175:4, 175:8,
  175:13,
  175:25.
millions 20:24,
  142:24.
mind 14:3,
  90:11, 97:15,
  110:18,
  111:16,
  197:14.
minds 94:17,
  94:18.
minimum 32:5.
Minter 1:32,
  3:14, 101:25,
  102:1.
minuscule
  147:25,
  169:1.
minute 30:14,
  156:2,
  209:23.
minutes 102:21,
  151:10,
  156:5.
mischaracterize

81:2.
mischaracterize
d 31:10,
31:25, 80:18,
177:22.
mischaracterize
s 88:6.
mischaracterizi
ng 88:11.
misleading
87:19.
misleadingly
80:17,
81:2.
misquoted
31:15.
misquotes
33:1.
misrepresented
80:6.
missed 171:9.
mission 146:14,
146:20,
146:23,
157:17,
157:24,
158:19.
misuses 33:2.
mix 25:21.
moderate
116:5.
moment 10:25,
41:22, 55:14,
88:10,
103:23,
126:20,
145:6, 171:1,
183:20,
191:25,
197:16,
199:21,
202:7, 204:8,
210:13.
Monday 23:3,
30:13, 30:18,
156:18,
156:19,
163:13,
163:17,
165:1,

171:16,
182:18,
199:24,
208:4.
money 54:6,
54:7,
145:1.
month 64:9,
123:19,
183:15,
187:2,
187:3.
Months 12:20,
26:6, 41:21,
41:23, 53:23,
54:22, 54:25,
55:10, 56:3,
59:15, 62:22,
63:15, 64:3,
79:15, 79:22,
80:16, 100:6,
127:19,
166:22,
171:23,
177:17,
179:4,
179:11,
196:20.
months.
53:25.
morale
127:23.
morning 3:6,
3:7, 3:8,
94:3, 96:2,
96:20,
101:22,
118:4.
Moseley 1:39.
mostly
106:19.
motion
209:10.
Motions Hearing
1:16.
mouth 133:22.
move 27:8,
56:22, 57:23,
112:5,
193:3.

moving 56:20,
57:8.
MR. MINTER
3:14, 102:4,
102:21,
102:24.
MS. LIN
104:7.
MSK 76:8,
78:7.
Multiple 129:5,
162:22,
194:22,
206:11.
muscle 74:18.
Muscle-skeletal
-something
74:18.
Musculoskeletal
74:3, 74:16,
74:17.
music 114:4.
Muslim 24:2,
24:10, 24:14,
24:15, 27:19,
197:1.
Muslims
196:25.
muster 17:3.
myself 4:19,
99:13,
154:10,
157:14.
.
.
< N >.
name 93:13,
109:12,
193:21.
National 1:33,
24:17.
nauseam 115:15,
118:4.
navigating
100:18.
Navy 204:22.
nearly 40:11,
41:2, 42:12,
62:17.
nebulous

166:21.
necessarily
85:23.
necessary
41:19, 42:6,
158:21,
183:7.
need 5:14,
34:5, 41:17,
57:9, 58:8,
60:11, 60:20,
60:25, 61:24,
75:6, 75:7,
93:2, 94:14,
113:6,
114:24,
134:21,
153:13,
153:15,
153:17,
156:17,
156:19,
176:21,
182:3,
199:25,
203:19,
209:17,
210:24.
needed 110:8,
209:20.
needs 60:22,
60:23.
negative 139:1,
167:3,
195:20.
negatively
176:4.
neither
174:24.
nerd 197:17.
nerds 45:7.
neurological
74:3, 74:25,
76:8, 78:7.
neuter 198:1.
News 18:16,
155:25.
Newtonian
56:17.
Next 26:9,

46:13, 49:15,
62:13, 65:15,
77:1, 77:2,
100:6, 126:2,
128:7,
163:21,
164:6,
164:25,
203:14,
209:16.
Nicolas 3:3.
NICOLAS
  TALBOTT, et
  al. 1:5.
nine 179:10.
nine-year
  146:11.
No. 1:5, 19:19,
  20:3, 25:17,
  119:10,
  159:21,
  186:6,
  188:16,
  196:15.
non-thought-out
  21:11.
nondeploy-
  42:16.
nondeployabilit
  y 40:13,
  41:4, 41:15,
  42:13, 42:17,
  43:21, 43:22,
  49:18, 50:22,
  55:19, 55:21,
  58:6, 58:9,
  65:4.
nondeployable
  40:12, 41:3,
  42:14, 55:3,
  55:8, 56:3,
  60:12, 62:19,
  63:3, 63:8,
  63:14, 63:18,
  64:2, 64:8,
  64:9, 64:11,
  64:15, 64:20,
  64:21,
  65:11.
nondeployment

41:22.
None 149:1,
  162:20,
  167:11,
  182:17,
  183:9,
  188:14,
  193:18,
  202:6.
Nonexistent
  175:19.
nongender
  177:13.
nonhormone
  78:6.
nonpeople
  198:3.
nonpublished
  7:17.
nonsensical
  196:2.
nonservice
  144:20.
nonsurgical
  174:15.
nontransgender
  41:23, 41:25,
  42:15, 47:17,
  51:4, 51:11,
  52:9, 52:21,
  53:6, 55:18,
  55:20, 64:13,
  68:25, 69:25,
  70:12, 70:21,
  70:23, 72:9,
  73:2, 73:19,
  118:1,
  144:21,
  149:9,
  149:12,
  151:21.
nor 174:25.
normal 99:20,
  110:10,
  111:11.
not. 60:6.
note 47:8,
  77:23,
  197:23.
noted 58:15,

65:18.
notes 69:7,
  77:21, 126:9,
  126:16,
  197:13.
nothing 20:14,
  41:11, 45:21,
  50:24, 67:4,
  67:5, 84:17,
  87:7, 91:19,
  104:10,
  112:6,
  116:17,
  137:16,
  137:17,
  142:15,
  143:11,
  154:21,
  154:23,
  189:12,
  194:8,
  194:20.
notice 83:3,
  210:5,
  210:21.
notified
  210:12.
notify 210:9.
notifying
  210:18.
noting 87:9.
nots 130:1.
notwithstanding
  131:14.
noun 195:16,
  195:19.
novo 110:2.
nowhere 144:6,
  191:6.
null 103:13,
  160:25,
  167:20,
  169:8.
numbered 37:19,
  44:6.
numbers 51:12,
  69:7, 78:21,
  144:14,
  144:20,
  145:7, 147:1,

147:23,
  149:20,
  174:8,
  174:19,
  178:12,
  178:15.
numerous
  24:5.
NW 1:40, 2:9,
  2:16, 2:43.
.
.
< O >.
objection
  104:7.
objective
  113:5.
observed 40:12,
  41:3,
  62:19.
obtain 18:18,
  19:9, 43:5.
obtained 11:7,
  11:21,
  146:7.
obvious 79:4,
  80:7,
  142:3.
Obviously 5:9,
  90:23, 97:15,
  116:16,
  127:18,
  132:5, 132:8,
  145:25,
  157:24.
occupational
  166:24.
occurred 10:21,
  25:1.
occurrence
  68:2, 68:6,
  68:19, 68:24,
  69:24, 70:19,
  71:12, 71:21,
  71:23, 71:25,
  72:2, 72:4,
  72:21, 74:10,
  77:19, 77:25,
  78:21, 78:22,
  80:14.

occurrences
  67:18, 72:5,
  72:8, 73:17,
  74:9,
  77:23.
of. 39:5.
off-the-cuff
  20:23.
offered 129:2,
  198:11.
Office 4:7,
  84:18, 87:8,
  88:7,
  143:14.
officer 125:11,
  125:18.
Official 2:42,
  18:9, 124:13,
  170:5,
  211:10.
officials
  123:24.
often 9:24,
  19:17, 21:10,
  26:22, 47:16,
  47:19, 67:17,
  67:25, 68:5,
  68:18, 68:19,
  72:9.
old 29:17.
once 13:20,
  45:5, 70:11,
  183:25.
ones 100:10,
  161:10.
open 127:23.
openly 135:25,
  136:5, 168:2,
  179:15,
  179:18,
  180:8.
opens 16:18.
operated
  197:25.
operations
  205:7.
operative 8:11,
  27:11.
opinion 7:17,
  12:9, 27:1,

105:25,
  178:3,
  209:7.
opportunities
  186:13.
opportunity
  94:1, 96:9,
  129:2.
opposite 84:7,
  138:24,
  175:5,
  200:6.
opposite.
  85:9.
opposition
  13:15, 13:16,
  13:20, 13:21,
  14:18, 16:16,
  17:6, 17:7,
  17:11, 60:11,
  83:1, 87:6,
  123:16,
  127:12,
  135:2,
  204:16,
  204:20.
orally
  159:18.
orders 22:20,
  59:18,
  207:13.
ordinarily
  110:13.
organized
  198:2.
original 24:6,
  24:10, 24:21,
  24:23, 25:13,
  25:22, 25:23,
  26:1, 26:2,
  27:2, 163:16,
  183:16,
  195:7.
otherwise
  91:24,
  151:22,
  163:17.
out-of-date
  135:22.
outcome

75:15.
outcomes 60:4,
  172:21.
outdated 10:2,
  10:3, 10:8,
  141:15,
  150:4,
  178:13,
  180:6.
outer 114:12.
outlined
  19:9.
outpatient
  55:8.
outside 116:20,
  173:19.
overall 52:4,
  55:20, 58:5,
  58:8, 72:8,
  108:18,
  145:22,
  148:18.
overlap 106:23,
  106:24.
overrule
  155:13.
overruled
  92:16.
overstates
  148:5.
overwhelmingly
  118:25.
owed 32:6.
own 11:7,
  11:20, 17:16,
  50:2, 110:2,
  136:8, 136:9,
  180:20,
  209:10.
.
.
< P >.
P. 1:32.
p.m. 93:11,
  155:24,
  184:4,
  211:2.
pages 13:14,
  37:19.
panel 11:6.

pants 169:20.
paragraph 46:3,
  49:15, 54:15,
  73:21, 85:14,
  85:21,
  124:12,
  126:1,
  157:21,
  192:9,
  194:21.
particular
  26:24, 44:24,
  72:20, 81:25,
  85:21, 94:25,
  110:20,
  119:3, 120:9,
  183:4,
  192:23.
particularly
  34:9.
parties 3:4,
  108:1,
  185:22,
  208:24,
  209:9.
partner
  209:12.
parts 40:25,
  66:7, 66:10,
  95:9.
party 20:24.
pass 17:2,
  19:21.
passes 17:1.
passive 39:2,
  39:4,
  166:19.
past 11:6,
  83:8, 83:9,
  86:20,
  132:13,
  209:20.
patterns
  49:17.
pause 38:3.
pay 127:3,
  128:3,
  134:22,
  165:8,
  165:21,

165:24,
166:1.
pays 152:20,
152:21.
penalized
165:22,
165:23.
pendency 82:14,
82:16.
Pending 185:5,
205:15.
Pennsylvania
2:9.
pent 149:23.
Pentagon
18:19.
per 145:20,
147:18,
150:5, 150:6,
152:20,
152:21,
153:1,
153:12,
153:19,
174:23,
176:17.
perceived
120:9.
percentage
78:8, 144:16,
148:18,
173:6,
173:19,
173:23,
175:8,
175:14,
175:20.
percentages
47:18.
perfectly
103:11.
perform
146:14.
performing
124:13,
146:20,
146:23.
period 40:13,
41:4, 46:6,
63:3, 63:5,

63:8, 63:9,
64:2, 79:18,
80:16,
146:11,
174:1, 203:7,
208:6,
209:11.
period. 62:19,
145:22.
periods
60:12.
permanent
205:15.
permitted
11:15,
177:17.
personally
86:9,
94:11.
persons 13:23,
69:24, 77:5,
78:3, 82:11,
117:18,
136:5, 144:8,
150:7,
187:18,
199:9.
Pete 21:21,
131:23.
petition
107:2.
petitioner
81:14,
107:2.
Phase 36:8,
36:9, 36:10,
36:12, 36:14,
36:15, 40:8,
44:1, 44:2,
44:3, 44:6,
66:17, 67:2,
67:7, 67:9,
67:10, 69:9,
75:10.
phases 36:7,
36:11.
PHCOE 49:16.
phenomenal
197:19.
phone 184:4,

184:7, 185:1,
185:20,
210:24.
phrase 56:25.
physical 118:5,
118:17,
128:13,
128:24,
130:5,
158:12,
180:22,
182:22.
physically
131:4.
physicists
56:19.
physics 56:13,
56:17,
58:12.
physiology
201:20.
pick 65:24,
78:17,
132:12,
181:5.
picked 152:7,
166:19,
167:14.
picture 4:21,
4:23.
piece 65:3,
179:2.
pillar 52:18.
pillars
52:17.
pin 47:14.
place 5:23,
6:21, 7:10,
18:7, 69:6,
79:11, 79:13,
79:14, 80:3,
81:25, 88:21,
106:14,
107:21,
132:20,
132:22,
136:6,
154:25,
182:23,
183:10,

183:12,
183:13.
placed 40:14,
185:8.
places 41:5,
95:10,
102:8.
Plaintiff 1:7,
3:6, 102:16,
151:13,
160:11,
161:7,
161:22,
185:13,
207:4,
208:25.
plan 202:24,
203:4,
203:6.
play 97:14,
101:4.
played 12:22.
playing
154:11.
Please 3:4,
15:4, 37:10,
50:8, 67:20,
104:3,
117:16,
122:9,
127:13,
158:13,
171:15,
176:4, 193:6,
207:3,
209:12.
PLLC 1:39.
plus 114:7.
podium 104:3.
pointing
153:14.
points 15:24,
38:24,
177:20,
177:23.
Poland
130:11.
policies 5:23,
10:8, 19:16,
34:5, 35:10,

35:12, 83:6,
99:8, 99:10,
107:21,
108:4, 117:2,
117:4,
204:12,
205:5,
206:12,
206:24.
policy.
98:25.
policymakers
120:8.
politely 4:20,
48:20.
political 34:7,
35:4, 157:19,
158:5.
politically
90:5.
pool 69:17.
population
103:11,
177:11.
portion
124:8.
pose 141:9.
posed 46:6.
poses 48:17,
49:1.
position 91:20,
91:23, 121:7,
141:16,
171:13,
171:14,
194:16,
207:4,
209:1.
positions
206:6.
possible 20:17,
149:22,
196:7, 196:9,
196:10.
possibly
146:25.
post 20:24,
111:22,
119:24,
201:22.

posted 18:4.
potential 49:3,
162:4.
potentially
168:19.
power 28:6,
85:23, 86:21,
86:24, 88:3,
110:3.
Powerpoint
75:10.
practical 21:3,
21:16.
Practically
21:4,
175:19.
practice
83:23.
preaccession
69:18, 70:1,
77:7, 78:9.
precedential
12:15.
precisely
26:23,
178:18.
precludes
205:8.
predict
136:2.
predicting
89:12.
prediction
100:3, 138:2,
190:14.
predictions
180:13.
predictive
89:11.
preliminary
6:20,
186:14.
preordained
81:3.
prepare
33:20.
prepared 16:11,
30:15, 30:19,
33:25, 105:5,
105:8,

188:3.
preparing
202:17.
presence
38:15.
present 100:7,
131:13,
131:16,
139:3.
presented
53:21,
102:10,
137:11,
141:14.
presenting
104:8.
Presidential
84:5, 85:7,
100:3.
pressing
210:12.
Presumably
15:16,
146:10,
163:16,
199:18,
200:15.
presumption
97:17,
97:18.
pretend 33:4.
pretext 31:20,
32:5, 121:2,
142:7,
152:13,
196:11,
196:19.
pretextual
196:14.
pretty 169:9,
184:13,
185:24,
195:20,
198:3.
previous 11:19,
177:16.
previously
193:9.
primary 9:9,
146:14.

printed
83:19.
printout 36:17,
36:18.
printouts
36:19.
prior 38:7,
38:8, 38:13,
38:16, 70:6,
131:25,
162:8.
priority
121:9.
privacy 198:19,
200:22,
200:23,
202:1, 202:3,
203:12,
203:20.
Probably 10:13,
14:14, 36:23,
57:14, 83:14,
125:24,
125:25,
135:4, 135:6,
138:7,
160:25.
problem 15:15,
16:2, 16:3,
22:17,
131:14,
137:11,
138:22,
166:18,
179:20,
191:16,
201:23,
201:24,
204:3, 204:5,
205:23.
problematic
190:16,
193:1.
problems 14:22,
43:14, 97:25,
139:4,
141:9.
procedures
140:5.
proceeded

45:13.
Proceedings
  2:48, 187:15,
  211:2,
  211:6.
Process 4:10,
  4:13, 6:3,
  6:4, 6:12,
  91:11,
  118:18,
  136:11,
  146:10,
  146:12,
  164:3, 164:5,
  164:20,
  169:22,
  169:23,
  186:15.
processes
  161:25.
proclamation
  24:3, 24:11,
  24:12, 27:17,
  28:5, 195:5,
  196:17,
  196:19,
  196:23,
  197:4.
proclamations
  24:9, 24:17,
  24:22,
  24:23.
prodeference
  86:15.
produced
  2:48.
professional
  32:21, 32:22,
  108:11,
  114:18,
  138:1,
  141:6.
proffered
  98:25,
  114:15.
prohibit
  119:8.
prohibitively
  148:16.
prohibits

205:12.
promise
  104:5.
pronoun
  198:7.
pronounce
  93:12.
pronounces
  197:15.
proof 112:13,
  187:18.
proper 31:3.
properly
  200:8.
proportion
  59:1, 59:8,
  69:18, 77:6,
  78:4.
proposition
  87:12,
  123:23,
  134:10,
  187:11.
protection
  91:10.
prove 167:2.
provide 84:6,
  85:8, 111:12,
  148:21,
  148:22,
  174:15,
  200:21,
  206:13.
provided
  162:10,
  166:7.
providers
  48:15,
  48:24.
provides
  166:5.
providing
  143:17.
PSA 84:2.
Psychiatric
  74:2, 74:12,
  76:8, 76:11,
  77:10, 78:6,
  116:2,
  118:17,

193:11.
Psychological
  38:18,
  40:4.
psychotherapy
  49:8, 118:8,
  122:19,
  122:22,
  143:19,
  144:20,
  145:21,
  146:7,
  148:19,
  176:20.
public 18:3,
  20:5, 20:20,
  20:25, 21:10,
  36:5.
public-facing
  25:10.
publicly
  90:7.
published 7:18,
  123:20.
pull 36:15,
  145:9,
  179:1.
pulled 206:5,
  206:6.
punch 86:3.
purposes 23:7,
  129:22,
  134:11,
  136:20,
  168:5,
  168:6.
pursuant
  204:11,
  205:6.
pursuit
  157:18.
pushed 209:8.
Putting 5:23,
  31:8, 141:22,
  152:10,
  164:12,
  164:13,
  167:19,
  201:23,
  201:24.

.
.
< Q >.
Qatar 130:9.
qualifications
  69:19,
  128:14,
  128:24,
  130:5,
  131:17.
qualified 88:9,
  142:24.
qualify 15:8.
quantifiable
  180:14.
quasi-suspect
  172:16.
questioned
  196:21.
questioning
  103:8,
  160:2.
questions 13:4,
  46:6, 93:22,
  93:25, 94:5,
  94:6, 94:12,
  94:13, 94:14,
  96:24, 97:6,
  100:12,
  100:25,
  101:19,
  105:21,
  114:25,
  123:23,
  136:20,
  143:9,
  144:13,
  145:11,
  145:15,
  156:11,
  156:22,
  161:19,
  182:6, 182:8,
  202:16.
quick 4:13,
  4:14, 94:21,
  151:3.
quickly 96:6,
  97:5, 185:21,
  210:19.

quiet 45:6,
  45:22.
Quinn 197:19.
quite 13:19,
  24:19, 30:6,
  34:14, 56:16,
  58:13, 63:24,
  81:21, 99:23,
  110:9,
  113:17,
  197:21,
  202:19,
  206:15.
quo 82:14,
  208:23.
quotation 62:7,
  62:13,
  124:12.
quotations
  31:25,
  53:14.
quote/unquote
  107:5,
  107:10.
quoted 30:8,
  31:2, 31:8,
  31:24, 50:22,
  83:2, 84:15,
  87:5, 87:6,
  87:10, 87:11,
  125:22,
  133:24,
  134:13.
quotes 88:18.
quoting 81:15,
  84:19, 92:12,
  166:6.
.
.
< R >.
R. 1:26.
race 140:24.
race-based
  139:13.
races 90:23.
radical 158:10,
  158:15.
Raise 90:11,
  104:7, 106:2,
  151:12.

raised 90:17,
  204:5,
  204:6.
raising
  90:12.
Rand 175:3.
random 168:23,
  168:24.
Rapid 18:5,
  18:13,
  18:23.
Rate 42:15,
  42:17, 42:18,
  43:3, 48:9,
  58:9, 67:11,
  68:13, 69:1,
  70:23, 71:20,
  71:21, 71:25,
  72:4, 72:8,
  76:7, 77:17,
  77:19, 77:25,
  78:22, 79:21,
  79:22,
  115:23.
rate. 55:21.
rather 8:11,
  27:25, 84:7,
  85:8, 156:5,
  156:9,
  165:7.
rational 53:7,
  100:14,
  110:10,
  111:4, 111:9,
  111:10,
  111:11,
  111:15,
  111:21,
  111:23,
  112:24,
  113:4,
  113:18,
  114:19,
  114:20.
rationalization
  s 28:10,
  28:12,
  28:14.
rationally
  111:3,

111:14.
rationally.
  110:23.
Rawls 34:10,
  34:15.
re-ask 177:7.
reach 42:24,
  43:2, 100:21,
  124:18,
  209:18,
  210:24.
reached 42:23,
  142:4.
readiness
  40:14, 41:5,
  47:1, 60:4,
  124:17,
  144:1, 157:2,
  190:21,
  198:7.
reading 62:25,
  63:2, 128:6,
  197:18.
realize 94:4,
  155:3,
  159:4.
really 8:14,
  20:19, 23:9,
  23:10, 27:20,
  35:18, 58:11,
  58:13, 64:10,
  82:13, 94:14,
  102:12,
  108:3, 135:3,
  141:8,
  141:19,
  154:13,
  166:1,
  194:16,
  196:14.
reasonable
  53:4, 94:17,
  94:18,
  135:19.
reasoning
  111:13,
  132:24,
  142:7.
reasons 20:9,
  28:4, 49:9,

55:4, 63:15,
  81:12,
  114:15,
  119:14,
  121:24,
  142:2,
  142:16,
  162:2,
  190:12,
  194:22,
  195:10,
  207:17.
reassess 31:4,
  89:8.
reassessing
  31:6.
reassessment
  108:10.
reassignment
  162:7.
reborn 34:20.
rebut 23:1.
recall 26:2,
  106:5, 124:2,
  156:23,
  161:14,
  161:15,
  186:1,
  190:17,
  198:11.
receipt
  59:16.
receive 116:1,
  165:8,
  165:21,
  175:22.
received 15:9,
  60:5, 162:9,
  174:1.
receiving
  120:1,
  175:10,
  176:1.
recent 82:7,
  89:18, 90:4,
  114:3, 146:7,
  160:6,
  163:3.
Recently 83:11,
  83:12, 86:18,

158:9.
recess 37:4,
   93:11,
   155:24.
recite
   136:21.
recognize
   104:14.
recognized
   160:7.
recollection
   184:20.
recorded
   2:48.
records 63:21,
   136:15,
   137:14,
   137:21,
   142:21,
   187:16.
recovering
   119:23.
recruits.
   46:7.
Red 139:15.
refer 144:9,
   159:19,
   170:7,
   181:22.
reference
   24:13, 24:14,
   36:16,
   120:17,
   148:10,
   207:6.
referral 95:2,
   95:7.
referring
   92:14,
   150:13,
   159:1,
   181:16.
refers 159:5,
   170:8,
   171:6.
reflect
   25:11.
reflected
   119:21.
reflecting

66:2.
reflects
   86:1.
refuses 7:12.
regarding
   38:15, 102:2,
   124:16.
regardless
   128:12.
regrets
   118:15.
regular
   130:17.
regulating
   100:18.
regulations
   106:3,
   141:24.
Rehnquist
   84:21.
reiterate
   103:1.
rejected 107:2,
   107:9.
related 55:4,
   104:10,
   120:13,
   173:12.
relating
   58:1.
relation 57:9,
   57:10,
   113:4.
relative 57:23,
   57:24,
   58:3.
Relatively
   57:19.
relatives
   197:24.
Relativity
   56:14,
   148:10.
relaxed
   99:23.
relevant 13:21,
   24:24, 27:3,
   32:4, 66:8,
   72:16, 93:4,
   111:2,

144:24,
   146:14,
   194:6.
reliance
   17:14.
relied
   115:18.
relief 97:18,
   206:13.
religion 24:13,
   24:16,
   105:22,
   196:24.
religious
   107:4.
rely 10:8,
   32:10, 66:7,
   66:12,
   143:8.
relying 135:14,
   135:21.
remain 65:9.
remained
   54:22.
remaining
   97:6.
remains 27:10,
   160:8.
remanding
   12:16.
remark 20:23.
remarkable
   142:22.
remedy 97:16.
remember 46:2,
   84:10,
   109:12,
   109:13,
   109:15,
   148:6,
   209:24.
remotely 133:8,
   133:9.
removing
   18:17.
repeat 67:20,
   158:24,
   191:19,
   209:6.
rephrase

130:1.
replace 79:10,
   80:4.
replaced 201:6,
   201:7.
Reported
   2:41.
reportedly
   174:14.
Reporter 2:42,
   48:21, 61:13,
   211:10.
reporters
   96:12.
reports 30:20,
   30:21, 30:22,
   30:25, 31:1,
   31:8, 31:10,
   31:11, 31:18,
   31:19, 31:20,
   32:3, 36:24,
   37:1, 50:5,
   108:14.
reposted
   18:4.
represent
   171:18,
   171:19.
representation
   65:22,
   200:3.
representations
   102:7.
represented
   96:22,
   97:1.
represents
   135:11.
reproductive
   198:23,
   199:3, 199:9,
   200:5, 200:7,
   200:10,
   200:17,
   200:24,
   201:12.
request
   183:23.
require 13:23,
   120:6,

161:23,
162:1,
176:3.
required 47:10,
48:4, 72:19,
81:21,
165:25.
requirement
12:24,
112:1.
requirements
107:3, 118:6,
158:11,
164:19,
180:23,
182:21.
requirements.
40:16,
41:7.
requires
132:15,
153:24,
157:17,
157:25.
requiring
12:17.
requisite
157:18.
Research 9:16,
9:22, 9:25,
10:2, 10:3,
40:5,
174:5.
researched
13:9.
Reserve
124:14.
resolved 29:11,
203:16.
respect 32:4,
32:5, 50:17,
50:22, 61:17,
64:13, 70:19,
78:3, 80:14,
82:6, 94:2,
95:7, 96:1,
101:6,
121:19,
122:19,
130:3,

134:25,
146:3, 162:3,
163:16,
189:8,
190:11,
193:19,
202:21,
203:12,
210:18.
Respectfully
119:2,
182:2.
respond 123:5,
123:10.
Response 18:5,
18:6, 18:13,
18:23, 18:24,
136:22,
137:2, 146:6,
152:2,
192:11.
responses
123:11.
responsibility
146:14.
responsive
90:3.
rest 26:23,
52:17, 56:11,
67:6, 80:7,
197:10,
206:7.
restart
48:22.
result 55:8,
127:23.
resulted 8:4,
90:5.
retaining
166:8.
retention
51:11, 51:12,
95:3, 95:7,
103:5,
163:25,
203:2.
retired 75:24,
76:1, 76:2,
78:8.
retirement

165:11,
166:5.
retrospective
63:25.
retweeted 19:4,
21:22, 22:11,
22:14.
reverse
200:10.
reviewed 30:7,
79:19, 80:10,
80:11, 80:25,
98:5, 117:17,
145:18,
187:24.
reviewing
30:25,
116:23,
140:8.
reviews 11:6,
122:1.
revolves
57:12.
reweigh 31:16,
114:18.
Reyes 16:9.
rhetorical
108:2, 108:3,
139:22,
142:9.
rhetorically
194:3.
rid 20:6,
20:10, 75:6,
90:25, 114:1,
138:17,
142:23,
176:21,
176:22.
ridiculous
82:3.
Rights 1:33,
91:10,
97:22.
rigorous 144:4,
158:21,
183:7,
188:12.
risk 34:24,
38:15, 40:14,

41:5,
144:1.
risks 123:5.
river 45:17,
45:18.
Roberts 24:19,
27:2, 27:22,
28:11.
role 31:4,
88:8, 142:8,
154:11,
208:7,
208:8.
Romer 154:20,
154:23.
roster
175:24.
Rostker 98:2,
106:7,
110:18,
110:21,
111:5, 111:7,
115:5, 115:6,
140:6, 140:9,
140:12,
140:14,
140:16,
140:17,
140:19.
rotation 56:23,
56:24,
57:5.
roughly 35:4.
round 143:18.
rounding
147:16.
RPR 2:41,
211:4.
rule 194:6.
rules 106:3.
run 93:21,
97:25, 121:6,
193:24.
.
.
< S >.
S. 1:44, 2:8,
2:15, 18:16,
130:10.
Sacramento

1:36.
safer 140:20.
safety 206:3.
Sam 104:24,
    201:6, 201:7,
    201:8,
    201:17.
Sara 1:38,
    3:17,
    209:13.
satisfaction
    118:17.
satisfactorily
    114:12.
satisfy 158:20,
    183:6.
Saturday
    129:12.
save 155:17.
saw 135:4,
    156:2,
    160:22,
    167:18,
    204:20.
scale 156:5.
Schlesinger
    115:10.
school 44:23,
    44:25, 45:15,
    45:16, 45:17,
    45:18, 45:20,
    104:17,
    105:13.
science
    199:11.
scientific
    81:17,
    107:16.
scientists
    57:2,
    199:2.
scope 5:13,
    8:24, 13:13,
    16:17, 16:18,
    27:24, 29:5,
    170:12,
    170:13,
    204:7,
    207:23.
scratch 65:5,

66:2.
scrupulously
    20:12.
scrutiny 98:5,
    99:21, 99:22,
    99:23,
    139:12,
    139:16,
    139:20,
    139:24,
    140:8,
    140:13,
    140:18,
    141:4.
Seal 204:22.
seated
    105:15.
Seattle
    156:2.
second 24:11,
    36:10, 37:18,
    40:25, 84:8,
    95:15, 96:6,
    102:18,
    107:22,
    110:17,
    126:15,
    145:12,
    154:15,
    157:4,
    162:25,
    174:10,
    177:9, 178:4,
    179:2,
    191:14,
    197:14.
second-guess
    32:21.
Section 44:10,
    162:13,
    165:5,
    173:9.
Security 5:25,
    6:12,
    24:18.
seek 103:2.
seeks 79:10,
    80:3.
seem 166:1.
seems 16:17,

29:10,
    103:10.
seen 16:6,
    72:20,
    154:16,
    171:8,
    171:10,
    180:24,
    206:4.
selfish 141:19,
    142:19,
    180:22.
selflessness
    158:13,
    182:13,
    182:25.
Senator 4:9,
    123:21,
    127:16,
    127:20,
    127:25.
send 23:17,
    30:14.
sending
    164:7.
sense 10:1,
    108:9,
    200:18.
sensitive
    90:5.
sent 5:20,
    13:14, 36:5,
    36:10,
    129:13.
sentence 14:15,
    46:11, 46:14,
    46:22,
    65:15.
sentences
    65:24.
separate 24:23,
    101:8,
    106:20,
    130:18,
    165:7,
    165:14,
    200:5.
separated
    161:23,
    162:1,

164:15,
    164:17,
    165:9,
    165:13.
separately
    15:22.
separation
    162:1, 162:4,
    164:3, 164:4,
    164:8,
    164:20,
    165:6, 165:8,
    165:20,
    165:21,
    165:23,
    166:4,
    187:14.
seriously
    206:6.
serve 52:4,
    55:18, 131:1,
    143:24,
    168:1,
    177:18,
    206:9,
    207:18,
    207:21.
served 51:24,
    52:1, 52:2,
    136:5.
service. 46:12,
    158:21.
services
    48:4.
services.
    47:11.
serving 20:16,
    91:25,
    103:12,
    128:15,
    130:16,
    135:25,
    136:23,
    162:3, 165:5,
    175:9,
    179:15,
    179:18,
    180:8, 205:9,
    205:10,
    207:16.

session 46:6.
set 12:7,
    56:17, 112:3,
    160:25,
    167:21,
    169:9.
set. 103:13.
sets 161:25.
seven 73:22,
    135:22,
    178:13,
    178:15,
    180:6.
seventh
    46:18.
several
    97:13.
sex-based 98:3,
    101:8,
    101:12,
    139:19,
    140:6,
    140:13,
    140:18,
    141:1.
sex-segregated
    106:20.
sexes 199:2.
sexualities
    90:23.
Shannon 1:32,
    3:14.
shape 113:21.
shift 174:21.
short 60:3,
    83:15.
short-cut
    99:20,
    142:12.
shorthand 2:48,
    19:18, 21:6,
    21:10, 22:4,
    22:6, 22:8,
    22:9, 22:10,
    23:14.
should't
    66:6.
shouldn't 20:3,
    85:23,
    170:12,

182:7, 190:2,
    204:18,
    205:20.
show 17:2,
    28:2, 32:2,
    57:4, 88:12,
    112:1,
    122:11,
    151:13,
    177:25,
    190:10.
shower 203:14,
    203:22,
    203:23.
showers
    203:13.
shows 117:19,
    134:5, 144:7,
    181:25.
sick 39:1.
side 32:19,
    156:4.
sides 96:21,
    96:22, 96:25,
    172:17.
sign 16:16,
    16:19.
signed 11:25,
    23:17.
significant
    40:14, 41:5,
    166:23,
    209:25.
signs 160:10.
single 15:17,
    68:23, 68:25,
    89:18,
    133:11,
    140:4, 161:7,
    162:21.
singled
    192:23.
singling
    194:11.
singular
    157:17,
    158:4.
singularly
    206:2.
Sir 26:16.

sit 103:23,
    152:3,
    186:5.
situate 97:8.
situation 26:8,
    27:6, 141:13,
    184:15,
    193:22.
six 46:18,
    73:22.
skeleton
    74:19.
skip 191:15.
Skrmetti 100:8,
    101:14.
slacks
    169:21.
sleep 4:15.
slide 77:1.
sloppy 22:24.
slow 48:19.
slower 56:23.
slurs 122:16.
Small 147:15,
    148:3, 148:4,
    160:24,
    168:24,
    175:17,
    175:20.
smaller
    72:21.
smarter 197:7,
    197:8.
SMS 77:5.
so-and-so 39:7,
    39:8.
social 166:24,
    208:9.
society 34:16,
    34:17, 34:19,
    34:20, 34:22,
    34:24, 34:25,
    35:1, 35:3,
    35:4,
    122:11.
soldier
    187:6.
sole 17:7.
Solicitor
    204:23,

209:13.
solvable
    204:5.
somebody
    146:18,
    179:17,
    179:21.
somehow 132:13,
    148:16,
    171:22,
    171:23.
sometimes
    99:14,
    141:24.
somewhat 47:5,
    141:13,
    147:14.
somewhere
    110:5, 135:6,
    157:7,
    160:12,
    169:2,
    179:22.
song 109:13,
    109:16.
soon 101:2,
    133:2,
    133:5.
sort 6:9, 8:3,
    18:24, 31:16,
    37:23, 46:3,
    57:6, 94:19,
    96:3, 96:9,
    99:20, 108:8,
    115:11,
    150:7,
    209:15.
sound 108:2,
    124:6.
sounds
    165:11.
South 130:12.
Sox 139:15.
Space 56:17,
    56:18, 57:5,
    57:18, 57:23,
    57:25, 58:2,
    58:4, 58:6,
    101:3,
    197:3.

speakers
   198:2.
Special 56:14,
   130:18,
   131:1, 131:2,
   134:22,
   135:17,
   148:9.
specialized
   142:25.
specific 21:13,
   61:5, 69:12,
   69:19, 70:3,
   77:9, 79:17,
   89:24, 91:15,
   91:16, 133:6,
   148:23,
   158:8,
   193:14,
   204:24.
specifically
   87:11.
specifics
   162:10.
speculate
   22:24.
speculation
   64:3.
speed 10:9,
   57:12, 57:13,
   57:15,
   57:16.
spend 92:9,
   197:18.
spending 72:17,
   145:17,
   145:20,
   147:20.
spent 143:16,
   144:10,
   165:19,
   174:14,
   174:23,
   185:1.
sperm 198:24,
   200:8,
   201:12.
spike 149:16,
   149:18.
spikes 150:2,

   150:3.
spitting
   160:19.
spoke 35:7,
   104:25.
squared
   45:14.
St. 1:34.
stability
   79:16, 79:18,
   79:22,
   166:23,
   171:23.
stable 29:18.
Staff 88:24,
   123:22,
   125:18,
   128:9,
   128:21,
   131:15,
   131:20,
   131:21,
   133:20,
   146:14,
   176:18.
stage 199:24.
stamped
   178:21.
stamps 155:1.
stand 20:13,
   52:16, 86:22,
   162:15.
standard 86:6,
   86:7, 87:23,
   87:24, 87:25,
   93:5, 107:1,
   110:10,
   110:14,
   110:15,
   139:9,
   140:7.
Standards
   13:25, 40:5,
   157:2,
   158:21,
   167:4, 167:5,
   172:2, 173:1,
   183:7,
   185:10,
   188:12,

   190:21,
   191:6.
standards.
   144:4.
Standing 33:21,
   52:14, 56:4,
   135:18,
   170:11,
   173:3.
Star 57:17,
   57:18, 138:9,
   138:10.
start 3:5, 6:3,
   35:22, 37:5,
   37:8, 40:24,
   41:1, 46:13,
   48:21, 58:15,
   69:13, 130:2,
   164:3, 164:4,
   169:20,
   179:21.
started 24:2.
starting
   139:11.
starts 41:1,
   46:4, 46:11,
   149:20.
State 85:22,
   100:17,
   111:25.
stated 35:4.
statements
   25:9, 25:10,
   27:12,
   194:12,
   194:17,
   194:18.
States 1:1,
   1:18, 3:25,
   79:21, 82:19,
   88:22, 94:8,
   132:21,
   138:6,
   141:15,
   190:20.
stating
   125:3.
status 46:11,
   77:7, 82:14,
   100:13,

   159:18,
   185:9,
   208:22.
status.
   46:19.
statute 112:4,
   113:3.
statutes
   112:5.
Stay 6:21, 7:9,
   12:16, 52:23,
   52:25, 53:5,
   66:16, 76:11,
   79:15, 118:7,
   119:24,
   197:11,
   209:10,
   209:18.
stayed 58:20.
stays 55:4.
stellar
   131:21.
stenographic
   211:5.
step 155:11,
   167:16.
step-by-step
   163:21.
steps 164:7.
stick 53:15,
   168:16,
   175:6.
stigma
   122:11.
stipulated
   148:2.
stop 21:7,
   104:11,
   177:10,
   191:1.
story 60:2,
   111:17.
Street 1:28,
   1:40, 2:16,
   19:20.
strength
   116:3.
stresses
   117:13,
   117:20.

stressful
  117:25.
strict 139:12,
  139:16,
  140:7,
  141:4.
strong 209:6.
structure
  200:9,
  200:11.
stuck 35:2.
studied 6:25,
  68:24,
  80:9.
studying 45:5,
  45:7, 45:19,
  51:18,
  116:23.
stuff 74:19,
  138:15,
  151:16.
stunning
  136:21.
subject 98:4,
  163:18,
  164:13,
  205:24,
  206:22.
subjected
  122:13.
subjects
  205:9.
submit 165:1.
subset
  119:16.
subsets
  121:19.
substantial
  48:17,
  49:2.
succeed
  100:4.
success
  100:2.
suffer
  184:17.
sufficiently
  122:22.
suggest 33:11,
  92:8, 92:10,

103:10.
suggested
  97:16,
  194:18.
suggesting
  12:24.
suggests
  59:15.
suicidal
  115:21,
  117:2, 117:9,
  117:15,
  122:7.
suicide 115:22,
  115:23,
  117:3, 117:4,
  117:7,
  117:15,
  122:13,
  122:14,
  123:1,
  168:15.
Suite 1:29,
  1:35, 1:41.
suited 52:23.
sum 96:9.
Sumerian
  197:23,
  198:2.
summarize
  134:12.
summary 62:16,
  77:15.
sunk 54:9,
  54:10,
  142:24.
superabundance
  98:24.
Supplement
  102:2,
  163:7.
support 31:11,
  31:23, 52:12,
  65:2, 79:2,
  81:16, 98:25,
  99:2, 106:3,
  107:15,
  109:18,
  109:19,
  110:7, 112:9,

113:2,
  114:16,
  169:3, 181:3,
  191:22.
supported
  32:13, 35:17,
  89:4,
  142:17.
supporting
  139:3,
  193:14.
supportive
  79:12.
supports 32:25,
  53:16, 88:6,
  113:13,
  113:23,
  126:18,
  166:9,
  166:13,
  187:11.
supposed 33:2,
  55:19, 80:24,
  135:1, 139:4,
  143:2, 154:9,
  154:10,
  155:10,
  176:25,
  177:8,
  178:19.
surgical
  118:14,
  143:20,
  144:22,
  148:17,
  148:18,
  174:15,
  190:23.
surprise 68:22,
  143:12.
surprised
  18:20,
  31:13.
surviving
  197:24.
susceptible
  117:19.
suspect 100:13,
  100:22,
  101:7,

101:13.
sweep 15:7.
switch 48:21.
symptom 14:20,
  15:18.
symptoms 14:14,
  14:16, 14:18,
  14:22, 15:12,
  17:13, 20:18,
  23:12,
  103:16,
  160:4,
  160:20,
  161:4, 162:5,
  170:14,
  170:16,
  170:17,
  190:25,
  192:14.
system 198:24,
  200:7,
  200:17,
  200:24.
systems 198:23,
  201:12.
.
.
< T >.
T. 2:41,
  211:9.
tab 40:8,
  40:9.
table 3:13,
  4:1, 45:10,
  73:20.
tagging
  170:15.
Talbott 3:3,
  131:3,
  131:11,
  131:12,
  131:17.
talk- 21:7.
talked 45:24,
  77:11, 97:21,
  131:18,
  139:6,
  141:5.
talks 45:22,
  169:14,

192:10.
tall 26:17,
    26:18.
target 120:9,
    203:5,
    203:9.
targeted
    120:21,
    120:22.
targeting
    89:23, 91:15,
    121:18.
targets
    119:16.
taught 134:1,
    134:2.
taxpayer
    21:1.
Team 18:6,
    18:8, 18:24,
    31:18, 33:13,
    33:16, 33:18,
    33:19, 163:5,
    202:17.
technology
    10:10.
Ted 4:9,
    151:10.
television
    132:1.
tells 67:25,
    71:23,
    104:19,
    120:14,
    141:20,
    141:24,
    159:13,
    174:19.
ten 78:12,
    147:8,
    147:12,
    153:5.
tend 204:18.
tendencies
    117:15.
tense 39:3,
    39:4, 39:6,
    39:7,
    166:19.
term 14:25,

16:1.
terms 8:24,
    12:15, 12:16,
    17:16, 69:17,
    106:18,
    162:17,
    170:15,
    196:22,
    202:1,
    202:20,
    205:24,
    206:23,
    209:15.
terrorism
    195:11.
terrorist
    195:14,
    195:18,
    195:23.
terrorizes
    195:19.
test 140:2,
    195:23,
    195:24.
testify 198:12,
    198:13.
testimony
    32:19,
    102:10,
    102:11,
    103:3,
    123:16,
    123:17,
    124:23,
    125:1, 127:2,
    134:5,
    134:9.
testimony.
    81:18,
    107:17.
thankful 96:22,
    96:24.
Thanks 95:25,
    127:25.
that. 103:18.
themes 97:8,
    97:13.
themselves
    165:14,
    194:19.

then-in-place
    38:8.
then-professor
    83:17,
    84:4.
theorists
    35:5.
Theory 34:7,
    34:15, 56:14,
    57:19.
therapies
    144:21.
therapy 60:6,
    119:8,
    119:12,
    119:14,
    119:17,
    119:22,
    120:1, 120:2,
    120:3, 120:6,
    143:20,
    144:21,
    162:6,
    167:15.
thereof
    160:10.
They've 51:17,
    130:9,
    130:10,
    130:11,
    130:12,
    143:1,
    165:25,
    202:2.
thinking
    100:10,
    120:25.
thinks 151:9,
    160:17,
    170:7.
third 36:8,
    36:10, 36:11,
    36:12, 36:15,
    37:20, 38:19,
    49:16.
thoroughly
    13:9.
though 28:10,
    35:24, 87:17,
    88:10, 114:5,

120:19,
    120:23,
    149:2, 152:6,
    162:7,
    185:16,
    191:2,
    191:16.
thoughts
    159:17.
thousandths
    147:12,
    147:19,
    147:25.
threat 48:17,
    49:2.
three 25:3,
    30:20, 30:25,
    33:22, 36:7,
    37:14, 38:24,
    39:20, 46:18,
    54:14, 73:22,
    75:15, 80:16,
    100:6, 102:8,
    102:21,
    138:23,
    146:12,
    167:6, 173:7,
    178:13,
    181:15,
    181:16,
    181:19,
    182:10,
    183:4,
    183:21,
    191:23,
    194:24.
threw 80:15.
throughout
    13:21, 54:22,
    135:1.
throw 152:13.
Thumb 206:19,
    209:3.
tie 24:16,
    169:21.
time-consuming
    146:12.
tip 83:23.
tissue
    199:10.

title 110:22.
titled 18:16.
TJ 59:6,
  59:8.
today 5:2,
  93:18, 95:19,
  135:21,
  140:13,
  170:11,
  173:6, 178:6,
  179:13,
  188:4,
  191:4.
together 31:22,
  34:3, 71:19,
  72:7,
  75:11.
tongue
  197:24.
took 11:8,
  11:21, 80:12,
  86:22,
  135:4.
top 60:3,
  89:11, 97:12,
  158:7,
  158:16.
top-line
  17:18.
total 70:8,
  91:24,
  145:16,
  145:20,
  145:21,
  147:20,
  148:1,
  197:17.
Totally 32:24,
  80:17,
  119:14,
  163:13,
  173:17,
  173:20,
  190:18,
  196:18.
touch 6:20,
  15:16, 28:5,
  135:3.
touching
  100:21.

towards 110:6,
  154:17.
track 137:8,
  137:18,
  145:5,
  173:10,
  173:11,
  173:12.
traditional
  115:2.
train 54:6,
  155:12.
trained 54:5.
training
  106:22,
  142:25.
trans 168:5,
  201:23,
  201:25,
  203:15,
  203:22,
  203:23.
trans- 65:20,
  122:6.
trans-identifyi
  ng 13:23.
Transcript
  1:16, 2:48,
  109:9,
  211:5.
transcription
  2:49.
transcripts
  5:6.
transgender.
  6:17.
transgenderism
  136:15.
transition
  23:14,
  118:13,
  167:1,
  167:17,
  169:16,
  169:18,
  169:19,
  169:21,
  169:23,
  170:25,
  171:5, 171:6,

171:25,
  172:21,
  201:22,
  202:24,
  202:25,
  203:6, 203:8,
  208:5, 208:9,
  208:10,
  208:17.
transitioned
  13:24, 14:9,
  17:11, 143:2,
  157:1,
  160:21,
  172:4,
  201:25.
transitioning
  169:15.
transpire
  206:5.
travel 57:4,
  57:16.
traveling
  56:22,
  56:24.
treat 143:17,
  144:23,
  146:1,
  152:23,
  176:17,
  177:13,
  196:3.
treated 27:25,
  173:24,
  175:12,
  202:24.
treatment
  29:18, 38:16,
  118:22,
  144:2, 154:2,
  154:5, 154:6,
  173:12,
  175:22,
  176:1,
  190:13,
  194:12,
  202:23,
  203:4.
Trek 57:17,
  57:18, 138:9,

138:10.
tremendous
  172:18.
Tremont 1:28.
Tricare 76:3,
  173:21,
  174:5.
trick 109:22.
TRO 183:20,
  184:1, 184:5,
  184:9,
  184:14,
  184:17,
  184:25,
  185:7,
  185:20,
  185:24,
  186:7,
  186:10,
  186:13.
troop 157:2.
troops 18:17,
  18:25,
  19:6.
truck 170:15.
true 6:23,
  9:24, 87:13,
  129:22,
  132:8.
Trump 3:3,
  5:20, 23:21,
  24:1, 24:4,
  25:3, 25:6,
  25:20, 26:9,
  27:6, 98:12,
  98:13,
  128:10,
  131:22,
  142:14,
  155:16,
  194:5, 194:7,
  194:9, 195:5,
  196:13,
  196:16,
  196:17.
Trust 6:17.
truthful 187:7,
  187:19,
  188:18,
  189:1.

try 9:25,
123:25,
142:8, 147:1,
148:14,
169:22.
trying 5:12,
11:2, 43:10,
43:11, 43:12,
43:13, 45:7,
68:9, 68:16,
109:1,
109:22,
109:23,
112:24,
139:16,
145:9,
146:25,
157:15,
160:14,
194:2,
197:20,
197:21.
tuition
166:1.
tuned 66:16.
turn 36:23,
37:10,
37:20.
turning
21:14.
turns 57:18,
122:5.
TV 125:17.
tweet 5:20,
6:3, 6:4,
6:7, 18:4,
18:13, 19:5,
20:2, 21:5,
22:5, 24:10,
24:22, 25:1,
25:4, 25:22,
26:1, 27:4,
27:18, 67:5,
141:22.
tweeted 18:24,
27:5, 92:2.
tweets 23:23,
24:1, 24:2,
24:6, 24:23,
25:11, 25:12,

26:4, 27:12,
27:16,
27:25.
twice 7:13,
116:1, 165:8,
165:21,
184:1.
Twitter 20:25,
21:6.
type 74:10.
types 73:17,
115:1.
typically
125:3, 128:1,
193:13.
.
.
< U >.
ultimate 25:11,
196:13.
ultimately
10:5,
100:4.
unacceptable
42:19.
unacceptably
42:13,
43:3.
uncertainty
101:3.
unconcerned
158:11,
182:21.
underage
100:18.
undercut
132:25.
undergraduate
44:20.
underline
209:6.
undermines
168:14.
undermining
107:5.
Undersecretary
124:19.
understandably
11:12.
understanding

5:18, 6:2,
11:16,
113:12,
129:15,
164:6, 169:7,
171:4,
171:12,
172:9,
198:18,
200:2, 203:7,
204:4, 204:8,
206:18,
208:22.
Understood
3:12, 57:22,
80:11.
undertook
49:16.
undisciplined
20:8, 138:13,
138:20,
188:20.
undoing
132:19.
unfair 71:13.
unfit 205:10,
206:10,
207:16.
unfortunately
37:19, 44:2,
44:5.
unhumble
141:19.
UNIDENTIFIED
SPEAKER
90:14.
uniform 61:7,
105:21,
106:13,
107:3.
uniformed
125:11,
125:18.
uniformity
105:21,
105:22,
157:3,
190:22.
unintentionally
80:18.

unit 112:14,
113:10,
113:11,
113:20,
113:21,
114:2, 114:8,
124:16,
127:22,
128:22,
131:14,
137:20,
138:22,
139:3,
157:20,
158:6,
158:13,
176:5,
176:18,
179:17,
182:25.
unit. 128:17.
United 1:1,
1:18, 3:25,
79:20, 82:19,
88:22, 94:8,
132:20,
138:6,
141:15,
190:20.
unknown
166:20.
Unless 18:18,
19:9, 22:19,
42:5, 57:17,
57:25, 58:7,
94:9, 94:11,
96:25, 107:4,
151:19,
166:22,
194:20,
197:10.
Unlike 11:6,
11:19, 53:13,
86:7.
unlikely
17:2.
unpublish-
12:11.
unpublished
12:12,

12:18.
unquote
    198:1.
unrelated 49:9,
    55:9, 111:18,
    119:14,
    155:1.
unsupported
    111:19,
    139:2.
until 5:24,
    23:3, 96:15,
    97:4, 129:7,
    134:4,
    182:18,
    202:25.
untransition
    172:5.
untreat
    168:19.
untreated
    168:20.
unusual 21:5,
    84:17, 87:7,
    120:8,
    124:15.
up-to-date
    10:20, 10:22,
    11:14, 11:16,
    12:1, 12:4,
    12:21, 13:9,
    92:21.
updated 93:2,
    93:8, 122:1,
    122:2, 174:6,
    210:8.
updates
    210:18.
upset 112:14,
    113:10,
    114:4,
    114:5.
upsets 113:20,
    113:21.
usage 120:13.
uses 54:15,
    110:23.
Using 21:23,
    48:13, 48:23,
    54:17, 54:20,

136:3,
    166:19.
utilization
    49:18.
utilization.
    65:11.
UVA 105:10.
.
.
< V >.
v. 23:21, 24:1,
    24:4, 25:3,
    25:6, 25:20,
    26:9, 27:6,
    81:8, 98:12,
    98:13,
    142:14,
    155:16,
    194:5, 194:7,
    194:9, 195:5,
    196:13,
    196:16,
    196:17,
    204:22.
vacate
    204:24.
vacated
    194:20.
vacating
    195:1.
vaccinated
    90:14.
vaccine 90:6.
validity 48:17,
    49:2.
value 28:10.
various 191:6,
    196:21.
vary 78:14.
vast 85:18,
    85:22,
    113:22.
Veil 34:11,
    34:15,
    35:10.
verbatim
    136:21.
version 81:25,
    139:9,
    139:20,

139:25,
    178:21.
versus 3:3,
    75:18, 76:10,
    77:5, 102:19,
    105:22.
veterans
    76:4.
Viagra 152:20,
    152:21,
    152:22,
    153:13,
    153:16,
    153:24,
    154:2,
    176:17.
view 17:18,
    17:22, 26:10,
    26:16, 27:8,
    32:20, 32:23,
    33:6, 66:8,
    88:7, 91:23,
    91:24,
    108:17,
    132:13,
    133:19,
    140:2,
    142:12.
views 86:2,
    92:2,
    135:12.
violation
    91:14.
violations
    184:18.
visits 48:16,
    49:1, 49:8.
VMI 140:9,
    140:22.
voluntarily
    165:7,
    172:19.
voluntary
    166:4.
volunteered
    143:24.
vs 1:8.
.
.
< W >.

W. 172:13.
waiting 46:6,
    197:14.
waiver 18:18,
    29:20,
    161:11,
    161:12,
    161:13,
    163:19,
    163:20,
    163:21,
    163:22,
    164:2, 164:5,
    164:12,
    164:13,
    165:16,
    166:3, 166:6,
    166:14,
    166:15,
    166:20,
    167:14,
    167:22,
    169:2,
    171:23,
    173:7.
waiver. 14:1.
walk 117:16.
wanted 6:10,
    30:17, 43:14,
    94:19, 95:4,
    102:8,
    129:17,
    144:18,
    144:22,
    145:25,
    146:17,
    184:4, 184:9,
    185:6,
    185:16,
    185:22,
    186:14,
    201:7, 201:8,
    208:3.
wanting
    15:20.
wants 36:2,
    37:6, 82:22,
    96:5, 168:20,
    195:13,
    199:20.

war 166:9,
    166:13,
    169:3.
warrior 138:14,
    142:20,
    157:18,
    180:21,
    181:21,
    182:1.
Washington
    1:12, 1:42,
    2:10, 2:17,
    2:44.
watched
    125:16.
watered
    140:3.
watered-down
    139:9,
    139:20,
    139:22,
    139:25.
ways 141:25,
    169:10,
    206:11.
weapons
    10:10.
wear 139:15,
    141:12.
wearing 105:18,
    169:20.
website
    20:25.
Wednesday
    18:19.
week 184:3,
    197:18,
    209:16.
weeks 25:3,
    64:21,
    146:12.
Weinberger
    81:8.
Weiss 98:2,
    115:8,
    115:9.
Welcome 4:25,
    202:17.
well-connected
    44:15.

well-done
    13:16.
wellness 48:16,
    49:1, 49:8.
West 197:20.
Whatever 5:14,
    32:15, 87:18,
    130:17,
    139:9,
    155:12,
    155:14,
    156:13,
    168:15,
    203:13,
    203:24.
whatevs 114:6,
    141:21.
whatnot 60:14,
    87:20.
whatsoever
    109:17,
    152:11,
    167:16.
whenever 44:11,
    209:16.
whereas
    174:23.
whichever
    155:18.
white 138:13,
    138:17,
    138:19.
whiz 71:17.
Whoever 36:2,
    62:15, 126:1,
    190:10,
    209:14.
whole 24:2,
    53:11, 53:15,
    57:17, 79:2,
    80:11, 82:15,
    83:7, 85:16,
    86:18, 96:25,
    115:11,
    118:24,
    124:12,
    134:4,
    194:13,
    195:24,
    196:1,

    205:22.
wholly 111:18,
    111:19,
    112:4,
    159:12.
whomever
    23:17.
WILES 61:12,
    61:19, 104:1,
    104:2, 104:4,
    104:13,
    104:16,
    104:18,
    104:23,
    104:25,
    105:3, 105:6,
    105:11,
    105:14.
Williams 98:21,
    133:25.
willing 160:21,
    167:3,
    167:17,
    168:10,
    168:17,
    172:1,
    209:19.
Windsor
    154:19.
winner
    176:19.
wise 89:14.
with. 15:12,
    17:14.
withdraw
    210:13.
withdrawn
    183:25.
Within 18:6,
    18:17, 53:25,
    59:15, 62:1,
    62:2, 62:22,
    63:9, 64:10,
    80:16, 82:23,
    82:24, 88:2,
    91:12, 115:1,
    162:12,
    165:5,
    173:19,
    177:5.

Without 13:23,
    19:1, 19:7,
    29:12, 40:15,
    41:6, 41:8,
    42:25, 58:3,
    89:3, 100:21,
    122:23,
    128:15,
    130:16,
    145:1,
    148:23,
    162:11,
    166:23.
witness
    104:8.
witnesses
    81:20, 88:19,
    88:21,
    142:3.
woman 61:6,
    201:24,
    201:25,
    203:15,
    203:22,
    203:23.
women 90:22.
won 114:3,
    114:4,
    114:5.
wondering
    144:15,
    144:17.
word 6:16,
    6:23, 8:14,
    8:22, 8:23,
    9:4, 9:5,
    11:11, 13:1,
    13:2, 20:12,
    22:15, 22:25,
    23:1, 50:16,
    74:16, 74:17,
    134:14,
    154:23,
    157:8,
    170:13,
    197:23,
    199:13,
    202:25.
words 20:4,
    22:22, 92:21,

110:23,
121:10,
133:22,
136:3, 136:8,
180:20,
188:15,
188:22,
189:8, 190:9,
201:9.
work 4:7, 12:6,
12:20, 12:25,
24:20, 71:18,
96:25, 99:19,
112:1,
146:19,
152:5,
166:13.
worked 4:8,
201:17.
working 8:2,
12:19, 79:13,
179:12,
200:7.
workload
209:16.
works 20:19,
25:21,
127:19.
World 98:1,
130:9,
197:19,
198:2.
worldwide
128:14,
130:13.
worry 52:15,
98:10.
worse 119:1,
160:24,
167:19.
worth 80:12.
wrap 191:3.
writ 111:6,
121:21.
write 20:11,
124:3,
162:13,
178:2.
writes 20:20,
190:10.

writing
85:12.
written 38:1,
39:2, 39:4,
87:3, 135:21,
197:23.
wrote 19:6,
19:14, 19:25,
23:8, 23:10,
39:11, 62:15,
126:1.
.
.
< X >.
X. 28:21.
.
.
< Y >.
Yankee 114:7.
Yankees 113:9,
113:11,
114:1,
115:1.
yarmulke
105:18,
141:8,
141:13.
year 4:18,
26:5, 26:6,
114:3, 114:5,
145:20,
147:18,
152:20,
152:21,
153:1, 153:7,
153:12,
153:24,
153:25,
174:23,
175:22,
176:17,
180:9, 201:5,
201:18.
years 11:22,
29:17, 29:18,
55:5, 57:15,
64:10, 71:7,
112:10,
112:11,
134:1,

135:22,
144:11,
145:18,
147:8,
147:12,
153:5,
165:10,
165:19,
165:24,
178:13,
178:15,
179:16,
180:7.
yelled 48:20.
yesterday
11:1.
yourselves
3:5.
youth 100:9.
Yup 59:13,
74:24.
.
.
< Z >.
Zalkind 1:45.