# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NICOLAS TALBOTT *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-00240-ACR |
| | ) | |
| UNITED STATES OF AMERICA *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND FOR A STAY PENDING APPEAL

There is no valid reason to dissolve the preliminary injunction issued by this Court on March 18, 2025. The legal standard is clear: a party seeking to dissolve an injunction must demonstrate "a significant change either in factual conditions or in law" that would make continued enforcement of the injunction "detrimental to the public interest." *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)). Defendants fail to meet this burden on both counts. First, the mere issuance of guidance regarding the identification of transgender servicemembers does not constitute a significant change affecting this Court's analysis or ruling. Second, it is not the enforcement but rather the dissolution of this Court's preliminary injunction that would harm the public interest.

With respect to their request for a stay pending appeal, Defendants make no effort to justify such a request, nor is there any viable justification. This Court already considered and correctly rejected Defendants' arguments in granting the preliminary injunction. Defendants have offered no new arguments or reasons to revisit them now.

## A. Defendants' Guidance About How to Identify Individual Transgender Servicemembers Reinforces this Court's Holding that the Hegseth Policy Targets Transgender People.

Defendants' motion to dissolve the preliminary injunction ("Defs.' Mot.") relies solely on a March 21, 2025 memorandum issued by the Office of the Under Secretary of Defense for Personnel & Readiness entitled *Prioritizing Military Excellence and Readiness: Military Department Identification*, ECF No. 91-2 (the "Identification Policy"). This memorandum provides guidance on how Military Departments should identify service members who are subject to discharge under the February 26, 2025 Memorandum (the "Hegseth Policy"), which implemented Executive Order 14183 ("EO14183" and, together, with the Hegseth Policy, the "Military Ban"). The Identification Policy explicitly confirms that "Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no

longer eligible for military service and will be processed for separation." Identification Policy at 1 (footnotes omitted). The document further specifies that "[t]he primary means of identifying [these] Service members . . . will be through reviewing medical records." *Id.* It also states that individual servicemembers with a current or past diagnosis of gender dysphoria will be required to report themselves to their commanding officers, which will cause them to be subject to involuntary separation. *Id.* at 2.

Nothing about the issuance of this document constitutes a "significant change" warranting dissolution of this Court's March 18 Order. First, it is not a change at all. As Defendants themselves acknowledge, the Hegseth Policy explicitly directed the Department of Defense ("DoD") to issue guidance by March 28 regarding how Defendants planned to identify transgender servicemembers for involuntary separation. *See* Hegseth Policy at 3.4(e). The release of such expected guidance cannot be considered a "change." *See* Def. Motion at 2 (referring to the Identification Memorandum as "expected guidance"). It merely represents a further step in implementing Defendants' policy to eliminate transgender people from military service—a step that was announced in the Hegseth Policy and anticipated by all parties and the Court. As such, the Identification Policy bears no resemblance to the type of genuinely new and unanticipated development that might justify dissolving an existing injunction. *See Doe 2 v. Shanahan*, 755 F. App'x at 22 ("Refusal to dissolve or modify an injunction that was not appealed, or was affirmed on appeal, should be disturbed only on a compelling showing of *changed circumstances not adequately considered by the trial court*." (emphasis added) (quoting 16 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3924.2 (3d ed. 2015))).

Second, the Identification Policy does not alter this Court's analysis regarding the likely unconstitutionality of the Military Ban. The Court previously determined that the Hegseth Policy

"aimed squarely at transgender persons." *See* Mar. 18, 2025 Mem. Op. ("*Talbott* Op."), ECF No. 89, at 20.    This new guidance *reinforces* the discriminatory treatment of transgender servicemembers and highlights the extraordinary measures Defendants have implemented to target them.    The Identification Policy requires a comprehensive review of all servicemembers' medical records specifically to identify the small fraction who are transgender.    Identification Policy at 1. Furthermore, it imposes an exceptional requirement on transgender servicemembers who are fully fit and capable of meeting all standards to report to their chain of command that they have a medical condition "that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service." *Id.* at 2.    This reporting requirement automatically results in the servicemember being classified as "Not Medically Ready" and recommended for involuntary separation, regardless of how capable or qualified the person may be, with no possibility of a waiver. *Id.*    This is not how Defendants treat any other medical condition and, consistent with this Court's prior analysis, *see Talbott* Op. at 67–69, strongly undercuts any contention that the ban is genuinely based on medical concerns.

Defendants recycle their previously rejected argument that this Court "misconstrued" the Military Ban, again claiming the ban targets only a medical condition rather than transgender individuals. *See* Defs.' Mot. at 3.    According to Defendants, the Identification Policy "confirms that the Court has misconstrued the scope of the DoD policy" by clarifying that "the phrase 'exhibit symptoms consistent with gender dysphoria' refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders" and "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months)." *Id.* at 2–3 (quoting Identification Policy at 1 n.2).    To be sure, this Court appropriately noted the questions raised by

-3-

the ambiguous phrase "exhibit symptoms consistent with gender dysphoria." *See Talbott* Op. at 60.[1]  But this Court's determination that the ban plainly targets transgender people did not depend on any specific interpretation of the phrase "exhibit symptoms consistent with gender dysphoria." Instead, as this Court's opinion carefully explained, the Hegseth Policy targets transgender individuals through multiple, overlapping provisions.

As this Court painstakingly detailed, while "the word transgender does not appear on its pages," the Hegseth Policy

> is nonetheless aimed squarely at transgender persons, banning everyone:
>
> - with a current diagnosis of gender dysphoria;
> - with a history of gender dysphoria;
> - who exhibits symptoms consistent with gender dysphoria;
> - with a history of cross-sex hormone therapy (as treatment for gender dysphoria or in pursuit of sex transition);
> - with a history of sex reassignment or genital reconstruction surgery (same);
> - who has transitioned or attempted to transition to a sex other than their birth sex; and,
> - who is not willing to serve in their birth sex.

*Talbott* Op. at 20–21 (citing Hegseth Policy at 3–6).  As this Court recognized, all these formulations are simply different ways of barring transgender individuals from military service. *See id.* at 21.

---

[1] It bears emphasizing that the Identification Policy does little, if anything, to resolve the concerns raised by this Court regarding the seemingly open-ended nature of this category.  How will this definition of the phrase be enforced?  Who will determine whether an individual has "symptoms consistent with" a gender dysphoria diagnosis?  How will servicemembers be identified to undergo this evaluation?  The Identification Policy answers none of these questions.

And, as this Court repeatedly noted, the Military Ban's requirement that individuals must serve only according to their birth sex is not tied to any medical condition but explicitly excludes transgender people. *See id.* at 21 n.17, 49, 63–64, 76. Defendants incorrectly argue that this requirement does not affect transgender people because they would already face discharge based on gender dysphoria. *See* Defs.' Mot. at 2. That argument fundamentally misses the point. As this Court previously determined, these provisions work together as complementary mechanisms that collectively prevent any transgender person from serving. *See Talbott* Op. at 20–21. Put simply, the Hegseth Policy bans all transgender servicemembers through a combination of requirements, each of which independently, intentionally, and expressly targets transgender people.

As this Court correctly stated at the March 21 hearing, "everyone knows what this ban is intended to do." Mar. 21, 2025 Hearing Tr. at 11:5–6. That is evident from the plain text of EO14183 and the Hegseth Policy. *Id.* at 10:24 (noting that "the documents do speak for themselves"). It is evident from Secretary Hegseth's official statements and from the many documents Defendants have submitted, many of which expressly use the term "transgender." *See, e.g.*, *Talbott* Op. at 20–21. And it is evident from the operation of the interlocking provisions of the Hegseth Policy, which ensure that no transgender person can serve. Defendants' repeated attempts to obscure this reality are unavailing.[2]

In addition, this Court went out of its way to make clear that *even if* the ban was based solely on gender dysphoria (which plainly it is not), it would *still* facially target transgender people

---

[2] As this Court correctly determined in its March 18 Opinion, two and two are four. In effect, Defendants suggest that because of some policy wordsmithing, two and two are not four. "Sometimes they are five. Sometimes they are three. Sometimes they are all of them at once." George Orwell, 1984 (1949).

and would therefore still require—and fail—intermediate scrutiny. *Id.* at 20–21, 47. In addition to targeting a medical condition that is expressly sex-based and experienced only by transgender people, *see Kadel v. Folwell*, 100 F.4th 122, 149 (4th Cir. 2024) (holding that "gender dysphoria, a diagnosis inextricable from transgender status, is a proxy for transgender identity"), the Hegseth Policy treats that medical condition differently than any other and in ways that undercut any claim that its genuine purpose is based on a concern about fitness and health. As this Court explained:

> Even if the Military Ban had focused solely on those diagnosed with gender dysphoria, Defendants do not identify any problem that needs a new solution. Appropriate treatment for gender dysphoria is both "effective" and "no more specialized or difficult than other sophisticated medical care the military system routinely provides." Dkt. 32-2 at 6, 9, 15. The 2025 Medical Literature Review the Action Memo cites concludes that gender-affirming medical care is highly effective. *See supra* Findings of Fact II.B.3. And recall that already under DoD Instruction 6130.0 (Medical Standards for Appointment, Enlistment, or Induction into the Military Services), individuals with a history of gender dysphoria seeking to enlist must be "stable" in their gender identity for 18 months before enlistment. Third Amend. Compl. ¶ 263. Defendants do not explain why addressing a *treatable* condition requires excluding all persons who have ever had—or even exhibited symptoms of—it. Nor do they explain why the constraint already in place, 18 months of stability, is insufficient.

Talbott Op. at 61; *see also* Mar. 21 Tr. at 13:13–19 (noting that "gender dysphoria is still sex based").

Defendants do not even acknowledge, much less address, this portion of the Court's opinion. Nor do they explain why, if the Hegseth Policy is simply about a medical condition, the policy treats gender dysphoria differently than any other medical condition and even expressly *prohibits* servicemembers with gender dysphoria from being evaluated for medical fitness in the Disability Evaluation System normally used for medical issues. Nor do Defendants explain

numerous other features of the ban that—were their asserted health concerns genuine—would be

patently irrational.  *See* Talbott Op. at 67–69.

### B.  Defendants Concede the Identification Policy Has No Bearing on Any Other Part of the Court's Opinion or Holding.

Defendants neither argue, nor could they reasonably argue, that the Identification Policy

affects—either factually or legally—any other element of the Court's opinion, including this

Court's determinations that:

1. Defendants "concede[] that each active-duty Plaintiff is honorable, truthful, and disciplined, and that each is currently physically and mentally fit to serve," and that Plaintiffs "have served honorably and have satisfied the rigorous standards of military service."  *Talbott* Op. at 15 (internal quotation marks omitted).

2. The Mattis Policy is based on limited and outdated data.  *Id*. at 24–25.

3. The 2021 Psychological Health Center Review and the 2025 Medical Literature Review cited by Defendants contradict, rather than support, a ban.  *Id*. at 25–28.

4. Defendants have offered no data on costs that support a ban.  *Id*. at 28–30.

5. The Hegseth Policy "does not contain: (1) evidence that transgender persons are inherently unfit to serve; (2) evidence that being transgender is inconsistent with 'honesty,' 'humility,' and 'integrity'; (3) evidence that being transgender 'conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle'; (4) analysis of whether the costs of discharging and replacing transgender servicemembers outweigh the costs of retaining them; [or] (5) analysis of the effect on military readiness of losing thousands of servicemembers."  *Id*. at 31 (internal citations omitted).

6. "Plaintiffs' declarants have personal knowledge concerning the impact of transgender persons serving openly on military preparedness.  And they unanimously conclude that they have had either no detrimental effect or have had a positive one.  Defendants concede that they have proffered no evidence to contradict these assertions."  *Id.* at 36.

7. Administrative exhaustion is not required.  *Id.* at 37–39.

8. The Court has an obligation to test the military's assertion of its interests.  *Id.* at 39–45.

9. The Military Ban classifies based on sex.  *Id.* at 46.

10. The logic of *Bostock* applies to an equal protection analysis.  *Id.* at 46–48.

11. Application of the ban to both males and females does not negate Plaintiffs' individual rights to equal protection. *Id.* at 49.

12. Transgender classifications warrant heightened scrutiny. *Id.* at 51–57.

13. The Hegseth Policy cannot survive heightened scrutiny. *Id.* at 57–63.

14. The Hegseth Policy is "soaked in animus and dripping with pretext." *Id.* at 64.

15. The Hegseth Policy will cause Plaintiffs irreparable harm. *Id.* at 74–75.

16. The balance of equities and public interest favor Plaintiffs. *Id.* at 75–77.

17. A facial injunction is necessary. *Id.* at 78.

**C.  Enforcement of the Injunction Would Not Be Detrimental to the Public Interest.**

This Court has already determined that enforcing the injunction would serve the public interest. *Id.* at 77.  As this Court previously found: "Granting the preliminary injunction would maintain the status quo of policies that have governed the military for years," and "Defendants have not provided, any studies or declarations that explain why maintaining the status quo pending litigation would unfairly burden the military."  *Id.* at 76.  Defendants have provided no new evidence or arguments on this point.

**D. There Is No Basis for a Stay Pending Appeal.**

This Court should deny Defendants' motion for a stay pending appeal.  Defendants have provided no explanation of how maintaining the status quo would cause them harm, nor have they offered any new explanation or defense of the Hegseth Policy, which is subject to, and fails, intermediate review.

**CONCLUSION**

For the reasons stated above, this Court should deny Defendants' motions.

DATED: March 25, 2025

Respectfully submitted,

_/s/ Joseph J. Wardenski_

Joseph J. Wardenski (D.C. Bar No. 995549)
joe@wardenskilaw.com
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311

Jennifer Levi (*pro hac vice*)
jlevi@glad.org
Mary L. Bonauto (*pro hac vice*)
mbonauto@glad.org
Michael Haley (*pro hac vice*)
mhaley@glad.org
Sarah Austin (*pro hac vice*)
saustin@glad.org
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350

Sara E. Kropf (D.C. Bar No. 48501)
sara@kmlawfirm.com
KROPF MOSELEY PLLC
1100 H Street, NW Ste 1220
Washington, DC 20003
Telephone: (202) 627-6900

Shannon P. Minter (*pro hac vice*)
sminter@nclrights.org
Amy Whelan (*pro hac vice*)
awhelan@nclrights.org
Christopher F. Stoll (*pro hac vice*)
cstoll@nclrights.org
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257

Inga S. Bernstein (*pro hac vice*)
ibernstein@zalkindlaw.com
ZALKIND DUNCAN AND BERNSTEIN LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: (617) 742-6020

*Attorneys for Plaintiffs*

-9-