UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, et al,

    *Plaintiffs*,

v.

UNITED STATES, et al,

    *Defendants*.

Civil Action No. 25-cv-00240 (ACR)

## MEMORANDUM OPINION AND ORDER

Defendants ask the Court to dissolve, or stay pending appeal, the preliminary injunction it entered on March 18, 2025.[1] Dkt. 91 (Motion to Dissolve (Mot.)). They claim that a newly-issued guidance document—the Military Department Identification Guidance, Dkt. 91-2 (MDI Guidance)—presents a significant change in fact. *Id.* at 3. This change, they contend, shows that the Court's Preliminary Injunction Opinion (Op.) is incorrect. *Id.*

The MDI Guidance is new, but Defendants' argument is not. Defendants re-emphasize their "consistent position that the [Hegseth] Policy is concerned with the military readiness, deployability, and costs associated with *a medical condition*." *Id.* (emphasis added). Regulating gender dysphoria is no different than regulating bipolar disorder, eating disorders, or suicidality. The Military Ban regulates a medical condition, they insist, not people.

And therein lies the problem. Gender dysphoria is not like other medical conditions, something Defendants well know. It affects only one group of people: all persons with gender

---

[1] The Court assumes the reader is familiar with its March 18, 2025 Opinion. For those who are not, it is available on the public court docket at 25-cv-00240, Dkt. 89. The Court recycles here the defined terms it used in the Opinion.

1

dysphoria are transgender and only transgender persons experience gender dysphoria. Defs. Concession Tr. (Mar. 21, 2025) at 23–24. Does this mean that all transgender persons have gender dysphoria? No, of course not. But it does mean that when Defendants regulate gender dysphoria, they knowingly and necessarily regulate only transgender persons.

Defendants try to obfuscate this key point at every turn. The Department of Defense (DoD) and Secretary of Defense publicly announced that the Military Ban disqualifies all "transgender troops"? No, they were using "shorthand" for gender dysphoria. Defendants accused transgender persons of inherently lacking honor, truthfulness, and discipline? No, they accused gender dysphoria of having those mission-endangering attributes. The military plans to discharge thousands of transgender troops who have made "America safer"? No, the military plans to discharge gender dysphoria. Total coincidence that gender dysphoria only afflicts transgender people.

This litigation is not about a medical condition. A medical condition has not given its country decades of military service. Or deployed into combat zones throughout the globe. Or earned countless commendations. People have. A medical condition has not fought terrorism. Or analyzed intelligence. Or commanded platoons. People have. A medical condition has not been accused of lacking warrior ethos. Or been branded dishonorable, dishonest, and undisciplined. Or been threatened with the loss of livelihood. People have. Transgender *people.*

Defendants' arguments did not sway the Court before; regurgitating them with the MDI Guidance is equally unpersuasive. The Court **DENIES** the Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal. The Court, on its own motion, stays its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

## BACKGROUND

On March 18, 2025, the Court granted Plaintiffs' Renewed Application for Preliminary Injunction, Dkt. 72, and enjoined Defendants from implementing Executive Order No. 14183 and the Additional Guidance on Prioritizing Military Excellence and Readiness, Dkt. 63-1, as well as any other policies issued pursuant to the Military Ban. Dkts. 88, 89. Three days later, Defendants filed a Motion to Dissolve the Preliminary Injunction. Dkt. 91. They argue that the MDI Guidance issued by DoD's Office of the Under Secretary of Defense for Personnel and Readiness on March 21, 2025 constitutes a "significant change either in factual conditions or in law." Mot. at 3 (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)).

Defendants claim that "the [Hegseth] Policy presumptively barring individuals from serving in the military turns on gender dysphoria—a medical condition—and does not discriminate against trans-identifying persons as a class." *Id.* at 2. In support, Defendants cite to the MDI Guidance. *See id.* at 3.

In the MDI Guidance, Defendants define—for the first time—the criteria in the Hegseth Policy, "exhibit symptoms consistent with gender dysphoria."[2] MDI Guidance at 1. In a footnote, the MDI Guidance states that the phrase "refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental [(DSM-V)] Disorders" for gender dysphoria and "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months)." *Id.* The MDI Guidance attaches the DSM-V criteria. Dkt. 92-2.

---

[2] To avoid wordiness, the Court refers to this phrase as "the Symptoms Criteria." Because Defendants' Motion concerns the definition of this phrase, the Court only includes the additional criteria "current diagnosis or history of gender dysphoria," as necessary.

The MDI Guidance explains that the "primary means" military leaders will use to identify servicemembers who meet the Symptoms Criteria "will be through reviewing medical records." MDI Guidance at 1. To this effect, the MDI Guidance reminds the Secretaries of each Military Department of their "authority to direct unit commanders, in coordination with supporting medical assets, to require that all Service members comply with their obligations." *Id.* at 2. Service members must complete a Periodic Health Assessment (PHA) and report any "medical issues . . . that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command." *Id.*

Moreover, "[w]ithin 45 days" of March 21, 2025, each servicemember's reporting responsibilities will include attesting "whether they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria." *Id.* "This attestation will be a standard part of the self-assessment done in conjunction with the annual PHA." *Id.* If a servicemember self-reports, "the facility or location conducting the PHA will be responsible for conducting or coordinating any follow-up medical evaluation, if necessary, and for notifying the Service member's command." *Id.* Each identified service member "*must* be categorized as 'Not Medically Ready' and non-deployable." *Id.* (emphasis added). They will be, consistent with new policies enacted by the Military Ban, "recommended for administrative separation or, where appropriate, enrolled in the Disability Evaluation system (e.g., where a co-morbidity or other qualifying condition is present)." *Id.*

Defendants contend that this new guidance "confirms that the Court has misconstrued the scope of the DoD Policy," and they "move to dissolve the March 18, 2025, preliminary injunction." Mot. at 2–3. In the alternative, they ask the Court to stay its Order pending appellate review. *Id.* at 3–4.

4

## STANDARD OF REVIEW

A party seeking to dissolve a preliminary injunction must show "'a significant change either in factual conditions or in law'" that makes continued enforcement of the injunction "'detrimental to the public interest.'" *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (quoting *Horne*, 557 U.S. at 447). The moving party "bears the burden of establishing that changed circumstances warrant relief." *Am. Council of the Blind. v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (cleaned up).

## ANALYSIS

### I.   THE MDI GUIDANCE SUPPORTS PLAINTIFFS' CLAIM

Defendants' Motion ignores the MDI Guidance's objective. The MDI Guidance's purpose is not to define the phrase "exhibit symptoms of gender dysphoria." Indeed, the Guidance relegates that definition to a footnote. *See* MDI Guidance at 1 n.2. Its purpose, instead, is to guide military personnel on how to identify individuals to disqualify.

In civilian-speak, DoD plans to (1) assign people—they do not say who, but presumably some type of military gender police—to review medical files for signs of gender dysphoria, and (2) require each of the estimated 1.3 million active-duty servicemembers to attest—at least once a year—whether they exhibit symptoms of gender dysphoria and turn themselves in if they do. Then DoD will discharge them. *See supra* at 4.

Pause for a moment on this approach. To target "a medical condition," Mot. at 3, Defendants plan to:

1. address (unsubstantiated) military readiness, non-deployability, privacy, and cost concerns[3] by
2. diverting personnel away from performing "mission critical functions,"[4] and
3. having them instead rummage through *private* medical records,[5] and also by
4. requiring more than 1.3 million active-duty servicemembers to self-assess *every year* whether they have had, have, or exhibit symptoms of gender dysphoria,[6]
5. with the goal of identifying the less than two-thousand people who *might* have had, have, or exhibit symptoms of gender dysphoria,[7]
6. a mental condition that current military policies already address,[8]
7. and requiring that those servicemembers "*must* be categorized as 'Not Medically Ready' and non-deployable,"[9]
8. which will result in the mass discharge of thousands of servicemembers.[10]

Really. This is not hyperbole. This is the process the MDI Guidance requires.

So does the MDI Guidance support Plaintiffs or Defendants? Well, let's Occam's razor this. What is the more straightforward explanation? That the new guidance reveals the Hegseth Policy for what it is: animus directed at transgender persons? Or that experienced military leaders acting in good faith have adjudged that ridding the military of the less than 2,000 persons who *might* have gender dysphoria requires committing scarce, expensive resources to invading

---

[3] Op. at 57–63.

[4] Dkt. 66 at 2–3.

[5] MDI Guidance at 2.

[6] *Id.*

[7] Op. at 29 n.19.

[8] *Id.* at 61.

[9] MDI Guidance at 2.

[10] Op. at 30.

the privacy of the more than 1.3 million active-duty members who certainly do not—year after year?

If the MDI Guidance confirms anything, it confirms that the Hegseth Policy is not based on reasoned judgment.

## II. THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S FACTUAL FINDINGS

### A. The Court Correctly Construed the Scope of the Military Ban

Defendants mainly contend that the MDI Guidance's definition of Symptoms Criteria "confirms that the Court has misconstrued the scope of the [Hegseth] Policy." Mot. at 2–3. How? They do not say. They recite the Court's factual finding that "'the Hegseth Policy bans all transgender troops.'" *Id.* at 2 (quoting Op. at 20). And they state that the Court based this finding "on an interpretation of, among other things, the following language in the [Hegseth Policy]: 'Service members who have a current diagnosis or history of, *or exhibits symptoms consistent with*, gender dysphoria are disqualified from military service.'" *Id.* at 2 (cleaned up) (emphasis in original). That is it.

Hardly a silver bullet. Indeed, not a bullet at all. For reading the MDI Guidance in toto confirms the Court's findings that the Military Ban targets people, not a medical condition. Recall that EO14183 covered those "individuals with" gender dysphoria. 90 Fed. Reg. 8757 (Jan. 27, 2025). The Hegseth Policy extended the ban by adding the phrase "exhibit symptoms consistent with" gender dysphoria. Dkt. 63-1 at 1, 3, 5, 6–9. The MDI Guidance in turn explains that this phrase covers persons whom no one has previously diagnosed with or treated for gender dysphoria. It does so based on the "prediction"—unsupported by "actual data"—that these persons might cause issues in the future. Op. at 40–41, 71–72; Tr. (Mar. 12, 2025) at 137–38.

7

Recall also that the Symptoms Criteria is but one of seven independent criteria the Hegseth Policy employss to disqualify people. *See* Op. at 21–22 (citing Dkt. 63-1 at 3, 6). Three criteria disqualify transgender persons with a current diagnosis or history of, or who exhibit symptoms consistent with, gender dysphoria—however defined. Those include transgender persons:

- with a history of cross-sex hormone therapy (as treatment for gender dysphoria *or in pursuit of sex transition*);
- with a history of sex reassignment or genital reconstruction surgery (as treatment for gender dysphoria *or in pursuit of sex transition*);
- who [have] transitioned or attempted to transition to a sex other than their birth sex.

*Id.* (emphases added). Defendants do not define the phrase "in pursuit of sex transition," but it must include persons with no prior or current gender dysphoria diagnosis. Otherwise, it would be redundant because the phrase "as treatment for gender dysphoria" already covers all those who pursue sex transition as treatment after a gender dysphoria diagnosis.

Finally, at the March 21, 2025 hearing, Defendants continued to insist that the Court should ignore DoD's and Secretary Hegseth's public statements that the Hegseth Policy disqualifies all transgender troops. Tr. (Mar. 21, 2025) at 7. The Court then *again* gave Defendants the opportunity to file a declaration from Secretary Hegseth or any other military official to correct the public record. Defendants *again* declined to do so. *Id.* at 5–6; *see also* Tr. (Mar. 12, 2025) at 22–23. That is of course their right. But the Court cannot credit a lawyer's argument that a Department and Cabinet member publicly misconstrued the scope of their own policy and then could not be bothered to correct the evidentiary record in a high-profile litigation concerning the scope of that same policy. Occam's razor again. DoD and Secretary Hegseth meant what they said. That noted, the Court wants to be clear. Even if it considered only the

8

text within the four corners of the Hegseth Policy, the Court would easily find that the Military Ban excludes all transgender troops.[11]

### B. The MDI Guidance Supports the Court's Scrutiny Analysis

The MDI Guidance undercuts every rationale Defendants have given for implementing the Military Ban. To wit:

*Military Readiness*: Earlier, Defendants claimed that answering certain cost questions would divert the attention of "the relevant staff's primary responsibility to perform mission critical functions." Dkt. 66 at 2, 3. Pulling staff away to review an untold number of medical files will presumably do the same (only on a far larger scale) and thus undermine military readiness. MDI Guidance at 1.

*Privacy*: To address "privacy concerns" purportedly caused by the less than 2,000 servicemembers treated for gender dysphoria, Defendants will invade the medical privacy of 1.3 million plus servicemembers. *Id.*

*Deployability*: To address the non-deployability concerns persons experiencing gender dysphoria *might* create, Defendants will *automatically* tag as "Medically Not Ready" and non-deployable servicemembers who possess no deployability concern, *e.g.*, transgender people who have been successfully treated for gender dysphoria and no longer exhibit symptoms. *Id.* at 2.

*Cost***:** And to save $5.2 million per year by cutting gender-affirming care, the military will spend untold millions (if not tens of millions) to identify persons not yet diagnosed with any medical condition. *Id.*; *see also* Op. at 29.

The MDI Guidance also fails to explain why it treats gender dysphoria differently than other disqualifying medical conditions. It requires, for example, servicemembers who were

---

[11] To better understand how the Court comes to this conclusion, see its Opinion at 20–22.

previously diagnosed with gender dysphoria to self-report for discharge, even if they have successfully completed treatment. MDI Guidance at 2. By contrast, other conditions "must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating" to be disqualifying. Dkt. 72-67 at 13.

The MDI Guidance offers no explanation for how the Military Ban's derogatory language covers a medical condition. Characterizations such as lacking warrior ethos, discipline, honor, and integrity apply to people, not medical conditions. One does not say, for example, that those who suffer from bipolar disorder inherently lack warrior ethos, discipline, honor and integrity. Moreover, as an example, DoD's medical standards for retention list bipolar disorder as a disqualifying condition. *Id.* at 36. Still, the military treats bipolar disorder, like all other disqualifying conditions, "on a case-by-case basis" considering "[t]he affected Service member's ability to safely complete common military tasks at a general duty level" and any "[l]imitations or requirements due to medical condition(s) or objections to recommended medical interventions that" present an obvious risk to the health and safety of the individual or their fellow servicemembers, among other factors. *Id.* at 8–9.

## C. The MDI Guidance Does Not Cure the Hegseth Policy's Many Defects

Defendants claim that the MDI Guidance supports their position that the Military Ban is only about "a medical condition—one that every prior Administration has, *to some degree*, kept out of the military." Mot. at 3 (emphasis added). Put differently, the Hegseth Policy is different only in degree from the Mattis and Austin Policies.

It is different in kind.  A simple comparison of the Mattis and Hegseth Policies using the factors the D.C. Circuit considered in *Doe 2* demonstrates this:

| Mattis Policy (2018) | Hegseth Policy (2025) |
|---|---|
| Facially neutral | Facially derogatory |
| Impact of transgender service was uncertain and hypothetical | Defendants did not review available evidence; Plaintiffs' evidence is that transgender service has a beneficial effect |
| Active servicemembers grandfathered | Active servicemembers not grandfathered. |
| Many servicemembers could serve in their biological sex | Virtually no servicemembers can serve in their biological sex |
| No evidence that serving in biological sex creates "hardship" | Record confirms serving in biological sex creates hardship, including "mental distress" |
| Months-long study by panel of experts | No review process |

*Compare* Mattis Policy at 2, 3, 11 *with* Op. at 18, 21, 45, 58.[12]

Moving onto the Austin Policy, Defendants contend that it deserves no more credence than the Hegseth Policy.  Tr. (Feb. 18, 2025) at 125–27.  This is so, they claim, because it did not result from any deliberative process.  *Id*. at 126, 128.  Wrong.  In issuing Executive Order 14004, President Biden relied on "substantial evidence" including "a meticulous, comprehensive study requested by [DoD]," testimony to Congress by military leaders, and statements by former United States Surgeons General from both political parties.  Op. at 10 (citing 86 Fed. Reg. 7471 (Jan. 25, 2021)).  Next, the Office of the Under Secretary of Defense for Personnel and Readiness convened a working group that "collect[ed] and consider[ed] evidence from a variety

---

[12] By making these comparisons, the Court does not opine on the constitutionality of the Mattis or Austin Policies.

11

of sources, including a careful review of all available scholarly evidence and consultations with [experts]." *Id.* (citing Dkt. 72-59 ¶¶ 10, 12). This deliberative process culminated with the release of the Austin Policy in March 2021. Op. at 10–12.

Defendants' argument also ignores that high-level military officials responsible for integrating transgender persons into the military from 2021 to 2024 have testified based on their personal knowledge of how the Austin Policy worked in practice. Based on that experience, they "unanimously conclude" that allowing transgender persons to serve openly had "no detrimental effect" on military preparedness. Op. at 36. Indeed, based on their experience, open service improved military readiness and unit cohesion. *Id.* at 32, 35. Defendants wish to change course. They are entitled to do so, and courts should defer to that determination. But if the new course bans a class of people from military service, the Fifth Amendment requires that Defendants provide a plausible, evidence-based rationale for the policy shift. *See id.* at 57. Defendants offered none before the Court issued its Opinion, and the MDI Guidance adds nothing. *See id.* at 57–63.

### III. THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S LEGAL CONCLUSIONS

#### A. Intermediate Scrutiny Applies

Defendants contend that if the Court construes the Military Ban as only addressing a medical condition, intermediate scrutiny cannot apply. Tr. (Mar. 12, 2025) at 28. Not so. Even Defendants' too-narrow view of the Hegseth Policy implicates intermediate scrutiny.

Just as it is impossible to know a person is transgender without knowing their sex, Op. at 47, it is impossible to know whether a person has gender dysphoria without knowing their sex. The Fourth Circuit's *en banc* decision in *Kadel v. Folwell* illustrates this common-sense proposition. *See* 100 F.4th 122 (4th Cir. 2024) (en banc). *Kadel* found that "gender dysphoria is

so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146. This is because "gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status." *Id.* And so the Fourth Circuit held that exclusion of coverage for gender dysphoria care discriminates based on sex because application of the exclusion "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Id.* at 147. That is why treatments for gender dysphoria "aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status." *Id.* at 146.

For this reason, Defendants "cannot immunize [themselves] from violating" the Fifth Amendment "by discriminating against only a subset of" transgender persons. *Id.* A ban on gender dysphoria, even if it does not reach every transgender person, can nonetheless discriminate against transgender persons as a class. Under Supreme Court precedent, "a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Id.* at 144 (cleaned up); *see also Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976). Thus, Defendants cannot evade discriminating against transgender people simply by labeling the policy as addressing gender dysphoria.

### B. The Court Did Not Rely on the Symptoms Criteria

Defendants concede that the MDI Guidance does not impact the Court's analysis in any material respect. It does not impact the Court's findings: (1) that the Hegseth Policy is based on outdated data, Tr. (Mar. 21, 2025) at 15, and studies that contradict, rather than support, a transgender ban, *id.* at 15, 28; (2) that the Hegseth Policy does not contain evidence supporting the Military Ban's stated objectives, *id.* at 18–22, 30; (3) that Plaintiffs' declarants have personal

13

knowledge concerning the impact of transgender persons serving openly, and that Defendants do not rebut those declarants, save one, *id.* at 23; (4) that administrative exhaustion is not required, *id.*; (5) that the Court has a duty to scrutinize the military's assertion of its interests, *id.* at 23; (6) that everyone with gender dysphoria is transgender, but that some transgender persons do not have gender dysphoria, *id.* at 23–24; and (7) that the Military Ban is animated by animus, *id.* at 31–32.

The Court discussed the Symptoms Criteria in only one paragraph of its analysis, noting that the phrase "was so broad as to capture persons who have never had gender dysphoria." Op. at 60. But even without that reasoning, the Court would still conclude that the Hegseth Policy targets more than just gender dysphoria. The Hegseth Policy's text is broad enough to cover people who do not have gender dysphoria without any reference to the Symptoms Criteria. *See supra* at 7–12.

### C. The MDI Guidance Makes It More Likely that the Hegseth Policy Will Not Survive Rational Basis Review

The MDI Guidance underscores that the Ban is "far removed from [its stated] justifications." *Romer v. Evans*, 517 U.S. 620, 624 (1996). To be sure, gender dysphoria is a valid health concern. But the MDI Guidance cites several DoD and military policies that already ensure medical readiness in transgender persons, whether they have had, have, or might later have gender dysphoria. For example, DoD conducts Periodic Health Assessments "at least yearly" for all servicemembers to ensure they meet the military's high medical standards. MDI Guidance at 2. If a servicemember becomes unable to meet the military's rigorous mental and physical standards, DoD would discover that during a Periodic Health Assessment. The redundancy of the Hegseth Policy gives the Court "considerable doubt" that it is based on anything other than animus. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973).

Additionally, the MDI Guidance states that DoDI 6025.19 requires servicemembers to report any medical issues "that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service." MDI Guidance at 2. Their commanders are responsible for ensuring that they do so. *Id.* So even if the Periodic Health Assessment fails to catch the issue, or if the medical condition develops between Health Assessments, the military will still be informed on medical issues. Thus, Defendants' argument that the Hegseth Policy—which bans anyone with a history of gender dysphoria—is necessary to ensure troop readiness raises the same doubt that the Supreme Court had in *Moreno*.

At the March 21, 2025, hearing, the Court asked Defense counsel to explain why the military needs to exclude people who meet the Symptoms Criteria when the MDI Guidance cites policies that already address deployability and retention concerns. Tr. (Mar. 21, 2025) at 33–35. Defense counsel gave no discernable answer, finally resorting to the argument that the Court must defer to the military's "predictive judgment," Tr. (Mar. 21, 2025) at 42, that people must be weeded out now—*Minority Report*-style[13]—to prevent hypothetical future problems. That response begs more questions than it answer.

## STAY PENDING APPEAL

For the reasons stated above and in the Court's earlier Opinion, the Court denies Defendants' Motion for a Stay Pending Appeal. Defendants provide no reason in support of their request. Plaintiffs still face irreparable harm. Indeed, in the few additional days that the Court extended its stay to consider this motion, Plaintiffs filed a Motion for Temporary Restraining Order, Dkt. 95, based on ongoing harms experienced by Plaintiffs.

---

[13] If you know, you know. If you don't, the Court commends to you *Minority Report* (20th Century Fox 2002).

Defendants, on the other hand, have yet to explain the burden on them of continuing the status quo. Much less do they explain how that purported burden is greater than the ongoing injury Plaintiffs experience and the additional harms that will result if the Court stays the injunction. Nor do Defendants explain how the public benefits from a stay of the injunction order, which will require DoD to enact a policy that likely violates Plaintiffs' Fifth Amendment rights.

The Court, on its own motion, stays its Order until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

## CONCLUSION

As the Court predicted, its Opinion has generated heated public debate, and Defendants will appeal. This is all to the good. But let's recall that our servicemembers make the debate and appeals possible. Their sacrifices breathe life into the phrase, "one nation under God, indivisible, with liberty and justice for all." The Court, again, thanks them. All.

\* \* \* \* \*

For the reasons stated above, the Court hereby:

**DENIES** Defendants' Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal, Dkt. 91; and

**STAYS** its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern.

Date: March 26, 2025                                  _____
                                                     ANA C. REYES
                                                     United States District Court Judge