APPEAL,TYPE–L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00240–ACR</u>
### *Internal Use Only*

| | |
|---|---|
| TALBOTT et al v. TRUMP et al | Date Filed: 01/28/2025 |
| Assigned to: Judge Ana C. Reyes | Jury Demand: None |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**NICOLAS TALBOTT**     represented by **Inga S. Bernstein**
ZALKIND DUNCAN & BERNSTEIN
LLP
65a Atlantic Avenue
Boston, MA 02110
617–742–6020
Email: ibernstein@zalkindlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.
Ste #11548
Sacramento, CA 95811
415–365–1338
Email: awhelan@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.
Ste #11548
Sacramento, CA 95811
415–365–1320
Email: cstoll@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108

617–426–1350
Email: jlevi@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617–426–1350
Email: mbonauto@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617–426–1350
Email: mhaley@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
KROPF MOSELEY PLLC
1100 H Street, NW
Ste 1220
20005
Washington, DC 20003
202–627–6900
Email: sara@kmlawfirm.com
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
617–426–1350
Email: saustin@glad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
NATIONAL CENTER FOR LESBIAN
RIGHTS
1401 21st St.

Ste #11548
Sacramento, CA 95811
415–365–1310
Email: SMinter@nclrights.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
347–913–3311
Fax: 347–467–7237
Email: joe@wardenskilaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERICA VANDAL**                    represented by   **Inga S. Bernstein**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Amy Whelan**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Christopher F. Stoll**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Jennifer Levi**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Mary Bonauto**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Michael R. Haley**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Sara E. Kropf**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**KATE COLE**                                    represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GORDON HERRERO**                    represented by   **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANY DANRIDGE**                    represented by    **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMIE HASH**                    represented by    **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KODA NATURE**                     represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAEL NEARY**                              represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Levi**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Bonauto**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MIRIAM PERELSON**                        represented by  **Inga S. Bernstein**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Amy Whelan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher F. Stoll**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Haley**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah K. Austin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shannon P. Minter**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLAYTON MCCALLISTER**                represented by    **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GREYSON SHISHKINA**                represented by    **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AUDRIE GRAHAM**                represented by    **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROAN PICKETT**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**QUINN TYSON**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**AMIAH SALE**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**MINERVA BETTIS**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**SAMUEL AHEARN**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**REGAN MORGAN**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**VERA WOLF**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**MICHELLE BLOOMROSE**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**HUNTER MARQUEZ**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**SEAN KERSCH–HAMAR**

represented by **Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KELSEY ORTH**                              represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TAYLOR MAIWALD**                           represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SABRINA BRUCE**                            represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**C.J. DULANEY**                             represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICAH JACQUELINE GROSS**                   represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**AUSTIN CONVERSE**                          represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATHALIE RICHTER**                         represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BECK SIMPSON**                             represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLARA WINCHELL**                           represented by  **Joseph J. Wardenski**
                                             (See above for address)
                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ASHLEY DAVIS**                             represented by

**Joseph J. Wardenski**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**DONALD J. TRUMP**                    represented by    **Jason C. Lynch**
*in his official capacity as President of the*          U.S. DEPARTMENT OF JUSTICE
*United States*                                        1100 L Street NW
*TERMINATED: 02/13/2025*                               Washington, DC 20005
                                                       202–514–1359
                                                       Email: Jason.Lynch@usdoj.gov
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Elizabeth Brooke Layendecker**
                                                       U.S. DEPARTMENT OF JUSTICE
                                                       1100 L Street NW
                                                       Washington, DC 20005
                                                       771–217–8107
                                                       Email: elizabeth.b.layendecker@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Manion**
                                                       DOJ–USAO
                                                       950 Pennsylvania Avenue, NW
                                                       Washington, DC 20530–0001
                                                       202–445–6214
                                                       Email: jason.manion2@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jean Lin**
                                                       U.S. DEPARTMENT OF JUSTICE
                                                       1100 L Street, NW
                                                       Room 11532
                                                       Washington, DC 20005
                                                       (202) 514–3716
                                                       Fax: (202) 616–8470
                                                       Email: jean.lin@usdoj.gov
                                                       *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**UNITED STATES OF AMERICA**           represented by    **Jason C. Lynch**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Elizabeth Brooke Layendecker**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**                    represented by    **Jason C. Lynch**
*in his official capacity as Secretary of*                    (See above for address)
*Defense*                                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK F. AVERILL**                     represented by    **Jason C. Lynch**
*in his official capacity as Acting*                          (See above for address)
*Secretary of the Army*                                      *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT**            represented by    **Jason C. Lynch**
**OF THE ARMY**                                              (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TERENCE EMMERT**
*in his official capacity as Acting
Secretary of the Navy*

represented by   **Jason C. Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT
OF THE NAVY**

represented by   **Jason C. Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GARY ASHWORTH**
*in his official capacity as Acting*

represented by   **Jason C. Lynch**
(See above for address)

*Secretary of the Air Force*                                        *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Elizabeth Brooke Layendecker**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jason Manion**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Jean Lin**
                                                                    (See above for address)
                                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT**          represented by   **Jason C. Lynch**
**OF THE AIR FORCE**                                   (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Elizabeth Brooke Layendecker**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Manion**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jean Lin**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**TELITA CROSLAND**                   represented by   **Jason C. Lynch**
*in her official capacity as Director of the*          (See above for address)
*Defense Health Agency*                                *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Elizabeth Brooke Layendecker**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jason Manion**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jean Lin**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**DEFENSE HEALTH AGENCY**                    represented by    **Jason C. Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Brooke Layendecker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Manion**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONSTITUTIONAL**                           represented by    **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                                     CONSTITUTIONAL
ACCOUNTABILITY CENTER
1200 18th Street, NW
Suite 501
Washington, DC 20036
(202) 296–6889 ext. 304
Email: brianne@theusconstitution.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF VERMONT**                         represented by    **Jonathan T. Rose**
OFFICE OF ATTORNEY GENERAL/VT
109 State Street
Montpelier, VT 05609–1001
802–793–1646
Email: jonathan.rose@vermont.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF WASHINGTON**

**Amicus**

**FRANK KENDALL**                            represented by    **Andrew Tutt**
*Hon.*                                                        ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202–942–5242

Fax: 202–942–5999
Email: andrew.tutt@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHRISTINE WORMUTH**                    represented by  **Andrew Tutt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2025 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against GARY ASHWORTH, MARK AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA ( Filing fee $ 405 receipt number ADCDC–11437641) filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOT, KATE COLE, GORDON HERRERO, CAEL NEARY. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons)(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Noncompliance with LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata. Blank/Incomplete/Missing civil cover sheet. Please file the Civil Cover Sheet (JS44) form at www.dcd.uscourts.gov/new–case–forms using the event Civil Cover Sheet. Form filed as fillable PDF. Please file form in a non–fillable PDF format. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsl) (Entered: 01/28/2025) |
| 01/28/2025 | 2 | ERRATA by NICOLAS TALBOT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Complaint (Corrected))(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | 3 | CIVIL COVER SHEET by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOT, KATE COLE, GORDON HERRERO, CAEL NEARY filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOT, KATE COLE, GORDON HERRERO, CAEL NEARY.(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/28/2025 | 4 | SEALED DOCUMENT filed by NICOLAS TALBOT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY(This document is SEALED and only available to authorized persons.)(Wardenski, Joseph) (Entered: 01/28/2025) |
| 01/29/2025 | | Case Assigned to Judge Ana C. Reyes. (zsl) (Entered: 01/29/2025) |

| 01/29/2025 | 5 | SUMMONS (11) Issued Electronically as to All Defendants. (Attachment: # 1 Notice and Consent)(zsl) (Entered: 01/29/2025) |
| 01/29/2025 | | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses– U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zsl) (Entered: 01/29/2025) |
| 01/30/2025 | 6 | REQUEST FOR SUMMONS TO ISSUE filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, GORDON HERRERO, CAEL NEARY. (Attachments: # 1 Summons)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/30/2025 | 7 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zdp) (Entered: 01/30/2025) |
| 01/30/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Jennifer L. Levi, Filing fee $ 100, receipt number ADCDC–11445702. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Declaration of Jennifer Levi, # 2 Supplemental Statement of Jennifer Levi, # 3 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/30/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Mary L. Bonauto, Filing fee $ 100, receipt number ADCDC–11445787. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Declaration of Mary Bonauto, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 01/30/2025) |
| 01/31/2025 | | MINUTE ORDER granting 8 Motion for Leave to Appear Pro Hac Vice. Attorney Jennifer L. Levi is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 01/31/2025. (lcacr2) (Entered: 01/31/2025) |
| 01/31/2025 | | MINUTE ORDER granting 9 Motion for Leave to Appear Pro Hac Vice. Attorney Mary L. Bonauto is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 01/31/2025. (lcacr2) (Entered: 01/31/2025) |
| 02/03/2025 | 10 | STANDING ORDER. The Court hereby ORDERS the parties to comply with its Standing Order. See Standing Order for details. Signed by Judge Ana C. Reyes on 02/03/2025. (lcacr2) (Entered: 02/03/2025) |
| 02/03/2025 | 11 | NOTICE of Appearance by Jennifer Levi on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY (Levi, Jennifer) (Entered: 02/03/2025) |
| 02/03/2025 | 12 | NOTICE of Appearance by Mary Bonauto on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY (Bonauto, Mary) (Entered: |

| | | |
|---|---|---|
| | | 02/03/2025) |
| 02/03/2025 | 13 | MOTION for Preliminary Injunction by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Joseph J. Wardenski, # 3 Index of Exhibits to Wardenski Decl., # 4 Exhibit A to Wardenski Decl., # 5 Exhibit B to Wardenski Decl., # 6 Exhibit C to Wardenski Decl., # 7 Exhibit D to Wardenski Decl., # 8 Exhibit E to Wardenski Decl., # 9 Exhibit F to Wardenski Decl., # 10 Exhibit G to Wardenski Decl., # 11 Exhibit H to Wardenski Decl., # 12 Exhibit I to Wardenski Decl., # 13 Exhibit J to Wardenski Decl., # 14 Exhibit K to Wardenski Decl., # 15 Exhibit L to Wardenski Decl., # 16 Exhibit M to Wardenski Decl., # 17 Exhibit N to Wardenski Decl., # 18 Exhibit O to Wardenski Decl., # 19 Exhibit P to Wardenski Decl., # 20 Declaration of Alex Wagner, # 21 Index of Exhibits to Wagner Decl., # 22 Exhibit A to Wagner Decl., # 23 Exhibit B to Wagner Decl., # 24 Exhibit C to Wagner Decl., # 25 Exhibit D to Wagner Decl., # 26 Exhibit E to Wagner Decl., # 27 Exhibit F to Wagner Decl., # 28 Declaration of Yvette Bourcicot, # 29 Exhibit A to Bourcicot Decl., # 30 Declaration of Gilbert Cisneros, # 31 Declaration of Shawn Skelly, # 32 Declaration of Nicolas Talbott, # 33 Declaration of Erica Vandal, # 34 Declaration of Kate Cole, # 35 Declaration of Gordon Herrero, # 36 Declaration of Dany Danridge, # 37 Declaration of Jamie Hash, # 38 Declaration of Koda Nature, # 39 Declaration of Cael Neary, # 40 Text of Proposed Order)(Wardenski, Joseph) (Entered: 02/03/2025) |
| 02/04/2025 | | MINUTE ORDER. The Court ORDERS the following schedule for Plaintiffs' 13 Application for Preliminary Injunction:<br><br>1. Defendants shall file their Opposition by February 12, 2025, at 6:00 PM EST;<br><br>2. Plaintiffs shall file their Reply by February 14, 2025, at 6:00 PM EST;<br><br>3. Amicus briefs, if any, shall be filed by February 14, 2025, at 6:00 PM EST;<br><br>4. The Court will hold a hybrid argument / evidentiary hearing on Plaintiffs' 13 Application on February 18, 2025, beginning at 10:00 AM EST and continuing day−to−day until completed.<br><br>The Court further AMENDS Section 5 of its 10 Standing Order (courtesy copies to Chambers) as follows:<br><br>1. Plaintiffs shall provide three (3) courtesy copies of their 13 Application and key legal references by February 5, 2025, at 12:00 PM EST;<br><br>2. Defendants shall provide three (3) courtesy copies of their forthcoming Opposition and key legal references by February 15, 2025, at 12:00 PM EST;<br><br>3. Plaintiffs shall provide three (3) courtesy copies of the Application, Opposition, and Reply briefs (without declarations or exhibits) in one binder by February 17, 2025, at 10:00 AM EST.<br><br>4. The Parties shall include in the courtesy copies declarations, exhibits, and key academic or government studies. |

| | | |
|---|---|---|
| | | The Court DIRECTS Plaintiffs' counsel to send this Minute Order to Defendants' counsel as soon as possible and no later than 12:00 PM EST on Tuesday, February 4, 2025, as Defendants' counsel has not yet entered appearance.<br><br>Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | 14 | MOTION for Temporary Restraining Order by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Declaration of Miriam Perelson, # 6 Exhibit 1 to Perelson Decl., # 7 Text of Proposed Order)(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER. The Court will hold a preliminary hearing on Plaintiffs' 14 Application for Temporary Restraining Order at 4:00 PM on Tuesday, February 4, 2025, in Courtroom 12.<br><br>Interested parties may access the Court's dial–in line. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held on 2/4/2025 regarding the Plaintiffs 14 Application for Temporary Restraining Order. Hearing on the Plaintiff's motion tentatively set for 2/7/2025 at 10:00 AM in Courtroom 12 (in person) before Judge Ana C. Reyes. Parties to submit a Joint Status Report by 4:00 PM on 2/5/2025 to determine if hearing will proceed. Interested members of the public and media may access the Motion Hearing by dialing the Courts toll–free public access line: (833)–990–9400, access code 787605272. ( Status Report due by 2/5/2025, Motion Hearing set for 2/7/2025 at 10:00 AM in Courtroom 12– In Person (Audio Line Available) before Judge Ana C. Reyes.). (Court Reporter Lisa Edwards.) (zakb) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER. Following today's preliminary hearing, the Court ORDERS the parties to submit a joint status report, on or before February 5, 2025, at 4:00 PM, addressing the issues discussed on the record. Signed by Judge Ana C. Reyes on 02/04/2025. (lcacr2) (Entered: 02/04/2025) |
| 02/04/2025 | 15 | AMENDED COMPLAINT against All Defendants filed by JAMIE HASH, KODA NATURE, ERICA VANDAL, DANY DANRIDGE, NICOLAS TALBOTT, KATE COLE, GORDON HERRERO, CAEL NEARY, MIRIAM PERELSON.(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/04/2025 | 16 | SEALED DOCUMENT filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON(This document is SEALED and only available to authorized persons.)(Wardenski, Joseph) (Entered: 02/04/2025) |
| 02/05/2025 | 17 | TRANSCRIPT OF STATUS CONFERENCE before Judge Ana C. Reyes held on February 4, 2025; Page Numbers: 1–55. Date of Issuance: February 5, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form |

| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/26/2025. Redacted Transcript Deadline set for 3/8/2025. Release of Transcript Restriction set for 5/6/2025.(Edwards, Lisa) (Entered: 02/05/2025) |
|---|---|---|
| 02/05/2025 | 18 | NOTICE of Appearance by Jason C. Lynch on behalf of All Defendants (Lynch, Jason) (Entered: 02/05/2025) |
| 02/05/2025 | 19 | Joint STATUS REPORT by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Declaration of LTC Baker (Feb. 4, 2025))(Lynch, Jason) (Entered: 02/05/2025) |
| 02/05/2025 | | MINUTE ORDER. The Court ORDERS the Government to immediately notify Plaintiffs and the Court if the Department of Defense (or any of its subsidiaries) issues any policy or guidance implementing the challenged Executive Orders in the military. The Court further ORDERS the Government to immediately notify Plaintiffs and the Court before any changes are made to Plaintiffs' status quo in any way, shape, or form. The Court will entertain a motion for a temporary restraining order should any action be taken against Plaintiffs before the preliminary injunction hearing on February 18, 2025. Signed by Judge Ana C. Reyes on 02/05/2025. (lcacr2) (Entered: 02/05/2025) |
| 02/05/2025 | 20 | Supplemental STATUS REPORT by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Lynch, Jason) (Entered: 02/05/2025) |
| 02/06/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Sarah K. Austin, Filing fee $ 100, receipt number ADCDC−11463030. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Michael Robert Haley, Filing fee $ 100, receipt number ADCDC−11463035. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, |

| | | |
|---|---|---|
| | | DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 23 | NOTICE *In Response to February 5, 2025 Minute Order* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 04 Feb 2025 Army Memorandum)(Lynch, Jason) (Entered: 02/06/2025) |
| 02/06/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Shannon Minter, Filing fee $ 100, receipt number ADCDC–11463119. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Supplement, # 3 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Christopher F. Stoll, Filing fee $ 100, receipt number ADCDC–11463121. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/06/2025 | 26 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Amy Whelan, Filing fee $ 100, receipt number ADCDC–11463124. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/06/2025) |
| 02/07/2025 | | MINUTE ORDER granting 21 Motion for Leave to Appear Pro Hac Vice. Attorney Sarah K. Austin is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 22 Motion for Leave to Appear Pro Hac Vice. Attorney Michael Robert Haley is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 24 Motion for Leave to Appear Pro Hac Vice. Attorney Shannon Minter is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 25 Motion for Leave to Appear Pro Hac Vice. Attorney Christopher F. Stoll is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on |

| | | |
|---|---|---|
| | | 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER granting 26 Motion for Leave to Appear Pro Hac Vice. Attorney Amy Whelan is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/07/2025. (lcacr2) (Entered: 02/07/2025) |
| 02/07/2025 | 27 | NOTICE of Appearance by Shannon P. Minter on behalf of All Plaintiffs (Minter, Shannon) (Entered: 02/07/2025) |
| 02/07/2025 | 28 | NOTICE of Appearance by Amy Whelan on behalf of All Plaintiffs (Whelan, Amy) (Entered: 02/07/2025) |
| 02/07/2025 | 29 | NOTICE of Appearance by Christopher F. Stoll on behalf of All Plaintiffs (Stoll, Christopher) (Entered: 02/07/2025) |
| 02/07/2025 | 30 | NOTICE of Appearance by Sarah K. Austin on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON (Austin, Sarah) (Entered: 02/07/2025) |
| 02/07/2025 | 31 | NOTICE of Appearance by Michael R. Haley on behalf of NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON (Haley, Michael) (Entered: 02/07/2025) |
| 02/08/2025 | 32 | DECLARATION *of George Richard Brown, MD, DFAPA* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 13 MOTION for Preliminary Injunction . (Attachments: # 1 Exhibit A – CV of George Richard Brown, GEORGE RICHARD BROWN, MD, DFAPA, # 2 Exhibit B – Elders et al., Medical Aspects of Transgender Military Service, Armed Forces & Society (2014))(Wardenski, Joseph) (Entered: 02/08/2025) |
| 02/10/2025 | | MINUTE ORDER. The Court ORDERS the parties to appear before Judge Reyes via Zoom on Thursday, February 13 at 12:00 PM to discuss logistics for the preliminary injunction hearing starting on Tuesday, February 18. The Court plans to accept all declarations as direct evidence. The parties should be prepared to discuss whether they wish to cross–examine any witness and/or make any evidentiary challenges, and how they jointly suggest the hearing should proceed. <br><br> Interested parties may access the Court's dial–in line for the February 13 Zoom hearing. The dial–in line will also be available for any part of the February 18 preliminary injunction hearing that does not involve witness testimony. The Public Access telephone number is 1–833–990–9400, and the access code is 371436084. <br><br> Signed by Judge Ana C. Reyes on 02/10/2025. (lcacr2) Modified on 2/13/2025 to correct access code for public (zcll). (Entered: 02/10/2025) |
| 02/10/2025 | 33 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1 – SecDef Memo)(Lynch, Jason) (Entered: 02/10/2025) |
| 02/11/2025 | 34 | TRANSCRIPT OF STATUS CONFERENCE (CONDUCTED IN CHAMBERS) before Judge Ana C. Reyes held on February 4, 2025; Page Numbers: 1–15. Date of Issuance: February 11, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form\n\nFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.\n\n**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.\n\nRedaction Request due 3/4/2025. Redacted Transcript Deadline set for 3/14/2025. Release of Transcript Restriction set for 5/12/2025.(Edwards, Lisa) (Entered: 02/11/2025) |
| 02/12/2025 | 35 | NOTICE of Appearance by Sara E. Kropf on behalf of All Plaintiffs (Kropf, Sara) (Entered: 02/12/2025) |
| 02/12/2025 | 36 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration of Lieutenant Colonel Baker, # 2 Text of Proposed Order)(Layendecker, Elizabeth) (Entered: 02/12/2025) |
| 02/12/2025 | 37 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 07 Feb 2025 Army Guidance)(Lynch, Jason) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. Upon consideration of Defendants' 36 Unopposed Motion for Leave to File under Seal, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/12/2025. (lcacr2) Modified on 2/12/2025 (zcll). (Entered: 02/12/2025) |
| 02/12/2025 | 38 | Memorandum in opposition to re 13 Motion for Preliminary Injunction,,,,,, filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, |

| | | |
|---|---|---|
| | | UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit 1 – 2018 DoD Report, # 2 Exhibit 2 – Feb 2018 Mattis Memo, # 3 Exhibit 3 – Mar 2018 Pres Memo, # 4 Exhibit 4 – Dec 2017 Health Data)(Lynch, Jason) (Entered: 02/12/2025) |
| 02/12/2025 | 39 | NOTICE of Appearance by Elizabeth Brooke Layendecker on behalf of All Defendants (Layendecker, Elizabeth) (Main Document 39 replaced on 2/13/2025) (zdp). (Entered: 02/12/2025) |
| 02/12/2025 | 64 | SEALED DOCUMENT filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. re 36 Sealed Motion for Leave to File Document Under Seal,,. (This document is SEALED and only available to authorized persons.)(zdp) (Entered: 02/27/2025) |
| 02/13/2025 | | NOTICE of PUBLIC LINE INFORMATION: Interested parties may access the Court's dial–in line for the February 13 Zoom hearing. The Public Access telephone number is 1–833–990–9400, and the access code is 720718696. (zcll) (Entered: 02/13/2025) |
| 02/13/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Pre–motion Conference held on 2/13/2025. Defendant DONALD J. TRUMP in his official capacity as President of the United States is hereby DISMISSED as a Defendant in this matter. Preliminary Injunction hearing remains scheduled for 2/18/2025 at 10:00AM before Judge Ana C. Reyes. (Court Reporter Christine Asif.) (zcll) (Entered: 02/13/2025) |
| 02/13/2025 | 40 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 2/13/2025; Page Numbers: 1–50. Date of Issuance:2/13/2025. Court Reporter Christine T. Asif, Telephone number 2023543247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/6/2025. Redacted Transcript Deadline set for 3/16/2025. Release of Transcript Restriction set for 5/14/2025.(Asif, Christine) (Entered: 02/13/2025) |
| 02/14/2025 | | Minute Order: The Court will provide access for the public to telephonically attend the hearing scheduled for 2/18/2025 at 10AM ET. The hearing can be accessed through dialing the Toll Free Number: 833–990–9400, Meeting ID: 787605272. It is hereby ORDERED that the attendees using the public access telephone line shall |

| | | |
|---|---|---|
| | | adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings (including those held by telephone or videoconference). **Parties are also advised that the public line will not be available during witness testimony. Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. SO ORDERED. Signed by Judge Ana C. Reyes on 2/14/2025. (zcll) (Entered: 02/14/2025)** |
| 02/14/2025 | 41 | Consent MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER granting 41 Motion for Leave to File an *Amicus Curiae* Brief by the Constitutional Accountability Center. Signed by Judge Ana C. Reyes on 02/14/2025. (lcacr2) (Entered: 02/14/2025) |
| 02/14/2025 | 42 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Inga S. Bernstein, Filing fee $ 100, receipt number ADCDC–11482040. Fee Status: Fee Paid. by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration of Inga S. Bernstein, # 2 Certificate of Good Standing)(Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 43 | AMICUS BRIEF by STATE OF VERMONT, STATE OF WASHINGTON. (Rose, Jonathan) (Entered: 02/14/2025) |
| 02/14/2025 | 44 | ENTERED IN ERROR.....AMICUS BRIEF by STATE OF VERMONT, STATE OF WASHINGTON. (zdp) Modified on 2/14/2025 (zdp). (Entered: 02/14/2025) |
| 02/14/2025 | 45 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (zdp) (Entered: 02/14/2025) |
| 02/14/2025 | 46 | MOTION for Leave to Appear on behalf of amici curiae by FRANK KENDALL, CHRISTINE WORMUTH. (Tutt, Andrew) (Entered: 02/14/2025) |
| 02/14/2025 | 47 | Consent MOTION for Leave to File *Amicus Brief in Support of Motion for Preliminary Injunction* by FRANK KENDALL, CHRISTINE WORMUTH. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Tutt, Andrew) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER granting 46 Motion for Leave to Appear and 47 Motion for Leave to File an *Amicus Curiae* Brief by Former Military Department Heads. Signed by Judge Ana C. Reyes on 02/14/2025. (lcacr2) (Entered: 02/14/2025) |
| 02/14/2025 | 48 | REPLY to opposition to motion re 13 Motion for Preliminary Injunction,,,,,, filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Declaration of Minerva Bettis, # 2 Declaration of Carlos Del Toro, # 3 Declaration of Audrie Graham, # 4 Declaration of Michael Haley, # 5 Exhibit A to Haley Decl., # 6 Exhibit B to Haley Decl., # 7 Exhibit C to Haley Decl., # 8 Exhibit D to Haley Decl., # 9 Exhibit E to Haley Decl., # 10 Exhibit F to Haley Decl., # 11 Exhibit G to Haley Decl., # 12 Exhibit H to Haley Decl., # 13 Exhibit I to Haley Decl., # 14 Exhibit J to Haley Decl., # 15 Exhibit K to Haley Decl., |

| | | |
|---|---|---|
| | | # 16 Declaration of Roan Pickett, # 17 Exhibit A to Pickett Decl., # 18 Declaration of Amiah Sale, # 19 Declaration of Quinn Tyson, # 20 Exhibit A to Tyson Decl., # 21 Exhibit B to Tyson Decl., # 22 Supplemental Declaration of Jamie Hash, # 23 Supplemental Declaration of Gordon Herrero, # 24 Supplemental Declaration of Miriam Perelson, # 25 Supplemental Declaration of Erica Vandal, # 26 Exhibit A to Supplemental Vandal Decl., # 27 Supplemental Declaration of Alex Wagner, # 28 Exhibit A to Supplemental Wagner Decl., # 29 Declaration of Joseph Wardenski, # 30 Exhibit A to Wardenski Decl., # 31 Exhibit B to Wardenski Decl., # 32 Exhibit C to Wardenski Decl.)(Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 49 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – Feb. 14, 2025 amendment to Army EXORD 150–25)(Lynch, Jason) (Entered: 02/14/2025) |
| 02/14/2025 | 50 | DECLARATION of *Greyson Shishkina* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 48 Reply to opposition to Motion,,,,,. (Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 51 | DECLARATION of *Clayton McCallister* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON re 48 Reply to opposition to Motion,,,,,. (Wardenski, Joseph) (Entered: 02/14/2025) |
| 02/14/2025 | 52 | Unopposed MOTION for Leave to File *Declaration of Timothy Dill* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit Dill Declaration, # 2 Text of Proposed Order)(Layendecker, Elizabeth) (Entered: 02/14/2025) |
| 02/15/2025 | | MINUTE ORDER granting 42 Motion for Leave to Appear Pro Hac Vice. Attorney Inga S. Bernstein is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ORDER. Upon consideration of Defendants' 52 Unopposed Motion for Leave to File the Declaration of Timothy Dill, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ENTRY. The Court extends its appreciation to all *amici* who submitted briefs in this matter. Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/15/2025 | | MINUTE ORDER. After conferring with the parties, the Court ORDERS that oral argument on Plaintiffs' 13 Motion for Preliminary Injunction will be heard on Tuesday, February 18 starting at 10:00 AM. Interested parties may access the Court's dial–in line and must adhere to the rules |

| | | |
|---|---|---|
| | | outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272. At this time, the Court does not expect to hear live testimony. If that changes, the public line will not be available for that testimony.<br><br>Signed by Judge Ana C. Reyes on 02/15/2025. (lcacr2) (Entered: 02/15/2025) |
| 02/16/2025 | 53 | Unopposed MOTION for Leave to File *Supplemental Declaration of Gilbert R. Cisneros Jr.* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Kropf, Sara) (Entered: 02/16/2025) |
| 02/16/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 53 Unopposed Motion for Leave to File the Supplemental Declaration of Gilbert R. Cisneros, Jr., the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/16/2025. (lcacr2) (Entered: 02/16/2025) |
| 02/18/2025 | 54 | NOTICE of Appearance by Inga S. Bernstein on behalf of All Plaintiffs (zdp) (Entered: 02/18/2025) |
| 02/18/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Preliminary Injunction hearing began on 2/18/2025. Preliminary Injunction Hearing continued to 2/19/2025 at 10:30 AM in Courtroom 12– In Person (Audio Line Available) before Judge Ana C. Reyes. (Court Reporter Lisa Edwards.) (zcll) (Entered: 02/18/2025) |
| 02/19/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Continued Preliminary Injunction hearing held on 2/19/2025. Further Preliminary Injunction Hearing set for 3/3/2025 at 10:30 AM in Courtroom 12– In Person (Audio Line Available) before Judge Ana C. Reyes. (Court Reporter Lisa Edwards.) (zcll) (Entered: 02/19/2025) |
| 02/19/2025 | | MINUTE ORDER. As stated on the record at the preliminary injunction hearing, the Court ORDERS the following briefing schedule for Defendants' surreply and the parties' supplemental briefing:<br><br>1. Defendants shall file a surreply to Plaintiffs' 13 Motion for Preliminary Injunction on or before February 25, 2025, at 6:00 PM.<br><br>2. The parties shall submit supplemental briefing, not to exceed five pages, addressing the questions of biology the Court raised in connection with the immutability analysis. Plaintiffs shall submit their supplemental brief on or before February 21, 2025, at 6:00 PM. Defendants shall submit their response on or before February 28, 2025, at 6:00 PM.<br><br>3. The parties shall submit optional briefing, on or before March 2, 2025, at 2:00 PM, addressing the forthcoming guidance issued by the Secretary of Defense implementing Executive Order 14183.<br><br>The Court further ORDERS that oral argument on Plaintiffs' 13 Motion for Preliminary Injunction will continue on March 3, 2025, at 10:30 AM. Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272. |

| | | |
|---|---|---|
| | | Signed by Judge Ana C. Reyes on 02/19/2025. (lcacr2) (Entered: 02/19/2025) |
| 02/19/2025 | 55 | SEALED DOCUMENT filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE(This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Sealed Declaration of Lieutenant Colonel Baker)(Layendecker, Elizabeth) (Entered: 02/19/2025) |
| 02/21/2025 | 56 | MOTION for Leave to File Excess Pages by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Wardenski, Joseph) (Entered: 02/21/2025) |
| 02/21/2025 | 57 | SUPPLEMENTAL MEMORANDUM to re 13 MOTION for Preliminary Injunction *on Immutability* filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, MIRIAM PERELSON. (Attachments: # 1 Exhibit A 2023 SAMHSA Report, # 2 Exhibit B 2015 SAMHSA Report, # 3 Exhibit C APA Resolution on Gender Identity Change Efforts, # 4 Exhibit D Fish et al., Sexual Orientation and Gender Identity Change Efforts, # 5 Exhibit E Turban et al., Association Between Recalled Exposure, # 6 Exhibit F Zhou et al., Sex Difference in the Human Brain, # 7 Exhibit G Luders et al., Regional Gray Matter Variation, # 8 Exhibit H Rametti et al., White Matter Microstructure, # 9 Exhibit I Berglund et al., Male–to–Female Transsexuals, # 10 Exhibit J Savic et al., Sex Dimorphism of the Brain, # 11 Exhibit K Heylens et al., Gender Identity Disorder in Twins, # 12 Exhibit L Henningsson et al., Sex Steroid–Related Genes, # 13 Exhibit M Rosenthal, Approach to the Patient, # 14 Exhibit N Dessens et al., Gender Dysphoria and Gender Change)(Wardenski, Joseph) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 56 Motion for Leave to File Excess Pages, the Court GRANTS the Motion. Signed by Judge Ana C. Reyes on 02/21/2025. (lcacr2) (Entered: 02/21/2025) |
| 02/24/2025 | 58 | TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING (PARTIALLY REDACTED) before Judge Ana C. Reyes held on February 18, 2025; Page Numbers: 1–260. Date of Issuance: February 24, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our |

| | | |
|---|---|---|
| | | website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/27/2025. Release of Transcript Restriction set for 5/25/2025.(Edwards, Lisa) Modified text on 3/4/2025 to correct number of pages (zljn). (Main Document 58 replaced on 3/4/2025) (zljn). (Entered: 02/24/2025) |
| 02/24/2025 | 59 | TRANSCRIPT OF CONTINUED PRELIMINARY INJUNCTION HEARING (PARTIALLY REDACTED) before Judge Ana C. Reyes held on February 19, 2025; Page Numbers: 1–121. Date of Issuance: February 24, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354–3269. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/27/2025. Release of Transcript Restriction set for 5/25/2025.(Edwards, Lisa) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court will hold a virtual status conference with the parties on Monday, February 24, 2025, at 4:30 PM.<br><br>Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/24/2025. (lcacr2) (Entered: 02/24/2025) |
| 02/24/2025 | 60 | AMENDED COMPLAINT (*Second*) against All Defendants filed by JAMIE HASH, KODA NATURE, DANY DANRIDGE, KATE COLE, ERICA VANDAL, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS.(Wardenski, Joseph) (Entered: 02/24/2025) |
| 02/24/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Status Conference held Via Zoom on 2/24/2025. (Court Reporter SONJA REEVES.) (mac) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. As stated on the record at today's virtual status conference, the Court VACATES the current briefing schedule and ORDERS Defendants to notify Plaintiffs and the Court as soon as practicable after the Secretary of Defense issues his forthcoming guidance implementing Executive Order 14183.The Court further |

| | | |
|---|---|---|
| | | ORDERS the following briefing schedule for Plaintiffs' forthcoming Third Amended Complaint and new motion for preliminary injunction:<br><br>1. Plaintiffs shall file their Third Amended Complaint and new motion for preliminary injunction on or before March 3, 2025, at 6:00 PM.<br><br>2. Defendants shall file their Opposition to Plaintiffs' new motion for preliminary injunction on or before March 10, 2025, at 6:00 PM.<br><br>3. The Court will hold a hearing on Plaintiffs' new motion for preliminary injunction on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/24/2025. (lcacr2) (Entered: 02/24/2025) |
| 02/25/2025 | | MINUTE ORDER. By agreement of the parties, the Court ORDERS the following modifications to the February 24, 2025 briefing schedule:<br><br>1. Plaintiffs shall file their Third Amended Complaint and new motion for preliminary injunction on or before March 4, 2025, at 6:00 PM.<br><br>2. Defendants shall file their Opposition to Plaintiffs' new motion for preliminary injunction on or before March 11, 2025, at 6:00 PM.<br><br>3. The Court will hold a hearing on Plaintiffs' new motion for preliminary injunction on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272.<br><br>Signed by Judge Ana C. Reyes on 02/25/2025. (lcacr2) (Entered: 02/25/2025) |
| 02/25/2025 | 61 | TRANSCRIPT OF REMOTE PROCEEDINGS VIA VIDEOCONFERENCE, STATUS CONFERENCE, before Judge Ana C. Reyes held on February 24, 2025; Page Numbers: 1–29. Date of Issuance:February 25, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Reeves, Sonja) Modified on 2/28/2025 to correct docket text (rj). (Entered: 02/25/2025) |
| 02/25/2025 | 62 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Layendecker, Elizabeth) (Entered: 02/25/2025) |
| 02/25/2025 | | Set/Reset Deadlines: Amended Pleadings And New Motion For Preliminary Injunction due no later than 6:00PM on 3/4/2025. Defendants Opposition To Plaintiffs' New Motion For Preliminary Injunction due no later than 6:00PM on 3/11/2025 (mac) (Entered: 02/26/2025) |
| 02/26/2025 | 63 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 26 Feb 2025 OSD Policy)(Lynch, Jason) (Entered: 02/26/2025) |
| 02/27/2025 | | MINUTE ORDER. The Court is in receipt of the 63 February 26, 2025 memorandum with Additional Guidance on Prioritizing Military Excellence and Readiness. In light of it, the Court Orders Defendants to file on the public docket the following by 10:00 am March 1, 2025:<br><br>1. The total amount of Department of Defense (DoD) spending per year from 2015 to 2024, and the total overall for that time period.<br><br>2. The total amount of DoD spending per year from 2015 to 2024 on psychotherapy for all service members, and the total overall for that time period.<br><br>3. The total amount of DoD spending per year from 2015 to 2024 on surgical care for all service members, and the total overall for that time period.<br><br>4. The total amount of DoD spending per year from 2015 to 2024 on elective surgical care for all service members, and the total overall for that time period.<br><br>5. If publicly available links exist, links to the line–item budget for DoD spending for each year between 2015 and 2024.<br><br>6. Identification of any "mental health constraint," other than gender dysphoria, that DoD has previously found to be inconsistent with "honesty, humility, and integrity."<br><br>7. For each Plaintiff, whether implementation of the Action Memo would require him or her to be separated from the Armed Forces.<br><br>8. The most recent estimate made by the DoD of the number of transgender individuals currently serving in the Armed Forces.<br><br>If Defendants do not have ready access to "spending" amounts, they can provide the |

| | | |
|---|---|---|
| | | budgeted amounts. If Defendants have any questions about this order, they should contact Chambers with Plaintiffs' counsel today, February 27, 2025, to have them addressed. Signed by Judge Ana C. Reyes on 2/27/2025. (lcacr1) (Entered: 02/27/2025) |
| 02/27/2025 | | MINUTE ORDER. The hearing on Plaintiffs' forthcoming motion for preliminary injunction will be on March 12, 2025, at 10:30 AM in Courtroom 12. Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 2/27/2025. (lcacr1) (Entered: 02/27/2025) |
| 02/28/2025 | 65 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 28 Feb 2025 Clarifyng Guidance)(Lynch, Jason) (Entered: 02/28/2025) |
| 03/01/2025 | 66 | RESPONSE TO ORDER OF THE COURT re 2/27/2025 Order Filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit CRS Report)(Layendecker, Elizabeth) Modified docket text on 3/6/2025 (zdp). (Entered: 03/01/2025) |
| 03/02/2025 | 67 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 01 Mar 2025 USAF Guidance)(Lynch, Jason) (Entered: 03/02/2025) |
| 03/04/2025 | 68 | Joint MOTION for Leave to File Excess Pages by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, MIRIAM PERELSON. (Attachments: # 1 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/04/2025) |
| 03/04/2025 | | MINUTE ORDER. The Court GRANTS, very reluctantly, the parties' 68 Joint Motion for Page Limit Expansion, which Plaintiffs precipitated. Plaintiffs should not have filed this Motion at the last minute. They knew of the brief's excessive length before 3:16 PM on the day of filing. And as Polonius reminds us, "brevity is the soul of wit." William Shakespeare, *Hamlet*, Act 2, Scene 2, Line 90. It is also, almost always, the soul of an effective brief. Signed by Judge Ana C. Reyes on 03/04/2025. (lcacr2) (Entered: 03/04/2025) |
| 03/04/2025 | 69 | AMENDED COMPLAINT *(THIRD)* against All Defendants filed by JAMIE HASH, QUINN TYSON, KODA NATURE, DANY DANRIDGE, KATE COLE, AMIAH SALE, AUDRIE GRAHAM, GREYSON SHISHKINA, ERICA VANDAL, CLAYTON MCCALLISTER, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, ROAN PICKETT, MINERVA BETTIS, CAEL NEARY, |

| | | |
|---|---|---|
| | | SAMUEL AHEARN, Michelle Bloomrose, REGAN MORGAN, VERA WOLF.(Wardenski, Joseph) (Entered: 03/04/2025) |
| 03/05/2025 | 70 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 04 Mar 2025 DoD Clarifying Guidance)(Lynch, Jason) (Entered: 03/05/2025) |
| 03/05/2025 | 71 | NOTICE of Appearance by Jean Lin on behalf of All Defendants (Lin, Jean) (Main Document 71 replaced on 3/6/2025) (zdp). (Entered: 03/05/2025) |
| 03/07/2025 | 72 | MOTION for Preliminary Injunction *(Renewed)* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Supplemental Memorandum on Immutability, # 4 Exhibit A to Supplemental Memorandum – 2023 SAMHSA Report, # 5 Exhibit B to Supplemental Memorandum – 2015 SAMHSA Report, # 6 Exhibit C to Supplemental Memorandum – APA GICE Resolution, # 7 Exhibit D to Supplemental Memorandum – Fish & Russel, # 8 Exhibit E to Supplemental Memorandum – Turban et al., # 9 Exhibit F to Supplemental Memorandum – Zhou et al., # 10 Exhibit G to Supplemental Memorandum – Luders et al., # 11 Exhibit H to Supplemental Memorandum – Rametti et al., # 12 Exhibit I to Supplemental Memorandum – Berglund et al., # 13 Exhibit J to Supplemental Memorandum – Savic & Arver, # 14 Exhibit K to Supplemental Memorandum – Heylens et al., # 15 Exhibit L to Supplemental Memorandum – Henningson et al., # 16 Exhibit M to Supplemental Memorandum – Rosenthal, # 17 Exhibit N to Supplemental Memorandum – Dessens et al., # 18 Declaration of Nicolas Talbott, # 19 Supplemental Declaration of Nicolas Talbott, # 20 Declaration of Erica Vandal, # 21 Supplemental Declaration of Erica Vandal, # 22 Second Supplemental Declaration of Erica Vandal, # 23 Declaration of Kate Cole, # 24 Supplemental Declaration of Kate Cole, # 25 Declaration of Gordon Herrero, # 26 Supplemental Declaration of Gordon Herrero, # 27 Second Supplemental Declaration of Gordon Herrero, # 28 Declaration of Dany Danridge, # 29 Supplemental Declaration of Dany Danridge, # 30 Declaration of Jamie Hash, # 31 Supplemental Declaration of Jamie Hash, # 32 Second Supplemental Declaration of Jamie Hash, # 33 Declaration of Koda Nature, # 34 Supplemental Declaration of Koda Nature, # 35 Declaration of Cael Neary, # 36 Supplemental Declaration of Cael Neary, # 37 Declaration of Miriam Perelson, # 38 Supplemental Declaration of Miriam Perelson, # 39 Second Supplemental Declaration of Miriam Perelson, # 40 Declaration of Minerva Bettis, # 41 Supplemental Declaration of Minerva Bettis, # 42 Declaration of Audrie Graham, # 43 Supplemental Declaration of Audrie Graham, # 44 Declaration of Roan Pickett, # 45 Supplemental Declaration of Roan Pickett, # 46 Declaration of Amiah Sale, # 47 Supplemental Declaration of Amiah Sale, # 48 Declaration of Quinn Tyson, # 49 Supplemental Declaration of Quinn Tyson, # 50 Declaration of Greyson Shishkina, # 51 Supplemental Declaration of Greyson Shishkina, # 52 Declaration of Clayton McCallister, # 53 Supplemental Declaration of Clayton McCallister, # 54 Declaration of Michelle Bloomrose, # 55 Declaration of Regan Morgan, # 56 Exhibit A to Morgan Declaration (Development Counseling Form), # 57 Declaration of Samuel Ahearn, # |

| | | |
|---|---|---|
| | | 58 Declaration of Vera Wolf, # 59 Declaration of Alex Wagner, # 60 Exhibit A to Wagner Decl. – DTM 16–005, # 61 Exhibit B to Wagner Decl. – Army Directive 2016–30, # 62 Exhibit C to Wagner Decl. – Army Directie 2016–35, # 63 Exhibit D to Wagner Decl. – DoDI 1300.28, # 64 Exhibit E to Wagner Decl. – Air Force Policy Memorandum 2021–36–01, # 65 Exhibit F to Wagner Decl. – PRRI Survey, # 66 Supplemental Declaration of Alex Wagner, # 67 Exhibit A to Supplemental Wagner Decl. – DoDI 6130.03 Vol. 2, # 68 Second Supplemental Declaration of Alex Wagner, # 69 Declaration of Yvette Bourcicot, # 70 Exhibit A to Bourcicot Decl. – RAND Report, # 71 Supplemental Declaration of Yvette Bourcicot, # 72 Declaration of Shawn Skelly, # 73 Supplemental Declaration of Shawn Skelly, # 74 Declaration of Gilbert Cisneros, # 75 Supplemental Declaration of Gilbert Cisneros, # 76 Second Supplemental Declaration of Gilbert Cisneros, # 77 Declaration of George Brown, # 78 Supplemental Declaration of George Brown, # 79 Declaration of Carlos Del Toro, # 80 Declaration of Carrie Baker, # 81 Exhibit A to Baker Decl. – Baker CV, # 82 Declaration of Martha Soper, # 83 Index of Exhibits to Soper Decl., # 84 Exhibit A to Soper Decl. – DoDI 1332.14, # 85 Exhibit B to Soper Decl. – DoDI 1332.30, # 86 Exhibit C to Soper Decl. – DoDI 1332.18)(Wardenski, Joseph) (Entered: 03/07/2025) |
| 03/07/2025 | 73 | DECLARATION of Joseph Wardenski by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re 72 MOTION for Preliminary Injunction (Renewed). (Attachments: # 1 Index of Exhibits, # 2 Exhibit A Sec. Carter Remarks, # 3 Exhibit B Implementation Handbook, # 4 Exhibit C Statement on Transgender Accessions, # 5 Exhibit D Wamsley Article, # 6 Exhibit E Palm Center Statement, # 7 Exhibit F August 2017 Presidential Memorandum, # 8 Exhibit G Mattis Report, # 9 Exhibit H DoDI 6130.03, Vol. 1, # 10 Exhibit I Cooper Article, # 11 Exhibit J OPM Memo, # 12 Exhibit K Sears Article, # 13 Exhibit L Currah Article, # 14 Exhibit M Transgender Health Care Report, # 15 Exhibit N Hassan Article, # 16 Exhibit O 2024 GOP Platform, # 17 Exhibit P Deliso Article, # 18 Exhibit Q Navy Guidance Memo N000–30, # 19 Exhibit R MEPS Email, # 20 Exhibit S Palm Center Report, # 21 Exhibit T Army Memo 2021–22, # 22 Exhibit U Navy Instruction 1000.1A, # 23 Exhibit V Action Memo, # 24 Exhibit W Analysis of Medical Administrative Data, # 25 Exhibit X Literature Review, # 26 Exhibit Y Implementing Guidance FAQs)(Wardenski, Joseph) (Entered: 03/07/2025) |
| 03/07/2025 | 74 | DECLARATION of Michael Haley by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re 72 MOTION for Preliminary Injunction (Renewed). (Attachments: # 1 Index of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J)(Wardenski, Joseph) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. After receiving Plaintiffs' 72 Renewed Application for Preliminary Injunction, the Court ORDERS the following:<br><br>1. Defendants shall notify Plaintiffs and the Court, via email by Saturday, March 8 at 12:00 PM EST, whether they wish to cross–examine any of the declarants listed in |

| | | |
|---|---|---|
| | | Plaintiffs' 72 Application. |
| | | 2. Defendants shall provide Plaintiffs, via email by Saturday, March 8 at 12:00 PM EST, with a list of any declarants they plan to rely on in their forthcoming Opposition to Plaintiffs' 72 Application. |
| | | 3. Plaintiffs shall notify Defendants and the Court, via email by Sunday, March 9 at 12:00 PM EST, whether they wish to cross–examine any of the declarants listed in Defendants' forthcoming Opposition to Plaintiffs' 72 Application. |
| | | Signed by Judge Ana C. Reyes on 03/07/2025. (lcacr2) Modified on 3/7/2025 to correct typo (zakb). (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. At the preliminary injunction hearing on Wednesday, March 12, the Court intends to take judicial notice, pursuant to Federal Rules of Evidence 201(b)(2) and (c)(1), of the following: |
| | | 1. "Fact Sheet: President Donald J. Trump Ensures Military Excellence and Readiness." Posted on January 27, 2025, on www.whitehouse.gov. |
| | | 2. X post from @DODResponse: "Transgender troops are disqualified from service without an exemption." Posted on February 27, 2025, at 12:08 PM. |
| | | 3. X post from @SecDef: Reposting @DODResponse's post above. Posted shortly thereafter. |
| | | The Court will give both parties an opportunity to present any objections and/or arguments to the Court doing so at the preliminary injunction hearing. |
| | | Signed by Judge Ana C. Reyes on 03/07/2025. (lcacr2) (Entered: 03/07/2025) |
| 03/07/2025 | 75 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 06 Mar 2025 Army Guidance, # 2 Exhibit 2 – 07 Mar 2025 Army EXORD 175–25)(Lynch, Jason) (Entered: 03/07/2025) |
| 03/10/2025 | 76 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Harold Hongju Koh, Filing fee $ 100, receipt number ADCDC–11528788. Fee Status: Fee Paid. by FRANK KENDALL, CHRISTINE WORMUTH. (Attachments: # 1 Declaration of Harold Hongju Koh, # 2 Certificate of Good Standing)(Tutt, Andrew) Modified docket text on 3/10/2025 (mg). (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER granting 76 Motion for Leave to Appear Pro Hac Vice. Attorney Harold Hongju Koh is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Ana C. Reyes on 03/10/2025. (lcacr2) (Entered: 03/10/2025) |
| 03/11/2025 | 77 | Consent MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus |

| | | |
|---|---|---|
| | | Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 03/11/2025) |
| 03/11/2025 | 78 | MOTION for Leave to File *Documents to Supplement Record* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Supplemental Declaration of Regan Morgan, # 2 Third Supplemental Declaration of Jamie Hash, # 3 Exhibit DoD Public Affairs Guidance, # 4 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER. Upon consideration of Plaintiffs' 78 Motion for Leave to Supplement the Record, the Court DENIES the Motion as to the supplemental declarations and GRANTS it as to the Public Affairs Guidance.<br><br>Plaintiffs are not permitted to file the supplemental declarations. It would be unfairly prejudicial to Defendants to require them to respond to two substantive declarations 6 hours before their Opposition brief is due and less than 24 hours before the Court's final preliminary injunction hearing. The Court has not and will not review the declarations at this time. Plaintiffs are permitted to refile the declarations during permanent injunction briefing.<br><br>Plaintiffs are permitted to file the Public Affairs Guidance, as admission of a Department of Defense document does not prejudice Defendants.<br><br>Signed by Judge Ana C. Reyes on 03/11/2025. (lcacr2) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER granting 77 Motion for Leave to File an *Amicus Curiae* Brief by the Constitutional Accountability Center. Signed by Judge Ana C. Reyes on 03/11/2025. (lcacr2) (Entered: 03/11/2025) |
| 03/11/2025 | 79 | DECLARATION *of Joseph Wardenski (Supplemental)* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON re 72 MOTION for Preliminary Injunction *(Renewed)*. (Attachments: # 1 Exhibit Z – DoD Public Affairs Guidance)(Wardenski, Joseph) (Entered: 03/11/2025) |
| 03/11/2025 | 80 | MOTION for Leave to File *Exhibit to Supplement Record* by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, MIRIAM PERELSON. (Attachments: # 1 Exhibit March 7 Memo from USAF to Jamie Hash, # 2 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/11/2025) |
| 03/11/2025 | 81 | Memorandum in opposition to re 72 Motion for Preliminary Injunction,,,,,,,,,,,,,,,,,, filed by TELITA CROSLAND, DEFENSE HEALTH AGENCY, DONALD J. TRUMP, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. |

| | | |
|---|---|---|
| | | AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Exhibit 1 – 7/28/2015 Carter Mem, # 2 Exhibit 2 – 5/26/2018 Mattis Testimony, # 3 Exhibit 3 – May 2017 Service Responses, # 4 Exhibit 4 – 6/30/2017 Mattis Mem, # 5 Exhibit 5 – 6/23/2020 Brown Dep. Tr.)(Lynch, Jason) (Entered: 03/11/2025) |
| 03/11/2025 | 82 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (zdp) (Entered: 03/12/2025) |
| 03/12/2025 | 83 | NOTICE of Appearance by Jason Manion on behalf of All Defendants (Manion, Jason) (Entered: 03/12/2025) |
| 03/12/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/12/2025 re 72 MOTION for Preliminary Injunction *(Renewed)* filed by MINERVA BETTIS, CAEL NEARY, VERA WOLF, KATE COLE, NICOLAS TALBOTT, AMIAH SALE, JAMIE HASH, ROAN PICKETT, GREYSON SHISHKINA, QUINN TYSON, SAMUEL AHEARN, DANY DANRIDGE, REGAN MORGAN, MICHELLE BLOOMROSE, GORDON HERRERO, KODA NATURE, MIRIAM PERELSON, ERICA VANDAL, AUDRIE GRAHAM, CLAYTON MCCALLISTER and taken under advisement. (Court Reporter Christine Asif.) (dot) (Entered: 03/14/2025) |
| 03/13/2025 | 84 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – 13 March 2025 ALLNAV 023/25)(Lynch, Jason) (Entered: 03/13/2025) |
| 03/14/2025 | 85 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – MARADMINS)(Lynch, Jason) (Entered: 03/14/2025) |
| 03/17/2025 | 86 | NOTICE *Pursuant to March 12, 2025 Hearing* by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit 1 – Tab 12 (Complete))(Lynch, Jason) (Entered: 03/17/2025) |
| 03/17/2025 | 87 | NOTICE by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE re Order,, (Attachments: # 1 Exhibit 1 – NAVADMIN 055/25)(Lynch, Jason) (Entered: 03/17/2025) |
| 03/18/2025 | 88 | ORDER granting Plaintiffs' 72 Renewed Application for Preliminary Injunction. See document for details. Signed by Judge Ana C. Reyes on 03/18/2025. (lcacr2) (Entered: 03/18/2025) |

| 03/18/2025 | 89 | MEMORANDUM OPINION regarding Plaintiffs' 72 Renewed Application for Preliminary Injunction. See document for details. Signed by Judge Ana C. Reyes on 03/18/2025. (lcacr2) (Main Document 89 reposted on 3/19/2025) (hmc). (Main Document 89 reposted on 3/25/2025) (hmc). (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 90 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/12/2025; Page Numbers: 1–259. Date of Issuance:3/18/2025. Court Reporter Christine T. Asif, Telephone number 202–354–3247, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(Asif, Christine) (Entered: 03/18/2025) |
| 03/21/2025 | 91 | MOTION To Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or Alternatively, to Stay Injunction Pending Appeal by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED STATES OF AMERICA, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Exhibit 1 March 21, 2025, Memorandum)(Lin, Jean). Added MOTION for Extension of Time to, MOTION to Stay on 3/24/2025 (zdp). (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court will hold an in–person hearing on Defendants' 91 Motions to Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or, Alternatively, to Stay Injunction Pending Appeal, on March 21, 2025, at 11:00 AM in Courtroom 12.

Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court ORDERS Defendants to post on the docket all attachments to the March 21, 2025 Memorandum from the Office of the Undersecretary of Defense for Personnel and Readiness. Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | | Set/Reset Hearings: Motion Hearing set for 3/21/2025 at 11:00 AM in Courtroom 12– In Person before Judge Ana C. Reyes. (tj) (Entered: 03/21/2025) |

| | | |
|---|---|---|
| 03/21/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/21/2025 re 91 MOTION To Dissolve Preliminary Injunction, Extend Stay of Injunction Pending Motion to Dissolve or Alternatively, to Stay Injunction Pending Appeal filed by UNITED STATES DEPARTMENT OF THE ARMY, MARK F. AVERILL, UNITED STATES OF AMERICA, TERENCE EMMERT, TELITA CROSLAND, UNITED STATES DEPARTMENT OF THE AIR FORCE, GARY ASHWORTH, DEFENSE HEALTH AGENCY, UNITED STATES DEPARTMENT OF THE NAVY. Oral argument heard. (Court Reporter: Christine Asif.) (ztj) (Entered: 03/21/2025) |
| 03/21/2025 | | MINUTE ORDER. The Court ORDERS Defendants to post any guidance concerning the March 26, 2025 separation date in the Hegseth Policy by 6:30 PM eastern on March 21, 2025. |
| | | The Court REINSTATES its stay of the 88 Preliminary Injunction until 48 hours after it rules on Defendants' 91 Motion to Dissolve or until such other time as the Court deems appropriate. The Court ORDERS Plaintiffs to file their Opposition to Defendants' 91 Motion to Dissolve on or before 10:00 AM eastern on Tuesday, March 25, 2025. |
| | | If any action occurs that negatively impacts a servicemember based on their transgender status before the Court lifts the stay, that individual may file a temporary restraining order (TRO), and the Court will consider it expeditiously. If the individual is not a current Plaintiff, Plaintiffs may amend their current Complaint to include that individual along with the filing of the TRO. |
| | | Signed by Judge Ana C. Reyes on 03/21/2025. (lcacr2) (Entered: 03/21/2025) |
| 03/21/2025 | 92 | NOTICE by TELITA CROSLAND, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Layendecker, Elizabeth) (Entered: 03/21/2025) |
| 03/21/2025 | 93 | NOTICE by TELITA CROSLAND, UNITED STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE (Attachments: # 1 Exhibit Compliance Memo)(Layendecker, Elizabeth) (Entered: 03/21/2025) |
| 03/24/2025 | 94 | AMENDED COMPLAINT *(Fourth)* against GARY ASHWORTH, MARK F. AVERILL, TELITA CROSLAND, DEFENSE HEALTH AGENCY, TERENCE EMMERT, PETER B. HEGSETH, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE NAVY, UNITED STATES OF AMERICA, HUNTER MARQUEZ, SEAN KERSCH–HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS filed by JAMIE HASH, REGAN MORGAN, QUINN TYSON, KODA NATURE, DANY DANRIDGE, SAMUEL AHEARN, KATE COLE, AMIAH SALE, AUDRIE GRAHAM, GREYSON SHISHKINA, ERICA VANDAL, |

| | | |
|---|---|---|
| | | CLAYTON MCCALLISTER, MIRIAM PERELSON, NICOLAS TALBOTT, GORDON HERRERO, ROAN PICKETT, MINERVA BETTIS, VERA WOLF, MICHELLE BLOOMROSE, CAEL NEARY, HUNTER MARQUEZ, SEAN KERSCH–HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS. (Attachments: # 1 Redline to Third Amended Complaint)(Wardenski, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | 95 | MOTION for Temporary Restraining Order by JAMIE HASH, SAMUEL AHEARN, VERA WOLF, HUNTER MARQUEZ, ASHLEY DAVIS. (Attachments: # 1 Supplemental Declaration of Samuel Ahearn, # 2 Declaration of Ashley Davis, # 3 Third Supplemental Declaration of Jamie Hash, # 4 Declaration of Hunter Marquez, # 5 Supplemental Declaration of Vera Wolf, # 6 Text of Proposed Order)(Wardenski, Joseph) (Entered: 03/24/2025) |
| 03/24/2025 | | MINUTE ORDER Setting Hearing on 95 MOTION for Temporary Restraining Order : Motion Hearing set for 3/24/2025 at 03:30 PM by Zoom (Audio Line Available) before Judge Ana C. Reyes. Interested parties may access the Court's dial–in line and must adhere to the rules outlined in the Court's February 14, 2025 Minute Order. The Public Access telephone number is 1–833–990–9400, and the access code is 787605272. Signed by Judge Ana C. Reyes on 3/24/2025. (lcacr3) (Entered: 03/24/2025) |
| 03/24/2025 | | Minute Entry for proceedings held before Judge Ana C. Reyes: Motion Hearing held on 3/24/2025 re 95 MOTION for Temporary Restraining Order filed by ASHLEY DAVIS, HUNTER MARQUEZ, VERA WOLF, SAMUEL AHEARN, JAMIE HASH. Defense Counsel to provide the Court with further information by 9:00AM ET on 3/25/2025 as stated on the record. The Court takes the motion for TRO under advisement. (Court Reporter Christine Asif.) (zcll) Modified on 3/24/2025 (zcll). (Entered: 03/24/2025) |
| 03/25/2025 | 96 | Memorandum in opposition to re 91 Motion for Miscellaneous Relief,,, Motion for Extension of Time to,,, Motion to Stay,, filed by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, HUNTER MARQUEZ, SEAN KERSCH–HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS, MIRIAM PERELSON. (Wardenski, Joseph) (Entered: 03/25/2025) |
| 03/25/2025 | 97 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/21/2025; Page Numbers: 1–92. Date of Issuance:3/25/2025. Court Reporter Christine T. Asif, Telephone number 202–354–3247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025.(Asif, Christine) (Entered: 03/25/2025) |
| 03/25/2025 | 98 | TRANSCRIPT OF PROCEEDINGS before Judge Ana C. Reyes held on 3/24/2025; Page Numbers: 1−39. Date of Issuance:3/25/2025. Court Reporter Christine T. Asif, Telephone number 202−354−3247, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025.(Asif, Christine) (Entered: 03/25/2025) |
| 03/25/2025 | 99 | ERRATA by NICOLAS TALBOTT, ERICA VANDAL, KATE COLE, GORDON HERRERO, DANY DANRIDGE, JAMIE HASH, KODA NATURE, CAEL NEARY, CLAYTON MCCALLISTER, GREYSON SHISHKINA, AUDRIE GRAHAM, ROAN PICKETT, QUINN TYSON, AMIAH SALE, MINERVA BETTIS, SAMUEL AHEARN, REGAN MORGAN, VERA WOLF, MICHELLE BLOOMROSE, HUNTER MARQUEZ, SEAN KERSCH−HAMAR, KELSEY ORTH, TAYLOR MAIWALD, SABRINA BRUCE, C.J. DULANEY, MICAH JACQUELINE GROSS, AUSTIN CONVERSE, NATHALIE RICHTER, BECK SIMPSON, CLARA WINCHELL, ASHLEY DAVIS, MIRIAM PERELSON re 94 Amended Complaint,,,,. (Attachments: # 1 Fourth Amended Complaint (Corrected), # 2 Redline to Third Amended Complaint (Corrected))(Wardenski, Joseph) (Entered: 03/25/2025) |
| 03/26/2025 | 100 | MEMORANDUM OPINION AND ORDER denying Defendants' 91 Motion to Dissolve the Preliminary Injunction and for a Stay Pending Appeal. See document for details. Signed by Judge Ana C. Reyes on 03/26/2025. (lcacr2) (Entered: 03/26/2025) |
| 03/26/2025 | 101 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 88 Order on Motion for Preliminary Injunction, 89 Memorandum & Opinion, , Order, 100 Order on Motion for Miscellaneous Relief, Order on Motion for Extension of Time to, Order on Motion to Stay . by TELITA CROSLAND, DEFENSE HEALTH AGENCY, UNITED |

| | | STATES OF AMERICA, PETER B. HEGSETH, MARK F. AVERILL, UNITED STATES DEPARTMENT OF THE ARMY, TERENCE EMMERT, UNITED STATES DEPARTMENT OF THE NAVY, GARY ASHWORTH, UNITED STATES DEPARTMENT OF THE AIR FORCE. Fee Status: No Fee Paid. Parties have been notified. (Lin, Jean) Modified on 3/27/2025 to add docket link (zjm). (Entered: 03/26/2025) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NICOLAS TALBOTT, *et.al.*

      *Plaintiff*,

v.

UNITED STATES, *et al.*,

      *Defendants*.

No. 1:25-cv-240-ACR

---

**NOTICE OF APPEAL**

All Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Court's Order and Memorandum Opinion granting Plaintiffs' Renewed Motion for Preliminary Injunction (ECF Nos. 88, 89), and from the Court's Order denying Defendants' Motion to Dissolve Preliminary Injunction (ECF No. 100).

Dated: March 26, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEX HAAS
Director, Federal Programs Branch

/s/ *Jean Lin*
JEAN LIN
Special litigation Counsel
JASON C. LYNCH
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-3716
Jean.lin@usdoj.gov
*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NICOLAS TALBOTT, et al, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00240 (ACR) |
| UNITED STATES, et al, | |
| *Defendants*. | |

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, the Court hereby:

**GRANTS** Plaintiffs' [72] Renewed Application for Preliminary Injunction; it further

**ORDERS** that Defendants Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States Department of the Army; Daniel P. Driscoll in his official capacity as Secretary of the Army; the United States Department of the Navy; Terence G. Emmert in his official capacity as Acting Secretary of the Navy; the United States Department of the Air Force; Gary A. Ashworth in his official capacity as Acting Secretary of the Air Force; the Defense Health Agency; Telita Crosland in her official capacity as Director of the Defense Health Agency, are preliminarily enjoined, pending further order of this Court, from implementing Executive Order No. 14183; as well as "Additional Guidance on Prioritizing Military Excellence and Readiness," Dkt. 63-1; and any other memorandums, guidance, policies, or actions issued pursuant to Executive Order 14183 or the Additional Guidance on Prioritizing Military Excellence and Readiness.

The effect of the Court's Order is to maintain the *status quo* of military policy regarding transgender service that existed immediately before President Donald J. Trump issued Executive

Order 14183, *e.g.*, the policies described in Department of Defense Instruction (DoDI) 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," change 5, May 28, 2024; DoDI 6130.03, Volume 2, "Medical Standards for Military Service: Retention," change 1, June 6, 2022; and DoDI 1300.28, "In-Service Transition for Transgender Service Members," change 1, December 20, 2022.

The Court also **ORDERS** that, pending further order of this Court, Defendants shall maintain and continue Plaintiffs' military statuses; it further

**ORDERS** Defendants to take all steps necessary to effectuate this Order; it further

**ORDERS** Defendants to provide written notice of this Order by 5:00 pm eastern on March 21, 2025, to all branches of the Department of Defense and to any other entity responsible for implementing military policy; it further

**ORDERS** Defendants to file with the Court confirmation by 6:00 pm eastern on March 21, 2025, that it has provided the written notice of the Order as the Court has directed; it further

**ORDERS** the parties to file a joint status report by March 31, 2025, that informs the Court of Defendants' compliance with this Order.

Finally, on its own motion, the Court **STAYS** the effect of this Order until March 21, 2025, at 10:00 am eastern.  This Order will automatically go into effect, unless stayed by an appellate court, on March 21, 2025, at 10:01 am eastern.

If the parties, at any time, have questions about the scope of this injunction, they should jointly reach out to Chambers.  The Court will move expeditiously to address any issues.

**SO ORDERED.**


Date: March 18, 2025

_____
ANA C. REYES
United States District Court Judge

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, et al, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00240 (ACR) |
| UNITED STATES, et al, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

In Executive Order No. 14183, President Donald J. Trump focuses on "Prioritizing

Military Excellence and Readiness."  90 Fed. Reg. 8757 (Jan. 27, 2025).  The military's "clear

mission" is to "protect the American people and our homeland as the world's most lethal and

effective fighting force."  *Id.* § 1.  Service by transgender persons[1] is "inconsistent" with this

mission because they lack the "requisite warrior ethos" to achieve "military excellence."  *Id.*

§§ 1, 2.  On February 26, 2025, the Secretary of Defense Peter B. Hegseth, through delegated

authority, issued a policy to implement EO14183's directives.  Dkt. 63-1 (Hegseth Policy).  It

disqualifies "[t]ransgender troops . . . from service without an exemption."[2]

The President has the power—indeed the obligation—to ensure military readiness.  At

times, however, leaders have used concern for military readiness to deny marginalized persons

---

[1] EO14183 does not employ the word "transgender."  But Defendants concede the term it does use—those with a gender identity that diverges from their biological sex—refers to transgender persons.  *See* Docket (Dkt.) 58, Transcript to Court Hearing (Tr.) (Feb. 18, 2025) at 44.

[2] The Hegseth Policy also studiously does not employ the word "transgender," but as issued it bans transgender persons.  Both the Department of Defense and Secretary Hegseth announced this inescapable fact via social media.  @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost).

1

the privilege of serving.  "[Fill in the blank] is not fully capable and will hinder combat effectiveness; [fill in the blank] will disrupt unit cohesion and so diminish military effectiveness; allowing [fill in the blank] to serve will undermine training, make it impossible to recruit successfully, and disrupt military order."[3]  First minorities, then women in combat, then gays filled in that blank.  Today, however, our military is stronger and our Nation is safer for the millions of such blanks (and all other persons) who serve.[4]

Currently before the Court is Plaintiffs' Renewed Application for Preliminary Injunction. Dkt. 72 (App.).  Plaintiffs, who are transgender, claim that EO14183 and the Hegseth Policy (together, the Military Ban) treat them as today's "fill in the blank" group.  Seeking nothing more than to serve their country, they ask the Court to enjoin the Military Ban.  App. at 26.  They claim that the Hegseth Policy was rushed and reached a preordained result, contains no analysis, and has an exemption in name only.  *Id.* at 56.  The Ban at bottom invokes derogatory language to target a vulnerable group in violation of the Fifth Amendment.  *Id.* at 29, 35–37; *see* U.S. Const. amend. V.

Not at all, say Defendants.  They assert that the Military Ban is necessary because transgender persons undermine "military readiness" and disrupt "[u]nit cohesion, good order, and discipline."  Dkt. 81 (Opp.) at 40–54.  Being transgender is "inconsistent" with "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  Hegseth Policy at 3.  Gender ideology activists are "unconcerned with the requirements of military service like physical and mental health, selflessness, and unit cohesion."

---

[3] Beth Bailey, Introduction, *Integrating the U.S. Military* 3 (Beth Bailey ed., 2017) (brackets in original).  *See also* Dkt. 82 (Amicus Br. of Const. Accountability Ctr.) at 14–23.

[4] *See* Dkt. 47-1 (Amicus Br. of Former Military Dep't Heads) at 5–12; Amicus Br. of Const. Accountability Ctr. at 14–23.

EO14183 § 1.  Transgender persons cannot maintain "an honorable, truthful, and disciplined lifestyle."  *Id.*  Their expression of sexual identity "is not consistent with [] humility and selflessness."  *Id.*  They also cost too much.  Opp. at 49.

Plaintiffs beg to differ.  And differ they can.  Together they have provided over 130 years of military service.  They have served in roles ranging from Senior Military Science Instructor to Artillery Platoon Commander to Intelligence Analyst to Satellite Operator to Operations Research Analyst to Naval Flight Officer to Weapons Officer.  They have deployed around the globe, from Afghanistan to Poland to Korea to Iraq to Kuwait to the USS Ronald Reagan and USS George W. Bush.  One is presently deployed to an active combat zone.  They have earned more than 80 commendations including: a Bronze Star; two Global War on Terrorism Service Medals; two Global War on Terrorism Expeditionary Medals; numerous Meritorious Service Medals; numerous Commendation Medals; Air and Space Outstanding Unit Awards; and the Military Outstanding Volunteer Service Medal, among many others.

Defendants rejoin that these service records are inapposite.  The Court must ignore them and instead "defer to the military's judgment."  Tr. (Mar. 12, 2025) at 180.  Yes, the Court must defer.  But not blindly.  The President issued EO14183 within seven days of taking office, and the Policy issued thirty days later.  There is no evidence that the President or Secretary Hegseth consulted with uniformed military leaders before doing so.  Neither document contains any analysis nor cites any data.  They pronounce that transgender persons are not honorable, truthful, or disciplined—but Defense counsel concedes that these assertions are pure conjecture.

> THE COURT: Is saying that transgender people or people with gender dysphoria, [that] their inherent identity is inconsistent with a commitment to an honorable, truthful, and disciplined lifestyle, is that demeaning to them?
>
> DEFENSE COUNSEL: I don't have a characterization for that, Your Honor.

3

> THE COURT: Okay.  And if I asked you about all the other words in [the Military Ban], with respect to the characterization of transgender people or people with gender dysphoria, you would have the same answer?
>
> DEFENSE COUNSEL: Yes, Your Honor.
>
> THE COURT: There's nothing [supporting these assertions] in the studies; right?
>
> DEFENSE COUNSEL: That says those same things, no, Your Honor, not that I know of.
>
> THE COURT: [No study] says anything close to those things; correct?
>
> DEFENSE COUNSEL: Not that I know of, Your Honor.

Tr. (Mar. 12, 2025) at 188–89.  An "Action Memo" claims the Policy "was informed through consideration of" three studies and cost data.  Dkt. 73-23 (Action Memo) at 4.  *Who* considered the information, however, is anyone's guess; Defendants do not know.  Maybe no one, because one study is eight years old and the other two support Plaintiffs' position.

Transgender persons have served openly since 2021, but Defendants have not analyzed their service.  That is unfortunate.  Plaintiffs' service records alone are Exhibit A for the proposition that transgender persons can have the warrior ethos, physical and mental health, selflessness, honor, integrity, and discipline to ensure military excellence.  ***Defendants agree.*** They agree that Plaintiffs are mentally and physically fit to serve, have "served honorably," and "have satisfied the rigorous standards" demanded of them.  Tr. (Feb. 18, 2025) at 9–14, 148; *see also* Tr. (Mar. 12, 2025) at 130.  Plaintiffs, they acknowledge, have "made America safer."  Tr. (Feb. 18, 2025) at 10.  So why discharge them and other decorated soldiers?  Crickets from Defendants on this key question.

Plaintiffs have also introduced declarations from the military leaders responsible for integrating transgender persons into open military service.  Each declarant attests that our military has not fallen into an "existential" crisis since transgender persons began serving openly

4

in 2021.  Nor have our "lethal and effective" soldiers come unglued when asked to use preferred pronouns, which the Hegseth Policy also bans.  To the contrary, they each testify that recruiting, unit cohesion, and military readiness have improved since 2021.

To obtain an injunction, Plaintiffs must establish a likelihood of success on the merits. They have done so.  The Court's factual findings, the vast majority conceded by Defendants and all supported by the Record, make it highly unlikely that the Military Ban will survive judicial review, whether it be rational basis or intermediate scrutiny.  Plaintiffs must also show irreparable harm and that the balance of the equities and the public interest favor an injunction. On the former, Plaintiffs face a violation of their constitutional rights, which constitutes irreparable harm.  Indeed, the cruel irony is that thousands of transgender servicemembers have sacrificed—some risking their lives—to ensure for others the very equal protection rights the Military Ban seeks to deny them.  On the latter, Defendants have not shown they will be burdened by maintaining the status quo pending this litigation, and avoiding constitutional violations is always in the public interest.

The Court therefore **GRANTS** Plaintiffs' Renewed Application for Preliminary Injunction.  Dkt. 72.  The Court details the scope of the injunction in the Order that accompanies this Opinion.  The Court, on its own motion, stays its Order until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing an emergency stay with the D.C. Circuit.

* * * * *

The Court does not issue this preliminary injunction lightly.  Judicial overreach is no less pernicious than executive overreach.  But the coordinate branches must, "by their mutual relations, be the means of keeping each other in their proper places."  The Federalist No. 51 (James Madison).  The President and Defendants could have crafted a policy that balances the

Nation's need for a prepared military and Americans' right to equal protection. They still can. The Military Ban, however, is not that policy. The Court therefore must act to uphold the equal protection rights that the military defends every day.

The Court's opinion is long, but its premise is simple. In the self-evident truth that "all people are created equal,"[5] *all* means *all*. Nothing more. And certainly nothing less.

## BACKGROUND

### I.    OBAMA—TRANSGENDER PERSONS CAN SERVE[6]

Before 2014, the United States precluded transgender persons from military service. Dkt. 69 (Third Amend. Compl.) ¶ 225. This changed during President Barack Obama's second term. In 2014, the Department of Defense (DoD) eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess the ban's rationales. *See* Dkt. 72-86 (DoDI 1332.18).

In 2015, then-Secretary of Defense Ashton B. Carter established a working group to identify issues related to open military service by transgender persons. Dkt. 72-70 (RAND Report) at 4. To aid its work, the group commissioned the RAND Corporation's National Defense Research Institute to study the issue.[7] *Id.* After a year of research, RAND concluded that allowing transgender persons to serve openly would have "minimal impact on unit

---

[5] Women were "included in the sequel" when passage of the Nineteenth Amendment granted them the right to vote in 1920. *See* Lin-Manuel Miranda, *Hamilton: An American Musical* (2016); *compare* U.S. Declaration of Independence (1776) *with* U.S. Const. amend. XIX (1920). That right is one of the many that thousands of transgender persons serve to protect.

[6] For an in-depth history, see *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177–85 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019).

[7] The National Defense Research Institute is not a fly-by-night operation. It is "a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community." RAND Report at 4–5.

6

cohesion" and estimated the "impact [of transgender persons serving openly] on readiness to be negligible." *Id.* at 13, 91. It further found that extending health care coverage for gender transition-related treatments represented an "exceedingly small proportion" of health care expenditures: between $2.4 million and $8.4 million out of $49.3 billion, or 0.017%—at most—of the Unified Medical Program budget. *Id.* at 12–13, 91. Relying in part on that report, the working group "unanimously concluded that transgender people should be allowed to serve openly in the military." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 179 (D.D.C. 2017). It found that "*prohibiting* transgender people from serving undermines military effectiveness and readiness." *Id.* (emphasis in original). Such a policy "excludes qualified individuals on a basis that has no relevance to one's fitness to serve[] and creates unexpected vacancies requiring expensive and time-consuming recruitment and training of replacements." *Id.*

To implement the working group's recommendation, in 2016, Secretary Carter issued Directive-Type Memorandum 16-005, titled "Military Service of Transgender Service Members." Dkt. 72-60 (Carter Policy). The Carter Policy stated that "open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity." *Id.* at 3.

Both the Army and the Air Force issued guidance allowing transgender individuals to serve openly starting in July and October 2016. *Doe 1*, 275 F. Supp. 3d at 182. The Carter Policy for acceding transgender persons to the military was set to take effect on June 30, 2017. *Id.* at 181. However, President Trump took office in January 2017, and on June 30—the date

accessions were to start—then-Secretary of Defense James Mattis deferred acceding transgender individuals into the military until January 1, 2018. *Id.* at 182.

## II.    TRUMP I—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Orders a Ban on Transgender Service

On August 25, 2017, President Trump issued a memorandum entitled "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security" (2017 Memorandum). *Doe 1*, 275 F. Supp. 3d at 183. The 2017 Memorandum called for a ban on members of the military from serving in a sex different from their birth sex, stopped the accession of transgender persons, and halted funding for gender-affirming care. *Id.* at 183–84. It instructed Secretary Mattis to gather a working group to review the 2017 Memorandum and advise if the group disagreed with the Memorandum's conclusions. *Id.* at 185.

### B.    Courts Enjoin the 2017 Memorandum

Litigation ensued. Several transgender persons then serving or hoping to enlist challenged President Trump's 2017 Memorandum. *Id.* at 175–76. On October 30, 2017, Judge Colleen Kollar-Kotelly of this Court entered a preliminary injunction, effectively barring any change from the status quo as it related to service and accession. *See id.* at 177. She dismissed the claims relating to gender affirming care based on a lack of standing. *Id.* The D.C. Circuit declined to stay the injunction pending appeal. *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017). Around the same time, three other federal courts also enjoined the 2017 Memorandum. *See Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017); *Karnoski v. Trump*, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017); *Stockman v. Trump*, 2017 WL 9732572 (C.D. Cal Dec. 22, 2017).

### C.    DoD Recommends Revisions to the 2017 Memorandum

DoD subsequently issued a report that addressed transgender military service.  Dkt. 73-8 (2018 Report) at 5–49.  The report concluded that transgender persons undermine military preparedness.  *See id.* at 37–38.  It likened gender dysphoria to "bipolar disorder, personality disorder, obsessive-compulsive disorder, suicidal behavior, and even body dysmorphic disorder." *Id.* at 25.  It claimed that individuals with gender dysphoria were more likely to have substance abuse issues and commit suicide and that they would inflict excessive costs on the military.  *Id.* at 26, 46.  It emphasized that the "uncertainty" surrounding the view of medical professionals meant that the military should "proceed with caution."  *Id.* at 11.

Based on this report, on February 22, 2018, Secretary Mattis presented a memorandum (Mattis Policy) to President Trump that proposed an alternative to the enjoined 2017 Memorandum.  *See generally id.* at 2–4.  The Mattis Policy would not have banned service by all transgender persons.  *Id.* at 3.  Instead, it recommended banning anyone who had undergone gender transition and those with a history or current diagnosis of gender dysphoria, except in some limited circumstances.  *Id.*  It allowed transgender persons already in the military—who did not have gender dysphoria and were otherwise qualified for service—to serve, but only in their biological sex.  *Id.* at 3–4.

President Trump issued a memorandum on March 23, 2018, revoking the 2017 Memorandum and delegating authority to DoD and the Department of Homeland Security to implement the Mattis Policy.  Third Amend. Compl. ¶ 256.

### D.    The Mattis Policy Takes Effect

Following publication of the Mattis Policy, the *Doe 1* plaintiffs amended their complaint. Again, the government moved to dismiss and asked the court to dissolve the existing preliminary

9

injunction.  *Doe 2 v. Trump*, 315 F. Supp. 3d 474, 479 (D.D.C. 2018).  The district court declined to do so.  *Id.* at 480.  The government again appealed—this time successfully.  *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019).  In an unpublished opinion on January 4, 2019, the D.C. Circuit reversed the district court's denial of the government's motion to dissolve the preliminary injunction and vacated the preliminary injunction without prejudice.[8]  *Id.*  The D.C. Circuit held that "[i]t was clear error [for the district court] to say there was no significant change" in military policy—from the genesis of the 2017 Memorandum to the issuance of the Mattis Policy—and so vacatur of the preliminary injunction was warranted.  *Id.* at 23.

The Mattis Policy went into effect after the dissolution of the preliminary injunction.  It remained in place until the beginning of the Biden administration in 2021.  App. at 14.

## III.    BIDEN—TRANSGENDER PERSONS CAN SERVE

On January 25, 2021, President Joseph R. Biden issued Executive Order 14004, "Enabling All Qualified Americans [t]o Serve Their Country in Uniform."  86 Fed. Reg. 7471 (Jan. 25, 2021) (EO14004).  EO14004 directed the Secretaries of Defense and Homeland Security to take necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."  *Id.* § 1.

EO14004 cited its reliance on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces."  *Id.* This included "a meticulous, comprehensive study requested by [DoD]," testimony to Congress by the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the

---

[8] As acknowledged by both parties, *Doe 2* is not binding on this Court, but it is persuasive.  *See* Fed. R. App. P. 32.1; *see also* Tr. (Feb. 19, 2025) at 5–7.

Marine Corps, and Chief of Staff of the Air Force that "they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service." *Id.* (cleaned up). It also included a statement by former United States Surgeons General, who served under both Democratic and Republican Presidents, "that transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason— including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care." *Id.* (cleaned up).

The Office of the Under Secretary of Defense for Personnel and Readiness convened a working group tasked with "formulat[ing] policy options for DoD regarding transgender service members." Dkt. 72-59 ¶ 9. After the group "collect[ed] and consider[ed] evidence from a variety of sources, including a careful review of all available scholarly evidence and consultations with medical experts, personnel experts, readiness experts, health insurance companies, civilian employers, and commanders whose units included transgender service members," it concluded that "banning service by transgender persons would harm the military by excluding qualified individuals based on a characteristic with no relevance to a person's fitness to serve." *Id.* ¶¶ 10, 12.

In March 2021, the Office of the Under Secretary of Defense for Personnel and Readiness issued guidance on accession. Dkt. 73-9 (DoDI 6130.03, Vol 1). In addition to meeting standard accession requirements, transgender persons with a history of gender dysphoria could enlist if they had been stable in their gender identity for at least 18 months prior to enlistment. *Id.* On April 30, 2021, the Office of the Under Secretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." Dkt. 72-63 (DoDI 1300.28). A servicemember could serve in their preferred sex by

11

changing their "DEERS Marker" (Defense Enrollment Eligibility Reporting System) to reflect their gender identity.[9]  *Id.* at 7.

In short, the Austin Policy allowed transgender persons to enlist and serve openly.

## IV.    TRUMP II—TRANSGENDER PERSONS CANNOT SERVE

### A.    President Trump Again Orders a Ban on Transgender Service

On the first day of his second term, President Trump issued Executive Order 14168, "Defending Women [f]rom Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (EO14168). That Order provides that the federal government will recognize only two sexes: male and female. *Id.* § 2.  EO14168 defines a "male" as a "a person belonging, at conception, to the sex that produces the small reproductive cell," and a "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell."  *Id.*

EO14168 requires federal agencies to ignore conflicting provisions of related executive orders from the previous administration, including Executive Orders: 13988, on preventing and combating discrimination based on gender identity or sexual orientation; 14004, on enabling transgender persons to serve openly in the military; 14020, which established the White House Gender Policy Council; 14021, addressing the need for a comprehensive approach to gender equity and equality; and 14075, on advancing equity for all individuals.  *Id.* § 7(b).  EO14183 also directed federal agencies to rescind guidance documents, such as "The White House Toolkit on Transgender Equality," "Supporting Transgender Youth in School," and "Back-to-School

---

[9] DoDI 1300.28 explains that "[g]ender transition in the military begins when a Service member receives a diagnosis from a military medical provider indicating the Service member's gender transition is medically necessary, and concludes when the Service member's gender marker in DEERS is changed and the Service member is recognized in the self-identified gender."  Dkt. 72-63 at 20.

Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS," among others relating to the LGBTQ+ community. *Id.* § 7(c).

On January 27, 2025, President Trump issued EO14183, which incorporates by reference the definitions in EO14168. EO14183 § 3. The Order revokes President Biden's Executive Order 14004, which allowed transgender persons to serve openly in the military. *Id.* § 5. It describes the U.S. military's mission as "protect[ing] the American people and our homeland as the world's most lethal and effective fighting force." *Id.* § 1. But it adds that "the Armed Forces have been afflicted with radical gender ideology to appease activists unconcerned with the requirements of military service." *Id.* It claims that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*

EO14183 declares that it is U.S. Government policy "to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. "This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.* EO14183 therefore requires: DoD to revise its medical standards (DoDI 6130.03 Volume 1 and Volume 2) within 60 days to reflect the purpose and policy of the Order, *id.* § 4(a); the Defense Secretary to end identification-based pronoun usage, *id.* § 4(b); and within 30 days to identify guidance to implement the Order, *id.* § 4(c); and the Armed Forces to prohibit servicemembers born male to use or share facilities for those born female and vice versa, *id.* § 4(d).

13

The White House also provided an accompanying fact sheet that reiterated EO14183's goal of "RESTORING SANITY IN OUR MILITARY: During the Biden Administration, the Department of Defense allowed gender insanity to pervade our military organizations." Fact Sheet: President Donald J. Trump Ensures Military Excellence and Readiness, The White House (Jan. 27, 2025).

On February 7, 2025, the Secretary of Defense issued a memorandum that "paused" all activities under the Austin Policy pending his forthcoming policy implementing EO14183. Dkt. 33-1 (Feb. 7 Memo).

### B.    Litigation Ensues

On January 28, 2025, one day after President Trump issued EO14183, eight transgender persons filed a Complaint for Declaratory and Injunctive Relief. Dkt. 1. The current operative complaint is the Third Amended Complaint. Dkt. 69. Plaintiffs Nicolas Talbott, Erica Vandal, Kate Cole, Gordon Herrero, Dany Danridge, Jamie Hash, Minerva Bettis, Audrie Graham, Roan Pickett, Amiah Sale, Quinn Tyson, Michelle Bloomrose, Vera Wolf, and Regan Morgan are transgender active-duty servicemembers. *Id.* ¶¶ 21–168. Plaintiff Miriam Perelson is enlisted in U.S. Army basic training. *Id.* ¶ 87. Plaintiffs Samuel Ahearn, Clayton McCallister, Greyson Shishkina, Koda Nature, and Cael Neary are transgender persons in the process of enlisting. *Id.* ¶¶ 169–206.

Collectively, the active-duty Plaintiffs have served in the U.S. military honorably and with distinction for over 130 years. Third Amend. Compl. ¶¶ 22, 33, 44, 53, 65, 77, 88, 106, 114, 122, 134, 146, 153, 160, 166.[10] The Court cites some of their accolades above; there are

---

[10] All Plaintiffs submitted sworn declarations, which Defendants do not contest. Dkts. 72-18–72-58. The Court accepts and incorporates them into the factual record.

14

many more. *Id.* ¶¶ 36, 46, 56, 69, 80, 108, 135, 147, 155, 162. The Government concedes that each active-duty Plaintiff is honorable, truthful, and disciplined, and that each is currently physically and mentally fit to serve. Tr. (Feb. 18, 2025) at 9. They have "served honorably" and "have satisfied the rigorous standards" of military service. *Id.* at 9, 14, 148. The Government also concedes that, together, Plaintiffs have made America safer. *Id.* at 10. The active-duty Plaintiffs have adhered to all military standards and serve without accommodation. *See, e.g.*, Dkt. 72-27 (Herrero Second Supp. Decl.) ("I meet all standards applicable to male service members."); Dkt. 72-58 (Wolf Decl.) ¶ 18 ("I meet all standards applicable to female service members."); Tr. (Mar. 12, 2025) at 130. Yet there is no dispute that the Military Ban's directives would prohibit Plaintiffs from serving. Tr. (Mar. 12, 2025) at 167.

Defendants are the United States of America, Secretary of Defense Peter B. Hegseth, Secretary of the Army Daniel P. Driscoll, the Department of the Army, Acting Secretary of the Navy Terence G. Emmert, the Department of the Navy, Acting Secretary of the Air Force Gary A. Ashworth, the Department of the Air Force, Director of the Defense Health Agency Telita Crosland, and the Defense Health Agency.[11] Third Amend. Compl. ¶¶ 207–16. Plaintiffs sue the individual Defendants in their official capacities. *Id.* ¶ 217.

Plaintiffs allege that the Military Ban, "[r]ather than being based on any legitimate governmental purpose, . . . reflects animosity toward transgender people because of their transgender status." *Id.* ¶ 314. They claim that the Military Ban violates the equal protection component of the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 317–31. They also allege that the Military Ban violates the currently serving Plaintiffs' procedural due process rights

---

[11] Upon agreement of the parties, the Court dismissed President Trump as a defendant on February 13, 2025. Dkt. Notice (February 13, 2025).

under the Fifth Amendment.  *Id.* ¶¶ 332–39.  And because some Plaintiffs "reasonably relied on the Austin Policy" when they transitioned, some also bring an estoppel claim.[12]  *Id.* ¶¶ 340–45.

On February 3, 2025, Plaintiffs filed an Application for Preliminary Injunction followed by an Application for Temporary Restraining Order the next day.  Dkts. 13, 14.  At a status conference on February 4, the Court explained that it could not grant the TRO because it addressed harm to a non-plaintiff.  Tr. (Feb. 4, 2025) at 42–43.  After further discussion, the parties agreed to follow the briefing and hearing schedule the Court had originally set for the preliminary injunction application.  Dkt. Notice (Feb. 4, 2025).

On February 13, 2025, the Court previewed for the parties, at length, the legal issues and cases it expected to address at the formal preliminary injunction hearing.  Tr. (Feb. 13, 2025). On February 15, 2025, the Government confirmed that it would neither present any affirmative witnesses nor cross-examine any of Plaintiffs' declarants at the preliminary injunction hearing.[13]  At that point, Plaintiffs notified all parties that it would not call on any of its declarants.[14]  The Court held oral argument on February 18 and 19, 2025.  At the February 18 hearing, the Court granted the Government's request that it refrain from ruling until after DoD released its implementing policies.  Tr. (Feb. 18, 2025) at 113–14.  On March 4, 2025, Plaintiffs filed their Third Amended Complaint.  Dkt. 69.  They filed a Renewed Application for Preliminary Injunction on March 7, 2025.  Dkt. 72.  Defendants filed their Opposition to Plaintiffs' Application on March 11, 2025.  Dkt. 81.  The Court heard oral argument on the renewed Application on March 12, 2025.

---

[12] Since Plaintiffs have established likelihood of success on their equal protection claim, the Court does not address the procedural due process or estoppel claims.

[13] Email from Defs.' Counsel to Court and Pls.' Counsel (Feb. 15, 2025).

[14] Email from Pls.' Counsel to Court and Defs.' Counsel (Feb. 15, 2025).

16

### C.    The Hegseth Policy Issues

On February 7, 2025, Secretary Hegseth delegated the authority to issue the policy effectuating EO14183 to the Under Secretary of Defense for Personnel and Readiness.  Dkt. 33-1 at 1.  DoD implemented EO14183 on February 26, 2025, in a memorandum entitled "Additional Guidance on Prioritizing Military Excellence and Readiness."  Dkt. 63-1 (Hegseth Policy). Under Secretary of Defense for Personnel and Readiness Timothy Dill issued the Policy "pursuant to Executive Order 14183, 'Prioritizing Military Excellence and Readiness.'"  *Id.* at 1. The Policy states that "[m]ilitary service by Service members and applicants for military service who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria is incompatible with military service."  *Id.* at 3.  Consequently, "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service."  *Id*.

The Hegseth Policy directs the Secretaries of the Military Departments to "[e]stablish procedures and implement steps to identify Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria within 30 days of this memorandum."  *Id.* at 5.  Next, "[w]ithin 30 days of identification," the Departments must "begin separation actions . . . for Service members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria and are not granted a waiver."  *Id.* Regarding retention policies, "[s]ervice members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are disqualified from military service."  *Id.* at 8.  In addition, "[s]ervice members who have a history of cross-sex hormone therapy or a history of sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition, are disqualified from military service."  *Id.*

17

The Hegseth Policy purports to allow exemptions "on a case-by-case basis, provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities" and the servicemember meets the following three conditions: he or she (1) "demonstrates 36 consecutive months of stability in [his or her] [birth] sex without clinically significant distress or impairment," (2) "demonstrates that he or she has never attempted to transition to any sex other than their [birth] sex," and (3) "is willing and able to adhere to all applicable standards, including the standards associated with the Service member's [birth] sex." *Id.* Any transgender person who cannot satisfy these conditions is disqualified from service.

With respect to separation policies, the Hegseth Policy provides that "[s]ervice members who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria may elect to separate voluntarily in the 30 days following signature of this guidance." *Id.* at 9. Those who do so "may be eligible for voluntary separation pay in accordance with 10 U.S.C. § 1175a and DoDI 1332.43 . . . at a rate that is twice the amount the Service member would have been eligible for involuntary separation pay, in accordance with DoDI 1332.29." *Id.* The Policy provides that those "choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. § 373(b)(l)." *Id.* On the other hand, "[t]he Military Departments may recoup any bonuses received prior to the date of this memorandum for Service members choosing to be involuntarily separated." *Id.*

On the same day that DoD issued the Hegseth Policy, the Under Secretary of Defense for Personnel and Readiness also distributed "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order," also called the Action Memo. Dkt. 73-23 (Action Memo). The Action Memo repeats the purposes and policies President Trump outlined in

18

EO14183 and reiterates the main points of the Hegseth Policy. *Id.* It lists four "consideration[s]" that "informed" the Hegseth Policy: (1) the Mattis Policy, (2) a 2021 review conducted by DoD's Psychological Health Center of Excellence and the Accession Medical Standards Analysis and Research Activity, (3) a 2025 medical literature review conducted by the Office of the Assistant Secretary of Defense for Health Affairs, and (4) a review of cost data. *Id.* at 4–5.

Based on these reviews, DoD concluded that "[w]hile Service members with gender dysphoria volunteered to serve their country, the costs associated with their health care, coupled with the medical and readiness risks associated with their diagnosis and associated treatment that can limit their deployability, make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force." *Id.* at 5.

## FINDINGS OF FACT

"A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004). Courts, for example, permit hearsay evidence in the form of sworn affidavits in considering an application for preliminary injunction. *See e.g.*, *Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C. 2019) (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases from six other circuits)).

The Court makes its factual findings based on the entire record, including the Third Amended Complaint, documents cited in the Complaint, exhibits to the preliminary injunction

19

application and opposition, the declarations the parties submitted, and concessions[15] or points of
agreement made by the parties at oral argument (altogether, the Record).  *See American Foreign
Service Ass'n, et al. v. Trump et al.*, 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025).  It is early
days for this litigation, however.  Things change.  If new developments cause Defendants to
move to dissolve this injunction, the Court will hear that motion expeditiously.

## I.    THE HEGSETH POLICY BANS ALL TRANSGENDER TROOPS

DoD issued the Hegseth Policy on February 26, 2025.  Dkt. 63-1.  The next day, the
Department of Defense and Secretary Hegseth publicly announced that under it: "Transgender
troops are disqualified from service without an exemption."[16]  Defense counsel contends that the
Court must ignore Secretary Hegseth's public description of the policy he oversaw and that he is
responsible for implementing.  Tr. (Mar. 12, 2025) at 19–22.  Secretary Hegseth used the word
"transgender," Defense counsel claims, only as "shorthand" for gender dysphoria.  *Id.* at 22.
Seriously?  These were not off-the-cuff remarks at a cocktail party.  DoD and Secretary Hegseth
used official government accounts to announce a new policy affecting the entire U.S. Military.
The Court presumes that in doing so they did not use loose or misleading language.  Indeed, if
the Hegseth Policy addressed only gender dysphoria, the post would have read, "Gender
dysphoria is a disqualifying medical condition for service."  Both sentences contain nine words,
belying counsel's "shorthand" excuse.

---

[15] Over three hearings on Plaintiffs' motion, Defendants made numerous concessions concerning
the scope and application of EO14183 and the Hegseth Policy.  When citing a concession, the
Court cites "Defs. Concession" and then the transcript cite.

[16] @DODResponse, X (Feb. 27, 2025, 12:08 PM); @SecDef, X (Feb. 27, 2025) (repost).  The
Court has taken judicial notice of their posts.  *See* Dkt. Notice (Mar. 7, 2025); Fed. R. Evid.
201(b)(2).

DoD and Secretary Hegseth announced that the Policy bans "transgender troops" because that is precisely what it does. To be sure, the word transgender does not appear on its pages. It is nonetheless aimed squarely at transgender persons, banning everyone:

- with a current diagnosis of gender dysphoria;
- with a history of gender dysphoria;
- who exhibits symptoms consistent with gender dysphoria;
- with a history of cross-sex hormone therapy (as treatment for gender dysphoria or in pursuit of sex transition);
- with a history of sex reassignment or genital reconstruction surgery (same);
- who has transitioned or attempted to transition to a sex other than their birth sex; and,
- who is not willing to serve in their birth sex.

Hegseth Policy at 3–6.

There is an exemption, but it is one in name only. Individuals can obtain a waiver if there "is a compelling government interest in retaining them that directly supports warfighting capabilities." *Id.* at 6. That includes only those with "special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department, if such experience, training, and education is directly related to the operational needs of the Military Service concerned." Dkt. 70-1 (Clarifying Guidance on Hegseth Policy) at 1. Even if someone stumbled into this elite cadre, she could continue to serve only if: (1) she has been stable in her *birth* sex for 36 consecutive months; (2) she has never transitioned or attempted to transition to anything other than her birth sex; and (3) she is willing (against medical advice) to serve in her birth sex.[17] *Id.* at 1–2.

---

[17] Medical experts, including the American Psychological Association, agree that "[f]orcing transgender individuals to suppress their gender identity and live according to their birth sex is not merely uncomfortable—it is psychologically harmful and can lead to significant distress, depression, and other serious mental health conditions." Dkt. 72-78 (Brown Decl.) ¶ 10.

Virtually no one can meet all these criteria. The Court finds that Plaintiffs, for their part, do not. *See* Third Amend. Compl. ¶¶ 27, 38, 48, 58, 71, 82, 88, 109, 115, 124, 136, 148, 157, 163, 167, 170, 185, 186, 198, 206.

## II.     THE MILITARY BAN IS BASED ON CONJECTURE

### A.     The Administration Rushed the Hegseth Policy

President Trump issued EO14183 seven days after taking office. No one knows what he relied on, if anything. Tr. (Feb. 18, 2025) at 117. EO14183 commanded DoD to craft the implementing policy within 30 days of that Order. EO14183 § 4. This was rushed by any measure. By comparison, DoD spent 12 months to craft the Carter Policy, 7 months to craft the Mattis Policy, and 8 months to craft implementing guidance on the Austin Policy. *See* Third Amend. Compl. ¶¶ 229, 237, 254–56, 262–66.

Alex Wagner, the former Assistant Secretary of the Air Force for Manpower and Reserve Affairs, notes that the "rushed and haphazard manner" in which Defendants "issued and implemented" the Military Ban is "highly unusual." Dkt. 72-68 (Wagner Second Supp. Decl.) ¶ 10. "Ordinarily, the reversal of an existing [military] policy—especially one [like the Austin Policy] adopted after careful study and review—would take place only in response to significant, documented problems with existing policy, after careful consideration and review including an explanation of what led to the problematic outcomes, and would be rolled out in a careful, orderly fashion that provided commanders and members clear guidance." *Id.* The "abrupt reversal" of the Austin Policy, without comprehensive review, "is unprecedented" and "an extreme departure from how military policy is typically made." Dkt. 72-74 (Cisneros Decl.) ¶ 21.

Former Deputy Under Secretary of Defense for Personnel and Readiness Shawn Skelly has "significant concerns about the immediate and long-term harms" of the Hegseth Policy and

22

"the ways in which it conflicts with established military policy and practices." Dkt. 72-73 ¶ 1. Based on her experience, she believes that this "categorical approach to administratively separate an entire class of people who demonstrate their ability to serve and meet military standards represents a significant departure from military practice." *Id.* ¶ 2. "There are no other circumstances where service members with a treatable condition that allows them to deploy and meet all readiness standards are nevertheless deemed categorically incapable of service." *Id.* ¶¶ 2.[18] In her view, this Policy—not transgender service—"will severely disrupt the chain of command and erode unit cohesion and trust," and "[t]he rollout of this policy is unprecedented in the chaos and confusion associated with it." *Id.* ¶¶ 5, 15.

### B.    Defendants' Evidence Supports Plaintiffs' Application

EO14183 and the Hegseth Policy provide nothing to support Defendants' view that transgender military service is inconsistent with military readiness. So instead, Defendants turn to the Action Memo. *See* Tr. (Mar. 12, 2025) at 136. The Action Memo, an internal document accompanying the Hegseth Policy, explains that the Military Ban "was informed through consideration of, among other things," EO14183, the Hegseth Policy, and the following: (1) the "SecDef Memorandum" from February 22, 2018 (*i.e.*, the Mattis Policy); (2) "a 2021 review conducted by . . . the Accession Medical Standards Analysis and Research Activity," (AMSARA Report), (3) "[a] 2025 medical literature review," (Medical Literature Review), and (4) "a review of cost data." Action Memo at 4–5.

After listing the sources the Military Ban relies on, the Action Memo concludes that

> [w]hile Service members with gender dysphoria volunteered to
> serve their country, the costs associated with their health care,

---

[18] Ms. Skelly claims that the Hegseth Policy is "both punitive and based on animus." Dkt. 72-73 ¶ 3. Because the parties have not briefed whether this is a legal conclusion, the Court does not accept her assertion as a finding of fact.

> coupled with the medical and readiness risks associated with their
> diagnosis and associated treatment that can limit their
> deployability, make continued service by such individuals
> incompatible with the Department's rigorous standards and
> national security imperative to deliver a ready, deployable force.

*Id.* at 5.  This claim is belied by the evidence the Action Memo itself cites.

### 1.    The Mattis Policy

Defendants contend that "[m]any of the rationales justifying the 2018 [Mattis] policy—which was approved by President Trump as the Commander in Chief in 2018—would apply here."  Dkt. 38 at 34.  The Court, they contend on repeat, must defer to the Hegseth Policy's adoption of the Mattis Policy's findings.  *See, e.g.*, Opp. at 12, 13, 14, 18, 28, 29, 30, 32–39, 40, 44, 47, 48, 50.  The Mattis Policy's findings, they claim, support the Action Memo's conclusion.  Action Memo at 5; *see also* Tr. (Mar. 12, 2025) at 135.  It does not.

The Mattis Policy resulted from the work over many months of  "a Panel of Experts comprised of senior uniformed and civilian Defense Department and U.S. Coast Guard leaders." Dkt. 73-8 at 2.  It "included combat veterans to ensure that our military purpose remained the foremost consideration."  *Id*.  And it "met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of gender dysphoria." *Id.* at 2–3.  No panel of experts—or any other kind—informed the Hegseth Policy.  The Record reflects only that it "was informed through consideration."  Action Memo at 4 (cleaned up).  But, again, Defendants do not even know *who* undertook the "consideration."  Tr. (Mar. 12, 2025) at 38–39.

By its own terms, moreover, the Mattis Policy's findings were limited by "uncertainty." Transgender persons had not served openly previously.  Dkt. 73-8 at 11.  And the medical

24

literature concerning "the study and treatment of gender dysphoria" was then also in a state of flux.  *Id.*  This mandated "caution."  *Id.*  That uncertainty no longer exists.  Transgender persons have served openly in the U.S. military since the Austin Policy issued in 2021, and medical studies now overwhelmingly conclude that gender dysphoria is "highly treatable."  Dkt. 72-77 ¶ 17.

General Mattis explained that "[u]nlike past reviews, the [Mattis] Panel's analysis was informed by the Department's own data and experience obtained since the Carter Policy took effect."  Dkt. 73-8 at 23; *see also* Tr. (Mar. 12, 2025) at 11.  Here, Defendants did not analyze the "Department's own data and experience since the [Austin] Policy took effect."

### 2.    *2021 Psychological Health Center Review*

The Action Memo references and attaches a 2021 review conducted by DoD's Psychological Health Center of Excellence and the Access Medical Standards Analysis and Research Activity (the Center, AMSARA Report).  Dkt. 73-24.  The Center studied medical issues relating to accession of persons with a history or diagnosis of gender dysphoria.  The Center compared the available accessions records of transgender service persons to a cohort of other servicemembers.  *Id.* at 5.

The Action Memo's entire discussion of the AMSARA Report is:

> A 2021 review conducted by DoD's [AMSARA team] found that "rates of disability *evaluation* were estimated to be higher [about 12%] among [transgender] service members [1%].  Additionally, this review found that nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable over a 24 month period.  This level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements.

Action Memo at 4 (emphasis added).

25

No one who has read the AMSARA Report could find that it supports this conclusion. To start, the Action Memo fails to mention the Report's key finding: rates of transgender persons experiencing the conditions of the cohort group (*psychiatric, musculoskeletal, and neurological*) "were comparable to those of all service members evaluated for disability." Dkt. 73-24 at 6 (emphasis added). The other rates the Center studied were "similar" between the transgender cohort and the other servicemember cohort as to: (1) the proportion with history of any accession medical disqualification status; (2) the distribution of specific medical disqualifications; (3) the rates of adverse attrition; and (4) the rates of existing prior to service discharge. *Id*. at 4. The Action Memo quotes the *only* rate that was higher for transgender persons, and that was a rate of *evaluation*, not occurrence. Action Memo at 4.

With respect to non-deployability, the Action Memo also ignores that "data w[as] not available from non-transgender service members that could serve as a basis for comparison to indicate if supposed non-deployability rates amongst the transgender cohorts differed from the overall non-deployability rate." Dkt. 86-1 (AMSARA Parts I-III) at 11–12. Without comparator data, the non-deployability rate for the transgender cohort is not informative, something the Report highlights. Dkt. 73-24 at 6.

The Center also conducted a medical literature review as part of its work that the Action Memo ignores altogether. One study stands out. The AMSARA Report cited, without criticism, a 2014 study that summarized "and challenge[d] [] common notions to justify barring transgender individuals from Service which are actually not supported by research and not internally consistent with other DoD policies." Dkt. 86-1 at 2. "The most notable challenge to these assumptions is falsely equating transgender identify with mental health disorders, which has become a debunked connection broadly in the field." *Id.*

The Court does not question military judgment broadly as to acceptable non-deployment rates. The Court instead finds that the Action Memo's summary of the AMSARA Report is inexplicably misleading. Further, the Report contradicts, rather than supports, the conclusions the Action Memo draws from it. These findings support Plaintiffs' contention that Defendants did not exercise military judgment to which the Court can defer on the narrow question of whether the Hegseth Policy comports with the Fifth Amendment.

### 3. *2025 Medical Literature Review*

The Action Memo also references the 2025 Medical Literature Review conducted by the Office of the Assistant Secretary of Defense for Health Affairs. The Action Memo's entire discussion of the Medical Literature Review is that it:

> Included findings that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime...[and] the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their cisgender counterparts," "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to cisgender individuals," and that the strength of the evidence on transgender mental health and gender-affirming care is low to moderate.

Action Memo at 4–5 (quoting Dkt. 73-25 (Med. Lit. Rev.) at 2–3).

No one summarizing the Review in good faith could draw these conclusions. To start, the Medical Literature Review did not survey studies on transgender persons in military service: *i.e.*, individuals already found to be physically and mentally fit. Dkt. 73-25 at 2; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 116–17. So it can shed little light on how transgender persons fare in the military. *See also* Defs. Concession, Tr. (Mar. 12, 2025) at 117. For that analysis, the Court refers to the AMSARA Report, which, again, found similar rates of psychotherapy for transgender and other servicemembers.

27

Second, the suicide conclusions of the Medical Literature Review undercut banning transgender persons from the military. To start, the military already restricts individuals with suicidal tendencies from enlisting. *See* DoDI 6130.03, Vol. 1, at 6.28(m). Moreover, the studies under review confirm that transgender persons are not inherently mentally unfit. Instead, the studies cited find that transgender suicide rates are influenced by external factors, such as "gender identity-related disparities, discrimination, lack of family and social support, barriers to gender-affirming care, co-occurring mental health conditions, economic instability, and experiences of violence and victimization." Dkt. 73-25 at 3. The studies also show "that suicide risk among transgender . . . individuals is mitigated by access to gender-affirming care, strong social and family support, legal and social recognition, affirming mental health services, community connectedness, and protections against discrimination." *Id.*; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 118–19.

Third, each meta-study cited found that Gender-Affirming Hormone Treatment and Gender-Affirming Surgery treatment improves psychological well-being, mental health, and quality of life. *See* Dkt. 73-25 at 4–6. Each treatment method reduces gender dysphoria, depression, anxiety, psychological distress, and depressive symptoms. *Id.* Further, "long-term studies show that regret rates are extremely low, with most individuals reporting improved quality of life, body image satisfaction, and overall well-being." *Id.* at 5.

The Court does not question military judgment as to what constitutes as disqualifying medical events. The Court instead finds that the Action Memo's summary of the 2025 Medical Literature Review is inexplicably misleading. Further, the Review contradicts, rather than supports, the conclusions the Action Memo draws from it. These findings support Plaintiffs'

contention that Defendants did not exercise military judgment to which the Court can defer on the narrow question of whether the Hegseth Policy comports with the Fifth Amendment.

### 4.    *Military Costs*

The Action Memo concludes that "the costs associated with [gender-affirming] health care," which it estimates at $52 million over 10 years, make service by transgender members incompatible with military readiness.  Action Memo at 5; Dkt. 66 at 5.  It is impossible to see how.  Assuming $5.2 million per year, the estimated cost of transgender care was fifty-seven hundred-thousandths of a percent (00.00057%) of total military spending for 2024.[19]  Perhaps understandably, then, Former Deputy Under Secretary Skelly testified, and Defendants do not rebut, that under the Austin Policy, the Assistant Secretary for Health Affairs or Defense Health Agency staff raised no concerns about the cost of treating transgender servicemembers.  *See* Dkt. 72-73 ¶ 14; *see also* Dkt. 72-68 ¶¶ 8–9.

Defendants could fairly respond that whether $5.2 million per year is a "rounding error" of the overall budget is not the right comparator.  Instead, they could argue, the number must be compared to similar costs the military incurs.  Had Defendants done that comparison—indeed, had they done *any* comparison—they might have a point.  But the Action Memo makes no comparison.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 144–45.  It states that the amount to treat gender dysphoria is $52 million over ten years and that this amount is too high.  Action Memo at 5.  Comparisons are important, though.  For example, the Department spent approximately $41 million for Viagra in 2023, compared to an estimated $5.2 million for gender-

---

[19] From January 1, 2016, to May 14, 2021, the military provided gender-affirming care to 1,892 active duty servicemembers.  Dkt. 66-1 at 2.  That number represents about two hundredths of one percent (0.02%) of the 9.5 million beneficiaries TRICARE covered in 2024.  *See id.*

affirming care.  *See* Dkt. 72-68 ¶ 9.[20]  Defendants do not explain why the former (and every other medical cost) is acceptable while the latter requires banning transgender persons from military service.  Tr. (Mar. 12, 2025) at 150–54.

Nor do Defendants analyze the costs of discharging and replacing thousands of trained servicemembers, many with decades of experience and specialized skills.  This is not an idle question.  The military's practice of discharging gay and lesbian servicemembers under "Don't Ask, Don't Tell" "cost taxpayers more than $600 million."  Dkt. 77-1 at 19 (cleaned up).  Even a sixth of that number would be twenty times the annual cost of care for gender dysphoria.  Nor do Defendants analyze whether the military could save the same costs, or more, in other areas and without excluding a class of people.

The Court does not question military judgment concerning how it should apportion its funds.  Nor does the Court find that the military must undertake an entire budget review before concluding some costs are unacceptably high.  But there must be *some* benchmark.  Citing a number—devoid of any context or analysis—and concluding that the number is too high does not support banning transgender persons from military service.  If it did, courts would have to accept *any* cost amount the military cites to justify any policy.

### 5. *Missing Evidence*

If the Military Ban goes into effect, it will upend lives and ruin the careers of thousands of persons.  Given this potential impact, the evidence *not* in the record is striking.  Defendants claim transgender persons impact military readiness, but they acknowledge the DoD does not track individuals "by gender identity and has no means of searching for [the number of]

---

[20] *See also Beyond the Budget: Addressing Financial Accountability in the Department of Defense: Joint Hearing Before the Subcomm. on Nat. Sec., the Border, & Foreign Affairs & the Subcomm. on Gov't Operations & the Fed. Workforce*, 118th Cong. 49 (2023).

'transgender individuals.'"  Dkt. 66 at 5; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 173.

Not only that, but DoD's own Public Affairs Guidance on the Military Ban acknowledges that

"[w]e [DoD] do not have an exact number of active-duty Service members diagnosed with

gender dysphoria."  Dkt. 79-1 at 6.  And it admits that "[w]e [DoD] do not have [a breakdown of

individuals in the military by service, gender, race, and occupation] readily available."  *Id.*

      Without answers to these basic questions, Defendants cannot explain how transgender

persons impact military readiness.  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 46–47.  How

have they done so?  Is that impact positive or negative?  Is it material?  How many have, like

Plaintiffs, served with distinction and are fit for continued service?  How many are stable after a

gender dysphoria diagnosis?  How many have had deployment issues?  How many will be

eligible for an exemption?  How many will be discharged?  What amount of irreplaceable

experience will the military then lose?  *See* Defs. Concession, Tr. (Mar. 12, 2025) at 136–37.

Who knows?  Not Defendants.

      The Hegseth Policy also does not contain: (1) evidence that transgender persons are

inherently unfit to serve; (2) evidence that being transgender is inconsistent with "honesty,"

"humility," and "integrity," EO14183 § 2; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 191;

(3) evidence that being transgender "conflicts with a soldier's commitment to an honorable,

truthful, and disciplined lifestyle," EO14183 § 1; *see also* Defs. Concession, Tr. (Mar. 12, 2025)

at 187; (4) analysis of whether the costs of discharging and replacing transgender

servicemembers outweigh the costs of retaining them; (5) analysis of the effect on military

readiness of losing thousands of servicemembers; or, among numerous other holes, (6) the

criteria of "exhibiting evidence of gender dysphoria," *see generally* Hegseth Policy, much less

how such behavior will be policed.  Defendants also concede that they have no *post hoc* evidence

31

(assuming the Court could even consider it) to justify the Military Ban.  Defs. Concession, Tr. (Feb. 18, 2025) at 146–48.

To contextualize this absence, consider, by contrast, Executive Order 14208, "Ending Procurement and Forced Use of Paper Straws."  90 Fed. Reg. 9585 (Feb. 10, 2025) (EO14208).  EO14208 makes it "the policy of the United States to end the use of paper straws."  *Id.* § 1.  EO14208 provides clear and articulable reasons to support its conclusions.  Paper straws: (1) "are nonfunctional," (2) "use chemicals that may carry risks to human health," (3) "are more expensive to produce than plastic straws," (4) "often force users to use multiple straws," and (5) "sometimes come individually wrapped in plastic, undermining the environmental argument for their use."  *Id.*  The White House also provided a fact sheet supporting EO14208, citing to multiple studies supporting these claims.  *See* Fact Sheet: President Donald J. Trump Ends the Procurement and Forced Use of Paper Straws, The White House (Feb. 2025).  No such rationale, much less supporting data, is anywhere to be found in EO14183.

Presumably, a policy that bans transgender persons from military service—individuals who have served honorably and "made America safer"—should result from a study at least comparable to one that bans paper straws.

### C.  Defendants' Failure to Consider the Military's Experience with Transgender Persons Serving Openly Undercuts the Military Ban

The Austin Policy—which the Hegseth Policy supersedes—"was based on years of thoughtful policymaking supported by peer-reviewed scientific research" and "has resulted in a stronger, not a weaker military."  Dkt. 13-28 ¶ 34.  High-ranking military leaders who implemented the Austin Policy have submitted sworn declarations in which they testify, from personal experience, that transgender persons serving openly has improved, not decreased, military preparedness.  Of the four declarations by high-ranking military leaders, Defendants

rebut only one aspect of one of them. The Court briefly reviews that testimony, including Defendants' sole rebuttal, here.

### 1.    *Plaintiffs' Declarants*

Declarant Carlos Del Toro was the 78th Secretary of the Navy. Dkt. 72-79 ¶ 1. Former Secretary Del Toro had "oversite [sic] responsibilities over all personnel matters affecting the Navy and Marine Corps, including implementation of . . . policies regarding service by transgender personnel." *Id.* ¶ 6. Secretary Del Toro testifies that "[b]ased on [his] direct experience and observation, transgender service members who meet the standards required for their positions serve effectively and contribute positively to unit readiness." *Id.* ¶ 7. Notably, during Secretary Del Toro's "three and a half years as Secretary," he "reviewed thousands of disciplinary cases and personnel matters," yet he cannot "recollect a single disciplinary case or performance issue related directly to a service member's transgender status." *Id.* ¶ 8.

Former Secretary Del Toro testifies that "being transgender does not inherently affect a service member's ability to meet [military] standards or to deploy worldwide," and that "[a]ny suggestion to the contrary contradicts the actual documented performance of transgender service members in our forces." *Id.* ¶ 10. He further testifies that "[t]here is no evidence-based justification for excluding from service someone who meets all applicable standards merely because they are transgender," and that "[s]uch exclusion would harm military readiness by depriving our force of qualified personnel who have proven their ability to serve." *Id.* ¶ 13. "Contrary to speculative concerns, [he] has observed that allowing transgender individuals to serve strengthens unit cohesion by fostering honesty and mutual trust," and that "excluding transgender individuals from military service is destabilizing to good order and discipline." *Id.* ¶¶ 15, 17.

Declarant Alex Wagner is the former Assistant Secretary of the Air Force for Manpower and Reserve Affairs. Dkt. 72-59 ¶ 1. Mr. Wagner was a member of the working group convened by the Acting Under Secretary of Defense for Personnel and Readiness "to formulate policy options for DoD regarding transgender service members." *Id.* ¶ 9. Mr. Wagner testifies that he is "not aware of any negative impact . . . on . . . our overall military readiness." *Id.* ¶ 27. Rather, he testifies that the Austin Policy "foster[ed] openness and trust among team members . . . thereby engender[ing] stronger unit cohesion." *Id.* ¶ 28. He is "not aware of any complaints regarding unit cohesion" or "readiness." *Id.* ¶¶ 32, 33. It is "patently clear" to him that "the Austin Policy [did] not negatively impact[]" these objectives. *Id.* ¶ 32.

Declarant Yvette Bourcicot is the former Acting Assistant Secretary of the Army for Manpower and Reserve Affairs and former Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs. Dkt. 72-69 ¶ 1. Ms. Bourcicot also served on the working group convened to study the new policy allowing transgender persons to serve. *Id.* ¶ 12. Ms. Bourcicot testifies that she reviewed each request submitted by a transgender servicemember wishing to transition and that she "made a recommendation on whether to grant the service member's request." *Id.* ¶ 19. To her "best recollection," "every request [she] received met the requirements of the policy, and every requesting service member met the necessary standards for serving." *Id.* Ms. Bourcicot "observed no negative impact from permitting transgender service in the Army [] on our military capabilities" and is "unaware of any complaints regarding unit cohesion resulting from permitting transgender people to serve." *Id.* ¶¶ 23, 26.

Declarant Shawn G. Skelly is the former Deputy Under Secretary of Defense for Personnel and Readiness and Assistant Secretary of Defense for Readiness. Dkt. 72-72 ¶ 1. Ms. Skelly's responsibilities "included implementing the policy permitting service by

transgender troops." *Id.* ¶ 8.  Ms. Skelly testifies that the Austin Policy "enable[d] [the] military

to retain highly trained and experienced service members by applying the same standards to

transgender service members that are applied to others."  *Id.* ¶ 10.  She further testifies that "[t]he

transgender service policy has not negatively impacted readiness," *id.* ¶ 11, and that she is "not

aware of any complaints regarding unit cohesion resulting from the Austin [P]olicy," *id.* ¶ 13.

"To the extent the Austin [P]olicy has had any appreciable impact on unit cohesion, it has

improved unit cohesion by fostering increased trust among team members."  *Id.*  "Personnel

policies that allow transgender service members to be evaluated based on skill and merit . . . do

not jeopardize the military's mission of protecting the United States, but strengthen it."  *Id.* ¶ 14.

### 2. *Challenge to One Declarant's Testimony*

The Court informed Defendants that, if not challenged, it would accept the testimony

contained in Plaintiffs' third-party declarations as findings of fact.  Min. Order (Feb. 10, 2025).

It repeatedly informed Defendants that they had a right to cross-examine these witnesses, but

Defendants declined to do so.  Tr. (Feb. 18, 2025) at 121–22; Tr. (Mar. 12, 2025) at 128–29.

Defendants did file the sworn declaration of Timothy D. Dill, Assistant Secretary of

Defense for Manpower and Reserve Affairs, Dkt. 52, to challenge the sworn declaration of

Gilbert R. Cisneros, Jr., former Under Secretary of Defense for Personnel and Readiness, Dkt.

13-30, filed by Plaintiffs.  Mr. Cisneros was responsible for overseeing implementation of the

Austin Policy and testifies that, "[i]f there were complaints or problems about transgender

service members, I would have known of them through my role as Under Secretary of Defense

for Personnel and Readiness."  Dkt. 13-30 ¶¶ 12, 17.  He further testifies that "[i]n that role, I did

hear complaints about some other issues, but I never received or heard about a single complaint

relating to transgender service members."  *Id.*  To rebut this, Mr. Dill testifies that "it would be

highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary [Mr. Cisneros]." Dkt. 52-1 ¶ 6. In response, Mr. Cisneros testifies that:

> [Mr. Dill's statement] does not accurately describe my degree of awareness of these matters as Under Secretary of Defense for Personnel and Readiness. As the Under Secretary in charge of readiness, it was my responsibility to be aware of unit cohesion, military readiness, medical readiness, deployability, and lethality. If a unit or service was dealing with readiness issues due to the service by transgender service members, that would have been brought to my attention.

Dkt. 53-1 ¶ 4. Mr. Cisneros provides an example concerning his oversight of Junior ROTC units to support this testimony. *Id.* ¶ 6. As between Mr. Cisneros, who testifies under oath as to his own experience, and Mr. Dill, who testifies under oath as to what he thinks Mr. Cisneros's personal experience would have been, the Court naturally credits Mr. Cisneros. That said, the Court would reach the same conclusions even if it did not credit this part of Mr. Cisneros's testimony.

Defendants argue generally that the declarants cannot have personal knowledge that "no complaint" was ever filed concerning a transgender servicemember. Tr. (Feb. 18, 2025) at 124–26. The Court accepts that contention and will not rely on these declarations for the proposition that *no* complaint anywhere in the Armed Forces ever arose. However, as former high-ranking officials at DoD directly involved in either drafting or implementing the Austin Policy, Plaintiffs' declarants have personal knowledge concerning the impact of transgender persons serving openly on military preparedness. And they unanimously conclude that they have had either no detrimental effect or have had a positive one. Defendants concede that they have proffered no evidence to contradict these assertions. Tr. (Feb. 18, 2025) at 120.

The Court, at this early stage of the litigation, accepts Plaintiffs' declarants' uncontested testimony as part of its findings of fact.

## STANDARD OF REVIEW

The "traditional goal of a preliminary injunction is to preserve [the] status quo," which is "the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). A party seeking preliminary injunctive relief must show that the following factors, taken together, weigh in favor of an injunction: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors "merge" into one "when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Circuits differ in their reading of *Winter*'s four factor test; some allow a strong showing of one factor to make up for a weaker showing on another, *see, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011) (employing this sliding-scale approach), while others require each element to be proven independently, *see, e.g.*, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Powell*, 915 F.3d 197, 215 n.7 (4th Cir. 2019).

Historically, this Circuit evaluated the factors on a sliding scale. *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). But it has read *Winter* "at least to suggest if not hold" that the moving party faces "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (cleaned up). Yet it has repeatedly "declined to take sides" on whether *Winter* so held. *Am Meat Inst. v. USDA*, 746 F.3d 1065,

1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

Because each of the four factors favors granting preliminary injunctive relief, Plaintiffs would prevail under either the sliding-scale or independent-factor approach.  The Court therefore remains on the sidelines of this ongoing debate.

## PRELIMINARY INJUNCTION ANALYSIS

### I.    PLAINTIFFS' COMPLAINT IS RIPE

Defendants contend that this Court lacks jurisdiction because Plaintiffs did not exhaust their administrative remedies.  Opp. at 26–28.  Because some Plaintiffs are current military personnel, they claim, those Plaintiffs must exhaust military tribunals before involving "civilian courts."  *Id*. at 27 (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) (cleaned up)).  Not so.

Plaintiffs claim the Military Ban violates the Fifth Amendment.  Defendants cite no support for their contention that exhaustion is required for claims that raise a constitutional challenge to agency action.  Opp. at 15–18.  In *Axon Enter. Inc. v. FTC*, the Supreme Court held that petitioners could raise, without exhausting their remedies, a challenge "collateral to any decisions the [agencies] could make in individual enforcement proceedings."  598 U.S. 175, 195 (2023).  *Axon* involved a challenge to the constitutionality of the agency itself, but its reasoning is informative here.  Plaintiffs claim that subjecting them to discharge proceedings, verbal degradation, and reputational damage, though they are physically and mentally fit to serve, are "here-and-now" injuries of being subjected to an unconstitutional policy.  *Id.* at 192.  No relief ordered by a military tribunal can remedy such harm.  *Id.*

Exhaustion is also futile.  Defendants push back by stating: "[t]he [obviously futile] exception applies only when 'the agency will most certainly deny any relief … because it has a

38

preconceived notion on … the matter.'"  Opp. at 17 (quoting *Randolph-Sheppard Vendors of*

*Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986)).  They claim the relief here is not

preordained.  It is.  The Hegseth Policy lays out in detail the military's "preconceived notion" on

Plaintiffs' service.

Defendants finally claim that "development of a factual record" by the military will assist

the Court in its analysis of the involuntary separation.  Opp. at 17.  What more facts does the

Court need as to the individual Plaintiffs?  Each active-duty Plaintiff is subject to the Hegseth

Policy, no Plaintiff is eligible for a waiver, and the military will discharge each one.  Defs.

Concession, Tr. (March 12, 2025) at 160–63.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Deference to the Military

#### 1.    *Defendants Seek Too Broad an Application of Deference*

The Court agrees that "courts [are] ill-equipped to determine the impact upon discipline

that any particular intrusion upon military authority might have" and that "the military

authorities [not courts] have been charged by the Executive and Legislative Branches with

carrying out our Nation's military policy."  *Goldman v. Weinberger*, 475 U.S. 503, 507–08

(1986) (cleaned up).  Often, courts accept "the reasoned, professional analysis of Congress and

the Executive on matters strictly within the realm of military expertise."  *Doe 2 v. Shanahan*, 917

F.3d 694, 702 (D.C. Cir. 2019) (Wilkins, J., concurring).

Defendants carry deference too far, however.  By "defer" they basically mean the Court

must side with the military's position, end-stop.  And they contend the Court must defer even if

the judgment, as here, does not make sense.

> THE COURT: [F]or every 1 thousand people we can expect less
> than 2 will require care for gender dysphoria.  Can you explain to

> me, please, how two out of 1 thousand people negatively impact
> unit cohesion?
>
> DEFENSE COUNSEL: I don't have an answer for that beyond
> what's in the record.
>
> THE COURT: Well, there's no answer in the record. If there's an
> answer in the record, tell me what the answer in the record is, if
> there is no answer, [and] you can't answer, that is fine.
>
> DEFENSE COUNSEL: These are judgments the military has
> made.

Tr. (Mar. 12, 2025) at 175–76.

Must defer even if prior military judgment supported by extensive study and data will go,

as here, by the wayside.

> THE COURT: [Can] you point to me any case in American
> history that says to a [c]ourt you should defer on a military policy
> [that replaces] another military policy that was put in place after
> review by the President of the United States and careful review by
> military leaders[. You] should ignore [the latter] and defer instead
> to a policy put in place by an individual who has been the
> Secretary of Defense for about 30 days and who cited in his
> reasoning, two studies that undercut what he is doing.
>
> . . .
>
> DEFENSE COUNSEL: I don't have a case that has every specific
> fact that's at issue here.
>
> THE COURT: …[A]nything remotely close to this?
>
> DEFENSE COUNSEL: I mean, I think every single of the
> Supreme Court's and Courts of Appeals military deference
> doctrines are deference to the current military…I think by
> definition, these are Courts that are deferring to current military
> judgments about an issue.

Tr. (Mar. 12, 2025) at 132–33.

Must defer even if the military judgment, as here, is not supported by "actual data."

> THE COURT: How can someone decide that a group of people are
> hurting unit cohesion and discipline if we have no records of them
> doing so and we don't even know who they are?
>
> DEFENSE COUNSEL: The person and the people who are
> entrusted to decide that question are the military and the president.

40

> And if there's not actual data to back something up, the question is
> a professional military judgment. Again, as I said, a prediction.

Tr. (Mar. 12, 2025) at 137–38.

### 2. *Courts Do Not Owe the Military Blind Deference*

Defendants' position does not urge judicial deference to military judgment. It urges

judicial abdication. No. The law does not demand that the Court rubber-stamp illogical

judgments based on conjecture. In fact, it requires the opposite because the executive does not

enjoy a "wholesale license to discriminate in matters of military policy." *Doe 2*, 917 F.3d at 704

(Wilkins, J., concurring).

The D.C. Circuit's recent decision in *Singh v. Berger* is informative. 56 F.4th 88 (D.C.

Cir. 2022). *Singh* reversed a district court's denial of a preliminary injunction against a Marine

Corps' standard grooming and dress policy that plaintiffs claimed violated their rights under the

Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq. Id.* at 91. The D.C.

Circuit acknowledged that "[t]o inculcate the importance to service members of sacrificing

personal preferences and identifies in favor of the overall group mission, the military has long

had an interest in the strict enforcement of its uniform dress requirements." *Id.* (cleaned up).

And it "indulge[d] the widest latitude in considering the Marine Corps' interests in fostering

cohesion and unity among its members, which surely qualifies as compelling." *Id.* at 99 (cleaned

up). But it also highlighted that "the cost of military service has never entailed the complete

surrender of all basic rights." *Id.* at 92 (citing cases) (cleaned up). The D.C. Circuit analyzed the

military's justifications and found that "the Marine Corps [had] come up very short." *Id.* at 107.

Defendants relegate *Singh* to a footnote. They claim it is inapposite because it involved

RFRA, which contains a strict scrutiny standard. Opp. at 38 n.8. It does. But even employing a

lower scrutiny standard, Plaintiffs retain their constitutional rights. Notwithstanding the

41

deference the Court owes it, the military still must show that burdening these Plaintiffs' equal protection rights is related to furthering a government interest. And as discussed throughout this opinion, the military's justifications "come up very short." *Singh*, 56 F.4th at 107.

Singh also instructed the district court to enter a preliminary injunction that altered the status quo. That itself is rare because "courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits." *Id.* at 95. Here, the Military Ban—not an injunction—would upend the status quo. Further, if Defendants later prevail on the merits, they will not be prejudiced as was the case in *Singh*.

Sidestepping *Singh*, Defendants point instead to *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), in which the Supreme Court upheld a law that required only men to register for the draft. Without question, *Rostker* is an example of the Supreme Court showing deference to military judgment, even when it implicates sex-based distinctions. Defendants overstep, however, in claiming that in *Rostker* "the Court's approach most closely resembles rational-basis review." Opp. at 38. Even in *Rostker*, the Supreme Court deferred because it found that Congress had acted with "deliberate consideration," rather than "unthinkingly" or "reflexively." 453 U.S. at 72, 83. The Military Ban's 30-day incubation period pales next to the "hearings, floor debate, and in committee" discussions that precipitated the law in *Rostker*. *Id.* at 72.

Further, the Supreme Court's later-decided *United States v. Virginia* (*VMI*) decision "drastically revise[d] [the Court's] established standards for reviewing sex-based classifications." 518 U.S. at 566 (Scalia, J., dissenting). When reviewing sex-based classifications, "the reviewing court must determine whether the proffered justification is exceedingly persuasive.

42

The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533.  That is intermediate, not rational basis, review.

Defendants' reliance on *Goldman v. Weinberger* is similarly unpersuasive.  475 U.S. 503 (1986).  Defendants argue that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society."  Opp. at 37–38; *see also* 475 U.S. at 507.  Sure.  But this is not a First Amendment case.  And the facts of *Goldman* bear no relation to those here. *Goldman* asked whether an Orthodox Jewish servicemember "can wear a yarmulke while in uniform." 475 U.S. at 504.  The question here is whether transgender persons can wear the uniform at all.  The Supreme Court would likely not have signed off on the military banning all Orthodox Jews who had ever worn a yarmulke from service.

### 3.    Trump v. Hawaii *Confirms that the Military Is Not Owed Blind Deference*

To argue the Court must defer to the military's judgment here, Defendants rely heavily on *Trump v. Hawaii*.  *See* Opp. at 39, 50–52; 585 U.S. 667 (2018).  That reliance is misplaced.

A week after taking office in 2017, President Trump issued what he had previously called a "Muslim Ban."  By executive order, he limited entry into the United States by foreign nationals from Muslim-majority countries.  *Hawaii*, 585 U.S. at 676.  A month and a half later, after an injunction blocked the policy, President Trump replaced his first executive order with a second executive order.  *Id.*  The second order restricted entry of foreign nationals from six of the original seven countries, though it allowed waivers on a case-by-case basis.  *Id.*  After lower courts again enjoined the order, the Supreme Court stayed the injunctions.  *Id.* at 677.

In September 2017, after the Secretary of Homeland Security completed a review of the policy, President Trump issued yet another iteration, Proclamation No. 9645.  *Id.*  The

43

Proclamation implemented entry restrictions for foreign nationals from eight countries "whose systems for managing and sharing information about their nationals the President deemed inadequate." *Id.* The plaintiffs in *Trump v. Hawaii* challenged it as a violation of the Establishment Clause, alleging that it was "motivated not by concerns pertaining to national security but by animus toward Islam." *Id.* at 681. They were unsuccessful.

The Supreme Court rejected plaintiffs' contention that the new policy simply continued the animus they claimed permeated the first one. *Id.* at 706. First, Proclamation No. 9645 "sa[id] nothing about religion." *Id.* at 706. It was a "facially neutral policy denying certain foreign nationals the privilege of admission" to the United States. *Id.* at 710. It did not mention Islam or any other religion. Additionally, the first ban went into effect seven days after President Trump was inaugurated. *Id.* at 676. Proclamation No. 9645 came 8 months later and "reflect[ed] the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies." *Id.* at 707. Because of the "thoroughness" of the "multi-agency review," the Supreme Court ultimately deferred to the Executive's determination that the ban was important for national security. *Id.* at 707–08.

Second, Proclamation No. 9645 restricted entry for foreign nationals from some Muslim majority countries, but not all, and it applied to foreign nationals of all religions. *Id.* at 707. Because the policy did not encompass all Muslim majority countries, the Supreme Court reasoned that "the determinations were justified by the distinct conditions in each country." *Id.* Third, it found Proclamation No. 9645 to be "expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Id.* at 706. It found that the restrictions reflected in the Proclamation were designed to achieve those purposes. *Id.* at 708–09.

Comparing the facts of the policy upheld in *Hawaii* to the ones here is informative.

| ***Trump v. Hawaii*** | **Military Ban** |
| --- | --- |
| Facially neutral | Not facially neutral |
| Months and numerous working groups removed from "Muslim ban" tweets | "Transgender ban" tweet posted the day after the Hegseth Policy issued |
| Multiple iterations of the ban | One iteration of the ban |
| No derogatory characterizations | Derogatory characterizations |
| Alleged animus statements were outside the proclamation's text | Animus in the ban's text |
| Legitimate waiver program | Waivers in name only |
| World-wide review process | No discernable review process |

This Court has the same obligation here as the Supreme Court did in *Hawaii* and the D.C. Circuit in *Singh* to test the military's assertion of its interests. It does so in the rest of this Opinion.

## B.    Intermediate Scrutiny

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. While "not as explicit a guarantee of equal treatment as the Fourteenth Amendment," the Supreme Court has held that "the Constitution imposes upon federal, state, and local government actors the *same* obligation to respect the personal right to equal protection of the laws." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 231–32 (1995) (emphasis added).

45

The parties dispute whether the Military Ban denies Plaintiffs equal protection as a quasi-suspect class. Laws that do not classify based on a suspect or quasi-suspect class "[are] presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Laws that discriminate based on a quasi-suspect classification must survive intermediate scrutiny. The government "must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 59 (2017) (quoting *VMI*, 518 U.S. at 533).

Plaintiffs are likely to succeed on their claim that the Military Ban is subject to intermediate scrutiny because it classifies based on sex and transgender status, two distinct quasi-suspect classes. Plaintiffs are also likely to succeed on their claim that the Military Ban fails intermediate scrutiny.

### 1.    *The Military Ban Classifies on the Basis of Sex*

The Supreme Court has recognized that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Plaintiffs claim that the logic of *Bostock* applies in the equal protection context; Defendants disagree. Plaintiffs have the better argument.

### a.    *The Logic of* **Bostock** *Applies to the Equal Protection Analysis*

In *Bostock*, the Supreme Court considered whether firing an employee for being transgender or homosexual constituted sex discrimination. *Bostock*, 590 U.S. at 650–52. The case arose under Title VII, which prohibits discrimination "because of . . . sex." *Id.* at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). In holding that firing an employee for being transgender

46

did in fact constitute sex discrimination, Justice Neil M. Gorsuch asserted that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. To illustrate this point, Justice Gorsuch offered a hypothetical involving an employer and two employees. *See id.* The two hypothetical employees were identical in every way except that one was a transgender woman and the other a cisgender woman. *See id.* Justice Gorsuch explained that if the hypothetical employer fires only the transgender woman because she is transgender, it has "intentionally penalize[d]" her "for traits or actions that it tolerates in an employee identified as female at birth." *Id.* He concluded that "if changing the employee's sex would have yielded a different choice by the employer," then the discrimination is based on sex. *Id.* at 659–60.

The Court agrees with Defendants that *Bostock*'s holding is cabined to Title VII. *Id.* at 660; Opp. at 34. But its reasoning is not. The Supreme Court deduced it *impossible*—end stop—to discriminate against a transgender person without discriminating against that person based on sex. *Bostock*, 590 U.S. at 660. Three circuit courts have applied that same logic in the Fifth Amendment context. The Fourth Circuit *en banc* has held that: "discriminating on the basis of [a gender dysphoria] diagnosis *is* discriminating on the basis of gender identity and sex." *Kadel v. Folwell*, 100 F.4th 122, 141 (4th Cir. 2024) (en banc) (cleaned up). Ditto the Ninth Circuit. *See Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024). Ditto the Tenth Circuit. *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024).

On the other hand, the Sixth and Eleventh Circuits have declined to borrow *Bostock*'s discrimination analysis because of "[d]ifferences between the language of [Title VII] and the Constitution." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023); *see also Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023). First, "Title VII

47

covers disparate impact claims" while "the [Fifth] Amendment does not." *L.W.*, 83 F.4th at 485. Second, Title VII is limited to certain classifications, and it does not incorporate tiers of scrutiny. *Bostock*, 590 U.S. at 655. In contrast, the Fifth Amendment "addresses all manner of distinctions between persons" and "implies different degrees of judicial scrutiny." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring). Third, Title VII also contains many defenses—such as "bona fide occupational qualifications and bona fide seniority and merit systems"—that the Fifth Amendment does not. *L.W.*, 83 F.4th at 485.

All true. But a distinction is not necessarily one with a difference. "[N]othing about these differences [] prevent[s] *Bostock*'s commonsense reasoning—based on the inextricable relationship between transgender status and sex—from [being] appl[ied] to the initial inquiry of whether there has been discrimination on the basis of sex in the equal protection context." *Fowler*, 104 F.4th at 790 (citing *Bostock*, 590 U.S. at 660). "Adopting *Bostock*'s commonsense explanation for how to detect a sex-based classification does not require us to import Title VII's test for liability." *Fowler*, 104 F.4th at 790–91 (cleaned up). That Title VII's defenses are codified in separate provisions of Title VII, arguably "bel[ies] any notion that those defenses must apply in equal-protection cases." *L.W.*, 83 F.4th at 503 n.7 (White, J., dissenting).

The differences between the provisions—material as they may be in some situations—have no bearing on the Supreme Court's careful step-by-step reasoning on the "inextricable relationship" that exists between transgender status and sex. *See Fowler*, 104 F.4th at 790. The Court therefore applies *Bostock*'s reasoning to analyze the Military Ban. In doing so, it does not "import[] the Title VII test for liability," *L.W.*, 83 F.4th at 485, into the equal protection guarantee of the Fifth Amendment. Rather, it borrows Justice Gorsuch's reasoning to conclude

48

that transgender discrimination is a form of sex discrimination for purposes of the equal protection inquiry.

> ### b.    Application of the Military Ban to Both Males and Females Does Not Negate Plaintiffs' Individual Rights to Equal Protection

The Military Ban's *raison d'être* is to exclude transgender persons from military service on the basis of their sex.  EO14183 posits that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." EO14183 § 1.  The Hegseth Policy declares that the DoD "only recognizes two sexes: male and female," and that "[a]n individual's sex is immutable, unchanging during a person's life." Hegseth Policy at 3.  It demands that "[a]ll Service members [] serve in accordance with their [biological] sex."  *Id.*

The Military Ban excludes from service transgender women because they are biologically male but identify as women.  Had those very same servicemembers been born female, the military would not ban them.  Is this discrimination on the basis of sex?  The test is simple: would changing that transgender soldier's sex lead to a different decision by the military?  Yes, a biological female who identifies as a woman is not banned.  Ergo, discrimination.  To adopt Justice Gorsuch's analysis to this case:

> [T]ake … a transgender person [discharged from the military] who was identified as a male at birth but who now identifies as a female.  If the [military] retains an otherwise identical [soldier] who was identified as female at birth, the [military] intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in [a soldier] identified as female at birth. Again, the individual [soldier's] sex plays an unmistakable and impermissible role in the discharge decision.

*Bostock*, 590 U.S. at 660.

To this, Defendants have no answer.  They argue instead that because the Military Ban "applies equally to male and female servicemembers," it does not discriminate based on sex. Dkt. 38 at 14; *see also id.* at 33.  They focus on Justice Gorsuch's assertion in *Bostock* that "[t]he employers might be onto something if Title VII only ensured equal treatment between groups of men and women . . . Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups."  590 U.S. at 671; Dkt. 38 at 33; Tr. (Feb. 19, 2025) at 35–39.

Defendants' argument "misreads the Equal Protection Clause to protect particular groups, a construction that [the Supreme Court has] tirelessly repudiated in a long line of cases understanding equal protection as a personal right."  *Schuette v. Coalition to Def. Affirmative Action*, 572 U.S. 291, 324 (2014) (Scalia, J., concurring) (cleaned up).  Instead, it is a "basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*."  *Adarand Constructors*, 515 U.S. at 227 (considering race classification) (emphasis in original).  Government actions based on sex "should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed."  *Id*.  Thus, in *Loving v. Virginia*, the Supreme Court rejected "the notion that the mere equal application of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discrimination."  388 U.S. 1, 8 (1967) (cleaned up).[21]  And in *J.E.B. v. Alabama ex rel. T.B.*, the Supreme Court held that the

---

[21] Granted, race-based claims are subject to a higher level of scrutiny than sex-based claims in an equal protection inquiry.  *See Cleburne*, 473 U.S. at 440–41.  But neither the Supreme Court nor the D.C. Circuit have said that the initial question—whether there is a classification—differs depending on the classification at issue.

Equal Protection Clause prohibits discrimination in jury selection on the basis of sex even though the challenged practice applied equally to both sexes. 511 U.S. 127, 131, 146 (1994).

Defendants' final push to distinguish *Bostock* centers on the "premise" from which *Bostock* proceeds. Opp. at 23. "While in the Title VII context individuals are generally similarly situated because an individual's homosexuality or transgender status is not relevant to employment decisions, . . . men and women are not similarly situated when it comes to certain military standards." *Id.* at 23–24 (cleaned up). True. But again, the Court here does not apply *Bostock* or "import[] the Title VII test for liability." *L.W.*, 83 F.4th at 485. It instead borrows Justice Gorsuch's logic to conclude that transgender discrimination is a form of sex discrimination. And because the Military Ban targets transgender persons for disparate treatment, it creates an explicit sex-based classification that requires application of intermediate scrutiny. *See VMI*, 518 U.S. at 531.

## 2.    *Transgender Persons are a Quasi-Suspect Group*

Plaintiffs argue that the Military Ban is also subject to intermediate scrutiny because transgender persons are a quasi-suspect class. Neither the Supreme Court[22] nor the D.C. Circuit has addressed this contention. But the relevant test is well established. *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987). Quasi-suspect classes have historically been subject to discrimination, *Cleburne*, 473 U.S. at 440–41; they have a defining characteristic that bears no relation to ability to contribute to society, *id.*; they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics, *Bowen*, 483 U.S. at 602; and they lack political power, *id.*

---

[22] A case pending before the Supreme Court might settle the question. *See United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024). But the Court cannot read tea leaves, so it will not speculate about the outcome there in reaching its decision.

The Court addresses each factor in turn. But, first, it acknowledges that the bar for recognizing a new quasi-suspect class is high. As Defendants emphasize, Opp. at 35, the Supreme Court "has not recognized any new constitutionally protected classes in over four decades[] and instead has repeatedly declined to do so." *L.W.*, 83 F.4th at 486. But the bar—no matter how high—is not insurmountable. *See Padula*, 822 F.2d at 102. Indeed, circuit courts have held that the transgender community clears it. *See Hecox*, 104 F.4th at 1079; *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) *as amended* (Aug. 28, 2020) [23]; *but see L.W.*, 83 F.4th at 486–87.

### a.    *Transgender Persons Face Discrimination*

Transgender persons, "[a]s a class[,] . . . have suffered, and continue to suffer, severe persecution and discrimination." *Doe 1*, 275 F. Supp. 3d at 208–09. Other executive orders issued by President Trump seek to deny them necessary medical care (and threaten those who help them with potential civil and criminal liability), erase them from all government websites, and refuse them access to homeless shelters. *See infra* Analysis II.C.3. Dozens of state laws also target transgender persons. *See* Dkt. 73-15. These bills span transgender rights to education, healthcare, birth certificates, employment, bathroom access, incarceration, marriage, civil rights, adoption, child abuse, pronouns, and the military. *See id.* Taken together, these

---

[23] Numerous district courts, including this one, have also held that transgender persons constitute a quasi-suspect class. *See Doe 1 v. Trump*, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017), *vacated on other grounds by Doe 2 v. Shanahan*, 755 Fed. Appx. 19 (D.C. Cir. 2019); *Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 872–74 (S.D. Ohio 2016); *Adkins v. City of New York.*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018).

actions show government hostility—and at times outright discrimination—against transgender persons.

This discrimination is not new.  *See Grimm*, 972 F.3d at 612.  The transgender community has historically "suffer[ed] from high rates of employment discrimination, economic instability, and homelessness."  *Id.* at 611.  According to a 2011 National Transgender Discrimination Survey (NTDS), transgender persons are twice as likely as the general population to experience unemployment.  *Id.* at 611–12.  When employed, 97% of NTDS respondents reported experiencing some mistreatment at work or having to conceal their transition to avoid mistreatment.  *Id.* at 612.  Transgender persons frequently experience harassment, and at times physical assault, in schools, medical settings, and retail stores.  *Id.*  They are also "more likely to be [victims] of violent crimes" than the general population.  *Id.*; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).  For good reason, then, in 2009, the House Judiciary Committee "recognized the extreme bias against gender nonconformity" and the "particularly violent crimes perpetrated against transgender persons." *Grimm*, 972 F.3d at 612 (cleaned up).

This discrimination has not been without effect.  The medical literature review study the Action Memo cites concludes that transgender persons have a higher rate of mental health episodes because of the pervasive discrimination they face.  *See supra* Findings of Fact II.B.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### b.    *Transgender Persons Contribute to Society*

Being transgender bears no relation to one's ability to perform or contribute to society. *Grimm*, 972 F.3d at 612.  Plaintiffs' service—exemplary service that Defendants recognize—

proves as much.  Dr. Brown,[24] Plaintiffs' expert, confirms that "there is no medical or scientific basis for the assertion that being transgender conflicts with military standards of troop readiness, lethality, cohesion, honesty, humility, uniformity, or integrity."  Dkt. 72-77 at 4.  Seventeen of the foremost medical, mental health, and public health organizations agree that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[25]  While some transgender persons experience gender dysphoria, and that could cause some level of impairment, not all transgender persons have gender dysphoria.  Those who do can obtain effective treatment.  Dkt. 32-2 at 6, 9, 15.  Defendants offer no rebuttal to this evidence.  For these reasons, the Court finds that transgender persons, as a class, satisfy this factor.

### c.    *Transgender Persons Have Immutable Characteristics*

The Court agrees with the holdings of other courts that transgender persons constitute a discrete group with immutable characteristics.  "Gender identity is formulated for most people at a very early age."  *Grimm*, 972 F.3d at 612.  It is also "not a choice."  *Id.*  "Rather, it is as natural and immutable as being cisgender."  *Id.*; *see also Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1087 (9th Cir. 2000).

Plaintiffs cite numerous studies to support their immutability argument.  First, those studies show that "transgender women and non-transgender women have similar brain structures,

---

[24] Dr. Brown earned his Doctor of Medicine from the University of Rochester School of Medicine in 1983.  Dkt. 72-77 ¶ 4.  He has three decades of experience researching, teaching, and consulting about transgender health issues, including gender dysphoria.  *Id.* ¶ 2.  He has authored well over a hundred publications on the subject and received dozens of awards for his work.  Dkt. 32-1 at 9–10, 14–22.

[25] Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender and Gender Non-Conforming Individuals 1 (2024), https://www.psychiatry.org/getattachment/ad686aa4-8ca9-4a92-b007-cf05a50f8e78/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

specifically in the volume of the bed nucleus of the stria terminalis." Dkt. 57 at 5. Second, they show "that if one identical twin is transgender, the other is much more likely to be transgender compared to fraternal twins." *Id.* And third, they show that scientists are now investigating differences in specific genes associated with being transgender. *Id.* at 5–6. These studies highlight that biology likely plays a role in shaping a person's transgender identity.

Defendants disagree. Citing the Sixth Circuit's *L.W.* decision, they claim that transgender identity "is not necessarily immutable, as the stories of detransitioners indicate." Opp. at 36 (citing *L.W.*, 83 F.4th at 487) (cleaned up). If people can detransition, being transgender is not immutable. Case closed, Defendants say. Not so fast, Plaintiffs shoot back. A detransition is not always voluntary and does not dispel gender dysphoria. Indeed, "no available research indicates that change efforts are effective in altering gender identity." Dkt. 72-3 at 3 (cleaned up). To the contrary, individuals who detransition "have reported harm resulting from these experience[s] such as emotional distress, loss of relationships, and low self-worth." *Id.* at 4 (cleaned up). Gender identity change efforts "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse." *Id.* (cleaned up). "Leading medical and mental health professional associations agree." *Id.* Defendants offer no rebuttal.

Defendants also cite *L.W.*'s statement that "[t]ransgender status [] is not characterized by a specific defining feature, but instead may be said to include 'a huge variety of gender identities and expressions.'" Opp. at 36 (citing *L.W.*, 83 F.4th at 487). But neither Defendants nor Plaintiffs assert such a broad definition of "transgender." *See* Third Amend. Compl. ¶¶ 218–23.

The parties' definitions cover individuals that either *live or wish to live in* (according to Plaintiffs, Third Amend. Compl. ¶ 218) or *identify as* (according to Defendants, Tr. (Feb. 18, 2025) at 45) a sex different than their birth sex. These definitions are consistent with each other and with the American Psychological Association's definition of "transgender." *See* Dkt. 57-3 at 2. The Court finds that, as a class, transgender persons satisfy this factor.

### d. *Transgender Persons Constitute a Minority Lacking Political Power*

Defendants deem it "untenable" to claim that transgender persons cannot attract the attention of lawmakers, and they cite federal and state laws protecting transgender persons in the employment setting. Opp. at 36–37. They also claim that transgender persons "achieved at least some version of their desired military policy from the last two Democratic Administrations and can reasonably be expected to do so again from the next Democratic Administration." *Id.* at 36. Likewise, the Sixth Circuit has stated that it is "difficult to maintain that the democratic process remains broken on this issue today" in part because "[t]he President of the United States [Biden] and the Department of Justice support the [transgender] plaintiffs." *L.W.*, 83 F.4th at 487. But that support was new, and the Trump Administration quickly withdrew that support when it re-assumed office.[26]

The question, however, is not whether the political process is broken on any given day on a given issue. The question is whether transgender persons—who comprise approximately 0.6% of the adult population in the United States[27]—have been "relegated to such a position of

---

[26] *United States v. Skrmetti*, No. 23-477 (U.S. argued Dec. 4, 2024) (Feb. 7, 2025 Letter from Deputy Solicitor General).

[27] Grace Abels, *How many trans people are there in the U.S., and why do we overestimate it?*, PolitiFact (July 13, 2023), https://www.politifact.com/article/2023/jul/13/how-many-trans-people-are-there-in-the-us-and-why/.

political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). This Memorandum Opinion's sub-headings concerning military service alone answer it:

> Part I.A. Obama—Transgender Persons Can Serve
> Part I.B. Trump I—Transgender Persons Cannot Serve
> Part I.C. Biden—Transgender Persons Can Serve
> Part I.D. Trump II—Transgender Persons Cannot Serve.

Being kicked around like a football by whatever team has possession is the opposite of meaningful political power. The Court finds that transgender persons, as a class, satisfy this factor.

### 3.    *Application of Intermediate Scrutiny*

Intermediate scrutiny is a "demanding" standard. *VMI*, 518 U.S. at 533. The burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *Id.* The Government must show "that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (cleaned up). The justification for a law that discriminates against a quasi-suspect class "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* "And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

Defendants suggest that "ample evidence supports the military's judgment on this issue." Opp. at 40. They divide their evidence into three categories: (1) military readiness, (2) unit cohesion, good order, and discipline, and (3) disproportionate costs. Below, the Court addresses the lack of any connection between Defendants' evidence and the Military Ban's directives. In a separate section below, *see infra* Analysis II.C., the Court finds that the Military Ban is littered

with animus and pretext.  That discussion is equally applicable in assessing why the Military Ban does not survive intermediate scrutiny.

### a.    *Military Readiness*

Defendants first argue that DoD "is concerned about subjecting those with a history of gender dysphoria to the unique stresses of military life."  Opp. at 41.  They explain that "any mental-health condition characterized by clinically significant distress or impairment in functioning raises readiness concerns."  *Id.*  And because there is an "absence of evidence on the impact of deployment on individuals with gender dysphoria," DoD "concluded that this condition posed readiness risks."  *Id.* (cleaned up).  Defendants also argue that "it remains the case that transition-related medical treatment . . . could render transitioning servicemembers non-deployable for a potentially significant amount of time," which could create "harmful effects on transitioning servicemembers' units as a whole."  *Id.* at 42–43 (cleaned up).

To support these conclusions, Defendants "expressly relied" on the 2018 Mattis Policy, the 2021 AMSARA Report, and the 2025 Medical Literature Review.  *Id.* at 41–44.  Not one of these supports a finding that the discriminatory means employed (banning transgender persons from serving) are substantially related to the achievement of the Ban's objectives (military readiness).  First, citing the Mattis Policy, Defendants claim that there is an "'absence [of experience] on the impact of deployment on individuals with gender dysphoria.'"  *Id*. at 41 (quoting Mattis Policy at 39).  Therefore, gender dysphoria "pose[s] readiness risks."  *Id.*  But there is no absence.  There *may* have been one *in 2018* when the Mattis Policy issued.  Since then, however, persons with gender dysphoria have been deployed under the Austin Policy.  *See supra* Background III.  That Defendants did not review the impact of their service does not mean it does not exist.

Second, the AMSARA Report supports *retaining* transgender persons in the military. *See* Dkt. 73-24 at 6. Of the eleven categories it studied, transgender persons' statistics were similar to or better than those for other servicemembers in ten. *Id.*; *see also* Tr. (Mar. 12, 2025) at 78. The Action Memo picked the one outlier: transgender persons are *evaluated* more. Tr. (Mar. 12, 2025) at 47. But their *occurrence* rates, including in psychotherapy and surgery, are similar. *Id.* at 68. Defendants' argument that the Report found that transgender persons' non-deployment rates were unacceptable is incorrect. The Report expressly found that more study was needed before anyone could reach such a conclusion because comparator data for other servicemembers had not been collected. Dkt. 73-24 at 6.

Third, the 2025 Medical Literature Review does not include studies that address military servicemembers. It therefore does not study the effect of service on active-duty transgender servicemembers, all of whom have met the military's mental fitness requirements to accede. *See* Tr. (Mar. 12, 2025) at 130. Indeed, Defendants cite no contemporaneous support for their purported concern that those with a history of gender dysphoria are more prone to the unique stresses of military life. To the contrary, the Review confirms that—contrary to the presumption that those who have ever had gender dysphoria cannot serve—gender dysphoria is highly treatable. *See* Dkt. 73-25 at 4–6.

Plaintiffs, for their part, have provided evidence that disproves any relation between the Military Ban's methods and goals. Five military leaders in charge of implementing the Austin Policy each conclude that the Austin Policy was "based on years of thoughtful policymaking supported by peer-reviewed scientific research" and that it "has resulted in a stronger, not a weaker military." Dkt. 72-69 ¶ 34. Based on their first-hand knowledge, they each also testify that the Austin Policy "fosters openness and trust among team members, thereby enhancing unit

cohesion." Dkt. 72-74 ¶ 13; *see also* Dkt. 72-72 ¶ 9. They testify that the Military Ban—not the Austin Policy—"is harmful to the military" and "undermines unit readiness." Dkt. 72-59 ¶ 38; *see also* Dkt. 72-72 ¶ 21 ("[A] prohibition on service by transgender individuals would degrade military readiness and capabilities."). Other than a limited foundation objection as to one declarant, Defendants do not rebut this testimony.

### b.    Unit Cohesion, Good Order, and Discipline

Defendants further contend that "DoD reasonably determined that exempting individuals with gender dysphoria who have undergone gender transition or seek to do so from the military's sex-based standards would undermine good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality." Opp. at 45 (cleaned up). They speculate that "a contrary approach would risk, among other things, eroding reasonable expectations of privacy by other servicemembers." *Id.* (cleaned up). Defendants also assert that "DoD has expressed concerns that exempting servicemembers from sex-based standards in training and athletic competitions on the basis of gender identity would generate perceptions of unfairness in the ranks." *Id.* at 47. And per Defendants, "DoD is also concerned that exempting servicemembers from uniform and grooming standards based on gender identity would create friction in the ranks." *Id.*

These justifications fail. To start, the Military Ban covers those who even "exhibit symptoms *consistent with*[] gender dysphoria." Hegseth Policy at 1 (emphasis added). Because it has no guard rails—*i.e.*, what these symptoms include, how often they can be exhibited, who decides whether they are being exhibited, Def. Concession Tr. (March 12, 2025) at 14–15—this exclusion is so broad as to capture persons who have never had gender dysphoria, and therefore do not even possibly present the same "concerns."

60

Defendants again rely almost exclusively on the Mattis Policy.  Opp. at 45–49.  But, yet again, the Mattis Policy is woefully stale.  *See supra* Findings of Fact II.B.1.  Further, the Military Ban's justifications impermissibly rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females."  *VMI*, 518 U.S. at 533.  They also impermissibly rely on not only overbroad, but also derogatory generalizations about the different talents, capacities, or preferences of transgender persons.  Such overbroad generalizations do not suffice to show that a sweeping discriminatory ban is substantially related to military readiness and unit cohesion.

Even if the Military Ban had focused solely on those diagnosed with gender dysphoria, Defendants do not identify any problem that needs a new solution.  Appropriate treatment for gender dysphoria is both "effective" and "no more specialized or difficult than other sophisticated medical care the military system routinely provides."  Dkt. 32-2 at 6, 9, 15.  The 2025 Medical Literature Review the Action Memo cites concludes that gender-affirming medical care is highly effective.  *See supra* Findings of Fact II.B.3.  And recall that already under DoD Instruction 6130.0 (Medical Standards for Appointment, Enlistment, or Induction into the Military Services), individuals with a history of gender dysphoria seeking to enlist must be "stable" in their gender identity for 18 months before enlistment.  Third Amend. Compl. ¶ 263.  Defendants do not explain why addressing a *treatable* condition requires excluding all persons who have ever had—or even exhibited symptoms of—it.  Nor do they explain why the constraint already in place, 18 months of stability, is insufficient.

These overbroad generalizations are also contradicted by the Record.  Plaintiff Talbott testifies: "In each military setting I have worked in so far—basic training, Officer Candidate School, and my Reserve unit—I have been open about my transgender status and have felt

welcomed by my peers and supervisors." Dkt. 72-18 ¶ 18. Plaintiff Vandal testifies that after

coming out she "received nothing but support and acceptance from my command and others who

learned I was transgender. Since then, I have been promoted to my current rank of Major." Dkt.

72-20 ¶ 14–15. Plaintiff Herrero testifies: "The support of my leaders, peers, and subordinates

throughout my transition has not only made our units stronger but has also made me a more

effective leader." Dkt. 72-25 ¶ 16. Plaintiff Danridge testifies: "In my time as both a Reservist

and on active duty, my transgender status has rarely come up and has never been an issue. In

fact, I received overwhelming support from my unit's Commanding Officer to apply for

OCS." Dkt. 72-28 ¶ 24.

This testimony—which Defendants do not rebut—is a credit to the military's ability to

welcome all those capable of serving. Indeed, had Defendants conferred with transgender

servicemembers and those who serve with them, instead of making specious generalizations,

they might have learned that the Military Ban is little more than a solution in search of a

problem.

### c.    *Disproportionate Costs*

Defendants argue that "DoD reasonably concluded that its disproportionate expenditures

on facilitating gender transition should be better devoted elsewhere." Opp. at 50. They explain

that "between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service

members to treat gender dysphoria" and that "medical costs for servicemembers with gender

dysphoria was nearly three times compared to servicemembers without this condition." *Id.* at 49.

To support this "three times" conclusion, Defendants rely on the Mattis Policy's

assessment of costs from the time before the Carter Policy was instituted through to the issuance

of the Mattis Report (2014 to 2018). Dkt. 73-8 at 46. But the Mattis findings show that costs

spiked after the military first began covering gender-affirming costs in September 2015, no doubt

because of pent up demand.  Dkt. 38-4 at 32.  They began returning to baseline thereafter.  *Id.*

That trend indicates two things.  First, the Mattis Policy findings are outdated.  Second, costs are

likely no longer disproportionate.  This is confirmed by the AMSARA Report's findings that

occurrence rates for common medical events are similar between transgender and non-

transgender service members.  Dkt. 73-24 at 4.

      As discussed in the Findings of Fact, Defendants cannot explain how transgender care

has resulted in "disproportionate" costs for the military.  *See supra* Findings of Fact II.B.4.

When asked to provide the overall medical, psychotherapy, and surgical costs for all

servicemembers so that some comparison could be made, Defendants could not answer.  *See* Tr.

(Mar. 12, 2025) at 144–50.   Without any source of comparison or benchmark, Defendants

cannot claim that allowing transgender persons to serve results in "disproportionate" costs for the

military.

### d.     *The Hegseth Policy's Exemption Provision*

      Defendants contend that the Hegseth Policy's exemption provision addresses any

potential issue.  Opp. at 22–23.  Hardly.  Transgender servicemembers can obtain an exemption

if they show that they can safely perform all military tasks, and if retaining the servicemember

would support warfighting capabilities.  Hegseth Policy at 8.  Even then, the transgender person

can only continue to serve if: (1) they have been stable in their birth sex for 36 consecutive

months, (2) they have never transitioned *or even attempted to transition* to any sex but their birth

sex, and (3) they agree to serve in their birth sex.  *Id.*  Under this test, none of the Plaintiffs

would be eligible for an exemption.  Indeed, it is hard to imagine anyone who could or, given the

constraints, would want to do so.  Even with this non-exemption exemption, the Military Ban is

not even remotely, much less rationally or substantially, related to the Government's goals.  *See supra* Findings of Fact II.

The Military Ban also prohibits the use of "invented" pronouns used to "identify" persons because they too are inconsistent with military readiness.  EO14183 § 4(b).  This assertion makes no sense as written—all pronouns are invented and used to identify persons.  That aside, Defendants could not even begin to identify how pronoun usage affects military readiness.  Tr. (Mar. 12, 2025) at 198.  The Court gave Defense counsel the opportunity to present a witness— any witness—to state under oath that it does.  *Id.*  None materialized.

* * * * *

Defendants have articulated important government objectives in military readiness, unit cohesion, and saving costs.  But the Fifth Amendment requires more than pointing to such "broadly formulated interests."  *Singh*, 56 F.4th at 97.  Defendants must show that the discriminatory Military Ban is in some way substantially related to the achievement of those objectives.  And they must do so without relying on "overbroad generalizations about the different talents, capacities, or preferences of males and females."  *VMI*, 518 U.S. at 538.  They do not come close.  Plaintiffs are likely to succeed on their claim that the Military Ban fails intermediate scrutiny review.

### C.    Animus

In our constitutional republic, citizens are free to hold and express divergent views.  But when "sincere, personal opposition [to a group of people] becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied."  *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).  Such is the case here.  The Military Ban is soaked in animus and dripping

with pretext.  Its language is unabashedly demeaning, its policy stigmatizes transgender persons as inherently unfit, and its conclusions bear no relation to fact.  Thus, even if the Court analyzed the Military Ban under rational basis review, it would fail.

### 1.    The Military Ban Is Fueled by Animus

Plaintiffs contend that because the Military Ban is fueled by animus, it fails any level of scrutiny.  They stand on solid legal ground.  *Romer v. Evans*: a law that "seems inexplicable by anything but animus toward the class it affects [] lacks a rational relationship to legitimate state interests."  517 U.S. 620, 632 (1996).  *Lawrence v. Texas*: "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause."  539 U.S. 558, 583 (2003) (O'Connor, J., concurring).  *United States v. Windsor*:  legislation intended to "injure," "stigma[tize]," "demean," and "degrade" does not survive scrutiny.  570 U.S. 744, 769, 770, 772, 774 (2013).  *Cleburne*: a law that "rest[s] on irrational prejudice" cannot stand.  473 U.S. at 450.  And *U.S. Dep't of Agric. v. Moreno*: "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  413 U.S. 528, 534 (1973).

Defendants respond that the Court cannot probe "government officials' subjective intentions."  Dkt. 38 at 27.  True, the Court cannot read minds.  But it can read.  EO14183 and the Hegseth Policy tag transgender persons as weak, dishonorable, undisciplined, boastful, selfish liars who are mentally and physically unfit to serve.[28]  Its accompanying Fact Sheet piles on, further calling transgender persons insane, not resilient, unhealthy, and unfit.  Dkt. Notice (Mar. 7, 2025).  Hardly subtle.  Refusing to give up the ghost, however, Defendants refused to

---

[28] The Court reaches this conclusion by mirroring the Ban's language.  For example, in stating that transgender persons cannot maintain discipline, the Ban necessarily asserts that transgender persons are undisciplined.

answer whether this language evinces animus.  Tr. (Feb. 18, 2025) at 155–56; *see also id.* at 154–59; Tr. (Mar. 12, 2025) at 192.  But the Court has no such problem.  It finds that the Military Ban's language evinces the "bare…desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534.

Faced with incontrovertible facts, Defendants do not contend that the Military Ban is an animus-free zone.  They argue instead that the Military Ban must be impossible to justify based on anything but animus to be unconstitutional.  Tr. (Feb. 19, 2025) at 63–64, 87.  "If," Defendants claim, "there is a facially legitimate, bona fide reason, then perceived animus is not a ground on which the courts can second-guess the political branches in the national security space."  *Id.* at 90.  Defendants have not provided a legitimate reason for banning all transgender troops.

That aside, animus alone has never been the standard.  The Colorado law at issue in *Romer*, for example, prohibited the state or any municipalities from enacting laws designed to protect members of the LGBTQ community.  517 U.S. at 624.  The state offered a legitimate, bona-fide reason for the law: "respect for other citizens' freedom of association."  *Id.* at 635. Nonetheless, because the "breadth of the amendment [wa]s so far removed from these particular justifications," the Supreme Court "f[ou]nd it impossible to credit them."  *Id.*  Thus, even though the state alleged a legitimate interest, the Court held that the law "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else."  *Id.*  The Military Ban does the same.

The Military Ban is also unique in its unadulterated expression of animus—an expression of animus that no law the Supreme Court has struck down comes close to matching.  Though the law at issue in *Romer* directly addressed "homosexuals," it did not include any demeaning or

66

derogatory language.  *Id.* at 624.  In *Cleburne*, a Texas city required a special permit for "hospitals for the insane or feeble-minded," but the zoning ordinance said nothing about the character of mentally ill persons.  473 U.S. at 436.  The provision at issue in *Moreno*, which involved a challenge to a food stamp restriction aimed at hippies, required only that food stamp recipients living in the same household be related.  413 U.S. at 531.  Even the Defense of Marriage Act was silent as to any negative stereotypes or generalizations about gay people.  *Windsor*, 570 U.S. at 752.  Yet the Supreme Court struck down each of these laws.

Defendants also argue that once the government identifies a legitimate interest, a court's inquiry stops.  Tr. (Feb. 18, 2025) at 158–59; Tr. (Feb. 19, 2025) at 63–64.  Not so.  The city in *Cleburne* argued that the special permit requirement was related to its interest in "the safety and fears of residents in the adjoining neighborhood."  473 U.S. at 437.  These safety concerns were not entirely unfounded—the city was worried about "negative attitudes" of local property owners, the location of the mental institution near a school, fire hazards, and traffic congestion.  *Id.* at 448–50.  But the Supreme Court did not simply take the city at its word.  Instead, it found that these rationales "fail[ed] rationally to justify" the special permit restriction.  *Id.* at 450.

The *Moreno* Court scrutinized the government's stated interest even further.  The government maintained that the food stamps restriction was meant to minimize fraud.  *Moreno*, 413 U.S. at 535.  But the Supreme Court noted that there were already provisions in place to minimize fraud, and whatever fraud did occur was subject to criminal prosecution.  *Id.* at 536.  Thus the Court had "considerable doubt" that the restriction was "rationally . . . intended to prevent those very same abuses."  *Id.* at 537.

Peeling back other stated rationales of the Military Ban reveals pretext for animus.  To start, Defendants concede that DoD has never identified any "mental health constraint" other

than gender dysphoria that is wholly inconsistent with characterizations such as "honesty, humility, and integrity" and therefore with military service.  Dkt. 66 at 3.  Moreover, current military policies already address gender dysphoria.  *See* Dkt. 72-67 (DoDI 6130.03, Vol. 2); DoDI 6130.03, Vol. 1 at 6.28(t).  If gender dysphoria were a genuine concern, the Policy would cover a narrow set of individuals with gender dysphoria.  Instead, the Policy reaches everyone who has ever "exhibit[ed] symptoms consistent with[] gender dysphoria."  Hegseth Policy at 3. Because this "breadth" is "so far removed" from military health concerns, it is "impossible to credit" Defendants' justifications.  *Romer*, 517 U.S. at 635.

Defendants claim more generally that the Ban is needed because every servicemember must meet the military's rigorous physical and mental fitness requirements.  *See* Dkt. 72-67; Dkt. 72-82 ¶ 20.  But such standards are already in place, and each active-duty Plaintiff already meets them.  *See, e.g.*, Dkt. 72-27 ¶ 4 ("I meet all standards applicable to male service members."); Dkt. 72-58 ¶ 18 ("I meet all standards applicable to female service members."); Defs. Concession, Tr. (Mar. 12, 2025) at 130.  And if the concern were genuine, the Policy would permit waivers for anyone who could demonstrate an "ability to safely complete common military tasks at a general duty level."  DoDI 6130.03, Vol. 2, at 3.2(a).  Or, to use the Policy's own language, it would allow for waivers "provided there is a compelling Government interest in retaining the Service member that directly supports warfighting capabilities."  *See* Hegseth Policy at 4.  So, like in *Moreno*, the Court has "considerable doubt" that this rationale is driving the Military Ban.

If the fitness concern were genuine, the Policy would also be limited to addressing health concerns.  Yet the Policy makes some assertions that can be explained only by pretext, *e.g.*, that pronoun usage in some (still unfathomable) way impacts military readiness.  *Id.* at 3.  Defendants

68

also make a passing reference that the military must address suicide ideation.  Fair, but again, the military already bars individuals with suicidality from enlisting.  *See* DoDI 6130.03, Vol. 1, at 6.28(m).  Additionally, if the health concern were genuine, the Policy would apply to all people who have received any kind of hormone therapy or genital reconstruction surgery.  But it does not.  It applies only to those who have received such care "as treatment for gender dysphoria or in pursuit of a sex transition."  Hegseth Policy at 6; *see also* Defs. Concession, Tr. (Mar. 12, 2025) at 120.

Defendants claim the Military Ban is necessary to ensure all servicemembers' privacy, such as in sleeping and showering arrangements.  *See* Hegseth Policy at 4.  If this concern were genuine, barrack assignments would be based on anatomical (phenotypic) sex, not reproductive (gonadal) sex.  For intersex individuals, who can present in about forty different ways,[29] the two are not necessarily aligned.  A person with ovotestes has both ovarian and testicular tissue and so presumably could not be assigned to either male or female barracks, regardless of their anatomical sex.[30]  A person with male genitalia but female reproductive anatomy would be put in female barracks, undoing the very privacy concern the Military Ban purports to address.[31]  And how will the military assure persons are tucked away in barracks without causing "privacy" concerns?  Presumably, by looking at them.  So why not base barrack assignments on anatomical

---

[29] The Cleveland Clinic's intersex internet page addresses some of these presentations. *Intersex*, Cleveland Clinic (last visited Mar. 16, 2025), https://my.clevelandclinic.org/health/articles/16324-intersex.

[30] *Id.*

[31] To be sure, being intersex is rare—about 1.7% of the U.S. adult population.  But then again, being transgender is more so—about 0.6% of the U.S. adult population.  *See* Rebecca Boone & Jeff McMillan, *How many transgender and intersex people live in the U.S.?*, US News (July 27, 2023, 10:31 AM), https://apnews.com/article/how-many-transgender-intersex-laws-0218b75a197f07d8c51620bb73495d55.

sex?  Because doing so would not exclude transgender persons from serving.[32]

Lastly, Defendants' cost concerns make clear that the Ban is purposely targeting transgender individuals.  As discussed, the cost of medical care for transgender troops is de minimis.  *See supra* Findings of Fact II.B.4.  And Defendants have not explained why *these* costs are of more concern than other costs.  "Many service members receive medical care for far more common medical conditions, at a far greater cost and with a significant impact on the military budget."  Dkt. 72-76 ¶ 13.  For example, Viagra cost the DoD $41,000,000 in 2023 alone— nearly eight times what the DoD spends on transgender medical care each year.  *See* Dkt. 72-68 ¶ 9.  Additionally, "the same medications (hormone therapies) and surgeries (mastectomies, hysterectomies, genital reconstruction)" that Defendants claim are too costly "are provided to non-transgender service members."  Dkt. 72-78 ¶ 65.  But the Hegseth Policy does not ban those treatments.  So why pay for hormone therapy for some servicemembers but not others?  Because the Policy clearly targets *transgender* medical care costs.  It "rest[s] on irrational prejudice." *Cleburne*, 473 U.S. at 450.

### 2.    *Defendants Misread* **Trump v. Hawaii** *Again*

Defendants rely on *Trump v. Hawaii* to argue that the Court must defer to the military even if it finds the military ban is fueled by animus.  They assert that because the government has offered what—on their face—appear to be legitimate reasons for the ban (*i.e.*, troop readiness and unit cohesion), the Court must uphold the Ban.  Opp. at 50–54.

---

[32] Courts have rejected privacy as a rationale for discrimination against transgender persons. *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Grimm*, 972 F.3d at 613–14; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018).

As discussed above, this has never been the Supreme Court's approach in animus cases. The *Hawaii* Court cited *Moreno*, *Cleburne*, and *Romer* as examples of laws that could *not* "reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 585 U.S. at 705, 706. Yet the defendants in those cases did not fail to proffer independent justifications. Rather, the Supreme Court found those purported justifications to be lacking. *See supra* Analysis II.C.1. So, too, does this Court find Defendants' justifications empty.

Defendants further argue that, to find animus, the *Hawaii* Court required that a law be "inexplicable by anything but animus." Opp. at 51 (quoting *Hawaii*, 585 U.S. at 706). But this quote is inapposite for two reasons. First, this is not what the Supreme Court said. Rather, it concluded that the entry restriction proclamation "d[id] not fit the pattern" of previous animus cases because it was neither "impossible to discern a relationship to legitimate state interests" nor was it "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 706 (cleaned up). Thus, at the very least, the *Hawaii* Court offered two paths to a finding of animus: the lack of a relationship to a legitimate state interest or the inability to explain by anything but animus. *Id.* This Court, as discussed above, cannot conclude that the Military Ban is related to the government's interests in military readiness, unit cohesion, and cost reduction. So, applying the *Hawaii* Court's own language, Defendants' argument fails.

Second, even if a law *had to be* inexplicable by anything but animus, the Court here has no trouble finding that the Military Ban fits this description. To recap, the Military Ban: disqualifies all "[t]ransgender troops . . . without an exemption"; contains an exemption in name only; relies on derogatory generalizations Defendants concede are pure conjecture; reflects no study of the service of transgender persons since 2021 and instead relies on "predictions" made

in 2018; egregiously misquotes studies and ignores data supporting service by transgender persons; asserts "justifications" untethered to fact except insofar as Defendants' own evidence contradicts them; and bans certain medical treatments only when prescribed to transgender individuals.  The Court could go on.  Suffice it to say, at this early stage, Plaintiffs are likely to prevail on their claim that the Military Ban is driven exclusively by animus.

### 3.    *The Government Has Targeted Transgender Persons Writ Large*

The Court could stop here in its analysis and comfortably conclude that Plaintiffs are likely to succeed on their claim that the Military Ban is motivated by animus and is not tailored to meet its stated goals.  But, as they say, there is more, for the Military Ban does not stand alone.  President Trump has signed an executive order recognizing the existence of only two sexes;[33] blocked schools from using federal funds to promote the idea that gender can be fluid;[34] directed the State Department to stop issuing documents that allow a third "X" gender marker;[35] changed references to "LGBTQI+" on government websites to "LGB," erasing not just transgender persons, but intersex people as well;[36] revoked the ability of transgender federal employees to receive gender-affirming care;[37] and directed that all incarcerated transgender

---

[33] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[34] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

[35] Shannon K. Kingston & Kiara Alfonseca, *State Department Halts 'X' Passport Gender Marker Applications*, ABC News (Jan. 24, 2025, 11:27 AM), https://abcnews.go.com/US/state-department-halts-passport-gender-marker-applications/story?id=118062178.

[36] Dkt. 74-8 at 8.

[37] *See* Lauren Clason, *Trump EOs Cast Doubt on Benefits for Transgender Federal Workers*, Bloomberg Law (Jan. 31, 2025, 10:38 AM), https://news.bloomberglaw.com/daily-labor-report/trump-eos-cast-doubt-on-benefits-for-transgender-federal-workers (discussing President Trump's revocation of Biden-era executive orders that expanded federal employee health coverage for gender-affirming care).

persons be denied medical treatments and be housed by birth sex,[38] where they are nine times more susceptible to violence.[39]

The Office of Personnel Management has issued a memo directing all agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology,"[40] resulting in vital Centers for Disease Control pages on contraception guidelines, vaccine information, and HIV data, among some 8,000, being taken down.[41]  The Office of Management and Budget—following the President's directives—issued a memo promising to stop the use of federal funds to promote "transgenderism."[42]

The federal government removed all references to LGBTQ+ youth from the website for the National Center for Missing and Exploited Children, including a page on the suicide rates of missing children and one on male victims of sex trafficking.[43]  It also removed references to LGBTQ+ youth from stopbullying.gov, including a 2016 study that showed the disproportionate rates at which LGBTQ+ students are bullied and a tipsheet on how to prevent such discrimination in schools.[44]  Apparently, bullying and exploiting children is okay if they are gay,

---

[38] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[39] Nora Neus, *Trans women are still incarcerated with men and it's putting their lives at risk*, CNN (June 23, 2021, 2:54 PM), https://www.cnn.com/2021/06/23/us/trans-women-incarceration/index.html.

[40] U.S. Off. of Pers. Mgmt., Initial Guidance Regarding President Trump's Executive Order *Defending Women* (Jan. 29, 2025).

[41] Dkts. 74-2, 74-7, 74-8.

[42] Matthew J. Vaeth, Off. of Mgmt. & Budget, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025).

[43] Dkt. 74-3 at 4.

[44] Dkt. 74-8 at 8.

transgender, or intersex.  And the National Park Service removed references to "transgender" from its webpage about the Stonewall National Monument.[45]

This Court does not opine on the constitutionality of these actions.  That said, the flurry of government actions directed at transgender persons—denying them everything from necessary medical care to access to homeless shelters—must give pause to any court asked to consider whether one such order under review furthers a legitimate government interest free of animus.

## III.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Irreparable harm is "a high standard."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The harm "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Id.* (cleaned up).  But it must also be "beyond remediation," meaning "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).

Plaintiffs readily meet these criteria.  "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (cleaned up).  Suits

---

[45] *Id.* at 4.  Stonewall Inn is a bar in New York City where LBGTQ+ rioters, including trans activists, sparked the gay rights movement.  Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025, 12:52 PM), https://www.npr.org/2025/02/14/g-s1-48923/stonewall-monument-transgender-park-service. The Stonewall Uprising "is regarded as a turning point in sparking a nationwide movement for the equal treatment of gay, lesbian, bisexual and transgender Americans."  *Id.*  To stress how ahistorical this change is, the Wikipedia page for Stonewall uses the word "transgender" (or its variations) fifty-three times.  *Stonewall riots*, Wikipedia, https://en.wikipedia.org/wiki/Stonewall_riots (last visited Mar. 13, 2025).

involving "the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). Separately, all transgender servicemembers suffer from the irreparable reputational stigma the Military Ban espouses and forced separation from their positions. *See Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (reputational harm is irreparable); *McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998) (irreparable harm in military context); *Elzie v. Aspin*, 841 F. Supp. 439, 443 (D.D.C. 1993) (same).

Plaintiffs also allege that their removal from military service would deprive them of steady income and medical care and that the order brands them as less capable solely because of their transgender status. Dkt. 72-1 at 75. Courts in this District have held such losses to be irreparable harms. *See McVeigh*, 983 F. Supp. at 221 (finding that the loss of "benefits attendant with being a Naval officer" constituted irreparable harm); *Elzie*, 841 F. Supp. at 443 (finding that a Marine suffered irreparable harm when he was "labeled as unfit for service solely on the basis of his sexual orientation").

## IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS

The final two factors—the balance of equities and the public interest—favor Plaintiffs. The balance of equities weighs the harm to plaintiffs absent a preliminary injunction against the harm to defendants if the court grants the motion. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). When the government is a party to the case, as it is here, this balancing test and the public interest merge into one factor. *Id.* ("the government's interest *is* the public interest").

Defendants will not suffer any harm if this Court grants the preliminary injunction.  In

*Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court emphasized the deference

afforded to the judgment of military officials "concerning the relative importance of a particular

military interest."  *Winter*, 555 U.S. 7, 24 (2008) (cleaned up).  In finding that the balance of

equities and consideration of the public interest "tip[ped] strongly in favor of the Navy," the

Court gave significant weight to officers' statements regarding the burden a preliminary

injunction would place on the Navy's ability to conduct training exercises and the resulting

adverse impact on national security.  *Id.* at 24–26.

Defendants have provided no testimony.  That is most likely because no such burden

exists here.  Granting the preliminary injunction would maintain the status quo of policies that

have governed the military for years.  *See* Dkt. 72-1 at 12–15, 28.  The accession policy has been

in place since 2021, *id.* at 14–15, and the retention policy has been in place for nearly a decade

(though it was interrupted by the first Trump Administration's Mattis Plan), *id.* at 2–6, 28.  The

Military Ban does not cite, and Defendants have not provided, any studies or declarations that

explain why maintaining the status quo pending litigation would unfairly burden the military.

In contrast, Plaintiffs will be subject to the irreparable harm discussed above absent a

preliminary injunction.  And absent one, Plaintiffs will also face significant hardship because the

Military Ban puts to them a Hobson's choice[46]: either immediately conform with the grooming

and appearance standards for their birth sex or choose separation, either voluntarily or by

removal proceedings.  Dkt. 72-1 at 74.  Since Plaintiffs cannot physically conform to those

---

[46] A "Hobson's choice" is a free choice in which there is only one real option.  The term traces its origin to Thomas Hobson, a sixteenth-century English stable owner who notoriously offered his customers a "choice" of taking the horse closest to the door (so all would get equally used) or leaving without a horse—essentially, no choice for those who needed a horse.  *See* H.W. Fowler, *Hobson's Choice, in The King's English* 203 (2d ed. 1908).

standards and would have to do so against medical advice even if they could, they have no

choice but to separate.  *See, e.g.*, Dkts. 72-19 ¶ 8; 72-22 ¶ 6; 72-24 ¶ 6.  This then puts to

Plaintiffs a Sophie's choice.[47]  If they separate voluntarily, they will leave a career that they have

no desire to end.  If they opt for removal proceedings, they may be discharged dishonorably and,

per the Hegseth Policy, will be required to repay the military their bonuses and other amounts.

Hegseth Policy at 7; Dkt. 79-1 at 7.  Permitting the Hegseth Policy to remain in place during

litigation, therefore, will work an obvious hardship to the Plaintiffs.

    Public interest considerations also support granting the preliminary injunction.  For one

thing, "[e]nforcement of an unconstitutional law is always contrary to the public interest."

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).  As discussed above, Plaintiffs have

shown they are likely to succeed on their Fifth Amendment claim.  And Plaintiffs point to

potential harm to military cohesion and capability should the ban go into effect.  Dkt. 72-1 at 75.

    Plaintiffs have carried their burden under all four preliminary injunction factors by

showing their likely success on the merits, the threat of irreparable harm, and that the public

interest and equities support an injunction.

## SCOPE OF THE INJUNCTION

    Considering the full Record and for the reasons stated above, the Court hereby **GRANTS**

Plaintiffs' Renewed Application for Preliminary Injunction.  The Court details the scope of the

injunction in the Order that accompanies this Opinion.  On its own motion, the Court stays this

---

[47] A "Sophie's choice" is a dilemma between two equally devastating options.  In the novel
*Sophie's Choice*, a camp doctor at Auschwitz makes Sophie choose which of her two children
would be gassed and which would live.  Sophie chooses to save her son, Jan, so that the family
name can continue through him.  She releases her daughter, Eva, and watches as she is taken
away to be killed in a gas chamber.  Sophie, unable to live with the guilt, later commits suicide.
*See* William Styron, *Sophie's Choice* (Random House 1979).  So, not a pick-me-up.

injunction until March 21, 2025, at 10:00 am eastern, to provide Defendants time to consider filing a motion for an emergency stay in the D.C. Circuit.

Defendants claim that any injunction must be limited to the Plaintiffs. Opp. at 61. It cannot be, rationally or logistically. Other transgender servicemembers face the same irreparable harms as Plaintiffs. Any transgender person affected by the Ban would need only to file a "me too" complaint in this Court to obtain the same relief. The Court and Defendants then would have to deal with a never-ending conveyor belt of claims. A limited injunction would also cause havoc for the Armed Forces. Some transgender persons would be permitted to serve and accede, others would not. Depending on what happened at the permanent injunction phase, one group or the other would be affected. Superiors and colleagues would need to keep track of ongoing litigation docket updates to understand who was covered. Notably, the government has reiterated that "uniformity" is one of the key goals of the Military Ban multiple times throughout this litigation. *See* EO14183 § 2; Hegseth Policy at 3; Action Memo at 2.

## CONCLUSION

The Court knows that this opinion will lead to heated public debate and appeals. In a healthy democracy, both are positive outcomes. We should all agree, however, that every person who has answered the call to serve deserves our gratitude and respect. For, as Elmer Davis observed, "[t]his nation will remain the land of the free only so long as it is the home of the brave."

78

The Court extends its appreciation to every current servicemember and veteran.  Thank you.

Date: March 18, 2025

_____
ANA C. REYES
United States District Court Judge

79

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT, et al,

      *Plaintiffs*,

    v.

UNITED STATES, et al,

      *Defendants*.

Civil Action No. 25-cv-00240 (ACR)

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants ask the Court to dissolve, or stay pending appeal, the preliminary injunction it entered on March 18, 2025.[1]  Dkt. 91 (Motion to Dissolve (Mot.)).  They claim that a newly-issued guidance document—the Military Department Identification Guidance, Dkt. 91-2 (MDI Guidance)—presents a significant change in fact.  *Id.* at 3.  This change, they contend, shows that the Court's Preliminary Injunction Opinion (Op.) is incorrect.  *Id.*

The MDI Guidance is new, but Defendants' argument is not.  Defendants re-emphasize their "consistent position that the [Hegseth] Policy is concerned with the military readiness, deployability, and costs associated with *a medical condition*."  *Id.* (emphasis added).  Regulating gender dysphoria is no different than regulating bipolar disorder, eating disorders, or suicidality.  The Military Ban regulates a medical condition, they insist, not people.

And therein lies the problem.  Gender dysphoria is not like other medical conditions, something Defendants well know.  It affects only one group of people: all persons with gender

---

[1] The Court assumes the reader is familiar with its March 18, 2025 Opinion.  For those who are not, it is available on the public court docket at 25-cv-00240, Dkt. 89.  The Court recycles here the defined terms it used in the Opinion.

1

dysphoria are transgender and only transgender persons experience gender dysphoria. Defs. Concession Tr. (Mar. 21, 2025) at 23–24. Does this mean that all transgender persons have gender dysphoria? No, of course not. But it does mean that when Defendants regulate gender dysphoria, they knowingly and necessarily regulate only transgender persons.

Defendants try to obfuscate this key point at every turn. The Department of Defense (DoD) and Secretary of Defense publicly announced that the Military Ban disqualifies all "transgender troops"? No, they were using "shorthand" for gender dysphoria. Defendants accused transgender persons of inherently lacking honor, truthfulness, and discipline? No, they accused gender dysphoria of having those mission-endangering attributes. The military plans to discharge thousands of transgender troops who have made "America safer"? No, the military plans to discharge gender dysphoria. Total coincidence that gender dysphoria only afflicts transgender people.

This litigation is not about a medical condition. A medical condition has not given its country decades of military service. Or deployed into combat zones throughout the globe. Or earned countless commendations. People have. A medical condition has not fought terrorism. Or analyzed intelligence. Or commanded platoons. People have. A medical condition has not been accused of lacking warrior ethos. Or been branded dishonorable, dishonest, and undisciplined. Or been threatened with the loss of livelihood. People have. Transgender *people.*

Defendants' arguments did not sway the Court before; regurgitating them with the MDI Guidance is equally unpersuasive. The Court **DENIES** the Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal. The Court, on its own motion, stays its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

**BACKGROUND**

On March 18, 2025, the Court granted Plaintiffs' Renewed Application for Preliminary Injunction, Dkt. 72, and enjoined Defendants from implementing Executive Order No. 14183 and the Additional Guidance on Prioritizing Military Excellence and Readiness, Dkt. 63-1, as well as any other policies issued pursuant to the Military Ban. Dkts. 88, 89. Three days later, Defendants filed a Motion to Dissolve the Preliminary Injunction. Dkt. 91. They argue that the MDI Guidance issued by DoD's Office of the Under Secretary of Defense for Personnel and Readiness on March 21, 2025 constitutes a "significant change either in factual conditions or in law." Mot. at 3 (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)).

Defendants claim that "the [Hegseth] Policy presumptively barring individuals from serving in the military turns on gender dysphoria—a medical condition—and does not discriminate against trans-identifying persons as a class." *Id.* at 2. In support, Defendants cite to the MDI Guidance. *See id.* at 3.

In the MDI Guidance, Defendants define—for the first time—the criteria in the Hegseth Policy, "exhibit symptoms consistent with gender dysphoria."[2] MDI Guidance at 1. In a footnote, the MDI Guidance states that the phrase "refers to the diagnostic criteria outlined in the Diagnostic and Statistical Manual of Mental [(DSM-V)] Disorders" for gender dysphoria and "applies only to individuals who exhibit such symptoms as would be sufficient to constitute a diagnosis (i.e., a marked incongruence and clinically significant distress or impairment for at least 6 months)." *Id.* The MDI Guidance attaches the DSM-V criteria. Dkt. 92-2.

---

[2] To avoid wordiness, the Court refers to this phrase as "the Symptoms Criteria." Because Defendants' Motion concerns the definition of this phrase, the Court only includes the additional criteria "current diagnosis or history of gender dysphoria," as necessary.

3

The MDI Guidance explains that the "primary means" military leaders will use to identify servicemembers who meet the Symptoms Criteria "will be through reviewing medical records." MDI Guidance at 1. To this effect, the MDI Guidance reminds the Secretaries of each Military Department of their "authority to direct unit commanders, in coordination with supporting medical assets, to require that all Service members comply with their obligations." *Id.* at 2. Service members must complete a Periodic Health Assessment (PHA) and report any "medical issues . . . that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service to their chain of command." *Id.*

Moreover, "[w]ithin 45 days" of March 21, 2025, each servicemember's reporting responsibilities will include attesting "whether they have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria." *Id.* "This attestation will be a standard part of the self-assessment done in conjunction with the annual PHA." *Id.* If a servicemember self-reports, "the facility or location conducting the PHA will be responsible for conducting or coordinating any follow-up medical evaluation, if necessary, and for notifying the Service member's command." *Id.* Each identified service member "*must* be categorized as 'Not Medically Ready' and non-deployable." *Id.* (emphasis added). They will be, consistent with new policies enacted by the Military Ban, "recommended for administrative separation or, where appropriate, enrolled in the Disability Evaluation system (e.g., where a co-morbidity or other qualifying condition is present)." *Id.*

Defendants contend that this new guidance "confirms that the Court has misconstrued the scope of the DoD Policy," and they "move to dissolve the March 18, 2025, preliminary injunction." Mot. at 2–3. In the alternative, they ask the Court to stay its Order pending appellate review. *Id.* at 3–4.

## STANDARD OF REVIEW

A party seeking to dissolve a preliminary injunction must show "'a significant change either in factual conditions or in law'" that makes continued enforcement of the injunction "'detrimental to the public interest.'"  *Doe 2 v. Shanahan*, 755 F. App'x 19, 22 (D.C. Cir. 2019) (quoting *Horne*, 557 U.S. at 447).  The moving party "bears the burden of establishing that changed circumstances warrant relief."  *Am. Council of the Blind. v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (cleaned up).

## ANALYSIS

## I.     THE MDI GUIDANCE SUPPORTS PLAINTIFFS' CLAIM

Defendants' Motion ignores the MDI Guidance's objective.  The MDI Guidance's purpose is not to define the phrase "exhibit symptoms of gender dysphoria."  Indeed, the Guidance relegates that definition to a footnote.  *See* MDI Guidance at 1 n.2.  Its purpose, instead, is to guide military personnel on how to identify individuals to disqualify.

In civilian-speak, DoD plans to (1) assign people—they do not say who, but presumably some type of military gender police—to review medical files for signs of gender dysphoria, and (2) require each of the estimated 1.3 million active-duty servicemembers to attest—at least once a year—whether they exhibit symptoms of gender dysphoria and turn themselves in if they do.  Then DoD will discharge them.  *See supra* at 4.

5

Pause for a moment on this approach.  To target "a medical condition," Mot. at 3,

Defendants plan to:

1. address (unsubstantiated) military readiness, non-deployability, privacy, and cost concerns[3] by

2. diverting personnel away from performing "mission critical functions,"[4] and

3. having them instead rummage through *private* medical records,[5] and also by

4. requiring more than 1.3 million active-duty servicemembers to self-assess *every year* whether they have had, have, or exhibit symptoms of gender dysphoria,[6]

5. with the goal of identifying the less than two-thousand people who *might* have had, have, or exhibit symptoms of gender dysphoria,[7]

6. a mental condition that current military policies already address,[8]

7. and requiring that those servicemembers "*must* be categorized as 'Not Medically Ready' and non-deployable,"[9]

8. which will result in the mass discharge of thousands of servicemembers.[10]

Really.  This is not hyperbole.  This is the process the MDI Guidance requires.

So does the MDI Guidance support Plaintiffs or Defendants?  Well, let's Occam's razor

this.  What is the more straightforward explanation?  That the new guidance reveals the Hegseth

Policy for what it is: animus directed at transgender persons?  Or that experienced military

leaders acting in good faith have adjudged that ridding the military of the less than 2,000 persons

who *might* have gender dysphoria requires committing scarce, expensive resources to invading

---

[3] Op. at 57–63.

[4] Dkt. 66 at 2–3.

[5] MDI Guidance at 2.

[6] *Id.*

[7] Op. at 29 n.19.

[8] *Id.* at 61.

[9] MDI Guidance at 2.

[10] Op. at 30.

the privacy of the more than 1.3 million active-duty members who certainly do not—year after year?

If the MDI Guidance confirms anything, it confirms that the Hegseth Policy is not based on reasoned judgment.

## II.    THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S FACTUAL FINDINGS

### A.  The Court Correctly Construed the Scope of the Military Ban

Defendants mainly contend that the MDI Guidance's definition of Symptoms Criteria "confirms that the Court has misconstrued the scope of the [Hegseth] Policy." Mot. at 2–3. How? They do not say. They recite the Court's factual finding that "'the Hegseth Policy bans all transgender troops.'" *Id.* at 2 (quoting Op. at 20). And they state that the Court based this finding "on an interpretation of, among other things, the following language in the [Hegseth Policy]: 'Service members who have a current diagnosis or history of, *or exhibits symptoms consistent with*, gender dysphoria are disqualified from military service.'" *Id.* at 2 (cleaned up) (emphasis in original). That is it.

Hardly a silver bullet. Indeed, not a bullet at all. For reading the MDI Guidance in toto confirms the Court's findings that the Military Ban targets people, not a medical condition. Recall that EO14183 covered those "individuals with" gender dysphoria. 90 Fed. Reg. 8757 (Jan. 27, 2025). The Hegseth Policy extended the ban by adding the phrase "exhibit symptoms consistent with" gender dysphoria. Dkt. 63-1 at 1, 3, 5, 6–9. The MDI Guidance in turn explains that this phrase covers persons whom no one has previously diagnosed with or treated for gender dysphoria. It does so based on the "prediction"—unsupported by "actual data"—that these persons might cause issues in the future. Op. at 40–41, 71–72; Tr. (Mar. 12, 2025) at 137–38.

7

Recall also that the Symptoms Criteria is but one of seven independent criteria the Hegseth Policy employss to disqualify people. *See* Op. at 21–22 (citing Dkt. 63-1 at 3, 6). Three criteria disqualify transgender persons with a current diagnosis or history of, or who exhibit symptoms consistent with, gender dysphoria—however defined. Those include transgender persons:

- with a history of cross-sex hormone therapy (as treatment for gender dysphoria *or in pursuit of sex transition*);
- with a history of sex reassignment or genital reconstruction surgery (as treatment for gender dysphoria *or in pursuit of sex transition*);
- who [have] transitioned or attempted to transition to a sex other than their birth sex.

*Id.* (emphases added). Defendants do not define the phrase "in pursuit of sex transition," but it must include persons with no prior or current gender dysphoria diagnosis. Otherwise, it would be redundant because the phrase "as treatment for gender dysphoria" already covers all those who pursue sex transition as treatment after a gender dysphoria diagnosis.

Finally, at the March 21, 2025 hearing, Defendants continued to insist that the Court should ignore DoD's and Secretary Hegseth's public statements that the Hegseth Policy disqualifies all transgender troops. Tr. (Mar. 21, 2025) at 7. The Court then *again* gave Defendants the opportunity to file a declaration from Secretary Hegseth or any other military official to correct the public record. Defendants *again* declined to do so. *Id.* at 5–6; *see also* Tr. (Mar. 12, 2025) at 22–23. That is of course their right. But the Court cannot credit a lawyer's argument that a Department and Cabinet member publicly misconstrued the scope of their own policy and then could not be bothered to correct the evidentiary record in a high-profile litigation concerning the scope of that same policy. Occam's razor again. DoD and Secretary Hegseth meant what they said. That noted, the Court wants to be clear. Even if it considered only the

text within the four corners of the Hegseth Policy, the Court would easily find that the Military

Ban excludes all transgender troops.[11]

### B.  The MDI Guidance Supports the Court's Scrutiny Analysis

The MDI Guidance undercuts every rationale Defendants have given for implementing

the Military Ban.  To wit:

***Military Readiness***:  Earlier, Defendants claimed that answering certain cost questions

would divert the attention of "the relevant staff's primary responsibility to perform mission

critical functions."  Dkt. 66 at 2, 3.  Pulling staff away to review an untold number of medical

files will presumably do the same (only on a far larger scale) and thus undermine military

readiness.  MDI Guidance at 1.

***Privacy***:  To address "privacy concerns" purportedly caused by the less than 2,000

servicemembers treated for gender dysphoria, Defendants will invade the medical privacy of 1.3

million plus servicemembers.  *Id.*

***Deployability***:  To address the non-deployability concerns persons experiencing gender

dysphoria *might* create, Defendants will *automatically* tag as "Medically Not Ready" and non-

deployable servicemembers who possess no deployability concern, *e.g.*, transgender people who

have been successfully treated for gender dysphoria and no longer exhibit symptoms.  *Id.* at 2.

***Cost***:  And to save $5.2 million per year by cutting gender-affirming care, the military

will spend untold millions (if not tens of millions) to identify persons not yet diagnosed with any

medical condition.  *Id.*; *see also* Op. at 29.

The MDI Guidance also fails to explain why it treats gender dysphoria differently than

other disqualifying medical conditions.  It requires, for example, servicemembers who were

---

[11] To better understand how the Court comes to this conclusion, see its Opinion at 20–22.

previously diagnosed with gender dysphoria to self-report for discharge, even if they have successfully completed treatment.  MDI Guidance at 2.  By contrast, other conditions "must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service member's office, grade, rank, or rating" to be disqualifying.  Dkt. 72-67 at 13.

The MDI Guidance offers no explanation for how the Military Ban's derogatory language covers a medical condition.  Characterizations such as lacking warrior ethos, discipline, honor, and integrity apply to people, not medical conditions.  One does not say, for example, that those who suffer from bipolar disorder inherently lack warrior ethos, discipline, honor and integrity.  Moreover, as an example, DoD's medical standards for retention list bipolar disorder as a disqualifying condition.  *Id.* at 36.  Still, the military treats bipolar disorder, like all other disqualifying conditions, "on a case-by-case basis" considering "[t]he affected Service member's ability to safely complete common military tasks at a general duty level" and any "[l]imitations or requirements due to medical condition(s) or objections to recommended medical interventions that" present an obvious risk to the health and safety of the individual or their fellow servicemembers, among other factors.  *Id.* at 8–9.

## C.  The MDI Guidance Does Not Cure the Hegseth Policy's Many Defects

Defendants claim that the MDI Guidance supports their position that the Military Ban is only about "a medical condition—one that every prior Administration has, *to some degree*, kept out of the military."  Mot. at 3 (emphasis added).  Put differently, the Hegseth Policy is different only in degree from the Mattis and Austin Policies.

10

It is different in kind.  A simple comparison of the Mattis and Hegseth Policies using the

factors the D.C. Circuit considered in *Doe 2* demonstrates this:

| **Mattis Policy (2018)** | **Hegseth Policy (2025)** |
| --- | --- |
| Facially neutral | Facially derogatory |
| Impact of transgender service was uncertain and hypothetical | Defendants did not review available evidence; Plaintiffs' evidence is that transgender service has a beneficial effect |
| Active servicemembers grandfathered | Active servicemembers not grandfathered. |
| Many servicemembers could serve in their biological sex | Virtually no servicemembers can serve in their biological sex |
| No evidence that serving in biological sex creates "hardship" | Record confirms serving in biological sex creates hardship, including "mental distress" |
| Months-long study by panel of experts | No review process |

*Compare* Mattis Policy at 2, 3, 11 *with* Op. at 18, 21, 45, 58.[12]

Moving onto the Austin Policy, Defendants contend that it deserves no more credence

than the Hegseth Policy.  Tr. (Feb. 18, 2025) at 125–27.  This is so, they claim, because it did not

result from any deliberative process.  *Id.* at 126, 128.  Wrong.  In issuing Executive Order 14004,

President Biden relied on "substantial evidence" including "a meticulous, comprehensive study

requested by [DoD]," testimony to Congress by military leaders, and statements by former

United States Surgeons General from both political parties.  Op. at 10 (citing 86 Fed. Reg. 7471

(Jan. 25, 2021)).  Next, the Office of the Under Secretary of Defense for Personnel and

Readiness convened a working group that "collect[ed] and consider[ed] evidence from a variety

---

[12] By making these comparisons, the Court does not opine on the constitutionality of the Mattis or Austin Policies.

of sources, including a careful review of all available scholarly evidence and consultations with [experts]." *Id.* (citing Dkt. 72-59 ¶¶ 10, 12).  This deliberative process culminated with the release of the Austin Policy in March 2021.  Op. at 10–12.

Defendants' argument also ignores that high-level military officials responsible for integrating transgender persons into the military from 2021 to 2024 have testified based on their personal knowledge of how the Austin Policy worked in practice.  Based on that experience, they "unanimously conclude" that allowing transgender persons to serve openly had "no detrimental effect" on military preparedness.  Op. at 36.  Indeed, based on their experience, open service improved military readiness and unit cohesion.  *Id.* at 32, 35.  Defendants wish to change course. They are entitled to do so, and courts should defer to that determination.  But if the new course bans a class of people from military service, the Fifth Amendment requires that Defendants provide a plausible, evidence-based rationale for the policy shift.  *See id.* at 57.  Defendants offered none before the Court issued its Opinion, and the MDI Guidance adds nothing.  *See id.* at 57–63.

### III.    THE MDI GUIDANCE DOES NOT IMPACT THE COURT'S LEGAL CONCLUSIONS

#### A.  Intermediate Scrutiny Applies

Defendants contend that if the Court construes the Military Ban as only addressing a medical condition, intermediate scrutiny cannot apply.  Tr. (Mar. 12, 2025) at 28.  Not so.  Even Defendants' too-narrow view of the Hegseth Policy implicates intermediate scrutiny.

Just as it is impossible to know a person is transgender without knowing their sex, Op. at 47, it is impossible to know whether a person has gender dysphoria without knowing their sex. The Fourth Circuit's *en banc* decision in *Kadel v. Folwell* illustrates this common-sense proposition.  *See* 100 F.4th 122 (4th Cir. 2024) (en banc).  *Kadel* found that "gender dysphoria is

so intimately related to transgender status as to be virtually indistinguishable from it." *Id.* at 146. This is because "gender dysphoria is simply the medical term relied on to refer to the clinical distress that can result from transgender status." *Id.* And so the Fourth Circuit held that exclusion of coverage for gender dysphoria care discriminates based on sex because application of the exclusion "is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Id.* at 147. That is why treatments for gender dysphoria "aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status." *Id.* at 146.

For this reason, Defendants "cannot immunize [themselves] from violating" the Fifth Amendment "by discriminating against only a subset of" transgender persons. *Id.* A ban on gender dysphoria, even if it does not reach every transgender person, can nonetheless discriminate against transgender persons as a class. Under Supreme Court precedent, "a law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Id.* at 144 (cleaned up); *see also Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000); *Nyquist v. Mauclet*, 432 U.S. 1, 7–9 (1977); *Mathews v. Lucas*, 427 U.S. 495, 504 n.11 (1976). Thus, Defendants cannot evade discriminating against transgender people simply by labeling the policy as addressing gender dysphoria.

### B. The Court Did Not Rely on the Symptoms Criteria

Defendants concede that the MDI Guidance does not impact the Court's analysis in any material respect. It does not impact the Court's findings: (1) that the Hegseth Policy is based on outdated data, Tr. (Mar. 21, 2025) at 15, and studies that contradict, rather than support, a transgender ban, *id.* at 15, 28; (2) that the Hegseth Policy does not contain evidence supporting the Military Ban's stated objectives, *id.* at 18–22, 30; (3) that Plaintiffs' declarants have personal

knowledge concerning the impact of transgender persons serving openly, and that Defendants do not rebut those declarants, save one, *id.* at 23; (4) that administrative exhaustion is not required, *id.*; (5) that the Court has a duty to scrutinize the military's assertion of its interests, *id.* at 23; (6) that everyone with gender dysphoria is transgender, but that some transgender persons do not have gender dysphoria, *id.* at 23–24; and (7) that the Military Ban is animated by animus, *id.* at 31–32.

The Court discussed the Symptoms Criteria in only one paragraph of its analysis, noting that the phrase "was so broad as to capture persons who have never had gender dysphoria."  Op. at 60.  But even without that reasoning, the Court would still conclude that the Hegseth Policy targets more than just gender dysphoria.  The Hegseth Policy's text is broad enough to cover people who do not have gender dysphoria without any reference to the Symptoms Criteria.  *See supra* at 7–12.

### C.   The MDI Guidance Makes It More Likely that the Hegseth Policy Will Not Survive Rational Basis Review

The MDI Guidance underscores that the Ban is "far removed from [its stated] justifications." *Romer v. Evans*, 517 U.S. 620, 624 (1996).  To be sure, gender dysphoria is a valid health concern.  But the MDI Guidance cites several DoD and military policies that already ensure medical readiness in transgender persons, whether they have had, have, or might later have gender dysphoria.  For example, DoD conducts Periodic Health Assessments "at least yearly" for all servicemembers to ensure they meet the military's high medical standards.  MDI Guidance at 2.  If a servicemember becomes unable to meet the military's rigorous mental and physical standards, DoD would discover that during a Periodic Health Assessment.  The redundancy of the Hegseth Policy gives the Court "considerable doubt" that it is based on anything other than animus.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973).

Additionally, the MDI Guidance states that DoDI 6025.19 requires servicemembers to report any medical issues "that may affect their readiness to deploy, ability to perform their assigned mission, or fitness for retention in military service." MDI Guidance at 2. Their commanders are responsible for ensuring that they do so. *Id.* So even if the Periodic Health Assessment fails to catch the issue, or if the medical condition develops between Health Assessments, the military will still be informed on medical issues. Thus, Defendants' argument that the Hegseth Policy—which bans anyone with a history of gender dysphoria—is necessary to ensure troop readiness raises the same doubt that the Supreme Court had in *Moreno*.

At the March 21, 2025, hearing, the Court asked Defense counsel to explain why the military needs to exclude people who meet the Symptoms Criteria when the MDI Guidance cites policies that already address deployability and retention concerns. Tr. (Mar. 21, 2025) at 33–35. Defense counsel gave no discernable answer, finally resorting to the argument that the Court must defer to the military's "predictive judgment," Tr. (Mar. 21, 2025) at 42, that people must be weeded out now—*Minority Report*-style[13]—to prevent hypothetical future problems. That response begs more questions than it answer.

## STAY PENDING APPEAL

For the reasons stated above and in the Court's earlier Opinion, the Court denies Defendants' Motion for a Stay Pending Appeal. Defendants provide no reason in support of their request. Plaintiffs still face irreparable harm. Indeed, in the few additional days that the Court extended its stay to consider this motion, Plaintiffs filed a Motion for Temporary Restraining Order, Dkt. 95, based on ongoing harms experienced by Plaintiffs.

---

[13] If you know, you know. If you don't, the Court commends to you *Minority Report* (20th Century Fox 2002).

Defendants, on the other hand, have yet to explain the burden on them of continuing the status quo. Much less do they explain how that purported burden is greater than the ongoing injury Plaintiffs experience and the additional harms that will result if the Court stays the injunction. Nor do Defendants explain how the public benefits from a stay of the injunction order, which will require DoD to enact a policy that likely violates Plaintiffs' Fifth Amendment rights.

The Court, on its own motion, stays its Order until March 28, 2025, at 7:00 pm eastern to provide Defendants the opportunity to file an emergency stay with the D.C. Circuit.

## CONCLUSION

As the Court predicted, its Opinion has generated heated public debate, and Defendants will appeal. This is all to the good. But let's recall that our servicemembers make the debate and appeals possible. Their sacrifices breathe life into the phrase, "one nation under God, indivisible, with liberty and justice for all." The Court, again, thanks them. All.

* * * * *

For the reasons stated above, the Court hereby:

**DENIES** Defendants' Motion to Dissolve the Preliminary Injunction and Motion for a Stay Pending Appeal, Dkt. 91; and

**STAYS** its Order, Dkt. 88, until March 28, 2025, at 7:00 pm eastern.


Date: March 26, 2025                    _____
                                        ANA C. REYES
                                        United States District Court Judge