## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT *et al.*, *individually and on behalf of all similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA*, et al.*, <br><br> Defendants. | Civil Action No. 25-cv-240-ACR |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION .........................................................................................................................1

ARGUMENT..................................................................................................................................2

    I.     The Similar Litigation in *Shilling* Is Not a Barrier to Class Certification. .....................2

    II.    The Proposed Class and Subclasses Satisfy Rule 23's Commonality and
          Typicality Requirements. ...............................................................................................5

    III.   The Proposed Class and Subclass Definitions Raise No Ascertainability
          Issues. .............................................................................................................................9

CONCLUSION .............................................................................................................................12

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

*Brewer v. Lynch*,
No. 08-1747, 2015 WL 13604257 (D.D.C. 2015)................................................................10

*Califano v. Yamasaki*,
442 U.S. 682 (1979) .........................................................................................................2–3

*D.L. v. District of Columbia*,
713 F.3d 120 (D.C. Cir. 2013)...........................................................................................5, 6

*D.L. v. District of Columbia*,
860 F.3d 713 (D.C. Cir. 2017).............................................................................................6

*General Telephone Company of the Southwest v. Falcon*,
457 U.S. 147 (1982) ...........................................................................................................8

*Harris v. Rainey*,
299 F.R.D. 486 (W.D. Va. 2014) ........................................................................................3

*Healthy Futures of Texas v. U.S. Department of Health & Human Services*,
326 F.R.D. 1 (D.D.C. 2018) .............................................................................................3, 4

*In re Johnson*,
760 F.3d 66 (D.C. Cir. 2014)...............................................................................................6

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019)....................................................................................5, 8, 9

*McReynolds v. Merrill Lynch & Co.*,
672 F. 3d 482 (7th Cir. 2012) .............................................................................................7

*McReynolds v. Richards-Cantave*,
588 F.3d 790 (2d Cir. 2009) ...............................................................................................4

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019)..............................................................................9, 10, 11

*Orr v. Trump*,
786 F. Supp. 3d 397 (D. Mass. 2025)..................................................................................3

*Pigford v. Glickman*,
182 F.R.D. 341 (D.D.C. 1998) ..........................................................................................10

*Ramirez v. U.S. Immigration and Customs Enforcement*,
338 F. Supp. 3d 1 (D.D.C. 2018).........................................................................................9

*Roe v. Shanahan*,
359 F. Supp. 3d 382 (E.D. Va. 2019)...................................................................................7

*Shelton v. Bledsoe*,
   775 F.3d 554 (3d Cir. 2015) ................................................................................9

*Shilling v. United States*,
   773 F. Supp. 3d 1069 (W.D. Wash. 2025) ........................................................7, 8

*Talbott v. United States*,
   775 F. Supp. 3d 283 (D.D.C. 2025).............................................................*passim*

*Talbott v. United States*,
   No. 25-5087, 2026 WL 1532205 (D.C. Cir. 2026) .......................................2, 8, 11

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ...............................................................................................4

*U.S. Navy Seals 1-26 v. Biden*,
   72 F.4th 666 (5th Cir. 2023) ..................................................................................7

*Vidal v. Wolf*,
   501 F. Supp. 3d 117 (E.D.N.Y. 2020) ................................................................3, 4

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................................................*passim*

## OTHER AUTHORITIES

Executive Order 14183 ...............................................................................................1

Fed. R. Civ. Pro. 23(a)(2) ...........................................................................................5

Fed. R. Civ. Pro. 23(b)(2)....................................................................................*passim*

**INTRODUCTION**

This case is exceptionally well-suited for class certification under Rule 23(b)(2). Plaintiffs challenge a single governmental policy, the ban on military service by transgender individuals announced in Executive Order 14183 and effectuated through the Defense Department's implementation guidance (the "Hegseth Policy") (collectively, the "Military Ban"), and they seek a common remedy: an injunction barring enforcement of the Military Ban. This Court already recognized that the Military Ban categorically applies to thousands of current and prospective transgender service members, supporting a single, class-wide injunction barring its enforcement. *See Talbott v. United States*, 775 F. Supp. 3d 283, 301 (D.D.C. 2025) ("DoD and Secretary Hegseth announced that the Policy bans 'transgender troops' because that is precisely what it does"); *id.* at 307 ("If the Military Ban goes into effect, it will upend lives and ruin the careers of thousands of persons"); *id.* at 334 (noting that "the government has reiterated that 'uniformity' is one of the key goals of the Military Ban" and discussing the "never-ending conveyor belt of claims" that would result from piecemeal challenges to the policy).

Although Plaintiffs plainly satisfy Rule 23's requirements for class certification, the government nonetheless asserts three baseless arguments in opposition to Plaintiffs' Motion for Class Certification, ECF No. 126 (the "Motion"). First, the government urges the Court to deny the Motion "[a]s a prudential matter" because certification "would interfere" with a similar lawsuit challenging the Military Ban in the Western District of Washington, *Shilling v. United States*, No. 2:25-cv-241 (W.D. Wash. filed Feb. 6, 2025). The existence of a similar lawsuit (which raises no class claims) is no reason to deny class certification here. Second, the government wrongly contends that the proposed Class and Subclasses lack commonality and typicality, suggesting that Plaintiffs' facial challenge to the Military Ban fails to present a common question of law or fact. Even cursory review of this Court's preliminary injunction decision and the D.C. Circuit's recent

decision affirming the injunction as to the named Actively Serving Plaintiffs,[1] *Talbott v. United States*, No. 25-5087, 2026 WL 1532205 (D.C. Cir. June 1, 2026), disproves this argument. Finally, the government argues that Plaintiffs' proposed Class and Subclasses are not ascertainable. To the extent that the ascertainability requirement even applies to injunctive relief classes under Rule 23(b)(2), which is unclear at best, the proposed classes are ascertainable.

The Court can, and should, easily dispense with government's arguments and certify the proposed Class and Subclasses.

## ARGUMENT

### I.    The Similar Litigation in *Shilling* Is Not a Barrier to Class Certification.

The government argues, in error, that the Supreme Court's decision in *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), renders class certification here inappropriate because it would "improperly interfere" with the *Shilling* litigation, which also challenges the Military Ban. *See* Defs.' Opp. Brief ("Opp. Br."), ECF No. 127, at 3–6. But the Supreme Court in *Califano* expressly rejected the argument that Rule 23(b)(2) class certification is improper simply because of the existence of similar, ongoing litigation. 442 U.S. at 702–03. While *Califano* cautioned courts to "take care to ensure" that class certifications do not interfere with other cases, the Court nonetheless "decline[d] to adopt the extreme position" that Rule 23(b)(2) class certification is improper simply because it would "foreclos[e] adjudication by a number of different courts and

---

[1] Plaintiffs initially referred to this subclass as the "Active Duty Plaintiff Subclass," using the phrase "active duty" as shorthand for individuals currently in military service. Fifth Am. Compl. ¶ 396(a), ECF No. 117; Pls.' Mot. for Class Cert., ECF No. 118, at 1–2; Pls.' Mem. in Support of Mot. for Class Cert., ECF No. 118-1, at 1, 11, 16. However, because the named Plaintiffs and putative subclass members include Reservists and National Guard members who are not on "active duty" as the military defines that term, to avoid confusion, Plaintiffs request that this subclass be renamed the "Actively Serving Plaintiff Subclass," and to refer to the putative representative of that subclass as the "Actively Serving Plaintiffs," and use those terms in this reply brief.

judges." *Id.* at 702–03.  Where, as here, plaintiffs in similar concurrent litigation can be carved out of a class definition, certification of the class remains appropriate.  *Id.* at 703 (crediting the district court's "sensitivity to ongoing litigation of the same issue in other districts" by excluding from the class definition plaintiffs and plaintiff class members in similar cases).

As the government notes, the *Shilling* plaintiffs have asked this Court to modify the proposed Class definition to exclude the *Shilling* plaintiffs (except for individual plaintiffs in this case who are also members of the organizational plaintiff in *Shilling*) or, in the alternative, to permit *Shilling* plaintiffs to opt out of a certified class here.  Opp. Br. at 4; Notice, ECF No. 124.

Plaintiffs agree with the *Shilling* plaintiffs that this Court may carve them out of the proposed class definitions.  *See, e.g.*, *Healthy Futures of Tex. v. U.S. Dep't of Health & Hum. Servs.*, 326 F.R.D. 1, 10 (D.D.C. 2018) (certifying a Rule 23(b)(2) class over the government's objection that certification was inappropriate due to the existence of related litigation, where plaintiffs in other cases were excluded from the class definition); *Orr v. Trump*, 786 F. Supp. 3d 397, 413 (D. Mass. 2025) (in case by transgender plaintiffs challenging executive order requiring passports and other documents to reflect one's sex "at conception," finding the "proposed exclusion of . . . plaintiffs [in similar case] is no barrier to certification under Rule 23(b)(2) in this matter"), *preliminary injunction vacated on other grounds*, 2026 WL 1642666 (1st Cir. Jun. 5, 2026); *Vidal v. Wolf*, 501 F. Supp. 3d 117, 137 (E.D.N.Y. 2020) (excluding individuals who challenged DACA memorandum in other cases); *Harris v. Rainey*, 299 F.R.D. 486, 488 (W.D. Va. 2014) (certifying Rule 23(b)(2) class of individuals challenging refusal to recognize same-sex marriages, excluding plaintiffs in similar cases).  Likewise, the *Shilling* plaintiffs' requested class definition carve-out would mitigate any concerns that the present case would improperly interfere with that litigation.

The Court need not resolve whether the *Shilling* plaintiffs' alternative request—the ability to opt out of a certified class—is available in a Rule 23(b)(2) class action. *See* Opp. Br. at 5 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363–64 (2011)); *but see Vidal*, 501 F. Supp. 3d at 137 ("Although the Government is correct that Rule 23(b)(2) does not require district courts to give notice or the opportunity for class members to opt out, the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(2) class actions.") (quoting *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009)) (modifications omitted). Regardless, a pre-certification definitional carve-out is not, as the government contends, "akin to an opt-out mechanism." Opp. Br. at 5. The government erroneously "conflates opting out of class membership with a class definition that excludes certain individuals." *See Vidal*, 501 F. Supp. 3d at 137. But "the 'class definition' and 'opt-out' mechanisms involve different decision makers, serve different functions, and take place at markedly different times." *Healthy Futures*, 326 F.R.D. at 9. By excluding from class definitions individuals who have brought separate claims, "the class definitions ensure administrability and judicial economy." *Vidal*, 501 F. Supp. 3d at 137.[2]

While Plaintiffs do not think it is necessary, Plaintiffs also do not object to an amendment of the proposed Class and Subclass definitions to add the modifying language requested by the *Shilling* Plaintiffs. *See* Notice, ECF No. 124, at 11. Such an amendment is a matter of class definition, not opt-out, and leaves the *Shilling* litigation undisturbed. The carve-out should not, however, extend to any individual who is both a named plaintiff in this case and a member of the

---

[2] The government's citation to *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), is inapposite. *CASA* addressed universal injunctions protecting non-parties, strangers to the litigation. A certified Rule 23(b)(2) class raises no such concern: class members are parties, bound by the judgment and represented through the class mechanism Rule 23 was designed to create. *CASA* distinguished class actions from universal injunctions as different devices operating under different rules. 606 U.S. at 849–50. Certifying a class here exercises this Court's equitable power in exactly the form the Federal Rules contemplate; it does not expand it.

*Shilling* organizational plaintiff, the Gender Justice League.  The *Shilling* Plaintiffs' proposed language accomplishes this.

**II.      The Proposed Class and Subclasses Satisfy Rule 23's Commonality and Typicality Requirements.**

The government's commonality and typicality arguments are without merit.  To satisfy these requirements, Plaintiffs need only present a single common question, *see J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019) (citing *Dukes*, 564 U.S. at 359), and demonstrate that the requested relief "respond[s], at least in part, to a common harm suffered as a result of a policy or practice that affects each class member," *D.L. v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)*.*  Rule 23(a)(2) does not require all questions be common to the class, nor does it "bar courts from granting equitable relief that does not reach every plaintiff in the class."  *Id.*  There can be no legitimate debate that Plaintiffs, who challenge a military policy that affects all transgender service members and who would each benefit from the injunctive and declaratory relief sought, satisfy these requirements.

The government's comparisons to *Dukes* are misplaced.  There, plaintiffs sought to certify a 1.5-million-member class of current and former female Wal-Mart employees who alleged Title VII sex discrimination.  *Dukes*, 564 U.S. at 343.  There was no "express corporate policy against the advancement of women."  *Id.* at 344.  Rather, plaintiffs alleged that Wal-Mart left pay and promotion decisions up to local supervisors, and those supervisors exercised their discretion in discriminatory ways.  *Id.*  The plaintiffs argued that this discretion led to differential treatment, including inappropriate comments about women's appearance, unequal pay, and denial of training opportunities.  *Id.* at 343–44.  *Dukes* held that Wal-Mart's policy of allowing discretion was, on its face, the "*opposite* of a uniform employment practice that would provide the commonality needed for a class action," defeating class certification.  *Id.* at 355, 359 (emphasis added).

The Military Ban, by contrast, is just such a uniform policy.  It applies broadly to all actively serving and prospective service members who are transgender, mandates their expulsion from the military or bars them from acceding, and leaves no discretion to active service members' commanders.  While *Dukes* turned on standardless decision-making delegated to thousands of individual supervisors, the disqualifying criterion in this case is written into the government's official policy and applied uniformly to transgender service members.  It operates as "a general policy of discrimination" that can "justify a class" because it "manifest[s] itself . . . in the same general fashion" for all class members.  *See id.* at 353.

The Military Ban is strikingly similar to the Merit Promotion Plan challenged in *In re Johnson*, in which "every class member was evaluated upon the same criteria and scored using the same numerical system."  760 F.3d 66, 73 (D.C. Cir. 2014).  Like the *Johnson* class members, each putative *Talbott* class member meets the same uniform policy criteria (i.e., they are transgender), and the government seeks to separate them from the military on this basis alone.

That some class members have retired or elected the so-called "voluntary separation" process, while others presently face involuntary administrative separation boards, is irrelevant to the question of commonality and typicality.  The Military Ban subjects all actively serving class members to the same false choice: leave the military, or be unceremoniously ousted.[3]  Either way, the Hegseth Policy bars accession or continued service by putative class members.  A declaratory

---

[3] It also makes no difference that only some members' due process rights will be infringed by the administrative separation proceedings.  Rule 23(b)(2) does not mandate that *all* questions be common to *all* members of the class: "even a single common question will do."  *See D.L.,* 713 F.3d at 128 (D.C. Cir. 2013) (quoting *Dukes*, 564 U.S. at 359) (modifications omitted).  If the court disagrees, certifying the voluntarily separated plaintiffs and those facing involuntary separation into two subclasses would easily cure any commonality concerns.  *See, e.g.*, *D.L. v. District of Columbia*, 860 F.3d 713, 725 (D.C. Cir. 2017) (upholding certification of three subclasses that were "far more concise" than a broader, previously vacated class).

judgment that the Hegseth Policy violates class members' constitutional rights and an injunction blocking enforcement of the policy would resolve the case for all class members in one stroke.[4] This is not conjecture; there are many examples of injunctions (including the one entered here) that, if made permanent and applied to a class, would provide relief to all class members. *See Talbott*, 775 F. Supp. 3d at 301; *Shilling v. United States*, 773 F. Supp. 3d 1069, 1099 (W.D. Wash. Mar. 27, 2025); *see also Roe v. Shanahan*, 359 F. Supp. 3d 382, 423 (E.D. Va. Feb 15, 2019) (enjoining defendants from separating or discharging from military service plaintiffs and any other similarly situated active-duty member of the Air Force due to their HIV-positive status); *cf. U.S. Navy Seals 1-26 v. Biden*, 72 F.4th 666, 671 (5th Cir. 2023) (noting that challenge to pending and completed separations of military personnel who objected to receiving the COVID-19 vaccine was mooted by presidential order to "stop separating servicemembers who had sought an exemption and to 'remove any adverse actions solely associated with denials of such requests'").

Throughout its brief, the government repeatedly mischaracterizes the breadth of the Military Ban as applying only to "those with a clinical diagnosis of gender dysphoria," rather than to all transgender people. *E.g.* Opp. Br. at 5, 11, 14. However, the policy sweeps in not only those who "have a current diagnosis or history of" gender dysphoria, but also those who merely "exhibit symptoms consistent with" gender dysphoria, have a "history of cross-sex hormone therapy or sex reassignment or genital reconstruction surgery as treatment for gender dysphoria or in pursuit of a sex transition" and cannot serve in their birth sex. Attachment to Feb 26, 2025, Memo, 4.1.a–c. This court has held that the terms of the policy are "aimed squarely at transgender persons,"

---

[4] It is no bar to class certification that individual plaintiffs' remedies may vary slightly in terms of matters such as reinstatements, withheld promotions, and back pay. So long as these harms all stem from the same unlawful policy, a question central to each class member's claim can be resolved in "one stroke." *See D.L.*, 713 F.3d at 127 (citing *McReynolds v. Merrill Lynch & Co.*, 672 F. 3d 482, 488–90 (7th Cir. 2012)).

*Talbott*, 775 F. Supp. 3d at 301, and that the disqualification is "so broad as to capture persons who have never had gender dysphoria," *id.* at 324. The D.C. Circuit upheld that finding, noting that the government's use of gender dysphoria diagnoses was "merely the means of achieving [the] end" of eliminating transgender persons from military service. *Talbott*, 2026 WL 1532205, at *8. Indeed, the Hegseth Policy is "undergirded" by the belief that "transgender persons are unfit for the military." *Id.* at *15; *see also Shilling*, 773 F. Supp. 3d at 1090 ("[C]ommon sense and binding authority defeat the government's claim that it does not discriminate against transgender people"). This Court need not entertain the government's thrice-rejected effort to mischaracterize the Hegseth Policy as based on a medical condition.

Plaintiffs' claims are typical of the putative class members' claims for the same reason that the putative class has commonality. *See Dukes*, 564 U.S. at 349 n.5 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157–158 n.13 (1982)). They stem from a "single event or unitary course of conduct"—the promulgation and implementation of the Military Ban—and are based on the "same legal [and] remedial theor[ies]"—a violation of Fifth Amendment equal protection rights that can be remedied for all putative class members by an injunction blocking implementation of the Military Ban. *See J.D.*, 925 F.3d at 1322. Like the members of the putative class, Actively Serving Plaintiffs have all been placed on the same road to expulsion from the military because they are transgender. The government presented transgender service members with the same "Hobson's Choice." *Talbott*, 775 F. Supp. 3d at 333. Whether an Actively Serving Plaintiff "chose" the voluntary separation process, the involuntary separation process,[5] or retirement is immaterial; all

---

[5] To the extent this court finds it appropriate to separate the Actively Serving Plaintiff Subclass into additional subclasses based upon their modes of separation or categories of relief sought, the named Plaintiffs include members who separated "voluntarily" and members who face involuntary separation, and their claims are typical of any subclasses divided along these lines.

saw or will see their military careers abruptly end due to an unconstitutional policy. Similarly, the claims of the Accession Plaintiffs are typical of prospective transgender service members who are categorically barred from pursuing accession because they are transgender.

## III.    The Proposed Class and Subclass Definitions Raise No Ascertainability Issues.

The government's final argument is that Plaintiffs' proposed Class and Subclasses "are impossible for the Court to ascertain." This is legally and factually unsupported.

First, it is doubtful that the ascertainability requirement applies to Rule 23(b)(2) class actions, and out-of-circuit decisions indicate that it does not. As the D.C. Circuit observed in *J.D v. Azar*, though "our court has not addressed whether Rule 23 contains an ascertainability requirement for class certification," other circuits are split on what, if any, ascertainability requirement applies to Rule 23(b)(2) classes seeking injunctive relief. 925 F.3d at 1320; *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 159–60 (D.D.C. 2019) (noting that the ascertainability requirement "has been recently disavowed by four federal appellate courts" and that "[i]t is 'far from clear . . . that there exists in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate ascertainability to merit certification'") (quoting *Ramirez v. U.S. Immigr. & Customs Enf't*, 338 F. Supp. 3d 1, 48 (D.D.C. 2018)). Even so, the D.C. Circuit has made clear that whether all class members are identifiable is less relevant in 23(b)(2) classes, where "the precise membership . . . is considered largely inconsequential." *See J.D.*, 925 F.3d at 1320. This is because "the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and a remedy obtained by one member will naturally affect the others, so the identities of individual class members are less critical." *Id.* (quoting *Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015)).

Even assuming arguendo that it does apply, the ascertainability requirement is not "particularly stringent." *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998); *O.A.*, 404 F. Supp. 3d at 160 (citing *Brewer v. Lynch*, No. 08-1747, 2015 WL 13604257, at *5 (D.D.C. 2015)). Parties moving for class certification need only show that "the general outlines of the membership of the class are determinable at the outset of the litigation," *Campbell v. AMTRAK*, 311 F. Supp. 3d 281, 313 (D.D.C. 2018) (quoting *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014)), "without engaging in burdensome individualized determinations," *O.A.*, 404 F. Supp. 3d at 160 (citing *Brewer*, 2015 WL 13604257, at *5).

In *O.A. v. Trump*, the court questioned whether the ascertainability requirement applies to Rule 23(b)(2) classes, but "[o]ut of an abundance of caution, . . . assume[d] for present purposes that such a requirement exists." *O.A.*, 404 F. Supp. 3d at 160. In that case, brought on behalf of a class of current and future asylum seekers challenging the first Trump Administration's bar on asylum eligibility, the court held that the class members "are easily determined" because "[t]he proposed class includes all asylum seekers who are subject to the Rule's categorical prohibition on asylum eligibility." *Id.* The court rejected the government's claim that the class would include "unknown and unidentifiable aliens who are outside the United States" since "aliens will only become members of the class *if and when* they enter the United States through the southern border without inspection." *Id.* (emphasis in original).

The proposed Class and Subclasses here are easily identifiable. The Class includes all transgender persons who are subject to the Military Ban. For the last year, the military has been identifying actively serving transgender service members to whom the Military Ban applies and initiating their separation proceedings. *See* Pls.-Appellees' Notice Pursuant to Fed. R. App. P. 28(j), *Talbott v. United States*, No. 25-5087, Doc. Nos. 2156380 (Jan. 28, 2026), 2164458 (Mar.

19, 2026); Defs.-Appellants' Notice of Case Status, *Talbott v. United States*, No. 25-5087, Doc. No. 2168994 (Apr. 16, 2026).  Indeed, there is no evidence that the government was hindered by ascertainability concerns when promulgating and executing the sweeping policy.  The government cannot now argue that identifying Actively Serving Plaintiffs is challenging, let alone "impossible."  Opp. Br. at 9.  Moreover, the proposed Accession Plaintiff Subclass turns on an objective, future event: an individual becomes a member if and when they seek to accede to the military and are denied entry under the Military Ban's criteria.  Membership thus depends on the government's own application of the policy—not on any individual's subjective state of mind— and members are readily identifiable at the point of exclusion.  *Cf. O.A.*, 404 F. Supp. 3d at 160.

The government's argument that the proposed classes are "too indefinite" because the definitions "depend on the putative class members' subjective state of mind—namely, whether they 'wish[] to live in a sex other than their birth sex,'" is misplaced.[6]  Opp. Br. at 9–10.  To afford the relief requested here, this Court need not inquire into any individual service member's "state of mind."  The military is separating transgender service members, and is barring accession for prospective transgender service members, based on the specific criteria laid out in the Hegseth Policy.  As this Court and the D.C. Circuit have held, the Military Ban targets transgender people as a group.  *Talbott*, 75 F. Supp. 3d at 301; *Talbott*, 2026 WL 1532205, at *4, *8, *13–14.  The injunctive relief sought in this case would prevent the government from applying the Military Ban to any transgender person.  The state of mind of individual service members is irrelevant to an across-the-board injunction barring application of the policy.  A more individualized inquiry is not

---

[6] In addition to being factually inaccurate, this argument directly conflicts with the government's insistence that the Military Ban applies only to individuals with a specific medical diagnosis.

required now, or ever, for this case to proceed as a class action and afford relief to all affected current and future transgender service members.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Class Certification.

DATED: June 12, 2026

Jennifer Levi (MA0056)
Mary L. Bonauto (*pro hac vice*)
Sarah Austin (*pro hac vice*)
Michael Haley (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jlevi@glad.org
mbonauto@glad.org
saustin@glad.org
mhaley@glad.org

Shannon P. Minter (*pro hac vice*)
Christopher F. Stoll (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
Telephone: (415) 392-6257
sminter@nclrights.org

Respectfully submitted,

*/s/ Joseph J. Wardenski*
Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
Telephone: (347) 913-3311
joe@wardenskilaw.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
65A Atlantic Avenue
Boston, MA 02110
Telephone: (617) 742-6020
ibernstein@zalkindlaw.com

*Attorneys for Plaintiffs*

12