# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT *et al.*,

                         Plaintiffs,

v.

UNITED STATES *et al.*,

                         Defendants.

Civil Action No. 1:25-cv-00240 (ACR)

## PLAINTIFFS' SUPPLEMENTAL BRIEF ADDRESSING
### *WEST VIRGINIA v. B.P.J.*

## INTRODUCTION

Pursuant to this Court's July 1, 2026 Order, Plaintiffs respectfully submit this brief addressing what effect, if any, *West Virginia v. B.P.J.*, Nos. 24-43 & 24-38 (U.S. June 30, 2026), has on the legal analysis governing this case.  The answer is:  It has none.

*B.P.J.*'s holding is "straightforward" and narrow:  "The Equal Protection Clause allows schools to maintain separate teams for female and male athletes."  Slip op. at 26.  The Court sustained classifications based on birth sex, not transgender status.  *Id.* at 23.  And it was undisputed that the classifications, on the whole, furthered each State's substantial interest in providing for sex-segregated sports teams.  *Id.* at 17.  Those classifications, moreover, were "not invidious."  *Id.* at 20.  The Supreme Court noted that a different rule—one that excluded "all transgender individuals"—"would be a distinct transgender classification" requiring different analysis.  *Id.* at 23.  That is this case.  The Military Ban[1] effectively excludes all transgender people from service and subjects them to disparate treatment on the basis that transgender servicemembers are liars who cannot meet the military's "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  *Talbott v. United States*, 176 F.4th 720, 741-42, 745 (D.C. Cir. 2026).  *B.P.J.* does not require this Court to ignore well-settled equal protection principles merely because both cases involve transgender people.

## ARGUMENT

*B.P.J.* has no effect on this case for three independent reasons.  First, the Ban cannot be explained by anything other than animus, unlike the legislation in *B.P.J.*, which was "not invidious."  Slip op. at 20.  Second, the Ban singles out all transgender people for worse treatment than every other servicemember, whereas the legislation in *B.P.J.* treated male and

---

[1] This brief adopts the Court's defined terms.  *See* Dkt. 89 at 1-2; Dkt. 100 at 1 n.1.

female athletes alike.  Finally, the Ban serves no legitimate government interest, while the legislation in *B.P.J.* undisputedly did.  *B.P.J.* does not require any changes to this Court's analysis of the unique issues presented in this case.

I.    ***B.P.J.* Considered "Not Invidious" Classifications, Whereas Animus Pervades the Military Ban**

The principal distinction between this case and *B.P.J.* is that animus played no role in the Supreme Court's decision.  The statutes at issue contained no derogatory characterizations of transgender—or any—people.  *See B.P.J.*, slip op. at 15-16.  In enacting the statutes, the legislatures expressly relied on the principles of preserving competitive fairness and safety in women's sports, which the plaintiffs agreed were legitimate state interests.  *Id.* at 17.  On that record, the Supreme Court observed that the statutes' classifications were ***"not invidious."***  *Id*. at 20 (emphasis added).

The Military Ban, by contrast, is "soaked in animus."  *Talbott v. United States*, 775 F. Supp. 3d 283, 326 (D.D.C. 2025).  Executive Order 14183 declares that persons "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service," and that adopting such an identity conflicts with "an honorable, truthful, and disciplined lifestyle" and with "the humility and selflessness required of a service member."  90 Fed. Reg. 8757 § 1 (Jan. 27, 2025).  The "President labeled transgender persons as dishonorable, undisciplined, arrogant, selfish liars."  *Talbott*, 176 F.4th at 734.  The "insult[s]" continued through "the [other] Executive Order[ ], the February 7 Memo, the Hegseth Policy, and the FAQs, all of which contain numerous statements demeaning transgender people as lacking honesty, integrity, and humility because of their gender identity."  *Id.* at 745.  And Defendants have failed to rebut these findings.  They have conceded in this Court that they possess no evidence that persons with gender dysphoria lack honesty, humility, or integrity as the

2

Policy alleges. *See Talbott*, 775 F. Supp. 3d at 292 (neither Executive Order 14183 nor the Hegseth Policy "contains any analysis nor cites any data"). On that record, the D.C. Circuit affirmed this Court's animus finding and held that "direct evidence in this case" demonstrated "that animus motivated the classifications in the Hegseth Policy." *Talbott*, 176 F.4th at 745-46.[2]

The overt animus behind the Military Ban does not merely distinguish this case from *B.P.J.*—it strips the Ban of any legitimate governmental interest. A "bare . . . desire to harm a politically unpopular group" can never constitute a legitimate governmental interest. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996); *United States v. Windsor*, 570 U.S. 744, 775 (2013); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Defendants cannot dispute that well-settled principle. Instead, they argue in their motion to stay the mandate filed in the D.C. Circuit that Justice Thomas's concurring opinion in *B.P.J.* "suggest[s] the Supreme Court may assess the animus allegations here differently than this Court [and the D.C. Circuit]." Mot. to Stay Mandate Pending Pet. for Writ of Cert. at 9, *Talbott v. United States*, No. 25-5087 (D.C. Cir. July 16, 2026), Doc. No. 2183623. But nothing in the majority's opinion—which expressly disclaims any reliance on animus—supports that assertion. *B.P.J.*, slip op. at 20.[3] Animus alone

---

[2] Defendants cannot attribute the dearth of evidence supporting any legitimate basis for the Ban to the preliminary posture in which this Court and the D.C. Circuit previously ruled. This Court expressly invited Defendants to present evidence connecting the Policy's classifications to military standards, but Defendants chose not to submit any. *See Talbott*, 775 F. Supp. 3d at 326. By contrast, Plaintiffs have submitted uncontested declarations of military leaders responsible for administering open service establishing that "recruiting, unit cohesion, and military readiness have improved since 2021." *Id.* at 292.

[3] No other Justice joined Justice Thomas's two-page concurrence.

invalidates the Military Ban under any standard, even "under rational basis review." *Talbott*, 775 F. Supp. 3d at 326.[4]

## II.    *B.P.J.* Considered Statutes That Applied the Same Rule to Every Athlete, Whereas the Military Ban Singles Out Transgender Servicemembers for Disparate Treatment

Another critical distinction between this case and *B.P.J.* is that the latter did not confront the singling out of one group for worse treatment than every other similarly situated person. The classifications in *B.P.J.* applied uniformly to every athlete of each sex; no athlete was denied a process the others received. Slip op. at 20. The Military Ban is different: Following its issuance, "servicemembers with every other medical condition receive an individualized review of their circumstances to determine if they can continue to serve—***except if they have gender dysphoria.***" *Talbott*, 176 F.4th at 744 (emphasis added). That singling out of transgender servicemembers for different—and worse—treatment than every other soldier violates bedrock equal protection principles.

Equal protection requires that "similarly situated persons must be treated similarly"— even in the military. *Talbott*, 176 F.4th at 739 (discussing *Rostker v. Goldberg*, 453 U.S. 57, 79-80 (1981)). *B.P.J.* did not silently displace that well-settled rule. The statutes there treated all athletes the same: They were all eligible to compete on the team associated with their birth sex. Here, it is undisputed that "persons with a history of gender dysphoria are not treated the same as similarly situated individuals." *Id*. at 744 (noting Defendants "conceded" the point). Specifically, every servicemember with a medical condition is afforded the opportunity to

---

[4] Nor does *B.P.J.* disturb this Court's application of intermediate scrutiny. *See Talbott*, 775 F. Supp. 3d at 319. The Supreme Court applied intermediate scrutiny to the sex-based classifications before it but expressly left open the standard governing classifications based on transgender status. *B.P.J.*, slip op. at 15, 23. Justice Thomas's view that classifications on the basis of transgender status never warrant heightened scrutiny drew no other vote. *Id*. at 1-2 (Thomas, J., concurring).

participate in the Disability Evaluation System, except for transgender servicemembers, who are relegated to the administrative separation process ordinarily reserved for personnel accused of misconduct like drug abuse, sexual assault, or domestic violence.  *Talbott*, 176 F.4th at 744; *see also* Dep't of Def. Instruction 1332.14, *Enlisted Administrative Separations* (Aug. 1, 2024).  The accession standards suffer from the same infirmity.  Prior policy applied a three-year stability standard to gender dysphoria, the same standard applied to other depressive disorders.  *Talbott*, 176 F.4th at 735-36.  The Military Ban, however, imposes a lifetime disqualification triggered by a single diagnosis at any time in a person's life.  *Id.* at 743.  Those policies represent the ***opposite*** of a generally applicable categorical rule that would be consistent with equal protection principles.  *B.P.J.* does not sanction the Government's unexplained decision to deviate from standard protocol and create disparate rules for transgender servicemembers.

### III.    *B.P.J.* Tested the Reach of an Admittedly Valid Rule, Whereas the Military Ban Lacks Any Justification

Finally, in *B.P.J.*, all parties "agree[d]" that the States may generally exclude athletes who are born male from women's and girls' teams.  Slip op. at 17.  The only dispute was whether equal protection required an exemption for a discrete "subclass" of transgender girls who "have taken puberty blockers or hormones."  *Id.*  The Supreme Court held that, "in the distinctive sports context," States may apply a single categorical rule to athletes of each sex.  *Id.* at 20.  The States were not required to "conduct an individual-by-individual comparison of the physical and athletic capabilities" of every affected athlete.  *Id*.

The Supreme Court tied the classifications' validity to "the relation [the classification] bears to the general problem."  *Id.* at 19.  "[A]s long as the relationship is sufficient as a general matter, the State is not *constitutionally* required to grant individualized exemptions to specific athletes or subclasses."  *Id*. at 21.  Plaintiffs in that case conceded that the statutes validly

5

excluded nearly all athletes who are born male from women's and girls' teams. *Id*. at 17. Here, Plaintiffs do not argue that the Military Ban is generally legitimate but sweeps too broadly in isolated cases. They argue instead that the Ban serves ***no legitimate interest*** in every case. No interest in cost, readiness, or cohesion explains disqualifying every person with any history of gender dysphoria, "even if the person has been asymptomatic for many years and even if their only diagnosis was as a child." *Talbott*, 176 F.4th at 741. Such persons "pose no costs or risks to the military." *Id.* And, unlike the statutes in *B.P.J.*, which rested on legislative findings, the Ban "did not even attempt to explain why this broad classification was necessary or appropriate." *Id.* Nor have Defendants offered any explanation.

The "waiver" contained in the Policy fares even worse. It provides that individuals may obtain a waiver only where there "is a compelling government interest in retaining them that directly supports warfighting capabilities," *i.e.*, for soldiers who have "special experience, special training, and advanced education in a highly technical career field designated as mission critical and hard to fill by the Secretary of a Military Department." *Talbott*, 775 F. Supp. 3d at 301. Even those who meet those stringent criteria must also demonstrate that they have (1) been "stable in [their] birth sex for 36 consecutive months," (2) "never transitioned or attempted to transition to anything other than [their] birth sex," and (3) are "willing (against medical advice) to serve in [their] birth sex." *Id.* at 302. As this Court concluded, "[v]irtually no one can meet all these criteria." *Id.* The waiver is "one in name only." *Id.* at 301.

In their motion to stay the mandate filed in the D.C. Circuit, Defendants suggested *B.P.J.* undermines this Court's and the D.C. Circuit's waiver analysis because "as long as the relationship is sufficient as a general matter, the [government] is not constitutionally required to

6

grant individualized exemptions." Mot. to Stay Mandate at 9 (quoting *B.P.J.*, slip op. at 21). That argument misses the mark entirely.

First, this case is not about granting "exemptions" to a generally valid rule. To the contrary, Plaintiffs seek to be subjected to the ***same*** standards and processes as every other soldier.

Second, the classification of transgender servicemembers as categorically unfit to serve is not a generally valid classification. There is ***no demonstrable relationship*** between the Ban and any claimed governmental interest—much less one that is "sufficient as a general matter." Defendants have made the strategic choice not to explain the "attempt to transition" bar, even when expressly invited to do so by this Court. *Talbott*, 176 F.4th at 741; *see* Notice to the Court at 1-2, Dkt. 86.[5] Having made the choice not to "articulate[ ] any basis, medical or otherwise, for such a broad waiver disqualification," Defendants have no basis to now turn around and say the Ban, including the waiver provision, is a generally valid classification that serves legitimate governmental interests. *Talbott*, 176 F.4th at 736. This Court cannot defer to a judgment Defendants never presented. *See B.P.J.*, slip op. at 25 ("[J]udicial deference does not mean abdication.").

## CONCLUSION

Plaintiffs respectfully submit that *B.P.J.* requires no alteration of this Court's or the D.C. Circuit's analysis.

---

[5] While Defendants offered a belated, made-for-litigation explanation on appeal that "attempt to transition" meant only attempts via medical intervention, the D.C. Circuit rejected that construction as inconsistent "with the plain text of the Hegseth Policy." *Talbott*, 176 F.4th at 741.

DATED: August 7, 2026

Jennifer Levi (MA0056)
Mary Bonauto (*pro hac vice*)
Michael R. Haley (*pro hac vice*)
Sarah K. Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
Phone: (617) 426-1350
jlevi@gladlaw.org
mbonauto@gladlaw.org
mhaley@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (*pro hac vice*)
Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st St. #11548
Sacramento, CA 95811
Phone: (415) 365-1320
cstoll@nclrights.org
sminter@nclrights.org
awhelan@nclrights.org

Respectfully submitted,

/s/ *Lauren M. Weinstein*
Lauren M. Weinstein (1035184)
Benjamin G. Bradshaw (460539)
Shruti Kannan (90006641)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
lweinstein@omm.com
bbradshaw@omm.com
skannan@omm.com

Brett Williamson (1024759)
O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (949) 823-6900
bwilliamson@omm.com

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
Phone: (617) 742-6020
ibernstein@zalkindlaw.com

*Counsel for Plaintiffs*

8