### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT, et.al.

   *Plaintiffs*,

v.

UNITED STATES, et al.,

   *Defendants.*

Civ. A. No. 25-240 (ACR)

### DEFENDANTS' BRIEF ABOUT IMPACT OF *WEST VIRGINIA v. B.P.J.*

The Court asked for the parties' views "on the impact on this litigation, if any, of *West Virginia v. B.P.J.*, 609 U.S. --- (2026) (No. 24-38), 2026 WL 1868739." Min. Ord. (July 1, 2026), ¶ 1. In *B.P.J.*, biological male athletes who identified as female challenged Idaho and West Virginia statues that prohibited biological male participation in female sports. *Id.* at \*5–6. The Supreme Court held that determining eligibility for women's and girls' sports on the basis of biological sex, regardless of gender identity, does not violate Title IX or the Equal Protection Clause of the Fourteenth Amendment. *B.P.J.*, 2026 WL 1868739, at \*4. *B.P.J.* has a significant impact on this litigation in at least three areas: (1) the 2025 policy's classifications; (2) the application of scrutiny; and (3) animus.

*First*, *B.P.J.* has a significant impact with respect to the type of classifications drawn by the 2025 policy. *B.P.J.* makes clear that, in determining the "basis" on which the 2025 policy "classif[ies]," *id.* at \*14, a court should look to the policy's operative terms—rather than the Executive Order, answers to FAQs, or other statements. In *B.P.J.*, the laws at issue were accompanied by legislative findings about "gender identity," W. Va. Code Ann. § 18-2-25d(4), and "gender-affirming treatment in transgender individuals," Idaho Code Ann. § 33-6602(11). Based on those findings, the plaintiffs argued that the laws "discriminate[d] against transgender individuals[.]" *B.P.J.*, 2026 WL 1868739, at \*14. The Supreme Court rejected that argument. The Court held: "[T]he laws do not classify based

1

on gender identity or transgender status. The laws classify on the basis of biological sex." *Id.* (citation omitted). The Court reached that conclusion by examining the laws' operative terms—which "determine[d] eligibility for women's and girls' sports based on biological sex[.]" *Id.* at *4.

Just as legislative findings did not change the operative terms of the laws at issue in *B.P.J.*, so too the Executive Order, answers to FAQs, and other statements do not change the operative terms of the policy at issue here. The operative terms of the 2025 policy classify based on a medical condition (gender dysphoria) and related interventions, 2025 Policy § 1, and Plaintiffs' contention that the 2025 policy discriminates based on "transgender status" fails for the same reason as in *B.P.J.*: No operative provision of the 2025 policy "classif[ies] based on gender identity or transgender status." 2026 WL 1868739, at *14.

*B.P.J.* also makes clear that *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), is not relevant here. This Court relied on *Bostock* in determining that the 2025 policy classifies on the basis of sex. *See Talbott v. United States*, 775 F. Supp. 3d 283, 316–17 (D.D.C. 2025), *aff'd in part, vacated in part*, 176 F.4th 720 (D.C. Cir. 2026). In *B.P.J.*, however, the Supreme Court held that "Title VII and *Bostock* are not relevant in th[e] very different statutory and factual context" of Title IX and sports. 2026 WL 1868739, at *9. The Court also found *Bostock* irrelevant in analyzing the plaintiffs' equal-protection challenges; in addressing those challenges, the Court did not mention *Bostock* at all. *See id.* at *9–16. Title VII and *Bostock* are likewise "not relevant in the very different" equal-protection and military context here. *Id.* at *9. Plaintiffs thus err in relying on *Bostock* to argue that the 2025 policy discriminates based on sex.

Moreover, "even if the [policy] made a transgender or gender-identity classification," the Court observed that it "'has not previously held' that intermediate or other heightened scrutiny applies to a transgender or gender-identity classification." *Id.* at *14 (citation omitted). The Court also noted that "[s]everal Members of this Court . . . have concluded that classifications based on transgender status

2

or gender identity should receive only deferential rational basis review and not intermediate or other heightened scrutiny." *Id.* (citing *United States v. Skrmetti*, 605 U.S. 495 (2025) (Barrett, J., concurring, joined by Thomas, J.) (Alito, J. concurring)). Thus, while the Supreme Court declined to extend heightened scrutiny to classifications based on transgender status, this Court readily did so. *See Talbott*, 775 F. Supp. 3d at 319–22.

*Second*, with respect to the application of scrutiny, *B.P.J.* makes clear that, as long as the government's interests are rationally related to excluding individuals with a history of gender dysphoria from military service in "*general*," a court may not second-guess the extent to which the 2025 policy "furthers the government's interests in *an individual case*." 2026 WL 1868739, at *14 (emphases added; citation omitted). In *B.P.J.*, the plaintiffs argued that the States' interests did "not justify excluding *all* biological males—including those who identify as female and have taken puberty blockers or hormones—from participation in women's and girls' sports." *Id.* at *11. The Supreme Court rejected that argument. The Court explained that under intermediate scrutiny, the "validity" of a policy depends on "the relation it bears to the general problem," not on "the extent to which it furthers the Government's interest in an individual case." *Id.* at *12 (citation omitted). The Court thus declined the plaintiffs' invitation to divide the category of "biological males" into various subclasses and then ask whether the States' interests were sufficiently related to excluding each subclass from women's and girls' teams. *Id.* at *11. Even under heightened scrutiny, such a subclass-by-subclass (or "individual-by-individual") approach was inappropriate. *Id.* at *12.

It follows, *a fortiori*, that such a subclass-by-subclass approach is inappropriate with respect to the facial challenge brought here, where the applicable level of scrutiny is even lower (*i.e.*, rational-basis review) and the military is entitled to substantial deference. There is no doubt that the government's interests in military readiness are rationally related to excluding individuals with a history of gender dysphoria from military service in *general*. After all, the Department's prior policies issued

by former Secretaries Carter, Mattis, and Austin all regarded gender dysphoria as *generally* disqualifying. It is true that the 2025 policy narrows the circumstances in which that presumption of disqualification can be overcome, but because the government's interests are rationally related to excluding such individuals in "*general*," a court may not second-guess the extent to which the 2025 policy "furthers the government's interests in *an individual case*." *Id.* at *14 (emphases added; citation omitted).

Yet the D.C. Circuit majority in *Talbott* did precisely that: It divided the category of individuals with a history of gender dysphoria into various subclasses (*e.g.*, individuals with a "remote" history of gender dysphoria) and then asked whether the 2025 policy was "sufficiently related" to each subclass. 176 F.4th at 740–741 (Wilkins, J.). That analysis cannot be reconciled with *B.P.J.*, which forecloses such a subclass-by-subclass approach to rational-basis or even intermediate scrutiny.

The suggestion that the government must justify the exclusion of the *specific, named plaintiffs* in these cases is contrary to *B.P.J.* for the same reason. The Supreme Court in *B.P.J.* rejected the argument that "the States' interests must justify the laws' application to a specific subclass or individual" even under intermediate scrutiny. 2026 WL 1868739, at *13.

*B.P.J.* also makes clear that the scope of the 2025 policy's waiver provision is constitutionally irrelevant. In *B.P.J.*, the Court rejected plaintiffs' argument that the state laws violated equal protection because they did not make an exception for "biological males" who "identify as female and have taken puberty blockers or hormones." *Id.*, at *13. The Court held that, as long as the relationship between "the State's classification and the State's interests" is "sufficient as a general matter, the State is not *constitutionally* required to grant individualized exemptions to specific athletes or subclasses." *Id.*; *see id.* at *16 ("[W]hen a sex-based classification is justified as a constitutional matter, as it is here, States need not make case-by-case exceptions—for example, schools need not make individual exceptions to allow certain biological males to compete in women's and girls' sports.").

Plaintiffs' contention that the 2025 policy's waiver provision is too narrow similarly fails. The relationship between the government's interests and excluding individuals with a history of gender dysphoria (or related interventions) is "sufficient as a general matter[.]" *Id.* at *13. Therefore, the government "is not *constitutionally* required to grant individualized exemptions to specific [servicemembers] or subclasses." *Id.*

*B.P.J.* makes clear that the Department is entitled to substantial deference with respect to its judgment that accommodating gender transition as a treatment for gender dysphoria would "present a significant challenge for unit readiness." DOD Report and Recommendations on Military Service by Transgender Persons, at 35 (Feb. 2018) ("Mattis Report"). The 2025 policy generally disqualifies servicemembers who are diagnosed with gender dysphoria instead of allowing them to undergo "gender transition." One of the reasons for that policy, as reflected in the Mattis report on which the Department relied, is that there is "considerable scientific uncertainty" concerning whether "transition-related" interventions, such as "cross-sex hormone therapy" and "sex reassignment surgery," "fully remedy . . . the mental health problems associated with gender dysphoria." *Id.* at 32.

In *B.P.J.*, the Supreme Court emphasized that, "in assessing state and federal laws passed under circumstances of 'medical and scientific uncertainty,'" "the Judiciary must be cautious about swooping in and invalidating laws." 2026 WL 1868739, at *15 (citation omitted). The Court explained that, "[e]specially on medical and scientific matters where there is serious debate and disagreement, it can be difficult for courts to meaningfully evaluate the considered policy judgments of the lawmakers who have scrutinized the medical evidence and scientific data before them, and have made a reasoned decision." *Id.*

Here, the Department noted the "considerable scientific uncertainty" concerning the efficacy of "transition-related" interventions and made the reasoned decision that the military could not tolerate the "risk" to "readiness" that accommodating such interventions would create. Mattis Report

at 32.  For reasons the Court emphasized in *B.P.J.*, Defendants did not "carry deference too far," *Talbott*, 775 F. Supp. 3d at 313; the Department's decision is entitled to substantial deference.

*B.P.J.* also supports the reasoning behind the Department's determination that accommodating gender transition as a treatment for gender dysphoria would undermine "unit cohesion and good order and discipline."  Mattis Report at 36.  The military maintains different sets of physical-fitness and other standards for biological males and biological females, in order to hold them to equivalent standards while accounting for their physiological differences.  *Id.* at 35.  The Mattis report, on which the Department relied, expressed concern that allowing a "biological male" to "compete against [biological] females in gender-specific physical training" would pose a serious safety risk and generate perceptions of unfairness—thereby undermining unit cohesion and good order and discipline.  *Id.* at 31; *see id.* at 29.

The Supreme Court recognized in *B.P.J.* that States have "important" interests in "safety and competitive fairness."  2026 WL 1868739, at *11.  The Court further recognized that "the States' sex-based classification—limiting women's and girls' sports to biological females—is substantially related to those interests," notwithstanding the existence of a subclass of "biological males who identify as female and have taken puberty blockers or hormones."  *Id.*

Just as the States' interests in safety and fairness justified separate female and male sports teams in *B.P.J.* (without any exception for trans-identifying athletes), the government's interests in safety and fairness justify separate female and male standards in the military (without any exception for trans-identifying servicemembers).  Maintaining those sex-specific standards, in turn, supports the Department's decision to exclude individuals with a history of gender dysphoria from military service rather than allow them to undergo "gender transition" and serve in something other than their biological sex.

*Third*, with respect to animus, as Justice Thomas's concurrence in *B.P.J.* shows, any attempt to infer animus from references to "honesty," "humility," "integrity," and "false 'gender identit[ies]'" is misplaced. *Talbott*, 176 F.4th at 726 (Wilkins, J.) (citation omitted). Those references, which appear in the Executive Order and other statements, simply reflect the views articulated by Justice Thomas—that "[m]en and boys with gender dysphoria are not women or girls, even if they believe that they are"; that "[s]ex is an immutable 'biological' characteristic," which is "binary"; that "'man' and 'woman,' 'boy' and 'girl,' are the terms that correspond to adults and children of each sex"; and that "[t]o use language to obscure reality—to show 'indifference regarding the truth'—is to lie to the public and cease to treat our fellow citizens 'as equals.'" *B.P.J.*, 2026 WL 1868739, at *17 (Thomas, J., concurring) (brackets and citations omitted). Indeed, using the word "sex" to refer to someone's "biological sex and not gender identity" is what Congress itself did in Title IX, as *B.P.J.* recognizes. *Id.* at *7 (majority opinion). "[W]hatever one may think of the cited statements, they are insufficient to show" that the 2025 policy was "based on" animus. *Mullin v. Doe*, 146 S. Ct. 2121, 2138–39 (2026).

*B.P.J.* thus has a significant impact on this litigation. Defendants reserve the right to make additional arguments in support of or in opposition to any subsequent motions.

Dated: August 7, 2026                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ALEXANDER K. HAAS
                                            Director

                                            KRISTINA A. WOLFE
                                            Assistant Branch Director

                                            */s/ Robert C. Bombard*
                                            ROBERT C. BOMBARD
                                            M. JARED LITTMAN
                                            ELIZABETH B. LAYENDECKER
                                            Trial Attorneys

7

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 598-9509
Robert.Bombard2@usdoj.gov

*Counsel for Defendants*