**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES *et al.*,<br><br>Defendants. | Civil Action No. 1:25-cv-240-ACR |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' SUMMARY JUDGMENT NOTICE**

This case is about whether Executive Order No. 14183—which deemed transgender people unfit for military service, claiming they lack a "commitment to an honorable, truthful, and disciplined lifestyle"—and the Hegseth Policy that implements it were motivated by animus. That is an "inherently complex endeavor" that requires factfinding. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). In just over two months, this Court will resolve that question on a fully developed record at trial. There is no reason to short-circuit that process.

"[D]iscriminatory intent is a finding of fact to be made by the trial court; it is not a question of law." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 (1982). To carry their initial burden, Plaintiffs need establish only that discriminatory purpose was "a motivating factor" underlying the challenged Policy. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Defendants then bear the burden "to demonstrate that the [Policy] would have been enacted without" discriminatory purpose. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). The text of the Executive Order and the Hegseth Policy easily satisfy Plaintiffs' threshold showing: The text of the Executive Order and Policy reflect animus. Defendants assert they can carry their burden as a matter of law because they assessed the "risks" of gender

dysphoria "differently" than prior administrations based on "professional military judgment." Dkt. 154 at 2 ("Notice"). That assertion does not resolve the animus question; it highlights it.

The Parties dispute whether Defendants have exercised *any* "professional military judgment" at all, much less a judgment deserving deference. Defendants admit the only "study, review, evaluation, or analysis conducted or considered before issuance of the Hegseth Policy" was "the Mattis Report" and "sources informing the Policy." Defs.' Resp. to Interrog. No. 9.[1] Their own witnesses know of nothing more. The Department never consulted Dr. Ortega, the Air Force's senior accession-waiver physician, about the Policy, and he knows of no study or working group that informed it; Defendants' other witnesses likewise were not consulted and identified no further information that the Department considered. *See* Ortega Rough Tr. 117:6-13, 117:19-118:15; Lee Rough Tr. 220:4-12; Lombardo Rough Tr. 196:16-197:1; DeGoes Rough Tr. 60:13-61:1, 79:16-19. The timeline further supports Plaintiffs' factual contentions that the readiness rationale was adopted to justify a decision already made. *See Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). The President signed the Executive Order one week after taking office; Secretary Hegseth issued the first memorandum setting out the terms of the Policy 11 days later. No evidence suggests Defendants studied the issue in those 18 days.

Whether the challenged ban advances readiness is also a contested fact question. Defendants' own witnesses support Plaintiffs' view that a categorical ban deviates from the case-by-case assessment afforded essentially every other service member. Dr. Ortega does not consider a history of gender dysphoria "too risky for the Air Force." Ortega Rough Tr. 67:16-68:1. General Lombardo testified that whether transgender individuals should serve "depends"

---

[1] Those "sources" are the materials cited in the February 26, 2025 Action Memo—principally the 2018 Mattis Report, a 2021 AMSARA analysis, a 2025 medical literature review, and 2015-2024 cost data. Dkt. 73-23 at 4-5.

on "their fitness level." Lombardo Rough Tr. 162:13-163:17. And Lieutenant Colonel Carolyn Salter, M.D., testified that whether a stable, transitioned member can serve "would have to be [considered] on an individualized basis." Salter Rough Tr. 34:5-12; DeGoes Rough Tr. 70:23-71:7 (similar).[2]

Even Defendants' account of the prior policies is disputed. Defendants describe the Hegseth Policy as "similar" to the Mattis Policy, Notice at 1, but the "differences between the Mattis Policy and Hegseth Policy abound." *Talbott v. United States*, 176 F.4th 720, 736 (D.C. Cir. 2026) (Wilkins, J.). "The Mattis Policy allowed servicemembers who had transitioned or were in the process of transitioning to remain in the military. . . . [T]he Hegseth Policy categorically excludes them." *Id.* Secretary Mattis stressed that transgender persons with gender dysphoria "are no less valued members of our Nation"—Secretary Hegseth "proclaimed the opposite." *Id.* at 735. Whether those departures reflect animus is a factual dispute Defendants cannot gloss over by calling the policies "similar."

Defendants insist that "[c]ourts should not interfere with [military] decisions." Notice at 2. But the deference Defendants invoke runs to "considered professional judgment." *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986). Whether the Policy reflects such judgment or instead mere pretext is a fact question that cannot be resolved on the papers. *See Waldie v. Schlesinger*, 509 F.2d 508, 510 (D.C. Cir. 1974) (reversing summary judgment because military officers' affidavits were "too ambiguous to be accepted as fact, untested by cross-examination").

Each attack on Counts I, II, and III (equal protection) fails. First, the Policy does not classify merely by "medical condition" under *United States v. Skrmetti*, 605 U.S. 495, 502 (2025). It disqualifies anyone who has ever "attempted to transition" or "exhibit[ed] symptoms

---

[2] Defendants have not completed document production, and depositions are ongoing. Plaintiffs expect to develop additional evidence relevant to these fact disputes as fact discovery continues.

consistent with[ ] gender dysphoria"—regardless of whether they ever received that diagnosis. Dkt. 63-1 (Hegseth Policy) at 6. Second, even assuming rational-basis review applies, the Policy still fails. Defendants' after-the-fact justifications do not "explain why all persons with a history of gender dysphoria are disqualified, even if the person has been asymptomatic for many years." *Talbott*, 176 F.4th at 741 (Wilkins, J.). Nor do they explain why service members with a history of gender dysphoria are categorically separated when those with every other treatable medical condition are assessed on a case-by-case basis—as Defendants' own witnesses confirm. *See, e.g.*, DoDI 6130.03, Vol. 2 § 3.2 (as amended Feb. 6, 2026); DeGoes Rough Tr. 127:6-13 (every depression "case is looked at individually")

*West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026) changes nothing. That case did not analyze animus because no one argued the statute at issue was motivated by animus. *See* Dkt. 138 (Pls' *B.P.J.* Br.) at 2-8. It thus does not require this Court to disregard the litany of anti-transgender statements the President and Secretary Hegseth have made, as Defendants urge. *See* Notice at 3. Even if it did, the animus underlying the Policy is plain from its text. *See Talbott*, 176 F.4th at 745 & n.14 (Wilkins, J.).[3]

Counts IV (procedural due process) and V (estoppel) also turn on disputed facts. Defendants' assertion that Plaintiffs received "the same" separation boards as other members, Notice at 4, is incorrect, and in any event procedures mean little if the Policy dictates the result. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Talbott*, 176 F.4th at 735, 744 n.13 (Wilkins, J.). And whether the Plaintiffs reasonably relied on the Austin Policy's commitment that they "were permitted to transition and serve," Notice at 2, is also a fact question. *See, e.g.*, *Watkins v. U.S. Army*, 875 F.2d 699, 706-11 (9th Cir. 1989).

[3] Plaintiffs respectfully refer the Court to their brief addressing *B.P.J.* (Dkt. 138) for a more detailed explanation of why the case is irrelevant to the Court's disposition of this lawsuit.

Dated: October 20, 2026

Respectfully submitted,

/s/ *Lauren M. Weinstein*
Lauren M. Weinstein (1035184)
Benjamin G. Bradshaw (460539)
Shruti Kannan (90006641)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
lweinstein@omm.com
bbradshaw@omm.com
skannan@omm.com

Brett Williamson (1024759)
O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (949) 823-6900
bwilliamson@omm.com

Janine F. Panchok-Berry (*pro hac vice*)
Eamonn W. Campbell (*pro hac vice*)
Qiran "Anna" Xie (*pro hac vice*)
Maggie M. Niu (*pro hac vice*)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Phone: (212) 326-2000
jpanchok-berry@omm.com
ecampbell@omm.com
axie@omm.com
mniu@omm.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
Phone: (617) 742-6020
ibernstein@zalkindlaw.com

Jennifer Levi (MA0056)
Mary Bonauto (*pro hac vice*)
Michael R. Haley (*pro hac vice*)
Sarah K. Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
Phone: (617) 426-1350
jlevi@gladlaw.org
mbonauto@gladlaw.org
mhaley@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (*pro hac vice*)
Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st St. #11548
Sacramento, CA 95811
Phone: (415) 365-1320
cstoll@nclrights.org
sminter@nclrights.org
awhelan@nclrights.org

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

*Counsel for Plaintiffs*