*Nicolas Talbott* et al.

v.

*United States* et al.

Civil Action No. 1:25-cv-00240

# REBUTTAL EXPERT REPORT OF SHAWN G. SKELLY

Former Deputy Under Secretary of Defense for Personnel and Readiness and
Former Assistant Secretary of Defense for Readiness

# I. INTRODUCTION

1. Plaintiffs' counsel has retained me to prepare this expert report in the matter of *Nicolas Talbott et al. v. United States et al.*, Civil Action No. 1:25-cv-00240, pending in the United States District Court for the District of Columbia. The purpose of this report is to rebut expert disclosures submitted by the government and address the impact of Executive Order 14183 and the subsequent implementing policy ("the Hegseth Policy")[1] on military readiness and unit cohesion. Specifically, I provide opinions in response to the following disclosures:

   a. Expert Disclosure of Colonel Kevin T. Black, USA

   b. Expert Disclosure of Lieutenant Colonel Bryan C. Lee, USA

   c. Expert Disclosure of Lieutenant General William J. Bowers, USMC

   d. Expert Disclosure of Vice Admiral Marc Miguez, USN

   e. Expert Disclosure of Colonel Kevin Cron, USA

2. My opinions draw on my direct experience while the Department of Defense ("DoD") was implementing the Biden-era transgender service policy as well as my extensive career overseeing military personnel and readiness policy at the highest levels of the Department of Defense.

3. I have provided three opinions and supported those opinions with my personal experience in military leadership, policy development, and readiness oversight, as well as information from the materials identified in Appendix B.

4. My rate for work performed in this matter is $300 per hour. My compensation is not contingent upon the opinions I express or the outcome of this litigation.

# II. SUMMARY OF OPINIONS

5. In this report, I offer the following opinions:

6. First, contrary to the opinions disclosed for Lieutenant General Bowers, Vice Admiral Miguez, Colonel Black, Colonel Cron, and Lieutenant Colonel Lee, the Department's experience under the Austin Policy showed that open service by transgender service

---

[1] The "Hegseth Policy" means the memorandum titled "Prioritizing Military Excellence and Readiness" issued by Secretary of Defense Peter B. Hegseth on February 7, 2025 as well as related implementing guidance. *See* Peter B. Hegseth, Sec'y of Def., *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025); Office of the Under Sec'y of Def. for Pers. & Readiness, *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025) (including attachment, *Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria*).

members did not negatively impact military readiness or unit cohesion. The force retained highly trained personnel who were evaluated on merit, and no readiness or cohesion issue attributable to transgender service reached the Department's senior readiness leadership. In my opinion, the Defendants' proposed expert witnesses are offering ex post justifications for the Executive Order and Hegseth Policy.

7. Second, the government's line officers are mistaken that the Hegseth Policy is "consistent with" the military's broader approach to deployability. The Department's medical and personnel standards are the product of a systematic, evidence-based development process. The Hegseth Policy bypassed that process and displaces the individualized deployability determinations those witnesses describe.

8. Third, the government's witnesses identify no readiness benefit from the Hegseth Policy, and the policy and the manner of its implementation impose readiness costs of their own: they remove qualified, deployable personnel from the force, disrupt medical care the Department was already delivering without strain, and undermine the institutional trust on which retention and unit cohesion depend.

## III. QUALIFICATIONS

9. I attended the University of South Carolina and obtained an undergraduate degree in history in 1988. After college, I attended the U.S. Naval War College and earned a master's degree in national security and strategic studies in 2002.

10. I began my military career in the United States Navy as a Naval Flight Officer, working in various combat and management positions, with a focus on global counter-terrorism operations, South Asia, Southeast Asia, and Oceania policy, and training Naval Aviators and Naval Flight Officers. From 2003 to 2006, I was the U.S. Pacific Command's Deputy Division Chief for South Asia, Southeast Asia, and Oceania Policy. After twenty years, I retired with the rank of Commander.

11. After a period in industry with defense contractor ITT Exelis, I joined the Obama Administration in 2013. During the Obama Administration, I served first as Special Assistant to the Under Secretary of Defense for Acquisition, Technology, and Logistics at the U.S. Department of Defense, and ultimately as the Director of the Office of the Executive Secretariat at the U.S. Department of Transportation.

12. In 2017, President Obama appointed me to serve as a Commissioner on the National Commission on Military, National, and Public Service, which delivered its final report to Congress, titled *Inspired to Serve*, in March 2020.[2] This Commission undertook a review of the military selective-service process and recommended methods to increase military participation.

[2] Nat'l Comm'n on Mil., Nat'l, & Pub. Serv., *Inspired to Serve: The Final Report of the National Commission on Military, National, and Public Service* (Mar. 2020).

13. On July 21, 2021, I was confirmed by the Senate to be the Assistant Secretary of Defense for Readiness. I served as the principal advisor to the Secretary of Defense and the Under Secretary of Defense for Personnel and Readiness on all matters related to the readiness of the entire military ("Total Force"). In this role, I developed policies and plans, provided advice, and made recommendations for Total Force Readiness programs, reporting, and assessments of readiness to execute the National Defense Strategy. My responsibilities also included departmental policy oversight of training and education, and force safety and occupational health.

14. From September 18, 2023 through January 20, 2025, I performed the duties of the Deputy Under Secretary of Defense for Personnel and Readiness. In this role, I served as the primary assistant to the Under Secretary of Defense for Personnel and Readiness in formulating and directing policy for force readiness, force management, health affairs, National Guard and Reserve Component affairs, education and training, and military and civilian personnel requirements and management, to include equal opportunity, morale, welfare, recreation, and quality of life matters.

15. As a Department of Defense official and United States Navy veteran, I can attest to the importance of rigorous, merit-based policies in bolstering military preparedness and to the harms to the military and to national security caused by banning qualified transgender individuals who meet rigorous standards for military service. A detailed curriculum vitae is provided in Appendix A.

## IV. FRAMEWORK AND METHODOLOGY

16. My analysis in this report draws on my direct, firsthand experience during the implementation of the Biden-era transgender service policy as Assistant Secretary of Defense for Readiness and performing the duties of Deputy Under Secretary of Defense for Personnel and Readiness. In these roles, I had day-to-day responsibility for, and visibility into, the policy's impact on military readiness, force management, health affairs, and personnel policy across the Total Force.

17. My framework for evaluating the policies at issue considers the following elements:

   a. **Standard DoD Policy Development Process.** I evaluate the process by which the executive order and implementing guidance were developed against the standard Department of Defense policy development process. That process is described in Section V.B below.

   b. **Impact on Military Readiness.** I assess the impact of both the Austin Policy[3] and the Hegseth Policy on military readiness. Readiness can mean many different things. Here, I use the term to refer to the ability of military units to perform their assigned missions, including the availability of trained and experienced personnel,

[3] The Austin Policy refers to DoD Instruction 1300.28, titled "In-Service Transition for Transgender Service Members," issued on April 30, 2021 by the Department of Defense under the direction of Secretary of Defense Lloyd Austin. The Austin Policy set forth guidance to allow service by qualifying transgender service members.

the continuity of medical care, and the maintenance of trust within the chain of command.

c. **Unit Cohesion.** I evaluate the effect of the Austin and Hegseth Policies on unit cohesion—the bonds of trust, confidence, and mutual reliance that enable service members to work effectively as a team. This includes consideration of how policy changes affect not only the directly impacted individuals or group but also the broader force. For this evaluation, I used the then-routine methodologies and processes of force-level readiness reporting, understanding, and analysis in the DoD for determining military readiness.

d. **Force Management and Medical Care.** I consider the implications of the Austin and Hegseth Policies for the management of military personnel and the provision of medical care, including the provision of gender-affirming health care services in the existing DoD health care system and the consequences of disrupting that care.

e. **Trust in the Chain of Command.** I assess the broader implications of the Austin and Hegseth Policies on institutional trust, the extent to which service members can rely on the military to follow its own rules, maintain consistent standards, and treat all personnel fairly based on merit and ability.

18. In forming my opinions, I have reviewed and considered the materials identified in Appendix B. I reserve the right to consider additional materials or testimony produced in discovery, prior to trial, or during trial.

## V. DISCUSSION

### A. The Austin Policy (Biden Administration's Transgender Service Policy).

19. Under the first Trump Administration's 2018 policy (the "Mattis Policy"), individuals with a history of gender dysphoria were, with limited exceptions, disqualified from military service. This policy included a limited exception for currently serving transgender individuals who had already transitioned in reliance on the prior policy.[4]

20. In 2021, President Biden issued Executive Order 14004, which stated that "it shall be the policy of the United States to ensure that all transgender individuals who wish to serve in the United States military and can meet appropriate standards shall be able to do so openly—free from discrimination." The Executive Order overturned the first Trump Administration's restrictions on service by transgender service members.

21. DoD Instruction 1300.28 was issued on April 30, 2021. From my confirmation as Assistant Secretary of Defense for Readiness in July 2021, and later as Deputy Under Secretary, I was responsible within the Office of the Under Secretary of Defense for

[4] *See* James Mattis, Sec'y of Def., *Military Service by Transgender Individuals* (Feb. 22, 2018); Dep't of Def., *Report and Recommendations on Military Service by Transgender Persons* (Feb. 2018).

Personnel and Readiness for overseeing the implementation of that policy. What I saw in that role was a policy that held everyone to the same standards and, by doing so, let the Department keep people it needed.

## B. Standard Military Policy Development Process

22. Typically, military policies are developed through a systematic and evidence-based process that involves multiple steps and input from various sectors and that addresses a documented issue, problem, or need within the military context. Issues, problems, or needs may arise from operational experiences, strategic assessments, or evolving threats. Once an issue is identified, the office of primary responsibility ("OPR") for the relevant policy owns and conducts a thorough analysis, gathering relevant data and evidence to understand the scope and implications of the problem. Each policy typically designates contributing or coordinating offices, whose respective responsibilities and relationships are delineated with respect to the policy's subject matter. In certain instances, however, the methodology or structure of the analysis may be suggested or directed by higher authority on a case-by-case basis. This evidence-based approach ensures that decisions are grounded in factual information and best practices.

23. Input from diverse stakeholders is typically integral to the policy-development process and often includes military personnel at various levels, subject-matter experts, government officials, and sometimes civilian advisors. Engaging different sectors helps to ensure that a wide range of perspectives and expertise are considered, fostering a more comprehensive and effective policy outcome.

24. The development process is typically orderly and structured, often involving several phases such as drafting, reviewing, and revising the policy proposals. This may also include public consultations or discussions with key stakeholders to refine the proposed policies. Finally, once the policy is finalized, it undergoes full coordination through the appropriate military and Office of the Secretary of Defense ("OSD") approval authorities before implementation. This collaborative and comprehensive approach aims to create military policies that are responsive, effective, and aligned with broader national security objectives.

25. Based on my observations, the development and implementation of the Austin Policy was consistent with the standard process described above. The Office of the Secretary of Defense, under Secretary Austin, adhered to established policy-development procedures during this period. Deputy Secretary Kathleen Hicks, who in her capacity as Deputy Secretary also served as the Department's chief management officer, maintained oversight of administrative processes, including policy creation, ongoing administrative maintenance, and real-world performance assessment through a series of recurring departmental meetings such as the Deputy's Management Action Group and the Deputy's Workforce Council. The Biden administration took deliberate and appropriate steps to include all relevant stakeholders and to afford their input and any concerns raised full and fair consideration throughout the policy-development process.

### C. The Trump Executive Order and Hegseth Policy

26. On January 27, 2025, President Trump issued Executive Order 14183, reversing the Biden Administration's policy that allowed transgender people to serve. In contrast to the 2018 Mattis Policy, the Hegseth Policy mandated by this new executive order requires the exclusion of both transgender service members currently serving and those seeking to accede. The Order states that having a "'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service."[5] It further states that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."[6] The Order also directed the Secretary of Defense to update the relevant DoD instructions to align with the Order.

27. On February 7, 2025, Secretary Hegseth issued a Memorandum for Senior Pentagon Leadership titled "Prioritizing Military Excellence and Readiness," which implements the Executive Order's directive. In that Memorandum, Secretary Hegseth stated: "The Under Secretary of Defense for Personnel Readiness is authorized and delegated the authority to provide additional policy implementation guidance outside of the normal DoD issuance process[.]"[7] The Memorandum ordered, effective immediately, a pause on all new accessions for individuals with a history of gender dysphoria and a pause on all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for current service members.

28. On February 26, 2025, the Office of the Under Secretary of Defense for Personnel and Readiness issued a memorandum titled "Additional Guidance on Prioritizing Military Excellence and Readiness." The February 26 Memorandum declared that the medical, surgical, and mental-health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are "incompatible with the high mental and physical standards necessary for military service."[8]

29. On March 4, 2025, the Office of the Assistant Secretary of Defense for Manpower and Reserve Affairs issued a memorandum titled "Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers." The March 4 Memorandum provided that service members and applicants disqualified under the February 26 Memorandum may be considered for retention or accession waivers on a case-by-case basis where there is a compelling government interest directly supporting warfighting capabilities, provided the individual demonstrates 36 consecutive months of

---

[5] Exec. Order No. 14,183, 90 Fed. Reg. 8,509 (Jan. 27, 2025).
[6] *Id.*
[7] *See* Peter B. Hegseth, Sec'y of Def., *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025).
[8] *See* Peter B. Hegseth, Sec'y of Def., *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025).

stability, has never attempted to transition, and is willing and able to adhere to all standards associated with his or her sex.[9]

## VI. OPINIONS

### A. Contrary to the opinions disclosed by the government's line officers, the Austin Policy did not negatively impact military readiness or unit cohesion, and it strengthened the force by retaining highly trained personnel evaluated on merit.

30. From the personnel and readiness perspective, cohesion begins as a manning problem: the Department has to recruit and keep people who can fill the full range of occupational specialties, and a policy that widens the qualified pool while holding standards constant serves that objective.

31. The Austin Policy served that objective. It held transgender service members to the standards that apply to everyone else, including the medical standards for retention and deployment, and in doing so allowed the Department to keep trained, experienced people in whom it had already invested.

32. The Defendants' proposed expert line officers—Lieutenant General Bowers, Vice Admiral Miguez, and Colonel Black—are each expected to testify that medical conditions requiring "ongoing specialty evaluation, treatment, monitoring, or ready access to specific medications" can burden deployability in remote and austere environments, and that these considerations "apply broadly to all medical and behavioral health conditions" and "are not unique to gender dysphoria." I do not disagree with that general proposition. Austere environments constrain medical support; that is precisely why the Department maintains deployment medical standards, theater-specific medical requirements, and combatant command waiver processes, and why every service member is individually screened against them before deploying. What none of these witnesses explains is why those existing, individualized mechanisms—which the Department applies to every other continuous-care condition, and which applied to transgender service members throughout the Austin Policy period—were inadequate or what readiness problem a categorical exclusion solves that individualized screening did not. The "broader approach" they describe is individualized assessment against deployment standards. The Hegseth Policy abandons that approach for a single diagnosis.

33. The RAND Corporation's 2016 report, titled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"), predicted that allowing transgender individuals to serve would not undermine military readiness. As part of my role, I managed and oversaw provision of health services to the Total Force, which includes 3.4 million active-duty, reserve, and National Guard service members and civilian employees and contractors. To address the health care needs of this large

[9] *See* Memorandum from Tim Dill, Performing the Duties of the Assistant Sec'y of Def. for Manpower & Reserve Affairs, to Senior Pentagon Leadership et al., *Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers* (Mar. 4, 2025).

population, the DoD health care system provides access to medical providers across a comprehensive array of specialties as well as a wide variety of medical services.

34. The care involved is not exotic. Hormone therapy is prescribed and monitored by the same endocrinologists and primary-care providers who manage it for non-transgender patients, and the surgical procedures involved are performed by specialties the Military Health System already staffs. In the briefings I received, no one from Health Affairs or the Defense Health Agency ever identified a capability the Department had to add, a contract it had to let, or a budget line it had to grow to accommodate this population. Whatever the increase in spending was, it was small enough that it never surfaced at my level, which is what the RAND Report had projected.

35. The RAND Report predicted that less than 0.0015 percent of total labor-years would likely be affected by permitting transgender individuals to serve and that the total proportion of the force that would seek treatment would be less than 0.1 percent. Just as important from a readiness standpoint, DoD Instruction 1300.28 did not permit a service member to self-schedule a transition. A military medical provider had to diagnose and recommend treatment, the member's commander had to approve the timing of that treatment against the unit's operational requirements, and the member's deployability status was tracked throughout. A commander therefore knew in advance when a member would be unavailable and for how long and could plan around that absence as for any other scheduled medical event.

36. The RAND Report also predicted that allowing transgender individuals to serve would have little or no effect on unit cohesion.[10] Consistent with the military's experience integrating other disadvantaged groups into the ranks, an individual's ability to do the job in front of them has proven to be more important to unit cohesion than any concerns regarding identity. During my tenure, no cohesion problem attributable to the Austin Policy was reported to Personnel and Readiness through the Services, the Joint Staff, or the Department's command-climate and readiness reporting channels. If the policy had any effect on cohesion that I could observe, it was that members who no longer had to conceal a basic fact about themselves could concentrate on their jobs, and their teammates could count on them to do so.

37. Under the Austin Policy, transgender service members were assessed for deployability under the same combatant command medical standards and waiver processes as every other service member. Through briefings from Health Affairs, the Defense Health Agency, and the Services' personnel leadership during my tenure, I was aware that transgender service members deployed while on hormone therapy, including to austere locations with limited medical support, as do many non-transgender service members on continuous medication, and no issue arising from any of those deployments was reported to me.

38. The presence of transgender service members did not affect readiness from a departmental perspective. The Department of Defense assesses readiness through a hierarchical reporting structure: individual readiness data is captured at the tactical level,

[10] *Id.* at 44.

aggregates through operational echelons, and feeds into the Defense Readiness Reporting System and Global Force Management framework at the strategic level. At the Office of the Secretary of Defense tier where I sat, readiness discussions focused on whether sufficient fighter wings, bomber units, tanker and airlift squadrons, carrier strike groups, surface combatants, and armored brigade combat teams were resourced, manned, and trained to meet annual requirements. Defendants have estimated that there were approximately 4,200 transgender service members at the time of the issuance of the Hegseth Policy.[11] Even at the estimate that Defendants have identified, that population constitutes roughly 0.19 percent of the 2.1 million active-duty, guard, and reserve force—dispersed across service branches, unit types, occupational and warfare specialties, ranks, and geographic locations. At the strategic level at which readiness is assessed, so small and widely dispersed a population does not register in the data on which readiness assessments are made.

39. Colonel Black is expected to emphasize the training required for armor crews and the effect that the loss of a single crew member can have on a crew's readiness. That is true of every crew member and every cause of loss—injury, illness, pregnancy, family emergency, misconduct, or a scheduled elective procedure—and the Department manages it the same way in every case: through individualized medical readiness screening before deployment and personnel management within the unit. Nothing in Colonel Black's disclosure explains why a transgender crew member who meets the same screening presents a different problem. Lieutenant Colonel Lee's opinion that service members with gender dysphoria would create "an unsustainable burden on medical assets in theater" in large-scale combat operations is likewise inconsistent with how the Department plans medical support. Theater medical planning is built around casualty estimates and the health of the entire deployed force, many of whom are on some form of continuous medication at any given time. A few thousand service members, dispersed across the force and individually screened for deployability, are not a variable in that planning. In my readiness oversight role, no Service, combatant command, or Joint Staff element ever raised transgender service members to me as a medical-planning constraint.

40. In my capacity as Assistant Secretary of Defense for Readiness and then as Deputy Under Secretary, personnel issues that raised questions of strategic significance were routinely escalated to my attention. For example, the policy response to significant changes in access to reproductive care for service members and their families nationwide in 2022 was one such issue that required direct engagement in the coordinated personnel and readiness response at my level. Notably, however, during my entire tenure in those roles, no issues concerning transgender service members, whether relating to readiness, unit cohesion, health-care delivery, or otherwise, were brought to my attention as a matter of strategic concern.

41. To the contrary, when I was briefed by the Assistant Secretary for Health Affairs and Defense Health Agency staff regarding provision of medical care for transgender service members, I did not receive any reports of cost issues regarding the approximately $26 million on gender-affirming care that Defendants report the Department of Defense spent

[11] Defs.' Resp. & Objs. to Pls.' First Set of Interrogs. No. 20, at 45–46, *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Sept. 14, 2026).

between January 1, 2016 and May 14, 2021.[12] Nothing suggested this course of care was impactful on the military health system or involved any costs that were not, in my words, "lost in the wash."

42. Colonel Cron is expected to testify that "treatable" or "curable" conditions may nevertheless be disqualifying for deployment absent a waiver and that during his time at U.S. Central Command he issued determinations on more than 12,000 medical waiver applications. I agree with the first proposition, and the second illustrates my point. The Department has long recognized that some conditions compatible with service require case-by-case evaluation against the receiving theater's medical standards, and it built a waiver system to make those determinations individually based on the medical facts of each service member and each deployment. Throughout the Austin Policy period, transgender service members were subject to that same system. Colonel Cron does not identify any respect in which that system failed for transgender service members or any reason it could not continue to do for them the work he describes it doing for every other condition.

43. In sum, the Department's own experience under the Austin Policy is the best evidence on the readiness question the government's witnesses raise, and it points the other way: measuring transgender service members against the same standards as everyone else cost the Department nothing in readiness and kept qualified people in the force.

### B. The Hegseth Policy was not developed through the Department's standard evidence-based process for setting personnel and medical standards, and the government's witnesses are mistaken that it reflects the military's broader approach to deployability.

44. The standard DoD policy-development process is systematic, evidence-based, and involves multiple steps before implementation. These steps include: identifying a documented issue; conducting thorough analysis; gathering relevant data and evidence; obtaining input from diverse stakeholders including military personnel, subject-matter experts, government officials, and civilian advisors; engaging in structured phases of drafting, reviewing, and revising; and obtaining full coordination through appropriate military and OSD approval authorities.

45. Lieutenant General Bowers, Vice Admiral Miguez, and Colonel Black are each expected to testify that considering the burden of continuous-care conditions is "consistent with" the military's "objective standards" or "broader approach" for determining whether a medical condition is compatible with worldwide deployment. That framing assumes the Hegseth Policy is a product of the Department's standard-setting system. It is not. The Department's medical standards for accession, retention, and deployment—DoD Instruction 6130.03, DoD Instruction 6490.07, and the combatant commands' deployment medical standards—are the product of the process described above: they are developed by the offices of primary responsibility, coordinated through the Military Departments, the Joint Staff, Health Affairs, and the General Counsel, and revised on the

[12] Defs.' Resp. to Pls.' First Reqs. for Admission No. 76, at 52, *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Sept. 14, 2026).

basis of data.[13] The Hegseth Policy was not developed or coordinated through that process, was expressly authorized to issue outside the normal issuance process, and was not preceded by any analysis of the Department's own experience under the Austin Policy. A categorical exclusion adopted in that manner is not an application of the Department's objective standards; it is a departure from the system that produces them.

46. The abrupt policy reversal mandated by Executive Order 14183 bore none of these hallmarks. It was not prompted by any problem or issue with the service of transgender troops. It was not developed through a systematic or evidence-based process, did not include input from stakeholders, and was not the product of a structured or iterative review process. Nothing comparable occurred during my tenure in senior positions in the Department; the only precedent of which I am aware is the similarly abrupt announcement of a ban on transgender service members in 2017, before my tenure.

47. Secretary Hegseth compounded this departure by authorizing the Under Secretary of Defense for Personnel and Readiness to "provide additional policy implementation guidance outside of the normal Do[D] issuance process."[14] In my three-and-a-half years in Senate-confirmed and senior leadership positions in the Department, I never saw an authorization of this sort.

48. The standard issuance process exists to ensure that potential impacts—including potential harms, costs, and implementation considerations—are fully understood before a policy is enacted. All relevant stakeholders, including the Services, Military Departments, Health Affairs, Joint Staff, and General Counsel, have the opportunity to review and comment. A policy change of this significance would ordinarily take over a year and should involve review of the longitudinal data DoD has accumulated over nearly a decade of open transgender service since 2016, as well as nearly four years of data from service members who transitioned under existing policy.

49. Instead, Secretary Hegseth's authorization permitted implementation guidance to issue without the review and coordination that the issuance process exists to provide. The executive order's claims that transgender people are inherently dishonest and unfit to serve, and that permitting them to serve hinders military effectiveness and lethality, are unfounded. Moreover, they are refuted by more than three years of direct experience under the Austin Policy.

### C. The Hegseth Policy imposes readiness costs of its own that the government's witnesses do not account for.

50. The sudden reversal of the DoD policy allowing transgender personnel to serve will cause significant disruption and thereby undermine military readiness. This reversal, coming after many transgender service members relied on statements from the highest

[13] Dep't of Def., Instruction 6130.03, Vol. 1, *Medical Standards for Military Service: Appointment, Enlistment, or Induction* (May 6, 2018) (Change 6, Feb. 3, 2026); Dep't of Def., Instruction 6490.07, *Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees* (Feb. 5, 2010).
[14] *See supra* note 7.

levels of the chain of command, conveys to service members that command cannot be relied upon to follow its own rules or maintain consistent standards.

51. The transgender service members affected by the policy are people who accessed, trained, and were retained under the Department's standards and, as Defendants have acknowledged, met them.[15] There is no evidence that transgender individuals are dishonest or morally unfit. Prohibiting transgender individuals from serving is harmful to the military and to our national security because it degrades readiness and capabilities. Separating them is a readiness loss the government's witnesses do not weigh: each occupies a billet the Department must now refill, and the training and experience that made them deployable leave with them.

52. Throughout my career in senior DoD personnel and readiness roles, I interacted extensively with service members across all branches, ranks, and occupational specialties. Based on that experience, I have observed no evidence that transgender service members as a group are subject to adverse personnel actions, including disciplinary proceedings, administrative separation, or other corrective measures, at rates disproportionate to any other demographic within the force. To the contrary, in my observation, the Services held transgender members to the same conduct, performance, and fitness standards as everyone else and, where those standards were not met, applied the same consequences.

53. Those serving in our military are expected to perform difficult and dangerous work. The reversal of policy puts tremendous additional and unnecessary stress on transgender service members, their command leaders, and those with whom they serve.

54. This categorical approach—administratively separating an entire class of people who have demonstrated their ability to serve and meet military standards—represents a significant departure from standard military practice. I am aware of no other circumstance in which service members with a treatable condition that allows them to deploy and meet all readiness standards are nevertheless deemed categorically incapable of service. The Hegseth Policy makes transgender service members ineligible for the Disability Evaluation System (DES) and thereby bypasses the individualized medical evaluation the Department applies to every other condition affecting fitness for duty. This approach effectively declares that transgender service members cannot serve despite their demonstrated ability to do so successfully. The guidance separates these service members not based on any independent evaluation of their ability to meet service obligations, which is standard military policy, but solely based on their transgender status.

[15] At the request of counsel, I reviewed the transcripts of the preliminary injunction hearing held in this matter. Defense counsel acknowledged at the hearing that the active-duty Plaintiffs had met all current physical and mental fitness qualifications and were serving without any special accommodation beyond what any other service member receives. Tr. of Preliminary Injunction Hr'g at 130:17–131:16, *Talbott v. Trump*, No. 25-0240-ACR (D.D.C. Mar. 12, 2025). In Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Admission, which I have also reviewed at the request of counsel, Defendants admit that a number of the Named Plaintiffs in this action were discharged from the military with Honorable characterizations.

55. The administrative separation procedures will severely disrupt the chain of command and erode unit cohesion and trust. This guidance will interfere with appointments, promotions, and assignments, as commanders will be unwilling and unable to assign responsibilities to transgender service members they perceive will be subject to imminent separation. The damage to transgender service members began immediately upon the issuance of this guidance. Their career progression is negatively affected as their future viability within the military is foreclosed. This interferes with deployments, assignments, leadership opportunities, and unit cohesion. Following issuance of the guidance, service members began losing educational and professional-development opportunities as their commands anticipate separation. The waiver provisions in sections 4.1(c) and 4.3(c) of the implementing guidance are designed to exclude transgender service members from both accessions and retention rather than provide genuine pathways for continued service. The requirements for waivers in both contexts bar transgender service members from receiving them.

56. The guidance also disrupts care the Department was already delivering. By disqualifying transgender service members from treatments for gender transition and ongoing care for gender dysphoria, the guidance cuts off access to medically necessary care. From a force-management perspective, abruptly halting care that the Department had determined to be medically necessary and had been providing through the Military Health System without strain creates a readiness disruption where none existed. That disruption was compounded by the immediate cancellation of "all unscheduled, scheduled, or planned surgical procedures associated with facilitating sex reassignment for Service members diagnosed with gender dysphoria."

57. Banning military service by transgender persons would impose significant costs that far outweigh the minimal cost of permitting them to serve. As explained in Section VI.A above, the Health Affairs briefings I received during my tenure never identified transgender health care as a cost concern, even though Defendants report that the Department of Defense spent approximately $26 million on gender-affirming care between January 1, 2016 and May 14, 2021.[16]

58. The rollout of this policy is unprecedented in the chaos and confusion associated with it. For one, Section 3.4(e) of the February 26 implementing guidance instructs that transgender service members are to be identified within thirty days of the memorandum.[17] Then, two days later, on February 28, a clarification was sent out stating that DoD personnel are not to identify affected service members.[18] And an FAQ posted on the DoD website answers a question about how to identify affected personnel by saying that instructions are forthcoming.[19] It is highly unusual to direct the Department

---

[16] *See supra* note 12.

[17] *See supra* note 8, at 3 (attachment, *Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria*).

[18] Memorandum from Tim Dill, Performing the Duties of the Assistant Sec'y of Def. for Manpower & Reserve Affairs, to Senior Pentagon Leadership et al., *Clarifying Guidance on Prioritizing Military Excellence and Readiness*, at 1 (Feb. 28, 2025).

[19] U.S. Dep't of Def., *Prioritizing Military Excellence and Readiness: Frequently Asked Questions*, at 2 (Feb. 26, 2025).

to identify service members within thirty days for administrative separation and provide no guidance about how to do that. At the same time, based on the documents I have reviewed, directives issued halting deployments, halting medical treatments, and directing service members to return from combat posts, all alongside directions not to identify affected service members. A rollout of this kind is unprecedented in my experience in its lack of clarity, and the confusion it produced is itself a readiness cost. Based on my professional experience in military personnel and readiness, I conclude that this guidance imposes immediate and lasting readiness costs. The policy disrupts ongoing medical treatment, creates unjustifiable barriers to continued service, and damages the careers and well-being of capable service members who have demonstrated their ability to serve effectively. Rather than enhancing military readiness, this guidance undermines it by removing qualified personnel from service based solely on their transgender status, regardless of their demonstrated ability to meet all service requirements.

59. The Hegseth Policy harms unit cohesion and readiness across the entire force, not only among transgender service members. Military retention and advancement rest on the foundational principle that service members who meet uniform standards can continue to serve. Separating personnel who satisfy all applicable standards solely because of a characteristic unrelated to performance violates that principle and erodes force morale.

60. Any new information with respect to this case will be considered and may impact my opinions and analyses. I reserve the right to amend or supplement my opinions if additional information becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 25, 2026

Shawn G. Skelly

# Appendix A

# Shawn Skelly

**Strategic Leader | Team Builder | Communicator**

Deeply experienced leader of interdisciplinary, multistakeholder coalitions in pursuit of large-scale, long term institutional goals as well as high visibility rapid response to emergent challenges. Accomplished speaker and relationship builder across the federal interagency, foreign government partners, state and local governments, corporations, educational institutions, non-profits, and advocacy organizations.

## Experience

SEPTEMBER 2026 – CURRENT
**Director, Business Development | Dexis Professional Services | Arlington, VA**

Develop and execute comprehensive capture plans for federal government business opportunities across the national security sector, while increasing the company's growth and brand recognition. Lead company strategic assessments over muti-year horizons while providing thought leadership and representation of the company in relevant forums, events, exchanges and conferences.

SEPTEMBER 2025 – CURRENT
**Member, Board of Directors | Human Rights Campaign| Washington, DC**

Part time, uncompensated volunteer member of the Board of Directors for both the Human Rights Campaign 501 (c) (4) and the Human Rights Campaign Foundation 501 (c) (3) entities. Board members determine HRC's mission and purposes and sustain the organization's vision; with ultimate authority over actions, fiscal management and budget approval. HRC, with four million members and supporters is the nation's largest civil rights organization working to achieve LGBTQ+ equality.

SEPTEMBER 2023 – JANUARY 2025
**Deputy Under Secretary of Defense for Personnel & Readiness | U.S. Department of Defense | Washington, DC**

Primary assistant to the Under Secretary of Defense for Personnel and Readiness in formulating, coordinating, and integrating policy for force readiness; force management; health affairs; National Guard and Reserve Component affairs; education and training; and military and civilian personnel requirements and management to include equal opportunity, morale, welfare, recreation, and quality of life matters.

JULY 2021 – SEPTEMBER 2023
**Assistant Secretary of Defense for Readiness | U.S. Department of Defense | Washington, DC**

Confirmed as Assistant Secretary of Defense for Readiness by the U.S. Senate on July 22, 2021. Principal advisor to the Secretary of Defense on all matters related to the readiness of the Total Force - nearly 3.4 million people. Developed policies and plans, provided advice, and made recommendations for Total Force Readiness programs, reporting, and assessments of readiness to execute the National Defense Strategy. Additionally, served as the DoD Designated Agency Safety and Health Official, responsible for integrated assessment and reporting of safety and occupational health issues, trend analysis, and mishap and accident reduction and mitigation activities.

NOVEMBER 2020 – JANUARY 2021

**Team Member | Department of Defense Agency Review Team | Biden - Harris Presidential Transition**

Fulltime volunteer contributor to the Team's mission responsibility for understanding the operations of the Department of Defense, ensuring a smooth transfer of power, and preparing President-Elect Biden, Vice President-Elect Harris and their cabinet to hit the ground running on day one of their administration.

JANUARY 2017 – SEPTEMBER 2020

**Commissioner | National Commission on Military, National, and Public Service | Washington, DC**

Appointed by President Obama to serve as one of eleven members of the National Commission on Military, National, and Public Service, an independent commission in the executive branch established by the 2017 National Defense Authorization Act to conduct a review of the military selective service process and consider methods to increase participation in military, national, and public service to address national security and other public service needs of the Nation. The Commission issued its final report to Congress, *Inspired to Serve*, in March 2020.

FEBRUARY 2018 – NOVEMBER 2020

**Acquisition Analyst | CACI | Washington, DC**

Project management support to two U.S. Navy Sea Systems Command (NAVSEA) Program Executive Offices - Integrated Warfare Systems (PEO IWS) and Unmanned and Small Combatants (PEO USC). Coordinated with Naval Research Laboratory, multiple program offices, Federally Funded Research and Development Centers (FFRDCs), defense industry and provided coordination of recurring programmatic-level Risk Management Boards.

JUNE 2016 – JANUARY 2017

**Director, Office of the Executive Secretariat | U.S. Department of Transportation | Washington, DC**

Personal and confidential assistant to both the Secretary and Deputy Secretary of Transportation, leading a fourteen-person team responsible for the conduct of the Department's correspondence and coordination with the White House, National Security Council, Congress, State, Local and Tribal governments. Maintained oversight of direct administrative and budgeting support to the Secretary and Deputy Secretary, responsible for administrative compliance of the Department's twenty-plus Advisory Committees. Co-chair of the Department of Transportation Executive Steering Committee tasked with strategic oversight of the Department's Electronic Document Management System (EDMS) replacement project.

DECEMBER 2013 – JUNE 2016

**Special Assistant to the Under Secretary of Defense for Acquisition, Technology, and Logistics | U.S. Department of Defense | Washington, DC**

Warfighter Senior Integration Group Coordinator. Responsible for the daily execution of a recurring, Departmental-level senior leader forum which facilitated the most urgent and unique support requirements of Combatant Commanders, focusing on support to coalition operations in Afghanistan and the campaign against the Islamic State. Led the preparation and conduct of two monthly principals meetings, consisting of thirty-five-plus Senior Executive Service, General and Flag Officer participants, representing the Office of the Secretary of Defense, the Joint Staff, Military Services, Defense Agencies, Combatant Commands and State Department.

OCTOBER 2008 – SEPTEMBER 2013
**Technical Director – Joint Service & Intel Programs | ITT Exelis | Herndon, VA**

Supported multiple contract proposal efforts, both Indefinite Delivery/Indefinite Quantity contracts and individual Task Orders, from capture planning through candidate recruitment, technical writing and proposal submission. Led multi-corporation teams comprised of major aerospace & defense firms, leading government consulting corporations and agile small business partners in the pursuit of opportunities across the Defense, Intelligence, and Homeland Security domains.

MAY 1988 – SEPTEMBER 2008
**Naval Flight Officer | U.S. Navy | Multiple Locations**

- Director, USMC Improvised Explosive Device Working Group | USMC Warfighting Laboratory | Quantico, VA
- Deputy Chief for South Asia, Southeast Asia & Oceania Policy | U.S. Pacific Command | Camp H.M. Smith, HI
- Department Head | Sea Control Squadron 29 | Naval Air Station North Island, CA
- Future Operations Officer | U.S. Second Fleet / NATO Striking Fleet Atlantic | Naval Station Norfolk, VA
- Fleet Replacement Squadron Instructor | Sea Control Squadron 41 | Naval Air Station North Island, CA
- S-3B Viking Mission Commander | Sea Control Squadron 37 | Naval Air Station North Island, CA

## Education

2002
**Master of Arts, National Security and Strategic Studies | U.S. Naval War College | Newport, RI**

1990
**Naval Flight Officer | Naval Air Training Command | Pensacola, FL**

1988
**Bachelor of Arts, History | University of South Carolina | Columbia, SC**

## Advocacy

**Co-Founder, Out in National Security**

Out in National Security is a 501(c)(3) organization dedicated to empowering LGBTQ+ national security professionals. ONS builds community, secures equality of opportunity, and promotes allyship by taking a broad view of the national security enterprise and bridging organizations of excellence to other like-minded groups. Served as Vice President of ONS from May 2019 – July 2021.

**Member, Atlantic Council LGBTI Advisory Council** August 2019 – July 2021

The Atlantic Council's LGBTI Advisory Council serves to promote and protect LGBTI rights across industries and countries and encourage US and foreign government officials, global business leaders, and civil society actors to play a more active role in ensuring that LGBTI rights are upheld.

**Member, Service Year Alliance Leadership Council** October 2020 – July 2021

Service Year Alliance works to increase public and private investments in the service year ecosystem by developing and documenting evidence in priority focus areas to persuade decision makers — including federal, state, and local legislators, as well as private sector leaders — to unlock funds for service years.

# Appendix B

# VII. Materials Considered

**Government Documents**

- Dep't of Def., Instruction 1300.28 (Apr. 30, 2021)
- Exec. Order No. 14004 (Jan. 25, 2021)
- Exec. Order No. 14183 (Jan. 27, 2025)
- Tim Dill, *Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers* (Mar. 4, 2025).
- Memorandum from Tim Dill, Performing the Duties of the Assistant Sec'y of Def. for Manpower & Reserve Affairs, to Senior Pentagon Leadership et al., Clarifying Guidance on Prioritizing Military Excellence and Readiness (Feb. 28, 2025)
- Peter B. Hegseth, Sec'y of Def., *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025)
- Office of the Under Sec'y of Def. for Pers. & Readiness, *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025) (including attachment, *Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria*).
- James Mattis, Sec'y of Def., Memorandum, *Military Service by Transgender Individuals* (Feb. 2018), and accompanying Dep't of Def., *Report and Recommendations on Military Service by Transgender Persons* (Feb. 2018).
- RAND Corp., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (2016).
- See Memorandum from Tim Dill, Performing the Duties of the Assistant Sec'y of Def. for Manpower & Reserve Affairs, to Senior Pentagon Leadership et al., Clarifying Guidance on Prioritizing Military Excellence and Readiness: Retention and Accession Waivers (Mar. 4, 2025)
- U.S. Dep't of Def., Prioritizing Military Excellence and Readiness: Frequently Asked Questions, at 2 (Feb. 26, 2025).
- Dep't of Def., Instruction 6130.03, Vol. 1, Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018) (Change 6, Feb. 3, 2026) and Dep't of Def., Instruction 6490.07, Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees (Feb. 5, 2010).

**Litigation Materials:**

- Hr'g Tr., Preliminary Injunction Hr'g, *Talbott v. Trump*, No. 25-0240-ACR (D.D.C. Mar. 12, 2025), at 130:17–131:16.
- Defendants' response to Plaintiffs' Request for Admission No. 76. P. 52. Dated: September 14, 2026
- Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories, Talbott v. United States, No. 1:25-cv-00240 (D.D.C. Sept. 14, 2026)

**Judicial Materials**

- Fifth Am. Compl., *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Apr. 15, 2026).
- Mem. Op. Granting Pls.' Renewed Application for Preliminary Injunction, *Talbott v. United States*, No. 25-5087 (D.C. Cir. Dec. 9, 2025) (ECF No. 01208803654)
- Defendants' Expert Disclosures filed in this matter.

# Appendix C

# VIII. Publications in the Last Ten Years

- Shawn Skelly, *In Fighting for Trans Rights, Don't Demean Others*, Wash. Blade (Nov. 2, 2018), https://www.washingtonblade.com/2018/11/02/opinion-transgender-rights-fight/.
- Shawn Skelly, *A New Era of Telework Should Be the Beginning of a More Flexible Federal Workforce*, Gov't Exec. (Apr. 9, 2020), https://www.govexec.com/workforce/2020/04/new-era-telework-should-be-beginning-more-flexible-federal-workforce/164504/.
- Shawn Skelly & Kayla Williams, *A Biden-Harris Administration Means Equitable Care for Transgender Veterans*, LGBTQ Nation (Sept. 8, 2020), https://www.lgbtqnation.com/2020/09/biden-harris-administration-means-equitable-care-transgender-veterans/.
- Shawn Skelly, *Transphobia and National Security*, CSIS Def. 360 Represent Series (Oct. 29, 2020), https://defense360.csis.org/transphobia-and-national-security/.
- Nat'l Comm'n on Military, Nat'l, & Pub. Serv., *Inspired to Serve: Final Report of the National Commission on Military, National, and Public Service* (2020), https://www.dmi-ida.org/knowledge-base-detail/inspired-to-serve-final-report.

# Appendix D

## IX. Testimony in the Last Four Years

X. None.