IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------

NICOLAS TALBOTT, et.al.,

Plaintiffs,

v. Civ. A. No. 25-240 (ACR)

UNITED STATES, et al.,

Defendants.

-------------------------------

ZOOM VIDEO DEPOSITION

Taken on behalf of the Defendants of

SHAWN SKELLY

Washington, D.C.

November 3, 2026

9:30 a.m.

Reported by: Audra M. Smith, RPR, CRR, FCRR

Video by: Orson Braithwaite

Job No. CS8534183

Q Did you have any role with Transgender Service Review Working Group that performed work in the time frame of 2015 to 2016?

A I did not. In the time frame 2015 to 2016, I contacted -- as I was serving as special assistant to the Under Secretary for Acquisition, Technology, and Logistics. And with the Under Secretary's approval, I contacted the Under Secretary for Personnel and Readiness who was leading the transgender service study to offer my assistance if he needed any additional manpower, which would be not in conflict with and above and beyond my already assigned duties.

The Under Secretary for Personnel and Readiness, who I had a conversation with, did not take up -- did not find a need for any additional support.

Q Do you know an individual by the name of Yvette Bourcicot?

A I do.

Q How do you know her?

A Yvette was a fellow Biden Administration appointee in the Department of Defense while I served as Assistant Secretary of

individual service members within a unit would often be included in recommendations by my office through the Under Secretary for Personnel and Readiness to the Secretary of Defense.

BY MR. CRABB:

Q During the course of this litigation, we have referred to as "the policy" during the Biden Administration, that permitted transgender service members to serve openly in the military. We've referred to that as "the Austin Policy."

Are you familiar with the Austin Policy?

A Yes, I am.

Q Did you have -- personally, did you have any role in the formulation of the Austin Policy?

A I did not.

Q During your tenure at the Department of Defense during the Biden Administration, did you have any tools at your disposal to track transgender service members?

A I did not.

Q To your knowledge did the Department of Defense make any effort to track the number of transgender service members?

signature authorities for particular documents, is responsible to cover all the things that the Under Secretary is responsible for: all of the health care issues; all of the personnel issues; all of the matters related to the subordinate defense agencies and field activities of personnel readiness such as defense commissaries; the defense education system, the elementary and high schools that the Department of Defense has; the Defense Human Resource Activity for civilian personnel and ID card support for the entire department; as well as everything within my own ASD Readiness portfolio, the Assistant Secretary of Health Affairs portfolio, and the Manpower Reserve Affairs portfolio, and to be one of the two officials available and responsible directly to the Deputy Secretary and the Secretary of Defense.

Q Did you have any other role at the Department of Defense during the Biden Administration other than what we've already discussed?

A That is it.

Q When did you leave the Department of

Defense?

A Noon on January 20, 2025.

Q And that coincided with the new Trump Administration taking over, I assume?

A That's correct.

Q Is it fair to say that you have no personal knowledge of the policy-making process within the Department of Defense after you left?

A No personal knowledge, no.

Q Do you have any personal knowledge regarding military readiness or deployability statistics from after you left the Department of Defense?

A I do not.

Q Do you have any personal knowledge of what's been referred to as the "Hegseth Policy" regarding service by transgender individuals other than what is publicly available?

A No, not beyond publicly available.

Q Is your knowledge of the impact of the Hegseth Policy on military readiness and unit cohesion limited to what is publicly available, or do you have any other source of information?

A My knowledge of the policy and its

their individual readiness, the readiness of their unit or the force writ large did not come to my attention, and in my opinion, I would expect that it would over that time.

BY MR. CRABB:

Q And why do you have that expectation that those -- that any problems would have come to your attention?

A With regard to problems, as regard to those -- excuse me -- few thousand service members as a group, as a cohort? I feel fairly certain that if there was a cohort-wide issue and problems being experienced across the force due to the presence of those service members distributed across the force, it would have been talked about, and it would have reached my attention at some point over those years.

Q Okay. So if I understand correctly, you believe that if there was a cohort-wide problem with service by transgender individuals, that that would have come to your attention.

What about individualized issues or problems with respect to readiness as it relates to transgender service members? Would you expect that each individual issue would have

come to your attention?

MR. CAMPBELL: Objection. Form.

You can answer.

A I would not expect each individual issue to come to my attention, no more so than the individual issues of any service member of the 2.1 million approximately active duty guard and reserve. There is always a service member of some rank, in some unit, in some location that has an issue with regard to their availability for duty at any one time or their subsequent deployability at any one time. Those types of matters, writ large, occur constantly.

BY MR. CRABB:

Q Could you turn to paragraph 38, please?

And in particular, I'm looking on the next page, page 9, at the top of the page within paragraph 38. There in the middle, you wrote: Defendants have estimated that there were approximately 4,200 transgender service members at the time of the issuance of the Hegseth Policy.

Do you see that?

A I do see it.

service members.

BY MR. CRABB:

Q And so to be clear, you are predicting harm that has not yet occurred, true?

MR. CAMPBELL: Objection. Form.

A I don't agree with that statement. I believe the harm is ongoing and began from the President's -- the current President's executive order and the subsequent Hegseth Policy and the continual statements of the Secretary of Defense with regard to transgender service members.

BY MR. CRABB:

Q Okay. And that's fair.

So to summarize your opinion, you believe that some harm related to the current policy under Secretary Hegseth has already occurred. Is it also your opinion that there is -- if the policy is permitted to continue in force that additional harm will occur in the future?

A Yes, I agree with that statement.

Q And that's harm that's not yet occurred, that's future harm?

MR. CAMPBELL: Objection. Form.

A I would say that it's continuing harm

of the sort that has occurred. And by "harm," I refer to the ability of Americans to believe they'll get fair treatment if they sign up and successfully enlist or are recruited into the military and qualified, that at sometime they could be found for reasons other than the actual facts of their successful service be separated.

BY MR. CRABB:

Q Would you agree with me generally speaking that all predictions about the future are inherently speculative in nature at least to some degree?

MR. CAMPBELL: Objection. Form.

A To some degree, of course.

BY MR. CRABB:

Q Is it your understanding that gender dysphoria is not a ratable condition by the VA?

MR. CAMPBELL: Objection. Form and --

A I'm not an expert in Veterans Affairs and veterans -- despite being a veteran, I'm not expert nor have I had any personal interactions with the Department of Veterans Affairs for my own veteran status and any benefits or care that I might receive, so I have no knowledge as to

developed and maintained those standards.

BY MR. CRABB:

Q At this point, have we by and large covered the waterfront in terms of the opinions you expect to give at trial?

A I believe that's correct.

Q If you -- between now and trial if you develop any new opinions or if you, for whatever reason, wish to modify one of your opinions, would you agree to inform plaintiffs' counsel so they can promptly inform me?

A I do.

Q Do you plan to do any other work on this case of any kind between now and trial?

A The only work I expect to do between now and trial would be as a layperson who has not participated in a trial before, what I would expect to be preparation commensurate to the trial that was made for this deposition.

Q Okay. Ms. Skelly, I understand from online sources that you yourself are transgender; is that accurate?

MR. CAMPBELL: I'll object to the relevance of this, and caution to see where you're going with it.

But you can answer the question.

A That's a public fact.

BY MR. CRABB:

Q Okay. And certainly not trying to pry at all. Do you mind if I ask you a few questions about that?

A I am concerned to what those questions might be with regard to the privacy of my health care.

Q Sure. And I don't intend to get into that at all.

The question I do have -- and tell me if you don't want to answer it. It's your prerogative. The question I do have is whether you transitioned before, during, or after your active duty service?

MR. CAMPBELL: Objecting to the relevance.

But if you're comfortable with the question.

A I've publicly stated that I believe that I began to undertake my gender transition while serving on active duty.

BY MR. CRABB:

Q Okay. And approximately what time

frame would that have been?

A Late 2006 to early 2007. Very late 2006, 2007, around the turn of the New Year 2007, through my retirement at the end of September 2008.

Q Do you believe that your transition was complete by the time of your retirement in 2008?

A It was not.

Q Let me just ask you this, and this may -- this may deal with the objection. Is there any part of your personal experience as a transgender service -- I'm sorry -- as a transgender person that you intend to testify about at trial?

A I'm not sure I understand how your question would relate to my answering any question at trial, per se.

Q Okay. So here's what I'm -- like I said before, this is a discovery deposition. It's my only opportunity to find out what you might testify about at trial. And so if you intend to make your personal experience part of your trial testimony, then I think I'm entitled to discover what that testimony might be and ask

you some personal questions.

If, on the other hand, you testify today that "I don't intend to get into my own personal experience at trial," then I tend to agree that it's probably not something that we need to get into today.

So that's the basis for my question. And to restate it is: Do you intend to testify about your own personal experience as a transgender person at the trial of this matter?

And if you want to go off the record and speak about it, I'm okay with that.

MR. CAMPBELL: Would you like to do that?

THE WITNESS: Yes, I would like to go off the record.

MR. CRABB: Okay. That's fine.

THE VIDEOGRAPHER: The time is 12:17 p.m. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 12:24 p.m. We're on the record.

BY MR. CRABB:

Q So, Ms. Skelly, the pending question is: Do you intend to testify at all about your

personal experience as a transgender person at the trial of this matter?

A I do not.

MR. CRABB: Okay. All right. Fair enough.

Counsel, I think what we'll probably do is come up with maybe an unopposed motion in limine that would cover that, but, of course, we can discuss that off the record.

MR. CAMPBELL: We can discuss that off the record.

MR. CRABB: Okay. With that, I have no further questions, and I will pass the witness.

MR. CAMPBELL: We have no questions today either. Thank you.

THE VIDEOGRAPHER: The time is 12:24 p.m. This concludes today's deposition. We're off the record.

(Reserved signature.)

(The deposition concluded at 12:24 p.m.)