**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*, *individually and on behalf of all similarly situated individuals,*

*Plaintiffs,*

v.

UNITED STATES *et al.*,

*Defendants.*

Civil Action No. 1:25-cv-240-ACR

**REBUTTAL EXPERT REPORT OF YVETTE BOURCICOT, J.D.**

I, Yvette Bourcicot, J.D., state as follows:

## I. INTRODUCTION

1. I make this report based on my own personal knowledge, my experience as detailed below, and my review of the materials identified in Appendix C (materials considered). The opinions I express are informed by my twenty-five years of experience in military personnel policy, including service as a United States Air Force Judge Advocate, Special Assistant to the Army General Counsel, member of the 2015 Department of Defense Working Group on Transgender Service, Acting Assistant Secretary of the Army for Manpower and Reserve Affairs, and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs.

2. I have been asked to provide my expert opinions by Plaintiffs' counsel on the following topics related to Executive Order 14183 and the Hegseth Policy[1] banning transgender individuals from military service: (a) whether the military's decision to allow transgender individuals to serve was based on well-researched evidence and considered professional judgment, drawing on my direct participation in the 2015 Working Group that developed that policy; (b) whether allowing transgender individuals to serve fostered trust, unit cohesion, and military readiness based on my direct experience implementing the policy in the Department of the Army; (c) whether Executive Order 14183 and the February 26, 2025, implementing memorandum ("Hegseth Policy") represent an abrupt and highly irregular reversal of established military policy that was not supported by evidence or informed by standard military policymaking processes; (d) whether the categorical bar imposed by Executive Order 14183 and the February 26, 2025, memorandum is consistent with the individualized, standards-based

[1] The "Hegseth Policy" refers to the Memorandum from the Performing the Duties of the Under Secretary of Defense for Personnel and Readiness (Darin S. Selnick), "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025).

assessment Army policy requires to evaluate medical fitness for its soldiers, and whether the stated rationales for that bar are consistent with the Department's own experience; and (e) whether the February 26, 2025, memorandum's waiver provisions for both accession and retention make service by transgender people impossible and virtually eliminate currently serving transgender personnel from the armed forces. These opinions are offered solely to contradict or rebut the opinions disclosed in Defendants' Rule 26(a)(2)(C) expert disclosures served on September 4, 2026, each of which I have reviewed, and in particular the disclosures of GEN Carden, LTG Lombardo, VADM Miguez, Lt Gen DeGoes, COL Cron, COL Black, CAPT Blair, CAPT White, CAPT Roberts, LTC Lee, LCDR Bayer, and Dr. Ortega. At the beginning of each section below I identify the disclosed opinions to which that section responds.

3. In evaluating whether a personnel policy or personnel action is consistent with military readiness for the purposes of this report, I apply the same criteria I applied in my official capacity as Acting Assistant Secretary and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs when reviewing personnel actions, [including requests for Exceptions to Policy for full-time Real Life Experience treatment described in Section III.B below]: (i) whether the affected soldier meets the medical fitness-for-duty, physical-fitness, and deployability standards applicable to all soldiers; (ii) the assessment of the soldier's commander regarding mission impact and unit cohesion; (iii) whether the action was developed through the Department's established process for adopting or revising personnel policy, including consultation with the military departments and the Joint Staff, medical review, legal review, and implementation planning; (iv) the Department's own data and operational experience; and (v) the cost and administrative burden of the action relative to the Army's overall personnel workload.

## II. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

### A. Professional Background

4. I attended Princeton University on an Air Force Reserve Officer Training Corps (ROTC) scholarship and obtained a Bachelor of Arts degree in English Literature in 2000. I later attended Georgetown University Law Center on an Air Force scholarship (Funded Legal Education Program) and as a Dean's Scholar, where I focused on public international law and national security law, earning a Juris Doctor degree in 2008.

5. From May 2000 to December 2010, I served as a commissioned officer in the United States Air Force in various positions at installations in Latin America, Virginia, and the Washington, D.C., area. My career began as a manpower officer before I attended law school and became an Air Force Judge Advocate (JAG). Following my medical retirement from the Air Force, I operated my own law practice from March 2011 to September 2012, specializing in family law, criminal law, military justice, and administrative law. I also collaborated in an Of Counsel capacity at The Burton Firm and SRIS Law Group on several cases. I am licensed to practice law in the District of Columbia, Maryland, and before the United States District Court for the District of Maryland.

6. From September 2012 to July 2014, I served as Special Assistant to the General Counsel of the Army, then Brad Carson, providing legal advice to the General Counsel, the Secretary of the Army, and Army staff on issues including the Army's response to the Washington Navy Yard shooting, accommodating transgender prisoner populations, updating background check procedures for Army Child Development Center workers, compliance with e-discovery requirements, coordinating an enterprise-wide review of Army Medicine, and reforming the Army Behavioral Health system. I also was assigned as the lead action officer to perform legal analysis and coordinate updates to Army Corrections Command's policies to

accommodate transgender inmates following Chelsea Manning's 2013 court-martial and conviction.

7. From July 2014 to December 2016, I served as Senior Advisor for International Humanitarian Policy in the Office of the Under Secretary of Defense for Policy, formulating policy on issues including lethal autonomous weapons systems, international support for LGBT human rights protections, and mass atrocities prevention and response. I co-authored changes to Department of Defense Directive 3000.09, the first Department of Defense governance framework for AI-enabled weapons systems. I represented the United States in United Nations policy negotiations regarding weapons covered by the Convention on Certain Conventional Weapons, including landmines, cluster munitions, and lethal autonomous weapons.

8. During that assignment, I attended the Auschwitz Institute for Peace and Reconciliation's Raphael Lemkin Seminar for Genocide Prevention (Global Edition) in November 2015. I gave talks and lectures on international humanitarian law and human rights at various venues, including the United States Military Academy (West Point), the United States Holocaust Memorial Museum, and the United States Army War College.

9. On July 28, 2015, Secretary of Defense Ashton B. Carter directed Brad Carson, then-Acting Under Secretary of Defense for Personnel and Readiness, to convene the Transgender Service Review Working Group ("Working Group") to study the policy and readiness implications of allowing transgender persons to serve in the armed forces. Mr. Carson requested that my leadership detail me to the Working Group as a subject matter expert, building on the background research I conducted on gender dysphoria and Department of Defense accession and retention policy in connection with the Chelsea Manning post-trial issues. The

Working Group produced an evidence-based recommendation to Secretary Carter to approve policy updates to allow transgender individuals to be accessed and retained in the military.

10. On June 30, 2016, Secretary Carter announced that the country's military would be best served by permitting transgender individuals to serve and issued Directive-Type Memorandum 16-005 (DTM 16-005), titled "Military Service of Transgender Service Members" (the "Carter Policy").

11. In December 2016, I became an Associate Deputy General Counsel in the Office of Legal Counsel, Department of Defense, advising on foreign and international litigation, matters pending before the U.S. Supreme Court, and litigation risk associated with certain personnel policies. During my time in the Office of Legal Counsel, I recused myself from all legal cases filed by transgender service members to challenge the rescission of the Carter Policy.

12. From February 2018 to January 2022, I worked in the private sector, filling a number of policy and communications roles at technology firms, including Facebook, Airbnb, and Match Group.

13. I returned to the Department of the Army to serve as Acting Assistant Secretary of the Army (ASA) for Manpower and Reserve Affairs (M&RA) from January 18, 2022, to December 23, 2022. In that role, I advised the Secretary of the Army on all personnel policy matters, including human capital, training, readiness, mobilization, military health care, force structure, manpower management, equal opportunity, recruiting, and marketing. The United States Army is the largest of the service branches of the United States Armed Forces and performs land-based military operations. The Department of the Army is one of the three Military Departments of the Department of Defense. The Army has an annual budget of more than $185.9 billion. During the last year of my tenure, the approximate end strength for the

Active Army was 452,800 soldiers, with an additional 328,000 soldiers in the Army National Guard, and 170,600 in the United States Army Reserve, for a total of 951,400 uniformed soldiers. Additionally, approximately 223,000 Army civilians supported the force.[2]

14. Among my duties as the ASA M&RA, I reviewed and coordinated mobilization orders, monitored and created policies to support unit readiness and cohesion, and oversaw a major shift in recruiting and training strategy. With respect to this case, I reviewed and approved requests from transgender soldiers to receive full-time Real Life Experience treatment in the Army and oversaw the implementation of policy covering transgender soldiers.

15. Following the Assistant Secretary's confirmation, I served as Principal Deputy Assistant Secretary of the Army (PDASA) for Manpower and Reserve Affairs from December 23, 2022, to January 20, 2025. In that role, I supported the Assistant Secretary's development, implementation, and oversight of the policies in the M&RA portfolio.

16. I am currently a 2026 Senior Visiting Fellow at the Institute for AI Policy and Strategy (IAPS) developing recommendations for frontier AI governance and emergency preparedness. I serve on the Advisory Committee of the American Bar Association's Standing Committee on Law and National Security and co-hosted its weekly podcast "National Security Law Today" from 2017 to 2022.

17. My areas of expertise include military human capital management and personnel policy; Army manpower and reserve affairs; military accession, retention, and separation standards; military health policy; and the Department of Defense's processes for developing, coordinating, implementing, and revising personnel policy, including the readiness, deployability, and unit-cohesion considerations that inform those policies.

---

[2] Defense Manpower Data Center, DoD Personnel, Workforce Reports & Publications, DMDC Web, U.S. Dep't of Def., https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports (last visited Sept. 25, 2026).

18. During my uniformed service, I was awarded the Meritorious Service Medal, the Air Force Commendation Medal, and the Army Commendation Medal. For my service as an Army civilian, I was awarded the Distinguished Public Service Medal and the Department of the Army Outstanding Civilian Service Medal. For my service as a Department of Defense civilian, I was awarded the Office of the Secretary of Defense Award for Outstanding Achievement and the Office of the Secretary of Defense Group Achievement Award.

19. I offer this report based on both my personal knowledge of the policies and processes described herein and my expertise in military personnel policy and manpower management. Where I provide factual testimony based on personal observation, I identify it as such. Where I offer expert opinions, I identify the analytical basis for those opinions.

## III. EXPERIENCE WITH THE DEVELOPMENT AND IMPLEMENTATION OF POLICIES CONCERNING TRANSGENDER SERVICE MEMBERS

### A. Participation in 2015 Working Group and Development of the Carter Policy

20. As noted in Section II above, I joined the Working Group that was established by Secretary of Defense Ashton B. Carter. On July 28, 2015, after consultations with the Secretaries of the Military Departments, Secretary of Defense Ashton Carter directed Brad Carson, Acting Under Secretary of Defense for Personnel and Readiness, to convene a Working Group to study the policy and readiness implications of allowing transgender persons to serve in the armed forces. Brad Carson requested that I join the Working Group as a subject matter expert based on my legal analysis concerning the Army's constitutional duty to provide medical support for gender dysphoria to service members incarcerated in Army correctional facilities. I supported the court-martial conviction of Private Manning, which I regarded as fair, and separately concluded that the Army was constitutionally obligated to provide medical care for gender dysphoria to soldiers in its custody. My specific responsibilities within the Working Group included advising

on which reports and expert opinions to consider in our analysis, supporting and attending monthly Working Group meetings, and responding to requests for information. Initially, the Working Group was asked to begin with the presumption that transgender individuals could serve unless objective, practical impediments were identified, and to develop an implementation plan that addressed those issues with the goal of maximizing military readiness.

21. The Working Group's process was rigorous and comprehensive. The Working Group was composed of senior representatives from each of the Military Departments, including their Surgeons General, as well as from the Joint Chiefs of Staff and relevant components from the Office of the Secretary of Defense, including personnel, training, readiness, and medical specialists. It considered information from a variety of sources, including medical and other experts from within and outside of the Department of Defense; senior uniformed officers and civilian officials from each military department; commanders who supervised transgender service members; transgender people on active duty; and doctors, employers, and insurance companies regarding the provision of medical care to transgender individuals. The Working Group also investigated the policies, lessons learned, and outcomes of at least eighteen foreign countries that already permitted transgender personnel to serve openly, including close allies such as the United Kingdom, Canada, Israel, and Australia.

22. A foundational consideration for the Working Group was a change in the science underpinning the Department of Defense's rationale for prohibiting transgender people from serving in the military. The Department's medical standards, following the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), had treated "gender identity disorder" as a categorically disqualifying psychosexual condition. However, the 2013 Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") introduced the term

"gender dysphoria" and acknowledged that appropriate treatment could resolve the mental health symptoms that disqualified otherwise qualified candidates for military service. The Working Group considered how people with gender dysphoria could be integrated into service, applying the same analytical framework used for other people with non-disqualifying medical conditions. Such reconsideration of Department of Defense policies following scientific updates and advancements is typical and ensures that the Department can recruit and retain qualified individuals from the broadest possible pool of talent. Accordingly, the Working Group also reviewed and developed policies consistent with the World Professional Association for Transgender Health (WPATH) Standards of Care, recognized internationally as representing the consensus view for supportive care for gender dysphoria.

23. Additionally, in 2015, the Department of Defense commissioned the RAND Corporation to conduct an independent study, which reviewed and analyzed all relevant scholarly literature, medical data, actuarial data, and foreign military research and developed recommendations. Throughout the course of the study, RAND periodically presented its findings to inform the Working Group's analysis.

24. In 2016, RAND published *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, which the Department of Defense commissioned in 2015 and which was published in June 2016 (the "RAND Report"). RAND is a global non-profit institution that seeks to make its research freely and readily available to the public. Accordingly, the research provided in RAND's publications is held to high-quality peer-review standards for objective analysis. The RAND Report detailed RAND's review of all of the relevant scholarly literature and empirical data, including the extensive medical literature, actuarial data, and research and

reports from the then-eighteen other countries that permitted service by transgender personnel.[3] The RAND Report concluded that costs, readiness, and unit cohesion would not be negatively impacted by allowing transgender service members to serve equally in the military. Indeed, RAND reported anecdotal research from Canada in which commanders disclosed that "increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges." (p. 61)

25. While the Working Group's operating assumption was that transgender people should be qualified for military service, the members thoroughly interrogated this hypothesis. As is typical for policy discussions, Department of Defense and Military Department representatives freely expressed points of agreement and dissent. There was significant, often spirited discussion about the potential impacts to military readiness, the ability to provide appropriate medical treatment to transgender service members in austere deployment environments, and the specter of degradation of unit cohesion and culture. The Working Group also considered the negative readiness impacts several units experienced when qualified transgender service members in key roles were separated.

26. The Working Group staff worked to provide an objective assessment of the additional concerns raised and to provide empirical evidence to develop feasible solutions. Crucially, to develop its policies, the Working Group referenced RAND's independent research and other peer-reviewed research, and adopted many of the best practices it identified from foreign militaries with transgender service members.

27. Throughout the months-long process, all participants had ample opportunity to air their concerns, request and receive additional analysis, and ensure each issue was

[3] Agnes Gereben Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* 85–91 (RAND Corp. 2016).

appropriately addressed by the policy. Following this exhaustive process, no member of the Working Group could identify any objective, data-informed, practical impediments that should disqualify transgender individuals or prevent them from serving effectively. In consideration of the experts' empirical findings, along with the multitude of opinions from military and civilian personnel, the Working Group reached consensus that transgender individuals who meet the standards for military service should be permitted to serve, that open service would not negatively impact unit cohesion, operational effectiveness, or readiness, and that policy updates and deliberate efforts to educate the force would ensure the smooth integration of transgender service members serving openly.

28. Moreover, consistent with ordinary practice, each stakeholder reviewed and decided whether to formally concur or nonconcur on the final draft policy. All offices concurred before Under Secretary Carson forwarded the draft to Secretary Carter for his approval.

29. Accordingly, Secretary of Defense Carter issued the Carter Policy, which required the Secretaries of the Military Departments, including the Army, to implement the Working Group's equal service policy. The Army implemented two Directives: Army Directive 2016-30 and Army Directive 2016-35, which applied to all personnel in the Active Army, U.S. Army Reserve, Army National Guard, and Army National Guard of the United States. Army Directive 2016-30 disallowed discrimination based on gender identity and stated, "The Army is open to all who can meet the standards for military service and remains committed to treating all Soldiers with dignity and respect." Meanwhile, Army Directive 2016-35 provided policies and standards for transgender soldiers to obtain transition-related medical care.

**B. Implementation of Executive Order 14004 and the Austin Policy**

30. On July 26, 2017, President Trump announced by social media that transgender individuals would no longer be permitted to serve, and on August 25, 2017, he directed the

Department to return to its pre-2016 policy. I was serving in the Department of Defense Office of Legal Counsel supporting the personnel policy portfolio at that time. I was not aware of, nor was I later made aware of, any policy consultation and deliberation processes that would normally have accompanied a change such as the July-August 2017 announcement and directive. This is a direct contrast to the Working Group's operations.

31. Following the President's social media announcement, then-Secretary of Defense James Mattis convened a panel of experts, and in February 2018 he recommended a policy under which persons with a history or diagnosis of gender dysphoria were disqualified from accession and retention subject to limited exceptions, while service members who had been diagnosed under the Carter Policy were permitted to continue serving consistent with their gender identities and to receive supportive care (the "Mattis Policy"). The Mattis Policy took effect in April 2019 after the preliminary injunctions against the 2017 directive were lifted. I do not offer an opinion here on the merits of the Mattis Policy. I note, however, that, in contrast to the defendants' actions, that reversal was preceded by a Department panel that met over several months and produced a written report, and that it preserved the service of those who had already transitioned in reliance on the Carter Policy.

32. On January 25, 2021, President Joseph R. Biden replaced the Mattis Policy with Executive Order 14004, entitled "Enabling All Qualified Americans To Serve Their Country in Uniform" (the "Biden Executive Order"). The Biden Executive Order directed the Secretary of Defense and Secretary of Homeland Security "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." The Biden Executive Order relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any

meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense" (referring to the RAND Report), 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly before Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason, including a diagnosis of gender dysphoria, to exclude them from military service or to limit their access to medically necessary care.'" The last reference is to a statement originally released on March 28, 2018, by the Palm Center and signed by six former United States Surgeons General: M. Joycelyn Elders, David Satcher, Richard Carmona, Regina Benjamin, Vivek H. Murthy, and Kenneth P. Moritsugu. The statement concluded that "transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

33. On April 30, 2021, the Department of Defense implemented Executive Order 14004 through the issuance of DoD Instruction 1300.28, entitled "In-Service Transition for Transgender Service Members" ("DoDI 1300.28"), which applied to all Military Departments until its rescission in 2025. This guidance provided that "service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

34. To implement DoDI 1300.28, the Secretary of the Army issued Army Directive 2021-22, entitled "Army Service by Transgender Persons and Persons With Gender Dysphoria" ("Army Directive 2021-22" or the "Policy Memorandum"). As is typical with policy changes, the Army hewed as closely as possible to existing implementation mechanisms to minimize disruption and optimize success.

35. The Policy Memorandum specified that personnel would be accessed or commissioned in accordance with medical standards issued by the Department of the Army and the Department of Defense.

36. The Policy Memorandum also confirmed that "[n]o otherwise qualified Soldier may be involuntarily separated, discharged, or denied reenlistment or continuation of service, or otherwise subjected to adverse action or treatment, solely on the basis of gender identity." Additionally, for any soldier "whose fitness for duty or ability to serve is adversely affected by a medical condition or medical treatment related to gender identity or gender transition," the Policy Memorandum stated that they "should be treated, for purposes of separation and retention, just as any other Soldier whose fitness for duty or ability to serve is similarly affected by non-gender identity or gender transition reasons." The Policy Memorandum stated that "[t]he Army is open to all who can meet the standards for military service and readiness. It remains committed to treating all Soldiers with dignity and respect while ensuring good order and discipline, including allowing transgender Soldiers to serve openly . . . ." For any standard, requirement, or policy that "appl[ies] differently to Soldiers according to gender, the Army recognizes a Soldier's gender by the Soldier's gender marker in the Defense Enrollment Eligibility Reporting System (DEERS)."

37. Under the Policy Memorandum, military medical providers were required to diagnose and provide supportive care for transgender soldiers. In general, a soldier whose medical provider indicated that "gender transition was medically necessary" informed the chain of command of the treatment plan and requested approval for the proposed schedule for treatment. In addition to the soldier's individual circumstances, the brigade commander would consider several factors, including "mission readiness . . . including deployment, operational, training, and exercise schedules, and critical skills availability" as well as "morale, welfare, good order, and discipline of the unit" to approve the treatment schedule. Once the medical provider confirmed the soldier's stability in the self-identified gender and the soldier received legal documentation supporting a gender change, the brigade commander would grant a request to change the soldier's gender marker in the DEERS. Following that update, the soldier's transition would be considered complete for administrative purposes. The soldier would be expected to conform to the physical fitness, uniform, and training standards consistent with the gender marker.

38. As Acting Assistant Secretary for Manpower and Reserve Affairs, I oversaw the Service Central Coordination Cell (SCCC), which comprised subject matter experts from the Office of the Surgeon General, the Office of General Counsel, the Office of the Judge Advocate General, and the Deputy Chief of Staff for Personnel (G-1). The SCCC supported oversight of the Policy Memorandum, advised brigade commanders managing transgender soldiers, and reviewed requests for gender marker changes. When soldiers requested permission for full-time Real Life Experience treatment, which would allow the soldier to conform to uniform standards matching the gender identity prior to the administrative recognition of transition, the SCCC

prepared an Exception to Policy package for my review. I reviewed each request, considering the medical provider's recommendation, input from the soldier's command, and a legal review.

39. Subsequently, as Principal Deputy Assistant Secretary for Manpower and Reserve Affairs, I was notified of each request and provided advice to the Assistant Secretary. Because the transgender population constitutes a very small fraction of total Army military personnel, I reviewed only one or two such requests per quarter, representing less than 1% of the hundreds of personnel actions processed by my office during the same period. This was a de minimis volume compared to the number of soldiers in the Army as discussed above. To the best of my recollection, every request I received satisfied the policy's requirements, and every requesting service member met the necessary standards for serving. I therefore never had cause to deny a request or recommend that a request be denied.

40. In implementing the Policy Memorandum from January 2022 through January 2025, I observed no negative impact from permitting transgender service on Army readiness, cohesion, or military capabilities. That observation rests on the information that routinely reached my office. As Acting Assistant Secretary and later Principal Deputy Assistant Secretary, I received recurring readiness briefings from the Army Commands and the Army Staff, including medical-readiness reporting from the Office of the Surgeon General; command climate survey summaries; Service Central Coordination Cell reporting required by DoDI 1300.28; congressional inquiries routed through the Office of the Chief of Legislative Liaison; and issues escalated through the chain of command and the Army's complaint channels. I also engaged directly with commanders during numerous installation visits worldwide and command briefings. Issues affecting unit readiness, morale, cohesion, good order and discipline, and deployability were routinely surfaced through these mechanisms. I addressed concerns across a

wide range of matters such as recruiting shortfalls, barracks conditions, complaints of misconduct, gaps in benefits, health care realignment, and evaluations for promotions and command. I received no complaint or concern, formally or informally, regarding the Policy Memorandum or transgender soldiers individually or as a group. The Army did not separately track transgender soldiers, and I do not claim to have reviewed readiness data specific to them. However, I can confirm that in none of these channels was transgender service identified as a readiness concern, a cohesion problem, or a disciplinary issue.

## IV. SUMMARY OF OPINIONS AND BASIS FOR THEM

41. The opinions I express are informed by my twenty-five years of experience in military personnel policy, including service as a U.S. Air Force Judge Advocate, Special Assistant to the Army General Counsel, member of the 2015 Department of Defense Working Group on Transgender Service, Acting Assistant Secretary of the Army for Manpower and Reserve Affairs, and Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs. In addition, I have reviewed the materials at Appendix C.

42. I am experienced in military human capital policy, Army personnel management, and the development, implementation, and evaluation of military accession, retention, and separation standards as they relate to the scope of my work on this matter. For 20 of the past 25 years, I served in active-duty Air Force officer roles and senior civilian positions within the Department of Defense and the Department of the Army, developing, implementing, and evaluating military personnel policies and their impact on force readiness. In connection with this work, I have overseen the human capital enterprise for approximately 1.17 million Army soldiers and civilians, personally reviewed requests from transgender soldiers under the Austin

Policy[4], and directly shaped policies governing the conditions under which individuals may enter, serve in, and be separated from the Armed Forces. My resume, attached as Appendix A, provides a summary of my experience and credentials, and Appendix D provides a list of matters in which I have given testimony over the last four years.

43. As a former Department of Defense ("DoD") official, Department of the Army official, and Air Force veteran, I can attest that personnel policies must be based on merit and objective criteria to promote readiness and unit cohesion. Moreover, my role in the Working Group allowed me to understand the thorough and careful research that informed the Carter Policy. When DoD Instruction 1300.28, entitled "In-Service Transition for Transgender Service Members," was issued on April 30, 2021, by the Department of Defense under the direction of Secretary of Defense Lloyd Austin (the "Austin Policy"), it set forth guidance to allow service by qualifying transgender service members. I understood that the instruction was based on years of thoughtful policymaking supported by peer-reviewed scientific research.

44. Based on my experiences above and my expertise, I hold the following opinions:

45. The military's decision to allow transgender individuals to serve openly was the product of a rigorous, months-long evidence-based process through the 2015 Working Group—in which I participated as a subject matter expert—that considered input from uniformed and civilian senior medical experts, personnel experts, commanders, Surgeons General, transgender service members, foreign military experiences, and the RAND Corporation.

46. In my positions overseeing Army personnel policy development and implementation, I would have been made aware of issues arising from the Austin Policy. I heard

[4]The "Austin Policy" refers to DoD Instruction 1300.28, entitled "In-Service Transition for Transgender Service Members" and issued on April 30, 2021, by the Department of Defense under the direction of Secretary of Defense Lloyd Austin.

no complaints about transgender service members undermining unit readiness, individual deployability, or unit cohesion.

47. In my opinion, permitting transgender service members to serve openly fostered trust among team members and advanced unit cohesion and readiness.

48. Executive Order 14183 and the February 26, 2025, implementing memorandum represent an abrupt and rushed reversal of established military policy, issued without the deliberative processes that accompanied the policies preceding it. No panel of experts, no working group, no consultation with uniformed military leaders, no analysis of the Department of Defense data following the implementation of the Austin Policy or evaluation of the performance of transgender service members preceded this change in policy. Unlike the 2017–2018 reversal, which was at least preceded by a Departmental panel and a written report and which preserved the service of those who had transitioned under the Carter Policy, the 2025 policy was adopted without any comparable process and reaches every currently serving transgender service member.

49. The Executive Order's claims that transgender identity is inconsistent with honesty, humility, integrity, and a disciplined lifestyle have no scientific or evidentiary basis and are wholly refuted by the honorable contributions transgender service members have made to their country. Likewise, the Hegseth Policy, which I understand implements the directive in the Executive Order, suffers from the same lack of scientific or evidentiary support.

50. In the absence of such support or other reasonable basis, and given the abrupt process by which the policies were adopted in the context of the President's and Secretary's public statements disparaging transgender service members when the policies were announced, I

am aware of no legitimate military-personnel rationale for these policies, and their stated rationales are inconsistent with the Department's own experience under the Austin Policy.

51. The February 26 Memorandum replaces the individualized, standards-based assessment that the Army applied to transgender soldiers under the Austin Policy with a categorical bar unrelated to any soldier's demonstrated fitness, performance, or contribution to readiness, and it separates soldiers who met every applicable standard.

52. The waiver provisions in Sections 4.1 (accessions) and 4.3 (retention) of the February 26 Memorandum cannot be satisfied by any service member who transitioned under the Austin Policy, and therefore function as a total ban rather than a genuine exemption process designed to support mission readiness objectives.

53. The use of administrative separation—rather than the Disability Evaluation System—to remove transgender service members with a treatable medical condition departs from standard Army procedures for soldiers who remain fit for duty and whose medical condition is being successfully managed under an approved treatment plan. Such soldiers are ordinarily retained, and a soldier whose condition renders him or her unfit is referred to the Disability Evaluation System rather than administratively separated.

54. The cost associated with transgender health care was never raised as a concern during my tenure, and the administrative workload was negligible.

55. In forming the opinions expressed in this report, I applied the criteria described in paragraph 3 above, which are the criteria I applied in my official capacity. Specifically: (i) I assessed the policy at issue against the established DoD personnel policymaking process, drawing on my direct experience with that process through the 2015 Working Group and my subsequent senior roles; (ii) I evaluated the operational outcomes of the Austin Policy using the

information channels available to me as Acting Assistant Secretary and Principal Deputy Assistant Secretary, including the readiness reporting, requests made pursuant to the Policy Memorandum, command climate data, and field-commander engagement described in Section III.B; (iii) I reviewed the empirical research identified in Section III.A, including the RAND Report and peer-reviewed military sociology literature; (iv) I compared the process underlying Executive Order 14183 against the standard DoD deliberative process for major personnel policy changes; and (v) I evaluated the February 26 Memorandum's waiver provisions against the Army's established standards for administrative separation, accession, and retention.

56. I acknowledge that my participation in the Working Group means I was involved in developing the policy framework now at issue. I address this involvement because: (i) my direct participation gives me firsthand knowledge of the analytical processes, evidence, and deliberations that informed the policy—knowledge not available from documents alone; and (ii) the opinions I express in this report do not depend on whether the policies I helped develop were correct as a policy matter. Rather, they rest on the documented evidence base, established military personnel frameworks, and observable operational outcomes during the years of implementation. Applying these same frameworks, I would reach the same conclusions regardless of my personal involvement.

57. I am being compensated at a rate of $300 per hour.

58. My prior testimony within the preceding four years, publications within the preceding ten years, curriculum vitae, and materials considered are set forth in Appendix A (CV), Appendix B (publications), Appendix C (materials considered), and Appendix D (prior testimony).

## V. STATEMENT OF OPINIONS AND FACTS IN SUPPORT OF THEM

### A. Open service by transgender soldiers under the Austin Policy did not impair and, in my experience, strengthened trust, unit cohesion, and readiness in the Army.

59. This section responds to the disclosures of General Carden (¶ 3), LTG Lombardo (¶ 6), COL Black (¶¶ 3–6), and LTC Lee (¶ 6), each of whom is expected to testify that soldiers with gender dysphoria present duty limitations or require special accommodation that burdens unit readiness, deployability, and cohesion.

60. Based on my expertise in military personnel policy and my knowledge of the Army's institutional mechanisms for surfacing and escalating readiness concerns, the complete absence of reports identifying transgender service as a significant or systemic problem through any of these established channels is strong evidence that open service by transgender soldiers does not negatively impact Army readiness, cohesion, or capabilities. The Army's reporting architecture is designed to ensure that operational concerns, even those arising at the unit level, reach senior leadership. That no such concern reached me through any channel during my three-year tenure is not merely an artifact of my personal awareness; it reflects the Army's institutional judgment that transgender service was not a readiness or cohesion issue.

61. Some transgender service members did require medical procedures that temporarily affected their deployability; from a force-management perspective, this is managed through the same temporary non-deployable tracking system used for any service member requiring surgery, extended medical treatment, or parental leave. I defer to medical experts for clinical details regarding the nature and duration of transition-related medical procedures. In my experience, the same is true of the far larger number of soldiers who are temporarily non-deployable at any given time for reasons unrelated to gender dysphoria. I anticipate that Defendants' witnesses may describe individual soldiers with gender dysphoria who had duty

limitations. The existence of individual duty limitations is not evidence of a readiness problem attributable to a policy; it is the ordinary condition that the Army's readiness systems are designed to manage, and it is the same condition presented by soldiers recovering from surgery, injury, or childbirth. Evidence of a readiness problem would be a pattern surfaced through the Army's reporting channels, and none was.

62. The RAND Report found no significant effect of openly serving transgender personnel on cohesion, operational effectiveness, or readiness in any of the four foreign militaries it examined—Australia, Canada, Israel, and the United Kingdom—and noted that some commanders in Canada and the United Kingdom reported that increased diversity had in fact improved readiness and performance by giving units the tools to address a wider variety of situations and challenges. A peer-reviewed study, *Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness*, published in *Armed Forces & Society* in 2015, similarly found no evidence that transgender-inclusive policy had harmed the operational effectiveness of the Canadian Forces, and specifically found no erosion of task cohesion, readiness, or the willingness of individuals to work together to achieve unit goals.

63. These empirical findings are consistent with my professional observation of unit dynamics during my tenure overseeing Army personnel policy. The established military social-science framework for evaluating cohesion distinguishes between "social cohesion" (personal bonds) and "task cohesion" (shared commitment to mission accomplishment).[5] I am not a military sociologist; I cite this literature because it is consistent with what I observed, not as the basis for an independent social-science opinion. The evidence indicates that inclusive policies do

[5] See Guy L. Siebold, The Essence of Military Group Cohesion, 33 *Armed Forces & Soc'y* 286 (2007); Robert J. MacCoun, Elizabeth Kier & Aaron Belkin, "Does Social Cohesion Determine Motivation in Combat? An Old Question with an Old Answer," 32 *Armed Forces & Soc'y* 646 (2006).

not impair task cohesion—the dimension most relevant to operational effectiveness—and may enhance it by eliminating the distraction and resource expenditure associated with concealment and identity management.

64. Based on my expertise in military personnel policy and the established social-science literature on military unit cohesion, an individual's contribution to unit cohesion is determined by their ability to perform their duties and their commitment to the team's mission, not by identity characteristics. This principle has been confirmed through the military's experience integrating other previously excluded groups, including the end of racial segregation in the armed forces, the repeal of the "Don't Ask, Don't Tell" policy, and the integration of women in combat roles.[6] The evidence from my tenure, including the absence of cohesion complaints through established and informal channels as well as the continued effective service of transgender personnel, is consistent with these findings. To the extent the Austin Policy has had any appreciable impact on unit cohesion, the evidence suggests it has been neutral or positive by enabling service members to serve without the distraction and erosion of trust associated with forced concealment of identity.

65. The Austin Policy was implemented following years of planning by experts and stakeholders across the military, as described above. From a force-management perspective—which is squarely within my expertise—the transgender population constitutes a very small fraction of the more than 2 million service members across all components: RAND estimated approximately 2,450 transgender individuals in the active component in 2016,[7] and the Department reported in 2025 that approximately 4,240 service members had a diagnosis of

---

[6] *See* RAND Corp., Assessing the Implications of Allowing Transgender Personnel to Serve Openly, at pp. 15, 63, 83 and 88 (2016) (the "RAND Report").
[7] *Id.*

gender dysphoria.[8] In my experience administering Army personnel policy, the volume of transition-related actions processed by my office was de minimis relative to the total personnel actions handled. I defer to medical experts for conclusions regarding the clinical nature of transition-related care, but from a manpower-management standpoint, the resource demands of administering the transgender service policy were negligible relative to the Army's overall personnel management workload.

**B. Executive Order 14183 and the February 26 Memorandum were an abrupt reversal of established military policy, adopted without the Department's ordinary policymaking process.**

66. This section responds to the disclosures of VADM Miguez (¶ 8), CAPT Blair (¶ 7), LCDR Bayer (¶ 8), CAPT White (¶ 8), CAPT Roberts (¶ 7), and COL Black (¶ 6), each of whom is expected to testify that the current policy's treatment of gender dysphoria is consistent with the military's general approach to medical and behavioral-health conditions. The Department's general approach to such conditions includes the deliberative process described in this Section, and when the Department applied that process to this question, in 2015–2016 and again in 2021, it reached the opposite conclusion.

67. On January 20, 2025, President Trump signed Executive Order 14148, revoking Executive Order 14004, which had permitted equal service by transgender individuals. On January 27, 2025, President Trump issued Executive Order 14183, revoking "all policies, directives, and guidance issued pursuant to" the order establishing that equal service policy and directing the Department of Defense "to take all necessary steps to implement the revocations"; the categorical exclusion of transgender persons was then imposed by the February 26 Memorandum.

[8] Dep't of Def., Transcript of a Senior Defense Official Background Briefing on Prioritizing Military Excellence and Readiness: Implementation Guidance (May 15, 2025).

68. Such an abrupt reversal of established military policy is highly unusual, especially without a significant change in the analysis supporting the policy. As a direct participant in the 2015 Working Group, I can attest that the Department of Defense's review process for adopting an equal-service policy extended over approximately twelve months and involved rigorous review of scientific literature, consultation with experts, commanders, and transgender service members, and close inter-departmental communication. The Working Group's conclusion was the result of a rigorous process involving consultation with subject-matter experts and uniformed military personnel from all service branches. The process began in 2015 with the establishment of the Working Group, followed by the Department of Defense-commissioned RAND study, a staged twelve-month implementation with a Commander's Training Handbook, medical guidance, a detailed implementation handbook, force-wide training, revised equal opportunity directives, and years of subsequent operational experience during which all four service chiefs publicly testified that open transgender service had caused no problems with cohesion, discipline, or morale. On January 25, 2021, President Biden issued Executive Order 14004, relying on this accumulated evidence.

69. Shortly thereafter, on April 30, 2021, Secretary of Defense Lloyd Austin oversaw the Department's publication of DoDI 1300.28, establishing Department-wide policy for in-service transition. The policy was based on the conclusion that open service by transgender persons subject to the same standards as other service members is consistent with military readiness. The Services issued their own implementing policies, and DoDI 1300.28 required multidisciplinary Service Central Coordination Cells, force-wide training, and Inspector General compliance inspections at least every three years. In total, the Department of Defense spent twelve months crafting the Carter Policy and approximately three months crafting the

Department-level implementing guidance on the Austin Policy, with Army implementing guidance following in June 2021.

70. Based on my experience with Department of Defense policymaking processes across multiple administrations and my specialized knowledge of military personnel policy development, the process that led to the Carter Policy and subsequently the Austin Policy conformed to the Department of Defense's established approach for major personnel policy changes. That approach typically includes: (i) commissioning independent research—here, the RAND study; (ii) convening a multi-stakeholder working group; (iii) staged implementation with training; (iv) ongoing assessment; and (v) revision only in response to documented problems. The reversal of the Austin Policy through Executive Order 14183 departed from each of these steps.

71. I have personal knowledge of the Carter Policy timeline, having participated directly in the Working Group from its inception. I am also personally familiar with the Austin Policy implementation timeline, having begun my role as Acting Assistant Secretary during its rollout. The contrast to the Executive Order 14183 process is stark: based on my review of publicly available records, no comparable panel, working group, or consultation process preceded the 2025 ban. Based on my expertise in DoD policymaking norms, bypassing the "normal DoD issuance process"—as Secretary Hegseth's memorandum expressly authorized—eliminates the institutional safeguards (uniformed service input, medical assessment, legal review, implementation planning) that exist to ensure major personnel policy changes are operationally sound.

72. President Trump issued Executive Order 14183 just seven days after taking office, and the implementing policy followed approximately thirty days later. President Trump's

Executive Order 14183 was issued without any evidence that allowing transgender individuals to serve over the past four years resulted in any negative impact whatsoever. The internal Action Memo accompanying the implementing policy stated that it "was informed through consideration of" four categories of materials: the 2018 Mattis Report, a 2021 Department of Defense review of disability and non-deployability rates, a 2025 medical literature review, and cost data. However, none of the four categories was the Department's own operational data.

73. Critically, the Trump Administration did not analyze the Department of Defense's own operational data from the approximately four years of Austin Policy implementation. Based on my own experience, the Department had ready means to assess that experience: the work product of the Service Central Coordination Cell in each Military Department, the readiness and medical-readiness reporting received by the Assistant Secretaries for Manpower and Reserve Affairs, Inspector General inspections required by DoDI 1300.28, and the non-deployable tracking systems the Services use for every service member. So far as I am aware, none of it was consulted. In my professional opinion, the failure to consult this data represents a departure from standard Department of Defense policymaking practice as I have experienced it across multiple administrations.

74. I am not aware of any evidence that the President or Secretary Hegseth consulted with uniformed military leaders before issuing the directive. I understand the Defendants did not provide any such evidence in connection with the preliminary injunction proceedings in this matter. [CITE: Talbott v. Trump, 775 F. Supp. 3d 274 (D.D.C. 2025)]. Secretary Hegseth's February 7, 2025, memorandum expressly authorized implementation guidance "outside of the normal DoD issuance process"—bypassing the ordinary interagency review in which subject matter experts and leaders from the Department of Defense, Military Departments, the Joint

Staff, and General Counsel would all have the opportunity to assess potential impacts, costs, and implementation considerations.

**C. The stated rationales of Executive Order 14183 and the February 26 Memorandum are contradicted by the Army's actual experience under the Austin Policy.**

75. This section responds to the disclosures of General Carden (¶ 3), LTG Lombardo (¶ 6), COL Black (¶¶ 3–6), and LTC Lee (¶ 6), each of whom is expected to testify that soldiers with gender dysphoria present duty limitations or require special accommodation that burdens unit readiness, deployability, and cohesion.

76. The Executive Order claims that (i) permitting transgender service harms military effectiveness and lethality, (ii) disrupts unit cohesion, and (iii) transgender identity is inconsistent with honesty, humility, integrity, and a disciplined lifestyle. I address each claim based on my direct experience implementing the Austin Policy:

i. Military Effectiveness: During my tenure overseeing Army personnel policy, I reviewed or advised on requests for Exceptions to Policy for Full-Time Real Life Experience for approximately ten transgender soldiers. Each met all applicable performance and medical standards. I received no report from any Army command identifying a soldier's expression of gender identity or the inclusion of transgender soldiers in the force as impairing unit effectiveness.

ii. Unit Cohesion: As discussed in Section III.B above, no cohesion concern related to transgender service was reported through any of the Army's established channels during my three-year tenure. The empirical literature, including the RAND Report and the Canadian Forces study, accurately predicted this outcome.

iii. Honesty, Integrity, and Discipline: I personally reviewed transition requests in which transgender service members disclosed their gender identity to their commands, worked cooperatively with medical providers, and followed every procedural requirement of the policy. This process required affirmative candor and integrity. Every service member whose request I reviewed demonstrated exactly the honesty, humility, and disciplined approach the Executive Order claims transgender individuals lack.

**D. The February 26 Memorandum replaces individualized, standards-based assessment with a categorical bar.**

77. This section responds to the disclosures of VADM Miguez (¶ 8), CAPT Blair (¶ 7), LCDR Bayer (¶ 8), CAPT White (¶ 8), CAPT Roberts (¶ 8), and COL Black (¶ 5), each of whom is expected to testify that the current policy's treatment of gender dysphoria is consistent with the military's general approach to medical and behavioral-health conditions. The Department's general approach to such conditions includes the accession and retention policies described below.

78. The Austin Policy required the Army to make accession and retention decisions based upon merit, not based upon a soldier's expression of gender identity. This policy upheld an important tenet of military service: that anyone who meets the necessary qualifications and raises their hand to serve should be allowed to serve. The policy required transgender soldiers to meet the same high standards as all other soldiers.

79. Under the Austin Policy, accession and retention decisions were made based on merit and objective criteria—the same standards applied to all soldiers. I personally confirmed this in my review of requests made pursuant to the Austin Policy: all soldiers met the standards required by their Military Occupational Specialties and had the support of their brigade

commanders and medical providers. The rescission of this merit-based framework replaces individualized assessment with a categorical bar unrelated to a service member's demonstrated fitness, performance, or contribution to readiness.

### E. The February 26 Memorandum makes accession of transgender people impossible and virtually eliminates currently serving transgender personnel from the armed forces.

80. This section responds to the disclosures of Lt Gen DeGoes (¶ 5), Dr. Ortega (¶¶ 3-5), COL Cron (¶¶ 6–7), CAPT Blair (¶ 6), and LCDR Bayer (¶ 7), each of whom is expected to testify about the military's medical waiver processes and to testify that most mental and behavioral-health conditions are disqualifying "absent a waiver." As explained below, the "waiver" in Section 4.3(c) of the February 26 Memorandum is not a waiver of that kind: it cannot be obtained by any soldier who transitioned under the Austin Policy.

81. I have reviewed the memorandum issued on February 26, 2025, by Darin S. Selnick, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, with the subject line "Additional Guidance on Prioritizing Military Excellence and Readiness" (the "February 26 Memorandum"). The February 26 Memorandum implemented Executive Order 14183 banning transgender people from serving in the military. Based on my expertise in military personnel policy and my experience administering the Austin Policy's accession and retention framework, it is my expert opinion that the February 26 Memorandum's provisions, when applied to the actual circumstances of transgender service members, operate as a categorical bar rather than an individualized assessment. I explain below why the waiver provisions cannot be satisfied by any currently serving transgender service member who received a gender dysphoria diagnosis and followed the treatment pathway established by the Austin Policy.

82. I have reviewed the waiver provisions in Sections 4.1 (accessions) and 4.3 (retention) in the February 26 Memorandum.

83. Per Section 4.1.c, the waiver requires a transgender person to serve in their birth sex. To the extent any transgender person could obtain a waiver for accessions under Section 4.1.c, they would be required to suppress who they are as a transgender person. From a policy-implementation standpoint, this creates a structural contradiction: the Austin Policy encouraged transgender service members to work with commands and medical providers to resolve dysphoria through supportive treatment, which included living and serving consistently with their gender identity. The February 26 Memorandum now requires the opposite.

84. Based on my experience administering personnel waiver processes in the Army, the practical likelihood of a waiver being granted depends not only on whether the applicant can meet the stated criteria but also on whether the approval authority has institutional support for granting the waiver. In a policy environment where the stated purpose is to exclude transgender individuals from service, approval authorities face significant institutional disincentives to grant waivers that would contravene that stated purpose. Based on my expertise in how military personnel processes function in practice, including the command-influence dynamics I observed during my tenure, Section 4.1 makes accession for transgender people impossible regardless of the theoretical availability of a waiver.

85. Similarly, Section 4.3 is an effective ban on retention of transgender service members, no matter how honorable their service or essential their duties. The waiver provisions are a barrier for anyone with a gender dysphoria diagnosis who is receiving supportive treatment.

86. A transgender service member is eligible to be considered for a retention waiver under Section 4.3(c) only if they meet all of the following conditions: (i) they have demonstrated

36 consecutive months of stability in their birth sex without clinically significant distress or impairment, (ii) they have never attempted to transition to any sex other than their birth sex, and (iii) they are willing to adhere to all applicable standards associated with their birth sex going forward. No service member who transitioned under the Austin Policy—that is, who did precisely what the Army approved—can meet that standard. A service member who has been stable in their birth sex for 36 consecutive months has, by definition, not transitioned, so the first condition alone excludes every soldier whose transition the Army approved. The second condition excludes the same soldiers for the same reason: under the Austin Policy, a gender dysphoria diagnosis was the gateway to a command-approved transition, so every soldier whose request reached my office had, by the Army's own process, "attempted to transition." The third condition confirms that Section 4.3(c) is not a waiver in the sense in which the Army uses that term. In my experience administering accession and retention standards, a medical waiver is a decision to accept a service member's condition and manage it consistent with readiness. Section 4.3(c) instead requires the condition to be absent and requires the soldier to abandon the treatment plan the Army itself approved. I offer no opinion on the clinical consequences of that requirement, which are outside my expertise, but from a personnel-administration perspective, this requirement is inconsistent with the established treatment protocols and would render the individual unable to comply with their existing medical treatment plan, potentially making them subject to administrative separation under Section 4.3.

87. To the final point, based on my administration of the Austin Policy, the established treatment pathway for transgender service members included living and serving consistently with their gender identity after completing their transition under DoDI 1300.28. Accordingly, from a policy-administration standpoint, any retention waiver requiring a

transgender person to live in their birth sex is inconsistent with the treatment plans that the Army approved and the service member followed under the prior policy. The clinical basis for that treatment approach is outside my expertise.

88. I reserve the right to revise or expand my conclusions to reflect any newly acquired information, including documentary and testimonial evidence introduced through deposition and trial.

I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 25, 2026

Yvette Bourcicot

# Appendix A

# Yvette K. W. Bourcicot

## CURRENT POSITIONS

**Senior Advisor, Orange Court Strategies**
*Washington, D.C.* 2025–present

**Senior Visiting Fellow, Institute for AI Policy and Strategy**
*Washington, D.C.* 2026–present

## GOVERNMENT SERVICE

**Acting Assistant Secretary of the Army (Manpower and Reserve Affairs)**
*Department of the Army, The Pentagon, Washington, D.C.* 2022

**Principal Deputy Assistant Secretary of the Army (Manpower and Reserve Affairs)**
*Department of the Army, The Pentagon, Washington, D.C.* 2022–2025

**Associate Deputy General Counsel, Office of Legal Counsel**
*Office of the Department of Defense General Counsel, The Pentagon, Washington, D.C.* 2016–2018

**Senior Advisor, International Humanitarian Policy**
*Office of the Under Secretary of Defense for Policy, The Pentagon, Washington, D.C.* 2014–2016

**Special Assistant to the Army General Counsel**
*Office of the Army General Counsel, The Pentagon, Washington, D.C.* 2012–2014

## MILITARY SERVICE

**Commissioned Officer (Active Duty), United States Air Force**
*Various locations* 2000–2010

## PRIVATE SECTOR

**Policy Communications Director, Match Group, Inc.**
*Washington, D.C.* 2020–2022

**Policy Manager, Airbnb, Inc.**
*Washington, D.C.* 2019–2020

**Policy Communications Manager, Facebook, Inc.**
*Washington, D.C.* 2018–2019

**Sole Proprietor, Law Offices of Yvette K. W. Bourcicot**
*Rockville, Maryland* 2011–2012

**Adjunct Professor, American University**
*Department of Justice, Law, and Criminology, Washington, D.C.* 2014–2017

## EDUCATION

**Georgetown University Law Center**
*Washington, D.C.* J.D., 2008

**Princeton University**
*Princeton, New Jersey* A.B., English, 2000

## AWARDS AND HONORS

**Distinguished Public Service Medal**
*Department of the Army* 2024

**Award for Outstanding Achievement**
*Department of Defense* 2016

**Group Achievement Award**
*Department of Defense* 2016

**Outstanding Civilian Service Medal**
*Department of the Army* 2016

**Meritorious Service Medal**
*Department of the Air Force* 2010

**Army Commendation Medal**
*Department of the Army* 2005

**Air Force Commendation Medal**
*Department of the Air Force* 2003

**Air Force Achievement Medal**
*Department of the Air Force* 2002

**Manpower Professional of the Year**
*1st Fighter Wing* 2002

## PROFESSIONAL MEMBERSHIPS AND ASSOCIATIONS

**Advisory Committee Member, ABA Standing Committee on Law and National Security**
2015–2022; 2024–present

**Co-host, National Security Law Today Podcast, ABA** 2017–2022

**Member, American Bar Association** 2009–present

## BAR ADMISSIONS

Maryland, District of Columbia, U.S. District Court for the District of Maryland

## PUBLICATIONS

"Prudent Policy: Accommodating Prisoners with Gender Dysphoria," *Stanford Journal of Civil Rights & Civil Liberties* (2016), with Daniel Woofter

Research Assistant, *International and Transnational Criminal Law* (Aspen Publishers, 2010)

## PRIOR TESTIMONY

Declaration, *Talbott v. Trump* (now *Talbott v. United States*), No. 1:25-cv-00240-ACR (D.D.C)

Declaration, *Shilling v. United States*, No. 2:25-cv-00241 (W.D. Wash).

# Appendix B

## Publications in the Last Ten Years

- Stitt, Brito, and Bourcicot, "The Army People Strategy—Civilian Implementation Plan" (2022).
- Bourcicot & Woofter, "Prudent Policy: Accommodating Prisoners with Gender Dysphoria," 12 Stan. J. C.R. & C.L. 283 (2016).

# Appendix C

# Materials Considered

**Government Documents**

- Exec. Order No. 14,183, "Prioritizing Military Excellence and Readiness," 90 Fed. Reg. 8757 (Jan. 27, 2025).
- Exec. Order No. 14,168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," 90 Fed. Reg. 8615 (Jan. 20, 2025).
- Dep't of Def., Transcript of a Senior Defense Official Background Briefing on Prioritizing Military Excellence and Readiness: Implementation Guidance (May 15, 2025).
- Exec. Order No. 14,148 (Jan. 20, 2025), revoking Exec. Order No. 14,004.
- Directive-Type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members" (Jun. 30, 2016) (the "Carter Policy").
- DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members" (Apr. 30, 2021) (the "Austin Policy").
- Defense Manpower Data Center, DoD Personnel, Workforce Reports & Publications, DMDC Web, U.S. Dep't of Def., https://dwp.dmdc.osd.mil/dwp/app/dod-data-reports/workforce-reports (last visited Sept. 25, 2026).
- Memorandum from Secretary of Defense Pete B. Hegseth, "Prioritizing Military Excellence and Readiness" (Feb. 7, 2025).
- Memorandum from the Performing the Duties of the Under Secretary of Defense for Personnel and Readiness (Darin S. Selnick), "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025) (the "February 26 Memorandum" / "Hegseth Policy").
- Action Memo, "Implementing Guidance for Prioritizing Military Excellence and Readiness Exec. Order" (Feb. 26, 2025).
- Exec. Order No. 14,004, "Enabling All Qualified Americans to Serve Their Country in Uniform," 86 Fed. Reg. 7,471 (Jan. 25, 2021) (the "Biden Executive Order").
- Memorandum from Secretary of Defense Ashton B. Carter directing the Acting Under Secretary of Defense for Personnel and Readiness to convene the Transgender Service Review Working Group (Jul. 28, 2015).
- Army Directive 2016-30, "Army Policy on Military Service of Transgender Soldiers" (Jul. 1, 2016).
- Army Directive 2016-35, establishing policies and procedures for gender transition in the Army (Oct. 7, 2016).
- Department of Defense Commander's Training Handbook, medical guidance, and implementation handbook issued to implement the Carter Policy (2016).
- President Donald J. Trump, statements on Twitter regarding military service by transgender individuals (Jul. 26, 2017).
- Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security, "Military Service by Transgender Individuals" (Aug. 25, 2017).

- Department of Defense, Report and Recommendations on Military Service by Transgender Persons (Feb. 2018), including the Panel of Experts recommendations (the "2018 Mattis Report").
- Army Directive 2021-22, "Army Service by Transgender Persons and Persons With Gender Dysphoria" (the "Policy Memorandum").
- DoDI 6130.03 Vol. 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" (May 28, 2024).
- DoDI 6130.03 Vol. 2, "Medical Standards for Military Service: Retention" (Jun. 6, 2022)
- Department of the Air Force Policy Memorandum.
- U.S. Army Human Resources Command, "Prioritizing Military Excellence and Readiness Implementation Guidance," https://www.hrc.army.mil/content/Prioritizing%20Military%20Excellence%20and%20Readiness%20Implementation%20Guidance.
- 2018 Congressional testimony by the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force before the Senate Armed Services Committee.

**Reports & Studies**

- Agnes Gereben Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (RAND Corp. 2016) (the "RAND Report").
- 2021 AMSARA Report (Accession Medical Standards Analysis and Research Activity).
- 2025 Medical Literature Review, Office of the Assistant Secretary of Defense for Health Affairs.
- Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM-IV).
- Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) (DSM-5).
- World Professional Association for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7).
- Statement of Former United States Surgeons General (Palm Center, Mar. 28, 2018)
- "Gender Identity in the Canadian Forces: A Review of Possible Impacts on Operational Effectiveness," *Armed Forces & Soc'y* (2015).
- Robert J. MacCoun, Elizabeth Kier & Aaron Belkin, "Does Social Cohesion Determine Motivation in Combat? An Old Question with an Old Answer," 32 *Armed Forces & Society* 646 (2006).
- Pub. Religion Rsch. Inst. (PRRI), 2025 survey data on support for LGBTQ nondiscrimination laws.
- Pub. Religion Rsch. Inst. (PRRI), *Mapping Support for LGBTQ Rights Across the 50 States: Insights from PRRI's 2025 American Values Atlas* (Mar. 19, 2026), https://prri.org/research/mapping-support-for-lgbtq-rights-across-the-50-states-insights-from-prris-2025-american-values-atlas/.
- Palm Ctr., "Military Chiefs of Staff Unanimous: Transgender Inclusion Has Not Harmed Unit Cohesion" (Apr. 25, 2018), https://palmcenterlegacy.org/military-chiefs-of-staff-unanimous-transgender-inclusion-has-not-harmed-unit-cohesion/.

- Guy L. Siebold, The Essence of Military Group Cohesion, 33 *Armed Forces & Soc'y 286* (2007).
- Fort McCoy Pub. Affs. Off., News Notes — July 9, 2021, U.S. Army Fort McCoy: The Real McCoy (July 9, 2021), https://home.army.mil/mccoy/my-fort/all-services/real-mccoy/real-mccoy-archive/news-notes-070921.

**Judicial Materials**

- Fifth Am. Compl., *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Apr. 15, 2026).
- Mem. Op. Granting Pls.' Renewed Application for Prelim. Inj., *Talbott v. United States*, No. 25-5087 (D.C. Cir. Dec. 9, 2025) (ECF No. 01208803654).
- Pls.' Resps. & Objs. to Defs.' First Set of Reqs. for Admission.
- Pls.' Resps. & Objs. to Defs.' First Set of Interrogs.
- Defs.' Expert Disclosures filed in this matter.
- Mem. Op. & Order Granting Pls.' Application for Prelim. Inj., *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Mar. 18, 2025).
- Trs. of Oral Arg., *Talbott v. United States*, No. 1:25-cv-00240 (D.D.C. Feb. 18, 2025; Feb. 19, 2025; Mar. 12, 2025).
- My prior declarations submitted in this matter (ECF Nos. 13-28, 72-69, 72-71).

**Discovery Materials**

- TALBOTT-0000000001 through TALBOTT-0000000203.

# Appendix D

# Testimony in the Last Four Years

None.