IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------

NICOLAS TALBOTT, et.al.,

Plaintiffs,

v. Civ. A. No. 25-240 (ACR)

UNITED STATES, et al.,

Defendants.

-------------------------------

ZOOM VIDEO DEPOSITION

Taken on behalf of the Defendants of

YVETTE KAREN WOOD BOURCICOT, J.D.

Washington, D.C.

October 26, 2026

9:18 a.m.

Reported by: Audra M. Smith, RPR, CRR, FCRR

Video by: Orson Braithwaite

Job No. CS8533400

Q And you said you joined the Office of Manpower & Reserve Affairs after that directive was issued?
A That's correct.
Q Was the full Austin Policy formed and in place by the time you started or did that happen later?
A It was in place by the time I started.
Q Okay. So I take it then you had no involvement in the deliberation or deliberative process behind the Austin Policy?
A I did not have direct involvement in the deliberations. I was responsible for implementing it within the Army.
Q You mentioned in your report --
I think this is paragraph 14, if you want to look at it.
A Thank you.
Q -- that part of your responsibility in the Office of Manpower & Reserve Affairs was reviewing requests from transgender soldiers to receive full-time Real Life Experience treatment.
And I'll give you a moment to get

A I worked for the Department of Defense at the Under Secretary Office of Defense for Policy and the Department of Defense Office of General Counsel. So are you asking me to cabin my response in terms of my service in those departments?

BY MR. CRABB:

Q My question was really meant to be broader; during any of your time during your involvement with the Department of Defense.

A Was I made aware of anyone separated because of their gender dysphoria?

Q Yes.

A Not to my recollection. I would say while at Department of Defense, that kind of separation action would not have been an action that I would have been the decision-making authority for. So it's not unusual that I would not have reviewed such a case.

Q Okay. I want to turn now to some of the opinions that you intend to offer on this case, or at the trial of this case. Why don't we just start with this: Can you tell me what your -- what expert opinions you expect to deliver at trial?

A I prefer to refer to my report in order to answer the question.
Q Please feel free.
A So I'm referring -- in the beginning starting on page 41.
Q Paragraph or page.
A Sorry. Paragraph 41. And going through paragraph 58. So my opinions are articulated in those paragraphs of my report. Do you have specific questions about them or?
Q Okay. Let's first try to limit it. Do you intend to offer any opinions at trial that are not contained within your report that's Exhibit 40?
A I previously testified that I intend to respond to the questions posed to me by counsel.
Q I appreciate that. But as an expert witness, I think the requirement is a little bit higher here. I'm entitled to find out what expert opinions you have formulated up to this point and which ones you intend to testify to at trial.
So I think we have to go a little bit beyond to answer whatever questions are asked of

you.

A So the -- the scope of my expert testimony is described in paragraphs 41 through 58 in my report. My challenge with being more expansive with you right now is the paucity of the submissions from the government's expert witnesses that I was called to rebut. There was not sufficient detail for me to be more comprehensive than this. And so if there are issues that arise in the course of that expert testimony that I'm called to rebut, I may be required to exceed the bounds of what I'm able to describe to you here or what I was able to articulate in my report.

Q A number of experts have been deposed recently in this case. Have you been provided with the deposition transcripts of any of those depositions?

A I have been provided with the rebuttal -- with the expert witness reports that I was called to rebut.

Q So you've only seen reports. You haven't seen deposition transcripts?

A I have not seen deposition transcripts.

been a challenge, there are ways that I describe in my report that we could have leveraged in order to -- in order to identify those soldiers, if necessary.

For example, the work of the Service Central Coordination Cell would have had information about soldiers that transitioned in service, for example.

Q To your recollection, when you were in the M&RA office, did you ever leverage any of those other methods by which to review records or readiness data as relates to transgender soldiers?

A I did not. As I say in the M&RA office there are plenty of challenges. We were responsible for all of the people policy for the 1.1 million soldiers and civilians in the Army. We were not in the habit of responding to problems that didn't exist.

Q In paragraph 47, you say: In my opinion, permitting transgender service members to serve openly fostered trust among team members and advanced unit cohesion and readiness.

Have I read that correctly?

A You have.

Q What's your basis for that opinion?

A My basis for that opinion comes from my experience with having supported the repeal of "Don't Ask, Don't Tell." When I was in the Army General Counsel's Office as a special assistant, my work in the transgender service working group and in the Office of Under Secretary for Defense and Policy, my review of the literature at the time and my current -- my review of the literature in support of preparing my expert report, and my experience overseeing the Deputy Assistant Secretary of the Army for Equity and Inclusion, which conducted studies generally on the contributions that inclusion training made to unit cohesion.

Q Did you ever have any personal experience being deployed in a unit that had, as one of its members, a transgender or gender dysphoric soldier?

A Not that I was aware of.

Q I believe you said when you were serving in the Office of M&RA, that you were the one who received application packages for soldiers who were seeking Real Life Experience

Q Does this contain information about your expert opinions?
A Yes, that's correct.
Q And it looks to me paragraph 84 and the surrounding paragraphs are dealing specifically with the issue of waivers.
A That's correct.
Q What are your opinion, if any, as it relates to the waiver process of the current gender dysphoria policy?
MS. XIEO: Objection. Vague.
A I state my opinion about the waiver process in my report. So I'm happy to clarify any questions that you might have about my statements in my report.
BY MR. CRABB:
Q My first question is: Whether you can summarize it for me as we sit here.
A I think that it's well articulated in my report.
Q But can you summarize it?
MS. XIEO: Objection. Asked and answered.
A I can -- I'm happy to read the paragraphs that you'd like. I am not, you know,

sure about -- I don't understand what --
BY MR. CRABB:
Q Only you know what your expert opinions are, and I'm just here to try to find out what they are and what you might testify to at trial. The question is generally, do you have an expert opinion as it relates to the waiver process under the current military's gender dysphoria policy?
A I --
MS. XIE: Same objection.
A I do. And I've expressed it in my report. And so to the extent --
BY MR. CRABB:
Q Here's the problem I have with that because in the past when I've asked if you're going to express any opinion that's outside your report, you've been disinclined to answer that question. So you see where the inconsistency is.
If I ask you to summarize what's in your report you're refusing to it do. If I ask you if you're going to testify anything outside your report you're refusing to do that too. Is that your position?

2017."

BY MR. CRABB:

Q You might slow down just a touch when you're reading.

A My apologies.

Make sure I'm comprehensive and make sure I capture the second executive order. It's called -- there it is. "Defending Women in Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

Q Do you have any data or information about how many waivers under the current gender dysphoria policy have been sought by service members?

A I do not have any current information, no.

Q Likewise then, do you have any information about how many waiver applications made by gender dysphoric service members have either been approved or denied under the current policy?

A I am not aware of a -- of a exact number of waivers that have been sought or granted. My understanding is that there have been no waivers granted based on the disclosures

under the Hegseth Policy.

Q Okay. And just to reiterate, you were not involved in the formulation of what you called "the Hegseth Policy," were you?

A I was not.

Q Okay. So you wouldn't have any firsthand knowledge about what was intended with the phrase "attempt to transition"?

A No. My opinion is based on the records that I had been invited to review as part of this case, in addition to the publicly available statements and policies that have been promulgated by the President and the Secretary of Defense.

Q Let's go ahead and move on. I'm going to hand you what has been marked as Exhibit 43.

Do you recognize this document, Ms. Bourcicot?

(Exhibit Number 43 was identified.)

A I do. This purports to be the article that I co-authored with Daniel Woofter for the Stanford Journal on Civil Rights and Civil Liberties, entitled: "Prudent Policy: Accommodation Prisoners with Gender Dysphoria."