**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT *et al.*, *individually and on behalf of all similarly situated individuals,*<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES *et al.*,<br><br>*Defendants.* | Civil Action No. 25-cv-240-ACR |

**REBUTTAL EXPERT REPORT OF ASHISH S. VAZIRANI**

## INTRODUCTION

1. I have been asked by counsel for Plaintiffs to provide expert opinions rebutting the opinions described in Defendants' September 4, 2026 disclosures for General Thomas M. Carden, Jr.; Lieutenant General William J. Bowers; Lieutenant General John J. DeGoes; Lieutenant General Charles T. Lombardo; Vice Admiral Marc Miguez; Major General (Ret.) Hussey; Colonel Black; Colonel Cron; Colonel Neese; Captain Peter Roberts; Captain Dennis A. White; Captain Blair; Lieutenant Colonel Carolyn A. Salter; Lieutenant Colonel Lee; Lieutenant Commander Bayer; Dr. Ortega; and Dr. Hopewell (collectively, the "Government Disclosures"). The section of this report titled "Government Opinions Addressed in This Report" identifies the specific opinions I address and where I address them. I provide rebuttal opinions based on my direct experience overseeing the Austin Policy at the highest levels of the Department of Defense, my firsthand knowledge of the policy's operational and strategic effects, and my expertise in military personnel management and readiness.

2. Drawing on my experience as Acting Under Secretary of Defense for Personnel and Readiness, my direct oversight of the Austin Policy's implementation across the Department of Defense, and my expertise in military readiness, health affairs, and personnel management, I

offer my opinions on whether the Executive Order Policies are consistent with established military policymaking practices, whether they are supported by evidence, and whether they will harm military readiness, unit cohesion, recruiting, and the military's ability to retain the talent necessary to accomplish its national security mission.

3. In particular, my opinions are directed to the following topics related to Executive Order 14183[1] and the Hegseth Policy[2] (together, the "EO Policies"): (a) the positive impact of the Austin Policy[3] on readiness and unit cohesion based on my direct oversight as Acting Under Secretary of Defense for Personnel and Readiness and as Deputy Under Secretary of Defense for Personnel and Readiness; (b) the evidence-based foundation of policies permitting transgender service; (c) the lack of evidentiary basis for the EO Policies; (d) the harmful effects of the policy reversal on military readiness, recruiting, and trust in military leadership; (e) the merit-based framework that strengthens the military; and (f) the reversal's departure from established military policymaking norms.

4. I am experienced in military personnel policy, force readiness, and the development, implementation, and evaluation of military accession, retention, and health policy as they relate to the scope of my work on this matter. I served as the Senate-confirmed Deputy Under Secretary of Defense for Personnel and Readiness from July 18, 2022, and as Acting Under Secretary of Defense for Personnel and Readiness and Performed the Duties of Under Secretary of Defense for Personnel and Readiness from September 8, 2023, to January 20, 2025. In those roles, I was the principal staff assistant and advisor to the Secretary of Defense for force readiness, force management, health affairs, National Guard and Reserve component affairs, education and training, and military and civilian personnel policies, requirements and management, which includes equal opportunity, morale, welfare, recreation, and quality of life matters. I was responsible for the Military Health System serving approximately 9.6 million Americans. Prior to these roles, I served as a commissioned officer in the United States Navy on

---

[1] Executive Order 14183, "Prioritizing Military Excellence and Readiness," 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Executive Order 14183").
[2] "Prioritizing Military Excellence and Readiness" issued by Secretary of Defense Peter B. Hegseth on February 7, 2025, implementing Executive Order 14183, and Additional Guidance on Prioritizing Military Excellence and Readiness (Feb. 26, 2025) (together, the "Hegseth Policy").
[3] U.S. Department of Defense, DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members" (implemented April 30, 2021) ("Austin Policy").

active duty in the Submarine Force from 1986 to 1993. Throughout this report I refer to the Department as the "Department of Defense" or "DoD," the name under which it operated during my tenure; Defendants refer to the same Department as the "Department of War."

5. I am being compensated at a rate of $300 per hour for my work in this matter. My compensation is not contingent upon the opinions I express or the outcome of this litigation.

6. A list of all publications I have authored in the previous ten years is included in Appendix A. A list of all other cases in which, during the previous four years, I have provided expert testimony at trial or by deposition is provided at Appendix C. In each of those matters, I testified in my capacity as the Acting Under Secretary of Defense for Personnel and Readiness (or as performing the duties of or as a former holder of that office).

## BACKGROUND AND QUALIFICATIONS

### A. Professional Background

7. I attended Vanderbilt University on a Navy Reserve Officer Training Corps scholarship and obtained a Bachelor of Engineering in Mechanical Engineering in 1986, summa cum laude. I later obtained a Master of Engineering from the McCormick School of Engineering at Northwestern University in 1995 and a Master of Business Administration from the Kellogg School of Management at Northwestern University in 1995.

8. After completing my bachelor's degree, I was commissioned as an officer in the United States Navy and served on active duty in the Submarine Force from 1986 to 1993. My service as a submarine officer provided me with firsthand understanding of military culture, operations, the critical importance of unit cohesion in high-stakes environments, and military personnel policy and requirements.

9. Following graduate school, I worked as a management consultant focused on sales and marketing issues in the health care and technology industries.

10. In 2017, I joined the Armed Services YMCA ("ASYMCA"), where I led development and programming and ensured implementation and measurement of programs to support junior enlisted families. In 2019, I went on to serve as the Executive Director and CEO of the National Military Family Association ("NMFA"), where I provided directional, strategic,

and operational oversight for all aspects of NMFA's advocacy and programming to support military families.

11. From 2018 to 2021, I also served as a Member of the National Academies of Sciences, Engineering, and Medicine's Committee on the Well-Being of Military Families.

12. From March 2022 to July 2022, prior to my positions within the Office of the Secretary of Defense, I served in the Department of the Navy as the principal advisor on issues pertaining to sexual assault, sexual harassment, and suicide prevention and response within the Office of the Assistant Secretary of the Navy for Manpower and Reserve Affairs.

13. On July 12, 2022, I was confirmed by the U.S. Senate to be the Deputy Under Secretary of Defense for Personnel and Readiness and was sworn in on July 18, 2022. As Deputy Under Secretary, I was the primary assistant to the then-serving Under Secretary.

14. On September 8, 2023, I assumed the duties of Acting Under Secretary of Defense for Personnel and Readiness, serving in that capacity until I resigned on January 20, 2025. I continued to hold the office of Deputy Under Secretary throughout that period. In this role, I served as the principal staff assistant and advisor to the Secretary of Defense for force readiness, force management, health affairs, National Guard and Reserve component affairs, education and training, and military and civilian personnel requirements and management.

15. **Force readiness and personnel management:** In the roles described above, I had direct, firsthand experience with the policies, processes, and operational realities of maintaining a ready force. This included oversight of the Department's deployability and retention policies, including DoD Instruction 1332.45, "Retention Determinations for Non-Deployable Service Members," the medical standards for accession and retention set out in DoD Instruction 6130.03, Volumes 1 and 2, and the Department's readiness reporting policy, including DoD Instruction 7730.66.

16. **Implementation and oversight of the Austin Policy:** As Acting Under Secretary, and previously as Deputy Under Secretary, my responsibilities included implementation and oversight of the Austin Policy permitting service by transgender troops, including evaluating any proposed new Military Department and Military Service regulations,

policies, and guidance related to military service by transgender persons and persons with gender dysphoria, and revisions to such existing regulations, policies, and guidance, to ensure consistency with the Austin Policy. Under DoD Instruction 1300.28, each Military Service maintained a Service Central Coordination Cell responsible for coordinating and tracking in-service transition cases. The Military Departments, the Assistant Secretary of Defense for Manpower and Reserve Affairs, the Assistant Secretary of Defense for Readiness, the Assistant Secretary of Defense for Health Affairs, and the Director of the Defense Health Agency reported to my office on personnel and medical readiness matters. Had the Austin Policy produced readiness, deployability, cohesion, or cost problems, those channels were the means by which such problems would have been surfaced to me.

17. **Military Health System management:** I was responsible for the Military Health System ("MHS") and the provision of health services to the Joint Force, which includes 2.1 million active duty, reserve, and National Guard service members as well as their dependents, and retired military members and their dependents—a total of approximately 9.6 million Americans.

18. **Military policymaking processes:** Through my service in senior DoD positions, I have personal familiarity with how military personnel policies are normally developed, coordinated, staffed, reviewed, approved and implemented—enabling me to identify departures from those norms.

19. I provide my curriculum vitae at Appendix A. Appendix B provides the list of materials considered. Appendix C lists my prior testimony.

## SUMMARY OF OPINIONS AND BASIS FOR THEM

20. The opinions I express are informed by my service as Acting Under Secretary of Defense for Personnel and Readiness and Performing the Duties of Under Secretary of Defense for Personnel and Readiness (September 2023–January 2025) and Deputy Under Secretary of Defense for Personnel and Readiness (July 2022–January 2025), as well as my military service as a commissioned officer in the United States Navy. In addition, I have reviewed the materials listed at Appendix B, including Defendants' Disclosures.

### A. Methodology

21. In forming the opinions expressed in this report, I applied the following analytical approach: (i) I reviewed the documentary record of military personnel policy concerning transgender service, including Executive Order 14183, the Hegseth Policy, the Austin Policy (DoDI 1300.28), the RAND Report,[4] and the 2022 National Defense Strategy;[5] (ii) I drew on my direct experience as Acting Under Secretary and Deputy Under Secretary of Defense for Personnel and Readiness; (iii) I evaluated the EO Policies against established military personnel frameworks, including the deliberative policymaking processes used by the Department of Defense; (iv) I considered the operational and strategic effects of the Austin Policy as I observed them during my tenure; (v) I reviewed each of the Government Disclosures and identified the readiness, deployability, cohesion, cost, and policy opinions stated in them; and (vi) I evaluated those opinions against the Department's own diagnosis-neutral deployability and retention policies and against what I observed during my tenure.

22. I also evaluated whether the policy-development process reflected in the record followed established Departmental policymaking norms, including consultation, evidence gathering, coordination, staffing, review, implementation, and assessment of operational effects.

23. Where I provide factual testimony based on personal observation or official responsibilities, I identify the basis for my knowledge; where I offer an expert opinion, I identify the criteria and materials supporting it. For clarity: I have personal knowledge of the implementation and operation of the Austin Policy from July 2022 through January 20, 2025. I was not in government when the Austin Policy was adopted in April 2021 or when the EO Policies were adopted in January and February 2025. My opinions about those two specific policy-development processes are based on the public record, the Department's documented policymaking practices, and my experience with how comparable personnel policies were developed and implemented during my tenure.

---

[4] Agnes Gereben Schaefer *et al.*, Assessing the Implications of Allowing Transgender Personnel to Serve Openly, Santa Monica, CA: RAND Corporation, 2016 ("RAND Report").
[5] 2022 National Defense Strategy of the United States of America, (Oct. 27, 2022).

**B. Summary of Opinions**

24. Based on my experience and review of the materials described above and more fully at Appendix B, I hold the following opinions.

25. Permitting open service by transgender soldiers under the Austin Policy did not negatively impact military readiness or unit cohesion. This is consistent with the RAND Report's predictions and with my direct observations during my tenure overseeing the Policy's implementation. I am not aware of any cases of reduced cohesion or readiness based on the service of a transgender service member.

26. Merit-based standards that include transgender service members strengthen the military. The military is an intensely meritocratic institution, and personnel policies that evaluate service members based on skill and merit rather than transgender status advance the military's mission.

27. The military invests significant resources in training service members, and removing qualified personnel, solely because they are transgender, wastes that investment and reduces readiness.

28. Healthcare costs for transgender service members have been negligible, and healthcare requirements for transgender service members have not required any significant changes to the Military Health System.

29. The reversal of the Austin Policy was abrupt, arbitrary, and contrary to the Department of Defense's deliberative policymaking process. The EO Policies were neither based in fact nor developed through the meticulous, structured process that typically governs DoD policy formulation. The EO Policies do not appear to consider secondary and tertiary effects, which is a hallmark of Departmental policymaking and planning.

30. The reversal risks reducing readiness, negatively impacting recruiting, and eroding trust in military leadership.

31. There is no evidence that the Austin Policy caused any actual harm to readiness, unit cohesion, or mission accomplishment. Theoretical concerns about the operational challenges of managing medical conditions in deployed environments apply broadly to service members

with a range of health conditions and are already addressed through existing force-management processes. The Government's own witnesses acknowledge that these concerns "apply broadly to medical and behavioral health conditions and are not unique to gender dysphoria."[6] The Department already has a diagnosis-neutral rule—DoDI 1332.45—that addresses any service member who cannot deploy for an extended period. The EO Policies single out one diagnosis for categorical exclusion from a system that otherwise evaluates every service member individually.

## GOVERNMENT OPINIONS ADDRESSED IN THIS REPORT

32. Defendants disclosed seventeen witnesses under Rule 26(a)(2)(C) on September 4, 2026. I understand Defendants have since withdrawn the disclosure for Major General (Ret.) Hussey. Each disclosure is, at best, a summary of the facts and opinions to which the witness is expected to testify. I have organized the opinions stated in those summaries into the following groups and identify below where in this report each group is addressed. Where a Government witness states an opinion outside my expertise—for example, the clinical characteristics of gender dysphoria or the complication rates of particular surgeries—I do not address it.

33. **Opinion Group 1 — Deployed-environment and logistics burden**. Lt. Gen. Bowers (¶¶ 6–7), VADM Miguez (¶¶ 6–7), COL Black (¶¶ 4–5), CAPT Roberts (¶ 6), COL Cron (¶ 7), COL Neese (¶ 3), and Lt. Gen. DeGoes (¶ 3) are each expected to testify that medical conditions requiring continuous medications, laboratory testing, specialty monitoring, or follow-up care are difficult to support in remote, austere, or contested environments, and that the consequences may include modified duties, restricted deployment, diverted transportation or medical assets, evacuation, or other unit members absorbing the duties of a non-deployable service member. LtGen Bowers (¶ 7) further states that these considerations "apply broadly to all medical and behavioral health conditions" and "are not unique to gender dysphoria." VADM Miguez (¶ 7), COL Black (¶ 5), and CAPT Roberts (¶ 6) similarly state that these considerations "apply broadly to medical and behavioral health conditions" and "are not unique to gender dysphoria." I address this group in Part A below (readiness and deployability).

[6] *E.g.*, Disclosure of Expert Testimony of CAPT Peter Roberts ¶ 6; Disclosure of Expert Testimony of COL Kevin T. Black ¶ 5.

34. **Opinion Group 2 — Large-Scale Combat Operations.** LTG Lombardo (¶¶ 5–6) is expected to testify that future deployments will not resemble past conflicts, that there will be "no sanctuaries or safe havens" for medical treatment, and that the readiness of the force before deployment is therefore paramount. LTC Lee (¶ 7) is expected to testify that service members with gender dysphoria "do not meet medical readiness standards" and "create an unsustainable burden on medical assets in theater." I address this group in Part A below.

35. **Opinion Group 3 — "Treatable" does not mean deployable; most mental health conditions are disqualifying absent a waiver**. COL Cron (¶ 7), CAPT Blair (¶ 6), and LCDR Bayer (¶ 7) are expected to testify that "treatable" or "curable" conditions are not necessarily compatible with accession, deployment, or retention, and that most mental and behavioral health conditions are disqualifying absent a waiver. I address this group in Part A below. In short, I agree that treatability alone does not establish deployability; the relevant point is that the waiver, profile, and Medical Evaluation Board processes are the Department's individualized mechanisms for making that determination, and the EO Policies remove those mechanisms for one diagnosis, or symptoms consistent with that diagnosis, only.

36. **Opinion Group 4 — The EO Policies are consistent with the military's general approach to mental and behavioral health conditions.** CAPT Blair (¶ 7), CAPT White (¶ 8), LCDR Bayer (¶ 8), and Dr. Hopewell (¶ 6) are each expected to opine that the policy's treatment of gender dysphoria is "consistent with the military's general approach to mental and behavioral health conditions." I disagree, and address this group in Parts A and D below.

37. **Opinion Group 5 — Comorbidity, post-operative recovery, and Air Force deployment model**. Dr. Ortega (¶¶ 3–5) is expected to testify that the Air Force deploys in "one-or-two-person deep" footprints; that applicants accessed on mental-health waivers show elevated duty restrictions, clinic utilization, and Medical Evaluation Board rates; that a gender-dysphoric population should be expected to match or exceed those metrics because of comorbid anxiety and mood disorders; and that post-transition surgical treatment carries a high likelihood of lost duty days. Dr. Hopewell (¶ 5) and LTC Salter (¶¶ 7–8) are expected to testify to comorbidities, suicide risk, and surgical complications, and Dr. Hopewell adds that gender-dysphoric service members receive "exemptions from physical fitness standards." I do not address the clinical

premises. I address the readiness and personnel-policy conclusions—including the accession standard that applied under the Austin Policy, the timing of transition-related care, and the physical fitness standards that applied—in Part A below.

38. **Opinion Group 6 — Special treatment, accommodation, and command resource decisions**. General Carden (¶ 3) is expected to testify about "military personnel with gender dysphoria who need special treatment and accommodation to continue serving," and about the decisions commanders make when devoting medical and administrative resources to personnel unable to meet readiness standards. LTG Lombardo (¶ 6) is expected to describe his personal experience with duty limitations of Soldiers with gender dysphoria. I address this group in Parts A and C below.

39. **Opinion Group 7 — Mental-health evacuations**. COL Cron (¶ 7), Col Neese (¶ 3), and Lt. Gen. DeGoes (¶ 3) are expected to testify that mental or behavioral health issues are a leading cause of medical evacuation from theater and that such evacuations negatively affect deployed units. I address this group in Part A below.

40. Parts C through E below address the stated rationale for the EO Policies and the consequences of the reversal. Part D responds to the claim by Government witnesses in Opinion Group 4 that the EO Policies are "consistent with" the military's general approach to mental and behavioral health conditions (CAPT Blair ¶ 7, CAPT White ¶ 8, LCDR Bayer ¶ 8, Dr. Hopewell ¶ 6), and to the Government's reliance on the 2018 Department of Defense Report, which predates the Austin Policy and contains no assessment of the policy's actual operational record. Part D addresses the readiness consequences of the reversal, including the loss of trained personnel and unit disruption that COL Black (Opinion Group 1) describes in terms that apply with equal force to separating deployable service members who are meeting standards. Part C addresses the role of merit-based, equal standards in the military's effectiveness and public trust.

## STATEMENT OF OPINIONS AND FACTS IN SUPPORT OF THEM

### A. The Austin Policy Did Not Negatively Impact Military Readiness

41. As Acting Under Secretary of Defense for Personnel and Readiness, I had direct oversight responsibility for the implementation of the Austin Policy (DoDI 1300.28) across the

Department of Defense. In this capacity, I was responsible for evaluating the policy's effects on force readiness, health affairs, and personnel management.

42. Throughout my tenure, I observed the benefits of merit-based policies for America's military capabilities. The Austin Policy, which permitted qualified transgender individuals to serve openly subject to the same standards as all other service members, operated effectively and without disruption to military readiness.

43. I am aware of no evidence to suggest that the Austin Policy negatively impacted readiness. This is consistent with the predictions of the RAND Corporation's 2016 report, entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (the "RAND Report"),[7] which, based on its review of available research including the experiences of foreign militaries, found no significant effect of openly serving transgender service members on cohesion, operational effectiveness, or readiness.

44. The military's retention standards require individualized assessment of fitness for duty. DoDI 6130.03, Volume 2, §§ 1.2, 3.2, 3.3.a(1), mandates case-by-case evaluation to determine whether a service member can perform their duties, deploy when required, and contribute effectively to the mission. The relevant question under these standards is whether an individual service member can meet applicable requirements, not whether the service member has a condition that may require treatment. COL Cron, CAPT Blair, and LCDR Bayer are expected to testify that a "treatable" condition is not necessarily compatible with deployment and that most mental and behavioral health conditions are disqualifying absent a waiver (Opinion Group 3). I do not disagree with either proposition, but neither supports the EO Policies. The medical profile, the waiver, and the Medical Evaluation Board are precisely the individualized tools the Department uses to decide whether a particular service member with a particular condition can deploy and should be retained. A service member with depression, anxiety, or post-traumatic stress disorder is evaluated through those tools; a service member with a history of a waivable condition is assessed through them. Under the Austin Policy, a service member with gender dysphoria was evaluated through the same tools. The EO Policies do not add a diagnosis to that individualized system; they remove one diagnosis from it and substitute a

[7] RAND Report at 39–47, 69–70, *supra* note 4.

categorical bar. That is the opposite of the military's general approach to medical and behavioral health conditions, and it is why I disagree with the opinion attributed to CAPT Blair, CAPT White, LCDR Bayer, and Dr. Hopewell that the EO Policies are "consistent with" that approach (Opinion Group 4).

45. Concerns about the availability of specialty medical care in austere deployed environments do not distinguish transgender service members from the broader force. Service members with a range of medical conditions—including those requiring medications, laboratory testing, monitoring, and surgical follow-up—are managed through the military's existing force-management and medical readiness systems. The Government witnesses who describe these deployed-environment concerns (Opinion Group 1) say the same thing. LtGen Bowers, VADM Miguez, COL Black, and CAPT Roberts are each expected to explain that these considerations "apply broadly" to medical and behavioral health conditions and "are not unique to gender dysphoria." I agree. But a consideration that applies to every condition requiring continuing care cannot justify a categorical exclusion of one condition, or anyone who has exhibited symptoms consistent with that condition. If limited access to medications, laboratory testing, and specialty follow-up in a contested theater warranted removing a diagnosis from the individualized system, the same logic would remove service members who take daily medication for hypertension, thyroid disease, asthma, low testosterone, or depression, or who require post-surgical follow-up for orthopedic injuries. The Department does not do that, and Defendants' proposed expert witnesses do not appear to suggest it should.

46. As Acting Under Secretary, I had direct oversight of the Austin Policy and the Military Health System serving 2.1 million active duty, reserve, and National Guard service members, and at no point did commanders, policymakers, or health affairs leaders identify transgender service members' medical needs as creating deployability problems. As described above, the Military Departments, the Assistant Secretary of Defense for Manpower and Reserve Affairs, the Assistant Secretary of Defense for Readiness, the Assistant Secretary of Defense for Health Affairs, and the Director of the Defense Health Agency reported to my office on personnel and medical readiness, and none reported such a problem. Transgender service members seeking health care followed the same process as any other service member, including adhering to readiness timelines. The Austin Policy operated for more than three years without

any disruption to deployability. The military routinely manages far larger populations of temporarily non-deployable service members because of pregnancy, injury, or other medical conditions.

47. The Department already has a diagnosis-neutral rule for the readiness concern the Government witnesses describe. DoDI 1332.45, "Retention Determinations for Non-Deployable Service Members," adopted in 2018 and in force throughout my tenure, requires that any service member who has been non-deployable for more than 12 consecutive months, for any reason, be referred for a retention determination or processed for separation, subject to limited exceptions.[8] That rule applies to a service member with gender dysphoria in exactly the same way it applies to a service member with any other condition. During my tenure, approximately 5 percent of the active and reserve component forces were non-deployable at any given time for medical, administrative, or legal reasons, a population several orders of magnitude larger than the estimated 0.2 percent of service members with a gender dysphoria diagnosis.[9] A service member with gender dysphoria who could not deploy for an extended period was already subject to separation under DoDI 1332.45; a service member with gender dysphoria who could deploy was, by definition, not the readiness problem the Government witnesses describe. The EO Policies therefore do not address a gap in the Department's readiness rules. They remove deployable service members whom those rules would retain.

48. The same principle applies to Large Scale Combat Operations ("LSCO"). LTG Lombardo is expected to testify that in LSCO there will be "no sanctuaries or safe havens" for medical treatment, so that the readiness of the force before it deploys becomes paramount (Opinion Group 2). I agree with that premise, and it is why the Department's deployability rules focus on whether a service member is deployable before deployment—through the individual medical readiness assessment, the profile system, the waiver process, and DoDI 1332.45—rather than on diagnosis. Those rules, which were established in 2018, were in effect during my tenure

---

[8] DoD Instruction 1332.45, "Retention Determinations for Non-Deployable Service Members" (July 30, 2018), § 1.2.

[9] Dave Philipps, *Number of Trans Troops Far Lower Than Estimated, Pentagon Figures Show*, N.Y. TIMES (Feb. 27, 2025), https://www.nytimes.com/2025/02/27/us/politics/trans-troops-pentagon-figures.html. *See also* C. Todd Lopez, DOD Issues Implementation Guidance on Separation of Service Members with Gender Dysphoria, DOD NEWS (May 16, 2025), https://www.war.gov/News/News-Stories/Article/Article/4188279/dod-issues-implementation-guidance-on-separation-of-service-members-with-gender/.

and were applied to service members with gender dysphoria. If a service member with gender dysphoria cannot meet pre-deployment readiness requirements, the existing system already prevents that service member from deploying and, if the condition persists, from remaining in service. A categorical exclusion based on a treatable medical condition would, if applied consistently, disqualify service members with numerous other conditions that the military currently manages through individualized assessment.

49. LTC Lee is expected to testify that service members with gender dysphoria "do not meet medical readiness standards" and "create an unsustainable burden on medical assets in theater" because of their need for specialized care, medication, and continuous treatment (Opinion Group 2). I do not offer clinical opinions, but as the official responsible for the Department's medical readiness standards during the relevant period I can state that the first proposition is incorrect as a matter of policy. Under the Austin Policy, the medical readiness standards applicable to a service member with gender dysphoria were the same standards applicable to every other service member; a diagnosis of gender dysphoria was not, by itself, a failure to meet them. As to the second proposition, a service member who in fact required in-theater specialty care, continuous treatment, or evacuation would have been non-deployable under the existing rules; the burden LTC Lee describes is a burden the Department's diagnosis-neutral rules already prevent. During my tenure, I received no report from any theater, combatant command, or Military Department that service members with gender dysphoria had imposed such a burden on deployed medical assets.

50. In my role, I had responsibility for the MHS and the provision of health services to the Joint Force, which includes 2.1 million active duty, reserve, and National Guard service members as well as their dependents, and retired military members and their dependents—a total of approximately 9.6 million Americans. Service members seeking healthcare relating to their transgender identity are required to go through a formal process that includes seeking a referral from their medical provider and undergoing review by command. A service member seeking healthcare relating to transgender identity follows the same process as any other service member seeking healthcare, including adhering to timelines and reporting procedures to ensure that readiness is not negatively impacted. Under DoDI 1300.28, a service member's commander was involved in the timing of transition-related care, and that care was scheduled around the unit's

mission and deployment requirements in the same way that elective and non-emergent care is scheduled for any service member.

51. Dr. Ortega is expected to testify that post-transition surgical treatment carries a high likelihood of prolonged lost duty days (Opinion Group 5). Post-operative recovery is not unique to transition-related surgery; the Department manages recovery from orthopedic, general, and other surgeries for tens of thousands of service members each year through temporary profiles, and it managed transition-related recovery the same way.

52. Dr. Ortega is also expected to testify that a gender-dysphoric population should be expected to exhibit the elevated duty-restriction and Medical Evaluation Board rates observed in Air Force cohorts accessed on mental-health waivers (Opinion Group 5). Whatever the clinical merits of that inference, it omits the accession standard that actually applied. Under the Austin Policy, a history of gender dysphoria remained a disqualifying condition for accession unless the applicant demonstrated an extended period of clinical stability—18 months without clinically significant distress or impairment—and applicants who had undergone medical transition were required to show comparable stability following that treatment.[10] In other words, the Austin Policy did not admit applicants on the basis of a mental-health waiver; it admitted applicants who met a stability standard designed to screen out the very risk Dr. Ortega describes. The Air Force's "one-or-two-deep" deployment model, which Dr. Ortega also describes, is a reason for the Air Force to apply its deployability standards rigorously to every Airman. It is not a reason to exempt one diagnosis from those standards.

53. Dr. Hopewell is expected to testify that service members with gender dysphoria receive "exemptions from physical fitness standards," and General Carden is expected to describe such service members as needing "special treatment and accommodation to continue serving" (Opinion Groups 5 and 6). Neither description matches the Austin Policy as I oversaw it. Under DoDI 1300.28, a service member who completed transition was held to the physical fitness, body composition, grooming, and uniform standards of the gender reflected in the Defense Enrollment Eligibility Reporting System (DEERS); there was no separate or reduced standard. A service member undergoing transition-related treatment who temporarily could not

[10] DoD Instruction 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction," §§ 5.24(t), 5.28(t) (as amended 2021).

meet a fitness standard was placed on a temporary profile—the same instrument used for a service member recovering from a knee surgery or a pregnancy—and was expected to return to the full standard when the profile ended. That is not an exemption or a special accommodation. It is the ordinary operation of the medical profile system.

54. COL Cron, Col. Neese, and Lt. Gen. DeGoes are expected to testify that mental and behavioral health issues are a leading cause of medical evacuation from theater and that evacuations negatively affect deployed units (Opinion Group 7). I agree that mental and behavioral health conditions are among the leading causes of medical evacuation and that such evacuations negatively affect deployed units. Published data confirm the point. A 2017 Institute for Defense Analyses study of medical evacuations from Operations Iraqi Freedom and Enduring Freedom found that battle injuries were the single largest cause of evacuation (18 percent of evacuations from Iraq, 24 percent from Afghanistan), followed by musculoskeletal disorders, non-battle injuries, and mental health disorders—each accounting for at least 12 percent of evacuations from both theaters and collectively more than 40 percent. The most frequent mental health conditions driving evacuations were adjustment reactions, mood disorders, anxiety disorders, and post-traumatic stress disorder—conditions the Department manages through individualized assessment and does not treat as categorically disqualifying. Gender dysphoria does not appear in those data as a contributor to theater medical evacuations.[11] During my tenure, no theater, combatant command, or Military Department reported to my office that gender dysphoria was a meaningful contributor to theater medical evacuations, and no Government witness is disclosed as expected to testify that it was.

55. Since the implementation of the Austin Policy, providing healthcare to transgender service members did not require any significant changes to the DoD healthcare system, and any additional costs related to providing such healthcare have been negligible.[12]

---

[11] Matthew S. Goldberg *et al.*, *Population Health During Combat Operations* at iii, IDA Document NS D-8697 (Institute for Defense Analyses Oct. 2017), https://www.ida.org/assets/2026/06/18021310/D-8697.pdf.

[12] *See* RAND Report at 34 ("Taking a weighted average of most of the information, we estimated that extending insurance coverage to transgender individuals would increase health care spending by 0.038 percent."), *supra* note 4. The RAND figure is a 2016 estimate made before the Austin Policy was implemented; the Department's actual experience is described in the text. *See also* Defendants' Responses and Objections to Plaintiffs' First Requests for Admission at 52 (stating that "DoD spent approximately $26 million on gender affirming care . . . for active-duty personnel as well as National Guard or Reservists on active duty for more than 30 days" between January 1, 2016 and May 14, 2021).

56. At no point during my tenure as Acting Under Secretary and Performing the Duties of Under Secretary, or as Deputy Under Secretary, of Defense for Personnel and Readiness, did health affairs leadership raise healthcare costs for transgender service members as a concern. These costs represented a tiny fraction of the Military Health System's overall budget. Based on the information provided to my office, the Department spent approximately $52 million on transition-related care for service members during fiscal years 2015–2024, on average $5.2 million per year out of an annual total Military Health System budget of approximately $60.2 billion in FY 2024[13]—that is, less than 0.01 percent of the MHS budget. Even taking the figure the Department itself has cited publicly since the EO Policies were announced, transition-related care represented a small fraction of one percent of Military Health System spending in every year of the Austin Policy.

**B. The Austin Policy Strengthened Unit Cohesion Through Trust and Merit-Based Standards**

57. Unit cohesion is crucial for military effectiveness. Cohesion is built on shared standards, shared hardship, and confidence that every member of the unit has earned their place by meeting the same requirements and demonstrates at least the minimum level of required competence. The Austin Policy supported cohesion in exactly that way: it applied the same standards to everyone. Cohesive teams are a significant component of the value proposition of military service as the military needs to recruit and retain individuals with an array of skills and capabilities necessary for mission execution.

58. The RAND Report predicted that allowing transgender individuals to serve would not have a negative impact on unit cohesion.[14] My direct experience overseeing the Austin Policy's implementation confirmed this prediction. Transgender service members continue to meet standards and are serving honorably, ably, and, in many cases, with distinction throughout the military.

59. I was not made aware of any cases of reduced unit cohesion or readiness based on the service of a transgender service member. The Government witnesses do not claim otherwise.

---

[13] FY2026 Budget Request for the Military Health System (Sept. 23, 2025), https://www.congress.gov/crs_external_products/IF/HTML/IF13108.html.

[14] *See* RAND Report at 45 (finding no evidence from foreign militaries of negative impact on unit cohesion in militaries that permit transgender service), *supra* note 4.

The "unit cohesion impacts" that many describe are not impacts of transgender status; they are the impacts of any non-deployable service member on the peers who must absorb that service member's duties. That is a real concern, and it is the concern DoDI 1332.45 and the individual medical readiness system exist to address, for every service member and every diagnosis. A transgender service member who is deployable and meeting standards imposes no such burden on the unit. A transgender service member who is not deployable is subject to the same retention determination as anyone else. In neither case does the categorical exclusion in the EO Policies improve cohesion; in the first case it removes a contributing member from the unit, which is itself a cohesion and readiness cost.

60. The military has historically been an intensely meritocratic institution: what counts is a person's ability to meet standards and execute the mission. Personnel policies that allow transgender service members to be evaluated based on merit rather than transgender status strengthen the military's mission of protecting the United States; they do not jeopardize it.

61. Everyone who wishes to serve and meets the eligibility requirements should have an equal opportunity to serve their country based on merit. This principle is foundational to military effectiveness and has been affirmed through decades of successful integration of previously excluded groups into the armed forces. It is also a principal foundation for recruiting and the value proposition for service—if a service member meets requirements and is able to execute the mission, they will advance within the military.

62. From a military personnel accession policy standpoint, the optimal approach is one that maximizes the pool of qualified applicants who meet established standards. Any policy that categorically excludes individuals who meet those standards, without an evidence-based justification tied to readiness, reduces the available talent pool and works against the military's personnel needs.

### C. Investment in Highly Trained Service Members Demands Retention of Qualified Personnel

63. The Austin Policy enables our military to retain highly trained service members with specialized skills that have taken significant investment and time to develop, all while

applying the same standards to transgender service members that are applied to others, including standards relating to medical care.

64. The military invests significant money and time (months to years, depending on occupational specialty) to develop a service member in a military specialty. For example, an aviation mechanic in the Army will spend 10 weeks in basic training followed by 24 weeks of advanced individual training. A military pilot will spend two to three years in pilot training before reporting to their first operational unit. Investments in professional development continue throughout a service member's career.

65. Applying the same standards to all service members ensures that the military services can realize the benefit of these investments over the long term. When transgender service members meet the same performance, fitness, and medical standards as all other service members, they contribute fully to military capability and justify the substantial investment made in their training and development.

66. Removing qualified service members who are meeting standards and succeeding on their merits, solely because they are transgender, wastes the taxpayers' investment in their training and development. Prohibiting currently serving transgender service members from continuing in service can result in a reduction in military capability based on the loss of highly skilled service members trained and developed at significant cost to the American taxpayer. Removal can also increase the risk of doubt within remaining members of the unit if they see unit members who have met the same standards removed for no other reason than that the service member is transgender, particularly when the reason given is that the transgender service member is unfit for service and does not meet standards.

67. The costs of accommodating service members who need medical or administrative support to continue serving are part of this same investment calculus. General Carden is expected to testify about the decisions commanders make when they devote medical and administrative resources to personnel who need support to continue serving (Opinion Group 6). Commanders make those decisions every day, for service members with every kind of condition (*e.g.*, service members who apply for parental leave), and the Department's policy is to weigh the cost of support against the value of the trained service member rather than to separate

categorically. Those costs are real, but they underscore the value of retaining trained personnel rather than justifying their removal. Focusing on the theoretical burdens of accommodation while ignoring the concrete cost of separating highly trained personnel who are meeting standards and contributing to the mission reflects an incomplete analysis of the military's readiness interests.

68. These skills take time and additional investment to replace, thereby reducing investment in other critical areas and resulting in a corresponding reduction in readiness in the near and long term.

**D. The EO Policies Represent an Abrupt Reversal Unsupported by Evidence**

69. On January 27, 2025, President Trump issued Executive Order 14183,[15] which directed the Secretary of Defense to revise the Department's policies on service by transgender individuals and individuals with gender dysphoria. On February 7, 2025, the Secretary issued a memorandum pausing accessions of individuals with a history of gender dysphoria and pausing transition-related medical care for currently serving members, and on February 26, 2025, the Secretary issued the guidance that rescinded DoDI 1300.28 and made a current diagnosis or history of gender dysphoria disqualifying for accession and retention.[16]

70. The executive order suggests that transgender service members are unfit for service solely because they are transgender and that their service is harmful to unit cohesion and reduces military readiness. The suggestion that a person's transgender status alone renders them dishonest or unfit for service is unsupported by evidence, and no Government witness is disclosed as expected to testify that it is true.

71. In fact, the past three years of experience under the Austin Policy indicates that transgender service members serve honorably, often with distinction, and meet the same standards as other service members. The evidence-based conclusions of the RAND Report, the deliberative process that led to the Austin Policy, and the military's own operational experience all confirm that transgender service has not harmed readiness.

---

[15] *See supra* note 1.
[16] *See* Hegseth Policy, *supra* note 2.

72. Dr. Hopewell, Dr. Ortega, LTC Salter, and LCDR Bayer are expected to testify that gender dysphoria is associated with elevated rates of co-occurring depression, anxiety, and suicidality (Opinion Group 5). I do not offer an opinion on the clinical literature. From a personnel-policy standpoint, however, the presence of comorbid conditions in a population is not a basis on which the Department categorically excludes a diagnosis. The Department manages populations with well-documented and substantial comorbidity—service members with post-traumatic stress disorder, traumatic brain injury, depression, musculoskeletal injury, and substance use disorders number in the hundreds of thousands—through individualized assessment of each service member's actual functioning and deployability. The RAND Report, which informed the Austin Policy, found that allowing transgender personnel to serve openly would have minimal impact on readiness, deployability, and healthcare costs, and that the military already had the capacity to provide necessary care.[17] Applying a different standard to gender dysphoria—while leaving analogous conditions subject to case-by-case review—is inconsistent with the military's own general approach to mental and behavioral health. The Austin Policy's three-year record of implementation without documented problems confirms that this approach works in practice.

73. DoD policies are typically formulated through a meticulous and structured process involving an extensive collection and analysis of pertinent facts and data; contributions from a variety of stakeholders and experts across multiple components of the Department; and several drafts and revisions based on review and feedback. This deliberative process ensures that Departmental policies are grounded in evidence, reflect operational realities, and serve the interests of military readiness and national security.

74. Given the absence of evidence that a problem exists requiring a policy change, the abrupt reversal of a policy that has been in place for over three years is highly unusual and contrary to the DoD's deliberative policymaking process.

75. The absence of any documented problem requiring the reversal—combined with the abandonment of the deliberative process that normally governs military personnel policy—

[17] RAND Report at 7–8, 69–71, *supra* note 4.

distinguishes this reversal from ordinary policy adjustments and lacks the evidentiary and procedural foundation that ordinarily supports military personnel policy changes.

76. I recognize that this is not the first time the Department has reversed course on this subject. In 2018, following a review conducted by a panel of senior officials over several months, the Department replaced the 2016 policy with one that generally barred service by persons with a history of gender dysphoria (the Mattis Policy), and in 2021, following a review directed by Executive Order 14004, the Department adopted the Austin Policy which essentially restored the 2016 policy. The 2025 reversal differs from both in a way that matters to my opinion. The February 7, 2025, memorandum was issued eleven days after the Executive Order and the February 26, 2025, guidance was issued less than three weeks after that. I am not aware of anything that indicates that the Department collected or analyzed data on the Austin Policy's actual effects over the nearly four years it operated, consulted the Military Departments, the Service Central Coordination Cells, or the Defense Health Agency about those effects, or staffed the change through the process by which the Department ordinarily develops personnel policy. The 2025 guidance instead relies on the 2018 report, a document prepared before the Austin Policy existed and which therefore contains no information about how that policy performed. A reversal that is justified by evidence pre-dating the policy it reverses, and that does not examine the policy's actual record, is not the product of the evidence-based, deliberative, and collaborative process the Department ordinarily follows.

77. This departure from established norms is particularly striking given that the Austin Policy was itself adopted after a rigorous, evidence-driven process that included the RAND Report and the deliberative policymaking process normally used by the Department of Defense. I was not in office when the Austin Policy was adopted; my understanding of that process is based on the public record and on the policy documents, implementing guidance, and Service regulations that I later oversaw, which reflect the staffing and coordination characteristic of the Department's ordinary process.

### E. The Reversal Degrades Military Readiness, Harms Recruiting, and Erodes Trust

78. Prohibiting transgender individuals from serving in the military degrades military readiness and is harmful to our national security for several reasons.

79. **Loss of Qualified Personnel.** Prohibiting currently serving service members who are meeting standards and succeeding on their merits from continuing in service, solely because they are transgender, can result in a reduction in military capability based on the loss of highly skilled service members trained and developed at significant cost to the American taxpayer, for the reasons set out in Part C above.

80. **Disruption to Units.** Removing currently serving transgender service members who are contributing to the mission and are meeting standards will cause a disruption to units by creating capability and capacity gaps. These gaps will create additional stress on the unit, reduce morale, and degrade unit cohesion and readiness. The disruption caused by forced separations is concrete and immediate, whereas the burdens of accommodating transgender service members during their service have proven to be manageable and minimal. COL Black is expected to testify to the training and familiarity an armor crew must achieve and the effect that the loss of a single crew member has on operational readiness. I agree that the loss of a single trained crew member degrades a crew. That is an argument against separating trained, deployable service members who are meeting and/or exceeding standards, which is what the EO Policies require.

81. **Erosion of Merit-Based Culture.** The abrupt and arbitrary reversal of the Austin Policy sends a message that equal opportunity is not afforded to all who are qualified and meet standards, and thus undermines the military's merit-based culture. When service members observe that personnel decisions are driven by factors unrelated to performance and fitness, it weakens their confidence in the fairness and rationality of the system.

82. **Harm to Recruiting.** Excluding transgender individuals from accessing into the military can further reduce the pool of qualified candidates at a time when, throughout my tenure, the pool of age eligible candidates was declining (due to lower national birth rates), the propensity to serve was declining, and only roughly one in four age-eligible Americans (23 percent) met the Department's accession eligibility requirements without a waiver. Further, the

abrupt reversal of the Austin Policy can negatively impact recruiting over time if the military is perceived to be discriminatory. Discriminatory practices can have a negative effect on individuals who may have an interest in serving in the military, as well as key influencers (*e.g.*, parents, teachers, school counselors, etc.) who may be guiding a candidate's decision.

83. **Erosion of Trust in Leadership.** Reversing policy in an abrupt and arbitrary manner can erode service members' trust in Departmental leadership's ability to make sound policy and military leadership's ability to uphold consistent standards, since the reversal was not based in fact, nor developed through a deliberate and thoughtful process. When operational challenges common to many medical conditions are invoked to categorically exclude only one group, it suggests the policy is not grounded in evidence-based readiness analysis.

84. The abrupt reversal of the Austin Policy will have a negative impact on readiness, morale, good order and discipline, unit cohesion, and mission effectiveness not only for transgender service members but for the total force.

## CONCLUSION

85. Based on my experience as Acting Under Secretary of Defense for Personnel and Readiness, my direct oversight of the Austin Policy, and my review of the materials described in Appendix B, I conclude that the EO Policies are harmful to military readiness and national security.

86. The Austin Policy worked as intended, with no negative impacts on readiness, unit cohesion, or military effectiveness. Transgender service members have served honorably and met the same standards as their peers. The additional healthcare costs associated with supporting transgender service members—including care related to gender dysphoria and transition—have been negligible. The policy strengthened the force by ensuring that all who meet the military's high standards have the opportunity to serve.

87. The deployed-environment concerns described by the Government's witnesses are real, but by those witnesses' own account they apply to every condition requiring continuing care and are not unique to gender dysphoria. The Department already addresses those concerns through diagnosis-neutral deployability and retention rules that were applied to service members

with gender dysphoria under the Austin Policy. The EO Policies do not strengthen those rules; they carve one diagnosis out of them.

88. The reversal of the Austin Policy lacks an evidentiary foundation, departs from the Department of Defense's established policymaking process, and is inconsistent with how the Department has historically developed and implemented military personnel policy changes. It will weaken the total force by removing qualified personnel, eroding trust in military leadership, undermining the military's merit-based culture, and harming recruiting at a time when the military can least afford to lose talent given the pacing challenge outlined in the 2026 National Defense Strategy and the requirements for homeland and hemispheric defense.[18]

89. Any new information with respect to this case will be considered and may impact my opinions and analyses. As such, I reserve the right to amend or supplement my opinions if additional information becomes available.

[18] *See* Department of War, 2026 National Defense Strategy (Jan. 23, 2026).

I declare under penalty of perjury that the foregoing Rebuttal Expert Report is true and correct and the opinions expressed herein are my own.

Executed on September 25, 2026.

______________________________
Ashish S. Vazirani

**APPENDIX A**

**Curriculum Vitae**

**ASHISH S. VAZIRANI**
linkedin.com/in/ashishsvazirani |

## SUMMARY

Senior executive with a diverse background in defense, non-profit, and consulting sectors. Served as the Department of Defense's senior leader with responsibility for establishing policies for recruitment, placement, and retention of 2.1 million military and 900,000 civilian personnel. Record of building and leading high-performance teams and delivering measurable and sustainable impact by enabling, empowering, and encouraging people.

## EXPERIENCE

**ARMED SERVICES YMCA**, Woodbridge, VA 2025 - Present

*Chief Operating Officer and Chief Programs Officer*

- Responsible for the development, implementation and impact of Armed Services YMCA's core programs and services that increase the resilience of military families and ease everyday life for military families carrying the quiet weight of service. ASYMCA's programs reach 398K service members and family members and provided 1.3M points of service in 2025.
- Provide guidance and direction to Armed Services YMCA Branch Executive Directors on operational planning and execution, and adherence to Armed Services YMCA policies, processes, and procedures.
- Responsible for the management of Armed Services YMCA's contracts with the Department of Defense (contract value >$175M). The DoD Child Development Center contract delivered 3 operational Child Development Centers serving over 600 children in 31 months.
- Engaged the Armed Services YMCA Board of Directors to draft the Armed Services YMCA strategic plan.

**UNITED STATES DEPARTMENT OF DEFENSE (DOD)**, Arlington, VA 2022 – 2025

*Acting Under Secretary of Defense for Personnel and Readiness* Sep 2023 – Jan 2025

- Served as the principal staff assistant and advisor to the Secretary of Defense for force readiness; force management; health affairs; National Guard and Reserve component affairs; education and training; and military and civilian personnel requirements and management, including equal opportunity, morale, welfare, recreation, and quality of life matters.
- Awarded the Department of Defense Medal for Distinguished Public Service.

*Deputy Under Secretary of Defense for Personnel and Readiness* Jul 2022 – Sep 2023

- Presidential Appointment confirmed by the U.S. Senate.
- Served as the primary assistant to the Under Secretary of Defense for Personnel and Readiness.

**Significant Accomplishments:**

- Enhanced military recruiting by implementing policies and programs to enhance propensity, increase eligibility, and streamline processing.
- Developed and implemented a plan to stabilize the military health system (MHS) that serves 9.6 million beneficiaries, by requiring the MHS to add capacity, improve access to care in military hospitals and clinics, and increase opportunities to sustain military clinical readiness for medical forces.
- Established policies to ensure Service members and their families were able to access non-covered reproductive health care. Expanded access to contraceptive care, including walk-in contraceptive care and counseling.
- Developed and implemented the Department's Warfighter Brain Health Initiative; Issued policy and implementation guidance to help manage the risks to brain health from blast overpressure.
- Launched the Office of the Chief Talent Management Officer (CTMO) to keep pace with a rapidly changing labor market and lead the development and implementation of the DoD’s talent acquisition and management strategy.
- Made considerable progress in eliminating sexual assault and sexual harassment in the military; first decrease in the estimated prevalence of sexual assault since 2016.
- Made Dependent Care and Health Care Flexible Spending Accounts available to Service members (active and reserve component).
- Established policy and developed a framework for assessing strategic readiness within the Department.
- Secured cumulative 14.3 percent pay raise for Service members over the past 3 years.
- Expanded military spouse employment programs: increased the number of partners in the Military Spouse Employment Partnership to over 800 employers, launched the Military Spouse Career Accelerator Program, and expanded eligibility of the My Career Advancement Account tuition benefit to spouses of active-duty members of all enlisted ranks. Streamlined the Domestic Employees Teleworking Overseas approval process.
- Improved access to DOD provided child care, significantly reduced wait lists and increased child care options including the Child Care in Your Home program.
- Reduced childcare fees for lower income military families while maintaining high-quality care at DOD child development centers around the world.
- Increased parental leave for Service members to 12 weeks.
- Expanded full-time, universal prekindergarten to 80 of 90 DOD Education Activity schools.
- Increased average savings at the commissaries by 3% to an overall 25%.

**DEPARTMENT OF THE NAVY** Mar 2022 – Jul 2022

*Senior Advisor to the Assistant Secretary of the Navy for Manpower and Reserve Affairs* and *Interim Director, Office of Force Resilience*

- Principal advisor on issues pertaining to sexual assault, sexual harassment, and suicide prevention and response.
- Guided the implementation of the Office of Special Trial Counsel within the Department of the Navy.

**A2O STRATEGIES, LLC**, Silver Spring, MD 2017 – 2022

Provided advisory services to high growth, mid-size, and large enterprises, commercial and non-profit, on the development, implementation, and execution of growth strategies. Example engagements include:

- Developed the GTM strategy and Routes to Market for an identity management solutions provider.
- Provided advisory services to The Gates Notes LLC in the development of 2019 strategic plan.
- Engaged with military service organizations to improve engagement with key stakeholders – particularly donors.

**NATIONAL MILITARY FAMILY ASSOCIATION**, Alexandria, VA 2019 – 2021

*Executive Director & Chief Executive Officer*

- Led the Staff and Board through the development of NMFA's 3-Year Strategic Plan (2021 – 2024), positioning NMFA for significant growth (60%) in 2021.
- Extended NMFA's programming to include childcare fee relief for military spouse scholars and junior military families experiencing challenges with childcare affordability.
- Drove a 7% increase in 2020 Program spend over prior year, while reducing administrative expenses by 24%.
- Expanded NMFA's partnerships and collaborations and facilitated the acquisition of new strategic donors.
- Guided the NMFA team through restoration of Charity Navigator's "4-Star" status, achievement of GuideStar "Platinum" status and maintenance of Charity Watch "Top-Rated" and BBB Wise "Accredited" status.
- Invested in the NMFA team by implementing a leadership and professional development program and increasing employee benefits. Guided the team through meaningful change while maintaining employee retention >90%.
- Steered the team on design, implementation, and measurement of virtual programming in response to COVID-19.

**NATIONAL ACADEMIES OF SCIENCES, ENGINEERING and MEDICINE**, Washington, DC 2018 – 2020

*Committee Member: Committee on the Well-Being of Military Families*

- Served on ad hoc committee to study the challenges and opportunities facing military families and what is known about effective strategies for supporting and protecting military children and families, as well as lessons learned from these experiences.
- Committee's lead briefer to the White House, Department of Defense, Congress, and the military community.
- Co-Author: *Strengthening the Military Family Readiness System for a Changing American Society*

**ARMED SERVICES YMCA**, Woodbridge, VA 2017 – 2019

*Chief Development Officer* 2018 - 2019

- Accountable for the ASYMCA's financial growth and development and for managing relationships with the ASYMCA's largest donors, including Robert Wood Johnson Foundation, USAA, and American Airlines.
- Ensured ASYMCA remained a top-rated charity by Charity Watch, Charity Navigator, and GuideStar.

*Senior Vice President, Programs & Strategy* 2017 –2018

- Responsible for the development, implementation, delivery, and measurement of standardized programs.
- Guided the development and implementation of the ASYMCA's long-term strategy.

**ZS ASSOCIATES**, San Francisco, CA 2010 – 2017

*Managing Principal, High Tech Industry Leader:*

- Established the high-tech industry vertical with responsibility for all aspects of practice development. Profit & loss responsibility for the practice. Grew the practice to over 50 clients engaged and $8M in annual revenue.
- Built a team of over a dozen dedicated consultants and an extended team of over forty-five consultants that worked with high tech industry clients.
- Created the Sales Channel Management & Strategy Practice to expand ZS's offerings in indirect sales strategy and partner channel management.

**MARKETBRIDGE,** Bethesda, MD & San Francisco, CA 2002 – 2010

*Senior Vice President, Strategy Consulting Group*

- Managed offering development, profit and loss management, revenue generation, fulfillment, and staff development, overseeing a team of over 40 consultants and generating annual revenue of $18 million. Built MarketBridge's West Coast consulting presence. Led all aspects of staffing of the San Francisco office growing the team to over 20 consultants.
- Established MarketBridge as a preferred services provider for the firm's largest client. Developed account to annual revenues of more than $12M across service offerings and completed 200+ engagements.

**ANALYTIKA**, A Division of DENDRITE INTERNATIONAL, Morristown, NJ 1999 – 2002

- *Director, Consulting Services* – Provided domain expertise for the development of all new analytic products and services including Analytika's longitudinal prescription data and analytics.

**HOFFMANN-LA ROCHE, ROCHE LABORATORIES**, Princeton, NJ 1997 – 1999

- *Regional Business Manager* – Managed operations of the $100 million region with 138 sales representatives and managers.

**ZS ASSOCIATES**, Princeton, NJ 1995 – 1997

- *Consultant* – Developed and implemented sales force strategy with Fortune 500 pharmaceutical companies.

**UNITED STATES NAVY, SUBMARINE FORCE** 1986 – 1993

- *Lieutenant* – Assignment Officer, Submarine/Nuclear Propulsion Division, 1991-1993
- *Ensign* to *Lieutenant* – Division Officer, USS Groton (SSN 694), 1986 - 1993

## EDUCATION

**NORTHWESTERN UNIVERSITY**, Evanston, IL

Kellogg Graduate School of Management / McCormick School of Engineering

- Master of Business Administration & Master of Engineering (MMM Program) with concentrations in manufacturing and operations, finance, and health services management.

**VANDERBILT UNIVERSITY**, Nashville, TN

- Bachelor of Engineering in Mechanical Engineering: Summa Cum Laude, Tau Beta Pi, Mortar Board, Naval Reserve Officers Training Corp, 4-year scholarship

## APPENDIX B

I authored or co-authored the following publications in the last ten years:

1. National Academies of Sciences, Engineering, and Medicine. 2019. *Strengthening the Military Family Readiness System for a Changing American Society*. Washington, DC: The National Academies Press. https://www.nationalacademies.org/our-work/the-well-being-of-military-families (co-author)

2. *Homeport*, LinkedIn (June 4, 2021), https://www.linkedin.com/pulse/homeport-ashish-vazirani

3. *Strength, Resilience, and Reunion*, LinkedIn (May 19, 2021), https://www.linkedin.com/pulse/strength-resilience-reunion-ashish-vazirani

4. *Our Military Family*, LinkedIn (May 4, 2021), https://www.linkedin.com/pulse/our-military-family-ashish-vazirani

5. *Reconcilation [sic] - Repair & Healing*, LinkedIn (April 21, 2021), https://www.linkedin.com/pulse/reconcilation-repair-healing-ashish-vazirani

6. *Strengthening Connections*, LinkedIn (April 14, 2021), https://www.linkedin.com/pulse/strengthening-connections-ashish-vazirani

7. *Reflect, (Re)Discover, (Re)Connect ...*, LinkedIn (April 8, 2021), https://www.linkedin.com/pulse/reflect-rediscover-reconnect-ashish-vazirani

8. *Vietnam Veterans: An Example of Leadership and Healing*, LinkedIn (March 29, 2021), https://www.linkedin.com/pulse/vietnam-veterans-example-leadership-healing-ashish-vazirani

9. *... and three is better*, LinkedIn (March 23, 2021), https://www.linkedin.com/pulse/three-better-ashish-vazirani

10. *The Ties that Bind ...*, LinkedIn (March 5, 2021), https://www.linkedin.com/pulse/ties-bind-ashish-vazirani

11. *Focus on Impact ... Three Simple Steps*, LinkedIn (February 24, 2021), https://www.linkedin.com/pulse/focus-impact-three-simple-steps-ashish-vazirani

12. Remarks at the Syracuse Service Summit on the Value of Service (Apr. 20, 2023), https://www.war.gov/News/Speeches/Speech/Article/3369340/deputy-undersecretary-of-defense-for-personnel-and-readiness-speaks-at-the-syra/

# APPENDIX C

## Materials Considered

In forming the opinions expressed in this report, I have considered the following materials:

- Exec. Order No. 9981, "Establishing the President's Committee on Equality of Treatment and Opportunity in the Armed Services," 13 Fed. Reg. 4313 (July 26, 1948)
- Executive Order 14004, "Enabling All Qualified Americans to Serve Their Country in Uniform," 86 Fed. Reg. 7471 (Jan. 25, 2021)
- Executive Order 14183, "Prioritizing Military Excellence and Readiness," 90 Fed. Reg. 8757 (Jan. 27, 2025)
- DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members" (Apr. 30, 2021)
- DoD Instruction 1332.45, "Retention Determinations for Non-Deployable Service Members" (July 30, 2018)
- DoD Instruction 6130.03, Volume 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" (as amended 2021)
- DoD Instruction 6130.03, Volume 2, "Medical Standards for Military Service: Retention"
- DoD Instruction 7730.66, "Readiness Reporting Guidance for the Defense Readiness Reporting System (Dec. 10, 2024)
- Memorandum from Secretary of Defense James N. Mattis, "Military Service by Transgender Individuals" (Feb. 22, 2018)
- Memorandum from Secretary of Defense Pete B. Hegseth, "Prioritizing Military Excellence and Readiness" (Feb. 7, 2025)
- Action Memo, "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025)
- Department of Defense, Report and Recommendations on Military Service by Transgender Persons (Feb. 2018)
- 2022 National Defense Strategy of the United States of America (Oct. 27, 2022)
- 2026 National Defense Strategy of the United States of America (Jan. 23, 2026)
- Dep't of the Army, Army Doctrine Publication (ADP) 6-22, Army Leadership and the Profession (31 July 2019)

- FY2026 Budget Request for the Military Health System (Sept. 23, 2025), https://www.congress.gov/crs_external_products/IF/HTML/IF13108.html

- Agnes Gereben Schaefer et al., Assessing the Implications of Allowing Transgender Personnel to Serve Openly, Santa Monica, CA: RAND Corporation, 2016

- Matthew S. Goldberg *et al.*, *Population Health During Combat Operations*, IDA Document NS D-8697 (Institute for Defense Analyses Oct. 2017), https://www.ida.org/assets/2026/06/18021310/D-8697.pdf

- C. Todd Lopez, DOD Issues Implementation Guidance on Separation of Service Members with Gender Dysphoria, DOD NEWS (May 16, 2025), https://www.war.gov/News/News-Stories/Article/Article/4188279/dod-issues-implementation-guidance-on-separation-of-service-members-with-gender/

- Dave Philipps, *Number of Trans Troops Far Lower Than Estimated, Pentagon Figures Show*, N.Y. TIMES (Feb. 27, 2025), https://www.nytimes.com/2025/02/27/us/politics/trans-troops-pentagon-figures.html

- Defendants' Disclosures Pursuant to Rule 26(a)(2)(C) dated September 4, 2026, concerning: General Thomas M. Carden, Jr.; Lieutenant General William J. Bowers, USMC; Lieutenant General John J. DeGoes, USAF; Lieutenant General Charles T. Lombardo, USA; Vice Admiral Marc Miguez, USN; Major General (Ret.) Hussey, USA; Colonel Black, USA; Colonel Cron, USA; Colonel Neese, USAF; Captain Peter Roberts, USN; Captain Dennis A. White, USN; Captain Blair, USN; Lieutenant Colonel Carolyn A. Salter, USA (with attachments); Lieutenant Colonel Lee, USA; Lieutenant Commander Bayer, USN; Dr. Ortega (with attachments); and Dr. Hopewell

## APPENDIX D

### Prior Testimony

During the previous four years, I have provided sworn testimony, declarations, or expert testimony in the following matters:

1. *Students for Fair Admissions, Inc. v. United States Naval Academy, et al.*, No. 1:23-cv-02699-RDB (D. Md.)

    - Live trial testimony (September 23, 2024) (ECF No. 144 at 3:21–79:24)

In each of the above matters, I testified or submitted declarations in my capacity as the Acting Under Secretary of Defense for Personnel and Readiness (or as performing the duties of or a former holder of that office), not as a retained expert witness. This is the first matter in which I have been retained as an expert witness.