IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------

NICOLAS TALBOTT, et.al.,

Plaintiffs,

v. Civ. A. No. 25-240 (ACR)

UNITED STATES, et al.,

Defendants.

-------------------------------

ZOOM VIDEO DEPOSITION

Taken on behalf of the Defendants of

ASHISH S. VAZIRANI

Washington, D.C.

November 4, 2026

9:18 a.m.

Job No. CS8534241

Reported by: Audra M. Smith, RPR, CRR, FCRR

Video by: Orson Braithwaite

APPEARANCES OF COUNSEL

ON BEHALF OF PLAINTIFFS:

O'MELVENY & MYERS, LLP
BY: EAMONN CAMPBELL, ESQ.
1999 Avenue of the Stars 8th Fl
Los Angeles, CA 90067
ecampbell@omm.com

O'MELVENY & MYERS, LLP
BY: MAX ROSENTHAL, ESQ.
1625 Eye St NW
Washington DC 20006
mrosenthal@omm.com

GLAD Law
BY: JENNIFER LEVI, ESQ.
BY: ALICE YAO, ESQ.
18 Tremont Street, Suite 950
Boston, Massachusetts 02108

ON BEHALF OF DEFENDANTS:

UNITED STATES DEPARTMENT OF JUSTICE
BY: ROBERT BOMBARD, ESQ.
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
robert.bombard@usdoj.gov

Also Present via Zoom:

# I N D E X

*****


| | | PAGE |
|---|---|---|
| ASHISH S. VAZIRANI | | |
| Examination By Mr. Bombard | | 2 |
| Examination By Mr. Campbell | | 199 |
| Exhibit 1 | Expert Report | 8 |
| Exhibit 2 | Defendants' Disclosure | 55 |
| Exhibit 3 | DoD Instruction 1300.28 | 104 |
| Exhibit 4 | In-service Transition for Transgender Service Members policy; effective date: April 30, 2021 | 140 |
| Exhibit 5 | Action Memo | 145 |
| Exhibit 6 | Office of the Assistant Secretary of Defense for Health Affairs Literature Review, Level of Evidence for Gender-Affirming Treatments | 147 |
| Exhibit 7 | USNI News Article | 166 |

BY MR. BOMBARD:

Q Thank you.

A Uh-huh.

Q Sticking with the report, do you know who wrote the first draft of this rebuttal expert report?

A The report's based on the declaration that I made in the Shilling case. My conversations with counsel, and then through the -- working with counsel, the draft was developed.

Q Do you know who wrote the first draft of the report?

MR. CAMPBELL: Objection to form.

A The first draft was shared with me, based on my conversation with counsel, my input with counsel through several conversations and meetings, and my input. And that was transmitted to me by Alice Yao.

BY MR. BOMBARD:

Q Okay. Thank you.

Were there -- was there multiple -- were there multiple rounds of drafting?

A Yes, there were.

Q Do you know how many rounds?

A I don't recall specifically. Several.

Q Several?

A Uh-huh.

Q During the several rounds of drafting, how would you characterize the sort of editing process that you were engaged in?

MR. CAMPBELL: Objection to the form.

You can answer.

A Can you clarify what you mean by "characterize the editing process"?

BY MR. BOMBARD:

Q Yeah.

Were you providing pretty substantive edits, like, sort of -- or were they sort of happy-to-glad sort of changes, as some people would say?

A They were --

MR. CAMPBELL: Objection.

Sorry. Objection to the form.

Go ahead.

A They were substantive edits.

BY MR. BOMBARD:

Q Okay.

A But the report is my report.

Q Okay. And you stated that the Shilling declaration from the early part of 2025 served as sort of a template for the initial draft at least?
A Served as a starting point for my thoughts on the Hegseth Policy, and the implications of the Hegseth Policy on readiness and utilization of health care. And then based on -- so that formed the basis for it. And then my review of other documents referenced in the report were the basis for the report itself.
Q Thank you.
In preparing this report -- I'm not talking about any conversations you had with any of the attorneys for plaintiffs, but did you talk to anybody else you had worked with at the Department of Defense?
A In development of the report?
Q Yes.
A I did not.
Q Did you talk to Mr. Wagner about it?
A Not regarding the development of my report, no.
Q Did you talk to Mr. Wagner about the deposition today?

command are there between a Navy lieutenant and the Deputy Under Secretary of Defense for P&R?

MR. CAMPBELL: Object to the form.

A I'll categorize it as many. I'm going to take a few minutes to think about all of the different layers in that chain of command.

Primarily -- let me just categorize. When you're serving in an operational command, as -- the Deputy Under Secretary of Defense doesn't serve in an operational role, so it's not a direct -- it's not a direct line, okay? So I just want to make sure we're clear on the structure of the military.

If you want -- and I'm happy to elaborate on the structure if you think that's helpful.

So how many different layers. And bear with me because I'm going to have to do this out loud so that I can keep track.

BY MR. BOMBARD:

Q May I --

A You want --

Q Perhaps it would be helpful -- well, I'll let you go ahead.

A You'd like me to go ahead and answer the question that you asked, which is: How many layers between a -- in my case, serving on a submarine as a division officer -- between a division officer on a fast attack submarine to the Deputy Under Secretary of Defense?

Q Yes.

A Okay. And what I want to clarify is there's not a direct line, right? There's a -- (Indicated.)

Let me make sure...

So as a division officer, I would have reported to a department head. Department head then reports to a commanding officer, but there is also an executive officer that is in that chain.

The commanding officer then -- depending on where that ship is assigned -- so if you're in a training environment and you're not deployed and allocated to a combatant commander, you report to the squadron commander, the CO reports to a squadron commander.

The squadron commander then reports to group commander. The group commander then would report to a fleet commander, in this

case -- my case, it would have been the Submarine Force Atlantic.

And that's when we were in that phase of training, and the Secretary of the Navy is "man, train, and equip" responsibilities under Title X.

(Stenographer requested clarification.)

A That type commander, in this case the Submarine Force Atlantic, would then have responsibilities to the -- under the Deputy Chief of Naval Operations for submarine warfare then would report to Chief of Naval Operations -- I think I'm keeping my fingers. Chief of Naval Operations reports to the Secretary of the Navy. Secretary of Navy reports to Secretary of Defense.

So that's eight layers.

The Deputy Under Secretary of Defense is the Principal Assistant to the Under Secretary of Defense who reports to the Secretary of Defense. The Deputy Under Secretary of Defense and the Under Secretary of Defense have responsibility for policy, some programs, but all of those policies and programs are then implemented by the military departments

through the services.
Is that -- so there's not a direct chain of command to Deputy Under Secretary of Defense from an operating unit.
That chain of command, that structure changes when a unit is then moved from, I'll call it, a training mission to an operation -- a deployment mission. That submarine -- the submarine I was on would then be -- become part of, generally, a task force and a task force commander.
So in the case of the USS Groton, it varied. When I was in the Mediterranean, it varied because the task force commander was a task force commander in the Mediterranean, and then that task force commander would then report into the combatant commander, and then the combatant commander through -- combatant commander has direct reporting responsibility to the Secretary of Defense and the President.
Again, not a direct line to the Deputy Under Secretary of Defense. It's an operational chain of command.
So in that sense, particularly because fast attack submarines and the way we

operated in late '80s and early '90s, there were fewer layers because of the role that unit would play in an operational environment. You might have a commanding officer reporting directly to a task force commander. Task force commander then having responsibility -- there may have been another layer. At that point in time, I don't recall. That task force commander then having responsibilities to a combatant commander, and then the combatant commander having responsibilities to the Secretary of Defense and the President.

Q How valuable was your prior military service in fulfilling the duties of your appointment as Deputy Under Secretary of Defense for Personnel and Readiness?

A It was --

MR. CAMPBELL: Object to the form.

Go ahead.

A It was incredibly valuable.

BY MR. BOMBARD:

Q Why was it incredibly valuable?

A Maybe you could clarify -- maybe I can --

Q How was your prior military service

incredibly valuable in fulfilling your role?
A So I think to answer that question -- I just want to make sure we have a common understanding how we're placing "value."
So you're asking me how valuable, in what regard?
Q I'm asking you -- do you not -- do you not understand?
A "Value" is defined in many different ways.
Q Okay. How do you define "value"?
A In the context of your question, the value was the experience having served, understanding operational environments, understanding the stresses of operational environments, understanding the importance of your confidence in the sailors who serve with you, having confidence in the leadership that you report to. Those experiences were very valuable.
I will add that it wasn't just my active duty experience that contributed to the value and how I approached the role of Deputy Under Secretary of Defense.
I also spent time working in the

Q But as a DoDI -- I'll strike.

MR. BOMBARD: All right. How are we doing? If people could use a break? You doing okay?

MR. CAMPBELL: For another few minutes.

MR. BOMBARD: Keep going?

THE WITNESS: I'm happy to keep going.

MR. BOMBARD: Yeah. Just checking. We have been going about an hour.

THE WITNESS: Maybe another 15, 20 minutes.

MR. BOMBARD: Perfect.

THE WITNESS: Unless there's a natural break.

BY MR. BOMBARD:

Q Thank you.

Mr. Vazirani, if you don't mind turning to your Summary of Opinions. That's page 7 of your report.

Paragraph 24 you state: Based on my experience and review of the materials described above and more fully at Appendix B -- which I believe is actually Appendix C in the report

that I have -- I hold the following opinions.

Paragraph 25 then reads: Permitting open service by transgender soldiers --

A Bear with me one second.

Q Oh, sorry, yeah. Do you see that Appendix B is your -- some of your publications?

A Yes, that's correct.

Q Okay.

A That should be --

Q So back to paragraph 25: Permitting open service by transgender soldiers under the Austin Policy did not negatively impact military readiness or unit cohesion. This is consistent with the RAND Report's predictions and with my direct observations during my tenure overseeing the policy's implementation. I am not aware of any cases of reduced cohesion or readiness based on the service of a transgender service member.

Did I read that correctly?

A Yes, you did.

Q So is that last sentence, "I am not aware of any cases of reduced cohesion" -- is that a factual statement?

MR. CAMPBELL: Objection to the form.

A It is a fact that I was not aware of

any cases of reduced cohesion or readiness.

BY MR. BOMBARD:

Q Okay.

A So it's a statement of fact of my awareness.

Q And you were -- I think you -- I asked just about cohesion. And then I think you answered as well as "readiness."

Can you confirm that that's also a factual statement?

MR. CAMPBELL: Objection to the form.

A I'll also acknowledge that that is a statement of fact regarding my awareness of any cases of reduced readiness.

BY MR. BOMBARD:

Q Okay. When you left your role on January 20, 2025, did you know the number of transgender service members in the United States military?

A When I left in January 2025, did I know the precise number of transgender service members?

Q Yes.

A I did not.

Q Did you have any precise numbers on

the number of transgender service members who transitioned under DoD Instruction 1300.28 during your tenure?

MR. CAMPBELL: Objection to form.

A During what time period?

BY MR. BOMBARD:

Q During your tenure in the office of --

A I don't recall.

Q Okay.

A I don't recall a precise number.

Q Do you recall whether anybody had collected that number in a database?

MR. CAMPBELL: Objection to form.

A Could you repeat the question?

BY MR. BOMBARD:

Q Would anybody within your office have been able to obtain that number in some sort of database?

MR. CAMPBELL: Objection to form.

A Referring to the number of transgender service members?

BY MR. BOMBARD:

Q The first question was: Did you know the number of transgender service members when

you left office?
A Uh-huh.
Q The second question was: Did you know the number of service members who transitioned under the Austin Policy?
MR. CAMPBELL: Objection to form.
A Did I know -- in January 2025, when I left office, did I know the number of transgender service members who transitioned under the Austin Policy? Is that --
BY MR. BOMBARD:
Q No. I'll just --
A Okay.
Q The first question, I'll just go back.
A Okay.
Q I said: When you left your role on January 20, 2025, did you know the number of transgender service members in the United States military?
MR. CAMPBELL: Do you understand what question is pending currently?
THE WITNESS: Yeah. The question that is being asked: Did I know the number of transgender service members in the

United States military?
MR. CAMPBELL: If that's -- sorry. If that's the pending question, I'll object to it as asked and answered. But...
BY MR. BOMBARD:
Q Okay. That's fine. That was asked and that was answered. So we'll move on.
The second question I asked: Did you have any precise numbers on the number of transgender service members who transitioned under DoD Instruction 1300.28 during your tenure?
MR. CAMPBELL: And I'll also object because I think he's also answered this one.
BY MR. BOMBARD:
Q Did anyone in your -- I'll strike the last question. That's fine. I believe that's correct that it was answered.
Did anyone track how many transgender service members at any point in your tenure were nondeployable?
MR. CAMPBELL: Objection to form.
A So their tracking transgender service members would not have been possible because

what would be tracked is a transgender service member who had a diagnosis of gender dysphoria. That information would have been trackable. But to track or say that there's a precise or known number of transgender service members would not have been possible.

BY MR. BOMBARD:

Q Okay. Same question, then, for a gender dysphoric service member, during your time, did you contract any data on gender dysphoric service members?

MR. CAMPBELL: Objection to form.

A I did not track gender dysphoric. The Defense Health Agency, through a medical diagnosis would have been able to know how many service members at a particular point in time had a diagnosis of gender dysphoria.

BY MR. BOMBARD:

Q And did you ever ask the Defense Health Agency for the number of gender dysphoric service members?

MR. CAMPBELL: Objection to form.

A I recall having discussions about the number of service members with gender dysphoria. I don't recall if I -- I specifically asked for

that number. It may have been in the context of a development of the budget for the Defense Health Agency and/or in preparation for testimony before Congress, anticipating that there may have been questions about the Austin Policy.

BY MR. BOMBARD:

Q Have you testified before Congress?

A I have.

Q How many times?

A Not including the confirmation hearing, I think it's about half a dozen times that I testified.

Q All during your time at -- working in the SecDef's Austin Pentagon?

A That's correct. Half a dozen roughly, plus or minus. Probably two to three times per year that I had testimony before Congress.

Q Were you ever asked a question about what we're calling the "Austin Policy"?

A I was never asked -- as I recall, I was not asked a question about the Austin Policy.

Q And in prep -- I understand those

prep sessions can sometimes be pretty involved. Did you seek information in anticipation of a potential question about the Austin Policy?

MR. CAMPBELL: Objection to form.

A I don't recall seeking it. I do recall being presented with that information.

BY MR. BOMBARD:

Q What information were you presented with regard to the Austin Policy?

MR. CAMPBELL: Objection.

A The information that I recall was the cost associated with the treatment of service members with gender dysphoria.

BY MR. BOMBARD:

Q Medical treatment?

A Medical treatment.

Q But it sounds like the Defense Health Agency, based on your answer earlier, could provide specific data regarding service members with a gender dysphoria diagnosis; is that right?

MR. CAMPBELL: Objection.

A The information regarding diagnosis of gender dysphoria would have been in the medical record, and the Defense Health Agency

would have been able to pull that data and aggregate that data.

BY MR. BOMBARD:

Q Was there ever any consideration during your tenure to -- I understand DHA, that's going to be medical info, so there might be a whole lot of reasons why you would not want to be requesting much besides, perhaps, a raw number. But was there ever any consideration during your tenure to -- seeing how the policy was working in real time -- with service members who were availing themselves of some of the -- of some of the -- availing themselves of the policy and pursuing transition or other things?

MR. CAMPBELL: Objection to form.

You can answer if you understand what he's asking.

A I don't know that I heard a question.

BY MR. BOMBARD:

Q Yeah. Did your office consider studying how the policy was operating in real life?

MR. CAMPBELL: Objection to the form.

A My office did not consider commissioning a study regarding the

implementation of the policy. The reason that we didn't commission a study is because there were no reports of degraded readiness or degraded unit cohesion, nor were there reports that there was a significant increase or a cost associated with the policy. And so there was -- there wasn't a need to conduct a study.

Typically, when a study would be commissioned, there would be a problem we're trying to understand or a particular hypothesis that we're trying to confirm or refute. There were no indications that the policy had created a problem that required study.

BY MR. BOMBARD:

Q And so what are the typical sources of reporting for any problem to your office?

A Well, when you say "any problem," that's very broad.

Q I meant it to be very broad.

A Okay.

Q You can answer broadly.

A Yeah, I'll answer broadly then.

There were -- there was a requirement on reporting for readiness by the military services, actually at the unit level, either

Is it your understanding that applicants who meet every performance standard can still be disqualified from military service based on medical history?

A Are you referring to the performance standard for a particular role? Or are you referring to performance standard during a training period? Or are you referring to a -- are you referring -- what -- maybe --

Q Let's take it at accessions. Let's start at the entry point.

A Uh-huh.

Q Are you aware that people who can otherwise meet any other performance criteria could have a condition like protein in their urine that's medically disqualifying?

A There are medical conditions and diagnoses that are disqualifying -- that would disqualify someone from accession to service, that is correct. Those are outlined in that -- in the DoDI that you referenced.

Q And you would agree that that's a categorical rule, not an individual merit judgment?

MR. CAMPBELL: Objection --

A They are --

MR. CAMPBELL: Sorry. Objection to form.

Go ahead.

A Those are not categorical. They are based on a diagnosis.

BY MR. BOMBARD:

Q This is your Significant Accomplishment section, page 28, in relation to your tenure at the Pentagon from '22 to '25.

I wanted to ask, bullet number 3 says you established policies to ensure service members and their families were able to access noncovered reproductive health care.

Do you see that?

A I do.

Q Do the policies -- are those policies that you established, do you know whether they remain in place?

A They do not.

Q Okay.

A If I can clarify. So the policies to ensure service members and their families were able to access noncovered reproductive health care no longer are in place. Those were

rescinded by the current administration.

The second half of that, expanded access to contraceptive care including walk-in contraceptive care and counseling, I'm not aware those have been rescinded. I think those are still in place. So I just want to make sure those -- to separate those two things.

Q Thank you.

So going back to an earlier line of questioning, I just want to make sure I understand this. While you were at the Pentagon, you were not aware of the precise number of service members diagnosed with gender dysphoria, correct?

MR. CAMPBELL: Objection to the form and to the extent it's been asked and answered already.

A While I was in service at the Pentagon, I was not aware -- or don't recall the precise number of service members who were diagnosed with gender dysphoria.

BY MR. BOMBARD:

Q So you're also -- don't know how many -- you don't know any subcategory that would flow from a gender dysphoric service

member as well, correct?

MR. CAMPBELL: Objection to form.

BY MR. BOMBARD:

Q If I asked you the number of surgeries.

A If you're asking for a precise number, I would not be able to give you a precise number. If you're asking for an -- a range, I would be able to answer a question about range.

Q Okay. For the range, what would be a range? And what -- go ahead.

MR. CAMPBELL: Objection to the form of that question.

A A range for what?

BY MR. BOMBARD:

Q You said, "If you asked me about a range, I could provide a range," and I said, "Okay. Go ahead, and you can provide me a range."

A You also asked about a number of different things.

(Overlapping speakers.)

A You asked about the diagnosis --

preparations for hearings, preparation for budget, and in reviewing the documents in developing my report and in the -- my estimation is based on that recollection of the fact that the number of -- the number with the diagnoses, particularly as it related to the costs associated with treatment for gender dysphoria, were small relative to the overall size of the force and the overall size of the budget for the military health system, small in the less than 1 percent, tenths of a percent range.

BY MR. BOMBARD:

Q I wanted to ask you about something in your implementation and oversight of the Austin Policy section, page 4 into 5, that's paragraph 16, which we looked at earlier. This references -- I'm on the page 5 in the first complete sentence, starting with: Under DoD Instruction 1300.28, each military service maintained a Service Central Coordination Cell responsible for coordinating and tracking in-service transition cases.

Do you see that?

A I do. Do you mind if I take a moment? I'd like to read it in the context --

Q Yes. Please.
A -- of the full paragraph.
Q As much time as you need.
So it states that each military service maintained a Service Central Coordination Cell, SCCC. Who was involved with managing these at the surface level -- service level?
MR. CAMPBELL: Objection to form.
A Who specifically by name or who by role?
BY MR. BOMBARD:
Q I would assume that, like, at some point there's somebody who's at -- the buck stops at somebody who has to report something from the Service Central Coordination Cell.
Do you know whether there was a person responsible on behalf of each military service?
MR. CAMPBELL: Objection to form.
A I would imagine, yes, that each service had someone responsible for that function. Who that individual was or who they specifically reported to, I couldn't say. The reason is because that is a military department,

military service role, not the role of OSD. We don't define how the departments and services organize themselves. That --

BY MR. BOMBARD:

Q It states later in the same paragraph, I'll just continue reading after the description of the Service Central Coordination Cells you write: The military departments, the Assistant Secretary of Defense for Manpower and Reserve Affairs, the Assistant Secretary of Defense for Readiness, the Assistant Secretary of Defense for Health Affairs, and the Director of the Defense Health Agency reported to my office on personnel and medical readiness matters. Had the Austin Policy produced readiness, deployability, cohesion, or cost problems, those channels were the means by which such problems would have been surfaced to me.

Is that right?

A You've read that correctly, yes.

Q And is that accurate? Those were the channels of which you would have -- problems would have surfaced to you?

A Do you have a copy of the 1300.28 instruction that I'm referring to?

Q Do you need to see it to --
A I'd like to see it, yes.
Q You'd like to see it? Yeah. Let's take a quick break off the record.
A And I will --
THE VIDEOGRAPHER: The time is 12:08 p.m.
(Whereupon, a recess was taken.)
THE VIDEOGRAPHER: The time is 1:29 p.m. This begins Unit Number 4. We're on the record.
BY MR. BOMBARD:
Q Mr. Vazirani, before the lunch break, I had asked you a few questions about the Service Central Coordination Cells, and you had asked that I provide you with the DoD Instruction 1300.28. During the break I sought to print out copies of this as an exhibit to provide you.
The exhibit that is before you now is the version dated September 4, 2020.
(Exhibit Number 3 was identified.)
MR. BOMBARD: Exhibit 3.
BY MR. BOMBARD:
Q But the exhibit that you cite in the

multiple forms, whether through the DRRS monthly reporting, whether it was through the process by which the Chairman of the Joint Chiefs of Staff coordinated the Secretary of Defense Orders Book, or through the process of submitting to Congress the semiannual readiness reports.

Q I believe in your rebuttal report you acknowledge that you were not involved at any point in the development of the Austin Policy; is that right?

A That's correct.

Q Okay. You were involved directly in the implementation?

A The implementation and the oversight, that's correct.

Q Despite not having the firsthand knowledge of the development process, you would agree that the Executive Order prompting the Austin Policy 14004 was issued within the week of the President Biden's inauguration?

MR. CAMPBELL: Objection to form.

A The Executive Order 14004 was issued on January 25th of 2021.

BY MR. BOMBARD:

Q So that would have been five days

And if you would please turn to -- if you want to follow the very top page number, we're just going to use that. It's page 6 of 23 for the exhibit. And I'm looking at Section 2.5: Secretaries of the Military Departments and Commandant in the United States Coast Guard.

A Uh-huh.

Q And my question is nested in subparagraph (c), and this is describing or discussing the Service Central Coordination Cell.

Do you see that paragraph?

A I do.

Q Besides having read this paragraph, what is your understanding of what the Service Central Coordination Cell function was?

MR. CAMPBELL: Objection to form.

A My understanding of the Service Central Coordination Cell is articulated in 2.5(c); that the Secretary of the Military Department maintains a cell that carries out the following functions: Provide multidisciplinary, for example, e.g., mental, medical health, legal, military personnel management, expert advice and assistance to commanders with regard

to service by transgender service members, and gender transition in the military to assist commanders in the execution of DoD military department and service policies and procedures.

BY MR. BOMBARD:

Q Did you ever meet with any Service Central Coordination Cell team?

A I did not.

Q If you wanted to meet with the Service Central Coordination Cell team, do you think you could have?

A Yes, I believe I could have. Would it have been unusual for me to meet with them? Possibly. It would have been dependent on what was the need for me to meet with them.

If I had questions about service coordination cells or information provided by service coordination cells to me, I probably would not have gone directly to the Service Central Coordination Cell. I would have gone to the appropriate military department level point of contact.

If I had a desire to meet with them just maybe to understand more about the work and the type of people, I probably could have

arranged for that, but I didn't find it necessary.

BY MR. BOMBARD:

Q From your time at the Pentagon, are you aware of any other comparable central coordination cell providing multidisciplinary services to service members with a particular medical condition?

MR. CAMPBELL: Objection to form.

A I'm not familiar with -- or I don't recall other cells carrying that SCCC title related to a particular medical condition.

BY MR. BOMBARD:

Q Ignoring the particular title, but just the general framework that's contemplated in 2.5 subparagraph (c) here, are you aware of any kind of apparatus in the department that was targeted towards another medical condition?

MR. CAMPBELL: Objection to form.

A I -- I'm aware of -- I can't say that I'm confident that this existed in every military department. I'm pretty sure, but I can't say for sure.

When I served as the senior advisor to the assistant -- at that point, acting

Assistant Secretary of the Navy for Manpower and Reserve Affairs, I was aware that there was a working group to evaluate -- "evaluate" may be not the right word, but to coordinate and support the military services in the implementation of the policy related to COVID vaccinations and how to -- and the review of those who refused COVID vaccinations.

BY MR. BOMBARD:

Q From your time at the Navy, do you recall what the result of that review was regarding the COVID vaccination policy?

MR. CAMPBELL: Objection to form.

A Can you repeat your question?

BY MR. BOMBARD:

Q Do you recall what the result was from the working group that was evaluating the implementation of the policy related to COVID vaccinations?

A So that working group was assembled to monitor and understand the process by which service members who had refused the COVID vaccine were being processed for separation, based on the fact that they had not followed the lawful order required by the COVID vaccine

individual was allowed to access.

Other things that maybe were disqualifiers were things like musculoskeletal injuries. Take, for example, an athlete who might have had a shoulder injury or a knee injury or a hip injury. Early on, those were disqualifying, and what we found is through good medicine and good physical therapy, those candidates were very eligible to serve. And so that was also learned from the experience of individuals who were in service and suffered those types of injuries and their ability to recover those injuries and return to full service.

And so based on the science and the body of evidence, those standards were adjusted but nobody was allowed in, unless they met the standards, unless there was a waiver, and certain conditions which were waiverable.

Q Thank you.

As a general matter, having your expertise on recruitment matters and policy, do you agree that the Department of Defense can be more selective in assuming medical risk in a scenario or circumstance where they're

surpassing recruitment goals, and there's a surplus of interested otherwise qualified candidates?

MR. CAMPBELL: Objection to form.

A I want to make sure I understand your question. Are you asking whether or not the department can be more selective, given a set of standards, or are you asking whether or not the department can change the standards as a means to be more selective?

BY MR. BOMBARD:

Q Do you think they can change the standards to be more selective?

A Can they? Yes, it's possible. Should they? In my opinion, no. I think they should apply the standards, and then if the candidate is eligible and is willing to serve, then that individual ought to be given the opportunity to serve their country.

Q If that was -- well, strike.

I do want to ask you that question again, though, so I'll repeat it. Do you agree that the DoD can be more selective in assuming medical risk in a scenario where they're surpassing recruitment quotas and there's a

surplus of otherwise qualified candidates?

MR. CAMPBELL: Objection to form.

A If you'd repeat it again? I just want to make sure I'm answering your question because I want to make sure I understand your question.

BY MR. BOMBARD:

Q Thank you.

Do you agree that the Department of Defense can be more selective in assuming medical risk in a scenario where they're surpassing recruitment quotas and there is a surplus of otherwise qualified candidates?

MR. CAMPBELL: Objection to form.

A I think the department can -- the department can be more selective, particularly once a quota is -- has been met.

I don't believe -- I don't agree that the department should categorically exclude a group of people without an individualized medical review, as is the case with -- under the Austin Policy, and as the case with other medical conditions.

BY MR. BOMBARD:

Q Do you agree that it's important the

you said reduces the level of trust of the populace who believes in the military, as well as the service members, and also reduces the legitimacy of that military in the eyes of those -- I think this might be a typo -- countries where we serve -- oh, nevermind -- countries where we serve who look at the U.S. as a place that is based on meritocracy rather than categorical exclusions.

How would you -- how would you measure those assertions?

MR. CAMPBELL: Objection to the form, and to the extent it's mischaracterizing the witness' testimony.

But you can answer, if you understand.

A If you could clarify the question?

BY MR. BOMBARD:

Q Is there any objective measure which you could analyze those opinions in terms of, you know, a reduction of reducing the level of trust of the populace, one; reduction of the level of trust among the service members, two; reduction of the legitimacy of the military in the eyes of those countries where we served?

A Yeah.

MR. CAMPBELL: Objection to form.

A The measure on impact and recruiting is the measure of propensity to serve. Also impacting that recruiting, as well as levels of trust, are the measures of key influencers of those who might be considering service -- family members, school counselors -- and the level of trust they place in the military and their willingness to promote military service; measures of trust by family members and whether or not they would recommend military service -- service members and their family members -- whether or not they would recommend service for their children or others.

BY MR. BOMBARD:

Q Thank you.

On paragraph 31, you opine: There is no evidence that the Austin Policy caused any actual harm to readiness, unit cohesion, or mission accomplishment.

And I'm not reading the full paragraph just yet. I wanted to just park it there for a second.

So your opinion is that there's no

evidence for these -- what's the factual basis for that opinion?

A During my time as the Deputy Under Secretary and acting Under Secretary, there were no reports that allowing transgender service members to serve resulted in reductions in readiness through the defense readiness reporting system; unit cohesion, as measured by our climate surveys; or our ability to meet mission based on the ability of the combatant commanders to meet the objectives of the National Defense Strategy and the National Security Strategy.

Q Was there any evidence that the Austin Policy enhanced readiness?

A I don't have a measure that says that there was an increase in readiness. There was no degradation of readiness. There was no indication that there was an increase to readiness.

I'll note that the Austin Policy, on the heels of the Mattis Policy, continued -- allowed the continuation of service for those in service.

Q Same question: Was there any

evidence that the Austin Policy caused enhanced unit cohesion?

A I was not aware of an indicator that the Austin Policy in and of itself increased unit cohesion. There was no indication that it degraded unit cohesion.

Q During your tenure at the Department of Defense, were you aware of any evidence that the Austin Policy enhanced mission accomplishment?

A The Austin Policy, along with other measures taken to enhance the quality of life and well-being of service members and their families, led to -- ensured that we were able to meet mission.

Did it increase our ability in or by itself? I can't say that with -- that that was a measure that was looked at in isolation.

Q So you just said the Austin Policy, along with other measures taken to enhance the quality of the life and well-being of service members and their families, led to ensure we were able to meet mission.

What evidence or facts do you have to support that statement?

BY MR. BOMBARD:
Q Obviously reviewing the medical recommendations provided to him, could Secretary Austin have made a different determination of 20 months, 24 months?
MR. CAMPBELL: Objection to form.
A I think you're asking me to speculate how Secretary Austin might have made a decision.
BY MR. BOMBARD:
Q I'm just asking could he have chosen a different timeline for whatever reason?
MR. CAMPBELL: Objection to form.
A Yes, Secretary Austin could have. I feel confident that he would have relied on the input of experts in that area in informing the policy and the decision that went into the development of the -- of DoDI 1300.28.
BY MR. BOMBARD:
Q I want to refer you to page 13, paragraph 47. There's a particular sentence in this paragraph, but feel free to read the entire paragraph first.
Thanks.
Within the paragraph, the sentence I'd like to ask you about states: During my

tenure, approximately 5 percent of the active and reserve component forces were nondeployable at any given time for medical, administrative, or legal reasons, a population several orders of magnitude larger than the estimated 0.2 percent of service members with a gender dysphoria diagnosis.

Within the -- first of all, where did you get the 5 percent nondeployability figure for the DoD?

MR. CAMPBELL: Objection to form.

A Based on my recollection from the time in office when I was reviewing deployability and readiness reports.

BY MR. BOMBARD:

Q Is that an average of the different reports you received throughout the two and a half years?

A That's correct, yes.

Q What percentage of the -- within the smaller -- 0.2 percent of service members with a gender dysphoria diagnosis, within that subgroup, what percent were nondeployable?

MR. CAMPBELL: Objection to form.

A I don't have a figure. I'm not aware

of the precise percent that were nondeployable.
BY MR. BOMBARD:
Q Did you ever look that up?
A I did not.
Q I wanted to ask you a question as well on page 14 and 15, it's the last sentence of page 14. It states: Under DoD -- DoDI -- excuse me -- 1300.28, the service members --
A Do you mind if I just read the full paragraph before you get --
Q Sure.
A Thanks.
Okay. Thank you.
Q I'll just read that last sentence: Under DoDI 1300.28, a service member's commander was involved in the timing of transition-related care, and that care was scheduled around the unit's mission and deployment requirements in the same way that elective and nonemergent care is scheduled for any service member.
Did you track how many requests commanders denied for transition care? Transition-related care, I should say?
MR. CAMPBELL: Objection to form.
A I did not personally track the number

of cases that were denied.

BY MR. BOMBARD:

Q Were approvals tracked?

A I did not personally track approvals.

Q If there were commands, plural, or individual commanders with a history of denying transition-related care, would something like that potentially reach your desk?

MR. CAMPBELL: Objection to form.

A If there were commanders who repeatedly, consistently denied requests, that would have gone up through the military department, and they would have addressed that issue. Had it come up to the military departments that there was something that needed to change in the policy or if the policy was creating a readiness challenge for those commanders, then that would have come to my attention.

During my time serving, neither of those types of instances came to my attention.

BY MR. BOMBARD:

Q How many applicants accessed with gender dysphoria between April 2021 and January 20, 2025?

MR. CAMPBELL: Objection to form.
A I'm not aware of the specific number that accessed during that time period.
BY MR. BOMBARD:
Q In paragraph 67 on page 19, you are -- I'll just ask the question to read -- well, sorry. I should just let you read the paragraph first.
A 67?
Q Yes, sir.
Do you see where you compared accommodation costs to the updated parental leave policy?
MR. CAMPBELL: Objection to form.
BY MR. BOMBARD:
Q In the parenthetical, "e.g. service members who apply for personal leave"?
A Yes, I see that.
Q Is it correct that parental leave was a benefit that Congress chose to provide by statute, the expanded parental leave benefits?
MR. CAMPBELL: Objection to form.
A 12 weeks of -- the 12 weeks of parental leave for the birth parent and for the nonbirth parent?

BY MR. BOMBARD:

Q Correct.

A I can't recall if it was a requirement of the NDAA or not. I can't recall if that was the impetus for that. We did implement that as policy.

Q And given your experience, does that seem more likely that it was something from an NDAA versus departmental policy?

MR. CAMPBELL: Objection to form.

A Not necessarily, no.

BY MR. BOMBARD:

Q Do you agree that the parental leave policy provides fixed durations of time?

A The parental leave policy did allow for a fixed duration of time within a calendar year. So those 12 weeks did not have to be congruent 12 weeks. It could be taken in different time periods, which allowed the commander to work with the service member to make sure that it worked for the service member and for the command's needs.

Q Going back to the earlier questions about the commanders' involvement with approving transition-related care. Were there similar --

your questions and answering in a manner -- given my understanding of your questions, I will say that some of the questions were difficult to understand. I think I tried to clarify or get you to clarify the question where possible. But given -- I did the best that I could, given my -- what I understood your questions to be.

MR. BOMBARD: Okay. Thank you very much for your time today. Those are all the questions I have.

EXAMINATION

BY MR. CAMPBELL:

Q I just have a handful of questions for you, Mr. Vazirani. And thank you for your time today.

Is it your opinion that the Austin Policy positively contributed to readiness?

A Yes, I believe that the Austin Policy contributed to readiness.

Q And what is your basis -- the basis for that opinion?

A My opinion is based on what I believe, that when we have units or a military and units that are -- reflect the nation that we serve, we have more cohesive and ready units

because we have people in service who come from different experiences and, as a result, are able to understand and mitigate risks, which is inherent in military service, particularly in operational environments.

Q And is it your opinion that the Austin Policy positively contributed to unit cohesion?

A Yes. I believe that the Austin Policy, in ensuring an environment, an inclusive environment that allows for individuals who have a willingness and ability to serve and who meet the standards to serve and to serve honorably and to contribute to the effectiveness, the military effectiveness of a unit.

Q And is it your opinion that the Austin Policy positively contributed to mission accomplishment?

A Yes. It is my opinion that the Austin Policy, along with other policies that were adopted during the -- my term in office, contributed to our ability to meet the objectives of the National Defense Strategy and the National Security Strategy.

MR. CAMPBELL: Okay. Thank you for