**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT, *et al.*,<br>Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br>Defendants. | Civ. A. No. 25- 240 (ACR) |

**DEFENDANTS' MOTION IN LIMINE NO. 7**

**<u>TO EXCLUDE ALEX WAGNER'S TESTIMONY</u>**

Pursuant to Rules 104, 702, and 703 of the Federal Rules of Evidence, Defendants respectfully move to exclude the expert opinions and testimony of Mr. Alex Wagner. Mr. Wagner served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, he was responsible for the "entire human capital enterprise of the United States Air Force and United States Space Force, including recruiting and retention, talent management, compensation, discipline, housing and lodging, health care and dependent care, oversight of the U.S. Air Force Academy and Air Force ROTC detachments, and reserve component affairs impacting nearly 700,000 Airmen, Guardians, and civilians across the Department of the Air Force ("DAF")." Rep. ¶ at 7. Previously, Mr. Wagner served as the Chief of Staff to the Secretary of the Army from 2015 to 2017, where he "was closely involved in developing and implementing policies enabling transgender Americans to openly serve their nation". Rep. ¶ at 12.

According to his report and recent deposition, Mr. Wagner intends to offer his opinions that: (1) the military studied and found no harm to readiness or operations from permitting

transgender soldiers to serve prior to enacting the open service policy; (2) during the entire period Mr. Wagner oversaw the Austin Policy's implementation, no cohesion, readiness, or discipline problem attributable to transgender service were ever reported to him; (3) transgender service presents no unique deployability burden, including under the Air Force deployment model; (4) Executive Order 14183 and the Hegseth Policy are not consistent with the military's general approach to mental and behavioral health conditions; and (5) the February 26, 2025 guidance's waiver and administrative-separation mechanisms are not individualized waiver and separation processes. *See* Wagner Rep. ¶ Section IV, ¶ A-E.

At bottom, his opinions are those of a former political appointee who disagrees with a policy that his successors, appointed by a different administration, have implemented. Whether a prior Administration's officials would have weighed the readiness risks associated with individuals who have a history of or a diagnosis of gender dysphoria differently does not make any fact of consequence more or less probable. FRE 401. Mr. Wagner's testimony should be excluded based on the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Incl.*, 509 U.S. 579 (1993). As an initial matter, these opinions are not relevant and stray from the limited role of the judiciary in reviewing military judgments, and contravene the Supreme Court's instruction that lower courts disregard similar outside "expert" testimony. *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986) (dismissing the views of outside experts on matters of good order and discipline as "quite beside the point."). Mr. Wagner's first two opinions should also be excluded as irrelevant because the prior policies implemented by the Department are not at issue. In addition, Mr. Wagner's third, fourth and fifth opinions should be excluded on the grounds that they are not reliable and because he lacks firsthand knowledge.

For these reasons, Defendants respectfully request that the Court exclude Mr. Wagner's expert testimony.

## STANDARD OF REVIEW

In determining the reliability and admissibility of expert testimony, "a district court exercises a special gatekeeping obligation." *EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015)

(quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Kumho Tire*, 526 U.S. at 147)). "The scope of the court's gatekeeping inquiry will depend upon the particular expert testimony and facts of the case." *Id.* (citing *Kumho Tire*, 526 U.S. at 150). The rigorous gatekeeping function assigned to trial judges includes review not only of testimony based on "scientific" knowledge, but also of testimony based on "technical" and "other specialized" knowledge. *Kumho Tire*, 526 U.S. at 141, 148.

Rule 702 provides that a qualified expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set forth a framework to assess the admissibility of expert testimony. 509 U.S. at 589–595. Pursuant to that framework, trial courts apply a "two-prong analysis that centers on evidentiary reliability and relevancy: the district court must determine first whether the expert's testimony is based on 'scientific knowledge;' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (quoting *Daubert*, 509 U.S. at 592). Under the first prong, courts assess the reliability of the testimony offered by evaluating the "methodology or reasoning employed" by the expert. *Id.* (quoting *Daubert*, 509 U.S. at 590). Under the second prong, courts "must determine whether the proffered expert testimony 'is sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute.'" *Id.* (quoting *Daubert*, 509 U.S. at 591).

The party proposing to introduce an expert's testimony bears the burden of establishing the pertinent admissibility requirements by a preponderance of the evidence. Fed. R. Evid. 702, advisory committee note (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)); *Daubert*, 509 U.S. at 593 n.10; *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). The decision to admit or exclude an expert rests within the trial court's discretion. *Kumho*

*Tire*, 526 U.S. at 152; *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2006).

## BACKGROUND

In June 2022 Alex Wagner was confirmed by the Senate to serve as the Assistant Secretary of the Air Force for Manpower and Reserve Affairs, a position he held until January 20, 2025. Rep. ¶ 7, 15. As a high-ranking political appointee, Mr. Wagner "directly oversaw the Air Force and Space Force's implementation of the Austin Policy." Rep. ¶ 22. Earlier, from 2015 to 2017, he served as Chief of Staff to the Secretary of the Army. Rep. ¶ 12. Despite describing his political appointment as "equivalent in rank to a four-star general" (Rep. ¶ 4), Mr. Wagner has never served in the military and has never commanded a unit. Tr. 59:2-10.

Mr. Wagner was not in government when the Austin Policy was adopted in April 2021 or when the challenged policy was adopted in February 2025. Tr. 116:12-117:2; 160:9-13; 181:20-21. Despite that lack of firsthand knowledge in the development of either policy, Plaintiffs offer him as a retained expert witness to inform the Court that the Austin policy which he oversaw worked, that the 2025 Policy that replaced it is not "consistent with the military's general approach," and that the change in the policy after the change in administration will degrade readiness. Rep. ¶ 34-40, 68.

## ARGUMENT

### I. Mr. Wagner's Opinions on Matters of Department Policy are not Relevant and are Unhelpful to the Court.

#### A. A former official's disagreement with his successors' policy judgment is not a fact of consequence.

This case asks whether the challenged 2025 Policy satisfies the Constitution. The question concerns the current administration's justifications and the relationship between the current policy and those justifications. Judicial review of military decisions is highly deferential, *Goldman*, 475 U.S. at 507–08, and "the tests and limitations to be applied may differ because of the military context," *Rostker v. Goldberg*, 453 U.S. 57 at 67 (1981). Courts give military judgments about personnel standards substantial deference, *Id.* at 64-67; *Weinberger*, 475 U.S. 503, 507–08 (1986).

The Supreme Court has cautioned that courts "must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest[,]" *Goldman*, 475 U.S. at 507, and "must be particularly careful not to substitute … [their] own evaluation of evidence for a reasonable evaluation by" the military, *Rostker*, 453 U.S. at 68. When applying this deferential standard of review, the Supreme Court has been particularly dismissive of "expert testimony" seeking to undermine military judgments. For example, in *Goldman*, it dismissed plaintiff's "expert testimony" as "quite beside the point," 475 U.S. at 509, and *Rostker* rebuked the district court for "palpably exceed[ing] its authority" in "relying on [such] testimony," 453 U.S. at 81. More recently, in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court once again cautioned that courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters" and that "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security[,]'" *id.* at 708.

Although Mr. Wagner served in the Department under previous administrations, Supreme Court precedent makes no exception for such experts. Expert testimony of former military officials is "quite beside the point." 475 U.S. at 509 (dismissing "expert testimony" proffered by the plaintiff from a former military official "that religious exceptions" to uniform standards "will increase morale"). In *Goldman*, an Air Force colonel challenged on First Amendment grounds an Air Force regulation banning the wearing of a yarmulke while in uniform. *Id*. at 509. The plaintiff provided expert testimony from former military officials which contradicted the Air Force's rationale for the prohibition and claimed that the Air Force's interest in good order and discipline and uniformity were exaggerated. *Id.* at 504. The Supreme Court rejected this evidence, finding expert testimony to have no relevance in the context of a constitutional challenge to military policy. *Id.*

Similarly, in litigation challenging the Mattis Policy, *Doe 2 v. Shanahan*, 917 F.3d 694 (D.C. Cir. 2019), Judge Williams and Judge Wilkins agreed that the Supreme Court's precedents foreclosed the use or consideration of expert testimony that those plaintiffs had sought to introduce.

Judge Wilkins recognized that "the [Supreme] Court noted that it was improper for lower courts to consider plaintiff expert testimony that contradicted the military experts about whether the policies at issue were justified under the circumstances." *Id.* at 706 (Wilkins, J., concurring) (citing *Rostker*, 453 U.S. at 80–81; *Goldman*, 475 U.S. at 509–10). And Judge Williams noted that "it does not appear that the Supreme Court considered *any* evidence uncovered by those trial courts' explorations [in *Rostker* and *Goldman*] to be necessary—or even pertinent—to its disposition of the cases." *Id.* at 736-37 (Williams, J., concurring in result).

Admitting Mr. Wagner's testimony contravenes these precedents. Mr. Wagner's testimony in support of prior Department policies and against the 2025 Policy is "quite beside the point." *Goldman*, 475 U.S. at 509. Such testimony is not relevant to review of military judgments not because military judgments cannot reasonably differ, but because control of the military is constitutionally committed to the political branches. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The judgments of current military officials, rather than those of former officials, are authoritative because "the military authorities have been charged by the" coordinate branches "with carrying out our Nation's military policy." *Goldman*, 475 U.S. at 507–08.

Whether a former political appointee of the opposite political party believes his successor's policy decision is not the same choice he would make is irrelevant and does not make any fact of consequence more or less probable. FRE 401. Mr. Wagner's own framing confirms the point: he describes the purpose of his report as addressing "whether the Executive Order 14183 and the Hegseth Policy are consistent with established military policymaking practices" and "whether they are supported by evidence." Rep. ¶ 6. He agreed the President may set military personnel and medical standards but believes that authority should be exercised only after "extensive reviews" and "interagency discussions," Tr. 164:4-165:123, and he testified that the 2025 Policy is "generally inconsistent with how policy gets made," Tr. 179:17-180:1. Yet when asked whether different Presidents and Secretaries weigh readiness risks differently, he conceded "it's tough for me to speculate on how they are developing their balancing act." Tr. 166:3-16. His opposition to restrictions on transgender service also predates this litigation by nearly a decade: in 2017 he

published an article titled "Trump's Trans Troops Ban Would Require a Cruel and Exorbitantly Expensive Witch Hunt." Rep. ¶ App. C., Tr: 26:9-11; 96:8-15. Speculation and policy preference is not expertise and thus should not be admitted at trial.

**B. Mr. Wagner's characterization of the 2025 Policy as a "categorical prohibition" that is "the opposite" of the military's approach and "a requirement not to be transgender" constitutes legal conclusions.**

Mr. Wagner's opinions that the 2025 Policy is a "categorical prohibition" that is "the opposite of" the military's approach to other medical conditions (Rep. ¶ 37), that the policy's waiver provision "is a requirement not to be transgender" and "is not a medical waiver provision" (Rep 84), that the policy "disqualifies the applicants [that][the accessions] standard was written to qualify" (Rep 81), that the policy "dispenses with" the requirements of DoDI 1332.14 and DAFI 36-3211 (Rep. ¶ 85-86, 90), and that the policy would "effectively preclude" transgender individuals from serving (Rep 80) are all legal questions the Court must decide. Mr. Wagner, a lawyer by training, confirmed the legal character of these opinions at his deposition, testifying that the Secretary's authority to set standards exists only "as long as it's consistent with the law otherwise" and likened the 2025 Policy to a hypothetical decision to "stop admitting Black people" or "women" into the military. Tr. 171:4-12; *see also* Tr. 164:9-165:12. Mr. Wagner's opinions should be excluded on that basis as well.

**II. Opinions 1 and 2 regarding the Carter and Austin Policies are Not Relevant.**

Mr. Wagner intends to offer testimony that the cohesion and readiness harms Defendants' witnesses' describe "did not materialize" during the years of open service that followed the RAND Report, Rep 34, and that the Austin Policy "ha[d] no adverse effect on unit cohesion in the Air Force or Space Force," Rep. ¶ 66, *see also* 35, 61. The question of how the Carter Policy was developed and implemented by the Army, Rep. ¶ 42-49, or whether the Austin Policy "did not negatively impact readiness" (Rep ¶ 61) will not assist the trier of fact in resolving any issue in the case. Neither the Carter Policy nor the Austin Policy is challenged in this case, and the question

of the quality of evidence on which those policies were based, and the professional judgments of the decisionmakers that developed those policies are not at issue here.

Mr. Wagner's opinion that the Austin Policy had "little or no effect on unit cohesion" and "did not negatively impact readiness" Rep. ¶ 61, 64, based on his experience overseeing its implementation in the Department of the Air Force, is not relevant. An expert witness's "specialized knowledge" must be relevant to the particular opinions they give, not just the general topics at issue. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

What's more, as a senior political appointee, information about unit level cohesion and readiness was unlikely to filter up to his level. Mr. Wagner had a broad and complex portfolio that he described as effectively that of the "Chief People Officer" of the Department of the Air Force, responsible for the "entire human capital enterprise" of "nearly 700,000 Airman, Guardians, and civilians," including recruiting and retention, talent management, compensation, discipline, housing, health care, dependent care, the Air Force Academy, and the reserve component. Rep. ¶ 7, Tr. 31:4-33:14. At his deposition when asked to identify the number of links in the chain of command between a new E-2 Airman and his office, Mr. Wagner responded "I can't speculate on a specific number, but many, many" and agreed there were "[m]ore than 10 links," and could not say whether there were more than fifteen. Tr. 61:18-62:14. Mr. Wagner has never commanded or served in a military unit of any size, Tr. 59:6-10, and he conceded that the readiness impact of losing a single crew member is "most acutely felt at the unit level," Tr. 112:16-113:8, and that "generally, routine issues of nondeployability would not rise to the Assistant Secretary level," Tr. 105:14-20; *see also* Tr. 110:14-112:4. His answer that any problem with the 2021 Policy "absolutely would have come to my office" because it was "politically sensitive" assumes the very conclusion he is offered to prove. Mr. Wagner's detachment from everyday unit and command level issues and the dozen of potential layers a report would have to pass before reaching the "four-

star general" equivalent along with the politically sensitive nature of the subject further illustrate that besides being irrelevant, this factual claim has very little weight given the context.

**III. Mr. Wagner's Opinions are Not Based on Sufficient Facts or a Reliable Method.**

Mr. Wagner's second, third, and sixth opinions, and much of Parts B and C of his report rest on one premise: he never heard about any problems with the Austin Policy. Rep. ¶ 35 ("I did not observe, not was made aware of, any adverse effect"); 36 ("no complaints or concerns were brought to my attention"); 40 ("at no point did the Office of the Surgeon General . . . raise the cost of care"); 59 ("No report, briefing, complaint, media article, or readiness assessment brought to my attention identified any negative impact"); 60 ("At no time did" accession or medical officials "raise gender dysphoria with me"). He goes so far as to assert that "the absence of any such report is significant evidence that transgender service did not negatively impact readiness." Rep 61. At his deposition he testified that paragraphs 35, 36, and 59 of his report are statements of "fact" and "factual testimony based on my personal observation". Tr 29:15-30:21; 40:8-16. He also conceded that "the absence of complaints" is at least "a part" of the basis for his opinion that the Austin Policy had no negative impact. Tr., 124:22-125:12.

Mr. Wagner's lack of knowledge of any negative reports tracks with his lack of knowledge about specific data on the subject as well. Mr. Wagner admitted he did not know how many Air Force service members were diagnosed with gender dysphoria during his tenure, or the number who transitioned during his tenure. Tr 102:9-103:22. He "couldn't state any number" of in-service transitions, agreed he could have asked for that number, and admitted that his "de minimis" characterization (Rep. ¶ 68) is "an opinion based on the lack of information that came to me." Tr. 42:4-44:25. He does not recall whether the Air Force tracked readiness data for transgender service members, Tr. 87:1-14, is not aware of any readiness data field identifying members with gender dysphoria, Tr. 99:11-19, and cannot recall reviewing even one readiness metric that specifically looked at service members with gender dysphoria, Tr. 135:19-24. Although the Air Force had a single multidisciplinary team that oversaw all transgender patients (Rep. ¶ 68), he never asked that team for any data. Tr. 99:20-100:24. He did not request data on lost duty days, explaining he would

not ask for data on a "nonissue." Tr. 133:24-134:23. His lone anecdote regarding unit cohesion was during a 2022 conversation with the 37th Training Wing command team regarding four trainees did not involve speaking with those trainees or their instructors. Rep. ¶ 65. Tr. 118:12-119:17. Mr. Wagner thus lacks foundation to testify regarding his opinions that the Austin Policy did not negatively impact readiness or unit cohesion in the Air Force and Space Force, that transgender servicemembers present no unique deployability burden; and that the healthcare costs of transgender service members are de minimis. For these same reasons, Mr. Wagner's opinions on these issues are unreliable and his testimony should be excluded.

## IV. Opinion 7 is Not Reliable Because Mr. Wagner has no Knowledge or Experience with the Development Process Underlying Either the 2021 Policy or the 2025 Policy.

Mr. Wagner intends to offer testimony that the development of Executive Order 14183 and the 2025 Policy was not consistent with "the military's general approach" to such policies because he is "not aware of any such consultation, evidence gathering, implementation, and assessment of operational effects having occurred prior to" their issuance. Rep. ¶29; see also ¶6. At his deposition, Mr. Wagner went even further, contending that the Austin Policy "relied on experience", the RAND Report, and the testimony of the Service Chiefs, while "[i]t's not clear to me that the Hegseth Policy relied on anything other than the literature review, which is generally inconsistent with how policy gets made." Tr. 179:17-180:1. But Mr. Wagner acknowledges that he "was not part of the Biden Administration when the Austin Policy was devised" and only came in after the policy had been announced." Tr. 144:6-11; *see also* 116:12-117:2 (he "was in the private sector at the time of the rollout" and "wasn't paying a ton of attention").

Mr. Wagner readily admitted in deposition that he was not in government from early 2017 until his confirmation in 2022 and has no personal knowledge of how the Mattis Policy operated. Tr. 160:9-16. Likewise, he admitted that he left government on January 20, 2025, and had no access to the Department's internal deliberations leading to the 2025 Policy. Tr. 180:3-181:22. Indeed, he conceded he is not aware of any new Department of Defense study that preceded either Executive Order 14004 or DoDI 1300.28 – the Austin Policy - that he holds up as the gold standard

for policy making. Tr. 175:3-178:2. Mr. Wagner has no valid basis upon which to offer opinions comparing the policy-making processes underlying the Austin Policy to the current 2025 Policy. He was not involved with either and his testimony on this subject should be excluded.

**V. Opinions 1, 3, and 6 are Not Reliable Because They are Speculative.**

Mr. Wagner intends to offer testimony that the 2025 Policy degrades readiness because each transgender servicemember removed "will have to be replaced by someone with less experience in that billet," and that the "readiness cost" of their removal "is significant." Rep. ¶ 68; *see also* ¶ 63. Mr. Wagner further explained that his opinion that there are "no unique issues related to deployability for any deployment" rests not on data, but on his general understanding that the "medical interventions required to treat gender dysphoria are not unique." Tr. 187:7-188:23; see Rep. ¶ 69-72. Asked how he knows that individuals with gender dysphoria "do not require any unique interventions," he pointed to his familiarity with the issue "since 2015" and his "on-the-job experience." Tr. 197:4-198:6. Mr. Wagner's report goes even further, asserting that the readiness harms Defendants' witnesses describe "did not materialize" and that the RAND Report's findings have been borne out, Rep. ¶ 34, 43-45, 66.

An opinion resting on what Mr. Wagner "would assume" Tr. 93:1-7; 176:19-177:2, is speculation and *ipse dixit*. A Court does "not abuse its discretion by excluding testimony that, based on the expert's own admissions, 'would be nothing other than speculation.'" *Young v. Burton*, 354 F. App'x 432, 432–33 (D.C. Cir. 2009) (citation omitted). Mr. Wagner has no basis to opine on whether the Austin Policy had any impact on military readiness or deployability and that any speculation about the future impact of the 2025 Policy is just that: speculation. He identified no study, survey, or data linking the service of individuals with gender dysphoria to any readiness or cohesion outcome, and his deposition testimony confirms he never sought any such data. Tr. 134:9-23; 135:19-24. These opinions should be excluded.

**VI. Mr. Wagner's Affirmative Opinions Exceed the Scope of Proper Rebuttal.**

Plaintiffs disclosed Mr. Wagner only as a rebuttal expert. Rep. ¶ 1. Rebuttal testimony is limited to evidence "intended solely to contradict or rebut evidence on the same subject matter

identified by another party." FRCP 26(a)(2)(D)(ii). Much of Mr. Wagner's report does not rebut any Government witness; instead, his report offers affirmative opinions about the history and development of the 2016 Carter Policy and his role in implementing it (Rep. ¶ 21, 42-49), the alleged success of the 2021 Austin Policy (35-36, 50-61, 64-66, the 2025 Policy making process of which he played no part (6, 29), the readiness cost of separating r service members with gender dysphoria (Rep. ¶ 63, 68) and the 2025 Policy's consistency with the Department's separation regulations (Rep 84-90).

Mr. Wagner confirmed that he first offered his deployability opinions in a February 3, 2025 declaration in this case that was filed nineteen months before Defendants' September 4, 2026 expert disclosures. His report repeats those opinions, including the same comparisons to the expansion of parental leave. *Compare* Tr. 183:13-185:23 (discussing Wagner Decl. 42) *with* Rep 69-70. He also submitted "largely similar" declarations in the *Shilling* case. Tr. 12:21-13:5. Opinions that would have been the same regardless of what the Government's witnesses said are not proper rebuttal. As such, Mr. Wagner's affirmative opinions should be excluded from trial.

## CONCLUSION

Defendants respectfully move for an Order in Limine excluding the expert testimony of Alex Wagner because it is not relevant, not helpful to the trier of fact, lacks basis in personal knowledge or experience, and is too speculative.[1]

DATED: November 13, 2026

Respectfully submitted:

JONATHAN D. GUYNN
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director

[1] Pursuant to Local Rule 7(m), counsel for the parties discussed this motion. Plaintiffs oppose.

KRISTINA A. WOLFE
Assistant Branch Director

*/s/ Robert C. Bombard*
M. JARED LITTMAN
ELIZABETH B. LAYENDECKER
ROBERT C. BOMBARD
MICHAEL T. CRABB
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9509
Email: Robert.bombard2@usdoj.gov

*Counsel for Defendant*