**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*, *individually and on behalf of all similarly situated individuals,*

*Plaintiffs,*

v.

UNITED STATES *et al.*,

*Defendants.*

Civil Action No. 1:25-cv-240-ACR

**REBUTTAL EXPERT REPORT OF THE HONORABLE ALEX WAGNER**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................ 1

II. BACKGROUND AND QUALIFICATIONS ........................................ 4

A. Professional Background ........................................ 4

B. Relevant Experience and Expertise ........................................ 7

III. SUMMARY OF OPINIONS AND UNDERLYING BASES FOR OPINIONS ........................................ 9

A. Methodology ........................................ 10

B. Summary of Opinions: ........................................ 11

IV. STATEMENT OF OPINIONS AND FACTS IN SUPPORT OF THEM ........................................ 14

A. The Military Studied—and Found No Harm To Readiness or Operations from—Permitting Transgender Soldiers to Serve Prior To Enacting the Open Service Policy. ........................................ 14

B. During the entire period I oversaw the Austin Policy's implementation, no cohesion, readiness, or discipline problem attributable to transgender service was reported up to me. ........................................ 18

C. Transgender Service Presents No Unique Deployability Burden, Including Under the Air Force Deployment Model. ........................................ 23

E. The February 26, 2025 guidance's "waiver" and administrative-separation mechanisms are not the individualized waiver and separation processes Defendants' witnesses describe. ........................................ 29

I, Alex Wagner, state as follows:

# I. INTRODUCTION

1. I have been retained by counsel for Plaintiffs to respond to the opinions disclosed in Defendants' expert disclosures dated September 4, 2026, for the following sixteen witnesses[1]: General Thomas M. Carden Jr. (Vice Chief, National Guard Bureau); LtGen Bowers (Deputy Commandant, Manpower and Reserve Affairs, USMC); LTG Lombardo (Army G-1); Lt Gen DeGoes (Surgeon General of the Air Force); VADM Miguez (Commander, U.S. 3rd Fleet); COL Black (Military Deputy, ASA(M&RA)); COL Cron; Col Neese (Command Surgeon, USSOUTHCOM); CAPT Roberts (USINDOPACOM Surgeon); CAPT Blair; CAPT White; LTC Lee; LTC Salter; LCDR Bayer; Dr. Ortega (Accession Medical Waiver Directorate, Air Force Accessions Center); and Dr. Hopewell (collectively, "Defendants' witnesses").

2. Specifically, I respond to the following opinions offered by Defendants' witnesses: (a) that service by persons with gender dysphoria imposes unit-cohesion, readiness, and "absorb the duties" burdens on other unit members (Bowers ¶ 6; Miguez ¶ 6; Black ¶ 4; Roberts ¶ 6; Lombardo ¶ 6; Carden ¶ 3); (b) that gender dysphoria presents unique or heightened deployability risks, including under the Air Force's "one-or-two-person deep" deployment model (DeGoes ¶¶ 3–5; Neese ¶¶ 3–4; Cron ¶ 7; Lee ¶ 7; Ortega ¶¶ 3, 5); (c) that transgender service members require "special treatment and accommodation" or receive "exemptions from physical fitness standards" (Carden ¶ 3; Hopewell ¶ 5); (d) that the medical needs of transgender service members "create a significant burden on the military healthcare system" and divert medical and administrative resources (Hopewell ¶ 5; Carden ¶ 3); and (e) that Executive Order 14183 and the Hegseth Policy

[1] I understand Defendants have withdrawn the report of Major General (Ret.) Hussey.

(including its implementation by the military departments)[2] treatment of gender dysphoria "is consistent with the military's general approach to mental and behavioral health conditions" and with the military's broader accession, retention, and waiver framework (Blair ¶ 7; White ¶ 8; Bayer ¶ 8; Hopewell ¶ 6; Roberts ¶ 7; Bowers ¶ 8; Miguez ¶ 8; Black ¶ 6; Ortega ¶¶ 3–5).

3. Because Defendants disclosed only summaries of the expected testimony of their witnesses, I have addressed the opinions as summarized in the disclosures. I reserve the right to supplement this report, or respond via my trial testimony, if any of the Defendants' proposed expert witnesses offers a report, declaration, or testimony that elaborates on or departs from those summaries, including proposed experts not listed in paragraph 1 of this report.

4. I have senior leader experience—equivalent in rank to a four-star general—in military human capital policy, personnel readiness, and the development, implementation, and evaluation of military accession, retention, and separation standards. For nearly ten years I have served in senior positions within the Department of Defense, most recently with my responsibilities focused on military personnel policy, specifically developing, implementing, and evaluating military and civilian personnel policies and their impact on force readiness across the United States Air Force and United States Space Force. In addition, I was the principal advisor to the Secretary of the Army during a time when Army personnel and soldier readiness matters were a topic of significant public, congressional, and media concern.

5. As Chief of Staff to the Secretary of the Army, I coordinated the development of personnel policies affecting every soldier in the Regular Army, U.S. Army Reserve, and Army National Guard. As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, my

---

[2] Memorandum from the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025) and the related Action Memo, "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order" (Feb. 26, 2025).

office retained or delegated review or oversight authority for all personnel policy decisions involving service members of all ranks, components, and specialties across the U.S. Air Force and U.S. Space Force. In connection with this work, I oversaw the human capital enterprise for nearly 700,000 service members and civilians, reviewed and supervised the implementation of accession and retention policies for approximately 500,000 Airmen and Guardians, and directly designed policies governing the conditions under which individuals may enter, serve in, and be separated from the Armed Forces. In addition, I had specific plenary oversight responsibility for all matters of the U.S. Air Force Reserve and Air National Guard.

6. The purpose of this report is to provide the Court with my expert opinions regarding the military personnel policy implications of Executive Order 14183 and the Hegseth Policy. Drawing on nearly a decade of experience in senior positions across the Department of Defense, including my direct involvement in understanding and effectively implementing the first policies enabling transgender service, my responsibility and oversight of the Austin Policy's implementation across the Air Force and Space Force, and my expertise in military and civilian human capital management, readiness, and recruiting, I offer my opinions on whether the Executive Order 14183 and the Hegseth Policy are consistent with established military policymaking practices, whether they are supported by evidence, and their impact on military readiness, unit cohesion, and the Department of the Air Force's ability to recruit and retain the talent necessary to accomplish its national security mission. I also address whether the Hegseth Policy's medical disqualification framework and administrative separation procedures are consistent with how the military treats other medical conditions, and whether the waiver provisions provide any realistic avenue for continued service by transgender personnel. I respond to the

readiness, deployability, cohesion, standards, health care cost opinions and comparisons to previous policies offered by Defendants and their proposed experts.

## II. BACKGROUND AND QUALIFICATIONS

### A. Professional Background

7. From June 10, 2022, through January 20, 2025, I served as the Senate-confirmed Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, I was responsible for the entire human capital enterprise of the United States Air Force and United States Space Force, including recruiting and retention, talent management, compensation, discipline, housing and lodging, health care and dependent care, oversight of the U.S. Air Force Academy and Air Force ROTC detachments, and reserve component affairs impacting nearly 700,000 Airmen, Guardians, and civilians across the Department of the Air Force ("DAF"). During that time, I led initiatives to modernize recruiting, expand quality of life programs, and enhance readiness and resilience.

8. I attended Brown University and obtained a Bachelor of Arts degree in Political Science and History in 1999. After college, I worked as a research analyst at DFI International (1999-2000) and then as a research analyst and reporter at the Arms Control Association in Washington, D.C. (2000-2002). I then enrolled at Georgetown University Law Center, graduating with a Juris Doctor in 2005.

9. After graduating law school, I practiced as an associate attorney at K&L Gates LLP (formerly Preston Gates & Ellis) in Seattle from 2005 to 2008, specializing in intellectual property enforcement, civil rights law, and public policy.

10. I have since worked in multiple senior positions within the Department of Defense ("DoD"). From 2009 to 2011, I served as Special Assistant to the Assistant Secretary of Defense for Global Strategic Affairs in the Office of the Secretary of Defense, working on the 2010 Nuclear

Posture Review, contributing to the New START Treaty negotiations, and serving as an advisor on the U.S. delegation to the 2010 Nuclear Non-Proliferation Treaty Review Conference at the United Nations in New York. From 2011 to 2014, I served as Senior Advisor to the Deputy Assistant Secretary of Defense for Rule of Law and Detainee Policy, where I served as deputy head of the U.S. delegation to the Convention on Certain Conventional Weapons Review Conference at the United Nations in Geneva, and supported the development of a principled law of war detention framework for DoD operations. During this time, I also helped shape U.S. landmine and cluster munition policy and supported the development and publication of the Defense Department's first policy framework for autonomy in weapon systems.

11. From 2014-2015, I served as Global Policy Development Manager at Uber Technologies.

12. From 2015 to 2017, I was appointed Chief of Staff to the Secretary of the Army, where I helped oversee operations for a 1.4 million-person, $140 billion organization on behalf of the Secretary. In this role, I was closely involved in developing and implementing policies enabling transgender Americans to openly serve their nation, opening all combat roles to women, and updating the Army's uniform and grooming regulations to enhance recruiting and retention of soldiers of faith, and I helped launch the Army Rapid Capabilities Office and the Army Digital Service.

13. I held an appointment as an adjunct professor at Georgetown Law from 2011 to 2017.

14. From 2017 to 2018, I was Of Counsel at Avicenna Strategy. From 2018 to 2022, I served as Vice President for Strategic Initiatives at the Aerospace Industries Association (AIA), leading policy efforts on behalf of America's most prominent aerospace and defense companies

focused on talent development, including specific programs to enhance workforce diversity, expand STEM education access, and protect employees' health and safety during the COVID-19 pandemic. I also helped lead development of and outreach for "Vision 2050," AIA's long-horizon forecast on autonomy, manufacturing, and workforce convergence across the aerospace and defense industry.

15. On July 29, 2021, I was nominated by President Joe Biden; on June 7, 2022, I was confirmed by the U.S. Senate, and on June 10, 2022, I was sworn in as Assistant Secretary of the Air Force for Manpower and Reserve Affairs. In this role, I provided overall supervision for matters related to manpower, military and civilian personnel, reserve component affairs, and readiness support for all military and civilian members of the United States Air Force and United States Space Force.

16. For my work in the DoD, I was awarded the Office of the Secretary of Defense Exceptional Public Service Medal in 2015, the Army's Distinguished Public Service Medal in 2017, and the Department of the Air Force's Decoration for Exceptional Public Service in 2025 (the latter two are the highest awards a civilian can earn).[3]

17. I have testified multiple times before Congress on military recruiting, personnel policy, and organizational effectiveness, demonstrating my recognized expertise in these areas.

18. I am currently Founder and Principal of Pacer Forge Strategies, a strategic advisory practice focused on talent, technology, and national security. I am a Distinguished Fellow at the Atlantic Council's Scowcroft Center for Strategy and Security and a Senior Advisor at Hiring Our Heroes. I also serve on the National Advisory Board of Blue Star Families and on the Board of Directors at Dog Tag, Inc. I was a Fall 2025 Pritzker Fellow at the University of Chicago's Institute

[3] I refer to the agency in which I served as the "Department of Defense" or "DoD." I understand Defendants refer to it as the "Department of War."

of Politics. And I am currently an Adjunct Professor at Syracuse University's Maxwell School of Citizenship and Public Affairs, where I teach a course entitled "Law, Policy and National Security."

**B. Relevant Experience and Expertise**

19. My expertise includes assessing whether service members are qualified to serve in increasingly advanced roles within the Department of the Air Force's high-technology force.[4] As Assistant Secretary of the Air Force for Manpower and Reserve Affairs, I exercised policy oversight of medical-readiness matters, including regular consultations with the Air Force's senior medical, legal, and chaplain leaders regarding medical recommendations for service members. My experience includes advising the Secretary of the Air Force, Chief of Staff of the Air Force, and Chief of Space Operations on these determinations and/or making such decisions directly as the Department's senior civilian official. Three of Defendants' witnesses served in the Department of the Air Force during my tenure: Lt Gen DeGoes, who served as Deputy Surgeon General and then, beginning in 2024, as Surgeon General of the Air Force; Col Neese, who served as Command Surgeon, 12th Air Force, from 2022 to 2024; and Dr. Ortega, who has served as the senior physician of the Accession Medical Waiver Directorate at the Air Force Accessions Center since 2020. I refer to their roles below where relevant. My experience and expertise are directly relevant to each of the opinions set forth below.

20. I also have expertise in human capital management and force readiness: As Assistant Secretary of the Air Force for Manpower and Reserve Affairs (2022–2025), I was responsible for overseeing the recruitment, retention, talent management, and readiness of all

[4] The Department of the Air Force is a two service military department. It includes the U.S. Air Force and since December 2019, the U.S. Space Force.

Department of the Air Force personnel—giving me direct, firsthand experience with the policies, processes, and operational realities of maintaining a ready force.

21. I have expertise in the development and implementation of transgender service policy. As Chief of Staff to the Secretary of the Army (2015-2017), I closely monitored the development and directly oversaw the implementation of the policies that first enabled transgender Americans to serve openly, including Army Directives 2016-30 and 2016-35. On June 30, 2016, Secretary of Defense Ashton Carter issued Directive-type Memorandum (DTM) 16-005, entitled "Military Service of Transgender Service Members" ("DTM 16-005"). To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning in the development and issuance of Army Directive 2016-30, entitled Army Policy on Military Service of Transgender Soldiers. I participated in shaping the Army's policy framework from nearly its inception.

22. I have expertise in the military's operations under the April 2021 Austin Policy and the implementation of that Policy.[5] As Assistant Secretary, I directly oversaw the Air Force and Space Force's implementation of the Austin Policy (DoDI 1300.28) and its related DAF Policy Memorandum (DAF 2021-36-01), giving me personal knowledge of how the policy operated in practice, including its effects on unit cohesion, readiness, and morale.

23. I have expertise in military medical standards for accession and retention. In my role as Assistant Secretary, I supervised the application of DoDI 6130.03 Volumes 1 and 2 to Air Force and Space Force personnel, giving me direct familiarity with how medical fitness determinations are made and how the case-by-case individualized assessment framework operates. I also exercised sole accession waiver authority for a variety of novel medical conditions.

[5] DoDI 1300.28, "In-Service Transition for Transgender Service Members" (Apr. 30, 2021) (hereinafter "Austin Policy").

24. I have expertise in recruiting and the talent marketplace. I led the Department of the Air Force's modernization of its recruiting enterprise, which resulted in exceeding the Air Force's Fiscal Year 2024 enlisted recruiting goals—giving me direct expertise on the competitive dynamics of military recruiting and on the value of retaining trained personnel toward ensuring a ready, lethal force.

25. I have expertise in military policymaking processes. Through my service in multiple senior DoD positions across two administrations, three military services, and two military departments as well as the Office of the Secretary of Defense, I have personal familiarity with the military's general approach to mental and behavioral health conditions and whether Executive Order 14183 and the Hegseth Policy[6] are consistent with this general approach—enabling me to identify departures from those norms.

26. I provide my curriculum vitae at Appendix A. Appendix B provides the list of materials considered. Appendix C provides a list of my publications over the last ten years. Appendix D provides a list of matters in which I have given expert testimony over the last four years.

## III. <u>SUMMARY OF OPINIONS AND UNDERLYING BASES FOR OPINIONS</u>

27. The opinions I express are informed by my nearly ten years of experience in senior Department of Defense positions, including service as Chief of Staff to the Secretary of the Army (2015-2017) and Assistant Secretary of the Air Force for Manpower and Reserve Affairs (2022–2025), as well as my review of certain materials identified in Appendix B.

[6] The term "Hegseth Policy," as used in this report, includes both the initial policy, or Memorandum from the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025) (Hegseth Policy) and the Action Memo, "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order" (Feb. 26, 2025).

**A. Methodology**

28. In forming the opinions expressed in this report, I applied the following analytical approach: (i) I reviewed the documentary record of military personnel policy concerning transgender service, including DTM 16-005, Army Directives 2016-30 and 2016-35, the applicable DoD Instructions ("DoDI") (1300.28 and 6130.03), the relevant Executive Orders, and the RAND Report; (ii) I drew on my direct experience administering military personnel policy at the Department of the Army and the Department of the Air Force; and (iii) I compared each opinion summarized in Defendants' disclosures against the standards and processes I administered during my tenure and the documentary record.

29. I also evaluated whether the development of Executive Order 14183 and the Hegseth Policy as reflected in the record is consistent with the military's general approach to policies impacting the mental and behavioral health conditions of service members, including whether any consultation, evidence gathering, implementation, or assessment of operational effects done prior to issuance of EO 14183 and the Hegseth Policy were consistent with the military's general approach to these health conditions. I am not aware of any such consultation, evidence gathering, implementation, and assessment of operational effects having occurred prior to issuance of EO 14183 or the Hegseth Policy. I considered whether the policies were developed and implemented through procedures consistently used for military personnel decisions, and whether any inconsistencies in those procedures were supported by documented evidence.

30. In assessing the cohesion, readiness, and deployability opinions of Defendants' witnesses, I relied on my direct observations and on the channels through which personnel and readiness issues were actually brought to my attention as Assistant Secretary: readiness briefings; directly overseeing the Office of Reserve Affairs and Airman and Guardian Readiness (MRR) and hiring a Deputy Assistant Secretary to lead that office, weekly briefings by MRR leadership;

weekly meetings with all of my direct reports responsible for the entire human capital enterprise of the DAF; monthly meetings on personnel matters with the Chief of Staff of the Air Force and the Chief of Space Operations; twice-monthly meetings with The Judge Advocate General of the Air Force, the Surgeon General of the Air Force, and the Chief of Chaplains; personnel actions requiring my review, including oversight of the officer promotion board process and all matters involving officer discipline; briefings on command climate and culture from Wing and Delta commanders and command chiefs during my installation visits; and my oversight of the Air Force Review Boards Agency, a direct reporting unit to my office.

31. Finally, I distinguish factual testimony based on my personal observation, official responsibilities, or records I reviewed from expert opinions and inferences drawn from my experience, the documentary record, and empirical research. Where I provide factual testimony based on personal observation, I identify the basis for my knowledge; where I offer an expert opinion, I identify the criteria and materials supporting it.

32. As stated above, I assisted in developing and overseeing implementation of certain of the policies discussed in this report. My involvement in advising the implementation or in overseeing these policies gives me firsthand knowledge of how they operated in practice, which supplements the documentary record. My opinions are grounded in that record, in established military personnel frameworks, and in the outcomes I observed during implementation.

**B. <u>Summary of Opinions:</u>**

33. Based on my experience and review of the materials described above and more fully at Appendix B, I hold the following opinions.

34. The cohesion and readiness harms that Defendants' commander witnesses (Bowers, Miguez, Black, Roberts, Lombardo, Carden) predict were specifically studied by the RAND Corporation in 2016 and did not materialize during the eight years of transgender open service that

followed. The Service Chiefs of the Army, Navy, Air Force and the Commandant of the Marine Corps testified to Congress in 2018 that they were aware of no cohesion, discipline, or morale problems resulting from open transgender service.[7] If readiness challenges as a result of the Carter Policy[8] existed at all, they would have likely manifested during those initial years of policy implementation (2016-2018). None of Defendants' disclosures identifies any study, report, or data that has since displaced those findings.

35. Throughout my oversight of the Austin Policy's implementation in the Air Force and Space Force, I did not observe, nor was made aware of, any adverse effect on readiness, deployability, unit cohesion, or good order and discipline, and none was reported to me through any official or unofficial reporting channel.

36. During my entire tenure as Assistant Secretary, no complaints or concerns were brought to my attention alleging that the service of transgender Airmen or Guardians caused problems with unit cohesion, readiness, or discipline. Based on my role and the high-profile nature of the Austin Policy, I am confident I would have been apprised of any such complaints or concerns had they existed. That includes concerns from the Office of the Surgeon General of the Air Force, with whom I met at least twice monthly, one-on-one, and from the commander of the U.S. Air Force Major Command, Air Education and Training Command, or the commander of the Air Force Accessions Center (formerly the Air Force Recruiting Service), both of which oversee the accession medical-waiver enterprise that Dr. Ortega works within, and both of which implement the personnel policies and authorities that I oversaw.

[7] Exec. Order No. 14,004, 86 Fed. Reg. 7,471 (Jan. 25, 2021).

[8] On June 30, 2016, Secretary Carter announced that the country's military would be best served by permitting transgender individuals to serve and issued the Directive-Type Memorandum 16-005 (DTM 16-005), titled "Military Service of Transgender Service Members" (the "Carter Policy").

37. Retention medical standards in the military are built around individualized fitness-for-duty evaluations conducted on a case-by-case basis. I am aware of no other medical condition that triggers a bar to retention without such an individualized assessment. Contrary to the opinions of CAPT Blair, CAPT White, LCDR Bayer, and Dr. Hopewell, a categorical prohibition applied without any fitness-for-duty determination for currently serving members of the military is not "consistent with the military's general approach to mental and behavioral health conditions"; it is the opposite of that approach.

38. Several of Defendants' witnesses (Cron, DeGoes, Ortega, Blair, Bayer) describe the military's individualized medical-waiver process as the mechanism that reconciles "treatable" conditions with readiness. The "waiver" in the February 26, 2025 guidance is not that process: Its criteria excludes anyone who has transitioned or attempted to transition so that no one who has received the standard treatment for the condition can qualify; it operates as a bar based on treatment history rather than on an individualized assessment of current fitness for duty.

39. When the Air Force or Space Force separates a member for a medical condition, it does so either through the Disability Evaluation System or, for a condition not amounting to a disability, through an administrative process that requires documented evidence that the condition has adversely affected the member's duty performance and that the member was counseled and given an opportunity to correct the deficiency.[9] I understand the Departments of the Army and Navy have similar policies. The Hegseth Policy[10] dispenses with both requirements and requires separating members who meet every performance and fitness standard. That is inconsistent with

[9] DoDI 1332.14, "Enlisted Administrative Separations" (Aug. 1, 2024); DoDI 1332.18, "Disability Evaluation System" (Nov. 10, 2022).
[10] See *supra* n. 5.

how the military and the Department of the Air Force by policy and practice during my tenure manages every other health-related separation.

40. Dr. Hopewell's opinion that the care of transgender service members creates "a significant burden on the military healthcare system," and General Carden's expected testimony that such members "need significant medical or administrative support to continue serving," are inconsistent with my experience.[11] Health care costs and the Defense Health Agency budget were frequent and regular topics of discussion during my tenure; at no point did the Office of the Surgeon General of the Air Force or the Office of the Assistant Secretary of Defense for Health Affairs raise the cost of care for transgender service members as a concern. Measured against the military health system budget, and against the cost of comparable care routinely provided to non-transgender members, those costs are de minimis.

## IV. STATEMENT OF OPINIONS AND FACTS IN SUPPORT OF THEM

### A. The Military Studied—and Found No Harm to Readiness or Operations from—Permitting Transgender Soldiers to Serve Prior to Enacting the Open Service Policy.

41. LtGen Bowers, VADM Miguez, COL Black, CAPT Roberts, and MG (Ret.) Hussey each state, in nearly identical language, that a service member with a condition requiring ongoing care may require other unit members to "absorb the operational duties of the non-deployable" member (Bowers) or to "assume responsibilities that the affected service member is unable to perform" (Miguez, Black, Roberts, Hussey), with resulting "unit cohesion impacts."[12]

[11] Defendants' Sept. 14, 2026 Objections and Responses to Plaintiffs' First Set of Requests for Admission to Defendants (Nos. 1–169) at Request No. 76 ("The DoD spent approximately $26 million on gender affirming care [between January 1, 2016 and May 14, 2021] for active-duty personnel as well as National Guard or Reservists on active duty for more than 30 days.").

[12] *See, e.g.*, Defendant's Disclosure Pursuant To Rule 26(a)(2)(C) Concerning Lieutenant General William Bowers, USMC ¶ 6 ("he will testify to the mission, logistical, and unit cohesion impacts that medical conditions requiring ongoing specialty evaluation, treatment, monitoring, or ready access to specific medications may have on Marine deployability and readiness," including "requir[ing] other unit members to absorb the operational duties of the non-deployable Marine"); see also Defendant's Disclosure Pursuant To Rule 26(a)(2)(C) Concerning Vice Admiral Marc

General Carden and LTG Lombardo state that they will testify to personal experience with soldiers with gender dysphoria who had duty limitations. Duty limitations are common when a service member is placed on a "medical profile."[13] Units are often placed in the position of absorbing duty limitations as a result of personnel placed on a medical profile. This occurs regularly for any number of treatable medical conditions, including but not limited to pregnancy, appendectomies, hamstring and Achilles tendon tears, etc. None of the seven disclosures identifies any data, study, unit report, or readiness metric supporting a cohesion or readiness effect attributable to transgender service.

42. On July 28, 2015, then-Secretary of Defense Ashton B. Carter ordered Brad Carson, in his capacity as Acting Under Secretary of Defense for Personnel and Readiness ("USD P&R"), to convene a working group to formulate policy options for DoD regarding transgender service members (the "Working Group"). Acting Under Secretary Carter ordered the Working Group to present its recommendations within 180 days. In the interim, service members identifying as transgender were not to be discharged or denied reenlistment or continuation of service.

43. In 2016, the RAND Corporation, a federally funded, independent research organization, presented the results of an exhaustive study requested by Mr. Carson. That report was entitled *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* ("RAND Report"). The RAND Report examined precisely the cohesion and readiness concerns now raised by Defendants' commander witnesses and found no evidence that allowing transgender people to serve would negatively impact unit cohesion, operational effectiveness, or readiness.[14]

---

Miguez, UCN ¶ 6; Defendant's Disclosure Pursuant To Rule 26(a)(2)(C) Concerning Colonel Kevin Black, USA ¶ 4; Defendant's Disclosure Pursuant To Rule 26(a)(2)(C) Concerning Captain Peter Roberts, USN ¶ 6.

[13] Lt. Col. Jeffrey Freeland, Where's My Profile?, McConnell Air Force Base (Oct. 6, 2011), https://www.mcconnell.af.mil/News/Commentaries/Display/Article/225897/wheres-my-profile/

[14] Agnes Gereben Schaefer, *et al.*, RAND Corp., Assessing the Implications of Allowing Transgender Personnel to Serve Openly (2016) ("RAND Report") at 44.

44. For instance, the RAND Report studied militaries in Canada, the United Kingdom, Australia, and Israel, and found "[i]n the case of Australia, there is no evidence and there have been no reports of any effect on cohesion, operational effectiveness, or readiness" and "[i]n the case of Israel, there has also been no reported effect on cohesion or readiness."[15] "Interviews with commanders in the United Kingdom also found no effect on operational effectiveness or readiness," and "[s]ome commanders reported that increases in diversity had led to increases in readiness and performance."[16] In Canada, the RAND research "found no evidence of any effect on operational effectiveness or readiness" and "[i]n fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges," while finding "no evidence of any effect on unit or overall cohesion."[17] The RAND study concluded that "[t]ransgender personnel in these militaries have reported feeling supported and accommodated throughout their gender transition, and there is no evidence of any impact on operational effectiveness."[18] RAND also noted that some service members were initially "less than welcoming" and that the small number of transgender personnel may limit measurable effects; those caveats do not alter its central finding, and none of Defendants' witnesses identifies any subsequent data contradicting it.[19]

45. The issues Defendants' proposed expert witnesses raise regarding transgender service members' impact on troop readiness and cohesion was examined directly before the Carter Policy was adopted, and the answer after eight years of its implementation from mid-2016 through 2024 was that no unmanageable effect resulted. The military adopted a number of policies aimed

[15] *Id.* at 45.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.* at 45, 60

at, and that did, mitigate any impact the service of transgender troops might have on readiness and cohesion.

46. Through DTM 16-005, the Secretary of Defense tasked the Secretaries of the Military Departments, including the Army, to identify all DoD, Military Department, and Service issuances in need of revision in light of the DoD change in policy, and to submit proposed revisions to USD P&R. USD P&R was tasked with drafting revisions to all necessary issuances consistent with DTM 16-005.

47. To begin implementing DTM 16-005 as applied to the Army, on July 1, 2016, I assisted then-Secretary of the Army Eric K. Fanning and the Department of the Army in the development and issuance of Army Directive 2016-30, entitled Army Policy on Military Service of Transgender Soldiers.

48. On October 7, 2016, I also assisted in Secretary Fanning's issuance of a further directive, Army Directive 2016-35, which "establishe[d] policies and procedures for gender transition in the Army."

49. Army Directive 2016-35 is also the first answer to Dr. Hopewell's assertion that transgender service members receive "exemptions from physical fitness standards" and General Carden's assertion that they require "special treatment and accommodation." From the outset of open service, the rule has been the reverse. The Directive further provided that "a Soldier eligible for military medical care with a diagnosis from a military medical provider indicating that gender transition is medically necessary will be provided medical care and treatment for the diagnosed medical condition." The Directive provided that gender transition in the Army begins with a diagnosis that gender transition is medically necessary and ends when the soldier's sex marker in DEERS is changed to show the Soldier's preferred sex. The Directive further stated that for

policies and standards that differ according to sex, the Army will recognize a soldier's sex based on the gender marker that appears in DEERS. It stated that "the Army applies, and Soldiers are expected to meet, all standards for uniforms and grooming, body composition assessment, physical readiness testing, participation in the Military Personnel Drug Abuse Testing Program, and other military standards" according to the sex marker in DEERS."

**B. During the entire period I oversaw the Austin Policy's implementation, no cohesion, readiness, or discipline problem attributable to transgender service was reported up to me.**

50. On January 25, 2021, President Joseph R. Biden issued Executive Order (EO) 14004, entitled Enabling All Qualified Americans to Serve Their Country in Uniform. The EO directed the Secretary of Defense and Secretary of Homeland Security to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination."

51. In setting this policy, President Biden relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 congressional testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service," and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care.'"[20] The 2018

[20] Exec. Order No. 14,004, 86 Fed. Reg. 7,471 (Jan. 25, 2021); Press Release, Palm Ctr., *Former Surgeons General Debunk Pentagon Assertions about Medical Fitness of Transgender Troops* (Mar. 28, 2018),

testimony is directly relevant to the opinions of Defendants' commander witnesses: it was given, under the first Trump Administration, by the then-serving Chiefs of the Army, Navy, and Air Force, as well as the Commandant of the Marine Corps—the four services whose readiness those witnesses now describe, after two years of experience with open service.

52. On April 30, 2021, the DoD implemented the EO through the issuance of DoD Instruction 1300.28, entitled In-Service Transition for Transgender Service Members (the "Austin Policy"). The Austin Policy applies to all military departments and sets forth guidance to allow service by qualifying transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."[21]

53. To implement the Austin Policy, the then-Acting Secretary of the Air Force issued Department of the Air Force Policy Memorandum 2021-36-01 (the "DAF Policy Memorandum"). Upon confirmation as Assistant Secretary of the Air Force for Manpower and Reserve Affairs in June 2022, my responsibilities included overseeing implementation of the DAF's policy permitting service by qualified transgender Airmen and Guardians.

54. The DAF Policy Memorandum stated that "[s]ervice in the Air Force and Space Force should be open to all persons who can meet the high standards for military service and readiness" and that "transgender Service members or applicants for accession must be subject to the same standards as all other persons." For any standard, requirement, or policy that "depends

https://palmcenterlegacy.org/former-surgeons-general-debunk-pentagon-assertions-about-medical-fitness-of-transgender-troops/.

[21] DoDI 1300.28 at § 1.2.

on whether the individual is male or female . . . all persons will be subject to the standard, requirement, or policy associated with their gender marker in [DEERS]."

55. The DAF Policy Memorandum specified that personnel will either be accessed or commissioned in accordance with medical standards issued by the DAF and the DoD.

56. The DAF Policy Memorandum also confirmed that "[n]o person, sole[ly] based on their gender identity, will be denied accession, involuntarily separated or discharged, denied reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force." Additionally, for service members "whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity or gender transition," the DAF Policy Memorandum stated that they "should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition."

57. These provisions are the standards I administered. Under them, a transgender Airman or Guardian is not exempted from any fitness, grooming, uniform, or deployability standard; the member is held to the standard associated with his or her gender marker in DEERS, and a member whose ability to serve is affected by transition-related care is treated exactly as any other member with a temporarily limiting medical condition, i.e., a medical profile. Dr. Hopewell's reference to "exemptions from physical fitness standards" and General Carden's reference to "special treatment and accommodation" describe something that did not exist under the policy as written or as implemented in the Department of the Air Force. If either witness has a specific instance in mind, it is not identified in the disclosure.

58. As Assistant Secretary, I had direct supervisory responsibility over personnel matters for the Air Force and Space Force, including in overseeing the implementation of the

Austin Policy and the DAF Policy Memorandum. Based on my direct oversight of Air Force and Space Force readiness matters, I received installation-level command climate and culture briefings from Wing and Delta commanders and their command chiefs when I visited Air and Space Force installations; detailed periodic updates on sexual assault and harassment throughout the force including at the United States Air Force Academy; and all matters involving officer discipline among many others. From June 2022 through January 2025, I was routinely made aware of issues relating to discrimination, academic cheating, hazing, inappropriate relationships among servicemembers, alcoholism, sexual assault and harassment, domestic violence, and drunk driving and other criminal behavior, among other issues. Issues affecting unit readiness, morale, or good order and discipline were routinely surfaced through well-established channels.

59. During my tenure, I did not attend a single meeting where concerns about the service of transgender Airmen or Guardians were raised, and certainly not as they related to overall readiness. No report, briefing, complaint, media article, or readiness assessment brought to my attention identified any negative impact from the service of transgender Airmen or Guardians.

60. That silence extended to the Department's senior medical and accession officials, including those Defendants now offer as witnesses. I met at least twice monthly with the Surgeon General of the Air Force. Lt Gen DeGoes served as Deputy Surgeon General of the Air Force throughout my tenure and as the Surgeon General during its final months. Col Neese served as Command Surgeon of 12th Air Force from 2022 to 2024. Dr. Ortega worked within the Air Force Accessions Center's accession medical waivers division throughout my tenure. At no time did the Air Education and Training Command and/or the Air Force Accessions Center, both of which oversaw the accession-waiver enterprise, or Office of the Surgeon General of the Air Force, or any other military medical professional raise gender dysphoria with me as a readiness, deployability,

medical-evacuation, or cost concern, although each of those directorates raised other medical-readiness issues with me regularly.

61. I can state as a matter of my own observations and based on my expertise in military manpower policy that the Austin Policy did not negatively impact readiness. Based on my expertise in military personnel policy and given the established channels through which such concerns would have reached my office, the absence of any such report is significant evidence that transgender service did not negatively impact readiness. The channels described above were the same channels through which every other personnel and/or readiness issue of the period reached me; they did not fail to function only for this one issue.

62. Defendants' commander witnesses describe a specific mechanism of cohesion harm: a non-deployable member whose duties others must absorb[22]. That mechanism is not unique to gender dysphoria, as five of those witnesses (Bowers, Miguez, Black, Roberts, and Hussey) acknowledge in their own disclosures ("these considerations apply broadly to all medical and behavioral health conditions and are not unique to gender dysphoria"). It is the ordinary burden of temporary non-deployability that every unit manages every day, and it is addressed in Section B below.

63. COL Black emphasizes "the impact the loss of a single crew member" or "a single Soldier" can have on operational readiness. I agree, and that principle cuts against Executive Order 14183 and the Hegseth Policy. The Austin Policy allowed the Department to retain trained and specialized Airmen and Guardians in whom it had already invested; Executive Order 14183 and the Hegseth Policy instruct commanders to direct that transgender service members otherwise

[22] *See, e.g.*, Defendant's Disclosure Pursuant To Rule 26(a)(2)(C) Concerning Lieutenant General William Bowers, USMC ¶ 6 ("he will testify to the mission, logistical, and unit cohesion impacts" caused by medical conditions like gender dysphoria, the consequences of which include "requir[ing] other unit members to absorb the operational duties of the non-deployable Marine"). *Supra* n. 11.

meeting all professional and health requirements and standards are to be excised from their crews and units, placed into an administrative leave status, and processed for separation—regardless of performance.

64. It is also clear to me that allowing transgender service had little or no effect on unit cohesion. I was not aware of any complaints regarding unit cohesion resulting from the Austin Policy. To the contrary, in my experience, inclusion of transgender service members into units was a non-issue.

65. During a 2022 visit to Air Force Basic Military Training at Lackland Air Force Base, I spoke directly with the command team of the 37th Training Wing, responsible for, among other things, providing foundational entry-level training for those entering the Air Force, Space Force, Air Force Reserve and Air National Guard—generating 93% of the enlisted corps. The command team reported to me that during their tenure, four transgender trainees had progressed through basic training with no cohesion issues reported by other trainees or leadership.

66. Drawing on my experience in military personnel policy, including my role overseeing the implementation of the Austin Policy, I conclude that the policy had no adverse effect on unit cohesion in the Air Force or Space Force, and that the contrary opinions of Defendants' commander witnesses are unsupported by any data identified in their disclosures. This conclusion is consistent with the RAND Report's findings.

### C. **Transgender Service Presents No Unique Deployability Burden, Including Under the Air Force Deployment Model.**

67. This section responds to the deployability opinions of Lt Gen DeGoes (¶¶ 3–5), Col Neese (¶¶ 3–4), COL Cron (¶ 7), LTC Lee (¶ 7), and Dr. Ortega (¶¶ 3, 5), and to the opinions of LtGen Bowers, VADM Miguez, COL Black, and CAPT Roberts that other unit members must assume the duties of a non-deployable member.

68. **Loss of Trained Personnel.** Defendants' witnesses frame the readiness question as the burden of a member who cannot deploy. Unlike the Departments of the Army and the Navy, the DAF had a single medical multidisciplinary team that oversaw all transgender DAF patients. My understanding is the number of DAF "in service transitions" was a de minimis number during my time in office. For those currently serving, removing transgender service members from their units degrades readiness in a way none of the disclosures accounts for. Defendants have identified approximately 4,200 transgender service members in the force.[23] Each occupies a billet the Department of Defense has already filled and trained, and many hold positions of leadership and technical responsibility; each will have to be replaced by someone with less experience in that billet. That is the cost side of the ledger that Defendants' witnesses omit. The readiness cost of removing *all* service members who identify as transgender and can deploy on that side of that ledger is significant, and none of the disclosures addresses it.

69. **Worldwide Deployability.** Lt Gen DeGoes, Col Neese, COL Cron, and LTC Lee describe the austerity of deployed environments, the priority given to acute care, and the disruption caused when a member must be evacuated for a mental or behavioral health issue. I do not disagree with any of that as a general description of deployed medicine. What their disclosures do not do is connect those general propositions to transgender service members. Under the Austin Policy, a transgender Airman or Guardian was subject to the same deployability determination as every other member: the member's treating provider and commander assessed whether the member could deploy, and a member who could not was managed, profiled, and if necessary evacuated exactly as any other member. Nothing in DoDI 1300.28 or the DAF Policy Memorandum

[23] Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories, Response to Interrogatory 20 (Sept. 14, 2026).

exempted a transgender member from deployment standards or required a commander to deploy a member who did not meet them.

70. From a force-management perspective, temporary non-deployability is a routine feature of military service that the DAF manages at the unit, Wing, or Delta level every day. The number of transgender members who may experience a period of non-deployability during transition is a negligible fraction of that already-managed population, and the 2023 expansion of parental leave to twelve weeks for both parents created a far larger population of temporarily non-deployable members than transgender service ever has.

71. Dr. Ortega's opinion that the Air Force's "one-or-two-person deep" deployment footprint makes gender dysphoria uniquely incompatible with Air Force service does not follow from his premise. The one-or-two-deep model is a reason the Air Force screens all deploying Airmen for deployability before they go, which it does through the same medical-readiness and profile process regardless of diagnosis; it is not a reason to exclude an entire category of members who meet that screen. During my tenure, the DAF deployed Airmen and Guardians with a wide range of managed medical conditions under that model, and neither Dr. Ortega's directorate (which was limited to accessions) nor the Surgeon General of the Air Force or any command surgeon I met during an installation visit reported to me that transgender Airmen or Guardians were failing pre-deployment screening at any elevated rate. Dr. Ortega's disclosure identifies no DAF data demonstrating that they were.

72. LTC Lee's opinion that soldiers with gender dysphoria "create an unsustainable burden on medical assets in theater" and "do not meet medical readiness standards" is stated categorically and without reference to any data. Under the Austin Policy, a member who required ongoing specialty care that could not be provided in theater would not have been deployed to a

theater of operations; that is what the deployability determination is for. LTC Lee's disclosure does not identify any instance in which a transgender service member was deployed in contravention of that determination.

**D.** ***The Executive Order 14183 and the Hegseth Policy are not "consistent with the military's general approach to mental and behavioral health conditions."***

73. The military maintains different medical standards for accession (entry into service) versus retention (continued service). For accessions, the standards are deliberately and appropriately stringent because the military makes a substantial long-term investment in each service member it accepts, including comprehensive medical care that may extend throughout their lifetime.

74. The military must ensure that newly accessed service members can fulfill their initial contract term and potentially serve for many years beyond. Given the significant financial and resource investment the military makes in training and developing each recruit, it can only accept individuals whose potential service value will equal or exceed the resources invested in them. This creates a necessarily high bar for medical qualification at accession.

75. The 18-month stability requirement for transgender individuals seeking to enter military service, as set forth in Volume 1 of DoD Instruction 6130.03, Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 28, 2024) ("DoDI 6130.03 Vol. 1"), Ex. H to Wardenski Dec., ECF No. 13-11, *see* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1), is based on the same considerations applied to other treatable medical conditions at accession, reflecting standard military medical policy rather than any unique restriction on transgender service. This also answers Dr. Ortega. His opinion rests on Air Force School of Aerospace Medicine data showing that applicants admitted on mental-health waivers for depression or anxiety had more restricted-duty days and higher Medical Evaluation Board rates

than fully qualified applicants. But under the Austin Policy, applicants with a history of gender dysphoria were not admitted on waiver; they were required to meet a stability standard as a condition of qualification. Dr. Ortega's waiver-cohort data therefore describes a different population and a different pathway, and his disclosure identifies no data on the accession outcomes of applicants who met the 18-month standard.

76. In contrast, retention medical standards, as set forth in Volume 2 of DoD Instruction 6130.03, Medical Standards for Military Service: Retention (June 6, 2022) ("DoDI 6130.03 Vol. 2"), focus on a service member's ability to perform their duties, deploy when required, and contribute effectively to the military mission.[24] The military recognizes that there are numerous roles and positions within its ranks, and importantly, it has made a substantial investment in those who have already been qualified to serve.

77. Based on my review of DoDI 6130.03 Vol. 2 and my experience administering retention standards along with waiver authority across the Air Force and Space Force, I am not aware of any other medical condition that results in a bar to *continued* service without an individualized fitness-for-duty assessment. The governing instruction explicitly requires case-by-case evaluation to determine if continued service is appropriate.[25] The instruction specifically mandates consideration of each service member's ability to safely complete common military tasks at their rank, their specific duty requirements, and whether they can serve in deployed or garrison conditions.[26] Prior to the Hegseth Policy, this individualized assessment framework had been the standard throughout my years of involvement in military personnel policy.

[24] *See* DoDI 6130.03 Vol. 2 at 1.2.
[25] *See Id.* at 1.2.b(1), 3.2, 3.3.a(1).
[26] *See Id.* at 3.2.a.

78. For transgender service members, service in the military means serving in a sex different from their sex assigned at birth. The process for gender transition during my tenure was governed by DoDI 1300.28, In-Service Transition for Transgender Service Members (Apr. 30, 2021, incorporating Change 1, Dec. 20, 2022), Ex. D to Wardenski Decl., ECF No. 13-25, which has since been rescinded by the Hegseth Policy.[27] It established a protocol for transgender service members. This includes notifying their command, obtaining a medical diagnosis from a military medical provider, developing and completing an approved medical treatment plan for gender transition, and changing their sex designation in DEERS.[28]

79. Once a transgender service member has changed their sex marker in DEERS, they serve fully in the sex designated on the DEERS marker. This means they must meet all of the military uniform, grooming, body-composition, and fitness standards associated with their DEERS marker, use facilities and be assigned berthing consistent with that marker, and be referred to accordingly.

80. Preventing a transgender service member from serving consistent with his or her updated DEERS marker would effectively preclude that person from serving in the military.

81. As is generally true, there are different criteria for accessions than for retention for transgender service members. For accession into the military under the preceding Austin Policy, a transgender person must have been stable for 18 months following completion of gender transition before they can enter service. *See* DoDI 6130.03 Vol. 1 at 6.13.g(1), 6.14.b, 6.14.n(1), 6.28.t(1). That standard was the Department's considered answer to the accession-risk question Defendants' witnesses now raise: it was stringent, it was specific to the condition, and it was the

[27] Hegseth Policy at 2. For an overview of the former policy, see Dr. Joshua Smalley and Greg Pavlik, *Transgender Policy in the Military: Past, Present, and Future* (Oct. 15, 2022), https://texasbarsections.com/wp-content/uploads/2022/10/8-Smalley-Pavlik-Transgender-Policy-Past-Present-and-Future-15-Oct-22.pdf
[28] *See* DoDI 1300.28 at 3.3.

product of the ordinary medical-standards process described in Section III. The Hegseth Policy's accession provision does not tighten that standard; it disqualifies the applicants that standard was written to qualify, by treating completed, stable transition itself as the disqualification.

82. However, for retention of transgender service members under the preceding Austin Policy there was no set time period during which a person must have been stable following gender transition. Instead, consistent with the case-by-case assessment required by DoDI 6130.03 Vol. 2, the determination of stability and readiness for duty was individualized and based on each service member's specific medical circumstances and needs. This reflected the military's recognition that medical needs vary among individuals and that blanket time requirements are neither necessary nor appropriate for retention determinations.

**E. *The February 26, 2025 guidance's "waiver" and administrative-separation mechanisms are not the individualized waiver and separation processes Defendants' witnesses describe.***

83. Under the February 26, 2025 guidance implementing Executive Order 14183 and the Hegseth Policy, transgender service members are to be separated through administrative separation. COL Cron, Lt Gen DeGoes, Dr. Ortega, CAPT Blair, and LCDR Bayer each describe a medical-waiver process in which a disqualifying condition is evaluated case by case to determine whether it "can be safely waived" or "safely managed in an operational theater." Dr. Ortega, for example, explains that mild eczema is routinely waived because cohort data show its operational outcomes mirror those of healthy personnel. That process asks about the individual and the condition. The waiver in the February 26 guidance does not.

84. Section 4.3(c) permits retention of a member with a diagnosis or history of gender dysphoria only if (i) there is a "compelling Government interest" in retaining the member that "directly supports warfighting capabilities"; (ii) the member has demonstrated 36 consecutive months of stability in his or her sex "without clinically significant distress or impairment"; (iii) the

member has never attempted to transition, which, as Defendants have explained in discovery, includes ever having taken cross-sex hormones or undergone gender-confirming surgery; and (iv) the member is willing and able to adhere to all standards associated with his or her sex. Not one of those criteria asks the question the waiver processes described by COL Cron, Lt Gen DeGoes, Dr. Ortega, CAPT Blair, and LCDR Bayer exist to answer: whether this individual, with this condition, can perform and deploy. The first criterion is not a medical question at all, and no medical-waiver process I administered applied anything like it. The second and third exclude every transgender service member: a transgender person is, by definition, someone who does not live in his or her birth sex, so a requirement of three years living in that sex without distress, and of never having taken a step toward transition, is a requirement not to be transgender. Section 4.3(c) is not a medical-waiver provision. It does not ask whether a member's condition can be safely managed in service, which is the question every waiver process Defendants' witnesses describe is designed to answer. Their opinion that the policy is 'consistent with the military's general approach to mental and behavioral health conditions' therefore cannot rest on it.

85. Defendants' witnesses also describe the ordinary process for separating a member whose medical condition affects service. CAPT White assesses fitness through the Disability Evaluation System; CAPT Blair and LCDR Bayer review administrative-separation recommendations for "Conditions Not Amounting to a Disability." Both pathways are individualized. Under DoDI 1332.14 and Department of the Air Force Instruction ("DAFI") 36-3211, Military Separations (June 24, 2022), an administrative separation for a condition not amounting to a disability requires documentation from the member's supervisory chain that the condition "has resulted in an adverse effect on the member's assignment or duty performance," and that the member was formally counseled about the deficiency and given an opportunity to

correct it before separation was initiated. DAFI 36-3211 ¶ 7.11.1.2. In my experience, including my oversight of the Air Force Review Boards Agency as a direct reporting unit to my office, I have never encountered or been briefed on an involuntary separation for a medical condition of a member who continued to meet every performance and fitness standard and against whom no adverse duty effect was documented.

86. The Hegseth Policy dispenses with each of those requirements. It directs separation of members with a diagnosis or history of gender dysphoria without any finding that the condition has affected duty performance, without counseling, and without an opportunity to correct a deficiency, because there is no deficiency to correct. The Department of the Air Force had to write an entirely new section into DAFI 36-3211 to accomplish this, because the existing involuntary-separation chapter could not be used for a member who met standards.

87. Normally, when a service member has a medical condition that would limit their ability to serve or deploy, they go through a medical review, not administrative separation.

88. In my experience, administrative separation is principally used to address misconduct, performance failures, and documented suitability concerns that manifest in the quality of their service. The ordinary process for evaluating the service impact of a medical condition is the Disability Evaluation System (DES) (DoDI 1332.18[29]), with administrative separation largely reserved for misconduct (including drug abuse) or repeated failure to meet standards, given the significant financial investment the military has already made in the member.

89. In addition, based on my experience, individual or aggregated costs associated with medication or medical procedures are not a justification for administrative separation. Transgender service members constitute a small fraction of military personnel, and their health care costs

[29] DoD Instruction 1332.18, Disability Evaluation System (Nov. 10, 2022).

represent a de minimis amount of overall health care spending. In fact, non-transgender service members may be prescribed the same medications transgender service members need for gender transition. There is no reason for this group to bear the burden of cost-cutting measures when other service members routinely require similar medical and drug interventions.

90. Neither DoDI 1332.14 nor DAFI 36-3211 identifies healthcare costs as a basis for administrative separation. *See* DoDI 1332.14 § 3 (enumerating sixteen[30] authorized reasons for separation, none of which include healthcare costs); DAFI 36-3211 (same). Nor does any DoD healthcare delivery policy authorize separation based on the cost of a service member's medical care. See 10 U.S.C. § 1074(a)(1) (active-duty members are entitled to medical care); DoDI 1332.18 (establishing the Disability Evaluation System, not administrative separation, as the proper pathway for evaluating medical conditions affecting service). This is consistent with the military's longstanding principle that service members are entitled to medically necessary care as a condition of service. In my experience administering these policies, the cost of providing medically necessary care has never been raised as a justification for separating an otherwise qualified service member.

91. Defense Health Agency data reported in 2015 showed that the Department spent approximately $84 million in 2014 on erectile-dysfunction medications, roughly $41 million of it on Viagra alone.[31] These expenditures are important investments and just one of many examples of the full spectrum health care that represents a benefit of service necessary to maintaining an all-volunteer force. By comparison, the RAND Report estimated in 2016 that covering transition-related care would increase active-component health care spending by approximately $2.4 million

[30] DAFI 36-3208, Administrative Separation of Airmen (July 9, 2004), was superseded by DAFI 36-3211.
[31] Defense Health Agency data, as reported in Patricia Kime, Military Times, *DoD Spends $84M a Year on Viagra, Similar Meds*, (Feb. 13, 2015), available at https://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/02/13/dod-spends-84m-a-year-on-viagra-similar-meds/.

per year and Defendants' own reported expenditures on this care since 2016, as stated in their responses to Plaintiffs' requests for admission, are of the same order of magnitude.[32] This comparison illustrates that the costs of healthcare for transgender service members represent a de minimis fraction of overall military healthcare spending.

92. Any new information with respect to this case will be considered and may impact my opinions and analyses. As such, I reserve the right to amend or supplement my opinions if additional information becomes available. Additionally, I may utilize demonstrative exhibits when providing testimony at trial.

93. I am being compensated at a rate of $500 per hour for my work on this matter. My compensation does not depend on the outcome of the case or the substance of my opinions.

Dated: September 25, 2026

Alex Wagner

[32] RAND Report at 34 ("Taking a weighted average of most of the information, we estimated that extending insurance coverage to transgender individuals would increase health care spending by 0.038 percent. Applying this figure to total AC health care spending of $6.27 billion, we find that covering gender transition–related care will increase AC health care spending by approximately $2.4 million."); Defendants' Sept. 14, 2026 Responses and Objections to Plaintiffs' Requests for Admission at Request No. 76 ("The DoD spent approximately $26 million on gender affirming care [between January 1, 2016 and May 14, 2021] for active-duty personnel as well as National Guard or Reservists on active duty for more than 30 days.").

APPENDIX A

CURRICULUM VITAE OF THE HONORABLE ALEX WAGNER

# ALEX WAGNER

Founder & CEO, Pacer Forge Strategies | Washington, D.C.

## CURRENT POSITIONS

**Founder & Chief Executive Officer, Pacer Forge Strategies**
*Washington, D.C.* 2025–present

**Distinguished Fellow, Atlantic Council**
*Scowcroft Center for Strategy and Security, Washington, D.C.* 2025–present

**Senior Advisor, U.S. Chamber of Commerce Foundation**
*Hiring Our Heroes, Washington, D.C.* 2025–present

**Senior Advisor, The Roosevelt Group**
*Washington, D.C.* 2025–present

**Adjunct Professor, Syracuse University**
*Maxwell School of Citizenship and Public Affairs, Syracuse, New York* 2025–present

**Board of Directors, Dog Tag Inc.**

**National Advisory Board, Blue Star Families**

## GOVERNMENT SERVICE

**Assistant Secretary of the Air Force (Manpower and Reserve Affairs)**
*Department of the Air Force, Washington, D.C.* 2022–2025

**Chief of Staff to the Secretary of the Army**
*Department of the Army, Washington, D.C.* 2015–2017

**Senior Advisor, Deputy Assistant Secretary of Defense (Rule of Law and Detainee Policy)**
*Office of the Secretary of Defense, Washington, D.C.* 2011–2014

**Special Assistant to the Assistant Secretary of Defense (Global Strategic Affairs)**
*Office of the Secretary of Defense, Washington, D.C.* 2009–2011

## PRIVATE SECTOR

**Vice President for Strategic Initiatives, Aerospace Industries Association**
*Arlington, Virginia* 2018–2022

**Global Policy Development Manager, Uber Technologies**
*Washington, D.C.* 2014–2015

**Of Counsel, Avicenna Strategy**
*Washington, D.C.* 2017–2018

**Associate Attorney, K&L Gates LLP**
*Seattle, Washington* 2005–2008

**Research Analyst, Arms Control Association**
*Washington, D.C.* 2000–2002

**Research Analyst, DFI International**
*Washington, D.C.* 1999–2000

## EDUCATION

**Georgetown University Law Center**
*Washington, D.C.* J.D., 2005

**Brown University**
*Providence, Rhode Island* A.B., Political Science and History, 1999

## AWARDS AND HONORS

**Decoration for Exceptional Civilian Service**
*Department of the Air Force* 2025

**Distinguished Public Service Medal**
*Department of the Army* 2017

**Exceptional Public Service Medal**
*Office of the Secretary of Defense* 2015

**Best Lawyers Under 40**
*National LGBT Bar Association* 2014

## PROFESSIONAL MEMBERSHIPS AND ASSOCIATIONS

**Security Fellow, Truman National Security Project** 2014–present

**Member, DC Bar** 2011

## PUBLICATIONS

“NATO 3.0 Needs More Manpower,” The National Interest (2026), with Kristen Taylor
“The Origin of Hegseth’s Anti-Beard Obsession,” The Atlantic (2025)
“How to Fill NATO’s Manpower Gap,” The National Interest (2025), with Kristen Taylor
“The Human Capital Advantage in Great-Power Competition,” Atlantic Council (2025), with Beth Foster
“Democrats: Don’t Retreat from the Flag, March With It,” The Hill (2025)
“Heads Must Roll for Signal Chat Debacle,” Defense One (2025)
“Loyalty Over Merit: Pete Hegseth’s Dangerous Military Makeover,” The Hill (2025)
“Actually, There’s Not Much DEI in the DOD,” The Washington Post (2025)
“Air Force Hit 2024 Recruiting Goal by Meeting Americans Where They Are,” Breaking Defense (2024)
“Winter Is Here, But the U.S. is Not Ready for Cyber War,” Defense One (2017)
“Why Congress and the Pentagon Should Bypass Trump’s Defense Spending Bill,” Defense One (2017)
“What Trump’s Trans Order Gets Wrong and Why It Matters,” Lawfare (2017), with Richard Eisenberg
“Trump’s Trans Troops Ban Would Require a Cruel and Exorbitantly Expensive Witch Hunt,” Slate (2017)
“Blurred Lines: An Argument for a More Robust Legal Framework Governing the CIA Drone Program,” Yale Journal of International Law Online, v. 38 (2012), with Andrew Burt.

## CONGRESSIONAL TESTIMONY

**House Armed Services Committee, Subcommittee on Military Personnel**
Recruiting Shortfalls and Growing Mistrust: Perceptions of the U.S. Military, December 13, 2023.

**House Armed Services Committee, Subcommittee on Military Personnel**
Diversity, Equity, and Inclusion: Impacts to the Department of Defense, March 23, 2023.

**Senate Armed Services Committee**

FY24 Military Personnel Posture Hearing, March 15, 2023.

**House Committee on Oversight and Reform, Subcommittee on National Security**
Status of the Junior Reserve Officers Training Corps Programs, November 16, 2022.

# APPENDIX B

## MATERIALS CONSIDERED

In forming the opinions expressed in this report, I have considered the following materials:

Defendants' Expert Disclosures pursuant to Fed. R. Civ. P. 26(a)(2)(C), dated September 4, 2026, for General Carden; LtGen Bowers; LTG Lombardo; Lt Gen DeGoes; VADM Miguez; MG (Ret.) Hussey; COL Black; COL Cron; Col Neese; CAPT Roberts; CAPT Blair; CAPT White; LTC Lee; LTC Salter (with attachments); LCDR Bayer; Dr. Ortega (with attachments); and Dr. Hopewell.

DAFI 36-3211, Military Separations, and prior DAFI 36-3208.

DoD Instruction 1332.14, Enlisted Administrative Separations; DoD Instruction 1332.18, Disability Evaluation System.

Air Force Instruction 1-2, Commander's Responsibilities (15 September 2025); Army Doctrine Publication 6-22.

RAND, Sexual Orientation and U.S. Military Personnel Policy (1993) and Update (2010); Belkin et al., Readiness and DADT Repeal, Armed Forces & Society (2013); Harrell & Miller, New Opportunities for Military Women (RAND 1997); GAO-11-170 (2011); Military Times, "DoD Spends $84M a Year on Viagra, Similar Meds" (Feb. 13, 2015).

Executive Order 14183, "Prioritizing Military Excellence and Readiness," 90 Fed. Reg. 8757 (Jan. 27, 2025).

Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," 90 Fed. Reg. 8615 (Jan. 20, 2025).

Executive Order 14004, "Enabling All Qualified Americans to Serve Their Country in Uniform," 86 Fed. Reg. 7471 (Jan. 25, 2021).

Memorandum from the Under Secretary of Defense for Personnel and Readiness, "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025) (Part of the "Hegseth Policy").

Action Memo, "Implementing Guidance for Prioritizing Military Excellence and Readiness Executive Order" (Feb. 26, 2025) (Part of the "Hegseth Policy").

Memorandum from Secretary of Defense Pete B. Hegseth, "Prioritizing Military Excellence and Readiness" (Feb. 7, 2025).

RAND Corporation, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* (2016) (RAND Report).

Directive-type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members" (Jun. 30, 2016) (Carter Policy).

Army Directive 2016-30, "Army Policy on Military Service of Transgender Soldiers" (Jul. 1, 2016).

Army Directive 2016-35, establishing policies and procedures for gender transition in the Army (Oct. 7, 2016).

DoD Instruction 1300.28, "In-Service Transition for Transgender Service Members" (Apr. 30, 2021) (Austin Policy).

Department of the Air Force Policy Memorandum 2021-36-01 (DAF Policy Memorandum).

DoDI 6130.03 Vol. 1, "Medical Standards for Military Service: Appointment, Enlistment, or Induction" (May 28, 2024).

DoDI 6130.03 Vol. 2, "Medical Standards for Military Service: Retention" (Jun. 6, 2022).

2018 DoD Report (Mattis Policy), including the Panel of Experts recommendations.

2021 AMSARA Report (Accession Medical Standards Analysis and Research Activity).

2025 Medical Literature Review, Office of the Assistant Secretary of Defense for Health Affairs.

PRRI analysis of Gen Z attitudes toward nondiscrimination protections for LGBT people (2024).

Statement by Secretary of Defense Ash Carter on DoD Transgender Policy (2015).

My own prior declarations submitted in this matter (ECF Nos. 13-20, 48-27, 72-66, 72-68).

The Third Amended Complaint and all exhibits thereto.

Declarations of other Plaintiffs filed in this matter.

Court transcripts from oral argument (Feb. 18, 2025; Feb. 19, 2025; Mar. 12, 2025).

Memorandum Opinion and Order of the Court granting preliminary injunction (Mar. 18, 2025).

# APPENDIX C

## PUBLICATIONS IN THE LAST TEN YEARS

“NATO 3.0 Needs More Manpower,” The National Interest (2026) with Kristen Taylor).

“The Origin of Hegseth’s Anti-Beard Obsession,” The Atlantic (2025).

“How to Fill NATO’s Manpower Gap,” The National Interest (2025) (with Kristen Taylor).

“Heads Must Roll for Signal-Chat Debacle,” Defense One (2025).

“Loyalty Over Merit: Pete Hegseth’s Dangerous Military Makeover,” The Hill (2025).

“Actually, There’s Not Much DEI in the DOD,” The Washington Post (2025).

“Democrats: Don’t Retreat from the Flag, March with It,” The Hill (2025).

“Winning Through People: The Human Capital Advantage in Great-Power Competition,” Atlantic Council Issue Brief (August 2025) (with Beth Foster).

“Air Force Hit 2024 Recruiting Goal by Meeting Americans Where They Are, Not Lowering Standards,” Breaking Defense (2024) (with Brig. Gen. Christopher R. Amrhein).

## APPENDIX D

### Prior Expert Testimony in the Last Four years

In the past four years I have not testified as an expert at trial or by deposition.