IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------

NICOLAS TALBOTT, et.al.,

Plaintiffs,

v. Civ. A. No. 25-240 (ACR)

UNITED STATES, et al.,

Defendants.

-------------------------------

ZOOM VIDEO DEPOSITION

Taken on behalf of the Defendants of

ALEX WAGNER, J.D.

Washington, D.C.

November 2, 2026

9:13 a.m.

Reported by: Audra M. Smith, RPR, CRR, FCRR

Video by: Orson Braithwaite

Job No. CS8533486

APPEARANCES OF COUNSEL

ON BEHALF OF PLAINTIFFS:

O'MELVENY & MYERS, LLP
BY: JANINE PANCHOK-BERRY, ESQ.
1625 Eye Street NW
Washington, DC 20006
jpanchokberry@omm.com

O'MELVENY & MYERS, LLP
BY: SEAN OH, ESQ.
1625 Eye Street NW
Washington, DC 20006
soh@omm.com

ON BEHALF OF DEFENDANTS:

UNITED STATES DEPARTMENT OF JUSTICE
BY: ROBERT BOMBARD, ESQ.
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
robert.bombard@usdoj.gov

Also Present: Rebecca Goth

I N D E X

*****


| | | PAGE |
|---|---|---|
| ALEX WAGNER, J.D. | | |
| Examination By Mr. Bombard | | 5 |
| Exhibit 1 | Expert Report | 20 |
| Exhibit 2 | The Mattis Policy | 150 |
| Exhibit 3 | Declaration | 183 |

want to get close to anything that was attorney-client privilege with you in your meetings with plaintiffs' counsel, O'Melveny & Myers, but I just want to know approximately how many times have you met with the plaintiffs' counsel?

A This is our first time in person.

Q Okay.

A But we've had at least half a dozen video teleconferences.

Q Okay. And approximately what's the approximate date range for those six VTC meetings?

A At least one or two was in preparation for my expert report, and then I think we've had three, maybe four in preparation for this deposition.

Q Okay. Have you ever had any paid or unpaid arrangement with GLAD Law?

MS. PANCHOK-BERRY: Object to form.

A I've never had a paid arrangement with GLAD Law prior to around the 18th September of 2026 to support the preparation of my expert report. I have collaborated with GLAD Law as I referenced around 2018 previously, which is when

I first got to meet Jennifer.
BY MR. BOMBARD:
Q And there's a number of different law firms and advocacy groups that are associated with plaintiffs in this case.
A Uh-huh.
Q Is there a particular organization that you're in a contractual agreement with as an expert?
MS. PANCHOK-BERRY: Objection.
You can answer.
A The GLAD Law is the organization to whom I submit my time sheets and my invoice.
BY MR. BOMBARD:
Q What about, have you ever had a paid or unpaid arrangement with NCLR?
A No.
Q What about the Palm Center?
A No.
Q What about the Human Rights Campaign?
A I have never had a paid arrangement with the Human Rights Campaign. The Human Rights Campaign, I believe, represents a different set of plaintiffs, and so I submitted largely similar -- excuse me -- depositions in

their case, in the Western District of Washington with different plaintiffs.

Q Did you mean by "depositions," did you mean declarations?

A Declarations, excuse me, yeah.

Q What about the Modern Military Association?

A I am familiar with the Modern Military Association from my time at the Pentagon, but since leaving the Pentagon, I've had no known contact with them.

Q And no paid or unpaid relationship?

A No, never.

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q What about Lambda Legal?

A Lambda Legal, I would have a similar relationship to the Human Rights Campaign. I believe they are representing a different set of plaintiffs in a different case on a similar topic, but again, unpaid.

Q Did you provide declarations for that litigation?

A I believe Lambda Legal and the Human Rights Campaign are co-counsel on the same case.

Q I see. Have you provided any kind of like -- I see that you've been an advisor in certain capacities in the private sector as well. I was curious, have you advised any plaintiff with regards to this litigation? You are an attorney, excuse me.

A Well, that is an interesting question these days: What's an attorney or a lawyer?

But, no, I have not -- I've not advised any plaintiff.

Q Okay. Do you advise or support any, like, advocacy organization currently?

MS. PANCHOK-BERRY: Objection.

A Advocacy organization...

Not that I can recall.

BY MR. BOMBARD:

Q Have you provided any sort of advice or -- advisory support on any transgender military service issues besides what you just described with the declarations in this case?

MS. PANCHOK-BERRY: Objection. Form.

A Can you ask a more specific question? I'm not sure what you mean.

BY MR. BOMBARD:

Q Yeah. Besides the two cases that you

A That is a fact.

BY MR. BOMBARD:

Q The same question for the next paragraph, paragraph 36, it says: During my entire tenure as Assistant Secretary, no complaints or concerns were brought to my attention alleging that the service of a transgender airmen or guardians caused problems with unit cohesion, readiness, or discipline. Based on my role and the high-profile nature of the Austin Policy, I am confident I would have been apprised of any such complaints or concerns had they existed.

Is that a fact or an opinion?

MS. PANCHOK-BERRY: Objection. Calls for a legal conclusion. Objection. These -- his report speaks for itself. If you want to ask a specific question that doesn't require a legal conclusion, we're happy to answer.

A I'm happy to answer. That is a fact -- would it be helpful for me to describe the portfolio of the Assistant Secretary of the Air Force for Manpower and Reserve Affairs to the extent that it goes to paragraphs 35 and 36

in terms of and unofficial channels?

BY MR. BOMBARD:

Q Sure.

A Effectively the Assistant Secretary of the Air Force for Manpower and Reserve Affairs functions as the Chief People Officer of the Department of the Air Force, a military department comprising two military services: The Air Force and the Space Force and anything that impacts any people in the Air Force and the Space Force means that effectively I was responsible to the Secretary of the Air Force, as well as to Congress on all of those matters. That includes getting young people interested in science and technology in middle schools and high schools so they could be qualified and capable and entering these two high-tech forces.

The Junior ROTC program, which is a citizenship program that Congress requires the military to fund and invest in at high schools all across America, thousands of Air Force Junior ROTC programs exist. The 145 ROTC detachments that the Air Force and Space Force run at colleges and universities across the country, oversight of the U.S. Air Force

Academy, oversight of the entire accession enterprise, including basic military training for the Air Force and the Space Force.

It includes oversight of the entire talent management system, including the promotion system of the Air Force and the Space Force; the entire health care enterprise of the Air Force and the Space Force.

Issues that I had no idea that would be part of the portfolio when I was preparing to get confirmed, including childcare, spouse employment, discipline, the entire Guard, Aero National Guard, 54 Aero National Guard units across the country and the globe, the entire Air Force Reserve, and even extended to questions over whether or not a general who had retired and had been dead for 50 years deserved a fourth star.

So the entire life cycle of personnel issues within the Air Force and the Space Force, then representing those both to the interagency, as well as within the Pentagon, and again, being responsible for anything that impacted any service member, including -- which I should have mentioned -- the entire harmful behaviors'

portfolio, including sexual assault, sexual harassment, domestic violence, and suicide. And often being responsible for those to the public as well in a variety of speeches that were made at public events.

So effectively any -- any and every issue that impacted or touched the 700,000 approximately men and women who serve in the Air Force and the Space Force, civilians who serve the Air Force and the Space Force, their dependents to include their children. Whether I liked it or not, I was responsible for it, therefore developed a number of formal means to acquire information.

But then I also, having relationships and experience in the Pentagon for nearly a decade, had developed informal channels where information could come to me, other than in meetings that were formally required as a result of my position.

Q Thank you. Let's stick with the formal means of information gathering. Could you list out all the formal means that you gathered info to the best of your ability?

MS. PANCHOK-BERRY: Objection.

A We could be here for some time.

BY MR. BOMBARD:

Q Give me the top 10.

A All right. I had regular meetings with the military leaders of the portfolios on which I oversaw. So I had at least twice a month one-on-one meetings, although often they or I would bring staff but not their principal deputies, not their experts, possibly the military assistants for notetaking and the same for me, with the Deputy Chiefs of Staff for Manpower Personnel and Services in the Air Force and Space Force. Those positions are known as the A1 and S1.

I had twice monthly meetings with the Office of the Judge Advocate General of the Space Force -- excuse me -- of the Air Force, twice monthly meetings with the Surgeon General of the Air Force, monthly meetings with the Chief of Chaplains. I had twice monthly meetings with my direct reports for portfolio updates, which includes the Director of the Air Force Review Boards Agency, the Deputy Assistant Secretary of the Air Force for Readiness and Reserve Affairs. The Deputy Assistant Secretary

and informal channels.

Q Thank you. If you don't mind flipping ahead two pages to paragraph 65. Take your time to read that paragraph.

The last sentence of paragraph 65 says: The command team reported to me that during their tenure, four transgender trainees had progressed through basic training with no cohesion issues reported by other trainees or leadership.

Same question as before: Is that a fact or an opinion?

MS. PANCHOK-BERRY: Objection.

To the extent you can answer, you can, but same objection.

A That is a factual assertion based on my experience, personal experience and observation.

BY MR. BOMBARD:

Q Okay. If you don't mind going to paragraph 68 on page 24. Take your time to read that paragraph.

I want to turn your attention to the second sentence of paragraph 68 that states: My understanding is the number of DAF, meaning

Department of Air Force, "in-service transitions" was a de minimis number during my time in office.

What formed the basis of that understanding?

MS. PANCHOK-BERRY: Objection.

A Two things. First is that I did not hear anything about the number of in-service transitions in the Department of the Air Force while I was in office, but I was aware that the Air Force, unlike departments of the Army and the Navy, had a single medical, multidisciplinary team that oversaw all transgender Department of Air Force patients, and a result that that office sat within the broader health care portfolio that I was managing and overseeing and responsible for.

BY MR. BOMBARD:

Q So you just stated two things: First I did not hear anything about the number of in-service transitions in the Department of Air Force while I was in office.

A I don't recall saying that.

Q I just read it from the live transcript, so.

A Oh, from what I just said, not from what I -- my report stated?
Q Yeah. From your testimony just --
A Okay. Got it.
Q -- just now. Yeah.
Is that incorrect, that you didn't hear anything about the number of in-service transitions in the Department of Air Force while you were in office?
A I was aware that there may have been in-service transitions due to the fact of a single medical multidisciplinary team that oversaw the process. So I was aware that there was a team that was processing individuals, but I was not aware of the number, and I did not hear in any meeting, formal or informal, about the number. And so I think it's fair to say that if there were a significant number, or as I said in my expert report, more than a de minimis number, I likely would have been made aware of it.
Q What number would be significant to push it out of the de minimis category?
MS. PANCHOK-BERRY: Objection.
A It's tough to speculate.

BY MR. BOMBARD:
Q And you don't know any number period about the Department of Air Force service members transitioning, correct?
MS. PANCHOK-BERRY: Objection.
A I couldn't state any number.
BY MR. BOMBARD:
Q Okay. Could you have asked to obtain that number?
MS. PANCHOK-BERRY: Objection.
A Yes. Yes.
BY MR. BOMBARD:
Q Thank you. So would you say there that your understanding, the number of in-service transitions was a de minimis number during your time in office, was that more of an opinion or would you state that that is factual?
MS. PANCHOK-BERRY: Objection. Seeks a legal conclusion. The report speaks for itself.
To the extent you can answer, go ahead.
A I'd say it is an opinion based on the lack of information that came to me through formal or informal channels.

BY MR. BOMBARD:

Q If you don't mind moving to page 25, paragraph 71. It's the second to last sentence which starts with "During my tenure," you write: During my tenure with the Department of Air Force (DAF) deployed airmen and guardians with a wide range of managed medical conditions under that model and neither Dr. Ortega's directorate (which was limited to accessions) nor the Surgeon General of the Air Force or any command surgeon I met during an installation visit reported to me that transgender airmen or guardians were failing predeployment screening at any elevated rate.

Did I read that accurately?

A You did.

Q For the sentence I just read in paragraph 71, is that factual in nature or is that your opinion?

MS. PANCHOK-BERRY: Objection. Form. Same objection. Seeks a legal conclusion. The report speaks for itself. Objection to form. But go ahead, if you can answer.

A Factual based on my personal experience and observation.

MS. PANCHOK-BERRY: Objection.
A I was required to hand-sign -- hand-sign each mobilization order.
BY MR. BOMBARD:
Q Was this exclusively limited to reservists and National Guard?
A It was.
Q What were your main -- what were your top sort of considerations when you were analyzing these mob orders as to whether or not an individual or a unit met your standards for readiness?
MS. PANCHOK-BERRY: Objection.
A One of the most important things was the amount of time that the individual or the unit had been notified that the mobilization or the deployment was going to occur and whether or not they had volunteered. So with a longer span of time, individuals, particularly in the reserve components, have time to get their life in order, and with a shorter amount of time I would ask questions about whether or not they had volunteered because that would be an indication to me that they were prepared for the assignment and ready to go and ready and willing

to go.

Q Mr. Wagner, have you ever served in the Armed Forces?

A I have not. I'm civilian. But as you know civilians oversee the Armed Forces.

Q So is it correct you've never commanded a unit having not served in the Armed Forces?

A I have never worn the uniform, so I have never commanded a unit. But again, the readiness of the entire enterprise at scale was one of the key responsibilities that the Office and the Assistant Secretary was responsible to, to the public, to Congress, and to the -- specifically the Secretary of the Air Force.

Q Within your disclosure, I believe paragraph 4 there's language that states that you were equivalent in rank to a 4-star general.

How would you describe that? What do you mean by that you're equivalent in rank to a four-star general?

A The U.S. military is, for lack of a better term, a very rank-conscious institution. And so for civilians that do not hold a military rank because they haven't served, the position

has a rank equivalence. That rank equivalence is stated in at least two places. The first is known as the "order of precedence." And the order of precedence for the Department of Defense is a document that is often published on a regular basis and sometimes changed, that lists the rank and rank equivalent of various individuals, both civilian and military.

Because the military is a rank-conscious institution, rank matters for things, both small and large. For small things it often matters where your name tent is at a table in a particular meeting or who visits whose office; who walks to the left of somebody down the hallway. I didn't know this when I served in the Office of the Secretary of Defense, but when I got to the Secretary of Army's office I realized because that position had the rank equivalent and the order of precedence of a 3-star general that the entire staff would move to my left -- and maneuver to my left -- while walking down the hallway, which was uncomfortable for me because I'm right-handed, and because I favor my right side I tend to talk and speak and look at people to

my right.

So the rank of the Office of the Assistant Secretary, I think, is somewhere around 26 or 18. I can't remember exactly on the order of precedence. But effectively what that means is that I outranked all Air and Space Force generals, except those who were combatant commanders, the Vice Chief of Staff of the two services, and the Chief of Staff of the two services.

Q So safe to -- fair to characterize it as a pretty important position within the Pentagon?

A We would often joke that we were the bottom rung of top civilian management. But, yes, it's one of the top leaders in a military department.

Q If you -- how many -- take it from like an E2 airman moving up the links in the chain of command before it gets up to your level, how many intermediaries would exist between that, like, E2, brand-new airman at the training command and you in the Pentagon?

A I can't speculate on a specific number, but many, many.

Q More than 10 links?
A More than 10 links.
Q More than 15 links?
A It depends on what you count -- qualify as a link.
Q Sure.
A In an Air Force unit you could have a first sergeant who oversaw a group of people and a commander who oversaw a group of people, and both of those could count as links or only one of them could count as links because of -- because they were on the equivalent. So it's -- it's challenging to answer that question with precision. But a fair number, yes. One of the benefits of being an Assistant Secretary in the Department of the Air Force is that you have access to mil air, military airlift. And by the time I came into my position, the Air Force Secretary allowed assistant secretaries to access military air for temporary duty assignments and the like, and as opposed to when I was in the department of the Army and the assistant secretaries needed to -- often were not granted military airlift.
I was able to generate ideas for

policy changes based on interaction with all ranks of airmen and guardians. One of the best parts of the position was that I often traveled with the Chief Master Sergeant of the Air Force and the Chief Master Sergeant of the Space Force, who are the top enlisted people in those two services.

And they would do town halls, and they -- having come up the ranks from an E1 up to an E9, had a rapport that I, as a civilian, and I, as a senior leader, could never generate with junior airmen or guardians.

And through their interactions and their town halls, I gained and gleaned information that would never have come to me through formal channels. And having the benefit of them as sherpas or opening acts to warm up a crowd, made that crowd and that audience much more comfortable with understanding my role and how what I did had an impact on them.

Q Thank you. I want to ask you about -- looks like -- obviously we've been focusing a lot on your time as Assistant Secretary of the Air Force. You also had time as Chief of Staff of the Army, Secretary of the

particularly those issues that required attention from Congress -- or demanded attention from Congress, so were political in nature or interesting to the public at large, i.e. could there be a news article about this policy, I needed to be aware and responsive, both on behalf of the Secretary, but also because I was a Senate-confirmed official I could be called to testify.

But short of that I had regular briefings with the professional staff members of both the House and Senate Armed Forces Committees and we discussed a range of issues that were coming. I committed to them that they would not read about a new policy or a problem in the news, and we would try to head off any surprises.

So I oversaw the implementation of the policy as a result of being confirmed in that position, similar to how I oversaw implementation of all policies that affected military manpower personnel, readiness, health care, et cetera, et cetera.

BY MR. BOMBARD:

Q Thank you.

For the -- for the Austin Policies we referred to, did the Department of Air Force track readiness data among transgender service members?

MS. PANCHOK-BERRY: Objection.

A I don't recall.

BY MR. BOMBARD:

Q Do you recall whether the Air Force tracked duty limitation days by transgender airmen and guardians?

MS. PANCHOK-BERRY: Objection.

A My understanding is that their -- that was distributed. So I don't believe there was a category to track for transgender airmen and guardians. But again, I point you to my expert report. For an issue of such high public and political interest, the fact that I was not -- I did not have -- I'll just look at the report for the exact language. I want to make sure I say it exactly as I said it in my report.

BY MR. BOMBARD:

Q Do you mind referring to where you're at when you find the spot?

A Yes, I will. On page 12, paragraphs 35 and 36, paragraph 35 reading: Throughout my

oversight of the Austin Policies' implementation in the Air Force and Space Force, I did not observe nor was made aware of any adverse effects on readiness, deployability, unit cohesion, or good order and discipline, and none was reported to me through any official or unofficial channel.

And similarly in paragraph 36, I will just read the first two sentences: During my entire tenure as Assistant Secretary, no complaints or concerns were brought to my attention alleging the service of transgender airmen or guardians caused problems with unit cohesion, readiness, or discipline. Based on my role and the high-profile nature of the Austin Policy, I am confident I would have been apprised of any such complaints or concerns had they existed.

Q Doesn't that cut both ways, though, Mr. Wagner, based on your role and based on the high-profile nature of the policy desired to be successful, which is a normal thing any political administration would want to see, does that bear at all on your confidence on whether issues would have made it all the way up to your

Manpower Personnel and Services. That would have everything from the racial and gender breakdown of the Air Force and the Space Force. It would have the number of single people and the number of married people, the number of people who were -- had -- who were married within the service. I am confident that if I needed the type of information that you describe, at some point I could get it.

BY MR. BOMBARD:

Q Same question: Did the Department of the Air Force track, to your knowledge, the disability evaluation system or medical evaluation board rates in which gender dysphoric or transgender service members were attempting to avail themselves of those processes?

A Could you repeat the question?

Q Yeah. Were you keeping data on MEB -- do you know the MEB, if I say M-E-B?

A Yeah, yeah.

Q Like Medical Evaluation Board.

A So --

Q Would you guys track that as it pertained to gender dysphoric or transgender airmen and guardians?

A I would assume that a variety of data and hopefully that would be captured if I needed access to it. I would like to think that on any medical condition I could make an assessment over whether or not our policies were working the way they intended to and could access appropriate data to inform that assessment.

Q Thank you. We can go off the record.

THE VIDEOGRAPHER: The time is 11:37 a.m. This ends unit 2. Off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 11:51 a.m. This ends unit number 3. We're on the record.

BY MR. BOMBARD:

Q All right. Mr. Wagner, I know earlier we talked about your time at the Aerospace Industries Association, but I understand from your CV that you also were at Avicenna Strategy; is that correct?

A I was.

Q Okay. So from 2017 when -- the first Trump Administration began -- to 2022 when you were confirmed by the United States Senate as

Assistant Secretary of the Air Force, you had no role in DoD personnel policy in those years; is that correct?

A No.

Q So you have no personal knowledge of how the Mattis policy operated from 2019 until 2021?

A I have some personal knowledge how it operated based on my oversight of the Austin Policy. Had there been specific issues that occurred as a result of implementation of the Mattis Policy, and likewise the Carter Policy, those would have informed the policy development of the Austin Policy of which was implemented under my review. So to the extent that if there were specific challenges that occurred any time in the eight plus years where transgender people were authorized to serve openly in the military, in my case specifically in the Department of the Air Force, I would have -- I would have probably needed to be aware of that in order to prepare for my Senate confirmation hearing, and then aware of it in my role as Assistant Secretary to the extent that those issues were of public or congressional concern.

Assistant Secretary of Defense for Public Affairs that included representatives of each of the services' recruiting enterprise, as well as the -- as well as the Director of Accessions Policy. And I believe at that press conference, the Director of Accession Policy said that 77 percent of Americans are ineligible to serve absent a waiver.

BY MR. BOMBARD:

Q When you were called -- you were talking about some interactions with HASC and SASC. I know you testified before Congress four times, and not counting your confirmation hearing. Obviously, you stated in the disclosure that this was a high-profile subject matter and policy item for the Administration. Did Congress ever request specific data from your office tracking, you know, any metrics regarding transgender service?

A Not that I can recall. Again, as I state in my expert report, these issues did not come up through normal reporting channels or even requests from Congress, and I can tell you that Congress did legislate during that period on transgender issues.

There was, I believe, a provision of the 2024 NDAA that restricted dependent care on gender-affirming care. But I -- that was never a part of any engagement with members of Congress. In hearings, members of Congress, some who would call me on the phone, or professional staff members, whether it was my -- I tried to have quarterly briefings with the SASC and HASC professional staff members on the personnel subcommittee.

Q Thank you. During your tenure as Assistant Secretary of the Air Force, did the Air Force have any data field identifying members diagnosed with gender dysphoria in any readiness system that you're aware of?

MS. PANCHOK-BERRY: Objection.

A There's no shortage of data on service members available. I am not aware of that specific type of data.

Q In your disclosure at page -- sorry. It's paragraph 68, skipping ahead. That's on page 24. The second sentence states: Unlike the departments of the Army and the Navy, the DAF had a single, medical multidisciplinary team that oversaw all transgender DAF patients.

Did you ever ask that team for data on duty limitation days?
A Can you just tell me which paragraph that is again?
Q Sorry.
A No, I'm sorry -- my pages are in the wrong order.
Q Yeah. Page 24, paragraph 68, sentence 2.
A I did not ask that team for data because the issue of -- can you repeat the question?
Q Sure. Did you ever ask that -- so basically you stated that there's this single medical multidisciplinary team that oversaw all transgender Department of Air Force patients, and my question was: Did you ever ask that team for any data -- any data -- that they had, period?
A No.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q The answer is no?
A The answer is no.
Q Did the Department of Air Force,

under your tenure, ever commission a study to determine how effectively or not the Austin Policy was impacting readiness?

MS. PANCHOK-BERRY: Objection.

A I believe as part of the DAF's implementation of the Austin Policy, within the DAF's policy document, which I don't have in front of me but I've referenced in my expert report, there was a required Inspector General assessment of policy implementation after -- if I had that document in front of me I could find it, but I believe three years, I recall. But I have never -- I would have seen that had it been finalized, and I have not seen that or heard whether or not that report was even completed.

BY MR. BOMBARD:

Q I think you stated -- correct me if I'm wrong -- that this required IG assessment was to be completed within three years. Is it possible that the change in administrations prevented that report from being finalized or do you have any information as to whether that report was ever finalized?

A Unfortunately, I have no information, yeah.

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q So you've never seen this IG report on how the policy, you know, accessing policy, how it was implemented?

MS. PANCHOK-BERRY: Objection.

A Neither when I was in that role nor since I haven't.

Q And you don't know how many Department of Air Force members were diagnosed with gender dysphoria during your tenure as Assistant Secretary of the Air Force for Manpower and Reserve Affairs, correct?

A I don't know how many people were diagnosed with any one particular medical condition to include gender dysphoria, but of course that was not one of the issues that I was focused on because there were so many other high-profile medical issues that came across my desk.

BY MR. BOMBARD:

Q And you do not know how many Department of Air Force members began transition during your tenure; is that correct?

MS. PANCHOK-BERRY: Objection.

A My understanding, based on what I state in my expert report is that -- and I'm reading here from paragraph 68 on page 24 -- is that my understanding is "the number of DAF in-service transitions was a de minimis number during my time in office."

BY MR. BOMBARD:

Q What is the source of that understanding?

A The source of that understanding is being responsible for the entire health care enterprise of the Department of the Air Force, and having general and regular briefings from those who were responsible for implementing that health care enterprise.

Q And what is that number? I know you don't have a specific number. What's that approximate de minimis number you're referencing?

A I can't tell you with any precision. I refer back to what I say in paragraph 68 of the expert report. What I wrote in that report.

Q Do you agree that if the population was, in fact, de minimis any readiness effect would also be small in absolute terms and

difficult for your office to detect at that high secretariate level?

MS. XIEO: Objection. Compound.

A Generally medical conditions that were of unique public concern or congressional interest, like gender dysphoria, would not be hard to detect, if there were challenges in executing the Austin Policy within the Department of the Air Force. In fact, I would expect to have been apprised of them in real-time.

Q You would expect to have been apprised of them in real-time. Was it surprising you were not being provided that kind of information?

MS. PANCHOK-BERRY: Objection. Mischaracterizes testimony.

A I wouldn't say that I wasn't being provided that kind of information. But issues of which my office had delegated authority to -- subdelegated that authority to other levels, often had a responsibility to flag issues upon which they were exercising that authority, as I noted earlier, that were of congressional or political legislative concern.

And as a result given that -- given the issues of the Carter Policy, the Mattis Policy, the Austin Policy, given how newsworthy this litigation at present appears to be, this would have been one of the types of issues that would have found its way to my office.

BY MR. BOMBARD:

Q On page 25 at paragraph number 70, you write: From a force management perspective, temporary nondeployability is a routine feature of military service that the Department of Air Force manages at the unit, wing, or delta level every day.

Those individual cases regarding nondeployability don't rise to the Assistant Secretary's level, do they?

MS. PANCHOK-BERRY: Objection.

A Generally routine issues of nondeployability would not rise to the Assistant Secretary level. However, when new policies are put into place, that may be as, again, congressional interest in public concern, particularly among them the department's 2022 implementation of new parental leave, that was an issue that we needed to ensure that the units

would be able to manage and absorb.

And so while I asked my team to keep an ear out if they had -- if they became aware of challenges in implementing the parental leave policy, I never -- similar to the Austin Policy -- never was briefed on any challenge or problem with that, because these are, as I state in my expert report, "temporary nondeployability" is a routine feature of military service that the DAF manages at the unit, wing, or delta level every day.

Q On page 20 through 21, I'm referencing paragraph 58 of your expert report on the following page on 21, you write, towards the second half of that paragraph: From June 2022 to January 2025, I was routinely made aware of issues relating to discrimination, academic cheating, hazing, inappropriate relationships among service members, alcoholism, sexual assault and harassment, domestic violence, and drunk driving and other criminal behavior, among other issues.

Are these all examples of reportable misconduct that come with like a formal reporting requirement?

So issues about -- revolving around the academy often would come to my level and often above. And then again, general officer misconduct, inappropriate relationship -- boy, I have some great stories -- alcoholism. And then the department's critical focus on the national -- on sexual assault and harassment required the standing up of a national commission that produced 82 recommendations that I was responsible for implementing when I was confirmed into the position and responsible for ensuring that the Secretary of Defense knew, down to very specific levels of individual reports.

And believe it or not. There are two kinds of reports. There are reports where you're anonymous and reports where you use your actual name and the distinctions and numbers of each of those, as well as propensity -- not propensity -- the -- there's a term of art for it. I can't remember. But effectively there's sexual assault reports and the commonality of sexual assault.

And then there was an entire effort stood up to combat domestic violence in the

force, which I think surprisingly is far more common than sexual assault.

So those are the nature of the issues that were -- that are often handled at the unit level, but would require attention at the Assistant Secretary level or even above because of their relationship to the academy, relationship to ROTC cadets, relationship to junior ROTC cadets.

As you saw my first hearing as Assistant Secretary was on sexual assault in the JROTC program.

BY MR. BOMBARD:

Q Thank you. So was it fair to say given the character that you just described of these more high-profile events, that unit absorbing a member's duty limitations is not at the same character that would reach the Assistant Secretary's level?

MS. PANCHOK-BERRY: Objection. Unclear.

A I am actually unclear.

Q So a unit has a member at a small unit and another team member of that unit is having to pick up the slack because one of the

members is missing for whatever reason, that's not of the same character as these high-profile matters that have reached your desk involving broad policy or the academy or general officer, flag officer misconduct. Would you agree?

MS. PANCHOK-BERRY: Objection. Mischaracterizes testimony.

A I would say all officer misconduct. Not only general flag officer. But I would -- in response to that I would say, I can tell you with specificity that very often suicide is an issue; that when there is a suicide in a unit, that unit is given specialized resources because one suicide often leads to additional suicides.

I'm aware of a news story where a number of Wisconsin Army Guard members, after a deployment, I think, three members of the same unit died by suicide. And so issues that are of high public profile, even though they're managed at the unit level, can rise to the Assistant Secretary level and often above, depending on the nature and the type of issue.

So I wouldn't want -- I wouldn't want to exclude all issues, but generally -- generally most issues that are not of

significant public or congressional concern, relationship to the academy, relationship to major initiatives that an administration is undertaking, would not rise to that level.

BY MR. BOMBARD:

Q And at page 22, paragraph 63 you agree with a since-withdrawn expert report by a Colonel Black, but you basically agree losing a single crew member can affect a unit's readiness, and then you go on to say that that actually cuts against the current executive order and the Hegseth policy.

Do you see that in the first sentence?

A I do see that.

Q Do you agree that that kind of effect is felt at the unit level and not at the Pentagon?

MS. PANCHOK-BERRY: Objection.

A Can you help me understand what you mean by "felt"?

BY MR. BOMBARD:

Q Yeah. The impact of a loss of a single crew member or single soldier and the impact it can have on operational readiness, is

that impact felt most acutely at the unit level or at the E ring in the Pentagon?

(Stenographer requested clarification.)

MS. PANCHOK-BERRY: Objection. Compound.

A You say "most acutely." I will agree with that characterization. I will say it's most acutely felt at the unit level.

BY MR. BOMBARD:

Q Earlier you testified that you were friends with Yvette Bourcicot. And I believe that she generally testified that manpower reserve affairs plays a strategic element level within the Pentagon. And that an issue in order to be sort of systemic to reach -- an issue. In order to reach that high level, had to become sort of systemic in nature.

Was that your experience with the Department of Air Force?

MS. PANCHOK-BERRY: Objection. Just to make clear, we haven't seen her testimony. If you'd like to put it in front of us. I don't want to characterize some other witness' testimony without --

MR. BOMBARD: I tried to caveat it a

bit. I can ask a different question.
We can move on.
BY MR. BOMBARD:
Q Mr. Wagner, I want to go back to page 20 and paragraph 56. I have a few more questions before we can take a break.
You referenced the Department of Air Force policy memorandum. I'll just read it: Also confirmed that no person solely based on their gender identity will be denied accession, involuntarily separated, or discharged, denied reenlistment or continuation of service or subjected to adverse action or treatment in the Air Force or Space Force.
So you would agree this policy memorandum barred any adverse action or treatment that was solely based on one's gender identity?
MS. PANCHOK-BERRY: Objection.
A Yeah. I'll just repeat what I wrote in this report; that the DAF implemented the Austin Policy, and in that implementation "stated that no person solely based on their gender identity will be denied accession, involuntarily separated or discharged, denied

reenlistment or continuation of service, or subjected to adverse action or treatment in the Air Force or Space Force."

BY MR. BOMBARD:

Q During your various stints almost, I believe, a decade or perhaps more in civilian military service, did you find that military culture is oriented towards carrying out leadership's stated policy objectives?

MS. PANCHOK-BERRY: Objection. Unclear.

BY MR. BOMBARD:

Q Is there a culture of following orders in the chain of command within the military?

A Generally. I'd say it makes for a very professional workforce, one of the most professional workforces I've ever had an opportunity to be a part of.

MR. BOMBARD: I think now is a good time to break for lunch.

THE VIDEOGRAPHER: The time is 12:26 p.m. This ends unit 3. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 1:40 p.m. This begins Unit Number 4. We're on the record.

BY MR. BOMBARD:

Q Mr. Wagner, did you discuss the substance of your testimony with counsel during the lunch break?

A Not the substance. Some of the "how was I doing?"

Q Thanks.

A Talking too much.

Q Did the -- while the Austin Policy was being rolled out, was it your impression that Air Force leadership at the time generally supported the policy?

A I was in the private sector at the time of the rollout, so I wasn't paying a ton of attention. I needed -- I think my first time thinking about it was reviewing the confirmation hearing transcripts of the Secretary and the Under Secretary while I was preparing for my confirmation hearing in the fall of 2022 -- 2021. Excuse me.

And I can't remember if that came up during that review, but that's when I started

focusing on what was going on in the department when I was preparing for my confirmation.

Q I mean, when the President issues an executive order, the Commander in Chief, and the Secretary of Defense implements a policy, is it fair to say that the military generally follows the orders of the superiors appointed above them?

MS. PANCHOK-BERRY: Objection.

A I think it's generally fair to say that. But often those instructions, those policies are developed in a way that gets input, that asks for best military advice that is collaborative, rather than "I am your superior, and thus you will do what I say." There is more of a give and take and, as a result, it's easier to follow advice that you're bought in on.

BY MR. BOMBARD:

Q I want to ask you about a section of your expert report at page 23, at paragraph 65. This is talking about one of your visits in 2022 to Lackland Air Force Base. It states that your -- you spoke directly with the command team of the 37th training wing, which was responsible for, among other things, providing foundational

entry-level training for those entering the Air Force, Space Force, Air Force Reserve, and Air National Guard, generating 93 percent of the enlisted corps.

The next sentence states that: The command team reported to me that during their tenure, four transgender trainees had progressed through basic training with no cohesion issues reported by other trainees or leadership.

Do you see that?

A I do.

Q Who were the members of the command team that you spoke with about this in paragraph 65?

A Believe it or not, I can remember the name of the 37th Training Wing's commander. I cannot remember the name of her command chief.

Q Okay.

A The commander was Colonel Lauren Courchaine, C-O-U-R-S-H-E-N-E [sic]. I don't think I've spelled that right. And then I can't remember the name of her command chief, but it was a he.

Q And at this -- during this visit to Lackland Air Force Base, did you speak with

these four individual trainees? Did you meet with them one on one?

A I did not.

Q Did you meet with any of their instructors?

A I did not. I met with -- let me rephrase that. It is possible. So we toured two of what the Air Force calls "dorms" -- in the Army, we would call them "barracks" -- for trainees. And the tours were offered by the individuals who led each of those flights or -- I'm not sure exactly what the right term is but...

So it is possible that I met someone who may have had a transgender trainee within their training wing or flight. So it's possible.

Q Thank you.

This next paragraph number 66 states: Drawing on my experience and military personnel policy, including my role overseeing the implementation of the Austin Policy, I conclude that the policy had no adverse effect on unit cohesion in the Air Force or Space Force and that the contrary opinions of defendants'

commander witnesses are unsupported by any data identified in their disclosures. This conclusion is consistent with the RAND Report's findings.

What -- besides what you've stated here, how did you -- what other data or evidence did you rely upon in order to make the conclusion here in paragraph 66?

MS. PANCHOK-BERRY: Objection.

A Part of the role of the Assistant Secretary of the Air Force for Manpower and Reserve Affairs is the overall readiness of the U.S. Air Force and the U.S. Space Force, and responsibility for that state of readiness to the Secretary of the Air Force and to Congress. Unit cohesion is a part of overall readiness. And you asked what did I rely on? What specific? Could you just repeat that question again?

BY MR. BOMBARD:

Q Yes. The data or evidence that you relied upon in forming that conclusion.

MS. PANCHOK-BERRY: Objection.

A The data and evidence that I relied on for the conclusion stated in paragraph 66 of

effectively managed at low risk for specific career fields, we changed our waiver policy to allow a session of more folks who had, as I said, food allergies, mild asthma, and hearing loss in one ear. I mentioned earlier we changed our policies on THC use at -- positive THC testing at MEP stations. But then we engaged in an entire review of all of the barriers to service that the Air Force had in place to determine whether or not those barriers needed modernization.

And we had a recruiting challenge coming out of the COVID pandemic, at the same time that we had, as I mentioned earlier, low familiarity with military service and, in 2022, an economy characterized by high private sector wage growth and pretty low -- relatively near-historic low unemployment, which creates challenges for military recruiting.

And so the Vice Chief of Staff in the Air Force and I were charged with leading this review of all the policies in the recruiting enterprise, and we made a number of changes, from tattoo policy changes to, as I said to THC, to the body fat percentage requirement. The Air

Force had a higher standard and, thus, a lower body fact requirement than the other services and that was allowed under the Office of Secretary of Defense's policies. So we changed that. And then monitored very closely the implementation.

I testified to Congress multiple times how the change in body fat percentage in one year allowed the Air Force to assess 6,000 young Americans that would have otherwise been excluded from service; and of those 6,000, only one failed to pass the basic training physical fitness requirements, which is a number much higher than the average population that did not come in under that new standard.

So, yes, we were constantly evaluating and revising policies based on data to -- especially with respect to that working group, opening up the opportunity to serve for all people who could meet our standards.

BY MR. BOMBARD:

Q So to that point about the constantly evaluating and revising policies based on data, it sounds like most of your testimony has been sort of the absence of complaints reaching your

office is sort of the basis for your opinion as to why the policy didn't have a negative impact.

Is that a fair characterization?

MS. PANCHOK-BERRY: Objection.

A I'd say it's a part.

BY MR. BOMBARD:

Q Okay.

A The absence of complaints certainly. I would say the absence of any type of incident, complaints aside -- incidents, challenges, any challenge to implementation on an issue that was so high profile would have come to my office and, you know, it -- while it takes time to revise an Air Force instruction, there's an interim procedure called an Air Force Guidance Memorandum that can be put in place to temporarily change a policy prior to the larger policy revision that results in an instruction.

So just to answer your question fully, I would say that it is not only the absence of complaints, it is the entire structure and process by which my office -- and when I say "my office," just for the sake of clarity, I don't mean my immediate office, I mean the entire office of the Assistant

Secretary, which is 280-some-odd people, plus the constant inputs from the Deputy Chiefs of Staff of the Air Force and the Space Force for manpower or personnel and services.

Q Thank you.

I believe you testified earlier generally that there was -- you know, you're responsible for like the personnel and HR, for lack of a better phrase, policy for 700,000 Airmen and Guardians. Is that about right?

A Around 500 Airmen and Guardians and then just under 200,000 Department of Air Force civilians.

Q I see, thank you.

A Yep.

Q And with your last answer, I believe you said -- and I'll pull up the transcript. Sorry.

"Any challenge to implementation on an issue that was so high profile would have come to my office" is what I'm reading here from your last answer, when I asked you about the lack of -- the absence of complaints forming a significant portion of your opinion.

Given the size and the -- of your

unit level that I was able to access and better understand as a result of those relationships, but the Austin Policy was not one of those issues.

This was an issue of high interest outside the Department of Defense. And because it was politically sensitive, it is an example of exactly the type of issue that would have been raised to my level, either through my team, either through my regular engagements and interactions with the A1 or the S1. It might have come to me in one of my monthly conversations with the Chief of Staff of the Air Force. But these are -- I mean, I can tell you unit-level issues, particularly unit-level issues that involved LGBTQ issues, landed directly on my desk.

You may remember in 2023 there was a fair bit of concern about Pride events in the department, and I found myself trying to understand issues that were often dispensed with at the unit level: What types of outside groups are allowed to have engagements and activities on base? What types are not? And precisely because of that, I was briefing the Deputy --

the Vice Chief of Staff of the Air Force because the Chief of Staff of the Air Force was TDY at that point before he went to a meeting with the Secretary of Defense, who ultimately decided to ban Pride events on military bases.

And so the incident in particular happened at an Air Force Base. And as the M&RA -- you know, far up the chain from the mission support group at Nellis, I was engaged with Nellis leadership, trying to understand the details so I could equip the Vice Chief of Staff of the Air Force for his conversation with the Secretary of Defense.

BY MR. BOMBARD:

Q And so the decision was to -- I think you said that the ultimate decision was to ban those events from taking place on bases?

A In the summer of -- right at the beginning of June 2023, the Secretary of Defense, after the issue came up in a congressional hearing during what's known as "posture season" made the decision to prohibit Pride events on military bases.

Q Going back to some of the earlier questions I was asking in particular about the

new policies in place, and it sounded like you had never -- you had not requested specific data in relation to, like, lost duty days; is that right?

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q As it pertains to a transgender service member under the Austin Policy.

A No, I did not request that data. Again, only because you would have to have some reason of concern to ask for a detailed data request that would require me engaging the A1, the Deputy Chief of Staff for Manpower, Personnel, and Services, having her reach out to the Air Force's personnel center, having them engage the Air Force Manpower Analysis Agency.

That is a lot of time and effort spent on something that I wouldn't ask for a nonissue. And when I did ask for that type of data, it takes time, and it takes away from their day-to-day. And so it would be a burdensome request if I had no reason for it or rationale to ask.

Q Wouldn't it be useful information to have in either direction, perhaps, for relaxing

some of the Austin Policy standards, making it maybe even more accessible to transgender service members if you had that data to rely on?

MS. PANCHOK-BERRY: Objection.

A I don't know how to say this other than the portfolio is so vast that you tend to focus on the issues that are -- that are the most impactful, that are the highest profile, that are the toughest.

And I often did not want to get my hand -- or my priorities or my team's hands or their priorities involved in issues that were being implemented without problems, and I wanted to focus on far more challenging issues. I could tell you -- we could talk for the rest of the day about the far more challenging issues I decided to take on.

BY MR. BOMBARD:

Q Last question in this vein, but is there even one readiness metric that you reviewed that broke out members with gender dysphoria?

MS. PANCHOK-BERRY: Objection.

A I can't recall.

BY MR. BOMBARD:

Q Okay. I believe you referenced the RAND Report. Are you familiar with the RAND Report that -- you cited it in your expert disclosures so --

A I am.

Q Okay. The RAND Report was requested by the -- I believe it was the Carson Working Group. Do you know Mr. Carson?

A I do.

Q And what was his title? I know that was a while ago now. Do you recall what his role was within the Army?

A Yeah. I first met him when he was the General Counsel of the Army. I organized a group of Schedule C lawyers at the Pentagon, and we would do brown bag lunches with some of the more senior lawyers. I understand he then went on to become the Under Secretary of the Army, was confirmed into that role, and then was nominated for -- and moved but never confirmed as Under Secretary of Defense for Personnel and Readiness. So he was either acting USDP&R or performing the duties of U.S. DP&R.

Q Do you agree that Former Secretary Ash Carter directed the RAND study to begin with

people. The second is that it prevented in-service transition. And the third is that it effectively grandfathered in those who had transitioned while in service, and treated those people the same as anyone else who was required to meet all standards for care, standards for duty, standards for deployability, standards for career fields. And so --

Q Um -- sorry.

A Sorry. I'm sorry.

And so that third element, effectively that meant there was open service for members who had transitioned and completed a medical treatment plan and changed -- and ended that transition process with a change in their gender marker in the DEERS database from effectively the time that the Austin Policy was created and signed and then subsequently implemented by the services throughout the first Trump Administration, culminating in data that was relied on by the Austin team.

Q That was going to be my next question.

A Yep.

Q So what was the data with regard to

that third component of the Mattis Policy -- that sort of grandfathered, we'll call it, component. What data did -- are you aware of that the Lloyd Austin Pentagon considered?

MS. PANCHOK-BERRY: Objection.

A I cannot tell you because I was, again, not a part of -- I was not a part of the Biden Administration when the Austin Policy was devised, when the discussions about the policy were active. I only came in after the policy had been announced.

But my expert opinion is that having a thorough review from the Carson Working Group, which is exactly the way the military often does -- punts issues that are new or novel. You create a working group. You hear different voices; you hear voices that are positive and negative -- the independent RAND review.

In 2018, each of the military service chiefs testified before Congress, not jointly but in each of the department of the Navy, department of the Air Force, and department of Army posture hearings, and I believe they were asked by Senator Gillibrand -- although I might be wrong -- if the Carter Policy created any

readiness or unicohesion issues.

And those service chiefs, who you know are not shy about providing best military advice, when asked, and often advice that conflicts with the Commander in Chiefs -- you'll recall during the testimony requested on repeal of "Don't ask, Don't tell," a number of the service chiefs, during the Obama Administration, were asked to testify and what their best military advice was, and several of them said that they did not agree with repealing "Don't ask, Don't tell."

Interestingly, during the Trump Administration, all of the Service Chiefs stated that there had been no unit cohesion or readiness issues in public on-the-record testimony. I understand there was then a letter signed by former Surgeons General in that intervening time period. And then you had, as I said earlier, the experience with actual open service.

And so my understanding is that those were the things that guided the Austin Policy, but these things are not done in a bubble. From my experience, what would typically happen would

there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require or have already undertaken a course of treatment to change their gender.

Furthermore, the Department also finds that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all service members, including transgender service members without gender dysphoria, could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality.

What's your expert opinion on the Mattis Reports' ultimate conclusion?

MS. PANCHOK-BERRY: Objection.

A This Memorandum for the President, which you just quoted from, is dated February 22, 2018.

My understanding is that posture season usually starts with the delivery of the President's budget, sometime in February 2018,

and after that budget is delivered, the Senate and the House Armed Services Committees hold hearings with senior department leadership, including the Secretaries and the Service Chiefs of Staff. In the department of Navy, it's both the Chief of Naval Operations and also the commandant to the Marine Corps.

That testimony which I cited, where the Service Chiefs of Staff said that there had been no challenges or problems -- and I could probably read it directly if I could see the executive order that cited it -- and unit cohesion or readiness based on open transgender service would seem to have come after this Memorandum for the President in 2018.

Additionally, I don't agree that exempting such persons from well-established mental health, physical health, and sex-based standards, which apply to all service members, is an accurate statement because the policy, in fact, required service members who transitioned to adhere to all standards: readiness standards, career training standards, physical fitness standards, uniform and grooming standards.

And so while I heard what you read

and while I can read it myself in front of me, it would seem that intervening events after submission of this Memorandum to the President, including from the Service Chiefs asked for their best military advice and opinion in open congressional testimony, in addition to, you know -- from the time of the Carter Policy to the time of the Austin Policy, that there were service members serving openly who happen to be transgender and meeting all professional physical fitness, uniform, and grooming standards. I would say that this paragraph has not aged well.

BY MR. BOMBARD:

Q The next paragraph starting with "The prior administration largely based its policy on a study prepared by the RAND National Defense Research Institute," do you agree that the prior administration "largely based its policy on a study prepared by RAND"?

A I would dispute the term "largely."

If it largely based its study on RAND, it would exclude the fact that there was an intensive working group convened by an intensive intra agency working group convened by

Under Secretary Carson. It would exclude the inputs from any tank meeting that occurred.

The RAND Report was one element and, no doubt, an important one because of its independence and because of the degree that the Department consistently relies on RAND to produce a political, nonpartisan, independent reports to inform military policymaking.

In fact, in my Air Force role, we contracted with RAND's project Air Force consistently to provide independent study and review of -- for a vast -- a vast array of issues that could help inform our policymaking.

So, no, I do not agree, based on my experience, serving in the Obama Administration as the Army Secretary's Chief of Staff, as well as based on, you know, my expert opinion conveyed in my expert report, that the Obama Administration, quote/unquote, largely based its policy on the RAND Report.

MR. BOMBARD: Maybe we can take --

THE WITNESS: Okay.

MR. BOMBARD: -- a little break.

If you don't mind, we can go off the record.

THE VIDEOGRAPHER: The time is 2:46 p.m. This ends Unit 4. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 2:56 p.m. This begins Unit 5. We're on the record.

BY MR. BOMBARD:

Q All right. Mr. Wagner, you were not in government from approximately early 2017 until your Senate confirmation in 2022; is that right?

A That's right.

Q Okay. So you don't have any personal knowledge of how the Mattis Policy operated?

A I don't have personal knowledge.

Q On page 10 of your -- back to your expert report, on paragraph 29 in the Methodology section.

A Uh-huh.

Q You state that "I also evaluated whether the development of Executive Order 14183 and the Hegseth Policy, as reflected in the record, is consistent with the military's general approach to policies impacting the

mental and behavioral health conditions of service members, including whether any consultation, evidence gathering, implementation or assessment of operational effects done prior to issuance of EO 14183 and the Hegseth Policy were consistent with the military's general approach to these conditions. I am not aware of any such consultation, evidence-gathering implementation, and assessment of operational effects having occurred prior to the issuance of EO 14183 or the Hegseth Policy."

Do you see that?

A I do.

Q You list the DoD's medical literature review from 2025 in your appendix. Does that sound familiar?

A It sounds familiar. Can you point it to me exactly so we can just agree on exactly --

Q Yes.

A -- what we're talking about?

Q Does your version have the appendix? Yes. Good.

A Yes.

Q It would be towards the second third -- or, yeah, the bottom third of page 39

of Appendix B. That would be the 2025 medical literature review from the Office of the Assistant Secretary of Defense for Health Affairs.

A I see that.

Q Did you review that?

A I reviewed that, yes.

Q And would that constitute evidence gathering in support of the Hegseth Policy?

A In my view --

MS. PANCHOK-BERRY: Objection.

Go ahead.

A In my view, that would not constitute evidence gathering related to the impact of transgender people serving in the military. My recollection is that this was a broad review of medical literature generally, and it would not constitute evidence on which such a major personnel policy change would be made alone.

Earlier we discussed my contention with the letter to the memorandum to the President in Exhibit X as not relying -- I want to make sure I say this right --

BY MR. BOMBARD:

Q Exhibit 2 you mean?

A Exhibit 2, where you noted -- I want to find it exactly that said, There was a principal reliance on the RAND Report. What was the term you used?

MS. GOTH: Largely rely.

A Largely rely. Yes.

BY MR. BOMBARD:

Q Yeah. Page 2.

A So I quibbled with "largely rely," because even such a well-regarded, established, independent review is not typically sufficient evidence for a major personnel change. And that's why you saw the RAND Report paired with the transgender working group during the Obama Administration.

My assumption is why, effectively, the Mattis Policy came after months of what they called "a panel of experts," which I think functionally operated the same way as a working group, and so a medical literature review may have been a nice-to-have in support of a number of other far more significant, relevant, and influential processes and commissioned evidence; but on its own, it wouldn't -- it would be a substantial departure, in my view, from the

normal process by which an administration makes personnel decisions impacting men and women who serve.

Q Okay. Now, the -- you agree that the President, as Commander in Chief, has the authority to set military personnel and medical standards?

MS. PANCHOK-BERRY: Objection.

A Consistent with otherwise applicable law, generally so, but, of course, that is often not done from the Oval Office.

But changes that impact hundreds to hundreds of thousands to millions of people often involve extensive reviews, interagency discussions convened by the National Security Council, comprising experts from at least -- when it involves the military -- two Cabinet departments.

Department of Homeland Security and Department of Defense would probably involve the Chairman of the Joint Chiefs, the Secretary of Defense, the Secretary of Homeland Security, the Assistant to the President for National Security Affairs.

Because when someone raises their

hand and swears an oath -- for officers of the Constitution or for enlisted folks to the officers above them -- they take on responsibility, and the military has a responsibility to take care of them.

And so usually major personnel decisions are deliberative, are thorough, and although vested in the President as Commander in Chief in the Armed Forces or certain authorities, those authorities do not exist in a vacuum. They need to be consistent with other aspects of our legal history and our law.

BY MR. BOMBARD:

Q Yes or no? The Secretary of Defense is authorized under Title 10 to set authorized medical standards within the Department?

MS. PANCHOK-BERRY: Objection.

A My understanding is that flowing from the Commander in Chief, delegated to the Secretary of Defense, further delegated to the Under Secretary of Defense for Personnel and Readiness for departmentwide minimal standards, and then the services each can develop their own policies and implementation of those policies based on the unique circumstances of those

services.

BY MR. BOMBARD:

Q And do you agree that different Presidents and Secretaries of the Department of Defense weigh readiness risks differently?

MS. PANCHOK-BERRY: Objection.

A It's hard for me -- I have seen the outcome of that weighting, but I don't know how they have made that risk, the balance the risk, because you're balancing a number of things when you're the President to the United States that I wouldn't have had to balance when I was the Assistant Secretary. And so some of those equities are so substantially different that it's tough for me to speculate on how they are developing their balancing act, so to speak.

BY MR. BOMBARD:

Q And do you agree that Assistant Secretaries implement the Secretary above them's policy, but they're not able to override those policies?

MS. PANCHOK-BERRY: Objection.

A It would be unusual for a policy decision to come down from the Secretary of Defense that impacted military personnel without

a process by which, in order to formulate a policy that would be effective for all the services, each of the services engaged in a conversation or a discussion about the balance of equities, implementation challenges, various elements that were unique to specific services.

And so much more often than not, the military departments and the Secretaries that lead those military departments would need to concur with the policy prior to it being signed out and effective, and, as a result, that buy-in was already in place. So it would be unusual for an Assistant Secretary to execute a policy that they disagreed with.

BY MR. BOMBARD:

Q Do you agree that Secretary Ash Carter changed the military's policy with respect to transgender service members in 2016?

MS. PANCHOK-BERRY: Objection. Asked and answered.

A As I said, I think he created a policy where none such existed to provide clarity for the entire department to better -- to better find ways for Americans who were transgender to serve as long as they could meet

years of implementation." But if you -- the way that you phrased that, it would seem that there had been eight years -- unbroken years of open-service, which would go back to 2013 by that.

Did you mean to incorporate it, by hindsight, the result of the four years of the Austin Policy?

A You're correct.

Q Okay.

A So it would have been the benefit of open service beginning in 2015 and then till 2021. So five and a half years, if I'm calculating right, six and a half -- five and a half years.

Q And then after the Austin Policy, the Secretary Hegseth Policy -- or the Hegseth Policy, as referred to in this litigation, in 2025, that changed the Austin Policy, correct?

A That struck the Austin Policy. And -- yeah. That fundamentally changed the policy for both accession and retention of transgender service members.

Q And all four of these Senate-confirmed Cabinet-level appointees were

acting under their lawful authority to enact these policies?

MS. PANCHOK-BERRY: Objection.

A Yeah. As I stated earlier, you have the authority to act as long as it's consistent with the law otherwise. For example, Secretary Hegseth could not decide to stop admitting Black people into the U.S. military. That would not be consistent with the law. Secretary Hegseth could not decide to stop admitting women into the military. That would not be consistent with the law.

BY MR. BOMBARD:

Q Leaving this specific policy aside, do you agree that different Commanders in Chief can reasonably set different targets for the share of their Armed Forces that must be able to deploy at any time?

MS. PANCHOK-BERRY: Objection.

A My understanding is that deployability is an important component of maintaining a ready force. And as a result, it is an important factor, among other factors, of ensuring the military is ready, as I said earlier, to deter and, if necessary, deny and

defeat. It's not the only factor. It's not the only consideration, but it is an important one.

BY MR. BOMBARD:

Q Okay. I'd like to sort of zoom out a little bit and talk about the sequence of these four different policies and your understanding. So among other things, you would agree that the RAND study predicated the Ash Carter Policy, correct?

MS. PANCHOK-BERRY: Objection.

A It predated; there's no question. And it was an influential factor in forming it. But I wouldn't go so far to say it predicated it. That would indicate to me it was largely informed, which was a term that I quibbled with when we discussed it earlier.

BY MR. BOMBARD:

Q And would you agree that, based on your review of the Mattis Policy, as you cite in your report that that formed -- well, you don't know. That was -- formed the basis of the recommendation -- or the panel of experts' report formed the core basis of Secretary Mattis' recommendation.

Would you agree with that?

MS. PANCHOK-BERRY: Objection.
A If I could just take a look.
BY MR. BOMBARD:
Q Sure.
A I think the Mattis Report states in it -- hang on a second.
Sorry, Rob. Could you repeat your question?
Q Sure.
Looking at page 2, paragraph 2, it states, "Based on the work of the panel and the Department's best military judgment, the Department of Defense concludes," and then it goes on to explain, you know, sort of the basis for this recommendation.
I suppose my larger question --
A Yeah.
Q -- would be there are two different policies in this regarding transgender service, each of which included studies, Carter's with the RAND Report, Mattis with the panel of experts.
And then there are two more recent policies, the Austin Policy and the Hegseth Policy. And so I want to go through the

timeline of those policies with you.

A Okay.

Q Based on your understanding, the materials that you've reviewed in preparing your report, are you aware that the Biden Executive Order 14004 was issued on January 25, 2021?

A That's my understanding. I can check the date. I think it's listed in the materials in my report.

Q And that would have been about -- I think you said earlier the Biden migration was --

A Yep, the 20th.

Q -- January 20th.

A Yep.

Q So five days after inauguration date, would that be correct?

A Yes.

Q Okay. And as referenced in your report, DoDI, Department of Defense Instruction, 1300.28, that policy was issued approximately three months later; is that correct?

MS. PANCHOK-BERRY: Objection.

A DoDI 1300.28, April 30, 2021. So just a little over three months.

Q A little over three months. Thank you.

And was the EO preceded by a new study of any kind conducted by the DoD?

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q Yes or no?

A As I understand, the EO was preceded by years of transgender people serving openly in the military. It was preceded by testimony of the Service Chiefs. It was preceded by a report from former Surgeons General, and it was informed by the RAND Report, which is largely played out, as expected, over the now eight years of transgender service members serving openly with respect to unit cohesion, a good order and discipline, and readiness.

And it was -- and it was informed by both the working group established by Secretary Carter, but then the decision by Secretary Mattis not to remove, I would assess, for readiness reasons, transgender service members serving openly, consistent with the Carter Policy post-transition, as long as they met all required professional and uniform and

grooming and physical fitness standards.
Q Okay. That wasn't my question. I asked if --
A Sorry.
Q -- whether the EO was preceded by a new DoD study, in the question?
MS. PANCHOK-BERRY: Objection. Asked and answered.
MR. BOMBARD: That was not answered at all.
MS. PANCHOK-BERRY: Okay.
BY MR. BOMBARD:
Q I asked if you're aware of any new DoD study --
MS. PANCHOK-BERRY: Since when?
BY MR. BOMBARD:
Q -- that preceded the Executive Order of January 25, 2021.
A I was not in government at the time, but I would assume, based on my expert knowledge of military personnel policy and how decisions of this magnitude are created -- and I would focus on the Department of Defense Policy 1300.28. That would have assessed a number of factors, including the opinions of the Service

Chiefs, the previous policies I stated in the answer before that.

I've told this to many friends, that like treaties, executive orders are not self-executing. They are -- they are instructions to consider implementing a proposed course of action to an executive agency and, thus, kicks off a policy development process, which, as we talked about, resulted in the Austin Policy in April.

But to the extent that I have read the relevant news reports, and based on my experience as Assistant Secretary, I'm not aware of any new panel of experts or any new working group report that influenced the Executive Order 14004.

Q Thank you.

And the same question: Was there any new DoD study that was relied upon prior to the April 30, 2021 instruction titled In-service Transition for Transgender Service Members?

MS. PANCHOK-BERRY: Objection.

A To the extent that you define study as something that results in a formal report, like the Ashton Carson Transgender Working Group

or the Mattis panel of experts, I'm not aware of one.

BY MR. BOMBARD:

Q Let's fast forward to the current executive order that is being challenged in this case, that's EO 14183 that was issued on January 27 of 2025 approximately a week after inauguration.

A Uh-huh.

Q Do you agree with that timeline?

A That looks like exactly the date that I listed in my expert report, so that would be the EO that I reviewed in support of it.

Q You also reviewed the Department of Defense's Implementing Guidance of February 2025, correct?

A Yes. This is -- just so we're talking about the same thing, are you talking about the Secretary's memorandum from the 7th or are you talking about the Under Secretary's additional guidance?

Q The additional guidance from the Under Secretary.

A Yep.

Q February 26.

A I reviewed that.
Q And so that implementing guidance was approximately one month after the executive order, correct?
A Approximately, yes.
Q So between -- in terms of the timelines between the policy post EO -- and the Hegseth Policy post EO, we're talking about one and three months, correct?
MS. PANCHOK-BERRY: Objection.
A I think comparing those two there would appear there was three times the amount of -- I hesitate to use the term "man days" used to create the Austin Policy vis-à-vis -- excuse me -- the Austin Policy versus the Hegseth Policy, but, yes.
Of course, as I noted before, the Austin Policy relied on experience. It relied on the RAND Report. It relied on the testimony of the Service Chiefs. It relied on a number of factors. Again, the Surgeons General report, former Surgeons General report. It's not clear to me that the Hegseth Policy relied on anything other than the literature review, which is generally inconsistent with how policy gets made

for weighting personnel decisions.

BY MR. BOMBARD:

Q You state in paragraph 29 of your disclosure you are "not aware of alternative consultation or evidence-gathering before EO 14183." Isn't it true that you were out of government and had no access to any of the internal deliberations at the Pentagon?

A Rob, what page is that on? Just so I can see.

Q 10.

A 10.

Q Second half of paragraph 29.

A That is true. I'm not aware of -- and while I was out of government, at some point I came back into government, and so I'm not aware of it during the time I was out of government, but I'm also not aware of its existence while I was -- any other reports when I was in government.

Q We're talking --

A Any consultation, evidence-gathering implementation, or assessment. Particularly the assessment part.

Q I see. But the reason you're not

aware is because you were out of government for the relevant period between the inauguration date in '25 and the implementation of the Hegseth Policy February 26?

MS. PANCHOK-BERRY: Objection. Are you asking about whether he was in government for the previous two years before the Hegseth Policy was implemented or during that five -- seven-day period after President Trump was inaugurated?

BY MR. BOMBARD:

Q My question was pinned to inauguration date '25 --

A Yes.

Q -- to policy February 26, 2025?

A I'm sorry. I was confused.

Q EO to policy.

MS. PANCHOK-BERRY: The 30-day period.

A So I left government on January 20, 2025. Sorry about that. Got a little confused on the timeline.

BY MR. BOMBARD:

Q No problem.

Do you agree that a person can be

transgender without having a diagnosis of gender dysphoria?

MS. PANCHOK-BERRY: Objection.

A I believe a person is, by definition, transgender if they live in a gender other than their birth sex.

Dysphoria, in my understanding, is the tension caused by the incongruence between one's birth sex and the gender that they identify with. And as a result while the vast majority of transgender people experience some dysphoria, not all do.

BY MR. BOMBARD:

Q Is it your understanding that gender dysphoria is a diagnosis within the DSM-V requiring clinically significant distress or impairment?

MS. PANCHOK-BERRY: Objection.

A I'd have to -- it's been a long time since I looked at the DSM-V. So I will -- I can't say exactly what the DSM-V says, but if you provide it to me I can affirm that's what it says.

Okay. Well, let's take another break. We'll go off the record for ten

service members deploying into combat zones?

MS. PANCHOK-BERRY: Objection.

A I want to clarify. So you are limiting deployability exclusively to combat zones rather than general deployability?

BY MR. BOMBARD:

Q Just for this particular question. Are we talking about like, you know -- understand deployment can maintain different things?

A Correct. Rammstein is different than Al Udeid is different than Osan is different than other places, you know, potentially on the Korean Peninsula.

Q Sure. My question is, the deployability in the question is an austere location that would be considered a war zone for lack of a better phrase.

A I'm sorry. This is the recovering lawyer in me, but a war zone might not necessarily be an austere location. For example, the U.S. has had a presence in Al Udeid for quite some time. I believe that's in the United Arab Emirates since it was established during, I believe, the first Gulf War, and so 20

plus years later that base, while not as -- while not a dependent tour so you can't bring your family members, but the services on that base, I would not say are austere, but that base is certainly in an area considered a combat -- a zone of combat operations.

So I just want to really understand your question. But as per my expert report, there are no unique issues related to deployability for any deployment to include zones in which locations which are active areas of combat.

Q And what facts or evidence form the basis for that opinion of yours?

MS. PANCHOK-BERRY: Objection.

A The facts that form the basis for my expert opinion is that largely the medical interventions required to treat gender dysphoria are not unique on their own, do not create unique issues as a result of them being often common interventions that are used to treat a variety of other medical conditions that do not necessarily involve gender dysphoria or categorized as gender-affirming care, and thus would not create unique issues relevant to

deployments.

BY MR. BOMBARD:

Q And what's the basis for your statement just now that the largely -- sorry.

You stated: The basis for my expert opinion is that largely medical interventions required to treat gender dysphoria are not unique on their own and do not create unique issues as a result of them being common interventions.

So I guess what medical interventions are you referring to in that answer?

MS. PANCHOK-BERRY: Objection.

A I think there's a broad category of things understood to be gender-affirming care that could include counseling, which is common for all service members in deployed and garrison environments. They could include hormone therapy. They could include a number of other interventions that would not be unique or would only create short periods of nondeployability similar to other medical conditions that occur every day throughout the force.

BY MR. BOMBARD:

Q What's the basis for your testimony

that it would only create short terms of non-- excuse me -- deployability for, say, hormone therapy?

A I've served as, you know, as we discussed before, the Secretaries of the Army's Chief of Staff, so I had to look at some of these issues and understand these issues in that role more closely because of their prominence than I would have otherwise delved into any -- into other specific issues of military medicine. I administered the Austin Policy, so I was well aware of a variety of other medical conditions that could have impacted and resulted in temporary periods of nondeployability. As I say in my expert report, perhaps the most prominent was the expansion of parental leave to 12 weeks. Now, that was not only for birth parents but that was for nonbirth parents. That was in cases of permanent foster care and/or adoption, which had broad impacts on the availability and deployability of members given that for non-health care-related reasons.

Q But you never collected or observed any data that specifically looked at deployability with respect to counseling?

those terms match up in your view?

MS. PANCHOK-BERRY: Objection.

A As I understand there's a spectrum of gender-affirming care that is unique and specialized per the individual in order to go from having this initial consultation with the doctor, creating a military transition plan, resulting in a change in the gender marker in DEERS, and the requirement to meet all military standards.

So the care and treatment of a diagnosis of gender dysphoria for in-service members would be part of the medically necessary care that we provide all members of the military who have accessed. They're based on the medical treatment plan. Whether or not there was a need for a surgical intervention would be a decision between the service member, their military medical professional, and in the Air Force and Space Force's case, the best practices' assessment of the transgender health military evaluation unit.

BY MR. BOMBARD:

Q Thank you. The final sentence of paragraph 42 here in your declaration states:

There's nothing about the health care needs of transgender individuals that in any way presents any unique issues relating to deployment.

What are the -- as you understand them -- the health care needs of transgender individuals as they relate to deployment?

MS. PANCHOK-BERRY: Objection.

A So I'm not -- I'll say I'm not sure what they are relating to deployment because it doesn't -- transgender individuals do not require any unique interventions.

BY MR. BOMBARD:

Q How do you know that?

MS. PANCHOK-BERRY: Objection.

A This is -- this is an issue I've been familiar with since 2015 leading up to the Carter Policy. Part of the -- part of -- the tough part of being a chief of staff, particularly to a service secretary, is you need to have the ability to understand what's coming before it lands on their plate and then advise them on what else is going on in the larger bureaucracy to assess and inform any decision. But also frankly not only my experience beginning in 2015, but then, you know, nearly

eight years of experience and preparation for a confirmation hearing and a whole host of understanding of -- extensive understanding and learning on-the-job experience and consultation and reliance on experts of the entire military health care enterprise.

BY MR. BOMBARD:

Q I want to shift gears back to your expert report.

A Got it.

Q Thank you. This is a similar section to the declaration you were looking at. It's also entitled Worldwide Deployability in paragraph 69.

A Can you tell me what page?

Q Oh, sorry. Page 24.

A Thanks.

Do you agree that deployed environments can be at times medically austere?

MS. PANCHOK-BERRY: Objection. Can you define "medically austere"?

BY MR. BOMBARD:

Q Do you understand the question I asked? Do you agree that deployed environments can be austere? Let's say lack of like

hospital-medical resources, first-world medical treatment is what I meant by that phrase.

A I think I understand your question. Deployed environments, and unfortunately even some garrison environments, can have limited access to the type of medical resources that I believe every service member is owed. And I have heard heartbreaking stories from places like Canon Air Force Base in eastern New Mexico where the closest childhood ophthalmologist is in Denver, multiple hours' drives away or in San Antonio, again, a three-hour drive.

So there are certain deployed environments, Rammstein, that might have much better access to medical care than arguably Canon in Eastern New Mexico or Northern North Dakota and the like, but there are other deployed environments that would have poorer access to medical care because of their austerity. Similar to rather remote bases here, CONUS.

Q You state: Lieutenant General DeGoes, Colonel Neese, Colonel Cron, Lt. Colonel Lee describe the austerity of deployed environments, priority given to acute care, and