MILITARY EXPERT WITNESS GROUP

Nicolas Talbott *et al.*

v.

United States *et al*.

Civil Action No. 1:25 – cv – 00240

---

# EXPERT REPORT

**Prepared for:**

O'Melveny & Myers LLP and GLBTQ Legal Advocates & Defenders, National Center for LGBTQ Rights, Wardenski Law LLP, and Zalkind Duncan & Bernstein LLP


by:

**MAJOR GENERAL (RET.) JAMES YOUNG**

**The Military Expert Witness Group**

## Table of Contents

Page

**I. INTRODUCTION** ........ 1

**II. EXECUTIVE SUMMARY OF OPINIONS** ........ 1

**III. QUALIFICATIONS** ........ 2

**IV. FRAMEWORK AND METHODOLOGY** ........ 4

**V. DISCUSSION OF SERVICE TIME, RETIREMENT AND VA PROGRAMS** ........ 10

**A. Service Time** ........ 10

**B. VA Disability Process** ........ 11

**C. VA Disability Compensation Among Military Retirees** ........ 13

**D. Retirement Pay and Benefits** ........ 14

**VI. OPINIONS** ........ 15

**Appendix A – Curriculum Vitae** ........ i

**Appendix B – Materials Considered** ........ iii

**Appendix C – Publications in the Last Ten Years** ........ iv

**Appendix D – Prior Expert Testimony in the Last Four Years** ........ v

## I. INTRODUCTION

1. Plaintiffs' counsel has retained me to prepare this expert report to describe, among other issues, military separation pay, Department of Veterans Affairs (VA) Disability pay, the VA disability adjudication process, and how these programs interact and impact each other.

2. I have provided three opinions and supported those opinions with my own personal experience, frameworks designed from my military experience and used in similar cases involving separation from the military and information from the materials identified in Appendix B. The opinions expressed in this report are based on a reasonable degree of certainty, grounded in my extensive professional experience and the specific facts reviewed in this case.

3. My rate for work performed in this matter is $540 per hour and $200 per hour for travel (up to a daily maximum of $1600 per day).

## II. EXECUTIVE SUMMARY OF OPINIONS

4. In this report, I offer the following opinions:

**Opinion 1**

5. Executive Order 14183 published on January 27, 2025, and the subsequent Hegseth Policy[1], curtailed successful military careers that were otherwise progressing.

**Opinion 2**

6. It is more likely than not that each plaintiff with military service will receive a VA disability rating at the conclusion of their service.

[1] The Hegseth Policy means the memorandum entitled "Prioritizing Military Excellence and Readiness" issued by Secretary of Defense Peter B. Hegseth on February 7, 2025, implementing the Executive Order, together with related implementing guidance. *See* Peter B. Hegseth, Sec'y of Def., *Prioritizing Military Excellence and Readiness* (Feb. 7, 2025), and *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025) (including attachment, *Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria*).

**Opinion 3**

7. The Hegseth Policy is depriving Plaintiffs of compensation they would otherwise be entitled to for three reasons: (i) they would have received more separation pay if permitted to remain in service, as the separation pay formula accounts for longevity (ii) the separation pay they are receiving as a result of the "voluntary separation" is not what they would have gotten if separated in another way, such as if they had separated at the end of their enlistment contract/obligated service or retired under Temporary Early Retirement (TERA), which would grant the veteran a pension, access to TRICARE, and other benefits, and (iii) the "voluntary separation pay" they are receiving is effectively zero.

8. Service members separated pursuant to the Hegseth Policy will receive separation pay. However, this separation payment is subject to a recoupment/offset obligation against later VA compensation. As a result, the service members effectively do not receive any remuneration from the separation payments.

## III. QUALIFICATIONS

9. I am a Distinguished Military Graduate of, and received my commission from, Davidson College in 1983 with a BA in Economics.

10. I have commanded all ranks from Second Lieutenant through Major General. I served as Commander of the 203rd Military Intelligence Battalion (Technical Intelligence) from 2003 to 2005 where I trained and then deployed the battalion to combat operations in Iraq for Operation Iraqi Freedom and served as the co – CJ3 (head of joint operations) of a joint command, consisting of Army, Navy, and Air Force personnel, as well as allied partners from the U.K., Australia, and Canada. In Iraq, as a Lieutenant Colonel, I organized and led well over a hundred missions throughout Iraq searching for weapons of mass destruction and other weapons that were brought into the country in violation of U.N. sanctions, often in some of the most contested and violent areas of Iraq. As a Colonel, I commanded two separate organizations, including a joint intelligence unit at the Pentagon, consisting of all four military services (*i.e.*, Army, Navy, Marine Corps, Air Force), and a Group consisting of ten deployable Military Intelligence Battalions. Of this Group, I oversaw the pre – deployment training of multiple formations who deployed

into both Iraq and Afghanistan. As a General Officer in the rank of Brigadier General, I commanded the Military Intelligence Readiness Command (MIRC) and was the senior intelligence officer in the Army Reserve. From 2009 to 2011, I oversaw the training, readiness, and leader development of over 4000 Soldiers from all intelligence disciplines and the combat deployment of multiple formations. I designed and piloted a career development program for reserve officers that was later adopted for the entire Army Reserve.

11. I also served as the Human Capital Enterprise Director, Army Reserve, where I had day – to – day oversight over all human capital/resource activities for the Army Reserve's 200,000 Soldiers to include pay, promotion, benefits, retirement, recruiting, leader development, VA coordination and medical health/readiness/disability policy. I served on Department of Defense[2] (DoD or DOD) working groups that reviewed human resource policies issues across the services. I led the process for the selection and assignments of hundreds of officers and senior non – commissioned officers across the Army Reserve. I designed and implemented the first career development program and office for reserve officers, measurably improving retention and promotion rates.

12. Promoted to Major General, I was selected as the Chief of Staff of the Army Reserve, where I was the senior staff officer in the Army Reserve, responsible for all human capital policy and program issues, intelligence, operations, deployments, training, logistics, medical readiness, and resourcing. As a Major General, I commanded the Seventy Fifth Training Command, an organization that trained and prepared dozens of National Guard and Army Reserve command teams and units that deployed to combat zones throughout the world. I later transformed this command into the Seventy Fifth Innovation Command, the largest innovation command in the Army, designed to bring private sector technology, talent and innovation into the Army. I was selected by the Secretary of the Army to participate in the General Officer promotion board that promoted Colonels to Brigadier General and Brigadier Generals to Major General.

[2] I use "Department of Defense" to refer to what I understand Defendants sometimes refer to as the "Department of War."

13. I have received several awards and decorations in recognition of my service, including the Ranger Tab, Distinguished Service Medal, Defense Superior Service Medal, Legion of Merit and Bronze Star.

14. As the Managing Partner of Military Expert Witness Group, I have testified as an expert on numerous cases involving military career progression, military separation and retirement, VA Disability pay and retirement pay. A detailed CV is provided in Appendix A.

## IV. FRAMEWORK AND METHODOLOGY

15. For cases like this one that involve separation from service and the financial impact of that separation, I use a framework that reviews two elements. The first is to review continued service; that is, what is the service member's potential for further service, absent the issue that caused separation. The second element is to assess the financial ramifications of leaving service prematurely—whether that is from separation or medical retirement—and to assess the compensation and benefits that accrue upon leaving service under different scenarios.

16. When assessing a service member's potential for continued military service, I review three elements:

- Individual Performance – How is the service member performing in their current and past roles and are they competitive for promotion and continued service? I assess this by reviewing their performance record as shown in their service record and comparing it against known promotion standards from historical promotion selection boards/activities.

- Service Need/Demand for Skills – Does the service need trained individuals like the service member in their formations, now and as can reasonably be expected in the future? I assess this by reviewing published metrics on career advancement and service structure, understanding historical force structure trends, any changes in service structure that are likely, as well as my human capital expertise.

- Contractual Obligation and/or Intention – Is there a formal or legal obligation that applies to the service member, and, if so, how does that impact their ability to continue to serve? Is there a mandated retirement date or timeline, based on their length of service? Is there a key promotion or retirement time horizon that

has a material impact on service and/or their intention to serve? I assess this by reviewing and understanding current regulations or policies that impact these areas, for example, regulations regarding mandatory removal dates, retention control points, and enlistment contracts.

17. Often these three elements impact each other. A service member may wish to serve indefinitely but will be realistically limited because they may not have the documented performance that justifies continued advancement. While the military is a meritocracy, it is also true that promotions early in the career of an enlisted member or an officer are essentially automatic, provided there are no significant disciplinary issues. Even as one enters “middle management,” advancement is common; promotion rates from O3 (Captain, Ensign) to O4 (Major, Lieutenant Commander), across the services, are often 70 – 80% of each cohort and promotion rates from O4 to O5 (Lieutenant Colonel, Commander) frequently range 60% to 70%. Someone who joins the military, enjoys it as a career and has positive performance, can usually achieve a 20 – year career.

18. Regarding service needs, while some career fields are obvious – the Army and Marines are likely to always need infantry Soldiers, and the Navy and Air Force pilots and their support crews, for instance – some career fields are in more demand than others, and this can translate into improved promotion and career advancement. Also, some career fields and services have a limited number of senior positions as one advances, or a “steeper” career ladder. The military may alter their force structure to eliminate certain career fields, dramatically reducing opportunities for advancement. If so, the military often offers retraining and reclassification opportunities, as well as retention bonuses, to retain seasoned experienced members.

19. Intention may change over time, as some may find “service life” incompatible with changing career and family aspirations as they get older. The opposite is also sometimes true; sometimes one enters the military primarily for educational benefits, and expects to only serve their minimum obligation, but then finds they enjoy the comradery, employment security and sense of purpose, and makes the military a career. A service member can start to draw a substantial defined benefit retirement at 20 years of active federal service (AFS), and this opportunity becomes a key milestone as individuals consider private sector opportunities, lifestyle changes and retirement

Confidential

milestones. While junior service members often have enlistment contracts that codify their mandated service, and officers have service obligations from ROTC scholarships or Service Academy attendance, once certain tenure gates are achieved, service members with consistent and positive performance are usually allowed to continue to serve until retirement.

20. As such, context matters and one should examine these elements individually, and as they may impact each other, for each situation.

21. This framework was developed over my 36 years of uniformed service, leading thousands of service members, and fully understanding the military's recruiting strategy, leader development programs and theories, force structure initiatives, as well as personally mentoring hundreds of service members. Being a joint commander, a member of command, slating and promotion boards, and reviewing hundreds of personnel files, provided expert insight into how each service manages their service members over time.

22. The following chart is a general summary of the named plaintiffs who served in the military prior to the implementation of the Hegseth Policy[3] and how their careers map to the framework. For this chart, intention to serve is assumed because all the plaintiffs are attempting to remain in service through this legal proceeding. Many are near the 20 – year retirement window (discussed below) and have enough tenure that they do not need to be promoted again to achieve this threshold.

Figure 1

| **Name[4]** | **Rank/Service** | **Years in service** | **Individual Performance** | **Service Need/Demand for Skills in Current Position** |
|---|---|---|---|---|
| Nicolas Talbott | Second Lieutenant (O1), USAR. | >1 year. | Named honor graduate. Completed Officer Candidate School. | Platoon leader in Military Policing Unit. |

[3] Plaintiff Cael Neary is an accession plaintiff and has no service record. Plaintiffs Clayton McCallister, Samuel Ahearn, and Hunter Marquez completed training but were placed on administrative leave before an extended period of service. Because of the lack of record, I do not analyze them in this report.

[4] The materials I relied upon to prepare Figure 1 are contained in TALBOTT-0000000001 through TALBOTT-0000000203.

Confidential

| Name[4] | Rank/Service | Years in service | Individual Performance | Service Need/Demand for Skills in Current Position |
|---|---|---|---|---|
| Erica Vandal | Major (O4), USA. | 14 years. | Bronze Star, Meritorious Service Medal, Army Commendation medal, Army Achievement Medals (2). | Managing brigade artillery officers, warrant officers, and NCOs. |
| Kate Cole | Sgt. 1st Class, USA. (E7) | 17 years. | Army Commendation Medal (5), Army Achievement Medal (7), top 10% of all Armor Branch Sergeants First Class. | Senior Military Instructor (UCLA ROTC). |
| Gordon Herrero | Captain (O3), USA. | 9 years. | Meritorious Service Medal, Joint Service Commendation Medal, Army Achievement Medal, Army Commendation Medal with two oak leaf clusters. | Operations Research Systems Analyst. Selected to become instructor at West Point. |
| Dany Danridge | Ensign (O1), USN. | 12 years. | Navy and Marine Corps Achievement Medals (2), Sailor of the Year Award, Combat Medal (Operation Inherent Resolve), Global War on Terrorism Service Medal, Global War on Terrorism Expeditionary Medal. Top 10% of flight school training class. | Student Naval Flight Officer. |
| Jamie Hash | Sen. Master Sgt. (E8), USAF. | 13 years. | Meritorious Service Medal (4), Air Force Commendation Medal, Air Force Achievement Medal (2), Wing NCO of the Year, Field Operating Agency NCO of the Year, Military Volunteer of the Year, NCO Academy John Levitow Award, AF Operations Directorate Senior NCO of the Year, USAF Operations Directorate Sijan Senior NCO Award, DAF HQ Management Engineering Award, DAF HQ Visionary Leadership Award, Senior NCO Academy Distinguished Graduate. Rated first out of 45 candidates for selection to E8. | Defense Legislative Fellow in U.S. Congress. |
| Minerva Bettis | Major (O4), USAF. | 11 years. | Air and Space Achievement Medal, Air and Space Commendation medal (2), Meritorious Service Medal. Twice ranked first in Company Grade officer stratifications. | Intelligence Analyst and Weapons Officer. Weapons School Instructor |

Confidential

| Name[4] | Rank/Service | Years in service | Individual Performance | Service Need/Demand for Skills in Current Position |
|---|---|---|---|---|
| Axel Graham | Petty Off. 3d Class (E4), USN. | 5 years. | Sailor of the Quarter, Sailor of the Week (2). | Firefighter. |
| Roan Pickett | Sgt First Class (E7), USA. | 12 years. | CID Agent, Senior Leaders Course, Army Commendation Medal (3), Army Achievement Medal (3), Bachelor of Arts degree | Criminal Investigator. |
| Amiah Sale | Master Sgt (E8), USA. | 18 years. | Meritorious Service Medal (2), Army Commendation Medal (7), Sergeant Audie Murphy Club member. Distinguished honor graduate. ECF No. 72 – 46, | Company First Sergeant. |
| Quinn Tyson | Master Sgt (E7), USSF. | 11 years. | Army Achievement Medal (5), Army Commendation Medal (3), Air and Space Force Commendation Medal. | Satellite controller. |
| Michelle Bloomrose | Commander (O5), USN. | 19 years. | Specialty "S" code in National Security Law. Specialty "Q" code in Environmental Law. Meritorious Service Medal (5) Navy and Marine Corps Commendation Medal (2), Navy and Marine Corps. Medals. | Director of JAG Corps Training in the Office of the Judge Advocate General. |
| Vera Wolf | Staff Sgt. (E5), USAF. | 8 years. | Air and Space Commendation Medal, Meritorious Service Medal (2), Air Force Good Conduct Medal, Global War on Terrorism Medal. | Weapons Specialist. |
| Regan Morgan | Staff Sgt. (E6), USA. | 15 years. | Army Commendation Medal, Army Achievement Medal, Army Overseas Service Ribbon, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, NCO Professional Development Ribbon (2), Army Good Conduct Medal (2), Operation Inherent Resolve Campaign Star. | Special Forces Medical Sergeant. |
| Nathalie Richter | Captain (O3), USANG. | 21 years. | Air Force Achievement Medal, Humanitarian Service Medal, Air Reserve Force Meritorious Service Medal, Global War on Terrorism Service Medal | Communications Squadron (cybersecurity specialization). |
| Austin Converse | Commander (O5), USN. | 15 years. | Defense Meritorious Service Medal, Meritorious Service Medal, Joint Commendation Medal (2). | Requirements Officer in the Navy Reserve Expeditionary Forces. |

Confidential

| Name[4] | Rank/Service | Years in service | Individual Performance | Service Need/Demand for Skills in Current Position |
|---|---|---|---|---|
| Clara Winchell | Lieutenant (O3), USN. | 2 years. | | Lieutenant Junior Grade Submarine Officer. |
| Taylor Maiwald | Staff Sergeant (E5), USAF. | 6 years. | Air and Space Achievement Award | Tactical Aircraft Maintainer. |
| Beck Simpson | Major (O4), USARNG. | 14 years. | Meritorious Service Medal, Army Commendation Medal (2), Joint Service Achievement Medal, Global War on Terrorism Expeditionary Medal. | Judge Advocate General. |
| Sabrina Bruce | Master Sgt (E7), USSF. | 13 years. | Senior NCO of the Quarter, Joint Achievement Medal, Commendation Medal (2), Meritorious Service Medal. | National Reconnaissance Officer and liaison to Senate Select Committee on Intelligence. |
| Ashley Davis | Lieutenant Colonel (O5), USAF. | 22 years. | Meritorious Service Medal (2), Air Medal, Air and Space Commendation Medal (3), one Air and Space Achievement Medal, National Defense Service Medal, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Nuclear Deterrence Operations Service Medal, Médaille de la Défense Nationale. | Air Force Aviator and Air Battle Manager. |
| CJ Dulaney | Lieutenant (O3), USN. | 10 years. | Navy and Marine Corps Achievement Medal, Global War on Terrorism Medal, and Global War on Terrorism Expeditionary Medal. | Theater Security Cooperation Action Officer. |
| Sean Kersch – Hamar | Captain (O3), USAF. | 2 years. | Combat Systems Officer wings. | Weapons Systems Officer. |
| Kelsey Orth | Chief Petty Officer (E7), USN. | 12 years. | Navy and Marine Corps Achievement Medal (3), Sea Service Deployment Ribbon (2), Overseas Service Ribbon. | Ships Fire Marshall. |
| M. Jackie Gross | Captain (O3), USARNG. | 15 years. | Submarine Warfare Insignia (Dolphins) Navy Achievement Medal, Good Conduct Medal (4), Global War on Terror Expeditionary Medal | Administrative Law Judge Advocate General. |

23. The second part of my methodology involves analyzing the various pay categories and benefits that accrue to a Service Member during a normal career, or in retirement, and the impact on these benefits if the service member is separated. These include, but are not limited to, a combination of base pay, an allowance for housing, a basic allowance for subsistence/food, as well as a calculation of the expected retirement benefit and healthcare. While the calculation of these factors is relatively objective and codified in regulations, I generally use methodology and financial tools that allow them to be calculated accurately. The DoD pay, benefits and retirement programs are uniform across each service. For this case, for the examples provided in Figure 2, I applied the methodology set forth in Department of Defense Instruction (DoDI) 1332.29 and the Hegseth Policy memo dated February 26, 2025 and performed the arithmetic necessary to calculate separation pay and recoupment rate accurately.

24. My framework also considers how the benefits impact each other. Certain methods of separation do not result in retirement pay. VA disability pay can only be paid concurrently with retirement pay under certain conditions.

## V. DISCUSSION OF SERVICE TIME, RETIREMENT AND VA PROGRAMS

25. Before I discuss my opinions in this case, I believe some background information on the important processes and programs will be useful.

### A. Service Time

26. For enlisted service members, service time is codified in enlistment contracts and can vary depending on several factors. For instance, it is common for a contract to mandate a period of time – often three to five years of active service, followed by a similar amount of time for reserve service. Officers who enter the military through ROTC or a Service Academy normally will have a four – or five – year obligation.[5] Military members generally leave active service through several distinct pathways, each with different consequences. The most routine is separation at the end of an enlistment

[5] This is not meant as an exhaustive list of scenarios; for officers Officer Candidate School and Direct Commissioning exist and some enlistment contracts call for no active duty service, only reserve service.

contract or obligated service period when the member is not reenlisting or otherwise continuing service.

27. A member may also leave service because of medical disability. When a condition may render a member unable to perform required military duties, the service can refer the member through the Disability Evaluation System (DES), including the Medical Evaluation Board and Physical Evaluation Board process. Depending on the findings, the member may be returned to duty, separated with disability severance pay, or medically retired.[6] A medical retirement generally allows the member to retire after the DES has adjudicated their condition and determined that they no longer meet the medical standards for retention. Medical retirement has its own formulas for calculating the payments that service members receive.

28. A member who completes the required years for a length – of – service retirement—generally 20 years for a regular active – duty retirement—will qualify for a “regular retirement” and will retire with a defined benefit pension and benefits. Reserve and National Guard personnel have additional retirement rules, including the requirement to reach qualifying service and generally wait until the applicable retirement age (age 60, with exceptions) before receiving retired pay. A Reserve retirement is referred to as a “non – regular” retirement. DoD’s definitive regulation on is the DoD Financial Management Regulation 7000.14 – R and applies across the services.

29. Under unique circumstances, the services have the authority to separate service members involuntarily. Historically, this was used during large scale service – wide force reductions (*e.g.*, the “peace dividend” years).

**B. VA Disability Process**

30. VA disability compensation is a tax – free monthly benefit paid by the Department of Veterans Affairs to Veterans with disabilities that are connected to their

[6] Of course, a service member may be separated or dismissed because of disciplinary or adverse administrative action, including misconduct, failure to meet standards, or other grounds established by military law and regulation; this is not applicable in this case. In this case, under the current government policy, the plaintiffs’ gender dysphoria is not a qualifying condition for DES. *See* Hegseth Policy.

military service. The amount is based primarily on the VA's assigned combined disability rating, with higher ratings generally resulting in higher monthly compensation.

31. The Department of Veterans Affairs adjudicates disability compensation in two basic stages: first, it determines whether a claimed condition is service connected; second, if service connection is established, it determines the severity of the condition and assigns a percentage under the VA Schedule for Rating Disabilities. In reviewing a claim, VA considers the Veteran's service treatment and personnel records, DD – 214[7] or other separation documents, VA and private medical records, medical testing, and lay statements from the Veteran or others. VA may also obtain a Compensation and Pension examination when additional medical information is necessary. The examiner's role is to provide medical findings and opinions; the VA adjudicator uses those findings, together with the entire evidentiary record, to decide service connection and the appropriate rating.

32. Once a condition is determined to be service connected, VA assigns a disability percentage based primarily on the severity and functional effects of the condition, using the criteria contained in 38 C.F.R. Part 4 (2026), the Schedule for Rating Disabilities.[8] VA ratings are generally assigned in 10 – percent increments from 0% through 100%. When a Veteran has multiple service – connected conditions, the percentages are not simply added together. Instead, VA uses the "whole person" or Combined Ratings Table, applies the disabilities sequentially, and then rounds the final combined value to the nearest 10 percent. For example, separate ratings of 50% and 30% produce a combined value of 65%, which is rounded to a 70% combined rating, rather than 80%.[9]

33. The resulting combined disability rating determines the basic monthly VA compensation amount, subject to factors such as dependents and certain special compensation provisions. The rating and payment can also change over time if a

---

[7] DD – 214, or Certificate of Release or Discharge from Active Duty, is a summary historical record of service, that is used by numerous organizations as proof of service.

[8] 38 C.F.R. pt. 4 (2026).

[9] *Id.*

condition worsens, improves, or another condition is subsequently recognized as service connected. VA's decision letter identifies the individual disability ratings, the combined rating, the monthly compensation amount, and the effective date from which payment is payable.

34. Thus, the VA process is not a simple determination of how much a Veteran's overall health has declined; it is a legal and medical adjudication in which VA first establishes the nexus to military service, then applies prescribed rating criteria to the documented severity of each service – connected condition and finally combines those ratings under VA's statutory and regulatory methodology.

**C. VA Disability Compensation Among Military Retirees**

35. Recent data from the U.S. Bureau of Labor Statistics (BLS) indicate that, in August 2025, 50 percent of Gulf War II – era Veterans—defined by BLS as Veterans who served on active duty at any time since September 2001—reported a service – connected disability. This compares with approximately 34 percent of all Veterans. Among post – 9/11 Veterans who reported a service – connected disability, approximately 70 percent reported a VA disability rating of 60 percent or higher. Thus, younger veterans are more likely than older veterans to have a service – connected disability and when they do, it is often a percentage greater than 50%.[10]

36. A similar study, conducted by the VA, concluded that based on historical data, the average degree of disability was forecasted to increase through 2025. The average degree of disability for Veterans increased from 63.1% in 2024 to 65.6% in 2025. This represents the largest year – over – year increase in Veteran average degree of disability in over 30 years.[11]

37. Therefore, in evaluating the economic consequences of military separation or retirement for a post – 9/11 career service member, it is reasonable to recognize VA

[10] U.S. BUREAU OF LABOR STATISTICS, Employment Situation of Veterans News Release (Apr. 28, 2026).

[11] U.S. DEPARTMENT OF VETERANS AFFAIRS, 2027 Budget Submission, Burial and Benefits Program and Department Administration, Vol. 3 of 5 (April 2026) at 166.

disability compensation as a common post – service benefit rather than an unusual or exceptional outcome. The available national evidence strongly supports the proposition that a substantial proportion of post – 9/11 Veterans receive VA disability compensation and that a large share of those Veterans receives disability ratings at or above 50 percent.

38. In my experience as a senior military officer and as an expert witness, having a VA disability rating of more than 50% is common.

**D. Retirement Pay and Benefits**

39. As briefly mentioned earlier, the Department of Defense provides three principal statutory retirement programs. Regular Retirement generally applies to service members who complete at least 20 years of active federal service. Non – Regular Retirement applies primarily to Reserve and National Guard members who accumulate sufficient qualifying service and, in most cases, begin receiving retired pay at age 60, although certain qualifying periods of active service can reduce that age. Retired Pay for Physical Disability, commonly referred to as medical retirement, applies when a service member is found unfit for continued military service because of a physical disability and receives a qualifying disability rating through the military's Physical Evaluation Board (PEB) process.

40. In addition to these retirement programs, service members may leave the military through voluntary or involuntary separation before becoming eligible for regular retirement. In some circumstances, a service member with at least 15 but fewer than 20 years of service may be eligible for TERA, which permits an otherwise qualified member to receive retired pay before completing 20 years, generally with a reduction to the retirement multiplier for retiring early. TERA is an early retirement authority rather than a separate retirement system.

41. Each of these methods of separation/retirement interact with VA Disability in a specific way. Concurrent receipt means a qualified military retiree may receive both military retired pay and VA disability compensation without having the VA payment

deducted from the retired pay. Generally, a VA disability rating of 50% or more is required for Concurrent Retirement and Disability Pay (CRDP).[12]

42. Thus, CRDP allows a qualifying longevity retiree with a VA combined rating of 50% or greater to receive both the full VA disability compensation and the full military retired pay. This also applies to TERA retirees, even though they have fewer than 20 years of service.

43. Separation pay is treated differently. A service member who receives voluntary separation pay and later becomes entitled to VA disability compensation is generally entitled to the VA benefit, but VA will withhold disability compensation until the separation payment, less the federal income tax withheld from that payment, has been recouped.[13] Likewise, if the member later qualifies for military retired pay, the government can recoup the separation payment from retired pay under 10 U.S.C. § 1174. Thus, separation pay does not create a concurrent – receipt entitlement; rather, it can create a recoupment/offset obligation against later VA compensation and, in some circumstances, retired pay.[14] The difference is often $2 to $3 million dollars over a lifetime. Being separated with separation pay also deprives a service member of other standard retiree benefits, to include access to subsidized TRICARE healthcare benefits.

## VI. OPINIONS

### Opinion 1

44. Executive Order 14183 published on January 27, 2025, and the Hegseth Policy curtailed successful military careers that were otherwise progressing.

45. As reflected in Figure 1, each named plaintiff who served beyond their initial entry training or rank had been promoted, some of them multiple times.[15] Each named

---

[12] Combat-Related Special Compensation (CRSC) is a tax-free benefit that allows certain combat wounded retirees to receive VA disability pay with less than a 50% disability rating.

[13] *See* 10 U.S.C. § 1175a.

[14] *See* 10 U.S.C. § 1175a(h); Dep't of Def. Instruction 1332.29, INVOLUNTARY SEPARATION PAY (NON-DISABILITY) (Mar. 3, 2017) § 3.2.a(1).

[15] I reviewed the plaintiffs' sworn declaration that provided an overview of their careers and performance. While there are differences in tenure, services, grades and occupational specialties, all appear to be

plaintiff was performing, a minimum, above the standard for retention and in many cases, toward the top of their field and cohort. Many of the plaintiffs had progressed to a grade where they were able to serve at least 20 – years of active federal service. Each was in a career field needed by their service. Each clearly had the intention of continuing to serve at the time the Hegseth Policy went into effect, and each would have a significant financial incentive to remain at least until they achieved 20 active federal service (AFS) years, and qualified for a regular retirement defined benefit pension, lifetime medical care, and other standard retiree benefits.

**Opinion 2**

46. It is more likely than not that each plaintiff with military service will receive a VA disability rating at the conclusion of their service.

47. Studies confirm that most of the post 9/11 veterans are rated as disabled by the VA.[16] Approximately 50% receive a VA rating that is more than 50% disabled. In my experience as the senior human resource officer of the Army Reserve, and as a senior Army commander with hundreds of transitioning Soldiers each year, I have seen the VA transition process at work. As part of the mandatory Transition Assistance Program, service members leaving active duty receive counseling and instruction concerning VA benefits and services, including disability compensation. The transition process also provides opportunities for individualized assistance from VA Benefits Advisors.[17] Understanding how the VA disability rating process works informs the development of opinion 3 below.

**Opinion 3**

The Hegseth Policy is depriving Plaintiffs of compensation they would otherwise be entitled to for three reasons: (i) they would have received more separation pay if permitted to remain in service, as the separation pay formula accounts for longevity (ii) the

---

performing at or above retention standards from a performance perspective. This paragraph is based on these declarations.

[16] U.S. Bureau of Labor Statistics, Employment Situation of Veterans News Release (Apr. 28, 2026).

[17] *Transition Assistance Programs*, VA, https://discover.va.gov/transition-programs/transition-assistance-program/ [https://perma.cc/6W23-UQY5].

separation pay they are receiving as a result of the "voluntary separation" is not what they would have gotten if separated in another way, such as if they had separated at the end of their enlistment contract/obligated service or retired under TERA, which would grant the veteran a pension, access to TRICARE, and other benefits, and (iii) the "voluntary separation pay" they are receiving is effectively zero.

48. Service members "voluntarily separated" pursuant to the Hegseth Policy will receive "voluntary separation" pay. However, this separation payment is subject to a recoupment/offset obligation against later VA compensation. As a result, the service members effectively do not receive any remuneration from the "voluntary separation" payments.

49. Voluntary Separation Pay is calculated, pursuant to 10 U.S.C. § 1175a(f) and DoDI 1332.29 § 3.2.a(1), as 10% x the member's years of service x 12 x the member's base pay. This number is then doubled under a written directive from DoD. However, a Voluntary Separation Payment is considered a credit against any future disability benefits the member might be entitled to from the Department of Veterans Affairs.

50. Specifically, 10 U.S.C. § 1174(h) states that: "…there shall be deducted from that disability compensation an amount equal to the total amount of separation pay, severance pay, and readjustment pay received, less the amount of Federal income tax withheld from such pay (such withholding being at the flat withholding rate for Federal income tax withholding, as in effect pursuant to regulations prescribed under chapter 24 of the Internal Revenue Code of 1986)."

51. For a member seeking to access any VA benefits, the value of the Voluntary Separation Pay over their lifetime will be zeroed out entirely, making it effectively worthless.

52. The below examples help illustrate how this Hegseth Policy effectively provides no benefit to service members.

Confidential

Figure 2

| Pro Forma Separation Pay Calculation | | | | | | | VA Disability Percentage/Pay-back Calculations | | |
|---|---|---|---|---|---|---|---|---|---|
| Grade | Years of AFS | x 12 | x Base Pay | x 10% | x 2 | Separation Pay | VA % | Monthly $ | # of months without VA $ |
| E5 | 6 | 12 | $4,110.00 | 0.1 | 2 | $59,184.00 | 80% | $2,102.15 | 28.2 |
| O3 | 10 | 12 | $8,375.70 | 0.1 | 2 | $201,016.80 | 70% | $1,808.45 | 111.2 |
| E7 | 15 | 12 | $5,835.00 | 0.1 | 2 | $210,060.00 | 100% | $3,938.58 | 53.3 |
| O4 | 15 | 12 | $10,214.40 | 0.1 | 2 | $367,718.40 | 50% | $1,132.90 | 324.6 |

53. Figure 2 shows the separation pay calculations under four scenarios of different pay grades and time in service, with the standard recoupment policy and assumes for illustrative purposes that the service member receives an 80% VA disability and has no dependents. Note that for an Army Captain with 10 years of service, and a 70% VA Disability rating, that the Captain will not receive a VA payment for over nine years, while he/she "pays back" the separation pay.

54. Current VA guidance provides a slightly modified recoupment schedule for members of the Navy, Marine Corps and Air Force.[18]

Figure 3

| If the Veteran's combined disability rating is ... | Then withhold from monthly payments ... |
|---|---|
| 10 or 20 percent | 100 percent of VA compensation. |
| 30, 40, or 50 percent | 75 percent of VA compensation. |
| 60, 70, 80, 90, or 100 percent | 50 percent of VA compensation. |

[18] U.S. DEPARTMENT OF VETERANS AFFAIRS, M21-1, Part VI, Subpart ii, Chapter 2 - Recoupment of Separation Benefits (Mar. 9, 2026). This is a policy implemented by the services, and the Army does not appear to have the same recoupment schedule.

55. The result is that 100% of the separation pay is still recouped from the service members, but on a slightly less draconian time schedule, depending on the disability percentage. At best, the severance payment effectively becomes a loan.

56. The impact of not receiving separation pay, or having a reduced amount, can be very problematic for those that have suddenly lost their military employment. A recent Washington Post article highlights a homeless veteran who was waiting to receive separation pay.[19] This combination of losing a job/income, losing a defined benefit retirement and service apathy in ensuring the separation payment was made, has placed this veteran in an untenable condition. The reporting reveals that a similar condition awaits other separated service members.[20]

James V. Young, Jr.
Major General (Retired), US Army

Dated: September 4, 2026

[19] Casey Parks, *A trans veteran became homeless after the military didn't pay her severance*, WASHINGTON POST, Aug. 30, 2026.

[20] *Id.*

Confidential

# Appendix A – Curriculum Vitae

## Major General (Retired) James Young



MG (Retired) James Young was a Distinguished Military Graduate and received his commission from Davidson College in 1983 with a BA in Economics. He has commanded all ranks from Second Lieutenant through Major General. He served as Commander of the 203d Military Intelligence Battalion (TI) at Aberdeen Proving Ground, Maryland, from 2003 to 2005 where he deployed the battalion to combat operations in Iraq for Operation Iraqi Freedom and served as the co – CJ3 of a joint command, consisting of Army, Navy, and Air Force, as well as allied partners. In Iraq, then-LTC Young organized and/or led well over a hundred missions throughout Iraq searching for weapons of mass destruction and other weapons that were brought into the country in violation of UN sanctions, often in some of the most contested and violent areas of Iraq. As a Colonel he commanded two separate commands, including a joint intelligence unit at the Pentagon, consisting of all four service components, and a Brigade consisting of ten deployable MI Battalions. Of this group, multiple formations deployed into both Iraq and Afghanistan.

As a General Officer, he commanded the Military Intelligence Readiness Command (MIRC) and was the senior intelligence officer in the Army Reserve. He worked side by side with the Army G2, INSCOM and Army Intelligence Center and School Commanders, to set intelligence policy and force structure recommendations for the Army. He oversaw the training and combat deployment of hundreds of Soldiers from all intelligence disciplines. He also served as the Human Capital Enterprise Director, Army Reserve, where he had day to day oversight over all human capital/resource activities in the Army Reserve to include pay, promotion, benefits, retirement, recruiting, leader development and medical health/readiness/disability policy. Promoted to Major General, he was selected as the Chief of Staff of the Army Reserve, where he was the senior staff officer in the Army Reserve, responsible for all human capital policy and program issues, intelligence, operations, deployments, training, logistics, medical readiness, and resourcing. As a Major General, he commanded the 75th Training Command, an organization that trained and prepared dozens of National Guard and Army Reserve command teams and units that deployed to combat zones throughout the world.

He was the senior Army representative on the Defense Innovation Board, the DOD's senior forum for transferring private sector innovation and ideas into the military. He was the only Army Reserve General Officer on the Board of Directors of the Exchange (i.e., AAFES), a Fortune 200 sized global retailer. He was selected by the Secretary of the Army to serve on a General Officer promotion board, selecting the next cohort of reserve General Officers.

MG (Retired) Young received a BA in Economics from Davidson College, an MBA from Goizueta Business School at Emory University, and a Master of Strategic Science from the Army War College.

His awards and decorations include the Distinguished Service Medal, Defense Superior Service Medal, Legion of Merit, Bronze Star Medal, Iraq Campaign Medal, Ranger Tab, Parachutist Badge, Royal Australian Parachutist Badge, Air Assault Badge, Army Staff Badge, and Joint Staff Identification Badge. MG Young retired in May 2019.

MG (Retired) Young has also had a distinguished civilian career, leading multiple manufacturing and service companies. He also serves as the President of Military Expert Witness Group, an organization that provides expert advice to trial lawyers and their clients on all aspects of military service, to include training, operations, combat operations, force structure, military personnel policy and systems, retirement pay, separations, disability pay and line of duty connection.

Major General Young's hourly rate is $540.

**Summary of Military Roles and Awards:**

Rifle Platoon Leader, B Company, 1st Brigade, 25th Infantry Division, Hawaii
Company Commander, A/337th MI Battalion (Airborne), Atlanta, Georgia
Battalion Commander, 203rd MI Battalion, Aberdeen, Maryland
Battalion Commander, 1/347th Regiment (OC/T), Fort Gillem, Georgia
Commander, Operational Readiness Group, Fort Belvoir, Virginia
Commander, Joint Intelligence Group, Pentagon, Virginia
Commanding General, Military Intelligence Readiness Command, Fort Belvoir, Virginia
Director of Human Capital, US Army Reserve, Pentagon, Virginia
Chief of Staff, US Army Reserve Command, Pentagon, Virginia
Commanding General, 75th Training Command, Houston, Texas
Commanding General, Army Reserve 75th Innovation Command, Houston, Texas

<u>Awards:</u>
Distinguished Service Medal
Defense Superior Service Medal
Legion of Merit (multiple awards)
Bronze Star Medal
Meritorious Service Medal (multiple awards)
Army Commendation Medal (multiple awards)
Army Achievement Medal
Iraq Campaign Medal
Ranger Tab
Parachutist Badge
Royal Australian Parachutist Badge
Air Assault Badge
Army Staff Badge
Joint Staff Identification Badge

# Appendix B – Materials Considered

**Statutes and Regulations**

38 C.F.R. pt. 4 (2026).

10 U.S.C. § 1174.

10 U.S.C. § 1175a.

**Government Documents**

U.S. BUREAU OF LABOR STATISTICS, Employment Situation of Veterans News Release (Apr. 28, 2026).

U.S. DEPARTMENT OF VETERANS AFFAIRS 2027 Budget Submission, Burial and Benefits Program and Department Administration, Vol. 3 of 5 (April 2026).

U.S. DEPARTMENT OF VETERANS AFFAIRS, M21-1, Part VI, Subpart ii, Chapter 2 - Recoupment of Separation Benefits (Mar. 9, 2026).

Dep't of Def. Financial Management Regulation, DoD 7000.14-R.

OFFICE OF SECRETARY OF DEFENSE (P&R) DIRECTORATE OF COMPENSATION, SELECTED MILITARY COMPENSATION TABLES (2025) ("Greenbook").

Defense Finance & Accounting Service, Military Pay Tables, https://www.dfas.mil/militarymembers/payentitlements/Pay-Tables/

Peter B. Hegseth, Sec'y of Def., *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025) (including attachment, *Service Members and Applicants for Military Service who Have a Current Diagnosis or History of, or Exhibit Symptoms Consistent with, Gender Dysphoria*) ("Hegseth Policy").

Dep't of Def. Instruction 1332.29, INVOLUNTARY SEPARATION PAY (NON-DISABILITY) (Mar. 3, 2017).

**Discovery Materials**

TALBOTT-0000000001 through TALBOTT-0000000203

**News**

Casey Parks, *A trans veteran became homeless after the military didn't pay her severance*, WASHINGTON POST, Aug. 30, 2026.

# Appendix C – Publications in the Last Ten Years

Publications of Major General (Ret.) James Young

- Boe Young, *Evaluating Military Career Damages in Personal Injury Cases*, N.C. ASS'N OF DEF. ATT'YS (Nov. 19, 2025).
- Boe Young, *Navigating Military Careers and Damage Claims in Transportation Litigation*, CLM MAG., May/June 2025, at 24.
- Boe Young, *The Mystery of DoD Procurement*, PEACEMAKER PARTNERS (July 4, 2024).
- Boe Young, *How Red Teaming Works*, PEACEMAKER PARTNERS (June 30, 2024).
- Boe Young, *Leadership Development for All*, PEACEMAKER PARTNERS (June 14, 2024).
- Boe Young, *Traits of the Best Innovators*, PEACEMAKER PARTNERS (May 31, 2024).
- Boe Young & Mitch Galloway, *Achieving Organization Agility Through Decision Rights and Governance*, GALLOWAY CONSULTING (2019).
- Boe Young, *Effective CEO Transitions: Accelerating the Drive to Sustainable Change*, GALLOWAY CONSULTING (2019).
- Boe Young, *Creating the Innovative Organization*, GALLOWAY CONSULTING (2019).
- Boe Young, *Leader Development That Creates Operational Success*, GALLOWAY CONSULTING (2019).
- Boe Young & Mitchell Galloway, *Offset Strategy in Healthcare*, GALLOWAY CONSULTING (2019).
- Boe Young, *The Staff Leaders Surprising Impact*, GALLOWAY CONSULTING (2019).

# Appendix D – Prior Expert Testimony in the Last Four Years

| Date | Litigants | Venue | Case Number | Testimony Type |
|---|---|---|---|---|
| 12/19/2022 | *Kelly Harrigan Campbell v. Michael Campbell* | Circuit Court for Anne Arundel County, State of Maryland | No. 02-C-08-136227 | Trial |
| 3/7/2023 | *Louis Scott et al v. Sheldon Hardy, Jr/12 Ten Fold Transportation, Inc/et al* | United States District Court, For the District of South Carolina, Florence Division | 4:20cv-01823-JD | Deposition |
| 7/14/2023 | *Louis Scott et al v. Sheldon Hardy, Jr/12 Ten Fold Transportation, Inc/et al* | United States District Court, For the District of South Carolina, Florence Division | 4:20-cv-01823-JD | Deposition |
| 1/9/2024 | *Stanley Black v. Perkinson Construction, LLC and Mark Perkinson* | Circuit Court for the City of Colonial Heights, VA | No. CL23-200 | Deposition |
| 4/17/2024 | *Zachary Young & NEMEX Enterprises, Inc. v. Cable News Network, Inc.* | Circuit Court of the Fourteenth Judicial Circuit in and For Bay County, Florida | No.03-2022-CA-000608 | Deposition |
| 9/2/2024 | *Nghia Do v. Dickinson Fleet Services, LLC, & Robert Lee Caulder* | Fifth Judicial Circuit, State of South Carolina, County of Richland | No.: 2023-CP-40 | Deposition |
| 12/17/2024 | *Daktaryaie Fox v. Priscilla Jessica Onica and GM Transportation* | Superior Court of the State of Arizona, in and for the County of Maricopa | No. CV2022-092671 | Arbitration |
| 1/10/2025 | *Zachary Young & NEMEX Enterprises, Inc. v Cable News Network, Inc.* | Circuit Court of the Fourteenth Judicial Circuit in and For Bay County, Florida | No.03-2022-CA-000608 | Trial |
| 4/7/2025 | *3M Company/Two Harbors Insurance v. AIG Europe Limited* | UK Arbitration Proceedings, London, England | UK Arbitration Proceedings | Arbitration |
| 10/22/2025 | *Eduidge Edward Blanchard v. Claribel Santana* | Circuit Court, 17th Judicial Court, Broward County, Florida | No. FMCE-013503 | Trial |
| 10/27/2025 | *Kasey Crowe v. Madeline Batchelder/Common Spirit Hospital* | District Court, El Paso County, Colorado | No. 2024 CV 31300 | Deposition |
| 6/17/2026 | *3M/Aereo/Two Harbors Insurance v. ACE AMERICAN INSURANCE COMPANY, AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, AMERICAN NATIONAL FIRE INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, ILLINOIS NATIONAL INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, TIG INSURANCE COMPANY, ROYAL SURPLUS LINES INSURANCE COMPANY, AND TWIN CITY FIRE INSURANCE COMPANY* | Superior Court of the State of Delaware | No. N23C-06-255SKR-CCLD | Deposition |
| 7/14/2026 | *Marisol Orozco, et al v. Lincoln Unified School District, et al* | Superior Court of the State of California in and for the County of San Joaquin | No. STK-CV-UPI-2024-0012422 | Deposition |
| 8/21/2026 | *Jesse Fulton v. Miguel Vergara Laureano & Consolidated Electrical Distributors, Inc.* | Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida | No.: 24-CA-006731 | Deposition |