0001

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -+

NICOLAS TALBOTT, et al, |
Plaintiffs, | Case Action Number:
vs. | 25-240(ACR)
UNITED STATES, et al, |
Defendants. |

- - - - - - - - - - - - - - -+

Video Deposition of
MAJOR GENERAL JAMES YOUNG
Wednesday, October 21, 2026
9:35 a.m.

Esquire Deposition Solutions
Reported by: Laurie Donovan, RPR, CRR, CLR

0002

October 21, 2026
9:35 a.m.

Video deposition of MAJOR GENERAL JAMES YOUNG, held in person, with the witness and all parties participating in person, pursuant to the Rules of the United States District Court for the District of Columbia, subject to such stipulations as may be recited herein or attached hereto, before Laurie Donovan, a Registered Professional Reporter and notary public of the District of Columbia, who officiated in administering the oath to the witness.

0003

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
O'Melveny & Myers LLP
1301 Avenue of the Americas
Suite 1700
New York, New York 10019
(212)326-2000
By: Janine Panchok-Berry, Esq.
jpanchok-berry@omm.com
Michael Haley, GLAD Law (Zoom)

ON BEHALF OF THE DEFENDANTS:
United States Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20005
(202)598-9509
By: Robert C. Bombard, Esq.
robert.bombard2@usdoj.gov
Rebecca Goth, Esq.

ALSO PRESENT:
Robert Leonard, videographer

0004

EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. BOMBARD . . . . . . . . . . | 6 |


E X H I B I T S


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of James Young . . | 9 |
| Exhibit 2 | News article entitled "Employment Situation of Veterans News Release" . . . . . . . . . . . . . | 98 |
| Exhibit 3 | Washington Post article entitled "Trans Troops are still owed | |

severance payments, one veteran because homeless after the military didn't pay her" . . . . 131
Exhibit 4 Declaration of Timothy Dill . . . 133
Exhibit 5 Memorandum for Senior Pentagon Leadership, February 26, 2025 . . 140

0005

---

P R O C E E D I N G S
9:35 a.m.

---

THE VIDEOGRAPHER: This is video file number one. Time on the record, 9:35 a.m. Eastern Time. Today's date is October 21, 2026.

This is the video deposition of James Young in the matter of Nicolas Talbott, et al, versus United States of America, et al, in the United States District Court for the District of Columbia, case number 25-240(ACR).

My name is Robert Leonard. I'm the video specialist. I represent Esquire Deposition Solutions. The court reporter today is Laurie Donovan. She also represents Esquire Deposition Solutions.

This deposition is taking place at the United States -- the United States Department of Justice civil Division in Washington, D.C.

Will counsel please identify themselves verbally and state who they represent, starting with the taking attorney.

MR. BOMBARD: Good morning. Robert Bombard on behalf of the United States Department of

0006

Justice on behalf of defendants, and with me is my colleague, Rebecca Goth, also United States Department of Justice. Thank you.

MS. PANCHOK-BERRY: Good morning. Janine Panchok-Berry for O'Melveny & Myers for the plaintiffs. I am here with my colleague, Michael Haley, on the video link, who is from GLAD Law.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

* * * * *

Whereupon,

MAJOR GENERAL JAMES YOUNG,

having been first duly sworn, testified

upon his oath as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BOMBARD:
Q Good morning, General Young. My first question is do you prefer "Mister" Young? "General" Young?
A Whatever you're more comfortable with. Either is fine.
Q Typically in these expert witness cases you've been involved in, are you referred to as "General Young" based on your retired status as an Army General?
0007
A Either way, but "General Young" is fine.
Q Is there any reason why you cannot give complete and accurate testimony at today's deposition?
A No.
Q And how many depositions have you taken part in as a witness?
A Approximately ten to 12.
Q Okay. When was the first deposition that you participated in as a witness?
A I'll be guessing, um, an educated guess, but it was probably three, three or four years ago.
Q Okay.
What did you do in preparation for this morning's deposition?
A I looked over my report. I looked over Mr. Dill's report.
THE REPORTER: Dill?
THE WITNESS: Dill, D-I-L-L, and I had a meeting with counsel yesterday in their office, and a couple short prep sessions prior to that.
BY MR. BOMBARD:
Q Okay. So would you say, then, meeting yesterday and then a couple prep sessions, does that make three prep sessions total?
A With counsel, yes.
0008
Q And then were there prep sessions without counsel?
A Yes, short, me looking over the report, me getting organized, that sort of thing.
Q I see. Approximately how long was each of the three prep sessions with counsel?
A Uh, the first I believe was about an hour. I'm doing this from memory, so this will be an approximate. Um, the second was between two and three hours, and the one yesterday was probably five to six hours in total.

Q In your expert report at Appendix B, there's a list of documents that you reviewed.
Are you familiar with Appendix B of your report?
A Yes.
Q What documents did you review in preparation for today that are not listed in Appendix B of your report?
A May I see Appendix B?
THE REPORTER: Are you going to mark that as an exhibit?
MR. BOMBARD: Yes, we will mark this as an exhibit.
And if you (Becca) could message the team to

0009

figure out what exhibit number we're on in this case, that would be useful.
Can we come back to that once we get the exhibit number in sequence?
THE REPORTER: Yes.
(Exhibit 1 was marked for identification.)
BY MR. BOMBARD:
Q General Young, are you familiar with this document?
A Yes.
Q How are you familiar with this document?
A I wrote it.
Q You wrote this document? You wrote every word of this document?
A Yes.
Q No other person provided any inputs or edits to this document?
A Uh, no, I wouldn't say that. There were some minor edits. There were suggestions that, uh, were suggested by counsel, and I looked at some of them and accepted some of them. They were not substantive. They were "happy" to "glad," as I like to say, that type of changes or typos, that sort of thing.

0010

Q And about how many changes would you estimate were made to the document?
MS. PANCHOK-BERRY: I'll just object as to privilege. Just make sure not to disclose anything privileged between us when answering the question.
THE WITNESS: Uh, I really couldn't say. Again, it was, um -- I would call it minor, and, um, I couldn't really give you a number.

BY MR. BOMBARD:

Q Less than ten?

A I don't know.

I'm going back to your original question on Appendix B.

Q Thank you.

A Um, I don't believe we looked at anything other than materials that are listed here.

Q Is this September 4th report a complete statement of every opinion you intend to offer in this case?

A As of right now, uh, those are my opinions. If I'm provided additional information, um, or asked to, um, provide an opinion on some other aspect of the case, then I would reserve the right to do that, but as it stands now, this is my report and my only report

0011

and my only opinions.

Q And is the September 4th report a complete -- does it provide the complete bases for every opinion that you have up to this point in time?

A Uh, yes, I believe so.

Q Do you have any -- and you reviewed this report during your approximately ten or 11, 12 hours of preparation, correct?

A Yes.

Q Okay. As you reviewed the report during those prep sessions, uh, do you have any corrections that you want to make to your report?

A Actually, I do have one, um, if you don't mind.

Um, on paragraph number 50 -- five zero -- that should actually refer to 1175, not 1174, and the quotation marks should probably be taken down. It is nearly an exact quote, but it is not exactly a quote, so -- and that's my, my error. Thank you for letting me correct that.

Q You're welcome, and was that correction flagged for you upon your review of the Dill declaration that you described in your preparation for today?

A Uh, no, I don't think, uh, Dill had anything

0012

to do with it. I just, uh, was looking back over that, this document and the documents that are referred to, and realized that I had, um, typed the wrong number in there.

Q Okay, but there's no other changes or errors or typos in this report?

A Not that I'm aware of at this time.

Q Do you plan to supplement this report at this time?
A Not at this point, but if I'm asked to by counsel, I reserve the right to do that.
Q Sticking with counsel, uh, when were you first contacted by counsel about this case?
A Um, I would say if the report was written on September 4th, um, then it was maybe two weeks, three weeks before that.
Q Okay. So approximately sometime in late August, mid to late August?
A Mid to late August would be my estimate.
Q And on the front cover of your report, it states -- do you see where, under the largest bold font, "EXPERT REPORT," it states "Prepared For" and then there's a list of a number of different law firms, law firms and advocacy groups?
A Yes.
0013
Q Yes? Which of these, which of these law firms contacted you? Because it lists O'Melveny & Myers, GLBTQ Legal Advocates & Defenders, National Center for LGBTQ Rights, Wardenski Law LLP, and Zalkind Duncan and Bernstein LLP.
Do you see that?
A Yes. Um, I don't exactly remember, but my work on this has really been with the attorneys from O'Melveny and, uh, GLAD Law or the, uh, GLBTQ Legal Advocates. I've, to my knowledge, not worked with somebody from the other law firms.
Q Thank you.
Do you have a written contract or engagement agreement with O'Melveny & Myers?
A It's actually with GLAD, yes.
Q It's only with GLAD?
A Yes.
Q Okay, um, now, when you're, when you're paid -- and you're being paid by GLAD, right?
A Yes.
Q Okay. Does that go to you directly, or does it go to the Military Experts Witness Group?
A Well, it goes to a company called Peacemaker Partners, which is the parent company of Military Expert Witness Group.
0014
Q Does Peacemaker Partners or the Military Expert Working Group keep a portion of your $540 hourly rate?
A Oh, they keep all of it. I mean I'm the owner of the firm, of Peacemaker Partners.

Q Of Peacemaker?
A Yes.
Q Okay. Thank you.
How many hours have you billed in this matter to date?
A Um, that's a good question. I don't really know. Um, I'm going to say, uh, as an estimate, maybe 30 to 40, um, but I haven't sent a bill, so I don't really remember.
Q Okay. That was going to be my next question, how much you've invoiced, but you have not done so yet?
A I'm waiting until after today to prepare the bill.
Q So beyond the 30 to 40 thus far, plus however long today will be, including travel, how many additional hours do you anticipate through trial in this case?
A So after today?
Q Correct.

0015

A I really, I really don't know. Um, I haven't really thought that far.
Q Okay, um, approximately -- or actually, not approximately. Strike that.
How many matters or cases do you take on per year?
A Well, it just sort of depends on who, um, calls, um, and how they come in. I would say that, um, on average I'm working on a couple of cases a month, um, and so, um, I mean I'll riff on this for a while, but I've done about 50 cases since I started this firm in 2019.
The first few years were, um, just a handful of cases, uh, that came in, and then as I got busier and busier, um, we got referrals, and the same client would call back with a, you know, a different case, it started to become, you know, something that I could devote quite a bit of time to if I wanted. So it's a part-time, um, part-time occupation for me, but, um -- so, you know, it's a couple a month, on average.
Q Okay, and I understand that we'll be getting into certain -- obviously, you're a retired major general, and so I understand you have that retirement income, uh, that you, that you are entitled to, but I was curious.

0016

What percentage of your, uh, non-retirement income comes from your expert witness experience?
A Probably about, um, 80 percent.

Q Okay, um, and I, I believe you stated that you've been an expert or you have been retained to be an expert or provide advice in approximately 50 cases since 2019; is that right?
A Yes.
Q Okay. Of those 50 cases, how many were you retained by plaintiff?
A It breaks down about one third plaintiff, two, two thirds defense.
Q Let me stay within civil. We'll keep that. How many of the 50 cases are civil matters versus criminal matters?
A Almost all are civil.
Q Okay, and of the civil cases, approximately a third you are retained by the plaintiff, the other two thirds by defendant?
A Yes.
Q Okay. Among those 50 cases, have you ever been retained by the United States?
A No, I don't think so.
Q Would you know?
A I should know, but I don't, I don't recall

0017

if I have, yes.
Q Can you tell me what the Military Expert Witness Group is, General?
A Yeah. We provide, um, expert witness services for attorneys that have a case involving military members or a military issue.
Q And when was it formed?
A Uh, 2019 was when Peacemaker Partners was formed. Um, I got a case. A lawyer called me, found me on LinkedIn. Um, I did that case. It was interesting, um, and I thought to myself, gee, this sounds like I could probably develop a little business around this.
And so then I started -- I built a website for Military Expert Witness Group, um, didn't really do any marketing or anything. It was just out there, and, um, and so that's how it started. It's always been a "d/b/a." It's not its own official, um, you know, LLC. Uh, Peacemaker Partners handles that part.
Q And "d/b/a" refers to "doing business as"?
A Yes.
Q Okay. Was this like a random cold call on LinkedIn, or is this an attorney that you had some relationship with, knew you, knew your background?
A The very first case?

0018

Q Correct.

A Cold call.

Q Cold call.

A Cold, yes.

Q What are your responsibilities at Peacemaker Partners?

A Uh, peacemaker is -- does a couple different things, but, um, primarily it serves as a consulting arm for businesses that, uh, need help, uh, with growth and with strategy, and so I'm a consultant in addition to being the founder and the CEO. It's essentially the LLC that supports my consulting businesses.

Q Paragraph 14 of your expert report lists you as a managing partner, and then I noticed also your CV refers to you as president.

Are those like concurrent titles, or is there any different between them?

A There's no difference.

Q Okay.

A Yeah.

Q Uh, how many other folks work at the Military Expert Witness Group?

A So it's me and my wife. Um, I have a cadre of, um, colleagues that work for, uh, the firm

0019

under -- as a 1099 subcontractor when their expertise could be helpful. So it just depends on the case, uh, it depends on the issue, um, and sometimes they help, sometimes, uh, they don't.

Q Now, do you receive compensation from, uh -- sounds like you do, so -- but I'm -- just to, just to confirm, do you receive compensation from Peacemaker Partners or Military Expert Witness Group outside of your expert witness practice?

A Um, no, uh, with the exception that Peacemaker Partners will occasionally make equity investments in firms, and if that ever pays off, there is a, you know, an exit, but, um, in terms of -- I think the way you're asking the question, which is, you know, sort of day-to-day compensation, um, you know, my wife and I are the employees, and Peacemaker Partners and Military Expert Witness Group are essentially the same entity, so the money that comes in, other than expenses that are paid, um, is distributed to us.

Q How does Military Expert working [sic] Group market itself?

A Um, we have a website. Um, I have gone to, uh, sort of conventions, if you will, of, um, at this point defense attorneys, and, um, so like the North

0020

Carolina Association of Defense Attorneys has a conference. I'll get a table and stand there until somebody comes over and, you know, asks me what it is that we do, and, um, I've done that, uh, but I had a client who I asked how -- what would be a good way to market the firm without coming off as an ambulance chaser, and she suggested, uh, these kind of organizations.

So I've done it in Virginia and North Carolina, South Carolina and Georgia, and I don't know that it works, but I've done it a handful of times.

Q And there's a fairly significant military population in each of those four states you listed?

A That, that's the thought, right, is that, um, target states that have a good military presence.

Q Going back to the preparation of your report, I just want to clarify a few things.

Did anybody else review the report besides yourself?

A Other than what I answered before, the attorneys on the case.

Q Okay, um, but you typed the first draft?

A Oh, yeah.

Q If you would please direct yourself to page 1, footnote 1.

0021

Did counsel for plaintiffs draft this footnote cite here?

A Uh, I don't recall who drafted it.

Q Is it possible that they drafted that footnote?

A It's possible they contributed to it.

Q Okay, and then the next footnote is on page 3, if you'd turn to that, please.

This refers to, quote, "what I understand Defendants sometimes refer to as the 'Department of War.'"

Is it your opinion that the department is using an incorrect name for itself?

A I'm, I'm not sure where this whole, uh, thing stands. I know that the Secretary refers to it as the, as the Department of War. I don't know if it's been legally codified that way or not, so I just don't know. I'm not trying to be argumentative about it, so I was trying to be, um, technically correct. Plus, many documents still refer to, you know, the Department of Defense, not the Department of War.

So anyway, no offense meant. Um, you can call it the Department of War if that's the

preference.

Q And General Young, if you'd now turn to page

0022

8. This is the chart with some of the named plaintiffs.

A Okay.

Q On the third block, it's Amiah Sale, and in the "Individual Performance" block, it lists "ECF No. 72-46."

Do you see that?

A I do.

Q Did you pull that from the docket yourself?

A Um, I don't recall which part of this, um, I would have typed or added to. The, um -- so there, there were some, there were some edits on this page, uh, from counsel, so it's possible that they added that, and I'd have to see Sergeant Sale's record to really, uh, refer -- you know, to answer that.

Q And then, General, back to Appendix B, which is romanette iii, who selected the 300 pages of discovery, discovery materials for you to review?

A That was provided by counsel.

Q Did you ask for anything from counsel that you, that you did not receive?

A Um, I don't believe so.

Q Nothing that you wanted to take a look at for your report that you weren't able to get?

A Well, when I was pulling together, um, the

0023

chart that you referred to earlier, um, that runs from page 6 through page 9, my request was what -- essentially what do we have that talks about their records, and this is what I got. So I didn't say is there something else, is there this, is there that. Um, it -- this is what was provided.

Q And when it was provided to you, did you follow up and say, hey, I need to, I need to see X, Y or Z in addition to this?

A Um, again, no. I, I mean I assumed I was provided everything that we had. I mean I knew that, um -- well, I guess I didn't know. I, I assumed that if we had other things, I would have been provided them.

Q What, um, facts or data did counsel provide you that you considered in forming your opinions?

MS. PANCHOK-BERRY: Objection as to privilege. I'll direct the witness not to answer to the extent it reveals privileged information.

THE WITNESS: Would you repeat the question?

BY MR. BOMBARD:

Q Yes, and in response to the objection, I think the question is just specifically seeking like the factual matters that were provided to you that you used in your report to come up with your opinions.

0024

A Well, that would be in Appendix B.
Q Okay, and that's a comprehensive summary of everything? All the facts that you relied upon would be in Appendix B?
A I believe so.
Q So everything in Appendix B is what you used to form your opinions, in addition to your experience?
A Yes.
Q When, when you were retained by counsel, did they ask you to make any assumptions in generating the report?
A Uh, not that I recall.
Q Did counsel supply the assumption in paragraph 22, that each and every plaintiff intends to serve?
A Well, they were serving, so I don't think that was an assumption that counsel provided. Um, if you consider it an assumption, I guess it's an assumption I made, but since they were serving, since they wanted to continue to serve, I have no reason to think that they didn't want to continue to serve, so if you consider that assumption, I think that would be my assumption.
Q I'd like to go talk a little bit about your CV, Appendix A, romanette i.

0025

General Young, what is a distinguished military graduate?
A Um, it is the folks at the top of your class as a, um, ROTC cadet. I don't remember if it's ten percent, 20 percent, um, somewhere in there, um, so . . .
Q So that was something that was upon graduation? It wasn't like an accolade like later in your career after you reached, you know, flag officer or something?
A No, no, no. I got a little certificate back in the day that said "Distinguished Military Graduate."
Q Okay, and I think it says you received your commission from Davidson College. I assume that obviously means through the Army, through the ROTC program that you attended at Davidson.
A Yes.
Q Is that correct?

A Yes.

Q Um, in going through your, um, I believe it was over 30 years of military service, what portion -- what years were you on active duty, and what years, if any, were you a reservist?

A So I started off, started off on active

0026

duty, um, in 1983, and then I came off active duty in '87 to, um, go to graduate school, um, and, you know, as a reservist, you're back on active duty frequently for training, for annual training, for schools, for mobilizations, um, and so on.

So I was mobilized during Desert Storm for a while. The war was actually over before we wound up going over. Um, the, uh -- and then I mobilized again to command the battalion in Iraq, and then, um, I was called to active duty again as a flag officer for, uh, four, four and a half years, something like that.

And then even when I was a, um, a, quote, "traditional reservist" as a flag officer, you're on active duty a lot. I did probably 12 days a month of active duty even while I was a reservist.

So, um, I think all of that added up to something like 16, 17 years total. Um, it's admittedly sometimes a day here, a day here, a week here, a week here, um, but it adds up after a while.

So, um, don't quote me on the 16 to 17, but it would -- it is clearly a mixed career of both active and, uh, reserve service with a lot of intensity, um, as a reservist.

Q Thank you, and so for the 16 to 17 approximate active duty service years in your career,

0027

I'm curious which -- and I understand in the Reserves that you are saying 12 days a month here and there, a couple, two weeks, maybe a longer period.

Could you identify the specific bands of time where you were on like extended active duty orders, activated up from the Reserves into active duty?

A Um, best I can.

Q Yeah.

A So, um, there's the initial, um, four, four and a half years of active duty, as I mentioned before, back in the '80s. There was a call to active duty during Desert Storm that lasted I'm going to say three months. That's an estimate.

Uh, there was -- when I was mobilized to, um, go to Iraq, that was I think ten months, 11 months, and then as a brigadier general, um, and as a

major general, I was -- again, I'm going to say four, four years or so.
Q Okay. Thank you.
Now, what years did you serve as the human capital enterprise director within the Army?
A I think that was in 2011, 2012.
Q And for how long after 2011 did you hold that role?
0028
A So I had that role for a year and change, and, and I got promoted into my boss's job, so I supervised that, uh, for another couple years.
Q And what was that promotion, that, that job you got after that?
A Chief of staff of the Army Reserve.
Q So chief of staff of the Army Reserve, is it exclusively limited to reservists? Do you have, do you have any authority or responsibilities over the active duty side?
A Well, I'll answer the question, your responsibility and your authority is limited to the people in the Reserves that you're responsible for. In terms of your influence or your, um, interaction, um, you know, the, the Army has done a pretty good job of being inclusive to all of the components, meaning the active Reserve and the Guard.
And so when there are policy meetings, even if they have a, um, you know, sort of a tangential impact on the Reserves, you're included, uh, in the discussion of that, um, because, you know, the leadership, the Army, at least at the time, respected your, you know, your opinion and your insight on it.
So I take your point. It is -- it's a -- you know, your responsibility and your authority, of
0029
course, lies to the people that you're responsible for. The impact or the influence that you have goes beyond that, I believe.
Q General, um, on paragraph 10 -- this is on page 2 under the "Qualifications" section. I just wanted to -- it lists, "I have commanded all ranks from second lieutenant through major general," the first sentence.
Do you see that?
A I do.
Q Did, did you mean that you -- I understand you retired as a major general. I was wondering if was that you served as all those ranks or was this correct as written?
A Well, I was a commander at all the ranks

that you can command at, okay? So typically, uh, majors don't command something. Um, so I, I see your point, but so platoon leaders, company commanders, battalion commander twice, was commander as a colonel twice, commanded as a general officer three times, so . . .

Q Understood. Thank you.

Did you retire under, uh -- you retired under a non-regular Reserve retirement?

A Yes.

0030

Q Okay, and what year and month did you retire?

A Uh, it was definitely 2019, and I think, I think it was May.

Q And I understand you had some joint tours in your career, but you've never managed any of the Navy or Air Force policy, obviously, as an Army officer, correct?

THE REPORTER: As a what officer?

BY MR. BOMBARD:

Q As an Army officer.

A No, not, not from a policy perspective. When I worked in the Pentagon as a colonel, my job was to command, um, all the Reserve units that supported the J2, who is the head of intelligence or the chairman of the joint chiefs, so in that sense I was, um, supervising individuals from all the services, but not, um, not from a joint policy perspective.

Q And not from a personnel policy perspective at all?

A Correct.

Q Okay.

I'd like to ask you a few questions about paragraph 11, and this is on page 3, if you don't mind. I'm going to just read the first sentence to

0031

you.

It says, "I also served as the Human Capital Enterprise Director, Army Reserve, where I had day-to-day oversight over all human capital/resource activities for the Army Reserve's 200,000 soldiers, to include pay, promotion, benefits, retirement, recruiting, leader development, VA coordination and [healthy] medical health/readiness/disability policy."

Could you give me a description of what you personally did in each of these little subcategories, starting with pay.

MS. PANCHOK-BERRY: Objection to form.

THE WITNESS: Well, let me try to give you a

general answer. Maybe this will get it, and if it doesn't, we can try to drill down.

So in a job like this, uh, which was based in the Pentagon, there are, um, working group meetings, policy meetings daily. I don't have access to my calendar. I don't remember, you know, um, what day I did which meeting, of course, but the, um -- if there was an issue regarding any of these things, if there was a problem, a systemic problem regarding any of these issues, then that would fall into my portfolio to solve in some way.

0032

The -- you know, an example that I can, um, certainly think of was this issue of VA coordination and the health/readiness/disability policy. Back, back then, the, um -- there was no Integrated Disability Evaluation System. The military did their thing, the VA did their thing, and so, um, the process was dumb.

I mean that's the only way you can describe it, because you're basically looking at the same records and applying much of the same standards to try to get to an answer of whether somebody is disabled or not.

And so we started that work there to, uh -- and I don't want to overstate my role. I'm a role player representing the Army Reserve, and something that obviously impacted the VA as well as every service. So I'm a, I'm a player in the, in the group, um, and -- but we started that process of trying to figure out how to integrate the systems.

Something like that impacts pay, impacts retirement pay, impacts VA coordination. You can make an argument it even impacts leader development from the standpoint that it's taking care of, uh, king care of soldiers.

0033

There's another example I can think of where, um, this leader development program, um, in the regular Army, um, you have, uh, basically career managers that work with each individual. Um, so if you're Captain Young, you have a branch manager or a, a -- they may call it something different now, but who kind of looks out for you, what's your next assignment going to be, what's good for your career.

So nothing like that existed in the Army Reserve, and so I built that program, um,

personally built that program, and we implemented it Army-wide. So again, that has an impact on pay, that has an impact on retention, has an impact on, um, leader development for sure.
So I, I mean I -- you know, I don't know if I can think of other issues, but when you're at the Pentagon and you're a young flag officer -- if there is such a thing -- a new flag officer, your day is consumed with meeting after meeting after meeting, all dealing with these kind of, uh, issues.
BY MR. BOMBARD:
Q Did the Army not have any kind of like career counseling program or collateral duties at the
0034
time when you were talking about this career development program?
A Again, this is --
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Sorry.
MS. PANCHOK-BERRY: Go ahead. You can answer.
THE WITNESS: Um, the Army did. The Army Reserve did not, and so, um, this was a -- we, we took sort of the active model and tried to scale it down as best we could, and, and we didn't try to blow the ocean. We tried to, um -- meaning we weren't trying to -- we didn't have the capacity and the resources to mimic what was done on active duty.
So we tried to target it toward junior officers at the beginning. Then it was expanded into enlisted after that, but the Army Reserve had a big problem with captains, you know, getting out and not getting promoted to major, and that was -- we were trying to really solve that problem, and by solving that problem, we felt like we could've solved a lot of other problems.
0035
BY MR. BOMBARD:
Q Is it correct that on the -- in the active component Army personnel policy belongs to the Army G-1?
A Uh, yes. Uh, the G-1 and then, uh, the HRC commander has some of the implementation authority, but the way you described it is generally correct.
Q Okay, and so when you were in the Reserve position as a flag officer, um, you did not have

authority over the active component, like separation, separation pay or retirement?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yeah, I did not have authority over it.

BY MR. BOMBARD:

Q During your time at the Pentagon, you just referenced that you were -- and I understand how the Pentagon works a little bit in terms of you're in meetings all day, like you described. Uh, could you name the three most, uh, significant working groups that you were -- that you participated in?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Uh, not off the top of my head.

0036

BY MR. BOMBARD:

Q Could you name one DOD working group that you participated in?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Um, there was, um -- there are definitely working groups that dealt with transition policy, meaning, in this instance, how we're going to transition from civilian world -- uh, military world to civilian world. Um, there were these, uh, working groups that dealt with the, um, as I said before, the VA and the disability, the Integrated Disability System.

So there's a couple that, uh, come to mind, and if I -- I don't know -- had a chance to reflect, maybe I could think of some more, but that will probably have to do it for now.

BY MR. BOMBARD:

Q And when you refer to the Integrated Disability Evaluation System, General, is that colloquially referred to as "IDES"?

A Yes. I-D-E-S.

Q Okay. Could you please look at the last sentence of paragraph 11. I'll read it out.

"I designed and implemented the first career development program and office for Reserve officers,

0037

measurably improving retention and promotion rates."

Was that the program you just discussed?

A Yes.

MR. BOMBARD: Why don't we go for a five-minute break?

THE VIDEOGRAPHER: We're going off the record at 10:20 a.m. Eastern Time.

(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: This is video file number two. Back on the record at 10:28 a.m. Eastern Time. You may begin.
BY MR. BOMBARD:
Q Okay. General Young, I want to ask you about the promotion board that you sat on for, um, general, the general officer promotion board.
Do you recall?
A I do.
Q Was that the only time you've sat on a general officer promotion board?
A Yes.
Q What year was that?
A Um, I'm guessing. 2017, maybe, in there somewhere. You're only allowed to sit on it -- uh, you can't sit on it back to back as an example. At least you couldn't back then. You had to -- they mix
0038
it up on purpose, so -- but yes.
Q Was this a Reserve board or was this an active component board?
A Uh, Reserve board. It had, um, it considered reserve officers. It did have, um, an active duty general officer on the board itself.
Q Have you sat on any active component promotion boards?
A No.
Q Outside of that one general officer promotion board on the Reserve side of the house, any other promotion boards you've participated in?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: The colonel command selection board.
BY MR. BOMBARD:
Q Any others besides the colonel command selection board?
A Maybe, but I can't recall them specifically today.
Q And what year did you sit on the -- and are those two different boards? Is it a selection for colonel, or is there also a sort of command section?
A Two separate boards, yeah.
Q Okay.
0039
A Um, um -- I'm thinking. Uh, I'm going to guess that it was 2007-ish.
Q That was the 06 board?
A The colonel, colonel, uh, command board.
Q Okay, but again, just so I have this

straight, that's just one board, colonel and command, or are they different boards?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yeah, they're different boards, so typically you're already promoted to colonel to be considered to command as a colonel. Not, not always, but typically, yeah.

BY MR. BOMBARD:

Q Understood, and both of those boards took place in 2007, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: One board. I did not sit on the colonel selection board. I was on the command board. They work very similarly, but . . .

BY MR. BOMBARD:

Q Selecting for suitability to command?

A Correct.

Q So other than the -- and that -- sorry. Strike that.

0040

That command board in 2007 was a Reserve only, correct?

A Yes.

Q What was your specific role on the command board in 2007?

A To review the files of the people that were being considered for command, and to recommend the best candidates for those positions.

Q How many other officers served on the board with you, or were you the only one?

A Oh, no. I -- my recollection is there were probably six to eight, and the general officer board was more. Um, it was probably a dozen.

Q But other than those two experiences, one in 2007 and one in 2017, that's the total number of boards you've sat on for promotion?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yes.

BY MR. BOMBARD:

Q Can you walk through the process at these -- at the promotion board, the general officer promotion board --

MS. PANCHOK-BERRY: Objection.

MR. BOMBARD: I'll just finish the question.

MS. PANCHOK-BERRY: Okay.

0041

BY MR. BOMBARD:

Q I just want to kind of have you walk through the process at the board until the officer selects and

puts on flag rank.

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Okay. So the Secretary of the Army decides who sits on the general officer promotion board, and you get a little letter. It says you're, you're picked. Um, it's supposed to be a big secret that you're picked. You don't tell anybody. Um, the reason is you don't want people advocating for, uh, anybody. Um, I don't know how much a big secret it is, because people know that you ran off to Kentucky for a week, but, um, anyway, you don't broadcast that you, um, went there.

Um, you go. There's a whole team of people that prepare the files, so the colonels -- these are colonels that want to be brigadier generals, brigadier generals that want to be two stars, a whole team of people that go through, make sure all their records are in order, correct, accurate, et cetera. All that happens behind the scenes before you even get there.

Um, initially, you sit at a computer

0042

terminal and you look at people's files. This is the same way the other board worked, essentially, and, um, you know, there are at this point hundreds of people that you need to go through, and you spend a couple days doing that.

Um, and you're looking for certain things. You're looking for obviously superior performance, you're looking for what kind of jobs did they have, what was their progression of jobs over, uh, time, um, and any other schools. In the Reserves, you give some consideration to what they do in the private sector, how that may, may not help the military, what their civilian education is. All these things kind of roll up.

The Secretary provides the boards with written guidance. Um, most of it's pretty generic, but sometimes they will say we want you to really pay attention to people that have had experience recruiting or pay attention to people who work in technology or whatever. I'm just giving a couple of examples.

Um, you score all of the files. My recollection, it was one to five or zero to five. Five good, zero bad, um, and, and so there's frankly a little subjectivity to it, but you're

0043

trying to be as objective as you can.

Um, once you get done with that part of the process, then the team that supports you rolls up the scores, and, um, because there's -- let's say there were ten. I said 12 earlier, but let's just keep the math simple. Uh, there are ten, ten other -- ten total people.

And so they will say, Young, uh, what was Young's score? Oh, Young got a 50, five out of five. Everybody thought Young was great, um, and, and then other people got other scores, and they literally rank them from top to bottom, and, um, uh, and then you talk about the people in a group.

So this is unusual. You don't do this in other promotion boards. At least you didn't at that point in time. Other promotion boards, the score was the score, okay, and if there were 20 positions, the top 20 basically made it. Um, it's a little more complicated than that, because maybe five of the top 20 were logisticians, and there weren't -- there's you know, only positions for three logisticians, so maybe you took the top 23 instead of the top 20.

0044

BY MR. BOMBARD:

Q Can I stop you quick and ask --

A Yeah.

Q When the scores are entered, is it, um, is it private in terms of your voting record, or do you know what the other panel members voted for on a particular officer?

A Uh, yeah.

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q Do you understand the question?

A I do. You do not know. You're, you're off by yourself voting, looking at the files by yourself. Um --

Q Can I ask a follow-up? Um, do you see the breakout? When you're saying the top 20 scores, they, they get -- they're the ones that promote, just hypothetically? Is that what your testimony was earlier, approximately?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yeah, I, I confused things. Let me, let me try to restate it, and maybe I'll answer your question.

So I was comparing the general officer board to say the colonel, uh, the colonel promotion

0045

board of a major or lieutenant colonel, and, um, in the case of the non general officers, the score is the score, okay? So, at least it was. This is back when I was serving. I know they have changed the process, they changed the process since then, but, um -- and so you didn't talk to your colleagues who are on the board. You didn't share your score. You didn't know how they voted at all, okay?

And so when I said the top 20, I was hypothetically referring to -- again, let's say it's the colonel board, and let's say they have got room to promote 20 colonels that year. Generally speaking, the top 20 are going to make it.

The only exception would be if there was a mismatch between the position that was open and the people. So you wouldn't put a logistician in an engineer, uh, position, right, because they're not qualified, so you might have to go down to 21 or 22 or 23 to find, uh, the right mix in terms of background for that position.

Okay. Now, the general officer board, so far is worked basically the same. Everybody votes, everybody assesses a file individually,

0046

but now you come together as a group. You're sitting around a big table like this, and you see the names that come up on the list.

Number one, and so, um, let's say Young is number one on the list, and Young is an intelligence officer. There's going to be somebody on the board who knows Young. Anybody who knows Young can talk about Young. This is -- it doesn't happen in the other ranks, okay?

And it's obviously, um, confidential about what people say, but you can say -- and on the board, people did say -- I don't know how that guy became a colonel, okay? There's no way we should make him a general. Here is why. I was at this meeting, I was in the field with him, I was in the meeting with her, whatever, and people let it rip, both positive and negative.

And so even if you are like -- you can come out on the vote as top five. If people on the board think that you should not get promoted, you can be basically knocked down or taken off that list.

BY MR. BOMBARD:

Q Is that, General, what you referenced earlier? You said frankly there's a little

0047

subjectivity to it when describing the process.

MS. PANCHOK-BERRY: Objection.

THE WITNESS: No, I wouldn't say that. I just said that, um, you're looking at a file. You're trying to be as objective as you can. I don't know that anybody is 100 percent, frankly, objective when they're looking at that, because they may, they may value combat experience over this other kind of experience, as an example.

So, um, it's, it's a fair process. It's an objective process. Um, like anything, you know, there's probably some subjectivity that comes into it, so --

BY MR. BOMBARD:

Q Isn't it, isn't it true, though, that each -- and each board changes year to year in terms of its personnel, correct?

A Yes.

Q And each year, the precepts may change from the Secretary of the Army or whoever is issuing the order to the board; is that right?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Um, yes. I do think there's some consistency over time. It hasn't fundamentally changed. You're expected to -- you

0048

know, if you want to be a colonel, you're expected to have performed well as a lieutenant colonel. You're -- it's better if you've commanded than if you haven't commanded. Um, how you do as a commander, um, impacts that, uh, your promotability.

So I don't -- I mean there are some things that are true today that were probably true 30 years ago about that, but, um, the guidance from the Secretary does change, even if it's at the margins. It changes a little bit, um, year to year.

BY MR. BOMBARD:

Q And these are -- there are different sort of standards within subspecialties within a branch as well?

MS. PANCHOK-BERRY: Objection.

BY MR. BOMBARD:

Q Would you agree with that?

A I don't know if I would categorize -- I don't know if I would agree with that. When you say

there are different standards, there's different jobs, there's different -- um, I mean a signal officer is different than an infantry officer, but, um, I don't know about different standards.

0049

Q Well, there may be different criteria that a board for a staff core officer dentist is versus, like you said, an infantry officer.

Would you agree?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yes. Dentists, doctors, lawyers, um, all have their own. Chaplains all have their own sort of different -- they're similar, but different boards, um, but yeah, you might -- maybe this is your question. I'm not trying to guess your question, but if your -- if the expectation, you might have different --

MS. PANCHOK-BERRY: Don't speculate.

I want to make sure he's not speculating. If you could clarify your question.

BY MR. BOMBARD:

Q My question is: You agree that within an organization as large as the Army, there are multiple boards per year?

A Yes.

Q And at every single or near every single rank, from 02 to 09?

A Not at 02, but I take your point that they -- the rank, the board -- there's a board that promotes you to major, a board that promotes you to

0050

lieutenant colonel, and once you get up actually to -- major general is the last promotion board. Lieutenant generals actually don't have a board, but, um, the, um -- yes I think is the answer to your question with those caveats, and the, uh, you would, you would look for different experiences from a dentist compared to an infantry officer.

Q And your experience is limited to the flag board in 2017 and the command board in 2007, correct?

A If you're asking about sitting on actual boards, yes. I think -- you know, the board is one event that happens over a few days. In terms of mentoring, managing careers, looking at files, looking at performance records, um, slating folks for different jobs, I mean that's been done hundreds of times, if not more.

And so there's another process, a slating board, slating process that's less formal than a promotion board, but it's done very similarly in that

you look at, you look at the files, you look at what people have done, you look at how much potential somebody has, and you try to put them in different, uh, different jobs.

I've managed that for the Army Reserve. I led that for the military, um, units, military

0051

intelligence units in the Army Reserve. So I mean the promotion board is -- it's important, but it's one, you know, few-day event that, uh -- there's many other things that are similar to it, and, um, that impact career development and, um, career advancement for individuals.

Q Have you ever worked for the Department of Veterans Affairs?

A No.

Q Have you ever adjudicated or approved a VA disability rating?

A No.

Q Have you ever served as a compensation or pension examiner?

MS. PANCHOK-BERRY: Objection; form.

THE WITNESS: Uh --

BY MR. BOMBARD:

Q Have you ever served as a --

THE REPORTER: I'm sorry. What was the answer? What was the answer?

THE WITNESS: I didn't answer it yet. She objected. I think he was restating it.

BY MR. BOMBARD:

Q I'll repeat the question. Have you ever served as a compensation examiner?

0052

A For the VA?

Q Yes.

A No.

Q Have you ever served on a medical evaluation board?

A No.

Q Have you ever served on a physical evaluation board?

A No.

Q Have you ever served as a physical evaluation board liaison officer?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: No.

BY MR. BOMBARD:

Q Have you ever worked at DFAS?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: No.

BY MR. BOMBARD:
Q Have you ever computed a separation payment or recoupment as part of your official military duties?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, no. I did it as part of this case but not as part of my duties.

0053
BY MR. BOMBARD:
Q And you're not a lawyer, correct?
A I am not.
Q Or a physician?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I am not.
BY MR. BOMBARD:
Q Or a psychologist?
A I am not.
Q Or an actuary?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I am not.
BY MR. BOMBARD:
Q A certified financial planner?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I am not.
BY MR. BOMBARD:
Q And you retired in May of 2019, I believe you said?
A Yes.
Q And since then, have you held any official role within the Department of Defense or War?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes.

0054
BY MR. BOMBARD:
Q What official role or position at DOD or DOW have you had since --
THE REPORTER: Say that again. I'm sorry. What official role --
BY MR. BOMBARD:
Q What official role have you held since May of 2019 at the Department of Defense?
A Um, I was an SGE, special government employee, for three to four years. I worked for an organization that is now Defense Innovation Unit.
Q Approximately what years and months did you work as an SGE?
A My recollection was I started in late 2019 or maybe early 2020, and then it went on for three or

four years.

Q I understand you were an SGE. Can you describe what an SGE does?

A I believe it stands for "special government employee," and I think this is a job Elon had while he was running DOGE, um, and, um, it is a part-time -- this is the way I'll describe it. I don't know if this is the official way it's described, but what I did was I was a, essentially a part-time consultant, if you will, and, uh, Defense Innovation Unit brings,

0055

uh, private sector technology into the military faster, and that's what I did in my last job in the military, and so I worked with that organization on issues relating to innovation and technology adoption.

Q Who is the civilian leader, for lack of a better phrase, of the Defense Innovation Unit?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Right now it's Owen West.

BY MR. BOMBARD:

Q Who was it when you were there?

A Well, it's gone through multiple iterations, so I initially worked for an organization called NSIN, uh, and which has been subsumed by DIU, and I had a couple different, uh, bosses. Morgan Plummer I believe is the one that hired me, and I'd have to go back and check, because Morgan left, and then it was -- I was, uh, detailed out to a couple different people. I don't honestly remember their names at this point.

Q What was Morgan Plummer's title at the time he or she brought you in?

A Uh, morgan is a male, and he was I think the managing director of NSIN, National Security Innovation Network. N-S-I-N.

Q And approximately -- you stated that this

0056

was like a part-time role?

A Yes.

Q Uh, approximately how many hours a week were you working for the Defense Innovation Unit?

A I mean it really varied. So you're only allowed to work -- I forget exactly what the rules are, but you're only allowed to work a certain number of days a year. I'm remembering it was like half, half the days or something, and then, you know, if you worked like one hour a day, that counted as a day, so I don't really remember.

It was sporadic. It was -- uh, there was times they needed me a lot, uh, to represent them or

to go to a conference or whatever, and there were other times where I might take two weeks, two weeks off, so I don't -- I really don't remember.
Q And why did you leave the Defense Innovation Unit?
A I think it just sort of ran its course. I was -- I had done what I could do, and they were getting reorganized into -- this is when NSIN was being subsumed by DIU. DIU has gone through -- you know, every time there's a change in administration, there's usually as a change at DIU, and I don't think they quite knew what to do with me, and I didn't

0057

really feel like I could continue to contribute.
So, I mean there was no issues. Just you get reauthorized every year, and I think we just mutually decided, um, you know, if you need me, I'll come back. If not, it's no big deal.
Q So what was the last month and year that you were an SGE?
A I, I'd have to go check. I really -- I don't recall. I think it would have run through the end of that year -- the year, whatever the year was --
Q Okay.
A And --
Q Do you recall which year that ended? Was it '24?
A It was -- my recollection is '23 or '24.
Q Switching gears a little, uh, are you -- you're familiar with the blended retirement system, correct?
A Yes.
Q And that system took effect I believe January 1, 2018?
A I believe you're right.
Q And that was after most of the majority of your career. I believe you said you retired in 2019; is that right?

0058

A (Nods.)
Q Is that a yes?
A Yes.
Q Which of the plaintiffs that you reviewed are covered by the blended retirement system?
A I don't know.
Q But your report doesn't mention the blended retirement system, correct?
A It's really beyond, um -- doing calculations of how the blended retirement system would impact them is not really part of this report.

Q And it doesn't mention it, does it?
A Well, I think --
MS. PANCHOK-BERRY: Objection.
THE WITNESS: -- I do talk about the retirement system in general. Um, if you'll give me a second, let me just -- yeah, so on page 14, section D, number 39, there's a, um, a very brief overview of the retirement systems. I don't specifically talk about the blended retirement system, but I'm aware of what, what it is.
BY MR. BOMBARD:
Q And under the blended retirement system, a member who separates keeps the government's thrift saving plans contributions?

0059

A Yes.
Q Did you account for that portable benefit for any plaintiff in your report?
A I wasn't asked to calculate that. I can calculate that if I had the information, but it's beyond the scope of this report.
Q General, if you would turn to Appendix D. This is the prior expert testimony in the last four years.
The first question is: Were any of these cases criminal matters?
A No.
Q Okay. Which of these cases involved military career progression?
A Um, almost -- well, most of them, um, or many of them, I guess I would say. The, um --
Q Why don't we do this. I'll -- let's just go through the top one, Kelly Harrigan Campbell v. Michael Campbell and work our way down, and I'll --
A Great.
Q I'll slow down there. Kelly Harrigan Campbell case.
A This was a dispute between, um, two people who used to be married about how reserve pay or how retirement pay -- uh, actually both reserve pay and

0060

regular and non-regular would be divvied up post, um, divorce, which is actually codified in the regulations very succinctly.
Um, the issue here was, when they got divorced, Colonel Campbell was, uh, in the Reserves, and then as soon as they got divorced, he came on active duty. So he originally qualified for an active -- uh, he eventually qualified for active duty retirement, but the divorce decree laid out how they

would split it up under a non-regular retirement, and so it's a actually pretty complex case in, in that sense.

Louis Scott was, um, a case. Mr. Scott was injured in a car wreck. He felt like the wreck, um, limited his career, so he was a commander in the Navy. So it was a case of trying to look at likely career progression, um, and then economic damages that might flow from that based, based off of that, and he fell under the regular retirement program.

Q Let me pause. In any of these cases, did any court exclude your testimony?

A Uh, if you go down a little bit to Zachary Young versus NEMEX, um, I wasn't excluded. Uh, there was a limitation, uh, there. That case was actually a defamation case. CNN, um, did a story on evacuations

0061

from Afghanistan, um, and Mr. Young, uh, who used to work for the three-letter agency, uh, helped facilitate getting some women, young women out of Afghanistan. This was after we had left and the Taliban had just taken over.

The, uh, CNN did a story that implied he was charging Afghans, and accused him of basically facilitating a black market. Mr. Young -- no relation to me, by the way -- uh, sued CNN for defamation, and, um, and so the reason I was asked to testify there is because I helped start one of these veteran groups that helped get US citizens, green card holders, and sponsored Afghans out of Afghanistan after we left.

And so I was familiar with the trade craft and the, how to move people from checkpoints past the Taliban, and all the rest of that. The -- I'm answering your question eventually, but it does take a little context.

The -- uh, I was limited in that I could not talk about the employment of a three-letter agency individual and, and what this, uh, may or may not have done, what the CNN story did or didn't do to his employability as a three-letter agency person.

So it's -- the answer is yes, but you have to kind of understand the context to realize it's

0062

pretty limited.

Q Was your testimony limited outside of like classified information, which it sounds like this was concerning, or sensitive information?

A Yes, but I mean I didn't really have any -- uh, they were very sensitive to who he used to work for, um, so talked around that issue a bit during the

trial, but, um, I mean it didn't -- the work I did was not classified. It was important and it was similar in what he did, because we got hundreds of people out of Afghanistan, but it was not, um, classified in any way.
Q I think what I meant to -- I think what my question was trying to ask was: Has any testimony that you've offered in a case been limited outside of like a classified --
A Oh.
Q -- scenario?
A Yeah, sorry. I didn't understand the question. Uh, no, that's the only, uh, time that it's been, uh, limited.
Q Has any party ever moved to exclude you as an expert witness?
A Um, Ms. or Mr. Campbell's lawyer tried, but, um, the judge did not agree, so -- if it's happened

0063

other times, I'm not aware of it.
Q So you're not aware whether a court has ever excluded you from providing expert testimony?
MS. PANCHOK-BERRY: Objection; mischaracterizes his testimony.
THE WITNESS: Yeah, I don't think that's what I said. I'm not aware of any time that I have -- that somebody has tried it or that I have been excluded.
BY MR. BOMBARD:
Q So to your knowledge, you've never been excluded as an expert in a case?
A Correct.
Q Are these 14 cases listed in Appendix D the total number of cases you've testified in?
A I've been deposed since, um, August, so obviously today and, um, I think two more times, uh, earlier. It's been a busy month.
Q Could you tell me about those two cases between August 21, 2026 in Appendix D and today.
A Um, I would have -- I can remember one. I'm trying -- honestly, they're running together a little bit. One was a contracting dispute, and the other was a case, um, like a lot of these cases that are personal injury, and, um, there is some sort of

0064

economic impact on pay, promotion, career advancement and retirement.
I'll have to check my calendar. I can do that now if you want, or I can do it at the break to get -- to be specific, but, um, and I apologize. It

is running together a bit this month.
Q So the two cases post-dating your appendix up to today, one was a contracting dispute, the other one was a personal injury type suit, correct?
A Yes.
Q Okay. Uh, most Appendix D matters are personal injury or insurance or family law cases, correct?
A Yes.
Q Have you ever testified in a constitutional challenge to a military personnel policy case?
A No.
Q Have you ever testified in a case against the United States of America?
A Um, no.
Q And I believe you said earlier that you've never testified on behalf of the United States as an expert; is that correct?
A Correct.
Q In Campbell v. Campbell, what opinions did

0065

you give in that case?
A Well, my opinion was -- essentially, I'm doing this from memory, but --
MS. PANCHOK-BERRY: Yeah, I object just to the extent he doesn't have the documents in front of him, but you may answer to the extent you recall.
THE WITNESS: So again, this is a -- this was an issue about two different methods of calculating what the spouse would be owed during -- from a military retirement once they were divorced.
So, um, my opinion was that the court needed to revise their order, essentially, because the original order was written under the Reserve retirement. Now he had an active retirement.
The way that it was written certainly did not favor Ms. Campbell. Even DFAS, um -- DFAS rejected the split as it was written initially, because they knew it was wrong, so -- but so that was it. That was the gist of it.
BY MR. BOMBARD:
Q You offer three opinions in this case and only three, correct?
A Yes.

0066

Q Do you intend to offer on opinion on any other subject, including, quote, "how these programs interact"?

A Well --
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I think I did comment on how they interact, uh, in this report, but I'll give a similar answer to what I did before. If there's, um, an additional opinion or additional work that is needed, and, um, counsel asks me to opine on that, then I would reserve the right to either have another report or an addendum, uh, to this report.
MS. PANCHOK-BERRY: If you want to go to the page number where he discusses this point, we can discuss it.
BY MR. BOMBARD:
Q General Young, you offer no opinion on whether the executive order is constitutional or lawful, correct?
A Correct.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q You offer no opinion whether the, quote, "Hegseth Policy" is constitutional or lawful, correct?
0067
MS. PANCHOK-BERRY: Objection.
THE REPORTER: Can you slow down. "You offer no opinion" --
THE WITNESS: I'm sorry --
MR. BOMBARD: I'll repeat the question.
THE REPORTER: Thank you.
MR. BOMBARD: No problem. I was going too fast.
BY MR. BOMBARD:
Q You offer no opinion on whether the executive order is constitutional or lawful, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct, I offer no opinion.
BY MR. BOMBARD:
Q You offer no opinion on whether the Hegseth Policy is constitutional or lawful?
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q Correct?
A Correct, I offer no opinion.
Q You offer no opinion on military readiness, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
0068
BY MR. BOMBARD:

Q You offer no opinion on lethality, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
BY MR. BOMBARD:
Q You offer no opinion on unit cohesion, correct?
A Correct.
Q You offer no opinion on deployability, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
BY MR. BOMBARD:
Q You offer no opinion on the medical standards for accession, correct?
A Correct.
Q You offer no opinion on medical -- excuse me. Strike that.
You offer no opinion on the medical standards for retention, correct?
A Correct.
Q You offer no opinion on gender dysphoria, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.

0069

BY MR. BOMBARD:
Q You offer no opinion on the treatment of gender dysphoria, correct?
A Correct.
Q You offer no opinion on whether any named plaintiff meets medical retention standards, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
BY MR. BOMBARD:
Q You offer no opinion comparing the current Hegseth Policy with prior policies, correct?
MS. PANCHOK-BERRY: Objection. That's a very broad question.
BY MR. BOMBARD:
Q I'll be more specific.
You offer no opinion comparing the Hegseth Policy with the 2018 Mattis Policy, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, just one moment.
MS. PANCHOK-BERRY: Can you define the "Mattis Policy"?
THE WITNESS: Yeah, I'm not aware of the --
BY MR. BOMBARD:
Q Do you need me to repeat the question?
A Yeah, if you could give me an overview of

0070

the Mattis Policy.

Q Do you know what the Mattis Policy is?

A Uh, I'm not sure.

Q So do you intend to offer an opinion on the Mattis Policy?

MS. PANCHOK-BERRY: Why don't we define what it is, since there are --

MR. BOMBARD: I'm asking the questions. If you can answer the questions.

MS. PANCHOK-BERRY: No, you're describing the name of a person and policy.

MR. BOMBARD: I'm not testifying. I'm asking him if he knows and has an opinion on the Mattis Policy.

MS. PANCHOK-BERRY: Do you have the date it was issued?

MR. BOMBARD: In the record. I just said it was 2018.

MS. PANCHOK-BERRY: That's not -- that's vague. We need the name of the policy, and if he's going to be responding about his opinion on a policy, you need the name of the policy, when it was issued, so that we can be clear about his opinion on that policy. Thank you.

THE WITNESS: Um, I am not, um -- I'm not

0071

sure --

BY MR. BOMBARD:

Q I don't know which question we're on.

A Yeah.

Q We just had like a long speaking objection from your attorney, so we'll just move on from that line of questioning. I think I -- I think you answered it.

A Well, could I -- I would like to actually --

Q I'm going to move on to the next question.

A I would like to respond if I could, actually. So you asked me about the executive order and the Hegseth Policy earlier.

Q Yes. Go ahead.

A And I would just refer you to my first opinion, so, um -- I thought at first you were asking me about constitutionality, et cetera, so I am aware of obviously the executive order in the Hegseth policy, and it is my opinion, as stated in my first opinion, that, as it reads here, that those policies "curtailed successful military careers that were otherwise progressing."

Q That's the only opinion you have on the

executive order that you are offering an as expert in this litigation?
0072
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes.
BY MR. BOMBARD:
Q General Young, have you reviewed the reports of defendant's experts in this case?
A I have reviewed Mr. Dill's, uh, report. That's the only other report I have, um, looked at that would be an expert report.
Q Do you intend to offer rebuttal opinions to the declaration of Timothy Dill?
A Um, I could do so if asked by counsel, but at this point I do not.
Q If you were asked to do so, what would those rebuttal opinions be?
MS. PANCHOK-BERRY: Why don't we bring up the Dill declaration so you're not speaking --
MR. BOMBARD: We can come back.
THE WITNESS: Yeah, just --
BY MR. BOMBARD:
Q Strike that last question. No need to respond.
If you would turn to the first page of your expert report at paragraph 2, please.
It states, "I have provided three opinions and supported those opinions with my own personal
0073
experience, frameworks designed from my military experience and used in similar cases involving separation from the military and information from the materials identified in Appendix B."
What do you mean by "frameworks designed from my military experience"?
A As it relates to, uh, this report, the framework that I'm speaking of is the one that, uh, starts on page 4.
Q And so it would be -- are you referring to paragraph 16 that states "when assessing a service member's potential for continued military service, I review three elements"?
A Yes.
Q And then the three elements are listed in the bullets below on page 4 of Exhibit 1?
A Yes.
Q And onto the top of page 5?
A Correct.
Q Are there any other elements that you assess or review when assessing a service member's potential

for continued military service besides these three?
A I think these three are adequate.
Q Let's go back to paragraph 2, which is on page 1.

0074

The last sentence says, "The opinions expressed in this report are based on a reasonable degree of certainty."
What does that mean?
A It means I'm reasonably certain in them. I suppose there theoretically could be other evidence produced that might change things, but at this point, based off everything I see and everything I know, I'm reasonably certain what I have stated.
Q How do you specifically quantify "reasonably certain"?
A I just did.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q So you just answered, when I asked about "reasonable degree of certainty," quote, "It means I'm reasonably certain in them. I suppose there theoretically could be other evidence produced that might change things, but at this point, based off everything I see and everything I know, I'm reasonably certain what I have stated."
Are you unable to quantify what you mean by like how certain, like a percentage? Are you 100 percent sure when you say it is? What is "reasonably certain"? That's a qualifier.

0075

MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q Is it "more likely than not"?
A It's definitely more likely than not.
Q How do you define "more likely than not"?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, greater than 50 percent. As it relates to these opinions, I'm certain of these opinions. I mean if we want to go there, let's go there. These are -- these opinions are essentially -- um, I, I -- it's --
BY MR. BOMBARD:
Q Let me ask you this: Is it scientific certainty?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Can you define that?
BY MR. BOMBARD:
Q Is it based on a particular methodology or -- is it based on a particular methodology that's

commonly accepted in expert circles?

MS. PANCHOK-BERRY: Objection; vague, unclear.

THE WITNESS: I believe that the framework that I've used, I've actually seen something very similar, uh, by other experts, um, so the

0076

framework that's outlined which helps support Opinion 1, I believe is, um -- I'll say that -- well, again, I've seen it used in other -- by other experts. I've used it in multiple, uh, successfully multiple reports, and frankly I think it's kind of common sense, um, in, um, in a lot of ways.

The -- you know, the second, the second opinion deals with, um, VA disability rating, so, um, we've shown some examples there. I think it is definitely more likely than not that, uh, the plaintiffs will leave service with a VA disability rating.

And then the third opinion talks about the separation pay and the, um, uh, and the recoupment of it.

This is codified in, um, you know, in regulation and in statute, and so I don't -- you know, unless there's going to be some sort of exception, uh, to the statute or to the regulation, then I see the -- you know, in those cases, I think there's certainty to it.

If there's reason -- reasonable certainty again would be if there's some new fact, uh, that presents itself, then maybe it would change, but

0077

subject -- unless there's new facts presented, then I'll stand by what I said.

BY MR. BOMBARD:

Q Let's talk about the specific facts.

The last clause in the sentence says -- I'll just read the sentence again. "The opinions expressed in this report are based on a reasonable degree of certainty, grounded in my extensive professional experience and the specific facts reviewed in this case."

What are those specific facts that you reviewed?

A Well, I think, uh, if you go to the appendix, uh, which we've looked at a few times now, um, there's some facts that come out of statutes, government documents, discovery materials, uh, in particular, so I would just refer you back to that

appendix.
Q So Appendix B is the comprehensive universe of fact material you reviewed?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, I believe so.
BY MR. BOMBARD:
Q Did you review any plaintiff's evaluation reports?
0078
MS. PANCHOK-BERRY: Objection.
THE WITNESS: No.
BY MR. BOMBARD:
Q Did you review any plaintiff's FITREPs?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: No.
BY MR. BOMBARD:
Q Did you review any plaintiff's official military personnel file?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, not the full file.
BY MR. BOMBARD:
Q Did you review any plaintiff's enlistment contracts?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, not that I can recall.
BY MR. BOMBARD:
Q Did you review any plaintiff's service obligation documents?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Not that I can recall.
BY MR. BOMBARD:
Q Did you review any plaintiff's DD 214, to the extent one existed?
MS. PANCHOK-BERRY: Objection.
0079
THE WITNESS: I believe there are some 214s in some of the documents, to my recollection.
BY MR. BOMBARD:
Q Did you review those DD 214s?
A If they were -- if they're in the, um, Appendix B, then yes.
Q Did you review any plaintiff's medical records?
A No.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q Did you review any plaintiff's Veterans Affairs claim file?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: No.

BY MR. BOMBARD:
Q Did you review any plaintiff's DFAS separation pay computation?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I don't believe so.
MR. BOMBARD: Let's take another five-minute break. It's been about an hour.
THE VIDEOGRAPHER: We're going off the record at 11:24 a.m. Eastern Time.
(Whereupon, a short recess was taken.)

0080

THE VIDEOGRAPHER: This is video file number three. We're back on record 11:38 a.m. Eastern Time. You may begin.
BY MR. BOMBARD:
Q Thanks, General Young. I want to ask you a few questions about the framework and methodology of your report, which is section IV on page 4.
A Okay.
Q You state that you "use a framework that reviews two elements."
Has anyone tested your framework's predictions against actual career outcomes?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: The framework was actually developed knowing about career outcomes, so -- this framework was developed after I retired, after I had had the experience of managing and leading hundreds, if not thousands, of soldiers, seeing what kind of files got promoted, which didn't, et cetera.
So that's how the framework is validated.
BY MR. BOMBARD:
Q My question was: Has it been tested? For example, like is there an error rate in your framework where you got the career outcome wrong?

0081

MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, it is not a framework that lends itself to a mathematical testing in the way that you're, um, describing.
BY MR. BOMBARD:
Q Okay. Would you agree that career potential is a multifaceted, individualized, evolving judgment?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Well, you, you've said -- you've given a couple different adjectives there, so I'll, I'll just say that I think these three elements in the framework account for the fact that career development can be multifaceted.

BY MR. BOMBARD:
Q In any of your engagements as an expert, did you conclude that the service member would not have continued serving?
A Yes.
Q How many times?
A I'd have to go back and look at every case. Um, normally I try to be relatively conservative, um, in that, and, um, so I can -- the one case that we looked at earlier comes to mind is Scott, and Scott, you know, had a good file, but he was trying to be an 06, and, you know, it's hard to be an 06.

0082

So it's a tough cut rate for that, and so, um, that would be an example where we argued that the framework applied to Scott, but that Scott didn't quite have the individual performance required to get promoted.
Q One of the elements within your assessment, it's the second bullet point on page 4, it says that you review "published metrics on career advancement and service structure."
Did you do that for any plaintiff here?
A Um, so I did it in the context of -- um, not for each plaintiff, but in the context of the services as a whole. So what I mean by that is we know, for instance, um, that, um, the approximate, um, sort of -- I'll call it the targeted promotion rates, for instance, from 03 to 04, from 04 to 05, so that's the sort of, um, metrics that I'm speaking of.
We know that there are rules about, for instance, once you become an E-6, uh, you continue to have solid performance, that you can basically retire at 20 years. Same for 04.
We know, for instance, that the Department of Defense asked Congress to approve a force structure increase.
THE REPORTER: A what?

0083

THE WITNESS: Force structure increase, um, as part of the budget.
These are the types of things that, um, I know, because I'm paying attention and I'm reading and I'm in the space, and that work their way into, uh, the framework when you talk about, um, published metrics or service structure, historical force structure trends, et cetera.
THE REPORTER: And you're saying "force," F-O-R-C-E?
THE WITNESS: Yes, F-O-R-C-E, force

structure. Sorry. I tend to mumble.
THE REPORTER: That's okay.
BY MR. BOMBARD:
Q These published metrics are not cited anywhere in Appendix B; is that right?
A Um, just one moment.
Well, as an example, on 17, um, we do talk about the general promotion rates, so that's an example. I didn't give an exhaustive list in, um, Appendix B, but you asked me what type of -- uh, essentially, you asked what type of data that we use, and so I was giving you examples.
Q What years and specific boards were those percentages obtained from?
0084
MS. PANCHOK-BERRY: Objection.
THE WITNESS: These percentages are, um, consistent year to year. Obviously, it varies a little bit year to year, but directionally, these percentages are solid across services year to year.
BY MR. BOMBARD:
Q You didn't actually review the actual promotion board percentages for 2026 for each rank, did you?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: In other cases, I have looked at actual promotion board results, so I'm very confident with what 17 says. I did not look at the 2026, uh, board results. I'm not sure which one you're speaking of. There would be many of those, but, um, uh, in any regard, I didn't look at 2026 for this case.
BY MR. BOMBARD:
Q You don't know the promotion board rates for each plaintiff's particular specialty or MOS, correct?
A I wasn't asked to do that.
Q So the answer is no?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: The answer is I wasn't asked to do that, so, comma, "no."
0085
BY MR. BOMBARD:
Q Paragraph 17, sticking with that, states, "Someone who joins the military, enjoys it as a career, and has positive performance can usually achieve a 20-year career."
What percentage of military entrants actually reach 20 years of service?
MS. PANCHOK-BERRY: Objection.

THE WITNESS: Um, it depends. It depends on the service, it depends on actually what age they come in, uh, to the service, and --
BY MR. BOMBARD:
Q Globally --
A -- and it depends on --
Q Sorry to interrupt you.
A You want me to finish? Um, it depends on intention.
Q Do you know the Department of Defense or Department of War global figure for percentage of United States Armed Forces who enter the military and end up serving 20 years?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, in other cases, I don't look at it that way. I look at it by the age

0086

that somebody comes into the service, and I don't recall what it is off the top of my head.
BY MR. BOMBARD:
Q Isn't it historically well under one in four entrants to military service that reaches 20 years?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, if you have a study that you'd like me to look at, I'm happy, uh, to do that. I'll answer your question as best I can.
There's obviously attrition that occurs. Obviously some people enter the military and don't stick around. Sometimes it's failure to adapt. Sometimes they just decide to go do something else. The military often markets itself that way. Just come in, go to the academy. All you have to do is give five years, uh, back.
So clearly there's, you know, attrition. Clearly people leave service to go do other things.
My point, and which was written in the report, I believe is valid, is somebody who comes into the service, has good solid performance, wants to stay for 20 years, can stay for 20 years, and, you know, even if I were to accept

0087

your one-in-four, um, number, then, um, the way I would, the way I would look at that is to say, well, 25 percent, you know, are the ones that wanted to stay and they were able to stay.
BY MR. BOMBARD:
Q Does continued military service depend on the needs of the military?

A Yes.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q Do you agree that no service member is guaranteed continued service?
A I think there's an implied understanding that -- what I said before and what I said in the report. If you are performing, if you, um -- then, under normal circumstances, you can achieve a 20-year career. It isn't the same as a guarantee, um, but it's sort of an implied understanding that, um, based off what I said before, I mean you wouldn't expect somebody who came in and who performed poorly to be able to achieve a 20-year career.
Q Paragraph 18, the final sentence acknowledges that force structure changes and certain instances where the services may eliminate or reduce certain career fields --

0088

MS. PANCHOK-BERRY: Where are we?
THE WITNESS: 18.
BY MR. BOMBARD:
Q Final sentence in paragraph 18. You agree that service priorities can and do change, correct?
A Well, that's not really what this, uh, sentence says. You, you refer to this sentence, and then you kind of ask a different, uh, different question.
So are you asking about like strategic priorities of the service?
Q The specific question I have is that service priorities, which would include the elimination of certain career fields or certain force restructuring, can and does happen.
A It can. That's not really what's happening in this case. Here, you have a class of people that are being eliminated, but, um, yes, it can happen.
Q For a service member who separates at the end of an enlistment or an obligated service period, they receive no separation pay, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, I believe that's correct.
BY MR. BOMBARD:
Q Congress has authorized involuntary

0089

separations outside of force reductions, correct?
A Yes.
Q Would failure to meet medical standards be one example?
A You can be separated from service for

failing to meet medical standards.

Q Do you claim to possess expertise in medical retirement?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: I claim expertise in understanding the process. I'm not a physician. I don't claim to be able to look at medical records and make a medical assessment, other than, in some cases, the summaries are written in very plain English that's designed to -- so that nonmedical people can understand them, but as a general rule, I would not make a medical -- try to make a medical determination.

BY MR. BOMBARD:

Q Do you claim expertise in the Disability Evaluation System process?

A Yes.

Q What is your expertise in the Disability Evaluation System process based on?

A What's it based off of? Um, understanding

0090

how it works based off of my military career and my expert witness career.

Q If you would please turn to page 11 of your expert report, I'd like to focus you to footnote 6.

Footnote 6 states, "Of course, a service member may be separated or dismissed because of disciplinary or adverse administrative action, including misconduct, failure to meet standards, or other ground established by military law and regulation. This is not applicable in this case. In this case, under the current government policy, the plaintiffs' gender dysphoria is not a qualifying condition for DES."

Do you see that?

A Yes.

THE REPORTER: DES?

BY MR. BOMBARD:

Q D-E-S.

A Disability Evaluation System. Yes, sir, I see that.

Q Do you understand that a service member with gender dysphoria, but who also has a condition that is untreated and rateable under the VASRD would be entitled to a referral to the Disability Evaluation System?

0091

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Um, can I -- let me try to repeat your question, make sure I understood it.

Are you, are you asking about somebody that has another dis-, a dis- -- maybe you can read it back to me. I'm sorry.
BY MR. BOMBARD:
Q Sure. Well, let me ask you first -- I'll get to that. I'll maybe clean it up a little bit.
Is gender dysphoria a condition listed in the VASRD? V-A-S-R-D.
A What is the acronym you're referring to?
Q Have you ever heard that acronym before?
A I'm not sure.
Q VASRD stands for the Veterans Affairs Schedule for --
A Oh.
Q -- rating Disabilities.
A I misheard you. I heard V as D, so -- um, okay. Is your question is gender dysphoria in the VA disability schedule? Uh, I don't believe so. I think that Mr. Dill said that in his, uh, report, if I recall correctly.
Q And do you believe that to be the case, based on your understanding of the Veterans Affairs Schedule for Rating Disabilities?

0092

A I believe Mr. Dill told the truth, so that's the way I understand it.
Q You're aware that even though gender dysphoria is not in the VASRD, if the service member has other conditions that are listed in the VASRD, that they may be referred into the Disability Evaluation System?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: An example meaning a broken leg or a hurt back or something like that?
BY MR. BOMBARD:
Q Correct.
A Yes.
Q So you are in agreement with Mr. Dill that gender dysphoria is not a condition rated under the VASRD?
A Well, I made no --
MS. PANCHOK-BERRY: Objection.
THE WITNESS: -- no opinion about gender dysphoria in my, in my report. I'm not -- I guess the way I would answer your question, I'm not disagreeing with Mr. Dill. Um, I didn't take an opinion on his report. I only mentioned that he mentioned it in his report.

0093

BY MR. BOMBARD:

Q I believe you stated that you consider yourself an expert on the DES process, correct?
A On the process, yes.
Q So as an expert, as an expert in the DES process, you understand that diagnosis of gender dysphoria provides no basis for DES referral?
A As I understand it.
Q Or a Chapter 61 disability retirement?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
BY MR. BOMBARD:
Q Is it true that medical retirement requires a Physical Evaluation Board, a/k/a "PEB" --
A Yes.
Q -- finding?
A Sorry. I thought you were finished.
Q No. I'm trying to go slow. That the member is unfit?
A Yes.
Q Is it your understanding that plaintiffs contend that they are all fit?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes.

0094

BY MR. BOMBARD:
Q I want to ask you a few questions about the Veterans Affairs adjudication process.
Is gender dysphoria a service-connected condition?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: My understanding is that it's not.
BY MR. BOMBARD:
Q Is it correct that a condition must be rateable under the VA Schedule for Rating Disabilities to support compensation for said disability?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes.
BY MR. BOMBARD:
Q Is it correct that by statute, the term "service-connected" means the disability was incurred or aggravated in the line of duty, in active military service?
MS. PANCHOK-BERRY: Objection; calls for a legal conclusion.
THE WITNESS: I'm not sure if that's exactly the way it's defined. The way you're reading it sounds like it might be, but, uh, in general, I would say yes, it has to be service-connected,

0095

uh, in order to be accepted by the VA as something that they will compensate for.

BY MR. BOMBARD:

Q The veteran -- the Department of Veterans Affairs and not the Department of War or Department of Defense decides service connection and ratings for disabilities, correct?

A Yes.

Q And nothing in the Hegseth Policy controls a VA rating decision, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Correct.

BY MR. BOMBARD:

Q Is it true that Veterans Affairs rating adjudications review on a condition-by-condition basis?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yes.

BY MR. BOMBARD:

Q Are you familiar with that process?

A Yes.

Q Is it a fair summary to say that a claimant would identify a specific diagnosed condition, and then establishes a service connection to said condition, and that the VA would independently then

0096

assign a rating, if appropriate?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Yes.

BY MR. BOMBARD:

Q Your report did not perform any of these steps for any plaintiff, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: That's correct. Most of the time, you don't go to the VA process, as you described, until you're separating from service. So, uh, at the point I analyzed this, these plaintiffs were in service. It would not really make sense for them to have a VA rating, uh, at that point in time.

BY MR. BOMBARD:

Q Administrative separation does not prevent a veteran from filing a VA claim for his service-connected condition, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: What type of administrative separation?

BY MR. BOMBARD:

Q Administrative separation in general. Let's

assume that the administrative separation in my question results in an honorable characterization of
0097
service, and the member is separated.

A Uh, in that case, yes, they can apply to the, uh, VA process.

Q And the ability to apply through that process is no guarantee that any claim will later be granted, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Correct.

BY MR. BOMBARD:

Q And so the Hegseth Policy neither creates nor forecloses any plaintiff's potential VA rating, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Correct.

BY MR. BOMBARD:

Q I want to ask you a few specifics about some of the plaintiffs who have -- that are not active component. I believe plaintiffs Talbott, Richter, Converse, Simpson, and Gross serve in either the Reserve component or National Guard.

My question is: Is a reservist's retirement -- it is generally a non-regular retirement that is payable at the age of 60, correct?

A Generally, yes. There are exceptions, but yes.
0098

Q Did you account for that for each of these either Reserve or National Guard plaintiffs?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: My first opinion dealt with their continued service, so it says that the "Executive Order . . . and the Hegseth Policy curtailed successful military careers that were otherwise progressing."

I didn't make a comment or a calculation about retirement pay.

MR. BOMBARD: I've handed the court reporter what will be marked as Exhibit 2.

(Exhibit 2 was marked for identification.)

BY MR. BOMBARD:

Q General Young, this is the first government document referenced in Appendix B of the materials you considered in your expert report. This document is a printed version of the document titled "Employment Situation of Veterans News Release," dated April 28, 2026, from the United States Bureau of Labor

Statistics.
The BLS data reflects here what veterans self-reported in a household survey, correct?
A I believe so.

0099

Q This was not a review of VA records, but rather a survey; yes?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, again, I believe so.
BY MR. BOMBARD:
Q Did you or anyone verify these self-reports?
A No.
Q In this report, if you look at the first paragraph when it's -- the second sentence states, "The jobless rate for all veterans increased over the year from 3.0 percent to 3.5 percent in 2025."
Is that right?
A That's what it says.
Q Then the next sentence states, "In August 2025, 50 percent of Gulf War era II veterans had a service-connected disability, compared with 34 percent of all veterans."
Do you see that?
A Yes.
Q To the extent you know, is the reference to Gulf War era II veterans, is that synonymous with a term used frequently, the Global War on Terror or GWOT?
A Yes, I believe that's a post-911 group, essentially.

0100

Q So according to this self-reported household survey, approximately half of the GWOT veterans had a service-connected disability, and the other half in this self-reported survey did not have a service-connected disability, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes, I would say you have to remember there are -- of the 60,000 people that it looks like they sampled, you'll have some of those folks that only served for a year or two, potentially, uh, or three or four years, so -- but yes, you're reading it correctly.
BY MR. BOMBARD:
Q Your report references an acronym "CRDP," which stands for "Concurrent Retirement and Disability Pay."
Do you see that in paragraphs 41 and 42?
A Yes.
Q And the 50 percent CRDP threshold, that's

set by statute, correct?
A Yes.
Q So that's -- Congress sets that, not the Pentagon or Department of War?
A Yes.
Q You say that ratings of 50 percent

0101

disability or more are common and expected, correct?
A Where do you see that?
Q Paragraph 38 on page 14. I'll read it.
"In my experience as a senior military officer and as an expert witness, having a VA disability rating of more than 50 percent is common."
A Yes.
Q By your own logic, many of the plaintiffs would potentially receive a substantial VA compensation for life?
A Well, I believe that the plaintiffs will receive -- it is more, certainly more likely than not, they will receive a VA disability rating. Many of them will get more than 50 percent.
Q I want to ask you a little bit about paragraph 43. Feel free to read the entire paragraph, but I want to ask you some questions about how you arrived, um, at your conclusion in the final sentence.
It states, "The difference is often $2 to $3 million dollars over a lifetime." Second-to-last sentence.
How did you calculate this figure of $2 to $3 million dollars over a lifetime?
A Those figures are based off my experience with other cases. Um, I did not do any calculations

0102

for any of these plaintiffs, because we don't have VA records. Many of them have not even been through the VA process, but I do know, uh, from looking at, um, the cases that we talked about earlier in my practice, um, it's often required of me to do the calculations of the VA disability and potentially the medical disability retirement, or the regular or non-regular retirement, so that we can look at the economic damage that may or may not occur.
That $2 to $3 million dollars over a lifetime is frankly pretty conservative, but it is a range and it's a general order of magnitude estimate, um, just to, um, make the point that the dollars that we're talking about are significant.
MR. BOMBARD: Okay. Thanks. I think we're at a good stopping point to go to lunch. We'll go off the record. Let's take an hour.

MS. PANCHOK-BERRY: Do you mind if we take less time, just because we started late?
MR. BOMBARD: That's fine. Why don't we -- it's 12:16. We can go off the record.
THE VIDEOGRAPHER: We're going off the record at 12:16 p.m. Eastern time.
(Whereupon, the lunch recess was taken.)

0103

THE VIDEOGRAPHER: This is video file number four. We are back on the record at 1:09 p.m. Eastern Time. You may begin.
BY MR. BOMBARD:
Q All right. Welcome back. Thank you, General Young.
I'd like to ask you to take a look at your expert report again on page 15. That's Exhibit 1. That's page 15. It's also footnote 15.
I'll read the footnote, which states in your report that "I reviewed the plaintiffs' sworn declaration that provided an overview of their careers and performance. While there are differences in tenure, services, grades and occupational specialties, all appear to be performing at or above retention standards from a performance perspective. This paragraph is based on these declarations."
Do you see that?
A Yes.
Q Uh, counsel for plaintiffs prepared those declarations in this litigation, correct?
A I don't know who prepared them. That's who gave them to me.
Q Okay. Other than the 203 documents in Appendix B, you didn't cross-reference or verify

0104

anything in the declarations independently?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, I'm not sure I understand the question.
BY MR. BOMBARD:
Q Let me rephrase.
A Cross-reference it to what?
Q Did you verify any of the statements that plaintiffs made in their declarations to the court independently after reviewing them?
A Well, they're sworn declarations, so I assumed they were true.
Q Would you -- okay.
Did you ask, um, for any supplemental documentation to verify any of those, or you just took

them to be true?
A Well, they were sworn declarations. I was told this is what we had, and so that is what I reviewed, and then I based my first opinion, uh, on that.
Q Do you agree that medical fitness is a component of retention standards across every military service?
A Yes.
Q I'd like to review the chart. It's

0105

headed -- the header is "Figure 1," which begins on page 6.
There's a table that has five columns identifying, the first column, the name; second column includes the rank and service; third column would include the years in service; the fourth column is titled "Individual Performance," and the fifth column is titled "Service Needs/Demand for Skills in Current Position."
Can you identify in column 4, "Individual Performance," um, which awards predate a plaintiff's diagnosis of gender dysphoria?
A No.
Q Can you identify which awards in Figure -- or in column 4 post-date each plaintiff's diagnosis of gender dysphoria?
A I don't know anything about the defendants' [sic] diagnosis or the date of the diagnosis, so no.
THE REPORTER: You said "the defendants' diagnosis"?
THE WITNESS: Or the plaintiffs, rather.
BY MR. BOMBARD:
Q In the Service Need/Demand column, that's the fifth column, uh, what analysis did you conduct on the service need and/or demand for these particular

0106

MOSs or specialties?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: I've outlined that, uh, before in a previous answer, uh, about the framework when we talked about, um, my understanding of force structure, of historical trends, of force shaping that may be going on --
THE REPORTER: Force shaping?
THE WITNESS: Force shaping.
THE REPORTER: Force shaping.
THE WITNESS: I think we struggled with that one before.
Um, and so, um, it is based off of that,

that, um, I made that assessment.
BY MR. BOMBARD:
Q Just taking the first named plaintiff in Figure 1, that would be the lead plaintiff, Nicolas Talbott; what is the service need or demand for platoon leaders in military police units as you understand it?
A Uh, my understanding is that we're not, um, doing away with military police units in the, uh, Army, and so it is a reasonable -- um, reasonable to believe that we're going to continue to need military police units in the future.
0107
Q For plaintiff Dandridge, which is Ensign Dandridge on page 7, it lists a number of -- actually, take -- strike that question, please.
If you would, General, uh, page 8, are you aware -- um, this -- one of the plaintiffs' here name is Commander Michelle Bloomrose. Are you aware that Commander Bloomrose has retired from the United States Navy?
A Um, I believe, um, yes, yesterday I learned that.
Q Okay, and for -- on page 9, it lists, at the very top of page 9, the individual performance for Clara Winchell is blank.
Is there any reason for that?
A I was looking at this yesterday. There's a couple things here. One, I would like to correct the years of service here from two to four. Um, that was my mistake, and I noticed it yesterday. Forgot to correct it earlier.
Um, the documentation on Winchell was limited. Uh, Lieutenant Winchell does have a top secret TS/SCI clearance. Uh, had I had a chance to, I guess, revise, I would have put that in the individual performance. That's an indication of trust and confidence in one's ability.
0108
Q And for plaintiff Winchell, what is her correct rank? I see both Lieutenant 03 and Lieutenant Junior Grade listed, uh, within the service member's entry here.
Do you know?
A I believe it's Lieutenant.
Q Okay. Moving down this chart to Lieutenant Colonel Ashley Davis, Lieutenant Colonel Davis has 22 years in service, correct?
A Uh, that's total service.
Q Okay, and --

A Colonel Davis I believe has reserve time and, um, active duty time.
Q Is Lieutenant Colonel Davis, to your knowledge, eligible for either an active or a reserve retirement?
A With 22 years of service, uh, Colonel Davis would be eligible for a retirement. Um, I would need to check the records to see how much of that time was reserve time and how much of it was active time.
Q All right. Thank you, General.
I'd like to move forward in your report to the opinion section again and focus on your second opinion, which is on page 16.
Is it your expert opinion that each of the
0109
plaintiffs has a greater than 50 percent chance of receiving a VA disability rating?
A Yes.
Q And on what basis do you make that, um, prognostication?
A The two studies that are cited in the appendix as well as my experience in, um, the services, and as well as my experience as an expert witness.
I could add, when somebody leaves the service, um, they go through a, a, um, transition point, transition in this case meaning transitioning from military to private sector, and part of that process is to basically talk to somebody from the VA about the process of VA disability, how to submit a claim, how to do it correctly, et cetera.
So the government has really set up a system that tries to take care of service members and tries to make sure that, if they're eligible for a VA disability, that they receive it.
Q But the -- your opinion, your second opinion here, though, rests primarily on this general household survey, correct, in addition to your military experience?
MS. PANCHOK-BERRY: Objection.
0110
THE WITNESS: It rests on all of it.
BY MR. BOMBARD:
Q And so you said there were the two studies as well as your expert -- experience as an expert?
A And my, um, my experience in the military.
Q But your experience in the military, as you testified earlier today, had -- you had no involvement in the VA disability assessment process, correct?
MS. PANCHOK-BERRY: Objection.

THE WITNESS: I don't believe that's what I said.
You asked a series of questions about whether I had essentially personally adjudicated claims, whether I was a, um, medical doctor, et cetera. I -- in my role in the military, we, um, absolutely dealt with things like these transition programs that I'm talking about, uh, some of which were piloted and put in back when I was in the human resource job.
We absolutely -- and I, I spent quite a bit of time talking about this, about, um, the integration between the VA disability system and the military disability system and the working groups that I sat in on, so that's how I would answer that question.

0111

BY MR. BOMBARD:
Q But you understand that the VA disability system is a completely individualized, case-by-case, individual-specific process?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Yes.
BY MR. BOMBARD:
Q All right, and so it is entirely possible that, despite the general population data you cited, that none of the plaintiffs could receive a VA disability rating; isn't that true?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Very unlikely.
BY MR. BOMBARD:
Q Why do you say that?
A I mean I feel like we're in a little circular loop here. For all the reasons that I previously gave in the previous answer.
Q I believe you stated just a moment ago that you're basing your opinion on two studies. I believe that there is only the one study referenced in Appendix B.
Did I, did I misunderstand?
A There's the study which we've looked at already, the Bureau of Labor Statistics study, the

0112

survey of 60,000 families.
There's, um, a Department of Veterans Affairs budget submission, which is admittedly a budget submission, but it's full of other data that, uh, would support, um, the, um, the information that we just talked about.
Q Okay. Would it be more accurate to state

then that there is one study you're relying on, and then there's also one Department of Veterans Affairs budget submission?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Well, no, I really don't think that's a fair way of putting it.

We included two examples. Um, I have no doubt that I could find similar studies, if I needed to, that would support the general conclusion that I'm making in Opinion 2, which is that, if we read Opinion 2, "It is more likely than not that each plaintiff with military service will receive a VA disability rating at the conclusion of their service."

I will stand by that. I think the, the documents that we've provided show that. The fact that the VA has people stationed at transition points adds credibility to that

0113

statement. My experience, um, as a senior Army officer would lend credibility to that.

I don't believe there's any other cases that I've looked at in my expert witness business where someone did not have a VA disability rating. I'm doing that from memory. I could be wrong, but I'm pretty confident in that.

BY MR. BOMBARD:

Q But just to be precise with the language that was used, I, I just want to ask: You said that you used two studies when I referenced you to Appendix B.

Is it your testimony that the budget analysis is a study?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: I mean we could refer to it as a study. We could refer to it as a budget analysis.

There are charts in there, uh, that will -- I referred to as a study, because they quote, uh, data, and if that's not the right phrase, then I'll rephrase it as simply data as opposed to a study.

BY MR. BOMBARD:

Q With the Bureau of Labor Statistics, though,

0114

you're, you're essentially just applying a, a just general population survey set to an individual basis without having reviewed the medical records, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: I think you're asking sort of

a compound question. I did not look in the medical records, which I've said before.

BY MR. BOMBARD:

Q Does the Bureau of Labor Statistics household self-reported survey, did it make any predictions on future VA disability rating percentages?

A Well, just a minute. Let me refer to my report.

Yeah, this is what I -- the second, um, document which I referred to as a study, uh, earlier, um, which is a budget submission noted on footnote 11 on page 13, um, concluded that the average degree of disability was forecasted to increase through, at that point, 2025, and it showed how it had, uh, increased over the, uh, past couple of years.

So I mean I think it's pretty clear that most veterans are going to get a, uh, disability percentage and that the percentage is probably going to be higher than it was in previous, uh, conflicts.

0115

That's what this data shows.

Q Isn't it true that the likelihood of a VA disability rating is contingent on factors such as, for one example, length of total service?

A I think that's a reasonable assumption.

Q Would it also be a reasonable assumption that such a factor that might be relevant is number of deployments?

A Sure.

Q Combat history?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Uh, it can.

BY MR. BOMBARD:

Q For a -- do you believe that a service member who is a reservist say with approximately one year of reserve service has the same likelihood of a VA disability rating as someone with over 20 years?

A Well, as you said before, it is an individual, um, circumstance, um, so probably you need to see the medical records, uh, of each to know. You could, after a year, um, you know, something could happen. Um, I will -- I'll give you that I think the longer you serve, the more likely you are to have a disability percentage.

Q And following that logic, a reservist, under

0116

statute, is required to show that that disability would be incurred or aggravated in the line of duty during a qualified active or inactive duty; yes?

A Yes.

Q Okay. Did you account for that, um, for the I believe five reservists and National Guard plaintiffs?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Well, I didn't, again, look at any medical records for anyone.

BY MR. BOMBARD:

Q Uh, but not looking into the medical records, but just the fact of their reserve service, less opportunities for those injuries incurred in the line of duty; did you factor that into your analysis for those plaintiffs?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: The -- I believe that the opinion, as stated in the report, holds true whether you're a reservist or whether you're on active duty.

BY MR. BOMBARD:

Q You believe that the likelihood of a VA disability rating would be the same for someone who is on active duty 365 days a year versus a reservist

0117

doing the minimal required reserve duty?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: I think this is a hypothetical, so I don't know. I don't know of any studies that show it one way or the other.

Um, I understand the point you're trying to make, that it seems more likely that somebody who's on duty more, uh, would have more opportunity, um, but that doesn't necessarily equate to the fact that one would have a disability or one wouldn't have a disability.

BY MR. BOMBARD:

Q You talked a little bit about separation payment recoupment. Uh, if a plaintiff or if anyone, any service member, never received a VA disability rating, that separation payment is not recouped, correct?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: Correct.

BY MR. BOMBARD:

Q Your ultimate opinion in number 2 predicts that plaintiffs have service-connected disabling conditions; yes?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: I didn't quite phrase it

0118

exactly the same way. My Opinion 2 says "It is

more likely than not that each plaintiff with military service will receive a VA disability rating at the conclusion of their service."
BY MR. BOMBARD:
Q Did you consider whether any such condition may bear on their fitness to serve if it's more likely than not that they will have a VA disability rating?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: No. There's many people that end their service with a VA disability, and that disability did not impact the length of their service.
BY MR. BOMBARD:
Q I want to ask you a bit about your third opinion, and I believe earlier you made a correction to paragraph 50, which lists a reference to 10 U.S.C. Section 1174(h), as in hotel. You wanted to -- you reviewed and noticed that that should read 1175.
Um, under section 1175(a), the Secretary established voluntary separation pay for eligible members who elect voluntary separation under the policy, and that separation pay is two times the standard separation pay formula.
Are you aware of that?
0119
A Yes.
Q And that was discretionary within the -- that was within the Secretary's discretion?
A That was my understanding.
THE REPORTER: Was there an objection?
MS. PANCHOK-BERRY: Yes. Objection.
BY MR. BOMBARD:
Q Is it also your understanding that Congress, not the Department of War, enacted the recoupment requirement that you reference in Opinion 3?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, yes.
BY MR. BOMBARD:
Q And is it your understanding that the recoupment applies to every service member who receives separation pay and later receives VA compensation, regardless of the reason for separation?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: It can.
BY MR. BOMBARD:
Q So you agree that nothing in this policy, the Hegseth Policy that you reference in your report, had anything to do with the recoupment mechanism? That was a creature of statute?
MS. PANCHOK-BERRY: Objection.

0120

THE WITNESS: Nothing in the Hegseth Policy?
BY MR. BOMBARD:
Q Correct.
A Are you including the two, two times payment when you describe the Hegseth Policy?
Q I'm only asking about the recoupment of when a service member has a VA disability benefit, the recoupment mechanism.
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Can we read back the question? I'm sorry. We've gone on, and now I forget what the question is.
BY MR. BOMBARD:
Q I could probably rephrase that a little better. Just one moment.
Your report references Title 10, section 1175, as we, as we discussed, and that statute, not the policy, governs how voluntary separation pay interacts with a later VA compensation, correct?
A Yes.
MS. PANCHOK-BERRY: Objection.
THE WITNESS: If we're going to talk about it more, could you show me the statute, um, just so I can refer to it, but yes is the answer to the question.

0121

BY MR. BOMBARD:
Q Okay, and that recoupment obligation by statute, it doesn't depend on a member's diagnosis or history of gender dysphoria, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: As far as I know.
BY MR. BOMBARD:
Q Can you identify any respect in which recoupment would apply differently to plaintiffs than to any other service member who received voluntary separation pay and later drew VA compensation?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Do I know of instances?
BY MR. BOMBARD:
Q I'll repeat the question.
A Sorry.
Q Can you identify any respect in which recoupment applies differently to the, to the plaintiffs than to any other service member who received voluntary separation pay and later drew VA compensation benefits?
A I can't identify any.
Q So in Opinion 3, subpart (i), this is on

page 16, you state, "The Hegseth Policy is depriving plaintiffs of compensation they would otherwise be

0122

entitled to for three reasons: (i), they would have received more separation pay if permitted to remain in service."

Do you see that part?

A I do.

Q And then it says, after the comma, "as the separation pay formula accounts for longevity."

In the scenario of a service member who separates at the end of an enlistment contract or an obligated service, are they entitled to any separation pay?

A Typically, no.

Q Then it states in subpart (ii), "The separation pay they are receiving as a result of the 'voluntary separation' is not what they would have gotten if separated in another way, such as if they had separated at the end of their enlistment contract/obligated service or retired under TERA, which would grant the veteran a pension, access to TRICARE, and other benefits."

Do you see that?

A I do.

Q Okay. So isn't it true that if the voluntary -- do you agree that the voluntary separation pay being doubled with the involuntary

0123

separation pay, in the context of the service member leaving -- actually, strike that whole question.

For this kind of broad opinion, it talks about like retiring under TERA. I mean how many of the plaintiffs that you reviewed would be eligible for TERA?

A That depends on the service, depends on their length of service, so some of them in this analysis would likely be eligible for TERA. It was used as an example. I didn't tie it to any specific person necessarily.

Q Is TERA available to Reserve and Guard members?

A I don't think so. I'm not sure, actually.

Q Do you have specific, like for this specific opinion, subpart (iii), subpart (ii), did you review these circumstances with each individual plaintiff?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: If you're asking if I did some sort of calculation or something, then no. I think I answered that before. My --

THE REPORTER: You said "I don't think I answered before"?
THE WITNESS: I think I answered that before. The -- perhaps if we broke up -- um, I
0124
understand the opinion has got a compound sentence there, so if maybe we broke it up into which part you're asking about, I might be able to be more responsive.
BY MR. BOMBARD:
Q You haven't analyzed whether any plaintiff is eligible or entitled to TERA, have you?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Not specifically as part of this case, no.
BY MR. BOMBARD:
Q The last clause is subpart (iii), which states "the 'voluntary separation pay' they are receiving is effectively zero."
What do you mean by "effectively zero"?
A Well, Opinion 2 and Opinion 3 are linked in that way, just in the same way that, um -- you know, you've tried to separate the VA payment from the separation payment, and in the same way that frankly I think Mr. Dill tried to separate it, the truth of the matter is, all these things interact with each other.
And so while the separation policy may seem generous to the uninformed, because it's 2X -- I mean a lot of people would look at that and say, hey, what's the problem? It's 2X. Um, the fact is that
0125
these plaintiffs are more likely than not going to get a VA disability, and so they're going to have to pay back, effectively pay back the separation payment.
And so it really doesn't matter if it was 2X or 2.5X or 3X. It would just change the dynamic in terms of how long it would take to pay it back, and so that's essentially what the third part of Opinion 3 is getting at.
Q But there's nothing unique about that to this group of plaintiffs with how that recoupment provision applies, correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Correct.
BY MR. BOMBARD:
Q I believe -- one moment.
At the last page of the report, page 19, paragraph 55, you write, "At best, the severance payment effectively becomes a loan."
Do you see that?

A Yes.
Q Is it your expert opinion that a loan is
worth effectively zero?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Um, there might be modest
value to having the money up front, but it is

0126

effectively a loan, and the severance payment is
effectively zero.
BY MR. BOMBARD:
Q That assumes that the member has a VA
disability, though, of course?
A Yes.
Q I believe you have an economy degree and
also an MBA.
Is $200,000 received today worth more than
$200,000 withheld in installments over the next nine
years?
A Yes.
MS. PANCHOK-BERRY: Objection.
BY MR. BOMBARD:
Q So the present value of a payment would
exceed zero, correct?
A The present value of what payment? Over
what period of time?
Q In my hypothetical, it's nine years.
A The present value -- let me try to restate
it. The present value of $200,000 is worth more than
$200,000 spread over equally nine years? Yes.
Q And the member who receives a payment in a
lump sum would be able to invest it?
MS. PANCHOK-BERRY: Objection.

0127

THE WITNESS: I think that depends on the
individual circumstance. I'm not really prepared
to say.
BY MR. BOMBARD:
Q The individual who receives a lump sum
payment would be able to pay off a high-interest debt?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Same answer as previous.
BY MR. BOMBARD:
Q Or a service member who receives a lump sum
payment would be able to fund a career transition,
correct?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Again, I think these are like
individual hypotheticals, so I think they're
outside the scope of my opinion.
BY MR. BOMBARD:

Q Is it true that the VA recoups only the amount net of the federal income tax withheld from the payment?
A Yes.
Q Is it true that VA compensation is itself tax-free?
A Yes.
Q I'd like you to take a look at page 18.
0128
It's Figure 2. Figure -- sorry. Figure 2 is a hypothetical, correct?
A Oh, yes.
Q So none of these four, like E5, 03, none of these scenarios are our plaintiffs?
A Correct. They're simply hypotheticals.
Q Figure 2 appears to divide the gross payment by the monthly VA rate.
Isn't it true that the statute recoups the net amount after the tax withholding?
MS. PANCHOK-BERRY: Objection.
THE WITNESS: Uh, yes.
BY MR. BOMBARD:
Q So is this chart incorrect in that regard?
A It's illustrative. So I'm not a tax accountant, so I didn't figure for the tax. I do know what the rule is, but I do not try to impute someone's estimated tax. Um, you can do that, and you might change the numbers, um, but the moral of the story would stay the same, and it would still take many months, uh, to repay the, um, uh, repay this loan. It may take fewer months, but it would still take many months.
Q Paragraph 53 says that the table assumes an 80 percent rating in each of these four scenarios.
0129
Do you see that in paragraph 53?
A Yeah, I do.
Q And it also assumes that they have no dependents, right?
A Well, I don't think it's actually phrased quite right. There is a -- um, there is a scenario that assumes 80 percent, but then other scenarios assume 70, 100 and 50. It could, admittedly, be phrased better.
Q So was this a typo?
A Um, I'll say it could have been phrased better.
Q Footnote 18 references the United States Department of Veterans Affairs. I believe this would be a publication titled "M21-1, Part VI, subpart ii,

Chapter 2." It has the title "Recoupment of Separation Benefits, March 9, 2026. Then you write, "This is a policy implemented by the services, and the Army does not appear to have the same recoupment schedule."

This is a Veterans Affairs manual, correct?

A I believe so, yes.

Q What's your basis for saying that this varies by service?

A Well, if this is wrong, I'm happy to correct

0130

it, but actually I pulled this directly out of the, um, the reference.

So the Army's policy, as I understand it, is essentially that we'll withhold all of your VA compensation every month until the loan is paid back. The Marines and the Navy and the Air Force secretaries have adopted a different, uh, what I call "less Draconian," um, payment schedule, and I understand the -- I believe the service secretaries have some latitude to do that, and this is what those recoupment schedules, uh, are.

The fact that it's in a VA document, I don't know why that is. You'd have to ask the VA.

Q In paragraph 56 you reference a Washington Post article?

A Yes.

Q And it looks like from the footnote there, footnote 19 at the bottom of page 19, the date of that article was about four or five days before you wrote your report.

Do you see that?

A Okay.

Q Is that correct?

A Uh, yes.

Q Who, who provided you this, or how did you

0131

come across this Washington Post article?

A Uh, counsel provided it to me.

Q Okay.

A And they asked just that I read it, and I thought it would be a good, um, way to sort of wrap up the report, so I included it.

Q Why did you think it would be a good way to wrap up the report?

A I just thought it was, um -- it made real, um, what can happen to veterans when there's a disconnect in terms of taking care of them.

MR. BOMBARD: Okay. I'm going to hand out the articles so we can talk about them.

(Exhibit 3 was marked for identification.)

BY MR. BOMBARD:

Q Do you agree with everything in this article?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: It's just an article. I don't vouch for the accuracy or validity of this article or anything that comes from the Washington Post.

BY MR. BOMBARD:

Q On page 3 of the exhibit, which is a

0132

printed-out copy of this Washington Post article, there's, um, some language in here I wanted to ask you about. It's at the very top. It's the last sentence of the first paragraph there.

Do you see where it says "risk a dishonorable discharge"?

A Yes.

Q Are you aware that the policy provides an honorable characterization unless the record warrants otherwise, and that an administrative separation cannot result in a dishonorable discharge?

A Yes.

Q Do you see in the fourth paragraph where it states that -- the article says that the double payment required agreeing not to apply for unemployment?

A Yes.

Q Did you check any factual statement on that with, with the policy?

A Um, I did notice that, and, um, I did not check it for, uh, accuracy, because I didn't really think it was applicable for any of my opinions.

Q Would you please take a look at the top of page 2 of the article. The sources for this article in this first sentence are, um, "nonprofit leaders and

0133

lawyers."

Do you see that?

A I do.

Q Do you know whether any of plaintiffs' counsel were the sources referenced at page 2 here?

A I don't know.

Q Did you discuss this with them?

MS. PANCHOK-BERRY: Objection; privileged. To the extent you can respond without discussing privileged communications, you may.

THE WITNESS: Um, I didn't. Again, they,

they said here is a recent article that talks about this, and that was basically the extent of the conversation about it.

MR. BOMBARD: We've been going for about an hour. I'd like to just take a five-minute break.

THE VIDEOGRAPHER: We're going off the record at 2:03 p.m. Eastern Time.

(Whereupon, a short recess was taken.)

(Exhibit 4 was marked for identification.)

THE VIDEOGRAPHER: This is video file number five. We're back on the record at 2:14 p.m. Eastern Time. You may begin.

0134

BY MR. BOMBARD:

Q General Young, I believe the court reporter has handed you what has been marked as Exhibit 4. We talked about this a little bit earlier today. This is the declaration of Timothy Dill.

Have you read this declaration before? I believe you testified to that earlier.

A Yes.

Q Thank you.

I'd like to turn your attention to paragraph 14 of the declaration, which states, "The Young report does not identify or discuss the medical or service treatment records of any named plaintiff, does not state that the author reviewed any such records, and does not identify any named plaintiff who has already filed a claim for VA disability compensation or received a rating decision."

Do you have any fact to dispute that?

A No.

Q If you'd please turn to the next page, paragraph 19, which states -- and take your time to read the preceding paragraphs, as this one references the previous paragraph, but it states at 19, "For that reason, any reduction in later VA disability compensation or retired pay attributable to recoupment

0135

is the result of the statutory coordination of benefits, not a disability-specific penalty or a special rule created for service members separated under the Policy."

Do you have any facts to dispute that sentence?

A I wasn't asked to rebut Mr. Dill's report, um, but at this point I don't have any facts to dispute it.

Q The next sentence states, "The Department applies the same statutory framework to this population that applies to other recipients of voluntary separation pay."

Do you -- are you aware of any facts to dispute that sentence?

A I'm not aware of any facts either way.

Q Why do you say "either way"?

A Well, he's talking about other recipients of voluntary separation pay. I'm not aware of all the recipients of voluntary separation pay, so I don't know that they apply it -- how they apply it to other people outside of this litigation.

Q But you agree that it's --

A Let me, let me answer it this way --

Q Let me strike the last question.

0136

A Okay.

Q The, the half question.

In paragraph 20, it says, "Major General Young's discussion also conflates two different issues: First, statutory recoupment of a lump-sum separation payment; and second, the potential difference between separating from military service and remaining long enough to become eligible for longevity retirement. These are distinct issues. No service member is guaranteed continued service through retirement eligibility, and eligibility for retirement, retired pay, concurrent receipt, and retiree benefits depends on the statutory requirements and the individual's circumstances applicable to that service member."

Focusing on the last sentence, do you have any facts to dispute the last sentence of paragraph 20?

A You don't want, you don't want me to address whether I think I conflated two issues or not?

Q The first question would be --

A That was a joke.

Q I know.

A Very good. The, um -- we've been at it a while. I thought I could add a little levity to it.

0137

The, um, the -- yeah, I don't think I conflated two issues. They may be distinct issues, but they are unrelated, so -- but I'll move on to your question.

The -- I agree no service member is guaranteed continued service. You asked me that before. I do think there's an implied understanding, which I answered before, that if you continue to

perform, um, and, um, you're probably going to be to continue to serve.

The, um -- in terms of, um, the -- I mean it is a, sort of a compound sentence here, but, um, these elements about eligibility for retirement, retirement pay, concurrent receipt, um, they are, um, codified in the statute, and individual circumstances do, um, dictate how they would be applied.

Q Thank you.

In paragraph 21, the, um, final sentence there beginning with "Likewise," it says, "a hypothetical comparison to Temporary Early Retirement Authority retirement does not establish that a particular service member was entitled to such retirement, which depends on the availability of that authority and satisfaction of its governing requirements."

Do you have any facts to dispute that

0138

statement?

A The whole way that, uh, TERA may or may not be applied here, um, is -- well, let's strike that, I guess. The, uh -- no is the answer to your question.

Q Is there anything -- do you have any facts that you dispute with what Mr. Dill states in paragraph 22?

A I think I've addressed all of these statements before, in that, um, I, I think if you don't look at the issue holistically, then, um, you might be able to convince yourself that, um, that what he's saying is accurate, but if you look at it holistically, then, um, there's -- it's more likely than not that the plaintiffs are going to effectively receive nothing from their severance payment.

Q Do you have any factual support that would dispute that recoupment results from a generally applicable statutory requirement that applies to voluntary separation pay recipients and is not unique to service members separated under the policy?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: No.

BY MR. BOMBARD:

Q As you said, you reviewed this I believe in preparation for your deposition. Can you identify any

0139

facts in Mr. Dill's declaration that, that you dispute?

A I wasn't asked to look at it as a -- or to do a rebuttal, um, of his, and so I will reserve the right to do that if I'm asked. The, um -- I'll make a

couple general comments.

I think where, um, Mr. Dill has made, um, comments about a program, um, then he's generally got it right. As an example, on paragraph 13, "VA disability compensation is adjudicated by the Department of Veterans Affairs on an individualized, condition-by-condition basis."

I agree. There are statements like that, without going through the entire thing, where, yeah, sure, he's got the definition of it right, the, um -- but as I said before, I think if you, um -- when you look at this holistically and you look at the interaction between, uh, the programs and the policies, then, um, I believe that what I've stated in my Opinion 3 is correct.

Q Do you intend to serve as a rebuttal expert for -- in response to Mr. Dill's declaration?

A I haven't been asked to, and, um, if I'm asked to, I'll consider it at that point in time.

Q Just a second.

0140

(Exhibit 5 was marked for identification.)

BY MR. BOMBARD:

Q General Young, are you familiar with this document?

THE REPORTER: Your microphone is --

BY MR. BOMBARD:

Q Oh, excuse me. Sorry, guys.

General Young, are you familiar with this --

A I'm looking at it. Just a moment.

Q Okay.

(Witness peruses document.)

THE WITNESS: I'm not sure. I've seen something similar, but I don't -- I believe, yeah, I've seen the one signed by Mr. Selnick. I don't think I've seen the cover letter signed by Mr. Dill, but I could be wrong.

I mean it seems familiar, but I don't know. The fact that Mr. Dill signed it, uh, kind of threw me for a second, so I don't know that I've seen that one, but I have seen the one that's, uh, after this, or before it, actually, from a date perspective.

BY MR. BOMBARD:

Q Okay. If you would turn to the end of the

0141

memo, which is signed by Mr. Darin Selnick, the next page has a boldfaced attachment on it, and it lays out paragraph 1, "Policy."

Do you see that page?

A Yes.

Q Let's focus on subparagraph echo, (e), excuse me. Section 1(e) here makes characterization honorable unless the record warrants otherwise.

Is it your understanding that an honorable characterization of service at -- excuse me -- at separation preserves a service member's eligibility for VA benefits?

A Yes.

Q And an example of some of the benefits a service member who is separated with an honorable, uh, would potentially include the GI bill?

A Yes.

Q Did you, did you factor in any of the monetary benefits associated with things like the GI bill in your opinions?

MS. PANCHOK-BERRY: Objection.

THE WITNESS: My opinions didn't deal with that, and so the answer is no.

BY MR. BOMBARD:

Q Let's turn to -- sticking in the same

0142

document, section 4.4, please, (a)(10), which is on page 7. This paragraph states, "Service members choosing voluntary separation will not have to repay any bonuses received prior to the date of this memorandum, even if they have a remaining service obligation, pursuant to 37 U.S.C. Section 373(b)(1)."

Did you account for this provision, um, when making your opinion in your expert report?

A I believe that this provision really refers to things like reenlistment bonuses. I don't believe this refers to the separation payment. If I'm wrong, if you could let me know that, that would be great. So I think we're talking about apples and oranges.

Q If you refer up to subparagraph (8) above where we just were, "Service members identified pursuant to section 3.4.e of this attachment with over 18, but less than 20, years of total active duty service are eligible for early retirement under the Temporary Early Retirement Authority in accordance with DOD Instruction 1332.46."

Do you see that?

A Yes.

Q Did you factor that into your opinions in your expert report?

A I mentioned TERA, which we've already talked

0143

about before, in, um, Opinion 3. Um, if you're asking

me if I did any sort of calculations, then again the answer is no.

MR. BOMBARD: All right. I'm going to go off the record again for five minutes.

THE VIDEOGRAPHER: We're going off the record at 2:33 p.m. Eastern Time.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: This is video file number six. We are back on the record at 2:40 p.m. Eastern Time. You may begin.

BY MR. BOMBARD:

Q General Young, have you now told me every opinion you hold in this case?

A Yes, with the caveats that I mentioned before about if I'm asked to do additional work, um, or respond to Mr. Dill's report, um, I would do that, but at this point you have all of my written opinions.

Q So up to this point, there's no work that you haven't already completed, that you haven't been requested to complete?

A Um, I have completed all the work, um, that I've been asked to do once this deposition concludes.

Q Do you intend to revise anything in your expert report?

0144

A Um, not at this point in time.

Q Do you intend to correct any of the figures or charts that we went through in your report?

A Um, nothing that would be material that I'm aware of.

Q And have you given me, um, the basis for every opinion that you hold in this case up to this point?

A I believe so, yes.

Q Going back to the Dill declaration, if you need five minutes to read through it again, that's understandable, and we can take a break. I wanted to ask you if you can identify any statement of fact in the declaration that you contend is inaccurate and identify it for me.

A Does that include statements that Mr. Dill made about me and my report or, or --

Q Anything.

A Anything? Okay. Well, yeah, I probably --

MS. PANCHOK-BERRY: I'll object just to the extent "fact" is not defined.

BY MR. BOMBARD:

Q Any statement in this declaration that you dispute as factually incorrect?

A I'll, I'll need to --

Q Of course.
A -- take some time.
Q Whatever you need to do.
A Yeah.
Q Would it be helpful to go off the record for that?
A It's up to you guys. I'm -- you're just going to sit here and watch me read, so either way.
THE VIDEOGRAPHER: We're going off the record at 2:42 p.m. Eastern Time.
(Whereupon, a short recess was taken.)
THE VIDEOGRAPHER: This is video file number seven. We're back on the record at 2:46 p.m. Eastern Time. You may begin.
THE WITNESS: Do you want to repeat the question?
BY MR. BOMBARD:
Q Yes. General Young, is there any statement in the declaration of Timothy Dill that you dispute as factually incorrect?
A I disagree with, um, how Mr. Dill has categorized some of my analysis or opinions. Um, on number 6 of his report, he, um, states that the effect of the policies on the service member's career progression is "a factual matter and not a proper



subject of" my expertise.
I mean I disagree with that. It's the policy -- the Department's policy had effect -- had a definite -- is having a definite impact on the career progression. My expertise covers those areas, and, um, and Opinion 1 actually does impact Opinions 2 and 3, so I disagree with most, if not all, I guess, of paragraph 6.
Um, the -- in paragraph 7, he makes sort of a, um, a comment at the beginning, um, where he puts in quotations "successfully progressing," and then he goes on to say that "no service member is guaranteed," which we've talked about before and I actually, um, agreed to, but, um, the way that it is phrased, in my opinion, calls -- he's calling into question whether their careers were successfully progressing. Uh, I -- they were successfully progressing, and he's offered no, no opinion in here that would suggest otherwise.
So, um, they were successfully progressing until this policy, which called out a category of people which they fell into, uh, was implemented.
Um, number 16, um, he calls my "assertion that voluntary separation pay is effectively zero

because it may be later recouped is incomplete and potentially misleading."

0147

I take exception to categorizing it that way for the reasons that he just stated. It's because it, it will be later recouped. He said it "may" be later recouped, but it's going to be later recouped. We've talked about that at length and why that would be the case.

Um, and the last thing I just double tap on number 20 where he says I'm conflating two different issues, uh, the recoupment of the separation pay and the difference between, um, say a longevity retirement.

Yes, I agree they are two different issues, but all of these, um, types of things are interrelated, and if you look at them myopically, um, in the way that sometimes Mr. Dill does, um, you would sort of fail to see the integration between them all. That's all I have.

Q General Young, I'm going to read back for you your answer to paragraph 16.

You say, "I take exception to categorizing it that way for the reasons that he just stated, it's because it will be later recouped," and "he said it may be later recouped, but it's going to be later recouped. We've talked about that at length and why that would be the case," but you aren't testifying

0148

that you know for a fact that any plaintiff has or will receive a VA disability compensation, so you're completely speculating on that point?

A I'm not completely, completely speculating at all, counselor. I think we've shown data that would show that the majority of veterans, uh, get a VA disability. We -- you can see that many of these plaintiffs have served for many years, and it's certainly more likely than not, uh, that they will get it. I will grant you that it's not 100 percent guaranteed, but it is, um, much more likely than not that, that they will.

MR. BOMBARD: All right. General Young, thank you for your testimony. Those are all the questions I have.

THE WITNESS: I have one other minor thing, but I -- it struck me at lunch.

You asked me at the very beginning if I had invoiced anything yet, and I actually have invoiced something on this Friday, and about 20 hours is my recollection, and I don't remember if

I've been paid or not, so -- I probably have. I'm not suggesting I'm not going to -- I just -- I don't remember, and again, it's very minor, but I didn't want to leave you with any hanging, uh,

0149

hanging things there, so . . .

MR. BOMBARD: Great. I appreciate that. Thank you.

MS. PANCHOK-BERRY: Why don't we take a break, have a short discussion, and maybe come back on the record just to make any final points.

MR. BOMBARD: Yeah, sure, great.

THE VIDEOGRAPHER: We're going off the record at 2:52 p.m. Eastern Time.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: This is video file number eight. We are back on the record at 3:08 p.m. Eastern Time.

Counsel, are there any more questions?

MS. PANCHOK-BERRY: No more questions on our side.

THE VIDEOGRAPHER: Since there are no more questions, this marks the end of the video deposition of James Young. We're going off the record and ending this deposition at 3:09 p.m. Eastern Time.

(Signature having not been waived, the video deposition of MAJOR GENERAL JAMES YOUNG was concluded at 3:09 p.m.)

0150

ACKNOWLEDGEMENT OF WITNESS

I, MAJOR GENERAL JAMES YOUNG, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

__________________ ______________________________

(DATE) (SIGNATURE)

0151

E R R A T A S H E E T

IN RE: Talbott, et al, vs. United States

RETURN BY:

PAGE LINE CORRECTION AND REASON

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

_____ ______ ____________________________________

________ _________________________________________

(DATE) (SIGNATURE)

0152

CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

I, Laurie Donovan, Registered Professional Reporter, Certified Realtime Reporter, and notary public for the District of Columbia, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 24th day of October 2026.

My commission expires: July 14, 2027

_______________________________
LAURIE DONOVAN
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA