**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,

Plaintiffs,

v.

UNITED STATES *et al.*,

Defendants.

Civil Action No. 1:25-cv-240-ACR

# PLAINTIFFS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE UNDISCLOSED DATA AND SOURCES FROM EXPERT TESTIMONY

Under Federal Rule of Civil Procedure 37(c)(1), Plaintiffs move *in limine* to exclude Defendants from offering any expert testimony that relies on data, analyses, studies, statistics, sources, bases, or methodologies they did not disclose under Rule 26(a)(2)(C).[1]

During depositions, Defendants' expert witnesses testified about undisclosed data, *e.g.*:

- a staff analysis of Air Force medical-readiness data that was prepared for Lt Gen DeGoes' deposition testimony;
- hospital database pulls LTC Salter gathered "in case anyone asked" in this case;
- studies reflecting complication rates for various gender-affirming surgeries that LTC Salter described but could not name or otherwise identify;
- a School of Aerospace Medicine study that is still underway and about which Dr. Ortega testified at his deposition;
- a blanket non-deployability assessment and a non-testifying nurse's statement about which LTC Lee testified;
- an Army data pull prepared for LTG Lombardo;
- suicide statistics GEN Carden found through Google;
- health-surveillance and behavioral-health data COL Cron "integrated" into his opinions but did not disclose prior to his deposition; and
- complication rates and research statistics CAPT Roberts and LCDR Bayer could not source yet testified about at their depositions.

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs conferred with Defendants about this motion. Defendants oppose.

Defendants' September 4, 2026 Rule 26(a)(2)(C) disclosures did not identify that data. Nor did Defendants disclose it in response to Plaintiffs' Interrogatory 5, which asked for every study, data set, and analysis supporting Defendants' readiness contentions. Defendants instead pointed only to the "Policy and all sources informing the Policy, including the Mattis Report, which the Policy relied on, and which were produced . . . on April 30, 2026." Defs.' Resp. to Pls.' Interrog. No. 5 (Ex. A). This Court's scheduling orders and Federal Rules of Civil Procedure 26 and 37(c)(1) bar Defendants from introducing improperly disclosed or undisclosed sources at trial; their witnesses should be permitted to testify only as to the facts and opinions that were actually disclosed with the timely filed expert disclosures.

## I. RULE 37(c)(1) LIMITS DEFENDANTS' WITNESSES TO THE DATA AND SOURCES DISCLOSED WITH THEIR RULE 26(A)(2)(C) DISCLOSURES.

Defendants made the strategic choice not to prepare full-throated expert reports for any witnesses and to instead disclose them pursuant to Rule 26(a)(2)(c). All of the disclosures were a handful of pages long. And only two disclosures (for LTC Salter and Dr. Ortega) identified articles or data that would form the basis for their expert testimony. Plaintiffs relied on Defendants' disclosures and the few attached articles that came with them to prepare for depositions. However, by the time their depositions came around, many of Defendants' witnesses had identified new sources—never previously disclosed to Plaintiffs—that they claimed supported their opinions. Plaintiffs could not meaningfully explore those materials in depositions, having just learned of them during the depositions themselves. Accordingly, Defendants may not use those undisclosed sources at trial.

A Rule 26(a)(2)(C) disclosure must state "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(i)-(ii). Such a disclosure "requires much more"

than naming broad topics without stating the actual facts and opinions. *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 72 (D.D.C. 2014). It must summarize "the opinions to be offered" and "the facts supporting those opinions." Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment; *see also Owens-Hart v. Howard Univ.*, 317 F.R.D. 1, 3-4 (D.D.C. 2016). The point is "to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert, and to prepare for depositions and cross-examination at trial." *Iacangelo v. Georgetown Univ.*, 272 F.R.D. 233, 234 (D.D.C. 2011).

A party that fails to disclose information as Rule 26(a) or (e) requires "is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The sanction is "self-executing" and "automatic." Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment. To avoid exclusion, Defendants must show that their failures were substantially justified or harmless. *Hargrove v. MedStar Wash. Hosp. Ctr.*, 188 F.4th 423, 431 (D.C. Cir. 2026); *Daniels*, 15 F. Supp. 3d at 72.[2] They can show neither.

Defendants' seventeen Rule 26(a)(2)(C) disclosures range from four to six pages. None appended sources except for LTC Salter's disclosure, which attaches three articles, and Dr. Ortega's disclosure, which attaches two. Defendants made the tactical decision to serve concise disclosures. Having made that choice, their witnesses' testimony must similarly be cabined to the facts, opinions, and sources their disclosures actually identify.

Defendants have nonetheless refused to agree that their experts will stay within the bounds of their disclosures. A few examples described below illustrates the broader problem:

---

[2] Bad faith is not required for exclusion. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 430 (D.C. Cir. 2014). A bad-faith requirement "would undermine the basic purpose of Rule 37(c)(1): preventing surprise and prejudice to the opposing party." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

**<u>Lt Gen DeGoes</u>** was disclosed to testify about Air and Space Force medical readiness and deployability, deployed medical care, operational effects of medical evacuations, and military fitness standards and waiver determinations. DeGoes Disclosure ¶¶ 3-5 (Ex. B). ***The disclosure did not mention gender dysphoria or any literature related to gender dysphoria.*** The only disclosed expertise underlying his opinions was his "extensive leadership experience and operational medical knowledge." *Id.* ¶ 3.

Instead of relying on his own experience and knowledge, at deposition, Lt Gen DeGoes relied heavily on an Air Force medical-readiness-data analysis that supposedly found that "those with gender dysphoria from 2022 to the present were not available for duty three to four times as many days as a random sampling of active duty." DeGoes Dep. 46:22-47:2 (Ex. C). He gave figures from that analysis, including an estimate—worked out at the deposition based on the data revealed during the deposition—that the deployability rate for airmen with gender dysphoria was "around 50 percent." *Id.* at 56:15-57:5, 96:5-9, 127:15-128:7, 167:4-5, 168:7-9.

That analysis was never previously disclosed, nor is it publicly available. "Someone else [in the military] looked at the data and reported it to [DeGoes]." *Id.* at 52:2-3. He reviewed the data while "preparing for [his] expert testimony in this matter" and received an update the day before his deposition. *Id*. at 50:6-14, 66:24-25. The disclosure identified anticipated testimony about "the current deployability rate of Airmen," not any gender-dysphoria cohort analysis or opinions about gender dysphoria. Asked where his disclosure covered that testimony, Lt Gen DeGoes admitted it does not, claiming only that the disclosure reveals it "by extension." *Id.* at 165:19-166:8. Nothing in the Federal Rules or applicable law permits expert opinions and data to be disclosed only "by extension." Such a reading would result in trial by ambush.

Lt Gen DeGoes expressly disclaimed any plan to offer an opinion on gender dysphoria. ***He does "not plan to offer an expert opinion on gender dysphoria."*** *Id.* at 146:14-17 (emphasis added); *see Hargrove*, 188 F.4th at 431 (affirming exclusion of an opinion the expert disclaimed at deposition). Defendants cannot turn undisclosed data revealed for a first time in a deposition into an expert opinion the witness himself disclaimed holding. Defendants should be barred from introducing the data, or testimony about them, at trial.

**GEN Carden** was disclosed to "testify generally about implementing the military's medical standards for accessions and retention," including "a range of disqualifying conditions for accessions and retention," and challenges with servicemembers who do not meet those standards. Carden Disclosure ¶ 3 (Ex. D). Like Lt Gen DeGoes' disclosure, GEN Carden's does not identify any study or underlying documents, stating only that GEN Carden's expertise comes from "his experience and knowledge regarding military personnel matters including military readiness." *Id.*

During Plaintiffs' examination, General Carden testified that he had seen studies suggesting individuals with gender dysphoria have higher rates of self-harm or suicidal ideation, including figures he described as "five to seven times more" and "40 percent more than the average cohort." Carden Dep. 193:1-22 (Ex. E). He identified no study, no author, and no dataset. Asked where the figures came from, he answered: "you can Google suicide." *Id.* at 193:1-6, 194:1-7. Whether he cannot recall the source or never had one, Defendants never disclosed it, and Plaintiffs cannot test a statistic whose source no one can identify.

Generals DeGoes and Carden were not outliers. In deposition after deposition, Plaintiffs encountered the same issue of witnesses relying on undisclosed data, studies, analyses, or statistics. They should be excluded for the reasons described above.

- **Dr. Ortega** testified about the following undisclosed data and should be barred from testifying about that data at trial:
  - Unnamed "medical literature" on prognosis and mental-health comorbidities in gender dysphoria, beyond his two attached articles. Ortega Dep. (Ex. F) 49:3-50:22;
  - Undisclosed UpToDate, PubMed, and Ovid searches summarizing those comorbidity findings. Ortega Dep. 50:8-22, 51:19-52:4, 62:16-20; and
  - An unpublished School of Aerospace Medicine study comparing duty restrictions, medical visits, and Medical Evaluation Board rates for recruits who entered with medical waivers against those who entered fully qualified. Ortega Dep. 84:12-18, 90:18-91:15.[3]
- **LTC Salter** testified about the following undisclosed data and should be barred from testifying about that data at trial:
  - "Discern Portal" data on her surgical case volumes and the number of gender dysphoria patients she has seen, pulled as part of her deposition preparation. Salter Dep. (Ex. G) 14:7-15:12, 40:14-22;
  - Unnamed VA and civilian studies on patient regret and on whether surgery improves mental-health outcomes, and the U.S. Transgender Survey. Salter Dep. 48:17-49:18;
  - Undisclosed articles on complications of gender-affirming surgery. Salter Dep. 50:11-22;
  - Complication rates for metoidioplasty (about 30%) and phalloplasty (about 75%) with no named source. Salter Dep. 97:18-98:15; and
  - Unnamed VA data and articles on her work computer. Salter Dep. 15:23-16:5, 131:8-18.
- **LTG Lombardo** testified about the following undisclosed data and should be barred from testifying about that data at trial:
  - An Army "data pull" counting soldiers with gender dysphoria, which he did not prepare and could not explain. Lombardo Dep. (Ex. H) 94:8-95:24, 99:6-10; and
  - "Army Vantage" non-deployability rates used in Army manning guidance. Lombardo Dep. 80:19-81:20.
- **LTC Lee** testified about the following undisclosed data and should be barred from testifying about that data at trial:
  - A recalled count of 32 Fort Campbell soldiers with gender dysphoria, all of whom he deemed "presumptively non-deployable." Lee Dep. (Ex. I) 242:12-244:6;

[3] While Plaintiffs managed to dig up the presentation in real-time during the deposition, they did not have any meaningful time to research the presentation or prepare questioning on it given that the presentation was never previously disclosed.

    - A nurse case manager's account of surgical complications. Lee Dep. Tr. at 275:20-276:20; and
    - A figure that true deployability drops a further "3 to 8 percent" when a unit is activated for deployment. Lee Dep. Tr. at 137:1-14.

- **COL Cron** testified about the following undisclosed data and should be barred from testifying about that data at trial:
    - Data on suicidality and deployment waivers from the Armed Forces Health Surveillance Branch and other commands, whose methods he did not examine. Cron Dep. (Ex. J) 119:5-121:10;
    - Unidentified studies linking gender dysphoria to suicidality and other mental illness. Cron Dep. 167:16-168:9; and
    - Undisclosed statistics showing mental health as the largest category of medical evacuations from the theater. Cron Dep. 178:7-15.
- **CAPT Roberts** testified about the following undisclosed data and should be barred from testifying about that data at trial:
    - A complication rate of up to 50 percent for gender-affirming genital surgery, from no named study. Roberts Dep. (Ex. K) 90:14-91:17, 111:1-6.
- **LCDR Bayer** testified about the following undisclosed data and should be barred from testifying about that data at trial:
    - UpToDate and OpenEvidence research on gender-dysphoria comorbidities and adverse outcomes, which his disclosure does not cite. Bayer Dep. (Ex. L) 128:12-18, 133:9-16.
    - Unnamed articles on rates of comorbidity, self-harm, and suicidality in people with gender dysphoria. Bayer Dep. 140:2-25, 141:23-142:2.
- **General Bowers** testified about the following undisclosed data, and should be barred from testifying about it at trial:
    - Unsourced FY2023 figures showing the Marine Corps 583 Marines over its authorized end strength. Bowers Dep. (Ex. M) 114:13-14.

## II. DEFENDANTS' FAILURE TO TIMELY DISCLOSE DATA AND SOURCES WAS NEITHER SUBSTANTIALLY JUSTIFIED NOR HARMLESS.

Neither exception to Rule 37(c)(1)—substantial justification or harmlessness—applies. Courts assessing those exceptions weigh "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Green v. Costco*

*Wholesale Corp.*, 2023 WL 2682119, at *4 (D.D.C. Mar. 29, 2023) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). Each factor favors exclusion.

When confronted with the fact that the disclosures failed to adequately disclose the data on which Defendants' expert witnesses would rely, *see* Sept. 17, 2026 Ltr. from J. Panchok-Berry to J. Littman (Ex. N), Defendants responded that Rule 26(a)(2)(C) disclosures "are not required to contain any 'data' at all," and that Plaintiffs could "follow up with the witnesses . . . at their depositions," Sept. 22, 2026 Email from M. J. Littman to Pls.' Counsel (Ex. O). Defendants' position is wrong. The Rule requires "a summary of the facts" to which the witness will testify, Fed. R. Civ. P. 26(a)(2)(C)(ii), including data, studies, and other analyses. As Plaintiffs explained, "the purpose of the disclosure is to enable adequate preparation for depositions, not to serve as a placeholder to be filled in during depositions." Oct. 8, 2026 Ltr. from J. Panchok-Berry to J. Littman (Ex. P), at 3; *see also Iacangelo* at 234.

Defendants had this data and decided not to disclose it. Lt Gen DeGoes reviewed his staff's analysis while preparing for his deposition and received an update on the figures the day before his deposition. DeGoes Dep. 50:6-14, 66:24-25. GEN Carden described suicide and self-harm statistics found through an online search presumably performed as preparation for his deposition, yet he identified no source. Carden Dep. 193:1-194:7. Defendants could have disclosed the data their witnesses later revealed but chose not to. A failure to disclose that is "the direct result of such a choice" is not "substantially justified." *Wannall*, 775 F.3d at 430.

Nor were the omissions harmless. Plaintiffs first learned of each analysis mid-deposition, with no document to examine and no source to test. Plaintiffs cannot use an expert to examine underlying data, methodologies, or conclusions of undisclosed assertions—the rebuttal report

deadline has long passed. Defendants' omissions deprived Plaintiffs of any meaningful chance to challenge their witnesses' claims.

The depositions did not cure the surprise, either. Comments made "for the first time in [a] deposition" do "not provide fair notice." *Hargrove*, 188 F.4th at 432; *see also Harvey v. Mohammed*, 941 F. Supp. 2d 93, 99-100 (D.D.C. 2013) (excluding expert testimony for failing to comply with Rule 26(a)(2)(C)), *vacated and remanded on other grounds*, *Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015). A deposition is the event Rule 26 disclosures are meant to prepare for, not the first permissible disclosure of the facts, data, and sources on which an expert will rely. Plaintiffs' "ability to ask . . . questions during [the expert's] deposition" does not show "that his disclosure was adequate." *Hargrove*, 188 F.4th at 432. The obligation, and failure, belongs to Defendants.

Cross-examination at trial is no substitute. The "ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure," because "rules of expert disclosure are designed to allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party's own experts." *S. States*, 318 F.3d at 598 (internal quotation marks omitted); *see also Anderson v. Bristol, Inc.*, 936 F. Supp. 2d 1039, 1062 (S.D. Iowa 2013) (finding prejudice from inadequate Rule 26(a)(2)(C) disclosures because defendants had "no documents or other information from which to prepare cross-examination or rebuttal witnesses"). Rule 26 exists so parties can examine expert material for flaws before trial, not improvise against undisclosed data in front of the factfinder.

Nor would late production solve the problem. Documents alone are "an inadequate substitute for proper expert disclosures and examination during discovery." *Green*, 2023 WL 2682119, at *4. Providing additional documents would still leave Plaintiffs without the

discovery needed to probe the analysis, depose the people who generated it, or prepare rebuttal expert testimony. And forcing that process now would disrupt pretrial preparation less than two months before trial begins.

A true cure would mean "reopening discovery (and possibly delaying trial)" to ensure Plaintiffs have "the opportunity to cross-examine [the expert] on his new opinions before trial and an adequate chance to offer expert testimony in rebuttal." *Wannall*, 775 F.3d at 429. But that is impossible—this Court has made clear that it is "not moving the date" of trial. June 30, 2026 Tr. 49:12-50:2, Dkt. No. 131. And Plaintiffs are not asking to reopen discovery or delay trial. To the contrary, Plaintiffs want to move forward expeditiously. Reopening discovery and delaying trial "are exactly the types of 'harms' that disclosure deadlines are intended to prevent." *Wannall*, 775 F.3d at 429-30. Defendants must bear the consequence of their tactical decision not to disclose data.

Finally, the importance factor supports exclusion. Importance "must be viewed from the perspective of both parties," and evidence that "might have been helpful to [the proponent's] case" is evidence that "should have been disclosed in a timely manner." *S. States*, 318 F.3d at 598-99 (internal quotation marks omitted). If Defendants claim the undisclosed data, analyses, and studies are critical to the case, they should have disclosed them on time.

For the foregoing reasons, Plaintiffs request an order that Defendants may not affirmatively elicit, offer, or rely on expert testimony based on data, analyses, studies, statistics, sources, bases, or methodologies that Defendants omitted from their Rule 26(a)(2)(C) disclosures.

Dated: November 13, 2026

Respectfully submitted,

/s/ *Lauren M. Weinstein*
Lauren M. Weinstein (1035184)
Benjamin G. Bradshaw (460539)
Shruti Kannan (90006641)
Timur Akman-Duffy (1779260)
Jack Derewicz (1779953)
Max J. Rosenthal (90028849)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
lweinstein@omm.com
bbradshaw@omm.com
skannan@omm.com
takman-duffy@omm.com
jderewicz@omm.com
mrosenthal@omm.com

Brett Williamson (1024759)
O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (949) 823-6900
bwilliamson@omm.com

Janine F. Panchok-Berry (*pro hac vice*)
Eamonn W. Campbell (*pro hac vice*)
Qiran "Anna" Xie (*pro hac vice*)
Maggie M. Niu (*pro hac vice*)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Phone: (212) 326-2000
jpanchok-berry@omm.com
ecampbell@omm.com
axie@omm.com
mniu@omm.com

Jennifer Levi (MA0056)
Mary Bonauto (*pro hac vice*)
Michael R. Haley (*pro hac vice*)
Sarah K. Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
Phone: (617) 426-1350
jlevi@gladlaw.org
mbonauto@gladlaw.org
mhaley@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (*pro hac vice*)
Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st St. #11548
Sacramento, CA 95811
Phone: (415) 365-1320
cstoll@nclrights.org
sminter@nclrights.org
awhelan@nclrights.org

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
Phone: (617) 742-6020
ibernstein@zalkindlaw.com

*Counsel for Plaintiffs*