# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

______________________________

NICOLAS TALBOTT et al., individually and on behalf of all similarly situated individuals,

Plaintiffs,

v.

UNITED STATES et al.,

Defendants.

______________________________

Civil Action No. 25-cv-240-ACR

Tuesday, October 20, 2026

Video deposition of LIEUTENANT GENERAL WILLIAM JOHN DEGOES, taken at the Law Offices of O'Melveny & Myers LLP, 1625 Eye Street NW, Washington, DC, beginning at 9:28 a.m., Eastern Standard Time, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia

refamiliarized myself with some of the readiness data that I had been tracking, you know, over the last couple of years.

Q. And what is that readiness data that you've been tracking?

A. The -- the mobility restrictions, and -- and so obviously being ready for duty is very important for the entire military. And -- and so the -- about 10 percent of the Air Force's 330,000 have mobility restrictions that are temporary. And about 5 and a half percent are what -- you know, they've been adjudicated at the Air Force Personnel Center. And they have an assignment limitation code, and we call it, like, C-1, C-2, C-3. C-3 is the most restrictive. Probably can only be in a very large urban area with lots of medical. C-1 a little less restrictive.

Of the 10 percent temporary, probably the number one there is pregnancy, and then musculoskeletal and mental health issues.

And then availability for duty, you know, I've looked at gender dysphoria versus non-gender dysphoria. And those with gender dysphoria from 2022 to the present were not

available for duty three to four times as many days as a random sampling of active duty. And, you know, we -- we only had about 160 total for gender dysphoria, and so we looked at multiple different random samples of 250 and reran it to make sure that the numbers would be about the same, and they were.

And -- and so, you know, again, between two to four times as -- as many days not available for duty and with the deployment restriction.

We also looked at, okay, let's just see what gender dysphoria deployment restrictions are versus non-gender dysphoria with a mobility restriction. So that -- you know, it was -- you know, that -- you looked at two groups that had medical issues. And even with the non-gender dysphoria medical, it's about twice as much with gender dysphoria. You know, a little more complex than the average.

And, again, I -- you know, these are not -- we didn't do them for statistical significance. Just that was the best data that we could have as to what is the readiness impact -- availability for duty, deployment restriction

quote 90 percent, it means that 90 percent are green on those major things: immunizations, gas mask insert, no health issue. Dental is Class 1 or 2. Doesn't have any cavities or things of that sort.

Q. Okay. Did you rely on the ASIMS data when you were putting together your expert opinion in this matter?

A. I -- I -- I wouldn't say I relied on it. I just used it as, you know, the ability to answer a question.

Q. Did you review it as you were preparing for your expert testimony in this matter?

A. Yes.

Q. What about the Form 469 data? Did you review that when you were putting together your expert testimony in this matter?

A. No. I mean, the -- the 469 would be a roll-up in part of the com -- a component of ASIMS that contributes to readiness. So the -- you could review 469s, and we -- we do have groups that are responsible for the quality of what's in a profile, the 469, and to make sure that -- you know, that -- that they're accurate and appropriate. And there's a process for when

A. I didn't do a study for availability of duty. The -- the -- I -- I looked at data to answer the question of the readiness impact on overall profiles or nonavailability for duty for the entire Department of the Air Force versus one diagnosis.

Q. So you say you didn't do a study, but you looked at data. What's the distinction there that you're making?

A. I -- I think -- I mean, one is analyzing. I guess maybe I'm -- I'm coming at it from a research background that I -- I didn't do a research study where I gave informed consent. And, you know, I -- I looked at available data sources to answer a question on availability for duty.

And certainly one of my jobs in all of the Air Force surgeon -- all of the service surgeon generals is focused on readiness and availability for duty and what are the things that limit availability for duty. And so we -- we -- I've been looking at that really my entire medical career.

Q. And did you personally look at the data, or did -- did someone else look at the

BY MR. DEREWICZ:

Q. So combined in the Air Force and the Space Force, there are about 330,000?

A. Correct.

Q. Is that correct?

A. Correct.

Q. Okay. And of those 330,000 people in 2022, 35 had a code for gender dysphoria?

A. Yes. And -- and -- yes.

Now, you're aware of that, that there were a voluntary separation period, and, you know, that that was prior to June of 2025. And there was -- you know, it could get a temporary early retirement authorization-type thing.

I have -- my staff gave me data that 597 total force, so active, guard and reserve -- almost entirely Air Force and just a very small minority Space Force -- did the voluntary separation.

And then we moved to involuntary in -- in the fall of '25. And there are -- I'm told as of today -- 190 in involuntary separation procedures, of which 39 have gone through the consolidated disposition authority that was appointed by former Chief of Staff, General Dave

Allvin. And it's the Air Force District of Washington commander because they meet the criteria of not being an operational commander and not being in the chain of command of Air Force JA and Air Force SG.

Q. Okay. So I'm -- I'm just trying to get an understanding of the numbers.

So there were -- you said that there were 35 with a code for gender dysphoria in 2022; is that correct?

A. Yes.

Q. Okay. And then you -- I think -- I believe you said there were around 160 with a code of gender dysphoria in 2026?

A. Correct.

Q. Do you know how many had a code for gender dysphoria in 2025?

A. It was about 130. So it -- it went from, like, 30 to 60 to 80 to 120, 160.

Q. Okay. And then you also said 597 -- yeah, at one point you said the number 597, and I missed its relevance.

MR. BOMBARD: Objection, vague.

BY MR. DEREWICZ:

Q. Can you please explain to me what the

MR. BOMBARD: Objection. Misstates the prior testimony.

THE WITNESS: Yeah. Many months ago. I mean, since the summer of '25 we've been looking at the gender dysphoria population versus the non-gender dysphoria population.

BY MR. DEREWICZ:

Q. So you started the study in the summer of 2025; is that correct?

MR. BOMBARD: Objection. Misstates his testimony.

THE WITNESS: Yeah. Not a study. Again, started looking at data for availability and healthcare use in the summer of 2025.

BY MR. DEREWICZ:

Q. And then when -- when did you receive the output of looking at the data?

MR. BOMBARD: Objection, vague.

THE WITNESS: I received it regularly. You know, every other month or so.

BY MR. DEREWICZ:

Q. And when did -- do you still receive it regularly every other month?

A. I received it yesterday as the most current data.

Q. -- were not available for duty?
MR. BOMBARD: Objection. Vague.
You may answer.
THE WITNESS: So for -- for the 160 gender dysphoria diagnoses in 2026, the amount of days not available was around 240. And then for a group that was not gender dysphoric -- and was just random, so it might have had a few mobility restrictions in -- it was 60-ish.
And then when you went and looked at a control group, non-gender dysphoria, that was on some kind of mobility restriction -- broken leg, high blood pressure not controlled -- there were -- it was 80 or 90.
So 240 to 80 or 90 not available. So --
BY MR. DEREWICZ:
Q. Do you know whether some of the 160 were available for more than 240 days?
MR. BOMBARD: Objection. Calls for --
BY MR. DEREWICZ:
Q. Excuse me. I think I did that math wrong.
Do you know that some of the pe -- of the 160 were available for more than the 125

about that?

A. I do.

Q. Okay. And can you please describe the waiver process for me?

A. Yeah. So there's a medical evaluation initially where somebody applies for a waiver, someone that didn't take the voluntary separation prior to June of 2025. And they get evaluated medically, and we do a record review looking for the -- the three -- there's three tests, and, you know, stable in their biologic gender for 36 months, no attempt to transition, and there's a third which is escaping me right now.

And we've had 10 people ask for waivers, and none of them met the three tests to be referred to A1, the personnel, because the -- there has to be a compelling government interest if you can pass the -- the medical tests.

Q. Right. So if I'm following you correctly, are you saying that -- so you're saying that 10 people -- 10 airmen have applied for waivers; is that correct?

A. Correct.

Q. Okay.

A. Correct.
Q. None of them have received waivers?
A. Correct.
Q. None of them have received waivers because they did not meet the -- one of the three requirements?
A. Yes. That's correct.
Q. None of them got to the point at which someone else -- I think you said A1 --
A. Correct.
Q. -- would then investigate whether or not --
A. That is correct.
Q. Okay. Great.
Do you know the individuals who applied for waivers?
A. I do not.
MR. BOMBARD: Objection. Gets into confidential information and HIPAA medical information. And I'd like to caution as well on deliberative process privilege in discussing these ongoing waiver processes. And so to the extent that these waivers are ongoing, I would instruct the witness not to discuss anything that is still in the process of being reviewed.

accuracy before September 4th, 2026?
A. I believe so. Yes.
Q. Okay. This document does not mention gender dysphoria anywhere; is that correct?
MR. BOMBARD: Objection.
THE WITNESS: I'd have to do a word search on it, but I don't think so.
BY MR. DEREWICZ:
Q. Okay. And it doesn't mention the word trans -- it doesn't -- just -- you don't disclose an expert opinion on transgender soldiers anywhere in this document, do you?
A. No.
Q. So at trial you do not plan to offer an expert opinion on gender dysphoria; is that correct?
A. That's correct.
Q. And do you not plan to offer an expert opinion on transgender soldiers' presence in the military; is that correct?
A. That's correct.
Q. Okay. Let's start with Paragraph 1.
This paragraph lists your credentials, and we've spent a lot of time earlier today talking about your credentials. Feel free to

A. To my knowledge, no.
Q. Okay. What about 2023?
A. To my knowledge, no.
Q. Okay. Since you've been in the Air Force, are you aware of a deployability rate that varied significantly from the current deployability rate?
A. No.
Q. Okay. Do you know the deployability rate for airmen with depression?
A. I do not.
Q. Are you planning to offer a deployability rate in your expert testimony about subgroups of airmen, or are you only planning to offer expert testimony on the deployability rate for all airmen?
MR. BOMBARD: Object to form.
You can answer.
THE WITNESS: Yeah. So I do have data on those with gender dysphoria that I -- I gave you that data a little earlier. And so I would be prepared to mention that population.
BY MR. DEREWICZ:
Q. Are you planning to offer testimony about the deployability rate of airmen with

gender dysphoria in this litigation?
A. If I'm asked.
Q. If you're asked, you would?
A. Yes.
Q. Okay. Is that disclosed anywhere in this document that you're aware of?
A. Well, I -- I think by extension it is in that the mental health, behavioral health, endocrine and surgical issues present unique challenges in deployed environments, and that issues arising from mental or behavioral health conditions may cause service members to be removed from theaters of deployment. And -- and so I -- yes.
Q. What -- so what is the deployability rate of airmen with gender dysphoria?
A. The deployability rate is -- so, again, it's a -- it's a lower number, like we talked about. And, again, it's increased from 35 in 2022 to about 160 now, at least diagnoses in the electronic health record, MHS GENESIS. And their rate of availability is two to four times less -- they're less available than airmen without a gender dysphoria diagnosis.
So I haven't carved it out as a

75 percent, but I -- I could -- I could easily do that just by reversing the -- who's not -- you know, not available.

So it -- it's -- it's around 50 percent that are -- are not available.

Q. Have you done the math yourself?

A. I -- I'm doing it in my head right now. Because I -- we -- we put it as, "Are you available?" to "Do you have a deployment restriction?" And so -- and we -- we did "how much deployment restriction" ver -- and then we did it compared to those without gender dysphoria and then those without gender dysphoria that were on a different medical deployment restriction. And so when you look at the absolute amount of time, it's around 50 percent not available to deploy.

And what I expressed earlier was that that amount was two to four times higher than non-gender dysphoria, and it's about two times higher than those with an underlying medic -- deployment restriction for a medical condition, part of that 10 percent that does not have gender dysphoria.

Q. Okay. So do you know what -- what is

the current deployability rate for airmen with gender dysphoria?

A. It's around 50 percent.

Q. Have you -- outside of doing the math in your head as we've sat here --

A. Yeah.

Q. -- have you ever done the math previously?

A. No.

Q. Okay. Do you know whether the deployability rate of airmen with gender dysphoria has remained constant in recent years?

A. It has not. It -- it has not.

As the numbers have increased between '22 to '26, and there's been more numbers and there's just many -- a much higher number of visits. So the nondeployable time in, you know, '22/'23 was, like, 40 days, and by '26 it was 230 days.

Q. So I'm confused by using time to measure deployability rate. Those two seem different to me.

I understand that you've calculated deployability rate by -- with the denominator of all airmen; is that correct?

C E R T I F I C A T E

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 4th day of November, 2026.

Notary Public

Robert Bombard, Esq.

robert.bombard2@usdoj.gov

November 4, 2026

RE: Talbott v. United States

10/20/2026, Lieutenant General William John DeGoes (#8491690)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions