# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

NICOLAS TALBOTT, et al., :
individually and on behalf :
of all similarly situated : Civil Action No.
individuals, : 25-cv-240-ACR
Plaintiffs, :
v. :
UNITED STATES, et al., :
Defendants. :

- - - - - - - - - - - - - - - - - x

Tuesday, October 6, 2026
Washington, D.C.

Videotaped Deposition of:

HERNANDO J. ORTEGA, JR., MD., MPH,

Called for oral examination by counsel for the Plaintiff, pursuant to notice, at the law offices of O'Melveny & Myers, LLP, 1625 I Street, Northwest, Tenth Floor, Washington, D.C. 20006, before Christina S. Hotsko, RPR, CRR, CA CSR, of Veritext Legal Solutions, a Notary Public in and for the District of Columbia, beginning at 9:32 a.m., when were present on behalf of the respective parties:

testimony was different than that.

But you can answer the question.

THE WITNESS: I think in my disclosure I discussed a little bit about the mental health conditions that are more prevalent than we have to deal with at much higher rates, at least in accession, because the prevalence is much higher. But that those same conditions are much, much more prevalent inside the small number of gender dysphoria patients who apply for service.

And so the risk, medical -- the medical risk data for estimating gender dysphoria inside of the military is -- there's not much there because the numbers are very low. And so as a proxy for looking at risk, you've got to look at something that is much more common, which is mental health disorders; and therefore, you know, you can't just judge gender dysphoria based off of the data for gender dysphoria because they also have comorbid many other things that also have their own innate risk inside of military service, if that makes sense.

BY MS. PANCHOK-BERRY:

Q. Yeah. Thank you.

So just to wrap up this section, aside from the two articles attached to your disclosure, did you rely on any other articles or studies to form your opinions?

A. To form my opinions on mental health disorders or on gender dysphoria?

Q. Whatever opinions you are going to offer in this case.

A. No, there are -- there are likely other articles regarding mood disorders and their risk of reoccurrence, anxiety disorders and their prevalence and risk of reoccurrence and prognosis, substance abuse disorders, their prevalence and prognosis and treatment options. Also substance -- no, excuse me, eating disorders.

So there are multiple comorbid things that, yes, I would have to look up those conditions as well. And there's -- yeah, there's probably lots -- lots of those that I can't name

right off the top of my head. But -- yeah.
Q. So did you rely on any of those other articles in order to form your opinions today?
A. Yeah. Rely -- I rely pretty heavily on the medical literature for the prognosis data and opinions for -- and what their recurrence risks are. Yeah.
Q. So which specific articles or data did you rely on? Do you know?
A. I don't -- I can't recall the names of specific articles for depression or anxiety or the other many, many medical conditions that we have to worry about. We pull up -- we pull some of the data from UpToDate, which is a medical software product that would -- that reviews medical literature and provides some of those -- some of those, I guess, prognosis -- some of those data. So we would use of that.
We could also do specific literature reviews for different -- for different conditions. But then also, you know, I have peers, other physicians that work with us, and

psychologists who we can also ask for their opinions for various mental health conditions.

Q. So I see that you say you could also do specific literature reviews for these different medical conditions --

A. Uh-huh.

Q. -- but what did you do specifically for your opinions in the disclosure?

A. I don't know that I did anything other than my normal work I would do for any individual applicant with conditions that they would apply with.

I often review the medical literature and look for those unique conditions to try to weigh prognosis data and likely outcome.

I know -- it's a little vague, the breadth of what we do is -- your question to me is a little vague, so sorry.

Q. No, it's okay. Thank you for saying that because I'll try to be more specific.

So let's just go to UpToDate.

What -- did you pull any data or analysis

from this medical software product called UpToDate to form the basis of your opinions in your disclosure?

A. Not specifically for this disclosure.

Q. What data do you rely on from UpToDate to form any opinions on gender dysphoria --

MR. LITTMAN: Objection.

BY MS. PANCHOK-BERRY:

Q. -- in your --

MR. LITTMAN: Sorry.

BY MS. PANCHOK-BERRY:

Q. -- in your disclosure?

A. I don't know whether there is specific data in UpToDate for gender dysphoria. There likely is.

So I'm not sure that I've sort of -- I haven't pulled that to review for this testimony, I think.

Q. You said there likely is specific data --

A. Uh-huh.

Q. -- in UpToDate medical software.

A. Uh-huh.

Q. But have you ever looked at that data on gender dysphoria in UpToDate?
A. I may have over the last few years at some point.
Q. Do you know for certain whether you've reviewed that UpToDate data on gender dysphoria?
A. In the last -- is there a time frame there?
Q. No.
A. I'm pretty sure I have at some point. I can't tell you when.
Q. Is that data publicly available?
A. I guess for subscribers, but yes, ma'am.
Q. And none of that data was attached to your disclosure, to be clear.
A. No, ma'am.
Q. Should it have been attached to your disclosure?
MR. LITTMAN: Objection.
Don't answer the question. That's privileged.
MS. PANCHOK-BERRY: Well, I don't see how

abuse disorder would be the same data that you would review for gender dysphoria.

MR. LITTMAN: Objection. Confusing.

THE WITNESS: It would be the -- not the same for a person -- not the same for an applicant with gender dysphoria, but the same for an applicant with gender dysphoria and a mood disorder. Right? So just because you have gender dysphoria does not mean you don't have any other things, and so all of those conditions would have to be reviewed depending on if they are disqualifying per the Department of Defense instruction. Right? So if they are disqualifying conditions, then my job is to assess each condition individually to decide on the risk of each condition to all those factors I mentioned about, you know, future service, you know, completing your term and those things.

BY MS. PANCHOK-BERRY:

Q. Okay. Okay. I think I understand --

A. Did that make -- right?

Q. I think I understand what you're saying,

then.

So you would -- just to make clear, so you would be, for instance, using the UpToDate data to assess someone with gender dysphoria who has depression?

A. Yes.

Q. So you --

A. I could.

Q. Okay.

A. I mean, I looked at the data many times. So yes, if there are conditions that I'm not too familiar with, I would use any source I could to look for prognosis data that helps to make that determination.

Q. Okay.

A. UpToDate is an example.

Q. Are there any other examples?

A. PubMed. Ovid. There are multiple medical literature databases that we can serve to do reviews for those data.

Q. Okay. Let me just go back to the question I asked a few minutes ago on the opinion

you gave earlier, right, that I restated.
How long have you held that opinion?
MR. LITTMAN: Objection. Asked and answered.
MS. PANCHOK-BERRY: He didn't answer, actually. That's why I'm asking.
THE WITNESS: You're saying the opinion of the gender -- I'm not sure which opinion, because I think I've talked [sic] two or three of those.
BY MS. PANCHOK-BERRY:
Q. What opinions do you intend to offer in this matter?
MR. LITTMAN: Objection. Asked and answered.
You can answer.
THE WITNESS: The relationship of at least my experience with accessions medicine and the determination of a waiver threshold for gender dysphoria can't be measured specifically by gender dysphoria. It has to be measured, or at least it can be estimated, by attendant

Q. Oh, no, no --
A. I mean --
Q. Have we missed any?
A. Well, I think there's -- the other opinion down there that is listed is about post-surgical issues. And while I don't have specific data on gender dysphoric surgical outcomes, I can tell you that, in general, a surgical condition requires a certain period of time away from duty; and the more surgery you have to have, the less duty availability you're going to have in the force.
So mostly because post-surgical -- post-operative condi- -- it just takes time to heal from most surgeries, and so, logically speaking, you would have more time away from duty or more time not able to deploy.
Q. Okay.
A. I think that's the last one in there --
Q. Okay. That's the last --
A. -- that I haven't covered -- that I haven't already covered.

Q. Okay.
A. You've already gotten the other ones.
Q. Okay. So then have we covered all of the opinions that you intend to offer at trial?
A. Yes.
Q. Great. All right.
Now let's jump down to paragraph 3 -- or go up. There we go.
Let's discuss the School of Aerospace Medicine.
A. Uh-huh.
Q. So I see that paragraph 3 relies on pioneering research, analyzing waiver cohorts, correct?
A. Yes.
Q. Do you know whether that research was attached to your disclosure?
A. It was not.
Q. Why was it not attached?
MR. LITTMAN: Objection.
THE WITNESS: The -- well, it's ongoing currently. There are still efforts there. These

are efforts that our office has taken on to attempt to establish or evaluate how good our current waiver decisions actually are in that area -- or in -- how risky is it to grant a waiver.

Those are questions we're trying to answer.

BY MS. PANCHOK-BERRY:

Q. Maybe give me a little bit more background on the pioneering research.

So is this ongoing research specific to gender dysphoria?

A. No.

Q. What medical conditions does it analyze?

A. All of them.

Q. All of them.

A. Or -- that we grant waivers for.

Q. About how many is that?

A. Thousands. 2, 3, 4,000.

There are many conditions in the Department of Defense instruction, and there's over 70,000 ICD-10 codes that you could include

Q. Okay. Can anyone outside the Air Force access this study now?
A. Yeah, I don't think so. I just -- I'm not sure -- like I said, I don't know exactly where it is at the School of Aerospace Medicine, but I'm sure the -- I'm betting that the proceedings of the military health symposium, whatever they are, is out there somewhere.
Q. Okay. The presentation that happened a few months ago --
A. Right.
Q. -- you mean is out there.
Publicly?
A. I'm not sure how the military health symposium publishes its presentations, but many are -- many organizations do that. Right? Will publish the proceedings of their meetings publicly. But...
Q. Let's go to this -- the contents of this study as you have laid out.
What risks does allowing individuals with medical conditions to accede to the military

produce, according to the study?
A. The major risks at least that we studied were mobility restriction days; that is, the number of days you are not available to deploy and fight the war.
Duty-restricted days, which would be the number of days you're not able to do your full number of duties inside of your regular peacetime assignment.
Medical visits and MEB rates, or medical evaluation board rates, which would be how often you meet the retention standard and activate the disability evaluation system for separation from the service.
All of those -- those are the primary, I guess, outcomes that we were -- that the study looked at.
Q. Can you quantify the risks of each of these?
A. That's part of what we're attempting to do. But in general, the risks of -- for -- if you take the two cohorts of those with waivers

and those without waivers, those who came in fully medically qualified, the risks are different. They are in the neighborhood of 20 percent higher as a general group. Remember, there's 2 or 3,000 conditions there. As a general group, they are 20 percent higher mobility restriction days, in the same range for higher duty restriction days, and maybe a slightly higher range for MEB rates and maybe similar rates for number of medical visits required by those two groups on average.

So there is an attendant risk to the force of the waivers, and the benefit to the force is that we actually have people in the force, I guess, doing partial work.

Q. Okay. And can you quantify the risks relating to gender dysphoria from this research?

A. I cannot.

Q. Why not?

A. Because there aren't enough diagnoses, gender dysphoric diagnoses, in the waiver population to actually have enough statistical

power to actually look at that. And I think the standard before population -- it takes time to look at that, so I'm looking at an older population from earlier, because it takes time for these outcomes to develop. So I granted waivers in the '15 to '19 time frame, and we're looking at the outcomes of '15 to '19 waivers, FY '15 to '19, with current data, and those outcomes take time to develop.

So it's not -- what I told you is not specific for a condition because it's just right now waivers and non-waivers, and I got to have enough numbers for that.

And so the numbers that we have broken out are depression and anxiety and a few that have large numbers. Those diseases that are very prevalent in the U.S. population of applicants clearly have more numbers for the statistical power of the study to look at.

And so some conditions I can look at as a specific condition. And as I think in one of the earlier opinions that you quoted me on, the

CERTIFICATE OF NOTARY PUBLIC

I, CHRISTINA S. HOTSKO, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotypy and thereafter reduced to typewriting under my direction; that said statement is a true record of the proceedings; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this statement was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

CHRISTINA S. HOTSKO
Notary Public in and for the
District of Columbia

My commission expires:
1 January 2027