# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

NICOLAS TALBOTT et al.,

individually and on behalf of

all similarly situated individuals,

Plaintiff,

-vs- Case No. 25-cv-240-ACR

UNITED STATES et al.,,

Defendant.

---

VIDEO-RECORDED DEPOSITION OF
CAROLYN A. SALTER, M.D.
9:36 a.m. to 2:51 p.m.
October 12, 2026

Job No. 8491856
REPORTED BY: Rhonda D. Tuck, RPR, CRR (Via Zoom)

A. She knows what the trial is about, but other than that, no.
Q. Okay. Is she in the military?
A. She is.
Q. What's her rank and role?
A. She's a major, and her role is chief of urology.
Q. Where does that rank against your rank?
A. It's technically a lower rank.
Q. Okay.
A. But she is the chief of the department.
Q. Okay. Did you speak with anyone in the Secretary of Defense's office about your testimony?
A. No.
Q. Okay. All right. Earlier, you mentioned that you had four meetings about your testimony in this matter. Were those the only meetings or preparation that you had for this deposition?
A. Yes.
Q. How else did you prepare for this deposition, if not that?
A. I reread some old articles that I had on this topic, and I did look at case volumes.

Q. Which articles?

A. Quite a few, but certainly the ones that are in the disclosure.

Q. Can you name the rest of the articles that you looked at?

A. Not offhand, no.

Q. Okay. And the case volumes?

A. I was just looking up how many surgeries I had done that pertained to this topic and how many patients with gender dysphoria I saw.

Q. What is a case volume?

A. Oh. Like your surgical case volume, like how many -- the number of a certain type of surgery that you performed in a certain time period.

Q. How are those kept?

A. So there's -- we have access to it on our government computer. There's -- they call it the Discern Portal, but it's basically a database, I guess, that you can look up various clinical statistics.

Q. Specifically about your surgeries?

A. There's different levels. Like, you can look at hospital-wide case volumes, for example. So there's different -- it's almost like

a Google-type thing. You can search for lots of things.

Q. Did you ask for any materials in connection with your preparation for this deposition?

A. I did ask for my total -- oh, the clinical encounters, I could not find that on my own, so I did ask I guess it would technically be IT, I think, or the database managers, just to pull the number of individual clinic encounters for patients with gender dysphoria, in case that became relevant.

Q. So you asked for clinical encounters specific to gender dysphoria, not surgeries specific to gender dysphoria?

A. Correct. I could look up the surgeries on my phone.

Q. Thank you. Did any of the documents that you reviewed refresh your recollection on issues related to your deposition?

A. Yes. The articles that are included, certainly.

Q. Are you able to access the other articles, the names of which you can't remember offhand?

A. Do I have the articles?
Q. Just are you able to access them?
A. Uh-huh.
Q. Okay.
A. I have them on my work computer.
Q. Okay. Do you consider yourself an expert?
A. Yes.
Q. In what fields?
A. Urology.
Q. Any other fields?
A. Well, specifically sexual medicine.
Q. Can you please define sexual medicine?
A. Sure. So my specific fellowship is male sexual reproductive medicine. So I do kind of the full spectrum of male sexual dysfunction, whether that's erectile dysfunction, testosterone deficiency, ejaculatory dysfunction, male infertility, and then I will do some general urology, as well, which might be things like bladder cancer, kidney stones, vasectomies.
Q. You mentioned sexual medicine in particular. Is that a fairly established field?
A. It is, yes.
Q. Okay.

A. As with most urology fellowships, it does not have its individual board certification. So I'm board certified in urology, but most fellowships don't have a specific certification. Sometimes it's also called andrology, but that focuses more on the sexual medicine, and so I like to space out that, yes, I also have specialty training in infertility.

Q. What is that specialty training?

A. So I did a two-year fellowship after I graduated from residency.

Q. Where was that?

A. My residency was at Walter Reed, and then my fellowship was at Memorial Sloan Kettering Cancer Center.

Q. Are you familiar with the DSM-5?

A. Yes.

Q. How are you familiar with the DSM-5?

A. I know that it exists. I used it in medical school going through psychiatric rotations, and then I have used it because there is an interplay between sexual medicine and behavioral health concerns, and so I have occasionally used it to look up diagnoses.

Q. How often would you estimate you use it

which you are to testify?
A. Yes.
Q. Okay. Do you expect to testify about any facts or opinions that are not in this disclosure?
A. Only if you ask, I guess.
Q. Let's assume that I don't ask.
A. Okay. Then no.
Q. Okay. Who wrote the first draft of this document?
A. Major Wiley (sic) drafted the bio part of it.
Q. And then facts and opinions portion?
A. I believe I did that with her.
Q. Okay. Did you review the final version before it was served?
A. Yes.
Q. Who decided what the subject matter of your testimony would be?
A. I think it came from our initial discussions, when I was talking about my experiences and thoughts about this topic.
Q. Who decided?
ATTORNEY LITTMAN: Objection.
You can answer.

BY ATTORNEY KANNAN

Q. You can answer.

A. I think -- I don't exactly know who was at that first meeting, but I think after that group meeting where we talked about my experiences and my opinions, then the group collectively maybe decided that that would be worth me sharing and asked me to serve as an expert witness.

Q. Okay. Did you decide the subject matter of your expert testimony?

A. Yes. These are things that I discussed with them in our initial meeting, and then I signed off on the final version of this document.

Q. Okay. Other than the articles that you attached, did you review any documents to put together this disclosure?

A. Not for the disclosure, no.

Q. For what, then?

A. Well, we had talked about the case volume and that sort of thing, so in case anyone asked, we wanted to be prepared to have some of that data.

Q. Thank you. I wanted to clarify. Okay. Can you please show me where your opinions are in this document? You can just refer to a paragraph

number. I have a copy as well.

A. Okay. So Paragraph 7 talks about the facts that I will share specifically convalescence requirements, comorbidities, complication rates.

Paragraph 8 talks about my own surgeries and the complications and also, as I've already alluded to, kind of the interplay between sexual medicine and behavioral or mental health.

And then I think it's that same -- so the second -- Page 4, but still Paragraph 8, talking about the psychiatric comorbidities, and then again kind of the complication rates as well as the specialized nature of medical and surgical care that are needed.

Q. Okay. Let's start with Paragraph 7. What is your specific opinion? Let's start with regard to convalescence requirements for certain aspects of transgender medical care.

ATTORNEY LITTMAN: Objection. Mischaracterizes her testimony.

You can answer.

THE WITNESS: So I would argue this isn't opinion. It's established fact about convalescent leave requirements.

conditions coexist.

Q. Okay. Did you hold -- you mentioned that this could be considered to be an opinion. Did you hold that opinion prior to agreeing to serve as an expert witness in this matter?

A. Yes.

Q. Okay. What methodology did you use to reach that opinion?

ATTORNEY LITTMAN: Objection.

BY ATTORNEY KANNAN

Q. You can answer.

A. Just my clinical practice as well as the medical literature and my training.

Q. What do you mean by "the medical literature"?

A. So going back to the published medical journals like we've already kind of talked about, so it's very well -- well, I guess in medicine, maybe just to explain, you know we obviously have textbooks that we read to learn, but there are ongoing medical journals that are continually being published with new information, almost like a newspaper, if you will, sharing new information but on medical conditions. And so that's a big part.

Even as a doctor who's finished training, you read a lot of medical literature to stay up to date and gain new information. So I'm referring to, like, those articles.

Q. Can you name the specific articles?

A. There's many out there. I would say specifically kind of focusing on erectile dysfunction, Peyronie's disease, and infertility, showing that those men can have higher rates of depression, for example, but I would have to look up the specific titles or authors.

Q. The articles you mentioned, are they specific to gender dysphoria?

A. No.

Q. Okay. Let's move on to the next line of Paragraph 8, which spans two pages, 3 and 4.

What is the specific data to -- sorry.

"The data that the psychiatric comorbidities of gender dysphoria can be profound."

What is the data you are referring to there?

A. So there are a lot of articles. Of course the Holloway article that's attached is a prime example of that, but there's other ones in

the VA patient population as well as civilian populations, and then that U.S. Transgender Survey also has really compelling data.

Q. Okay. The data in the VA patient population and civilian populations, where do you find those?

A. That would be in the various published articles.

Q. Can you name the articles?

A. I would have to go back and, again, look on my computer for the exact names and titles.

Q. Did you review those specifically to put together this disclosure?

ATTORNEY LITTMAN: Objection.

BY ATTORNEY KANNAN

Q. You can answer.

A. No.

Q. Okay. Do you have an opinion regarding the data that the psychiatric comorbidities of gender dysphoria can be profound?

A. I mean, I would argue that's objective data. It's not an opinion.

Q. So do you have a specific opinion about that?

A. I mean, I --

ATTORNEY LITTMAN: Objection.

BY ATTORNEY KANNAN

Q. You can answer.

A. I believe the data that's been published.

Q. Okay. Let's move on to the next line.

"Surgeries for service members with gender dysphoria can have high post-operation complication rates."

What is the basis for that statement?

A. Sure. So mainly from, again, the published medical literature. So there's been many studies looking at that.

Q. What studies?

A. So, again, I don't know the specific names, but going back to Rachel Bluebond-Langner, she has a lot of articles on that. And then typically what I do when I read something is that if there's good references in that article, then that kind of leads me to read that article, and so that's how I've gathered some of this information.

Q. Okay. Let's move on to the next line, that you'll "testify about the highly specialized nature of physicians qualified to provide the

surgical and corrective care required for members of the gender dysphoric immunity."

Can you say more about what that statement means?

A. Sure. So it's just getting at essentially the specialty care or the medical resources that many of these patients require. So things like behavioral health, endocrinology, surgery, whether that's urology, plastic surgery, ENT for facial feminization.

These patients often need physical therapy. So if you have a vaginoplasty, that requires pelvic floor physical therapy. If you have a phalloplasty, it's my understanding that they need physical therapy to help with the donor site, whether that's their leg or their forearm.

They often need speech therapy if they want voice retraining. Electrolysis or laser hair removal. So it's kind of getting at all the specialty care that's required.

Q. Okay. Is this another line that you would characterize as data or facts?

A. This could venture a little bit, I guess, into opinion. It's -- although, I would argue that there's a lot of good objective data to

again believe that the NYU group did one of them, Rachel Bluebond-Langner.

Q. Okay. So you don't know specifically what series had a 90 percent complication rate?

A. I could find it, but I don't know off the top of my head.

Q. Okay. Are vaginoplasties done on non-transgender patients?

A. Not -- not unless very rare circumstances. There is a disorder. I'm now blanking on the name. It's named after the surgeon who discovered it. But you can be born without a vagina. It's incredibly rare, but that would be the only other scenario that I could think of.

Q. Do you know what the complication rate is in that circumstance?

A. No. I don't think that's done very frequently at all.

Q. Okay. All right. Let's talk about metoidioplasty. Did I pronounce that correctly?

A. Metoidioplasty.

Q. Metoidioplasty. Okay. Do metoidioplasties have high post-operation complication rates?

A. They do. They are less than phalloplasty, so it's often viewed as a better alternative in people who don't want the full complications of phalloplasty, but it is a different surgery.

So if your goal is to just stand to urinate, then metoidioplasty is good. But it would not provide a phallus acceptable for penetrative intercourse, so that's where the decision-making often comes into patient goals. That's not as well studied because it's not as well done, but my understanding is, again, about 30 percent.

Q. Okay. And do non-transgender patients ever have metoidioplasties?

A. Not that I'm aware of. I can't think of a scenario.

Q. Okay. And what is the basis for your statement, the 30 percent number that you mentioned around complications for metoidioplasties? Are there specific studies or literature you can name?

A. None off the top of my head, but they do exist.

Q. Okay. And for phalloplasties, do

phalloplasties have high post-operation complication rates?

A. Yes.

Q. Okay. What is the post-operation complication rate?

A. There's been some series that show on average about 75 percent.

Q. Okay. Can you name those series or the studies that refer to those series?

A. I would have to look them up again, but there are some good review papers. I think Wang might be one of the authors, but there are a few series out there that are, like, a review paper looking at essentially combining results from other case series.

So looking at -- instead of just saying, like, a single surgeon experience, like these are my complications with 30 patients, then there's another author who combines, looks at published literature, and then presents like a synopsis --

Q. Okay.

A. -- or a review paper is what it's called, that shows it in multiple series.

Q. Okay. And you said Wang might be one

of the authors for those?
A. I think so.
Q. Okay. And do non-transgender patients ever have phalloplasties?
A. It would be exceedingly rare. If you have a micropenis, that would be an example where someone might want to have a phalloplasty. Potentially in trauma scenarios. That would be unlikely but not impossible. So some people do have penile reconstruction after an injury, for example.
Q. Do you know what the complication rate in those circumstances would be?
A. No, because they're very rare scenarios.
Q. Okay. Are there any other surgeries that you're referring to in your disclosure when you state, "Surgeries for service members with gender dysphoria can have high post-operation complication rates"?
A. I was specifically referring to the genital surgery. So that's really all that's encompassed. Like, I'm not talking about facial feminization or top surgery.
Q. Okay. Your disclosure also states,

but it was -- first of all, I think it was facial feminization and not bottom surgery, but also, it just barely made that clinically significant difference.

Q. Okay. Do you otherwise generally agree with the contents of this study?

A. Yes, I do.

Q. Okay. Do you believe that transgender individuals within the United States are consistently marginalized?

ATTORNEY LITTMAN: Objection. Scope of the disclosure.

BY ATTORNEY KANNAN

Q. It's on the first line of your study.

A. Where is that reference?

Q. It's the introduction.

A. I haven't read that reference in a while, but if that's what it says, then I would agree with that.

Q. Okay. What are some examples of how they're marginalized?

ATTORNEY LITTMAN: Objection. Disclosure.

BY ATTORNEY KANNAN

Q. You can answer.

A. So kind of regarding the poor health outcomes, these patients will often have a lot of healthcare-related anxiety and so may be less likely to seek medical care. I believe that there's higher -- across the board, I think they're more at risk for being below the poverty line and even being homeless, I think.

Q. Is your testimony about being less likely to seek medical care based on specific data?

A. I believe there is data from the VA that references that. Again, I can't speak off the top of my head, but certainly I have read articles talking about their healthcare-related anxiety.

Q. You can't name those off the top of your head?

A. No.

Q. Okay. I just have to check.

ATTORNEY KANNAN: All right. Let's go off the record and take a 15-minute break.

THE VIDEOGRAPHER: The time is 1:46 p.m. This ends Unit 3. Off the record.

(Break in proceedings.)

THE VIDEOGRAPHER: The time is

2:05 p.m. This begins Unit Number 4. We're on the record.

BY ATTORNEY KANNAN

Q. Dr. Salter, did you talk about the substance of your testimony on the break?

A. No.

ATTORNEY KANNAN: Okay. Those are actually all my questions. So we will hold the deposition open on the basis of the improper objection not to answer based on privilege.

Thank you for your time.

ATTORNEY LITTMAN: Thank you. And defendants have some questions.

E X A M I N A T I O N

BY ATTORNEY LITTMAN

Q. Dr. Salter, in your expert opinion, can gender dysphoria resolve?

A. I think that, as with many chronic conditions, gender dysphoria can be managed, but I think it is not something that can be resolved, and the literature really shows sustained dysphoria and mental health comorbidities after treatment.

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Rhonda D. Tuck, RPR, CRR, Notary Public in and for the Commonwealth of Virginia at Large, and whose commission expires on May 31, 2028, do certify that the aforementioned appeared before me, via remote videoconferencing, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal in Fluvanna County, Virginia, this 25th day of October, 2026.



______________________________________

Rhonda D. Tuck, RPR, CRR

Notary Public Registration No. 224847

Commonwealth of Virginia at Large

Job No. 8491856

Jared Littman, Esquire
jared.littman2@usdoj.gov

October 26, 2026

RE: Talbott v. United States

10/12/2026, Lieutenant Colonel Carolyn A. Salter , M.D. (#8491856)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions