# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NICOLAS TALBOTT et al., individually and on behalf of all similarly situated individuals,

Plaintiffs,

v.

UNITED STATES et al.,

Defendants.

Civil Action No. 25-cv-240-ACR

Friday, October 16, 2026

Video deposition of LIEUTENANT GENERAL CHARLES LOMBARDO, taken at the Law Offices of O'Melveny & Myers LLP, 1625 Eye Street NW, Washington, DC, beginning at 9:33 a.m., Eastern Standard Time, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia

dealt with any exceptions to policies that involve transgender soldiers?
MR. BOMBARD: Objection. Outside the scope of the disclosure.
THE WITNESS: I have not. Not yet.
BY MR. ROSENTHAL:
Q. Okay. And in this position -- so is deployability part of your profile of -- in this job --
MR. BOMBARD: Objection.
BY MR. ROSENTHAL:
Q. I'm sorry. Strike.
Do your duties and responsibilities encompass the deployability of soldiers in the Army?
A. The deployability is a medical -- in the Office of the Surgeon General works with that. I -- her and I work together on the casualty tracking, because that's a personnel function. And, like, we're working on the modernization of that right now. But, yeah, I don't -- those are not in the personnel purview.
Q. Can you describe what you mean by casualty tracking?
A. Well, we -- we work, from a doctrinal

perspective, from point of injury, tracking casualties. That's a S1 function -- like a personnel G1, S1 function, from the point of injury in a battlefield all the way through back to the medical treatment facility back in the United States.

So we're working on that right now. That's something that is collaboration between the Army G1's office and the Office of Surgeon General. That's a medical personnel kind of collaboration. That's kind of what I mean. Like, throughout the forward edge of the battlefield all the way, you know, evac and triaging back, and then bang to long-term healthcare as the soldier redeploys back home.

Q. Does this track only soldiers who are deployed, or is this across the whole force?

A. We have systems that do both, yeah.

Q. So in this position, do you ever see data or statistics about how many soldiers are nondeployable?

A. Yes. We -- that's in our Army Vantage. We see that everywhere. I mean, every leader, we discuss it on a monthly -- our deployability status is a -- a key metric that we track.

Q. And how do you use that metric in -- in your work?

A. Well, from a -- from an Army G1, it's -- it's a model that, you know, based on the percentage of people that are nondeployable -- able to -- you know, that factors into my Army active component manning guidance. So we -- for example, we -- our category A, you know, which is our high-level, we factor in -- there's a certain percentage historically that are nondeployable for education reasons, for medical. And so we will factor that in. In order to meet a unit's needs, we have to, you know, sometimes we have to factor that in.

Q. What are the historical percentages of nondeployability?

A. It varies. I don't know -- I don't know how it would be fair to lay that out. But anywhere from, you know, a low 2 percent to -- it just varies. It's based on location and, I think, based on where, you know, where we're at contextually, you know?

Q. So there's not an overall total force number that you come to?

A. Not right now. I mean, it -- you know,

I would be speculating if I -- if I provided that, you know?

Q. So you -- is that a number you could access or look up in any way?

A. We could, yes.

Q. Have you ever done that?

A. I have, yes.

Q. When was the last time you did that?

A. Last month.

Q. Did you do that in preparation for this deposition?

A. No, not at all. No, I'm doing that to tell -- when I take care of a -- a two-star commander calls me and asks me for, "Hey, I need more people." That's the first thing I'm looking at, "Okay. Are you fixing the people we've given you?" You know?

Q. Do you remember what the percentage that that number was at that time you looked it up?

A. For that it was 5 percent.

Q. Would you consider that a normal number?

A. That's a good number.

Q. And so what are the -- what are some of

I guess, kind of an illustration of that. I don't know what our medical providers -- how they provided that and -- to the community -- to the personnel community, yeah.

BY MR. ROSENTHAL:

Q. And so you didn't know any of these 11 soldiers individually, correct?

A. I did not, no.

Q. Do you --

A. Other than the one soldier in Korea that I had come in -- as a result of the incident, and then the one soldier as a O-6 commander in 2016. Those were the only two that I was really tracking.

Q. And were those two included in the 11 soldiers --

A. No.

Q. -- with gender dysphoria?

A. I'm sorry. The one from 2016 was not part of that.

Q. Is not. But the O-6 from 2005 is included in those 11 soldiers, with gender dysphoria, that you know of?

A. 2025?

Q. Yes.

A. The sergeant? Yeah. He was a part of that, the latest -- the initial -- I think the most recent scrub, I believe. But I -- yeah.

Q. Yeah. And so when did you learn about these 11 transgender soldiers -- or, I'm sorry. When did you learn about these 11 soldiers who were diagnosed with gender dysphoria?

A. That was at the very end of command when there was a data pull. You know, the Army has had 235 with soldiers with gender dysphoria. 118 of them voluntarily left service between 2026. And there -- so right now we're -- we're -- we were managing the 117 that are still in the service.

That's when I -- you know, really my first, kind of, time in G1, not as much in division command, we started to, you know, have to manage it to provide names, or provide -- to provide numbers, you know, that -- where we're at. But that's kind of -- at the end of '26 and into my current position is when I was more familiar with it.

Q. So this data pull was in 2026?

A. The most recent one that I'm familiar with, yes.

Q. The one in which you learned that there were 11 transgender -- or the 11 soldiers with gender dysphoria under your command was in 2026?
A. Yes, sir.
Q. Do you remember what month?
A. No, I do not.
Q. And so why was that data pull done?
MR. BOMBARD: Objection. Deliberative privilege process. Instruct the witness not to go into any kind of thought process or decision-making in the Department within the scope of this question.
THE WITNESS: And I -- and I don't know. As a tactical commander, I was just answering the policy of the tasking of our higher headquarters. You know, so I can't go into that, because I don't even know, you know?
BY MR. ROSENTHAL:
Q. So this data pull was done in response to a policy or an order of some kind?
MR. BOMBARD: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. ROSENTHAL:

Q. Yes?

MR. BOMBARD: Objection.

THE WITNESS: I don't know. Yeah.

BY MR. ROSENTHAL:

Q. Do you know, was it in response to -- strike that.

Sorry. So you did just say this data pull was done in a response to a policy or order of some kind, correct?

A. It was --

MR. BOMBARD: Object -- objection. Instruct the witness not to get into any deliberative privilege process.

MS. WEINSTEIN: The question does not ask for deliberative process. The question was, "Did you say this?"

MR. BOMBARD: And I'm -- he can answer that question, but I'm instructing the witness --

MS. WEINSTEIN: Yes. You're interfering with the testimony by continually cautioning him against answering questions that are not being asked. So please stop messing with the witness's testimony. We have your objection on the record.

A. Yes. Just to -- to identify, you know --

Q. Yeah. And who gave you that tasking?

A. I don't remember. Yeah. I mean -- and I don't know specifically, yeah.

Q. Okay. So just reading from the live here, just a minute ago I said -- I asked you, "And to be clear, I'm not asking about the rationale or the reasoning behind it. I'm saying you said there was a tasking. So this data pull was done in response to a tasking that came down to you?" And you said, "Yes. Just to identify, you know" -- and then I said, "Who gave you that tasking?"

When you said, "Just to identify, you know," what were you referring to?

A. Identify the 11 -- the 11 soldiers.

Q. And when did you take command of the Second Infantry Division?

A. In May of 2024.

Q. 2024.

So these 11 -- do you know if these 11 soldiers with gender dysphoria were serving during that entire period --

A. I do not know that --

Q. -- under your --
A. Yeah.
Q. Do you know how long any of them were serving under your command?
A. No, I do not know.
Q. But the first time you knew about -- that any of these 11 soldiers had a diagnosis of gender dysphoria was when that data pull was done, correct?
A. That is correct.
Q. So of these 11 soldiers, did any of them have any effect on your unit's readiness?
A. Other than the one we talked about, you know -- you know, I'm not tracking any of the other events at the -- at the tactical -- or the -- at the two-star level, like, yeah.
Q. So nothing other than that one incident that we spoke of in 2025 with the range officer came up to your level?
A. Correct.
Q. Okay. So moving outside of your personal experience, do you know of any other specific examples in which a transgender soldier had a negative effect on their unit's readiness or unit cohesion?

MR. BOMBARD: Objection, compound.
THE WITNESS: Are you -- you mean soldier with gender dysphoria?
BY MR. ROSENTHAL:
Q. Well, let's do transgender soldiers first.
A. Okay.
Q. So a transgender soldier?
MR. BOMBARD: Objection. Outside the scope of the disclosure.
THE WITNESS: Yeah. I'm not familiar with --
BY MR. ROSENTHAL:
Q. Okay. So not familiar with anything that other officers might have discussed with you that you may have read in documents or anything like that?
A. Yeah. Nothing --
MR. BOMBARD: Objection, compound.
THE WITNESS: Nothing from that.
BY MR. ROSENTHAL:
Q. And so, I guess, the same question then for soldiers with a diagnosis of gender dysphoria. Do you know of any examples outside of your own personal command where these

C E R T I F I C A T E

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 28th day of October, 2026.



________________________________

Notary Public