# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
:
NICOLAS TALBOTT et al., :
individually and on behalf :
of all similarly situated :
individuals, :
:
Plaintiffs, :
: Civil Action No.
v. : 25-cv-240-ACR
:
UNITED STATES et al., :
:
Defendants. :
:
- - - - - - - - - - - - - - - - x

October 13, 2026

9:30 a.m. EDT

Videotaped deposition of LIEUTENANT COLONEL BRYAN C. LEE, held at the offices of O'Melveny & Myers LLP, 1625 Eye Street, N.W., Washington, D.C., and taken stenographically by Misty Klapper, Registered Merit Reporter, Certified Shorthand Reporter, Registered Professional Reporter, Realtime Systems Administrator and Notary Public.

dysphoria or its treatment?

A. At this time in the 101st we have zero soldiers with gender dysphoria, with one exception, who is currently on terminal leave pending final separation. Because of our execution of -- of the guidance in the executive order and subsequent guidance, we have zero soldiers who are non-deployable for gender dysphoria.

Q. And for that soldier that is currently on terminal leave because of the guidance, were they previously considered deployable?

A. Prior to the executive order they were -- they would have been tracked as deployable. Because of the guidance from previous administrations, I am of the opinion that they would not have been deployable in the vast majority of deployments that the 101st would be expected to participate in and certainly not in anything remotely resembling what we believe the future fight will be.

This is not uncommon when a deployment comes up. The Army has medical readiness standards. CENTCOM and other combatant commands have their deployability guidance.

When you are activated for a deployment, you expect a 3 to 8 percent further drop in true deployability from medical readiness, which is why you know you're going to see that and you just have to be incredibly proactive about managing it up front, because it's always going to get worse. And then, of course, in theater, you expect it to worsen further.

Q. So for that individual who was considered deployable, there were, in fact, some circumstances in which they could have been deployed prior to the current guidance; is that right?

A. I likely would have supported a deployment to the NORTHCOM area of responsibility, generally remaining within

the Continental United States, potentially to SOUTHCOM or EUCOM. I would not have supported a deployment to anything involving active combat operations or a medically austere environment, and certainly not in the future fight involving large-scale combat operations.

Q. So we talked a little bit about the future fight earlier in your testimony.

How is the future fight different than the current potential deployments that are available to a soldier?

A. It's going to be -- we believe that it's going to be worse and it's my responsibility to plan for it being worse.

If we fail to assume that it's going to be worse and therefore fail to plan, it is my strong belief, and I believe the belief of everyone I work for, that that will cost soldiers their lives.

This will happen regardless, but any unnecessary loss of life is, of course,

establishing those procedures. I was involved with implementing the guidance that eventually resulted after that 30-day period.

Q. And what was the guidance that was implemented after those 30 days to establish those procedures and implementing steps?

A. Soldiers who were identified as having gender dysphoria or a history thereof through one of two avenues, either during the conduction of a periodic health assessment or following a request by a commander for an individual medical assessment, would then be profiled in the portal, the healthcare portal, for gender dysphoria and that provider would also prepare a standard memorandum that would then be provided to the commander.

Q. What do you mean when you say a standard memorandum?

A. There was a, I believe in the HQDA, EXORD or potentially some other formal

guidance we were provided with a template to follow when responding to a commander's request for an individual medical assessment or in the event that we needed to notify a commander following an incidental identification during a periodic health assessment.

Q. So that template would have been included in the EXORD that you described earlier?

A. Yes.

Q. How many soldiers in the 101st were identified after the Hegseth policy was enacted?

A. I don't know the specific breakdown for the 101st. To the best of my recollection, there were 32 soldiers on all of Fort Campbell, which houses 25- to 27,000 soldiers. The majority of those, I believe, 32 soldiers were in the 101st, but not all of them.

Q. Do you know how many of those

32 soldiers were considered MRC1 at the time?

A. I do not.

Q. Do you know how many were considered deployable at the time?

A. Because those --

MR. BOMBARD: Objection, vague.

THE WITNESS: So some of those soldiers were tracked by the transgender care team as having a history of gender dysphoria, but tied to a self-identification of being agender or nonbinary. I don't know if those soldiers would have then received a clinical diagnosis of gender dysphoria.

But otherwise, of those, I believe, 32 soldiers, all of them would have had a diagnosis of gender dysphoria and I would have considered all of them to be presumptively non-deployable.

I do not know how many of them

were actively tracked --
BY MS. XIE:
Q. Um-hmm.
A. -- in a system of record or by their commander as non-deployable at that time.
BY MS. XIE:
Q. Do you know how many of them had previously deployed?
A. I do not, no.
Q. Do you know how many of them were medics?
A. I do not, no.
Q. What about any other critical specialties?
A. I'm aware of one who served in a singular position. Another one I believe was in command, but I don't know that for certain. And while there are many company commanders, it's generally considered a mission-critical position that cannot be casually exchanged.

Q. Do you know if any of them were pulled from a deployment?

A. I am aware of a soldier who was pulled from a deployment with a diagnosis of gender dysphoria. That soldier was separately non-deployable for a number of other medical reasons.

Q. To clarify, they were non-deployable but they were actively on a deployment?

A. I'm so sorry. Pulled from a deployment in the sense that they were pending deployment and pulled from the roster prior to the departure. I am unaware of anyone who was removed from an active deployment one way or the other. I don't know if that happened.

Q. Who would make the decision to pull a soldier who identified as having gender dysphoria from a deployment?

A. While they were actively deployed or prior to departure for a deployment?

we can make a decision earlier or we can make a decision later, subject to some limitations and additional restrictions.

We invest a great deal in the soldiers that we bring into the Army. And if we believe that we can restore a soldier to functionality in a reasonable period of time, which Army regulations at this time say is generally 365 days, but longer in some cases, then we would look to retain that soldier and our investment.

In the event that we have a soldier who has a condition that we do not believe will resolve -- and there are a number of those -- we would, instead, proceed directly to the medical retention determination point. And we could do so in a matter of weeks, as opposed to months or 365 days.

This would be entirely dependent on the individual diagnosis, condition, the soldier and -- and the overall set of circumstances in the situation.

BY MS. XIE:

Q. Is a soldier who had transition-related surgery five years ago with no complications at any greater surgical risk in theater than any other soldier?

MR. BOMBARD: Objection, calls for speculation, outside the scope of the disclosure.

THE WITNESS: Based on my limited conversations on this topic with the transgender care team, my understanding is yes, but I'm not an expert in that field.

BY MS. XIE:

Q. Could you elaborate on your understanding of why they pose a greater risk?

A. The senior nurse case manager for the transgender care team at Fort Campbell and I had a handful of clinical conversations. We had at least two soldiers who had received, again, bottom surgery, neither of whom were assigned to the 101st. But I was consulted by the transgender care team on essentially their medical readiness and the long-term determination, balancing the ongoing care and, at the time, the administration, previous administration, for a period of time, support for service by soldiers with gender dysphoria with Army standards on retention and medical readiness.

In the course of those conversations, the senior nurse case manager stated that every single soldier we had seen who had received bottom surgery was subsequently referred to DES for complications from that surgery.

Q. What does the phrase "limited field hygiene" mean?

A. We don't have showers or robust bathing facilities in a deployed austere environment. I would say that limitation of hygiene is -- is probably one of the defining aspects of an austere environment. No laundry, no hand washing. Bathroom facilities are not what you would characterize them as here. They would be field expedient, slit trenches.

I could elaborate, but ...

Q. What does limited field hygiene have to do with service members with gender dysphoria?

CERTIFICATE OF NOTARY

I, MISTY KLAPPER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_______________________________

Misty Klapper, RMR, CSR, RPR,
RSA and Notary Public