# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

*****************************************************

| | | |
|---|---|---|
| NICHOLAS TALBOTT, et al., | ) | |
| individually and on behalf of | ) | |
| all similarly situated | ) | Case No. 1:25-cv-240 |
| individuals, | ) | (ACR) |
| Plaintiffs, | ) | |
| -vs- | ) | |
| UNITED STATES OF AMERICA, et | ) | |
| al, | ) | |
| Defendants. | ) | |

*****************************************************

VIDEOTAPED DEPOSITION OF

LIEUTENANT COMMANDER MARTIN BAYER, USN

9:36 AM to 4:47 PM

October 29, 2026

1625 Eye Street, NW

Washington, DC 20006

Job No. PA 8534254

REPORTED BY: Lisa Reinicke, Court Reporter

Robert Leonard, Videographer

Q. Okay, great.
When did you first see this document?
A. In this form, yesterday.
Q. Okay. And what is this document?
A. It is a disclosure form. It's discussing my professional background, the area of my expertise to certify -- or to serve as an expert witness in this -- in this case.
Q. All right. Does it set forth a summary of the facts and opinions to which you are expected to testify?
A. I believe so, yeah.
Q. And this document doesn't cite any other sources; is that right?
A. I think so, yeah. I don't -- I haven't seen any citations or anything, so --
Q. Okay. And it doesn't attach any additional documents other than what you see here?
A. It does not.
Q. Okay. So you're relying primarily on your expertise developed by your service, right?
A. Education, training, and life experience as a psychiatrist, yeah.
Q. Okay. Are you relying on any other sources in your testimony?
A. No.

Q. Okay. Do you expect to testify about any facts or opinions not mentioned in this disclosure?
A. I don't expect to, no.
Q. Okay. Other than Dr. Brown's expert report, can you confirm that you haven't read any of plaintiff's other expert reports?
A. Yes, I believe -- well, I don't actually know who drafted those other documents that were sent to me that I referenced earlier --
Q. Uh-huh.
A. -- that referenced my name. Like someone had read this and then -- and commented upon it. So I don't know what those documents were. But I saw those.
Q. Okay.
A. But that's it.
Q. And did you read them carefully or just scan them?
A. Just control find for my last name.
Q. Okay. Do you intend to offer any opinions in response to any of the plaintiff's experts?
A. I don't ant -- I don't anticipate doing so. But if I'm specifically asked, I'll answer the questions.
Q. Did you write this disclosure?
A. No, I did not technically write this document.

A. I think there were two or three. The one that I recall specifically was the idea that the presence of a condition, he was of the opinion, should not be used as a proxy for another condition. And I basically explained a couple of situations in medicine where like that is in fact what we do all the time. And it's a useful, useful thing to do.

Q. Did you review the final version of this disclosure before it was served?

MS. LAYENDECKER: Objection, asked and answered.

A. No, I did not again.

BY MS. XIE:

Q. Okay. Is there anything inaccurate in the final disclosure?

A. So in paragraph 3 it's reasonable to qualify that I'm the -- the MEB authority for SURFLANT for mental health cases specifically.

Q. Sorry, could you direct me to specifically --

A. Paragraph 3, the middle of the paragraph.

Q. Okay.

A. Where it says, "Additionally he serves as the primary medical evaluation board approval authority for CNSL.

Q. Uh-huh.

A. That is true for mental health cases specifically. It's not true for general medical conditions.

Q. Is there anything else?

A. Yeah, I'm just being thorough here.

Q. Oh, yeah, no worries. Take your time.

A. Yes, that's the only qualification I would offer.

Q. Okay. Other than Dr. Brown's expert report, did you review any other documents to put together your draft for the disclosure?

MS. LAYENDECKER: Objection, asked and answered.

A. So like I said before, I did review some material on UpToDate and OpenEvidence, the DSM, things like that.

BY MS. XIE:

Q. Okay. So earlier we talked about the materials you were provided to prepare for the deposition. Were you given all the materials you wanted to prepare for your disclosure?

A. I didn't ask for any specifically.

Q. Okay.

A. I asked is there anything that you need me to look at.

A. Yeah, so I think my comments upon that, if asked to discuss it, would be, you know, about the -- the admin separation pathway because that's the process by which persons with conditions that are not ratable as disabilities are removed from service if it's preventing them from serving in their job.

Q. How long have you held the opinions you just described around the risks associated with assessing, deploying, and retaining service members?

A. Probably since my third or fourth year of residency when I really started to integrate my training as a psychiatrist with my -- you know, my training as a -- as a Naval officer. And early on in training when I was a psychiatrist in the military or, you know, focused on learning their craft. And, you know, the Navy stuff comes a little later. So --

Q. Before your involvement in this case, have you ever written any of those opinions down anywhere?

A. No, I don't -- I mean, not -- not outside of how those thoughts and like assessments have bearing upon a particular case.

Q. Uh-huh.

A. Saying, yes, I agree with that stuff. Yes, I agree with LIMDU. Yes, you know, this, that, and the other.

Q. Uh-huh.

And what facts did you rely on in -- in forming the -- those opinions?

A. Yeah, so there's all sorts of research data --

Q. Uh-huh.

A. -- that inform that opinion.

Q. Uh-huh.

A. You know, specific facts about the rates of comorbidity of personality disorders, with gender dysphoria, the -- the rates of self-harm behavior, the rates of suicidal thinking, the rates of suicide attempts. You know, the -- the change in those risks pre and post treatment. You know, tran -- transition therapy being provided.

Knowing that like, yes, the -- there is some reduction in risk post treatment. But the risk remains substantially elevated for all of these negative outcomes. And so most importantly in my mind is the fact that all of this data, the quality of the evidence is generally quite poor.

Q. Uh-huh.

A. We don't have a lot of good longitudinal studies to guide -- guide treatment. You know, the -- the data that we have about prognosing like negative outcomes is as reliable as one could expect it to be.

But, yeah, like more research is needed.
Q. Uh-huh.
A. But that is -- that information, going through textbooks and whatnot, is where I base my opinions.
Q. What methodology did you use to reach that opinion?
A. Do you mean something specific by the term methodology?
Q. Yes. So it would be the process by which you review the facts or the data or your experience --
A. Yeah.
Q. -- and then ultimately end up at an opinion.
A. I see. Okay.
So the methodology would be active participation in the training program of my residency. The methodology would be compliance with the American Board of Psychiatry and Neurology's continuing education curriculum.
And it would be sort of the general practice of physicians to refer to peer review literature when trying to answer questions that they face in clinical practice. You know, yeah, that's the --
Q. Did you do any independent analysis for this case?
A. No. It just -- just finding research articles

that draw certain conclusions, provide certain statistics and the percentages of things. And like, okay, that's what the --

Q. Uh-huh.

A. -- that's what it says. It's a reputable journal. The process of their investigation seems reasonable and appropriate.

Q. Got it.

Okay. Turning back to paragraph 7, you're also expected to testify about the unique challenges posed by the prevention and treatment of mental and behavioral conditions in austere deployed environments, including the limited medical resources available in such environments.

Could you elaborate on the testimony you might offer to that topic?

A. Sure. So in the Navy deployments are generally shipboard. And different ships have different resource -- medical resources available to them. The ships, the platform I'm most familiar with is the Navy destroyer, which has a single independent duty corpsman. So essentially kind of like a paramedic. And then they have one, sometimes two, more junior corpsman that assist the independent duty corpsman. And that's it. That's their medical department.

COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

I, Lisa Reinicke, a court reporter and Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires October 31st, 2028, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel, and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding nor otherwise interested in the event thereof.

Given under my hand and notarial seal at Charlottesville, Virginia, this 2nd day of November 2026.

Lisa Reinicke, Court Reporter
Notary Public Registration No. 7863327
Commonwealth of Virginia at Large