**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NICOLAS TALBOTT *et al.*, individually and on behalf of all similarly situated individuals,<br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES *et al.*,<br>*Defendants*. | Civil Action No. 1:25-cv-240-ACR |

**REBUTTAL EXPERT REPORT OF PAISLEY CURRAH, Ph.D.**

## I. INTRODUCTION AND ASSIGNMENT

1. My name is Paisley Currah. I have been retained by counsel for Plaintiffs in this action to offer expert opinions in rebuttal to the expert disclosures served by Defendants on September 4, 2026. The opinions expressed here are my own.

2. I was asked to review Defendants' expert disclosures and, drawing on my scholarship on the history of sex classification in American law and governance, to address the following questions: (a) whether, as several of Defendants' witnesses assume, "sex" has operated in American governance as a single, fixed classification applied consistently across institutions; (b) whether the definition of sex adopted in Executive Order 14168[1] and incorporated into Executive Order 14183[2] and the Department of Defense's February 26, 2025 implementing policy[3] (the "Hegseth Policy") reflects prior federal administrative practice; (c) whether the characterization of the challenged policy by Defendants' witnesses as a neutral medical standard "consistent with the military's general approach to mental and behavioral health conditions" is consistent with the text of the policy and with the history of the military's treatment of transgender people; and (d) the historical lineage of the specific language the Executive Orders use to describe transgender people.

[1] Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (hereinafter "Executive Order 14168" or "E.O. 14168").
[2] Exec. Order No. 14,183, 90 Fed. Reg. 8757 (Jan. 27, 2025) (hereinafter "Executive Order 14183" or "E.O. 14183").
[3] Dep't of Def. Memorandum "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025).

3. My opinions are limited to history, political science, and the administrative practice of sex classification. I do not offer opinions on human biology, on medicine or psychology, or on the ultimate legal questions in this case.

## II. QUALIFICATIONS

4. I am Distinguished Professor of Political Science and Women's and Gender Studies at Brooklyn College and the Graduate Center of the City University of New York. I received my B.A. (Honours, First Class) from Queen's University at Kingston, Ontario, and my M.A. and Ph.D. in Government from Cornell University.

5. My scholarly work for more than twenty-five years has examined how governments in the United States use sex classifications as tools of governance: how agencies decide what a person's legal sex is, how and why those rules have differed across agencies and over time, and how disputes over those rules have become central to contemporary politics.

6. I am the author of *Sex Is as Sex Does: Governing Transgender Identity* (New York University Press, 2022), a book-length study of the history of sex classification by federal, state, and local governments in the United States, based on archival research, court records, agency correspondence, and legislative materials. The book won the Best Book Award from the Sexuality and Politics section of the American Political Science Association, and was selected as a finalist in the Government and Politics category of the Association of American Publishers' Prose Awards. I am the co-author of *Transgender Equality: A Handbook for Activists and Policymakers* (National Gay and Lesbian Task Force Policy Institute), and the co-editor of *Transgender Rights* (University of Minnesota Press) and *Corpus: An Interdisciplinary Reader on Bodies and Knowledge*. My essays and public scholarship have appeared in The New Yorker, The New York Review of Books, n+1, The Boston Review, Nature, and The Yale Review.

7. I am the founding co-editor of *TSQ: Transgender Studies Quarterly*, published by Duke University Press, the first peer-reviewed academic journal devoted to transgender studies in the social sciences and humanities. In 2024–25 I was a Member of the Institute for Advanced Study in Princeton, New Jersey.

8. I have delivered keynote and plenary addresses on sex classification and its history at, among others, the *National Institutes of Health Symposium on Sex and Gender in the Genomic Era* (2024), the *Law and Society Association* (2025), the *Network of Interdisciplinary Gender Studies in Europe* (2025), and the *International Colloquium on Transgender Studies at Université Paris 8* (2022).

9. My curriculum vitae is attached as Appendix A. A list of all publications I have authored in the previous ten years is attached as Appendix B. I have not testified as an expert in the last four years.

10. I am being compensated for my work in this matter at the rate of $300 per hour for research, analysis, and report preparation, and $300 per hour for deposition and trial testimony. My compensation does not depend on the outcome of this litigation or on the substance of my opinions.

11. In forming my opinions I considered the materials listed in Appendix C.

12. I reserve the right to supplement this report based on additional information made available to me prior to, or during, trial; if Defendants' witnesses offer testimony beyond what can be discerned from disclosed summaries of their anticipated testimony; or if I am asked to respond to further expert opinions.

## III. DEFENSE TESTIMONY ADDRESSED AND SUMMARY OF OPINIONS

13. Defendants' disclosures identify the following testimony to which my opinions respond.

- Dr. Hopewell is designated to testify about "the nature of sex, gender identity, and gender dysphoria" and describes his training of clinicians on the reclassification of gender identity disorder between the DSM-IV and DSM-5.[4]
- Dr. Ortega relies on materials that define "sex" as "a person's categorization as biologically male or female generally based on the genitals and reproductive tract."[5]
- Dr. Hopewell, CAPT Blair, CAPT White, and LCDR Bayer each will opine that the challenged policy's treatment of gender dysphoria is "consistent with the military's general approach to mental and behavioral health conditions."[6]
- LtGen Bowers will testify that consideration of these factors is consistent with the Department's "objective standards" and he, VADM Miguez, COL Black, and CAPT Roberts each will opine that the policy is "consistent with the military's broader approach" to such conditions and rests on considerations "not unique to gender dysphoria."[7]
- Lt. Gen. DeGoes will testify to the importance of permitting the military and its commanders to set and implement their own fitness standards.[8]

[4] Defs.' Rule 26(a)(2)(C) Expert Disclosure of Dr. Hopewell (dated Sept. 4, 2026) (all short forms for Expert Disclosures hereinafter "Expert Disclosure(s) of [Witness Name(s)]").
[5] Expert Disclosure of Dr. Ortega.
[6] Expert Disclosures of Dr. Hopewell, CAPT Blair, CAPT White, and LCDR Bayer.
[7] Expert Disclosures of LtGen Bowers, VADM Miguez, COL Black, and CAPT Roberts.
[8] Expert Disclosure of Lt. Gen. DeGoes.

- LTC Lee will testify that service members with gender dysphoria "do not meet medical readiness standards," and LTG Lombardo that the force must be "fit to fight without exception."[9]

- GEN Carden and COL Cron are designated to rebut Plaintiffs' experts on whether gender dysphoria is compatible with military service.[10]

14. In response, I offer the following opinions, each of which is explained, with its basis and reasons, in Section IV:

- **Opinion One.** Contrary to the literature attached to Dr. Ortega's disclosure, which defines sex as a binary biological category based on anatomy, "sex," as a classificatory category in American law and governance, has not operated as a single, fixed, biologically derived fact applied consistently across institutions. It has often operated as what I call a "dependent variable": a category whose legal definition or operational criteria agencies have defined and redefined in light of the governance purpose of the particular rule at issue.

- **Opinion Two.** Defendants' witnesses do not themselves rely on a single definition of sex. Dr. Ortega's materials define sex by "the genitals and reproductive tract"[11]; Executive Order 14168 defines it by reproductive-cell type "at conception"; and LTC Salter's disclosure describes a clinical taxonomy organized by anatomy and course of treatment, while studies she relies on define sex as "assigned at birth" or allow respondents to select "intersex"[12]. That variation reflects the broader record. There has been no uniform definition of "sex" across American institutions. Federal, state, and local agencies have set their own rules, including different rules among agencies of the same government. As a result, a single transgender person may simultaneously hold different legal sex classifications across government documents and institutions.

- **Opinion Three.** LtGen Bowers characterizes the challenged policy as applying the Department's "objective standards."[13] A sex-based standard, however, is only as objective as the definition of sex it employs, and the choice of that definition is not a measurement. The variation across institutions described in Opinion Two cannot be explained by bureaucratic inconsistency or confusion: each institution's definition of sex has generally tracked its own governance objective. The definition the Department now applies was not developed for the Department's purposes but adopted from a government-wide executive order.

[9] Expert Disclosures of LTC Lee and LTG Lombardo.
[10] Expert Disclosures of GEN Carden and COL Cron.
[11] Expert Disclosure of Dr. Ortega.
[12] Expert Disclosure of LTC Salter.
[13] Expert Disclosure of LtGen Bowers.

- **Opinion Four.** GEN Carden and COL Cron are designated to address whether gender dysphoria is compatible with military service. That question takes as given the definition of sex under which transgender service members are classified. The definition itself is not a clinical finding. An institution's adoption of a restrictive definition of "biological sex," calibrated to exclude transgender people who would otherwise qualify under the institution's own prior practice, is itself a governance decision rather than the discovery of a pre-existing fact.

- **Opinion Five.** The definition of sex adopted in Executive Order 14168 and incorporated into Executive Order 14183 and the Hegseth Policy is not attributable to any identified new biological or scientific information, departs from the practice, followed by federal and state agencies since they first confronted the question in the mid-twentieth century, of each agency defining sex by reference to its own functions, and operates to exclude transgender people from programs and institutions in which they had previously been recognized. That E.O. 14168 imposed a uniform definition and directed all federal agencies to adopt is itself evidence that such uniformity did not exist.

- **Opinion Six.** Eight of Defendants' witnesses will testify either that the policy's treatment of gender dysphoria is "consistent with the military's general approach to mental and behavioral health conditions" (Dr. Hopewell, CAPT Blair, CAPT White, LCDR Bayer) or that the operational considerations they describe "are not unique to gender dysphoria" (LtGen Bowers, VADM Miguez, COL Black, CAPT Roberts). The text of the governing Executive Orders is inconsistent with those characterizations because they single out transgender identity in moral terms applied to no other condition. The Orders' description of transgender identity as a "falsehood," of transgender people's recognition as "radical gender ideology," and of their pronouns as "invented" draws on a long, well-documented history of characterizing transgender people as deceptive, and is unlike the vocabulary the Department of Defense has used for any other medical condition, including in its own prior policies restricting transgender service.

- **Opinion Seven.** LTC Lee will testify that service members with gender dysphoria "do not meet medical readiness standards,"[14] and LTG Lombardo that the force must be "fit to fight without exception."[15] The historical record shows that transgender service members met the Department's standards and deployed under its own policies from 2016 until the Hegseth Policy took effect (with the partial exception of the 2019–2021 Mattis Policy described below). Requiring transgender service members to serve in their birth sex has the effect of excluding transgender service members who had been meeting the military's standards from continuing or beginning service. That exclusion

[14] Expert Disclosure of LTC Lee.
[15] Expert Disclosure of LTG Lombardo.

continues a history of categorical exclusion that predates gender dysphoria as a diagnostic category.

## IV. OPINIONS, BASES, AND REASONS

15. My opinions rely on qualitative methods of policy and institutional analysis standard in political science, including policy analysis, public law, and American political development. I analyze primary sources, including statutes, executive orders, regulations, agency directives and correspondence, archival records, judicial decisions, and litigation records, together with relevant secondary scholarship. I examine how government actors defined and applied sex classifications, the purposes those classifications served, and the reasons officials gave for adopting or changing particular rules, comparing these materials across institutions and jurisdictions, and over time. My opinions about governmental practice are based on patterns in this documentary record rather than on assumptions about what sex is as a matter of biology, medicine, or psychology.

16. Where I state that I am aware of no instance of a particular practice, that statement reflects my research over more than twenty-five years and my research for this report. It is not an exhaustive survey of all governmental practice, and I would reconsider such a statement in light of contrary evidence.

### Opinion One: "Sex" Has Operated as a Dependent Variable in American Governance

*Responds to: Dr. Hopewell ("the nature of sex, gender identity, and gender dysphoria"), Dr. Ortega (disclosed materials defining sex by genitals and reproductive tract).*

17. Dr. Hopewell is designated to testify about "the nature of sex."[16] To the extent his testimony assumes, as the Executive Orders assert, that sex has functioned in American law as a single, fixed fact that agencies merely record, that assumption is contradicted by the historical record.

18. My scholarship, and the broader scholarly literature on the regulation of transgender identity in the United States, have shown that government and institutional use of "sex" as a classificatory category does not reflect a single, stable, biologically derived fact applied consistently across contexts. Sex classifications in American law and policy have operated as a "dependent variable": a category that the state and its institutions produce and redefine to serve the particular governance purpose of the agency or policy at issue, rather than an independent variable that exists prior to, and is simply registered by, the rule. I use "dependent variable" to describe a classification whose meaning and application vary with the institutional context and governing purpose.[17]

[16] Expert Disclosure of Dr. Hopewell.
[17] Paisley Currah, *Sex Is as Sex Does*: Governing Transgender Identity 40–41 (2022).

19. The basis for this opinion is the archival and legal record I examined in writing *Sex Is as Sex Does,* which includes agency correspondence, administrative rulemaking files, litigation records, and legislative history from the mid-twentieth century to the present. That record shows that when agencies were confronted with the question of how to classify transgender people, their policies often varied according to the practical consequences of classification for the agency's particular functions. The record therefore points to governance, rather than a question of scientific expertise or biological truth. The practical function that a sex classification serves for a particular agency has been more determinative of the rule than any abstract account of what sex inherently is. That inference is drawn from the pattern of the policies themselves, and it is confirmed in several instances by officials' own explanations of their rules. The examples discussed under Opinions Two and Three illustrate the pattern.

20. This opinion concerns how governments have defined and used sex as a legal and administrative category. It is not an opinion about human biology, and it does not depend on any claim about biology.

**Opinion Two: No Uniform Definition of "Sex" Has Governed Across American Institutions**

*Responds to: Dr. Hopewell, Dr. Ortega (anatomy-based definition of sex in disclosed materials, which differs from the definition in Executive Order 14168), and LTC Salter (clinical taxonomy of "male sexual and reproductive medicine" and "transgender medical care").*

21. No single, uniform definition of "sex" has governed across American institutions since agencies first confronted the question of how to classify transgender people. Government agencies, from the Department of Homeland Security and the Department of State to state Departments of Motor Vehicles, vital-records offices, prisons, schools, and social-service agencies, have set their own rules for what counts as a person's sex and how that classification is determined and verified. The result is that a single transgender individual may hold different, even contradictory, legal sex classifications across documents and institutions depending on the state, the jurisdiction of birth, and the agency involved.[18]

22. Government actors have themselves recognized that the rationality of their sex-classification rules derives from each agency's mission rather than from a unified understanding of sex. In 1965, for example, when New York City officials were deciding how to respond to a request to change the sex on a birth certificate issued by the City, the director of the City's Bureau of Records and Statistics wrote to the National Center for Health Statistics, a division of the federal Department of Health, Education, and Welfare, asking for guidance on the question of sex classification. In researching a response, the recipient of the letter, the chief of the Registration Methods Branch, consulted "a number of security and non-security agencies in the Federal Government for their viewpoints," and found that "this has been a long-term and difficult problem for them as well." The federal government could not provide any guidance to the City on the

[18] Currah, *Sex Is as Sex Does, supra* n. 8*,* at 7, 99–118.

question, he concluded, "since various agencies carry out differing responsibilities the problems which confront them vary."[19] In fact, "the more we delved into the problem, the more the ramifications that cropped up."[20] Similarly, in 2011, when transgender advocates challenging a City policy on sex classification pointed out that New York State allowed people to change the sex marker on their driver's license, the City responded that "the existence of different approaches to similar problems does not render an agency's rule irrational."[21] In other words, the rationality of each agency's approach to sex classification depended on its remit, not on what "sex" is in itself. From the City's perspective, sex classification policies were an output of governing, not a priori to governing.

23. Defendants' own disclosures illustrate the point. The literature Dr. Ortega attaches to his disclosure defines sex as "a person's categorization as biologically male or female generally based on the genitals and reproductive tract." That is an anatomy-based definition. Executive Order 14168, by contrast, defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and "male" by reference to the small reproductive cell. Those are different criteria, and they can yield different classifications for the same individual. The scientific literature on sex classification distinguishes among several dimensions of sex that are measured separately and need not coincide in a given individual, including chromosomal sex, sex assigned at birth (which is recorded on the initial birth record and generally reflects genital appearance), reproductive sex (gametes), and the presence of sex-specific organs (e.g. prostate, uterus). Researchers in that literature treat the assumption that all such dimensions align in every person as a source of misclassification.[22] The definitions invoked in this case select different dimensions from this list. Where the dimensions diverge, as they may in people with intersex conditions, these definitions can assign different sexes to the same person. I offer no opinion on the underlying biology. I rely on the cited literature for the point that sex comprises multiple dimensions, and I note only that the classification criteria Defendants themselves invoke are not the same criterion. LTC Salter's disclosure, in turn, describes a clinical practice organized around "male sexual and reproductive medicine" and "transgender medical care," a taxonomy that classifies patients by anatomy and course of treatment, not by gamete type at conception. Yet one study attached to LTC Salter's disclosure operationalizes sex as "assigned at birth."[23] While the E.O. 14168 states that "it is the policy of the United States to recognize two sexes, male and female," another study

---

[19] Letter from Charles R. Council, Chief, Registration Methods Branch, Div. of Vital Stat., Dep't of Health, Edu. & Welfare, to Carl L. Erhardt, Dir., Bureau of Recs. & Stat., N.Y.C. Health Dep't (June 11, 1965) (on file with N.Y. Acad. Med. Archives; copy on file with author).
[20] *Id.*
[21] *Berkley et al. v. Farley*, Respondents' Memorandum of Law, Sup. Ct. N.Y., N.Y. Cnty. (July 15, 2011), p. 22. Index No. 114372/2009; Currah, *Sex Is as Sex Does, supra* n. 8, at 36; Paisley Currah, *What Sex Does*, N.Y. Rev. Books, May 27, 2022.
[22] Greta R. Bauer, *Sex and Gender Multidimensionality in Epidemiologic Research*, 192 Am. J. Epidemiology 122 (2023).
[23] Holloway et al., *Mental Health and Health Risk Behaviors of Active Duty Sexual Minority and Transgender Service Members in the United States Military*, 8 LGBT Health 2, 153 (2021) (attached to Expert Disclosure of LTC Salter).

relied on by Dr. Salter allowed survey respondents to select "male, female, or intersex."[24] Even within Defendants' own presentation, then, there is no single operative definition of sex.

24. The DSM revisions Dr. Hopewell describes teaching[25]—the replacement of "gender identity disorder" in the DSM-IV with "gender dysphoria" in the DSM-5, and the parallel replacement of "transsexualism" with "gender incongruence" in ICD-11, described in the literature Dr. Ortega attaches[26]—show that the diagnostic categories have changed while the people described by them have not. Those revisions were made because the classifying institutions concluded that the earlier categories no longer served their diagnostic and clinical objectives.[27]

**Opinion Three: Sex Classifications Have Tracked Governance Objectives**

*Responds to: Dr. Hopewell, Dr. Ortega, LtGen Bowers, VADM Miguez, COL Black, and CAPT Roberts (characterization of the policy as applying "objective standards" and the military's "broader approach").*

25. The variability described in Opinion Two is not the product of mere bureaucratic inconsistency. When institutions were required to develop or clarify a definition of sex, the definition they adopted generally tracked that institution's own governance objective at the moment the rule was adopted or applied. What "sex" is asked to do administratively—sorting people for housing in prisons, for eligibility in a sport, for access to a restroom, or for identity verification—has typically determined which biological, documentary, or other criterion is treated as controlling in that context. The same government has applied a genital- or anatomy-based definition in one setting, a birth-certificate-based definition in another, and a medical-criteria-based definition in a third, without reconciling them or acknowledging them as inconsistent.[28]

26. Identity documents provide a clear example. Until very recently, almost all states allowed transgender people to change the sex marker on their driver's license, for reasons of public policy: a license is an identity document, and it is not in the state's interest for an individual to carry a document that does not accurately describe the person carrying it. State Departments of Motor Vehicles were accordingly among the first government agencies to permit such changes and, later, to drop requirements such as surgery.[29] The federal government reasoned the same way about passports. In 1978, the head of the Passport Office's Legal Division explained: "Our policy

---

[24] Schvey et al., *A Descriptive Study of Transgender Active Duty Service Members in the U.S. Military*, 5 Transgender Health 83, 150 (2020) (attached to Expert Disclosure of LTC Salter).
[25] Expert Disclosure of Dr. Hopewell ¶ 2.
[26] Expert Disclosure of Dr. Ortega at PDF 7–24.
[27] Am. Psychiatric Ass'n. Gender Dysphoria (2013) (fact sheet), https://www.psychiatry.org/file%20library/psychiatrists/practice/dsm/apa_dsm-5-gender-dysphoria.pdf; Am. Psychiatric Ass'n. Diagnostic and Statistical Manual of Mental Disorders 512–13 (5th ed., text rev. 2022); *see also Gender Incongruence and Transgender Health in the ICD*, World Health Org., https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-health-in-the-icd.
[28] *Sex Is as Sex Does*, *supra* n. 8, chs. 1, 2, 3, 4, 5.
[29] *Sex Is as Sex Does*, *supra* n. 8, ch. 4.

explained above is based on the fact that the passport is a document of identity as well as citizenship and is highly regarded as such both domestically and abroad. Accordingly, the passport must be issued with data which best identifies the bearer. We believe that a pre-operative transsexual whose treatment has progressed to the final stages prior to surgery can, in most cases, be better identified by the new sex."[30] But in published trial and appellate cases before *Obergefell v. Hodges*, 576 U.S. 644 (2015), involving transgender individuals whose marriages were challenged, judges generally classified those individuals according to birth sex, even if they had successfully changed their identity documents.[31] As a Maryland judge explained in a proceeding seeking a judicial declaration of a change of sex, the collateral effect of such a declaration, including on marriage, depends on the law governing the particular purpose for which the judgment holder seeks to use it: "What effect a judgment has depends on the law governing what the judgment holder seeks to do, and that is true in this regard as well."[32] This decision thus recognized something that is easy to miss when "sex" is treated as a single fact: the legal effect of a sex classification depends on what the person is seeking to do. As historians of marriage have demonstrated, marriage and family law serve a different governing function from identity documents: they organize family relationships and govern the distribution and transmission of property, parental rights, and other legal benefits across generations.[33] Marriages involving transgender people unsettled this legal arrangement because they revealed how much these rights and relationships depend on sex classifications that are supposed to look natural and fixed.

27. This history bears directly on the testimony of the four commander witnesses who characterize the challenged policy as an application of the Department's "objective standards" (LtGen Bowers) and of the military's "broader approach" to medical conditions (VADM Miguez, COL Black, CAPT Roberts). A rule that classifies service members by sex is only as "objective" as the definition of sex it employs, and the history shows that the choice of definition has consistently been a policy choice made to serve institutional ends. Whatever may be said of the objectivity of a body-fat table or a run time, the definition of sex embedded in the Hegseth Policy is not a measurement; it is a classification rule of the kind agencies have repeatedly written and rewritten.

**Opinion Four: Restrictive Definitions of "Biological Sex" Are Governance Decisions**

*Responds to: Dr. Hopewell, Dr. Ortega, GEN Carden, and COL Cron (whom Defendants have designated to rebut Plaintiffs' experts on compatibility of gender dysphoria with service).*

---

[30] Letter from Michele E. Truitt, Acting Chief, Legal Division, Passport Office, U.S. Department of State (by Robert W. Knott, Attorney Advisor), to Joanna M. Clark, Director, Legal Research Division, Renaissance (Aug. 18, 1978), *reprinted in* Proceedings of the Fourth International Conference on Transgender Law and Employment Policy, at H-5 to H-6 (ICTLEP, Inc., June 1995), https://www.digitaltransgenderarchive.net/files/st74cq55j.
[31] *See, e.g.*, *Anonymous v. Weiner*, 50 Misc. 2d 380 (N.Y. Sup. Ct. 1966); *Littleton v. Prange*, 9 S.W.3d 223 (Tex. App. 1999); *In re Estate of Gardiner*, 42 P.3d 120 (Kan. 2002);
[32] *In re Heilig*, 816 A.2d 68, 86 n.10 (Md. 2003).
[33] Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 157 (Harvard Univ. Press 2000).

28. Because, in practice, the operative definition of sex has not been fixed by biology but has been selected and adjusted by institutions to serve their own purposes, an institution's choice, at a given moment, to adopt a restrictive definition of "biological sex"—one calibrated to exclude transgender people who would otherwise qualify under the institution's own prior practice, or under a definition used by a comparable institution—is itself a governance decision, not the discovery of a pre-existing fact. I use "governance decision" descriptively, to mean a choice by an institution about how it will classify people, whatever the merits or purposes of that choice. The term does not imply that the choice served any legitimate institutional function; whether it did is a separate question I do not address.

29. Such definitional choices emerge not from newly discovered biological information but from a change in the institution's classificatory purpose. Changes of this kind have followed transgender people's increased visibility, legal recognition, and inclusion.[34] As transgender people became more visible and more fully included in institutions, previously obscure and fragmented decisions about sex classification became more consequential. Political opponents of transgender inclusion then made those classificatory questions the subject of sustained political mobilization, transforming what had largely been an administrative matter into a focal point of political conflict.[35]

30. GEN Carden and COL Cron are designated to rebut Plaintiffs' experts on whether gender dysphoria is compatible with military service. My opinion does not address that clinical question. It addresses an antecedent one: the Department permitted transgender service members to serve under its own standards from 2016 to 2025 (with the partial exception described in Opinion Seven), and the change that ended their ability to serve was a change in the definition of sex imposed on the Department, not a change in the service members or in any measure of their performance.

**Opinion Five: The Executive Orders' Definition of Sex Has No Antecedent in Federal Administrative Practice**

*Responds to: Dr. Hopewell (nature of sex), Lt. Gen. DeGoes (importance of military discretion to set and implement fitness standards), and Dr. Ortega ("consistent, standardized" adjudication under current Department policies).*

31. The definition of sex adopted in Executive Order 14168 and carried into Executive Order 14183 and the Hegseth Policy is, as far as I have been able to determine, the first definition of sex that a federal authority has imposed across the government as a whole. Before 2025, I have found no federal agency that defined sex by reference to reproductive-cell type at conception, and no federal authority that required all agencies to use the same definition. From the time federal agencies first had to address questions of sex classification, agencies generally worked out those

[34] *Sex Is as Sex Does*, Introduction and Foreword to the 2024 paperback edition; Currah, "The Anti-Trans Playbook," *New York Review of Books* (Dec. 18, 2025).
[35] "The Anti-Trans Playbook," *supra* n. 34.

questions for themselves, in ways that reflected their particular missions and programs. Neither Executive Order identifies a biological or scientific development that required changing that approach. What changed in 2025 was both the definition itself and the requirement that every federal agency use it. One result has been to remove recognition of transgender people from programs and institutions where individual agencies had previously recognized them. The fact that Executive Order 14168 had to direct all federal agencies to use a single definition is itself evidence that no such uniform definition existed across the federal government before 2025.

32. Executive Order 14168 declares that sex is binary and immutable, "grounded in fundamental and incontrovertible reality," and defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell" and "male" as a person belonging "to the sex that produces the small reproductive cell." I do not offer an opinion regarding the biology that appears to inform that definition. My opinion focuses instead on administrative history. To my knowledge, the use of that definition as matter of governmental administration lacks precedent. I am aware of no federal agency that has previously defined sex by reference to reproductive-cell type at conception for any administrative purpose. Nor does either Executive Order identify any scientific development that prompted the government to adopt that definition. The Executive Order's definition does have antecedents, but they are not administrative or scientific: since 2023 a number of state legislatures have enacted statutes defining sex by reference to the reproductive cell a person's body is organized to produce, and the Executive Order's language tracks some of those statutes, though, unlike the E.O., they do not refer to conception.[36] The federal definition was adapted from recent state legislation, not derived from any federal agency's prior practice or from new science. My research also documents that scientific researchers themselves have treated sex as comprising multiple dimensions, focusing on chromosomes, reproductive anatomy, genital development, hormone levels, and/or psychological and social factors, depending on the research question.[37]

33. Executive Order 14168 mandates that a single definition apply to all agencies and programs of the federal government is inconsistent with the historical practice in which each agency calibrated its definition of sex to its own mission. By imposing a single definition from outside the agencies, the Executive Order removes much of the flexibility that had allowed agencies,

[36] *See, e.g.*, Kan. Stat. Ann. § 77-207 (2023); Idaho Code § 73-114(2)(c), (g), (n) (2024); La. Stat. Ann. § 9:58(6), (9), (14) (2024); "The Anti-Trans Playbook," *supra* n. 34.

[37] Greta R. Bauer, *Sex and Gender Multidimensionality in Epidemiologic Research*, 192 Am. J. Epidemiology 122 (2023); Katharina Hoppe, L. Zachary DuBois, Madeleine Pape, Paula-Irene Villa Braslavsky, Paisley Currah, Lorraine Greaves, Katrina Karkazis, Alexandra Brewis & Amber Wutich, Gender, Sex, and Their Entanglement: From Scientific Research to Policy and Practice, in Sex and Gender: Toward Transforming Scientific Practice 269 (L. Zachary DuBois, Anelis Kaiser Trujillo & Margaret M. McCarthy eds., 2d ed., Springer Nature 2026).

including the Department of Defense under the Carter[38] and Austin[39] Policies, to tailor sex-classification rules to their operational needs.

34. This point responds directly to Lt. Gen. DeGoes, who is expected to testify to the importance of permitting the military and its commanders to set and implement their own fitness standards.[40] I agree that the Department has historically set its own classification rules; that is the pattern my research documents across agencies. But the Executive Orders did the opposite of preserving that discretion. They displaced the Department's own standards—which, from 2016 to 2025 (with the partial exception of the 2019–2021 Mattis Policy described in Opinion Seven), permitted transgender people to serve consistent with their gender identity upon meeting the Department's medical and readiness criteria—with a government-wide definition adopted by executive order and applied to the military by directive. Dr. Ortega's testimony is expressly premised on "current Department of War and Department of the Air Force policies."[41] His waiver adjudication applies medical criteria whose content is fixed by the Executive Order's definition of sex; it does not show that the Department's own medical-standards process, operating independently, produced either the definition or the exclusion.

**Opinion Six: The Executive Orders' Language Draws on a Long History of Characterizing Transgender People as Deceptive**

*Responds to: Dr. Hopewell, CAPT Blair, CAPT White, and LCDR Bayer (policy "consistent with the military's general approach to mental and behavioral health conditions"); VADM Miguez, LtGen Bowers, COL Black, and CAPT Roberts (considerations "not unique to gender dysphoria").*

35. Defendants have disclosed, in nearly identical language, that they expect eight of their proposed expert witnesses will testify that the challenged policy treats gender dysphoria the way the military treats other mental and behavioral health conditions and that its considerations are "not unique to gender dysphoria."[42] The text of the Executive Orders is inconsistent with that characterization. The specific language they employ goes beyond the language of ordinary policy disagreement, and beyond the language the Department uses for any other medical condition, and draws on rhetorical tropes with a long, well-documented history of stigmatizing transgender people as dishonest and dangerous. Moreover, Defendants' own witnesses do not agree on this characterization. Dr. Ortega is expected to testify that gender dysphoria presents "unique, heightened, and significantly increased" risks exceeding those of "many other standard disqualifying medical conditions."[43]

---

[38] Dep't of Def., Directive-Type Memorandum (DTM) 16-005, Military Service of Transgender Service Members (June 30, 2016) (hereinafter "Carter Policy").
[39] Revisions to DoD Instruction (DoDI) 1300.28, 86 Fed. Reg. 17590 (Apr. 6, 2021) (hereinafter "Austin Policy").
[40] Expert Disclosure of Lt. Gen. DeGoes; Expert Disclosure of GEN Carden.
[41] Expert Disclosure of Dr. Ortega.
[42] Expert Disclosures of CAPT Keisha Blair, LCDR Martin Bayer, Dr. Alan Hopewell, CAPT Dennis White, CAPT Peter Roberts, COL Black, VADM Miguez, and LtGen Bowers.
[43] Expert Disclosure of Dr. Ortega.

**A. "False Gender Identity" and "Falsehood"**

36. Executive Order 14183 declares that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service"; that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life"; and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."[44]

37. This language does not merely establish a policy; it conveys a moral judgment that transgender identity is itself dishonest and incompatible with honor, truth, discipline, humility, and selflessness. By characterizing a transgender person's identity as a "falsehood," and the expectation that others respect it as an unreasonable demand, the Order casts transgender people as deceptive. My research documents that this characterization has deep roots in the history of anti-transgender discrimination, in which transgender people have long been stigmatized as frauds, imposters, and deceivers.[45]

38. I am aware of no other medical or behavioral health condition addressed in the Department's accession or retention standards that the Department, the Secretary, or the President has described in the governing directive as a "falsehood" or as inconsistent with honesty, humility, or integrity. That is what distinguishes this policy from the treatment of other conditions, and it is why the testimony that the policy is "consistent with the military's general approach" cannot be squared with the policy's own text.

39. The contrast with the Department's own prior restriction is instructive. The 2018 Mattis Policy, which also limited service by transgender people, expressly stated that nothing in it "should be viewed as reflecting poorly on transgender persons" and that "[t]ransgender persons with gender dysphoria are no less valued members of our Nation than all other categories of persons who are disqualified from military service."[46] The Hegseth Policy contains no comparable statement. Although it is written largely in administrative terms, it does not stand apart from the Executive Orders' characterizations. It identifies Executive Order 14183 as its authority; it adopts verbatim Executive Order 14168's definition of gender identity as a "sense of self, disconnected from biological reality," which restates in definitional form the Orders' premise that transgender identity is false; and it commits the Department to standards of "honesty" and "humility," the very virtues Executive Order 14183 describes transgender identity as violating. The policy thus takes from the Orders not only its authority but the terms in which it defines the people it regulates. A policy whose stated authority, definitions, and values are drawn from directives that characterize

---

[44] Executive Order 14183.

[45] *Sex Is as Sex Does, supra* n. 8, at 9, 33, 41; Paisley Currah and Lisa Jean Moore, "'We Won't Know Who You Are': Contesting Sex Designations on New York City Birth Certificates." *Hypatia* 24, no. 3:113-135 (2009); Talia Bettcher, "Evil Deceivers and Make-Believers: On Transphobic Violence and the Politics of Illusion," *Hypatia* 22(3):43-65 (2007).

[46] Dep't of Defense, Report and Recommendations on Military Service by Transgender Persons (Feb. 22, 2018).

transgender people as deceptive does not stand apart from that characterization, even where it does not repeat every term the directives use. The shift in the federal government's stated rationale—from the technocratic vocabulary of prior policies (readiness, deployability, cost) to explicit moral characterizations of transgender identity as false—represents a marked change in the nature of the government's justification, one I have written about in my published work.[47]

**B. "Radical Gender Ideology" and "Gender Ideology Extremism"**

40. The Executive Orders repeatedly characterize the recognition and accommodation of transgender people as "radical gender ideology" and "gender ideology extremism." Executive Order 14183 states that "the Armed Forces have been afflicted with radical gender ideology to appease activists unconcerned with the requirements of military service." Executive Order 14168 is titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." Secretary Hegseth has used the same vocabulary in addressing the military's own leadership. Speaking to the Department's assembled general and flag officers at Quantico, he declared: "No more identity months, DEI offices, dudes in dresses. No more climate change worship. No more division, distraction or gender delusions. No more debris."[48] He has since repeated the theme in public remarks, telling a political rally that "[a]t the Department of War, we do training, not t***nies,"[49] and using the same slur a month later at the opening of a military recruiting tour.[50] This language does not describe a medical condition subject to fitness standards. It describes transgender people as the product of an ideology to be purged ("afflicted," "extremism") and as delusional, the same framing of transgender identity as unreal or false that runs through Executive Orders 14168 and 14183.

41. This framing characterizes the existence and recognition of transgender people as an ideological contagion, something that "afflicts" institutions, rather than as a feature of human diversity that American institutions have accommodated, in varying ways, for decades. The international "anti-gender" movement has deployed the concept of "gender ideology" to delegitimize the rights and recognition of transgender and gender-diverse people.[51] Framing

---

[47] *See* "The Anti-Trans Playbook," *supra* n. 34; Paisley Currah, *Full-Throated, Explicit Dehumanization*, n+1 (Feb. 10, 2025), https://www.nplusonemag.com/online-only/online-only/full-throated-explicit-dehumanization/.

[48] U.S. Dep't of War, Transcript, *Secretary of War Pete Hegseth Addresses General and Flag Officers at Quantico, Virginia* (Sept. 30, 2025), https://www.war.gov/News/Transcripts/Transcript/article/4318689/secretary-of-war-pete-hegseth-addresses-general-and-flag-officers-at-quantico-v/.

[49] Remarks at Iowa State Fair rally for Rep. Zach Nunn (Aug. 17, 2026), as reported in Washington Blade, *Hegseth Uses Transphobic Slur While Campaigning for Iowa Congressman* (Aug. 20, 2026), https://www.washingtonblade.com/2026/08/20/hegseth-uses-transphobic-slur-while-campaigning-for-iowa-congressman/

[50] Remarks at Texas A&M University (Sept. 2026), as reported in People, *Pete Hegseth Again Uses Transphobic Slur in Military Speech* (Sept. 21, 2026), https://people.com/pete-hegseth-again-uses-transphobic-slur-in-military-speech-12132567

[51] Anti-Gender Campaigns in Europe: Mobilizing Against Equality (Roman Kuhar & David Paternotte eds., 2017); Serena Bassi & Greta LaFleur, Introduction: TERFs, Gender-Critical Movements, and Postfascist Feminisms, 9 TSQ: Transgender Stud. Q. 311 (2022); Mary Anne Case, Trans Formations in the Vatican's War on "Gender Ideology," 44 Signs: J. Women Culture & Soc'y 639 (2019); Elizabeth S. Corredor, *Unpacking "Gender Ideology" and the*

transgender people's lives as an "ideology" rather than an identity casts them as a political choice that can and should be rejected.

**C. "Invented" Pronouns**

42. Executive Order 14183 directs the Secretary of Defense to "end invented and identification-based pronoun usage" and declares the policy "inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." Characterizing pronouns that reflect a person's gender identity as "invented" and "inaccurate" denies the validity of transgender people's identities through the mechanism of official language. Control over the sex markers on identity documents has long been one of the principal mechanisms by which governments have granted or refused recognition to transgender people; the regulation of pronouns is a recent extension of that mechanism, and the withdrawal of recognition across government settings is a recurring feature of exclusionary policy.[52]

**Opinion Seven: The Policy Excludes Transgender Service Members Who Had Been Meeting Military Standards**

*Responds to: LTC Lee (service members with gender dysphoria "do not meet medical readiness standards"); LTG Lombardo ("fit to fight without exception"); GEN Carden and COL Cron (compatibility of gender dysphoria with military service); Dr. Hopewell, CAPT Blair, CAPT White, and LCDR Bayer (policy as ordinary medical standard).*

43. A standard requiring transgender service members to serve in their birth sex has the effect of excluding transgender service members who had been meeting the military's standards from continuing to serve and excluding would-be transgender service members.

44. LTC Lee is expected to testify that service members with gender dysphoria "do not meet medical readiness standards,"[53] and LTG Lombardo that the force must be "fit to fight without exception."[54] The historical record is that transgender service members did meet the Department's standards. From June 2016 until the Hegseth Policy took effect, transgender people served openly under the Carter and Austin Policies, subject to the same medical, physical, and readiness requirements as all other service members, and the Department deployed them worldwide.[55] The Hegseth Policy identified no decline in the performance of these service members and announced no new fitness criteria. It changed the category into which they were sorted, and their disqualification followed from that reclassification.

---

*Global Right's Antigender Countermovement*, 44 Signs: J. Women Culture & Soc'y 613 (2019); Paisley Currah, Gender Wars: Two Scholars Excavate the Origins of Today's Trans Backlash, 112 Yale Rev. 126 (2024).

[52] *Sex Is as Sex Does*, *supra* n. 8, ch. 4; "The Anti-Trans Playbook," *supra* n. 34.

[53] Expert Disclosure of LTC Lee.

[54] Expert Disclosure of LTG Lombardo.

[55] Carter Policy; Austin Policy.

45. The record reflects that for decades before 2016 the armed forces' medical standards categorically disqualified transgender people from service, and that the exclusion applied whether or not an individual had any diagnosis.[56] A version of the ban was restored between 2019 and 2021 under the Mattis Policy, which exempted service members who had already been diagnosed under the Carter Policy. During those periods, service members and applicants who satisfied all other qualifications were nevertheless subject to discharge or denial of entry based on their transgender status or history of gender dysphoria. Executive Order 14183 revoked Executive Order 14004, which had lifted the ban in 2021, and directed the Department to reinstate it, which the Department did through the Hegseth Policy of February 26, 2025. My opinion does not depend on the details of that history. It rests on the sequence the record reflects for 2025: the same people, meeting the same standards, became ineligible once the Department adopted a different definition of sex through which to apply those standards.

46. The Executive Order's language shows that the exclusion is not simply an incidental consequence of a neutral readiness standard. The Order expressly characterizes transgender identity as itself incompatible with honorable service. By characterizing transgender identity as a "false" identity that "conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle," the Order advances a judgment about transgender people's identity and character, not their medical fitness or capacity to meet military requirements. That characterization contradicts Secretary Hegseth's own statement that the Department must "ensure it is building 'One Force' without subgroups defined by anything other than ability or mission adherence."[57] Secretary Hegseth further warned that "[e]fforts to split our troops along lines of identity weaken our Force and make us vulnerable."[58] Yet a policy that excludes service members because of their identity, rather than their ability, splits the force along precisely those lines. That is why the testimony describing the policy as an ordinary medical standard is not consistent with the policy's own terms.

---

[56] Agnes Gereben Schaefer et al., Assessing the Implications of Allowing Transgender Personnel to Serve Openly (RAND Corp. 2016); Dep't of Def., Summary of the 2018 National Defense Strategy of the United States of America: Sharpening the American Military's Competitive Edge 1 (2018); Dep't of Def. Instruction 6130.03, Medical Standards for Military Service: Appointment, Enlistment or Induction (pre-2016); Army Regulation 40-501; Dep't of the Army, Army Directive 2016-30, *Army Policy on Military Service of Transgender Soldiers* (July 1, 2016) (permitting open transgender service under equal standards).
[57] U.S. Dep't of Def., Memorandum for Senior Pentagon Leadership et al., *Prioritizing Military Excellence and Readiness* 1 (Feb. 7, 2025).
[58] *Id.*

I declare under penalty of perjury that the foregoing Rebuttal Expert Report is true and correct.

Executed on September 25, 2026.

Paisley Currah

**Appendix A**

# Curriculum Vitae

**PAISLEY CURRAH**
**Brooklyn College and the Graduate Center**
**The City University of New York**
**www.paisleycurrah.com**
**pcurrah@brooklyn.cuny.edu**

## POSITIONS AND APPOINTMENTS

2026- Distinguished Professor, Brooklyn College and The Graduate Center, City University of New York

2024-2025 Member, Institute for Advanced Study, Princeton

2023- Doctoral Faculty, PhD Program in English, The Graduate Center, The City University of New York

2013- Doctoral Faculty, PhD Program in Political Science and the MA and Certificate Program in Women's and Gender Studies, The Graduate Center, The City University of New York

2011-2014 Chair, Department of Political Science, Brooklyn College, The City University of New York

2010- Professor, Department of Political Science, Brooklyn College, The City University of New York

2009-2023 Visiting Adjunct Professor, Barnard College and Columbia University (teaching Transgender Theories and Politics; Sexual Orientation, Gender Identity, and Human Rights)

2003-2007 Executive Director, Center for Lesbian and Gay Studies, The Graduate Center, The City University of New York

2001-2009 Associate Professor, Department of Political Science, Brooklyn College, The City University of New York

2000-2003 Coordinator, Women's Studies Program, Brooklyn College, The City University of New York

1994-2000 Assistant Professor, Department of Political Science, Brooklyn College, The City University of New York

## FIELD-BUILDING AND INSTITUTIONAL LEADERSHIP

2011-2019 Founding Co-Editor, *TSQ: Transgender Studies Quarterly*

2003-2007 Director, Center for Lesbian and Gay Studies, City University of New York.

1999-2016 Founder and Board Member, Transgender Law and Policy Institute

## BOOKS AND EDITED VOLUMES

2022 Currah, Paisley. *Sex Is as Sex Does*: *Governing Transgender Identity*. New York: NYU Press.

(Paperback edition with new foreword released September 2024)

Winner, Best Book Award, Sexuality and Politics section, the American Political Science Association.

Finalist for the Association of American Publishers' Professional and Scholarly Excellence Awards in the Government and Politics category.

Reviewed in: *The Boston Review, The Bulletin of Applied Transgender Studies, Choice, Dissent, Gender and Society, Law and Political Economy Project, Ms. Magazine, The Nation, Perspectives on Politics, Politics and Gender, Liber: A Feminist Review, Psychology of Women Quarterly, Them, TSQ: Transgender Studies Quarterly, Women's Studies Quarterly, Xtra*

2011 Casper, Monica J. and Paisley Currah, eds. *Corpus: An Interdisciplinary Reader on Bodies and Knowledge*. New York: Palgrave.

2006 Currah, Paisley, Richard M. Juang, and Shannon Price Minter, eds. *Transgender Rights.* Minneapolis: University of Minnesota Press.

Winner, Sylvia Rivera Award in Transgender Studies

Finalist, Lambda Literary Award

## EDITED SPECIAL ISSUES

2015 Currah, Paisley and Susan Stryker, eds. *Making Transgender Count*. Thematic issue of *TSQ: Transgender Studies Quarterly* 2, no. 1.

2014 Currah, Paisley and Susan Stryker, eds. *Postposttranssexual: Key Concepts for a Twenty-First-Century Transgender Studies*. Thematic double issue of *TSQ: Transgender Studies Quarterly* 1, nos. 1-2.

2008 Currah, Paisley, Lisa Jean Moore, and Susan Stryker, eds. *Trans-*. Thematic double issue of *Women's Studies Quarterly* 36, nos. 3-4.

2008 Spade, Dean and Paisley Currah, eds. *The State We're In: Locations of Coercion and Resistance in Trans Policy, Part II*. Thematic issue of *Sexuality Research and Social Policy* 5, no. 1.

2007 Currah, Paisley and Dean Spade, eds. *The State We're In: Locations of Coercion and Resistance in Trans Policy, Part I*. Thematic issue of *Sexuality Research and Social Policy* 4, no. 4.

## WORK IN PROGRESS

Currah, Paisley. *The Afterlife of Sex*. Represented by Adam Eaglin, The Cheney Agency.

Currah, Paisley, "Sex by Fiat, Magical Thinking, and the Gender of Your Socks," (working title)

Currah, Paisley. "Reproduction's Beard: Cisgender Husbands, Transgender Fathers, and Pregnant Men."

Rayas, Andrés Besserer, Alejandro Gómez Restrepo, Maria Camila Moreno Gil, and Paisley Currah. "Identity, Recognition, and Implementation Gaps: Lessons for trans migrants from Colombia's regularization process."

## SELECTED JOURNAL ARTICLES AND BOOK CHAPTERS

2026 Currah, Paisley. "Sex as a State Effect." In *Sex and Gender: Toward Transforming Scientific Practice*, edited by L. Zachary DuBois, Anelis Kaiser Trujillo, and Margaret M. McCarthy, 339–51. Strüngmann Forum Reports 36. Cham: Springer Nature. (Previously issued 2025, pp. 311–23.)

2026 Hoppe, Katharina, L. Zachary DuBois, Madeleine Pape, Paula-Irene Villa Braslavsky, Paisley Currah, Lorraine Greaves, Katrina Karkazis, Alexandra Brewis, and Amber Wutich. "Gender, Sex, and Their Entanglement: From Scientific Research to Policy and Practice." In *Sex and Gender: Toward Transforming Scientific Practice*, edited by L. Zachary DuBois, Anelis Kaiser Trujillo, and Margaret M. McCarthy, 269–93. Strüngmann Forum Reports 36. Cham: Springer Nature. (Previously issued 2025, pp. 241–65.)

2022 Currah, Paisley. "Incarceration, Identity Politics, and the Trans-Cis Divide." In *The Transgender Studies Reader Remix,* edited by Susan Stryker and Dylan McCarthy Blackston. New York: Routledge.

2021 Currah, Paisley. "The Work that Sex Does." In *Intimate States: Gender, Sexuality, and Governance in Modern US History*, edited by Margot Canaday, Nancy F. Cott, and Robert O. Self, 303-323. Chicago: University of Chicago Press.

2020 Currah, Paisley. "How a Conservative Legal Perspective Just Saved LGBT Rights." *The Boston Review*, June 19.

2019 Currah, Paisley and Aeyal Gross. "Social Justice for Gender and Sexual Minorities," *Critical Analysis of the Law* 6, no. 1: 81-101.

2017 Currah, Paisley. "Transgender Rights Without a Theory of Gender?" *Tulsa Law Review* 52: 441-451.

2017 Aultman, B Lee and Paisley Currah. "Politics Outside the Law: Transgender Lives and the Challenge of Legibility." In *LGBTQ Politics*, edited by Marla Brettschneider, Christine Keating, and Susan Burgess, 34-53. New York: New York University Press.

2015 Currah, Paisley and Susan Stryker. "Making Trans Count." *TSQ: Transgender Studies Quarterly* 2, no. 1: 1-12.

2015 Moore, Lisa Jean and Paisley Currah. "Legally Sexed: Birth Certificates and Transgender Citizens." In *Feminist Surveillance Studies*, edited by Rachel Dubrofsky and Shoshana Magnet, 58-77. Durham, NC: Duke University Press.

2014 Stryker, Susan and Paisley Currah. "Postposttranssexual: Key Concepts for a 21st Century Transgender Studies." *TSQ: Transgender Studies Quarterly* 1, nos. 1-2: 1-18.

2014 Currah, Paisley. "The State." *TSQ: Transgender Studies Quarterly* 1, nos. 1-2: 197-200.

2013 Currah, Paisley. "Homonationalism, State Rationalities, and Sex Contradictions." *Theory & Event* 16, no. 1: 1-10.

2011 Currah, Paisley and Tara Mulqueen. "Securitizing Gender: Identity, Biometrics, and Gender Non-conforming Bodies at the Airport." *Social Research* 78, no. 2: 557-582.

2011 Currah, Paisley and Monica J. Casper. "Bringing Forth the Body." In *Corpus: An Interdisciplinary Reader on Bodies and Knowledge*, edited by Monica J. Casper and Paisley Currah, 1-20. New York: Palgrave.

2009 Currah, Paisley and Lisa Jean Moore. "'We Won't Know Who You Are': Contesting Sex Designations on New York City Birth Certificates." *Hypatia* 24, no. 3: 113-135. Reprinted in *The Transgender Studies Reader*, vol. II, edited by Susan Stryker and Aren Aizura. New York: Routledge. Originally published in *Hypatia* 24, no. 3 (2009).

2008 Currah, Paisley. "Expecting Bodies: The Pregnant Man and Transgender Exclusion from the Employment Non-Discrimination Act." *Women's Studies Quarterly* 36, nos. 3-4: 330-336. Reprinted in *Gendered Bodies*, edited by Judith Lorber and Lisa Jean Moore. New York: Oxford University Press, 2010.

2008 Stryker, Susan, Paisley Currah & Lisa Jean Moore. "Trans, Trans-, Transgender." *Women's Studies Quarterly* 36, nos. 3-4: 11-22.

2008 Spade, Dean and Paisley Currah. "The State We're In: Locations of Coercion and Resistance in Trans Policy, Part II." Thematic issue of *Sexuality Research and Social Policy* 5, no. 1: 1-4.

2007 Currah, Paisley and Dean Spade. "The State We're In: Locations of Coercion and Resistance in Trans Policy." *Sexuality Research and Social Policy: Journal of National Sexuality Resource Center* 4, no. 4: 1-6.

2006 Currah, Paisley. "Gender Pluralisms Under the Transgender Umbrella." In *Transgender Rights*, edited by Paisley Currah, Richard M. Juang and Shannon Price Minter, 3-31. Minneapolis: Minnesota University Press. Reprinted in *Essays on Equality and Anti-Discrimination Law*, edited by Suzanne Goldberg, 353-382. London: Ashgate Press, 2013.

2004 Currah, Paisley. "The Other Sex in Lawrence v. Texas." *Cardozo Women's Law Journal* 10, no. 2: 321-324.

2003 Currah, Paisley. "The Transgender Rights Imaginary." *Georgetown Journal of Gender and the Law* 4: 705-720. Reprinted in: *Gender and Equality Law*, edited by Julie Goldscheid. London: Ashgate Press, 2013; *Sexuality and Equality Law*, edited by Suzanne B. Goldberg, New York: Routledge, 2013, 353-382; *Feminist and Queer Legal Theory: Intimate Encounters, Uncomfortable Conversations*, edited by Martha Albertson Fineman, Jack E. Jackson and Adam P. Romero, 245-257. London: Ashgate Press, 2009.

2001 Currah, Paisley. "Queer Theory, Lesbian and Gay Rights, and Transsexual Marriages." In *Sexual Identities/Queer Politics*, edited by Mark Blasius, 178-199. Princeton: Princeton University Press.

2000 Currah, Paisley and Shannon Minter. "Unprincipled Exclusions: The Struggle for Legislative and Judicial Protections for Transgendered People." *College of William and Mary Journal of Women and the Law* 7, no. 1: 37-66. Reprinted in *Regulating Sex: The Politics of Intimacy and Identity*, edited by Elizabeth Bernstein and Laurie Schaffner, 35-49. New York: Routledge, 2003.

2000 Currah, Paisley. "European Enlightenment." In *The Encyclopedia of Homosexuality: Lesbian Histories and Cultures*, 2nd ed., edited by Bonnie Zimmerman. New York: Garland.

1997 Currah, Paisley. "Practices, Politics, Publics: Identity and Queer Rights." In *Playing with Fire*, edited by Shane Phelan, 231-266. New York: Routledge.

1997 Currah, Paisley. "Defending Genders: Sex and Gender Non-Conformity in the Civil Rights Strategies of Sexual Minorities." *Hastings Law Journal* 48, no. 6: 1363-1385.

1995 Currah, Paisley. "Searching for Immutability: Homosexuality, Race, and Rights Discourse." In *A Simple Matter of Justice*, edited by Angelia R. Wilson, 51-90. London: Cassell Press.

**SELECTED ESSAYS, COMMENTARIES, AND INTERVIEWS**

2026 Currah, Paisley. "Policy, Not Biology." Reply to letter. *New York Review of Books*. March 26.

2025 Currah, Paisley. "The Anti-Trans Playbook," *The New York Review of Books*, December 18.

2025 Currah, Paisley. "Donald Trump's War on Gender is Also Part of the War on Government," *New Yorker*, May 27.

2025 Currah, Paisley, "High Court Must Acknowledge US History of Anti-Trans Laws," *Law360*, February 24, 2025.

2025 Currah, Paisley. "Full-Throated, Explicit Dehumanization." *n+1*. February 10.

2025 Currah, Paisley, Alyson Cole, and Robyn Marasco. "Ask a Political Scientist: A Conversation with Paisley Currah on the Impact of Trans Studies in Political Science." *Polity 57*, no. 1: 179–87. (Interview.) January.

2024 Currah, Paisley. "The Return of Trump—IV." *New York Review of Books*. November 11.

2024 Currah, Paisley, Jennifer L. Levi, and Shannon Price Minter. "Inside the Legal Fight for Trans Rights." *Boston Review*. (Interview.) March 6.

2022 Currah, Paisley. "To Set Transgender Policy, Look to the Evidence." *Nature* 609, no. 7929: 877. September 27.

2022 Currah, Paisley. "To Challenge Trans Injustices, We Must First Understand Why They Exist." *Rewire News Group*. (Excerpted from *Sex Is as Sex Does*, preface.) May 31.

2022 Currah, Paisley. "What Sex Does." *New York Review of Books*. (Adapted from *Sex Is as Sex Does*, ch. 1.) May 27.

2020 Currah, Paisley. "How a Conservative Legal Perspective Just Saved LGBT Rights." *Boston Review*. June 19.

2019 Fischel, Joseph J., Paisley Currah, and Aeyal Gross. "Social Justice for Gender and Sexual Minorities: A Discussion with Paisley Currah and Aeyal Gross." *Critical Analysis of Law* 6, no. 1: 81–101. (Interview.)

2016 Miller, Alice M., Dianne Otto, Violeta Neubauer, Charlotte Bunch, Geetanjali Misra, Paisley Currah, Alda Facio, and Scott Long. "Why the UN Needs a Broader Concept of Gender." Global Health Justice Partnership, Yale University. June.

2013 Currah, Paisley. "What Does Solidarity Look Like? The 2014 Winter Olympics." *The Feminist Wire*, November 5.

2015 Currah, Paisley. "Feinberg's Gender Revolution," *The Brooklyn Quarterly*, January.

2011 Currah, Paisley. Editor of and contributor to "Symposium: The State of LGBT/Sexuality Studies in Political Science," 13-16. *PS: Political Science & Politics* (June).

## EDITORIAL INTRODUCTIONS, *TSQ: TRANSGENDER STUDIES QUARTERLY*

2019 Currah, Paisley. "General Editor's Introduction." *TSQ: Transgender Studies Quarterly* 6, no. 1: 1–3. February.

2018 Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 3: 295–97. August.

2018 Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 2: 161–63. May.

2018 Currah, Paisley, and Susan Stryker. "Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 1: 1–8. February.

2017 Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 4, nos. 3–4: 323–25. November.

2017 Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 4, no. 2: 159–61. May.

2017 Currah, Paisley, and Susan Stryker. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 4, no. 1: 1–3. February.

2016 Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 3, nos. 3–4: 331–32. November.

2016 Currah, Paisley. "General Editor's Introduction." *TSQ: Transgender Studies Quarterly* 3, nos. 1–2: 1–4. May.

## BLOGS

| | |
|---|---|
| 2026 | Sederbaum, Isaac, and Paisley Currah. "When Compliance Becomes a Crime: What Does Transgender Citizenship Mean after a New Kansas Law?" *Can We Still Govern?*, newsletter of Donald Moynihan. March 3. |
| 2026 | Currah, Paisley. "How Anti-Trans Politics Remakes the State." paisleycurrah.substack.com. January 30. |
| 2019 | Currah, Paisley. "The Aimee Stephens Case: On the Problem with Describing a Trans Woman as an 'Insufficiently Masculine' Biological Male." paisleycurrah.com. October 15. |
| 2016 | Currah, Paisley. "Feminism, Gender Pluralism, and Gender Neutrality: Maybe It's Time to Bring Back the Binary." paisleycurrah.com. April 26. |
| 2016 | Currah, Paisley. "Keeping North Carolina Safe for Business." paisleycurrah.com. April 13. |
| 2016 | Currah, Paisley. "The New Transgender Panic: 'Men' in Women's Bathrooms." paisleycurrah.com. March 31. |

## AWARDS, FELLOWSHIPS, GRANTS, AND HONORS

| | |
|---|---|
| 2026 | Pioneer Award, a lifetime achievement award, International Transgender Education Organization |
| 2024-2025 | Member, Institute for Advanced Study, Princeton. |
| 2024 | Excellence in Scholarly and Creative Achievement Award, Brooklyn College, CUNY |
| 2024 | Distinguished Fellow, Advanced Research Collaborative, The Graduate Center, CUNY. |
| 2023 | Best Book Award for *Sex Is as Sex Does,* Sexuality and Politics Section, American Political Science Association |
| 2023 | Finalist for *Sex Is as Sex Does,* Government and Politics Category, Association of American Publishers' Prose Awards |
| 2019-2021 | Internal Endowed Chair, Women's and Gender Studies Program, Brooklyn College, CUNY. |
| 2017-2018 | Tow Professorship, Brooklyn College, CUNY. |
| 2013 | The 2013 Trans 100 inaugural list recognizing excellence in service to the trans community. (http://www.thetrans100.com/wp-content/uploads/2017/01/Trans100-Final02.pdf) |
| 2011 | Michael Lynch Service Award, from the GL/Q Caucus of the Modern Language Association. The award is intended, in Eve Sedgwick's words, "to publicize and celebrate--and as widely as possible--the range, the forms, the energy, and the history of queer activism by academics." |
| 2010 | $1,800: The Williams Institute Small Grant for a pilot project, "Administering Sex: |

Investigating how federal agencies develop criteria for sex reclassification."

2007 Sylvia Rivera Award in Transgender Studies, 2007, for *Transgender Rights*, edited by Paisley Currah, Richard M. Juang, and Shannon Price Minter. Minneapolis: University of Minnesota Press, 2006.

2006 Lambda Literary Awards, Finalist, for *Transgender Rights*, edited by Paisley Currah, Richard M. Juang, and Shannon Price Minter, Minneapolis: University of Minnesota Press.

2005 Distinguished Awardee, NYC Comptroller William C. Thompson's Lesbian, Gay, Bisexual, and Transgender Pride Celebration, June.

2002 Wayne F. Placek Award, American Psychological Foundation. One of two scholars chosen nationally for a $30,000 award to support two years of research investigating federal and state judicial opinions and briefing materials involving transgender plaintiffs and the construction of gender in the law.

1999-2000 Fellow, Wolfe Institute for the Humanities, Brooklyn College: Project: "Liberalism, Cultural Pluralism, and the Reproduction of Gender."

**POLICY ENGAGEMENT, RESEARCH LEADERSHIP, AND PUBLIC IMPACT**

2025 Contributing author, Brief of Law and History Scholars for the Transgender Law Center as Amicus Curiae Supporting Respondents in Little v. Hecox, U.S. Supreme Court

2024- Advisory Board, Institute on Gender, Law, and Transformative Justice, School of Law, City University of New York.

2024 Invited Briefing, UN Working Group on Discrimination Against Women and Girls, Yale University, New Haven.

2021 Expert witness for the Transgender Legal Defense and Education Fund. I authored a declaration asserting that transgender people constituted a suspect class for the purpose of 14th Amendment litigation. Lange v. Houston County, Georgia (U.S. District Court for the Middle District of Georgia, Macon Division).

2012-2015 Gender Identity in U.S. Surveillance (GENIUSS Group), Williams Institute, University of California Law School.

2009-2017 International Advisory Board, Global Action for Trans* Equality, 2009-2015; Treasurer and Member of the Board of Directors

2008-2010 Board of Directors, Lesbian, Gay, Bisexual, and Transgender Community Center, New York, NY

2006-2007 New York City Department of Homelessness Services. Training with intake staff on gender identity policy.

2006-2012 Human Rights Watch Lesbian, Gay, Bisexual, and Transgender Rights Program Advisory

Committee

2005-2006 External Advisory Committee to the New York City Department of Health and Mental Hygiene for the Amendment of Birth Certificates for Transgender Persons.

2004-2005 Citizen's Advisory Committee Transgender Subcommittee, New York City Human Resources Administration; co-author of "Recommended Best Practices for Working with and Serving Transgender and Gender Non-Conforming Employees and Clients."

2000-2007 Federal Employment Non-Discrimination Act Working Coalition. Representing the Transgender Law and Policy Institute, I worked with the Human Rights Campaign, the ACLU Gay Rights Project, the National Gay and Lesbian Task Force, the National Center for Transgender Equality and other LGBT advocacy groups in discussions about drafting and lobbying for this bill.

2000 Currah, Paisley and Shannon Minter. *Transgender Equality: A Handbook for Policymakers and Activists*. New York: National Center for Lesbian Rights and the Policy Institute of the National Gay and Lesbian Task Force.

1998-2001 Founder and Board Member, New York Association for Gender Rights Advocacy

**SELECTED INVITED LECTURES AND PLENARY PRESENTATIONS**

2025 "Gender, Sexuality, and Reproductive Freedom," invited panelist at "Upholding Human Dignity in Turbulent Times" conference, Jewish Theological Seminary, November 17, 2025.

2025 "Sex as an Output of Governing," Hancock Symposium, Westminster College, September 16

2025 "Sex Classification as a Tool of Governance," Network of Interdisciplinary Gender Studies in Europe, University of Utrecht, Utrecht, Netherlands, August 27

2025 "Sexual Democracy, Moral Panics, and Trans Politics," Socialism 2025, Chicago, Illinois, July 5

2025 "The centrality of Gender in Trump's Attack on the Administrative State," at Diálogos Pendientes y Emergentes, Sexuality Policy Watch, Rio de Janeiro, Brazil, via Zoom, June 17; and for Politics of the Body at the Crossroads Plenary Panel, Law and Society Association, Chicago, Illinois, May 22

2024 "Against Transphobia," Plenary panel at the Second International Trans Conference, Northwestern University, September 4

2024 "The History of Sex Categorization and the Genome," at the National Institutes of Health symposium, "Exploring the many dimensions of sex and gender in the genomics era: Clarifying complexities in light of social and genomic advances and their histories," July 17

2024 “The Politics of Sex Classification,” Global Institute on Sexuality, Gender, Rights, organized by CREA, a feminist international human rights organization based in the Global South, Zagreb, Croatia, May 9th. (On Zoom due to a scheduling conflict).

2024 “Legislating Gender,” the Sex, Sexuality, and Gender Symposium, Reed College, April 11; the Minx Auerbach Annual Lecture, University of Louisville, March 7; and the Monday Night Lecture Series Center for the Humanities, Wesleyan University, March 4

2023 “Sex classification as a technology of government,” Annual Meeting of the International Academy of Sex Research, Montreal, Québec, August 9

2023 “What does sex and gender do,” 36th Ernst Strüngmann Forum, on *Sex and Gender: Transforming Scientific Practice*, Frankfurt, Germany, October 8-13

2023 “How the Women’s Rights Movement Paved the Way for Transgender Equality--and the Work that Remains to be Done,” Women’s Rights National Historic Park, Wesleyan Chapel, Seneca Falls, July 21

2023 “The United States of Transgender? ‘Red’ States, ‘Blue’ States, and the Myth of Geographical Gender Revanchism,” California Polytechnic State University, May 19

2023 “This Anti-trans Moment: Resisting the Right and the Center,” The University of California, Santa Cruz, April 14

2023 “Defining Sex and Gender in Science and Public Policy,” panel discussion, *Cell,* with Kendra Albert and Sarah Richardson, January 11

2022 “Trans Studies After Identity Politics,” Keynote address, International Colloquium on Transgender Studies/Transgender Epistemologies, Laboratoire des études de genre et de sexualité (LEGS), UMR 8238, Université Paris 8 Vincennes Saint-Denis, October 17-19

2022 “Sex Is as Sex Does,” for the On-Philosophy Colloquium, presented by *The Philosopher* (UK) and *The Boston Review*, with Robin Dembroff, October 10; Brooklyn Book Festival, with Hugh Ryan and Brian Vines; Center for Gender & Sexuality Law, Columbia University, with Che Gossett, Katherine Franke, and Kendall Thomas, September 21, 2022

2022 “What is Sexual Justice?” Brudner roundtable with Paisley Currah, Che Gossett, Tey Meadow, and Shatema Threadcraft, Yale University, April 14

2021 “What Would a Transgender Political Science Look Like?” keynote address for the conference, “Intersectionality and Transgender Studies: From Margin to Center,” Otto Suhr Institute of Political Science at the Freie Universität, Berlin, Germany, October 27

2020 “Sex is as Sex Does,” Law School, Queen’s University at Kingston, Canada, February 28

2017 “Neoliberal Futures, Cultural Backlashes, and the Politics of Sex Classification,” keynote address at the annual meeting of Women's and Gender Studies *et recherches féministes*, part of

the Annual Congress of the Canadian Federation for Humanities and Social Sciences, Toronto, Ontario, May 28

2016 “What’s the Political Use of Transgender?” Plenary Panel, Trans* Studies International Conference, University of Arizona, September 8

**SELECTED MEDIA AND PUBLIC ENGAGEMENT**

2025 Quoted in “New Passport Rule Sends Blunt and Sweeping Message to Trans Americans,” *New York Times*, November 17.

2026 “The Anti-Trans Playbook,” Factually with Adam Conover, February 26.

2025 On DEI, Nerd from the Future Podcast, September 15.

2025 “The Right’s War on Gender is Also a War on Government,” This is Hell podcast, June 22.

2024 Quoted in feature profile of Judith Butler, *The New Yorker,* May.

2024 Interview with Riki Wilchins, Assigned Media, October 10.

2024 “What is ‘sex’? What is ‘gender’? How these terms changed and why states now want to define them,” *Politifact*, The Poynter Institute, March 22.

2023 Science podcast, with Angela Saini, August 24.

2022 “Governing Transgender Identity,” *Boston Review,* October 27.

2022 “Why the Law Cares about Your Sex,” The Waves podcast, *Slate*, October 13.

2022 Think, with Kris Boyd, on KERA (podcast), August 16.

2022 “A lack of evidence in transgender policy making,” *Nature* podcast, September 28.

2022 “Sex Is as Sex Does,” New Books Network podcast, July 29.

2022 “Governing Transgender Identity,” Factually with Adam Conover, (podcast), July 13.

2022 Behind the News, with Doug Henwood, (podcast), June 23.

2022 “Sex According to the State,” *Jewish Currents*, June 29.

2022 “The Asymmetry of Gender,” *New York Review of Books*, May 29.

2020 “A Win For LGBTQ Employees At The Supreme Court,” IA podcast, National Public Radio, June 16.

2022 “Post-‘Roe,’ Transgender People Fear for the Future,” *The American Prospect*, August 1.

2021 "Elliot Page Is Ready for This Moment," *Time*, March 16.

2019 "The Trans Divide," Colleen Flaherty, *Inside Higher Ed*, July 19.

2016 "Exclusive: Women, young more open on transgender issue in U.S.," Reuters, April 21.

2015 "Once a Pariah, Now a Judge: The Early Transgender Journey of Phyllis Frye," *The New York Times*, August 29.

2015 "How Transgender People Choose Their New Names," *Time*, June 1.

2014 "Meet Transgender America," *Time,* May 29.

**EDITORIAL BOARDS**

2020- *Polity*

2020-2024 *American Political Science Review*

2010-2014 *Trans Bodies, Trans Selves*

2008-2020 *Sexuality Research and Social Policy*

2005- *GLQ: A Journal of Lesbian and Gay Studies*

2004-2023 *WSQ: Women's Studies Quarterly*

**SELECTED PEER REVIEWING**

Journals: *American Political Science Review, Feminist Studies, Gender & Society, GLQ: A Journal of Lesbian and Gay Studies, International Feminist Journal of Politics, Journal of Multiple Methods Research, Journal of Sex Research, Journal of Social Philosophy, Law & Social Inquiry, Men and Masculinities, New Political Science, Perspectives on Politics, Psychology and Sexuality, Politics, Groups and Identities, Polity, Radical History Review, Sexuality Research and Social Policy, Signs, Sex Roles, TSQ: Transgender Studies Quarterly, WSQ: Women's Studies Quarterly*

Grants: American Council of Learned Societies, American Psychological Foundation's Wayne F. Placek's Major Grant Program, European Science Foundation, Ford Foundation's Black Sexuality and Latina/o Sexualities Research Projects, Frieberg Institute for Advanced Studies, Fulbright Program, Open Society Institute, Social Science and Humanities Research Council of Canada

Presses: Bloomsbury Press, Fordham University Press, Harrington Park Press, Manchester University Press, Minnesota University Press, New York University Press, Oxford University Press, Palgrave Macmillan, Pluto Press, Routledge, University of Minnesota Press, Temple University Press, Vanderbilt University Press

## EDUCATION

1994 PhD in Government: political theory and American politics with an interdisciplinary certificate in feminist, gender, and sexuality studies, Cornell University, Ithaca, New York (Committee: Susan Buck-Morss, Zillah Eisenstein, Isaac Kramnick, Biddy Martin)

1992 MA in Government, Cornell University, Ithaca, New York

1987 BA (Honours) in Political Studies, (First Class), Queen's University at Kingston, Ontario, Canada

## TEACHING AND MENTORSHIP

2023-2024 Tow Mentoring Initiative: mentor for faculty in the School of Humanities and Social Sciences at Brooklyn College; conducted training for interested faculty on best mentoring practices; mentor to Angelique Gonzalez, "Defining Sex Bills: The Difference between Rhetoric and Policy"

Dissertation supervision:

B. Aultman, Political Science, "Feeling as Knowing: Trans Phenomenology and Epistemic Justice" (2018)

Drake Logan, Political Science, "Searching for Pōhakuloa: A Citizen-Scientist's Journey in Aloha ʻĀina," (2020)

Heidi Restrepo Rhodes, Political Science, "Afterlives of Discovery: Speculative Geographies in the Colombian Political Landscape" (2021)

Charlie Marksbreiter, English, "Rapid Onset: Anti-trans Culture and the Decline of American Empire, 2001-2024," (2026)

Master's Thesis Supervision:

Institute for the Study of Human Rights, Columbia University: supervised 19 MA theses between 2016 and 2023.

Selected mentorship (outside the City University of New York)

National transgender law and policy dissertation research group, 2022-

American Political Science Association Mentorship Program, 2022-2023.

Senior tutor, International LGBT Psychology Institute, a workshop for PhD candidates, postdoctoral fellows, and untenured assistant professors, University of Michigan, July 2010.

Advisory board member, University Consortium for Sexuality Research and Training, I was involved in planning a national conference, "The Future of Sexuality Research: Methodological to Social Policy Innovations," co-sponsored by the Kinsey Institute, Bloomington, IN, April, 2007.

Research consultant for Dean Spade's project, "Deregulating Gender: Model Policies for Transgender Equality," Sexuality Research Fellowship Program, Social Science Research Council, 2005-06.

Courses taught

Introduction to Women's and Gender Studies
Identity Politics and Its Critics
The Politics of LGBTQ Human Rights
Global Sexualities
Biopolitics (Brooklyn College and The Graduate Center)
Gender and the State
Feminist Political Theory
Modern Political Theory
Contemporary Political Theory
Introduction to Lesbian & Gay/Queer Studies (The Graduate Center)
Transgender Theories and Politics (Brooklyn College, The Graduate Center, Barnard College)
Politics and Sexuality
Fundamental Concepts in LGBTQ Studies
Sexual Orientation, Gender Identity, and Human Rights (Columbia University Human Rights Program)
Surveillance and the City
Political Ethnography
States and Borders
Core Studies 1230: People, Power, and Politics
Policy Analysis
U.S. Constitutional Law: Civil Rights and Civil Liberties
Qualitative Research Methods in Political Science

**SELECTED PROFESSIONAL SERVICE**

*American Political Science Association:*

2016-2017 Program Co-Chair, Normative Political Theory

2010-2011 President, Sexuality and Politics Section

2009-2010 Program Chair, Sexuality and Politics Section

2008-2011 Executive Committee, Sexuality and Politics Section

2008-2011 Committee on the Status of Lesbians, Gays, Bisexuals and the Transgendered in the Profession

*Advisory Boards:*

2025- Founding Advisory Board, Gender/Sex/uality Research Community (new international research community created as an alternative to the Society for the Scientific Study of Sexuality)

| | |
|---|---|
| 2008-2016 | Sexuality and the Law, Social Science Research Network |
| 2009-2015 | Consortium Member, Project on Bioethics, Sexuality, and Gender Identity, University of Pennsylvania |
| 2008-2014 | Biopolitics: Medicine, Health, and Technoscience in the 21st Century, a book series from New York University Press edited by Monica Casper and Lisa Jean Moore |
| 2007-2009 | International Resource Network, a project hosted at the Center for Lesbian and Gay Studies and funded by the Ford Foundation |
| 2005-2008 | University Consortium on Sexuality Research and Training |

*Program Review:*

| | |
|---|---|
| 2008 | External Reviewer, Department of Women's Studies, Simon Fraser University, March |
| 2008 | External Evaluator, University of Toronto Undergraduate Program in Sexual Diversity Studies, January |

**GRANTS AWARDED DURING MY LEADERSHIP OF THE CENTER FOR LESBIAN AND GAY STUDIES, THE GRADUATE CENTER.**

| | |
|---|---|
| 2007 | $361,000: Ford Foundation's Education, Sexuality and Religion section of the Knowledge, Freedom and Values Program: "CLAGS's International Resource Network." (www.irnweb.org). Awarded for a three-year period. |
| 2003-2007 | Multiple small grants from New York State Senate, NYC Council, and NY Council for the Humanities |
| 2006 | $100,000: Arcus Foundation: "CLAGS LGBTQ History Project." A two-year grant |
| 2006 | $18,000: Funding Exchange: Three-year grant in support of the Heller-Bernard Fellowships |
| 2006 | $2,000: CUNY Diversity Projects Development Fund to support the Queer CUNY conference |
| 2006 | $1,000: Astraea Lesbian Foundation for Justice to support Queer CUNY conference |
| 2005 | $2,000: New York Council for the Humanities: mini-grant in support of CLAGS's program, "Whither Lesbian Feminism" |
| 2005 | $3,000: CUNY Diversity Projects Development Fund to support the Queer CUNY conference |
| 2005 | $2,000: Senate of the State of New York, for general operating |
| 2004 | $15,000: Open Society Institute for a conference and publication, "Trans Justice, Social Change, and Politics." Awarded for a two-year period |

2004 $15,000: Gill Foundation for a conference and publication, "Trans Justice, Social Change, and Politics." Awarded for a two-year period

2004 $300,000: Ford Foundation's Education, Sexuality and Religion section of the Knowledge, Freedom and Values Program: "CLAGS International Resource Network" (www.irnweb.org). Awarded for a three-year period

2004 $10,000: Paul Rapoport Foundation matching grant, one year.

2004 $8,000: New York Council for the Humanities: a one-year grant to support CLAGS's "Seminars in the City" program

2003 $10,000: Paul Rapoport Foundation matching grant, one year

2003 $4,000: Council of the City of New York, for general operating

**SELECTED COMMUNITY SERVICE**

2024- Assistant Sea Kayak Trip Leader, Sebago Canoe Club

2022-2024 Nominating Committee, Ann Snitow Prize

2020-2024 Crown Heights Mutual Aid

2012-2013 Maple Street School, Board of Directors

## APPENDIX B — PUBLICATIONS, 2016–2026

### Books

Currah, Paisley. *Sex Is as Sex Does: Governing Transgender Identity*. New York: New York University Press. (Paperback edition with new foreword, 2024.) 2022.

### Book Chapters and Journal Articles

Currah, Paisley. “Sex as a State Effect.” In *Sex and Gender: Toward Transforming Scientific Practice*, edited by L. Zachary DuBois, Anelis Kaiser Trujillo, and Margaret M. McCarthy, 339–51. Strüngmann Forum Reports 36. Cham: Springer Nature. (Previously issued 2025, pp. 311–23.) 2026.

Hoppe, Katharina, L. Zachary DuBois, Madeleine Pape, Paula-Irene Villa Braslavsky, Paisley Currah, Lorraine Greaves, Katrina Karkazis, Alexandra Brewis, and Amber Wutich. "Gender, Sex, and Their Entanglement: From Scientific Research to Policy and Practice." In *Sex and Gender: Toward Transforming Scientific Practice*, edited by L. Zachary DuBois, Anelis Kaiser Trujillo, and Margaret M. McCarthy, 269–93. Strüngmann Forum Reports 36. Cham: Springer Nature. (Previously issued 2025, pp. 241–65.) 2026.

Currah, Paisley. “Incarceration, Identity Politics, and the Trans-Cis Divide.” In *The Transgender Studies Reader Remix*, edited by Susan Stryker and Dylan McCarthy Blackston, 352–65. New York: Routledge. (Excerpted from *Sex Is as Sex Does,* ch. 5.) May 2022.

Currah, Paisley. “The Work that Sex Does.” In *Intimate States: Gender, Sexuality, and Governance in Modern US History*, edited by Margot Canaday, Nancy F. Cott, and Robert O. Self, 303–23. Chicago: University of Chicago Press. 2021.

Aultman, B Lee, and Paisley Currah. “Politics Outside the Law: Transgender Lives and the Challenge of Legibility.” In *LGBTQ Politics*, edited by Marla Brettschneider, Christine Keating, and Susan Burgess, 34–53. New York: New York University Press. 2017.

Currah, Paisley. “Transgender Rights Without a Theory of Gender?” *Tulsa Law Review* 52: 441–51. 2017.

### Essays, Commentary, and Interviews

Currah, Paisley. “Policy, Not Biology.” Reply to letter. *New York Review of Books*. March 26, 2026.

Currah, Paisley. “The Anti-Trans Playbook.” *New York Review of Books*. December 18, 2025.

Currah, Paisley. “Donald Trump's War on Gender Is Also a War on Government.” *The New Yorker*. May 27, 2025.

Currah, Paisley. “High Court Must Acknowledge US History of Anti-Trans Laws.” *Law360*. February 24, 2025.

Currah, Paisley. "Full-Throated, Explicit Dehumanization." *n+1*. February 10, 2025.

Currah, Paisley, Alyson Cole, and Robyn Marasco. "Ask a Political Scientist: A Conversation with Paisley Currah on the Impact of Trans Studies in Political Science." *Polity 57*, no. 1: 179–87. (Interview.) January 2025.

Currah, Paisley. "The Return of Trump—IV." *New York Review of Books*. November 11, 2024.

Currah, Paisley. "Gender Wars: Two Scholars Excavate the Origins of Today's Trans Backlash." *The Yale Review* 112, no. 1: 126–40. Spring 2024.

Currah, Paisley, Jennifer L. Levi, and Shannon Price Minter. "Inside the Legal Fight for Trans Rights." *Boston Review*. (Interview.) March 6, 2024.

Currah, Paisley. "To Set Transgender Policy, Look to the Evidence." *Nature* 609, no. 7929: 877. September 27, 2022.

Currah, Paisley. "To Challenge Trans Injustices, We Must First Understand Why They Exist." *Rewire News Group*. (Excerpted from *Sex Is as Sex Does*, preface.) May 31, 2022.

Currah, Paisley. "What Sex Does." *New York Review of Books*. (Adapted from *Sex Is as Sex Does*, ch. 1.) May 27, 2022.

Currah, Paisley. "How a Conservative Legal Perspective Just Saved LGBT Rights." *Boston Review*. June 19, 2020.

Fischel, Joseph J., Paisley Currah, and Aeyal Gross. "Social Justice for Gender and Sexual Minorities: A Discussion with Paisley Currah and Aeyal Gross." *Critical Analysis of Law* 6, no. 1: 81–101. (Interview.) April 2019.

Miller, Alice M., Dianne Otto, Violeta Neubauer, Charlotte Bunch, Geetanjali Misra, Paisley Currah, Alda Facio, and Scott Long. "Why the UN Needs a Broader Concept of Gender." Global Health Justice Partnership, Yale University. June 2016.

**Editorial Introductions, *TSQ: Transgender Studies Quarterly***

Currah, Paisley. "General Editor's Introduction." *TSQ: Transgender Studies Quarterly* 6, no. 1: 1–3. February 2019.

Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 3: 295–97. August 2018.

Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 2: 161–63. May 2018.

Currah, Paisley, and Susan Stryker. "Introduction." *TSQ: Transgender Studies Quarterly* 5, no. 1: 1–8. February 2018.

Stryker, Susan, and Paisley Currah. "General Editors' Introduction." *TSQ: Transgender Studies Quarterly* 4, nos. 3–4: 323–25. November 2017.

Stryker, Susan, and Paisley Currah. “General Editors’ Introduction.” *TSQ: Transgender Studies Quarterly* 4, no. 2: 159–61. May 2017.

Currah, Paisley, and Susan Stryker. “General Editors’ Introduction.” *TSQ: Transgender Studies Quarterly* 4, no. 1: 1–3. February 2017.

Stryker, Susan, and Paisley Currah. “General Editors’ Introduction.” *TSQ: Transgender Studies Quarterly* 3, nos. 3–4: 331–32. November 2016.

Currah, Paisley. “General Editor’s Introduction.” *TSQ: Transgender Studies Quarterly* 3, nos. 1–2: 1–4. May 2016.

**Blog Posts**

Sederbaum, Isaac, and Paisley Currah. “When Compliance Becomes a Crime: What Does Transgender Citizenship Mean after a New Kansas Law?” *Can We Still Govern?*, newsletter of Donald Moynihan. March 3, 2026.

Currah, Paisley. “How Anti-Trans Politics Remakes the State.” paisleycurrah.substack.com. January 30, 2026

Currah, Paisley. “The Aimee Stephens Case: On the Problem with Describing a Trans Woman as an ‘Insufficiently Masculine’ Biological Male.” paisleycurrah.com. October 15, 2019.

Currah, Paisley. “Feminism, Gender Pluralism, and Gender Neutrality: Maybe It’s Time to Bring Back the Binary.” paisleycurrah.com. April 26, 2016.

Currah, Paisley. “Keeping North Carolina Safe for Business.” paisleycurrah.com. April 13, 2016.

Currah, Paisley. “The New Transgender Panic: ‘Men’ in Women’s Bathrooms.” paisleycurrah.com. March 31, 2016.

# APPENDIX C — MATERIALS CONSIDERED

**Expert Disclosures**

• Expert Disclosure of CAPT Keisha Blair

• Expert Disclosure of LCDR Martin Bayer

• Expert Disclosure of COL Black

• Expert Disclosure of GEN Carden

• Expert Disclosure of COL Cron

• Expert Disclosure of Lt. Gen. DeGoes

• Expert Disclosure of Dr. Alan Hopewell

• Expert Disclosure of LTC Lee

• Expert Disclosure of LTG Lombardo

• Expert Disclosure of VADM Miguez

• Expert Disclosure of Dr. Ortega

• Expert Disclosure of CAPT Peter Roberts

• Expert Disclosure of LTC Salter

• Expert Disclosure of CAPT Dennis White

• Expert Disclosure of LtGen Bowers

**Executive Orders, Policies, and Government Documents**

• Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

• Executive Order 14183, Prioritizing Military Excellence and Readiness

• Executive Order 14004, Enabling All Qualified Americans to Serve Their Country in Uniform

• Carter Policy: Dep't of Def., Directive-Type Memorandum (DTM) 16-005, Military Service of Transgender Service Members (June 30, 2016).

• Austin Policy: Revisions to DoD Instruction (DoDI) 1300.28, 86 Fed. Reg. 17590 (Apr. 6, 2021).

• Mattis Memorandum: Dep't of Defense, Report and Recommendations on Military Service by Transgender Persons (Feb. 22, 2018).

• Hegseth Policy: Dep't of Def. Memorandum "Additional Guidance on Prioritizing Military Excellence and Readiness" (Feb. 26, 2025).

• U.S. Dep't of Def., Memorandum for Senior Pentagon Leadership et al., Prioritizing Military Excellence and Readiness (Feb. 7, 2025)

• Dep't of Def. Instruction 6130.03, Medical Standards for Military Service: Appointment, Enlistment or Induction (pre-2016).

• Dep't of the Army, Army Regulation 40-501.

• Dep't of the Army, Army Directive 2016-30, Army Policy on Military Service of Transgender Soldiers (July 1, 2016).

• 2016 RAND Report: Agnes Gereben Schaefer et al., Assessing the Implications of Allowing Transgender Personnel to Serve Openly (RAND Corp. 2016).

• Mattis Report: Dep't of Def., Summary of the 2018 National Defense Strategy of the United States of America: Sharpening the American Military's Competitive Edge 1 (2018).

• U.S. Dep't of War, Transcript, Secretary of War Pete Hegseth Addresses General and Flag Officers at Quantico, Virginia (Sept. 30, 2025)

**Judicial Decisions**

• *Anonymous v. Weiner*, 50 Misc. 2d 380 (N.Y. Sup. Ct. 1966)

• *In re Estate of Gardiner*, 42 P.3d 120 (Kan. 2002)

• *In re Heilig*, 816 A.2d 68 (Md. 2003)

• *Littleton v. Prange*, 9 S.W.3d 223 (Tex. App. 1999)

• *Obergefell v. Hodges*, 576 U.S. 644 (2015)

**Legislation**

• Idaho Code § 73-114(2)(c), (g), (n) (2024)

• Kan. Stat. Ann. § 77-207 (2023)

• La. Stat. Ann. § 9:58(6), (9), (14) (2024)

**Correspondence and Archival Materials**

• Letter from Charles R. Council, Chief, Registration Methods Branch, Division of Vital Statistics, Dep't of Health, Education and Welfare, to Carl L. Erhardt, Director, Bureau of Records and Statistics, City of New York Health Dep't (June 11, 1965)

• Letter from Michele E. Truitt, Acting Chief, Legal Division, Passport Office, U.S. Dep't of State (by Robert W. Knott, Attorney Advisor), to Joanna M. Clark, Director, Legal Research Division, Renaissance (Aug. 18, 1978), reprinted in Proceedings of the Fourth International Conference on Transgender Law and Employment Policy, at H-5 to H-6 (ICTLEP, Inc., June 1995)

**Litigation Records**

• *Berkley et al. v. Farley*, Respondents' Memorandum of Law, Supreme Court of the State of New York, County of New York (July 15, 2011), Index No. 114372/2009

**Books and Monographs**

• Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* (Harvard Univ. Press 2000)

• Paisley Currah, *Sex Is as Sex Does: Governing Transgender Identity* (N. Y. Univ. Press 2022)

**Journal Articles and Book Chapters**

• *Anti-Gender Campaigns in Europe: Mobilizing Against Equality* (Roman Kuhar & David Paternotte eds., 2017)

• Serena Bassi & Greta LaFleur, *Introduction: TERFs, Gender-Critical Movements, and Postfascist Feminisms*, 9 TSQ: Transgender Stud. Q. 311 (2022)

• Greta R. Bauer, *Sex and Gender Multidimensionality in Epidemiologic Research*, 192 Am. J. Epidemiology 122 (2023)

• Talia Bettcher, *Evil Deceivers and Make-Believers: On Transphobic Violence and the Politics of Illusion*, 22 Hypatia 43 (2007)

• Mary Anne Case, *Trans Formations in the Vatican's War on "Gender Ideology,"* 44 Signs: J. Women Culture & Soc'y 639 (2019)

• Elizabeth S. Corredor, *Unpacking "Gender Ideology" and the Global Right's Antigender Countermovement*, 44 Signs: J. Women Culture & Soc'y 613 (2019)

• Paisley Currah, *Gender Wars: Two Scholars Excavate the Origins of Today's Trans Backlash*, 112 Yale Rev. 126 (2024)

• Paisley Currah & Lisa Jean Moore, *"We Won't Know Who You Are": Contesting Sex Designations in New York City Birth Certificates*, 24 Hypatia 113 (2009)

• Katharina Hoppe, L. Zachary DuBois, Madeleine Pape, Paula-Irene Villa Braslavsky, Paisley Currah, Lorraine Greaves, Katrina Karkazis, Alexandra Brewis & Amber Wutich, *Gender, Sex, and Their Entanglement: From Scientific Research to Policy and Practice*, *in Sex and Gender: Toward Transforming Scientific Practice* 269 (L. Zachary DuBois, Anelis Kaiser Trujillo & Margaret M. McCarthy eds., 2026)

**Public Scholarship and Media**

• Paisley Currah, *The Anti-Trans Playbook*, N.Y. Rev. Books (Dec. 18, 2025)

• Paisley Currah, *What Sex Does*, N.Y. Rev. Books (May 27, 2022)

• Paisley Currah, *Full-Throated, Explicit Dehumanization*, n+1 (Feb. 2025)

• *Hegseth Uses Transphobic Slur While Campaigning for Iowa Congressman*, Wash. Blade (Aug. 20, 2026)

• *Pete Hegseth Again Uses Transphobic Slur in Military Speech*, People (Sept. 21, 2026)

**Diagnostic and Clinical Materials**

• American Psychiatric Association, DSM-5 Gender Dysphoria Fact Sheet

• American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 512–13 (5th ed., text rev. 2022)

• World Health Organization, Gender Incongruence and Transgender Health in the ICD (ICD-11)

• Holloway et al, *Mental Health and Health Risk Behaviors of Active Duty Sexual Minority and Transgender Service Members in the United States Military*, 8 LGBT Health 2, 153 (2021) (study attached to LTC Salter's disclosure)

• Schvey et al., *A Descriptive Study of Transgender Active Duty Service Members in the U.S. Military*, 5 Transgender Health 83, 150 (2020) (study attached to LTC Salter's disclosure)