IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

| | |
|---|---|
| IN THE MATTER OF:<br><br>NICOLAS TALBOTT, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, et al.<br><br>Defendants. | Civil Action No.<br>25-240 (ACR) |

Washington, D.C.

Thursday,
November 12, 2026

DEPOSITION OF:

PAISLEY CURRAH

called for examination by Counsel for the Defendants, pursuant to Notice of Deposition, at 1100 L Street NW, Washington, D.C. 20005, when were present on behalf of the respective parties:

APPEARANCES:

On Behalf of the Plaintiffs:

INGA S. BERNSTEIN, ESQ.
Zalkind Duncan & Bernstein LLP
2 Oliver Street, #200
Boston, Massachusetts 02109
617-742-6020
ibernstein@zalkindlaw.com

On Behalf of the Defendants:

ELIZABETH B. LAYENDECKER, ESQ.
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
771-217-8107
elizabeth.b.layendecker@usdoj.gov

ALSO PRESENT:

SHANNON MINTER, ESQ., National Center for LGBTQ Rights
REBECCA GOTH, ESQ., United States Department of Justice
SAM FRANCIS, Videographer

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| P. Currah | 6 | N/A | N/A | N/A |

| EXHIBIT NO. | | PAGE |
|---|---|---|
| 1 | Mr. Currah’s Expert Report | 36 |
| 2 | Lieutenant General DeGoes’ deposition Transcript | 72 |
| 3 | Dr. Ortega’s deposition transcript | 75 |

sorry?

BY MS. LAYENDECKER:

Q Yes, it's okay. How did federal agencies work out those questions for themselves to quote the report.

A I would love to know how the agency did that. That would be excellent for my research, but that archival record is sparse. So, what I have to look at are the actual policies they come up with.

I did find a letter from 1965 where a federal official was talking about the problem of defining sex uniformly, and that was interesting. I would love to find more stuff like that, but it's what I have. What I'm able to go by is the actual policies they created and then their effects. That's how I can try to think about the justifications for them.

Q So, maybe focusing on a time period a bit later when you know there is better documentation, how do agencies generally work out questions of sex classification?

MS. BERNSTEIN: Objection. I think the point of the sentence that you read is that kind of a general practice, that prior to this, there

wasn't one uniform practice, and it's not the question of the hows and the whys of that, but that it just didn't exist. That's how I understood that sentence.

THE WITNESS: By that sentence, I meant that it was an agency by agency decision.

MS. LAYENDECKER: Okay.

THE WITNESS: The record is hard to study outside of the policies themselves because they didn't follow the rules or they didn't follow the procedures for, you know, probably all the promulgating rules. They were like, we could just define it without having to like public comment. So, that really makes the record -- until recently -- that makes the record, you know, sparse. So, only able to look at the actual things they come up with.

BY MS. LAYENDECKER:

Q So, focusing, I guess, then on more recent agency sex classifications where there is some kind of record, what generally is your understanding what agencies consider when they're making these classification decisions?

A Yeah, I mean consider is hard because that implies like, I could have some documents

from the agencies, like, here's what we consider. But if I look at the actual rules and look at their effects, I can see possibly that's what the that would have gone into the justification.

So, for the Social Security Administration when they changed whenever they changed rules for sex classification and the limited record, they would say, but this doesn't necessarily apply for the purposes of marriage. That's a separate question. So, you could see that they understood that the classification policy could have ramifications for spousal benefits, people who are married and stuff like that. And so, that's an indication that they were thinking about those kinds of things because they limited like where the new sex classification would apply.

Q So, I guess, then, more broadly, have you done research on again, to the extent there are documented more contemporary policies, agency processes, pre-promulgation of a rule. So, you talked about focusing on, you know, the actual content of a rule and its effects. But have you researched the procedural process leading up to that or considerations that the agency articulated regardless of whether or not that they actually

considered them.

A Yeah.

MS. BERNSTEIN: Objection, you could go ahead and answer.

THE WITNESS: Yeah, I have tried to research that through my FOIA request, but I don't think they kept those kind of records because when they weren't promulgating rules, it was just housekeeping. So, it's hard to find that material. So, I don't know. I can't talk about the agency processes.

MS. LAYENDECKER: Okay. And then, taking the second part of that sentence. So, you're talking about agencies addressing questions of sex classification in ways that reflect their particular missions and programs. Can you explain a little bit more of what you mean by that?

THE WITNESS: Well, an example would be identity documents. For example, identity documents, so this passport is a document of identity and it's supposed to confirm who the bearer is. So, in the records that are cited here, there's this letter from 1978 where an attorney for the passport office says this woman should have an F on her passport, so that she

could you know, because it most accurately reflects who she is. And then, the proviso is that this is before surgery, you know, so the next time it's renewed after surgery will be a permanent F, but that will be the example of explaining the purpose of the classification.

BY MS. LAYENDECKER:

Q Thank you. Any other examples that come to mind apart from identification for any federal agency?

A Other examples?

MS. BERNSTEIN: And the Social Security one that you mentioned before.

MS. LAYENDECKER: Yeah. And yes, in addition to those, too.

THE WITNESS: I think there are different Bureau of Prison policies where decisions about sex classification were based on considerations of housing prisoners and those kinds of things. Yeah, that's what I can think of right now.

MS. LAYENDECKER: And what about the military?

THE WITNESS: (Laughter.) Oh, the military. Forgot that agency. I'm sorry. I got nervous. Yeah, military. Right. So, the

question is, do I apply to the military?

BY MS. LAYENDECKER:

Q Yeah. How has the military addressed questions of sex classification in ways that reflected its particular missions and programs?

A Well, from that you can find the documentary record. You could see the executive orders or the memos that came out when a policy was changed. And one policy would say, you know, it's in the interests of the military to allow transgender people to serve. Another policy would say it's in the interest of the military for transgender people not to serve. So, they do state -- they do have these justifications there.

Q And anything specific to the military's rules about sex classification, like how it determines whether it regards a service member as being a man or a woman?

MS. BERNSTEIN: I'm sorry. I'm not sure I understand the question.

THE WITNESS: Yeah. What was the first part of that question?

MS. LAYENDECKER: In general, I'm asking how the military addresses questions of sex classification in ways that reflect their

particular missions and programs? You responded about the inclusion or exclusion of transgender service members, and I was asking specifically about how the military's sex classification policy, about how it determines whether it regards a service member as being a man or a woman, reflects its particular missions and programs?

MS. BERNSTEIN: Objection.

THE WITNESS: Well, there's a lot going on in that question so, I'm not sure if this is what you're getting at, but for example, under the Carter policy, they allowed transgender people to serve. And then, they had these things that had to be met and one served under the classification in the DEERS System. And they explain the processes for changing that classification.

In terms of analysis and committee members approval and transition and actually getting an identity document. And once those conditions were met, the sex classification of the individual would be changed.

MS. LAYENDECKER: Okay. Yeah, it –

(Simultaneous speaking.)

MS. BERNSTEIN: Could we have a I'm sorry, before you ask another question, could we

have a quick break?

MS. LAYENDECKER: Sure.

MS. BERNSTEIN: Thank you.

VIDEOGRAPHER: The time is now 11:10 a.m. We are going off the record.

(Whereupon, the above entitled matter went off the record at 11:10 a.m. and resumed at 11:25 a.m.)

THE VIDEOGRAPHER: The time now is 11:25 a.m. We're back on the record.

MS. LAYENDECKER: Okay, welcome back and I just wanted to ask, did you discuss the subject of your testimony during the break?

MS. BERNSTEIN: Objection.

MS. LAYENDECKER: I'm entitled to ask that.

MS. BERNSTEIN: Yeah, of course. Of course. There was some discussion of the testimony. That's what --

MS. LAYENDECKER: What was discussed?

MS. BERNSTEIN: That's privileged.

MS. LAYENDECKER: If it's facts, data underlying the testimony. That's not privileged.

MS. BERNSTEIN: I'm going to instruct you not to answer that question.

MS. LAYENDECKER: Okay. And again, follow your counsel's instruction. Just answer yes or no, did you discuss the testimony during prior breaks earlier in the day?

MS. BERNSTEIN: Objection.

THE WITNESS: Do I answer that?

MS. LAYENDECKER: Just yes or no.

A Did I discuss what? Instruction?

BY MS. LAYENDECKER:

Q The subject of your testimony.

A Yes.

Q Okay. Thank you. All right. So picking up where we left off. I believe we had just discussed the Carter policy. I guess generally, can you explain your understanding of what the Carter policy's sex classification policy was?

MS. BERNSTEIN: Objection.

THE WITNESS: I can talk about how the Carter policy talked about the sex classification policy in the DEERS record?

MS. LAYENDECKER: Generally how the Carter's policy determined whether or not a service member would be regarded as a man or a woman within the military?

THE WITNESS: Yeah. The Carter policy

said that the DEERS record would determine whether someone was considered male or female for service in the military, and it laid out all the things that had to happen for those criteria to be met.

BY MS. LAYENDECKER:

Q Okay. And for those criteria to be met, are you referring to context in which someone would change their DEERS marker?

A That was the last part of the process of that Carter policy.

Q Okay. And so, just to spell it out more clearly, where someone who is assigned male at birth would go through a process, the final step of which would be to change the DEERS marker to female?

A Or male or yeah, to the other.

Q Yes, it's the opposite sex. Understood. Okay. But, in general, your understanding, and please correct me if I'm misstating this, but your understanding is that sex classification under the Carter policy was based on that DEERS marker system?

A Yes.

Q Okay. And how did that system and those processes reflect the mission and programs of the

Department of Defense?
A Well, I'm not an expert on the mission of the Department of Defense or like all the other aspects of the DEERS System. The Carter policy was taken to make it possible for transgender service members to serve in their gender. I'm sorry, I'm forgetting the rest of the question.
Q I was asking how the Carter policy as policy on sex classification, as we just discussed, reflects the mission and programs of the U.S. military?
A Right. I can't speak to the mission and programs of the U.S. military. The Carter policy, you know, took the existence of transgender people in the military and came up with a policy that would allow them to serve and, you know, recognize their gender and allow them to serve openly.
Q And are you aware of what the rationales, may have been for that policy?
A There were a lot of studies around that. The RAND report, I'm not an expert on that, but they put, you know, some thought and consideration of the effects of the policy change.
Q And specifically on the policy regarding the sex classifications and the DEERS markers are

just the policy as a whole, to the extent that, you know?

A It was a pretty huge study, like looked at how the military all those questions that other people are good at with cohesion and cost and the military and all that sort of stuff, right, and then, I actually can't remember if the DEERS process was spelled out in that study or it's something the military came up with itself.

Q Are you aware of what the military's policy on sex classification was prior to the Carter policy?

A The military would list they didn't really have a policy on sex classification. They just listed it in their disqualifying conditions, like go under was under the category of like male genitalia or female genitalia. It would be like having had a surgery there. I think they said sex change, hermaphroditism. That's where the military would have excluded people who had had genital surgery from serving.

Q But to your knowledge, the military did not have a policy on sex classification as you defined it earlier.

MS. BERNSTEIN: Objection.

speak to like the military stuff, I'm not an expert around, you know, that kind of thing.

Q Okay. And then, moving on to Paragraph 34. In this paragraph, you're responding to, I believe, the expert disclosure of Lieutenant General DeGoes and Dr. Ortega as well. Do you recall what you were responding to in this paragraph from their disclosures?

A No, I can only recall by looking at how it characterizes our disclosures. But DeGoes was expected to testify about parts of military having their own ability to set their own and implement their fitness standards. In Dr. Ortega's testimony was about waiver adjudication policies.

Q Actually, I think I have both of them. Do I have both of them? I do. Okay. All right. We can start with DeGoes.

(Whereupon, the above referred to document was marked as Exhibit No. 2 for identification.)

THE WITNESS: Thank you.

MS. LAYENDECKER: So, just generally, did you review any deposition transcripts in preparation for today?

THE WITNESS: No, I mean, I reviewed

their these --

BY MS. LAYENDECKER:

Q These disclosures?

A Not deposition, no.

Q Okay. Take your time to review that. When you're ready, the question is just to what you were responding with this paragraph.

A Yes. So, my response does not suggest that the military should not be setting its own fitness standards, that's not what I'm suggesting. But that the Executive Order 14168's definition sex that had to be implemented in the military was the trigger that caused them to think about fitness standards differently. So, the change came as a result of like an outside influence of the Executive Order's definition of sex, not from the Department's own processes.

Q Okay. Would you mind just pointing me specifically where in this declaration what you're responding to, like, within the text itself?

A Like I said, in Paragraph 4.

Q Okay.

A It says Lieutenant General DeGoes was expected to testify about the physical and mental fitness standards required for military service

and why it's important that the military and military commanders be permitted to make fitness determinations for service members. Yeah. So, that's one of the things I'm responding to.

Q And what testimony are you intending to offer in response to that statement or that testimony from Lieutenant General DeGoes?

A My testimony is to suggest that the Executive Order undermines the ability to set its own fitness and readiness standards, because it starts with this outside imposition of a category or a classification that the military has to then meet. It doesn't come from within the military itself.

Q Let's see. And for Dr. Ortega's testimony, do you recall what you meant by his waiver or adjudication?

A No. Could I have a look at that? Because waiver adjudication is, like, it's not my area, I need to be reminded. I think I know, but I'm not sure.

Q I don't mean to quiz you here. I just don't want to make you flip through another big document unnecessarily.

(Whereupon, the above referred to

document was marked as Exhibit No. 3 for identification.)

THE WITNESS: This got it's strings attached.

(Laughter.)

MS. LAYENDECKER: You know where he comes in? Oh, there's a tab. Yeah, yeah. Sorry. I could see.

THE WITNESS: Okay, so the question is?

BY MS. LAYENDECKER:

Q Yeah. Can you please just clarify what waiver adjudication you're referring to?

A I believe it would be the diagnosis of gender dysphoria. It becomes an automatically disqualifying condition for accession.

Q Can you, again, please, for my benefit, point me to the specific text from the disclosure that you're responding to.

MS. BERNSTEIN: Take your time.

THE WITNESS: Okay.

MS. LAYENDECKER: Yeah, take as much time as you need to read through.

THE WITNESS: Sorry, so, is the question I just the answer was to clarify --

MS. BERNSTEIN: You made this statement

earlier thing about Dr. Ortega's testimony as expressly premised on that.

THE WITNESS: Yeah.

MS. BERNSTEIN: What are you referring to, I think is the question.

MS. LAYENDECKER: Yeah. Which waiver or adjudication process are you referring to?

THE WITNESS: Okay. Let me have a look at that, at which waiver or adjudication process?

BY MS. LAYENDECKER:

Q Or if it's easier, just specifically what text from the disclosure you're responding to with that sentence.

A Well, his waiver adjudication is looking at, in this particular case, gender dysphoria. The point I make in Paragraph 34 is that under other policies, the Department itself made decisions on medical criteria and all that sort of thing. With the Executive Order that comes first. The definition of sex comes first and everything else comes after.

So, the process that the Department would use to make these kinds of decisions didn't arise independently from the military, but it came from this outside force of the executive order.

Q And again, would you mind just referring me to the specific part of Dr. Ortega's disclosure that discusses the waiver process that you're responding to?

A Okay.

Q Or more generally, what your opinion is responding to within the declaration?

A Well, I this is --

MS. BERNSTEIN: You shouldn't guess.

THE WITNESS: Yeah. I'm not guessing because I don't remember the policy well enough. How the waiver worked under the Hegseth policy. I know that you had to give birth sex. So, I find it -- I'm just a little -- I'm not quite sure which process is which here.

MS. LAYENDECKER: Okay. And you don't recall what you were referring to in Dr. Ortega's in the following sentence? For Dr. Ortega's waiver adjudication, you're not sure what waiver process that's referring to that's referenced in the disclosure?

THE WITNESS: Well, there's two processes referred to here which is non-waivable and waivable.

BY MS. LAYENDECKER:

Q Okay.

A And I don't --

Q Can you point me to those.

A Paragraph 4.

Q Okay. So, both within Paragraph 4?

A Yeah.

Q Okay.

A Technical variable and non-variable medical conditions.

Q Okay. So, this paragraph though is what you were responding to, then? Or, sorry, to phrase as a question. Does this sentence that we've been discussing respond to this Paragraph 4 in this disclosure?

A Waiver adjudication applies medical criteria whose content is fixed by the executive orders definition of sex. Well, I think it's responding to the distinction between these waivable and non-waivable. Then, he has testimony that he will present about what he thinks about gender dysphoria and that is not my area of expertise. And it's not talking talk about sex classification policies.

I'm not talking about how to evaluate transgender soldiers for fitness. That's not my