# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x

NICOLAS TALBOTT et al., individually and on behalf of all similarly situated individuals,

Plaintiffs,

v.

UNITED STATES et al.,

Defendants.

- - - - - - - - - - - - - - - x

Civil Action No. 25-cv-240-ACR

CONFIDENTIAL

November 5, 2026

9:36 a.m. EST

Videotaped deposition of C. ALAN HOPEWELL, M.P., Ph.D., ABPP, BSM, held at the offices of O'Melveny & Myers LLP, 1625 Eye Street, N.W., Washington, D.C., and taken stenographically by Misty Klapper, Registered Merit Reporter, Certified Shorthand Reporter, Registered Professional Reporter, Realtime Systems Administrator and Notary Public.

with the war department to help with this issue. I -- as far as I know, that they understood my background and my expertise and so I responded to a request from my -- from -- from HRPO, really.

BY MR. DEREWICZ:

Q. Did they reach out to you?

A. Well, yes.

Q. Do you remember who reached out to you?

A. I think the original contact was with Ms. Schmeling (ph.), but the -- the -- the division has a number of people that I've been introduced to over the past three or four months. So there are numerous people involved.

Q. Do you remember when Ms. Schmeling first reached out to you?

A. Probably late August, early September.

Q. And when Ms. Schmeling reached

out to you, was that the first that you learned about this litigation?

A. Yes. I wasn't aware of anything prior to that.

Q. When did you begin working on the matter?

A. Probably early to mid September.

Q. Okay. Do you remember the date specifically?

A. No.

MR. DEREWICZ: Let's look at tab 1, Sean.

(Thereupon, Exhibit 150 was marked for identification.)

BY MR. DEREWICZ:

Q. Dr. Hopewell, this is Exhibit 150. And it's titled Defendants' Disclosure Pursuant to Rule 26(a)(2)(C) Concerning C. Alan Hopewell.

Do you see that?

A. Yes.

Q. And do you see that if you go to

the last -- the second to last page of this disclosure, do you see that the disclosure is dated September 4th 2026?

A. Yes.

Q. Are you familiar with this document?

A. Yes.

Q. Did you draft this document yourself?

A. I provided the information in the document and I remember corresponding with Ms. Wolfe and I think they're the ones who actually drafted it in this form.

Q. So am I right that you provided some input and then they are the ones that did the drafting?

A. Yes.

Q. Did you provide input for -- on all of the paragraphs in this document or just some of them?

A. All.

Q. All of them.

What was your input?

MR. CRABB: Objection, vague, ambiguous.

You can answer, if you understand.

THE WITNESS: Well, my input -- one, two, three -- was the four pages that are printed here. That was my input.

BY MR. DEREWICZ:

Q. So you dictated the -- what the content of these four pages was going to be?

A. I testified to that, yes.

Q. Let's go to a new document.

MR. DEREWICZ: This one's tab 2, Sean.

(Thereupon, Exhibit 151 was marked for identification.)

BY MR. DEREWICZ:

Q. This is Exhibit 151 and it's a document titled Expert Rebuttal Report of C. Alan Hopewell, M.P., Ph.D., ABPP, BSM.

Q. When did you begin drafting this report?
A. Again, probably mid to late September, I think.
Q. Mid to late September.
Let's look at Appendix A in the report, and page 5 of Appendix A.
A. The appendix --
Q. It's not paged consecutively so it's hard to find, but it's -- it's about --
A. Oh, I see.
Q. -- probably halfway through.
Under -- do you see where it says Current Clinical Practice?
A. Yes.
Q. And the first entry there says, 4 September 2026 to present, Special Government Employee, Department of War, Health Readiness and Policy Oversight.
Do you see that?
A. Yes.
Q. So you took the job as a special

government employee on September 4th 2026; is that correct?

A. Correct.

Q. So before September 4th 2026, you were not a special government employee?

A. Correct.

Q. How did you get the job of a special government employee?

A. I don't know exactly. I have spoken to Dr. Rauch, who's my current department director. To the best of my knowledge, I am probably the senior neuropsychologist in -- currently in the Department of War. And -- and that's a fact.

Based on my prior service, my training, my professional reputation, many of the people involved with that department know me from my contributions to neuropsychology.

Dr. Rauch and I actually entered the Army about the same time. And so my understanding was that they were wanting my help -- my help with a variety of projects.

They're -- they're also currently working on blast exposures, PTSD, other issues as well.

And some of those have been presented to me, although I haven't done much active work in those -- those areas yet. I've just been too busy.

Q. You referenced a Dr. Rauch. What is Dr. Rauch's full name?

A. I -- I -- I think it's Terry. I'm not sure. It's R-A-U-S-C-H [sic].

Q. Thank you. That's helpful.

A. And he's the -- the -- the director of, I guess, my unit of HRPO, as far as I -- I know.

Q. Okay. And you've used the acronym HRPO. When you're -- when you use that acronym, are you referring to Health Readiness Policy and Oversight [sic]?

A. Yes. Correct.

Q. Did Dr. Rauch or someone else reach out to you about you taking this

days. And I've been a government employee before, of course. And so kind of my understanding was if there was a need, that could always be -- what's the word -- renewed or something. But my understanding now, I've got a 180-day -- day contract.

Q. Okay. What have your roles and responsibilities been since you became a special government employee on September 4th?

A. One responsibility is that I participate in a weekly Zoom meeting -- Zoom, of course, because of geographical distance -- here in Washington with the department and the directors. Dr. Lee's been in that meeting I've known.

One requirement was that I was scheduled to meet with Dr. -- I mean Colonel Gibbons, but I think our duties or schedules have -- have not allowed that to this extent.

And the other duty to which I was assigned was to analyze a report by Dr. Brown and -- and make a response, make -- provide

an analysis of that.

Q. You --

A. I've also -- I'm sorry.

I've also been involved in some training for blast concussions, but I've not been tasked with anything. But I have undergone -- we -- we recently revised the perimeter boundaries for blast -- blast exposures and how those soldiers would be screened. And I've been involved in -- in that, although I haven't written a paper or anything yet.

Q. You referenced a weekly Zoom meeting that Dr. Lee also attends.

Can -- what -- who is -- what is Dr. Lee's full name?

A. I think it -- I think it's Kathy. I think it's Kathy Lee. And it's L-E-E.

Q. And what is the subject matter that's discussed during that weekly Zoom meeting?

MR. CRABB: And -- and at this

there more quickly.
MR. CRABB: Yeah.
MR. DEREWICZ: That's fair.
BY MR. DEREWICZ:
Q. Does -- have -- during these meetings -- just a yes or no question -- have you ever participated? Have you ever spoken?
A. Dr. Rauch introduced me to the meeting. That's the only time.
Q. And have these meetings addressed -- just a yes or no question:
Has this litigation come up during those meetings?
A. No.
Q. Okay. You referenced HRPO.
What is HRPO's focus?
MR. CRABB: Objection, calls for speculation.
THE WITNESS: I don't really know specifically. I have -- I did discuss with Dr. Rauch and with Dr. Lee and my -- my understanding is

A. I'm trying to remember, because, of course, I was a government administrator myself, so I can't remember the exact terms.

But it's -- there's a government ranking. And for contractors like this, there is an hourly compensation that's assigned. So somehow with the contract I have a -- an hourly compensation.

And what I do is I -- I will report any time that I spend working on a project.

Q. And those projects include your -- putting together your expert opinions in this matter?

A. It has included that as part of it, yes.

Q. Approximately how many hours have you dedicated to this matter so far?

A. Prior to this week, I think -- and when I say we, because my administrative officer at my practice handles mostly administrative issues -- I think we turned in

about eight days of -- worth of -- worth of work that I had dedicated to the project.

Q. And you said you're compensated hourly, correct?

A. Yes.

Q. What is your hourly compensation?

A. I don't even know exactly. When I reviewed this with the -- with my administrator, I think it was $77 an hour, but -- and I don't pay much attention to things like that.

Q. And do you know whether your hourly compensation is the same whether you're working on something that has to do with this litigation versus something else as a government -- as a -- as a special government employee?

A. It's -- it's all the same as far as I know, because it's under the government contract.

Q. And since you became the special government employee, how many hours have you

dedicated to things that are not this
litigation?
A. The hours would be the attendance
at the required meetings and, again, the
training that I did in speaking with, you
know, the two liaison officers, which would
be -- I -- I don't know how to estimate --
probably -- let's see -- three, four, five --
probably five to eight, five to ten hours
on -- on those issues. I -- I don't recall.
Q. Did you prepare for today's
deposition?
A. Yes.
Q. How did you prepare?
A. I reviewed materials before I
arrived in Washington. And then I've
reviewed those materials since I've been here
with members of my department.
Q. And when you say members of your
department, who are those members?
A. Colonel Mallone, who's active
duty Air Force appointee, Ms. Wolfe and --

I'm sorry --

MR. CRABB: Crabb.

THE WITNESS: -- and -- and Mr. -- Mr. Crabb, who were appointed by the -- as far as I know appointed by the -- the department to, you know, guide me in these matters.

BY MR. DEREWICZ:

Q. And how many meetings did you have with them?

A. Today's Thursday. So we had three meetings.

Q. And about how long in total did those meetings last?

A. Probably 12 hours total, approximately.

Q. Let's turn back to your rebuttal report, which I believe is Exhibit 151.

And if we could go to the second paragraph of your report.

And as far as you're aware, is this paragraph accurate as of today?

A. No.

Q. Okay. Do you want to take one last break or do you want to power through?

A. No, let's finish.

Q. Okay.

MR. DEREWICZ: Let's go to tab -- it's tab 1. And what is the exhibit number?

MR. OH: 150.

BY MR. DEREWICZ:

Q. Let's go to Exhibit 150, which is the first one that -- that we used today.

And this is your disclosure in this case; is that correct?

A. Correct.

Q. Okay. And in this disclosure is it your understanding that defendants are disclosing opinions that you may offer in this case?

A. That's my understanding, yes.

Q. Okay. Are there any opinions that you may offer in this case pursuant to

this disclosure that we haven't discussed today?

A. There well could be --

Q. Okay.

A. -- depending on questions I may be asked.

Q. Okay. Well, let's take a look through your disclosure then.

In -- in paragraph 1 -- I think -- well, I think paragraph 1 describes your experience and credentials.

Are there any opinions in paragraph 1 that you may offer at trial?

A. Well, paragraph 1 does not reference opinions. It references my training, background and education.

Q. Great.

Let's look at paragraph 2.

Paragraph 2 -- does paragraph 2 contain any opinions that you plan to offer in this -- in this litigation?

A. And what was your question again?

A. I think it would, yes.
Q. Okay. This one says:
(As read):
... the nature of sex, gender identity and gender dysphoria; the best practices and the accepted standards of care for individuals with gender dysphoria, including the efficacy of gender-affirming care; and the impact that the provision of denial of treatment for gender dysphoria, including cross-sex hormones, has on individuals, particularly in a military readiness context.
Do you see that?
A. Yes.
Q. And we've covered many of these topics today already; is that right?
A. I think so, yes.
Q. Okay. Are there any topics in here that we have not covered that you would

plan to testify about at trial?

A. Well, I -- I think you have asked me about other issues that are not in this particular paragraph. And there could be other issues that I could be asked.

Q. Okay. What are those issues that you could be asked?

A. I can't predict what I might be asked. I could be asked about other psychiatric issues or, I guess, military issues. I -- I can't predict those.

Q. What is the nature of sex, gender identity and gender dysphoria?

A. Well --

MR. CRABB: Objection, overbroad.

THE WITNESS: Yeah. I -- I mean, to some extent we've addressed that. When you asked me that question, that -- that pertains to any psychiatric literature or philosophy regarding those issues, to include, I

don't know, the -- are you asking about the DNA compensation -- composition of sex? It would -- it -- it -- address any of that.

BY MR. DEREWICZ:

Q. So the -- this is a disclosure from defendants to plaintiffs in this matter. And defendants disclosed that you may testify on the nature of sex, gender identity and gender dysphoria. And I'm trying to understand what that means.

So can you tell me what that means or is it so broad that you can't really tell me what that means?

A. I think it's so broad that I can't really tell you in a succinct way. Again, the nature of sex would range all the way from the DNA chromosomal nature of sex to psychosexual development to psychiatric aspects of sex.

The question would really have to specify what -- what was being inquired.

CERTIFICATE OF NOTARY

I, MISTY KLAPPER, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting by me; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.



______________________________

Misty Klapper, RMR, CSR, RPR,
RSA and Notary Public