EXHIBIT 1



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NICOLAS TALBOTT et al., individually and on behalf of all similarly situated individuals, | |
| Plaintiffs, | Civil Action No. 25-cv-240-ACR |
| v. | |
| UNITED STATES et al., | |
| Defendants. | |

Tuesday, October 20, 2026

Video deposition of LIEUTENANT GENERAL WILLIAM JOHN DEGOES, taken at the Law Offices of O'Melveny & Myers LLP, 1625 Eye Street NW, Washington, DC, beginning at 9:28 a.m., Eastern Standard Time, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia

refamiliarized myself with some of the readiness data that I had been tracking, you know, over the last couple of years.

Q. And what is that readiness data that you've been tracking?

A. The -- the mobility restrictions, and -- and so obviously being ready for duty is very important for the entire military. And -- and so the -- about 10 percent of the Air Force's 330,000 have mobility restrictions that are temporary. And about 5 and a half percent are what -- you know, they've been adjudicated at the Air Force Personnel Center. And they have an assignment limitation code, and we call it, like, C-1, C-2, C-3. C-3 is the most restrictive. Probably can only be in a very large urban area with lots of medical. C-1 a little less restrictive.

Of the 10 percent temporary, probably the number one there is pregnancy, and then musculoskeletal and mental health issues.

And then availability for duty, you know, I've looked at gender dysphoria versus non-gender dysphoria. And those with gender dysphoria from 2022 to the present were not

available for duty three to four times as many days as a random sampling of active duty. And, you know, we -- we only had about 160 total for gender dysphoria, and so we looked at multiple different random samples of 250 and reran it to make sure that the numbers would be about the same, and they were.

And -- and so, you know, again, between two to four times as -- as many days not available for duty and with the deployment restriction.

We also looked at, okay, let's just see what gender dysphoria deployment restrictions are versus non-gender dysphoria with a mobility restriction. So that -- you know, it was -- you know, that -- you looked at two groups that had medical issues. And even with the non-gender dysphoria medical, it's about twice as much with gender dysphoria. You know, a little more complex than the average.

And, again, I -- you know, these are not -- we didn't do them for statistical significance. Just that was the best data that we could have as to what is the readiness impact -- availability for duty, deployment restriction

for gender dysphoria versus non-gender dysphoria.

Q. Okay. Let's unpack that a little bit.

Let's start with -- you first talked about mobility restrictions. What data did you -- what specific data did you look at for mobility restrictions?

A. What's called ASIMS. A-S-I-M-S is the acronym. And it's the Aerospace Medicine Information Management System.

Q. And do you have that data available to you in your -- in your ordinary cor -- in -- in, like, your normal job -- job duties?

A. Less available now. Because when we -- the DHA took over, the Air Force transferred oversight of that program to the Defense Health Agency.

And so, you know, I -- I used to look at it almost on a daily basis at the 59th Medical Wing, and now I have to kind of request an Air Force person who works at the DHA headquarters to run a -- you know, a data pull for me.

Q. So who would you request run that data pull for you if you wanted that ASIMS data now?

A. Yeah.

Q. Who would you ask?

A. I -- I'd ask my Chief of Aerospace Medicine, Colonel Dr. Stephanie Wilson.

Q. Great.

A. And she works for Brigadier General Yao, who I'd go through her first so as to not reach into the pond without following the chain of command.

Q. Understood.

You talked about data that speaks to availability for duty. What specific data did you review that speaks to availability for duty?

A. So the Form 469 is our profile form. It's a -- you know, a duty restriction, and it says specifically what you can't do. And -- and so reviewed that.

And then there's some -- within ASIMS, you know, there -- there's all kinds of -- you know, there's, you know, "Do you have gas mask inserts, you know? Have you had your immunizations? Do you have a medical issue?" So, you know, that is all part of -- and "Is your dental up to date?" It's five or six different things that come into what -- when I

quote 90 percent, it means that 90 percent are green on those major things: immunizations, gas mask insert, no health issue. Dental is Class 1 or 2. Doesn't have any cavities or things of that sort.

Q. Okay. Did you rely on the ASIMS data when you were putting together your expert opinion in this matter?

A. I -- I -- I wouldn't say I relied on it. I just used it as, you know, the ability to answer a question.

Q. Did you review it as you were preparing for your expert testimony in this matter?

A. Yes.

Q. What about the Form 469 data? Did you review that when you were putting together your expert testimony in this matter?

A. No. I mean, the -- the 469 would be a roll-up in part of the com -- a component of ASIMS that contributes to readiness. So the -- you could review 469s, and we -- we do have groups that are responsible for the quality of what's in a profile, the 469, and to make sure that -- you know, that -- that they're accurate and appropriate. And there's a process for when

commanders think "DeGoes is malingering," or, you know, "Why is he away from work all the time?" We have a thing called AMRO. I'm sorry about the acronyms.

Q. No, please.

A. AMRO, the Airman Medical Readiness Optimization.

And so it's typically the senior flight medicine person at every military -- Air Force military treatment facility that reviews all of the profiles, or Form 469s, particular attention on those that have been lingering, you know, that are longer. And -- because if -- if you're requiring -- if you're not available for duty at a year, you should have a medical evaluation board for fitness for duty and continued service decision.

Q. Okay. You talked about looking at airmen with gender dysphoria as part of this study that you did on availability for duty; is that correct?

MR. BOMBARD: Objection. Misstates the testimony. Outside the scope.

BY MR. DEREWICZ:

Q. Is that correct?

A. I didn't do a study for availability of duty. The -- the -- I -- I looked at data to answer the question of the readiness impact on overall profiles or nonavailability for duty for the entire Department of the Air Force versus one diagnosis.

Q. So you say you didn't do a study, but you looked at data. What's the distinction there that you're making?

A. I -- I think -- I mean, one is analyzing. I guess maybe I'm -- I'm coming at it from a research background that I -- I didn't do a research study where I gave informed consent. And, you know, I -- I looked at available data sources to answer a question on availability for duty.

And certainly one of my jobs in all of the Air Force surgeon -- all of the service surgeon generals is focused on readiness and availability for duty and what are the things that limit availability for duty. And so we -- we -- I've been looking at that really my entire medical career.

Q. And did you personally look at the data, or did -- did someone else look at the

data and then report it to you?

A. Someone else looked at the data and reported it to me.

Q. Who looked at the data?

A. Colonel Stephanie Wilson, Colonel Larissa Weir were the two primary.

Q. Okay. And Colonel Stephanie Wilson, what is her -- what is her role?

A. She's the chief of aerospace medicine at the headquarters.

Q. Okay. And I think the second person --

A. Larissa Weir, W-e-i-r.

Q. Okay.

A. And Larissa is now the chief of operations, what we'd call the AFMED A3.

Q. And how did they send this? They looked at the data, and how did they communicate the results of -- of their review to you?

MR. BOMBARD: Objection, vague.

You may answer.

THE WITNESS: Verbally and via email, talking paper, a bullet background paper, charts.

BY MR. DEREWICZ:

Q. So are some of the results of their

review written down somewhere?
A. Yes. Yeah. Written, yeah.
Q. In email?
A. Yeah.
Q. Are they written in -- in memos?
A. Not -- no -- I've not written a memo for record on -- on it. It's -- it was simply just giving a request for data and information and, you know, getting the team to answer it and where the source came from so that I could be reasonably certain of the validity.
Q. Do you know whether they wrote it down in a memo somewhere?
A. I do not.
Q. Okay. Let's talk about the data itself a little bit.
I think -- I believe that you said that you had about 160 airmen with gender dysphoria to work with. What does that mean?
A. So in looking at the medical record from -- you know, yearly from '22 through '26, and electronic health record and looking for that code, we were taking care of, you know, 35 in '22, and I believe we were up to as -- as many as 160 in '26. And they're somewhat

cumulative but not completely, because not everybody stays in. So I don't have that associated with a name and a record.

I -- it's just a analysis of the ICD-10 code associated with gender dysphoria.

Now -- so, yeah.

Q. Okay. So is the -- are you looking across all airmen in the Air Force?

A. And -- and Space Force, yes.

Q. And Space Force?

A. Yes.

Q. So how many airmen are in the Air Force and guardians are in the Space Force?

MR. BOMBARD: Objection.

THE WITNESS: Yeah.

MR. BOMBARD: Compound.

You may answer.

THE WITNESS: Okay.

There are about 320,000 in the Air Force, and about 10- or 11,000 today in the Space Force. But as has been, you know, mentioned in the media and on the Hill in testimony, the Space Force is significantly increasing and will be as -- over 20,000 by 2032.

BY MR. DEREWICZ:

Q. So combined in the Air Force and the Space Force, there are about 330,000?

A. Correct.

Q. Is that correct?

A. Correct.

Q. Okay. And of those 330,000 people in 2022, 35 had a code for gender dysphoria?

A. Yes. And -- and -- yes.

Now, you're aware of that, that there were a voluntary separation period, and, you know, that that was prior to June of 2025. And there was -- you know, it could get a temporary early retirement authorization-type thing.

I have -- my staff gave me data that 597 total force, so active, guard and reserve -- almost entirely Air Force and just a very small minority Space Force -- did the voluntary separation.

And then we moved to involuntary in -- in the fall of '25. And there are -- I'm told as of today -- 190 in involuntary separation procedures, of which 39 have gone through the consolidated disposition authority that was appointed by former Chief of Staff, General Dave

Allvin. And it's the Air Force District of Washington commander because they meet the criteria of not being an operational commander and not being in the chain of command of Air Force JA and Air Force SG.

Q. Okay. So I'm -- I'm just trying to get an understanding of the numbers.

So there were -- you said that there were 35 with a code for gender dysphoria in 2022; is that correct?

A. Yes.

Q. Okay. And then you -- I think -- I believe you said there were around 160 with a code of gender dysphoria in 2026?

A. Correct.

Q. Do you know how many had a code for gender dysphoria in 2025?

A. It was about 130. So it -- it went from, like, 30 to 60 to 80 to 120, 160.

Q. Okay. And then you also said 597 -- yeah, at one point you said the number 597, and I missed its relevance.

MR. BOMBARD: Objection, vague.

BY MR. DEREWICZ:

Q. Can you please explain to me what the

number 597 is?

A. 500 --

MR. BOMBARD: Objection, vague.

THE WITNESS: Am I okay to --

MR. BOMBARD: You're okay to answer.

THE WITNESS: Yeah. Okay.

So the 597 were those who took voluntary separation that was offered in the spring of 2025 and had to do it by, I think it was, 6 June 2025.

BY MR. DEREWICZ:

Q. So many of the people who voluntarily separated did not have a code for gender dysphoria; is that correct?

MR. BOMBARD: Objection, form.

THE WITNESS: It -- it was probably a -- a much older code. And so this -- the 2022 was what was in right then and there.

And -- and so I -- I think that's an excellent question. Not everybody who had gender dysphoria or had transitioned continued to have that code. And so the -- the numbers that I -- the 35, 36 that I cited for you, they were able to confirm that those people were serving then and had that active code.

BY MR. DEREWICZ:

Q. And so the 597, they may have had a previous code that is no longer active; is that correct?

A. Yes. And -- and the -- the -- some of these folks had been in for over 20 years, 25 years. And so it -- it is -- it was a very large population of -- of individuals.

Q. So some individuals who were in, say, 20 -- for 20 years, they may have a different code that indicates that they previously had gender dysphoria, but not the current code for gender dysphoria; is that correct?

MR. BOMBARD: Objection. Calls for speculation. Compound.

THE WITNESS: Yeah. Yeah. They volunteered that they had -- they were gender dysphoric or transgender, and -- and so they -- took the -- the early voluntary separation. I would be speculating as to why that -- they didn't have a gender dysphoria code.

BY MR. DEREWICZ:

Q. Okay. You said that 190 people are in the involuntary separation process; is that correct?

A. Yes.

Q. How -- and as of 2026, 160 people have the gender dysphoria code. How are there more people who were in the involuntary separation process than there are that have -- that have the gender dysphoria code?

MR. BOMBARD: Objection, form.

THE WITNESS: Yeah. I don't know. I don't know.

The -- the 190 is total force, and so that's likely -- I'm speculating, but that's likely the difference. The 160 is almost certainly active-duty because that's what's in MHS GENESIS, our electronic health record. Guard and reserve have private physicians, you know, and -- and so that's probably the delta.

BY MR. DEREWICZ:

Q. Okay. And then -- and you said 39 have gone through the Consolidated Disposition Authority; is that correct?

A. Correct.

MR. BOMBARD: Objection. Outside the scope of the disclosure.

BY MR. DEREWICZ:

Q. Is that -- do you know when that data

-- is -- is that data up to date as of today?

MR. BOMBARD: Objection. Outside the scope of the disclosure.

THE WITNESS: Yes.

BY MR. DEREWICZ:

Q. As of today?

A. Yes.

Q. Great. Thank you.

And then -- let me go back for a second.

So you're off -- you said that you looked at this data, and this data suggests that those with gender dysphoria are not available for duty three to four times the number of days.

A. I think I said two to four.

Q. Two to four times --

A. Yes.

Q. -- the number of days. Thank you.

A. Mm-hmm.

Q. What was the -- how did you put together the control set?

A. So my staff did. And they -- they picked -- so the Air Force is 80 percent male and 20 percent female, and 80 percent enlisted and 20 percent officers. So they selected

representative groups of about double the size of non-gender dysphoria versus the gender dysphoria.

And because it was a small sample size, you know, they ran it multiple times to make sure that they didn't have something that was not random. And so the, you know, three or four times of running different random samples of 300 non-gender dysphoria came up with very similar ratios of two to four times more visits. And this is not just primary care. It's specialty care. All -- all outpatient visits.

Q. So it's two to four times the number of visits. It's not two to four times the number of days that you're available for duty?

A. That -- that's both of them. And -- and I'm sorry, I didn't -- didn't have data on both, on -- on numbers of visits. And then some visits don't -- are not associated with nonavailability for duty, I mean, if you didn't -- you know, if you had a one-hour visit and then you went back to work.

So we -- we looked at two different things: the number of the -- the amount of healthcare required, which was two to four

times. And then the amount of not available to deploy, which is two to three times as much.

Q. So --

MR. BOMBARD: Counsel, we've been going for a little over an hour. I was wondering if we could take, like, a five-minute health and comfort break?

MR. DEREWICZ: Absolutely. We can take a break now.

THE VIDEOGRAPHER: The time is 10:38 a.m. This ends Unit 1. We're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time is 10:55 a.m. This begins Unit Number 2. We're on the record.

BY MR. DEREWICZ:

Q. Lieutenant General DeGoes, before the break we were talking about this data review.

A. Yes.

Q. And we were -- you said that you -- you ran the study multiple times. What do you mean when you say you "ran the study multiple times"?

MR. BOMBARD: Objection. Mischaracterizes testimony.

THE WITNESS: Yeah. Yeah. We

looked at a random control group of non-gender dysphoria airmen multiple times, because, you know, we were dealing with a small group that would be a control of 320,000, plus 10,000 Space Force. And so we wanted to make sure that we didn't have a skewed sample of 300 non-gender dysphoria.

And we looked at healthcare required by total visits and then deployment readiness impact via deployment restrictions. So two different things: how many visits, and then your ability to deploy.

BY MR. DEREWICZ:

Q. How many people were in -- how many airmen were in the control sample?

A. Around 300.

Q. And when you ran it again, did you change the group that's in the 300?

A. Yes.

Q. Okay. When you -- when you created the control sample, did you control for age?

A. Yes.

Q. What other things did you control for?

A. Sex and officer-enlisted.

Q. So were those the -- the three?

A. Yes.
Q. When you -- and is it "officer enlisted"?
A. Oh, officer and enlisted.
So as I mentioned, 80 percent of the Air Force is enlisted. 20 percent are officers. 80 percent are male, and 20 percent are female.
Q. Why did you do this study?
A. To answer the question of the impact on readiness and availability for duty.
Q. And why were you interested in knowing the answer to the impact on readiness and availability for duty?
A. That's part of my job --
Q. So --
A. -- as the surgeon general.
Q. So you conducted this study as part of your -- your day -- your ordinary course of your day -- of your job responsibilities, not necessarily to be an expert in this litigation?
A. Correct.
MR. BOMBARD: Objection. Misstates his prior testimony.
BY MR. DEREWICZ:
Q. When did you do this study?

MR. BOMBARD: Objection. Misstates the prior testimony.

THE WITNESS: Yeah. Many months ago. I mean, since the summer of '25 we've been looking at the gender dysphoria population versus the non-gender dysphoria population.

BY MR. DEREWICZ:

Q. So you started the study in the summer of 2025; is that correct?

MR. BOMBARD: Objection. Misstates his testimony.

THE WITNESS: Yeah. Not a study. Again, started looking at data for availability and healthcare use in the summer of 2025.

BY MR. DEREWICZ:

Q. And then when -- when did you receive the output of looking at the data?

MR. BOMBARD: Objection, vague.

THE WITNESS: I received it regularly. You know, every other month or so.

BY MR. DEREWICZ:

Q. And when did -- do you still receive it regularly every other month?

A. I received it yesterday as the most current data.

Q. And is the data that you're reporting today the data that you received yesterday?

A. Yeah.

Q. Okay. You talked about that you looked at availability for duty. What do you mean by availability for duty?

A. So the -- the absence of what's called an Air Force Form 469, a profile. That's -- that's how we characterize temporary medical absences. And so that's within ASIMS that I mentioned earlier, and that's how the staff looked at it.

Q. Is it the same as deployability?

MR. BOMBARD: Objection, confusing.

THE WITNESS: No. Some 469s impair deployability. Some do not.

BY MR. DEREWICZ:

Q. Okay. So what is the difference between temporary medical absences and deployability?

A. The ability to grant a waiver. So I quoted you earlier there are 10 percent of the Air Force has got a temporary medical restriction or a profile. Some of that is waivable by the combatant commander and -- who

typically delegates that to their lead medical person. Some is not waivable.

Q. Okay. Did the people who conducted this data review have training in statistical methods for social sciences?

MR. BOMBARD: Objection. Calls for speculation.

THE WITNESS: Yeah. I don't know.

BY MR. DEREWICZ:

Q. How would you know? How would you -- how would you learn?

MR. BOMBARD: Same objection.

THE WITNESS: Yeah. I'd -- I'd ask them.

BY MR. DEREWICZ:

Q. Okay. And when they sent you this data, you did not ask them whether they have training?

A. No.

Q. Okay. Let's move on to another document.

(Exhibit No. 15, Executive Order 14183 titled Prioritizing Military Excellence and Readiness, was introduced.)

MR. DEREWICZ: I think this is Exhibit