**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,

Plaintiffs,

v.

UNITED STATES *et al.*,

Defendants.

Civil Action No. 1:25-cv-240-ACR

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE* #1 & #2 TO EXCLUDE CERTAIN STATEMENTS TO PROVE ANIMUS

This case is "squarely about the government's intent in issuing the Hegseth policy." Nov. 16, 2026 Hr'g Tr., Dkt. 184, 14:18-19. Yet Defendants urge the Court to ignore the President's and Secretary's statements that confirm their discriminatory intent. There is no basis for excluding the President's and Secretary's own statements in a case where their intent is squarely at issue. Defendants' Motion *in Limine* #1, Dkt. 171 ("Motion 1"), and Motion *in Limine* #2, Dkt. 172 ("Motion 2"), lack all merit and should be denied.[1]

## I. The President's and Secretary's Statements Are Relevant

Animus turns on intent. And when intent is at issue, even when a challenged action is facially neutral—and the Hegseth Policy is not—"contemporary statements by members of the decisionmaking body" are "highly relevant." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). Both this Court and the D.C. Circuit have already reviewed the Hegseth Policy's text, along with Secretary Hegseth's and the Executive Order's words, and

[1] Plaintiffs file this combined response to more efficiently present the issues for the Court's resolution.

relied on them to find that Plaintiffs made their preliminary showing that animus drives the Hegseth Policy.

- The Executive Order and the Policy "tag transgender persons as weak, dishonorable, undisciplined, boastful, selfish liars." *Talbott v. United States*, 775 F. Supp. 3d 283, 327 (D.D.C. 2025).
- Secretary Hegseth announced the Policy bans "transgender troops" "because that is precisely what it does." *Talbott*, 775 F. Supp. 3d at 301.
- In the Executive Order, "the Commander-in-Chief declared transgender people as categorically unfit for military service explicitly because of their gender identity." *Talbott v. United States*, 176 F.4th 720, 734 (D.C. Cir. 2026) (Wilkins, J.).
- When Secretary Hegseth repeated the Order's "false 'gender identity'" language, "the purpose of the Policy was expressed in terms of expelling from the military all transgender persons." *Talbott*, 176 F.4th at 734 (Wilkins, J.).
- Expelling all persons with a "false gender identity" was "Secretary Hegseth's explicit goal," and targeting gender dysphoria "was merely the means of achieving that end." *Talbott*, 176 F.4th at 735 (Wilkins, J.).
- The decisionmakers' words are "direct evidence in this case that animus motivated the classifications in the Hegseth Policy." *Talbott*, 176 F.4th at 745-46 (Wilkins, J.).

Secretary Hegseth's statements and the Executive Order remain relevant and admissible.

Defendants claim the Secretary's and President's statements are irrelevant. But evidence is relevant if it has "any tendency" to make a fact of consequence "more or less probable." Fed. R. Evid. 401. The President's and Secretary's respective statements about "trans lunacy," use of slurs to refer to transgender service members, and disparagement of transgender people as "weird" certainly make it more probable that animus underlies the Policy the President directed the Secretary to implement. When policymakers speak, courts take them at their word. *See, e.g.*, *United States v. Windsor*, 570 U.S. 744, 770 (2013) ("The history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute. It was its essence."); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (legislative history revealed food-stamp amendment "was

intended to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program"). Secretary Hegseth has told the country the purpose of the Policy: "No more Trans @ DOD." Def. Hegseth's Resp. to Interrog., No. 8 (Ex. A). This Court should have the opportunity to evaluate that statement—and similar ones—in assessing the intent behind the Policy.

Defendants have no business asking this Court to "just ignore the disparaging statements repeatedly made by the decisionmakers." *Talbott*, 176 F.4th at 745 (Wilkins, J.). The Executive Order's language and the Secretary's statements go to the heart of the intent behind the Policy. As the Court explained, Secretary Hegseth is "the one who delegated the policy, he has signed off on the policy. He tweeted about what the policy means . . . [so] his alleged animus has to play a part." Oct. 14, 2026 Hr'g Tr., Dkt. 179, 15:23-16:3. The best evidence of intent remains the Policy's text and the statements made by the Secretary who signed the Policy and the President who directed the Secretary to implement the Policy.

The Executive Order's language is not extrinsic evidence at all; it is the Policy's ***own text***. The Policy was issued pursuant to the Executive Order and cites and incorporates it. *Talbott*, 176 F.4th at 735, 745 n.14 (Wilkins, J.); Sec'y of Def. Mem. "Prioritizing Military Excellence and Readiness" (Feb. 7, 2025). The Policy itself declares the character of transgender people—whom it identifies by reference to gender dysphoria, a history of the condition, or its symptoms—as "inconsistent" with the "high standards . . . [of] honesty, humility, . . . and integrity" required of service members. *Talbott*, 176 F.4th at 726. And the Department's approved answers to questions about the Policy repeat that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service." *Id.* at 742. This Court need not entertain the Defendants'

"willful ignorance"—treating the "false gender identity" language "as if it was not repeatedly made in the Executive Order and policy documents." *Id.* A court cannot decide whether a policy is constitutional without reading it.

Defendants attempt to explain away both the Policy's text and the President's and Secretary's statements. They claim in Motion 1 that the Policy "draws classifications based on a medical condition (gender dysphoria) and related interventions," not "suspect . . . classifications." Mot. 1 at 1. That claim cannot be squared with the Policy's own text, as this Court and the D.C. Circuit have already recognized. *See Talbott*, 775 F. Supp. 3d at 327; *Talbott*, 176 F.4th at 734-35 (Wilkins, J.). And they claim in Motion 2 that the Secretary's and President's statements "do not reflect animus," "are all tied to the medical condition of gender dysphoria," and "are not 'overtly' discriminatory and 'could rest' on 'neutral justifications.'" Mot. 2 at 3-4. Those are "[f]actual questions" that "should not be resolved through motions *in limine*." *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011) (internal quotations and citations omitted). Defendants are welcome to try to persuade the Court that the President's and Secretary's statements do not reflect animus at trial.

## II. Rule 403 Does Not Render the President's and Secretary's Statements Inadmissible

Admitting the President's and Secretary's statements as evidence poses no "danger of unfair prejudice and confusing the issues under" Rule 403. Mot. 1 at 1. In a bench trial, "excluding relevant evidence on the basis of unfair prejudice is a useless procedure" because "trial judges are unlikely to rule emotionally, or to misuse evidence, in the way that juries

might." *United States v. Griffith*, 2023 WL 2043223, at *2 (D.D.C. Feb. 16, 2023). Defendants identify no unfair prejudice and no risk of confusion. There is none.

## III. The Defendants' Authorities Do Not Render the President's and Secretary's Statements Inadmissible

Defendants retry the arguments about *Trump v. Hawaii*, 585 U.S. 667, 705 (2018), that this Court rejected at the preliminary-injunction stage. They fare no better weeks before trial than they did 18 months ago. This Court has repeatedly told Defendants that *Hawaii* does not apply. *See Talbott*, 775 F. Supp. 3d at 314, 330 (Defendants' reliance on *Hawaii* is "misplaced" and their reading "is not what the Supreme Court said"); Oct. 14, 2026 Hr'g Tr., Dkt. 179, 13:21-22 (noting the opinion included "a whole chart [on *Hawaii*] as to why it doesn't apply to this case"); Nov. 16, 2026 Hr'g Tr., Dkt. 184, 15:10-14 ("The Court has already rejected the government's reading of *Trump v. Hawaii.* Plus, *Doe 2* held that *Trump v. Hawaii* doesn't make the government's intent or decision-making process developing the Mattis plan irrelevant."). Moreover, *Hawaii* did not exclude the President's statements. The Supreme Court said that courts ***"may consider plaintiffs' extrinsic evidence"*** in determining animus and framed the question as "the significance of those statements." *Hawaii*, 585 U.S. at 702, 705 (emphasis added). That is a question of weight, not admissibility. And *Hawaii* involved a proclamation the Court described as "facially neutral toward religion." *Id.* at 702. This case involves no such facially neutral proclamation.

*Mullin v. Doe*, 609 U.S. 324 (2026), does not help Defendants either. Defendants invoke it for the proposition that statements with a "race-neutral explanation" do not show improper motive. Mot. 2 at 2. But the Court reached that conclusion only ***after*** it had reviewed the statements at issue. *See Mullin*, 609 U.S. at 347 (applying the *Arlington Heights* standard). It examined what President Trump and Secretary Noem said, considered "the context in which a

challenged statement was made," and found the statements "insufficient to show" a racial motive. *Id. at* 347-49. The Court never suggested the statements were inadmissible. As in *Hawaii*, the Court considered the statements and found them to be insufficient evidence of animus.[2]

*Anthropic PBC v. United States Department of [Defense]*, 192 F.4th 537 (D.C. Cir. 2026), is even further afield. There, the D.C. Circuit considered Secretary Hegseth's "pungent" social-media post and found that "for all its flourishes, the Secretary's social media post" did not evidence a First Amendment violation. *Id.* at 562. Defendants argue that the Executive Order and the Secretary's statements likewise "squarely address[ ]" a legitimate justification. Mot. 2 at 2. But calling transgender servicemembers "t***nies" and "dudes in dresses" addresses no medical or readiness concern. And the *Anthropic* court reached its conclusion by ***weighing*** the Secretary's words, not by excluding them.

Finally, *West Virginia v. B.P.J.*, 609 U.S. 958 (2026), is not an animus case and has no bearing here. *Id.* at 985 (recognizing that the classification was "not invidious"); *see also* Dkt. 138 (Plaintiffs' supplemental brief addressing *B.P.J.*). The challenged statements are not comparable to Justice Thomas's concurrence, as Defendants argue. *See* Mot. 2 at 3. A Justice's views about sex and language are not a policymaker's statements about the people his policy excludes.

* * *

At base, Defendants are trying to exclude the President's and Secretary's own statements because they are powerful evidence of animus. Few would believe that "trans lunacy" refers to a

---

[2] Nor does *Mullin*'s remark about "scandal[ous]" political discourse help Defendants. Mot. 2 at 2. The Court found that the statements at issue in *Mullin* had a "strong, race-neutral explanation." *Mullin*, 609 U.S. at 329. There is no "neutral explanation" for a Policy whose own text disparages the people it excludes, much less for the Secretary's repeated use of a slur aimed at them.

"condition that impacts combat readiness and efficacy," or that "dudes in dresses" "references the uniform and grooming standards" of the United States military. Mot. 2 at 1, 3; *see Talbott*, 775 F. Supp. 3d at 301 ("Seriously?"). Secretary Hegseth believes "[t]ransgender people should never be allowed to serve. It's that simple." Pete Hegseth, *The War on Warriors* 62 (2024). Plaintiffs should be allowed to use his own words, and the President's, along with the Policy itself, to show that their discriminatory beliefs drive the Hegseth Policy, not some made-for-litigation invocations of military readiness or unit cohesion. The Motions should be denied.

Respectfully submitted,

Dated: November 20, 2026

/s/ *Lauren M. Weinstein*
Lauren M. Weinstein (1035184)
Benjamin G. Bradshaw (460539)
Shruti Kannan (90006641)
Timur Akman-Duffy (1779260)
Jack Derewicz (1779953)
Max J. Rosenthal (90028849)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
lweinstein@omm.com
bbradshaw@omm.com
skannan@omm.com
takman-duffy@omm.com
jderewicz@omm.com
mrosenthal@omm.com

Brett Williamson (1024759)
O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (949) 823-6900
bwilliamson@omm.com

Janine F. Panchok-Berry (*pro hac vice*)
Eamonn W. Campbell (*pro hac vice*)
Qiran "Anna" Xie (*pro hac vice*)
Maggie M. Niu (*pro hac vice*)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Phone: (212) 326-2000
jpanchok-berry@omm.com
ecampbell@omm.com
axie@omm.com
mniu@omm.com

Jennifer Levi (MA0056)
Mary Bonauto (*pro hac vice*)
Michael R. Haley (*pro hac vice*)
Sarah K. Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
Phone: (617) 426-1350
jlevi@gladlaw.org
mbonauto@gladlaw.org
mhaley@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (*pro hac vice*)
Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st St. #11548
Sacramento, CA 95811
Phone: (415) 365-1320
cstoll@nclrights.org
sminter@nclrights.org
awhelan@nclrights.org

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
Phone: (617) 742-6020
ibernstein@zalkindlaw.com

*Counsel for Plaintiffs*