**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NICOLAS TALBOTT *et al.*,

Plaintiffs,

v.

UNITED STATES *et al.*,

Defendants.

Civil Action No. 1:25-cv-240-ACR

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTIONS *IN LIMINE* NOS. 4-9 TO EXCLUDE EXPERT TESTIMONY**

# TABLE OF CONTENTS

**Page**


I. The Deference Owed to Military Judgment Does Not Make Plaintiffs' Expert Testimony Inadmissible ..... 3

A. The D.C. Circuit Approved of Reliance on Expert Testimony in this Case ..... 4

B. Defendants' Authorities Do Not Support Exclusion ..... 5

II. The Federal Rules of Evidence and *Daubert* Do Not Require Exclusion ..... 8

A. Plaintiffs' Experts' Testimony Will Help this Court Resolve Fact Questions at Trial ..... 9

1. Ms. Bourcicot, Ms. Skelly, Hon. Wagner, and Hon. Vazirani ..... 9

2. Major General Young ..... 10

3. Professor Currah ..... 12

B. Plaintiffs' Experts' Opinions Are Based on Sufficient Facts or Data ..... 15

1. Ms. Bourcicot ..... 15

2. Ms. Skelly ..... 17

3. Hon. Vazirani ..... 18

4. Hon. Wagner ..... 19

5. Major General Young (Ret.) ..... 20

6. Professor Currah ..... 21

C. Plaintiffs' Experts' Opinions Are the Product of Reliable Principles and Methods That They Reliably Applied to the Facts of this Case ..... 22

1. Ms. Skelly ..... 22

2. Ms. Bourcicot ..... 23

3. Hon. Vazirani ..... 24

4. Hon. Wagner ..... 25

5. Major General Young (Ret.) ..... 26

6. Prof. Currah ..... 26

III. Plaintiffs' Expert Testimony Does Not Contain Legal Conclusions ..... 27

1. Hon. Vazirani ..... 27

2. Hon. Wagner ..... 28

3. Prof. Currah ..... 29

IV. Plaintiffs' Experts Offered Proper Rebuttal Testimony ..... 29

1. Hon. Vazirani ..... 30

2. Hon. Wagner ..... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bazemore v. Friday*,
478 U.S. 385 (1986) ........ 20

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ........ 1

*Burkhart v. Wash. Metro. Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) ........ 27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........ 8, 9, 10, 11, 17, 19, 22, 32

*DL v. District of Columbia*,
109 F. Supp. 3d 12 (D.D.C. 2015) ........ 3

*Doe 2 v. Esper*,
2019 WL 4394842 (D.D.C. Sept. 13, 2019) ........ 7

*Doe 2 v. Shanahan*,
917 F.3d 694 (D.C. Cir. 2019) ........ 6, 7

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 22

*Gilligan v. Morgan*,
413 U.S. 1 (1973) ........ 7

*Goldman v. Weinberger*,
475 U.S. 503 (1986) ........ 5, 8

*Groobert v. President & Dirs. of Georgetown Coll.*,
219 F. Supp. 2d 1 (D.D.C. 2002) ........ 15, 16

*Heller v. D.C.*,
801 F.3d 264 (D.C. Cir. 2015) ........ 15

*In re Navy Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ........ 7

*Khairkhwa v. Obama,*
793 F. Supp. 2d 1 (D.D.C. 2011) ........ 21

*Kreis v. Sec'y of the Air Force*,
406 F.3d 684 (D.C. Cir. 2005) ........ 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........ 17, 18, 26

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020) ........ 15, 21

*Rostker v. Goldberg*,
453 U.S. 57 (1981) ........ 5, 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


*Rothe Dev., Inc. v. Dep't of Def.*,
107 F. Supp. 3d 183 (D.D.C. 2015), *aff'd on other grounds sub nom. Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57 (D.C. Cir. 2016) .......... 27

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) .......... 7

*Talbott v. United States*,
176 F.4th 720 (D.C. Cir. 2026) .......... 1, 4, 5, 6, 10, 11

*Talbott v. United States*,
775 F. Supp. 3d 283 (D.D.C. 2025) .......... 1, 7

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 5, 7

*United States ex rel. Morsell v. NortonLifeLock, Inc.*,
567 F. Supp. 3d 248 (D.D.C. 2021) .......... 8

*United States v. Philip Morris USA Inc.*,
2022 WL 1101730 (D.D.C. Apr. 13, 2022) .......... 30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 3, 4, 10, 12

**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) .......... 29

Fed. R. Civ. P. 37(c)(1) .......... 32

Fed. R. Evid. 104(a) .......... 8

Fed. R. Evid. 702 .......... 9, 20

Fed. R. Evid. 703 .......... 8

Fed. R. Evid. 704(a) .......... 27

Defendants seek to exclude testimony of six of Plaintiffs' experts.[1] Defendants do not dispute the experience on which each witness's expertise rests: senior posts in the Department of Defense and the military departments, more than three decades of military service, and more than 25 years of research on sex classification.[2] Defendants claim instead that this experience does not support particular opinions. Their primary argument is that the experts' testimony is irrelevant because of the deference owed to military judgments. *See* Dkt. 172, at 4-5. That is not true. As this Court previously held in this case: "Yes, the Court must defer. But not blindly." *Talbott v. United States*, 775 F. Supp. 3d 283, 291 (D.D.C. 2025). The D.C. Circuit affirmed that ruling, *Talbott v. United States*, 176 F.4th 720, 726-27 (D.C. Cir. 2026) (Wilkins, J.), and did not find error in this Court's reliance on expert testimony at the preliminary injunction stage. There is no reason why expert testimony should now be excluded in favor of blind deference to the military.

The central question in this case is whether Defendants exercised military judgment in enacting the Hegseth Policy or whether they acted with animus, which the face of the Policy reflects. Plaintiffs' experts' testimony will help the Court resolve that question. Each expert provides specialized knowledge and experience that will help the Court answer a disputed issue of fact:

---

[1] Defendants' Motions *in Limine* Nos. 4-9 present nearly identical legal arguments as to each expert. Defs.' Mot. *in Limine* No. 4 ("Skelly Mot."), Dkt. 174; Defs.' Mot. *in Limine* No. 5 ("Bourcicot Mot."), Dkt. 175; Defs.' Mot. *in Limine* No. 6 ("Vazirani Mot."), Dkt. 176; Defs.' Mot. *in Limine* No. 7 ("Wagner Mot."), Dkt. 177; Defs.' Mot. *in Limine* No. 8 ("Young Mot."), Dkt. 178; Defs.' Mot. *in Limine* No. 9 ("Currah Mot."), Dkt. 182. With the Court's permission, Plaintiffs file this omnibus response to more efficiently present the issues for the Court's resolution. *See* Nov. 16, 2026 Hr'g Tr., Dkt. 184, 21:9-16.

[2] *See* Skelly Mot. at 6 (the issue "is not the qualifications of a witness in the abstract" (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994))); Bourcicot Mot. at 6 (same); Vazirani Mot. at 7 (same); Wagner Mot. at 8 (same); Young Mot. at 3 ("His military career spanned over three decades."); Currah Mot. at 2 ("As relevant here, Professor Currah has spent 'more than 25 years' researching and writing about sex classifications in government policies.").

- **Ms. Yvette Bourcicot** served as Acting Assistant Secretary and then Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs from January 2022 to January 2025, and before that, she served on the 2015 Working Group that developed the Carter Policy. *See* Bourcicot Rep., Dkt. 175-1 ¶¶ 9, 13-15. She will testify that while she was implementing the Austin Policy, no readiness or cohesion concern about transgender soldiers reached her through any Army channel, and that the Hegseth Policy departed from the Department's ordinary policymaking process. *Id.* ¶¶ 40, 48, 68-74.

- **Professor Paisley Currah** has studied the history of sex classification in American law and governance for more than 25 years. *See* Currah Rep., Dkt. 182-1 ¶ 5. Professor Currah will testify that the definition of sex in Executive Orders 14168 and 14183 departs from prior federal administrative practice, and that the Orders' description of transgender people draws on a long history of stigmatization. *Id.* ¶¶ 2, 14, 21-24, 31-34.

- **Ms. Shawn G. Skelly**, a retired Navy Commander with twenty years of service, was confirmed by the Senate in July 2021 as Assistant Secretary of Defense for Readiness and later performed the duties of the Deputy Under Secretary of Defense for Personnel and Readiness through January 20, 2025. *See* Skelly Rep., Dkt. 174-1 ¶¶ 10-14. She will testify about the military's experience with transgender service under the Austin Policy and about the development of the Hegseth Policy outside the Department's standard process. *Id.* ¶¶ 6-7, 36-40, 44-49.

- **Hon. Ashish S. Vazirani** served as Deputy Under Secretary of Defense for Personnel and Readiness from July 2022, and performed the duties of the Under Secretary from September 2023 through January 2025. In that role, he oversaw the Austin Policy across the Department and was responsible for the Military Health System. *See* Vazirani Rep., Dkt. 176-1 ¶¶ 13-17. He will testify that the Department's reporting channels surfaced no harm from transgender service. *Id.* ¶¶ 16, 43-59.

- **Hon. Alex Wagner** served as Assistant Secretary of the Air Force for Manpower and Reserve Affairs from June 2022 to January 2025. *See* Wagner Rep., Dkt. 177-1 ¶ 7. He will testify that the Air Force experienced no cohesion, readiness, or deployability problems under the Austin Policy; and that the Hegseth Policy's "waiver" is not an individualized medical waiver of the kind the military uses for other conditions. *Id.* ¶¶ 30, 35-38, 59-60, 83-87.

- **Major General James Young (Ret.)** served 36 years in the Army, including as Chief of Staff of the Army Reserve, and sat on general officer promotion boards. *See* Young Rep., Dkt. 178-1 ¶¶ 10-12, 21. He will testify about what separation under the Hegseth Policy means for a service member's career, retirement, and benefits, compared with the military's treatment of other conditions. *Id.* ¶¶ 43-55.

The experts' anticipated testimony is directly relevant to whether Defendants exercised any military judgment to which the Court could defer. Each opinion satisfies Rule 702 and *Daubert*. And, in any event, the Court's gatekeeping function is "substantially relaxed" because this is a bench trial. *DL v. District of Columbia*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015). Defendants' disagreement with the experts' conclusions can be tested through cross-examination and contrary evidence; it is not a basis for exclusion.

## I. The Deference Owed to Military Judgment Does Not Make Plaintiffs' Expert Testimony Inadmissible

Plaintiffs' experts address factors that are directly probative of whether the Hegseth Policy reflects military judgment or, as its text indicates, animus. Even when a policy is neutral on its face, determining discriminatory purpose requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). That is a fact-intensive inquiry that examines the decision's history, departures from ordinary procedures, and whether the factors ordinarily important to the decisionmaker favored a different result. *Id.* at 267-68. Plaintiffs' experts will provide testimony relevant to those subjects. They explain the military's experience with transgender service members, the procedures the military ordinarily uses to evaluate fitness and readiness, and how the Policy departs from those practices. *See, e.g.*, Bourcicot Rep. ¶¶ 40, 48, 68-74, 81-87; Skelly Rep. ¶¶ 36-40. Excluding that evidence would deprive the Court of the military's own experience in evaluating Defendants' claim that military judgment underlies the policy.

The Policy announces its own purpose. But even where purpose must be inferred, once discriminatory purpose is shown to be "a motivating factor," Defendants bear the "burden of establishing that the same decision would have resulted even had the impermissible purpose not

been considered." *Arlington Heights*, 429 U.S. at 265-66, 270 & n.21. Plaintiffs' experts' testimony about how service by transgender individuals affected the military, the military's treatment of comparable conditions, and the consequences of separating trained personnel directly tests that defense. *See, e.g.*, Wagner Rep. ¶¶ 35-36, 59-60; Young Rep. ¶¶ 43-55.

### A. The D.C. Circuit Approved of Reliance on Expert Testimony in this Case

The D.C. Circuit relied on this kind of evidence in its decision in this case. The controlling opinion asks whether the Policy's classifications are "based on detailed study rather than 'archaic and overbroad generalizations,'" whether similarly situated persons are treated similarly, and whether the classification rests on invidious discrimination. *Talbott*, 176 F.4th at 739 (Wilkins, J.). Judge Wilkins answered each question based on testimony in the record. He relied on Hon. Wagner's uncontradicted testimony that administrative separation is generally used for misconduct while "the Disability Evaluation System is ordinarily used for evaluating impacts from medical conditions." *Id.* at 744. Judge Wilkins also relied on a former Deputy Assistant Secretary of the Air Force's uncontested declaration describing the individualized medical review that the Policy denies transgender service members. *Id.* Judge Rogers, too, approved of this Court's reliance on "uncontested declarations by military officials," including a former Secretary of the Navy's statement that "there is no evidence-based justification" for excluding transgender service members who meet all applicable standards. *Id.* at 755-56 (Rogers, J., concurring in part and dissenting in part). Defendants' "unexplained and unreasoned departures from standard protocols" helped show that Defendants' stated justifications were pretextual. *Id.* at 746 (Wilkins, J.). Plaintiffs' experts will offer evidence of the same kind at trial.

Only the dissent accepted the position Defendants now advance. Judge Walker wrote that a court may not "credit contrary expert views over military judgment," and that whether

Plaintiffs' "expert witnesses" agree with the military "is quite beside the point." *Talbott*, 176 F.4th at 769, 775 (Walker, J., dissenting). Judge Wilkins responded that deference does not make an Article III court "a judicial rubber stamp." *Id.* at 737 (Wilkins, J.). And Judge Rogers agreed with this Court that the military's judgment is owed deference, "not '[b]lind [d]eference,'" adding that *Trump v. Hawaii*, 585 U.S. 667 (2018), "does not require lower courts to presume that evidence of animus is immaterial under rational basis review." *Id.* at 752, 756 (Rogers, J., concurring in part and dissenting in part).

**B. Defendants' Authorities Do Not Support Exclusion**

None of the cases Defendants cite requires exclusion of Plaintiffs' experts' testimony. Defendants argue *Rostker* rebuked the district court for "'palpably exceed[ing] its authority' in 'relying on [such] testimony.'" Skelly Mot. at 4 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 81 (1981)). But the Court did not hold that the testimony should have been excluded. The Court explained that the district court erred by "ignor[ing] Congress' considered response" in favor of its own analysis. *Rostker*, 453 U.S. at 81. Deference was appropriate because "Congress did not act 'unthinkingly' or 'reflexively and not for any considered reason.'" *Id.* at 72. The issue was the lack of deference to Congress's reasoned judgment. Here, one of the key factual questions for trial is whether there is any reasoned judgment to which this Court can defer.

*Goldman v. Weinberger*, 475 U.S. 503 (1986), is similar. Defendants describe the case as "finding expert testimony to have no relevance in the context of a constitutional challenge to military policy." Skelly Mot. at 5 (citing *Goldman*, 475 U.S. at 504). Those words appear nowhere in the decision. No party challenged the admission of the expert testimony, and, therefore, the Court did not rule on the testimony's admissibility. Instead, the Court determined that expert testimony on "religious exceptions" to the Air Force's dress regulation could not displace the military's "considered professional judgment" on the question. *Id.* at 509. The case

does not say that expert testimony is categorically barred as Defendants suggest. As Judge Wilkins explained in this case, the Court deferred only after it "carefully reviewed the specific requirements of the regulation" and found that the regulation "reasonably and evenhandedly regulated" military dress. *Talbott*, 176 F.4th at 737-38 (Wilkins, J.). This Court has not determined that the Hegseth Policy is a reasoned military judgment to which it can defer. Plaintiffs' experts will help the Court resolve that question at the permanent injunction stage.

Nowhere does *Doe 2 v. Shanahan*, 917 F.3d 694 (D.C. Cir. 2019) "agree[ ] that the Supreme Court's precedents foreclose[ ] the use or consideration of expert testimony," as Defendants urge. Skelly Mot. at 5 (citing *Doe 2*, 917 F.3d 694). The appeal concerned whether changed circumstances warranted dissolving a preliminary injunction; it did not concern whether expert testimony can be considered when a case involves a change in DOD policy. *Doe 2*, 917 F.3d at 695 (Wilkins, J., concurring) ("As we described in the Judgment, the District Court's finding of no changed circumstances and its denial of the motion to dissolve the preliminary injunction was error."). If anything, the sentence Defendants quote from Judge Wilkins's opinion undermines their position. Judge Wilkins explained that "requir[ing] the government to explain fully, under oath, [its] justification," for a policy does not encroach on military deference. *Id.* at 706. "Even when dealing with facially neutral policies," the political branches "receive deference only where military policies are based upon the 'considered professional judgment' of 'appropriate military officials' and only after finding that the policies 'reasonably and evenhandedly regulate' the matter at issue." *Id.* at 703-04. That expert evidence is relevant to assessing the claim's justifications is further evidenced by the D.C. Circuit's regular acceptance of expert testimony in military cases, including this one. *See, e.g.*, *Talbott*, 176 F.4th at 744 (Wilkins, J.) (relying on Hon. Wagner's testimony that "administrative separation is

generally used for misconduct"); *In re Navy Chaplaincy*, 697 F.3d 1171, 1180 (D.C. Cir. 2012) (remanding for findings on competing expert analyses of bias in Navy promotions); *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 688 (D.C. Cir. 2005) (requiring the Air Force Board for the Correction of Military Records to "address the merits of the expert military opinions").

Defendants' reliance on Judge Williams's separate concurrence in *Doe 2* changes nothing. *See, e.g.*, Skelly Mot. at 5. No other judge joined his opinion. He wrote separately because he "believe[d] the record and the law require dismissal of plaintiffs' claims." *Doe 2*, 917 F.3d at 707 (Williams, J., concurring in the result). His view that those claims could not succeed at trial says nothing about who may testify at this one.

Nor does *Trump v. Hawaii*, 585 U.S. 667 (2018), support exclusion. Defendants emphasize that "the Executive's evaluation of the underlying facts is entitled to appropriate weight." *Hawaii*, 585 U.S. at 708; *see also* Skelly Mot. at 4. But that is the ***question*** here: Whether the Executive evaluated the "underlying facts," or instead excluded transgender people from the military because of animus against that group. And, in any event, the opinion makes clear that courts ***"may consider plaintiffs' extrinsic evidence"*** to determine whether a policy is unconstitutional. *Hawaii*, 585 U.S. at 705 (emphasis added); *see also Talbott*, 775 F. Supp. 3d at 314-16 ("*Trump v. Hawaii* Confirms that the Military Is Not Owed Blind Deference").[3]

Deference "is not guaranteed based on the mere fact that the challenged policy concerns the military." *Doe 2 v. Esper*, 2019 WL 4394842, at *3 (D.D.C. Sept. 13, 2019); *see also Singh v. Berger*, 56 F.4th 88, 99 (D.C. Cir. 2022) (similar). Here, the central question to be resolved at

[3] The motions against Hon. Vazirani and Hon. Wagner also cite *Gilligan v. Morgan*, 413 U.S. 1 (1973), for the proposition that such "testimony is not relevant to review of military judgments . . . because control of the military is constitutionally committed to the political branches." Vazirani Mot. at 5-6; Wagner Mot. at 6. *Gilligan* did not examine the admissibility of evidence, expert testimony, or Rule 702. It also "neither h[e]ld nor impl[ied] that the conduct of the [military] is always beyond judicial review." *Gilligan*, 413 U.S. at 11. It is beside the point.

trial is whether the Hegseth Policy constitutes a ***"considered response"*** or reflects a ***"considered professional judgment"*** to which this Court could defer. *Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 81 (emphasis added). Resolving that dispute requires evidence. Plaintiffs' experts will provide that evidence.[4]

## II. The Federal Rules of Evidence and *Daubert* Do Not Require Exclusion

Defendants argue that each expert fails Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for three reasons: (1) the testimony will not help the Court decide any disputed fact; (2) the testimony lacks a sufficient factual basis; and (3) the testimony rests on unreliable methods or speculation.[5] *See, e.g.*, Skelly Mot. at 1-2, 6-8; Vazirani Mot. at 6-10; Wagner Mot. at 7-11. Each is wrong. The experts' testimony bears directly on facts the Court must find at trial. Their opinions rest on their professional experience and the documentary record, and they have applied the specialized knowledge acquired through their training, experience, and education reliably to their analysis of the issues in this case. Defendants' objections go at most to weight, not admissibility.

Under Rule 702, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. And because this is a bench trial, "resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence." *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 260 (D.D.C. 2021). Rule 702 permits a "witness who is qualified as an expert by

---

[4] Defendants also mischaracterize the testimony as former officials' disagreement with current policy. *See* Vazirani Mot. at 2, 6; Wagner Mot. at 2, 6. These witnesses will testify to what the Department observed while transgender service members served on equal terms and to how the Policy departs from its ordinary practices, not to whether the Hegseth Policy is a good one.

[5] Defendants also invoke Federal Rules of Evidence 104 and 703. Neither creates grounds for exclusion. Rule 104(a) directs that the "court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). And Rule 703 permits an expert to base an opinion on facts "that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court must ensure that expert testimony is "not only relevant, but reliable," with a focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 589, 595. Plaintiffs' experts meet each requirement.

### A. Plaintiffs' Experts' Testimony Will Help this Court Resolve Fact Questions at Trial

Defendants argue chiefly that none of Plaintiffs' experts will testify on a topic relevant to this trial. That is incorrect. Each will offer testimony relevant to the fact questions this Court must resolve at trial, as discussed below.

#### *1. Ms. Bourcicot, Ms. Skelly, Hon. Wagner, and Hon. Vazirani*

Disclaiming the stated basis in the Executive Order and Hegseth Policy for excluding transgender service members because they lack "honesty, humility, uniformity, and integrity," Defendants now claim the Policy is needed because transgender service members impair readiness, unit cohesion, and impose disproportionate costs. *See* Exec. Order No. 14183 §§ 1-2; Sec'y of Def. Mem. "Prioritizing Military Excellence and Readiness" (Feb. 7, 2025). Whether the justifications Defendants invoke in litigation have any support is a disputed question of fact at trial.

These four former officials will address whether the military's experience with equal transgender service supports Defendants' claimed concerns about readiness, cohesion, and cost.

They held senior positions responsible for personnel and readiness in the Department of Defense or a military department, and they developed or implemented the policies that preceded the challenged Policy. *See* Skelly Rep. ¶¶ 13-14; Bourcicot Rep. ¶¶ 9, 13-15; Vazirani Rep. ¶¶ 4, 13-16; Wagner Rep. ¶¶ 7, 21. They will describe what the Department observed under those policies and how it ordinarily assesses personnel needs and costs. That testimony is directly relevant to deciding whether the Hegseth Policy's asserted justifications are valid or pretextual.

Defendants argue that the Carter and Austin Policies are "not at issue." *See* Skelly Mot. at 6; Bourcicot Mot. at 6; Vazirani Mot. at 6; Wagner Mot. at 7-8. But those policies need not be "at issue" to be relevant. The "basic standard of relevance . . . is a liberal one." *Daubert*, 509 U.S. at 587. And in an equal protection case, the "historical background of the decision" and departures from the factors "usually considered important by the decisionmaker" are evidence of purpose. *Arlington Heights*, 429 U.S. at 267. How the military operated under previous policies is relevant to determining whether the current Policy has valid justifications. *See also Talbott*, 176 F.4th at 742 (Wilkins, J.) (considering Mattis Policy).

Defendants nitpick that the experts were too senior to learn of unit-level issues and that they did not request data specific to service members with gender dysphoria. *See* Skelly Mot. at 6; Vazirani Mot. at 7-9; Wagner Mot. at 8-10. Those arguments go to weight, not admissibility. The appropriate means to determine weight is with "[v]igorous cross-examination [and] presentation of contrary evidence," not a motion in limine. *Daubert*, 509 U.S. at 596.

*2. Major General Young*

Defendants claim the Policy treats gender dysphoria like any other disqualifying condition, and that service members separated under it are treated the same as anyone else who receives voluntary separation pay. *See* Young Mot. at 6, 8; Decl. of Timothy D. Dill ¶¶ 7-10, 15-19, 22 (Sept. 25, 2026). The Policy's text says otherwise, and Defendants have already

"conceded that persons with a history of gender dysphoria are not treated the same as similarly situated individuals." *Talbott*, 176 F.4th at 742 (Wilkins, J.). To the extent Defendants reassert that claim despite their concession, it raises a question for trial, not a basis for excluding testimony that answers it.

Major General Young (Ret.) addresses the extent of the harm the Policy imposes on transgender service members. He served more than thirty years as an Army officer, including as Human Capital Enterprise Director and Chief of Staff of the Army Reserve with oversight of pay, promotion, benefits, retirement, and disability policy, and sat on general officer promotion boards. *See* Young Rep. ¶¶ 10-12, 21 & App. A. He has testified as an expert in numerous cases involving military career progression, separation and retirement, and VA disability and retirement pay. *Id.* ¶ 14 & App. D. He explains how the Policy routes these service members out of the Disability Evaluation System and into administrative separation and what that means in practice: careers cut short before retirement eligibility, separation pay that is recouped against later VA compensation, and the loss of retiree benefits. *Id.* ¶¶ 7-8, 27 & n.6, 43-45, 47-55. His testimony shows the extent to which Plaintiffs are being treated differently from others in the military with behavioral health conditions—contrary to Defendants' claim—by being separated without individualized consideration.

Defendants respond that the recoupment statute applies to every recipient of voluntary separation pay. Young Mot. at 8-9. That misses the point. The Policy decides which separation path these service members take, and with it which pay and benefits rules apply. *See* Young Rep. ¶¶ 7-8, 43-45, 47-55. Defendants' disagreement with his analysis, *see* Young Mot. at 5-9, goes to weight, not admissibility. *See Daubert*, 509 U.S. at 596.

*3. Professor Currah*

Defendants claim the Policy's definition of sex continues the military's historical practice of using "a single, uniform sex designation across all servicemembers." Currah Mot. at 5. Whether the Policy instead departs from prior federal practice is a disputed question of fact at trial.

Professor Currah addresses whether the Policy's definition of sex is consistent with prior federal practice. He has studied for more than twenty-five years how American institutions, including federal agencies, classify sex and is a well-respected expert in his field. *See* Currah Rep. ¶ 5. His testimony on how federal institutions have classified sex is further evidence of the Policy's discriminatory purpose. The Court may consider the "historical background of the decision" as evidence of intent. *Arlington Heights*, 429 U.S. at 267. Professor Currah's research identified no federal agency that had used the definition of sex the Policy now mandates, which is evidence that the Policy departs from prior practice. See Currah Rep. ¶¶ 31-32.

Defendants cannot treat the definition of sex as irrelevant. The Policy itself depends on it: Executive Order 14183 and the February 26, 2025 memorandum incorporate the definition of sex adopted in Executive Order 14168. *See* Currah Rep. ¶¶ 2, 31, 39; Exec. Order No. 14183 § 3, 90 Fed. Reg. 8757 (Jan. 27, 2025), Dkt. 63-1 (February 26, 2025 memo). Defendants' own witnesses will also testify about it. Dr. Hopewell, Lieutenant Colonel Salter, Lieutenant General DeGoes, and Dr. Ortega are each expected to address the definition of sex or the Department's standards.[6]

[6] *See* Defs.' Disclosure Concerning C. Alan Hopewell (Ex. A) ¶ 4 (Sept. 4, 2026) ("the nature of sex, gender identity, and gender dysphoria"); Defs.' Disclosure Concerning Lieutenant Colonel Carolyn Salter (Ex. B) ¶ 7 (Sept. 4, 2026) ("transgender medical care" and "comorbidities associated with gender dysphoria"), *and id.*, Attachs. (studies defining sex as "assigned at birth" or permitting respondents to select "male, female, or intersex"); Defs.' Disclosure Concerning Lt Gen DeGoes, Dkt. 179-3 ¶ 4 (Sept. 4, 2026) ("the physical and mental fitness standards required for military service and why it is important that the military (and military commanders) be permitted to make fitness determinations for service members"); Defs.' Disclosure Concerning Dr. Hernando J. Ortega, Jr. (Ex.

Professor Currah will testify that no single definition of sex has governed across American institutions and that federal, state, and local agencies have set their own rules for classifying sex. Currah Rep. ¶¶ 21-22 (describing Opinion 2). Defendants argue that the practices of other institutions are irrelevant because the military has used a single sex marker in its personnel system. Currah Mot. at 5. But that marker was itself a rule the Department adopted for its own purposes. Professor Currah testified that he found no military-wide policy on sex classification before the Carter Policy, that the Carter Policy made the marker in the Department's personnel system controlling, and that the same policy set out the process by which a service member could change it. Currah Dep. Tr. (Ex. D) 58:25-59:16, 61:10-62:3. The Policy replaced that rule with the government-wide definition in Executive Order 14168. Currah Rep. ¶¶ 31, 33-34. Professor Currah's Opinion 2 describes the prior practice against which that change is measured. It also responds to Defendants' witnesses, whose disclosures use criteria for sex that differ from one another and from the Executive Order's. *Id.* ¶ 23.

Defendants next argue that Professor Currah cannot compare the definitions their witnesses use because he is not a medical expert. Currah Mot. at 6. The comparison does not require medical expertise. Professor Currah states that he offers "no opinion on the underlying biology" and notes only that "the classification criteria Defendants themselves invoke are not the same criterion." Currah Rep. ¶ 23; *see also id.* ¶¶ 3, 20; Currah Dep. Tr. 38:19-23. Identifying the criteria an institution uses to classify sex, and how those criteria differ, is the subject of his scholarship. Currah Rep. ¶¶ 5-6. Defendants also challenge paragraph 24 of the report, which discusses revisions to diagnostic categories. Currah Mot. at 6. Plaintiffs will elicit from

C) ¶ 5 (Sept. 4, 2026) ("the physical and mental fitness standards required for military entry, operating under the premise of current Department of War and Department of the Air Force policies"), *and id.*, Attach. at 15 (defining sex as "a person's categorization as biologically male or female generally based on the genitals and reproductive tract")

paragraph 24 only the fact that the diagnostic categories were revised by the institutions that maintain them, which Defendants' own disclosures describe. Professor Currah will not offer any opinion about the clinical basis for those revisions, nor does he need to in order to make his testimony relevant. *See* Currah Rep. ¶ 24 & nn.25-26; Currah Dep. Tr. 44:17-25.

Professor Currah will also testify that the definition of sex in Executive Order 14168 is, as far as he has been able to determine, the first definition of sex that a federal authority has imposed across the government as a whole, and that he has found no federal agency that previously defined sex by reference to reproductive-cell type at conception. Currah Rep. ¶¶ 31-32 (describing Opinion 5). Defendants argue that he is not qualified to address the biological nature of sex. Currah Mot. at 7. He very plainly is not offering such an opinion: "I do not offer an opinion regarding the biology that appears to inform that definition. My opinion focuses instead on administrative history." Currah Rep. ¶ 32.

Defendants also argue that Professor Currah is not qualified to say whether the Executive Order's definition serves the military's needs, and they quote his statement that he "can't talk about the agency processes." Currah Mot. at 7 (quoting Currah Dep. Tr. 53:10-11). That out-of-context statement answered a question about the internal procedures agencies followed before adopting a rule. Currah Dep. Tr. 52:17-53:11. Professor Currah explained that agencies generally did not keep records of those procedures and that his research therefore examines the policies agencies adopted and their effects. *Id.* at 50:6-18, 51:8-17, 53:5-11. Opinion 5 rests on that kind of evidence and concerns where the definition came from, not what definition would best serve the military, a subject on which Professor Currah claims no expertise. *See id.* 60:2-13. As he testified, his opinion "does not suggest that the military should not be setting its own fitness standards"; it is that the change resulted from the Executive Order's definition of sex,

"not from the Department's own processes." *Id.* 73:8-17; *see also* Currah Rep. ¶¶ 33-34. Plaintiffs do not intend to elicit testimony from Professor Currah about how waivers are adjudicated, which he testified is outside his field. *See* Currah Dep. Tr. 74:18-21, 78:19-79:3.

**B. Plaintiffs' Experts' Opinions Are Based on Sufficient Facts or Data**

Plaintiffs' experts' reports make clear the facts and data on which they rely. *See* Skelly Rep. App. B; Bourcicot Rep. App. C; Vazirani Rep. App. C; Wagner Rep. App. B; Young Rep. App. B; Currah Rep. App. C. Five of Plaintiffs' expert witnesses testify from directly relevant experience. Rule 702 expressly recognizes expertise gained through experience—in "certain fields," experience is the "predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 Amendment Advisory Committee's Note; *Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 7 (D.D.C. 2002) (Rule 702 is "liberal" and "flexible," and "personal experience can be a reliable and valid basis for expert testimony."). Consistent with that principle, the D.C. Circuit has upheld expert opinions supported by "substantial relevant experience and the sources [the experts] cited," *Heller v. D.C.*, 801 F.3d 264, 272 (D.C. Cir. 2015), and by experts who "drew upon both materials admitted" in the record and "sources encountered in their research and professional experience," *Owens v. Republic of Sudan*, 864 F.3d 751, 791 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020).

Defendants' arguments as to each witness' opinions fail to provide a basis for exclusion.

*1. Ms. Bourcicot*

Defendants contend that Ms. Bourcicot's opinion about the Army's experience under the Austin Policy does not rest on her work implementing it. Bourcicot Mot. at 6-7. Her report says otherwise: As Acting Assistant Secretary, Ms. Bourcicot "oversaw the Service Central Coordination Cell," which "prepared an Exception to Policy package for my review." Bourcicot

Rep. ¶ 38. She "reviewed each request, considering the medical provider's recommendation, input from the soldier's command, and a legal review." *Id.* In all, she "reviewed or advised on requests for Exceptions to Policy for Full-Time Real Life Experience for approximately ten transgender soldiers. Each met all applicable performance and medical standards." *Id.* ¶ 76(i); *see id.* ¶ 39 ("every requesting service member met the necessary standards for serving"). Her observation that the Austin Policy had "no negative impact . . . on Army readiness, cohesion, or military capabilities" rests "on the information that routinely reached my office." *Id.* ¶ 40. No readiness or cohesion problem attributable to transgender service reached her during her tenure. *Id.* ¶¶ 40, 46, 60. She cites the research literature as confirmatory of what she observed, not as an independent basis for her opinions. *Id.* ¶ 63.

Defendants also argue that Ms. Bourcicot lacks a foundation for her opinion regarding the waiver provided by the Hegseth Policy because she does not know how many waivers have been sought or granted. Bourcicot Mot. at 7-8 (citing Bourcicot Dep. Tr. 140:11-24). Her opinion does not depend on knowing a single number. It rests on the terms of the February 26, 2025 memorandum and on her experience administering Army waivers. *See* Bourcicot Rep. ¶¶ 55(v), 81-87; Dkt. 63-1. To obtain a retention waiver, a service member must show "36 consecutive months of stability in their birth sex without clinically significant distress or impairment," must "never [have] attempted to transition," and must be "willing to adhere to all applicable standards associated with their birth sex." Bourcicot Rep. ¶ 86. As she explains, "[n]o service member who transitioned under the Austin Policy . . . can meet that standard." *Id.* Defendants' disagreement with how Ms. Bourcicot applies that experience to the Policy's waiver provisions goes to weight, not admissibility. *See Groobert*, 219 F. Supp. 2d at 9-10.

2. *Ms. Skelly*

Defendants argue that Ms. Skelly lacks foundation for her opinion about the Austin Policy because she would have learned of cohort-wide problems but not necessarily of unit-level ones. Skelly Mot. at 6. That goes to weight, not admissibility. *See Daubert*, 509 U.S. at 596.

In any event, Defendants are wrong on the facts. Ms. Skelly worked at the level where the Department assesses readiness, through a reporting structure that aggregates unit data into the Defense Readiness Reporting System, and personnel issues of strategic significance were routinely escalated to her. Skelly Rep. ¶¶ 38, 40. During her tenure, no cohesion problem attributable to the Austin Policy was reported through the Services, the Joint Staff, or the Department's command-climate and readiness reporting channels, and no Service, combatant command, or Joint Staff element raised transgender service members as a medical-planning constraint. *Id.* ¶¶ 36, 39. She was also briefed that transgender service members deployed while on hormone therapy, including to austere locations, without any reported issue. *Id.* ¶ 37. The law permits her to "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999).

Defendants also ask the Court to preclude Ms. Skelly from "offering any testimony at trial about her personal experience as a transgender person," asserting that the parties reached an agreement on this point. Skelly Mot. at 2, 8–9. They did not. Plaintiffs' counsel did not agree to limit Ms. Skelly's trial testimony; counsel stated only that the topic would be discussed off the record. Defendants never followed up to have that discussion—not after the deposition, and not during the parties' November 9, 2026 meet-and-confer on motions in limine.

During the deposition, Ms. Skelly answered the question put to her; she does not intend to testify about her personal experience as a transgender person. Skelly Mot. at 8 (quoting Skelly Dep. Tr. 119:24–120:3). Consistent with that answer, Plaintiffs do not intend to elicit testimony

about Ms. Skelly's personal medical treatment or her own transition. But the order that Defendants seek is overbroad. Ms. Skelly is a transgender woman, which, as she testified, is a "public fact." *Id.* (quoting Skelly Dep. Tr. 116:20-117:2). Her identity and her related life experiences are part of who she is, and they properly inform the perspective she brings as a veteran and former senior Department official. The Court should deny Defendants' request or, at most, limit it to testimony about Ms. Skelly's personal medical treatment and transition history, which Plaintiffs do not intend to elicit.

*3. Hon. Vazirani*

Defendants argue that Hon. Vazirani's opinions about the Austin Policy "rest on one premise: he never heard about any problems with the Austin Policy." Vazirani Mot. at 7-8. That is not a basis to exclude his testimony, and it is wrong on the substance. *See Kumho Tire*, 526 U.S. at 156 (expert may testify to conclusions based on observations). As Deputy Under Secretary and Acting Under Secretary of Defense for Personnel and Readiness, Hon. Vazirani was responsible for the Department's deployability and retention policies, its medical standards, its readiness reporting policy, and the Military Health System. Vazirani Rep. ¶¶ 14-17. The Military Departments, the Assistant Secretaries of Defense for Manpower and Reserve Affairs, Readiness, and Health Affairs, and the Director of the Defense Health Agency reported to his office on personnel and medical readiness. *Id.* ¶ 16. He explains that "those channels were the means by which such problems would have been surfaced to me," and that none reported a deployability, cohesion, or cost problem attributable to transgender service members. *Id.* ¶¶ 16, 46, 49. That opinion is drawn from the Department's own reporting structure by the official at its head. His testimony also answers Defendants' witnesses who say service members with gender dysphoria "do not meet medical readiness standards"; he was the official responsible for those standards. Vazirani Rep. ¶¶ 34, 49.

Hon. Vazirani also draws on the Department's written policies and its data, not just his own experience. Under a rule adopted in 2018, any service member who is non-deployable for more than twelve consecutive months is referred for a retention determination, whatever the diagnosis. Vazirani Rep. ¶ 47. About five percent of the force was non-deployable at any given time during his tenure, against an estimated 0.2 percent with a gender dysphoria diagnosis. *Id.* Published evacuation data do not show gender dysphoria as a contributor to theater medical evacuations, *id.* ¶ 54, and transition-related care cost less than 0.01 percent of the Military Health System budget, *id.* ¶ 56.

4. *Hon. Wagner*

Defendants argue that information about unit cohesion and readiness was unlikely to reach Hon. Wagner. Wagner Mot. at 8-9. Again, that goes to weight, not admissibility. *Daubert*, 509 U.S. at 596. And it is wrong on the facts. Hon. Wagner received weekly briefings from the office responsible for Airman and Guardian readiness, met monthly on personnel matters with the Chief of Staff of the Air Force and the Chief of Space Operations, met at least twice monthly with the Surgeon General of the Air Force, and received command climate briefings from wing and delta commanders during installation visits. Wagner Rep. ¶¶ 30, 36, 58. Those were the channels through which other personnel and readiness issues reached him. *Id.* ¶ 61. Three of Defendants' own witnesses served in the Department of the Air Force during his tenure, including the officer who became its Surgeon General, and none raised gender dysphoria as a readiness concern. *Id.* ¶¶ 19, 60. Hon. Wagner's testimony about the Army's implementation of the Carter Policy rests on his work as Chief of Staff to the Secretary of the Army, where he assisted in developing the Army's implementing directives. *Id.* ¶¶ 21, 47-48. That testimony is helpful and admissible.

5. *Major General Young (Ret.)*

Defendants argue that General Young has no basis for his opinion that the Policy cut short the careers of service members who were otherwise on track to keep serving and advancing, because he did not review Plaintiffs' evaluation reports, personnel files, or VA claim files. Young Mot. at 7 (citing Young Dep. Tr. 77:24-79:15). But General Young's opinion does not turn on any one Plaintiff's file. It concerns what the Policy does to careers that were progressing: it separates service members before they reach retirement eligibility and ends their prospects for promotion. General Young knows how the military's promotion systems work from more than thirty years of service, including oversight of the Army Reserve's promotion, retirement, and disability policy, as well as seats on promotion and command selection boards. Young Rep. ¶¶ 10-12, 21.

Defendants also contend that General Young cannot predict that Plaintiffs will likely receive VA disability ratings. They say he relied on a Bureau of Labor Statistics survey of post-9/11 veterans without reviewing Plaintiffs' medical records, and that he has never worked at the VA. Young Mot. at 3, 7-8. But Rule 702 permits an expert qualified by "experience," not only by training or employment at a particular agency. Fed. R. Evid. 702. General Young does not offer a medical opinion or predict how the VA will rate any one Plaintiff. He offers the likelihood that a separated service member will receive a rating, based on the government's own survey data and his experience with how separation and VA disability systems interact. Young Rep. ¶¶ 11, 35-38, 46-47. That General Young does not include all the factors Defendants believe necessary is not grounds for exclusion—"failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part, joined by all other Members of the Court). Defendants may test on cross-examination how length of service or deployment history would move that estimate.

*6. Professor Currah*

Defendants argue that Professor Currah's observations "do not require any expertise" and do not reflect "a reliable application of an expert methodology." Currah Mot. at 6-7. Professor Currah's opinions rest on his scholarship and on a documentary record. Currah Rep. App. C. Testimony based on a "systematic inquiry" that consults "primary and secondary sources" and seeks corroboration across sources is admissible. *Khairkhwa v. Obama,* 793 F. Supp. 2d 1, 12-13 (D.D.C. 2011). Professor Currah may draw on record materials and sources encountered in research and professional experience; that is not work a layperson could reliably replicate. *Owens*, 864 F.3d at 791.

Professor Currah is the author of *Sex Is as Sex Does: Governing Transgender Identity* (2022), a study of the history of sex classification by federal, state, and local governments that received the Best Book Award from the Sexuality and Politics section of the American Political Science Association, and he is the founding co-editor of a peer-reviewed journal in his field. Currah Rep. ¶¶ 6-7. His opinions apply "qualitative methods of policy and institutional analysis standard in political science" to primary sources, including statutes, executive orders, regulations, agency directives and correspondence, archival records, and judicial decisions, and he identifies the sources on which each opinion rests. *Id.* ¶¶ 15, 19. His research on federal agencies draws on archival materials, published regulations, and Freedom of Information Act requests. Currah Dep. Tr. 30:19-31:4. That is a reliable basis for testimony about the history of administrative practice. *See Owens*, 864 F.3d at 791 (upholding reliance on experts who drew on "sources encountered in their research and professional experience").

### C. Plaintiffs' Experts' Opinions Are the Product of Reliable Principles and Methods That They Reliably Applied to the Facts of this Case

Defendants argue that the experts' opinions about the Hegseth Policy's effects are improperly speculative because the experts acknowledged that they could not predict the Policy's effects with absolute certainty or that they were not involved in the formation of the Hegseth Policy. Skelly Mot. at 7 ("all predictions about the future are inherently speculative in nature at least to some degree") (quoting Skelly Dep. Tr. 110:9-14)); *see also* Bourcicot Mot. at 7; Vazirani Mot. at 9-10; Wagner Mot. at 11; Currah Mot. at 7-8. But Rule 702 does not require absolute certainty; testimony is admissible even if the conclusion is not "'known' to a certainty." *Daubert*, 509 U.S. at 590. Nor does Rule 702 require personal knowledge. It is well established that experts can testify to facts beyond their personal knowledge. What matters is that the experts "will have a reliable basis in the knowledge and experience of [their] discipline" from which to judge these issues. *Id.* at 592; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (relevant question is whether there is "too great an analytical gap between the data and the opinion proffered"). Each has that. The experts' assessment of the Hegseth Policy's likely effects rests on their experience managing personnel and readiness, including the time and cost required to replace trained service members. *See* Skelly Rep. ¶¶ 51, 54-58; Vazirani Rep. ¶¶ 64-68, 80; Wagner Rep. ¶¶ 63, 68. And each expert explains "how that experience leads to the conclusion reached." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The Federal Rules and *Daubert* do not require anything more.

#### *1. Ms. Skelly*

Defendants argue that Ms. Skelly has no personal knowledge of readiness or deployability statistics since the Policy took effect. Skelly Mot. at 7. That is irrelevant. Ms. Skelly will testify to the process by which the Department in which she worked for more than

three years ordinarily develops and issues personnel policy and medical standards: An office of primary responsibility gathers and analyzes data, and the proposal is coordinated through the Military Departments, the Joint Staff, Health Affairs, and the General Counsel before it issues. Skelly Rep. ¶¶ 13-14, 22-24, 44-45, 48. For the 2025 policy change, she relies on Defendants' own documents. The Secretary's February 7, 2025 memorandum authorized implementation guidance "outside of the normal DoD issuance process," an authorization she had not seen in her time at the Department. *Id.* ¶¶ 27, 47. And she describes effects that have already occurred or that follow from the text of the guidance: the loss of trained personnel whose billets must be refilled, the bypassing of the Disability Evaluation System, the halt to medical care the Department had been providing, and conflicting directions, issued within days of each other, about identifying affected service members. *Id.* ¶¶ 51, 54, 56, 58. Her opinions thus reliably apply what she knows of the Department's ordinary process to the facts in the record.

*2. Ms. Bourcicot*

Defendants argue that Ms. Bourcicot was not involved in formulating the Hegseth Policy and that the Austin Policy was in place before she arrived. Bourcicot Mot. at 7. Neither point matters. Ms. Bourcicot knows the Department's process for major personnel policy changes from her participation in the 2015 working group. That group met for months, drew on the Military Departments, the Joint Staff, medical experts, and commanders, worked alongside the RAND study the Department commissioned, and obtained each stakeholder's formal concurrence. Bourcicot Rep. ¶¶ 20-28, 68, 70. And her account of the 2025 process comes from the public record and the Action Memo. The Executive Order issued seven days after the inauguration and the implementing policy about thirty days later. The Action Memo accompanying the policy lists four categories of materials it considered, none of which is the Department's own data from the years the Austin Policy was in effect. *Id.* ¶ 72. Ms. Bourcicot

identifies the sources of that data the Department had available. *Id.* ¶ 73. She also distinguishes the 2018 change, which followed a panel that met for several months and produced a written report. *Id.* ¶¶ 31, 48. Her report ties her opinion to the exception-to-policy requests she personally reviewed and to the readiness reporting that reached her office, which reflect a reliable application of her experience to the facts of the case. *Id.* ¶¶ 38-40.

*3. Hon. Vazirani*

Defendants argue that Hon. Vazirani's opinions on readiness, recruiting, and trust are speculation because he described one of them as "based on what I believe." Vazirani Mot. at 10 (quoting Vazirani Dep. Tr. 202:16-203:24). That answer came during Plaintiffs' brief examination at the close of the deposition, in response to whether the Austin Policy "positively contributed to readiness." Vazirani Dep. Tr. 202:16-21. It is not a reflection that Hon. Vazirani's report is baseless.

Hon. Vazirani also details in his report the basis for his opinion that the 2025 Policy departed from the Department's ordinary policymaking process. He was not in government when either policy was adopted. But as Deputy Under Secretary and then Acting Under Secretary of Defense for Personnel and Readiness from July 2022 to January 20, 2025, he oversaw implementation of the Austin Policy and became familiar with how personnel policies are "developed, coordinated, staffed, reviewed, approved and implemented." Vazirani Rep. ¶¶ 13-14, 16, 18. His opinions about those processes rest on "the public record, the Department's documented policymaking practices, and [his] experience with how comparable personnel policies were developed and implemented during [his] tenure." *Id.* ¶ 23. He describes the ordinary process, which involves collecting and analyzing data, gathering input from stakeholders across the Department, and producing "several drafts and revisions based on review and feedback." *Id.* ¶ 73. He then compares it to the public record: the 2025 guidance issued

within weeks of the Executive Order and relied on a 2018 report that predates the Austin Policy. *Id.* ¶ 76.

Hon. Vazirani's opinions about the effects of separating trained service members rest on the same experience. He describes the time and cost of training service members in particular specialties and the effect on a unit of losing a trained member, a point on which he agrees with Defendants' witness Colonel Black. Vazirani Rep. ¶¶ 64, 66-68, 80. His opinion on recruiting rests on the Department's accession data during his tenure, including that roughly one in four age-eligible Americans met accession requirements without a waiver. *Id.* ¶ 82. His report explains how he reached each conclusion. *See id.* ¶¶ 21-23.

*4. Hon. Wagner*

Defendants claim that Hon. Wagner's deployability opinion rests on what he "would assume" rather than on data. Wagner Mot. at 11. His report proves otherwise. Mr. Wagner compares the 2025 process, as reflected in the record, with the Department's ordinary approach to developing policies affecting the health conditions of service members, which he is familiar with due to senior leadership roles he held in two administrations and two military departments. Wagner Rep. ¶¶ 25, 28-29. The record he reviewed includes the February 26, 2025 guidance and the accompanying Action Memo. *Id.* nn.2, 6. His opinions on deployability and separation rest on the standards he administered. Under the Austin Policy, a transgender Airman or Guardian was subject to the same deployability determination and medical profile process as every other member. *Id.* ¶¶ 57, 69, 71. And when the Air Force separates a member for a medical condition, its regulations require either referral to the Disability Evaluation System or documented evidence that the condition has affected duty performance, with counseling and an opportunity to correct the deficiency. *Id.* ¶¶ 39, 85. Mr. Wagner explains that the Hegseth Policy dispenses with those requirements and that the Department of the Air Force wrote a new section into its separation

instruction to carry it out. *Id.* ¶ 86. His opinions thus rest on standards he administered, applied to the text of the Policy, not assumptions as Defendants suggest.

*5. Major General Young (Ret.)*

Defendants note that General Young conceded his framework does not "lend itself to a mathematical testing." Young Mot. at 7 (quoting Young Dep. Tr. 80:23-81:4). That doesn't prove anything. The *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. The key question is "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

General Young fully discusses how he reliably applies his experience. Young Rep. Part IV, 4-10 ("FRAMEWORK AND METHODOLOGY"). First, he asks whether the member can continue serving "absent the issue that caused separation," examining three elements. *Id.* ¶¶ 15-16. Second, he assesses the "financial ramifications of leaving service prematurely." *Id.* He applied that framework to each Plaintiff who served before the Policy took effect, noting each one's rank, years of service, performance record, and current duties. *Id.* ¶ 22 & Fig. 1. That is the same "intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

*6. Prof. Currah*

Defendants also argue that Professor Currah cannot opine that the Executive Order "displaced" the Department's own standards, because he is not an expert in military fitness standards or waiver adjudication. Currah Mot. at 7-8. His opinion depends on neither. It instead traces where the Policy's definition of sex came from: An Executive Order, not the Department.

Whatever the waiver process, the medical criteria it applies take their content from the Executive Order's definition of sex. *See* Currah Rep. ¶ 34. Tracing a policy's source in this way is the kind of analysis his methods support.

## III. Plaintiffs' Expert Testimony Does Not Contain Legal Conclusions

Defendants characterize statements in three reports as "legal conclusions" and ask that the experts' opinions "be excluded on that basis." Vazirani Mot. at 6; Wagner Mot. at 7; Currah Mot. at 5-6. An expert opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). An expert "may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997). Plaintiffs' experts offer opinions on factual matters that bear on the Court's legal conclusions, not on whether the legal standards have been satisfied. For example, statements that the Policy operates as a categorical exclusion, or that its waiver provision differs from the medical waivers the Department ordinarily grants, describe how the Policy operates in comparison with other Department standards. *See* Wagner Mot. at 7; Vazirani Mot. at 6.

Even if a particular statement were a legal conclusion, that would not justify excluding the witness's opinions as a whole. "[T]he appropriate remedy for an alleged statement of legal opinion is to exclude only that particular portion of testimony." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 202 (D.D.C. 2015), *aff'd on other grounds sub nom. Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57 (D.C. Cir. 2016). And in a bench trial there is little risk that such a statement would confuse the factfinder.

### *1. Hon. Vazirani*

Defendants object to four phrases in Hon. Vazirani's report: that the Policy is "arbitrary," is "not based in fact," "lacks an evidentiary foundation," and singles out one diagnosis for

"categorical exclusion." Vazirani Mot. at 6. Each describes a factual observation about the Policy or the process that produced it. "Categorical exclusion" describes how the Policy operates: Under the Department's retention standards, service members with conditions are evaluated individually through the profile, waiver, and Medical Evaluation Board processes, but the Hegseth Policy singles out one diagnosis—gender dysphoria—to exclude transgender service members without that evaluation. Vazirani Rep. ¶¶ 31, 44. His statements that the Hegseth Policy is "[n]ot based in fact" and "lacks an evidentiary foundation" refer to his observation that the Department did not collect or analyze data on how the Austin Policy operated before reversing it. *Id.* ¶¶ 76, 83, 88. And "arbitrary" appears alongside "abrupt" as a description of the departure from the Department's ordinary policymaking process. *Id.* ¶¶ 29, 81, 83. Hon. Vazirani plainly does not apply a legal standard or offer an opinion on whether the Policy is lawful.

*2. Hon. Wagner*

Defendants also label as legal conclusions Hon. Wagner's statements that the Policy is a "categorical prohibition," that its waiver provision "is not a medical waiver provision," and that it "dispenses with" the requirements of the Department's separation regulations. Wagner Mot. at 7. Each compares the text of the Policy with regulations Hon. Wagner administered. The retention standards require an individualized fitness-for-duty evaluation, and he is aware of no other condition that bars retention without one. Wagner Rep. ¶¶ 37, 77. The waiver criteria exclude anyone who has transitioned, so the provision turns on treatment history and not on current fitness. *Id.* ¶¶ 38, 84. And the separation regulations require findings that the Policy does not. *Id.* ¶¶ 39, 85-86. Those are descriptions of how the Department's regulations operate, given by the official who applied them. That Hon. Wagner is a nonpracticing lawyer does not convert them into opinions about whether the Policy is lawful.

*3. Prof. Currah*

Defendants identify one statement in Professor Currah's report as a legal conclusion: that "the rationality of each agency's approach to sex classification depended on its remit, not on what 'sex' is in itself." Currah Mot. at 5 (citing Currah Rep. ¶ 21). The statement appears in paragraph 22 and summarizes two historical sources discussed there: a 1965 letter in which a federal official explained that agencies' approaches differed because their responsibilities differed, and a position New York City took in litigation in 2011. Currah Rep. ¶ 22. It describes how government actors explained their own rules. It does not express an opinion on whether any classification, including the Policy, satisfies a legal standard, and Professor Currah states that he offers no opinion on "the ultimate legal questions in this case." *Id.* ¶ 3.

## IV. Plaintiffs' Experts Offered Proper Rebuttal Testimony

Defendants argue that portions of the Vazirani and Wagner reports exceed the scope of rebuttal because (i) they state affirmative opinions that do not respond to any Government witness, and (ii) the witnesses held and expressed the same views before Defendants served their disclosures. Vazirani Mot. at 10-11; Wagner Mot. at 11-12. That argument is untimely. Defendants had the opportunity to raise this discovery dispute earlier by the Court's deadline of October 12. *See* Order Granting Second Joint Motion to Adjust Pretrial Deadlines (Oct. 21, 2026), Dkt. 162. Indeed, they raised exactly that dispute with regard to Plaintiffs' experts Baker and Currah. *See* October 12, 2026 email from S. Kannan to Chambers (Ex. E); November 4, 2026 Minute Order. They have forfeited the argument by failing to raise it on the schedule required by the Court.

Regardless, the argument fails on the merits. Rule 26 defines rebuttal as evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Each challenged portion of the reports addresses a

subject on which Defendants' witnesses have offered testimony, as set out for each witness below. Testimony is proper rebuttal if it responds to the other side's evidence, whether or not the party offering it could have presented it earlier. *See United States v. Philip Morris USA Inc.*, 2022 WL 1101730, at *7 (D.D.C. Apr. 13, 2022) (whether testimony is rebuttal "does not turn on whether the proffering party could have anticipated the relevance or importance of its subject matter beforehand"). The Vazirani and Wagner reports meet that standard.

*1. Hon. Vazirani*

Hon. Vazirani's report sorts the opinions in Defendants' disclosures into seven groups and states where he responds to each. Vazirani Rep. ¶¶ 32-40. The portions Defendants call "affirmative" fall within that structure. The report answers Defendants' witnesses on deployability, medical readiness standards, comorbidity and recovery, fitness standards, evacuations, and unit cohesion, *id.* ¶¶ 41-59; General Carden on the resources commanders devote to service members who need support, *id.* ¶¶ 63-68; the four witnesses who say the Policy is "consistent with the military's general approach to mental and behavioral health conditions," as well as Defendants' reliance on the 2018 report, *id.* ¶¶ 36-40, 69-77; and Colonel Black on the effect of losing a trained member of a unit, *id.* ¶¶ 78-84.

The remaining challenged paragraphs answer the same opinions, though they name no witness. Paragraphs 60-62 supply the principle behind the report's answers to testimony that service members with gender dysphoria fail medical readiness standards, need special accommodation, and receive fitness exemptions. Vazirani Rep. ¶¶ 34, 37-38, 49, 53. Service members are judged by whether they meet the same standards as everyone else, and a policy that excludes those who meet them shrinks the qualified pool. *Id.* ¶¶ 60-62; *see id.* ¶¶ 44, 52. Paragraphs 73-75 and 77 likewise explain why Defendants' reliance on the 2018 report, which predates the Austin Policy, departs from the Department's ordinary process. *Id.* ¶¶ 73-77.

Paragraphs 81-83 follow from a concession by four of Defendants' witnesses: the deployed-environment concerns they describe "are not unique to gender dysphoria." *Id.* ¶¶ 33, 45. When a policy uses problems common to many conditions to exclude only one group, it suggests the policy is not grounded in readiness analysis, eroding trust and harming recruiting. *Id.* ¶¶ 81-83. Paragraphs 78-79 and 84 introduce and summarize that discussion, and paragraph 79 incorporates Part C's response to General Carden. *Id.* ¶¶ 67, 78-79, 84. The summary paragraphs Defendants cite, *id.* ¶¶ 25-27, 29-30, preview these same opinions and stand or fall with them. These paragraphs thus address the same subject matter as Defendants' witnesses (whether the Policy serves readiness) and contradict their conclusion.

*2. Hon. Wagner*

Hon. Wagner's report opens by listing the opinions of Defendants' witnesses to which it responds, with citations to their disclosures. Wagner Rep. ¶¶ 1-2. The portions Defendants call "affirmative" respond to those opinions. The history of the Carter Policy and the Army directives, *id.* ¶¶ 42-49, respond to the commander witnesses' predictions about unit cohesion, which RAND studied before the policy was adopted, and the assertions that transgender service members receive fitness exemptions or special treatment; the account of the Austin Policy in the Air Force and Space Force, *id.* ¶¶ 50-66, responds to the same witnesses and three Government witnesses who served in the Department of the Air Force during his tenure; the paragraphs on separating trained personnel, *id.* ¶¶ 63, 68, respond to Colonel Black; and the paragraphs on waivers and separation, *id.* ¶¶ 83-90, respond to the witnesses who describe the Department's medical-waiver and separation processes. His opinion on the 2025 policymaking process, *id.* ¶¶ 6, 29, responds to the four Government witnesses who say the Policy is "consistent with the military's general approach to mental and behavioral health conditions," *id.* ¶¶ 25, 29, 37.

Even if any portion exceeded proper rebuttal, exclusion would not follow. A party's failure to disclose under Rule 26(a) warrants exclusion only if it was not "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). Defendants received both reports on schedule and deposed both witnesses about them. They suffered no prejudice.

* * *

Each expert meets the requirements of Rule 702 and *Daubert*. Their opinions are relevant to disputed fact questions the Court will resolve following trial, and they rest on sufficient facts and data. Each expert reliably applies professional experience or scholarship to the record. Defendants' objections are disagreements with the experts' conclusions. But the Rule 702 inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Their testimony should be admitted and Defendants' Motions *in Limine* Nos. 4-9 should be denied. To the extent the Court determines that any of the proposed testimony is not helpful or relevant, Plaintiffs respectfully request that the Court also exclude the testimony on the same subjects from Defendants' witnesses.

Dated: November 20, 2026

Respectfully submitted,

/s/ *Lauren M. Weinstein*
Lauren M. Weinstein (1035184)
Benjamin G. Bradshaw (460539)
Shruti Kannan (90006641)
Timur Akman-Duffy (1779260)
Jack Derewicz (1779953)
Max J. Rosenthal (90028849)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C. 20006
Phone: (202) 383-5300
lweinstein@omm.com
bbradshaw@omm.com
skannan@omm.com
takman-duffy@omm.com
jderewicz@omm.com
mrosenthal@omm.com

Brett Williamson (1024759)
O'MELVENY & MYERS LLP
610 Newport Center Drive
Newport Beach, CA 92660
Phone: (949) 823-6900
bwilliamson@omm.com

Janine F. Panchok-Berry (*pro hac vice*)
Eamonn W. Campbell (*pro hac vice*)
Qiran "Anna" Xie (*pro hac vice*)
Maggie M. Niu (*pro hac vice*)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Phone: (212) 326-2000
jpanchok-berry@omm.com
ecampbell@omm.com
axie@omm.com
mniu@omm.com

Jennifer Levi (MA0056)
Mary Bonauto (*pro hac vice*)
Michael R. Haley (*pro hac vice*)
Sarah K. Austin (*pro hac vice*)
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street
Suite 950
Boston, MA 02108
Phone: (617) 426-1350
jlevi@gladlaw.org
mbonauto@gladlaw.org
mhaley@gladlaw.org
saustin@gladlaw.org

Christopher F. Stoll (*pro hac vice*)
Shannon P. Minter (*pro hac vice*)
Amy Whelan (*pro hac vice*)
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st St. #11548
Sacramento, CA 95811
Phone: (415) 365-1320
cstoll@nclrights.org
sminter@nclrights.org
awhelan@nclrights.org

Joseph J. Wardenski (995549)
WARDENSKI P.C.
134 West 29th Street
Suite 709
New York, NY 10001
Phone: (347) 913-3311
joe@wardenskilaw.com

Inga S. Bernstein (*pro hac vice*)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street
Suite 200
Boston, MA 02109
Phone: (617) 742-6020
ibernstein@zalkindlaw.com

*Counsel for Plaintiffs*