# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\+ + + + +

______________________________

IN THE MATTER OF:

NICOLAS TALBOTT, et al.

Plaintiffs,

v. Civil Action No. 25-240 (ACR)

UNITED STATES, et al.

Defendants.

______________________________

Washington, D.C.

Thursday,
November 12, 2026

DEPOSITION OF:

PAISLEY CURRAH

called for examination by Counsel for the Defendants, pursuant to Notice of Deposition, at 1100 L Street NW, Washington, D.C. 20005, when were present on behalf of the respective parties:

So, they didn't necessarily change the rules for sex classification, but they dropped classifying people for the purposes of Metro cards because it was not -- they didn't think it was a good idea.

Q And so, more recently, what has been the focus of your research?

A Like, since when? Sorry.

Q So, you said at the beginning of your research on writing on sex classifications, you focused on this example of New York. Since then, what have other focuses of your research? And you, also, gave the example of marriage and sex classification. What other areas of research?

A So, the research kind of stayed on sex classification, but it covers different jurisdictions and different agencies. So, I would look at rules in Florida or Idaho or different states. So, kind of expanded geographically. Looking at policies around birth certificates, driver's license, marriage cases, and then any number of state agencies like every state homeless shelter, every state department of corrections has its own policy. There's a lot to look at. So, that was one stage of the research.

Q And have you researched federal agencies?

A Yes.

Q And what has that research been focused on?

A That was focused on how state agencies define sex. So, I looked at the State Department's policy on passports, sex markers on passports. I looked at the Social Security Administration's policies on changing the sex classification. It's not on your card, but it's in your numident record. I made inquiries to lots of other federal agencies to find out what their policies were.

Q Have you done any research on the Department of War?

A I have, yeah. I started paying attention to the Department of War in 2016 when they first changed their policy on the ability of transgender people to serve.

Q And your research on federal agencies, what's kind of the time period you've been looking at for your research?

A Well, I was hoping to find as much as I possibly could. Then, I submitted -- did archival research, code of federal regulations. I submitted so many FOIA requests over the years, so

I would love to have gone as far back as possible. But mostly it was since the ‘70s onwards where you could start to see that they were forming sex classification policies.

Q So, prior to the 1970s, are you aware of federal sex classification policies?

A I couldn’t find articulated sex classification policies part of the ‘70s. That’s not saying they’re not there, but I couldn’t find any. Obviously, the federal government distinguishes between men and women, and that’s was a central part of a lot of policy making, but defining who’s a man and who’s a woman, they didn’t do that as far as I found.

Q And you kind of already answered my next question, but just to clarify in this context, what do you mean by a sex classification policy? Do you mean in how they define man and woman?

A Yes. How they define man and woman and that they would often define men and women when they were when someone asked to have their sex reclassified, they were like, oh, we better have a definition. And so, sex classification policies were often articulated as a result of people coming forward trying to change their sex

classification policy.

Q What's the earliest example you've you can recall of a federal sex classification policy?

A The earliest example that I can recall, I think would be the 1978 passport office. I think there are earlier ones for sure, and I'm sure other, you know, folks have found them, but the one that I recall is the 1978 one.

Q And we discussed a lot of your research on sex classification. Are there any other subjects that you would consider yourself to have expertise in?

A Sex classification --

MS. BERNSTEIN: That would be relevant to this litigation you're saying?

MS. LAYENDECKER: I just mean generally.

THE WITNESS: Well, I write about in political science, there's debates around kind of identity politics and reformist politics and different kinds of feminism. And so, I'm interested in those questions and touch on them in my writing. So, they're related, but also slightly different questions.

BY MS. LAYENDECKER:

Q Yeah. Are there any other areas of

about Paragraph 15.

A Okay. Okay.

Q Okay. Great. So, just to confirm, as we've discussed, your research has focused on, as you say, governmental practice. Based on patterns in this documentary record rather than on assumptions about what sex is as a matter of biology, medicine or psychology. So, just to confirm, your area of expertise is political science and government. Do you have any expertise in medicine or psychology?

A So, yes, my expertise is in political science and government. And no, I have no expertise in medicine or psychology.

Q Okay. And so, the opinions you're planning to offer are based on your experience and research in government and political science.

A Yes.

Q And looking at Paragraph 16, your research over more than 25 years is not an exhaustive survey of all government practice. As we've discussed, it seems like your research is generally focused on the latter half of the 20th century and the 21st century. Is that fair to say?

A Yes. And in the latter half of the 20th century, especially in the last 25 years of the 20th century.

Q Okay, so from, kind of, ‘70s onward and then the new millennium. Have you done any research on time periods outside of that time period?

A Well, as someone in the field of, you know, political science and gender studies, I read other people’s research. You know, I read historians’ books, and I’d like to see what they’re coming up with. It’s not my area of research.

Q Okay. All right. So, let’s move into Opinion Two. I guess it’s kind of a preparatory question. How are you using the term sex in this report? How would you define that term for purposes of this report?

A So, for the purposes of this report I’m interested in, and I write about how sex is defined by state agencies or courts, but I’m not talking about biological or popular conceptions of sex.

Q And just to clarify, when you say state agencies or courts, you mean generally

governmental entities, not like a federal state, right?

A Sorry, in political science we say state too much, but.

(Laughter.)

Q We probably say federal too much. Okay. Thanks, that's very helpful. And just looking at maybe let's look at the summary of Opinion Two on Page 4. Do you see Paragraph 14?

A Yes.

Q So, what's the general basis for your opinion for the specific Opinion Two?

A What do you mean by basis?

Q Based on your experience, research.

A Okay. Well, I like to look at what's written down by the government. And so, in Opinion Two, for example, when I went over the declarations, I was interested to see how sex was being defined in the declarations or in the literature that was cited by the declarations, so.

Q Okay. I think back sorry to jump around, but paragraph let's see, Paragraph 22. So, we've already talked through some of this, but I wanted to ask, what do you mean by sex classification policies were an output of governing? It's at the

attached to those disclosures.

BY MS. LAYENDECKER:

Q Okay. You, also, discuss the Executive Order 14168 definition of sex. And what testimony do you intend to offer, assuming that you will answer questions asked, regarding that executive order as it relates to the definition of sex?

A Well, if I was asked, I would say there to my knowledge, there's no federal antecedent definition that defines sex according to, you know, gamete size at conception. So, I would say that.

Q I'm sorry, to narrow my question, focusing just on Paragraph 23 still. You reference it towards the very end. While EO 14168 states yada, yada.

A What I would say is that the executive order defines sex in one particular way, and then asks federal agencies to implement it implement that and make changes. And that seems to show that there is a there is no uniform definition even in the literature that is cited by the Defendants, or rather, there's no uniform definition, but there are different ways of classifying people by sex, different criteria.

The EO chooses gametes.

Q And then, in Paragraph 24, you discuss the changes to the diagnosis of what was previously called gender identity disorder now terms gender dysphoria. Do gender dysphoria and gender identity disorder apply to the same group of people or --

MS. BERNSTEIN: Objection.

MS. LAYENDECKER: -- are they different?

MS. BERNSTEIN: Objection.

THE WITNESS: That’s out of my area of expertise.

MS. LAYENDECKER: You do state that the diagnostic categories have changed while the people described by them have not. What do you mean by that?

THE WITNESS: Okay. Well, the revisions in the Diagnostic and Statistical Manual, and again, it’s not my area of expertise, but they do generally, I understand, apply, you know, to people whose gender is incongruent with the sex they’re assigned at birth. And so, again, it’s not my expertise, but the diagnostic categories change as a result of institutional decisions and the American Psychiatric Association.

BY MS. LAYENDECKER:

Q And so, the people encompassed within each diagnostic category might change as the diagnostic criteria change or as the terms change? Is that a fair characterization of your testimony?

(Simultaneous speaking.)

MS. BERNSTEIN: Objection.

THE WITNESS: Yeah. It's not my area of expertise. So, I can't say how the population of people attached to each particular diagnosis would like change or be enlarged or made smaller. There's -- but I can say there's a large it would be a huge overlap.

MS. LAYENDECKER: Okay. And just generally do you think that there is a difference between having gender dysphoria and being transgender?

THE WITNESS: Gender --

MS. BERNSTEIN: Objection.

THE WITNESS: Okay.

MS. BERNSTEIN: If you can answer.

THE WITNESS: It's not my area of expertise, but transgender is understood as a broader category than the diagnostic category of the DSM.

before that?

A I'm not aware, but that's not to say they're not in there somewhere. Yeah.

Q Yeah, understood. And next, say from the time federal agencies first had to address questions of sex, classification agencies generally worked out this questions for themselves in ways that reflected their particular missions and programs. So, there are you referring to that time period in the '70s when they first had to address questions of sex classification or a different time period?

A It would start in the '70s, but then move onwards.

Q Okay.

A Yeah.

Q And can you generally describe how agencies generally worked out those questions and how they did so in ways that reflected the agency's missions and programs?

MS. BERNSTEIN: Objection.

THE WITNESS: Yeah, I could if you could split that into two parts.

MS. LAYENDECKER: Sure, yeah.

THE WITNESS: So the first part was how,

sorry?

BY MS. LAYENDECKER:

Q Yes, it's okay. How did federal agencies work out those questions for themselves to quote the report.

A I would love to know how the agency did that. That would be excellent for my research, but that archival record is sparse. So, what I have to look at are the actual policies they come up with.

I did find a letter from 1965 where a federal official was talking about the problem of defining sex uniformly, and that was interesting. I would love to find more stuff like that, but it's what I have. What I'm able to go by is the actual policies they created and then their effects. That's how I can try to think about the justifications for them.

Q So, maybe focusing on a time period a bit later when you know there is better documentation, how do agencies generally work out questions of sex classification?

MS. BERNSTEIN: Objection. I think the point of the sentence that you read is that kind of a general practice, that prior to this, there

wasn't one uniform practice, and it's not the question of the hows and the whys of that, but that it just didn't exist. That's how I understood that sentence.

THE WITNESS: By that sentence, I meant that it was an agency by agency decision.

MS. LAYENDECKER: Okay.

THE WITNESS: The record is hard to study outside of the policies themselves because they didn't follow the rules or they didn't follow the procedures for, you know, probably all the promulgating rules. They were like, we could just define it without having to like public comment. So, that really makes the record -- until recently -- that makes the record, you know, sparse. So, only able to look at the actual things they come up with.

BY MS. LAYENDECKER:

Q So, focusing, I guess, then on more recent agency sex classifications where there is some kind of record, what generally is your understanding what agencies consider when they're making these classification decisions?

A Yeah, I mean consider is hard because that implies like, I could have some documents

from the agencies, like, here's what we consider. But if I look at the actual rules and look at their effects, I can see possibly that's what the that would have gone into the justification.

So, for the Social Security Administration when they changed whenever they changed rules for sex classification and the limited record, they would say, but this doesn't necessarily apply for the purposes of marriage. That's a separate question. So, you could see that they understood that the classification policy could have ramifications for spousal benefits, people who are married and stuff like that. And so, that's an indication that they were thinking about those kinds of things because they limited like where the new sex classification would apply.

Q So, I guess, then, more broadly, have you done research on again, to the extent there are documented more contemporary policies, agency processes, pre-promulgation of a rule. So, you talked about focusing on, you know, the actual content of a rule and its effects. But have you researched the procedural process leading up to that or considerations that the agency articulated regardless of whether or not that they actually

considered them.

A Yeah.

MS. BERNSTEIN: Objection, you could go ahead and answer.

THE WITNESS: Yeah, I have tried to research that through my FOIA request, but I don’t think they kept those kind of records because when they weren’t promulgating rules, it was just housekeeping. So, it’s hard to find that material. So, I don’t know. I can’t talk about the agency processes.

MS. LAYENDECKER: Okay. And then, taking the second part of that sentence. So, you’re talking about agencies addressing questions of sex classification in ways that reflect their particular missions and programs. Can you explain a little bit more of what you mean by that?

THE WITNESS: Well, an example would be identity documents. For example, identity documents, so this passport is a document of identity and it’s supposed to confirm who the bearer is. So, in the records that are cited here, there’s this letter from 1978 where an attorney for the passport office says this woman should have an F on her passport, so that she

could you know, because it most accurately reflects who she is. And then, the proviso is that this is before surgery, you know, so the next time it's renewed after surgery will be a permanent F, but that will be the example of explaining the purpose of the classification.

BY MS. LAYENDECKER:

Q Thank you. Any other examples that come to mind apart from identification for any federal agency?

A Other examples?

MS. BERNSTEIN: And the Social Security one that you mentioned before.

MS. LAYENDECKER: Yeah. And yes, in addition to those, too.

THE WITNESS: I think there are different Bureau of Prison policies where decisions about sex classification were based on considerations of housing prisoners and those kinds of things. Yeah, that's what I can think of right now.

MS. LAYENDECKER: And what about the military?

THE WITNESS: (Laughter.) Oh, the military. Forgot that agency. I'm sorry. I got nervous. Yeah, military. Right. So, the

have a quick break?

MS. LAYENDECKER: Sure.

MS. BERNSTEIN: Thank you.

VIDEOGRAPHER: The time is now 11:10 a.m. We are going off the record.

(Whereupon, the above entitled matter went off the record at 11:10 a.m. and resumed at 11:25 a.m.)

THE VIDEOGRAPHER: The time now is 11:25 a.m. We're back on the record.

MS. LAYENDECKER: Okay, welcome back and I just wanted to ask, did you discuss the subject of your testimony during the break?

MS. BERNSTEIN: Objection.

MS. LAYENDECKER: I'm entitled to ask that.

MS. BERNSTEIN: Yeah, of course. Of course. There was some discussion of the testimony. That's what --

MS. LAYENDECKER: What was discussed?

MS. BERNSTEIN: That's privileged.

MS. LAYENDECKER: If it's facts, data underlying the testimony. That's not privileged.

MS. BERNSTEIN: I'm going to instruct you not to answer that question.

MS. LAYENDECKER: Okay. And again, follow your counsel's instruction. Just answer yes or no, did you discuss the testimony during prior breaks earlier in the day?
MS. BERNSTEIN: Objection.
THE WITNESS: Do I answer that?
MS. LAYENDECKER: Just yes or no.
A Did I discuss what? Instruction?
BY MS. LAYENDECKER:
Q The subject of your testimony.
A Yes.
Q Okay. Thank you. All right. So picking up where we left off. I believe we had just discussed the Carter policy. I guess generally, can you explain your understanding of what the Carter policy's sex classification policy was?
MS. BERNSTEIN: Objection.
THE WITNESS: I can talk about how the Carter policy talked about the sex classification policy in the DEERS record?
MS. LAYENDECKER: Generally how the Carter's policy determined whether or not a service member would be regarded as a man or a woman within the military?
THE WITNESS: Yeah. The Carter policy

said that the DEERS record would determine whether someone was considered male or female for service in the military, and it laid out all the things that had to happen for those criteria to be met.

BY MS. LAYENDECKER:

Q Okay. And for those criteria to be met, are you referring to context in which someone would change their DEERS marker?

A That was the last part of the process of that Carter policy.

Q Okay. And so, just to spell it out more clearly, where someone who is assigned male at birth would go through a process, the final step of which would be to change the DEERS marker to female?

A Or male or yeah, to the other.

Q Yes, it’s the opposite sex. Understood. Okay. But, in general, your understanding, and please correct me if I’m misstating this, but your understanding is that sex classification under the Carter policy was based on that DEERS marker system?

A Yes.

Q Okay. And how did that system and those processes reflect the mission and programs of the

Department of Defense?

A Well, I'm not an expert on the mission of the Department of Defense or like all the other aspects of the DEERS System. The Carter policy was taken to make it possible for transgender service members to serve in their gender. I'm sorry, I'm forgetting the rest of the question.

Q I was asking how the Carter policy as policy on sex classification, as we just discussed, reflects the mission and programs of the U.S. military?

A Right. I can't speak to the mission and programs of the U.S. military. The Carter policy, you know, took the existence of transgender people in the military and came up with a policy that would allow them to serve and, you know, recognize their gender and allow them to serve openly.

Q And are you aware of what the rationales, may have been for that policy?

A There were a lot of studies around that. The RAND report, I'm not an expert on that, but they put, you know, some thought and consideration of the effects of the policy change.

Q And specifically on the policy regarding the sex classifications and the DEERS markers are

just the policy as a whole, to the extent that, you know?

A It was a pretty huge study, like looked at how the military all those questions that other people are good at with cohesion and cost and the military and all that sort of stuff, right, and then, I actually can't remember if the DEERS process was spelled out in that study or it's something the military came up with itself.

Q Are you aware of what the military's policy on sex classification was prior to the Carter policy?

A The military would list they didn't really have a policy on sex classification. They just listed it in their disqualifying conditions, like go under was under the category of like male genitalia or female genitalia. It would be like having had a surgery there. I think they said sex change, hermaphroditism. That's where the military would have excluded people who had had genital surgery from serving.

Q But to your knowledge, the military did not have a policy on sex classification as you defined it earlier.

MS. BERNSTEIN: Objection.

THE WITNESS: I haven't found a policy on sex classification that covers all the military before that.

MS. LAYENDECKER: So, in Paragraph 31, you state that neither the executive order or neither executive order, pardon me, identifies a biological or scientific development that required changing that approach and, that approach referring to the prior sentence we just discussed. In your research and experience, in what contexts is sex classification using biological sex appropriate or commonly used?

MS. BERNSTEIN: Objection.

THE WITNESS: Well, there's yeah, there's lots of parts that question. Sex classification policies use components of biological sex and each policy, you know, is a policy choice about which particular component of biological sex might be used. Or it could be identity documents or self-attestation. I lost track of your question, I'm sorry.

MS. LAYENDECKER: I was asking, you know, in your research and your experience, you've talked about, you know, government policy makers having different considerations or different

contexts in which different sex classifications are appropriate. And I was asking, in what contexts do government policy makers tend to consider biological sex more heavily when creating a policy of sex classification?

MS. BERNSTEIN: Objection. And I don't think that's at all responsive to the question you were just asking about. Are you meaning to move away from that?

MS. LAYENDECKER: No.

MS. BERNSTEIN: That the statement neither EO, you know, identifies a scientific development that will require changing the approach of allowing different administrations to come up with their own policy and instead have one unified policy. That was the question, I thought.

MS. LAYENDECKER: Okay. Please answer my question if you can understand it or if you understood, I am happy to try to repeat it.

THE WITNESS: Oh, could you repeat it for sure. My short term memory, it's not so great.

BY MS. LAYENDECKER:

Q Okay. So, you previously testified in this deposition about various considerations that governments have when making policies on sex

speak to like the military stuff, I'm not an expert around, you know, that kind of thing.

Q Okay. And then, moving on to Paragraph 34. In this paragraph, you're responding to, I believe, the expert disclosure of Lieutenant General DeGoes and Dr. Ortega as well. Do you recall what you were responding to in this paragraph from their disclosures?

A No, I can only recall by looking at how it characterizes our disclosures. But DeGoes was expected to testify about parts of military having their own ability to set their own and implement their fitness standards. In Dr. Ortega's testimony was about waiver adjudication policies.

Q Actually, I think I have both of them. Do I have both of them? I do. Okay. All right. We can start with DeGoes.

(Whereupon, the above referred to document was marked as Exhibit No. 2 for identification.)

THE WITNESS: Thank you.

MS. LAYENDECKER: So, just generally, did you review any deposition transcripts in preparation for today?

THE WITNESS: No, I mean, I reviewed

their these --

BY MS. LAYENDECKER:

Q These disclosures?

A Not deposition, no.

Q Okay. Take your time to review that. When you're ready, the question is just to what you were responding with this paragraph.

A Yes. So, my response does not suggest that the military should not be setting its own fitness standards, that's not what I'm suggesting. But that the Executive Order 14168's definition sex that had to be implemented in the military was the trigger that caused them to think about fitness standards differently. So, the change came as a result of like an outside influence of the Executive Order's definition of sex, not from the Department's own processes.

Q Okay. Would you mind just pointing me specifically where in this declaration what you're responding to, like, within the text itself?

A Like I said, in Paragraph 4.

Q Okay.

A It says Lieutenant General DeGoes was expected to testify about the physical and mental fitness standards required for military service

and why it’s important that the military and military commanders be permitted to make fitness determinations for service members. Yeah. So, that’s one of the things I’m responding to.

Q And what testimony are you intending to offer in response to that statement or that testimony from Lieutenant General DeGoes?

A My testimony is to suggest that the Executive Order undermines the ability to set its own fitness and readiness standards, because it starts with this outside imposition of a category or a classification that the military has to then meet. It doesn’t come from within the military itself.

Q Let’s see. And for Dr. Ortega’s testimony, do you recall what you meant by his waiver or adjudication?

A No. Could I have a look at that? Because waiver adjudication is, like, it’s not my area, I need to be reminded. I think I know, but I’m not sure.

Q I don’t mean to quiz you here. I just don’t want to make you flip through another big document unnecessarily.

(Whereupon, the above referred to

document was marked as Exhibit No. 3 for identification.)

THE WITNESS: This got it's strings attached.

(Laughter.)

MS. LAYENDECKER: You know where he comes in? Oh, there's a tab. Yeah, yeah. Sorry. I could see.

THE WITNESS: Okay, so the question is?

BY MS. LAYENDECKER:

Q Yeah. Can you please just clarify what waiver adjudication you're referring to?

A I believe it would be the diagnosis of gender dysphoria. It becomes an automatically disqualifying condition for accession.

Q Can you, again, please, for my benefit, point me to the specific text from the disclosure that you're responding to.

MS. BERNSTEIN: Take your time.

THE WITNESS: Okay.

MS. LAYENDECKER: Yeah, take as much time as you need to read through.

THE WITNESS: Sorry, so, is the question I just the answer was to clarify --

MS. BERNSTEIN: You made this statement

Q And again, would you mind just referring me to the specific part of Dr. Ortega's disclosure that discusses the waiver process that you're responding to?

A Okay.

Q Or more generally, what your opinion is responding to within the declaration?

A Well, I this is --

MS. BERNSTEIN: You shouldn't guess.

THE WITNESS: Yeah. I'm not guessing because I don't remember the policy well enough. How the waiver worked under the Hegseth policy. I know that you had to give birth sex. So, I find it -- I'm just a little -- I'm not quite sure which process is which here.

MS. LAYENDECKER: Okay. And you don't recall what you were referring to in Dr. Ortega's in the following sentence? For Dr. Ortega's waiver adjudication, you're not sure what waiver process that's referring to that's referenced in the disclosure?

THE WITNESS: Well, there's two processes referred to here which is non-waivable and waivable.

BY MS. LAYENDECKER:

Q Okay.
A And I don't --
Q Can you point me to those.
A Paragraph 4.
Q Okay. So, both within Paragraph 4?
A Yeah.
Q Okay.
A Technical variable and non-variable medical conditions.
Q Okay. So, this paragraph though is what you were responding to, then? Or, sorry, to phrase as a question. Does this sentence that we've been discussing respond to this Paragraph 4 in this disclosure?
A Waiver adjudication applies medical criteria whose content is fixed by the executive orders definition of sex. Well, I think it's responding to the distinction between these waivable and non-waivable. Then, he has testimony that he will present about what he thinks about gender dysphoria and that is not my area of expertise. And it's not talking talk about sex classification policies.
I'm not talking about how to evaluate transgender soldiers for fitness. That's not my

area. It's just the automatic disqualification that's shifted between the Austin policy and the Hegseth policy.

MS. LAYENDECKER: Okay. I think I -- can we go off the record?

THE VIDEOGRAPHER: Time now is 12:02 p.m. We're going off the record.

(Whereupon, the above entitled matter went off the record at 12:02 p.m. and resumed at 12:13 p.m.)

THE VIDEOGRAPHER: The time is now 12:13 p.m. We're going back on the record.

MS. LAYENDECKER: Yeah. The only thing I wanted to clarify is, you're not represented by counsel here, correct?

THE WITNESS: No, I'm not.

MS. LAYENDECKER: Okay. Yeah. Do you have anything for redirect?

MS. BERNSTEIN: No.

MS. LAYENDECKER: Okay. All right. Yeah. Based on the interview, proper research and the privilege over the discussion of testimony during the breaks, we'll be holding the deposition open, but otherwise we have nothing further.

THE REPORTER: Would the witness like to

read and sign?

THE WITNESS: Yeah. Do what? Sorry.

MS. BERNSTEIN: Yeah, what they'll do, they'll prepare a transcript, and these folks will get it to you. You'll have the opportunity to review it.

MS. LAYENDECKER: We can explain more after.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is now 12:14 p.m. This concludes the testimony given by Mr. Paisley Currah. Thank you, sir. Thank you everyone.

(Whereupon, the above-entitled matter went off the record at 12:14 p.m.)

# C E R T I F I C A T E



This is to certify that the foregoing transcript

Deposition Of: Paisley Currah

In the Matter Of: Nicolas Talbott, et al. vs. United States, et al.

Date: 11/13/2026

Place: Washington, DC

was duly recorded and accurately transcribed under my direction; further, that said transcript is a true and accurate record of the proceedings.



----------------------

Court Reporter